EXHIBIT 5

# REPORT OF INDEPENDENT INVESTIGATION

**TABLE OF CONTENTS**

I.  EXECUTIVE SUMMARY ...........................................................................................1

II. INVESTIGATIVE REPORT INTO ALLEGATIONS OF MISCONDUCT BY
    VICTOR AENLLE, SHERIFF CHRISTINA CORPUS, AND LEADERSHIP OF
    THE SAN MATEO COUNTY SHERIFF'S OFFICE...........................................3

    A.  INTRODUCTION ...................................................................................3

        1.  Purpose of the Investigation: . ...................................................3

        2.  The Investigator: .........................................................................3

    B.  INVESTIGATION AND FINDINGS: ...................................................3

        a)  The Fact-Finding Process ...........................................................4

        b)  Interviewees ...............................................................................4

        c)  Interview of Victor Aenlle ..........................................................4

        d)  Offer to Interview Sheriff Christina Corpus ...............................4

        e)  The Policy Manual ......................................................................5

        f)  Organizational Chart for the San Mateo County Sheriff's Office ..............6

        g)  Election of Christina Corpus.......................................................6

        h)  Aenlle Contract #1 .....................................................................7

        i)  Termination of Aenlle Contract #1 .............................................7

        j)  Aenlle Consultant Contract.........................................................8

        k)  Aenlle Extra-Help Position Request ...........................................9

        l)  Aenlle Executive Director of Administration Position.................9

        m)  Sheriff Corpus' Request for Highest Pay Level for Aenlle .......10

        n)  Multiple Requests for Aenlle Pay Increase...............................10

        o)  The Allegations.........................................................................11

            1.  Allegation #1: Sheriff Corpus and Aenlle have a "personal
                relationship" that creates a conflict of interest..............11

            2.  Allegation #2: Aenlle has not met the Policy Manual's
                duty requirements for a Level I Reserve Deputy. ..........21

i

3.      Allegation #3: Aenlle has exceeded and/or abused his
        authority with the approval of Sheriff Corpus.................................25

4.      Allegation #4: Sheriff Corpus, Aenlle and the Executive
        Team engage in retaliation and intimidation .................................40

5.      Allegation #5: Aenlle has outside employment that has not
        been approved. ................................................................................61

6.      Allegation #6: Aenlle had a conflict of interest when
        negotiating the lease for the Broadway Property............................66

7.      Allegation #7: Aenlle did not follow the proper protocol
        for the selection of a construction contractor for the
        Broadway Property. .......................................................................71

8.      Allegation #8: Aenlle does not follow the County's
        procurement policies .....................................................................73

9.      Allegation #9: Sheriff Corpus and Aenlle improperly
        issued Concealed Carry Weapon permits .....................................78

10.     Allegation #10: Aenlle has improperly removed social
        media posts criticizing Aenlle and Sheriff Corpus ......................80

11.     Allegation #11: Aenlle, Sheriff Corpus and her Executive
        Team improperly possess suppressed rifles ..................................82

12.     Allegation #12: Aenlle has misrepresented that he earned a
        Ph.D. ...............................................................................................84

13.     Allegation #13: Aenlle is not authorized to wear a badge
        that resembles the gold badges of sworn employees ....................86

14.     Allegation #14: Aenlle and Sheriff Corpus improperly
        issued honorary badges and an identification card to
        civilians ..........................................................................................88

15.     Allegation #15: Sheriff Corpus has uttered and texted
        racial and homophobic slurs in the workplace..............................90

III.    CONCLUSION:..............................................................................................91

**EXECUTIVE SUMMARY**

On July 10, 2024, John Nibbelin, the County Counsel of San Mateo County, retained Judge LaDoris H. Cordell (Ret.) to conduct an independent fact-finding investigation into complaints and concerns that current and former members of the Sheriff's Office have about Victor Aenlle, who serves on the Executive Team of Sheriff Christina Corpus. Over the course of the investigation, additional matters regarding the Sheriff's Office were identified and added to the scope of the investigation.

Judge Cordell interviewed 40 current and past sworn and civilian employees, the great majority of whom were complainants. Interviews were conducted via phone and were not recorded. Judge Cordell offered to interview Victor Aenlle and Sheriff Corpus. Mr. Aenlle accepted the offer and spoke to Judge Cordell in a recorded phone call. <u>Sheriff Corpus did not respond to Judge Cordell's offer to be interviewed</u>.

Judge Cordell investigated fifteen (15) allegations ranging from whether Mr. Aenlle and Sheriff Corpus have a personal relationship beyond mere friendship, to retaliation and abuse of authority, to exploring Mr. Aenlle's claim that he is a reserve deputy sheriff. This Executive Summary highlights seven (7) of the allegations with their abbreviated findings.

- **Allegation:** Sheriff Corpus and Aenlle have a "personal relationship" that creates a conflict of interest.
  **Findings:** Despite their denials, there is factual evidence that Sheriff Corpus and Victor Aenlle have a personal relationship, beyond mere friendship. In fact, the evidence establishes that they have had an intimate relationship. This relationship has led Sheriff Corpus to relinquish control of the San Mateo County Sheriff's Office to Aenlle, someone who has far more experience as a Coldwell Banker associate real estate broker than he has in law enforcement. Sheriff Corpus violated the Office's conflict of interest policy when she hired Aenlle; she violated the policy by having Aenlle directly report to her; and she violated the policy when she repeatedly recommended pay increases for him. **Sustained.**

- **Allegation:** Aenlle has not met the duty requirements for a Reserve Deputy Sheriff.
  **Findings:** Aenlle is out of compliance with the requirements to maintain his status as a Level I Reserve Deputy because he claimed that his hours working as Executive Director also served as his <u>volunteer</u> duty hours required for Reserve Deputies. **Sustained.**

- **Allegation:** Sheriff Corpus and her Executive Team engage in retaliation and intimidation.
  **Findings:** Fear of retaliation is rampant in the organization. In one instance, Sheriff Corpus fired an Assistant Sheriff for cooperating with this investigation. In another instance, the Sheriff improperly locked out a Captain when she had given notice of her resignation; and in yet another instance, Aenlle demeaned and criticized a female civilian

employee for her decision to move to another agency. Other employees described similar retaliatory and abusive behaviors under Corpus/Aenlle's leadership.
**Sustained.**

- **Allegation:** Aenlle has exceeded and/or abused his authority with the approval of Sheriff Corpus.
  **Findings:** Aenlle exercises authority well beyond that of supervising civilian personnel. With the Sheriff's approval, Aenlle has moved himself to the top of the Chain of Command so that he exercises wide-ranging and sometimes abusive authority over both civilian and sworn employees.
  **Sustained.**

- **Allegation:** Aenlle had a conflict of interest when negotiating the lease for the Broadway Property.
  **Findings:** Aenlle played a major role in securing a lease of property for a new substation brokered by Coldwell Banker Real Estate ("CBRE"). Aenlle, who is an associate broker with CBRE, had a conflict of interest and should not have participated in the lease negotiations. Sheriff Corpus knew or should have known of Aenlle's connection to CBRE and should have removed Aenlle from participating in the transaction.
  **Sustained.**

- **Allegation:** Aenlle is not authorized to wear a badge that resembles the gold badges of sworn employees.
  **Findings:** Aenlle is a full-time, salaried civilian employee, not a full-time, salaried sworn peace officer. By wearing a gold badge, he has likely committed a misdemeanor for willfully wearing a facsimile badge that could deceive a civilian into believing he is a sworn officer with full police powers. Sheriff Corpus, by issuing the gold badge to Aenlle, may have committed a misdemeanor, as well.
  **Sustained.**

- **Allegation:** Sheriff Corpus has uttered and texted racial and homophobic slurs in the workplace.
  **Findings:** When Sheriff Corpus texted several homophobic slurs about a local city official to an employee, and when she uttered a racial slur in the presence of an employee, she violated the County's Equal Employment Opportunity policy's commitment to a workplace free of discrimination and harassment.
  **Sustained.**

Lies, secrecy, intimidation, retaliation, conflicts of interest, and abuses of authority are the hallmarks of the Corpus administration. Sheriff Corpus should step down and Victor Aenlle's employment with the Sheriff's Office should be terminated immediately. Nothing short of new leadership can save this organization that is in turmoil, and its personnel demoralized.

**INVESTIGATIVE REPORT INTO ALLEGATIONS OF MISCONDUCT BY VICTOR AENLLE, SHERIFF CHRISTINA CORPUS, AND LEADERSHIP OF THE SAN MATEO COUNTY SHERIFF'S OFFICE**

## A. INTRODUCTION

1. **Purpose of the Investigation:** On July 10, 2024, John Nibbelin, the County Counsel of San Mateo County, retained Judge LaDoris H. Cordell (Ret.) to conduct a fact-finding investigation into complaints and concerns that current and former members of the Sheriff's Office have about Victor Aenlle, who serves on the Executive Team of Sheriff Christina Corpus. Over the course of the investigation, additional matters regarding the Sheriff's Office were identified and added to the scope of this investigation.

2. **The Investigator:** LaDoris H. Cordell is a 1974 graduate of Stanford Law School. She is a retired Superior Court Judge who served on the Santa Clara County bench from 1982-2001. Her work in academia included positions as Assistant Dean of Stanford Law School (1978-1982) and Vice Provost & Special Counselor to the President of Stanford University (2001-2009). From 2010-2015, she was the Independent Police Auditor for the City of San Jose where her office engaged in civilian oversight of the San Jose Police Department. She chaired Santa Clara County's Blue Ribbon Commission that evaluated the county's jails in the aftermath of the murder of a mentally ill inmate by jail guards. She was one of three judges who served on a Blue Ribbon Panel that evaluated the San Francisco Police Department in the aftermath of the racist texting scandal involving several officers. She currently serves on the San Francisco District Attorney's Innocence Commission. Judge Cordell is the author of a recently published memoir *Her Honor: My Life on the Bench. . . What Works, What's Broken, How to Change It.*

## B. INVESTIGATION AND FINDINGS:

1. Review of complaints and concerns about Sheriff Corpus, Victor Aenlle, and members of her Executive Team.
2. Review of the Administrative Memorandum, Number B-1: Soliciting, Selecting and Developing Agreements with Providers of Goods and Services (5/9/2022)
3. Review of the San Mateo County EEO Policy: Board of Supervisors' Commitment to Equal Employment Opportunity (Approved 1/11/2022)
4. Review of the San Mateo County Ethics Policy
5. Review of the San Mateo County Departmental Social Media Policy (revised April 2015)
6. Review of the San Mateo County Violence in the Workplace Policy (Approved 1/9/2021)
7. Review of relevant provisions of the San Mateo County Sheriff's Office Policy Manual
8. Review of the San Mateo County Sheriff's Office Organizational Assessment by Meliora Public Safety Consulting
9. Interviews of current and former sworn employees of the San Mateo County Sheriff's Office
10. Interviews of current and former non-sworn/civilian employees of the San Mateo County Sheriff's Office
11. Interviews of other County employees
12. Interview of Executive Director Aenlle

## a) The Fact-Finding Process:

The investigator's fact-finding process was based upon (1) interviewees' descriptions of their interactions with leadership of the Office, (2) interview of Victor Aenlle, (3) review of relevant documents. Rumors and innuendos were deemed irrelevant and excluded from this investigation.

The investigator finds that all of the current and former sworn and civilian complainant-interviewees were credible in their responses to the investigators' questions. This investigator also finds that the great majority of the interviewees harbor fears of retaliation by Sheriff Corpus, Victor Aenlle and her current Executive Team for speaking with this investigator and for not supporting her during her campaign for Sheriff. For this reason, with few exceptions, the names of interviewees are not included in this report; instead, they will be described as "current or former sworn employees" and "current or former civilian employees." Their identities will remain confidential, revealed only to the County Counsel and his designees.

## b) Interviewees:

Interviewees, the great majority of whom were complainants, consisted of 25 current and past sworn employees, and 15 civilian current and past employees of the Sheriff's Office. All of the civilian interviewees are female. Interviews were conducted via phone and were not recorded. The investigator expended more than 60 hours speaking with the 40 interviewees.

Sworn interviewees have a combined total of more than 450 years of law enforcement experience, with a great majority of that time at the San Mateo County Sheriff's Office. Civilian interviewees have a combined total of more than 146 years of service to the Sheriff's Office.

## c) Interview of Victor Aenlle:

On September 12, 2024, this investigator emailed Victor Aenlle a request for an interview. On September 16, 2024, James Touchstone, an attorney who had been retained by Mr. Aenlle, responded and subsequently scheduled the interview. On September 25, 2024, this investigator conducted a phone interview of Mr. Aenlle for two hours, 15 minutes. Mr. Touchstone, who participated in the call, asked to record the interview. This investigator had no objection and consented to the recording. Mr. Touchstone subsequently provided the recording to this investigator who had the recording transcribed. The transcript is attached to this report as **"Exhibit 1: Aenlle Transcript."**

## d) Offer to Interview Sheriff Christina Corpus:

On October 2, 2024, at 12: 48 pm, this investigator emailed Sheriff Christina Corpus offering her an opportunity to be interviewed:

*Dear Sheriff Corpus:*

*I have been retained by the San Mateo County Counsel to investigate circumstances surrounding the employment of Victor Aenlle in your office. The Board of Supervisors has additionally, asked me to investigate the circumstances surrounding your termination from employment of Assistant Sheriff Ryan Monaghan.*

*Although you are not obligated to speak with me, I offer you an opportunity to do so before I complete my investigation. I am available today (10/2) through Friday (10/4) between 3pm - 5 pm. Please let me know what works for you. Our conversation will be via phone. My cellphone:* ▮▮▮▮▮▮. *I look forward to hearing from you.*

*Sincerely,*
*Judge Cordell (Ret.)*

At 4:14 pm that same day, Sheriff Corpus emailed this response:

*Judge Cordell,*

*I am in receipt of your email. I am considering your request and will be in contact with you.*

*Regards,*
*Sheriff Corpus*

Sheriff Corpus did not contact this investigator after the Sheriff sent the email of October 2, 2024, and has never responded to this investigator's request for an interview.

**e) The Policy Manual**

Each law enforcement agency in California, including every Sheriff's office, is governed by rules, policies and procedures that are contained in a manual, frequently titled "Policy Manual" or "Duty Manual." Any law enforcement personnel who fail to adhere to the policies and procedures can be subject to internal investigations and possible discipline.

The Policy Manual governing the San Mateo County Sheriff's Office is available online: https://www.smcsheriff.com/sites/default/files/resources_files/SMCSO-Lexipol-Policy-Manual-7.9.2024.pdf

The most recent version of the Policy Manual, with an introduction by Sheriff Corpus states, "The San Mateo County Sheriff's Office Policy Manual provides the framework for performing our law enforcement mission. . . Employees shall utilize this manual coupled with the Lexipol Daily Training Bulletins to stay up to date and knowledgeable on the policies of this Office. Christina Corpus, Sheriff, January 1, 2023." (Emphasis added.) (Policy Manual, Policy Statement, pg. 1)

The Policy Manual also contains the Mission and Core Values of the San Mateo County Sheriff's Office, to wit, "As stewards of our community, we envision a world where all humanity is valued and respected. We recognize our role as leaders in this effort and commit to seeking creative and effective ways to work with and listen to the needs of our residents, businesses and stakeholders. We do this with the passion to preserve safety for all who live visit or work in San Mateo County. Core Values: Dignity, Compassion, and Respect." (Mission Statement & Core Values, Policy Manual, pg. 2)

**f) Organizational Chart for the San Mateo County Sheriff's Office**

There are 58 Sheriffs in California---one in each of the state's 58 counties. Sheriff's Offices are hierarchical, with the Sheriff at the head of the organization. The typical Chain of Command is the Sheriff, Undersheriff, Assistant Sheriffs, with a Professional Standards Bureau that includes an Internal Affairs Unit, reporting directly to the Sheriff. For example, see the organizational chart on the website of the Santa Clara County Sheriff's Office:
https://files.santaclaracounty.gov/2024-09/updated-organizational-chart.pdf?VersionId=E7w99OgfyjCBFGUfsBYLLZvUFtNf_97J

Another example is the organizational chart on the website of the San Diego County Sheriff's Office that includes an Executive Director of Management Services (comprised of civilian staff) who reports directly to the Undersheriff:
Organizational Chart | San Diego County Sheriff

A search for "organizational chart" on the San Mateo County Sheriff's Office website leads to a page that states, "*Your search yielded no results.*" (See https://www.smcsheriff.com/search/node?keys=organizational+chart)

The Office's Policy Manual, Section 200.2.4 at pg. 23, titled "Organizational Chart" reads as follows: "See the Sheriff's Office website for an organizational chart of the Sheriff's: https://www.smcsheriff.com/administration/organizational-chart"
However, that link leads to a page that reads, "ACCESS DENIED. You are not authorized to access this page."

On September 25, 2024, this investigator said to Mr. Aenlle, "The organizational chart is not on the sheriff's website or anything. Because I looked, and I couldn't find it."

Mr. Aenlle answered, "I can tell you that that's been a work in progress. I can tell you we're working on it. . . It hasn't been finalized yet. I think . . . I think we're . . . the undersheriff is getting close. I know he's working on that but. . ." (Aenlle transcript at pgs. 19, 20.)

As of the writing of this report, the administration does not have an official organizational chart.

**g) Election of Christina Corpus:**

On June 7, 2022, following a contested county-wide race, Christina Corpus was voted in as the first female and first Latina to the position of Sheriff, replacing the incumbent Sheriff Carlos Bolanos.

Prior to assuming office as the Sheriff, Corpus was a captain assigned to the Millbrae substation. (Pursuant to contracts, the Sheriff's Office provides law enforcement services to Millbrae, Half Moon Bay, San Carlos, Portola Valley and Woodside.) Some former and present, sworn and unsworn employees supported Corpus in her campaign for Sheriff. Some employees supported her opponent Bolanos, while others remained neutral.

Victor Aenlle was a part of her campaign team, dubbed "Team Revolution," and was viewed by some as Corpus' campaign manager. In response to this investigator's question, "Were you her campaign manager or?" Aenlle responded, "I never took that title officially. I did a lot. I was the lawn sign person. I was the errand person. I was many, many things. I never took officially that role in any capacity. . . I think the consultant . . . the campaign consultant really filled that hole." (Aenlle Transcript at pg. 13.)

The interviewees who had been Corpus' supporters were thrilled and excited about the "culture change" that she promised to bring to the Office. The interviewees who did not initially support Corpus' election, to a person, adopted the attitude of a willingness to support her given that she had been elected Sheriff.

### h) Aenlle Contract #1:

During the six-month period between Corpus' election in June 2022 and January 2023, when she officially began her role as Sheriff, she was stationed at the Millbrae Office serving as a Captain and Millbrae's Police Chief. (The City of Millbrae has a contract with the Sheriff's Office to provide law enforcement services.) Corpus sought and received the approval of the County Executive Mike Callagy to fund a transition team on the condition that the transition team would complete its work within six months. Callagy found the request to be unprecedented, but because he "wanted to make sure that the Sheriff succeeded," agreed to fund the transition team contracts. Aenlle signed his transition team contract on August 30, 2022; Callagy signed off on it for the County on September 20, 2022. **(Exhibit 2: Transition Team Contract) (Exhibit 3: Aenlle Contract #1)**

The transition team was comprised of five individuals: two civilians (Victor Aenlle and Max Szabo), two retired sworn peace officers, and one current peace officer. **(Exhibit 4: Transition Team Meeting Notes)**

Aenlle described his work on the transition team to this investigator:

"When Sheriff Corpus decided to run, she approached me to see if I would help or be part of her campaign, and I gladly accepted, as I felt that new leadership could benefit our community just in the office. So it was a non-paid position, completely volunteer, and that went successful, as, as, as you can see. And then I was further asked, because of my experience, institution, and knowledge of the office, my business experience, to be part of her transition team. And one of the biggest projects that I took on was the new building of 50,000 square feet, five stories, that needed to be reviewed and make sure it was safe for the employees to occupy."

(Aenlle Transcript at pgs. 4-5)

### i) Termination of Aenlle Contract #1:

According to a civilian employee (#3), at an early meeting of the transition team in the Millbrae briefing room, Aenlle required the transition team to sign Non-Disclosure Agreements ("NDA") to ensure that the transition was maintained in secrecy, stating that if anyone were to leak information, "We'll come after you; you'll get sued." Aenlle also signed the NDA. Sheriff-elect Corpus, who was present, did not sign the NDA. The civilian employee was required to

sign the NDA at this meeting, as well. According to the civilian employee, all of the signed NDAs were handed to Corpus who maintained them in her Millbrae office.

When asked by this investigator if he requested the transition team to sign non-disclosure agreements, Aenlle said, "I believe we did. I don't know if . . . I know we had a discussion. I don't know if all of them got signed. And that was not necessarily me, but that was at the direction of the strategist that was helping us along and was part of the team. . . Normal business practice. I think any person in . . . in the political world has a theme. It's . . . it's . . . I believe she did that also in the campaign. The campaign manager . . . consultant asked everybody to do that." (Aenlle Transcript at p.12)

According to County Executive Callagy, in late October 2022, he heard rumors that Corpus and Aenlle had traveled together to Hawaii. Callagy called Corpus to his office and asked, "Hey, did you go to Hawaii with Victor Aenlle on vacation?" to which Corpus responded, "Yes, I did. We are good friends. Victor is good with my son. He went to help with my kids. If this were Bolanos [previous Sheriff whom Corpus defeated in the 2022 election], no one would care. It's the good ole' boys spreading rumors about me because I'm Latina." Callagy disagreed and told her, "You didn't tell me Victor was a good friend. I wouldn't have approved his contract. It's the perception that I hired a contractor who went to Hawaii with the Sheriff-elect." That same day, on October 21, 2022, the County Executive's Office terminated Aenlle's contract. **(Exhibit 5: Email from Iliana Rodriguez to Aenlle terminating his contract)**

In response to this investigator's question about the termination of his transition team contract, Aenlle said, "It was terminated by the County Executive. . . And, by the way, I even have---I still have a copy of that contract, and it was terminated illegally, even by their own contract. But basically, I got a call from. . . Iliana Rodriguez. But there was a conflict in the contract and, and, the County Executive decided to cancel it, without, without any process, due notice, nothing." (Aenlle Transcript at pg. 6)

**j) Aenlle Consultant Contract:**

On January 31, 2023, shortly after Corpus had been officially sworn into office as Sheriff, Aenlle signed a one-year agreement for the period from January 1, 2023, to December 31, 2023, as an independent contractor for the Sheriff's Office. This contract provided that Aenlle would fulfill thirteen tasks that included, "translating the Sheriff's vision into concrete policies and initiatives. Receive general direction from the Sheriff or Undersheriff." His compensation under this one-year agreement was $92.44 per hour, not to exceed $192,275.00. (Emphasis added.) **(Exhibit 6: 2023 Aenlle one-year contract)**

When this investigator asked Aenlle about this contract he said:

"In 2023 when I came in, yes, I had a . . . I had a contract with the Sheriff's Office, like a third-party contract, while my position was created." This investigator then asked, "So you had a contract that kind of got you from when she was sworn in to when you got this position that eliminated an assistant sheriff's position and instead put you in? Fair? Aenlle responded, "Fair. And it wasn't eliminated. It was just converted." (Aenlle Transcript at pg. 11)

**k) Aenlle Extra-Help Position Request:**

On or about March 7, 2023, Sheriff Corpus directed submission to the County's Human Resources Office a request for a Special Projects Coordinator I position. This was an extra-help position with a requested hourly rate of $118/hour. The job description is nearly identical to the job description of Aenlle's one-year contract, including the provisions that Aenlle "receive general direction from the Sheriff or Undersheriff."**(Exhibit 7: Special Projects Coordinator I Job Description)**

Aenlle submitted an application and a resume for this extra-help position. While the application is undated, given the fact that the Sheriff's request to fill the position was made on March 7, 2023, Aenlle must have submitted it sometime after that date. **(Exhibit 8: Aenlle Application for Special Projects Coordinator I).** On his application Aenlle stated that he worked 40 hours per week for Coldwell Banker as an Associate Broker and worked 40 hours per week supervising three employees in his private investigation business.

Human Resources understood this request to be a "contract to extra help conversion," since Aenlle was already working under a one-year contract (Contract #2) that would not end until December 31, 2023. **(Exhibit 9: Email exchange (3/7/23) from Lisa Yapching)**

Human Resources approved the extra-help position for Aenlle, but at an hourly rate of $73 and no benefits. On March 17, 2023, Sheriff's Office Internal Human Resources personnel raised a question about how to conduct a background check on Aenlle because they were unfamiliar with "how we normally process the backgrounds for folks transitioning from reserve deputy (non paid positions) to county paid employees if there is no break in service." **(Exhibit 10: Email (3/17/23) from Joann Lov)**

It is unclear why, after the Sheriff hired Aenlle as an independent contractor in January 2023 for a one-year period, that three months later, she submitted a request to hire him as an extra-help Special Projects Coordinator. What is very clear is that it was important to Sheriff Corpus that Aenlle remain employed by her office as a direct report.

**l) Aenlle Executive Director of Administration Position:**

Three months later, in June 2023, Sheriff Corpus worked with the County's Human Resources Department ("Human Resources") to create a job description for a new full-time, unsworn/unclassified position for Aenlle--- Sheriff's Executive Director of Administration. This description was similar to the job descriptions of the previous two positions. **(Exhibit 11: Job Description for Executive Director of Administration)** The date on which this position was established was July 6, 2023, as noted on the final page of the job description.

At one point, a Human Resources employee (#21) was asked by a civilian employee (#15) in the Sheriff's Office, if a reserve deputy could be hired into a non-sworn position. The Human Resources employee was also told that the Sheriff's Office needed to "get this done." She understood this to mean that the Sheriff wanted to fill the position quickly. The Human Resources employee checked with her supervisor and informed the civilian employee that a reserve deputy could fill a non-sworn position.

Aenlle applied for this position. **(Exhibit 12: Aenlle Application for Executive Director of Administration & Resume)** In response to the question on the application "How did you learn about this position?" Aenlle wrote "Other." To the next question, "If you answered 'Other' to the above question, please indicate below how you learned about his job," Aenlle responded, "Employee. On the last page of his application in the section "Supplemental Questions," he listed "Sheriff Christina Corpus" as the person who offered him this position.

Aenlle noted on his application that he was not interested in an extra help position but instead, was "Interested in regular employment only." And once again, he listed his outside employment with Coldwell Banker (40 hours per week) and with his private security business (40 hours per week).

This application is undated, but could not have been submitted before July 6, 2023, when the job description was published.

In July 2023, Aenlle was hired by Sheriff Corpus as Executive Director of Administration. His annual salary is approximately $246,979 plus benefits. There was no announcement of this job opening, and no applicants other than Aenlle.

**m) Sheriff Corpus' Request for Highest Pay Level for Aenlle:**

On July 31, 2023, immediately after Aenlle accepted the position of Executive Director, but before he actually began working at the Sheriff's Office, Sheriff Corpus requested that his starting salary be set at Step E, the level of an Assistant Sheriff.

In a glowing memorandum requesting the highest possible pay for Aenlle, she wrote, "I respectfully request that Mr. Victor Aenlle receive "Step E" compensation for his recent appointment to the Sheriff's Office Executive Director of Administration position, as it has been extended to him and accepted. . . As the Executive Director of Administration position holds the same equivalence as an Assistant Sheriff, we have consistently employed a practice of offering Step E salaries to lateral hires with over 5 years of law enforcement expertise. Victor Aenlle, having accumulated an impressive 15 years of experience with the San Mateo County Sheriff's Office and executive-level experience, should be treated no differently in his appointment to this role than other executives brought in as laterals with extensive experience. Therefore, it is only fair and justified that he receives the same consideration and compensation as his counterparts." (Emphasis added.) **(Exhibit 13: Sheriff 2023 Memo for Aenlle Pay Step E)**

Given the fact that Sheriff Corpus had promised the Step E pay increase to Aenlle before requesting approval from Human Resources, Human Resources honored the request "as a one-time non-precedent setting exception." **(Exhibit 14: 2023 Kiryczun Email)**

**n) Multiple Requests for Aenlle Pay Increase:**

Before Aenlle had completed his first year as Executive Director, Sheriff Corpus submitted at least two requests to increase Aenlle's pay: (1) February 2024, **(Exhibit 15: Corpus February 2024 Request for Aenlle Pay Increase);** (2) March 2024 (**Exhibit 16: Corpus March 2024 Request for Aenlle Pay Increase)** and (3) April 2024 (**Exhibit 17: Corpus April 2024 Request for Aenlle Pay Increase).**

According to then-Undersheriff Chris Hsiung, Sheriff Corpus actually authored the March 2024 pay increase request. She then ordered Hsiung to edit and send the request to Human Resources under Hsiung's name.

Each time, the Sheriff's requests were denied by the Human Resources Department and by the County Executive. **(Exhibit 18: HR Denial of March 2024 Pay Increase Request)**; **(Exhibit 19: HR Denial of April 2024 Pay Increase Request)**

**o) The Allegations:**

This investigator examined fifteen (15) allegations lodged by former and current civilian and sworn employees against Aenlle, Sheriff Corpus and her Executive Team. What follows are the results of the investigation into these allegations.

**1. Allegation #1: Sheriff Corpus and Aenlle have a "personal relationship" that creates a conflict of interest.**

Policy 1025 of the Policy Manual defines "Personal Relationship" as "marriage, cohabitation, dating or <u>any other intimate relationship beyond mere friendship.</u>" (Emphasis added.) Webster's Dictionary defines an intimate relationship as, "of a very personal or private nature," "suggesting informal warmth or privacy" or **"**engaged in, involving, or marked by sex or sexual relations." The Policy 1025's phrasing, "any other intimate relationship beyond mere friendship" makes it clear that an intimate relationship can exist without sexual intimacy.

Therefore, the inquiry is not narrowly focused on whether Sheriff Corpus and Aenlle have a sexual relationship, but whether, prior to her election campaign to the present time, their relationship is one of a "very personal or private nature, beyond mere friendship."

The Sheriff's Office Policy 1025, "Nepotism and Conflicting Relationships," <u>prohibits conflicts of interest in hiring, recruitment, and supervision</u>:

**"**1025.1 PURPOSE AND SCOPE
The purpose of this policy is to ensure equal opportunity and effective employment practices by avoiding actual or perceived favoritism, discrimination or actual or potential conflicts of interest by or between Sheriff's Office employees. These employment practices include: <u>recruiting</u>, testing, <u>hiring</u>, <u>compensation</u>, assignment, use of facilities, access to training opportunities, <u>supervision</u>, performance appraisal, discipline and workplace safety and security. (Emphasis added.)

Section 1025.1.1 (at pg. 703) defines conflict of interest as "Any actual, perceived or potential conflict of interest in which it reasonably appears that a department employee's action, inaction or decisions are or may be influenced by the employee's personal or business relationship. . .Personal relationship: Includes marriage, cohabitation, dating or <u>any other intimate relationship beyond mere friendship.</u>" (Emphasis added.)

Section 1025.2(a) (at pg. 704) makes it clear that anyone in a supervisory position may not supervise an employee with whom the supervisor has a personal relationship: "<u>(a) Employees are</u>

prohibited from directly supervising, occupying a position in the line of supervision or being directly supervised by any other employee who is a relative or with whom they are involved in a personal or business relationship." (Emphasis added.)

Additionally, the Sheriff's Office conflict of interest code prohibits employees "from participating in, contributing to or recommending promotions, assignments, performance evaluations, transfers or other personnel decisions affecting an employee who is a relative or with whom they are involved in a personal or business relationship." (Emphasis added.) (Section 1025.2 (b) at pg. 704)

Former and current sworn and civilian employees of the Sheriff's Office described to this investigator the following interactions involving Sheriff Corpus and Aenlle that they witnessed or statements that they heard in support of the allegation that Sheriff Corpus and Aenlle have a personal relationship that constitutes a conflict of interest.

- In 2022, Corpus told a civilian employee (#3), "If he [Victor Aenlle] ever leaves me, I don't know how I'll make it. I won't survive."

- A civilian employee (#3) frequently saw Aenlle rubbing Corpus' neck, shoulders and feet in Corpus' Millbrae office. These observations occurred in 2021 and 2022, when Corpus was assigned to the Millbrae Substation.

- In September or October 2021, when Corpus left her cellphone on her desk at the Millbrae Substation, a civilian employee (#3) saw on it a text from "Campaign Manager" [whom she knew to be Aenlle] that read, "Baby, I love you, I miss you so much."

- In September 2021, civilian employee (#3) saw Corpus and Aenlle sitting together on a couch in Corpus' office at the Millbrae Substation giving each other a peck on the lips.

- Sworn employee (#30) said that on September 7, 2021, Aenlle and Corpus came to the firing range at Coyote Point for a private session to qualify the Sheriff. Corpus was wearing a knee-length lavender dress, matching lavender high heels, and a gun belt around her waist. Aenlle ordered the sworn employee to leave, saying, "I got it from here. You can go." The sworn employee left, leaving Aenlle and Corpus alone at the range. At the end of the session, the qualification sheet that was returned to the sworn employee appears to have been signed by Aenlle, qualifying Corpus. The sworn employee questioned whether Corpus actually met the qualification requirements since there was no one there to observe her other than Aenlle. The sworn employee (#30) also said that in early 2023, he ended the practice of allowing private qualification sessions at the range. **(Exhibit 20: Corpus qualification sheet)**

- One week after the Millbrae Art & Wine Festival in September 2021, on a Wednesday evening, a civilian employee (#3) was on a Zoom call and could see that Aenlle and Corpus were at Aenlle's ranch house at the San Mateo County coastside. The two were feeding each other in an intimate fashion, touching and rubbing each other, and "playing footsie."

- In October 2021, a civilian employee attended a dinner but could not recall if the location was the Green Hills Country Club or the 100 Club. The civilian employee (#3) drove her car and picked up Corpus who was "bent out of shape." Corpus told the civilian employee, "Victor won't sit with us." Aenlle was seated with the San Mateo Police Department Chief Ed Barbarini [sic]. At the dinner, Aenlle texted Corpus, "Tell [the name of the civilian employee (#3)] to switch seats so I can see you." Corpus showed the civilian employee the text message; the civilian employee declined to switch seats.

- In the Fall of 2021, a civilian employee (#3) was in Corpus' office. Corpus was wearing a V-neck blouse. Corpus told the civilian employee, "Victor told me never to wear a V-neck. Corpus further stated that Aenlle said, "'I'm the only one who should see this.'" Corpus continued, "That's why I never dated Hispanic men; they are too controlling. But I like that he's so jealous and protective."

- In December 2021, the Day Sergeant told a civilian employee (#3) that Corpus "rolled in at 4:30 a.m." wearing the same clothes from the previous day. The Night Sergeant also saw it and said to the civilian employee, "You won't believe it. . ." The next day, Corpus and the civilian employee were talking in the civilian employee's office. Corpus was seated in a yellow chair. When the civilian employee brought up the subject of the "same clothes" incident, Corpus said, "[First name of her then-spouse] dropped me off." When the civilian employee reminded Corpus that her car had been parked at the station and that Corpus was wearing the same clothes from the previous day, Corpus remained silent.

- Civilian employee (#3) reported to this investigator that in late December 2021, Aenlle bought Corpus a $1,200 pair of red-bottomed Christian Louboutin boots. Corpus showed the boots to the civilian employee (#3) who saw the receipt showing that they were paid for in cash. The boots were in a black box and purchased at Nordstrom's at Hillsdale or Stanford. Corpus placed the box with the boots in the back of her hatchback van which was where Corpus showed them to the civilian employee. Corpus said to the civilian employee, "I'm keeping them back here for now so [First name of her then-spouse] won't see them." Civilian employee (#3) provided to this investigator a link to an advertisement with an image of the boots that were gifted to Corpus: https://www.nordstrom.com/s/5194699?color=001&size=8us%20/%2038eu

- At the end of 2021 or in early 2022, Corpus was sitting in her office in Millbrae. Aenlle was there, standing behind Corpus. A civilian employee (#3) was in the office. Aenlle said, "We're practicing a lot to have kids." The civilian employee responded, "Gross. I don't want to hear this. Don't ever say anything like that to me again." Corpus did not say anything in response, but chuckled.

- In November or December 2021, Corpus and a civilian employee (#3) were together in the Millbrae Substation. Corpus told the civilian employee that she and her then-spouse had an argument, and that Corpus told Aenlle about it. Corpus said that Aenlle's response was, "I'll put a bullet in [Name of Corpus' then-spouse]'s head."

- On January 27, 2022, Sheriff Corpus told a civilian employee (#3) that both Aenlle and Corpus were going to divorce. Corpus asked the civilian employee to find wedding sites for Aenlle and Corpus, saying, "We're going to get married." The civilian employee found some venues online on Maui and gave the information to Corpus via "Signal." Corpus responded, "Great!"

  Aenlle texted the civilian employee (#3) via Signal, "Those are great venues." Signal is a secure messaging app. Communications on Signal are end-to-end encrypted, which means only the people in messages can see the content of those messages. As well, messages can be set to disappear after a certain period of time. Aenlle required the Sheriff and the civilian employee (#3) to communicate with each other via Signal.

- On January 27, 2022, Corpus told a civilian employee (#3) that Aenlle handed her $12,000 in cash to buy a pair of diamond earrings at Tiffany's at Stanford Shopping Center. Corpus, on a Facetime call, told the civilian employee and the civilian employee's mother about the purchase, adding, "I got $11k earrings." The civilian employee (#3) provided to this investigator a link to an advertisement with an image of the earrings that were gifted to Corpus: https://www.tiffany.com/jewelry/earrings/tiffany-victoria-earrings-GRP11459/ According to the civilian employee, Corpus wears the diamond earrings every day. **(Exhibit 21: Photos of Corpus Wearing Earrings)** The civilian employee (#3) texted Corpus that she should "Enjoy being spoiled and doted on," and requested Corpus to "Send me a pic of your sparklies[.] **(Exhibit 22: Text message re diamond earrings)**

- In March or April 2022, Corpus called a civilian employee (#3) from a department store where Corpus was with her two children. Corpus told the civilian employee to get Aenlle "right now." Corpus told the civilian employee that Corpus' husband knew that she and Aenlle were having an affair and that her husband was upset. Immediately thereafter, the civilian employee called and texted Aenlle more than 10 times. When Aenlle finally called, the civilian employee told him that Corpus was "in bad shape." Corpus later told the civilian employee that she had gotten a room with her children at a hotel in Burlingame.

- A civilian employee (#3) knows that Aenlle has the code to access Corpus' phone because the civilian employee saw Aenlle logging into Corpus' phone at a party announcing Corpus' candidacy for Sheriff at the Masonic Lodge #40 in Burlingame, on September 28, 2021.

- According to a civilian employee (#3), starting in January 2022, Corpus and Aenlle left the Millbrae Substation together after work nearly every night in Aenlle's car, while Corpus' van remained parked at the Substation.

- In 2021 and 2022, Corpus told a civilian employee (#3) that Corpus and Corpus' then-spouse argued nights when Aenlle drove Corpus to her home, sometimes as late as 11:30 pm and midnight. Corpus said that her then-spouse was waiting for her and was "so mad," and told her, "I know you were with Victor." The civilian employee urged Aenlle

to drop Corpus at her home earlier in the evenings, to which Aenlle responded, "She [Corpus] doesn't want to go home. She doesn't want me to drop her off early."

- On June 7, 2022, which was election night for the 2022 primary election, Corpus had a watch party on the roof top of Union Bank (now US Bank) in San Mateo (4th & El Camino). At the watch party, Corpus gave a victory speech thanking her "Team Revolution" as well as her then-husband. Afterward, a civilian employee (#3) witnessed and was involved in the following exchange between Aenlle and Corpus:

  - Aenlle (to Corpus): "How dare you thank [Name of Corpus ex-husband]!"
  - Corpus: "I had no choice."
  - Aenlle: "It's over. It's over. We're done."
  - Interviewee #3 (to Aenlle): "It's not about you!"
  - Aenlle: "Yes, it is."
  - Corpus was crying and following Aenlle pleading with him, "Please don't do this, baby!"

  The civilian employee was able to move Corpus and Aenlle away from the gathering at the watch party to Aenlle's car and asked Corpus, "Are you okay?" Corpus answered, "No. we're going to his mom's house to talk." The next day, when the civilian employee was off work, Corpus called the civilian employee and said that she and Aenlle had talked until 4 a.m., that Corpus apologized to him, and said that "We're okay."

- Before and after the election in June 2022, Corpus told a civilian employee (#3) that she and Aenlle spent a lot of time at Aenlle's ranch on the San Mateo County coastside. Corpus told the civilian employee, "The ranch is beautiful" and that she has brought her children there. On June 30, 2022, Corpus texted the civilian employee a video of herself at the ranch in which Aenlle can be heard talking in the background. **(Exhibit 23: Video of Corpus at the ranch)**

- On Wednesday, September 21, 2022, a former sworn employee (#25), employed for 29 years by the San Mateo County Sheriff's Office, and his wife flew Hawaiian Airlines from SFO to Maui. They flew annually to Maui and always traveled first class. As they were boarding the plane, he saw Corpus and said to his spouse "Oh, that's our new Sheriff!" Corpus saw him and immediately turned away. He then saw Aenlle 10 to 12 feet ahead. Aenlle was with Corpus' son. He made eye contact with Aenlle who said nothing, then "walked fast," toward the gate, along with Corpus.

  That same day, the former sworn employee texted a civilian employee (#3), "I just saw Victor and the Sheriff in Maui." Thereafter, the civilian employee texted Corpus using "Signal," an encrypted message system required by Aenlle for the transition team, "You were seen." Even though the civilian employee had texted Corpus, <u>Aenlle responded to the text, using the Sheriff's cellphone number, writing, "I'm doing security detail in Maui. I'm protecting the Sheriff."</u>

One week later, Sheriff Corpus texted the former sworn employee (#25) writing, "I don't appreciate you spreading rumors about me." He texted back, "I didn't spread a rumor. I saw you at the airport. That's not a rumor." When the former sworn employee returned home, <u>Aenlle called him and said, "We were in a big hurry. I didn't see you. I went there to have the Sheriff be on vacation. I watch the kids</u>." The sworn employee had made eye contact with Aenlle when boarding the plane and was standing 10 to 12 feet away from Aenlle.

- In 2022 Corpus' then-husband, also a sworn member of the Office, told a former sworn employee (#4) that Corpus was having an affair with Aenlle and that he did not go on the Hawaii trip because Corpus told him that the flight was full and that there wasn't a plane ticket available for him. Corpus traveled to Hawaii with the couple's son and daughter. Upon Corpus' return, Corpus' then-husband told the former sworn employee that his daughter tearfully reported to him that Aenlle was on the plane "in her dad's seat." The former sworn employee supported Corpus' campaign for Sheriff and had agreed to serve on her transition team.

  In November or December 2022, the former sworn employee (#4) called Corpus and said, "I want honesty and transparency. I don't want you to lie. What's going on with you and Victor?" Corpus told him that nothing was going on. <u>He asked Corpus, "Why did Victor go to Hawaii with you?" Corpus responded, "He didn't</u>." The former sworn employee said, "I don't agree with Victor being in the place of the undersheriff. Think about it and let me know what you are going to do." Corpus did not thereafter respond to the former sworn employee.

  After this conversation, Aenlle called the former sworn employee (#4) and said, "What is your problem? You never liked me." The former sworn employee said, "You need to back out because of nepotism and conflicts of interest." <u>Aenlle then denied going to Hawaii with Corpus</u>. The former sworn employee said, "You just lied to me. You were in Hawaii. I can't work with a liar. Own up. I can find out. I have a friend who works at the airport. If you are on the leadership team, I'm out."
  Two weeks later, Aenlle called the former sworn employee and threatened him, saying, "I'm going to sue you for defamation and slander if you keep talking about me." *After this interaction, the sworn employee left the transition team.*

- In October 2022, County Counsel Nibbelin came to meet Corpus at her Millbrae office. Corpus told Nibbelin, "<u>I just got back from Hawaii with my husband.</u>" A civilian employee (#3) heard Corpus say this. As noted, Corpus' husband did not, in fact, travel to Hawaii with Corpus.

- In 2022, before Corpus assumed the office of Sheriff, approximately 15 employees of the Sheriff's Office flew to Anaheim to attend a Women Leaders in Law Enforcement conference. Corpus and Aenlle also went. Aenlle and Corpus flew first class. The rest of the employees flew economy class.

- In October 2022, a civilian employee (#3) and Corpus were in Corpus' Millbrae office. The civilian employee told Corpus, "You can't hire your lover. It will ruin everything that

we worked toward. He'll ruin you." Corpus responded, "He deserves it; he worked so hard for my campaign." The civilian employee said, "I disagree. Keep the two separate. You can't bring your lover on. It's a bad look." Corpus said, "I have to."

- On the Sheriff's birthday, on March 20, 2023, Aenlle called a civilian employee (#1) and told her to cancel all of his meetings that day. The civilian employee could hear Corpus talking in the background.

- Aenlle told a civilian employee (#1), "I love her [Sheriff Corpus]. I love who she is. I love what she stands for."

- In 2022, Aenlle and a former sworn employee (#17) had drinks in Burlingame where he accused Aenlle of having an affair with Corpus. Aenlle said, "No, I'm a married man." The former sworn employee replied, "You can't be in the administration." Aenlle said, "Yes, I can."

- At a conference in Texas where there was an outdoor concert for "Country Night Out," Corpus wore a pair of new cowboy boots. A former sworn employee (#17) told Corpus that he liked her boots. Corpus volunteered, "[First name of her then-husband] got them for me." Shortly thereafter, the former sworn employee asked Corpus' then-husband if he had bought the boots for Corpus and was told, "I didn't buy them. Victor bought them."

- In late December 2022, Sheriff Corpus was in the Deputy Sheriff's Association (hereinafter "DSA") office speaking with Interviewee (#5), a sworn employee. Another sworn employee was also present. Aenlle came in, shut the door and said, "There's a rumor that the Sheriff and I were together and seen on a plane. It's true. I'm her security."

- In late 2023, Aenlle and a sworn employee (#18), spoke in Aenlle's office. When the sworn officer asked Aenlle if he knew why Corpus was avoiding him, as the two had been long-time friends, Aenlle said, "I don't know anything about you. You gave $50 to the Sheriff's campaign. It's creepy how you text her. Trust me, I know how the Sheriff thinks. I'm with the Sheriff all of the time."

- A sworn employee (#18) has seen Aenlle regularly park in the Sheriff's parking spot at the Sheriff's weapons range in Coyote Point.

- A sworn employee (#23) was told by Sheriff Corpus' ex-spouse that "she just wants the money. She just wants the money."

- Sometime between June and August 2024, a civilian employee (#6) heard Aenlle say "Te amo." [I love you] when he ended a phone conversation with Sheriff Corpus. The civilian employee knew that Aenlle was talking to Corpus because she was in Aenlle's office and saw Corpus' name on Aenlle's cellphone.

- On July 16, 2024, in the evening, during the first Independent Citizen

Advisory Committee (ICAC) meeting, Sheriff Corpus introduced the Captains, Undersheriff Dan Perea and Assistant Sheriff Ryan Monaghan. Sheriff Corpus did not mention Aenlle in the introduction. Monaghan could see that Aenlle was upset. When Sheriff Corpus sat down next to Aenlle, he said something to her. In response, Sheriff Corpus said to Aenlle, "Sorry, I'm human." She then returned to the podium and introduced Aenlle.

- A sworn employee (#23) resides with a relative in San Mateo County when he is on duty. The home is kitty-corner from the home of Sheriff Corpus. Approximately three to four months ago, at 9:30 pm, as he was backing his car into the driveway, with headlights on, he saw Aenlle walk out of the Sheriff's home. He observed Aenlle look directly at him, tuck his head, and get in his car and drive away.

- A civilian (#29), who operates a handyman business with his brother and cousin said that in July 2024, his brother and his cousin, who are primarily Spanish-speakers, were power-washing the home of Sheriff Corpus. The civilian was told the following by his brother:

  At some point, Aenlle arrived and "walked into Corpus' home like he owned it." When Aenlle returned outside, he asked the men, in Spanish, "What are you doing?" His brother said, in Spanish, that Christina [Sheriff Corpus] had okay'd them to do the power washing job. Aenlle responded, "Don't talk to Christina. Ask me first. Don't do any work here unless I tell you to." Aenlle appeared to be angry when he said this.

**Victor Aenlle's response:**
This investigator: "Since 2021, do you have a personal relationship with Sheriff Corpus? Personal relationship is defined as any intimate relationship beyond mere friendship. It's also defined as a very personal or of a private nature, not necessarily of a sexual nature."

Aenlle: "No. I have a professional relationship with Sheriff Corpus. I admire that woman. She has inspired me. I've known her for a long time. She's a beautiful human being, and I'm honored to work for her and to push forward her vision in modernizing this department and the services that she provides to this community, and I respect her incredibly and just admire her to no end, and that's why I'm so honored to work for her and have been here by her side from day one. . . I've always had a strong friendship with her, but it's been a professional relationship. It is not one that's beyond mere friendship. I've been married for 30 years, and my wife knows the sheriff. And my wife knows the sheriff very well."

This investigator: "Have you and the sheriff, when you go to conferences having to do with the Sheriff's Office, do you travel, have you ever traveled first class?"
Aenlle: "I, we both have upgraded in different scenarios. But I can tell you, and not to sound off, I don't travel with anything less than first class. I'm not a child anymore. I have back pain. I don't, I don't like people in close proximity to me, So if I can't upgrade, I won't travel. And I do that on my own, my own money. And when the sheriff wants to and can, that's, has she done that before? Yes, she has. Does she do, does that all the time? Not that I'm aware of. But I will not travel unless I can upgrade to first class."

This investigator: "When the two of you do go to a meeting or conference together, do you, do you, since you fly first class, does she fly first class with you?"

Aenlle: "Not all the time. There's been like a couple of instances. But I can tell you that just most recently, the last trip, I was in first class. She was in the back of the plane. . . The only trips, yeah, it's a business trip. It was a WLLE. It's a Women for Leadership."

This investigator: "And so you traveled first class? And she did not?"

Aenlle: "Oh, yeah. Correct."

This investigator: "Have you ever paid for her to fly first class?"

Aenlle: "No, ma'am. And if I've ever paid for something for the sheriff, she always gives me the money back. If it's something like, you know, something that we're doing or something's happened, and, and we do that for each other. I do that with the undersheriff. I've done that, we just Venmo each other back whatever it is that, whoever is picking it up, whether it's lunch or a dinner or something. We always do that."

This investigator: "Did you and the sheriff and her children travel together to Maui in 2022?"

Aenlle: "<u>The sheriff went to Maui with her family, her kids, and her brother. I was in Maui at the same time. I was on a security detail. Barely even saw each other. I think we crossed paths, but she was there with her family and her brother.</u>"

This investigator: "Do you know why her husband was not there?"

Aenlle: "They were already having problems. I believe they were going through their issues."

This investigator: "Can you explain more the security detail you were on in Maui?"
Aenlle: "Yes, ma'am. I, I, I was doing covert detail for a high-net-worth individual."

This investigator: "So you were privately retained by that person?"

Aenlle: "Yeah."

This investigator: "And when did that security detail end?"

Aenlle: "I think I was in Maui for four days or something like that, ma'am."
This investigator: "Did anyone else know that you were there on a security detail? For example, did the sheriff know?"

Aenlle: "Oh, sure. The sheriff knew, yeah, I, yeah."

This investigator: "Did anyone else know.?"

Aenlle: "No, ma'am. I don't, I don't discuss that with anybody. I have my network of friends. It's pretty small and tight. That's not something I discuss, actually, the nature. Most of my stuff, you know that we do in that realm, it's, you know, you sign NDAs and all kinds of things. It's not something I go around and advertise, especially when it's a covert detail which is what I specialized in."

This investigator: "And did you and the sheriff sit together on the flight to Maui?"

Aenlle: "I don't think we were together. I think we were close."

This investigator: "But you were not seated next to each other?"

Aenlle: "No. No. It's been a couple of years, but I can tell you that, that it was in a close proximity, but I don't recall being next to her." (Aenlle Transcript at pgs. 122-128)

**Findings:**

Despite Aenlle's and Sheriff Corpus' denials, there is overwhelming factual evidence that Aenlle and Sheriff Corpus have continuously been in a personal relationship. Unsettling are the various explanations offered by Aenlle about the trip to Hawaii ranging from an outright denial of being in Hawaii, to being there to protect the Sheriff, to being there to watch the Sheriff's children, to telling this investigator that it was a coincidence that the two of them happened to be on the same flight to Maui.

As well, Aenlle's explanations contradict statements that Sheriff Corpus made to various interviewees when she told one person that she did not go to Hawaii, while telling others that she was accompanied by Aenlle who assisted with her children. And there was her lie to County Counsel Nibbelin that she went to Hawaii with her husband. Her then-spouse did not go on that trip.

When Aenlle and Corpus were spotted in the San Francisco Airport about to board the plane to Hawaii, a retired sworn employee made eye contact with Aenlle who turned away and hurriedly walked with Corpus toward the boarding area. It is clear that Corpus and Aenlle have tried to cover up the fact that they were together on a vacation. Why? Because they knew that their relationship was personal, beyond "mere friendship," and therefore, a violation of County and Policy Manual rules.

There were Aenlle's gifts to Corpus of $11,000 diamond earrings from Tiffany's and $1,000 Christian Louboutin boots that she concealed from her then-husband, their late-night rides together to her home, their constant companionship that Aenlle attributed to his protection of the Sheriff, Aenlle's taking charge of repairs on Corpus' home "like he owns it," their personal text messages, their discussion about a wedding site for them in Maui, the Sheriff's meltdown at her election night watch party when Aenlle berated her for thanking her then-spouse. These, and so many more observations reported by interviewees demonstrate that Aenlle and Sheriff Corpus are not engaged in a "mere friendship."

Finally, there were Sheriff Corpus' relentless efforts to hire Aenlle as her direct report right after her election in 2022, culminating in her securing Aenlle's full-time employment, followed by her repeated attempts to increase Aenlle's compensation. These are not the actions of "mere friends."

There is overwhelming factual evidence that Sheriff Corpus and Victor Aenlle have been and continue to be in a personal relationship as defined in Policy 1025.

With respect to a conflict of interest, the following facts are not in dispute: (1) Sheriff Corpus hired Aenlle as Executive Director of Administration; (2) Sheriff Corpus is Aenlle's supervisor; (3) Aenlle is Sheriff Corpus' subordinate; (4), from the time that Sheriff Corpus first hired Aenlle as a member on her transition team to her employment of Aenlle as her Executive Director, Sheriff Corpus has maintained a personal relationship with Aenlle; and (5) Sheriff Corpus and Aenlle failed to disclose their personal relationship.

Sheriff Corpus violated the Office's conflict of interest code when she hired Aenlle; she violated the policy by having Aenlle directly report to her; and she violated the policy when she repeatedly recommended pay increases for him.

There is overwhelming factual evidence that Sheriff Corpus and Aenlle continue to be in a personal relationship since 2021, and that Sheriff Corpus has an actual conflict of interest, in violation of Policy 1025.

**Allegation #1 is SUSTAINED.**

2. **Allegation #2: Aenlle has not met the Policy Manual's duty requirements for a Level I Reserve Deputy.**

California Penal Code Section 832.6 provides, in pertinent part, "(a) Every person deputized or appointed, as described in subdivision (a) of Section 830.6, shall have the powers of a peace officer <u>only when the person is any of the following</u>:

> (1) A level I reserve officer deputized or appointed pursuant to paragraph (1) or (2) of subdivision (a) or subdivision (b) of Section 830.6 and assigned to the prevention and detection of crime and the general enforcement of the laws of this state, whether or not working alone, and the person has completed the basic training course for deputy sheriffs and police officers prescribed by the Commission on Peace Officer Standards and Training. . . . <u>Reserve officers appointed pursuant to this paragraph shall satisfy the continuing professional training requirement prescribed by the commission.</u>" (Emphasis added.)

The Policy Manual provides that the applicant for a Reserve deputy "must meet the standards defined by the San Mateo County Sheriff's Office as they apply to the position of full-time Deputy Sheriff to include a background investigation conducted by the Professional Standards Bureau." (Policy Manual, Section 322.4.2 (f), at pg. 200.)

There are four levels of Reserve Deputies: Designated Level I, Level I, Level II, and Level III. (Policy Manual, Section 322.4.7, at pg. 204). "Designated Level I" must have three years as a Level I Reserve Deputy and "shall, at the discretion of the Sheriff or his designee, have 24-hour police powers, may perform general law enforcement duties without immediate supervision and must comply with CPT [California POST Training] requirements." (Policy Manual, Section 322.4.7, at pg. 203)

This investigator: "So, if you're a designated Level I reserve, . . . is that different from your being the Executive Director . . .And so you are, you are both? You are a reserve, and you are executive director/chief of staff?

Aenlle: "Yes. As the reserve, I don't do regular duties reserves any longer because of my position, right? But I do not lose my police powers, right? I'm still listed, I'm still, I still have my post [POST]is what it's called, yeah. . ." (Aenlle Transcript at pg. 107)

On his application for the Executive Director position, Aenlle described himself as a designated Level I Reserve since 2009.

**Exhibit 23-A:**

The California Commission on Peace Officer Standards and Training (POST) requires that "Level I and II reserve officers shall satisfy the same Continuing Professional Training (CPT) requirement as full-time regular officers (24 hours every two years). (https://post.ca.gov/reserve-officer-program )

Policy Manual Section 322.5.1 describes the minimum duty requirements for all Reserve Deputies, in part,

"(a) Reserve Deputies are required to volunteer a minimum of 16 hours per month or the equivalent averaged over the year, for a total of 192 hours. . .
(b) All Reserve Deputy Sheriffs are required to attend 75% of the scheduled regular monthly training meetings. Exceptions will be reviewed on a case-by-case basis and must be approved by the Coordinator or Assistant Coordinator.
(c) Compliance for Reserve Deputy Sheriffs includes, but is not limited to, meetings, P.O.S.T. continuing professional training (CPT) requirements, other training, firearms qualification and duty hours. Compliance records will be generated and reviewed by the Reserve Coordinator quarterly and provided to the Homeland Security Division/ESB Sergeant annually.
 (d) If a Reserve Deputy fails to meet the minimum standards at any time they may be subject to discipline including documentation of counseling, a performance improvement plan, formal discipline, suspension or dismissal from the Reserve Deputy Program." (Emphasis added.)

Complainants allege that Aenlle has not fulfilled the requirements to maintain his status as a Reserve Deputy:

- A sworn employee interviewee (#16) who is a member of the Emergency Services Bureau tracks compliance with all Reserve deputy duty requirements. The sworn employee regularly sends emails to all Reserves, including Aenlle, requesting proof of their mandatory hours of service and classes as required by POST and the Policy Manual. The sworn employee reported to this investigator that since Aenlle began his job as Executive Director, in August 2023, Aenlle has ignored numerous emails from the sworn employee and has not provided proof of compliance as required for all Reserve deputy sheriffs, --- until September 16, 2024.

- On September 16, 2024, at 5:13 pm, Aenlle made numerous entries into the Sheriff's Office "Volunteer Hour Database," showing the hours that he claimed to have volunteered as a Reserve deputy for the period from January 2024 through July 2024. He entered "Headquarters" as the location of service for all of this reported reserve duty. Specifically, he reported that he performed eight (8) hours of Reserve duty on each of the following days:

  January 2024: 2, 3, 4, 5, 8, 9, 10, 11, 12, 16, 17, 18, 19, 22, 23, 24, 25, 26, 29, 30, 31
  February 2024: 1, 2, 5, 6, 7, 8, 9,12,13,14, 15, 16, 20, 21, 22, 23, 26, 27, 28, 29
  March 2024: 1, 4, 5, 6, 7, 8, 11, 12, 13, 14, 15, 18, 19, 20, 21, 22, 25, 26, 27, 28
  April 2024: 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 29
  May 2024: 1, 2, 3, 6, 8, 9, 10, 13, 14, 15, 16, 17, 20, 21, 22, 23, 24, 28, 29, 30, 31
  June 2024: 4, 5, 6, 7, 10, 11, 12, 13, 14, 17, 18, 20, 21, 24, 25, 26, 27, 28
  July 2024: 1, 2, 3, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 29, 30, 31
  **(Exhibit 24: Aenlle Reserve Volunteer Duty Database Entries)**

- "Headquarters" refers to the Sheriff's Office headquarters building, located at 330 Bradford Street, Redwood City, which is where Aenlle's Executive Director office is located. A sworn employee (#22) stated that Level I Reserve deputies are to perform16 hours per month of volunteer Reserve level work in core areas such as patrol, working events, transit and the jails.

**Findings:**

The Policy Manual mandates that Reserve deputies are to perform their volunteer hours <u>in uniform</u>. (See Policy Manual Section 1024.2: Wearing and Condition of Uniform and Equipment at pg. 684.) Employees situated near Aenlle's office have never seen him in uniform when working at his office.

Per Policy Manual Section 322.1, the Reserve Unit "was established to <u>supplement and assist regular sworn sheriff's deputies</u> in their duties. This unit will provide professional, <u>sworn volunteer reserve deputies who can augment regular staffing levels.</u>" (Policy Manual, Section

322.1, at pg. 199.) (Emphasis added.) As the Executive Director of Administration, Aenlle fills a full-time, salaried civilian position whose subordinates are exclusively civilian employees. This position does not appear to "augment regular staffing levels" nor does it "supplement and assist regular sworn sheriff's deputies." When Aenlle entered the volunteer hours into the database, he knew or should have known that those hours were not spent augmenting regular staffing levels nor were they supplementing and assisting regular sheriff's deputies.

According to civilian employee (#6) who maintains his calendar, on the dates he entered into the Reserve database, Aenlle was at work at his headquarters office, had meetings or other business, and was not in uniform.

It appears that Aenlle has used his full-time, salaried position as Executive Director to fulfill his obligation to perform Reserve deputy work hours. In other words, Aenlle is double-dipping.

Significant is the fact that on September 10, 2024, in a San Mateo Daily Journal article, Aenlle stated that once he began his employment as Executive Director in August 2023, he was no longer a Reserve deputy. "Once he assumed the chief of staff position, Aenlle said he no longer served in a reserve deputy capacity, but maintained, 'you don't stop wearing the badge' and is still a sworn peace officer with 'full 24-hour police powers. That entitles me to my badge or my gun.'" (https://www.smdailyjournal.com/news/local/no-confidence-vote-brought-against-the-san-mateo-countys-sheriff-s-chief-of-staff/article_aa5f2e04-6f27-11ef-bd4f-0775d39e7527.html ) This makes no sense. If he is no longer a Reserve deputy, then he no longer has the right to wear a Reserve deputy badge, nor have the police powers of a sworn peace officer.

And yet, as recently as October 30, 2024, Aenlle told the *Daily Post* that he continues to serve as a sworn reserve deputy. (https://padailypost.com/2024/10/31/the-other-side-of-the-story-sheriff-chief-of-staff-aenlle-gives-his-side-of-unions-allegations/ )

Also significant, as a matter of timing, is that on September 12, 2024, this investigator reached out to Aenlle requesting an interview. Four days later, on September 16, 2024, Aenlle entered his Reserve deputy volunteer hours into the database.

Aenlle's database entries show that he is claiming his hours as a full-time, salaried, civilian employee at Headquarters, and also as his Reserve deputy volunteer hours. Common-sense and the Policy Manual suggest otherwise. There is sufficient evidence to establish that Aenlle is out of compliance with the Policy Manual's duty requirements to maintain his status as a Level I Reserve Deputy. Even worse, it appears that he likely falsified his volunteer hours when he entered them into the database.

**Allegation #2 is SUSTAINED.**

3. **Allegation #3: Aenlle has exceeded and/or abused his authority with the approval of Sheriff Corpus.**

Historically, there were three civilian directors in the Sheriff's Office: Directors of Finance, IT and Food & Nutrition Services. With Sheriff Corpus' creation of the Executive Director of Administration position in 2023, there are now four civilian directors in the Sheriff's Office.

"The Sheriff exercises command over all personnel in the Office. During planned absences the Sheriff will designate the Undersheriff to serve as the acting Sheriff." (Section 200.3, Policy Manual, pg. 23) "[T]he order of command authority <u>in the absence or unavailability of the Sheriff</u> is as follows:

    (a) Sheriff
    (b) Undersheriff
    (c) Assistant Sheriff-Corrections
    (d) Assistant Sheriff-Administration & Support Services
    (e) Assistant Sheriff -Operations
    (f) Captain/Civilian Director
    (g) Lieutenant/Civilian Manager
    (h) Sergeant/Civilian Supervisor
    (i) Deputy/Correctional Officer/Civilian Employee" (Emphasis added.)

This means that Aenlle, along with the Sheriff's Office three civilian directors, are sixth in the chain of command, after the Assistant Sheriffs and the Captains.

This investigator: "Can you talk to me now about what your role is in the office."

Aenlle: "I oversee the civilian departments. There's a number of, of them under me. So directors report to me, and I have a couple managers that do as well, and I basically represent and oversee that. I'm also part of the executive team, and <u>I assist the sheriff with whatever she assigns me. . . It just involves projects. It involves programs, community programs, community relations. I-- basically anything that has to do with the sheriff's communication with the community</u>." (Emphasis added.) (Aenlle Transcript at pgs.15-16.)

A sworn employee (#22) told this investigator that he attended an academy graduation in early 2024 where Aenlle introduced himself to other law enforcement personnel in attendance as "Chief of Staff." When a law enforcement officer from another agency, a female, asked Aenlle if he was a sworn officer, Aenlle said, "I'm third in command." The sworn employee who witnessed this conversation was taken aback by Aenlle's statement.

This investigator: "Have you ever said to anyone that you are third in command?"
Aenlle: "The only time I can recall anything like that and I remember the experience was in Santa Clara County, there was a Academy graduation. We were at that, and I was speaking to one of their people in command. A lady. I can't recall her name, but she's one of the, the female assistant sheriffs there. And I introduced, we were meeting each other. I'm like, 'I'm the chief of staff.' And we're talking, and she goes, 'What does that mean? What level is

that? Is that lieutenant level?' And I said, 'No. In our department, that's, that's executive team level. It sits at, it's an assistant sheriff's level, which is considered the line of, of, of third in command.' Aside from that, no."

This investigator: "So do you consider yourself, then, third in command in the office?"

Aenlle: "I consider myself a member of the executive team, ma'am."

This investigator: "So can you tell me, then, what, what is the chain of command in the Sheriff's Office?"

Aenlle: "Yeah. Per our org. chart is the sheriff, undersheriff, and then the assistant sheriff, and chief of staff is the next line and everything else below." (Aenlle Transcript at pgs. 16-17)

Policy Manual Section 201.1 states that "<u>The Assistant Sheriff is third in command</u> in the Office and is appointed by the Sheriff." (Emphasis added.)

Aenlle identifies himself as "Chief of Staff," a title that appears nowhere in the Executive Director job description.

This investigator: [W]here did that title come from, 'Chief of Staff'?"

Aenlle: "So, yeah, that's a working title that I have. There's a lot of positions in the county that, if you look at them, they do not make any sense. They were just created because that's, that's the proper format. You know, my IT directors like that and many others. But my role has always been 'Chief of Staff.' It was a working title."

This investigator: "But I don't know what that means, I guess, is what I'm saying. It's like did you just say, 'Okay. I'm the Executive Director, but I want you all to know I'm the Chief of Staff, or did someone else give you that?"

Aenlle: "No, ma'am. <u>The, the sheriff assigned that</u>. That's, that's my role in the office, yeah." (Aenlle Transcript at pgs.14-15)

Complainants described the following conduct to support the allegation that Aenlle exceeds/abuses his authority as a civilian director:

### a. Allegation 3(a): Requiring sworn employees to report to Aenlle:

o In July 2022, after the election of Corpus and before she was sworn into office, Aenlle told a sworn employee (#30) in a face-to-face conversation, "<u>The Sheriff is untouchable. The Sheriff can do whatever she wants. If I give you an order, it's as if it is coming directly from the Sheriff.</u>"

o On July 11, 2024, then-Assistant Sheriff Monaghan, was told by a captain that both he and another captain were to report directly to Aenlle.

- In July or August 2024, a sworn employee (#15), spoke with a Captain who told her that Aenlle required him and another Captain to report to Aenlle because, according to Aenlle, the new Undersheriff (Perea) "is too busy."

- A retired sworn employee (#10) was told by two Captains, after the abrupt departure of Undersheriff Hsiung, that Aenlle ordered the Captains to report to Aenlle.

- On August 19, 2024, there was a morning meeting of the Executive Team that included Sheriff Corpus and Aenlle. Aenlle asked then-Assistant Sheriff Monaghan for updates on projects assigned to him, as well as other matters within Monaghan's area of responsibility. Aenlle instructed Monaghan on how he should prioritize the Sheriff's wishes.

**Aenlle's response to allegation 3(a):**

In a September 12, 2024, San Mateo Daily Journal article, Aenlle is quoted as saying that "he 'has every right' to question personnel on higher level, operational needs, regardless if they are professional or sworn, and that he doesn't need to make anybody report to him. . . 'They think that the only people they need to report to or answer to have to be sworn and carry a big badge on them,' Aenlle said. 'I am chief of staff. <u>The undersheriff is her right hand, I'm her left hand.</u>'" (Emphasis added.)

([https://www.smdailyjournal.com/news/local/no-confidence-vote-brought-against-the-san-mateo-countys-sheriff-s-chief-of-staff/article_aa5f2e04-6f27-11ef-bd4f-0775d39e7527.html](https://www.smdailyjournal.com/news/local/no-confidence-vote-brought-against-the-san-mateo-countys-sheriff-s-chief-of-staff/article_aa5f2e04-6f27-11ef-bd4f-0775d39e7527.html) )

This Investigator: "Have you ever in your role as, and I'll just call you 'chief of staff/executive director', have you ever required any sworn officers to report to you?"

Aenlle: "No, ma'am." (Aenlle Transcript at pg. 61)

Aenlle: "I want to dispel something just to make sure that, that you're aware that, that the stance that a civilian can't tell a sworn what to do or, or likewise, vice versa, is, is not in any policy of the Sheriff's Office. It's actually, you know, old-time mentality of law enforcement. It's not, not written anywhere. It's a lack of understanding." (Aenlle Transcript at pg. 63)

This Investigator: "Okay. So, you've never required any, for example, captains? Ever told them they have to now report to you?"

Aenlle: "No, ma'am." (Aenlle Transcript at pg. 62)

This Investigator: Is it your view that in your position that you can, in certain circumstances, give orders to and direct sworn officers? I'm talking about captains, lieutenants, sergeants, deputies."

Aenlle: "No, ma'am. And. I'd like to say that the way we conduct and, and at the division of the Sheriff's Office and the Sheriff s, you know, you know, we don't really go around ordering people. That's not the way we talk to people or conduct ourselves. . .

"So, to answer the question, I don't, there's no sworn cop that reports to me at all whatsoever. A lot of them will come to me for questions about something or advice on something or help on something, and I'm happy to work with them. These are people that I've known for 16 years since I've been here, right? But there's no orders being given.

"With that said, if the sheriff says, 'Victor, I need you to go take care of this right now,' am I going to call a captain or say, 'Hey, on behalf of the sheriff, she would like this done'? Yes, I've done that."

This Investigator: "But that's different. 'I would like'---'On behalf of the sheriff, I would like this done' versus you directing somebody to do something, right?"

Aenlle: "I have always worked, and I'm very clear that I work at the direction of the sheriff. I'm here to advance her vision and improve this organization, and I've done that from day one." (Aenlle Transcript at pgs. 63-65)

### b. Allegation 3(b): Interfering in confidential Internal Affairs investigations concerning sworn employees:

- In March 2022, when Corpus was then the Captain assigned to the Millbrae Substation, she had prepared on her laptop, a confidential report about a Sergeant who was to be investigated by the Sheriff Office's Professional Standards Bureau's (hereinafter, "PSB") Internal Affairs Unit. Corpus asked Aenlle, who was in her office, to read the report. A civilian employee (#3) was also present and said to Aenlle, "You can't read it. It's confidential," after which Aenlle sat in Corpus' chair, read the report, and then said to Corpus, "This looks good."

- A high-ranking sworn employee (#8) authored a 9-page memo **(Exhibit 25: 9-page memo)** describing what the employee considered potentially improper conduct of a deputy who had, on behalf of Sheriff Corpus, interjected himself into a Professional Standards Bureau interview panel in an effort to manipulate the testing process. In preparing the memorandum, the sworn employee conducted an Internal Affairs investigation that included statements from witnesses. He subsequently learned from a Captain, that at the direction of Sheriff Corpus and Aenlle, the deputy was not disciplined. The sworn employee said that the deputy's brother had sponsored a fundraiser for Sheriff Corpus' election campaign.

- Within the last three to four months, a deputy who was on probation uttered a racial slur that was recorded on his body camera. The Professional Standards Bureau decided that the deputy should be released, but should be given the opportunity to resign, rather than be fired. When the deputy was contemplating what he would do, a sworn employee (#13) who was a member of the PSB, went to the 5th floor in the Sheriff's Office administration

building. There he observed Undersheriff Perea, Sheriff Corpus and Aenlle in the waiting area outside the Sheriff's office at about 5 pm.

When Sheriff Corpus asked, "How's it going?" The sworn employee said, "Not great. He's not happy. [referring to the deputy who was on probation]. Aenlle then yelled, "Sheriff, just fucking fire him! This is what you get for being nice!" Corpus said nothing. The sworn employee said, "Sheriff, generally it's better if he resigns to avoid litigation." Aenlle then said, "I completely disagree," and asked the Undersheriff, "What do you think?" The Undersheriff responded, "I defer to you, Sheriff." Sheriff Corpus then said, "Okay, just fire him."

However, this decision to fire the deputy occurred *after* the deputy had already resigned and signed his resignation letter. The deputy had to be informed by the PSB member who signed off on the resignation letter that the deputy could not resign and was, instead, fired. **(Exhibit 26: Revoked signed resignation letter)**

- On August 7, 2024, then-Assistant Sheriff Monaghan informed Undersheriff Perea of a notice to interview a Captain who was the subject of an Internal Affairs investigation involving serious allegations lodged by a Sergeant. An outside subject-matter expert was recommended to be the investigator. Aenlle told Monaghan that he, Aenlle, disapproved of the Captain being the subject of the investigation. After Undersheriff Perea met with Aenlle, the Undersheriff took over the internal affairs investigation. Monaghan was never updated, even though as Assistant Sheriff, he had oversight of Internal Affairs matters.

- On August 28, 2024, a sworn employee (#13) who is a member of the Professional Standards Bureau authored a memorandum that described a disturbing incident involving a deputy ███████████████████████ including a video of the deputy's actions. **(Exhibit 27: August 2024 PSB Memo)** The sworn employee sent the memorandum to his Captain who briefed then-Assistant Sheriff Monaghan. After speaking with Undersheriff Perea, Monaghan told the sworn employee, "The Undersheriff has instructed me to find out if there is any way that we not provide the video to the District Attorney." The sworn employee replied, "No. you can't do that. This is exculpatory (Brady) material." Monaghan said, "Okay, I'll tell the Undersheriff." The sworn employee is unaware of the status of the investigation into the deputy's misconduct. The sworn employee knows that the subject deputy is "one of the Sheriff's favorites."

- According to then-Undersheriff Chris Hsiung, in March 2024, two Captains had a conversation with a Sergeant over a personnel issue. The conversation got heated, voices were raised such that the Sergeant filed a complaint about this interaction with the Captains.

Because this incident involved two Captains, the Executive Team comprised of Hsiung, then-Assistant Sheriff Monaghan, Aenlle and Sheriff Corpus, discussed retaining an outside investigator to look into the complaint because no one in the PSB was of higher

rank than the Captains. They also discussed not tainting the investigation by speaking with the two Captains who were the subjects of the complaint.

To Hsiung's dismay, he learned that Aenlle subsequently spoke to one of the subject Captains and asked the Captain specific questions about the incident.

Sometime in April 2024, Hsiung told Sheriff Corpus about Aenlle's interactions with the Captain, and telling her that it was completely inappropriate for Aenlle to interfere with an ongoing Internal Affairs investigation. Specifically, Hsiung told Sheriff Corpus that Aenlle tainted the investigation by speaking to a witness, that he had created POBAR (Public Safety Officers Procedural Bill of Rights Act) issues, and that Aenlle had potentially jeopardized the outcome of the investigation, up to and including any discipline that might be imposed.

Hsiung, who has attended POST certified Internal Affairs classes and has conducted an Internal Affairs investigation, told Sheriff Corpus that Aenlle had not taken a class nor conducted an Internal Affairs investigation. Hsiung stated that Sheriff Corpus said that she would talk to Aenlle. Thereafter, Hsiung's relationship with Aenlle and the Sheriff took a turn for the worse, with both growing increasingly distant and cold to him.

Later, in April 2024, Hsiung had a discussion with Aenlle and then- Assistant Sheriff Monaghan in Hsiung's office. Hsiung informed Aenlle that he was going to leave the Sheriff's Office. During this conversation, Hsiung told Aenlle, directly and bluntly, how inappropriate it was for Aenlle to meddle in the Captains' Internal Affairs investigation and that Aenlle's conduct could adversely affect the outcome of that investigation.

**Aenlle's response to allegation 3(b):**
This Investigator: "Have you ever been involved in any confidential sworn officer investigations conducted through Internal Affairs in the Professional Standards Bureau?"

Aenlle: "Absolutely not, ma'am." (Aenlle Transcript at pg. 62)

**c. Allegation 3(c): Aenlle improperly gives directives to Sheriff Corpus:**
o   Aenlle told a civilian employee (#1) that he tells Sheriff Corpus what to do.

o   More than ten times, a civilian employee (#6) heard Aenlle say to Sheriff Corpus words to the effect, "You better do something. Stop being nice to these people. You're the Sheriff, you can do whatever you want."

o   When a civilian employee (#15) was in a hallway in the Hall of Justice, she saw and heard Aenlle telling Sheriff Corpus, "This is why you can't be so nice. They just take advantage."

o   In 2023, a sworn employee (#13) was with Sheriff Corpus and Aenlle, either in the Sheriff's office or Aenlle's office, discussing a personnel matter in which Sheriff Corpus

was reluctant to terminate a sworn officer. Aenlle told her, "I don't know why we don't do this. They are all expendable. Just get rid of him."

**Aenlle's response to allegation 3(c):**
This Investigator: "Have you ever given any directives or any kind of orders to Sheriff Corpus?"

Aenlle: "What? No... Okay. The answer is 'No.'" (Aenlle Transcript at pg. 62)

### d. Allegation 3(d): Aenlle interferes in personnel decisions concerning sworn employees:

o When Captain ███████████ wanted to hire an individual as her executive assistant, Aenlle intervened and made it clear to her that he wanted someone else to fill the position.

o A sworn employee (#18), a Lieutenant, and a civilian employee (#15) interviewed three candidates for the Professional Standards Bureau, one of whom was a sworn employee (#30) identified as Candidate #3. They selected Candidate #3 as best qualified for the position.

However, they were informed by Undersheriff Perea that it couldn't be Candidate #3 and that they had to choose another candidate. The sworn employee (#18) believed that Candidate #3 had previously failed Aenlle in the Field Training Program. In the presence of the sworn employee (#18) and Sheriff Corpus, Aenlle said, "We're going to move him [Referring to Candidate #3]."

**Aenlle's response to allegation 3(d):**
This Investigator: "If a sworn officer wants a certain individual to be that sworn officer's secretary or administrative assistant, have you ever been involved in, like, vetoing that decision of a sworn officer?"

Aenlle: "But have I told a captain or somebody they can't have, that's not, I've never taken that role. I've never done anything like that." (Aenlle Transcript at pgs. 63-64)

### e. Allegation 3(e): Aenlle interferes in budgets under the control of sworn employees:

o Captain ███████████ was in a meeting to discuss her budget where she was the Police Chief in Half Moon Bay. In attendance was Sheriff Corpus, the Undersheriff, an Assistant Sheriff, and Aenlle. Aenlle ran the meeting and at one point said to Cpt. ████ "You have a $1 million surplus." Captain ████ subsequently spoke with the Sheriff's Office Finance Director who advised her that there was no such surplus.

At that meeting, Captain ████ did not recognize a particular budget item and asked Aenlle about it. Aenlle told her "<u>It's the Sheriff's budget and she can do what she wants with all of the money.</u>" That item in Captain ████ budget was subsequently signed off by Aenlle, not by Captain ████

After that budget meeting, Captain ▮▮▮ advised the other captains to bring the Finance Director with them to their budget meetings with the Sheriff. Shortly thereafter, when Captain ▮▮▮ was in Aenlle's office, he told her, "I heard you were not happy about the budget meeting." She understood his comment to be one of disapproval of her alerting the other captains.

**Aenlle's response to allegation 3(e):**

This Investigator: "Have you ever been involved in signing off on budget items on, in a sworn officer's budget?"

Aenlle: "Ma'am, I oversee a fiscal, I'm very, I'm a numbers person. I'm very conscious and very conservative on spending. Anybody, if you talk to any of my, my directors that have to do with money, they'll tell you that. One of the first things that I did when I came to the Sheriff's Office was review all the contracts that were done, and we were able to, to save about $1.5 million of the Sheriff's Office budget. No company comes directly to me or anything like that about their budget. I will have meetings with the undersheriff. I'll be present at meetings with other sworn people. Half of our department are sworn people, and we go over the budgets and so forth. And when they don't understand it, I, I help with the numbers. But it's not my role to deny any kind of budget. That's not even within my, my capacity. That doesn't happen."

This Investigator: So if a captain has a budget there and there's a budget item that the captain doesn't even know why it's there, have you ever said to a captain, for example---you know, have you ever signed off on a budget item where a captain didn't even know why the item was even in that captain's budget?"

Aenlle: "Ma'am, that's not even in my realm. That's not even anything I would do. I don't sign off anything that I don't understand or isn't clearly defined. . . And when we have, we have our meetings, and I'm not alone at these meetings. I'm with the sheriff, undersheriff and assistant sheriff. That said captain didn't even understand her, her own numbers. And the only thing I pointed out was that it seemed like it was done in error; that org---org chart, because numbers stick in my head, not did belong to the bureau. But at no time. . . At no time did I approve something like that. it's not even me for---I do not approve the chief's budgets or independent bureau's budgets. It doesn't work that way."

This Investigator: "And can you tell me why you are involved in meetings about a captain's budget if it's the captain's budget?"

Aenlle: <u>I'm involved in all meetings that pertain to the Sheriff's Office</u>. I'm part of the executive team. So I'm involved to have outside input to use expertise on numbers and finances because it's part of the Sheriff's Office everyday business. . . It has nothing to do with sworn or non-sworn. If it's the bottom line, <u>I oversee fiscal and at the will of the sheriff</u>. That's who she wants present during these budget meetings." (Aenlle Transcript pgs. 65-69)

**f. Allegation 3(f): Aenlle directs sworn and/or civilian personnel to address Aenlle as "Dr.":**

o At a large dinner gathering, Aenlle directed a sworn employee (#16), "Call me Dr." The sworn officer responded, "Unless you are a medical doctor, I'm not calling you Dr." Twice more during the dinner, Aenlle told the sworn employee, "You need to call me Dr."

o Several female civilian personnel stated that Aenlle requires them to address him as "Dr. Aenlle."

**Aenlle's response to allegation 3(f):**
This Investigator: Have you ever directed civilian personnel to always address you as "Dr. Aenlle?"

Aenlle: No, ma'am. Not at all. Not at all.

This Investigator: Have you ever requested or directed any sworn personnel to address you always as "Dr. Aenlle?"

Aenlle: No, ma'am. Not at all. (Aenlle Transcript at pg. 69)

**g. Allegation 3(g): Aenlle is a civilian director and improperly acts as the Sheriff's personal bodyguard:**

o Aenlle told then-Assistant Sheriff Monaghan that he travels with Sheriff Corpus to give her "dignitary protection."

o After a civilian employee (#3), texted Corpus using "Signal," an encrypted message system required by Aenlle for the transition team, "You were seen," Aenlle responded to the text, writing, "I'm doing security detail in Maui. I'm protecting the Sheriff."

o Aenlle told a former sworn employee (#17), "I have to be with her [Sheriff Corpus] all of the time. The Sheriff needs my protection."

o Almost every interviewee stated that Aenlle is constantly at Sheriff Corpus' side, whether in the workplace, at official events, or in the community.

**Aenlle's response to allegation 3(g):**
This Investigator: "Do you act as the sheriff's personal bodyguard?"

Aenlle: "No. No. but every, anybody, anybody in this department---when the sheriff is out, everybody should be her bodyguard. Everybody should watch out for the sheriff. She's a very well-known political figure in the county, and at the current times in law enforcement, I would hope that anybody that works for this department would always watch out for their sheriff's safety."

This Investigator: "So my question is not so much everybody cares about the sheriff. And I understand she's high profile. Is, have you ever said that you are her dignitary protection?"

Aenlle: "No. there's no dignitary protection. Am I, when I attend, when I attend political things or go with the, with the sheriff to political things, am I looking out for her safety? Absolutely, ma'am. Every time."

This Investigator: "But you have never said you were her personal bodyguard?"

Aenlle: "I've never said I was her bodyguard. Do I provide security for the sheriff, or do I make sure she's safe when she has meetings or different areas in different cities where the tensions are a little high? Absolutely. Everybody should. Anybody in uniform or not in uniform should do that for the sheriff."

This Investigator: So does that mean that if the sheriff is attending a meeting somewhere out of the office that you will be there to give her protection or. . ."

Aenlle: "I'm there, I'm to support. I'm there to engage for the community. I'm there for whatever she needs."

This Investigator: "Right. I, right. But I guess my question's a little different. When the sheriff has to go to a meeting and that meeting doesn't involve you, do you still go, though, to make sure she has protection?"

Aenlle: "If the, if the meeting doesn't involve me and she doesn't need me, I don't go." (Aenlle Transcript at pgs. 69-71)

   **h.  Allegation 3(h): Aenlle is a civilian director who supervises civilian employees only, but interferes with the recruitment of sworn employees:**
o  In 2024, a sworn employee (#8), attended a meeting convened by Aenlle who questioned how the recruitment/selection panels for sworn officers were conducted. Aenlle directed the sworn employee to tell all recruitment panelists that they were "looking for good people with good hearts."

**Aenlle response to allegation 3(h):**
This Investigator: "With regard to recruitment of sworn personnel, have you ever been involved in recruitment decisions regarding recruiting for sworn personnel?"

Aenlle: "Again, ma'am, my involvement would be at the executive team level, discussion about 'What do you need?' 'Where should we go?' 'What are we missing?' 'Let's, let's, let's look for people where we've never looked before.' 'Let's think outside the box.' 'What support do they need?' 'Do we need to hire more, more background investigators?' 'Do we have enough?' Yes, I am involved in those decisions, regardless of sworn or non-sworn, because we're also hiring for, for civilian staff as well, right?"

This Investigator: "Right."

Aenlle: "Recruitment for it."

This Investigator: "Right."

Aenlle: "But yes."

This Investigator: "By 'recruitment decisions' I also mean picking people. Like, 'No. that's the person.'"

Aenlle: "No, ma'am. . . Not at all. That's, that's I've never been involved in that. That's completely outside. I don't, I'm not even in the queue for that. . . I'm not anywhere near part of that process." (Aenlle Transcript at pgs. 71-72)

    **i. Allegation 3(i): Aenlle interfered in trainings for sworn personnel:**
- On or about August 1, 2024, Aenlle ordered then-Assistant Sheriff Ryan Monaghan to move an active shooter training set for October 2024, a date that <u>had already been approved by Sheriff Corpus</u>, to August 2024. According to Monaghan, that same day, Aenlle called the owner of the company that provided the training and got the owner to agree to an August date, leaving just two weeks to enroll sworn officers for the training, at a time when the Sheriff's Office was facing a major staffing shortage. A sworn employee (#26) believes that Aenlle has a relationship with the company's owner.

- According to Monaghan, changing the training to August took huge amounts of time for Monaghan and the Captains, and caused tremendous stress on them and on sworn employees, some of whom had to change their vacations and work plans to attend. There was no apparent reason to change the time of the training other than Aenlle's decision to move the date.

**Aenlle's response to allegation 3(i):**
This Investigator: "There are trainings for sworn personnel. They have to go through certain trainings. Have you ever been involved such that you've directed that trainings happen at a certain time when they're for sworn personnel, not for civilians? . . . The active shooter training that was set for October and then was changed to August. Can you talk to me about that?"

Aenlle: "Ma'am, I think I know what you're referring to. So I'll just speak to that. . . This— so this training initiated after—we go back to the Half Moon Bay shooting, the massacre that took place basically 21 days into the sheriff's tenure. The findings from that really identified that-- that we needed more training. . .

"So that training was—was conducted. It was—it was done on the coast, and it was a complete success. People were thrilled. The sheriff's wishes was that we had to do that same training on this side of the bay. On this side. It was—and it was—and that was the direction. Somehow training fell behind, whatever the case was, and it was not—it was not done.

"When the sheriff found out that it was pushed back all the way to October, with the tensions and the recent mass shootings and the elections coming up, she wanted to make sure that her—her employees were prepared. So she asked the company to see if they could move up

the training as she wanted to because October was going to be too late with the current tensions. . . There was—there was nothing needed, and there was like two weeks' advance notice for that training to take place to only better prepare our employees for anything major like that. That's it."

This Investigator: "So I just want to. . . but I want to clarify that the directive to move it up, have it in August, everything—that was all at the sheriff's initiative, not yours?"

Aenlle: "Of course, ma'am. Absolutely. . . Absolutely."
This Investigator: "Do you know whether or not the sheriff had approved that training for October?"

Aenlle: "To my knowledge, she had not. She was not even aware. That day—she was—she was told about that, and that's why she wanted to move it up. She was told about that later. She was surprised that they had not been scheduled sooner."

This Investigator: "I see. And you know she was surprised because she told you this?"

Aenlle: I know because I was in a meeting when that came up. And she goes, 'Can't they do it any sooner?' . . . So she felt that it was really important, and she had to elevate it. She wanted to make sure that if something happened, her employees, who she cares about deeply, were well-trained and prepared."

This Investigator: "So the meeting where she was—got this information, was surprised, what meeting—when does—tell me about that meeting—when it was and who was there."

Aenlle: "It was one of the executive-level meetings."

This Investigator: "But who was there?"

Aenlle: "So the—the former undersheriff and former assistant sheriff."

This Investigator: "And you? Were you there?"

Aenlle: "Of course. Of course, yeah."

This Investigator: "And the sheriff, obviously. So do you know who told her, 'This is scheduled for October'?"
Aenlle: "I believe it was the assistant sheriff [Monaghan], yeah." (Aenlle Transcript at pgs. 74-78)

### j. Allegation 3(j): Aenlle makes disparaging comments:
o Aenlle criticized Meloria Consulting, a company retained by the County to evaluate the operation of the Sheriff's Office. According to then-Undersheriff Hsiung, Aenlle told him, "This outfit doesn't know what they are doing. This is a waste of time." Sheriff Corpus, a civilian employee, and a sworn employee were present when Aenlle said this.

- Many times, Aenlle told Chris Hsiung, the then-Undersheriff, "You don't understand the Sheriff's Office. The Undersheriff has to be a hammer." Hsiung replied, "I disagree. My job is to inspire." Aenlle disagreed with him. Hsiung said that Aenlle was repeatedly dismissive of him. Hsiung is a nationally and highly respected leader in law enforcement who had been recruited by Sheriff Corpus.

- A civilian employee (#1) said that Aenlle was very vocal about employees whom he disliked. She heard Aenlle disparage sworn and civilian employees, including then-Assistant Sheriff Ryan Monaghan and then-Undersheriff Chris Hsiung, referring to all of these employees as disloyal and "Fuck them."

- Aenlle was so fixated on a female civilian employee that he directed a civilian employee (#1) to "triple-check" the employee's work.

**Aenlle's response to Allegation 3(j):**
This Investigator: "Have you ever disparaged or said or bad-mouthed any sworn personnel? Like calling them names, the -- you know, that's about it. Have you ever done that?"

Aenlle: "Calling people names?"

This Investigator: "Or putting them down. You know, just—"

Aenlle: "No. No.· I'm not putting anybody down." (Aenlle Transcript at 78-79)

### k. Allegation 3(k): Aenlle has improperly taken over Corrections:
- Then-Undersheriff Hsiung said that on or about April 2023, Aenlle took over management of Corrections.

- Assistant Sheriff Monaghan saw emails from Aenlle to Sheriff Corpus about Corrections assignments.

**Aenlle's Response to Allegation 3(k):**
This Investigator: "Have you ever been or are you now the director of or running the Corrections operation?"

Aenlle: "No, ma'am."

This Investigator: "You've never, ever been in charge of Corrections?"

Aenlle: "I've never been in charge of Corrections, ma'am. . . I've helped—I help—I help the sheriff and undersheriff to make sure that information doesn't get lost. So I—I—I inform them. I—I share information just to make sure everybody's aware, but I don't run any facilities. I don't run any Correction facilities. . . I run the departments that I'm assigned."

This Investigator: "So you've never told anyone, 'I'm—I'm running Corrections now'?"

Aenlle: "No, ma'am." (Aenlle Transcript at pgs. 79-80)

**l. Allegation 3(l): Aenlle has Authored Memoranda in the name of Sheriff Corpus:**

o   On August 9, 2024, at 7 pm, Aenlle called a civilian employee (#6) at her home and directed her to send out an office-wide memorandum about overtime that he then emailed to her. The memorandum was directed to all sworn officers and was on Sheriff Corpus' letterhead and was under the Sheriff's name. The civilian employee believes that Aenlle actually wrote the memorandum after Aenlle told her during the phone call, "What a $100k doctorate gets you is good writing." Sheriff Corpus does not have a Ph.D. Aenlle claims to have earned a Ph.D. He then asked the employee, "Does it [the memorandum] look okay?"

**Aenlle's Response to Allegation 3(l):**
This investigator: "Have you ever initiated the writing of a memo and then had it sent out under the sheriff's name? Now, the sheriff may have known about it. That's not what I'm—I'm not saying you're sneaky or doing anything without her knowing. But have you ever done that? In other words, you're the author. You wrote it, and it went out under the sheriff's name."

Aenlle: "Ma'am, anything that I write or edit or whatever is at the sheriff's directions or her telling me what to put on it or a dictation that I take or something like that. it's not authored by me. It's not my ideas. It's not authored by me. . . So when I hear 'authored,' I—it—it is my assertion or influence or ideas, and my answer would be, 'No.'"

This investigator: "So there was a—an overtime—a memo that went out on the sheriff's letterhead about overtime that caused a big kerfuffle because. . . then the DSA got upset and everything. Did you write that memo?"

Aenlle: "I did not write it. I helped edit it and –and grammar. And it was not only me. It was the former assistant sheriff, undersheriff, and myself. We worked under a Google document at the direction of the sheriff just cleaning up. It had outdated language like 'jail.' it referred to 'jail' as opposed to 'correctional facility.' It was—it was a bunch of different things that she wanted to make simple. It was a five-page overtime policy, and she wanted to clean it up. She instructed the undersheriff, former assistant sheriff, myself to look at this and clean it up and—and put it together. . . The description that I authored that paper and I—I mean, it—it's wrong. . . And untrue." (Aenlle's Transcript at pgs. 86-88)

**m. Allegation 3(m): Aenlle has improperly taken control of the Sheriff's calendar, cellphone, and emails:**

o   Aenlle told a civilian employee (#11) to block off Sheriff Corpus' calendar on Tuesdays and Thursdays, saying, "Do not schedule any meetings---nothing." The civilian employee felt that it was strange that Sheriff Corpus did not, herself, make this request.

o   Sometime during the first three months of 2023, Aenlle told a civilian employee (#11) to copy him on all of Sheriff Corpus' emails, including her upcoming events and any

requests for items such as Corpus' bio. The civilian employee felt that it was strange that Sheriff Corpus did not, herself, make this request.

o A civilian employee (#3) knows that Aenlle has the code to access Corpus' phone because the civilian employee saw Aenlle logging into Corpus' phone at a party announcing Corpus' candidacy for Sheriff at the Masonic Lodge #40 in Burlingame, on September 28, 2021. The civilian employee has seen Aenlle carrying Corpus' purse.

**Aenlle's Response to Allegation 3(m):**
This Investigator: "Have you taken control ever or now of Sheriff Corpus' calendar? Do you control it?"

Aenlle: "Not at all. I can—I can add and—and do some things. And when she needs me, I make sure that, you know, she—she doesn't forget certain meetings because she's got a lot on her plate. But her admin assistant has a hundred percent and—and primary function of her schedule."

This Investigator: "Do you have the access code to Sheriff Corpus' cellphone?"

Aenlle: "No."

This Investigator: "Have you ever texted from her phone without letting anyone know that you were texting it and not the sheriff?"

Aenlle: "Ma'am, I would never do that, and the sheriff knows that. And -- and -- and that's -- no. The answer is, 'No'" (Aenlle Transcript at pgs. 88-89)

**Findings:**
Aenlle's actual authority is limited to the supervision of civilian personnel, yet his work at the Sheriff's Office has far exceeded the responsibilities described in his job description.

Aenlle's approach to his responsibilities is best described in his statement to a sworn employee shortly after Sheriff Corpus was elected: "If I give you an order, it's as if it is coming directly from the Sheriff." With this statement, Aenlle, early on, signaled his intention to assume the power of the Sheriff.

Aenlle frequently invokes the phrase, "at the direction of the Sheriff" in exercising his authority. By doing so, Aenlle has succeeded in moving himself to the top of the Chain of Command. Unfortunately, Sheriff Corpus has elected not to speak with this investigator. Even so, whether or not Sheriff Corpus has explicitly given Aenlle this wide-ranging power over her Office is not the point. That the Sheriff *permits him* to engage in this conduct is clear.

The complainant/interviewees gave detailed descriptions of their observations, with many of them facing the real risk of retaliation as discussed below in Allegation #4. This investigator finds the interviewees to be credible. In light of his false statements to this investigator and to others about his personal relationship with Sheriff Corpus, Aenlle is not credible on this subject.

At best, his words are suspect; at worst, they are simply not believable. Aenlle has repeatedly exceeded and abused his authority, with the knowledge and approval of Sheriff Corpus.

**Allegation #3 is SUSTAINED.**

4.  **Allegation #4: Sheriff Corpus, Aenlle and the Executive Team engage in retaliation and intimidation.**

San Mateo County Ordinance 2.14.060-2.14.090, sometime called the "Whistleblower Ordinance," provides, for investigations of alleged improper governmental activity and also prohibits retaliation: "Any retaliation or reprisal by any County officer or employee against any complainant or informant is strictly prohibited; provided, however, if it is determined that a complaint was filed by a County employee in bad faith, said employee may be subject to appropriate disciplinary action. This prohibition against retaliation is in addition to the protections contained in California Labor Code section 1102.5, and any amendment thereto."

San Mateo County's Equal Employment Opportunity (EEO) policy, adopted by the Board of Supervisors, prohibits retaliation, to wit, "Retaliation is defined as unlawful punishment or adverse action against an employee because that employee reported unlawful discriminatory conduct, participated in an investigation of discrimination, or engaged in other protected conduct. The most obvious types of retaliation include denial of promotion, refusal to hire, denial of job benefits, demotion, suspension and discharge. Other types of retaliation may include threats, reprimands, or negative evaluations.

"The County does not tolerate any acts of retaliation. County employees are prohibited from retaliation against the efforts of any employee or applicant in reporting any violation of this EEO Policy. Corrective action, up to and including dismissal, shall be taken against individuals in violation of any provision of this policy." (County EEO Policy, Section II-E: Policy on Retaliation)

As well, Policy #1029 (at pgs. 713-716) in the Policy Manual directs its members to prohibit retaliation:

"1029.2: The San Mateo County Sheriff's Office has a <u>zero tolerance for retaliation</u> and is committed to taking reasonable steps to protect from retaliation members who, in good faith, engage in permitted behavior or who report or participate in the reporting or investigation of workplace issues. All complaints of retaliation will be taken seriously and will be promptly and appropriately investigated." (Emphasis added.)

"1029.3: No member may retaliate against any person for engaging in lawful or otherwise permitted behavior; for opposing a practice believed to be unlawful, unethical, discriminatory or retaliatory; for reporting or making a complaint under this policy; or for participating in any investigation related to a complaint under this or any other policy.

"Retaliation includes any adverse action or conduct, including but not limited to:

- Refusing to hire or denying a promotion.
- Extending the probationary period.
- Unjustified reassignment of duties or change of work schedule.
- Real or implied threats or other forms of intimidation to dissuade the reporting of wrongdoing or filing of a complaint, or as a consequence of having reported or participated in protected activity.
- Taking unwarranted disciplinary action.
- Spreading rumors about the person filing the complaint or about the alleged wrongdoing.
- Shunning or unreasonably avoiding a person because he/she has engaged in protected activity."

San Mateo County has a Code of Ethical Conduct that states, in part, "Always treat members of the public and fellow co-workers with courtesy and respect. . . No abuse of authority will be tolerated. . . Contribute to a safe and productive work environment by promoting open and honest communication, and freely voicing ethical concerns." (https://www.smcgov.org/hr/ethics-policy)

A review of the Policy Manual reveals that the San Mateo County Sheriff's Office does not have its own Code of Ethical Conduct.

Interviewees reported the following instances in which they allege that Executive Director Aenlle, Sheriff Corpus, and/or the Sheriff's Executive Team engaged in retaliation and intimidation:

- Then-Undersheriff Chris Hsiung complained to Sheriff Corpus about Aenlle's conduct, telling her, "Victor is wholly unqualified to weigh in on executive decisions due to his lack of experience."  Sheriff Corpus did not agree.

- On April 23, 2024, Hsiung had a lunch meeting with Sheriff Corpus at the Broadway Masala restaurant in Redwood City when he told her that he was not a good fit for the Office and was leaving, but would stay on a few months for the transition for his replacement. He also told the Sheriff, "Victor treats people like shit and makes them feel like garbage." The Sheriff's response was that she would talk to Aenlle.

- On June 21, 2024, Hsiung handed his official resignation to Sheriff Corpus and asked if he could say his goodbyes that day. Sheriff Corpus told him "No," and directed him to come in to remove his belongings on Saturday when none of the employees would be present. Sheriff Corpus asked Hsiung to sign a Non-Disclosure Agreement ("NDA"); Hsiung refused to sign it. **(Exhibit 28: Non-Disclosure Agreement)**

- On June 21,2024, Aenlle ordered a civilian employee (#15) to collect the badge, computer, and phone from Chris Hsiung who had just resigned as Undersheriff, and to

"watch him as he packs up." Aenlle also told the civilian employee, "I don't want him [Chris Hsiung] accessing his computer or anything else." Aenlle also directed the civilian employee to make sure that the devices were not wiped.

- The civilian employee did what Aenlle ordered, met with Hsiung on Saturday, and retrieved his devices and badge. Hsiung also handed the civilian employee a copy of his resignation letter. **(Exhibit 29: Resignation letter)**

- The following Monday, the civilian employee, following an established protocol for employee resignations, sent an email to payroll, Sheriff Corpus, and the PSB members, notifying them of Hsiung's resignation. Aenlle called the civilian employee and yelled, "Get that fucking thing off the computer system! He didn't resign. The Sheriff let him go. Call IT and tell them to erase it from the system. Call Julio Flores (IT)."

- The civilian employee called Flores in IT and said, "Victor directed me to erase the email from the system. I'm a messenger for Victor." Flores told her, "I don't think that we can do this. It's not a good idea." The civilian employee said, "I agree."

- Chris Hsiung learned that after he resigned in June 2024, Aenlle took possession of his work cell phone and laptop. Hsiung learned that Aenlle instructed IT, "don't wipe the phone," and that Aenlle took the phone and subsequently accessed it.

- Not long after Hsiung resigned from the Sheriff's Office, he had lunch with his friend East Palo Alto Police Chief Jeff Liu. Shortly after their lunch, Aenlle called Hsiung and said, "You are talking crap about me. Did you have lunch with Jeff Liu? Did you talk bad about me?"

- Subsequently, East Palo Alto Police Chief Liu told Hsiung that *before* their lunch, Sheriff Corpus called him to ask if he was having lunch with Hsiung. Chief Liu also told Hsiung that *after* their lunch, Sheriff Corpus again called him and asked, "What did you talk about?" Hsiung believes that Aenlle learned of his lunch appointment with Chief Liu by accessing his cellphone and then sharing this information with Sheriff Corpus.

- On September 3, 2024, at 1:51 pm, a sworn employee (#18) was ordered by Undersheriff Perea to serve a notice of discipline on a deputy. The sworn employee refused because he believed that the proper protocol had not been followed. According to the sworn employee, a complaint is first lodged with the Professional Standards Bureau (PSB), followed by an investigation, culminating in a memorandum recommending a formal investigation for misconduct that is submitted to the Assistant Sheriff for approval. In this instance, the Undersheriff reviewed the investigation, bypassing then-Assistant Sheriff Monaghan who was in charge of the PSB. The sworn employee believed that the Undersheriff improperly runs everything by Aenlle and that Aenlle was inappropriately involved in the investigation process.

- On September 4, 2024, at 9 pm, Aenlle called a civilian employee (#15) at her home and asked if the sworn employee (#18) who had refused to serve the notice of discipline was

still on probation. Aenlle said to her, "Is there something I'm missing? Why would he disobey a direct order, get IA'd [investigated by Internal Affairs] and be fired?" The civilian employee subsequently texted Aenlle that the sworn employee was not on probation. **(Exhibit 30 Screenshot of text messages between Aenlle and the civilian employee)**

- In January 2023, a sworn employee (#24) told a civilian employee (#3), "The Sheriff told me to take away your overtime on Fridays, and that you are taking too many vacation days." The civilian employee asked the sworn employee if he knew why the Sheriff was doing this to her. He said, "No, I don't." The civilian employee was entitled to 18 days of vacation per year and had accumulated several days of vacation time and had never abused her use of vacation time.

- In April 2023, the sworn employee (#24) told the civilian employee (#3), "Check it out. I'm giving your overtime back," adding, "If [the Sheriff] has a problem, we'll cross that bridge when we get to it. I'm running the bureau." The civilian employee had previously advised Sheriff Corpus not to hire Aenlle and believes that Sheriff Corpus retaliated against her for opposing Aenlle's employment in her administration.

- A civilian employee (#1) was terrified to tell Aenlle that she had secured another job at a different agency for fear of retaliation. Aenlle considered her to be his "eyes and ears" and his "right hand." When she told Aenlle that she was leaving, Aenlle repeatedly asked her to reconsider and remain as his assistant.

- In early April, 2024, at her farewell party in the Sheriff's Office, Aenlle, without any evidence, confronted her and accused her of posting negative comments online about Sheriff Corpus. She denied doing this, was devastated and reduced to tears by Aenlle's accusation, thereby ruining her departure from the Office.

- Then-Assistant Sheriff Monaghan and another sworn employee (#8) spoke with the civilian employee (#1) and consoled her. He told her that she had the option of filing a complaint with Human Resources about Aenlle's conduct. The civilian employee subsequently filed a complaint.

- Two days before she left the Sheriff's Office in 2024, Aenlle told her, "We have a "problem," and to keep what he had to tell her "internal." Aenlle said that he had learned that a civilian employee, who was being considered for a promotion had, in 2022, taken down Corpus' campaign sign from a body shop owned by Victor Khedr. Aenlle told her that no way was the employee going to get the promotion. When the civilian employee said that what the employee did during the campaign was not relevant, Aenlle said, "She's out."

- In late April 2024, after the civilian employee (#1) had left the Sheriff's Office, and while her complaint against Aenlle was pending with Human Resources, Aenlle came to Monaghan's office, closed the door and said, "Can we talk about the [Name of civilian employee (#1)] thing?" Aenlle said that he didn't do anything wrong and that he wanted

to "clear the air" with the civilian employee who had filed a complaint with Human Resources. Aenlle said, "Everyone thinks [name of civilian employee (#1)] is meek; she's not. She's emotional and mentally unstable." Aenlle went on to say that he had evidence about her. He raised his voice and said that he was prepared to sue her for defamation if she bad-mouthed him," adding "I have evidence. I will sue her." Aenlle complained, "I have a problem with the way this was handled in the beginning." Monaghan told him, "It was handled appropriately."

- On June 24, 2024, the civilian employee (#1) attended a public swearing-in event with a police chief of a local law enforcement agency, who was her new boss. Aenlle was there, standing with Sheriff Corpus Assistant Sheriff Monaghan, and another member of the Executive Team. When Aenlle saw the civilian employee (#1), Monaghan heard Aenlle say, "How dare she show up here. I'd like to smash her face in."

- On June 13, 2024, a sworn employee (#8) refused to accept an application for a "special deputy sheriff" non-access ID card because he did not know the applicant. He subsequently learned that the application was for a friend of Aenlle. Aenlle was upset about the sworn employee's refusal to sign off on the application and said to Monaghan "Who the fuck is [Name of sworn employee (#8)] to question this?!"

- On June 19, 2024, the sworn employee (#8) was transferred to the jails, without being given the standard 2-weeks' notice for transfers. He believes that his assignment to the jails was retaliation by Aenlle for the sworn employee's refusal to sign off on the application. He also believes that his immediate transfer was retaliation for how he handled the civilian employee's (#1) complaint against Aenlle, and for pursuing an Internal Affairs investigation into the misconduct of a deputy who is a close ally of Sheriff Corpus.

- On April 3, 2024, a civilian employee (#1), who was visibly upset and crying, told the sworn employee (#8) about a disturbing interaction she had just experienced with Aenlle at her going away party. The civilian employee said that she felt that Aenlle's conduct toward her was workplace harassment. The sworn employee told her that she could file a complaint against Aenlle with Human Resources. The sworn employee then reported the interaction to then-Assistant Sheriff Monaghan. On April 5, 2024, the sworn employee told Monaghan that the civilian employee was still upset and that he believed that Aenlle's behavior had been inappropriate.

- Later that month, after the civilian employee had left her employment at the Sheriff's Office, Aenlle confronted the sworn employee (#8) about the incident. According to the sworn employee, Aenlle said that he didn't do anything wrong and that he wanted "to clear the air" with the sworn employee. Aenlle said, "I have a problem with the way this was handled in the beginning. It was handled appropriately. We need to be more careful about believing the first person who comes forward with a complaint." The sworn employee stated that Aenlle raised his voice and was angry.

- On April 24, 2024, the sworn employee (#8) was told by another sworn employee (#19) that a deputy had improperly intervened in a Zoom meeting of employee-panelists whose job was to interview applicants seeking employment with the Sheriff's Office. The sworn employee subsequently conducted an investigation that included witnesses to the incident and concluded that the deputy's conduct was egregious. He wrote a 9-page memorandum documenting his investigation; on April 29, 2024, he sent the memorandum to a Captain (#18), then-Assistant Sheriff Monaghan and to then-Undersheriff Hsiung. On May 2, 2024, the sworn employee was informed by Hsiung that there would be no formal investigation. He subsequently learned that the deputy received verbal counseling. The sworn employee believed that the deputy was given favorable treatment because the deputy's brother had sponsored a fundraiser for Sheriff Corpus' election campaign.

- In June 2024, a sworn employee who is an officer with the Deputy Sheriff's Association ("DSA") (#5) graduated from the County's year-long leadership program. He attended the graduation ceremony with his spouse, his mother, and his three adult children. Aenlle was at the ceremony. After the ceremony, an adult son of the sworn employee asked who the guy in the cowboy hat was. The sworn employee said that it was Aenlle. His son then described his handshake with Aenlle, saying, "He [Aenlle] shook my hand and wouldn't let it go. He kept squeezing it so hard that I had to use my other hand to get out of it. The whole time he stared into my eyes." The sworn employee believes that Aenlle's threatening conduct toward his son was an attempt to intimidate the sworn employee for his leadership position with the DSA and for Aenlle's hostility toward the union.

- Aenlle had made it clear to a civilian employee (#12), that he doesn't think that the labor unions should be running the Sheriff's Office. Aenlle told her, "You can't have the tail wag the dog." When the civilian employee responded, "This is California law---bargaining in good faith," Aenlle said, "We already met. We're not going to give the DSA anything they want. We're giving them nothing."

- Tuesday, August 13, 2024, there was a Professional Standards Bureau meeting at which Undersheriff Perea, sworn employee (#13), a Lieutenant, a sworn employee (#18), and two deputies were present, along with a civilian employee (#12). Aenlle ran the meeting. When the overtime issue came up, Aenlle said, "If people don't like it, they can just leave. We can hire 110 more people." Aenlle told Deputies ███ and ███ "You are DSA members; you should take over the DSA."

- In early August 2024, at 11 a.m., there was a second emergency staffing meeting in the 4th floor conference room. At the meeting were Aenlle, Undersheriff Perea, then-Assistant Sheriff Monaghan, a Captain, a civilian employee (#15), a Lieutenant, a Deputy, and two sworn employees (#18) and (#13). Sheriff Corpus was not in attendance. According to a sworn employee (#13), Aenlle ran the meeting. When someone asked, "People are asking how many hours do they need to work before being mandated?" Aenlle responded, "You're looking at the wrong thing. The power of the DSA isn't with the board; it's with the members. I encourage you to tell people to vote out the DSA Board."

- In December 2023, a sworn employee who is a female (#20), authored and circulated an email opposing the Sheriff's proposed budget cuts that would adversely impact salaries of the Lieutenants. Shortly thereafter, the sworn employee received a call from her immediate supervisor who told her that Sheriff Corpus had called him and ordered the sworn employee transferred from her special assignment with the Command of Crisis Negotiation Unit, a position that she had successfully held for three years and that required a special FBI security clearance. The sworn employee believed that the Sheriff's order for her transfer was retaliation for circulating the email.

- For Women's History Month in March 2024, Aenlle approved a post on the Office's Instagram with photos showcasing the Office's women of rank. However, when the photos were posted, they excluded <u>the longest ranking female in the Office</u>--- the sworn employee (#20) who had circulated the email. She subsequently learned from a Captain that it was Aenlle's decision not to include her photograph in the post.

- On Thursday, September 12, 2024, the sworn employee (#20) was assigned by Assistant Sheriff Monaghan to ride in the motorcade detail for candidate Trump's visit to Woodside. The assignment was confirmed by another sworn employee (#16) who provided her with the Secret Service plans for the detail. Later that day, her assignment was abruptly switched to providing security at the perimeter, a less prestigious assignment. She believes that the reassignment was continued retaliation by the Sheriff. The sworn employee was also advised to attend an 8am briefing the next morning at Woodside Town Hall.

- That evening, at 8:52 pm, Undersheriff Perea called the sworn employee (#20) at her home and asked who had assigned her to the motorcade detail. He repeatedly questioned whether she intended to be at the 8 am briefing. Assistant Sheriff Monaghan was also on this call because he had been ordered by the Undersheriff to do so. The sworn employee found the Undersheriff's tone of voice to be "aggressive, accusatory, and condescending." She subsequently lodged a complaint against Undersheriff Perea with the County's Human Resources department. The sworn employee believes that her reassignment to the perimeter of the Trump detail and the harassing call from the Undersheriff were retaliation for her circulating the email. **(Exhibit 31: Complaint of sworn employee (#20)**

- Sheriff Corpus was asked by federal security personnel to designate two people from her security detail to be photographed with presidential candidate Donald Trump on Friday, September 13, 2024. The Sheriff designated a Captain and a Deputy. The day after the event in Woodside, on Saturday, September 14, 2024, at10:45 a.m., then-Assistant Sheriff Ryan Monaghan received a call from a friend who was an FBI special agent in San Francisco, and who had been assigned to the Trump detail.
The agent described the following interaction that he had with Aenlle at the event: The special agent had the names of the two individuals that Sheriff Corpus had selected for the photo-ops. He was approached by Aenlle who said, "I'm here to take the photo for the Sheriff. I'm the Chief of Staff." The agent told Aenlle that he wasn't on the list and that

the Sheriff had already selected the two people for the photos and gave Aenlle the names. Aenlle then said, "Who? A deputy getting a photo over me?!" The agent told Monaghan that Aenlle was "one of the most arrogant pricks I've ever seen." He called Aenlle an "arrogant asshole" and said that Aenlle was "poor representation of your Office." Because Aenlle "made a scene," the special agent reluctantly acceded to Aenlle's demand and allowed him to be photographed instead of Deputy ███ **(Exhibit 32: Photo of Aenlle with Donald Trump)**

- As noted in Allegation 3(d), a sworn lieutenant employee (#18) and a civilian employee (#15) interviewed three candidates for the Professional Standards Bureau, they selected Candidate #3 as best qualified for the position. However, they were informed by Undersheriff Perea that it couldn't be Candidate #3 and that it had to be another candidate. Candidate #3 had previously failed Aenlle in the Field Training Program. In the presence of the sworn employee (#18) and Sheriff Corpus, Aenlle said, "We're going to move him [Candidate #3]."

- According to a civilian employee (#1), Aenlle and Sheriff Corpus are obsessed with loyalty. Aenlle, on several occasions, told the civilian employee the names of employees whom he disliked and hated, telling her that they were disloyal and "fuck them." The civilian employee said nothing because she was fearful of Aenlle.

- In May 2024, the Sheriff's Office relocated to the new administration building in Redwood City. A civilian employee (#6) was involved in the move-in on a Friday. At 4:30 pm Aenlle, who had not been there all day, came in and asked if all of his personal "stuff" had been hung on the wall (pictures, his mirror, etc.). The civilian employee was extremely tired after having stacked 30 bins. Aenlle ordered her to look through all of the bins for a hammer to hang his items. She did so because she feared Aenlle. It was not until 6 pm before she was able to leave. Aenlle did not hang his personal items; instead, he directed two Captains to do it for him.

- In March 2024, there was a training at a conference in Vacaville that 9-10 employees of the Sheriff's Office attended, including, a civilian employee (#6). During a break, the civilian employee bought coffee from Starbucks for the team and placed the drinks on a table in an empty room. Aenlle walked in and bumped the table with his backpack, spilling all of the coffee on the floor and on his clothing. Aenlle did not apologize. Aenlle grabbed some paper towels and tossed them at the civilian employee, saying, "Here you go, [name of the civilian employee (#6)]." Aenlle then walked to the bathroom to wipe the coffee that had splashed on his clothing. The civilian employee cleaned up the coffee, fearing that if she said anything to Aenlle, he would retaliate.

- Four to five times, Aenlle told a civilian employee (#6), "There's a rat in this office. I'm gonna' find out who it is."

- In early 2023, before the move to the new administration building, a sworn employee (#23), walked on to the 3rd floor of the Hall of Justice where he saw Aenlle and Sheriff Corpus standing in front of the Sheriff's door. Aenlle glanced at him then turned his back.

Aenlle repeated this conduct and turned his back when the sworn employee passed him upon leaving the floor.

- Several interviewees stated that Aenlle raises his voice and becomes angry when sworn and civilian employees do not agree with him. Almost to a person, female civilian employee interviewees reported being intimidated by Aenlle.

- In December 2023 there was a toy wrapping event in Redwood City. Then-Undersheriff Hsiung was there, along with Sheriff Corpus and Aenlle who was in uniform. At one point, Sheriff Corpus said to Hsiung, "[Name of a sworn employee (#19)] didn't say hi to me. He wouldn't have done that to Bolanos."

- The next day, Sheriff Corpus ordered Hsiung to write up the sworn employee (#19) for misconduct. Hsiung asked her, "What's the policy violation?" to which the Sheriff responded, "I don't know." Hsiung said that he told the sworn employee what the Sheriff had directed him to do, whereupon the sworn employee said, "You've got to be kidding me."

- On April 17, 2024, Hsiung attended a public event at which several sworn employees were texting one another using Evertel, an app for secure law enforcement messaging. One of the texts read, "[Name of sworn employee (#19)] took a screenshot of this chat." The chat was critical of Aenlle's and the Sheriff's relationship. Thereafter, Sheriff Corpus said to Hsiung, "I want [Name of sworn employee (#19)] written up." Once again, Hsiung asked her, "What's the policy?" Sheriff Corpus told Hsiung, "Make one up or add a policy."

- Captain ███████ ███ had nearly 20 years with the Sheriff's Office. She documented interactions of retaliation against her by Sheriff Corpus and by individuals under the direction of Sheriff Corpus after she gave notice in June 2024 that she was leaving her position with the Sheriff's office for employment with another law enforcement agency. She had been serving as Captain at the Half Moon Bay Substation. **(Exhibit 33: Cpt. ██████ chronology of retaliation)**

- Among the acts of retaliation documented in Captain ██████ chronology that occurred while she was still employed at the Sheriff's Office are (1) deleting her NextDoor goodbye post to the Half Moon Bay/Coastside community, (2) revoking her access to NextDoor, (3) revoking her access to Evertel (a secure law enforcement communications system to share critical information), (4) locking her out of her email account, (5) denying her access to the Sheriff's Office website, (6) locking her out of her Half Moon Bay Substation, (7) prohibiting her from using any social media, (8) prohibiting her from sending emails, and (9) requiring a monitor to be present when she removed her personal belongings.

- County Executive Callagy spoke to Sheriff Corpus and suggested that she reconsider locking out Captain ██████ Sheriff Corpus told Callagy that she would reverse her decision to lock out Captain ██████ However, Sheriff Corpus did not change her order,

with the result that Captain ███ was improperly denied access to her office. Then-Undersheriff Hsiung texted Sheriff Corpus, advising against the lock out of Captain ███ **(Exhibit 34: Cpt. ███ lock out text messages)**

- On August 13, 2024, Aenlle summoned a civilian employee, (#15) and told her, "The County is investigating me. I believe the County Executive is targeting me so he can remove me and weaken the Sheriff's stance. She didn't get here alone. I helped her get elected. I own the third largest parcel in San Mateo County. It's worth $60 million. The County Executive has tagged a bunch of buildings on my properties as a way of messing with me."

- A few weeks ago, a civilian employee (#15) was directed by Aenlle to request that all Captains donate $500 gift baskets to the upcoming SAL fundraiser. She relayed the message to each Captain, being sure to state that the request was from Aenlle, adding, "I'm just the messenger." A sworn employee (#18) a Captain, and former Assistant Sheriff Monaghan believe that the request is inappropriate and that donating is a test of loyalty to the Sheriff and Aenlle. When two Captains subsequently declined to make the $500 donations, the civilian employee (#15) heard Aenlle say, "Hmmm. . . that's very telling. It's disappointing." Sheriff Corpus asked the civilian employee, "Is it true that [names of two captains] refused to give a gift basket? When the civilian employee said, "Yes," Sheriff Corpus responded, "After everything I've done for them."

- In August or early September 2024, sworn employee (#24), was requested to donate a $500 basket for a SAL fundraiser. A civilian employee (#15) made the request and told the sworn employee that she was making the request "on behalf of Victor." He could see that the civilian employee was uncomfortable making the request. The sworn employee felt like this request was an inappropriate and an unethical "pay to play," and a loyalty test. He told the civilian employee, "Victor has my number. He can ask me." He then told the civilian employee that he "respectfully declined to donate."

- The first week of September 2024, at 9:30 am, Undersheriff Perea, Aenlle and the Captains were in a briefing meeting in the Sheriff's conference room. When Aenlle and the Undersheriff arrived, they sat next to each other. The Undersheriff said, "These briefings are high level, and succinct. It's 9:34 and this meeting will be over at 10 a.m." While the Undersheriff did most of the talking, Aenlle stared at the sworn employee (#24) and said, "Thank you to those of you who donated." The sworn employee stared back at Aenlle. The sworn employee felt that retaliation was coming because he declined to donate the $500.

- The sworn employee (#24) attended the DSS/OSS press conference in September 2024. He had emailed a request to Assistant Sheriff Monaghan for one-hour vacation time, a request that Monaghan approved. At the press conference, the sworn employee wore a "cover coat" that covered his badges and patches because he did not want anyone to think that he was there while on duty. At the press conference, he saw a Deputy milling about in the rear while talking on his cellphone. The sworn employee believed that the Deputy, favored by Sheriff Corpus, was identifying for Sheriff Corpus and/or Aenlle employees who were in attendance so that they could retaliate against the employees.

- The day after the press conference, the sworn employee (#24) learned that two Internal Affairs file numbers were pulled for an investigation into two Captains. The names of the Captains were not attached. The sworn employee found this to be unusual because the names of the subject officers are typically attached to Internal Affairs investigations. The sworn employee (#24) is a Captain. He and another Captain (#19) were the only Captains who attended the press conference. The sworn employee knew that that the other Captain had also taken vacation time and was wearing a cover coat. The sworn employee (#24) believes that Sheriff Corpus and Aenlle are gearing up to demote or fire him and the other Captain in retaliation for their attendance at the press conference and for refusing to donate $500 baskets for the SAL fundraiser.

- The next morning, there was a swearing-in ceremony in Millbrae. When the sworn employee (#24) and his administrative assistant (#3) walked to the entrance of the building, Sheriff Corpus was seated in her car, talking on her phone. The sworn employee was in uniform. He learned later that the Sheriff uttered a profanity at his administrative assistant for not saying "Hi" to the Sheriff. Inside, he saw Aenlle and said "Hi" to him. Aenlle shook his hand by grabbing it tightly and shaking it back and forth, as if to say, "I see you!" Aenlle was not in uniform and was wearing a suit. The sworn employee did not notice if Aenlle was wearing a firearm or a badge.

- When the sworn employee was seated, Undersheriff Perea walked up to him, stood very close so that Perea's crotch was in close proximity to the sworn employee's face. Undersheriff Perea looked down at the sworn employee and said, "Hello, Captain." The sworn employee, who is 6'4" tall, slowly stood up and shook the Undersheriff's hand. The two were nose to nose as the sworn employee said, "Hello, Undersheriff." The sworn employee believes that Undersheriff Perea was trying to intimidate him.

- After the ceremony, there was a debrief meeting about the Millbrae Arts and Wine Festival. The Millbrae City Manager was present. The City Manager told the sworn employee (#24) that he had received a call from Sheriff Corpus about a "meeting," referring to the press conference that the sworn employee attended the day before. The sworn employee felt that the Sheriff was laying the groundwork to retaliate against him.

- On Thursday, September 19, 2024, the sworn employee (#24) attended a 10 a.m. press conference convened by Sheriff Corpus at which Aenlle was present. The announcement of the press conference was not office-wide; however, the sworn employee had heard about it and arrived at 9:45 a.m. The sworn employee approached Sheriff Corpus who immediately turned her back on him. He then shook hands with Aenlle. He subsequently said "Hello" to the Sheriff. A short time later, Sheriff Corpus asked to speak with the sworn employee. She told him, "You don't need to stay. You can go." The sworn employee said "Okay" and left. The press conference was an outdoor public event.

- On Friday, September 20, 2024, the day after Assistant Sheriff Monaghan was fired by Sheriff Corpus, Monaghan spoke with the sworn employee (#24) telling him, "Hey, last week I spoke to [name of civilian employee (#33)] who said that she heard that the City

Manager [of Millbrae] was upset with the sworn employee attending the press conference." Thereafter, the sworn employee called the City Manager and told him what he had been told by Monaghan. The City Manager was livid and said, "If Victor messes with you, I will form a new Millbrae Police Department and hire you as the police chief." The sworn employee feels that Sheriff Corpus and Aenlle are defaming him and harming his reputation, as well as retaliating against him.

- A few weeks ago, a civilian employee (#15) associated with Human Resources, noticed a man whom she did not recognize sitting in a nearby office. She asked him who he was and was told that this was his first day as a new hire in the Professional Standards Bureau. He told her that he was an extra-help deputy from the San Francisco Police Department. His hiring was not announced to the civilian employee or to her team. The deputy had an access card and an ID card. Despite there being an empty office at the end of the hall, he was seated outside her door. The civilian employee had no idea what the extra-help deputy's role is in the PSB since he had no desk and no assigned duties. The civilian employee was concerned because she is obligated to give the deputy full access to everything on the Professional Standards Bureau. The civilian employee subsequently learned that the deputy is a good friend of Undersheriff Perea. The civilian employee felt intimidated having an unfamiliar sworn staff member parked outside of her door.

- Ryan Monaghan was an Assistant Sheriff and a member of the Sheriff's Executive Team. He has 30 years of law enforcement experience, with 26 of those years at San Mateo Police Department. He also served as a Police Chief. Monaghan directly reported to the Undersheriff. Monaghan documented interactions of retaliation and intimidation by Sheriff Corpus, Aenlle, Undersheriff Perea and by other individuals under the direction of Sheriff Corpus. **(Exhibit 35: Monaghan's chronology of retaliation)**

- Among the acts of retaliation and intimidation by Sheriff Corpus and her Executive Team documented in Monaghan's chronology are (1) repeated criticism of him by Sheriff Corpus and Aenlle about the handling of a civilian employee's (#1) complaint against Aenlle, (2) belittling him, (3) badmouthing him to civilian employees and to sworn employees, (4) accusing him of sharing "private" information with the County Executive, (5) being treated as Aenlle's subordinate, (6) excluding him from Executive Team meetings, (7) excluding him from meetings involving his subordinates, (8) excluding him from Internal Affairs investigations over which he was responsible, (9) receiving a bizarre "haters" video from Sheriff Corpus' personal Instagram account (**Exhibit 36: Sheriff Corpus Instagram "haters" post to Monaghan**), and (10) questioning by Sheriff Corpus and Aenlle about his speaking with this investigator.

- On Tuesday, September 17, 2024, Monaghan attended a city council meeting in Half Moon Bay. Present at the meeting were Aenlle, Sheriff Corpus and Undersheriff Perea. After the meeting, in the parking lot, Aenlle, in the presence of Undersheriff Perea, asked Monaghan if he had spoken to this investigator. Monaghan responded, "Yes." Aenlle asked, "When were you going to let us know?" Monaghan told Aenlle that it should have been understood that he, Monaghan, would cooperate with the investigation.

- On Wednesday, September 18, 2024, at 9:45 am, Monaghan was at the Millbrae Recreation Center to attend a Sheriff's Office ceremony at which Sheriff Corpus was present. Monaghan told the Sheriff that Aenlle had asked him if he had spoken to the investigator and told her that it was inappropriate for Aenlle to have asked him. Sheriff Corpus disagreed and said that Aenlle had been hearing things and was just asking a question. Sheriff Corpus referred to the investigation as a "witch hunt."

- Two days later, on Friday, September 20, 2024, after directing her civilian employees to go home early, Sheriff Corpus called Monaghan into her office and fired him. Undersheriff Perea was present. Sheriff Corpus told Monaghan that she no longer trusted him because "people" said that he wasn't loyal. Monaghan was not given an opportunity to resign. Instead, he was escorted to his office by Undersheriff Perea who took possession of Monaghan's firearm, badge and ID card. Monaghan was walked out of the Administration Building by Undersheriff Perea. Monaghan believes that Sheriff Corpus fired him in retaliation for cooperating with the investigation and for standing up to Aenlle.

**Aenlle's Response to Allegation #4:**
This investigator: "Have you ever attempted to change the resignation of a sworn officer to a firing of that officer?"

Aenlle: "No."

This investigator: "And I'll be specific. I'm talking about Chris Hsiung. Did he resign, or did he -- was he fired?"

Aenlle: "My understanding is – my understanding is that he resigned. What Chris told me is, 'I beat her to the punch by two -- you know, by a couple hours,' or something like that. I did not ask. I didn't inquire about the sheriff. It was not my business. She -- she can fire and hire whoever she wants. It was not my role. I learned from that from --from -- from Chris Hsiung."

This investigator: "So you never said to anybody, 'He was fired.' It's not 'resigned.' He was fired"?

Aenlle: "No." (Aenlle Transcript at pg. 89)

     . . .  . . .  . .

This investigator: "Have you asked anyone, sworn or civilian, in the office if they have been questioned by me?"

Aenlle: "Yes."
This investigator: "And can you tell me who you asked?"

Aenlle: "Former Assistant Sheriff Monaghan."

This investigator: "Anyone else?"

Aenlle: "No, not that I can think of."

This investigator: "And why did you ask him why –"

Aenlle: "It was in passing. I was actually kind of glad. We were having a short talk -- a small talk with the undersheriff, non-confrontational.  I said, 'Hey, [Ryan], have you -- have you -- have you talked to her?' And he's like, 'Yeah, I have.' I'm like, 'Whoa. Wow. Great.' And then I went to the bathroom. That was it. I didn't ask, 'What did you tell her? I didn't ask, 'What was it about?' Zero. I didn't ask any further questions at all whatsoever. I was kind of glad to hear that somebody on my team that had seen what I've done and not done here at least had a chance to speak to you."

This investigator: "In that conversation with then Assistant Sheriff Monaghan, did you say to him, 'Why didn't you tell us?'"

Aenlle: "No. I said, 'I thought you would tell me.' And he goes, 'No. I thought it was implied.' I'm like, 'Oh, okay.' That was it."

This Investigator:  . . . "So the reason you asked him was why?"

Aenlle:  Curiosity, ma'am. There was a lot of rumors in the office. There have been a lot of rumors for quite some time now, and, you know, I'm sure the rumors got blown up, and -- and it was more of a curiosity than anything else. There was no malice behind it. I wasn't upset. It was -- it was literally a couple words, and I kept going about my business. No big deal. I was kind of glad that he got interviewed by you."

This investigator: "So it was curiosity, not about retaliation?"

Aenlle: "Oh, ma'am, absolutely not. . . I -- I -- I just want to make that
clear. Absolutely not. . . And -- and my demeanor was very calm, and I really just -- I -- I was -- actually, inside I was actually kind of glad. I'm like, 'Okay. Good. At least she talked to you.' Because the information that was coming back to me, ma'am, to be honest, is that you were only talking to the people that you were instructed to talk to; that there was other people that reached out to you, captains and manager and people to -- that wanted to be interviewed and -- and share their experience with me, and they never got a call back.· And -- and that's some of the rumors that were taking place."
This investigator: "Got it. When you had the conversation with Ryan Monaghan."

Aenlle: "Yes."

This investigator: "was -- was the sheriff there during that conversation?"

Aenlle: "The undersheriff was there, ma'am."

This investigator: "But the sheriff was not?"

Aenlle: "No. Not at all."

This investigator: "Did you -- did you tell the sheriff later that you had asked Ryan and what Ryan said, he had talked to me? Did you tell her that?"

Aenlle: "Yeah. I think in a conversation with the undersheriff and sheriff, I said, 'Oh.' I mentioned Ryan. 'He got interviewed.' It was like, 'Oh, okay. Cool.' That was it. It was not a big discussion. It was not -- actually, I take it back. I think it was Ryan that told her, and then she kind of mentioned that Ryan mentioned it to her. I said, 'Yeah, he was.'" (Aenlle Transcript pgs. 89-93)

. . .     . . .     . . .

This investigator: "A subject that's, you know, not one of your favorites, but can we talk for just a bit about [Name of civilian employee (#1)] please?"

Aenlle: "Yes, please. Absolutely. . . And, Judge Cordell, I'm open to talk whatever it is you want to talk about. There's nothing I'm hiding, and -- and I really do want to clear my name."

This Investigator: "[Name of civilian employee #1]. Has she -- after an interaction with you, she filed a complaint with HR. She's no longer there at the Sheriff's Office. Her complaint is that you, without any evidence at all, accused her of posting criticism, bad stuff, about the sheriff, posting online, and -- and that your doing this was really retaliation because she was leaving, and you didn't really want her to be leaving the position. Can you talk to me about that, your -- your --your side of this."

Aenlle: "I would love to, ma'am. That never happened. And -- and just to back up, [Name of civilian employee #1] is a wonderful person. I -- she was probably one of the best admin assistants that I had while here. I consider her a friend. Over the top. I can't give her enough. I don't know who put her up to this or why she did this because this is completely false, and I'll share with you why. In my computer, I have a folder saved with1,000 emails that I was going to make available to you of how wonderful of a boss and how incredible I've been with her. A thousand emails. On my phone, I also wanted to share with you -- let me back up and -- and tell you.
"I was in my office. I think it was like the last day she was going to be there, and -- and she came in. I'm like, 'Hey, [Name of civilian employee (#1)] check out this email – this text.' It was that lady from -- from one of the organizations that said, 'Hey, it's a good thing that, you know, your assistant is leaving because she's talking pretty -- pretty bad about you and the sheriff.' And I'm like, 'What?' And literally my text says, 'No, not [Name of civilian employee #1]. Impossible.' It's in my phone.

"So she came in. I'm like, 'Hey, I just want to make you aware that whoever these silly people are that are posting things online, like the comments on the article, they're -- they're making it sound like you.' But I told this lady, 'No way. Not [Name of civilian employee (#1)]. I don't believe it for one second.' That was it. That was it. And like -- and she made a comment like, 'God, people are horrible, Victor. I'm like, 'Yeah, I know.' And then she left my office, and then she went to her office or whatever.

"A short time later, I stopped by her office because I wanted her to mentor one of the intern - - interns to cover until I got a full-time person, and I had another chat with her. I sat on the chair. And then at that time, I could see that she was -- had a little bit of watery eyes, and she was crying. I'm like, '[Name of civilian employee (#1)], don't -- don't worry about it. I -- I -- just -- just don't even -- don't even think twice about it. People are like that. I – not for a moment did I even think it was you.'

"And then she just -- she goes, 'I know, Victor, but it's hard.' And -- and I left there. She was crying a little bit. [Name of civilian employee (#1)] tends to -- just to put things in con- -- in context, [Name of civilian employee (#1)]'s a wonderful person, but she does run a little bit high on anxiety. For example, when the sheriff was -- was doing a 'Shop with a Cop', [Name of civilian employee #1] was in charge of the decorations for the building with one of our other admins here. And when the sheriff went by to visit it and she looked at it, she goes, 'Oh, no. It's -- I – I really' -- she didn't like it. She wanted more decorations. [Name of civilian employee (#1)] went into the bathroom and -- and started crying. And I was later told by the other admin that she didn't eat or sleep for three days because of that. So she's a little bit sensitive; right?

"So I -- I left her office. Everything was fine. I came in my office, and then I hear that she's not doing well and she's crying or whatever. Former Assistant Sheriff Monaghan apparently went to go see her, which I don't know why he would do that, but he went to go see her. And then he came by my office literally after that, and he said, 'Hey, Victor, [Name of civilian employee (#1)] is really upset,' whatever, 'but I told her just to come and talk to you.' That's directly from Sheriff – Assistant Sheriff Monaghan. 'But I told her to come talk to you.'

"So if -- if -- if the allegations that I berated her and I screamed and whatever were true, why would he ask her to come and talk to me? It's impossible. So she did come back to my office and talked to me, and -- and she was upset. And I'm like, '[Name of civilian employee (#1)], I never thought about it again. I wish you didn't take this so hard.' I'm really sorry, but you don't have any issues with me. I never believed it. So I want to read to you, Judge Cordell, -- two -- two of the texts that I saved on my phone.

". . . So on March, 2021, at 2- -- at 12:51 – so after the alleged incident in her office -- sorry. I take it back. April 3rd at 1:44 PM. That was her last day there. After the incident in her office or whatever -- this is closer to the afternoon right before she was leaving because she got off at 3:00 or 2:00 or whatever it was. She says, 'Are you in your office?' And I said, 'Yes, I'm here. You want to --I heard you want to stop by.' And she said, 'Yeah. It's okay. I just needed to calm down a little bit. I don't know why that person would say those things. I just needed to re- --reiterate that those are total lies, and I don't appreciate her saying them.' And I said, '[Name of civilian employee (#1)], forget it. Stop by. Come see me,' or whatever I said.

"I went back on my -- on my texts, and I found -- there's many of them, but one specifically is two weeks before is when she had to give me her -- her two weeks' notice. And she said, 'I'm sorry I had to email that letter. I was going to give it to you in our meeting yesterday. I

know there's lots to discuss, and I will do whatever possible to make this perfect -- make this the perfect transition for you,' exclamation mark. And I said, 'I understand.' And then she texted, 'You've always been kind to me. I will never forget that.' I would be more than happy to share those texts with you."

This investigator: "So anything else you want to add about [Name of civilian employee (#1)]?"

Aenlle: "Nothing. I think she's wonderful. I'm -- I'm really surprised that she did this. I don't know what -- what the motive is behind it. I've never had anything bad with her. I care deeply about her. I thought she was great, and I really enjoyed my time with her, honestly. It was -- I was very saddened to – to really see this because it -- I've never been mean to her. I never raised my voice. I never accused her of -- of -- that it was her. Not at all whatsoever. I only made her aware of it just because I know that she's sensitive and if she learned that from somebody else or somebody said to her, I knew it was going affect her. So I wanted to give her the heads-up. But at no time did I accuse her of anything, ma'am."

This investigator: "So that was really --the last question I want to ask about that incident is that you got a text, and you knew –there was no merit to it."

Aenlle: "Because she's my friend. I wanted to share it with her. That's -- that's -- that's the only reason why. Because she was going to find out anyways because, you know -- ma'am, the Sheriff's Office is -- is a tunnel, I mean, of rumors and everything else. Once something is found out, it literally takes seconds to fly through the entire office, whether it's good or bad, ma'am." (Aenlle Transcript pgs. 93-101)

···     ···     ···

This investigator: "Have you ever been involved in changing assignments of sworn personnel as retaliation?"

Aenlle: "I have never retaliated in any form of anybody in -- in the office at all. Ma'am, I -- and just to put that in context, I know what it feels like, ma'am. When --when I supported the sheriff and initially came out, the information that I was going to be helping her with the campaign, I was kicked out of the range staff after nine years of -- of working for free, and I was one of the top trainers. I'm a POST-certified trainer. I was kicked out of there. And -- and -- and the sheriff at that time told -- told the sergeant, 'He needs to be shut down.' If that's not retaliation, I don't know. So I know what -- I know what it feels like, and -- and that's not the kind of person I am, which a lot of people here -- they've done a lot of bad things. Neither the sheriff or myself at any given point have retaliated against anybody. They've actually been promoted. One of the things I admire about the sheriff the most is -- is that she separates, and she's very good to people." (Aenlle Transcript at pgs. 102-103)

···                    ···                    ···

This investigator: "Have you ever gained access to and then searched electronic device of a sworn personnel?"

Aenlle: "No. And I don't -- and to be clear, can you -- are we talking about -what are we talking about here?"

This investigator: "I'm talking about either a phone or a laptop."

Aenlle: "No."

This investigator: "Have you ever gained access to and searched the electronic device of a sworn personnel after the person left the Sheriff's Office?"

Aenlle: "I was instructed to collect the things and by the undersheriff to go ahead and have ISD process it so we can wipe it and reassign the equipment. . . But I did not search any devices at all whatsoever."

This investigator: "So when you said "ISD," what is that? "

Aenlle: "It's -- it's the County's official IT department. It handles all our stuff. . .
It's a process. I go through my IT department. I am the director, the DSU of the IT department. So I give them the equipment, just like we've done in the past, and they do what they need to do, and then they get cleared, and they get reissued."

This investigator: "Have you ever given a directive not for an -- for a phone and a laptop from an officer -- from a sworn personnel who has left -- have
you ever given a directive to anyone to say, 'Give me' -- you. That is you, Mr. Aenlle – 'the phone and the laptop'?"

Aenlle: "No, ma'am."

This investigator: ". . . Specifically, have you ever requested that the phone and the laptop of Chris Hsiung, who was the undersheriff who left -- have you ever directed that you be given his two -- those two devices?"

Aenlle: "No, not to my recollection. Not -- not at all."

This investigator: "Have you ever looked into Chris Hsiung's cell phone after he left?"

Aenlle: "Not that I can recall. There's nothing I would look in there for (unintelligible)."

This investigator: "Have you ever inquired about a conversation that Chris Hsiung, the former undersheriff, had with the Chief of East Palo Alto Police Department?"

Aenlle: "Oh, absolutely. I had a conversation with Chris Hsiung."

This investigator: "And can you please tell me about that."

Aenlle: "'Chris, I heard that you're saying not so nice things about me; that you're claiming that you left the Sheriff's Office because of me.' And he basically told me, 'No, Victor. That's not true. I didn't leave because of you.'"

This investigator: "Either he called you or you called him. I don't know."

Aenlle: "I called him."

This investigator: "All right. And did you – did you call him and ask him about speaking with the Police Chief in East Palo Alto?"

Aenlle: "He already knew. I just called him and said, 'I understand that you're not saying nice things about me.' We had a nice talk. He understood. He agreed. He said, 'Hey, this is not between us. We don't have to say that.' He -- he was upset that he thought I was saying something about him. And we cleared -- cleared it up, and that was it. . . But, yes, I called him and had a conversation with him."

This investigator: "Did you know that he was meeting with the police chief of East Palo Alto?"

Aenlle: "Yes. I -- I knew he was meeting -- that he had met with him."

This investigator: "How did you know that?"

Aenlle: "I don't recall how I learned that. . . I don't recall. . . Some -- one of the people in – in East Palo Alto."

This investigator: "I'm sorry. I didn't understand."

Aenlle: "It could have been one -- one of the employees in East Palo Alto."

This investigator: "Who did what?"

Aenlle: "That mentioned that to me; that somebody was not talking very nicely about me."

This investigator: "Okay. And so your purpose in -- in calling Chris was -- was what?"

Aenlle: "Have a conversation with him, just clear it up, see if he really had a problem with me, see if there was anything I could do. Because it's not – I didn't -- Chris and I didn't have a relationship like that. I'd work -- we had our differences, but as people, we got along just fine."

This investigator: "Okay. But he had left; right? He had left your office."

Aenlle: "Yes, he had left. He was no longer an employee, yeah."

This investigator: "Have -- do you know whether or not Sheriff Corpus called the Police Chief of East Palo Alto?"

Aenlle: "Ma'am, I'm not aware of what calls the sheriff made or didn't make.  I know -- I know that they're friends, but I don't know how much they talk or so forth." (Aenlle Transcript at pgs. 80-85)

**Findings:**

On the eve of a civilian employee's departure from the Office at her farewell party, Aenlle felt it important to tell her about a rumor about her that even he didn't believe. His explanation for doing so was, "Because she's my friend. I wanted to share it with her. . . Because she was going to find out anyways[.]" This investigator does not find this explanation to be credible.

The civilian employee's belief that Aenlle did this to retaliate against her for leaving her job as his "eyes and ears" makes far more sense. Then, after she filed a complaint against Aenlle and had left the Sheriff's Office, he denigrated her to a sworn employee and at one point, said that he wanted to "smash her face in." The civilian employee, when recounting the events to this investigator was clear and cogent. This investigator's subsequent conversation with the civilian employee's supervisor, the Redwood City Police Chief, confirmed the civilian employee's competence, stability, and honesty. This investigator finds that Aenlle is not credible and that he did, in fact, retaliate against the civilian employee by making an accusation about her that he knew to be false.

When then-Assistant Sheriff Ryan Monaghan spoke with this investigator, he had the protected status of an "informant," under San Mateo County's Whistleblower Ordinance.

Aenlle explained that when he asked Monaghan if he had spoken with this investigator, his inquiry was motivated by "curiosity," and that the inquiry was "in passing," that "there was no malice behind it," and that he "was actually kind of glad. . . I was kind of glad that he got interviewed by you." However, the timing of Monaghan's firing suggests otherwise.

On September 17, 2024, Monaghan told Aenlle and Undersheriff Perea that he had spoken with this investigator. On September 18, 2024, Monaghan informed Sheriff Corpus that he had spoken with this investigator. Two days later, on September 20, 204, Sheriff Corpus fired Monaghan in the presence of Undersheriff Perea.

The County's Whistleblower ordinance prohibits adverse action against an employee who engages in protected conduct. As well, the Sheriff's Office Policy 1029.3 prohibits retaliation against any person "for participating in any investigation related to a complaint under this policy or any other policy" and engaging in "lawful or otherwise permitted behavior." The Sheriff's termination of Monaghan's employment was an adverse action. Monaghan's speaking with this investigator was the protected conduct of free speech.

The history of Monaghan's mistreatment by Aenlle and Sheriff Corpus as described in his detailed chronology, and the events that transpired between September 17th and September 20th that culminated in his firing, lead to the inescapable conclusion that when Sheriff Corpus' terminated Monaghan's employment was retaliation.

The retaliation by Sheriff Corpus against Captain ███ could not be clearer. The Sheriff acknowledged to County Executive Callagy that she had ordered Captain ███ locked out of her

office at a time when the captain was still employed by the Sheriff's Office. The text message exchange between Sheriff Corpus and then-Undersheriff Hsiung confirm this. And after telling Callagy that she would reverse her lock-out order, Sheriff Corpus did not do so. Captain ███ detailed chronology of the retaliatory conduct directed against her by Sheriff Corpus is credible. It is clear that Sheriff Corpus retaliated against Captain ███ in violation of San Mateo County Ordinance 2.14.090, County EEO Policy, Section II-E, and Policy Manual, and Policy 1029 of the Sheriff's Office Policy Manual.

The alleged retaliation against then-Undersheriff Chris Hsiung took the forms of (1) Sheriff Corpus denying Hsiung the opportunity to say goodbye to his colleagues, (2) Aenlle taking control of and accessing Hsiung's cellphone, (3) interrogating Hsiung and Chief Jeff Liu about their private conversations after Hsiung had left his employment with the Sheriff's Office, and (4) Aenlle's effort to change Hsiung's resignation to a termination of his employment.

Aenlle couldn't recall if he looked into Hsiung's cellphone; and he couldn't recall how he learned of Hsiung's private meeting with Chief Jeff Liu. Neither Hsiung nor Chief Liu told Aenlle about their meeting. Therefore, it is reasonable to conclude that Aenlle knew about the meeting because he accessed Hsiung's cellphone and/or laptop and saw the scheduled meeting.

Aenlle gave this reason for contacting Hsiung: "Have a conversation with him, just that he clear it up, see if he really had a problem with me, see if there was anything I could do. Because it's not – I didn't -- Chris and I didn't have a relationship like that. I'd work -- we had our differences, but as people, we got along just fine." Nothing could be further from the truth. Hsiung made it clear to this investigator that he did not get along with Aenlle and that he complained to Sheriff Corpus about Aenlle's disruptive conduct.

Aenlle's and the Sheriff's inquiries about a former employee's private affairs are the behaviors of individuals who cannot abide being criticized and who have no compunctions about confronting those critical of them, within or outside of the Sheriff's Office and no matter how inappropriate. The only reasonable explanation for this kind of conduct is intimidation and retaliation.

In addition to the incidents summarized above, Aenlle, Sheriff Corpus and her Executive Team retaliated against and/or intimidated employees with a crushing handshake, hard stares at employees, loyalty tests in the form of SAL donations, back turning on disfavored employees, spying on former employees, omitting from a Women's History post showcasing photos of the Office's sworn females, the longest ranking female, and demeaning female civilian employees.

This investigator finds that the complainants/interviewees' allegations of retaliation and intimidation are credible, and that many, if not most of Aenlle's responses to these allegations are not credible. This investigator finds that Aenlle and/or Sheriff Corpus engaged in retaliation against Ryan Monaghan, Chris Hsiung, Captain ███ Sworn Employee (#20), Sworn Employee (#8), Sworn Employee (#5), Sworn Employee (#18), Civilian Employee (#3), Civilian Employee (#1), Civilian Employee (#6), Sworn Employee (#24), and Civilian Employee (#15).

**Allegation #4 is SUSTAINED.**

**5. Allegation #5: Aenlle has outside employment that has not been approved.**

The Board of Supervisors of San Mateo County enacted Section 2.75.020 of the San Mateo County Ordinance Code that requires each Department Head formulate rules relating to incompatible activities and outside employment. (https://www.smcgov.org/hr/regulations-governing-incompatible-activities-and-outside-employment-adopted-board-supervisors)

As well, the Sheriff's Office Policy 1022 (at pgs. 676-680) sets forth rules that apply to its employees who engage in "any outside employment," regardless of the hours devoted to that employment. The policy mandates that all employees undergo an approval process before they can engage in outside employment:

"1022.1 PURPOSE AND SCOPE
In order to avoid actual or perceived conflicts of interest for employees engaging in outside employment, all employees shall obtain written approval from the Sheriff prior to engaging in any outside employment. Approval of outside employment shall be at the discretion of the Sheriff in accordance with the provisions of this policy.

"1022.1.1 DEFINITIONS
Outside Employment - Any employee who receives wages, compensation or other consideration of value from another employer, organization or individual not affiliated directly with this Office for services, product(s) or benefits rendered. For purposes of this section, the definition of outside employment includes those employees who are self-employed and not affiliated directly with this Office for services, product(s) or benefits rendered.

"1022.2 OBTAINING APPROVAL
No Sheriff's Office employee may engage in any outside employment without first obtaining prior written approval of the Sheriff. Failure to obtain prior written approval for outside employment or engaging in outside employment prohibited by this policy may lead to disciplinary action. (Emphasis added.)

"In order to obtain approval for outside employment, the employee must complete the Sheriff's Office "Application for Permission to Engage in Off-Duty Employment" and the County of San Mateo Human Resources' "Incompatible Activities Form" which shall be submitted to the employee's immediate supervisor. The applications will then be forwarded through the chain of command to the Support Services Division Assistant Sheriff and then presented to the Sheriff for consideration. (Emphasis added.)

"If approved, the employee will be provided with a copy of the approved application. Unless otherwise indicated in writing on the approved application, an approved application will be valid through the end of the calendar year in which the application is approved. Any employee seeking to renew their approval to work shall submit a new "Application for Permission to Engage in Off- Duty Employment" and "Incompatible Activities Form" in a

timely manner." (Emphasis added.)
([https://www.smcsheriff.com/sites/default/files/resources_files/SMCSO-Lexipol-Policy-Manual-7.9.2024.pdf](https://www.smcsheriff.com/sites/default/files/resources_files/SMCSO-Lexipol-Policy-Manual-7.9.2024.pdf) )

The complainants allege that Aenlle engages in outside employment that he has failed to disclose.

**Aenlle's Response to Allegation #5:**
This investigator: "Do you have any outside employment?"

Aenlle: "No, ma'am. I -- my real estate business, I pretty much stopped doing it. I'm still licensed. But as of 2023, my involvement with the Sheriff's Office -- it demanded too much of my time. I am no longer practicing real estate. As far as my PPO, my private security company, I have also, as of 2023, when I got involved with the Sheriff's Office, I've not engaged in -- in -- in those activities as well."

This investigator: "Got it. So let's just -- I just want to nail it down, and this is important. When you say you stopped in 2023, can you tell me when in 2023?"

Aenlle: "A few months -- a few months into it when I started. When my position -- I believe it was closer when my position got finalized."

This investigator: "So -- and when was that? Because I forgot to ask you that when you said you converted the –"

Aenlle: "It took a long time. I want to say somewhere in -- this is not a hundred percent – but somewhere around July, I believe."

This investigator: "Of 2023?"

Aenlle: "Yes, ma'am."

This investigator: "So between January 2023, and July, did you have any outside employment?"

Aenlle: Well, I've contracted maybe a few security details of close friends or of old clients. Real estate, I referred out."

This investigator: "So when you say 'referred out,' if you got someone who was interested in some real estate -- you would not -- you would not accept it and -- and just give it to someone else in your office –"

Aenlle: "Yes, ma'am."
This investigator: "And can you tell me when you were doing real estate, did you work for a company?"

Aenlle: "Yeah. Even though I'm a broker, I did -- I've always hung my license with Coldwell Banker."

This investigator: "So you -- I'm sorry. And you are a broker, which is different from –"

Aenlle: "Also a broker, ma'am."

This investigator: "Right? That's different from being a real estate salesperson?· Is that . . ."

Aenlle: "Yes, ma'am."

This investigator: "Am I getting that right? Okay."

Aenlle: "Yes."

This investigator: "So you were with Coldwell Banker. And did you work out of any particular office? This is, again, before you began your executive director work or chief of staff work."

Aenlle: "Yes. I was out of the San Mateo office, which -- which closed, and then everybody merged into San Carlos or Burlingame. I hung my license in San Carlos."

This investigator: "San Carlos. Okay. Were you ever in -- work out of the Half Moon Bay office?"

Aenlle: "I never worked there. My -- they could have transferred my license there to -- I think my manager was in both. My manager was in San Carlos and Half Moon Bay. In the past, I did do a lot of business there. So . . .But I've never actually done business out of San Carlos -- out of Half Moon Bay. I've never had an office there, a desk there, nothing like that."

This investigator: "You used the words 'pretty much stopped doing the real estate.' I'm not sure what you mean by that. So -- so the question is, you know, did you have any outside employment? And, by the way, it's not a bad thing. I'm just asking. Did you have –"

Aenlle: "No. I understand."

This investigator: "also have employment when you were employed by either the Sheriff's Office or the County or had a contract with them? Doing business with the County or the Sheriff's Office, did you have any outside employment?"

Aenlle: "Just to be clear, while I was waiting for my position to open --you know, ma'am, I have to be honest with you. Even back when we started the campaign, there was so much involvement and it took so much time that even -- even back then, I started referring business out and was not accepting. I can tell you that when I started even as a contractor here from

January 2023 --it was very, very minimal. And by the time I took my position, I'm basically doing the job of three people here. I stopped doing everything altogether."

This investigator: "Did you go through any kind of an approval process in -- when you had the outside employment and when you were, at least January maybe until July, doing some outside work, employment?"

Aenlle: "I think as a contractor, that was not a requirement. But the sheriff was aware, and -- it was approved."

This investigator: "And when you say, 'it was approved,' do you mean the sheriff gave her approval? Like, "It's okay. You can do it'?"

Aenlle: "Yeah. Many people in the office have outside businesses and outside employment. I just -- we just have to make the sheriff aware."

This investigator: "Uh-huh. And you said you did make her aware, and she was okay with it?"

Aenlle: "Again, she was okay with it, but I -- again, I was not really doing -- my business took so much time by that point."

This investigator: "But she was aware, and the only way she could be aware is if you told her; right? And –"

Aenlle: "That's correct."

This investigator: "Yeah. And then she was – she gave her approval? I don't want to put words in your mouth. So I'm just -- I'm just trying to understand how you knew that it was okay with her. So either she did something in writing, or she told you. I don't know. Can you tell me that?"

Aenlle: "Yes. She's aware, and I -- well, and I asked her. I said, 'My business -- as you know, I'm moving away from it. There might be some – a couple last-minute deals or something that I have to finish, just so you're aware that I would do that. It would not be during the time of -- of my work responsibilities or interfere at all in any type of the work that I'm doing at the Sheriff's Office. It would be on my own time and possibly weekends.'"

This investigator: "And when you had this conversation with her, that would have been at the beginning of 2023?"

Aenlle: "At some point around 2023, yes. Prior to me accepting the—the full-time position. (Aenlle Transcript at pgs. 21-27)

**Findings:**

Aenlle's LinkedIn page, under "Experience," states, "Broker Associate- Commercial and Residential/ Global Luxury Realtor, Coldwell Banker Commercial NRTColdwell Banker Commercial NRT/ <u>1990 - Present 34 yrs 9 mos</u>
• Certified Commercial Investment Member
• Ranked among the top 2% of Coldwell Banker Nationwide
• Recommend acquisition, lease disposition, improvement, property management, and other action consistent with the best interest clients Real Estate portfolios
• Negotiate contracts with sellers and buyers of Real Estate holdings involving commercial and residential properties." (Emphasis added.)
(https://www.linkedin.com/in/victor-aenlle-ph-d-916aa5266/?trk=public_profile_browsemap-profile)

Aenlle's LinkedIn page includes his work as a private investigator:
"Private Investigator/Aenlle Investigative and Protective Services <u>2018 - Present · 6 yrs 9 mos</u>/ Conduct investigations, criminal investigations, executive protection, and surveillance details." (https://www.linkedin.com/in/victor-aenlle-ph-d-916aa5266/?trk=public_profile_browsemap-profile)

Aenlle Investigative and Protective Services is listed on the Guard Guru website:
https://guardguru.com/company/aenlle-protective-and-investigative-services-burlingame-california-121257/

Aenlle did not list any outside employment in his profile that is posted on the Sheriff's Office website. (https://www.smcsheriff.com/executive-director-of-administration-chief-of-staff-victor-aenlle) According to civilian employee (#15), Aenlle has an active private investigator's license: #188650.

Aenlle's image and profile as an associate real estate broker with Coldwell Banker is posted on the company's Half Moon Bay website: (https://www.coldwellbankerhomes.com/ca/half-moon-bay/agent/victor-aenlle/aid_3152/ ) This investigator placed a phone call to the Coldwell Banker Half Moon Bay office on <u>August 15, 2024</u>, at 4:32 pm. It was answered by a woman who confirmed that Aenlle "doesn't work there as much as he used to but that yes, he is still here." She also provided Aenlle's direct phone number: ███ ███ ████

In 2024, Aenlle told a civilian employee (#15) that he was out showing houses and that he was disappointed because he turned down an opportunity to buy commercial property in Pacifica.

On his job application for the Executive Director position that had to have been submitted <u>after July 6, 2023,</u> the date that the job description for the position was published, Aenlle listed his outside employment as "Coldwell Banker 2/1990 – Present, Commercial NRT, San Mateo, California, Hours worked per week: 40."

If, as it appears, Aenlle has had outside employment since 2023, when he began work as the Executive Director of Administration, he would have been obligated to complete the Sheriff's Office "Application for Permission to Engage in Off-Duty Employment," and the County of San

Mateo Human Resources' "Incompatible Activities Form," both of which had to be approved by the Undersheriff and Sheriff Corpus and filed with Human Resources.

Chris Hsiung, the Undersheriff in 2023 through June 2024, told this investigator that he did not receive either of these applications from Aenlle for his approval. Further, a civilian employee (#12) in the Human Resources Department, confirmed that these outside employment applications are maintained in the applicants' personnel files, and that neither of these applications are in Aenlle's personnel file.

It is reasonable to conclude that Aenlle had and continues to have outside employment since 2023 when he was hired as the Executive Director of Administration. As such, Aenlle failed to comply with the County's and the Policy Manual's requirements to engage in outside employment.

**Allegation #5 is SUSTAINED.**

6. **Allegation #6: Aenlle had a conflict of interest when negotiating the lease for the Broadway Property:**

California Government Code Section 1126 prohibits any employee of a governmental agency from engaging "in any employment, activity, or enterprise for compensation which is inconsistent, incompatible, in conflict with, or inimical to his or her duties as a local agency officer or employee or with the duties, functions, or responsibilities of his or her appointing power or the agency by which he or she is employed. ([https://casetext.com/statute/california-codes/california-government-code/title-1-general/division-4-public-officers-and-employees/chapter-1-general/article-47-incompatible-activities/section-1126-generally](https://casetext.com/statute/california-codes/california-government-code/title-1-general/division-4-public-officers-and-employees/chapter-1-general/article-47-incompatible-activities/section-1126-generally) )

As noted in the "Outside Employment" section above, the Sheriff's Office enacted Policy 1022 to address actual or perceived conflicts of interest for employees engaging in outside employment. Section 1022.3 of that policy states, "Consistent with the provisions of Government Code Section 1126. . . the Sheriff's Office prohibits the employee's use of departmental time, facilities, equipment or supplies, the use of the Department badge, uniform, prestige or influence for private gain or advantage. (Emphasis added.)

Several complainants alleged that Aenlle had a conflict of interest when he negotiated the lease for the Broadway Property.

On September 1, 2023, the County secured a 10-year lease agreement for a building located at 686-690 Broadway Street in Redwood City ("Broadway Property") to house a Sheriff's Office Substation and childcare center. The new substation will replace the existing substation in North Fair Oaks, situated in the jurisdiction of the Sheriff's Office. The site for the new substation is not located in the Sheriff's Office jurisdiction. The property is owned by the DiNapoli Family LP, the lessor. **(Exhibit 37: DiNapoli Lease Agreement)**

Complainants allege that Aenlle's involvement in negotiating the lease was improper because of his close ties to Coldwell Banker Real Estate who brokered the lease.

The terms of the lease provide that the County (Lessee), is to pay monthly rent of approximately $35,000. According to a civilian employee (#37) who works in the County's Real Estate Properties Department, the lease is a "triple-net lease" which means that in addition to the monthly rent, the County is obligated to pay all of the lessor's expenses such as property taxes, property insurance, and all maintenance. In this instance, the triple-net lease" added $9,000 to the monthly rent. According to the civilian employee, a "triple-net lease" greatly favors the landlord, to the detriment of the lessee.

The civilian employee (#37) had been contacted by Aenlle who emailed her a flyer advertising the availability of the Broadway Property. He told her that the Sheriff was looking for a property where childcare could be provided for her employees and that he wanted a location in Redwood City. Thereafter, she contacted Bob McSweeney, a well-known Coldwell Banker commercial real estate broker in San Mateo County listed on the flyer, to let him know of the Sheriff's interest in the property. **(Exhibit 38: Email and Flyer for Broadway Property) (Exhibit 39: Broadway Property Brochure)**

Three to four weeks later, Sheriff Corpus, Aenlle, McSweeney and the civilian employee went to view the Broadway Property. Aenlle said, "It's perfect; the location is great." He told the civilian employee to "Wrap it up. We want it."

Subsequently, in a phone call to Aenlle, the civilian employee suggested that they negotiate a lower price with the owner. Aenlle dismissed it and told her that it wasn't a good move. One of the civilian employee's responsibilities is to negotiate leases to ensure that the best use is made of the taxpayers' money. However, in light of Aenlle's instance on moving forward, the civilian employee refrained from negotiating a lower price for the lease.

The civilian employee did, however, negotiate other terms, such as for the duration of the lease. She was able to secure a 10-year lease, with two five-year extension options, for a total of 20 years. The civilian employee said that she "pushed back hard" on provisions that the owner wanted, eventually securing terms more favorable to the County.

In a June 15, 2023, email to Aenlle and Sheriff Corpus, the civilian employee attached a proposed Letter of Intent from Bob McSweeney on letterhead that prominently displayed "CBRE," initials, and also appeared directly under Mr. McSweeney's name. **(Exhibit 40: CBRE Letter of Intent)** In September 2023, the lease was signed off by all parties. Since that time, the Sheriff's Office has spent approximately $572,000 to lease the Broadway Property that continues to be vacant.

The civilian employee stated that although the County is the signatory on the lease, all payments on the lease are the responsibility of the various departments or offices that occupy the premises. In this instance, payment of the monthly rent and triple-net expenses for the Broadway Property totaling approximately $44,000 must be paid from the Sheriff's Office budget.

On pg. 4 of the lease agreement, "CBRE" is listed as the <u>dual broker</u> for the lease: "CBRE Bob McSweeney, Evan Chang & Matt Murray represents County and CBRE Bob McSweeney, Evan Chang & Matt Murray represents Landlord." As well, the owner of the property agreed to

pay CBRE a commission: "Landlord agrees to pay CBRE a leasing commission per the CBRE standard Commission Schedule upon execution of a formal Lease agreement." A Google search revealed that Bob McSweeney, Evan Chang & Matt Murray are Coldwell Banker employees. It is clear, then, that "CBRE" stands for Coldwell Banker Real Estate, and that, given the dual brokerage fees and the commission, this agreement was likely a lucrative one for Coldwell Banker.

The civilian employee told this investigator that there are three Sheriff's Office leases over which Aenlle has asserted supervisory authority, the terms of which are as follows:
(1) Fair Oaks Substation: $4,456.20 per month; expiration date is 6/1/2026;
(2) North Fair Oaks SAL site: $9,023.05 per month; a month-to-month lease that can be terminated anytime without penalty;
(3) Broadway Property: $35,000 per month plus $9,000 per month for the triple-net lease provision= $44,000 per month; 10-year lease plus 5 yr + 5 yr extension option; vacant since September 2023

The Sheriff's Office payments on all of these leases total $57,456 per month. In 2023, the Sheriff's Office paid nearly $700,000 for these leased properties. In 2024, the Sheriff's Office has paid more than $500,000 for the leases. **(Exhibit 41: Lease Summary)**

**Aenlle's Response to Allegation #6:**
This investigator: "Is your involvement in these real estate
transactions -- is that a part in your -- let me go back. Is there a job description for your position as chief of staff and executive director? Is there a job description that exists somewhere?"

Aenlle: "Yeah. Part of that job – there is a job description. It's quite lengthy but also is in projects at the direction of the sheriff. Since -- I mean, why not use the talent that you have and the expertise to make sure that everything looks good? That's it. . . If you look at some of my correspondence with the real estate attorney, you can see that my recommendations on the lease or things that I brought forth had a lot of value that was over- --overlooked."

This investigator: "So your involvement in the real estate transactions is at the behest of the sheriff –"

Aenlle: "Correct."  (Aenlle Transcript at pgs. 45-46)

Aenlle: "My involvement is it was just the Sheriff's Office needed to grow. The substation in North Fair Oaks was subpar. She had been looking for a property for a long time, and one of her sergeants that works in the area sent her a flyer and said, 'What about this?' So she showed it to me, and I said, 'Yeah. Let's -- let's investigate.' And we moved it over to the Real Property Services department for him to – to look into it."

This investigator: "Okay. And -- and was that the extent of your involvement?"

Aenlle: "I mean, I reviewed their – some of their leases, and I helped with information to help. But, yes, pretty much that was it. That's the involvement."

This investigator: "So do you have -- did you -- the lease is with the DiNapoli Family LP. Did you have any -- did you assist at all in getting -- getting that lease?"

Aenlle: "Not at all, ma'am. That was Real Property Services. I do not know the owners. I do not know the agents. I've never been there and met the agent with Real Property Services with me. Zero."

This investigator: "Got it. So you don't -- you had nothing to do with getting -- getting the -- locating this property; right?"

Aenlle: "The property was actually located by Lilian Tashiro. She's a sergeant, and she --- set the fire to the sheriff."

This investigator: "Got it. And you had nothing to do with contacting the lessor -- that would be the DiNapoli family --getting -- had anything to do with them at all?"

Aenlle: "The first time that I heard that name is -- is right here with you today."

This investigator: "Got it. And do you -- did you have anything to do with brokering the lease? Because there -- there – the lease was brokered by a real estate company. Did you have anything to do with that?"

Aenlle: "Absolutely not, ma'am. Absolutely not. That lease was --- was negotiated and brokered through the County. . . I'm not here to steal from anybody or do any shitty deals, believe me. It's—it's—that's not me."

This investigator: ". . . So my question -- and, again, just bear with me on this -- is do you know -- and bear with me a second. There were three individuals who were the brokers for this lease, and they are people who work for Coldwell Banker. "So my question to you is did you know that Coldwell Banker was the broker for this lease?"

Aenlle: "Ma'am, I don't think that is correct. I don't remember Coldwell Banker being there. I thought it was Wakefield or something or -- so the answer to your question is, "No."· Yeah."

This investigator: ". . . Do you know if Coldwell Banker brokered that lease for the -- the -- the building for the substation? Do you know whether or not they did?"

Aenlle: "No, I do not. I thought it was Wakefield or something like that. I met the guy once or -- or twice there when he opened up the building for all of us when we were there. But I -- off the top of my head, I don't think he was Coldwell Banker."

This investigator: "Okay. And do you -- do you --so you're not -- but you don't know who the broker is?"

Aenlle: "I don't recall the broker. I want to say Wakefield, maybe, but I really do not. I didn't know -- I didn't know the agents before. I never met them before. I've never done business with them before. Coldwell Banker residential is big in our area. Coldwell Banker Commercial is not. And I don't recall Coldwell Banker Commercial handling that, per my recollection. . . So in commercial, the way it works is like you have one main guy, and then all those additional names are just -- like just got out of college kind of guys. They're just there to kind of assist. I don't remember -- I can kind of see his face. I really don't remember his name, but I can tell you that the County has done business with him before on other buildings and other leases."

This investigator: "And the 'him' – . . .The 'him' you're talking about is not someone connected with -- with Coldwell Banker?"

Aenlle: "No, no."

This investigator: ". . . I found the three names that I just want to run by you and -- and ask you if these names ring a bell. These were the names that I believe -- and I could be wrong on this -- but were part of brokering the – the lease in Redwood City for the substation and the child care center.· So I'm just going to --- see if you -- if you know these names. The first name is Bob McSweeney. Does that ring a bell with you at all?"

Aenlle: "It is. That's the guy that --that I met there."

This investigator: "And when you say you met there, you met at the building when you did a –"

Aenlle: "At the building—"

This investigator: "-- walk-through?"

Aenlle: "At the building with –"

This investigator: "Yes."

Aenlle: "Real Property itself with Caroline Shaker, yes."

This investigator: "Got it. And did you know Mr. McSweeney before that walk-through?"

Aenlle: I've never met Mr. McSweeney before in my life before that day. I've never done any transaction with him, never met him."

This investigator: "Okay. The next name is Evan Chang. Does that ring a bell?"

Aenlle: "No. Not at all."

This investigator: "And the next one is Matt Murray. Does that ring a bell?"

Aenlle: "No." (Aenlle Transcript at pgs. 33-39; 47-48)


**Findings:**

(1) Aenlle is an associate broker with Coldwell Banker Real Estate, (2) Aenlle initiated and played a major role in securing the Broadway lease, (3) Sheriff Corpus participated in the negotiations and approved the lease, and (4) Coldwell Banker Real Estate brokered the lease agreement, earning dual brokers' fees.

Aenlle has denied knowing that the broker for the lease was Coldwell Banker. However, his words and at least one document emailed to him cast doubt on his denial. At one point, Aenlle told this investigator, "[C]early, I've been around the business world and in real estate for 30 years. I know contracts. I know leases." (Aenlle Transcript at pg. 29) It is reasonable to believe that Aenlle would have, at a minimum, heard of Bob McSweeney's extensive commercial real estate transactions with the County.

More compelling is the fact that the initials "CBRE" appear prominently at the top of the Letter of Intent (LOI) that was emailed to Aenlle; the initials also appear directly beneath Bob McSweeney's name on that document. It stretches credulity to believe that Aenlle, a longtime associate real estate broker with Coldwell Banker did not know that "CBRE" is the acronym for Coldwell Banker Real Estate. As well, Aenlle stated that when he viewed the Broadway location with Sheriff Corpus, the Coldwell Banker broker who represented the owner, Bob McSweeney, was there to show the property. Once again, it is difficult to believe that Aenlle had no idea that Mr. McSweeney represented Coldwell Banker in the Broadway lease negotiations.

At the very least, Aenlle's involvement in the lease negotiations for the Broadway Property created a *perception* of a conflict of interest because of his long-standing association with Coldwell Banker. At most, if he financially benefitted from the transaction, his involvement would constitute an actual conflict of interest. In either instance, Aenlle appears to have violated Government Code 1126 and the Sheriff's Office Policy 1022 by not disclosing his employment with Coldwell Banker.

Finally, if Sheriff Corpus knew or should have known of Aenlle's connection to Coldwell Banker, she would have been obligated to remove Aenlle from participating in the negotiations for the property to avoid violating Government Code 1126 and Policy 1022.

**Allegation #6 is SUSTAINED.**


7. **Allegation #7: Aenlle did not follow the proper protocol for the selection of a construction contractor for the Broadway Property.**

San Mateo County Administrative Memorandum B-21 prescribes the requirements regarding contracts for construction and public works: (https://elr-smcgov.org/selection-of-construction-contractors/) "A public construction project as defined by the Public Contract Code, includes

construction, reconstruction, erection, alteration, renovation, improvement, demolitions, and repair work, painting or repainting."

For construction contracts valued at $100,001 and greater, "DPW [Department of Public Works] or County Manager's Office Capital Projects (CMOCP) staff must manage these projects regardless if the facility is maintained by DPW. These projects will go through a formal bid process and must be approved by the Board of Supervisors and comply with other applicable sections of the Public Contract Code." (Administrative Memorandum B-21, Section III).

Complainants allege that Aenlle did not follow the County's procedures for the construction contract to renovate the Broadway Property.

- A civilian employee (#14) facilitates the County's contracts and ensures compliance with procurement policies. She said that there are strict rules for public construction projects, that must include properly executed Requests For Proposals ("RFP"). After the Broadway Property lease was signed, according to the civilian employee, Aenlle rushed the construction/renovation process for the property, so that there is insufficient time to properly execute the RFP. The civilian employee told Aenlle that more time was needed. In response, Aenlle said that he didn't care.

  There was a Zoom meeting about the RFP for the Broadway Property attended by the civilian employee (#14), another civilian employee (#15), a sworn employee (#18), and one other civilian employee. Aenlle ran the meeting. At one point, a civilian employee said to Aenlle, "We will get crap if we rush [the RFP]." Aenlle cut him off, raised his voice and said, "I don't need a lesson in county policy!"

  The civilian employee (#14) understood that RFPs with a value of $500,000 or more must be reviewed by County Counsel and so advised Aenlle. In response, Aenlle instructed the civilian employee to use an estimated value of $450,000. The civilian employee believes that Aenlle set this value in order to bypass County Counsel review. The civilian employee believes that the estimated value of the construction contract for the Broadway Property is considerably higher than Aenlle's estimated value for the renovations.

  The civilian employee stated that the RFP was subsequently cancelled, and the process re-started. The civilian employee believes that it was Aenlle's rush to process the RFP and his failure to heed staff's advice that resulted in cancellation of the RFP.

**Aenlle's Response to Allegation #7:**
Aenlle: "When it came down to County Counsel approval, they found that a small statute that had to do with notice or something like that was not followed. When we looked into it, that statute was -- it was an oversight. It was not listed anywhere in any documents in the county or in the process itself or any of the documents in the process of RFP.

"We also learned that we had switched over to a new system, NEOGOV, for all county RFP processes, and we learned that even though you check the box just like a city planning, you

know, building process works when we check the box, documents go to certain departments for approval. Even though our box is being checked, it never notified those documents, one being legal counsel.

"So they kind of learned about this RFP process and -- you know, at the tail end, and they were not comfortable that that statute, which was small in nature but nevertheless was a statute, was overlooked. We brought it to the County Executive's attention and the attorneys, and they recommended we basically redo the entire process through a QRF design-build process, and they also recommended that we hire a project manager." (Aenlle Transcript at pgs. 51-52)

**Findings:**
According to Aenlle, the cancellation of the RFP was because of his staff's "oversight." The civilian employees stated that it was Aenlle's refusal to listen to their advice that caused the RFP to be cancelled. A civilian employee's (#14) responsibility is to facilitate County contracts and ensure compliance with County rules. Her position requires her to be well-versed in the County's compliance rules. Aenlle's does not have a background in the County's compliance procedures and does not appear to be interested in acquiring that information. Therefore, it is reasonable to find that the civilian employee's explanation is credible.

**Allegation #7 is SUSTAINED.**

8. **Allegation #8: Aenlle does not follow the County's procurement policies:**
The County has established rules for soliciting, selecting and developing agreements with providers of good and services. (See Administrative Memorandum, Number B-1, issued May 9, 2022.) Those rules require that "all procurements should adhere to the County's Procurement Ethics Policy" and emphasize that "competitive procurement is the County's preferred method of procurement." (At pg. 1) (Emphasis added.)

The County's Procurement Ethics Policy addresses procurement activities:
"Public employees are stewards of public funds and must ensure that expenditures of public funds, such as through the procurement and contracting process, occur in an ethical and responsible manner. . . Solicitations for procurement should be conducted in a fair, open, consistent and transparent manner. Information regarding the manner in which goods and services are procured should be available to all parties at the same time. Once the solicitation process has been completed, the information about the solicitation should be available to the public." (https://www.smcgov.org/ceo/procurement-ethics)

Complainants allege that Aenlle did not follow the County's procurement rules for service contracts.
- A civilian employee (#14) facilitates County contracts and ensures compliance with contracting rules. According to her, the normal process is for the requestor to complete a contract form that is submitted to her. However, she said that Aenlle is reluctant to put his requests in writing. She noted that several times, Aenlle bypassed her review and, instead, executed contracts on his own. As a consequence, on at least five occasions, the civilian

employee received invoices from the Sheriff's Office that the County was not authorized to pay because Aenlle had not followed the proper procedures.

- According to a civilian employee (#14), in 2023, Sheriff Corpus verbally agreed to a service contract with a business to provide food for Corrections. Civilian employee (#14) prepared the contract and sent it to the Sheriff for her approval. Sheriff Corpus subsequently refused to sign the contract even though the contractor had begun working. Aenlle told the civilian employee, "That guy's a crook," referring to the contractor. Aenlle refused to allow the contractor to continue working. The contractor became upset and told the civilian employee, "I started working. How do I get compensated?" The matter was eventually resolved with a financial settlement paid by the County to the contractor.

- A civilian employee (#14) said that Aenlle, on his own, and without submitting the proper paperwork to the civilian employee, entered into a contract with a woman to write grants for the Sheriff's Office. The civilian employee knew nothing about the woman, and yet was forced to grant the woman access to the County's grant data. It quickly became clear to the civilian employee that the woman did not know what she was doing. Subsequently, the civilian employee's supervisor ordered the woman's access to be blocked. The woman's contract was eventually cancelled.

**Aenlle's Response to Allegation #8:**
This investigator: "Two more just on service contracts. I don't have a lot of detail, and if you don't recall, that's fine. But I'm curious if you recall a service contract with a vendor to provide food at the jails that eventually fell through. Does that ring a bell with you at all? That would have been in 2023."

Aenlle: "Yeah, very slightly. Again, I was not part of that. So I have very limited information available. But I was not part of initiating that contract or anything like that."

This investigator: "Right. Did you ever, though, say -- accuse the contractor of being a crook?"

Aenlle: "No."

This investigator: "Do you recall -- let me put it this way: Do you recall getting any information that might have caused you to believe that that contractor should not have a contract?"

Aenlle: "I –"

This investigator: "Again, if you don't remember –"

Aenlle: "I can't speak to that."

This investigator: "That's fine. And when you say you can't speak to it, does that mean you don't remember it or you just don't want to talk about it?"

Aenlle: "No, no, no. It's not that I don't want to talk about it. I really don't remember that –"

This investigator: "Okay."

Aenlle: "what you're asking me. And that -- that contract was not initiated by me."

This investigator: "But you had nothing to do --you didn't get involved in it at all subsequently?"

Aenlle: "At some point, with the advice of legal counsel, I got involved."

This investigator: "Talk to me about that."

Aenlle: "Just to make sure that the separation was proper and was done accordingly."

This investigator: "Okay. And when you say 'legal counsel,' can you recall who"

Aenlle: "David Silberman."

This investigator: "David Silberman?"

Aenlle: "Yes."

This investigator: "Okay. All right." So you reached out to him, or he reached out to you?"

Aenlle: "I don't recall who reached out to whom."

This investigator: "[D]id you recall entering into a contract with a woman that you brought in to write grants – do grant writing for the Sheriff's Office?"

Aenlle: "Yes, ma'am."

This investigator: "Can you talk to me about that and what happened and your involvement in it."

Aenlle: "We were looking for opportunities to increase the revenue for the office, and we felt that there was a lot of potential grants available, and we had nothing set up in the office. The only contract that we had set up was with a lobbyist in Washington, D.C., from the prior administration, and basically he was just taking money and not providing any results.

"Out of four or five years of paying him a very large amount of money, he only materialized with one grant that, again, we were not able to correctly use. So I looked for opportunities at the direction of the sheriff. 'Let's see if we can get some people that can -- can really go after

this -- the grant so we can supplement the department and get -- get more training or -- or whatever else the department needs.' It didn't -- it didn't work. I thought she was good, but nothing ever came of it. She never secured anything."

This investigator: "Right. How was she even brought into it? I guess that's really what I'm asking now. Who brought her in, and who did the contract?"

Aenlle: "Word -- word of mouth. We – we asked some recommendations, you know, some people that are using. She was out of Las Vegas, and she came highly recommended. I don't recall the -- the actual details, but I initiated that contract."

This investigator: "Got it."

Aenlle: "Like I –"

This investigator: "And then what –"

Aenlle: "Like I've done many, just at the direction of the office."

This investigator: "So when you say "the office," you mean the sheriff?"

Aenlle: "Yes."

This investigator: "Again, I'm not trying to put words in your mouth, but I want -- I just want to be –"

Aenlle: "The sheriff, the undersheriff. I have -- I have -- I report directly to the undersheriff.

This investigator: "Right. But I think your job description says you can also -- you report to the undersheriff and to the sheriff."

Aenlle: "Absolutely, ma'am. We all do."

This investigator: "Okay. I've got you."

Aenlle: "So let me -- let me make one thing clear. They contract with the -- with that specific person -- actually, I -- ma'am, can we go back for one second?"

This investigator: "Absolutely. Absolutely."

Aenlle: "I want to make sure that I'm giving you the right information and it's not getting mixed up because there's been two contracts with grant writers with a woman. So I want to make sure that I'm speaking to what you're asking me of."

This investigator: "Yeah. The one I'm asking about is the one that got canceled."

Aenlle: "None of them got canceled, but I'm only going to go with the one in Vegas, yeah. So the contract stopped monetarily. She was only going to get paid if she got -- if she got -- it was a commission based, if she actually was able to secure grants for us. That's it."

This investigator: "Got it. Is there a -- is there a process or protocol for contracting with -- either for services or whatever? Do you have to follow certain procedures or what? Can you explain to me, like, how that works."

Aenlle: "Yeah. It -- it depends, ma'am. If -- if we're going for a vendor or something like that --"
This investigator: "Yes."

Aenlle: "-- we follow an RFP process. If it has to do for -- you know, something for the sheriff's -- for the Sheriff's Office -- for example, a personnel that has an expertise that's needed in the office that we don't have the -- the upper staff or we need an expertise, no. The sheriff has the ability to -- to hire that person --"

This investigator: "So you --"

Aenlle: "under a separate contract."

This investigator: "Got it. So when we're talking about the vendor for the food that was going to be for the jails and that got --and you had legal counsel advise you about that one, was that a contract, or was that a -- did that have to go through an RFP, or how did that have to -- how did that work?"

Aenlle: "Ma'am, I just want you to know that that contract never went through. We were never in contract with that person. And just so you know, we were never in contract with that person."

This investigator: "Do you know if the sheriff approved it verbally, and then it was subsequently then -- do you know anything about that? Again, I don't want to put words in your mouth. I'm just trying to --"

Aenlle: "And I don't want to speak for the sheriff. But I can tell you that how she is, she would not have said -- approved anything verbally like that I know I'm not speaking --This is just from my -- from my point of view." (Aenlle Transcript at pgs. 54-61)

**Findings:**
When Aenlle was asked by this investigator to describe the County's process for securing service contracts, he said, "It -- it depends, ma'am. If -- if we're going for a vendor or something like that we follow an RFP process. If it has to do for -- you know, something for the sheriff's -- for the Sheriff's Office -- for example, a personnel that has an expertise that's needed in the office that we don't have the -- the upper staff or we need an expertise, no. The sheriff has the ability to -- to hire that person under a separate contract." Aenlle did not even mention the rules that are clearly delineated in the County's Administrative Memorandum. It is clear that Aenlle is not

familiar with the County's procurement rules for soliciting and selecting providers of services, and that he has no interest in learning them.

**Allegation #8 is SUSTAINED.**

9. **Allegation #9: Sheriff Corpus and Aenlle improperly issued Concealed Carry Weapon permits.**

California Penal Code sections 26150 and 26155 provide that a Sheriff of a county or the Chief or other head of municipal police department of any city, or city and county, shall issue or renew a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person (Concealed Carry Weapon license).

Effective January 1st, 2024, Senate Bill 2 requires that the firearms training course for initial CCW applications be a minimum of 16 hours and for CCW renewal applications be a minimum of 8 hours - Penal Code 26165.

The California Department of Justice Bureau of Firearms lists the categories of individuals who are prohibited from receiving CCW permits. (https://oag.ca.gov/system/files/media/Firearms-Prohibited-Categories.pdf)

Complainants alleged that Sheriff Corpus and Aenlle improperly issued concealed carry weapon ("CCW") permits to Aenlle's son and to a Sergeant who had been terminated from the Sheriff's Office for egregious misconduct.

- A sworn employee (#30) stated that after the election of Sheriff Corpus, he was in charge of reviewing requests for CCW permits. He "cleaned up" the CCW procedures that had been in effect under the Bolanos administration and explained the new procedures to Aenlle. In March or April 2023, Aenlle or the Sheriff removed the sworn employee (#30) from operating the CCW program and hired a retired sworn employee, who had been the range master under Bolanos, as his replacement. The retired sworn employee is an "extra-help" senior management analyst, whose pay is an additional cost for the Sheriff's Office, as opposed to the sworn employee (#30), a salaried, full-time peace officer who operated the CCW program as part of his official duties. The sworn employee (#30) believes that his replacement follows Aenlle's orders, such that Aenlle has control of the CCWs.

- According to an anonymous sworn employee, Sheriff Corpus, with the assistance of Aenlle, "possibly" issued a CCW permit to Sergeant ████ ████ who had been terminated from the Sheriff's Office for several "egregious" violations and should not have been issued the permit. The anonymous sworn employee also complained that Aenlle issued a CCW permit to his own son.

**Aenlle's Response to Allegation #9:**

This investigator: "Have you ever been involved in or assisted in giving a concealed carry permit to a terminated sheriff's sergeant whose name is ███ – and I'll spell the last name --

Aenlle: "I oversee the CCW permit. ███ was an applicant here. He did not have anything in his background. Per law, they would -- would not permit him to have a CCW."

This investigator: "Okay."

Aenlle: "He was treated like any other members of -- of the community. There's a lot of members that I think they should be denied, and I struggle with that every day. But the way that the current laws are, we have very limited reasons to deny somebody a CCW in today's environment. ███ met every qualification. He was not afforded anything special and -- and qualified to get his permit. I personally did not approve it. I'm part of the chain that makes sure that – that everything's followed and corrections done, and the final decision is made by the sheriff."

This investigator: "So it was the sheriff who had the final say with that particular permit?"

Aenlle: "Every permit, it gets -- it gets approved by the sheriff. It doesn't matter –"

This investigator: "Did you –"

Aenlle: "-- who it is."

This investigator: "Sure. Did you recommend that it be approved?"

Aenlle: "I -- I rec- -- I don't recommend or not. I move them up the chain. So once -- once I see it in my level and make sure that everything's been uploaded, that everything's been done, that the psych- -- psychological testing has been done, that all the guns have been run, I check for facts; that it doesn't have any qualifying factors that has to be dismissed almost like, you know, arrest or, you know, something major in their record. I make sure the DOJ is cleared. Then I move it on to the sheriff, and she makes all the decisions on every single CCW."

This investigator: "So if something had been wrong, you -- and you saw it, you could have flagged it then; right? That you would do?"

Aenlle: "Anything that I see that's wrong that -- And let me -- let me -- let me correct "wrong." That -- that -- that is outside within the -- the legal limits of issuing a CCW, yes, I flag and make sure that it's -- it's looked at further and evaluated. Sometimes I'll pull in legal counsel for advice. We've done that many times. Sometimes I'll call a unit meeting with all the background investigators to -- to -- and the – the lieutenant to review those, and that's part of the process."

This investigator: "Got it. Did you approve a CCW permit for your son?"

Aenlle: "I wasn't even an employee."

This investigator: "Is the answer –"

Aenlle: "My son –"

This investigator: "Go ahead. Go right ahead."

Aenlle: "The answer is, "No." I could not have approved that. My son applied just like anybody else, went through the process like anybody else, met the law, met all the requirements, and that permit was not approved by me. I was not employed in the Sheriff's Office." (Aenlle Transcript at pgs. 116-119)

**Findings:**
Aenlle oversees the CCW permit program; and as he noted, final approval for the issuance of all CCW permits rests solely with Sheriff Corpus. Aenlle acknowledged that he reviewed former Sgt. ████ permit request and did not flag it as being problematic. Only those individuals who fall within the prohibited categories designated by California Department of Justice Bureau of Firearms prohibited categories, can be denied CCW permits. Those categories include certain criminal convictions and mental health adjudications. That ████ may have been fired by the Sheriff's Office for egregious conduct would not, alone, be sufficient reason to deny him a CCW permit. Aenlle stated that when his son was issued a CCW permit, he was not employed by the Sheriff's Office.

**Allegation #9 is UNFOUNDED.**

**10. Allegation #10: Aenlle has improperly removed social media posts criticizing Aenlle and Sheriff Corpus.**
The Sheriff's Office maintains an Instagram account:
https://www.instagram.com/smcsheriff/?hl=en
The account has nearly 12,000 followers and more than 1,500 posts. Its purposes appear to be to support its personnel and to keep the public informed about the work of the Office. The Sheriff's Office Instagram account also provides a forum for public comment. As such, comments posted to the account are speech protected by the First Amendment, even those comments that are critical of the Office.

As the U.S. Supreme Court has explained, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." (*Texas v. Johnson, 491 U.S. 397 1989); https://supreme.justia.com/cases/federal/us/491/397/#tab-opinion-1958036* However, hate speech and threatening speech may be regulated by government.

An anonymous complainant alleged that several of his comments on the San Mateo County Sheriff's Office Instagram page that were critical of the Sheriff and Aenlle were removed and that on March 19, 2024, he was banned from posting comments.

- The complainant stated that in the comments section, he was "critical of Sheriff Corpus and her Boyfriend Mr. Aenlle. I have pointed out that she is having an affair with Aenlle and that she uses county funds to go away on "work trips" with Mr. Aenlle" and that "Aenlle uses the funds Corpus pays him to rebate back to Sheriff Corpus."

  Further, the complainant stated that Aenlle paid for first class airline upgrades, bought the Sheriff $12,000 earrings from Tiffany, expensive shoes and clothing worth tens of thousands of dollars, "in exchange for her hiring him for a job she made up." The complainant stated that all of these comments were deleted by the Sheriff's Office.

  According to the complainant, on March 19th, 2024, after the Sheriff's Office Instagram account posted a photo of Sheriff Corpus and Aenlle, the complainant posted the comment, "Does she go to ANY event without her boyfriend?" A few hours later, the complainant was blocked from posting comments on the San Mateo County Sheriff's Office Instagram page.

**Aenlle's Response to Allegation #10:**
This investigator: "Have you ever directed that any social media posts such as Instagram, for example, be blocked or taken down? And, again, this is in connection with the Sheriff's Office."

Aenlle: "Yeah, yeah. I'm sure there was --there was some discussions. I -- I -- I never ran the social media before. It was Chris Hsiung, and there were some voices made because it met certain requirements, but we don't make a habit of that."

This investigator: "But have you ever done that? Have you ever directed it be done?"

Aenlle: "I -- what I directed to be done --and I think it was once, and I think it was discussed with legal counsel -- is a nature that was -- that met the requirements to be at least removed or blocked for -- for some reason. But I can tell you that I was not the only one part of that decision. That was -- that was – Chris Hsiung was involved in that."

This investigator: "Okay."

Aenlle: No, ma'am, we don't make a habit of doing that. I think was a -- a one case. In one of them, somebody threatened his life. Something like that. Or it was -- it was just one of those weird things."

This investigator: "But if there were comments --have there been negative comments online about the sheriff or about you, the Sheriff's Office? Have you been a part of directing that negative comments -- I'm not talking about threats -- be blocked or removed?"

Aenlle: "I think there was one that crossed the line that was talking about the sheriff's kids, ma'am, if you're speaking to that, and Chris Hsiung was involved in that, and I was involved,

and it was a decision to -- to block that person. And I believe that was brought up to legal counsel as well." (Aenlle Transcript at pgs. 120-122)

**Findings:**

While the complainant's comments were disagreeable to Aenlle and Sheriff Corpus, they were neither hateful nor threatening. Therefore, the deletion of the complainant's comments and blocking the complainant's access to the account by someone in the Sheriff's Office likely violated the complainant's First Amendment right of free speech.

Aenlle has denied directing the removal from the Office's Instagram account of any critical comments or blocking any individuals from posting on the account. He did state that the Office removed a life-threatening comment and another comment that was abusive of the Sheriff's children, actions that were likely appropriate under the First Amendment.

While this investigator has no reason to doubt that the complainant's comments were deleted and that the complainant was blocked from accessing the Office's Instagram account, there is insufficient evidence to establish that Aenlle was directly responsible for deleting the complainant's comments and blocking the complainant from the account.

**Allegation #10 is NOT SUSTAINED**

**11. Allegation #11: Aenlle, Sheriff Corpus and her Executive Team improperly possess suppressed rifles.**

*Note: This allegation arose after Aenlle's interview with this investigator.*

Penal Code section 33410 makes it a felony to illegally possess a silencer or suppressor.  Penal Code section 33415 (b) exempts "regular, salaried, full-time peace officers employed by an agency listed in Section 830.1, or by the military or naval forces of this state or of the United States, when on duty and when the use of silencers is authorized by the agency and is within the course and scope of their duties."

A complainant alleged that Aenlle, Sheriff Corpus and her Executive Team are unauthorized to possess suppressed rifles.

- On September 24, 2024, at 16:47 hrs., a sworn employee (#30) received a call from a Captain who directed him to give three suppressed rifles to the Sheriff, the Undersheriff and Assistant Sheriff Fox.

- According to the sworn employee who is assigned to the firing range, suppressed rifles are rifles with silencers. In 2023, the Sheriff's Office purchased 220 suppressed rifles that arrived approximately four months ago.

- The sworn employee told the Captain that Aenlle could not have a suppressed rifle because he was a civilian, and that neither the Sheriff, Undersheriff nor the Assistant Sheriff could lawfully possess the rifles because they were out of compliance due to their lack of mandatory training.

- In response, the Captain laughed and said, "You can arrest Victor. Just do it anyway. Bring the three rifles next week. Also, print out labels and put the names of the Sheriff, Undersheriff and Assistant Sheriff on each rifle." The sworn employee said that he would do as ordered and also that would report the transfer of the rifles in RIMS (a reporting system that tracks Sheriff's Office property).

- On Monday, September 30, 2024, at 11:17 hrs., the sworn employee spoke with the Acting Assistant Sheriff and told him that the Sheriff, Undersheriff and he, the Acting Assistant Sheriff, had not attended classes to qualify to possess the rifles. In response, the Acting Assistant Sheriff said, "I know. I never attended class in Daly City. If Armageddon hits, we'll pass them [the rifles] out."

- The Acting Assistant Sheriff also told the sworn employee that he had just installed a gun safe on the 5th floor of Headquarters near the offices of the Sheriff, the Undersheriff and Aenlle.

- That same day, on September 30th, Aenlle called the sworn employee and said, "[Name of a Captain] said something about a problem with the rifles." The sworn employee told Aenlle that the Sheriff, Undersheriff and Assistant Sheriff could not possess the rifles and that he, Aenlle, could not have one either because "you are a civilian now." Aenlle told him, "I'm a designated Level I reserve, I've been to rifle class, I'm still registered in POST as a Designated Level I." The sworn employee believes that Reserves cannot possess suppressed rifles, even if they are Designated Level I.

- At approximately 9:40 a.m. on Tuesday, October 8, 2024, the sworn employee delivered three suppressed rifles to the 5th floor of Headquarters. He saw Sheriff Corpus in the hallway near the reception area and said hello. The Sheriff asked him, "What are you doing?" The sworn employee said, "I'm delivering the rifles." The Sheriff responded, "Okay. Thank you," and walked away.

- Aenlle was in the reception area and said, "Hey, [first name of the sworn employee (#30)]." The sworn employee said, "Per your request, here are the rifles," to which Aenlle responded, "Oh, thank you." Aenlle then walked over and touched the rifles, saying, "Oh, these are them?" A gun safe was bolted to the floor just outside Aenlle's office and was open. The sworn employee said, "I put labels on them" and then placed the suppressed rifles in the safe, with the muzzles up. The sworn employee had labeled each rifle "Sheriff," "Undersheriff," and "Assistant Sheriff" as he had been instructed by the Captain. **(Exhibit 42: Photos of Suppressed Rifles)**

- Aenlle lifted one of the rifles without removing it from the safe and inspected it. The sworn employee asked Aenlle, "Do you have the code to the safe?" Aenlle said, "I have the combination." The sworn employee closed the safe and asked Aenlle to open it to confirm that he, in fact, had the code. Aenlle entered the code and opened the safe.

- The sworn employee believes that the Sheriff, Undersheriff, Assistant Sheriff and Aenlle are not qualified to possess rifles with or without silencers/suppressors. According to the

sworn employee, if a rifle is assigned to a specific person, no one else can use that rifle, unless the person assigned to the rifle gives it to someone who is qualified, and the assignment is documented.

**Findings:**

Aenlle is not a "regular, salaried, full-time peace officer." He is a salaried, full-time <u>civilian</u>. If he were a reserve deputy, which is questionable, he still would not be a "regular, salaried, full-time peace officer." As such, he is prohibited by Penal Code Sections 33410 and 33415(b) from possessing a suppression rifle. Aenlle has the code to the gun safe where the rifles are stored, and given his interest in securing the weapons, he now has easy access to the suppressed rifles.

POST requires a 2-day training for certification to possess a rifle. According to the sworn employee, the Undersheriff, the Assistant Sheriff and the Sheriff have not taken any such training. And even though these three individuals are "regular, salaried, full-time peace officers," under Penal Code section 33415(b), if they are not in compliance with POST and with Policy Manual training requirements for the suppressed rifles, it would seem that they are not qualified to possess them. Until that matter is clarified, the three suppressed rifles should be immediately removed from the gun safe and returned to proper storage at the firing range.

**Allegation #11 is SUSTAINED with respect to Aenlle.**
**Allegation #11 is NOT SUSTAINED with respect to Sheriff Corpus, Undersheriff Perea, and Assistant Sheriff Fox.**

**12. Allegation #12: Aenlle has misrepresented that he earned a Ph.D.**
Complainants alleged that Aenlle has lied about earning a Ph.D.
- As noted earlier in this report, a civilian employee reported that Aenlle insists that staff address him as "Dr. Aenlle." And at least one sworn employee was repeatedly told by Aenlle to address him as "Dr."

- On October 26, 2023, Sheriff Corpus sent a memo to all personnel in which she congratulated Aenlle for earning a Ph.D. **(Exhibit 43: Corpus Ph.D. Memo)**

**Aenlle's Response to Allegation #12:**
This investigator: "Have you earned -- in fact, earned a PhD?"

Aenlle: "Yes, ma'am. Of course."

This investigator: "So you -- and when did you finally get your PhD?"

Aenlle: "2023 sometime midyear. At some point around there."

This investigator: "Okay. And I do understand that the place from which you earned your PhD is no longer in existence."

Aenlle: "That is correct."

This investigator: "Right. Are you able still to get your transcript if you were asked?"

Aenlle: "Yes, ma'am. I would be able to, yeah. Union -- Union Institute and University is -- is geared towards law enforcement. Many people in this department have at least a bachelor or whatever they finished through there, and throughout the law enforcement community, it is very well-known. Like anything else through COVID, they went through financial. Their PhD program is one of the top and the best in this country, and it was actually -- it didn't go under. It was moved to another college. So this same program still lives today. So -- and, yes, I can still have -- get transcripts, I'm sure, and whatever else you need. I earned my PhD, ma'am. . . so So I --I -- and I wanted to help people after my brother was killed. That's the only reason why I'm in this department.

"And I made it a point, and I got my bachelor's in criminal justice, and I got my master's in organizational leadership, and I went further and got my PhD. And I would have been done sooner. I should probably -- I got my PhD in -- in -- in three and a half, four years, but the sheriff campaign took a lot of time, and I couldn't keep writing 60-page papers every night, and it got delayed. Once she was -- once she won, then I took a step back and focused on -- on what I needed to finish and defended my -- my dissertation -- successfully defended my dissertation. So anybody that tries to dimin- -- diminish my work, my investment, and my hard work to earn a PhD that not everybody has is shame- -- should be shame- -- shameful." (Aenlle Transcript at pgs. 114-116)

**Findings:**
Aenlle's biography on the Sheriff's Office website includes his photograph and directly beneath it, his name "Victor Aenlle, Ph.D." This biography also includes the following educational information: "Victor returned to school to study at Union Institute & University, earning a Bachelor of Science in Criminal Justice Management, a Master of Science in Organizational Leadership, and Ph.D. in Interdisciplinary Studies specializing in Ethical and Creative Leadership."(Source: https://www.smcsheriff.com/executive-director-of-administration-chief-of-staff-victor-aenlle )

On the website Experience.com, his profile includes the following description of his educational background: "Education: Doctor of Philosophy in Interdisciplinary Studies (In Progress), Master of Science Degree in Organizational Leadership, Bachelor of Science Degree Professional Philosophy."  (Source: https://www.experience.com/reviews/victor-3918456 ) On his LinkedIn page, Aenlle's description of his educational background is as follows: "Victor has earned a bachelor's degree in criminal justice management, a master's in organizational leadership, and is now a doctoral candidate specializing in creative and ethical leadership." This page is up-to-date because on it he includes his length of employment as Executive Director, to wit, "Chief of Staff, Executive Director of Administration, August 2023-Present- 1 yr. 2 mos." (Source: https://www.linkedin.com/in/victor-aenlle-ph-d-916aa5266/?trk=public_profile_browsemap-profile) (Emphasis added.)

The resume that Aenlle submitted along with his application for his current position with the Sheriff's Office, states that in 2016 and 2018, he received his bachelor's and master's degrees

from Union Institute & University in Sacramento, California, and that he "expected" to receive his doctorate in August 2023.

On his application for the Executive Director position, he answered, "No" when asked did he graduate with a Doctor of Philosophy.

Union Institute & University was a private nonprofit online institution, having permanently closed its doors on June 30, 2024. It is currently facing a class action lawsuit by disgruntled students and has been fined $4.3 million by the U.S. Department of Education for misappropriating federal funds. (https://www.classaction.org/news/union-institute-and-university-sued-by-students-graduates-beset-by-consequences-of-alleged-financial-mismanagement)

Contrary to Aenlle's assertion, Union Institute & University has not simply relocated. It is permanently closed due to financial mismanagement. Whether Aenlle possesses a Ph.D. is questionable. Since transcripts of former students of the now-defunct Union Institute & University can be obtained using this link: https://myunion.edu/request-transcript/, Aenlle should allow County Counsel or his designee access to Aenlle's transcripts to establish what are his actual educational credentials.

**Allegation #12 is NOT SUSTAINED.**

### 13. Allegation #13: Aenlle is not authorized to wear a badge that resembles the gold badges of sworn employees.

California Penal Code Section 538d(b)(2) imposes criminal penalties on anyone who ". . . willfully. . . uses any badge. . . which so resembles the authorized badge of a peace officer as would deceive any ordinary reasonable person into believing that it is authorized for the use of one who by law is given the authority of a peace officer, for the purpose of fraudulently impersonating a peace officer, or of fraudulently inducing the belief that he or she is a peace officer."

This prohibition on facsimile badges is a misdemeanor, punishable by imprisonment in a county jail not to exceed one year, a fine not to exceed $2,000, or both. (Penal Code Section 538d(b)(2))

Furthermore, any who issues such badges is guilty of a misdemeanor, to wit, "[Anyone]. . . who willfully. . . gives, or transfers to another, any badge . . . which so resembles the authorized badge. . . of a peace officer as would deceive an ordinary reasonable person into believing that it is authorized for the use of one who by law is given the authority of a peace officer, is guilty of a misdemeanor. (Penal Code Section 538d(c))

The Sheriff's Office Policy 1026.2 states, "The uniform badge shall be issued to Office members as a symbol of authority and the use and display of Office badges shall be in strict compliance with this policy. Only authorized badges issued by this Office shall be displayed, carried or worn by members while on duty or otherwise acting in an official or authorized capacity." (Emphasis added.)

With respect to civilian personnel, "Badges and Office identification cards issued to non-sworn personnel <u>shall be clearly marked to reflect the position of the assigned employee</u>. (a) Non-sworn personnel shall not display any badge except as part of his/her uniform and while on duty, or otherwise acting in an official and authorized capacity. (b) <u>Non-sworn personnel shall not display any badge or represent him/herself on or off duty, in such a manner which would cause a reasonable person to believe that he/she is a sworn peace officer.</u>" (Emphasis added.)

Several interviewees reported that Aenlle wears a gold badge on his waistband when in street clothes and that the badge is identical in size and shape to the gold badges issued to regular sworn members of the Office. Aenlle's gold badge has the words "Chief of Staff" on it.

Some interviewees complained that at a distance, the words "Chief of Staff" on his badge are not readily visible so that without closely examining Aenlle's gold badge, it looks like the badge of a regular sworn employee of the Sheriff's Office.

**Aenlle's Response to Allegation #13:**

This investigator: "Do you wear a badge?"

Aenlle: "Yes, ma'am."

This investigator: "And can you please describe the badge."

Aenlle: "It is a Sheriff's Office badge with a rocker that says, 'Chief of Staff.'"

This investigator: "Okay. And does -- and can you tell me what color it is."

Aenlle: "The same color as all the other badges. It's a gold badge."

This investigator: "Gold badge. And who issued you the badge?"

Aenlle: "The sheriff issues badges, ma'am."

This investigator: "So the sheriff directed that you have that badge?"

Aenlle: "Correct."

This investigator: "Okay. And do -- isn't it -- and, again, I'm just trying to get clarification on things. It is my understanding that all sworn personnel have gold badges. Is that true?"

Aenlle: "That is true."

This investigator: "Right."

Aenlle: "That's a true statement." (Aenlle Transcript at pg. 104)

**Findings:**

Aenlle is a full-time, salaried civilian employee in the Sheriff's Office. His claim to be a Reserve deputy, even if true, does not transform him into a full-time, salaried sworn peace officer. Aenlle, by his own admission and supported by the observations of numerous civilian and sworn employees, wears a gold badge that closely resembles the gold badges worn by all of the full-time, salaried sworn peace officers of the Sheriff's Office. **(Exhibit 44: Aenlle Wearing Gold Badge)** Aenlle's badge has the words "Chief of Staff," a civilian position, printed in small print at the top of the badge, rendering it virtually indistinguishable from the gold badges of the full-time, sworn employees.

Aenlle's Chief of Staff gold badge could easily deceive any civilian into believing that Aenlle has the authority of a peace officer. Aenlle is likely in violation of Penal Code Section 538d(b)(2), a misdemeanor, for willfully wearing a facsimile badge that allows him to impersonate a full-time, salaried sworn employee with full police powers.

Aenlle stated that Sheriff Corpus issued the facsimile gold Chief of Staff badge to him. If this is true, then Sheriff Corpus is in violation of Penal Code Section 538d(c), a misdemeanor, for willfully giving the facsimile badge to Aenlle.

**Allegation #13 is SUSTAINED as to Aenlle and Sheriff Corpus.**

14. **Allegation #14: Aenlle and Sheriff Corpus improperly issued honorary badges and an identification card to civilians.**

In 2007, the California's Office of the Attorney General ("AG") issued an opinion that addressed a sheriff's issuance of an honorary badge to a private individual, stating, in part, "A sheriff's gift of an honorary badge to a private citizen violates California law if (1) the badge falsely purports to be authorized, or would deceive an ordinary reasonable person into believing that it is authorized, for use by a peace officer, or (2) the badge indicates membership in an organization whose name would reasonably be understood to imply that the organization is composed of law enforcement personnel when, in fact, less than 80 percent of the members of the organization are law enforcement personnel, active or retired, and the sheriff has knowledge of such fact."

As important is the AG opinion that the <u>sheriff and the county could be subject to civil liability "for an injury suffered in connection with a recipient's subsequent misuse of the badge if the injury is proximately caused by the sheriff's own negligent or wrongful act in providing the badge;</u> the county's civil liability would depend upon whether the sheriff's negligent or wrongful act occurred within the scope of his or her employment." (The Honorable Rod Pacheco, 90 Ops. Cal. Atty. Gen. 57 (2007))

The Sheriff's Office issues honorary or special deputy identification cards and badges. Complainants allege that the issuance of these cards and badges by Sheriff Corpus and Aenlle is improper.

- A sworn employee (#16) is in charge of the 360 volunteers in the Emergency Services Bureau. At the end of 2023, the sworn employee retrieved honorary badges that had been

issued by Sheriff Corpus or Aenlle to some of the retiree volunteers. He advised them that the badges would be installed on plaques to avoid any inadvertent misuse of the badges. The sworn employee told then-Undersheriff Hsiung and then-Assistant Sheriff Monaghan what he had done. They told him that they approved of his approach.

After Hsiung informed Sheriff Corpus about the retrieved badges, the sheriff told Hsiung to order the sworn employee to return the badges to the volunteers. The sworn employee believes that it was Aenlle who directed the Sheriff to order the badges returned. The sworn employee said that he has no control over the issuance of the badges under the Corpus administration.

- There is an animal rescue group in Half Moon Bay. According to a sworn employee (#16), in mid-2023, Aenlle met with the group's leaders and told them they could become a part of the Sheriff's Office saying, "I'll get you badges." Subsequently, the sworn employee re-contacted the group's leaders to let them know that they could not be issued badges, saying, "This is not how it works."

- Aenlle ordered a sworn employee (#8) to sign an application for a non-access ID card, for Angelo Costanzo, designating him as a "Special Deputy Sheriff." The sworn employee did not know this person. The sworn employee was told by a civilian employee (#6) that the person was a life-long friend of Aenlle. The sworn employee refused to sign the application and instead took it to then-Assistant Sheriff Monaghan who, similarly, knew nothing about it. After Monaghan spoke with Aenlle, he told the sworn employee that Aenlle said, "Who the fuck is [Name of the sworn employee] to question this?!" Aenlle also said, "It needs to be authorized. He already has the badge." The sworn employee did not sign the application and does not know who eventually did. **(Exhibit 45: ID Application for Special Deputy Sheriff)**

**Aenlle response to Allegation #14:**
This Investigator: "Have you ever directed sworn personnel to issue special badges to anyone?"

Aenlle: "I don't have the power to do that. And I have not." (Aenlle Transcript at pg. 72)

**Findings:**
This investigator's search of the Sheriff's Office website failed to disclose any reference to a Special Deputy program. It appears that the Office does not have a formal written policy for the distribution of honorary badges and identification cards. In light of the civil liability facing the Sheriff and the County were an honorary badge to be misused, it is imperative that the Sheriff's Office create a written policy for the distribution of these badges and identification cards, and that the policy be reviewed for approval by County Counsel. The Office should also consider eliminating the distribution of these honorary badges and cards entirely.

Aenlle has denied issuing special or honorary badges. The interviewees claim that they were directed by Aenlle and Sheriff Corpus to distribute these badges. With respect to the application for the non-access card, this investigator learned that Aenlle and Angelo Costanzo served

together in San Mateo County Mounted Patrol Troop 1, a 501(c)(4) nonprofit. Records maintained by ProPublica's Nonprofit Explorer show that in 2014, Aenlle was Secretary of the Troop when Costanzo was a Captain. In 2017, Aenlle was a Director of the Troop and when Costanzo was a Mess Sergeant.
(https://projects.propublica.org/nonprofits/organizations/946106865)

It is reasonable to conclude that Aenlle had an interest in providing a Sheriff's Office identification card to his friend and that he ordered a sworn employee to approve his friend's application.

This investigator finds that the sworn employees' statements are credible, and that Aenlle and Sheriff Corpus ordered the distribution of honorary badges and an identification card to civilians without considering the legal ramifications in doing so.

**Allegation #14 is SUSTAINED.**

**15. Allegation #15: Sheriff Corpus has uttered and texted racial and homophobic slurs in the workplace.**

The County's Equal Employment Opportunity Policy ("EEO"), approved by the San Mateo County Board of Supervisors on January 11, 2022, recognizes the County's commitment to "an inclusive, results-oriented, equal employment environment aimed at a diverse workforce free of illegal discrimination and harassment." (Section II-A: EEO Policy).

As well, "The County considers violation of this policy, on the basis of any EEO-protected categories, to constitute misconduct that undermines the integrity of the employment relationship. Corrective action up to and including dismissal shall be taken against individuals who violate any provision of this policy." (EEO Policy Introduction)

A complainant alleged that Sheriff Corpus violated the County's EEO Policy by using racial and homophobic epithets.

o   In January or February 2022, a civilian employee (#3) watched a Zoom meeting in her Millbrae office in which then-Sheriff Bolanos and County Executive Callagy were discussing a matter that may have had to do with ICE. The civilian employee's screen was muted as she watched the meeting. Then-Cpt. Corpus walked into the employee's office, stood behind her, looked at the screen and uttered near the civilian employee's ear, "Nigger" at Sheriff Bolanos-- twice. The civilian employee's adult son is biracial— (African American/Caucasian) and identifies as African American. Corpus knows her son because he volunteered for Corpus' campaign for Sheriff. The civilian employee was stunned and upset yet remained silent out of fear of retaliation.

o   On July 13, 25, 2022 and August 15, 2022, Sheriff Corpus sent the civilian employee (#3) text messages criticizing a local City Council member by calling her "Fuzz Bumper," a homophobic slur directed at lesbians. **(Exhibit 46: Corpus homophobic texts)**

**Findings:**

Sheriff Corpus' racial and homophobic slurs have no place in the workplace. That she had no compunction about uttering and texting these slurs to an employee is alarming and disgraceful.

**Allegation #15 is SUSTAINED.**

**CONCLUSION:**

It is abundantly clear that Sheriff Corpus and Victor Aenlle have a personal relationship, beyond mere friendship. It is also clear that that relationship has led Sheriff Corpus to relinquish control of the San Mateo County Sheriff's Office to Victor Aenlle, someone who has far more experience as a Coldwell Banker associate real estate broker than he has in law enforcement. Indeed, Aenlle has no experience running a law enforcement agency.

There is substantial evidence that Corpus/Aenlle leadership has created a hostile, retaliatory and abusive work environment, leaving the Office's civilian and sworn employees severely demoralized. Since Sheriff Corpus took office in January 2023, at least 106 sworn staff members, from Correctional officers to the rank of Undersheriff, have departed the Office. **(Exhibit 47: Separation List)** Of those 106 employees who separated from the agency, 51 were not even eligible to retire. As well, the recent Deputy Sheriff's Association's overwhelming vote of "no confidence" (96% of 318 members) in Victor Aenlle attests to the extreme level of discontent with their leadership.

Fear of retaliation is rampant in the organization. In one instance, Sheriff Corpus fired an Assistant Sheriff for cooperating with this investigation. In another instance, the Sheriff improperly locked out a Captain when she had given notice of her resignation; and in yet another instance, Aenlle demeaned and criticized a female civilian employee for her decision to move to another agency. Other employees described similar retaliatory and abusive behaviors under Corpus/Aenlle leadership.

The Corpus/Aenlle administration is obsessed with loyalty that borders on paranoia. One civilian employee (#6) described Aenlle's demand that his office be swept for bugging devices because he thought that people were out to get him. Another civilian employee (#7) reported that when Aenlle saw that there was a hole "the size of a silver dollar" in a closet ceiling in Aenlle's office, he told her to call public works because of his concern that it might be a security issue. And Aenlle told a civilian employee (#7), "We think someone is leaking information. We have to keep things confidential. We shouldn't be dealing with the public when they want to meet with the Sheriff."

Aenlle's and Sheriff Corpus' dishonesty about their personal relationship, their incompetent management of the Sheriff's Office, and Sheriff Corpus' shocking willingness to relinquish control of the Office to a real-estate-broker- turned-Reserve-Deputy, who failed to complete the Field Officer Training Program, have combined to leave the Sheriff's Office in utter disarray.

After publicly decrying this investigation as a "witch hunt," Sheriff Corpus refused the offer of this investigator to respond to the serious allegations lodged against her and her leadership team. Her silence speaks volumes.

As the first female/Latina Sheriff of San Mateo County, Christina Corpus could have taken the Sheriff's Office in a new and positive direction. Sadly, she has done no such thing. Rather, under her leadership, morale at the Sheriff's Office is at an all-time low, staffing shortages are at an all-time high, leaving public safety at risk.

Lies, secrecy, intimidation, retaliation, conflicts of interest, and abuses of authority are the hallmarks of the Corpus administration. This investigator takes no pleasure in recommending that Sheriff Corpus step down and that Victor Aenlle's employment with the Sheriff's Office be terminated immediately. Nothing short of new leadership can save this organization.

Submitted by Judge LaDoris H. Cordell (Ret.)

**EXHIBIT 1**

CONFIDENTIAL

INVESTIGATION OF SAN MATEO COUNTY SHERIFFS OFFICE



**CERTIFIED TRANSCRIPT**

TRANSCRIPT OF

RECORDED INTERVIEW OF VICTOR AENLLE

BY JUDGE LaDORIS CORDELL

VIA PHONE

File: Aenlle Interview Recording LaDoris Cordell.m4a

Date:        September 25, 2024

Time:        3:53 PM

Transcribed by:  Denise C. Shuey, CSR
                 License No. CSR-6814

 1          JUDGE CORDELL:  Sure.

 2          MR. AENLLE:  I met Sheriff Corpus 16 years ago,

 3   maybe closer to 17 at this point, here at the Sheriff's

 4   Office.  I have been a designated Level 1 Reserve Deputy

 5   with the office since '09.  And through that capacity,

 6   I've worked with Sheriff Corpus in -- in many different

 7   things in the office, details or patrol, and just

 8   different areas of the office, and that's how I first

 9   got to know her.

10          I've also been a range instructor, Range

11   Master, at the Sheriff's Office for nine of those years,

12   and I would participate in the training and qualify and

13   so forth.  So my professional and friendship with the

14   sheriff dates back to that time.

15          JUDGE CORDELL:  Got it.

16          And I understand that you were a part of her

17   campaign and also on her transition team.  Can you tell

18   me about -- just a little bit about that.

19          MR. AENLLE:  Yes, ma'am.  When Sheriff Corpus

20   decided to run, she approached me to see if I would help

21   or be part of her campaign, and I gladly accepted, as I

22   felt that new leadership could benefit our community

23   just in the office.  So it was a non-paid position,

24   completely volunteer, and that went successful, as --

25   as -- as you can see.



1          And then I was further asked, because of my

2    experience, institution, and knowledge of the office, my

3    business experience, to be part of her transition team.

4    And one of the biggest projects that I took on was the

5    new building of 50,000 square feet, five stories, that

6    needed to be reviewed and make sure it was safe for the

7    employees to occupy.

8          JUDGE CORDELL:  Got it.

9          So if I could go back a little bit.  She

10   approached you -- her campaign -- she was elected in

11   June, 2022.  So her campaign got going in 2021?

12         MR. AENLLE:  Yes, ma'am.

13         JUDGE CORDELL:  So that --

14         MR. AENLLE:  I had been campaigning for about a

15   year and a half, I believe.

16         JUDGE CORDELL:  Okay.  Got it.  That helps.

17         And then the transition team.  That -- that

18   transition team went from -- what? -- after her election

19   till she was sworn in?

20         MR. AENLLE:  Shortly after her election, a few

21   months after.  I don't think it -- it got put together

22   right away.  I think there needed some County approvals.

23   But shortly thereafter.

24         JUDGE CORDELL:  Got it.  Got it.

25         Did you have a contract for -- to be on the



1   transition team?  A contract, meaning with the County?

2            MR. AENLLE:  Yes, ma'am, I did.

3            JUDGE CORDELL:  And was that contract

4   terminated by the County Exec?

5            MR. AENLLE:  It was terminated by the County

6   Executive.  And --

7            JUDGE CORDELL:  Can you tell me about that.

8   Yeah.

9            MR. AENLLE:  Yes.  Yes.  And, by the way, I

10  even have -- I still have a copy of that contract, and

11  it was terminated illegally, even by their own contract.

12           But, basically, I got a call from the --

13  Rodriguez.  I can't picture her first name now.  Iliana

14  Rodriguez.

15           JUDGE CORDELL:  Okay.

16           MR. AENLLE:  But there was a conflict in the

17  contract, and -- and the County Executive decided to

18  cancel it --

19           JUDGE CORDELL:  Did --

20           MR. AENLLE:  -- without -- without any process,

21  due notice, nothing.

22           JUDGE CORDELL:  Was the conflict ever explained

23  to you?

24           MR. AENLLE:  Never explained.

25           JUDGE CORDELL:  So you were just told, "It's



1        JUDGE CORDELL:  Right.  Right.

2            So in 2023 were you -- did you have a contract,

3    or were you employed in the Sheriff's Office starting --

4            MR. AENLLE:  In 2023 when I came in, yes, I had

5    a -- I had a contract with the Sheriff's Office, like a

6    third-party contract, while my position was created.

7            JUDGE CORDELL:  That's what I needed cleared

8    up.

9            So you had a contract that kind of got you from

10   when she was sworn in to when you got this position that

11   eliminated an assistant sheriff's position and instead

12   put you in?  Fair?

13           MR. AENLLE:  Fair.  And it wasn't eliminated.

14   It was just converted.

15           JUDGE CORDELL.  Changed or transformed?

16           MR. AENLLE:  Yes.

17           JUDGE CORDELL:  Right.  Okay.

18           So in -- so that contract you had from January

19   to when you became executive director.  And then after

20   you became this next position, which is executive

21   director, and that contract ended, and you began the

22   full-time in the position you're in now?

23           MR. AENLLE:  Yes, ma'am.

24           JUDGE CORDELL:  Okay.  Got it.

25           All right.  So in the transition team, when



1   that team existed, did you ask the transition team, each

2   of the members, to sign non-disclosure agreements?

3           MR. AENLLE:  I believe we did.  I don't know

4   if -- I know we had a discussion.  I don't know if all

5   of them got signed.

6           JUDGE CORDELL:  Uh-huh.

7           MR. AENLLE:  And that was not necessarily me,

8   but that was at the direction of the strategist that was

9   helping us along and was part of the team.

10          JUDGE CORDELL:  Right.  So do you re- -- do you

11  recall why they wanted -- this person wanted an NDA?

12          MR. AENLLE:  Normal business practice.  I think

13  any person in -- in the political world --

14          JUDGE CORDELL:  Uh-huh.

15          MR. AENLLE:  -- has a theme.  It's -- it's -- I

16  believe she did that also in the campaign.  The campaign

17  manager --

18          JUDGE CORDELL:  Uh-huh.

19          MR. AENLLE:  -- consultant asked everybody to

20  do that.

21          JUDGE CORDELL:  Got it.  Got it.

22          Were -- so you were -- I have heard --

23          MR. AENLLE:  Uh-huh.

24          JUDGE CORDELL:  -- you referred to as the

25  campaign manager.  Were you her campaign manager or --



1           MR. AENLLE:  I never took that title

2    officially.  I did a lot.  I was the lawn sign person.

3    I was the errand person.  I was many, many things.  I

4    never took officially --

5           JUDGE CORDELL:  Okay.

6           MR. AENLLE:  -- that role in any capacity.

7           JUDGE CORDELL:  Do you know who was officially

8    her campaign manager?  Any --

9           MR. AENLLE:  I don't think we ever did.  I

10   think the consultant -- the campaign consultant really

11   filled that hole.

12          JUDGE CORDELL:  Got it.

13          And was that Mr. Szabo (phonetic) or something?

14   Does that --

15          MR. AENLLE:  Szabo was one of the --

16          JUDGE CORDELL:  -- sound about right?

17          MR. AENLLE:  Yeah.  Szabo was the main -- no.

18   Szabo came in afterwards.

19          JUDGE CORDELL:  Okay.

20          MR. AENLLE:  He was not -- she had already won

21   the campaign.

22          JUDGE CORDELL:  Got it.

23          MR. AENLLE:  His name --

24          JUDGE CORDELL:  Okay.

25          MR. AENLLE:  Like I --



1        JUDGE CORDELL:  That's okay.  It --

2        MR. AENLLE:  It will come _ it will come to

3   me.

4        JUDGE CORDELL:  All right.

5        MR. AENLLE:  It's been a little while.

6        JUDGE CORDELL:  It's not really important.  I

7   appreciate that, and it's not important.

8        Okay.  So you are currently the executor

9   director -- the executive director of administration; is

10  that correct?

11       MR. AENLLE:  Yes, ma'am.

12       JUDGE CORDELL:  All right.  I've also heard you

13  referred to as "Chief of Staff."  Is that --

14       MR. AENLLE:  Yes.

15       JUDGE CORDELL:  -- in the executive director

16  job description, or is that -- where did that title come

17  from, "Chief of Staff"?

18       MR. AENLLE:  So -- yeah, that's a working title

19  that I have.  There's a lot of positions in the county

20  that, if you look at them, they do not make any sense.

21  They were just created because that's -- that's the

22  proper format.

23       JUDGE CORDELL:  Uh-huh.

24       MR. AENLLE:  You know, my IT director's like

25  that and many others.  But my role has always been



1    "Chief of Staff."

2             JUDGE CORDELL:  So the title came from where?

3    I mean, was it --

4             MR. AENLLE:  It was a working title.

5             JUDGE CORDELL:  But I don't know what that

6    means, I guess, is what I'm saying.  It's like did you

7    just say, "Okay.  I'm the executive director, but I want

8    you all to know I'm the chief of staff," or is that --

9    did someone else give you that?  That's all I'm --

10            MR. AENLLE:  No, ma'am.  The -- the sheriff

11   assigned that.

12            JUDGE CORDELL:  Okay.

13            MR. AENLLE:  That's -- that's my role in the

14   office, yeah.

15            JUDGE CORDELL:  Got it.

16            Now, let's follow up on that.  Can you talk to

17   me now about what your role is in the office.

18            MR. AENLLE:  I oversee the civilian

19   departments.  There's a number of -- of them under me

20   So directors report to me, and I have a couple managers

21   that do as well, and I basically represent and oversee

22   that.  I'm also part of the executive team, and I assist

23   the sheriff with whatever she assigns me --

24            JUDGE CORDELL:  Got it.

25            MR. AENLLE:  -- which --



1    JUDGE CORDELL:  And -- go right ahead.  I don't

2  want to cut you off.  Go right ahead.

3    MR. AENLLE:  No, no.  It just involves

4  projects.  It involves programs, community programs,

5  community relations.  I -- basically anything that has

6  to do with the -- the sheriff's communication with the

7  community.

8    JUDGE CORDELL:  Gotcha.

9    Okay.  Have you ever said to anyone that you

10  are third in command?

11    MR. AENLLE:  The only time I can recall

12  anything like that --

13    JUDGE CORDELL:  Okay.

14    MR. AENLLE:  -- and I remember the

15  experience -- was in Santa Clara County, there was a

16  Academy graduation.  We were at that, and I was speaking

17  to one of their people in command.

18    JUDGE CORDELL:  Okay.

19    MR. AENLLE:  A lady.  I can't recall her name,

20  but she's one of the -- the female assistant sheriffs

21  there.

22    JUDGE CORDELL:  Okay.

23    MR. AENLLE:  And I introduced -- we were

24  meeting each other.  I'm like, "I'm the chief of staff."

25    And we're talking, and she goes, "What does



1   that mean?  What level is that?  Is that lieutenant

2   level?"

3            And I said, "No.  In our department, that's --

4   that's executive team level.  It sits at -- it's an

5   assistant sheriff's level, which is considered the line

6   of -- of -- of third in command."

7            JUDGE CORDELL:  Uh-huh.

8            MR. AENLLE:  Aside from that --

9            JUDGE CORDELL:  But -- uh-huh.

10           MR. AENLLE:  Aside from that, no.

11           JUDGE CORDELL:  So do you consider yourself,

12  then, third in command in the office?

13           MR. AENLLE:  I consider myself a member of the

14  executive team, ma'am.

15           JUDGE CORDELL:  So let's just take it a step

16  further.  I -- I -- I did some work as --

17           MR. AENLLE:  Yes.

18           JUDGE CORDELL:  -- as a police auditor for

19  the -- in the City of San Jose and dealt a lot with the

20  San Jose PD.  And I know a PD's office is different from

21  Sheriff's Office, but there's still a hierarchy, and

22  there's still --

23           MR. AENLLE:  Sure.

24           JUDGE CORDELL:  -- something called a chain of

25  command; right?



1          JUDGE CORDELL:  Go ahead.

2          MR. AENLLE:  -- the right fit for the office.

3          JUDGE CORDELL:  Got it.

4          So you mentioned an org chart, an
5    organizational chart.  I looked online, anyway, to try
6    to find it, and I can't find an organizational chart.
7    Can you tell me where I can find it.

8          MR. AENLLE:  I can send it to you.  It's also
9    part of the Meliora report that was done.  It was that
10   third-party investigation into the office, and the goal
11   was to make it more efficient.  And I know they have a
12   copy of our initial, still in the work- --
13   work-in-process, org chart.  But --

14          JUDGE CORDELL:  So that's fine.  I can -- I can
15   get ahold of the report.  I have seen it.

16          So is there -- but the organizational chart is
17   not on the sheriff's website or anything?  Because I
18   looked, and I couldn't find it.

19          MR. AENLLE:  I can tell you that that's been a
20   work in progress.  I can tell you we're working on it.

21          JUDGE CORDELL:  Sure.

22          MR. AENLLE:  I just -- I can't confirm whether
23   it's on the website or not, but I can -- I can check and
24   verify that.

25          JUDGE CORDELL:  Okay.  That's fine.



1          And you say it's a work in progress.  What do

2   you mean?  Like what's --

3          MR. AENLLE:  It hasn't been finalized yet.  I

4   think -- I think we're -- the undersheriff is getting

5   close.  I know he's working on that but --

6          JUDGE CORDELL:  Okay.

7          MR. AENLLE:  Yeah.

8          JUDGE CORDELL:  That's fine.  Because I was

9   looking, and I couldn't find it.  So I appreciate your

10  telling me it's coming.

11         MR. TOUCHSTONE:  Judge Cordell, I'm sorry to

12  interrupt, ma'am.  This is Jim Touchstone.  I would note

13  that there is reference to these positions in the San

14  Mateo County Sheriff's Office policies, which are

15  online.

16         JUDGE CORDELL:  When you say "reference to

17  these," what do you mean?  The chain of command, for

18  example?

19         MR. TOUCHSTONE:  Yes.  Yes, ma'am.

20         JUDGE CORDELL:  Yeah.  Good.

21         MR. TOUCHSTONE:  And the positions have been

22  identified.

23         JUDGE CORDELL:  Absolutely, yes.  And I'm aware

24  of that, and thank you.

25         So, Mr. Aenlle, I'd like to -- to -- to ask --



1   move now to questions about outside employment, and it's

2   just a very straightforward question.

3           Do you have any outside employment?

4           MR. AENLLE:  No, ma'am.  I -- my real estate

5   business, I pretty much stopped doing it.  I'm still

6   licensed.  But as of 2023, my involvement with the

7   Sheriff's Office -- it demanded too much of my time.  I

8   am no longer practicing real estate.

9           As far as my PPO, my private security company,

10  I have also, as of 2023, when I got involved with the

11  Sheriff's Office, I've not engaged in -- in -- in those

12  activities as well.

13          JUDGE CORDELL:  Got it.

14          So let's just -- I just want to nail it down,

15  and this is important.  When you say you stopped in

16  2023, can you tell me when in 2023?

17          MR. AENLLE:  A few months -- a few months into

18  it when I started.  When my position -- I believe it was

19  closer when my position got finalized.

20          JUDGE CORDELL:  So -- and when was that?

21  Because I forgot to ask you that when you said you

22  converted the --

23          MR. AENLLE:  It took a long time.  I want to

24  say somewhere in -- this is not a hundred percent -- but

25  somewhere around July, I believe.



1        JUDGE CORDELL:  Of 2023?

2        MR. AENLLE:  Yes, ma'am.

3        JUDGE CORDELL:  So between January, 2023, and

4   July, did you have any outside employment?

5        MR. AENLLE:  Well, I've contracted maybe a few

6   security details of close friends or of old clients.

7   Real estate, I referred out.

8        JUDGE CORDELL:  So when you say "referred out,"

9   if you got someone who was interested in some real

10  estate --

11       MR. AENLLE:  Yes, ma'am.

12       JUDGE CORDELL:  -- you would not -- you would

13  not accept it and -- and just give it to someone else in

14  your office --

15       MR. AENLLE:  Yes, ma'am.

16       JUDGE CORDELL:  -- in the office?

17       Got it.

18       So -- and can you tell me when you were doing

19  real estate, did you work for a company?

20       MR. AENLLE:  Yeah.  Even though I'm a broker, I

21  did -- I've always hung my license with Coldwell Banker.

22       JUDGE CORDELL:  So you -- I'm sorry.  And you

23  are a broker, which is different from --

24       MR. AENLLE:  Also a broker, ma'am.

25       JUDGE CORDELL:  Right?  That's different from



1  | being a real estate salesperson?  Is that --

2  |          MR. AENLLE:  Yes, ma'am.

3  |          JUDGE CORDELL:  Am I getting that right?  Okay.

4  |          MR. AENLLE:  Yes.

5  |          JUDGE CORDELL:  So you were with Coldwell

6  | Banker.  And did you work out of any particular office?

7  | This is, again, before you began your executive director

8  | work or chief of staff work.

9  |          MR. AENLLE:  Yes.  I was out of the San Mateo

10 | office, which -- which closed, and then everybody merged

11 | into San Carlos or Burlingame.  I hung my license in San

12 | Carlos.

13 |          JUDGE CORDELL:  San Carlos.  Okay.

14 |          Were you ever in -- work out of the Half Moon

15 | Bay office?

16 |          MR. AENLLE:  I never worked there.

17 |          JUDGE CORDELL:  Uh-huh.

18 |          MR. AENLLE:  My -- they could have transferred

19 | my license there to -- I think my manager was in both.

20 | My manager was in San Carlos and Half Moon Bay.

21 |          JUDGE CORDELL:  Uh-huh.

22 |          MR. AENLLE:  In the past, I did do a lot of

23 | business there.  So . . .

24 |          JUDGE CORDELL:  Got it.

25 |          MR. AENLLE:  But I've never actually done



1   business out of San Carlos -- out of Half Moon Bay.

2              JUDGE CORDELL:  Got it.

3              MR. AENLLE:  I've never had an office there, a

4   desk there, nothing like that.

5              JUDGE CORDELL:  I've got you.

6              You used the words "pretty much stopped doing

7   the real estate."  I'm not sure what you mean by that.

8   So -- so the question is, you know, did you have any

9   outside employment?  And, by the way, it's not a bad

10  thing.  I'm just asking.  Did you have --

11             MR. AENLLE:  No.  I understand.

12             JUDGE CORDELL:  -- also have employment when

13  you were employed by either the Sheriff's Office or the

14  County or had a contract with them?  Doing business with

15  the County or the Sheriff's Office, did you have any

16  outside employment?

17             MR. AENLLE:  Just to be clear, while I was

18  waiting for my position to open --

19             JUDGE CORDELL:  Uh-huh.

20             MR. AENLLE:  -- you know, ma'am, I have to be

21  honest with you.  Even back when we started the

22  campaign, there was so much involvement and it took so

23  much time that even -- even back then, I started

24  referring business out and was not accepting.  I can

25  tell you that when I started even as a contractor here



1    from January, 2023 --

2            JUDGE CORDELL:  Yeah.

3            MR. AENLLE:  -- it was very, very minimal.  And

4    by the time I took my position, I'm basically doing the

5    job of three people here.

6            JUDGE CORDELL:  Uh-huh.

7            MR. AENLLE:  I stopped doing everything

8    altogether.

9            JUDGE CORDELL:  Got it.

10           So -- okay.  I've got it.

11           Did you go through any kind of an approval

12   process in -- when you had the outside employment and

13   when you were, at least January maybe until July, doing

14   some outside work, employment?

15           MR. AENLLE:  I think as a contractor, that was

16   not a requirement.

17           JUDGE CORDELL:  Got it.  Okay.

18           MR. AENLLE:  But the sheriff was aware, and --

19           JUDGE CORDELL:  Okay.

20           MR. AENLLE:  -- it was approved.

21           JUDGE CORDELL:  And when you say "it was

22   approved," do you mean the sheriff gave her approval?

23   Like, "It's okay.  You can do it"?

24           MR. AENLLE:  Yeah.  Many people in the office

25   have outside businesses and outside employment.



1          JUDGE CORDELL:  Right.

2          MR. AENLLE:  I just -- we just have to make the

3    sheriff aware.

4          JUDGE CORDELL:  Uh-huh.  And you said you did

5    make her aware, and she was okay with it?

6          MR. AENLLE:  Again, she was okay with it, but

7    I -- again, I was not really doing -- my business took

8    so much time by that point.

9          JUDGE CORDELL:  Uh-huh.  Okay.

10          But she was aware, and the only way she could

11    be aware is if you told her; right?  And --

12          MR. AENLLE:  That's correct.

13          JUDGE CORDELL:  Yeah.  And then she was -- she

14    gave her approval?  I don't want to put words in your

15    mouth.  So I'm just -- I'm just trying to understand how

16    you knew that it was okay with her.  So either she did

17    something in writing, or she told you.  I don't know.

18          Can you tell me that?

19          MR. AENLLE:  Yes.  She's aware, and I -- well,

20    and I asked her.  I said, "My business -- as you know,

21    I'm moving away from it.  There might be some -- a

22    couple last-minute deals or something that I have to

23    finish, just so you're aware that I would do that.  It

24    would not be during the time of -- of my work

25    responsibilities or interfere at all in any type of the



1 | work that I'm doing at the Sheriff's Office.  It would

2 | be on my own time and possibly weekends."

3 | JUDGE CORDELL:  Gotcha.

4 | And when you had this conversation with her,

5 | that would have been at the beginning of 2023?

6 | MR. AENLLE:  At some point around 2023, yes.

7 | JUDGE CORDELL:  Okay.

8 | MR. AENLLE:  Prior to me accepting the -- the

9 | full-time position.

10 | JUDGE CORDELL:  Gotcha.

11 | So back to the full-time position.  You said to

12 | me it's a civilian position.  I guess that also means

13 | unclassified.  And so -- okay.  So executive director.

14 | Got it.

15 | Do you in your job -- you mentioned it, and I'm

16 | just going to go back to it now.

17 | You said something about the building that

18 | the -- the Sheriff's Office is now in, that new

19 | building, and that you were involved in that.  So can

20 | you just talk to me.  Just first generally, are you

21 | involved in any real estate transactions that involve --

22 | not -- not as a Realtor.  I'm not talking about that.

23 | I mean in your role as the chief of staff,

24 | executive director, have you been and are you engaged in

25 | any kind of real estate transactions in that role?



1    Zero.

2              JUDGE CORDELL:  That's the building --

3              MR. AENLLE:  I'm talking about --

4              JUDGE CORDELL:  -- that -- excuse me.

5         That's the building you're in now?

6              MR. AENLLE:  Yes, ma'am.

7              JUDGE CORDELL:  Go ahead.  Go ahead.

8              MR. AENLLE:  So that's one -- that's one of the

9    things I did.  When I discovered that, I made that -- I

10   brought it to the sheriff's attention, and then we had

11   to get working on it because it was not a safe building

12   to be in as far as conducting law enforcement services.

13             JUDGE CORDELL:  Got it.

14             MR. AENLLE:  As far as any of the other

15   projects, clearly I've been around the business world

16   and in real estate for 30 years.  I know contracts.

17             JUDGE CORDELL:  Got it.

18             MR. AENLLE:  I know leases.  So I helped -- I

19   worked -- I was the contact, along with the sheriff,

20   with the office -- County office, which is called Real

21   Property Services.  They're engaged in negotiating the

22   current lease for the sheriff, doing extensions,

23   acquiring new property under lease, and so forth.

24   Everything that I've done or helped with was -- was with

25   them involved.



1        So one was the administrative building that

2   you're in now.  So are you involved at all -- or were

3   you involved at all in the lease of the building in

4   Redwood City for a substation and possibly a child care

5   center?

6        MR. AENLLE:  Yes, ma'am.

7        JUDGE CORDELL:  Okay.  So can you talk to me

8   about that now, please.

9        MR. AENLLE:  My involvement is it was just the

10  Sheriff's Office needed to grow.  The substation in

11  North Fair Oaks was subpar.  She had been looking for a

12  property for a long time, and one of her sergeants that

13  works in the area sent her a flyer and said, "What about

14  this?"  So she showed it to me, and I said, "Yeah.

15  Let's -- let's investigate."  And we moved it over to

16  the Real Property Services department for him to -- to

17  look into it.

18        JUDGE CORDELL:  Okay.  And -- and was that the

19  extent of your involvement?

20        MR. AENLLE:  I mean, I reviewed their -- some

21  of their leases, and I helped with information to help.

22  But, yes, pretty much that was it.  That's the

23  involvement.

24        JUDGE CORDELL:  Got it.

25        So do you have -- did you -- the lease is with



1    the DiNapoli Family LP.  Did you have any -- did you

2    assist at all in getting -- getting that lease?

3            MR. AENLLE:  Not at all, ma'am.

4            JUDGE CORDELL:  Do you know the --

5            MR. AENLLE:  That was Real Property Services.

6    I do not know the owners.  I do not know the agents.

7    I've never been there and met the agent with Real

8    Property Services with me.  Zero.

9            JUDGE CORDELL:  Got it.

10           So you don't -- you had nothing to do with

11   getting -- getting the -- locating this property; right?

12           MR. AENLLE:  The property was actually located

13   by Lilian Tashiro.  She's a sergeant, and she --

14           JUDGE CORDELL:  Right.

15           MR. AENLLE:  -- set the fire to the sheriff.

16           JUDGE CORDELL:  Got it.

17           And you had nothing to do with contacting the

18   lessor -- that would be the DiNapoli family --

19   getting -- had anything to do with them at all?

20           MR. AENLLE:  The first time that I heard that

21   name is -- is right here with you today.

22           JUDGE CORDELL:  Got it.

23           And do you -- did you have anything to do with

24   brokering the lease?  Because there -- there -- the

25   lease was brokered by a real estate company.



1          Did you have anything to do with that?

2          MR. AENLLE:  Absolutely not, ma'am.

3          JUDGE CORDELL:  All right.

4          MR. AENLLE:  Absolutely not.  That lease was --

5          JUDGE CORDELL:  So --

6          MR. AENLLE:  -- was negotiated and brokered

7    through the County.

8          JUDGE CORDELL:  Got it.

9          The reason I ask -- and -- and, again, I am

10   not -- please understand, Mr. Aenlle, I'm not making any

11   accusations.  I am, again, trying to get facts.

12         MR. AENLLE:  I understand, ma'am.

13         JUDGE CORDELL:  There are allegations, and

14   that's why I'm trying to get facts.  So just --

15         MR. AENLLE:  Yeah.

16         JUDGE CORDELL:  -- bear with me on this,

17   please.  And I --

18         MR. AENLLE:  Absolutely.

19         JUDGE CORDELL:  Please do not take personal

20   offense at this because it's not my intention at all.

21         MR. AENLLE:  I don't.  I understand your

22   position.  Thank you.

23         JUDGE CORDELL:  Okay.  But I -- I know it's

24   hard.  I know this is hard.

25         MR. AENLLE:  Yes, ma'am.



1              JUDGE CORDELL:  It must be hard for you to
2    hear.

3              MR. AENLLE:  I'm not here to steal from anybody
4    or do any shitty deals, believe me.  It's -- it's --
5    that's not me.

6              JUDGE CORDELL:  So my question -- and, again,
7    just bear with me on this -- is do you know -- and bear
8    with me a second.  There were three individuals who were
9    the brokers for this lease, and they are people who work
10   for Coldwell Banker.

11             So my question to you is did you know that
12   Coldwell Banker was the broker for this lease?

13             MR. AENLLE:  Ma'am, I don't think that is
14   correct.

15             JUDGE CORDELL:  Okay.

16             MR. AENLLE:  I don't remember Coldwell Banker
17   being there.  I thought it was Wakefield or something
18   or -- so the answer to your question is, "No."  Yeah.

19             JUDGE CORDELL:  So my question was do you
20   know -- all right.  So let me go back.  I'll reask it.

21             MR. AENLLE:  Yeah.

22             JUDGE CORDELL:  Do you know if Coldwell Banker
23   brokered that lease for the -- the -- the building for
24   the substation?  Do you know whether or not they did?

25             MR. AENLLE:  No, I do not.



1           JUDGE CORDELL:  Okay.  Do you know who --

2           MR. AENLLE:  I --

3           JUDGE CORDELL:  Go ahead.

4           MR. AENLLE:  I thought it was Wakefield or

5    something like that.  I met the guy once or -- or twice

6    there when he opened up the building for all of us when

7    we were there.  But I -- off the top of my head, I don't

8    think he was Coldwell Banker.

9           JUDGE CORDELL:  Okay.  And do you -- do you --

10   so you're not -- but you don't know who the broker is?

11          MR. AENLLE:  I don't recall the broker.  I want

12   to say Wakefield, maybe, but I really do not.

13          JUDGE CORDELL:  Got it.

14          MR. AENLLE:  I didn't know -- I didn't know the

15   agents before.  I never met them before.  I've never

16   done business with them before.  Coldwell Banker

17   residential is big in our area.  Coldwell Banker

18   Commercial is not.  And I don't recall Coldwell Banker

19   Commercial handling that, per my recollection.

20          JUDGE CORDELL:  Got it.  Okay.

21          I was just trying to get the names of the --

22   what I believe to be of the brokers on that property,

23   and there were three last names, and I'm just curious if

24   any of them ring a bell for you.

25          MR. AENLLE:  Yeah.  Okay.  Go ahead.



1           JUDGE CORDELL:  No, no, no.  Go ahead because

2    I -- I don't have it right in front of me.

3           MR. AENLLE:  Yeah.  Yeah.  They -- they don't.

4    So in commercial, the way it works is like you have one

5    main guy, and then all those additional names are

6    just -- like just got out of college kind of guys.

7    They're just there to kind of assist.

8           I don't remember -- I can kind of see his face.

9    I really don't remember his name, but I can tell you

10   that the County has done business with him before on

11   other buildings and other leases.

12          JUDGE CORDELL:  And the "him" --

13          MR. AENLLE:  He's the real- --

14          JUDGE CORDELL:  -- you're talking about -- I'm

15   sorry.

16          The "him" you're talking about is not someone

17   connected with -- with Coldwell Banker?

18          MR. AENLLE:  No, no.

19          JUDGE CORDELL:  Got it.  Okay.  I've got it.

20          And if I can get --

21          MR. AENLLE:  If I can look it up on the

22   Internet and -- and see if I can pull up the old slide

23   (phonetic) if you'd like me to.

24          JUDGE CORDELL:  No, no, no.  It's fine.  And

25   I -- you know, I appreciate.  I just want to -- first of



1  all, I'm making sure I'm asking you the questions that,

2  you know, people are -- have been raising, and I want to

3  make sure I hear from you about it.  And if I dig up the

4  names, I'll run them by you, and you can let me know if

5  you've ever --

6            MR. AENLLE:  Yeah.

7            JUDGE CORDELL:  -- heard of them.

8            MR. AENLLE:  Absolutely.

9            JUDGE CORDELL:  Okay.  Bear with me one second

10  here.  And, again, I'm taking a one-pass look to see if

11  I can come up with the names.  Bear with me one second.

12  I have not seen it.  Okay.  Let me keep moving.  And --

13  and I appreciate your patience.

14            MR. AENLLE:  Of course.

15            JUDGE CORDELL:  Okay.  Other -- were you

16  involved in any real estate transaction in Half Moon

17  Bay?

18            MR. AENLLE:  Yes, ma'am.

19            JUDGE CORDELL:  Can you talk to me about that,

20  please.

21            MR. AENLLE:  So my -- my involvement is not me

22  as a Realtor or as a broker or -- it's always been

23  through Real Property Services.  The -- so the Sheriff's

24  Office is actually a nonprofit.  It's -- it's the

25  Sheriff's Activities League.  It's basically programs



1    MR. AENLLE: Yeah. Yeah.

2    JUDGE CORDELL: Okay.

3    MR. AENLLE: He's the attorney that oversees

4    the leases. Besides the sale, the nonprofit, the

5    Sheriff's Office also secured a lease in El Granada.

6    It's a -- it's going to be a center, basically, to -- to

7    have emergency equipment for the coast because during

8    the fires and all the emergencies out there -- a lot of

9    times many, too, shut down -- it's hard to get equipment

10   through there. So that was done. They did that lease.

11   My involvement is I -- I oversee -- I overlook things to

12   make sure that the best interest of the sheriff is

13   re- -- is -- is represented, and that's about it.

14   JUDGE CORDELL: Okay. And can you tell me -- I

15   have never heard -- this is my ignorance. El Granada.

16   Where is that?

17   MR. AENLLE: It's a little south -- a little

18   north of Half Moon Bay.

19   JUDGE CORDELL: Huh. I've never heard of it.

20   MR. AENLLE: It's right across from the harbor.

21   JUDGE CORDELL: Never heard of it.

22   Okay. And, once again, your involvement --

23   this is at -- is it -- okay. Two questions.

24   Is your involvement in these real estate

25   transactions -- is that a part in your -- let me go



1    back.

2            Is there a job description for your position as

3    chief of staff and executive director?  Is there a job

4    description that exists somewhere?

5            MR. AENLLE:  Yeah.  Part of that job -- there

6    is a job description.  It's quite lengthy but also is in

7    projects at the direction of the sheriff.

8            JUDGE CORDELL:  Got it.

9            MR. AENLLE:  Since -- I mean, why not use the

10   talent that you have and the expertise to make sure that

11   everything looks good?  That's it.

12           JUDGE CORDELL:  Got it.

13           MR. AENLLE:  If you --

14           JUDGE CORDELL:  So --

15           MR. AENLLE:  If you look at some of my

16   correspondence with the real estate attorney, you can

17   see that my recommendations on the lease or things that

18   I brought forth had a lot of value that was over- --

19   overlooked.

20           JUDGE CORDELL:  Got it.

21           So your involvement in the real estate

22   transactions is at the behest of the sheriff --

23           MR. AENLLE:  Correct.

24           JUDGE CORDELL:  -- given your expertise in real

25   estate and development?



1          MR. AENLLE:  Yep.

2          JUDGE CORDELL:  Okay.

3          MR. AENLLE:  And in working along with -- with

4   Real Property Services from -- from the County.

5          JUDGE CORDELL:  Got it.

6          MR. AENLLE:  But not in the capacity of a

7   broker or an agent or being involved in any of that or

8   benefiting at all from it.

9          JUDGE CORDELL:  Okay.

10         I found the three names that I just want to run

11  by you and -- and ask you if these names ring a bell.

12  These were the names that I believe -- and I could be

13  wrong on this -- but were part of brokering the -- the

14  lease in Redwood City for the substation and the child

15  care center.  So I'm just going to --

16         MR. AENLLE:  Okay.

17         JUDGE CORDELL:  -- see if you -- if you know

18  these names.

19         The first name is Bob McSweeney.  Does that

20  ring a bell with you at all?

21         MR. AENLLE:  It is.  That's the guy that --

22  that I met there.

23         JUDGE CORDELL:  And when you say you met there,

24  you met at the building when you did a --

25         MR. AENLLE:  At the building --



1          JUDGE CORDELL:  -- walk-through?

2          MR. AENLLE:  At the building with --

3          JUDGE CORDELL:  Yes.

4          MR. AENLLE:  -- Real Property itself with

5    Caroline Shaker, yes.

6          JUDGE CORDELL:  Got it.

7          And did you know Mr. McSweeney before that

8    walk-through?

9          MR. AENLLE:  I've never met Mr. McSweeney

10   before in my life before that day.

11         JUDGE CORDELL:  Got it.

12         MR. AENLLE:  I've never done any transaction

13   with him, never met him.

14         JUDGE CORDELL:  Okay.  The next name is Evan

15   Chang.  Does that ring a bell?

16         MR. AENLLE:  No.  Not at all.

17         JUDGE CORDELL:  And the next one is Matt

18   Murray.  Does that ring a bell?

19         MR. AENLLE:  No.

20         JUDGE CORDELL:  Okay.  Got it.

21         All right.  Any other real estate transactions

22   you want to tell me about at all?  So we've talked about

23   Half Moon Bay, El Granada, the building that you're in

24   now, the -- and the Redwood City building.

25         Anything else --



1          MR. AENLLE:  The captain.  And then they

2    basically reported to me on -- on the project:  how

3    things are going, major decisions, and things like that.

4          So the project was going well.  Both Philip and

5    Enders did a great job.  They completed a successful RFP

6    process, and a contractor won -- won the process, and it

7    was the contractor actually that built this building.

8    They're very reputable, and --

9          JUDGE CORDELL:  Got it.

10         MR. AENLLE:  -- it was great.

11         When it came down to County Counsel approval,

12   they found that a small statue that had to do with

13   notice or something like that was not followed.  When we

14   looked into it, that statue was -- it was an oversight.

15   It was not listed anywhere in any documents in the

16   county or in the process itself or any of the documents

17   in the process of RFP.

18         We also learned that we had switched over to a

19   new system, NEOGOV, for all county RFP processes, and we

20   learned that even though you check the box just like a

21   city planning, you know, building process works when we

22   check the box, documents go to certain departments for

23   approval.  Even though our box is being checked, it

24   never notified those documents, one being legal counsel.

25         So they kind of learned about this RFP process



1    and -- you know, at the tail end, and they were not

2    comfortable that that statue, which was small in nature

3    but nevertheless was a statue, was overlooked.

4            We brought it to the County Executive's

5    attention and the attorneys, and they recommended we

6    basically redo the entire process through a QRF

7    design-build process, and they also recommended that we

8    hire a project manager.

9            Edgar Lopez -- I don't know him.  Never -- I

10   met him just recently.  Never done any business with him

11   at all whatsoever.  He came at the recommendation -- the

12   County Manager's office, Adam Eli -- I have emails from

13   him -- basically gave us a bunch of names that they've

14   used, and they think they're good.

15           We selected a couple of them.  My manager,

16   Heather Enders, and Captain Philips interviewed them.

17   They came back and gave me the -- their -- their

18   findings, and we selected Edgar Lopez & Associate.

19   That's how that came about.

20           JUDGE CORDELL:  So that was a competitive bid,

21   then, or not?

22           MR. AENLLE:  That's correct.

23           JUDGE CORDELL:  Okay.

24           MR. AENLLE:  Yeah.

25           JUDGE CORDELL:  It was a competitive bid.



1              So there is no contract right now or an

2    agreement with West Coast Security?

3              MR. AENLLE:  Not -- not for that building,

4    ma'am.

5              JUDGE CORDELL:  And is it -- is there a

6    contract with them for another building?  Maybe I'm

7    getting the wrong information but --

8              MR. AENLLE:  Yeah.  I -- I believe -- I believe

9    there is, and it's been in place for many, many years.

10             JUDGE CORDELL:  I see.

11             MR. AENLLE:  I don't know which one.  There's

12   of lot of them that they monitor.

13             JUDGE CORDELL:  Got it.

14             So there is no agreement right now with West

15   Coast for the Broadway building?

16             MR. AENLLE:  No, ma'am.

17             JUDGE CORDELL:  Okay.  All right.  Two more

18   just on service contracts.  I don't have a lot of

19   detail, and if you don't recall, that's fine.  But I'm

20   curious if you recall a service contract with a vendor

21   to provide food at the jails that eventually fell

22   through.

23             Does that ring a bell with you at all?  That

24   would have been in 2023.

25             MR. AENLLE:  Yeah, very slightly.  Again, I was



1  not part of that.  So I have very limited information

2  available.  But I was not part of initiating that

3  contract or anything like that.

4          JUDGE CORDELL:  Right.

5          Did you ever, though, say -- accuse the

6  contractor of being a crook?

7          MR. AENLLE:  No.

8          JUDGE CORDELL:  Do you recall -- let me put it

9  this way:  Do you recall getting any information that

10 might have caused you to believe that that contractor

11 should not have a contract?

12         MR. AENLLE:  I --

13         JUDGE CORDELL:  Again, if you don't remember --

14         MR. AENLLE:  I can't speak to that.

15         JUDGE CORDELL:  That's fine.  And when you say

16 you can't speak to it, does that mean you don't remember

17 it or you just don't want to talk about it?

18         MR. AENLLE:  No, no, no.  It's not that I don't

19 want to talk about it.  I really don't remember that --

20         JUDGE CORDELL:  Okay.

21         MR. AENLLE:  -- what you're asking me.  And

22 that -- that contract was not initiated by me.

23         JUDGE CORDELL:  But you had nothing to do --

24 you didn't get involved in it at all subsequently?

25         MR. AENLLE:  At some point, with the advice of



1  legal counsel, I got involved.

2          JUDGE CORDELL:  Talk to me about that.

3          MR. AENLLE:  Just to make sure that the

4  separation was proper and was done accordingly.

5          JUDGE CORDELL:  Okay.  And when you say "legal

6  counsel," can you recall who --

7          MR. AENLLE:  David Silberman.

8          JUDGE CORDELL:  David Silberman?

9          MR. AENLLE:  Yes.

10         JUDGE CORDELL:  Okay.  All right.

11         So you reached out to him, or he reached out to

12  you?

13         MR. AENLLE:  I don't recall who reached out to

14  whom.

15         JUDGE CORDELL:  All right.  And one last one

16  about contracts.  Do you recall entering -- you now,

17  not --

18         MR. AENLLE:  Yes.

19         JUDGE CORDELL:  -- the office but you --

20  entering -- when you were, obviously, in the position

21  you're in now, did you recall entering into a contract

22  with a woman that you brought in to write grants -- do

23  grant writing for the Sheriff's Office?

24         MR. AENLLE:  Yes, ma'am.

25         JUDGE CORDELL:  Can you talk to me about that



1  and what happened and your involvement in it.

2         MR. AENLLE:  We were looking for opportunities

3  to increase the revenue for the office, and we felt that

4  there was a lot of potential grants available, and we

5  had nothing set up in the office.  The only contract

6  that we had set up was with a lobbyist in Washington,

7  D.C., from the prior administration, and basically he

8  was just taking money and not providing any results.

9  Out of four or five years of paying him a very large

10  amount of money, he only materialized with one grant

11  that, again, we were not able to correctly use.

12         So I looked for opportunities at the direction

13  of the sheriff.  "Let's see if we can get some people

14  that can -- can really go after this -- the grant so we

15  can supplement the department and get -- get more

16  training or -- or whatever else the department needs."

17         It didn't -- it didn't work.  I thought she was

18  good, but nothing ever came of it.

19         JUDGE CORDELL:  Got it.

20         MR. AENLLE:  She never secured anything.

21         JUDGE CORDELL:  Right.  How was she even

22  brought into it?  I guess that's really what I'm asking

23  now.  Who brought her in, and who did the contract?

24         MR. AENLLE:  Word -- word of mouth.  We -- we

25  asked some recommendations, you know, some people that



 1  are using.  She was out of Las Vegas, and she came

 2  highly recommended.  I don't recall the -- the actual

 3  details, but I initiated that contract.

 4            JUDGE CORDELL:  Got it.

 5            MR. AENLLE:  Like I --

 6            JUDGE CORDELL:  And then what --

 7            MR. AENLLE:  Like I've done many, just at the

 8  direction of the office.

 9            JUDGE CORDELL:  So when you say "the office,"

10  you mean the sheriff?

11            MR. AENLLE:  Yes.

12            JUDGE CORDELL:  Again, I'm not trying to put

13  words in your mouth, but I want -- I just want to be --

14            MR. AENLLE:  The sheriff, the undersheriff.  I

15  have -- I have -- I report directly to the undersheriff.

16            JUDGE CORDELL:  Right.  But I think your job

17  description says you can also -- you report to the

18  undersheriff and to the sheriff.

19            MR. AENLLE:  Absolutely, ma'am.  We all do.

20            JUDGE CORDELL:  Okay.  I've got you.

21            MR. AENLLE:  So let me -- let me make one thing

22  clear.  They contract with the -- with that specific

23  person -- actually, I -- ma'am, can we go back for one

24  second?

25            JUDGE CORDELL:  Absolutely.  Absolutely.



1      MR. AENLLE:  I want to make sure that I'm

2  giving you the right information and it's not getting

3  mixed up because there's been two contracts with grant

4  writers with a woman.  So I want to make sure that I'm

5  speaking to what you're asking me of.

6      JUDGE CORDELL:  Yeah.  The one I'm asking about

7  is the one that got canceled.

8      MR. AENLLE:  None of them got canceled, but I'm

9  only going to go with the one in Vegas, yeah.  So the

10  contract stopped monetarily.  She was only going to get

11  paid if she got -- if she got -- it was a commission

12  based, if she actually was able to secure grants for us.

13  That's it.

14      JUDGE CORDELL:  Got it.

15      Is there a -- is there a process or protocol

16  for contracting with -- either for services or whatever?

17  Do you have to follow certain procedures or what?  Can

18  you explain to me, like, how that works.

19      MR. AENLLE:  Yeah.  It -- it depends, ma'am.

20  If -- if we're going for a vendor or something like

21  that --

22      JUDGE CORDELL:  Yes.

23      MR. AENLLE:  -- we follow an RFP process.  If

24  it has to do for -- you know, something for the

25  sheriff's -- for the Sheriff's Office -- for example, a



1   personnel that has an expertise that's needed in the

2   office that we don't have the -- the upper staff or we

3   need an expertise, no.  The sheriff has the ability

4   to -- to hire that person --

5           JUDGE CORDELL:  So you --

6           MR. AENLLE:  -- under a separate contract.

7           JUDGE CORDELL:  Got it.

8           So when we're talking about the vendor for the

9   food that was going to be for the jails and that got --

10  and you had legal counsel advise you about that one, was

11  that a contract, or was that a -- did that have to go

12  through an RFP, or how did that have to -- how did that

13  work?

14          MR. AENLLE:  Ma'am, I just want you to know

15  that that contract never went through.  We were never --

16          JUDGE CORDELL:  Oh.

17          MR. AENLLE:  -- in contract with that person.

18          JUDGE CORDELL:  Got it.  Okay.

19          MR. AENLLE:  And just so you know, we were

20  never in contract with that person.

21          JUDGE CORDELL:  Do you know if the sheriff

22  approved it verbally, and then it was subsequently

23  then -- do you know anything about that?  Again, I don't

24  want to put words in your mouth.  I'm just trying to --

25          MR. AENLLE:  And I don't want to speak for the



1   sheriff.  But I can tell you that how she is, she would

2   not have said -- approved anything verbally like that.

3            JUDGE CORDELL:  Okay.

4            MR. AENLLE:  I know I'm not speaking --

5            JUDGE CORDELL:  Sure.

6            MR. AENLLE:  This is just from my -- from my

7   point of view.

8            JUDGE CORDELL:  Got it.

9            Okay.  So I'm going to go back to the chain of

10  command when you were describing to me where you are and

11  how it all works.

12           So I'm going to ask you some questions.  Again,

13  these are not -- I'm -- how do I say this?  I'm the

14  messenger.  I just want to ask you about things that

15  people are saying, and --

16           MR. AENLLE:  Sure.

17           JUDGE CORDELL:  -- and then I'd love to get

18  your feedback.  And anything you're uncomfortable with

19  answering, then it's fine.  You don't have to answer.

20           So have you ever in your role as -- and I'll

21  just call you "chief of staff/executive director."

22           Have you ever required any sworn officers to

23  report to you?

24           MR. AENLLE:  No, ma'am.

25           JUDGE CORDELL:  Okay.  So you've never required



1   any, for example, captains?  Ever told them they have to

2   now report to you?

3           MR. AENLLE:  No, ma'am.

4           JUDGE CORDELL:  Have you ever been involved in

5   any confidential sworn officer investigations conducted

6   through Internal Affairs in the Professional Standards

7   Bureau?

8           MR. AENLLE:  Absolutely not, ma'am.

9           JUDGE CORDELL:  Have you ever given any

10  directives or any kind of orders to Sheriff Corpus?

11          MR. AENLLE:  What?  No.

12          JUDGE CORDELL:  Just answer.  Listen, man,

13  just --

14          MR. AENLLE:  Okay.  The answer is, "No."

15          JUDGE CORDELL:  Okay.  Have you -- all right.

16  Have you ever been involved in personnel decisions

17  concerning sworn officers?  And let me be a little more

18  specific.

19          MR. AENLLE:  Please.

20          JUDGE CORDELL:  If a sworn officer wants a

21  certain individual to be that sworn officer's secretary

22  or administrative assistant, have you ever been involved

23  in, like, vetoing that decision of a sworn officer to

24  bring in somebody for that sworn officer?

25          MR. AENLLE:  So if I may --



1        JUDGE CORDELL:  Sure.

2        MR. AENLLE:  __ I want to -- I want to dispel

3   something just to make sure that -- that you're aware

4   that -- that -- the stance that a civilian can't tell a

5   sworn what to do or -- or likewise, vice versa, is -- is

6   not in any policy of the Sheriff's Office.  It's

7   actually, you know, old-time mentality of law

8   enforcement.  It's not -- it's not written anywhere.

9   It's a lack of understanding.

10       LAPD, which started this many, many years ago,

11  and it's, basically, best practice, they actually hire

12  an employee -- civilians in an executive level, and

13  actually law -- sworn officers actually report to them.

14  It's the same thing with the Chief of the San Francisco

15  PD.  He brought that model over, and many other police

16  departments and sheriff's office structures that way.

17       But to your -- your point of question, I am

18  involved in meetings at the -- in the executive level

19  that has to do with operational needs.  It has to do

20  with employee (unintelligible) and many things.  In that

21  meet, I have a voice, but ultimately it's just one voice

22  of four, and decisions are made at that level like that,

23  whether they're civilian, whether they're sworn.

24       But have I told a captain or somebody they

25  can't have -- that's not -- I've never taken that role.



1    I've never done anything like that.

2           JUDGE CORDELL:  Okay.  Is it your view that in

3    your position that you can, in certain circumstances,

4    give orders to and direct sworn officers?  I'm talking

5    about captains, lieutenants, sergeants, deputies.

6           MR. AENLLE:  No, ma'am.  And I'd like to say

7    that the way we conduct and -- and at the division of

8    the Sheriff's Office and the sheriff is, you know, if

9    you know -- we don't really go around ordering people.

10   That's not the way we talk to people or conduct

11   ourselves.

12          JUDGE CORDELL:  So how do --

13          MR. AENLLE:  We try to create --

14          JUDGE CORDELL:  How do you conduct yourselves?

15          MR. AENLLE:  I mean, people, like humans.

16   Like -- like being part of a team, being part of the

17   group.

18          So to answer the question, I don't -- there's

19   no sworn cop that reports to me at all whatsoever.  A

20   lot of them will come to me for questions about

21   something or advice on something or help on something,

22   and I'm happy to work with them.  These are people that

23   I've known for 16 years since I've been here; right?

24          JUDGE CORDELL:  Right.

25          MR. AENLLE:  But there's no orders being given.



 1   With that said, if the sheriff says, "Victor, I need you
 2   to go take care of this right now," am I going to call a
 3   captain or say, "Hey, on behalf of the sheriff, she
 4   would like this done"?  Yes, I've done that.

 5            JUDGE CORDELL:  Right.  But that's different.
 6   "I would like" -- "On behalf of the sheriff, I would
 7   like this done" versus you directing somebody to do
 8   something; right?

 9            MR. AENLLE:  Absolutely.  Absolutely, ma'am.
10            JUDGE CORDELL:  Got it.

11            MR. AENLLE:  A different thing.  So if -- to
12   your -- to your questions, no, ma'am.  I have always
13   worked, and I'm very clear that I work at the direction
14   of the sheriff.  I'm here to advance her vision and
15   improve this organization, and I've done that from day
16   one.

17            JUDGE CORDELL:  Have you ever been involved in
18   signing off on budget items on -- in a sworn officer's
19   budget?

20            MR. AENLLE:  Ma'am, I oversee a fiscal -- I'm
21   very -- I'm a numbers person.  I'm very conscious and
22   very conservative on spending.  Anybody -- if you talk
23   to any of my -- my directors that have to do with money,
24   they'll tell you that.

25            One of the first things that I did when I came



**TALTY COURT REPORTERS, INC.**
**taltys.com · 408.244.1900**

65

1    to the Sheriff's Office was review all the contracts

2    that were done, and we were able to -- to save about

3    $1.5 million of the Sheriff's Office budget.  No company

4    comes directly to me or anything like that about their

5    budget.  I will have meetings with the undersheriff.

6    I'll be present at meetings with other sworn people.

7    Half of our department are sworn people, and we go over

8    the budgets and so forth.  And when they don't

9    understand it, I -- I help with the numbers.  But it's

10   not my role to deny any kind of a budget.  That's not

11   even within my -- my capacity.  That doesn't happen.

12            JUDGE CORDELL:  I understand.  And I'll be a

13   little more specific.

14            MR. AENLLE:  Yes.

15            JUDGE CORDELL:  If there was a -- was there

16   ever a budget item in, let's say, a captain's budget

17   and -- and a captain had a budget, and there was a

18   budget item.  The captain said, "I don't even know what

19   that is," and it's an item that you signed off on?  Has

20   that ever happened?

21            MR. AENLLE:  I'm sorry, ma'am.  Can you repeat

22   that one more time.

23            JUDGE CORDELL:  Sure.

24            MR. AENLLE·  I'm not -- I'm not following,

25   yeah.



1        JUDGE CORDELL:  Sure.  Let us say a captain has

2    a budget.  So a captain's at -- at a -- let's make a

3    bureau.  We'll do one of the bureaus.  So there's Half

4    Moon Bay.  There's San Carlos.  Whatever.  One of them.

5    All right?  So there's a captain.

6        MR. AENLLE:  Uh-huh.

7        JUDGE CORDELL:  And they -- and they -- they're

8    actually also called the -- the chief because they're

9    kind of the --

10       MR. AENLLE:  Correct.

11       JUDGE CORDELL:  -- chief for that; right?

12       MR. AENLLE:  Yeah.

13       JUDGE CORDELL:  Okay.

14       MR. AENLLE:  Okay.

15       JUDGE CORDELL:  All right.  So if a captain has

16   a budget there and there's a budget item that the

17   captain doesn't even know why it's there, have you ever

18   said to a captain, for example -- you know, have you

19   ever signed off on a budget item where a captain didn't

20   even know why the item was even in that captain's

21   budget?

22       MR. AENLLE:  Ma'am, that's not even in my

23   realm.  That's not even anything I would do.  I don't

24   sign off anything that I don't understand or isn't

25   clearly defined.



1        I can recall -- you know, you're putting this
2    about a captain and a bureau and so forth.  And when we
3    have -- we have our meetings, and I'm not alone at these
4    meetings.  I'm with the sheriff, undersheriff, and
5    assistant sheriff.  That said captain didn't even
6    understand her -- her own numbers.  And the only thing I
7    pointed out was that it seemed like it was done in
8    error; that org -- org chart, because numbers stick in
9    my head, not did belong to that bureau.  But at no
10   time --
11        JUDGE CORDELL:  I think we know who we're --
12   right.
13        MR. AENLLE:  Yeah.
14        JUDGE CORDELL:  I think we know who we're
15   talking about; right?
16        MR. AENLLE:  Oh, absolutely.  At no time did I
17   approve something like that.  It's not even me for -- I
18   do not approve the chief's budgets or independent
19   bureau's budgets.  It doesn't work that way.
20        JUDGE CORDELL:  And can you tell me why you are
21   involved in meetings about a captain's budget if it's
22   the captain's budget.
23        MR. AENLLE:  I'm involved in all meetings that
24   pertain to the Sheriff's Office.  I'm part of the
25   executive team.  So I'm involved to have outside input



 1   to use expertise on numbers and finances because it's

 2   part of the Sheriff's Office everyday business.

 3            JUDGE CORDELL:  Got it.

 4            MR. AENLLE:  It has nothing to do with sworn

 5   and non-sworn.

 6            JUDGE CORDELL:  Okay.

 7            MR. AENLLE:  If it's the bottom line, I oversee

 8   fiscal and at the will of the sheriff.  That's who she

 9   wants present during these budget meetings.

10            JUDGE CORDELL:  Okay.  Got it.

11            Have you ever directed civilian personnel to

12   always address you as "Dr. Aenlle"?

13            MR. AENLLE:  No, ma'am.  Not at all.

14            JUDGE CORDELL:  Have you ever --

15            MR. AENLLE:  Not at all.

16            JUDGE CORDELL:  Have you ever requested or

17   directed any sworn personnel to address you always as

18   "Dr. Aenlle"?

19            MR. AENLLE:  No, ma'am.  Not at all.

20            JUDGE CORDELL:  Do you act as the sheriff's

21   personal body guard?

22            MR. AENLLE:  No.  No.  But every -- anybody --

23   anybody in this department -- when the sheriff is out,

24   everybody should be her body guard.  Everybody should

25   watch out for the sheriff.  She's a very well-known



1   political figure in the county, and at the current times

2   in law enforcement, I would hope that anybody that works

3   for this department would always watch out for their

4   sheriff's safety.

5           JUDGE CORDELL:  So my question is not so much

6   everybody cares about the sheriff.  And I understand.

7   She's high profile.

8           Is -- have you ever said that you were her

9   dignitary protection?

10          MR. AENLLE:  No.  There's no dignitary

11  protection.  Am I -- when I attend -- when I attend

12  political things or go with the -- with the sheriff to

13  political things, am I looking out for her safety?

14  Absolutely, ma'am.  Every time.

15          JUDGE CORDELL:  But you have never said you

16  were her personal body guard?

17          MR. AENLLE:  I've never said I was her body

18  guard.

19          JUDGE CORDELL:  Okay.

20          MR. AENLLE:  Do I provide security for the

21  sheriff, or do I make sure she's safe when she has

22  meetings or different areas in different cities where

23  the tensions are a little high?  Absolutely.  Everybody

24  should.  Anybody in uniform or not in uniform should do

25  that for the sheriff.



1      JUDGE CORDELL:  So does that mean that if the

2  sheriff is attending a meeting somewhere out of the

3  office that you will be there to give her protection

4  or --

5      MR. AENLLE:  I'm there -- I'm to support.  I'm

6  there to engage for the community.  I'm there for

7  whatever she needs.

8      JUDGE CORDELL:  Right.  I -- right.  But I

9  guess my question's a little different.

10      When the sheriff has to go to a meeting and

11  that meeting doesn't involve you, do you still go,

12  though, to make sure she has protection?

13      MR. AENLLE:  If the -- if the meeting doesn't

14  involve me and she doesn't need me, I don't go.

15      JUDGE CORDELL:  Okay.  With regard to

16  recruitment of sworn personnel, have you ever been

17  involved in recruitment decisions regarding recruiting

18  for sworn personnel?

19      MR. AENLLE:  Again, ma'am, my involvement would

20  be at the executive team level, discussions about, "What

21  do we need?"  "Where should we go?"  "What are we

22  missing?"  "Let's -- let's -- let's look for people

23  where we've never looked before."  "Let's think outside

24  the box."  "What support do they need?"  "Do we need to

25  hire more -- more background investigators?"  "Do we



1   have enough?"  Yes, I am involved in those decisions,

2   regardless of sworn or non-sworn, because we're also

3   hiring for -- for civilian staff as well; right?

4         JUDGE CORDELL:  Right.

5         MR. AENLLE:  Recruitment for it.

6         JUDGE CORDELL:  Right.

7         MR. AENLLE:  But yes.

8         JUDGE CORDELL:  By "recruitment decisions," I

9   also mean picking people.  Like, "No.  That's the

10  person" --

11        MR. AENLLE:  No, ma'am.

12        JUDGE CORDELL:  -- "that I want it to be."

13        MR. AENLLE:  No.  No, ma'am.

14        JUDGE CORDELL:  Got it.  Okay.

15        MR. AENLLE:  Not at all.  That's -- that's --

16  I've never been involved in that.  That's completely

17  outside.  I don't -- I'm not even in the queue for that.

18        JUDGE CORDELL:  Okay.

19        MR. AENLLE:  I'm not anywhere near part of that

20  process.

21        JUDGE CORDELL:  Okay.  Have you ever directed

22  sworn personnel to issue special badges to anyone?

23        MR. AENLLE:  I don't have the power to do that.

24        JUDGE CORDELL:  Okay.

25        MR. AENLLE:  And I have not.



1          JUDGE CORDELL:  Got it.

2          There are trainings for sworn personnel.  They

3    have to go through certain trainings.  Have you ever

4    been involved such that you've directed that trainings

5    happen at a certain time when they're for sworn

6    personnel, not for civilians?

7          MR. AENLLE:  Ma'am, I think I know what you're

8    referring to.  So I'll just speak to that.

9          JUDGE CORDELL:  Yeah, let's be up front because

10   I --

11         MR. AENLLE:  Yeah.

12         JUDGE CORDELL:  -- you know, I want to be as up

13   front with you as I can.  So I'm talking about --

14         MR. AENLLE:  Absolutely.

15         JUDGE CORDELL:  Sure.  So I'm talking about the

16   active shoot- -- let's see.  Yeah.

17         MR. AENLLE:  Sure.

18         JUDGE CORDELL:  The active shooter training

19   that was set for October and then was changed to August.

20         Can you talk to me about that?

21         MR. AENLLE:  Absolutely.  I would be happy to.

22         JUDGE CORDELL:  Okay.

23         MR. AENLLE:  This -- so this training initiated

24   after -- we go back to the Half Moon Bay shooting, the

25   massacre that took place basically 21 days into the



1    sheriff's tenure.  The findings from that really

2    identified that -- that we needed more training.  The

3    Sheriff's Office went out and -- and researched certain

4    companies.  There was a company.  We had done business

5    with them in the past, and they trained our SWAT team.

6    She approached them, and -- and we identified some of

7    the needs that -- that were identified.  There was a

8    class put together which -- which was done in

9    partnership with the fire department, with AMR, with the

10   school district because we felt that training for such

11   incidents in a collaborative way provides better

12   results.

13           So that training was -- was conducted.  It

14   was -- it was done on the coast, and it was a complete

15   success.  People were thrilled.  The community was also

16   appreciative of being included, and it was a success.

17           The sheriff's wishes was that we had to do that

18   same training on this side of the bay.  On this side.

19   It was -- and it was -- and that was the direction.

20   Somehow training fell behind, whatever the case was, and

21   it was not -- it was not done.  When the sheriff found

22   out that it was pushed back all the way to October, with

23   the tensions and the recent mass shootings and the

24   elections coming up, she wanted to make sure that her --

25   her employees were prepared.  So she asked the company



1   to see if they could move up the training as she wanted

2   to because October was going to be too late with the

3   current tensions.

4          The training -- that training was to be done in

5   our facility.  We didn't need to rent anything.  That

6   training was to be done in our range.  There was --

7   there was nothing needed, and there was like two weeks'

8   advance notice for that training to take place to only

9   better prepare our employees for anything major like

10  that.  That's it.

11         So she instructed the training unit to go ahead

12  and get this ready, and so that's as far as it went.  It

13  had nothing to do with me, ma'am.

14         JUDGE CORDELL:  So you had no --

15         MR. AENLLE:  It --

16         JUDGE CORDELL:  I'm sorry.  So I just want

17  to -- that's exactly what you were getting ready to say,

18  but I want to clarify that the directive to move it up,

19  have it in August, everything -- that was all at the

20  sheriff's initiative, not yours?

21         MR. AENLLE:  Of course, ma'am.  Absolutely.

22         JUDGE CORDELL:  Okay.

23         MR. AENLLE:  Absolutely.

24         JUDGE CORDELL:  Then -- got it.

25         Do you know whether or not the sheriff had



1  approved that training for October?

2          MR. AENLLE:  To my knowledge, she had not.  She

3  was not even aware.  That day -- she was -- she was told

4  about that, and that's why she wanted to move it up.

5  She was told about that later.  She was surprised that

6  they had not been scheduled sooner.

7          JUDGE CORDELL:  I see.  And you know she was

8  surprised because she told you this?

9          MR. AENLLE:  I know because I was in a meeting

10 when that came up.  And she goes, "Can't they do it any

11 sooner?  This is -- this is -- I asked this" -- so just

12 to put it in perspective, ma'am, the last time any

13 training like that was done was in January -- in, I want

14 to say, March of 2023.  What's that?  16 months, 18

15 months with no training for a critical incident?  So she

16 felt that it was really important, and she had to

17 elevate it.  She wanted to make sure that if something

18 happened, her employees, who she cares about deeply,

19 were well-trained and prepared.

20         JUDGE CORDELL:  So --

21         MR. AENLLE:  16 to 18 months without having any

22 type of training like that.

23         JUDGE CORDELL:  Got it.

24         So the meeting where she was -- got this

25 information, was surprised, what meeting -- when does --



1   tell me about that meeting -- when it was and who was

2   there.

3           MR. AENLLE:  It was one of the executive-level

4   meetings.

5           JUDGE CORDELL:  But who was there?

6           MR. AENLLE:  So the -- the former undersheriff

7   and former assistant sheriff.

8           JUDGE CORDELL:  And you?  Were you there?

9           MR. AENLLE:  Of course.  Of course, yeah.

10          JUDGE CORDELL:  So you're -- okay.

11          And so that would have been -- okay.  And the

12  sheriff, obviously.

13          So do you know who told her, "This is scheduled

14  for October"?

15          MR. AENLLE:  I believe it was the assistant

16  sheriff, (unintelligible), yeah.

17          JUDGE CORDELL:  Got it.  Okay.  Thank you for

18  clarifying that.

19          MR. AENLLE:  Yeah.  My pleasure.

20          JUDGE CORDELL:  Have you ever disparaged or

21  said or bad-mouthed any sworn personnel?  Like calling

22  them names, the -- you know, that's about it.  Have you

23  ever done that?

24          MR. AENLLE:  Calling people names?

25          JUDGE CORDELL:  Or putting them down.  You



1   know, just --

2          MR. AENLLE:  No.  No  I'm not putting anybody

3   down.

4          JUDGE CORDELL:  Okay.  Have you ever been or

5   are you now the director of or running the corrections

6   operation?

7          MR. AENLLE:  No, ma'am.

8          JUDGE CORDELL:  You've never, ever been in

9   charge of corrections?

10          MR. AENLLE:  I've never been in charge of

11   corrections, ma'am.

12          JUDGE CORDELL:  And you've never told

13   anybody --

14          MR. AENLLE:  I --

15          JUDGE CORDELL.  Sorry.  Go ahead.

16          MR. AENLLE:  I've helped -- I help -- I help

17   the sheriff and undersheriff to make sure that

18   information doesn't get lost.  So I -- I -- I inform

19   them.  I -- I share information just to make sure

20   everybody's aware, but I don't run any facilities.  I

21   don't run any correction facilities.

22          JUDGE CORDELL:  So you've never told --

23          MR. AENLLE:  I run the departments that I'm

24   assigned.

25          JUDGE CORDELL:  So you've never told anyone,



1   "I'm -- I'm running corrections now"?

2        MR. AENLLE:  No, ma'am.

3        JUDGE CORDELL:  Okay.  Have you ever gained

4   access to and searched an electronic device of any sworn

5   personnel?

6        MR. AENLLE:  I'm sorry?

7        JUDGE CORDELL:  Have you ever gained access to

8   and then searched electronic device of a sworn

9   personnel?

10       MR. AENLLE:  No.  And I don't -- and to be

11   clear, can you -- are we talking about -- what are we

12   talking about here?

13       JUDGE CORDELL:  I'm talking about either a

14   phone or a laptop.

15       MR. AENLLE:  No.

16       JUDGE CORDELL:  Have you ever gained access to

17   and searched the electronic device of a sworn personnel

18   after the person left the Sheriff's Office?

19       MR. AENLLE:  I was instructed to collect the

20   things and by the undersheriff to go ahead and have ISD

21   process it so we can wipe it and reassign the equipment.

22       JUDGE CORDELL:  Can you tell me --

23       MR. AENLLE:  I did not search --

24       JUDGE CORDELL:  I'm sorry.  Go ahead.

25       MR. AENLLE:  But I did not search any devices



1   at all whatsoever.

2           JUDGE CORDELL:  So when you said "ISD," what is

3   that?

4           MR. AENLLE:  It's -- it's the County's official

5   IT department.

6           JUDGE CORDELL:  Got it.

7           MR. AENLLE:  It handles all our stuff.

8           JUDGE CORDELL:  I --

9           MR. AENLLE:  It's a process.  I go through my

10  IT department.  I am the director, the DSU of the IT

11  department.  So I give them the equipment, just like

12  we've done in the past, and they do what they need to

13  do, and then they get cleared, and they get reissued.

14          JUDGE CORDELL:  Have you ever given a directive

15  not for an -- for a phone and a laptop from an

16  officer -- from a sworn personnel who has left -- have

17  you ever given a directive to anyone to say, "Give

18  me" -- you.  That is you, Mr. Aenlle -- "the phone and

19  the laptop"?

20          MR. AENLLE:  No, ma'am.

21          JUDGE CORDELL:  Okay.  Have you -- and I'm --

22  I'm -- I'm going to use a name here.

23          MR. AENLLE:  Yes.

24          JUDGE CORDELL:  Specifically, have you ever

25  requested that the phone and the laptop of Chris Hsiung,



1   who was the undersheriff who left -- have you ever

2   directed that you be given his two -- those two devices?

3            MR. AENLLE:  No, not to my recollection.

4   Not -- not at all.

5            JUDGE CORDELL:  Have you ever looked into Chris

6   Hsiung's cell phone after he left?

7            MR. AENLLE:  Not that I can recall.  There's

8   nothing I would look in there for (unintelligible).

9            JUDGE CORDELL:  Okay.  No problem.

10           Have you ever -- ever -- inquired about any

11  private conversation that Chris Hsiung may have had with

12  East Palo Alto Police Chief?

13           MR. AENLLE:  Can you repeat that again.

14           JUDGE CORDELL:  Sure.

15           Have you ever inquired about a conversation

16  that Chris Hsiung, the former undersheriff, had with the

17  Chief of East Palo Alto Police Department?

18           MR. AENLLE:  Oh, absolutely.  I had a

19  conversation with Chris Hsiung.

20           JUDGE CORDELL:  And can you please tell me

21  about that.

22           MR. AENLLE:  "Chris, I heard that you're saying

23  not so nice things about me; that you're claiming that

24  you left the Sheriff's Office because of me."

25           And he basically told me, "No, Victor.  That's



1  not true.  I didn't leave because of you."

2          JUDGE CORDELL:  And when you called -- I'm not

3  going to make any assumptions.

4          MR. AENLLE:  Yeah.

5          JUDGE CORDELL:  Either he called you or you

6  called him.  I don't know.

7          MR. AENLLE:  I called him.

8          JUDGE CORDELL:  All right.  And did you -- did

9  you call him and ask him about speaking with the Police

10  Chief in East Palo Alto?

11          MR. AENLLE:  No.  He already knew.  I just

12  called him and said, "I understand that you're not

13  saying nice things about me."  We had a nice talk.  He

14  understood.  He agreed.

15          He said, "Hey, this is not between us.  We

16  don't have to say that."  He -- he was upset that he

17  thought I was saying something about him.  And we

18  cleared -- cleared it up, and that was it.

19          JUDGE CORDELL:  Did you --

20          MR. AENLLE:  But, yes, I called him and had a

21  conversation with him.

22          JUDGE CORDELL:  Got it.

23          Did you know that he was meeting with the

24  police chief of East Palo Alto?

25          MR. AENLLE:  Yes.  I -- I knew he was



1 | meeting -- that he had met with him.

2 |       JUDGE CORDELL: How did you know that?

3 |       MR. AENLLE: I don't recall how I learned that.

4 |       JUDGE CORDELL: Okay.

5 |       MR. AENLLE: I don't recall.

6 |       JUDGE CORDELL: That's -- that's okay. I

7 | mean --

8 |       MR. AENLLE: Some -- one of the people in -- in

9 | East Palo Alto.

10 |       JUDGE CORDELL: I'm sorry. I didn't

11 | understand.

12 |       MR. AENLLE: It could have been one -- one of

13 | the employees in East Palo Alto.

14 |       JUDGE CORDELL: Who did what?

15 |       MR. AENLLE: That mentioned that to me; that

16 | somebody was not talking very nicely about me.

17 |       JUDGE CORDELL: Okay. And so your purpose

18 | in -- in calling Chris was -- was what?

19 |       MR. AENLLE: Have a conversation with him, just

20 | clear it up, see if he really had a problem with me, see

21 | if there was anything I could do. Because it's not -- I

22 | didn't -- Chris and I didn't have a relationship like

23 | that. I'd work -- we had our differences, but as

24 | people, we got along just fine.

25 |       JUDGE CORDELL: Okay. But he had left; right?



1   He had left your office.

2           MR. AENLLE:  Yes, he had left.  He was no

3   longer an employee, yeah.

4           JUDGE CORDELL:  Okay.  So have you ever --

5   okay.  Let me just -- I'm just -- I'm going through my

6   list.  So just bear with me here.

7           MR. AENLLE:  Sure.

8           JUDGE CORDELL:  I want to make sure every

9   concern, every allegation that I'm aware of that you're

10  aware of.  That's why I'm -- I'm doing -- I'm doing

11  this, and I appreciate your patience.

12          MR. AENLLE:  Yeah.

13          JUDGE CORDELL:  Have -- do you know whether or

14  not Sheriff Corpus called the Police Chief of East Palo

15  Alto?

16          MR. AENLLE:  Ma'am, I'm not aware of what calls

17  the sheriff made or didn't make.  I know -- I know that

18  they're friends, but I don't know how much they talk or

19  so forth.

20          JUDGE CORDELL:  Okay.  All right.

21          Have you ever authored any memos with the

22  sheriff's letterhead on it that -- under her name but

23  you wrote it?  Have you ever done that?

24          MR. AENLLE:  All the memos in the office have

25  the letterhead of the sheriff.



1       JUDGE CORDELL:  Right.  Have you --

2       MR. AENLLE:  Can you be more specific.

3       JUDGE CORDELL:  Sure.

4       My question is are you the one that wrote the

5  memos and --

6       MR. AENLLE:  Typically, the --

7       JUDGE CORDELL:  In other words, it went out

8  under the sheriff's name, but actually you're the one

9  who wrote them.  Have you ever done that?

10       MR. AENLLE:  Most of the memos goes -- go out

11  by the admin assistants.  Do I sometimes review, edit

12  things for anybody in the executive teams?  Yes.  But

13  not -- I do not insert my information or my authority

14  over them.

15       JUDGE CORDELL:  Got it.

16       Have you ever initiated the writing of a memo

17  and then had it sent out under the sheriff's name?  Now,

18  the sheriff may have known about it.  That's not what

19  I'm -- I'm not saying you're sneaky or doing anything

20  without her knowing.  But have you ever done that?  In

21  other words, you're the author.  You wrote it, and it

22  went out under the sheriff's name.

23       MR. AENLLE:  Ma'am, anything that I write or

24  edit or whatever is at the sheriff's directions or her

25  telling me what to put on it or a dictation that I take



 1   or something like that.  It's not authored by me.  It's

 2   not my ideas.  It's not authored by me.

 3              JUDGE CORDELL:  Okay.

 4              MR. AENLLE:  So when I hear "authored," I --

 5   it -- it is my assertion or influence or ideas, and my

 6   answer would be, "No."

 7              JUDGE CORDELL:  Right.  Okay.

 8              So there was a -- an overtime -- a memo that

 9   went out on the sheriff's letterhead about overtime

10   that --

11              MR. AENLLE:  Yes, ma'am.

12              JUDGE CORDELL:  -- caused a big carfuffle

13   because --

14              MR. AENLLE:  Yes.

15              JUDGE CORDELL:  -- then the DSA got upset and

16   everything.

17              Did you write that memo?

18              MR. AENLLE:  I did not write it.  I helped edit

19   it and -- and grammar.  And it was not only me.  It was

20   the former assistant sheriff, undersheriff, and myself.

21   We worked under a Google document at the direction of

22   the sheriff just cleaning up.  It had outdated language

23   like "jail."  It referred to "jail" as opposed to

24   "correctional facility."  It was -- it was a bunch of

25   different things that she wanted to make simple.  It was



1   a five-page overtime policy, and she wanted to clean it

2   up.  She instructed the undersheriff, former assistant

3   sheriff, myself to look at this and clean it up and --

4   and put it together.

5           JUDGE CORDELL:  But did --

6           MR. AENLLE:  The description that I authored

7   that paper and I -- I mean, it -- it's wrong.

8           JUDGE CORDELL:  Okay.

9           MR. AENLLE:  And untrue.

10          JUDGE CORDELL:  Okay.  Got it.  So noted.

11          Have you taken control ever or now of Sheriff

12  Corpus's calendar?  Do you control it?

13          MR. AENLLE:  Not at all.  I can -- I can add

14  and -- and do some things.  And when she needs me, I

15  make sure that, you know, she -- she doesn't forget

16  certain meetings because she's got a lot on her plate.

17  But her admin assistant has a hundred percent and -- and

18  primary function of her schedule.

19          JUDGE CORDELL:  Got it.

20          Do you have the access code to Sheriff Corpus's

21  cell phone?

22          MR. AENLLE:  No.

23          JUDGE CORDELL:  Have you ever texted from her

24  phone without letting anyone know that you were texting

25  it and not the sheriff?



1          MR. AENLLE:  Ma'am, I would never do that, and

2     the sheriff knows that.  And -- and -- and that's -- no.

3     The answer is, "No."

4          JUDGE CORDELL:  No problem.  No problem.

5          Have you ever attempted to change the

6     resignation of a sworn officer to a firing of that

7     officer?

8          MR. AENLLE:  No.

9          JUDGE CORDELL:  And I'll be specific.  I'm

10     talking about Chris Hsiung.

11          Did he resign, or did he -- was he fired?

12          MR. AENLLE:  My understanding is -- my

13     understanding is that he resigned.  What Chris told me

14     is, "I beat her to the punch by two -- you know, by a

15     couple hours," or something like that.  I did not ask.

16     I didn't inquire about the sheriff.  It was not my

17     business.  She -- she can fire and hire whoever she

18     wants.  It was not my role.  I learned from that from --

19     from -- from Chris Hsiung.

20          JUDGE CORDELL:  Got it.

21          So you never said to anybody, "He was fired.

22     It's not 'resigned.'  He was fired"?

23          MR. AENLLE:  No.

24          JUDGE CORDELL:  Got it.

25          Okay.  Moving right along.  And, again, I



1    appreciate your patience.

2           Have you asked anyone, sworn or civilian, in

3    the office if they have been questioned by me?

4           MR. AENLLE:  Yes.

5           JUDGE CORDELL:  And can you tell me who you

6    asked?

7           MR. AENLLE:  Former Assistant Sheriff Monaghan.

8           JUDGE CORDELL:  Anyone else?

9           MR. AENLLE:  No, not that I can think of.

10          JUDGE CORDELL:  And why did you ask him why --

11          MR. AENLLE:  It was in passing.  I was actually

12   kind of glad.  We were having a short talk -- a small

13   talk with the undersheriff, non-confrontational.  I

14   said, "Hey, Ron, have you -- have you -- have you talked

15   to her?"

16          And he's like, "Yeah, I have."

17          I'm like, "Whoa.  Wow.  Great."

18          And then I went to the bathroom.  That was it.

19   I didn't ask, "What did you tell her?"  I didn't ask,

20   "What was it about?"  Zero.  I didn't ask any further

21   questions at all whatsoever.  I was kind of glad to hear

22   that somebody on my team that had seen what I've done

23   and not done here at least had a chance to speak to you.

24          JUDGE CORDELL:  In that conversation with then

25   Assistant Sheriff Monaghan, did you say to him, "Why



1    didn't you tell us"?

2            MR. AENLLE:  No.  I said, "I thought you would

3    tell me."

4            And he goes, "No.  I thought it was implied."

5            I'm like, "Oh, okay."  That was it.

6            JUDGE CORDELL:  And the reason --

7            MR. AENLLE:  He said, "I thought it was

8    implied.  I thought it was" --

9            JUDGE CORDELL:  Sure.

10           MR. AENLLE:  -- "kind of a given," or something

11   like that.  That's what he said.

12           I said, "Okay."  That was it.

13           JUDGE CORDELL:  So the reason you asked him was

14   why?

15           MR. AENLLE:  Curiosity, ma'am.  There was a lot

16   of rumors in the office.  There have been a lot of

17   rumors for quite some time now, and, you know, I'm sure

18   the rumors got blown up, and -- and it was more of a

19   curiosity than anything else.  There was no malice

20   behind it.  I wasn't upset.  It was -- it was literally

21   a couple words, and I kept going about my business.  No

22   big deal.  I was kind of glad that he got interviewed by

23   you.

24           JUDGE CORDELL:  Got it.

25           So it was curiosity, not about retaliation?



1          MR. AENLLE:  Oh, ma'am, absolutely not.

2          JUDGE CORDELL:  Okay.

3          MR. AENLLE:  I -- I -- I just want to make that

4     clear.  Absolutely not.

5          JUDGE CORDELL:  Okay.

6          MR. AENLLE:  And -- and my demeanor was very

7     calm, and I really just -- I -- I was -- actually,

8     inside I was actually kind of glad.  I'm like, "Okay.

9     Good.  At least she talked to you."

10         Because the information that was coming back to

11    me, ma'am, to be honest, is that you were only talking

12    to the people that you were instructed to talk to; that

13    there was other people that reached out to you, captains

14    and manager and people to -- that wanted to be

15    interviewed and -- and share their experience with me,

16    and they never got a call back.  And -- and that's some

17    of the rumors that were taking place.

18         JUDGE CORDELL:  Got it.

19         When you had the conversation with Ryan

20    Monaghan --

21         MR. AENLLE:  Yes.

22         JUDGE CORDELL:  -- was -- was the sheriff there

23    during that conversation?

24         MR. AENLLE:  The undersheriff was there, ma'am.

25         JUDGE CORDELL:  But the sheriff was not?



1        MR. AENLLE:  No.  Not at all.

2        JUDGE CORDELL:  Did you -- did you tell the

3   sheriff later that you had asked Ryan and what Ryan

4   said, he had talked to me?  Did you tell her that?

5        MR. AENLLE:  Yeah.  I think in a conversation

6   with the undersheriff and sheriff, I said, "Oh."  I

7   mentioned Ryan.  "He got interviewed."

8        It was like, "Oh, okay.  Cool."

9        That was it.  It was not a big discussion.  It

10  was not -- actually, I take it back.  I think it was

11  Ryan that told her, and then she kind of mentioned that

12  Ryan mentioned it to her.

13       I said, "Yeah, he was."

14       JUDGE CORDELL:  Got it.  Okay.

15       MR. AENLLE:  Yeah.

16       JUDGE CORDELL:  Now, so --

17       MR. AENLLE:  Yeah.  Ryan -- Ryan was the one

18  that told her.

19       JUDGE CORDELL:  Got it.

20       A subject that's, you know, not one of your

21  favorites, but can we talk for just a bit about ▉▉▉

22  ▉▉▉▉▉  please?

23       MR. AENLLE:  Yes, please.  Absolutely.

24       JUDGE CORDELL:  All right.  So --

25       MR. AENLLE:  And, Judge Cordell, I'm open to



1   talk whatever it is you want to talk about.  There's

2   nothing I'm hiding, and -- and I really do want to clear

3   my name.

4          JUDGE CORDELL:  I appreciate it.

5          ███████████  Has she -- after an interaction

6   with you, she filed a complaint with HR.  She's no

7   longer there at the Sheriff's Office.  Her complaint is

8   that you, without any evidence at all, accused her of

9   posting criticism, bad stuff, about the sheriff, posting

10  online, and -- and that your doing this was really

11  retaliation because she was leaving, and you didn't

12  really want her to be leaving the position.

13         Can you talk to me about that, your -- your --

14  your side of this.

15         MR. AENLLE:  I would love to, ma'am.

16         That never happened.  And -- and just to back

17  up,  ████  is a wonderful person.  I -- she was probably

18  one of the best admin assistants that I had while here.

19  I consider her a friend.  Over the top.  I can't give

20  her enough.  I don't know who put her up to this or why

21  she did this because this is completely false, and I'll

22  share with you why.

23         In my computer, I have a folder saved with

24  1,000 emails that I was going to make available to you

25  of how wonderful of a boss and how incredible I've been



1   with her.  A thousand emails.  On my phone, I also

2   wanted to share with you -- let me back up and -- and

3   tell you.

4            I was in my office.  I think it was like the

5   last day she was going to be there, and -- and she came

6   in.  I'm like, "Hey, ███████ check out this email -- this

7   text."  It was that lady from -- from one of the

8   organizations that said, "Hey, it's a good thing that,

9   you know, your assistant is leaving because she's

10  talking pretty -- pretty bad about you and the sheriff."

11           And I'm like, "What?"

12           And literally my text says, "No, not ███████

13  Impossible."  It's in my phone.

14           So she came in.  I'm like, "Hey, I just want to

15  make you aware that whoever these silly people are that

16  are posting things online, like the comments on the

17  article, they're -- they're making it sound like you."

18           But I told this lady, "No way.  Not ██████  I

19  don't believe it for one second."  That was it.  That

20  was it.

21           And like -- and she made a comment like, "God,

22  people are horrible, Victor."

23           I'm like, "Yeah, I know."

24           And then she left my office, and then she went

25  to her office or whatever.  A short time later, I



1  stopped by her office because I wanted her to mentor one

2  of the intern -- interns to cover until I got a

3  full-time person, and I had another chat with her.  I

4  sat on the chair.  And then at that time, I could see

5  that she was -- had a little bit of watery eyes, and she

6  was crying.

7         I'm like, "███████ don't -- don't worry about

8  it.  I -- I -- just -- just don't even -- don't even

9  think twice about it.  People are like that.  I -- not

10 for a moment did I even think it was you."

11        And then she just -- she goes, "I know, Victor,

12 but it's hard."

13        And -- and I left there.  She was crying a

14 little bit.  ██████ tends to -- just to put things in

15 con- -- in context, ██████ a wonderful person, but she

16 does run a little bit high on anxiety.

17        For example, when the sheriff was -- was doing

18 a "Shop with a Cop," ██████ was in charge of the

19 decorations for the building with one of our other

20 admins here.  And when the sheriff went by to visit it

21 and she looked at it, she goes, "Oh, no.  It's -- I -- I

22 really" -- she didn't like it.  She wanted more

23 decorations.

24        ██████ went into the bathroom and -- and started

25 crying.  And I was later told by the other admin that



1   she didn't eat or sleep for three days because of that.

2   So she's a little bit sensitive; right?

3            So I -- I left her office.  Everything was

4   fine.  I came in my office, and then I hear that she's

5   not doing well and she's crying or whatever.

6            Former Assistant Sheriff Monaghan apparently

7   went to go see her, which I don't know why he would do

8   that, but he went to go see her.  And then he came by my

9   office literally after that, and he said, "Hey, Victor,

10  ▓▓▓▓ is really upset," whatever, "but I told her just

11  to come and talk to you."

12           That's directly from Sheriff -- Assistant

13  Sheriff Monaghan.  "But I told her to come talk to you."

14           So if -- if -- if the allegations that I

15  berated her and I screamed and whatever were true, why

16  would he ask her to come and talk to me?  It's

17  impossible.

18           So she did come back to my office and talked to

19  me, and -- and she was upset.  And I'm like, "▓▓▓▓ I

20  never thought about it again.  I wish you didn't take

21  this so hard.  I'm really sorry, but you don't have any

22  issues with me.  I never believed it."

23           So I want to read to you, Judge Cordell --

24           JUDGE CORDELL:  Uh-huh.

25           MR. AENLLE:  -- two -- two of the texts that I



1  saved on my phone that I shared with -- with Jim

2  Touchstone because he asked me to look through some

3  texts, and I never even thought about it.

4         So on March, 2021, at 2- -- at 12:51 -- so

5  after the alleged incident in her office -- sorry.  I

6  take it back.  April 3rd at 1:44 PM.  That was her last

7  day there.  After the incident in her office or

8  whatever -- this is closer to the afternoon right before

9  she was leaving because she got off at 3:00 or 2:00 or

10 whatever it was.

11        She says, "Are you in your office?"

12        And I said, "Yes, I'm here.  You want to" --

13 "I heard you want to stop by."

14        And she said, "Yeah.  It's okay.  I just needed

15 to calm down a little bit.  I don't know why that person

16 would say those things.  I just needed to re- --

17 reiterate that those are total lies, and I don't

18 appreciate her saying them."

19        And I said, "        forget it.  Stop by.  Come

20 see me," or whatever I said.

21        Jim then asked me, "What about a couple weeks

22 before?"

23        And I found another text --

24        MR. TOUCHSTONE:  Hey --

25        MR. AENLLE:  -- in which she said --



1          MR. TOUCHSTONE:  Hey, let me interrupt you for

2    a minute, Victor.  Please don't discuss our

3    conversations.

4          JUDGE CORDELL:  Right.

5          MR. TOUCHSTONE:  I mean --

6          JUDGE CORDELL:  Correct.

7          MR. TOUCHSTONE:  -- discuss --

8          JUDGE CORDELL:  Yes.

9          MR. TOUCHSTONE:  -- what you have in your phone

10   without reference to what you and I may have discussed.

11   Okay?

12         MR. AENLLE:  Yes.  I'm sorry about that, Jim.

13   I apologize.

14         MR. TOUCHSTONE:  No.  That's fine.

15         MR. AENLLE:  I went back on my -- on my texts,

16   and I found -- there's many of them, but one

17   specifically is two weeks before is when she had to give

18   me her -- her two weeks' notice.

19         And she said, "I'm sorry I had to email that

20   letter.  I was going to give it to you in our meeting

21   yesterday.  I know there's lots to discuss, and I will

22   do whatever possible to make this perfect -- make this

23   the perfect transition for you," exclamation mark.

24         And I said, "I understand."

25         And then she texted, "You've always been kind



1   to me.  I will never forget that."

2          I would be more than happy to share those texts

3   with you.

4          JUDGE CORDELL:  Sure.  Absolutely.  Absolutely.

5   And maybe Mr. Touchstone can forward them to me,

6   whatever.  That's fine.  Thank you.

7          So anything else you want to add about ████

8          MR. AENLLE:  Nothing.  I think she's wonderful.

9   I'm -- I'm really surprised that she did this.  I don't

10  know what -- what the motive is behind it.  I've never

11  had anything bad with her.  I care deeply about her.  I

12  thought she was great, and I really enjoyed my time with

13  her, honestly.  It was -- I was very saddened to -- to

14  really see this because it -- I've never been mean to

15  her.  I never raised my voice.  I never accused her

16  of -- of -- that it was her.  Not at all whatsoever.  I

17  only made her aware of it just because I know that she's

18  sensitive and if she learned that from somebody else or

19  somebody said to her, I knew it was going affect her.

20  So I wanted to give her the heads-up.  But at no time

21  did I accuse her of anything, ma'am.

22          JUDGE CORDELL:  Yeah.  So that was really --

23  the last question I want to ask about that incident is

24  that you got a text, and you knew --

25          MR. AENLLE:  Yes.



1        JUDGE CORDELL:   -- there was no merit to it.

2   Why would you tell her at all?

3        MR. AENLLE:   Because she's my friend.  I wanted

4   to share it with her.  That's -- that's -- that's the

5   only reason why.  Because she was going to find out

6   anyways because, you know -- ma'am, the Sheriff's Office

7   is -- is a tunnel, I mean, of rumors and everything

8   else.  Once something is found out, it literally takes

9   seconds to fly through the entire office, whether it's

10  good or bad, ma'am.

11       JUDGE CORDELL:   Got it.

12       MR. AENLLE:   Normally the bad goes a little

13  further and faster.

14       JUDGE CORDELL:   Right.

15       Did you have any involvement in the firing of

16  Ryan Monaghan?

17       MR. AENLLE:   Not at all, ma'am.  Not at all.

18       JUDGE CORDELL:   Did you advise -- did you

19  advise the sheriff that she should fire him?

20       MR. AENLLE:   No.  The sheriff makes her own

21  decisions on firing and hiring.

22       JUDGE CORDELL:   Did she come to you for advice

23  about whether or not she should fire Ryan Monaghan?

24       MR. AENLLE:   That's not -- she -- the sheriff

25  does not seek advice of me about firing people.



 1           JUDGE CORDELL:  So that answer is, "No"?

 2           MR. AENLLE:  The answer is, "No."

 3           JUDGE CORDELL:  Got it.

 4           Have you ever been involved in changing

 5    assignments of sworn personnel as retaliation?

 6           MR. AENLLE:  I have never retaliated in any

 7    form of anybody in -- in the office at all.

 8           JUDGE CORDELL:  Okay.

 9           MR. AENLLE:  Ma'am, I -- and just to put that

10    in context, I know what it feels like, ma'am.  When --

11    when I supported the sheriff and initially came out, the

12    information that I was going to be helping her with the

13    campaign, I was kicked out of the range staff after nine

14    years of -- of working for free, and I was one of the

15    top trainers.  I'm a POST-certified trainer.  I was

16    kicked out of there.  And -- and -- and the sheriff at

17    that time told -- told the sergeant, "He needs to be

18    shut down."  If that's not retaliation, I don't know.

19           So I know what -- I know what it feels like,

20    and -- and that's not the kind of person I am, which a

21    lot of people here -- they've done a lot of bad things.

22    Neither the sheriff or myself at any given point have

23    retaliated against anybody.  They've actually been

24    promoted.

25           One of the things I admire about the sheriff



1   the most is -- is that she separates, and she's very

2   good to people.

3           JUDGE CORDELL:  Have you -- do you have an

4   opinion about the firing of Ryan Monaghan?  And, again,

5   if you don't want to share it with me, it's fine.  I'm

6   just curious, given what you've just told me about

7   retaliation, what your view is about his firing.

8           MR. TOUCHSTONE:  Well, I think an opinion --

9           MR. AENLLE:  My view is --

10          MR. TOUCHSTONE:  Excuse me.  I'm going to

11  interrupt.

12          JUDGE CORDELL:  Sure.

13          MR. TOUCHSTONE:  I think any opinion that

14  Victor may have on this issue is irrelevant to these

15  proceedings.  Frankly, that is the sheriff's decision,

16  as I pointed out in a letter to County Counsel today.

17          JUDGE CORDELL:  I -- I haven't -- I didn't know

18  of your letter.  So --

19          MR. TOUCHSTONE:  Yeah.  Well, Victor --

20          JUDGE CORDELL:  -- I don't want to -- I don't

21  want to -- absolutely, I don't want to intrude into

22  areas that -- you know, that border that.  So no

23  problem.

24          Don't answer that one, Mr. Aenlle.  Don't even

25  answer it, and we'll move on.  And I'm getting -- we're



 1   getting close.  So just bear with me.

 2           Do you wear a badge?

 3           MR. AENLLE:  Yes, ma'am.

 4           JUDGE CORDELL:  And can you please describe the

 5   badge.

 6           MR. AENLLE:  It is a Sheriff's Office badge

 7   with a rocker that says "Chief of Staff."

 8           JUDGE CORDELL:  Okay.  And does -- and can you

 9   tell me what color it is.

10           MR. AENLLE:  The same color as all the other

11   badges.  It's a gold badge.

12           JUDGE CORDELL:  Gold badge.

13           And who issued you the badge?

14           MR. AENLLE:  The sheriff issues badges, ma'am.

15           JUDGE CORDELL:  So the sheriff directed that

16   you have that badge?

17           MR. AENLLE:  Correct.

18           JUDGE CORDELL:  Okay.  And do -- isn't it --

19   and, again, I'm just trying to get clarification on

20   things.  It is my understanding that all sworn personnel

21   have gold badges.

22           Is that true?

23           MR. AENLLE:  That is true.

24           JUDGE CORDELL:  Right.

25           MR. AENLLE:  That's a true statement.



1    MR. AENLLE:  -- as a designated Level I

2    reserve.

3         JUDGE CORDELL:  Right.  So if you're a

4    designated Level I reserve, your -- you -- to be a

5    reserve, this -- again, basic understanding here is that

6    that's different from your being the executive director.

7    That's two different things --

8         MR. AENLLE:  That's two different --

9         JUDGE CORDELL:  -- correct?

10        MR. AENLLE:  -- things, ma'am, yeah.

11        JUDGE CORDELL:  Right.

12        MR. AENLLE:  Two different things.

13        JUDGE CORDELL:  Got it.

14        And so you are -- you are both?  You are a

15   reserve, and you are executive director/chief of staff?

16        MR. AENLLE:  Yes.  At the reserve, I don't do

17   regular duties reserves any longer because of my

18   position; right?  But I do not lose my police powers;

19   right?  I'm still listed -- I'm still -- I still have my

20   post is what it's called, yeah.

21        JUDGE CORDELL:  Okay.  Do you carry a gun, a

22   firearm?

23        MR. AENLLE:  Yes.

24        JUDGE CORDELL:  And do you carry it openly or

25   concealed?



1  in fact, earned a PhD?

2          MR. AENLLE:  Yes, ma'am.  Of course.

3          JUDGE CORDELL:  So you -- and when did you

4  finally get your PhD?

5          MR. AENLLE:  2023 sometime midyear.  At some

6  point around there.

7          JUDGE CORDELL:  Okay.  And I do understand that

8  the place from which you earned your PhD is no longer in

9  existence.

10         MR. AENLLE:  That is correct.

11         JUDGE CORDELL:  Right.

12         Are you able still to get your transcript if

13  you were asked?

14         MR. AENLLE:  Yes, ma'am.  I would be able to,

15  yeah.

16         JUDGE CORDELL:  Okay.

17         MR. AENLLE:  Union -- Union Institute and

18  University is -- is geared towards law enforcement.

19  Many people in this department have at least a bachelor

20  or whatever they finished through there, and throughout

21  the law enforcement community, it is very well-known.

22  Like anything else through COVID, they went through

23  financial.  Their PhD program is one of the top and the

24  best in this country, and it was actually -- it didn't

25  go under.  It was moved to another college.  So this



1    same program still lives today.  So -- and, yes, I can

2    still have -- get transcripts, I'm sure, and whatever

3    else you need.  I earned my PhD, ma'am.

4         I -- I'm an immigrant.  I came here when -- on

5    a -- on a -- on a boat with a single mom and a brother

6    with the clothes on my back when I was 12 years old.  I

7    learned English at 13.  I was -- I went to communist

8    school all the way till -- till I was in the fifth

9    grade.  Top of my class.  I came to this country, and

10   everything went to hell.  So I was not great in school

11   and -- and barely graduated high school.

12        But I -- I figured out life and made a great

13   life for myself and learned the value.  And I -- I

14   couldn't push education on my kids if -- if I had -- had

15   not done it myself; right?  I'd be a hypocrite.  So I --

16   I -- and I wanted to help people after my brother was

17   killed.  That's the only reason why I'm in this

18   department.  And I made it a point, and I got my

19   bachelor's in criminal justice, and I got my master's in

20   organizational leadership, and I went further and got my

21   PhD.  And I would have been done sooner.  I should

22   probably -- I got my PhD in -- in -- in three and a

23   half, four years, but the sheriff campaign took a lot of

24   time, and I couldn't keep writing 60-page papers every

25   night, and it got delayed.  Once she was -- once she



1   won, then I took a step back and focused on -- on what I

2   needed to finish and defended my -- my dissertation --

3   successfully defended my dissertation.

4           So anybody that tries to dimin- -- diminish my

5   work, my investment, and my hard work to earn a PhD that

6   not everybody has is shame- -- should be shame- --

7   shameful.

8           JUDGE CORDELL:  And, by the way, I did not

9   know, and I'm sorry.  You mentioned about your brother.

10  I did not know until you said --

11          MR. AENLLE:  My brother was killed 16 years

12  ago, and I --

13          JUDGE CORDELL:  And I'm sorry.

14          MR. AENLLE:  Yeah.  I didn't -- I didn't turn

15  out to be -- go into this field, but it needed change.

16  I was actually affected by that in this very

17  department -- in this very department, and that's what

18  motivated me to go into public service.

19          Maybe people don't like me here because I tell

20  the truth, and -- and -- and -- I'll just leave it

21  there.

22          JUDGE CORDELL:  Okay.  Again, I'm sorry.

23          MR. AENLLE:  Thank you, ma'am.

24          JUDGE CORDELL:  Have you ever been involved in

25  or assisted in giving a concealed carry permit to a



1  terminated sheriff's sergeant whose name is ███ __ and

2  I'll spell the last name -- ███████, ██████

3  ███████

4          MR. AENLLE:  I oversee the CCW permit.

5          JUDGE CORDELL:  Right.

6          MR. AENLLE:  ████ was an applicant here.  He

7  did not have anything in his background.  Per law, they

8  would -- would not permit him to have a CCW.

9          JUDGE CORDELL:  Okay.

10          MR. AENLLE:  He was treated like any other

11  members of -- of the community.  There's a lot of

12  members that I think they should be denied, and I

13  struggle with that every day.  But the way that the

14  current laws are, we have very limited reasons to deny

15  somebody a CCW in today's environment.

16          JUDGE CORDELL:  Hmm.

17          MR. AENLLE:  ████ met every qualification.  He

18  was not afforded anything special and -- and qualified

19  to get his permit.  I personally did not approve it.

20  I'm part of the chain that makes sure that -- that

21  everything's followed and corrections done, and the

22  final decision is made by the sheriff.

23          JUDGE CORDELL:  So it was the sheriff who had

24  the final say with that particular permit?

25          MR. AENLLE:  Every permit, it gets -- it gets



1    approved by the sheriff.  It doesn't matter --

2           JUDGE CORDELL:  Did you --

3           MR. AENLLE:  __ who it is.

4           JUDGE CORDELL:  Sure.

5           Did you recommend that it be approved?

6           MR. AENLLE:  I -- I rec- -- I don't recommend

7    or not.  I move them up the chain.  So once -- once I

8    see it in my level and make sure that everything's been

9    uploaded, that everything's been done, that the

10   psych- -- psychological testing has been done, that all

11   the guns have been run, I check for facts; that it

12   doesn't have any qualifying factors that has to be

13   dismissed almost like, you know, arrest or, you know,

14   something major in their record.  I make sure the DOJ is

15   cleared.  Then I move it on to the sheriff, and she

16   makes all the decisions on every single CCW.

17          JUDGE CORDELL:  So if something had been wrong,

18   you -- and you saw it, you could have flagged it then;

19   right?  That you would do?

20          MR. AENLLE:  Anything that I see that's wrong

21   that --

22          JUDGE CORDELL:  Yeah.

23          MR. AENLLE:  And let me -- let me -- let me

24   correct "wrong."  That -- that -- that is outside within

25   the -- the legal limits of issuing a CCW, yes, I flag



1   and make sure that it's -- it's looked at further and

2   evaluated.

3           JUDGE CORDELL:  Got it.

4           Does that --

5           MR. AENLLE:  Sometimes I'll pull in legal

6   counsel for advice.  We've done that many times.

7   Sometimes I'll call a unit meeting with all the

8   background investigators to -- to -- and the -- the

9   lieutenant to review those, and that's part of the

10  process.

11          JUDGE CORDELL:  Got it.

12          Did you approve a CCW permit for your son?

13          MR. AENLLE:  I wasn't even an employee.

14          JUDGE CORDELL:  Is the answer --

15          MR. AENLLE:  My son --

16          JUDGE CORDELL:  Go ahead.  Go right ahead.

17          MR. AENLLE:  The answer is, "No."  I could not

18  have approved that.  My son applied just like anybody

19  else, went through the process like anybody else, met

20  the law, met all the requirements, and that permit was

21  not approved by me.  I was not employed in the Sheriff's

22  Office.

23          JUDGE CORDELL:  Okay.  Got it.

24          And let's see.

25          MR. AENLLE:  Boy, Judge Cordell.



1           JUDGE CORDELL:  Yes?  I know -_

2           MR. AENLLE:  You're throwing as many bumps as

3   possible.  This is a --

4           JUDGE CORDELL:  No, no.

5           MR. AENLLE:  This is -- wow.

6           JUDGE CORDELL:  Mr. Aenlle, I'm telling you I'm

7   trying to make sure that --

8           MR. AENLLE:  I know.  This is --

9           JUDGE CORDELL:  Okay.

10          MR. AENLLE:  Somebody took a lot of extra time

11  to do that.  Do you know what I mean?  Because this

12  is --

13          JUDGE CORDELL:  Just hang in.

14          Have you ever directed that any social media

15  posts such as Instagram, for example, be blocked or

16  taken down?

17          MR. AENLLE:  I --

18          JUDGE CORDELL:  And, again, this is in

19  connection with the Sheriff's Office.

20          MR. AENLLE:  Yeah, yeah.  I'm sure there was --

21  there was some discussions.  I -- I -- I never ran the

22  social media before.  It was Chris Hsiung, and there

23  were some voices made because it met certain

24  requirements, but we don't make a habit of that.

25          JUDGE CORDELL:  But have you ever done that?



1    Have you ever directed it be done?

2          MR. AENLLE:  I -- what I directed to be done --

3    and I think it was once, and I think it was discussed

4    with legal counsel -- is a nature that was -- that met

5    the requirements to be at least removed or blocked

6    for -- for some reason.  But I can tell you that I was

7    not the only one part of that decision.

8          JUDGE CORDELL:  Uh-huh.

9          MR. AENLLE:  That was -- that was -- Chris

10   Hsiung was involved in that.

11         JUDGE CORDELL:  Okay.

12         MR. AENLLE:  No, ma'am, we don't make a habit

13   of doing that.  I think was a -- a one case.  In one of

14   them, somebody threatened his life.  Something like

15   that.  Or it was -- it was just one of those weird

16   things.

17         JUDGE CORDELL:  But if there were comments --

18   have there been negative comments online about the

19   sheriff or about you, the Sheriff's Office?  Have you

20   been a part of directing that negative comments -- I'm

21   not talking about threats -- be blocked or removed?

22         MR. AENLLE:  I think there was one that crossed

23   the line that was talking about the sheriff's kids,

24   ma'am, if you're speaking to that, and Chris Hsiung was

25   involved in that, and I was involved, and it was a



 1   decision to -- to block that person.  And I believe that

 2   was brought up to legal counsel as well.

 3          JUDGE CORDELL:  Okay.  Have you and the

 4   sheriff -- when you go to conferences having to do with

 5   the Sheriff's Office, do you travel -- have you ever

 6   traveled first class?

 7          MR. AENLLE:  I -- we both have upgraded in --

 8   in different scenarios.  But I can tell you -- and not

 9   to sound off -- I don't travel with anything less than

10   first class.  I'm not a child anymore.  I have back

11   pain.  I don't -- I don't like people in close proximity

12   to me.  So if I can't upgrade, I won't travel.

13          JUDGE CORDELL:  So --

14          MR. AENLLE:  And I do that on my own -- my own

15   money.  And when the sheriff wants to and can, that's --

16   has she done that before?  Yes, she has.  Does she do --

17   does that all the time?  Not that I'm aware of.  But I

18   will not travel unless I can upgrade to first class.

19          JUDGE CORDELL:  Got it.

20          When the two of you do go to a meeting or

21   conference together, do you -- do you -- since you fly

22   first -- first class, does she fly first class with you?

23          MR. AENLLE:  Not all the time.  There's been

24   like a couple instances.  But I can tell you that just

25   most recently, the last trip, I was in first class.  She



1    was in the back of the plane.

2              JUDGE CORDELL:  And what trip was that?  Was

3    that a business -- I don't want to get in your personal

4    business.  Was this a -- a business trip?

5              MR. AENLLE:  The only trips -- yeah, it's a

6    business trip.  It's --

7              JUDGE CORDELL:  Okay.

8              MR. AENLLE:  It was a WLLE conference.

9              JUDGE CORDELL:  And I don't -- say it again.

10             MR. AENLLE:  It's a Women for Leadership.

11             JUDGE CORDELL:  Yes.

12             MR. AENLLE:  W- --

13             JUDGE CORDELL:  Yes.

14             MR. AENLLE:  -- double L-E.

15             JUDGE CORDELL:  Right.  And so you traveled

16   first class?

17             MR. AENLLE:  Oh, yeah.

18             JUDGE CORDELL:  And she did not?

19             MR. AENLLE:  Correct.

20             JUDGE CORDELL:  Okay.  Have you ever paid for

21   her to fly first class?

22             MR. AENLLE:  No, ma'am.

23             JUDGE CORDELL:  We're almost there.  Just bear

24   with me now.  Okay.

25             MR. AENLLE:  And if I've ever paid for



1    something for the sheriff, she always gives me the money

2    back.  If it's something like -- you know, something

3    that we're doing or something's happened, and -- and we

4    do that for each other.  I do that with the

5    undersheriff.  I've done that -- we just Venmo each

6    other back whatever it is that -- whoever is picking it

7    up, whether it's a lunch or --

8            JUDGE CORDELL:  Right.

9            MR. AENLLE:  -- a dinner or something.  We

10   always do that.

11           JUDGE CORDELL:  Okay.  We're getting now to the

12   end.  And, again, thank you for your patience.

13           Do you have -- and I'm going to say since 2021.

14   At least since then.  Do you have a personal

15   relationship with Sheriff Corpus?  Let me just finish

16   the whole thing.  Personal relationship is defined as

17   any intimate relationship beyond mere friendship.  And

18   let me go a step further.  It's also defined as a very

19   personal or of a private nature, not necessarily of a

20   sexual nature.

21           So with that, have -- do you have -- let's do

22   it in two parts.  Do you have a personal relationship

23   with Sheriff Corpus?

24           MR. AENLLE:  No.  I have a professional

25   relationship with Sheriff Corpus.  I admire that woman.



1  She has inspired me.  I've known her for a long time.

2  She's a beautiful human being, and I'm -- and I'm

3  honored to work for her and to push forward her vision

4  in modernizing this department and the services that she

5  provides to this community, and I respect her incredibly

6  and just admire her to no end, and that's why I'm so

7  honored to work for her and have been here by her side

8  from day one.

9          JUDGE CORDELL:  Do -- I asked the question.  I

10 thank you for your answer.  I did ask do you -- are you

11 in a personal relationship?

12         Have you ever been in a personal relationship

13 with Sheriff Corpus, as I've defined it?

14         MR. AENLLE:  I've always had a strong

15 friendship with her, but it's been a professional

16 relationship.

17         JUDGE CORDELL:  Is it one that is beyond mere

18 friendship?

19         MR. AENLLE:  It is not one that's beyond mere

20 friendship.

21         JUDGE CORDELL:  Got it.

22         MR. AENLLE:  I've been married for 30 years,

23 and my wife --

24         JUDGE CORDELL:  And you still --

25         MR. AENLLE:  -- knows the sheriff.



1           JUDGE CORDELL:  And you still are?  And you

2    still are married?  Okay.

3           MR. AENLLE:  And my wife knows the sheriff very

4    well.

5           JUDGE CORDELL:  Did you and the sheriff and her

6    children travel together to Maui in 2022?

7           MR. AENLLE:  The sheriff went to Maui with her

8    family, her kids, and her brother.  I was in Maui at the

9    same time.  I was on a security detail.  Barely even saw

10   each other.  I think we crossed paths, but she was there

11   with her family and her brother.

12          JUDGE CORDELL:  Do you know -- and, again, if

13   you don't know, it's fine.  Do you know why her husband

14   was not there?

15          MR. AENLLE:  They were already having problems.

16   I believe they were going through their issues.  I can't

17   speak to --

18          JUDGE CORDELL:  Got it.  That's fine.

19          MR. AENLLE:  Yeah.

20          JUDGE CORDELL:  What -- can you explain more

21   the security detail you were on in Maui.

22          MR. AENLLE:  Yes, ma'am.  I -- I -- I was doing

23   covert detail for a high-net-worth individual.

24          JUDGE CORDELL:  And it's someone you can't

25   disclose?



1          MR. AENLLE:  Of course, ma'am.

2          JUDGE CORDELL:  Okay.  So you were doing high

3    security for somebody worth a lot?  Is that fair?

4          MR. AENLLE:  Yeah, that's fair.

5          JUDGE CORDELL:  Okay.  All right.

6          MR. AENLLE:  That's fair.

7          JUDGE CORDELL:  All right.  So you were

8    privately retained by that person?

9          MR. AENLLE:  Yeah.

10          JUDGE CORDELL:  And when did that security

11   detail end?

12          MR. AENLLE:  I think I was in Maui for four

13   days or something like that, ma'am.

14          JUDGE CORDELL:  Got it.

15          Did anyone else know that you were there on a

16   security detail?

17          MR. AENLLE:  My --

18          JUDGE CORDELL:  For example, did the sheriff

19   know?

20          MR. AENLLE:  Oh, sure.  The sheriff knew, yeah.

21   I -- yeah.

22          JUDGE CORDELL:  All right.  Okay.  Did anyone

23   else know?

24          MR. AENLLE:  No, ma'am.  I don't -- I don't

25   discuss that with anybody.  I have my network of



1    friends.  It's pretty small and tight.

2              JUDGE CORDELL:  Right.

3              MR. AENLLE:  That's not something I discuss,

4    actually, the nature.  Most of my stuff, you know, that

5    we do in that realm, it's -- you know, you sign NDAs and

6    all kinds of things.

7              JUDGE CORDELL:  Right.

8              MR. AENLLE:  It's not something I go around and

9    advertise, especially when it's a covert detail --

10             JUDGE CORDELL:  Got it.

11             MR. AENLLE:  -- which is what I specialized in.

12             JUDGE CORDELL:  Okay.  And did you and the

13   sheriff sit together on the flight to Maui?

14             MR. AENLLE:  I don't think we were together.  I

15   think we were close.

16             JUDGE CORDELL:  But you were not seated next to

17   each other?

18             MR. AENLLE:  No.  No.

19             JUDGE CORDELL:  Okay.

20             MR. AENLLE:  It's been a couple years, but I

21   can tell you that -- that it was in a close proximity,

22   but I don't recall being next to her.

23             JUDGE CORDELL:  Okay.  That's fine.

24             I don't think that I have anything else to ask

25   you.  You have been so patient.  We have been talking



**EXHIBIT 2**

DocuSign Envelope ID: 269EE8E6-7C36-4DA6-A418-78AC5F8F40C2

Agreement No. _____

**AGREEMENT BETWEEN THE COUNTY OF SAN MATEO AND SECURITY SOLUTIONS LLC**

This Agreement is entered into this      day of AUGUST, 2022, by and between the County of San Mateo, a political subdivision of the state of California, hereinafter called "County," and Security Solutions LLC, hereinafter called "Contractor."

\*          \*          \*

Whereas, pursuant to Section 31000 of the California Government Code, County may contract with independent contractors for the furnishing of such services to or for County or any Department thereof; and

Whereas, it is necessary and desirable that Contractor be retained for the purpose of assisting the San Mateo County Sheriff Elect's Transition Team.

**Now, therefore, it is agreed by the parties to this Agreement as follows:**

**1.      Exhibits and Attachments**

The following exhibits and attachments are attached to this Agreement and incorporated into this Agreement by this reference:

        Exhibit A—Services
        Exhibit B—Payments and Rates

**2.      Services to be performed by Contractor**

In consideration of the payments set forth in this Agreement and in Exhibit B, Contractor shall perform services for County in accordance with the terms, conditions, and specifications set forth in this Agreement and in Exhibit A.

**3.      Payments**

In consideration of the services provided by Contractor in accordance with all terms, conditions, and specifications set forth in this Agreement and in Exhibit A, County shall make payment to Contractor based on the rates and in the manner specified in Exhibit B.  County reserves the right to withhold payment if County determines that the quantity or quality of the work performed is unacceptable.  In no event shall County's total fiscal obligation under this Agreement exceed THIRTY FIVE THOUSAND DOLLARS ($35,000.00).  In the event that the County makes any advance payments, Contractor agrees to refund any amounts in excess of the amount owed by the County at the time of contract termination or expiration. Contractor is not entitled to payment for work not performed as required by this agreement.

**4.      Term**

Subject to compliance with all terms and conditions, the term of this Agreement shall be from September 1, 2022, through January 15, 2023

---

## 5.    Termination

This Agreement may be terminated by Contractor or by the County Manager or his/her designee at any time without a requirement of good cause upon thirty (30) days' advance written notice to the other party. Subject to availability of funding, Contractor shall be entitled to receive payment for work/services provided prior to termination of the Agreement.  Such payment shall be that prorated portion of the full payment determined by comparing the work/services actually completed to the work/services required by the Agreement.

County may terminate this Agreement or a portion of the services referenced in the Attachments and Exhibits based upon the unavailability of Federal, State, or County funds by providing written notice to Contractor as soon as is reasonably possible after County learns of said unavailability of outside funding.

County may terminate this Agreement for cause.  In order to terminate for cause, County must first give Contractor notice of the alleged breach. Contractor shall have five business days after receipt of such notice to respond and a total of ten calendar days after receipt of such notice to cure the alleged breach. If Contractor fails to cure the breach within this period, County may immediately terminate this Agreement without further action. The option available in this paragraph is separate from the ability to terminate without cause with appropriate notice described above. In the event that County provides notice of an alleged breach pursuant to this section, County may, in extreme circumstances, immediately suspend performance of services and payment under this Agreement pending the resolution of the process described in this paragraph. County has sole discretion to determine what constitutes an extreme circumstance for purposes of this paragraph, and County shall use reasonable judgment in making that determination.

## 6.    Contract Materials

At the end of this Agreement, or in the event of termination, all finished or unfinished documents, data, studies, maps, photographs, reports, and other written materials (collectively referred to as "contract materials") prepared by Contractor under this Agreement shall become the property of County and shall be promptly delivered to County.  Upon termination, Contractor may make and retain a copy of such contract materials if permitted by law.

## 7.    Relationship of Parties

Contractor agrees and understands that the work/services performed under this Agreement are performed as an independent contractor and not as an employee of County and that neither Contractor nor its employees acquire any of the rights, privileges, powers, or advantages of County employees.

## 8.    Hold Harmless

### a.    General Hold Harmless

Contractor shall indemnify and save harmless County and its officers, agents, employees, and servants from all claims, suits, or actions of every name, kind, and description resulting from this Agreement, the performance of any work or services required of Contractor under this Agreement, or payments made pursuant to this Agreement brought for, or on account of, any of the following:

(A) injuries to or death of any person, including Contractor or its employees/officers/agents;

(B) damage to any property of any kind whatsoever and to whomsoever belonging;

(C) any sanctions, penalties, or claims of damages resulting from Contractor's failure to comply, if applicable, with the requirements set forth in the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and all Federal regulations promulgated thereunder, as amended; or

(D) any other loss or cost, including but not limited to that caused by the concurrent active or passive negligence of County and/or its officers, agents, employees, or servants. However, Contractor's duty to indemnify and save harmless under this Section shall not apply to injuries or damage for which County has been found in a court of competent jurisdiction to be solely liable by reason of its own negligence or willful misconduct.

The duty of Contractor to indemnify and save harmless as set forth by this Section shall include the duty to defend as set forth in Section 2778 of the California Civil Code.

## 9.  Assignability and Subcontracting

Contractor shall not assign this Agreement or any portion of it to a third party or subcontract with a third party to provide services required by Contractor under this Agreement without the prior written consent of County.  Any such assignment or subcontract without County's prior written consent shall give County the right to automatically and immediately terminate this Agreement without penalty or advance notice.

## 10.  Insurance

### a.  General Requirements

Contractor shall not commence work or be required to commence work under this Agreement unless and until all insurance required under this Section has been obtained and such insurance has been approved by County's Risk Management, and Contractor shall use diligence to obtain such insurance and to obtain such approval.  Contractor shall furnish County with certificates of insurance evidencing the required coverage, and there shall be a specific contractual liability endorsement extending Contractor's coverage to include the contractual liability assumed by Contractor pursuant to this Agreement.  These certificates shall specify or be endorsed to provide that thirty (30) days' notice must be given, in writing, to County of any pending change in the limits of liability or of any cancellation or modification of the policy.

### b.  Workers' Compensation and Employer's Liability Insurance

Contractor shall have in effect during the entire term of this Agreement workers' compensation and employer's liability insurance providing full statutory coverage.  In signing this Agreement, Contractor certifies, as required by Section 1861 of the California Labor Code, that (a) it is aware of the provisions of Section 3700 of the California Labor Code, which require every employer to be insured against liability for workers' compensation or to undertake self-insurance in accordance with the provisions of the Labor Code, and (b) it will comply with such provisions before commencing the performance of work under this Agreement.

### c.  Liability Insurance

Contractor shall take out and maintain during the term of this Agreement such bodily injury liability and property damage liability insurance as shall protect Contractor and all of its employees/officers/agents

DocuSign Envelope ID: 269EE8E6-7C38-4DA8-A418-78AC5F8F40C2

while performing work covered by this Agreement from any and all claims for damages for bodily injury, including accidental death, as well as any and all claims for property damage which may arise from Contractor's operations under this Agreement, whether such operations be by Contractor, any subcontractor, anyone directly or indirectly employed by either of them, or an agent of either of them. Such insurance shall be combined single limit bodily injury and property damage for each occurrence and shall not be less than the amounts specified below:

(a) Comprehensive General Liability...    $1,000,000

County and its officers, agents, employees, and servants shall be named as additional insured on any such policies of insurance, which shall also contain a provision that (a) the insurance afforded thereby to County and its officers, agents, employees, and servants shall be primary insurance to the full limits of liability of the policy and (b) if the County or its officers, agents, employees, and servants have other insurance against the loss covered by such a policy, such other insurance shall be excess insurance only.

In the event of the breach of any provision of this Section, or in the event any notice is received which indicates any required insurance coverage will be diminished or canceled, County, at its option, may, notwithstanding any other provision of this Agreement to the contrary, immediately declare a material breach of this Agreement and suspend all further work and payment pursuant to this Agreement.

## 11.    Compliance With Laws

All services to be performed by Contractor pursuant to this Agreement shall be performed in accordance with all applicable Federal, State, County, and municipal laws, ordinances, and regulations, including but not limited to the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Federal Regulations promulgated thereunder, as amended (if applicable), the Business Associate requirements set forth in Attachment H (if attached), the Americans with Disabilities Act of 1990, as amended, and Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination on the basis of disability in programs and activities receiving any Federal or County financial assistance.  Such services shall also be performed in accordance with all applicable ordinances and regulations, including but not limited to appropriate licensure, certification regulations, provisions pertaining to confidentiality of records, and applicable quality assurance regulations.  In the event of a conflict between the terms of this Agreement and any applicable State, Federal, County, or municipal law or regulation, the requirements of the applicable law or regulation will take precedence over the requirements set forth in this Agreement.

Contractor will timely and accurately complete, sign, and submit all necessary documentation of compliance.

## 12.    Non-Discrimination and Other Requirements

### a.    General Non-discrimination

No person shall be denied any services provided pursuant to this Agreement (except as limited by the scope of services) on the grounds of race, color, national origin, ancestry, age, disability (physical or mental), sex, sexual orientation, gender identity, marital or domestic partner status, religion, political beliefs or affiliation, familial or parental status (including pregnancy), medical condition (cancer-related), military service, or genetic information.

**b.  Equal Employment Opportunity**

Contractor shall ensure equal employment opportunity based on objective standards of recruitment, classification, selection, promotion, compensation, performance evaluation, and management relations for all employees under this Agreement.  Contractor's equal employment policies shall be made available to County upon request.

**c.  Section 504 of the Rehabilitation Act of 1973**

Contractor shall comply with Section 504 of the Rehabilitation Act of 1973, as amended, which provides that no otherwise qualified individual with a disability shall, solely by reason of a disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination in the performance of any services this Agreement.  This Section applies only to contractors who are providing services to members of the public under this Agreement.

**d.  Compliance with County's Equal Benefits Ordinance**

Contractor shall comply with all laws relating to the provision of benefits to its employees and their spouses or domestic partners, including, but not limited to, such laws prohibiting discrimination in the provision of such benefits on the basis that the spouse or domestic partner of the Contractor's employee is of the same or opposite sex as the employee.

**e.  Discrimination Against Individuals with Disabilities**

The nondiscrimination requirements of 41 C.F.R. 60-741.5(a) are incorporated into this Agreement as if fully set forth herein, and Contractor and any subcontractor shall abide by the requirements of 41 C.F.R. 60–741.5(a).  This regulation prohibits discrimination against qualified individuals on the basis of disability and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified individuals with disabilities.

**f.  History of Discrimination**

Contractor certifies that no finding of discrimination has been issued in the past 365 days against Contractor by the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or any other investigative entity.  If any finding(s) of discrimination have been issued against Contractor within the past 365 days by the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or other investigative entity, Contractor shall provide County with a written explanation of the outcome(s) or remedy for the discrimination prior to execution of this Agreement.  Failure to comply with this Section shall constitute a material breach of this Agreement and subjects the Agreement to immediate termination at the sole option of the County.

**g.  Reporting; Violation of Non-discrimination Provisions**

Contractor shall report to the County Manager the filing in any court or with any administrative agency of any complaint or allegation of discrimination on any of the bases prohibited by this Section of the Agreement or the Section titled "Compliance with Laws".  Such duty shall include reporting of the filing of any and all charges with the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or any other entity charged with the investigation or adjudication of allegations covered by this subsection within 30 days of such filing, provided that within such 30 days such entity has not notified Contractor that such charges are dismissed or otherwise unfounded.  Such notification shall include a general description of the circumstances involved and a general description of

DocuSign Envelope ID: 269EE8E6-7C38-4DA8-A418-78AC5F8F40C2

the kind of discrimination alleged (for example, gender-, sexual orientation-, religion-, or race-based discrimination).

Violation of the non-discrimination provisions of this Agreement shall be considered a breach of this Agreement and subject the Contractor to penalties, to be determined by the County Manager, including but not limited to the following:

    i.     termination of this Agreement;

    ii.    disqualification of the Contractor from being considered for or being awarded a County contract for a period of up to 3 years;

    iii.   liquidated damages of $2,500 per violation; and/or

    iv.   imposition of other appropriate contractual and civil remedies and sanctions, as determined by the County Manager.

To effectuate the provisions of this Section, the County Manager shall have the authority to offset all or any portion of the amount described in this Section against amounts due to Contractor under this Agreement or any other agreement between Contractor and County.

**13.**    **Compliance with County Employee Jury Service Ordinance**

Contractor shall comply with Chapter 2.85 of the County's Ordinance Code, which states that Contractor shall have and adhere to a written policy providing that its employees, to the extent they are full-time employees and live in San Mateo County, shall receive from the Contractor, on an annual basis, no fewer than five days of regular pay for jury service in San Mateo County, with jury pay being provided only for each day of actual jury service. The policy may provide that such employees deposit any fees received for such jury service with Contractor or that the Contractor may deduct from an employee's regular pay the fees received for jury service in San Mateo County. By signing this Agreement, Contractor certifies that it has and adheres to a policy consistent with Chapter 2.85. For purposes of this Section, if Contractor has no employees in San Mateo County, it is sufficient for Contractor to provide the following written statement to County: "For purposes of San Mateo County's jury service ordinance, Contractor certifies that it has no full-time employees who live in San Mateo County. To the extent that it hires any such employees during the term of its Agreement with San Mateo County, Contractor shall adopt a policy that complies with Chapter 2.85 of the County's Ordinance Code." The requirements of Chapter 2.85 do not apply unless this Agreement's total value listed in the Section titled "Payments", exceeds two-hundred thousand dollars ($200,000); Contractor acknowledges that Chapter 2.85's requirements will apply if this Agreement is amended such that its total value exceeds that threshold amount.

**14.**    **Retention of Records; Right to Monitor and Audit**

(a) Contractor shall maintain all required records relating to services provided under this Agreement for three (3) years after County makes final payment and all other pending matters are closed, and Contractor shall be subject to the examination and/or audit by County, a Federal grantor agency, and the State of California.

(b) Contractor shall comply with all program and fiscal reporting requirements set forth by applicable Federal, State, and local agencies and as required by County.

(c) Contractor agrees upon reasonable notice to provide to County, to any Federal or State department having monitoring or review authority, to County's authorized representative, and/or to any of their respective audit agencies access to and the right to examine all records and documents necessary to

determine compliance with relevant Federal, State, and local statutes, rules, and regulations, to determine compliance with this Agreement, and to evaluate the quality, appropriateness, and timeliness of services performed.

## 15.     **Merger Clause; Amendments**

This Agreement, including the Exhibits and Attachments attached to this Agreement and incorporated by reference, constitutes the sole Agreement of the parties to this Agreement and correctly states the rights, duties, and obligations of each party as of this document's date. In the event that any term, condition, provision, requirement, or specification set forth in the body of this Agreement conflicts with or is inconsistent with any term, condition, provision, requirement, or specification in any Exhibit and/or Attachment to this Agreement, the provisions of the body of the Agreement shall prevail. Any prior agreement, promises, negotiations, or representations between the parties not expressly stated in this document are not binding. All subsequent modifications or amendments shall be in writing and signed by the parties.

## 16.     **Controlling Law; Venue**

The validity of this Agreement and of its terms, the rights and duties of the parties under this Agreement, the interpretation of this Agreement, the performance of this Agreement, and any other dispute of any nature arising out of this Agreement shall be governed by the laws of the State of California without regard to its choice of law or conflict of law rules. Any dispute arising out of this Agreement shall be venued either in the San Mateo County Superior Court or in the United States District Court for the Northern District of California.

## 17.     **Notices**

Any notice, request, demand, or other communication required or permitted under this Agreement shall be deemed to be properly given when transmitted via email to the email address listed below

In the case of County, to:

| | |
|---|---|
| Name/Title: | Iliana Rodriguez, Deputy County Executive |
| Address: | 400 County Center, 1st Floor |
| | Redwood City, CA 94063 |
| Telephone: | (650) 363-4130 |
| Email: | irodriguez@smcgov.org |

In the case of Contractor, to:

| | |
|---|---|
| Name/Title: | Jeff Kearnan, Owner – Security Solutions LLC |
| Address: | |
| Telephone: | |
| Email: | |

**18.    Electronic Signature**

Both County and Contractor wish to permit this Agreement and future documents relating to this Agreement to be digitally signed in accordance with California law and County's Electronic Signature Administrative Memo. Any party to this Agreement may revoke such agreement to permit electronic signatures at any time in relation to all future documents by providing notice pursuant to this Agreement.

**19.    Reimbursable Travel Expenses**

To the extent that this Agreement authorizes reimbursements to Contractor for travel, lodging, and other related expenses as defined in this section, the Contractor must comply with all the terms of this section in order to be reimbursed for travel.

a.    Estimated travel expenses must be submitted to authorized County personnel for advanced written authorization before such expenses are incurred. Significant differences between estimated and actual travel expenses may be grounds for denial of full reimbursement of actual travel expenses.

b.    Itemized receipts (copies accepted) for all reimbursable travel expenses are required to be provided as supporting documentation with all invoices submitted to the County.

c.    Unless otherwise specified in this section, the County will reimburse Contractor for reimbursable travel expenses for days when services were provided to the County. Contractor must substantiate in writing to the County the actual services rendered and the specific dates. The County will reimburse for travel at 75% of the maximum reimbursement amount for the actual costs of meals and incidental expenses on the day preceding and/or the day following days when services were provided to the County, provided that such reimbursement is reasonable, in light of travel time and other relevant factors, and is approved in writing by authorized County personnel.

d.    Unless otherwise specified within the contract, reimbursable travel expenses shall not include Local Travel. "Local Travel" means travel entirely within a fifty-mile radius of the Contractor's office and travel entirely within a fifty-mile radius of San Mateo County. Any mileage reimbursements for a Contractor's use of a personal car for reimbursable travel shall be reimbursed based on the Federal mileage reimbursement rate.

e.    The maximum reimbursement amount for the actual lodging, meal and incidental expenses is limited to the then-current Continental United States ("CONUS") rate for the location of the work being done (i.e., Redwood City for work done in Redwood City, San Mateo for work done at San Mateo Medical Center) as set forth in the Code of Federal Regulations and as listed by the website of the U.S. General Services Administration (available online at http://www.gsa.gov/portal/content/104877 or by searching www.gsa.gov for the term 'CONUS'). County policy limits the reimbursement of lodging in designated high cost of living metropolitan areas to a maximum of double the then-current CONUS rate; for work being done outside of a designated high cost of living metropolitan area, the maximum reimbursement amount for lodging is the then-current CONUS rate.

f.    The maximum reimbursement amount for the actual cost of airfare shall be limited to fares for Economy Class or below. Air travel fares will not be reimbursed for first class, business class, "economy-plus," or other such classes. Reimbursable car rental rates are restricted to the mid-level size range or below (i.e. standard size, Intermediate, compact, or subcompact); costs for specialty,

DocuSign Envelope ID: 269EE8E6-7C38-4DA8-A418-78AC5F8F40C2

luxury, premium, SUV, or similar category vehicles are not reimbursable. Reimbursable ride-shares are restricted to standard or basic size vehicles (i.e., non-premium vehicles unless it results in a cost-saving to the County). Exceptions may be allowed under certain circumstances, such as unavailability of the foregoing options, with written approval from authorized County personnel. Other related travel expenses such as taxi fares, ride-shares, parking costs, train or subway costs, etc. shall be reimbursable on an actual-cost basis. Reimbursement of tips for taxi fare, or ride-share are limited to no more than 15% of the fare amount.

g.     Travel-related expenses are limited to: airfare, lodging, car rental, taxi/ride-share plus tips, tolls, incidentals (e.g. porters, baggage carriers or hotel staff), breakfast, lunch, dinner, mileage reimbursement based on Federal reimbursement rate. The County will not reimburse for alcohol.

h.     Reimbursement of tips are limited to no more than 15 percent. Non-reimbursement items (i.e., alcohol) shall be excluded when calculating the amount of the tip that is reimbursable.

*          *          *

**THIS CONTRACT IS NOT VALID UNTIL SIGNED BY ALL PARTIES. NO WORK WILL COMMENCE UNTIL THIS DOCUMENT HAS BEEN SIGNED BY THE COUNTY PURCHASING AGENT OR AUTHORIZED DESIGNEE.**

**For Contractor:**

DocuSigned by:

*Jeff Kearnan*

Jeff Kearnan

8/29/2022

Contractor Signature          Date          Contractor Name (please print)

**For County:**

DocuSigned by:

8/29/2022

Purchasing Agent Signature          Date          Michael P. Callagy
(Department Head or                                 Purchasing Agent Name (please print)
**Authorized** Designee)                            (Department Head or **Authorized** Designee)
County of San Mateo                                 County of San Mateo

County Executive Officer
Purchasing Agent or **Authorized** Designee
Job Title (please print)
County of San Mateo

DocuSign Envelope ID: 269EE8E6-7C38-4DA8-A418-78AC5F8F40C2

## Exhibit A

### SCOPE OF WORK

In June 2022, San Mateo County held its primary elections which resulted in the election of a new sheriff. Given that it has been several years since an incumbent County elected official officer did not win a contested election, there is a need for a transition team to be put in place now to ensure that the new Sheriff is able to begin serving without disruption on January 2, 2023. The Sheriff Elect's transition team will assist in planning, organizing, directing and reviewing of current budgets, contracts and other initiatives as necessary. The transition team will also be tasked with translating the Sheriff Elect's vision into concrete policies, initiatives, and recruitment of staff to make this vision a reality.

In consideration of the payments set forth in Exhibit B, Contractor will serve on the Sheriff Elect's transition team and shall provide the following services:

1. Contractor was previously the Undersheriff and will use his deep institutional knowledge of the San Mateo County Sheriff's Department to advise Sheriff Elect Corpus and the rest of the transition team on planning, organizing, directing and reviewing all functions and activities of the Sheriff's Department. Contractor will advise, in particular, on the following:

   o Organizational structure,
   o Staffing, and
   o Programming.

2. In consultation with the Sheriff Elect, serve as the lead in strategic planning/organization of the transition team.

3. Oversee the development of the Sheriff Department's proposed operations budget and grants and present to the Sheriff Elect.

4. Review existing operational contracts and make appropriate recommendations to the Sheriff Elect regarding these contracts and increasing office efficiency.

5. Assist in the identification, vetting, and selection of key members of the Sheriff Elect's Executive Team.

## Exhibit B

In consideration of the services provided by Contractor described in Exhibit A and subject to the terms of the Agreement, County shall pay Contractor $126.87 per hour.

Under no circumstances shall the total cost for the services provided by Contractor pursuant to this Agreement exceed $35,000.00.

Contractor shall invoice the County on a monthly basis, and all invoices from Contractor shall include, at minimum: (a) a description of services provided; (b) the time spent on such services; and (c) the employee/professional providing such services with applicable rate(s). Invoices shall be provided to Sheriff Elect Christina Corpus, at: CCorpus@smcgov.org

**EXHIBIT 3**

DocuSign Envelope ID: 11735789-6F4C-4A3D-A690-F1D45EE95EF3

**AGREEMENT BETWEEN THE COUNTY OF SAN MATEO AND VICTOR AENLLE**

This Agreement is entered into this ___ day of AUGUST, 2022, by and between the County of San Mateo, a political subdivision of the state of California, hereinafter called "County," and Victor Aenlle, hereinafter called "Contractor."

*        *        *

Whereas, pursuant to Section 31000 of the California Government Code, County may contract with independent contractors for the furnishing of such services to or for County or any Department thereof; and

Whereas, it is necessary and desirable that Contractor be retained for the purpose of assisting the San Mateo County Sheriff Elect's Transition Team.

**Now, therefore, it is agreed by the parties to this Agreement as follows:**

1.      **Exhibits and Attachments**

The following exhibits and attachments are attached to this Agreement and incorporated into this Agreement by this reference:

      Exhibit A—Services
      Exhibit B—Payments and Rates

2.      **Services to be performed by Contractor**

In consideration of the payments set forth in this Agreement and in Exhibit B, Contractor shall perform services for County in accordance with the terms, conditions, and specifications set forth in this Agreement and in Exhibit A.

3.      **Payments**

In consideration of the services provided by Contractor in accordance with all terms, conditions, and specifications set forth in this Agreement and in Exhibit A, County shall make payment to Contractor based on the rates and in the manner specified in Exhibit B. County reserves the right to withhold payment if County determines that the quantity or quality of the work performed is unacceptable. In no event shall County's total fiscal obligation under this Agreement exceed THIRTY THOUSAND DOLLARS ($30,000.00). In the event that the County makes any advance payments, Contractor agrees to refund any amounts in excess of the amount owed by the County at the time of contract termination or expiration. Contractor is not entitled to payment for work not performed as required by this agreement.

4.      **Term**

Subject to compliance with all terms and conditions, the term of this Agreement shall be from September 1, 2022, through January 15, 2023

## 5.     Termination

This Agreement may be terminated by Contractor or by the County Manager or his/her designee at any time without a requirement of good cause upon thirty (30) days' advance written notice to the other party. Subject to availability of funding, Contractor shall be entitled to receive payment for work/services provided prior to termination of the Agreement. Such payment shall be that prorated portion of the full payment determined by comparing the work/services actually completed to the work/services required by the Agreement.

County may terminate this Agreement or a portion of the services referenced in the Attachments and Exhibits based upon the unavailability of Federal, State, or County funds by providing written notice to Contractor as soon as is reasonably possible after County learns of said unavailability of outside funding.

County may terminate this Agreement for cause. In order to terminate for cause, County must first give Contractor notice of the alleged breach. Contractor shall have five business days after receipt of such notice to respond and a total of ten calendar days after receipt of such notice to cure the alleged breach. If Contractor fails to cure the breach within this period, County may immediately terminate this Agreement without further action. The option available in this paragraph is separate from the ability to terminate without cause with appropriate notice described above. In the event that County provides notice of an alleged breach pursuant to this section, County may, in extreme circumstances, immediately suspend performance of services and payment under this Agreement pending the resolution of the process described in this paragraph. County has sole discretion to determine what constitutes an extreme circumstance for purposes of this paragraph, and County shall use reasonable judgment in making that determination.

## 6.     Contract Materials

At the end of this Agreement, or in the event of termination, all finished or unfinished documents, data, studies, maps, photographs, reports, and other written materials (collectively referred to as "contract materials") prepared by Contractor under this Agreement shall become the property of County and shall be promptly delivered to County. Upon termination, Contractor may make and retain a copy of such contract materials if permitted by law.

## 7.     Relationship of Parties

Contractor agrees and understands that the work/services performed under this Agreement are performed as an independent contractor and not as an employee of County and that neither Contractor nor its employees acquire any of the rights, privileges, powers, or advantages of County employees.

## 8.     Hold Harmless

### a.     General Hold Harmless

Contractor shall indemnify and save harmless County and its officers, agents, employees, and servants from all claims, suits, or actions of every name, kind, and description resulting from this Agreement, the performance of any work or services required of Contractor under this Agreement, or payments made pursuant to this Agreement brought for, or on account of, any of the following:

(A) injuries to or death of any person, including Contractor or its employees/officers/agents;

(B) damage to any property of any kind whatsoever and to whomsoever belonging;

(C) any sanctions, penalties, or claims of damages resulting from Contractor's failure to comply, if applicable, with the requirements set forth in the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and all Federal regulations promulgated thereunder, as amended; or

(D) any other loss or cost, including but not limited to that caused by the concurrent active or passive negligence of County and/or its officers, agents, employees, or servants. However, Contractor's duty to indemnify and save harmless under this Section shall not apply to injuries or damage for which County has been found in a court of competent jurisdiction to be solely liable by reason of its own negligence or willful misconduct.

The duty of Contractor to indemnify and save harmless as set forth by this Section shall include the duty to defend as set forth in Section 2778 of the California Civil Code.

## 9. Assignability and Subcontracting

Contractor shall not assign this Agreement or any portion of it to a third party or subcontract with a third party to provide services required by Contractor under this Agreement without the prior written consent of County. Any such assignment or subcontract without County's prior written consent shall give County the right to automatically and immediately terminate this Agreement without penalty or advance notice.

## 10. Insurance

### a. General Requirements

Contractor shall not commence work or be required to commence work under this Agreement unless and until all insurance required under this Section has been obtained and such insurance has been approved by County's Risk Management, and Contractor shall use diligence to obtain such insurance and to obtain such approval. Contractor shall furnish County with certificates of insurance evidencing the required coverage, and there shall be a specific contractual liability endorsement extending Contractor's coverage to include the contractual liability assumed by Contractor pursuant to this Agreement. These certificates shall specify or be endorsed to provide that thirty (30) days' notice must be given, in writing, to County of any pending change in the limits of liability or of any cancellation or modification of the policy.

### b. Workers' Compensation and Employer's Liability Insurance

Contractor shall have in effect during the entire term of this Agreement workers' compensation and employer's liability insurance providing full statutory coverage. In signing this Agreement, Contractor certifies, as required by Section 1861 of the California Labor Code, that (a) it is aware of the provisions of Section 3700 of the California Labor Code, which require every employer to be insured against liability for workers' compensation or to undertake self-insurance in accordance with the provisions of the Labor Code, and (b) it will comply with such provisions before commencing the performance of work under this Agreement.

### c. Liability Insurance

Contractor shall take out and maintain during the term of this Agreement such bodily injury liability and property damage liability insurance as shall protect Contractor and all of its employees/officers/agents

while performing work covered by this Agreement from any and all claims for damages for bodily injury, including accidental death, as well as any and all claims for property damage which may arise from Contractor's operations under this Agreement, whether such operations be by Contractor, any subcontractor, anyone directly or indirectly employed by either of them, or an agent of either of them. Such insurance shall be combined single limit bodily injury and property damage for each occurrence and shall not be less than the amounts specified below:

(a) Comprehensive General Liability…     $1,000,000

County and its officers, agents, employees, and servants shall be named as additional insured on any such policies of insurance, which shall also contain a provision that (a) the insurance afforded thereby to County and its officers, agents, employees, and servants shall be primary insurance to the full limits of liability of the policy and (b) if the County or its officers, agents, employees, and servants have other insurance against the loss covered by such a policy, such other insurance shall be excess insurance only.

In the event of the breach of any provision of this Section, or in the event any notice is received which indicates any required insurance coverage will be diminished or canceled, County, at its option, may, notwithstanding any other provision of this Agreement to the contrary, immediately declare a material breach of this Agreement and suspend all further work and payment pursuant to this Agreement.

## 11.    **Compliance With Laws**

All services to be performed by Contractor pursuant to this Agreement shall be performed in accordance with all applicable Federal, State, County, and municipal laws, ordinances, and regulations, including but not limited to the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Federal Regulations promulgated thereunder, as amended (if applicable), the Business Associate requirements set forth in Attachment H (if attached), the Americans with Disabilities Act of 1990, as amended, and Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination on the basis of disability in programs and activities receiving any Federal or County financial assistance.  Such services shall also be performed in accordance with all applicable ordinances and regulations, including but not limited to appropriate licensure, certification regulations, provisions pertaining to confidentiality of records, and applicable quality assurance regulations.  In the event of a conflict between the terms of this Agreement and any applicable State, Federal, County, or municipal law or regulation, the requirements of the applicable law or regulation will take precedence over the requirements set forth in this Agreement.

Contractor will timely and accurately complete, sign, and submit all necessary documentation of compliance.

## 12.    **Non-Discrimination and Other Requirements**

### a.    **General Non-discrimination**

No person shall be denied any services provided pursuant to this Agreement (except as limited by the scope of services) on the grounds of race, color, national origin, ancestry, age, disability (physical or mental), sex, sexual orientation, gender identity, marital or domestic partner status, religion, political beliefs or affiliation, familial or parental status (including pregnancy), medical condition (cancer-related), military service, or genetic information.

**b. Equal Employment Opportunity**

Contractor shall ensure equal employment opportunity based on objective standards of recruitment, classification, selection, promotion, compensation, performance evaluation, and management relations for all employees under this Agreement. Contractor's equal employment policies shall be made available to County upon request.

**c. Section 504 of the Rehabilitation Act of 1973**

Contractor shall comply with Section 504 of the Rehabilitation Act of 1973, as amended, which provides that no otherwise qualified individual with a disability shall, solely by reason of a disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination in the performance of any services this Agreement. This Section applies only to contractors who are providing services to members of the public under this Agreement.

**d. Compliance with County's Equal Benefits Ordinance**

Contractor shall comply with all laws relating to the provision of benefits to its employees and their spouses or domestic partners, including, but not limited to, such laws prohibiting discrimination in the provision of such benefits on the basis that the spouse or domestic partner of the Contractor's employee is of the same or opposite sex as the employee.

**e. Discrimination Against Individuals with Disabilities**

The nondiscrimination requirements of 41 C.F.R. 60-741.5(a) are incorporated into this Agreement as if fully set forth here, and Contractor and any subcontractor shall abide by the requirements of 41 C.F.R. 60–741.5(a). This regulation prohibits discrimination against qualified individuals on the basis of disability and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified individuals with disabilities.

**f. History of Discrimination**

Contractor certifies that no finding of discrimination has been issued in the past 365 days against Contractor by the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or any other investigative entity. If any finding(s) of discrimination have been issued against Contractor within the past 365 days by the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or other investigative entity, Contractor shall provide County with a written explanation of the outcome(s) or remedy for the discrimination prior to execution of this Agreement. Failure to comply with this Section shall constitute a material breach of this Agreement and subjects the Agreement to immediate termination at the sole option of the County.

**g. Reporting; Violation of Non-discrimination Provisions**

Contractor shall report to the County Manager the filing in any court or with any administrative agency of any complaint or allegation of discrimination on any of the bases prohibited by this Section of the Agreement or the Section titled "Compliance with Laws". Such duty shall include reporting of the filing of any and all charges with the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or any other entity charged with the investigation or adjudication of allegations covered by this subsection within 30 days of such filing, provided that within such 30 days such entity has not notified Contractor that such charges are dismissed or otherwise unfounded. Such notification shall include a general description of the circumstances involved and a general description of

the kind of discrimination alleged (for example, gender-, sexual orientation-, religion-, or race-based discrimination).

Violation of the non-discrimination provisions of this Agreement shall be considered a breach of this Agreement and subject the Contractor to penalties, to be determined by the County Manager, including but not limited to the following:

i.    termination of this Agreement;
ii.    disqualification of the Contractor from being considered for or being awarded a County contract for a period of up to 3 years;
iii.    liquidated damages of $2,500 per violation; and/or
iv.    imposition of other appropriate contractual and civil remedies and sanctions, as determined by the County Manager.

To effectuate the provisions of this Section, the County Manager shall have the authority to offset all or any portion of the amount described in this Section against amounts due to Contractor under this Agreement or any other agreement between Contractor and County.

## 13.    Compliance with County Employee Jury Service Ordinance

Contractor shall comply with Chapter 2.85 of the County's Ordinance Code, which states that Contractor shall have and adhere to a written policy providing that its employees, to the extent they are full-time employees and live in San Mateo County, shall receive from the Contractor, on an annual basis, no fewer than five days of regular pay for jury service in San Mateo County, with jury pay being provided only for each day of actual jury service. The policy may provide that such employees deposit any fees received for such jury service with Contractor or that the Contractor may deduct from an employee's regular pay the fees received for jury service in San Mateo County. By signing this Agreement, Contractor certifies that it has and adheres to a policy consistent with Chapter 2.85. For purposes of this Section, if Contractor has no employees in San Mateo County, it is sufficient for Contractor to provide the following written statement to County: "For purposes of San Mateo County's jury service ordinance, Contractor certifies that it has no full-time employees who live in San Mateo County. To the extent that it hires any such employees during the term of its Agreement with San Mateo County, Contractor shall adopt a policy that complies with Chapter 2.85 of the County's Ordinance Code." The requirements of Chapter 2.85 do not apply unless this Agreement's total value listed in the Section titled "Payments", exceeds two-hundred thousand dollars ($200,000); Contractor acknowledges that Chapter 2.85's requirements will apply if this Agreement is amended such that its total value exceeds that threshold amount.

## 14.    Retention of Records; Right to Monitor and Audit

(a) Contractor shall maintain all required records relating to services provided under this Agreement for three (3) years after County makes final payment and all other pending matters are closed, and Contractor shall be subject to the examination and/or audit by County, a Federal grantor agency, and the State of California.

(b) Contractor shall comply with all program and fiscal reporting requirements set forth by applicable Federal, State, and local agencies and as required by County.

(c) Contractor agrees upon reasonable notice to provide to County, to any Federal or State department having monitoring or review authority, to County's authorized representative, and/or to any of their respective audit agencies access to and the right to examine all records and documents necessary to

determine compliance with relevant Federal, State, and local statutes, rules, and regulations, to determine compliance with this Agreement, and to evaluate the quality, appropriateness, and timeliness of services performed.

## 15.   **Merger Clause; Amendments**

This Agreement, including the Exhibits and Attachments attached to this Agreement and incorporated by reference, constitutes the sole Agreement of the parties to this Agreement and correctly states the rights, duties, and obligations of each party as of this document's date. In the event that any term, condition, provision, requirement, or specification set forth in the body of this Agreement conflicts with or is inconsistent with any term, condition, provision, requirement, or specification in any Exhibit and/or Attachment to this Agreement, the provisions of the body of the Agreement shall prevail. Any prior agreement, promises, negotiations, or representations between the parties not expressly stated in this document are not binding. All subsequent modifications or amendments shall be in writing and signed by the parties.

## 16.   **Controlling Law; Venue**

The validity of this Agreement and of its terms, the rights and duties of the parties under this Agreement, the interpretation of this Agreement, the performance of this Agreement, and any other dispute of any nature arising out of this Agreement shall be governed by the laws of the State of California without regard to its choice of law or conflict of law rules. Any dispute arising out of this Agreement shall be venued either in the San Mateo County Superior Court or in the United States District Court for the Northern District of California.

## 17.   **Notices**

Any notice, request, demand, or other communication required or permitted under this Agreement shall be deemed to be properly given when transmitted via email to the email address listed below

In the case of County, to:

| | |
|---|---|
| Name/Title: | Iliana Rodriguez, Deputy County Executive |
| Address: | 400 County Center, 1st Floor |
| | Redwood City, CA 94063 |
| Telephone: | (650) 363-4130 |
| Email: | irodriguez@smcgov.org |

In the case of Contractor, to:

| | |
|---|---|
| Name/Title: | Victor Aenlle |
| Address: | ██████████████ |
| | |
| Email: | ██████████████ |

DocuSign Envelope ID: 117357B9-6F4C-4A3D-A690-F1D45EE95EF3

**18.** **Electronic Signature**

Both County and Contractor wish to permit this Agreement and future documents relating to this Agreement to be digitally signed in accordance with California law and County's Electronic Signature Administrative Memo. Any party to this Agreement may revoke such agreement to permit electronic signatures at any time in relation to all future documents by providing notice pursuant to this Agreement.

**19.** **Reimbursable Travel Expenses**

To the extent that this Agreement authorizes reimbursements to Contractor for travel, lodging, and other related expenses as defined in this section, the Contractor must comply with all the terms of this section in order to be reimbursed for travel.

a.  Estimated travel expenses must be submitted to authorized County personnel for advanced written authorization before such expenses are incurred. Significant differences between estimated and actual travel expenses may be grounds for denial of full reimbursement of actual travel expenses.

b.  Itemized receipts (copies accepted) for all reimbursable travel expenses are required to be provided as supporting documentation with all invoices submitted to the County.

c.  Unless otherwise specified in this section, and subject to prior approval as described above, the County will reimburse Contractor for reimbursable travel expenses for days when services were provided to the County. Contractor must substantiate in writing to the County the actual services rendered and the specific dates. The County will reimburse for travel at 75% of the maximum reimbursement amount for the actual costs of meals and incidental expenses on the day preceding and/or the day following days when services were provided to the County, provided that such reimbursement is reasonable, in light of travel time and other relevant factors, and is approved in writing by authorized County personnel.

d.  Unless otherwise specified within the contract, reimbursable travel expenses shall not include Local Travel. "Local Travel" means travel entirely within a fifty-mile radius of the Contractor's office and travel entirely within a fifty-mile radius of San Mateo County. Any mileage reimbursements for a Contractor's use of a personal car for reimbursable travel shall be reimbursed based on the Federal mileage reimbursement rate.

e.  The maximum reimbursement amount for the actual lodging, meal and incidental expenses is limited to the then-current Continental United States ("CONUS") rate for the location of the work being done (i.e., Redwood City for work done in Redwood City, San Mateo for work done at San Mateo Medical Center) as set forth in the Code of Federal Regulations and as listed by the website of the U.S. General Services Administration (available online at http://www.gsa.gov/portal/content/104877 or by searching www.gsa.gov for the term 'CONUS'). County policy limits the reimbursement of lodging in designated high cost of living metropolitan areas to a maximum of double the then-current CONUS rate; for work being done outside of a designated high cost of living metropolitan area, the maximum reimbursement amount for lodging is the then-current CONUS rate.

f.  The maximum reimbursement amount for the actual cost of airfare shall be limited to fares for Economy Class or below. Air travel fares will not be reimbursed for first class, business class, "economy-plus," or other such classes. Reimbursable car rental rates are restricted to the mid-level

size range or below (i.e. standard size, intermediate, compact, or subcompact); costs for specialty, luxury, premium, SUV, or similar category vehicles are not reimbursable. Reimbursable ride-shares are restricted to standard or basic size vehicles (i.e., non-premium vehicles unless it results in a cost-saving to the County).  Exceptions may be allowed under certain circumstances, such as unavailability of the foregoing options, with written approval from authorized County personnel. Other related travel expenses such as taxi fares, ride-shares, parking costs, train or subway costs, etc. shall be reimbursable on an actual-cost basis.  Reimbursement of tips for taxi fare, or ride-share are limited to no more than 15% of the fare amount.

g.    Travel-related expenses are limited to: airfare, lodging, car rental, taxi/ride-share plus tips, tolls, incidentals (e.g. porters, baggage carriers or hotel staff), breakfast, lunch, dinner, mileage reimbursement based on Federal reimbursement rate. The County will not reimburse for alcohol.

h.    Reimbursement of tips are limited to no more than 15 percent.  Non-reimbursement items (i.e., alcohol) shall be excluded when calculating the amount of the tip that is reimbursable.

*      *      *

**THIS CONTRACT IS NOT VALID UNTIL SIGNED BY ALL PARTIES. NO WORK WILL COMMENCE UNTIL THIS DOCUMENT HAS BEEN SIGNED BY THE COUNTY PURCHASING AGENT OR AUTHORIZED DESIGNEE.**

**For Contractor:**

| | | Victor Aenlle |
|---|---|---|
| Contractor Signature | 8/30/2022<br>Date | Contractor Name (please print) |

**For County:**

| | | Michael P. Callagy |
|---|---|---|
| Purchasing Agent Signature<br>(Department Head or<br>**Authorized** Designee)<br>County of San Mateo | 9/20/2022<br>Date | Purchasing Agent Name (please print)<br>(Department Head or **Authorized** Designee)<br>County of San Mateo |

County Executive Officer
Purchasing Agent or **Authorized** Designee
Job Title (please print)
County of San Mateo

# Exhibit A

## SCOPE OF WORK

In June 2022, San Mateo County held its primary elections which resulted in the election of a new sheriff. Given that it has been several years since an incumbent County elected official did not win a contested election, there is a need for a transition team to be put in place now to ensure that the new Sheriff is able to begin serving without disruption on January 2, 2023. The Sheriff Elect's transition team will assist in planning, organizing, directing and reviewing of current budgets, contracts and other initiatives necessary. The transition team will also be tasked with translating the Sheriff Elect's vision into concrete policies, initiatives, and recruitment of staff to make this vision a reality.

In consideration of the payments set forth in Exhibit B, Contractor will serve on the Sheriff Elect's transition team and shall provide the following services:

1. Use his previous experience in organizational leadership to advise Sheriff Elect Corpus and the rest of the transition team on the following:
   - Advise on budget development, grants and contracts.
   - Review existing grants for compliance with all reporting requirements.

2. Capital Planning: Monitor the contractor work on remodeling of the Old McGuire Jail, which is currently being converted into administrative office space for the Sheriff's Department and keep Sheriff Elect informed of progress and concerns.

3. Review existing contracts and make appropriate recommendations to the Sheriff Elect regarding these contracts and increasing office contract efficiency.

4. Assist in the identification, vetting, and selection of key members of the Sheriff Elect's Executive Team.

5. Perform other duties that may be assigned from the Sheriff Elect to assist with transition work.

## Exhibit B

In consideration of the services provided by Contractor described in Exhibit A and subject to the terms of the Agreement, County shall pay Contractor $105.00 per hour.

Under no circumstances shall the total cost for the services provided by Contractor pursuant to this Agreement exceed $30,000.00.

Contractor shall invoice the County on a monthly basis, and all invoices from Contractor shall include, at minimum: (a) a description of services provided; (b) the time spent on such services; and (c) the employee/professional providing such services with applicable rate(s). Invoices shall be provided to Sheriff Elect Christina Corpus, at: ccorpus@smcgov.org

**EXHIBIT 4**

9.15.22

Transition Team Meeting @ Millbrae Police Bureau

Present:

1. Captain Christina Corpus
2. Maxwell Szabo
3. ███████
4. Victor Aenlle
5. ███████

## **Agenda 9/14/22**

1. **VISION** – DAY 1 PRIORITIES
   a. CCW Update - Victor
   b. Recruitment Firm // Proposal for Services – S&A
   c. DS Recruitment Plan – CC
i. Recruitment Campaign
      1. Study Session/Support
2. Review questionnaire for employees // Survey software through County - Assigned to ███
   (no action at this time)
   @CC - please connect S&A with County Counsel so we can facilitate the questionnaire
3. Inauguration @ SM Community College
      Date
   a. Entertainment
   b. Speakers
      Josh Becker
         Faith Leader
   c. VIPs/Who is swearing CC in
   d. Planning
4. Updates on external meetings/calls from team
5. IACP Check-In
   ███ – format for reimbursements
6. Deputy Town Hall - Victor
   Planning
   a. Second Meeting Date
7. County Manager & Counsel – CC
8. Fix'n SMC – Victor

**EXHIBIT 5**

| | |
|---|---|
| **From:** | Iliana Rodriguez |
| **To:** | Michael Callagy |
| **Cc:** | John Nibbelin |
| **Subject:** | FW: Termination of Contract |
| **Date:** | Friday, October 21, 2022 10:54:59 AM |
| **Attachments:** | image001.png |

FYI

Iliana Rodriguez (she/her/ella)

Deputy County Executive

County Executive's Office

400 County Center, 1st Floor

Redwood City, CA 94063

Phone l 650-363-4130

Email l irodriguez@smcgov.org



**From:** Iliana Rodriguez <IRodriguez@smcgov.org>

**Sent:** Friday, October 21, 2022 10:54 AM

**To:** Victor Aenlle <victor@aenllefamily.com>

**Subject:** Termination of Contract

Dear Mr. Aenlle,

This e-mail is a follow up to our phone conversation earlier this morning and serves as our official notification of our decision to terminate our contract for your services effective immediately. Please submit your final invoice to our office by Monday, October 24, 2022.

Thank you for your services.

Sincerely,

Iliana Rodriguez (she/her/ella)

Deputy County Executive

County Executive's Office

400 County Center, 1st Floor

Redwood City, CA 94063

Phone l 650-363-4130

Email l irodriguez@smcgov.org



**EXHIBIT 6**

Dotusign Envelope ID: 9E29ACE9-9BB4-4D13-9380-81A0013AF232

CR40783

**Agreement No. 30000-23-D00158**

## AGREEMENT BETWEEN THE COUNTY OF SAN MATEO AND VICTOR AENLLE

This Agreement is entered into this 01 day of January, 2023, by and between the County of San Mateo, a political subdivision of the state of California, hereinafter called "County," and Victor Aenlle, hereinafter called "Contractor."

*       *       •

Whereas, pursuant to Section 31000 of the California Government Code, County may contract with independent contractors for the furnishing of such services to or for County or any Department thereof; and

Whereas, it is necessary and desirable that Contractor be retained for the purpose of providing consulting services.

**Now, therefore, it is agreed by the parties to this Agreement as follows:**

### 1.     Exhibits and Attachments

The following exhibits and attachments are attached to this Agreement and incorporated into this Agreement by this reference:

>  Exhibit A—Services
>  Exhibit B—Payments and Rates

### 2.     Services to be performed by Contractor

In consideration of the payments set forth in this Agreement and in Exhibit B, Contractor shall perform services for County in accordance with the terms, conditions, and specifications set forth in this Agreement and in Exhibit A.

### 3.     Payments

In consideration of the services provided by Contractor in accordance with all terms, conditions, and specifications set forth in this Agreement and in Exhibit A, County shall make payment to Contractor based on the rates and in the manner specified in Exhibit B. County reserves the right to withhold payment if County determines that the quantity or quality of the work performed is unacceptable. In no event shall County's total fiscal obligation under this Agreement exceed **One Hundred Ninety-Two Thousand Two Hundred Seventy-Five Dollars ($192,275.00)**. In the event that the County makes any advance payments, Contractor agrees to refund any amounts in excess of the amount owed by the County at the time of contract termination or expiration. Contractor is not entitled to payment for work not performed as required by this agreement.

### 4.     Term

Subject to compliance with all terms and conditions, the term of this Agreement shall be from **January 01, 2023**, through **December 31, 2023**.

## 5.   Termination

This Agreement may be terminated by Contractor or by the Sheriff or Sheriff's designee at any time without a requirement of good cause upon thirty (30) days' advance written notice to the other party. Subject to availability of funding, Contractor shall be entitled to receive payment for work/services provided prior to termination of the Agreement.  Such payment shall be that prorated portion of the full payment determined by comparing the work/services actually completed to the work/services required by the Agreement.

County may terminate this Agreement or a portion of the services referenced in the Attachments and Exhibits based upon the unavailability of Federal, State, or County funds by providing written notice to Contractor as soon as is reasonably possible after County learns of said unavailability of outside funding.

County may terminate this Agreement for cause.  In order to terminate for cause, County must first give Contractor notice of the alleged breach. Contractor shall have five business days after receipt of such notice to respond and a total of ten calendar days after receipt of such notice to cure the alleged breach. If Contractor fails to cure the breach within this period, County may immediately terminate this Agreement without further action. The option available in this paragraph is separate from the ability to terminate without cause with appropriate notice described above. In the event that County provides notice of an alleged breach pursuant to this section, County may, in extreme circumstances, immediately suspend performance of services and payment under this Agreement pending the resolution of the process described in this paragraph. County has sole discretion to determine what constitutes an extreme circumstance for purposes of this paragraph, and County shall use reasonable judgment in making that determination.

## 6.   Contract Materials

At the end of this Agreement, or in the event of termination, all finished or unfinished documents, data, studies, maps, photographs, reports, and other written materials (collectively referred to as "contract materials") prepared by Contractor under this Agreement shall become the property of County and shall be promptly delivered to County.  Upon termination, Contractor may make and retain a copy of such contract materials if permitted by law.

## 7.   Relationship of Parties

Contractor agrees and understands that the work/services performed under this Agreement are performed as an independent contractor and not as an employee of County and that neither Contractor nor its employees acquire any of the rights, privileges, powers, or advantages of County employees.

## 8.   Hold Harmless

### a.  General Hold Harmless

Contractor shall indemnify and save harmless County and its officers, agents, employees, and servants from all claims, suits, or actions of every name, kind, and description resulting from this

Agreement, the performance of any work or services required of Contractor under this Agreement, or payments made pursuant to this Agreement brought for, or on account of, any of the following:

> (A) injuries to or death of any person, including Contractor or its employees/officers/agents;

> (B) damage to any property of any kind whatsoever and to whomsoever belonging;

> (C) any sanctions, penalties, or claims of damages resulting from Contractor's failure to comply, if applicable, with the requirements set forth in the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and all Federal regulations promulgated thereunder, as amended; or

> (D) any other loss or cost, including but not limited to that caused by the concurrent active or passive negligence of County and/or its officers, agents, employees, or servants. However, Contractor's duty to indemnify and save harmless under this Section shall not apply to injuries or damage for which County has been found in a court of competent jurisdiction to be solely liable by reason of its own negligence or willful misconduct.

The duty of Contractor to indemnify and save harmless as set forth by this Section shall include the duty to defend as set forth in Section 2778 of the California Civil Code.

### b. **Intellectual Property Indemnification**

Contractor hereby certifies that it owns, controls, and/or licenses and retains all right, title, and/or interest in and to any intellectual property it uses in relation to this Agreement, including the design, look, feel, features, source code, content, and/or other technology relating to any part of the services it provides under this Agreement and including all related patents, inventions, trademarks, and copyrights, all applications therefor, and all trade names, service marks, know how, and trade secrets (collectively referred to as "IP Rights") except as otherwise noted by this Agreement.

Contractor warrants that the services it provides under this Agreement do not infringe, violate, trespass, or constitute the unauthorized use or misappropriation of any IP Rights of any third party. Contractor shall defend, indemnify, and hold harmless County from and against all liabilities, costs, damages, losses, and expenses (including reasonable attorney fees) arising out of or related to any claim by a third party that the services provided under this Agreement infringe or violate any third-party's IP Rights provided any such right is enforceable in the United States. Contractor's duty to defend, indemnify, and hold harmless under this Section applies only provided that: (a) County notifies Contractor promptly in writing of any notice of any such third-party claim; (b) County cooperates with Contractor, at Contractor's expense, in all reasonable respects in connection with the investigation and defense of any such third-party claim; (c) Contractor retains sole control of the defense of any action on any such claim and all negotiations for its settlement or compromise (provided Contractor shall not have the right to settle any criminal action, suit, or proceeding without County's prior written consent, not to be unreasonably withheld, and provided further that any settlement permitted under this Section shall not impose any financial or other obligation on County, impair any right of County, or contain any stipulation, admission, or acknowledgement of wrongdoing on the part of County without County's prior written consent, not to be unreasonably withheld); and (d) should services under this Agreement become, or in Contractor's opinion be likely to become, the

subject of such a claim, or in the event such a third party claim or threatened claim causes County's reasonable use of the services under this Agreement to be seriously endangered or disrupted, Contractor shall, at Contractor's option and expense, either: (i) procure for County the right to continue using the services without infringement or (ii) replace or modify the services so that they become non-infringing but remain functionally equivalent.

Notwithstanding anything in this Section to the contrary, Contractor will have no obligation or liability to County under this Section to the extent any otherwise covered claim is based upon: (a) any aspects of the services under this Agreement which have been modified by or for County (other than modification performed by, or at the direction of, Contractor) in such a way as to cause the alleged infringement at issue; and/or (b) any aspects of the services under this Agreement which have been used by County in a manner prohibited by this Agreement.

The duty of Contractor to indemnify and save harmless as set forth by this Section shall include the duty to defend as set forth in Section 2778 of the California Civil Code.

## 9.  Assignability and Subcontracting

Contractor shall not assign this Agreement or any portion of it to a third party or subcontract with a third party to provide services required by Contractor under this Agreement without the prior written consent of County.  Any such assignment or subcontract without County's prior written consent shall give County the right to automatically and immediately terminate this Agreement without penalty or advance notice.

## 10.  Insurance

### a.  General Requirements

Contractor shall not commence work or be required to commence work under this Agreement unless and until all insurance required under this Section has been obtained and such insurance has been approved by County's Risk Management, and Contractor shall use diligence to obtain such insurance and to obtain such approval.  Contractor shall furnish County with certificates of insurance evidencing the required coverage, and there shall be a specific contractual liability endorsement extending Contractor's coverage to include the contractual liability assumed by Contractor pursuant to this Agreement.  These certificates shall specify or be endorsed to provide that thirty (30) days' notice must be given, in writing, to County of any pending change in the limits of liability or of any cancellation or modification of the policy.

### b.  Workers' Compensation and Employer's Liability Insurance

Contractor shall have in effect during the entire term of this Agreement workers' compensation and employer's liability insurance providing full statutory coverage.  In signing this Agreement, Contractor certifies, as required by Section 1861 of the California Labor Code, that (a) it is aware of the provisions of Section 3700 of the California Labor Code, which require every employer to be insured against liability for workers' compensation or to undertake self-insurance in accordance with the provisions of the Labor Code, and (b) it will comply with such provisions before commencing the performance of work under this Agreement.

c. **Liability Insurance**

Contractor shall take out and maintain during the term of this Agreement such bodily injury liability and property damage liability insurance as shall protect Contractor and all of its employees/officers/agents while performing work covered by this Agreement from any and all claims for damages for bodily injury, including accidental death, as well as any and all claims for property damage which may arise from Contractor's operations under this Agreement, whether such operations be by Contractor, any subcontractor, anyone directly or indirectly employed by either of them, or an agent of either of them. Such insurance shall be combined single limit bodily injury and property damage for each occurrence and shall not be less than the amounts specified below:

>   (a) Comprehensive General Liability.............$1,000,000

>   (b) Motor Vehicle Liability Insurance.............$1,000,000

County and its officers, agents, employees, and servants shall be named as additional insured on any such policies of insurance, which shall also contain a provision that (a) the insurance afforded thereby to County and its officers, agents, employees, and servants shall be primary insurance to the full limits of liability of the policy and (b) if the County or its officers, agents, employees, and servants have other insurance against the loss covered by such a policy, such other insurance shall be excess insurance only.

In the event of the breach of any provision of this Section, or in the event any notice is received which indicates any required insurance coverage will be diminished or canceled, County, at its option, may, notwithstanding any other provision of this Agreement to the contrary, immediately declare a material breach of this Agreement and suspend all further work and payment pursuant to this Agreement.

11. **Compliance With Laws**

All services to be performed by Contractor pursuant to this Agreement shall be performed in accordance with all applicable Federal, State, County, and municipal laws, ordinances, regulations, and executive orders, including but not limited to the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Federal Regulations promulgated thereunder, as amended (if applicable), the Business Associate requirements set forth in Attachment H (if attached), the Americans with Disabilities Act of 1990, as amended, and Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination on the basis of disability in programs and activities receiving any Federal or County financial assistance, as well as any required economic or other sanctions imposed by the United States government or under state law in effect during the term of the Agreement. Such services shall also be performed in accordance with all applicable ordinances and regulations, including but not limited to appropriate licensure, certification regulations, provisions pertaining to confidentiality of records, and applicable quality assurance regulations. In the event of a conflict between the terms of this Agreement and any applicable State, Federal, County, or municipal law, regulation, or executive order, the requirements of the applicable law, regulation, or executive order will take precedence over the requirements set forth in this Agreement.

Contractor will timely and accurately complete, sign, and submit all necessary documentation of compliance.

## 12. Non-Discrimination and Other Requirements

### a. General Non-discrimination

No person shall be denied any services provided pursuant to this Agreement (except as limited by the scope of services) on the grounds of race, color, national origin, ancestry, age, disability (physical or mental), sex, sexual orientation, gender identity, marital or domestic partner status, religion, political beliefs or affiliation, familial or parental status (including pregnancy), medical condition (cancer-related), military service, or genetic information.

### b. Equal Employment Opportunity

Contractor shall ensure equal employment opportunity based on objective standards of recruitment, classification, selection, promotion, compensation, performance evaluation, and management relations for all employees under this Agreement. Contractor's equal employment policies shall be made available to County upon request.

### c. Section 504 of the Rehabilitation Act of 1973

Contractor shall comply with Section 504 of the Rehabilitation Act of 1973, as amended, which provides that no otherwise qualified individual with a disability shall, solely by reason of a disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination in the performance of any services this Agreement. This Section applies only to contractors who are providing services to members of the public under this Agreement.

### d. Compliance with County's Equal Benefits Ordinance

Contractor shall comply with all laws relating to the provision of benefits to its employees and their spouses or domestic partners, including, but not limited to, such laws prohibiting discrimination in the provision of such benefits on the basis that the spouse or domestic partner of the Contractor's employee is of the same or opposite sex as the employee.

### e. Discrimination Against Individuals with Disabilities

The nondiscrimination requirements of 41 C.F.R. 60-741.5(a) are incorporated into this Agreement as if fully set forth here, and Contractor and any subcontractor shall abide by the requirements of 41 C.F.R. 60–741.5(a). This regulation prohibits discrimination against qualified individuals on the basis of disability and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified individuals with disabilities.

### f. History of Discrimination

Contractor certifies that no finding of discrimination has been issued in the past 365 days against Contractor by the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or any other investigative entity. If any finding(s) of discrimination have

been issued against Contractor within the past 365 days by the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or other investigative entity, Contractor shall provide County with a written explanation of the outcome(s) or remedy for the discrimination prior to execution of this Agreement.  Failure to comply with this Section shall constitute a material breach of this Agreement and subjects the Agreement to immediate termination at the sole option of the County.

### g. Reporting; Violation of Non-discrimination Provisions

Contractor shall report to the County Executive Officer the filing in any court or with any administrative agency of any complaint or allegation of discrimination on any of the bases prohibited by this Section of the Agreement or the Section titled "Compliance with Laws".  Such duty shall include reporting of the filing of any and all charges with the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or any other entity charged with the investigation or adjudication of allegations covered by this subsection within 30 days of such filing, provided that within such 30 days such entity has not notified Contractor that such charges are dismissed or otherwise unfounded.  Such notification shall include a general description of the circumstances involved and a general description of the kind of discrimination alleged (for example, gender-, sexual orientation-, religion-, or race-based discrimination).

Violation of the non-discrimination provisions of this Agreement shall be considered a breach of this Agreement and subject the Contractor to penalties, to be determined by the County Executive Officer, including but not limited to the following:

    i.    termination of this Agreement;
    ii.    disqualification of the Contractor from being considered for or being awarded a County contract for a period of up to 3 years;
    iii.    liquidated damages of $2,500 per violation; and/or
    iv.    imposition of other appropriate contractual and civil remedies and sanctions, as determined by the County Executive Officer.

To effectuate the provisions of this Section, the County Executive Officer shall have the authority to offset all or any portion of the amount described in this Section against amounts due to Contractor under this Agreement or any other agreement between Contractor and County.

### 13. Compliance with County Employee Jury Service Ordinance

Contractor shall comply with Chapter 2.85 of the County's Ordinance Code, which states that Contractor shall have and adhere to a written policy providing that its employees, to the extent they are full-time employees and live in San Mateo County, shall receive from the Contractor, on an annual basis, no fewer than five days of regular pay for jury service in San Mateo County, with jury pay being provided only for each day of actual jury service.  The policy may provide that such employees deposit any fees received for such jury service with Contractor or that the Contractor may deduct from an employee's regular pay the fees received for jury service in San Mateo County.  By signing this Agreement, Contractor certifies that it has and adheres to a policy consistent with Chapter 2.85.  For purposes of this Section, if Contractor has no employees in San Mateo County, it

is sufficient for Contractor to provide the following written statement to County: "For purposes of San Mateo County's jury service ordinance, Contractor certifies that it has no full-time employees who live in San Mateo County. To the extent that it hires any such employees during the term of its Agreement with San Mateo County, Contractor shall adopt a policy that complies with Chapter 2.85 of the County's Ordinance Code." The requirements of Chapter 2.85 do not apply unless this Agreement's total value listed in the Section titled "Payments", exceeds two-hundred thousand dollars ($200,000); Contractor acknowledges that Chapter 2.85's requirements will apply if this Agreement is amended such that its total value exceeds that threshold amount.

## 14. Retention of Records; Right to Monitor and Audit

(a) Contractor shall maintain all required records relating to services provided under this Agreement for three (3) years after County makes final payment and all other pending matters are closed, and Contractor shall be subject to the examination and/or audit by County, a Federal grantor agency, and the State of California.

(b) Contractor shall comply with all program and fiscal reporting requirements set forth by applicable Federal, State, and local agencies and as required by County.

(c) Contractor agrees upon reasonable notice to provide to County, to any Federal or State department having monitoring or review authority, to County's authorized representative, and/or to any of their respective audit agencies access to and the right to examine all records and documents necessary to determine compliance with relevant Federal, State, and local statutes, rules, and regulations, to determine compliance with this Agreement, and to evaluate the quality, appropriateness, and timeliness of services performed.

## 15. Merger Clause; Amendments

This Agreement, including the Exhibits and Attachments attached to this Agreement and incorporated by reference, constitutes the sole Agreement of the parties to this Agreement and correctly states the rights, duties, and obligations of each party as of this document's date. In the event that any term, condition, provision, requirement, or specification set forth in the body of this Agreement conflicts with or is inconsistent with any term, condition, provision, requirement, or specification in any Exhibit and/or Attachment to this Agreement, the provisions of the body of the Agreement shall prevail. Any prior agreement, promises, negotiations, or representations between the parties not expressly stated in this document are not binding. All subsequent modifications or amendments shall be in writing and signed by the parties.

## 16. Controlling Law; Venue

The validity of this Agreement and of its terms, the rights and duties of the parties under this Agreement, the interpretation of this Agreement, the performance of this Agreement, and any other dispute of any nature arising out of this Agreement shall be governed by the laws of the State of California without regard to its choice of law or conflict of law rules. Any dispute arising out of this Agreement shall be venued either in the San Mateo County Superior Court or in the United States District Court for the Northern District of California.

17. **Notices**

Any notice, request, demand, or other communication required or permitted under this Agreement shall be deemed to be properly given when both: (1) transmitted via email to the email address listed below; and (2) sent to the physical address listed below by either being deposited in the United States mail, postage prepaid, or deposited for overnight delivery, charges prepaid, with an established overnight courier that provides a tracking number showing confirmation of receipt.

In the case of County, to:

| | |
|---|---|
| Name/Title: | Veronica Ruiz/Management Analyst |
| Address: | 400 County Center, 3rd floor, Redwood City, CA 94063 |
| Telephone: | 650-363-7819 |
| Email: | VRuiz@smcgov.org |

In the case of Contractor, to:

| | |
|---|---|
| Name/Title: | Victor Aenlle |
| Address: | ▇▇▇▇▇▇▇▇▇▇▇▇ |
| Telephone: | ▇▇▇▇▇▇ |
| Email: | ▇▇▇▇▇▇ |

18. **Electronic Signature**

Both County and Contractor wish to permit this Agreement and future documents relating to this Agreement to be digitally signed in accordance with California law and County's Electronic Signature Administrative Memo. Any party to this Agreement may revoke such agreement to permit electronic signatures at any time in relation to all future documents by providing notice pursuant to this Agreement.

19. **Payment of Permits/Licenses**

Contractor bears responsibility to obtain any license, permit, or approval required from any agency for work/services to be performed under this Agreement at Contractor's own expense prior to commencement of said work/services. Failure to do so will result in forfeit of any right to compensation under this Agreement.

20. **Reimbursable Travel Expenses**

To the extent that this Agreement authorizes reimbursements to Contractor for travel, lodging, and other related expenses as defined in this section, the Contractor must comply with all the terms of this section in order to be reimbursed for travel.

a. Estimated travel expenses must be submitted to authorized County personnel for advanced written authorization before such expenses are incurred. Significant differences between

estimated and actual travel expenses may be grounds for denial of full reimbursement of actual travel expenses.

b.   Itemized receipts (copies accepted) for all reimbursable travel expenses are required to be provided as supporting documentation with all invoices submitted to the County.

c.   Unless otherwise specified in this section, the County will reimburse Contractor for reimbursable travel expenses for days when services were provided to the County. Contractor must substantiate in writing to the County the actual services rendered and the specific dates. The County will reimburse for travel at 75% of the maximum reimbursement amount for the actual costs of meals and incidental expenses on the day preceding and/or the day following days when services were provided to the County, provided that such reimbursement is reasonable, in light of travel time and other relevant factors, and is approved in writing by authorized County personnel.

d.   Unless otherwise specified within the contract, reimbursable travel expenses shall not include Local Travel. "Local Travel" means travel entirely within a fifty-mile radius of the Contractor's office and travel entirely within a fifty-mile radius of San Mateo County. Any mileage reimbursements for a Contractor's use of a personal car for reimbursable travel shall be reimbursed based on the Federal mileage reimbursement rate.

e.   The maximum reimbursement amount for the actual lodging, meal and incidental expenses is limited to the then-current Continental United States ("CONUS") rate for the location of the work being done (i.e., Redwood City for work done in Redwood City, San Mateo for work done at San Mateo Medical Center) as set forth in the Code of Federal Regulations and as listed by the website of the U.S. General Services Administration (available online at http://www.gsa.gov/portal/content/104877 or by searching www.gsa.gov for the term 'CONUS'). County policy limits the reimbursement of lodging in designated high cost of living metropolitan areas to a maximum of double the then-current CONUS rate; for work being done outside of a designated high cost of living metropolitan area, the maximum reimbursement amount for lodging is the then-current CONUS rate.

f.   The maximum reimbursement amount for the actual cost of airfare shall be limited to fares for Economy Class or below. Air travel fares will not be reimbursed for first class, business class, "economy-plus," or other such classes. Reimbursable car rental rates are restricted to the mid-level size range or below (i.e. standard size, intermediate, compact, or subcompact); costs for specialty, luxury, premium, SUV, or similar category vehicles are not reimbursable. Reimbursable ride-shares are restricted to standard or basic size vehicles (i.e., non-premium vehicles unless it results in a cost-saving to the County). Exceptions may be allowed under certain circumstances, such as unavailability of the foregoing options, with written approval from authorized County personnel. Other related travel expenses such as taxi fares, ride-shares, parking costs, train or subway costs, etc. shall be reimbursable on an actual-cost basis. Reimbursement of tips for taxi fare, or ride-share are limited to no more than 15% of the fare amount.

DocuSign Envelope ID: 5E25ACE3-5BB4-4D13-9360-61A0013AF232

g.    Travel-related expenses are limited to: airfare, lodging, car rental, taxi/ride-share plus tips, tolls, incidentals (e.g. porters, baggage carriers or hotel staff), breakfast, lunch, dinner, mileage reimbursement based on Federal reimbursement rate. The County will not reimburse for alcohol.

h.    Reimbursement of tips are limited to no more than 15 percent.  Non-reimbursement items (i.e., alcohol) shall be excluded when calculating the amount of the tip that is reimbursable.

**THIS CONTRACT IS NOT VALID UNTIL SIGNED BY ALL PARTIES. NO WORK WILL COMMENCE UNTIL THIS DOCUMENT HAS BEEN SIGNED BY THE COUNTY PURCHASING AGENT OR AUTHORIZED DESIGNEE.**

**For Contractor:**

DocuSigned by:

2D09AAFBE1A54F8...

1/31/2023 | 10:17 AM PST

Victor Aenlle

| Contractor Signature | Date | Contractor Name (please print) |

**For County:**

DocuSigned by:

C2EF6300A24C4A9...

1/31/2023 | 11:20 AM PST

Stacey Stevenson

Purchasing Agent Signature
(Department Head or
**Authorized** Designee)
County of San Mateo

Date

Purchasing Agent Name
(please print)
(Department Head or
**Authorized** Designee)
County of San Mateo

Director of Finance, Acting

Purchasing Agent or
**Authorized** Designee
Job Title (please print)
County of San Mateo

**30111**

Budget

# EXHIBIT A
## SCOPE OF WORK

In consideration of the payments set forth in Exhibit B, Contractor will provide the following services:

1. Contractor will be tasked with translating the Sheriff's vision into concrete policies and initiatives. Receive general direction from the Sheriff or Undersheriff.

2. Consult with and advise other County staff and the public regarding pertinent policy issues and participate in the development of standards and programs relating to these policies.

3. Monitor current and proposed federal, state, and local legislation to assess its impact and to develop the County's legislative response either in support of or opposition to such legislation.

4. Plan, monitor, evaluate, and supervise the operation of assigned area; coordinate the work of the various subdivisions; advise and consult with section managers; meet with appropriate staff to identify and resolve problems or conflicts; make or recommend final decisions regarding policy, operations, and administrative procedures.

5. Develop, implement and maintain procedures, coordinate work activities between divisions within the department to prevent delays in required actions or to improve programs or services; assist in the identification, development and implementation of departmental goals, objectives, policies, and priorities; assist in the determination of resource allocation and levels of service according to established policies.

6. Develop policy and procedures that demonstrate transparency and impartiality at all levels within the organization.

7. Receive and analyze division and departmental reports; direct the preparation of monthly and annual reports; direct the gathering and analysis of information and reports necessary to document and evaluate processes.

8. Monitor and evaluate the effectiveness and efficiency of the division's service delivery system, organizational structure, staffing levels, financial systems, and other internal operations; identify and recommend alternative approaches or improvements; implement revisions and changes.

9. Serve as liaison for the department with a variety of other city/county staff, policy-

DocuSign Envelope ID: 5E25ACE3-5BB4-4D13-9360-61A0013AF232

making officials, and officials of outside agencies; explain and justify departmental or administrative procedures, policies, or programs; negotiate and resolve difficult and complex issues and problems.

10. Plan, develop, implement or direct major or complex projects or programs which span a number of the department's established sections or divisions; direct the research of complex, highly technical issues; analyze alternative solutions or approaches; recommend most effective course of action.

11. Develop and streamline the CCW approval process, create efficiencies in the application process, and work collaboratively with the Range staff to ensure qualifications are being met.

12. Assist with developing the Community Advisory for Responsible Engagement, participate in developing the related standards and policies, and process applications.

13. Perform related duties as assigned.

DocuSign Envelope ID: 9E29A0E9-9DD4-4D19-9500-61A001JAF292

## Exhibit B
## Payments and Rates

1. In consideration of the services provided by Contractor described in Exhibit A and subject to the terms of the Agreement, County shall pay Contractor **$92.44 per hour**.

| Fiscal Year | Estimated Hours | Estimated Cost |
|---|---|---|
| 1/1/2023 - 6/30/2023 | 1,040 | $ 96,138 |
| 7/01/2023 - 12/31/2023 | 1,040 | $ 96,138 |
| **TOTAL** | **2,080** | **$ 192,275** |

2. Contractor shall invoice the County on a monthly basis. and all invoices from Contractor shall include, at minimum:
   - (a) a description of services provided:
   - (b) the time spent on such services;
   - (c) the contract number with applicable rate(s).

3. Invoices shall be provided to Gina Sheridan. at GSheridan@smcgov.org.

**EXHIBIT 7**

**EXAMPLES OF DUTIES:**

Duties may include, but are not limited to the following:

1. Review, develop, and propose action plans to ensure policies and initiatives align with the Sheriff's strategic plan. Establish specific goals to put the strategy into action and divide resources for the strategy's execution. Receive general direction from the Sheriff or Undersheriff.

2. Consult with Sheriff's office staff on policies and programs. Develop standards and programs relating to these policies. Check-in with the executive team for a monthly progress report.

3. Track current and proposed federal, state, and local legislation. Assess impacts and develop the County's legislative response.

4. Plan and evaluate the operation of assigned area. Coordinate the work of the various subdivisions. Advise and consult with section managers. Meet with appropriate staff to identify and resolve problems or conflicts. Make or recommend final decisions regarding policy, operations, and administrative procedures.

5. Oversee various support services divisions. Ensure legal compliance in Records division. Seek efficiencies in Records leveraging technology and innovative strategies. Collaborate with the Director of IT in the strategic implementation of advanced technology to foster transparency with the public. Oversee the Crime Lab and it's use of state-of-the-art technology and modern policing and crime solving practices.

6. Develop, implement and maintain procedures. coordinate work activities between divisions within the department to prevent delays. Improve programs or services. Assist in the identification, development and implementation of departmental goals, objectives, policies, and priorities.

7. Develop policy and procedures that demonstrate transparency at all levels within the organization.

8. Receive and analyze division and departmental reports. Direct the preparation of monthly and annual reports. Direct the gathering and analysis of information necessary to document and evaluate processes.

9. Monitor and evaluate the effectiveness and efficiency of the division's service delivery. Develop the organizational structure. Determine staffing needs. Identify and recommend alternative approaches or improvements; implement revisions, and changes.

10. Serve as liaison for the Department with a variety of other City/County staff, policy-making officials, and officials of outside agencies. Explain and justify Departmental or administrative procedures, policies, or programs. Negotiate and resolve difficult

and complex issues and problems.

11. Plan, develop, implement or direct major or complex projects or programs which span a number of the department's established sections or divisions. Direct the research of complex, highly technical issues. Analyze alternative solutions or approaches; recommend most effective course of action.

12. Develop and streamline the CCW approval process. Create efficiencies in the application process. Work with the Range staff to ensure qualifications are being met.

13. Assist with developing the Community Advisory for Responsible Engagement, participate in developing the related standards and policies, and process applications.

14. Perform related duties as assigned.

**Knowledge of:**

- Applicable federal, state and local laws, codes, ordinances and court decisions applicable to the assigned division.
- Principles of financial administration, including budgeting and financial analysis.
- Computer systems and applications as used within the County.
- Principles of personnel training, supervision and evaluation.

**Skill/Ability to:**

- Direct and participate in advanced administration and operational activities related to the divisions.
- Coordinate program area activities with other divisions, departments, programs and/or outside agencies.
- Direct and participate in the analysis of a wide variety of moderate to complex administrative/operational problems and make effective operational and/or procedural recommendations.
- Develop and administer policies, guidelines and procedures related to the divisions.
- Use the appropriate interpersonal style and methods of communication to gain acceptance, cooperation, or agreement of a plan, activity, and/or program idea.
- Negotiate agreements between differing individuals and groups of individuals.
- Monitor current and proposed federal, state and local legislation that impact on the division.
- Communicate effectively both orally and in writing.
- Establish and maintain effective work relationships with those contacted in the performance of required duties.

**Education and Experience:**
Any combination of education and experience that would likely provide the required knowledge, skills and abilities is qualifying. A typical way to qualify is:

Five years of increasingly responsible experience performing a wide variety of administrative and managerial duties in a large agency including two years in a senior level administrative or management position.

**Licensure/Certification:**

- Possession of a Class C California driver license or equivalent.

**EXHIBIT 8**

## Contact Information -- Person ID: 53308045

| | | | |
|---|---|---|---|
| Name: | Victor G. Aenlle | Address: |  US |
| Home Phone: | | Alternate Phone: | |
| Text Messaging Mobile No: | | Email: | |
| Former Last Name: | | Month and Day of Birth: | |

## Personal Information

Driver's License:                                                    Yes, California ,

Can you, after employment, submit proof of          Yes
your legal right to work in the United States?

What is your highest level of education?            Doctorate

## Preferences

Are you willing to relocate?

Types of positions you will accept:
Types of work you will accept:
Types of shifts you will accept:

## Objective

## Education

**Professional**                                          Did you graduate: No
*Union Institute & University*                            Major/Minor: Doctor of Philosophy
-                                                         Degree Received: Professional
Cincinnati , Ohio

**Graduate School**                                       Did you graduate: Yes
*Union Institute & University*                            Major/Minor: Master of Science
-                                                         Degree Received: Master's
Cincinnati , Ohio

**College/University**                                    Did you graduate: Yes
*Union Institute & University*                            Major/Minor: Bachelor of Science
-                                                         Degree Received: Bachelor's
Cincinnati , California

**Professional**                                          Did you graduate: Yes
*Public Safety Training Institute*                        Major/Minor: Certificate of
-                                                         Completion
San Jose, California                                      Degree Received: Professional

**Professional**                                          Did you graduate: Yes
*Front Sight Firearms Institute*                          Major/Minor: Certificate of
-                                                         Completion
Las Vegas, California                                     Degree Received: Professional

## Work Experience

**Coldwell Banker**
2/1990 - Present

Hours worked per week: 40
May we contact this employer?

Commercial NRT
San Mateo, California

**Duties**
Coldwell Commercial NRT, Broker Associate- Commercial and Residential / Global Luxury Realtor
-------
* Ranked among the top 2% of Coldwell Banker Nationwide
* Recommend acquisition, lease disposition, improvement, property management, and other action consistent with the best interest clients Real Estate portfolios
* Negotiate contracts with sellers and buyers of Real Estate holdings involving both commercial and residential properties

LEADERSHIP EXPERIENCE

**Firearms Instructor/ POST certified trainor**
3/2015 - Present

Hours worked per week: 10
May we contact this employer?

San Mateo County Sheriff's Office
Redwood City, California 94063

**Duties**
San Mateo County Sheriff's Office, Post Certified Firearms Instructor/Range Master -------
* Teach, qualify, and supervise all activities taking place at the Range

**Rescue Member**
6/2013 - Present

Hours worked per week: 40
May we contact this employer?

Mounted Patrol of San Mateo County
Woodside, California

**Duties**
Supervised and oversaw the affairs of the Mounted Patrol

**Captain**
1/2017 - Present

Hours worked per week: 40
May we contact this employer?

Mounted Patrol of San Mateo County
Woodside, California

**Duties**
Mounted Patrol of San Mateo County, -------
* Supervised and oversaw the affairs of the Mounted Patrol
* Exercised the exclusive powers and discharged the duties of the office

**California Licensed Private Investigator**
3/2023 - Present

APIS

Hours worked per week: 40
# of Employees Supervised: 3
Name of Supervisor: Victor Aenlle
May we contact this employer?



**Duties**
All aspects of civil, criminal, and background investigations.

**Reserve Deputy Designated level 1**
8/2009 - Present

Hours worked per week: 16
May we contact this employer? Yes

San Mateo County Sheriff's Office
400 County Center
Redwood City, California 94063

**Duties**
San Mateo County Sheriff's Office, -------
* Perform all law enforcement-related duties including patrol (as a solo level-one deputy),
investigations, jail, gang unit detail, warrant service, and specialized details
* Conduct investigations involving narcotics, warrant arrests, stolen vehicles, coroner cases, and
mentally challenged subjects
* Respond to and resolved over 450 documented calls for service which resulted in police reports

**Mounted Reserve Deputy - Horseback**
8/2014 - 8/2023

Hours worked per week: 3
May we contact this employer?

San Mateo County Sheriff's Office- Mounted Search and
Rescue
Redwood City, California 94063

**Duties**
* Conduct search and rescue operations in remote areas on horseback
-------
* Worked collaboratively to disseminate the funds for the unit
* Organized and orchestrated routine meetings and duty assignments for the Reserves

**Certificates and Licenses**

**Skills**

Office Skills

Typing:
Data Entry:

**Additional Information**

**References**
Professional
**Tresmontan, Dave**
Investigator

Professional
**Marinaro, Frank**
Wealth Manager

**Resume**

**Text Resume**

**Attachments**

| Attachment | File Name | File Type | Created By |
|---|---|---|---|
| V-Aenlle- Resume.doc | V-Aenlle- Resume.doc | **Resume** | Job Seeker |

**Agency-Wide Questions**

1.  Q: Do you claim veteran service preference?

A: No

---

**2.** Q: How did you learn about this position?

A: Other

---

**3.** Q: If you answered "Other" to the above question, please indicate below how you learned about this job. Your response to this question will help us in better marketing County jobs. Type NA if not applicable.

A: Employee

---

**4.** Q: Select the language(s) in which you are fluent, other than English. **To select more than one choice, hold the Control Key, and click on the language(s) you want to select.**

A: Spanish

---

**5.** Q: PLEASE READ THE FOLLOWING QUESTION AND OPTIONS CAREFULLY AND SELECT ALL THE OPTIONS THAT APPLY: Are you currently a County of San Mateo employee? (A "no" response will not affect the status of your application.)

A: No, I am not a County employee at this time but I was previously a regular employee in the County.

---

**6.** Q: If you are currently a County employee, please indicate your Employee ID Number (9-digit number located on the upper left side of your pay stub). This number will be used to check your promotional points, if applicable. **IMPORTANT: Enter the 9-digit number only! Do not enter any other text.**

A:

---

**7.** Q: Are you related by blood or marriage to anyone currently employed in the County of San Mateo? (A "Yes" answer will not disqualify you from this recruitment.)

A: No

---

**8.** Q: If you are related by blood or marriage to a current County employee, please indicate in the space below the (A) employee's name and (B) your relationship with employee, for example: daughter, son, aunt, cousin, etc. If you are not related to anyone by blood or marriage, type NA below.

A: NA

---

**9.** Q: If you were referred to this position by a current San Mateo County employee, please indicate the name of the employee in the space provided. Type NA if you were not referred.

A: NA

---

**10.** Q: San Mateo County departments sometimes need the following temporary workers, in addition to regular employees:
**Extra Help** - Extra-help positions are short-term employment for up to 1040 hours which is equivalent to about six months; however, employment might end sooner depending on the needs of the hiring departments. Extra-help positions are non-benefitted and are paid on an hourly rate basis.
**Unclassified** - Unclassified positions are at-will for a limited duration, typically associated with grant or other special funding. These positions are not covered by San Mateo County Civil Service Rules; and there is no formal probation period. The following are the same for classified and unclassified positions: salary, increases and other forms of compensation; accrual of sick leave, vacation, overtime, holiday and leaves of absence; health, dental, vision, long & short term disability, and retirement.
**Limited Term** - Limited Term positions are designated for a specific and limited period

of time, anywhere from 6 months to a maximum of 3 years depending on the assignment. Benefits package for term positions are similar to regular positions EXCEPT for retirement. Term employees receive a 401A retirement package and are not eligible for retiree health benefits or a defined benefit pension.

**Relief** - Relief positions are short-term and are utilized on a per diem basis. Relief employees are expected to work at least two major holidays in the year, and are expected to be willing to cover shifts that come up on an emergent basis as well as on a pre-designated basis, in order to meet the needs of the facility. Shifts include: days, swings, overnights, holidays and weekends for a 24-hour facility. Relief positions are non-benefitted and are paid hourly at a rate that is 5% above salary rate of regular positions.

Using the above descriptions as a guide, please indicate which temporary positions you would like to be considered for employment. Make sure to check all that apply.

A: Extra Help positions

## Supplemental Questions

1. Q: IMPORTANT: Applicants for Extra-help, per diem, temporary or other special assignments are required to submit full responses on the application and to the following supplemental questions. Your application and responses will give us additional information about your background and experience related to this position and will be used in the selection process. <u>Be sure to indicate on the application which specific licenses and certificates you possess that qualify you or are required for the position.</u> **Be concise and specific. Neatness, clarity of expression, grammar, spelling and ability to follow instructions will be considered in the evaluation process. A resume will not be accepted as a substitute for your completed application or responses to the supplemental questions.**

   A: Proceed to supplemental questions.

2. Q: Indicate the **Position Title** of the extra-help, per diem, or temporary position you were offered.

   A: Special Projects Coordinator I

3. Q: Enter the name of the **Hiring Manager** who offered you the extra-help, per diem, or temporary position.

   A: Heather Enders

4. Q: Please enter the **Requisition Number** provided to you.

   A: 24566

5. Q: Please indicate the name of the **Personnel Clerk** that has provided you with this application link.

   A: Joann Lov

**EXHIBIT 9**

**From:** Lisa Yapching <lyapching@smcgov.org>
**Sent:** Tuesday, March 7, 2023 6:16 PM
**To:** Joann Lov <jlov@smcgov.org>; Heather Enders <henders@smcgov.org>
**Subject:** Fw: 2 EH positions - Correction

I apologize - for Special Project #1 our position for Victor, the most I can actually recommend is $73 per hour consistent with base pay of similar County positions. I was reminded that for contract to extra help conversion, we don't include benefits. We certainly aren't doing it in the case of Project 2. Thanks.


**Lisa Yapching, MSHR, PHR, IPMA-SCP**
Classification/Compensation Manager
San Mateo County Human Resources
P: (650) 363-4381 E: lyapching@smcgov.org
W: http://hr.smcgov.org
Follow us on Twitter @SMCountyJobs

*This e-mail message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and protected information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient please contact the sender by reply e-mail and destroy all copies of the original message.*

---

**From:** Lisa Yapching
**Sent:** Tuesday, March 7, 2023 5:12 PM
**To:** Joann Lov <jlov@smcgov.org>; Heather Enders <henders@smcgov.org>
**Subject:** RE: 2 EH positions

Hi, Heather and Joann.

First of all thanks for sending us the job descriptions. I've had a chance to review the proposed duties and responsibilities and have discussed this with the HR Director.

We approve the use of the Special Projects Coordinator classification for the work described for the duration that work would be assigned to extra help.

We can justify approving a $118/hour rate for the work associated to Special Projects #2 (Paul). It is our opinion that the work described is appropriate for pay close to the Assistant Sheriff level as he will be taking on work in support of the Corrections Division under direction from the Sheriff/Undersheriff, among other things and consistent with previous Assistant Sheriff roles. I'm sure SamCERA will not have an issue with rate of pay for a retiree doing this body of work.

Unfortunately, we cannot support nor justify a $118/hour rate for the work described in Special Projects #1 (Victor). It is not at the level of an Assistant Sheriff (that pays $119+/hour at the E step) nor does it have the same scope and breadth as Specialist Projects #2. Furthermore, this second position is non-sworn and should not be aligned to a higher level sworn role/pay. And with all due respect, the work described is more in alignment with higher-level Analyst work or mid-level management work (i.e. wide variety of high-level administrative, analytical, and work-flow and special project support work impacting organizational, operational, and policy change and implementation; and community engagement and maintaining close contact/relations with regulatory agencies). For this body of work, I recommend pay rate of $100/hour (equivalent to Senior MA + cost of benefits since extra helps do not get benefits). If Sheriff is amenable to this pay rate please note that approval to hire at that pay rate is not precedence-setting if and when this body of work is incorporated into the Chief of Staff position that I know that Sheriff is looking to create.

Lastly, it is best practice to not have extra help staff manage/supervise divisions and staff so while we can Paul heavily coordinating direction of corrections with the Sheriff or Undersheriff, and with management staff in Corrections, and I can see Victor coordinating projects with service division managers, both of these positions should not be managing/supervising staff while in extra help capacity (and most especially while on contract).

Thanks for consulting with us on this. You can certainly forward this message to the Sheriff, or if you want me to send it directly to her, let me know.

Thanks,
LY

**LISA YAPCHING (She/Her), MSHR, PHR**
Classification/Compensation Manager
San Mateo County Human Resources
(650) 363-4381
lyapching@smcgov.org
www.smcgov.org/hr


**From:** Joann Lov <jlov@smcgov.org>
**Sent:** Thursday, March 2, 2023 2:23 PM
**To:** Lisa Yapching <lyapching@smcgov.org>; Heather Enders <henders@smcgov.org>
**Subject:** 2 EH positions

Hi Lisa,

Attached are the duties/job description of the 2 positions, requested hourly amount is $118/hour.

Number 1: Victor Aenlle

Number 2: Paul Kunkel (samcera retiree)

Thank you Lisa!
Joann

**EXHIBIT 10**

**From:** Joann Lov <jlov@smcgov.org>
**Sent:** Friday, March 17, 2023 10:00 AM
**To:** Heather Enders <henders@smcgov.org>
**Cc:** Jonathan Sebring <Jsebring@smcgov.org>; Lavinia Prema <lprema@smcgov.org>;
Nicole Mejia <nmejia@smcgov.org>
**Subject:** Re: Extra help positions

Hi Heather,

Just a quick status update on this so you are aware- the 2 special projects coordinator EH positions have been requested in workday.  Once Stacey approves and the position is available in neogov (most likely by monday), we can go ahead and create the requisitions. After that, we'll work on sending them both the EH links and keep Ximena in the loop so she can refer the apps to the req once completed.

Regarding backgrounds, Capt. Kunkel retired from the office on 05/01/2021 and was recently on contract with us so he has a break in service.   We'll push him through for an "updated" background as special projects coordinator.  (same process that is consistent with Pronske and Pettit)

For Mr. Aenelle, I believe he was a reserve deputy with us prior to his contractor position.  If confirmed that he did not have a break in service, do we pull his old reserve deputy background and submit a new profile for him in guardian in the special projects coordinator position? (like we are doing for julio)
I'm not too familiar with how we normally process the backgrounds for folks transitioning from reserve deputy (non paid positions) to county paid employees if there is no break in service.  I'll have to ask for Nicole's help so we can review his old background and see if there are any items we need updated.  The updated required documents can then be requested and uploaded to Guardian for documentation.  Let us know if this is incorrect or if we should proceed with a different process?

Thanks!
Joann

**From:** Joann Lov <jlov@smcgov.org>
**Sent:** Thursday, March 16, 2023 4:59 PM
**To:** Heather Enders <henders@smcgov.org>; Lavinia Prema <lprema@smcgov.org>
**Cc:** Jonathan Sebring <Jsebring@smcgov.org>
**Subject:** Re: Extra help positions

Thanks, Heather!

We'll work on this request tomorrow.

Thanks,
Joann

---

**From:** Heather Enders <henders@smcgov.org>
**Sent:** Thursday, March 16, 2023 4:16 PM
**To:** Joann Lov <jlov@smcgov.org>; Lavinia Prema <lprema@smcgov.org>
**Cc:** Jonathan Sebring <Jsebring@smcgov.org>
**Subject:** FW: Extra help positions

Hello Joann and Lavinia,

Per the approval below, please move forward with hiring these two as extra help Special Projects Coordinators. Hourly rates are approval by County HR as per the emails attached herein.

Thank you,

**Heather Enders, MPA**
Human Resources Manager

**San Mateo County Sheriff's Office**
County Government Center
400 County Center, 3ʳᵈ Floor
Redwood City, CA 94063
650.363.4872
http://www.smcsheriff.com
**COMMITMENT « INTEGRITY « COMPASSION « INNOVATION**

**From:** Chris Hsiung <chsiung@smcgov.org>
**Sent:** Thursday, March 16, 2023 3:51 PM
**To:** Heather Enders <henders@smcgov.org>
**Subject:** Extra help positions

Heather,
Please proceed with completing the process for extra help positions for Paul Kunkel and Victor Aenlle.

**EXHIBIT 11**

County of San Mateo
# Sheriff's Executive Director of Administration - Unclassified

CLASS CODE B421    SALARY    $95.00 - $118.74 Hourly
$7,600.00 - $9,499.20 Biweekly
$16,466.67 - $20,581.60 Monthly
$197,600.00 - $246,979.20 Annually

## Definition

Under general direction, plan, organize, direct, and coordinate activities of the Sheriff's Office Support Services Division; develop and implement division goals, policies, and priorities; and provide highly responsible and complex administrative support to senior level management within assigned area of specialization.; and perform related duties as assigned.

## SUPERVISION RECEIVED AND EXERCISED

Receive general direction from the Sheriff or Undersheriff.  Exercise direct and indirect supervision over lower level supervisory, professional, technical, and clerical employees.

## Examples Of Duties

Duties may include, but are not limited to, the following:

- Plan, organize, coordinate, and direct the programs and activities across the Support Services Division within the Sheriff's Office which includes Professional Standards, the Forensic Laboratory, Fiscal Services, Technology Services, Training, Payroll, Records, Property, and Civil.
- Monitor current and proposed federal, state, and local legislation to assess its impact and to develop the County's legislative response either in support of or opposition to such legislation; make recommendations and initiate changes in practices and policies as needed.
- Plan, monitor, evaluate, and supervise the operations of the assigned areas; coordinate the priorities and direction on behalf of the Sheriff; coordinate the work of the various subdivisions; advise and consult with section managers; meet with appropriate staff to identify and resolve problems or conflicts; make or recommend final decisions regarding policy, operations, and administrative procedures.
- Develop, implement, and maintain procedures, coordinate work activities between divisions within the department to prevent delays in required actions or to improve programs or services; assist in the identification, development, and implementation of departmental goals, objectives, policies, and priorities; assist in the determination of resource allocation and levels of service according to established policies.
- Direct subordinate managers in the development, maintenance, and evaluation of systems and analyze outcome data in order to evaluate, plan, and implement Sheriff's Office goals and objectives and to plan for future needs; conduct or direct and evaluate complex studies pertaining to a variety of administrative and operational problems and develop and implement effective solutions.
- Direct and counsel assigned staff in the planning, budgeting, and systems needed to monitor and evaluate the effectiveness of the assigned program responsibilities.
- Assist in the preparation and administration of the budget.
- Perform a variety of special assignments, prepare complex analytical, and statistical reports in any of several areas of planning, as assigned.
- Receive and analyze division and departmental reports; direct the preparation of monthly and annual reports; direct the gathering and analysis of information necessary to document and evaluate efficiency in processes.
- Monitor and evaluate the organizational structure, staffing levels, technology needs, financial systems, and other internal operations; identify and recommend alternative solutions or improvements; implement revisions or changes as needed.
- Consult with and advise other County staff and the public regarding pertinent policy issues and participate in the development of standards and programs relating to these policies.
- Provide oversight for fiscal and analytical operations, which may include, but are not limited to, the functions of fiscal control, accounting, purchasing, personnel, grant preparation and analysis, contract administration, and capital improvement.
- Assist with negotiations and monitoring of city and/or special district contracts for services.
- Perform related duties as assigned

## Qualifications

Note: The level and scope of the knowledge and skills listed below are related to job duties as defined under Distinguishing Characteristics.

Knowledge of:

- Applicable federal, state, and local laws, codes, ordinances, and court decisions relevant to the assigned division.
- Principles and practices of public administration and organizational management necessary to plan, organize, direct, manage, and evaluate the staff and functions of the financial, human resources, information systems, and administrative functions of a large governmental department providing criminal justice services.
- Principles of management and coaching, including training, directing, evaluating, and supervising subordinate staff.
- Budget, management analysis, supervision, personnel management, employee relations, training, and information systems
- Administrative and financial problems common to the operation of a criminal justice agency.

- Analysis and resolution of problems related to budget, project management, organization, personnel, systems, and policy governance.
- Advanced principles and practices of modern law enforcement administration and criminal investigation.
- Principles of financial administration, including public budgeting and financial analysis.
- Computer systems and applications as used within the County.

Skill/Ability to:

- Direct and participate in advanced administration and operational activities related to Support Services.
- Coordinate program area activities with other divisions, departments, programs and/or outside agencies.
- Direct and participate in the analysis of a wide variety of moderate to complex administrative/operational problems and make effective operational and/or procedural recommendations.
- Develop and administer policies, guidelines, and procedures related to the divisions.
- Use the appropriate interpersonal style and methods of communication to gain acceptance, cooperation, or agreement of a plan, activity, and/or program idea.
- Negotiate agreements between differing individuals and groups of individuals.
- Monitor current and proposed federal, state, and local legislation that impacts the Office.
- Supervise, evaluate, and train assigned personnel.
- Audit and evaluate processes to determine efficiency; make recommendations accordingly.
- Communicate concisely and effectively both orally and in writing; have ability to make effective presentations of information, findings, and recommendations.
- Establish and maintain effective work relationships with those contacted in the performance of required duties.
- Effectively represent the Sheriff and department on a variety of matters with other County agencies and departments, the public, media, and other organizations.
- Apply sound supervisory and managerial principles and techniques.

Education and Experience:

Any combination of education and experience that would likely provide the required knowledge and skills is qualifying. A typical way to qualify is an advanced degree, as well as experience specific to the criminal justice system, law enforcement issues, and public safety operations is highly desired.

Licensure/Certification:

Possession of a class C California driver license or equivalent.

**Date Established/Revised**

Established **7-6-23**

**EXHIBIT 12**

# VICTOR G. AENLLE

## PROFESSIONAL SUMMARY

Real Estate business professional and private investigator with over 15 years of Law Enforcement experience and extensive training in investigations, conflict resolution and public service.

## EDUCATION

**Union Institute & University, Sacramento, CA**
Doctor of Philosophy in Interdisciplinary Studies     Expected: August 2023
Master of Science in Organizational Leadership     June 2018
Bachelor of Science in Criminal Justice     June 2016

**South Bay Regional Public Safety, San Jose, CA**
Basic Police Academy Level 1     August 2009

**College of San Mateo, San Mateo, CA**
Administration of Justice – Module II     December 2008
Administration of Justice – Module III     June 2008

## WORK EXPERIENCE

**San Mateo County Sheriff's Office**, Redwood City, CA     2023-Present
*Executive Consultant*

**Aenlle Investigative Services**, Burlingame, CA     2018- Present
*California Licensed Private Investigator PI-188650*
- Conduct background investigations, criminal investigations, executive protection, and surveillance details

**San Mateo County Sheriff's Office**, Redwood City, CA     2009-Present
*Reserve Deputy Sheriff, LD1*
- Perform all law enforcement related duties including, patrol (as a solo level-one deputy), investigations, jail, gang unit detail, warrant service, and specialized details
- Conduct investigations involving narcotics, warrant arrests, stolen vehicles, coroner cases, and mentally challenged subjects
- Respond to and resolve over 450 documented calls for service which resulted in police reports.

**Coldwell Banker and Coldwell Commercial NRT**, San Mateo, CA     1990-Present
*Broker Associate- Commercial and Residential / Global Luxury Realtor*
- Ranked among the top 2% of Coldwell Banker Nationwide
- Recommend acquisition, lease disposition, improvement, property management, and other action consistent with the best interest clients Real Estate portfolios
- Negotiate contracts with sellers and buyers of Real Estate holdings involving both commercial and residential properties

## LEADERSHIP EXPERIENCE

**San Mateo County Sheriff's Office**, Redwood City, CA
*Post Certified Firearms Instructor/Range Master*     2015- Present
- Teach, qualify, and supervise all activities taking place at the Range
*Mounted Search and Rescue Member*     2013-Present
- Conduct search and rescue operations in remote areas on horseback
*President of Reserve Unit RDSA*     2014-2015
- Worked collaboratively to disseminate the funds for the unit
- Organized and orchestrated routine meetings and duty assignments for the Reserves

**Mounted Patrol of San Mateo County**, Woodside, CA     2010- Present

*Captain / Commander-in-Chief 2016-17*
- Supervised and oversaw the affairs of the Mounted Patrol
- Exercised the exclusive powers and discharged the duties of the office

## ADDITIONAL TRAINING

### Progressive Force Concepts
- Tactical Firearms Instructor Certification- Handgun (TFIC-H)
- Certificate of completion of Emergency Response Training (ERT)
- Certificate of completion of Protective Security Operations certificate course (PSOC)
- Certificate of completion of Tactical Combat Casualty Care (TCCC)

### Peace Officer Standards of Training Certified Instructor
- Certificate of Completion of Post Certified Instructor Course- AICC
- Certified Background Investigator
- Certified Firearms Instructor - specializing in handguns and rifles
- Crisis Intervention Training (CIT) Course- critical incident management

### Alameda County Sheriff's Office
- Certificate of Completion of Post Certified Firearms Instructor Course - Handguns and Rifles

### San Mateo County Sheriff's Office
- Certificates of Completion for Tactical Patrol Rifle, Gang Investigations, Emergency Vehicle Operations (EVOC), and Intelligence Unit
- Certificate of Completion of Crisis Intervention Training Program (CIT)

### Smith & Wesson
- Certificate of Completion of Smith & Wesson M&P Armorer Program

### California Mounted Officers Association
- Certificate of Attendance of Mounted Police & Horsemanship

### California Narcotic Officers Association
- Certificate of Completion of Narcotic Enforcement

### Public Safety Training Institute
- Certificate of Completion of Tactical Response to School/Community Violence

### Northern California HIDTA
- Certificate of Achievement of Detecting Deception

### California Reserve Peace Officer Association
- Certificate of Completion of the following courses: ARIDE, Express Interrogation, Deadly Weapons Law in California, Carrying Concealed Weapons, Officer Safety, Communications

### Calibre Press
- Certificate of Completion of Street Survival Seminar

### Front Sight Firearms Institute, Las Vegas
- Certificates of distinguished graduate of the following courses: Defensive Handgun, Advanced Tactical Handgun, Practical Rifle, Practical Shotgun

## LICENSE AND AFFILIATIONS

- California Real Estate Broker License
- Certified Commercial Investment Member
- Appointed to Trial Judge for Masonic Trials
- Captain of the San Mateo County Mounted Patrol
- San Mateo County Latino Leadership Council

- Shriners Hospital for Children, Member
- 8 Ball Bay Area Law Enforcement Member
- Post Reserve Officer Certificate
- Basic Post Level 1 Academy Certificate
- LEOSA / CCW Permit - CA, NV, FL

## RELEVANT SKILLS

Firearm Safety, Self-defense, Negotiations, Legal Agreements, Public Safety & Service, Bilingual (Spanish)

## Contact Information -- Person ID: 53308045

Name: Victor G. Aenlle    Address:    ████████ US

Home Phone: ████    Alternate Phone:

Text Messaging Mobile No: ████    Email: ████

Former Last Name:    Month and Day of Birth: ████

## Personal Information

Driver's License:    Yes, California , ████

Can you, after employment, submit proof of your legal right to work in the United States?    Yes

What is your highest level of education?    Doctorate

## Preferences

Are you willing to relocate?

Types of positions you will accept:
Types of work you will accept:
Types of shifts you will accept:

## Objective


## Education

**Professional**
*Union Institute & University*
-
Cincinnati , Ohio

Did you graduate: No
Major/Minor: Doctor of Philosophy
Degree Received: Professional

**Graduate School**
*Union Institute & University*
-
Cincinnati , Ohio

Did you graduate: Yes
Major/Minor: Master of Science
Degree Received: Master's

**College/University**
*Union Institute & University*
-
Cincinnati , California

Did you graduate: Yes
Major/Minor: Bachelor of Science
Degree Received: Bachelor's

**Professional**
*Public Safety Training Institute*
-
San Jose, California

Did you graduate: Yes
Major/Minor: Certificate of Completion
Degree Received: Professional

**Professional**
*Front Sight Firearms Institute*
-
Las Vegas, California

Did you graduate: Yes
Major/Minor: Certificate of Completion
Degree Received: Professional

## Work Experience

**Coldwell Banker**                                    Hours worked per week: 40
2/1990 - Present                                       May we contact this employer?

Commercial NRT
San Mateo, California

**Duties**
Coldwell Commercial NRT, Broker Associate- Commercial and Residential / Global Luxury Realtor
-------
* Ranked among the top 2% of Coldwell Banker Nationwide
* Recommend acquisition, lease disposition, improvement, property management, and other
action consistent with the best interest clients Real Estate portfolios
* Negotiate contracts with sellers and buyers of Real Estate holdings involving both commercial
and residential properties

LEADERSHIP EXPERIENCE

**Firearms Instructor/ POST certified trainor**          Hours worked per week: 10
3/2015 - Present                                       May we contact this employer?

San Mateo County Sheriff's Office
Redwood City, California 94063

**Duties**
San Mateo County Sheriff's Office, Post Certified Firearms Instructor/Range Master -------
* Teach, qualify, and supervise all activities taking place at the Range

**Mounted Reserve Deputy - Horseback**                   Hours worked per week: 3
8/2014 - Present                                       May we contact this employer?

San Mateo County Sheriff's Office- Mounted Search and
Rescue
Redwood City, California 94063

**Duties**
* Conduct search and rescue operations in remote areas on horseback
-------
* Worked collaboratively to disseminate the funds for the unit
* Organized and orchestrated routine meetings and duty assignments for the Reserves

**Captain**                                              Hours worked per week: 40
1/2010 - Present                                       May we contact this employer?

Mounted Patrol of San Mateo County
Woodside, California

**Duties**
Mounted Patrol of San Mateo County, -------
* Supervised and oversaw the affairs of the Mounted Patrol
* Exercised the exclusive powers and discharged the duties of the office

**California Licensed Private Investigator**              Hours worked per week: 40
3/2018 - Present                                       # of Employees Supervised: 3
                                                       Name of Supervisor: Victor Aenlle
APIS                                                    May we contact this employer?



**Duties**

All aspects of civil, criminal, and background investigations.

**Reserve Deputy Designated level 1**                Hours worked per week: 16
8/2009 - Present                                      May we contact this employer? Yes

San Mateo County Sheriff's Office
400 County Center
Redwood City, California 94063

**Duties**
San Mateo County Sheriff's Office, -------
* Perform all law enforcement-related duties including patrol (as a solo level-one deputy),
investigations, jail, gang unit detail, warrant service, and specialized details
* Conduct investigations involving narcotics, warrant arrests, stolen vehicles, coroner cases, and
mentally challenged subjects
* Respond to and resolved over 450 documented calls for service which resulted in police reports

**Certificates and Licenses**

**Skills**

Office Skills

Typing:
Data Entry:

---

Languages

Spanish - Speak, Read, Write

**Additional Information**

**References**

Professional
**Tresmontan, Dave**
Investigator
█████████████

---

Professional
**Marinaro, Frank**
Wealth Manager
█████████████

**Resume**

**Text Resume**

**Attachments**

| Attachment | File Name | File Type | Created By |
|---|---|---|---|
| V-Aenlle- Resume-May23.docx.pdf | V-Aenlle- Resume-May23.docx.pdf | **Resume** | Job Seeker |

**Agency-Wide Questions**

1. Q: Do you claim veteran service preference?
   A: No

2. Q: How did you learn about this position?
   A: Other

**3.** Q: If you answered "Other" to the above question, please indicate below how you learned about this job. Your response to this question will help us in better marketing County jobs. Type NA if not applicable.

A: Employee

---

**4.** Q: Select the language(s) in which you are fluent, other than English. **To select more than one choice, hold the Control Key, and click on the language(s) you want to select.**

A: Spanish

---

**5.** Q: PLEASE READ THE FOLLOWING QUESTION AND OPTIONS CAREFULLY AND SELECT ALL THE OPTIONS THAT APPLY: Are you currently a County of San Mateo employee? (A "no" response will not affect the status of your application.)

A: No, I am not a County employee at this time but I was previously a regular employee in the County.

---

**6.** Q: If you are currently a County employee, please indicate your Employee ID Number (9-digit number located on the upper left side of your pay stub). This number will be used to check your promotional points, if applicable. **IMPORTANT: Enter the 9-digit number only! Do not enter any other text.**

A:

---

**7.** Q: Are you related by blood or marriage to anyone currently employed in the County of San Mateo? (A "Yes" answer will not disqualify you from this recruitment.)

A: No

---

**8.** Q: If you are related by blood or marriage to a current County employee, please indicate in the space below the (A) employee's name and (B) your relationship with employee, for example: daughter, son, aunt, cousin, etc. If you are not related to anyone by blood or marriage, type NA below.

A: NA

---

**9.** Q: If you were referred to this position by a current San Mateo County employee, please indicate the name of the employee in the space provided. Type NA if you were not referred.

A: NA

---

**10.** Q: San Mateo County departments sometimes need the following temporary workers, in addition to regular employees:
**Extra Help** - Extra-help positions are short-term employment for up to 1040 hours which is equivalent to about six months; however, employment might end sooner depending on the needs of the hiring departments. Extra-help positions are non-benefitted and are paid on an hourly rate basis.
**Unclassified** - Unclassified positions are at-will for a limited duration, typically associated with grant or other special funding. These positions are not covered by San Mateo County Civil Service Rules; and there is no formal probation period. The following are the same for classified and unclassified positions: salary, increases and other forms of compensation; accrual of sick leave, vacation, overtime, holiday and leaves of absence; health, dental, vision, long & short term disability, and retirement.
**Limited Term** - Limited Term positions are designated for a specific and limited period of time, anywhere from 6 months to a maximum of 3 years depending on the assignment. Benefits package for term positions are similar to regular positions EXCEPT for retirement. Term employees receive a 401A retirement package and are not eligible for retiree health benefits or a defined benefit pension.
**Relief** - Relief positions are short-term and are utilized on a per diem basis. Relief employees are expected to work at least two major holidays in the year, and are expected to be willing to cover shifts that come up on an emergent basis as well as on a

pre-designated basis, in order to meet the needs of the facility. Shifts include: days, swings, overnights, holidays and weekends for a 24-hour facility. Relief positions are non-benefitted and are paid hourly at a rate that is 5% above salary rate of regular positions.

Using the above descriptions as a guide, please indicate which temporary positions you would like to be considered for employment. Make sure to check all that apply.

A: None of the above. Interested in regular employment only.

## Supplemental Questions

1. Q: IMPORTANT: Applicants for Extra-help, per diem, temporary or other special assignments are required to submit full responses on the application and to the following supplemental questions. Your application and responses will give us additional information about your background and experience related to this position and will be used in the selection process. Be sure to indicate on the application which specific licenses and certificates you possess that qualify you or are required for the position. **Be concise and specific. Neatness, clarity of expression, grammar, spelling and ability to follow instructions will be considered in the evaluation process. A resume will not be accepted as a substitute for your completed application or responses to the supplemental questions.**

   A: Proceed to supplemental questions.

2. Q: Indicate the **Position Title** of the extra-help, per diem, or temporary position you were offered.

   A: Executive Director of Administration

3. Q: Enter the name of the **Hiring Manager** who offered you the extra-help, per diem, or temporary position.

   A: Sheriff Christina Corpus

4. Q: Please enter the **Requisition Number** provided to you.

   A: 25107

5. Q: Please indicate the name of the **Personnel Clerk** that has provided you with this application link.

   A: Lavinia Prema

**EXHIBIT 13**



**DATE:**       July 31, 2023

**TO:**          Rocio Kiryczun, Director of Human Relations

**FROM:**      Christina Corpus, Sheriff

**SUBJECT:**  Victor Aenlle – Step E Request

---

I respectfully request that Mr. Victor Aenlle receive "Step E" compensation for his recent appointment to the Sheriff's Office Executive Director of Administration position, as it has been extended to him and accepted. Over the last 30 years, Mr. Aenlle has served in various leadership and management roles and gained significant exposure to administrative operations in various capacities. In addition to his substantial executive leadership experience, Mr. Aenlle has been an active member for 15 years with the San Mateo County Sheriff's Office.

Throughout his expansive and diverse career, Mr. Aenlle has managed and directed operations for large teams and companies in the areas of sales, marketing, asset acquisition, business development, property management, investments, and investigative and protective services. In each of these roles, he has acquired and demonstrated extensive executive experience in the development of processes, operational oversight, conflict resolution, fiscal management, strategic planning, policy governance, and personnel recruitment, retention, training, and evaluation. Mr. Aenlle has also served as the Captain/CEO for the Mounted Patrol of San Mateo County. In this role, he was responsible for the administration of all facets and provided direction and support to its 140 members.

In his time as a contracted "Executive Consultant" with the Sheriff's Office, Mr. Aenlle has made significant contributions spanning across all divisions and bureaus. Mr. Aenlle's strong aptitude for complex analytical processes and his solution-based mindset have allowed for an expansion of services provided to those we serve. He has worked tirelessly to ensure that the Sheriff's Office is as fiscally responsible as possible, while also enhancing the level of support we provide to the public and members of our office.

While Mr. Aenlle's professional background is noteworthy, he has also successfully pursued and achieved significant educational goals. Mr. Aenlle holds a Bachelor of Science degree in Criminal Justice Management as well as a Master of Science degree in Organizational Leadership. He is a doctoral candidate focusing on Ethical and Creative Leadership as it applies to public safety, community resiliency, and law enforcement training. He has also completed numerous training programs related to public safety.

The precedent for the Step E request is firmly established in our standard hiring practices for lateral candidates with significant law enforcement experience. As the Executive Director of Administration position holds the same equivalence as an Assistant Sheriff, we have consistently employed a practice of offering Step E salaries to lateral hires with over 5 years of law enforcement expertise. Victor Aenlle, having accumulated an impressive 15 years of experience with the San Mateo County Sheriff's Office and executive-level experience, should be treated no differently in his appointment to this role than other executives brought in as laterals with extensive experience. Therefore, it is only fair and justified that he receives the same consideration and compensation as his counterparts.

My recommendation of "Step E" compensation is clearly supported by Mr. Aenlle's extensive leadership experience, his in-depth knowledge as it relates to public safety and the San Mateo County Sheriff's Office, and his strong educational pursuits and accomplishments. I would be happy to discuss any additional questions you may have.

**EXHIBIT 14**

| | |
|---|---|
| **From:** | Rocio Kiryczun |
| **Sent:** | Tuesday, August 1, 2023 2:10 PM |
| **To:** | Christina Corpus |
| **Subject:** | RE: Step E Request |

Good afternoon,

Given that the candidate has already been informed by the Sheriff's Office that they will receive the top step of the Executive Director of Administration-Unclassified position, HR will honor this commitment as a one-time non-precedent setting exception. However, as I've shared with the Undersheriff, based on our assessment of the candidate's application and resume, as well as our broader experience reviewing advanced step requests countywide, we do not believe Step E is in alignment with the candidate's experience.

I'll ask Ximena to work with your team to process the approval.

Thanks.
Rocio


**From:** Christina Corpus <CCorpus@smcgov.org>
**Sent:** Monday, July 31, 2023 1:53 PM
**To:** Rocio Kiryczun <rkiryczun@smcgov.org>
**Subject:** Step E Request

Rocio,

Please see the attached memo regarding the request for E step for Victor Aenlle.

I appreciate your consideration.

Regards,

Christina

**Christina Corpus, Sheriff**

San Mateo County Sheriff's Office

400 County Center

Redwood City, CA 94063

(650) 599-1664

ccorpus@smcgov.org

http://www.smcsheriff.com

DIGNITY ★ COMPASSION ★ RESPECT

**EXHIBIT 15**


**DATE:** February 13, 2024

**TO:** Rocio Kiryczun, Director of Human Resources

**FROM:** Christina Corpus, Sheriff

**SUBJECT:** Differential Request for Dr. Victor Aenlle

---

Dr. Victor Aenlle was appointed to the Executive Director of Administration/Chief of Staff position in July 2023. In this role, he oversees several bureaus including Technology Services, Records, Property, Professional Standards, Finance, Payroll, the Forensic Laboratory, the Sheriff's Activities League, and the CCW unit.

In addition to his role as Executive Director of Administration/Chief of Staff, Dr. Aenlle has been temporarily assigned to manage over ten million dollars in special projects and initiatives that require considerable expertise, time, and experience.

Some of these projects include:

- Managing the planning and logistics for the new childcare center for employees
- Developing enhanced swim safety programs throughout San Mateo County, focusing on underserved areas
- Managing the acquisition, planning, and logistics for the new Sheriff's Activities League building in Half Moon Bay
- Managing and directing the acquisition and renovation of the old fire station on the coast to be used for emergency equipment/EVOC/ and emergency operations
- Acquiring, planning, and building the new Sheriff's Office substation in North Fair Oaks
- Overseeing the logistics and remodel of the Moss Beach Substation
- Overseeing community outreach initiatives including "Lights On!", and "Project Guardian"
- Creating the San Mateo County Home Buying Assistance Program
- Creating the Sheriff's Office nonprofit foundation

During this time, Dr. Aenlle is being asked to fulfill the duties of his Executive Director of Administration/Chief of Staff role, and also to take ownership of various projects and initiatives that fall outside the scope of his primary position. Additionally, the Sheriff's Office Corrections Division has been temporarily reassigned to the Undersheriff. This will require several areas of responsibility and oversight previously assigned to the Undersheriff to be transitioned to Dr. Aenlle, effective immediately.

Dr. Aenlle is a valued member of the Executive Team who has the breadth of knowledge and experience necessary to move these projects from conception to completion. This temporary differential will help recognize the substantive and highly demanding additional workload.

**EXHIBIT 16**



**DATE:**     March 12, 2024

**TO:**       Rocio Kiryczun, Director of Human Resources

**FROM:**     Chris Hsiung, Undersheriff

**SUBJECT:**  Temporary Differential Pay

---

Dr. Victor Aenlle was appointed to the Executive Director of Administration/Chief of Staff position in July 2023. In this role, he oversees several bureaus including Technology Services, Records, Property, Professional Standards, Finance, Payroll, the Forensic Laboratory, the Sheriff's Activities League, and the CCW unit.

In addition to his role as Executive Director of Administration/Chief of Staff, Dr. Aenlle has been temporarily assigned to manage over ten million dollars in special projects and initiatives that require considerable expertise, time, and experience.

Some of these projects include:

- Managing the planning and logistics for the new childcare center for employees
- Developing enhanced swim safety programs throughout San Mateo County, focusing on underserved areas
- Managing the acquisition, planning, and logistics for the new Sheriff's Activities League building in Half Moon Bay
- Managing and directing the acquisition and renovation of the old fire station on the coast to be used for emergency equipment/EVOC/ and emergency operations
- Acquiring, planning, and building the new Sheriff's Office substation in North Fair Oaks
- Overseeing the logistics and remodel of the Moss Beach Substation
- Overseeing community outreach initiatives including "Lights On!", and "Project Guardian"
- Creating the San Mateo County Home Buying Assistance Program
- Creating the Sheriff's Office nonprofit foundation
- Assisting with the PIO team

During this time, Dr. Aenlle is being asked to fulfill the duties of his Executive Director of Administration/Chief of Staff role, and to take ownership of various projects and initiatives that fall outside the scope of his primary position. Additionally, the Sheriff's Office Corrections Division has been temporarily reassigned to me, which has taken up a lot of bandwidth and

*CONFIDENTIAL*
For San Mateo County Sheriff's Office Internal Use Only

resources.  As such, Dr. Aenlle has assisted the executive leadership team by taking on projects, as listed above, to help with the Office's goal's and vision.

Dr. Aenlle is a valued member of the Executive Team who has the breadth of knowledge and experience necessary to move these projects from conception to completion.  This temporary 10% differential will help recognize the substantive and highly demanding additional workload.

EXHIBIT 17



**DATE:** April 16, 2024 Updated

**TO:** Rocio Kiryczun, Director of Human Resources

**FROM:** Christina Corpus, Sheriff

**SUBJECT:** Differential Request for Dr. Victor Aenlle

---

Dr. Victor Aenlle was appointed to the Executive Director of Administration/Chief of Staff position in July 2023. In this role, he oversees several bureaus including Technology Services, Records, Property, Professional Standards, Finance, Payroll, the Forensic Laboratory, the Sheriff's Activities League, and the CCW unit.

In addition to his role as Executive Director of Administration/Chief of Staff, Dr. Aenlle has been temporarily assigned to manage over ten million dollars in special projects and initiatives that require considerable expertise, time, and experience. I am asking for the management differential in the amount of 10% for Dr. Aenlle for the duration of one year. During this time frame, he will be performing the duties outlined in the job description for Executive Director of Administration as well as one-time projects and initiatives that fall outside the scope of his assigned position. The alternative to Dr. Aenlle managing these projects would be for the County to hire several consultants and/or project managers, which would likely be cost prohibitive. The following assigned projects are estimated to take up approximately 25% of Dr. Aenlle's time.

Some of these projects include:

- Managing the planning and logistics for the new childcare center for employees
- Developing enhanced swim safety programs throughout San Mateo County, focusing on underserved areas
- Managing the acquisition, planning, and logistics for the new Sheriff's Activities League building in Half Moon Bay
- Managing and directing the acquisition and renovation of the old fire station on the coast to be used for emergency equipment/EVOC/ and emergency operations
- Acquiring, planning, and building the new Sheriff's Office substation in North Fair Oaks
- Overseeing the logistics and remodel of the Moss Beach Substation
- Overseeing community outreach initiatives, including "Lights On!" and "Project Guardian."
- Creating the San Mateo County Home Buying Assistance Program
- Creating the Sheriff's Office Nonprofit Foundation

During this time, Dr. Aenlle is being asked to fulfill the duties of his Executive Director of Administration/Chief of Staff role and take ownership of various projects and initiatives that fall outside the scope of his primary position.

Though the job description for Executive Director of Administration includes highlights the "analysis and resolution of problems related to…project management", there is no mention about planning, coordinating, and managing several office-wide and county-wide projects and initiatives.

The job description for the Executive Director of Administration position very clearly outlines operational oversight over Professional Standards, the Forensic Laboratory, Fiscal Services, Technology Services, Training, Payroll, Records, Property, and Civil.  At this time, Dr. Aenlle has also taken on oversight for the Sheriff's Activities League and has assumed the duties of the interim Director.

Additionally, the Sheriff's Office Corrections Division has been temporarily reassigned to the Undersheriff.  This will require several areas of responsibility and oversight previously assigned to the Undersheriff to be transitioned to Dr. Aenlle, effective immediately.

Dr. Aenlle is a valued member of the Executive Team who has the breadth of knowledge and experience necessary to move these projects from conception to completion.  This temporary differential will help recognize the substantive and highly demanding additional workload.

**EXHIBIT 18**

| From: | Rocio Kiryczun |
| --- | --- |
| To: | Chris Hsiung |
| Cc: | Christina Corpus |
| Subject: | RE: Discretionary Pay for Victor Aenlle |
| Date: | Wednesday, March 13, 2024 2:17:00 PM |
| Attachments: | image001.png |
| | image002.png |

Good afternoon,

We had a chance to review your request to offer Victor Aenlle a 10% management differential. Based on our review of the projects listed on the memo, we believe that they all fall under the scope of his position. The job title is Executive Director of Administration, and definition is to "plan, organize, direct, and coordinate activities of the Sheriff's Office Support Services Division; develop and implement division goals, policies, and priorities; and provide highly responsible and complex administrative support to senior level management within assigned area of specialization; and perform related duties as assigned."

The projects listed all fall under the umbrella of administration and so by default are within his scope already. The management differential criteria cites 2 scenarios where a management allowance is applicable:

- To appropriately compensate current classified employees who accept a short-term project or assignment, which is critical to the continued business operations and overall strategic effectiveness of the organization, and the short-term project/assignment **is not customarily assigned to the position or an expected part of the regular assignment**. **It is distinctly outside the scope of the regular assignment, short-term, and critical to the mission of the department.** This is not intended to reward tenured staff or as a promotion; and/or

- To compensate current classified employees **for temporarily assuming the full set of duties from a higher-level vacant position or from a higher-level encumbered position whose incumbent is on an extended leave**. It is not a substitution for the promotional or allocation process.

If the role and assignment is led by a lower level position, it might make sense to give an allowance because some of these projects should sit at a higher level manager that has authority to speak on behalf of the Sheriff and the organization. But because Mr. Aenlle's classification is set a high/executive level, these projects do not exceed his scope.

Please let me know if you have any questions.

Thanks.

Rocio

**From:** Chris Hsiung <chsiung@smcgov.org>
**Sent:** Tuesday, March 12, 2024 2:09 PM
**To:** Rocio Kiryczun <rkiryczun@smcgov.org>
**Cc:** Christina Corpus <CCorpus@smcgov.org>
**Subject:** Discretionary Pay for Victor Aenlle

Rocio,

Thank you for taking the time to chat with me. As promised, I'm attaching the memo outlining the projects I described on the phone call. Please let me know if you have any questions.

Thanks!

-Chris

**Chris Hsiung, Undersheriff**
**San Mateo County Sheriff's Office**
County Government Center
400 County Center, 3rd Floor
Redwood City, CA 94063
650-599-1662
www.smcsheriff.com
X | Facebook | Instagram | LinkedIn
PEOPLE FIRST – SERVICE ABOVE SELF

**EXHIBIT 19**

| From: | Rocio Kiryczun |
| --- | --- |
| To: | Christina Corpus |
| Subject: | Request for Reconsideration of Allowance for Victor Aenlle |
| Date: | Wednesday, April 24, 2024 11:54:00 AM |
| Attachments: | Outlook-oebwkvhz |
| | RE Discretionary Pay for Victor Aenlle.msg |

Good Morning Sheriff,

Hope you are doing well... I wanted to reiterate HR's position on the management differential request for Victor Aenlle for overseeing projects that are within scope of his executive level position. As per our previous response (attached) the listed projects fall under the administration umbrella which he has ultimate responsibility for. This includes overseeing SAL after the Executive Director position vacated. For this reason, and because the work described does not fall under either of the criteria for management allowance, we cannot support the allowance.

With regards to covering for the vacated SAL Director position, it is not uncommon for managers to step in when there is a vacancy if other backfilling options (such as working someone else out of class into the position) is not viable, however the manager would not be entitled to extra compensation for doing so as it is expected of a manager to take over a function they oversee when needed. Our Talent Acquisition team is ready to work with you or Victor on a recruitment to fill that vacancy immediately so as to minimize the impact on his workload.

Thank you.

Rocio

**From:** Victor Aenlle <vaenlle@smcgov.org>
**Sent:** Monday, April 22, 2024 12:24 PM
**To:** Christina Corpus <CCorpus@smcgov.org>
**Cc:** Rocio Kiryczun <rkiryczun@smcgov.org>
**Subject:**

Hello Sheriff,

I hope you are doing well. I am resubmitting my request for Management Differential Pay. I have thoroughly reviewed the Management Differential Criteria and find that my request falls within the scope and requirements outlined (attached for reference). Additionally, with the untimely departure of the SAL Executive director, I have assumed those responsibilities and am the acting/interim SAL Executive Director. For context, we have recently approved and granted differential pay when one of our directors assumed the duties of a vacant position and, to this day, continues to receive their differential pay

while training the new hire.

I hope you and the Director of Human Services find my request acceptable. If this is not the case, I would like a written response outlining the reasons for the denial.

Respectfully,

Victor

**Victor Aenlle, Ph.D.**

Chief of Staff

Executive Director of Administration

**San Mateo County Sheriff's Office**

County Government Center

400 County Center, 3rd Floor

Redwood City, CA 94063

650.363.4045

http://www.smcsheriff.com

**DIGNITY ★ COMPASSION ★ RESPECT**



**EXHIBIT 20**



# FIREARMS QUALIFICATION RECORD

Date: _9-7-21_

Name: _Christian Corpus_    Badge # _40_

Signature

**Firearm Category**    <span style="color:red">**(PRINT CLEARLY)**</span>

| | Make | Model | Serial # | Caliber | |
|---|---|---|---|---|---|
| **On Duty Gun** | Smith & Wesson | MMP9 | HUR7053 | 9mm | Pass Fail |
| **Off Duty Gun** | | | | | Pass Fail |
| **Backup Gun** | | | | | Pass Fail |
| **Shotgun** | | | | | Pass Fail |
| **AR15** | | | | | Pass Fail |

Taser Serial #_____

Taser Recertification    Yes    No

Downloaded    Yes    **No**

Do Not Write Below Range Staff Only

Comments:_____

_____

_____

Scenario:

1. _____    2. _____

3. _____

Scorekeeper _____    Verified by: _____

Classification: _____

Rev 6/14

EXHIBIT 21











**EXHIBIT 22**



**Sheriff Christina**

Jan 27, 2022 at 14:56

Did you approve the OD order for the printer?

Yes 👏

Yes Queen

Have fun today
Enjoy being spoiled and doted on
You deserve to smile and be happy

Irving
Torres.vcf
Contact Card ·
149 bytes

Bring the AFSCME questions to go over on the ride down and make the changes so we can submit tonight:

Ok

Send me a pic of your sparklies in please. 💎 💎

iMessage

EXHIBIT 23

**Video of Corpus at the ranch
(.mov)**

**EXHIBIT 23-A**

RECORD REDACTED FOR PRIVACY

EXHIBIT 24

**RECORD REDACTED FOR PRIVACY**

EXHIBIT 25

RECORD REDACTED FOR PRIVACY

**EXHIBIT 26**

**RECORD REDACTED FOR PRIVACY**

**EXHIBIT 27**

RECORD REDACTED FOR PRIVACY

**EXHIBIT 28**

# MUTUAL NON-DISCLOSURE AGREEMENT

This Mutual Non-Disclosure Agreement (the "Agreement") is entered into as of June 20, 2024 (the "Effective Date") by and between:

**Christina Corpus (hereafter "Corpus"),**

and

**Chris Hsiung (hereafter "Employee").**

## 1. Confidentiality

Terms and Negotiations to be Kept Confidential. Employee understands and agrees that all discussions, negotiations, and correspondence relating to this Agreement and the terms thereof (collectively "Confidential Settlement Information") are strictly confidential and that this confidentiality provision is a material term of this Agreement. Employee agrees not to disclose to anyone (other than Employee's spouse, financial advisors, legal counsel, and accountants) any Confidential Settlement Information unless such disclosure is (i) lawfully required by any government agency; (ii) otherwise required to be disclosed by law (including legally required financial reporting) and/or by court order; or (iii) necessary in any legal proceeding in order to enforce any provision of this Agreement. Employee may respond to any inquiry about the status and/or resolution of the issues relating to this Agreement by stating that the matter has been resolved to the mutual satisfaction of the Parties. If Employee discloses Confidential Settlement Information to Employee's spouse, financial advisors, counsel or accountant, Employee will make such person aware of the confidential nature of this information.

## 2. Obligations of Employee

Employee agrees to: a) Maintain the confidentiality of the Confidential Information using at least the same degree of care as he uses to protect his own confidential information, but in no event less than reasonable care. b) Use the Confidential Information solely for the purpose of [litigation or accounting, e.g., evaluating a potential business relationship] and not for any other purpose. c) Limit disclosure of the Confidential Information to other employees, agents, or third parties who have a need to know and who are bound by confidentiality obligations no less restrictive than those contained herein. d) Not disclose any Confidential Information to any third party without the prior written consent of the Corpus.

## 3. Non-Disparagement
Disparagement Prohibited. Employee agrees not to make any disparaging or defamatory remarks against or concerning Corpus, including, but not limited to, any elected or appointed officials, council members, contractors, business associates, law enforcement professionals, or employees.

In consideration for Employee's non disparagement, Corpus agrees not to make any disparaging or defamatory remarks against or concerning Employee except when legally required to make such disclosures.

## 4. Exclusions from Confidential Information

Confidential Information does not include information that: a) Is or becomes publicly known through no breach of this Agreement by the Employee; b) Is received from a third party without breach of any obligation of confidentiality; c) Is independently developed by the Employee without use of or reference to the Confidential Information; d) Is required to be disclosed by law, regulation, or court order, provided that the Employee gives the Corpus prompt written notice of such requirement and cooperates with the Corpus in obtaining an appropriate protective order.

## 5. Term and Termination

This Agreement shall commence on the Effective Date and continue until July 2029 unless terminated earlier by mutual agreement of both parties upon 30 days written notice. The confidentiality obligations hereunder shall survive any termination or expiration of this Agreement.

## 6. Return or Destruction of Materials

Upon termination or expiration of this Agreement, or upon the Corpus's written request, the Employee shall promptly return or destroy all documents and other tangible materials representing the Confidential Information and any copies thereof.

## 7. Choice of Law
Except as otherwise provided in this Agreement, its interpretation and performance will be governed by the laws of the State of California without reference to that jurisdiction's choice of law provisions.

## 8. Recovery of Attorney's Fees.
If Corpus prevails in an action to enforce any provision of this Agreement, or relating to Employee's breach of any provision of this Agreement, then, in addition to any other relief to which the Receiving Party may be entitled, Employee shall reimburse the Corpus for the costs and attorneys' fees incurred by the in any such action.

## 9. Miscellaneous

a) **Entire Agreement**: This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. b) **Amendment**: This Agreement may not be

amended or modified except by a written agreement signed by both parties. c) **Severability**: If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible, and the unenforceable provision shall be deemed modified to the limited extent required to permit enforcement of the Agreement as a whole. d) **Waiver**: No waiver of any provision of this Agreement shall be deemed a waiver of any other provision nor shall any waiver constitute a continuing waiver.

IN WITNESS WHEREOF, the parties hereto have executed this Mutual Non-Disclosure Agreement as of the Effective Date.

**Christina Corpus**
By: _____
Name: _____
Title: _____

**Chris Hsiung**
By: _____
Name: _____
Title: _____

**EXHIBIT 29**



**SHERIFF**

**CHRISTINA CORPUS**

SAN MATEO COUNTY SHERIFF'S OFFICE
330 Bradford Street, Redwood City, CA 94063
Telephone: (650) 363-4911

June 21, 2024

Sheriff Christina Corpus
330 Bradford St.
Redwood City, CA 94063

Dear Sheriff Corpus:

Please accept this memorandum as formal notice of my intent to resign from the San Mateo County Sheriff's Office effective immediately.

I have enjoyed my time working at the San Mateo County Sheriff's Office and am grateful for the opportunities I have had to grow professionally.

Thank you for your understanding and support.

Sincerely,

Chris Hsiung, Undersheriff

**EXHIBIT 30**



**EXHIBIT 31**

Hi Judge!

It just occurred to me that I could send you this!! I am sending it to the county now.

Thank you again!!

██████

Begin forwarded message:

**From:** ████████████████████████████████████
**Subject: 1**
**Date:** September 16, 2024 at 5:13:41 PM PDT
**To:** ████████████████████████ @smcgov.org>

Hi Ms. Roberts,

I would like to file a formal HR complaint against Undersheriff Dan Perea for his hostile treatment of me.

On Friday, September 13, the Sheriff's Office had a large multi-agency operation for a dignitary security detail. Being assigned to NCRIC, I was not initially involved but was just coordinating possible support from NCRIC for intelligence analysts providing real time open source analysis for any threats to the dignitary.

On a Thursday mid-day meeting, A/S Monaghan assigned me to the motorcade. I actually thought that was odd since that's kind of a cool assignment, so I called Lt. Will Young later to confirm that's what I heard. Will confirmed that and got me the Secret Service info to plan the details, which I promptly did. A couple hours later, maybe 4 pm, Will called me back and said there was a change of plans and that Sgts. Moore and Chong would be doing the USSS detail, and asked me to take care of that. So I did, got them all set up with their detail and advised them to also attend the 0800 briefing at the Woodside Town Hall as I thought everyone should be there. I'll note that after the 0800 briefing, Sgt. Moore was again reassigned to a patrol detail and had to go back to the office to change into his uniform.

On Thursday at 8:52 pm, Monaghan called me. He and I get along well and he always has a friendly sounding voice. He sounded a little off, not rude or upset, but just not the usual. He said he was calling me to do a three way call with Undersheriff Perea and would call him and patch him in. He said he had no idea what this was about. He clicked over and ensured we could all hear one another.

US Perea addressed me as Lieutenant and asked me what my understanding was about my assignment tomorrow (Friday). His tone was aggressive, accusatory, and condescending. I explained that I would be at the 8 am briefing and then at the command post. As i started to explain what I thought my role was, he interrupted me and said it was late at night and he didn't get much sleep.

He asked why I thought I was assigned to the motorcade. I explained the meeting with Monaghan and advised that Mike (Sena) also told me that I would be on the detail. Mike didn't specifically say that I was on the motorcade but he said the Sheriff specifically told him that I was on the detail. He repeated the question and I said I think she told him that. I wasn't there so I can't promise that she told him that. And he said, "Do you think or do you know, you just said she did, which is it?" in a very accusatory tone.

He asked something about why I was talking to people about their assignments I said I spoke with Chong and Moore in order to give them their assignments. It sounded like he was angry off that I was telling them what to do and asked why I did that. I told him Will Young asked me to set them up which was easy and I handled it. For context, though Will and I are the same rank, I was happy to take direction from him as he was largely responsible for the event and in direct contact with the Captain / exec staff about it. asked if I was

I asked why I was in trouble, and he asked why I thought I was in trouble. I said it was his tone of voice. Admittedly, by this point, I had lost my normal nice tone of voice and was assertive. He said that we don't know each other all that well, this is his normal tone. I have only spoken to him a few times and had not heard him speak that way. His tone on this occasion was very hostile.

He repeatedly asked if I would be at the briefing at 8 am, if I would be doing the detail, if I was planning to go to work, etc. Every time he asked sounded like an accusation, as if I was planning on not attending. Everytime he asked, I said, yes, I would be there and I've said several times to several people that I would be there.

He said he didn't "appreciate having to call a Lieutenant at 9 pm" to make sure I was doing my job or something along those lines in a way that made it clear he was blaming me for the waste of time. I said he didn't need to call me, I had already confirmed with multiple people that I was doing my job and had already done what I needed to do.

He said either "goodbye or goodnight Lieutenant" in a harsh tone and said I could hang up. He said, "Ryan stay on".

I texted Monaghan a few minutes later and apologized for reacting. He said he just heard it from him after I hung up, as in he got yelled at. I called Mike Sena to advise him of this as I figured US Perea would call and yell at him about me as well, but as far as I know he hasn't.

This was not a conversation, this was an interrogation based on his apparent thought that I had done something wrong or was planning on doing something wrong, which was completely untrue. I have never been spoken to like this. I am absolutely appalled at his tone, his line of questioning and his refusal to accept my answers. I admittedly raised my voice from my normal 9 pm relaxed and friendly tone, and I was assertive but I didn't yell, swear, or do anything that could be considered insubordination. I'll also add that I had not had anything to drink and do not take any medication. I was 100% awake and in full understanding of the conversation. It was 9 pm and I was getting ready to go to bed to work all day the next day and I was not going to be spoken to that way without at least defending myself. I wish I had said more but I was so surprised it was difficult.

I'm a Lieutenant having worked my way up from Correctional Officer over 25 years ago. I am respected by my peers, the people I supervise, my bosses, and command, for the most part that is. If he'll speak that way to me, I can't imagine how he would speak to someone who actually made a mistake, or someone of lower rank.

The fact that Sheriff Corpus is allowing this is horrible. She is creating a culture of fear and a hostile work environment. I am worried for other staff who will be berated by US Perea and will not be supported by the Sheriff.

I appreciate your filing this HR complaint and I fully anticipate more is coming your way. I have heard of several other incidences.

Thank you!

**EXHIBIT 32**



**EXHIBIT 33**

*Historical:*

The Sheriff's Office runs several contract city police bureaus in San Mateo County. Half Moon Bay opted to enter into such an agreement with the Sheriff's Office in 2011, and for the past 2 years (apx.) I have been assigned in my capacity as a Sheriff's Captain, to act as the Police Chief in Half Moon Bay, overseeing municipal police operations as well as overseeing the Unincorporated San Mateo County Coastline from the City limits with Pacifica to the Santa Cruz Countyline.

Despite being the senior Captain amongst all of us of the same rank, I was assigned to the Coast when the Sheriff took office, despite her knowing I had a toddler and an infant at home and lived 60 miles from where she was sending me. My commute to and from work has been approximately 4 hours every day that I worked, for the past 2 years. And every time I asked to be moved to an assignment closer to home (which would have been literally any other Captain position) I was told it was not the right timing or that "I was a victim of my own success," and that I had done such a good job, they could not move me.

All that said, the following is what occurred after notifying the Sheriff (on Monday, May 6, 2024) that I was in backgrounds with another police agency, had been offered a conditional offer, and should a final offer come, it would be my intention to accept.

- With a 6-week notification of conditional offerings, regular ridicule on text and phone calls about the process...even though I had not been officially hired.
- Regular communication from Assistant Sheriff Monaghan (at the Sheriff's direction) about giving "appropriate" notice and insistent pressure to provide information about process, even though the process was not complete.
- After being told that I would be attending the Cal Chiefs conference in Palm Springs, making arrangements to attend, completing the travel paperwork, and having hotel and plane reservations, the Sheriff rescinded the travel (just a few days prior to the conference) as I was told it was her position that the spot would be better given to someone who was not leaving the office. Again, no official offer of employment was provided and/or guaranteed.
- Even being given 6-weeks' notice of potential offerings, the command staff refused to work with me about the transition and movement of new personnel and instead regularly told me I should have given them more notice and urging me to stay on longer to help with staffing coverage.
- Once I was given the offer and submitted my official notice, the notice was specific that my last day of work was June 21, 2024. That was given to personnel and HR, after which I was told to resubmit another notice indicating my last day of work would be June 20, and that I would physically come into the office to train my replacement on that day.

*June 18, 2024:*

- 5:18pm I drafted and posted a NextDoor goodbye post telling the community that I would be taking a position outside the County and saying they would be in good hands with the next Captain. This was immediately after my City Manager told me he had informed Assistant

Sheriff Monaghan that he had approved selection of the new Captain. Below is the post for reference as well as the comments I was able to initially capture.



- 6:09pm I received a phone call while at the park with my kids, from Undersheriff Hsiung asking me who gave me permission to post on Nextdoor, a platform I post on regularly without asking for permission and which the Command staff has asked me to teach to the other Captains because I have had so much success with Community Engagement using the platform.
  - o I told the Undersheriff that the Sheriff's Office Communications Director knew I was going to post something this week as it had been discussed just prior to my going on vacation. The Undersheriff told me the Sheriff had not known I was posting the letter and it put them in an awkward position. I told them that was a conversation they should have with their communications Director, since she works directly for the Executive Team, and asked why the post was problematic.
  - o The Undersheriff told me the administration was not ready to publicly speak about my leaving or who would be replacing me. I informed him I would no longer be working for the Sheriff's Office in 2 days, and asked how much longer they would have wanted me to wait to tell the Community I have been serving that I will no longer be there when they call.
  - o He told me they would have put out a prepared message maybe next week... which I pointed out would be after I had already left giving me no time to say goodbye to my community members.

- 6:20pm I sent the Undersheriff a screenshot of the email from our Communications Director, dated May 31, 2024, laying out the communications plan, including this NextDoor post, regarding my leaving my position. This was to show him this had been in the works, and she had known about it, since he told me the Communications Director said she knew nothing about my plans to post anything online. It was at this time I was told that the email was up for interpretation, and I should have asked before posting, something which I have never previously had to do and have been told many times by the Executive Team they trust me to know my community and post as I see fit. I also have an email from the Communications Director that had been cc the Undersheriff from moths ago outlining that Bureau Chiefs are expected to utilize NextDoor to share information with Community members as they see fit and urging us all to do so.
- The Undersheriff asked me if my City Manager knew I had posted this open letter and I told the Undersheriff he did know and had no issues with it.
- 7:13pm I received a text message from Captain Philip asking me to let him know what time on Thursday I would be coming into work so he could meet me and take my badge, since I am leaving and not retiring, which I know to be incongruent with past practice, as Captain Kristina Bell, did not retire, but left to become the Redwood City Police Chief and was allowed to keep her badge. Additionally, this only came up tonight in response to the Sheriff being upset I posted on Nextdoor. A post which, at last viewing had many positive and thankful comments from Community members wishing me well.
- 7:23pm I received a call from the Undersheriff telling me he was speaking on behalf of the Sheriff and that she was having my access to Nextdoor and Evertel revoked and I was not to come back to work unless I was under another employee's supervision. I was also told not to send anyone any emails and not to post on social media. I reminded him I am still an employee of the Sheriff's Office and this was completely unreasonable to do to me as a current employee and in retaliation for something I did that violated no policies and I had not been investigated for.
- 8:44pm I called Captain Philip back on the phone after missing a few calls and was told my access to department email had been revoked in addition to Evertel and Nextdoor. I informed him this was not right as I am still an employee and he told me knew that it was wrong but he learned of it from Acting Lt. Zaidi, as Captain Philip was left out of the decision.
- 9:03pm I tried to access my Nextdoor page and received a message stating there was an error loading the feed, verifying I no longer had access. I screen shotted this.
- 9:04pm I tried to access my work email and received a message saying my account had been locked. I screen shotted this.
- At 9:32 I called Assistant Sheriff Monaghan back after missing a call from him a short time before. He told me he had just learned of what had been done to me (He was out of town for a family member's funeral) and he told me on a personal note he was appalled at what was being done to me and that this was not how treat someone who had been a loyal and hardworking employee on their way out.  He told me if you look at every line of the Sheriff's Office retaliation policy, that this was not right and he did not agree with it.
- 10:31pm I tried to login to the County website so I could check my timecard but I am unable to access the site, despite still currently working for the County. I took a screen shot of this.

- I was still being paid and I am on vacation
- I still have personal items in my office that belong to me (e.g., refrigerator, clothing, items in my storage cabinet, etc.)
- I have never been required to retain approval for a Next Door Post in the past.
- Capt. Philps was told by an acting Lt. that I was no longer allowed to be on campus without escort, though I am still employed.
- The same person told Capt. Philip that I no longer had access to my email and NextDoor accounts.
  - Confirmed on this date via screen shots.
  - Also confirmed with a phone conversation to Capt. Philip.
- Was told that I would not have access to the building, though I was still employed with the County despite not having been accused of punitive action (civil) or violations despite yet was being administratively locked out of email and told to come back to County premises. Additionally, since my email had been locked, I could not access any County Systems, like the county payroll system or benefits, so at that time I was not even sure I would be getting paid my last week of work.

*June 19, 2024*

- 8:53am I called Assistant County Manager Iliana Rodriguez, and told her I had tried to reach County HR but given it was Juneteenth no one was in the office, and shared with her all that had occurred. She asked that I send her the screenshot of the Nextdoor post that had started all this and if it would be ok to share with the County Manager. I told her that would be fine and sent her the screen shot.
- 9:24am texted me that she had spoken to the County Manager and he would be contacting County HR about my disparate treatment.
- 11:22am I was told there was no trace of my post on Nextdoor from someone in Half Moon Bay.
- 11:50am I was texted a link to an Instagram story about Captain Cheechov being the new Coastside Captain and Chief of Half Moon Bay, effective immediately. Which I found odd considering it was still my position and I still worked here.
- 2:23pm I texted Undersheriff Hsiung to ask if my Nextdoor post had been taken down, and was told when my Nextdoor access was revoked by Sheriff's Administration, it had inadvertently taken down every post I ever made along with all the comments from community members, but that this was an unintended consequence, and he felt really bad and was going to work with Nextdoor to reinstate the posts.
- 3:14pm I called Acting Captain Cheechov, who told me he received a call from Sheriffs Administration last night (6/18/2024) telling him effective immediately he was the Chief of Half Moon Bay. I received no such notification and again, was still currently employed by the Sheriff's Office so another coworker of mine was told he was taking over my position while I was on vacation and no one told me I was relieved of my position. Additionally, the Acting-Captain mentioned the fact that I had personal items in the office I would need to get and it was told to him that I may be able to retrieve my items as long as someone was there

4

monitoring me. We were supposed to meet the following morning (June 20) so I could send him emails to follow up on and let him know what he needed to know taking over the Bureau but he understood that would not be possible since I had been locked out of my email and was ordered not to email anyone regardless.

June 20, 2024

- I met Captain Philip at the Half Moon Bay substation around 10am, and when I got there I tried to put the code into the door to enter but it did not work. I then tried the other door to the substation, however that door would not open as well. An overtime Sergeant was working and had a key, and therefore was able to let us in. Once inside I was told the key code to the bureau doors had been changed the previous day.
- I provided Captain Philip with my office issued equipment, and it was at that time he told me the Sheriff had changed her mind about taking both of my badges but wanted one to make into a plaque for me. As I did not have them on me at the time I could not provide them, but noted the reasoning for taking the one back in the last hour of my last day seemed a bit preposterous, especially given no one else in my same position had ever been made to turn their badges in previously, and the Sheriff had known I was leaving for 6 weeks, and had ample opportunity to do something to denote my service in the lead up to my exit.
- As I was in my office, one of the deputies (Lomu) was lurking in the doorway and thinking he was there to say goodbye, I invited him in. I asked if he needed something, and he shut the door and then told me all the Sergeants had been told I was not to be on the premises and if they saw me to keep an eye on me. The deputy told me everyone that worked for me didn't feel good about this and the Sergeants had told the deputies if they saw me to give me some space, but that he would be in the next room and to just let him know when I was done. Prior to leaving he asked why this was being done to me specifically and I told him I didn't know.

Final Thoughts-

- I was not an "At Will" employee.
- I was administratively locked out of Sheriff's Headquarters in Redwood City and was told if I tried to enter any County Building my ID card would not work, and therefore did not feel comfortable returning there on my last day of work, knowing I was not welcome at my own workplace.
- I felt worried (at the time) that I was administratively locked out of the County work systems as I recognized that to be something congruent with suspension/discipline/termination, and as the former commander for professional standards, I was concerned.
- Failure of Due Process
- No Violations of Policy / Procedures
- I have an Unblemished Record
- Calls/texts from Command Staff and members of Professional Standards, saying this was wrong and they were embarrassed and appalled.

POBAR Violation 3304(d)(1) admin disciplined without being any type of investigation

Labor Law Violation... you can't take away my access to email with no cause and no notice

The Sheriff has exhibited similar retaliatory behavior to several current and former managers who work/worked at the Sheriff's Office, from her Executive Assistant baselessly accusing our former Records Manager of secretly posting negative things about himself and the Sheriff online to the point he had her sobbing in her office in front of everyone who worked for her, embarrassing her and humiliating her on her last day at work. The Sheriff also caught wind of a Lieutenant sending a personal email on her days off to other mid-level managers, suggesting they might want to form a union so they could have some rights for themselves, and subsequently informed that Lieutenant's boss that she was going to be transferred, despite the fact the Lieutenant was nearing retirement and that it would take approximately a year to get someone else the necessary clearances to do this Lieutenant's job. The Sheriff was convinced to walk that threat back but has still indicated this Lieutenant will likely be transferred at some point.

It is sad to me that after almost 20 years with the County, this is how I was treated. I filed a formal complaint with County HR but as of now have yet to hear what, if anything, that will result in. I am not optimistic however, as many complaints have been filed with the Couty regarding the Sheriff's behavior, and aside from several law suits she is now facing, it seems her behavior is just getting worse and worse.

**EXHIBIT 34**

I am so sick of people stepping all over us in fear of retaliation. She has already proven us wrong 20:21

I know 20:22

Zaidi can meet her in HMB to get her things and off board her. No. Red for her to spend a day at the office 20:22



No need 20:23

Today

No need for two people to meet with ███████ Just have Phillip meet her. Now

**EXHIBIT 35**

RECORD REDACTED FOR PRIVACY

**EXHIBIT 36**

**Sheriff Corpus Instagram "haters" post to Monaghan (.mov)**

**EXHIBIT 37**

**OFFICE LEASE**


between

**DINAPOLI FAMILY LP**

as Landlord


and


**COUNTY OF SAN MATEO**

as Tenant


For the leasing of
686-690 Broadway Street
in Redwood City, California


September 1, 2023


Lease No. 1345

# OFFICE LEASE

## Table of Contents

**Contents** Page

1.  BASIC LEASE INFORMATION ............................................................................ 1

2.  PREMISES.................................................................................................. 6
    2.1.  Lease Premises.................................................................................. 6
    2.2.  Parking ............................................................................................ 6

3.  TERM ......................................................................................................... 6
    3.1.  Term of Lease ................................................................................... 6
    3.2.  Effective Date, Commencement Date, Rent Commencement Date and
          Expiration Date ................................................................................. 6
    3.3.  Delay in Delivery of Possession ......................................................... 7
    3.4.  Extension Options............................................................................. 7

4.  RENT ......................................................................................................... 7
    4.1.  Base Rent......................................................................................... 7
    4.2.  Adjustments in Base Rent ................................................................. 7
    4.3.  Additional Charges ........................................................................... 8
    4.4.  Definitions........................................................................................ 8
    4.5.  Proration.......................................................................................... 10
    4.6.  Audits .............................................................................................. 10
    4.7.  Records ........................................................................................... 10

5.  USE............................................................................................................ 10
    5.1.  Permitted Use................................................................................... 10
    5.2.  Observance of Rules and Regulations................................................. 10
    5.3.  Interference with Access.................................................................... 11

6.  LEASEHOLD IMPROVEMENTS .................................................................... 11
    6.1.  Landlord's Obligation to Construct Leasehold Improvements.................. 11
    6.2.  Installation of Telecommunications and Other Equipment...................... 11

7.  ALTERATIONS ............................................................................................ 12
    7.1.  Alterations by County......................................................................... 12
    7.2.  Title to Improvements ....................................................................... 12
    7.3.  County's Personal Property ............................................................... 12
    7.4.  Alteration by Landlord ....................................................................... 13

8.  REPAIRS AND MAINTENANCE .................................................................... 13
    8.1.  Landlord's Repairs ............................................................................ 13
    8.2.  County's Repairs .............................................................................. 13
    8.3.  Liens ............................................................................................... 14

9.  UTILITIES AND SERVICES .......................................................................... 14

10. COMPLIANCE WITH LAWS; PREMISES CONDITION.................................... 14

10.1. Premises Condition and Landlord's Compliance with Laws; Indemnity .......... 14
10.2. County's Compliance with Laws ................................................... 14

11. SUBORDINATION ................................................................................. 15

12. DAMAGE AND DESTRUCTION ............................................................. 15

13. EMINENT DOMAIN ............................................................................... 16
13.1. Definitions ................................................................................... 16
13.2. General ....................................................................................... 17
13.3. Total Taking; Automatic Termination ........................................... 17
13.4. Partial Taking; Election to Terminate .......................................... 17
13.5. Rent; Award ................................................................................ 17
13.6. Partial Taking; Continuation of Lease ......................................... 18
13.7. Temporary Taking ....................................................................... 18

14. ASSIGNMENT AND SUBLETTING ....................................................... 18

15. DEFAULT; REMEDIES .......................................................................... 18
15.1. Events of Default by County ....................................................... 18
15.2. Landlord's Remedies ................................................................... 19
15.3. Landlord's Default ....................................................................... 19

16. INDEMNITIES ....................................................................................... 19
16.1. County's Indemnity ..................................................................... 19
16.2. Landlord's Indemnity ................................................................... 20
16.3. Concurrent Negligence ............................................................... 20

17. INSURANCE ......................................................................................... 20
17.1. County's Self-Insurance ............................................................. 20
17.2. Landlord's Insurance ................................................................... 21
17.3. Waiver of Subrogation ................................................................ 21

18. ACCESS BY LANDLORD ...................................................................... 21

19. ESTOPPEL CERTIFICATES .................................................................. 21

20. SURRENDER OF PREMISES ................................................................ 22

21. HAZARDOUS MATERIALS .................................................................... 22
21.1. Definitions ................................................................................... 22
21.2. Landlord's Representations and Covenants .................................. 22
21.3. Landlord's Environmental Indemnity ............................................ 23
21.4. County's Covenants .................................................................... 23
21.5. County's Environmental Indemnity ............................................... 23

22. RIGHT OF FIRST REFUSAL ................................................................. 23

23. GENERAL PROVISIONS ....................................................................... 24
23.1. Notices ....................................................................................... 24

23.2.   No Implied Waiver .................................................................. 24
23.3.   Amendments ...................................................................... 25
23.4.   Authority ........................................................................... 25
23.5.   Parties and Their Agents; Approvals ...................................... 25
23.6.   Interpretation of Lease ....................................................... 25
23.7.   Successors and Assigns ...................................................... 26
23.8.   Brokers ............................................................................ 26
23.9.   Severability ....................................................................... 26
23.10.  Governing Law .................................................................. 26
23.11.  Entire Agreement .............................................................. 26
23.12.  Holding Over ..................................................................... 26
23.13.  Cumulative Remedies ......................................................... 27
23.14.  Time of Essence ................................................................ 27
23.15.  Survival of Indemnities ....................................................... 27
23.16.  Signs ............................................................................... 27
23.17.  Quiet Enjoyment and Title ................................................... 27
23.18.  Bankruptcy ....................................................................... 28
23.19.  Transfer of Landlord's Interest ............................................. 28
23.20.  Non-Liability of County Officials, Employees and Agents ............ 28
23.21.  Counterparts ..................................................................... 28
23.22.  Certification by Landlord ..................................................... 28
23.23.  Acceptance of Lease by Landlord .......................................... 28

LIST OF EXHIBITS:

EXHIBIT A – Floor Plan of Premises
EXHIBIT B – Notice of Commencement Date

# OFFICE LEASE
## Lease No. 1345

THIS OFFICE LEASE (this "Lease"), dated for reference purposes only as of August 1, 2023, is by and between DINAPOLI FAMILY LP ("Landlord"), and the COUNTY OF SAN MATEO, a political subdivision of the State of California ("County" or "Tenant").

Landlord and County hereby agree as follows:

## 1.   BASIC LEASE INFORMATION

The following is a summary of basic lease information (the "Basic Lease Information"). Each item below shall be deemed to incorporate all the terms in this Lease pertaining to such item. In the event of any conflict between the information in this Section and any more specific provision of this Lease, the more specific provision shall control.

| | |
|---|---|
| Lease Reference Date: | August 1, 2023 |
| Landlord: | DiNapoli Family LP |
| Tenant: | County of San Mateo |
| Property: | That certain real property identified as 686 and 690 Broadway Street, in Redwood City, California, also known identified as San Mateo County Assessor's Parcel Numbers 054-040-200 and 054-040-190, together with the improvements therein ("Property"). |
| Premises (Section 2) | Approximately 14,275 total rentable square feet as shown on Exhibit A, which is made part hereof by reference ("Premises"). The Premises consists of: <br>• 8,400 square feet at 690 Broadway; and<br>• 5,875 square feet in 686 Broadway |
| Initial Term (Section 3.1) | 10 years |
| Extension Options (Section 3.4) | County shall have the right to extend the Term for Two additional terms of five years each, exercisable by County by written notice to Landlord given not less than six months in advance. |
| Commencement Date (Section 3.2) | The Effective Date shall be on the date this Lease is fully executed by the Parties. Estimated Commencement Date: September 1, 2023 |

| | |
|---|---|
| Base Rent (Section 4.1) | The Base Rent shall be $35,687.50 per month, based on $2.50 per square foot per month. |
| | Rent shall commence on September 1, 2023, or when the Lease has been fully executed by the Parties, whichever is later ("Rent Commencement Date"). |
| Base Rent Adjustments | The Base Rent shall escalate by three percent (3%) per year during the Initial Term, starting on the anniversary of the Rent Commencement Date ("Rent Adjustment Date"). |
| Base Rent for Extension Options | Commencing on the Extended Term resulting from the exercise of the first Extension Option, the Base Rent for the following twelve-month period shall be calculated to reflect ninety-five percent (95%) of the then Fair Market Value, but in no event greater than three percent (3%) increase over the rent for the last year of the Initial Term. |
| Tenants Proportionate Share of Basic Operating Costs ("Additional Charges") (Section 4.3) | County's proportionate share of the Property shall be noted at 74.04%. Thus, County's estimated additional cost to Landlord for the first calendar year is Fifty-Nine Cents ($0.59) per square foot. Such Additional Charges shall be excluded from the annual Base Rent Adjustments as described herein. |
| Utility Charges (Section 4.2) | County shall contract directly with and be solely responsible for paying for all separately metered utilities including water, electricity and natural gas. |
| Janitorial and Garbage | County shall contract directly for its own janitorial services and garbage removal. |
| Use (Section 5.1) | County shall occupy 690 Broadway for office and warehouse use. |
| | County shall have the option to use all or a portion of 686 Broadway Avenue for Childcare Services for the sole use of their Employees. |
| | County shall also have the option to use a portion of the parking area to create an outdoor space for the Childcare Services. In no way shall this impact the ingress or egress |

of other tenants of the Property or reduce the parking below the parking required by law for the Project (provided that any reduction permitted by a variance or CUP required for such use shall be acceptable evidence of compliance with parking requirements) (herein, the "Outdoor Childcare Use").

County shall abide by all City and Fire codes for the indoor and outdoor Childcare areas. County and Landlord shall work together and agree upon a designated area for the Outdoor Childcare Use.

| | |
|---|---|
| Parking | County shall have approximately 31 parking stalls. |
| Leasehold Improvements (Section 6) | Landlord shall deliver the Premises in a clean condition and free of all personal effects and debris. Restroom fixtures in good shape. All lighting, electrical, HVAC, doors, windows, loading doors and load leveler equipment and throughout the Premises to be in good, functional condition. Landlord to provide a frost/glaze to the front windows of the Premises. Landlord to restore entrance located towards the rear of 686 Broadway Street, directly adjacent to the parking lot. Handicap stalls to be configured prior to Lease Commencement.

County hereby agrees to accept the Premises in its "As-Is" condition. |
| Notice of Address of Landlord (Section 23.1) | DiNapoli Family LP<br>99 Almaden Blvd., Suite 565<br>San Jose, CA 95113 |
| Key Contact for Landlord: | Eire Stewart<br>(408) 535-2222<br>eires@DINCO.com |
| Notice of Address for County (Section 23.1) | Real Property Services Division<br>County of San Mateo<br>Attn: Real Property Services Manager<br>555 County Center<br>4th Floor Redwood City, CA 94063 |
| Key Contact for County: | (650) 363-4047<br>cshaker@smcgov.org |

| | |
|---|---|
| Maintenance Obligations | During the term of the Lease, County shall maintain the interior of its premises, including the HVAC systems, doors windows, basic electrical outlets and above ground plumbing and fixtures. County shall also maintain its loading doors, dock levelers and dock bumpers. |
| | Landlord shall maintain the roof, sidewalls, foundation, parking lots, landscaping, exterior paint, sewer lateral and all underground utilities serving the premises. Landlord shall also maintain the fire sprinkler systems and the main electrical panel and its connection to the service provider. |
| Landlord Broker | CBRE Bob McSweeney, Evan Chang & Matt Murray represents County and CBRE Bob McSweeney, Evan Chang & Matt Murray represents Landlord. Thus, CBRE is acting as an authorized "Dual Agent". Landlord agrees to pay CBRE a leasing commission per the CBRE standard Commission Schedule upon execution of a formal Lease agreement. |

## 2. PREMISES

### 2.1. Lease Premises

Landlord leases to County and County leases from Landlord, subject to the provisions of this Lease, the premises in the building identified in the Basic Lease Information (the "Building") together with all appurtenances and more specifically shown on the floor plan(s) attached hereto as Exhibit A (the "Premises"). The Premises contain the rentable area and are located on the floor of the Building specified in the Basic Lease Information. As used in this Lease, the term "rentable area" shall mean that measurement of interior floor area computed in accordance with the "Standard Method for Measuring Floor Area in Office Buildings, the American National Standard" (ANSI Z65.1 1996), adopted by the Building Owners and Managers Association (BOMA). The Building, land upon which the Building is located and all other improvements on or appurtenances to such land are referred to collectively as the "Property."

### 2.2. Parking

County shall have the right to use the parking area that is specifically identified in Section 1, the Basic Lease Information.

## 3. TERM

### 3.1. Term of Lease

The Premises are leased for an initial term (the "Initial Term") commencing on the date specified in the Basic Lease Information as the estimated commencement date (the "Estimated Commencement Date"), or such later date as the County Board of Supervisors authorizes the execution of this Lease. The Initial Term of this Lease shall end on the Expiration Date specified in the Basic Lease Information, or such earlier date on which this Lease terminates pursuant to the provisions of this Lease, provided that County shall have the right to extend the Initial Term pursuant to Section 3.4 (Extension Options), below. The word "Term" as used herein shall refer to the Initial Term and any Extended Terms if County exercises the Extension Options as provided in Sections 1.9 and 3.4.

### 3.2. Effective Date, Commencement Date, Rent Commencement Date and Expiration Date

The date on which this Lease shall become effective (the "Effective Date") is the date upon which (i) the County Board of Supervisors, in its sole and absolute discretion, adopts a resolution authorizing the execution of this Lease, and (ii) this Lease is duly executed by the parties hereto. The Term of this Lease commences on the Effective Date, and the dates on which the Term commences and terminates pursuant hereto are referred to respectively as the "Commencement Date" and the "Expiration Date."

The date on which the County is first obligated to pay Base Rent and Additional Charges provided for herein is referred to as the "Rent Commencement Date." The Rent Commencement Date shall be the date on which Landlord shall have delivered the Premises to County with the Leasehold Improvements (as defined below) having been substantially completed by Landlord and with said improvements having been accepted by the County Executive pursuant to Section 6.1 (Landlord's Obligation to Construct Improvements). Promptly thereafter Landlord shall deliver to County a notice substantially in the form of Exhibit B attached hereto, confirming the actual Rent Commencement Date, but Landlord's failure to do so shall not affect the date on which the County is first obligated to pay Base Rent and Additional Charges.

### 3.3. Delay in Delivery of Possession

Landlord shall use its best efforts to deliver possession of the Premises with all the Leasehold Improvements substantially completed and accepted by County's County Executive, or the County Executive's designee, pursuant to Section 6.1 (Landlord's Obligation to Construct Improvements). However, if Landlord is unable to deliver possession of the Premises as provided above, then, subject to the provisions of this Section below, the validity of this Lease shall not be affected by such inability to deliver possession except that County's obligations to pay Base Rent or any other charges shall not commence until such time as Landlord has delivered the Premises as required under this Lease. If the Term commences later or earlier than the Estimated Commencement Date, this Lease shall nevertheless expire on the Expiration Date, unless sooner terminated pursuant to the provisions under this Lease. If Landlord is unable to deliver possession of the Premises to County as required hereunder within sixty (60) days after the Effective Date, then County may, at its option, terminate this Lease, without any further liability under this Lease, upon written notice to Landlord.

### 3.4. Extension Options

County shall have the right to extend the Initial Term of this Lease (the "Extension Options") for the additional terms specified in the Basic Lease Information (the "Extended Terms"). Such Extension Options shall be on all the same terms and conditions contained in this Lease. County, at its sole discretion, may exercise the Extension Options, if at all, by giving written notice to Landlord no later than six months prior to expiration of the term to be extended; provided, however, if County is in material default under this Lease on the date of giving such notice and fails to cure such default as set forth in Section 15.1, Landlord may reject such exercise by delivering written notice thereof to County promptly after such failure to cure.

## 4. RENT

### 4.1. Base Rent

Beginning on the Rent Commencement Date as set forth in Section 3.2 of this Lease, County shall pay to Landlord during the Term the Base Rent specified below (the "Base Rent"). The Base Rent shall be calculated based on the same rentable area occupied by County identified in the Basic Lease Information and shall be payable in consecutive monthly payments on or before the first day of each month, in advance, at the address specified for Landlord in Section 1 of the Basic Lease Information, or such other place as Landlord may designate in writing upon not less than thirty (30) days' advance notice. County shall pay the Base Rent without any prior demand and without any deductions or setoff except as otherwise provided in this Lease. If the Commencement Date occurs on a day other than the first day of a calendar month, or the Expiration Date occurs on a day other than the last day of a calendar month, then the monthly payment of the Base Rent for such fractional month shall be prorated based on a thirty (30) day month.

### 4.2. Adjustments in Base Rent

On each date specified in Section 1 of the Basic Lease Information for the Adjustment of Base Rent (an "Adjustment Date"), the Base Rent for the following twelve-month period shall be adjusted to equal one hundred three percent (103%) of the Base Rent for the lease year preceding such Adjustment Date. Rent Adjustment Dates shall be scheduled as following:

| September 1, 2024 – August 31, 2025 | $36,758.13 |
| September 1, 2025 – August 31, 2026 | $37,860.87 |
| September 1, 2026 – August 31, 2027 | $38,996.69 |
| September 1, 2027 – August 31, 2028 | $40,166.60 |
| September 1, 2028 – August 31, 2029 | $41,371.59 |
| September 1, 2029 – August 31, 2030 | $42,612.74 |
| September 1, 2030 – August 31, 2031 | $43,891.12 |
| September 1, 2031 – August 31, 2032 | $45,207.85 |
| September 1, 2032 – August 31, 2033 | $46,564.09 |

### 4.3. Additional Charges

County shall pay for any utility or Additional Charges or other amounts required under this Lease as specified in Section 1 Basic Lease Information above. Any Additional Charges shall be payable to Landlord at the place where the Base Rent is payable. Landlord shall have the same remedies for a default in the payment of any Additional Charges as for a default in the payment of Base Rent. The Base Rent and Additional Charges are sometimes collectively referred to below as "Rent."

As provided in the Basic Lease Information, County's initial monthly proportionate share (74.04%) of Basic Operating Costs for the Property shall be Fifty Nine Cents ($0.59) per square foot.

Landlord shall use commercially reasonable efforts to provide within 120 days after the end of any calendar year for which the Additional Charges paid hereunder by Tenant differs from the actual charges paid for by Landlord to operate the Property. Landlord shall provide written notice to Tenant stating the computation of actual costs paid by Landlord for that calendar year for Basic Operating Expenses, and the amount of Additional Charges paid for by County. Landlord and Tenant shall settle and credit the other party for the difference of actual costs paid by Landlord and Additional Charges paid for by Tenant (the "Basic Operating Cost Adjustment"). Landlord's failure to give such notice and statement within 365 days after the end of any calendar year for which a Basic Operating Cost Adjustment is due shall release Tenant from its obligations to pay for any adjustment.

Whenever a timely notice and statement of the Basic Operating Cost Adjustment shows a variance of more than 20% from total of the prior year's total Additional Charges, Landlord may at is option give County notice of an increase in the Additional Charges to be paid monthly in the following year. Upon issuance of such notice, County's monthly obligation to pay Additional Charges shall be recalculated to one-twelfth (1/12) of the County's 74.04% proportionate share of the prior year's Basic Operating Costs. Nothing in this paragraph shall relieve the County from making a payment of the Basic Operating Cost Adjustment upon timely issuance of the notice and statement required above. **Definitions**

For purposes hereof, the following terms shall have the meanings hereinafter set forth:

a) "Additional Charges" shall mean all monetary obligations of Tenant hereunder other than the obligation for payment of Basic Rent. Such Additional Charges shall not be subject to the annual Rent Adjustments as set forth herein.

b) "County's Share" shall be determined based on the percentage of the Rentable Area of the Building that is occupied by County, which shall be 74.04%.

c) "Basic Operating Costs" shall mean all expenses and costs because of and in connection with the management, maintenance, preservation, ownership and operation of the Property.

d) "Expense Year" means each calendar year commencing January 1st of each year during the Term, including any partial year in which this Lease commences; provided that Landlord, upon advance written notice to County, may change the Expense Year to any other twelve (12) consecutive month period and, in the event

of any such change, County's Percentage Share of Operating Costs shall be equitably adjusted for the Expense Years involved in any such change.

e) "Real Estate Taxes" means all taxes, assessments and charges levied upon or with respect to the portion of the Property occupied by County or any personal property of Landlord used in the operation thereof, or Landlord's interest in the portion of the Property occupied by County or such personal property. County's Share of Real Estate Taxes shall be County's Proportionate Share for any given month of the Term as set forth in Section 4.3(b) hereof. Real Estate Taxes shall include, without limitation, all general real property taxes and general and special assessments, charges, fees, or assessments for transit, housing, police, fire, or other governmental services thereof, service payments in lieu of taxes, and any tax, fee, or excise on the act of entering into this Lease or any other lease of space in the Building or any part thereof, or on the rent payable under any lease or in connection with the business of renting space in the Building, that are now or hereafter levied or assessed against Landlord by the United States of America, the State of California or any political subdivision thereof, public corporation, district, or any other political or public entity, and shall also include any other tax, fee or other excise, however described, that may be levied or assessed as a substitute for, or as an addition to, in whole or in part, any other Real Estate Taxes, whether or not now customary or in the contemplation of the parties on the date of this Lease.

Notwithstanding the foregoing, Real Estate Taxes shall exclude (1) franchise, transfer, inheritance, or capital stock taxes or income taxes measured by the net income of Landlord from all sources unless, due to a change in the method of taxation, any of such taxes is levied or assessed against Landlord as a substitute for, or as an addition to, in whole or in part, any other tax that would otherwise constitute a Real Estate Tax, (2) any penalties, fines, interest or charges attributable to the late payment of any taxes, except to the extent attributable to County's failure to pay its portion of Real Estate Taxes hereunder, (3) any personal property taxes payable by County hereunder or by any other tenant or occupant of the Building, or (4) any increase in Real Estate Taxes due to any reassessment upon a transfer of any of Landlord's interest in the Building or the real property on which the Building is located during the Initial Term.

f) "Tax Year" means each calendar year during the Term, including any partial year during which the Lease may commence; provided that Landlord, upon notice to County, may change the Tax Year from time to time to any other twelve (12) consecutive month period and, in the event of any such change, County's Percentage Share of Real Estate Taxes shall be equitably adjusted for the Tax Year involved in any such change.

## 4.4. Proration

If the Rent Commencement Date or Expiration Date shall occur on a date other than the first or last day of a Tax Year or Expense Year, County's Share of Real Estate Taxes or Insurance for the Tax Year or Expense Year in which the Rent Commencement Date or Expiration Date occurs shall be prorated based on a 365-day year.

### 4.5. Audits

County shall have the right, upon not less than thirty (30) business days' notice to Landlord, to audit the books and records of the building related to Insurance and Real Estate Taxes. If such audit discloses any discrepancies that would result in a reduction of County's Share of Insurance and Real Estate Taxes for any Expense Year, Landlord shall immediately refund to County the amount of any overpayment by County. County shall pay the cost of such audit, provided that if such audit discloses any discrepancies that result in a reduction of County's Share of Insurance or Taxes of five percent (5%) or more for any Expense Year or Tax Year, then Landlord shall pay the actual costs of such audit. No contingency fee based auditor shall be permitted to be used.

### 4.6. Records

Landlord shall maintain at the building or at its offices in Santa Clara County, in a safe, complete and organized manner all of its records pertaining to this Lease and Real Estate Taxes, Insurance, and any other charges paid by County pursuant hereto, for a period of not less than three (3) years following expiration of the Term. Landlord shall maintain such records on a current basis and in sufficient detail to facilitate adequate audit and review thereof. All such books and records shall be available for inspection, copying and audit by County and its representatives, at County's expense, subject to the provisions of Section 4.7 above.

## 5. USE

### 5.1. Permitted Use

County may use the Premises for general office uses and such other County operations as determined by Tenant. Notwithstanding the foregoing, Tenant shall use commercially reasonable efforts to accomplish all loading/unloading in shared areas and to accomplish all loading/unloading. Landlord shall notify Tenant of any noncompliance with specific information of such noncompliance and Tenant shall use all reasonable efforts to correct the issues. At no time shall Tenant or occupants of the Property hinder or block other tenants' ability to load/unload at this location and Landlord will fully enforce Tenant's rights to do so under the Lease.

in a timely manner.

### 5.2. Observance of Rules and Regulations

County shall observe Landlord's reasonable rules and regulations for the building subject to the provisions of this Lease. Landlord may make reasonable additions or modifications thereto, which shall be binding upon County within a reasonable implementation period upon Landlord's delivery to County of a copy thereof, provided that such additions or modifications shall not reduce Landlord's obligations hereunder nor interfere with County's business in the Premises, and such additions or modifications must be applicable to the other Building tenants are not in conflict with the provisions of this Lease, do not materially increase the burdens or obligations upon County, do not impose a change upon County for services which this Lease expressly states are to be provided to County at no charge, and do not materially adversely affect the conduct of any business in the Premises which County is permitted to conduct pursuant to Section 5.1 hereof. Landlord shall administer the Rules and Regulations in a fair and nondiscriminatory manner.

### 5.3. Interference with Access

Landlord shall provide to County at all times use of the Premises and uninterrupted access thereto to the maximum extent possible, including, without limitation, during any power outages affecting the Premises or any portion of the Building; provided, however, that Landlord may, after consultation with the County Executive or the County Executive's designee, interrupt County's access to the Premises or the Building in the event of an immediate risk of danger to the Property and the Building being rendered unsafe for human occupancy to the extent that such condition effects the Premises. If County's use of any of the Premises or access thereto is interrupted as a result of the Premises or any other portion of the building being rendered unsafe for human occupancy due to Landlord's failure to comply with its obligations under this Lease or for any other reason that is within Landlord's control, then Landlord shall immediately undertake all commercially reasonable steps to correct such condition. In the event such condition continues for two (2) days and prevents County's ability to carry on its normal, usual or customary business in the Premises, the Rent payable hereunder shall be abated based on the extent County is unable to carry on its business at the Premises. If any such default by Landlord shall continue for thirty (30) days or more after County's use is interrupted and materially impairs County's ability to carry on its business in the Premises, then County shall have the right, without limiting any of its other rights under this Lease to terminate this Lease, unless Landlord supplies County with evidence reasonably satisfactory to County that County's normal and safe use will be restored within ninety (90) days of the date County's use was interrupted, and such use is actually restored within such 90-day period. Nothing in this Section shall limit County's rights with respect to any disruption due to casualty pursuant to Section 12 (Damage and Destruction) hereof.

## 6. LEASEHOLD IMPROVEMENTS

### 6.1. Landlord's Obligation to Construct Leasehold Improvements

Landlord, through its general contractor, shall construct the certain improvements, if any, that are identified in Section 1, Leasehold Improvements. The Landlord shall perform the work and make the installations in the Premises and the Common Areas ("Base Building Improvements") at the Landlord's sole cost, which cost shall not be subject to reimbursement.

### 6.2. Installation of Telecommunications and Other Equipment

Landlord and County acknowledge that the Leasehold Improvement Work shall be completed by Landlord is exclusive of the installation of telecommunications, data and computer equipment. County shall be responsible for installing such facilities and equipment, provided that Landlord shall furnish access to County and its consultants and contractors to the main telephone service serving the Premises and all other parts of the Property for which access is needed for proper installation of all such equipment including, but not limited to, wiring incidental to such installation. County shall have the right to enter the Premises and such other portions of the Property at reasonable times during construction of the Leasehold Improvements in order to install such equipment. County and Landlord shall use their good faith efforts to coordinate any such activities to allow the Leasehold Improvements and the installation of such equipment to be completed in a timely and cost-effective manner.

## 7.  ALTERATIONS

### 7.1.  Alterations by County

County shall not make or permit any alterations, installations, additions or improvements (collectively, "Alterations") to the Premises without first obtaining Landlord's written consent, which Landlord shall not unreasonably withhold or delay.  However, the installation of furnishings, fixtures, equipment or decorative improvements, none of which involve the installation or removal of partitions, demising walls, doors or windows, and the repainting and recarpeting of the Premises shall not constitute Alterations requiring Landlord's consent.  Any Alterations permitted hereunder shall be made at County's cost in compliance with applicable Laws as defined in Section 10.  Landlord shall, without cost to itself, cooperate with County in securing building and other permits and authorizations needed in connection with any permitted Alterations.  Landlord shall not be entitled to any construction or other administrative fee in connection with any Alteration.  County shall not be required to remove any Alterations upon the expiration or earlier termination of this Lease unless Landlord notifies County in writing at the time Landlord approves such Alterations that they must be removed at the Expiration Date; provided that Tenant shall be required to remove (and restore back to the condition existing on the Effective Date) any Outdoor Childcare Use installed by Tenant as provided herein.  Any Alterations made by County shall be made by Landlord's contractor or, at County's option, by a contractor reasonably acceptable to Landlord.

### 7.2.  Title to Improvements

Except for County's Personal Property (as defined in Section 7.3 below), all appurtenances, fixtures, improvements, equipment, additions and other property permanently installed in the Premises as of the Rent Commencement Date or during the Term shall be and remain Landlord's property.  County may not remove such property unless Landlord consents thereto; provided that Tenant shall be required to remove (and restore back to the condition existing on the Effective Date) any Outdoor Childcare Use installed by Tenant as provided herein.

### 7.3.  County's Personal Property

Except as set forth in this Section below, all furniture, furnishings, equipment, trade fixtures and articles of movable personal property installed in the Premises by or for the account of County and that can be removed without structural damage to the Premises (collectively, "County's Personal Property") shall be and remain County's property.  At any time during the Term or at the expiration thereof, County may remove any of County's Personal Property provided County shall repair any damage to the Premises resulting therefrom.  Upon the expiration or earlier termination of this Lease, County shall remove County's Personal Property from the Premises in accordance with Section 20 (Surrender of Premises), below.  Landlord acknowledges that some of County's Personal Property may be financed by an equipment lease financing otherwise subjected to a security interest or owned by an equipment company and leased to County.  Landlord, upon County's reasonable request, shall execute and deliver any document required by any supplier, lessor, or lender in connection with the installation in the Premises of any items of County's Personal Property, pursuant to which Landlord waives any rights it may have or acquire with respect to County's Personal Property, so long as the supplier, equipment lessor or lender agrees that it (i) will remove the Property from the Premises on or before the Expiration Date (but if it does not remove County's Personal Property within such time it shall have waived any rights it may have had to County's Personal Property), and (ii) will immediately repair any damage caused by the removal of County's Personal Property.  Landlord shall recognize the rights of a supplier,

lessor or lender who has an interest in any items of County's Personal Property to enter the Premises and remove such property at any time during the Term.

### 7.4. Alteration by Landlord

Landlord shall use commercially reasonable efforts to minimize interference with or disruption to County's use and occupancy of the Premises during any alterations, installations, additions or improvements to the Building or the Property, including without limitation any leasehold improvement work for other tenants in the Property. Landlord shall promptly remedy any such interference or disruption upon receiving County's notice thereof.

## 8. REPAIRS AND MAINTENANCE

### 8.1. Landlord's Repairs

Landlord shall repair and maintain, at its cost and in good condition, the exterior and structural portions of the Buildings, including, without limitation, the roof, foundation, bearing and exterior walls, exterior windows, and subflooring, and the heating, ventilating, air conditioning (if any), plumbing, electrical, fire protection, life safety, security, and other mechanical, electrical and communications systems of the Building (collectively, the "Building Systems") and the driveways, parking areas, sidewalks and landscaped areas of the Property. Without limiting the foregoing, Landlord shall maintain the Building and the Property in a clean, safe and attractive manner, and shall not knowingly permit to be done in or about the Building or the Property anything that is illegal, is dangerous to persons or property or constitutes a nuisance. Any damage caused by or repairs necessitated by any negligence or act of County or any County Entity may be repaired by Landlord at Landlord's option and County's expense. Landlord's liability with respect to any defects, repairs, or maintenance for which Landlord is responsible under any of the provisions of this Lease shall be limited to the cost of such repairs or maintenance, and there shall be no abatement of rent and no liability of Landlord by reason of any injury to or interference with County's business arising from the making of repairs, alterations or improvements in or to any portion of the Premises, the Building or the Property or to fixtures, appurtenances or equipment in the Building.

### 8.2. County's Repairs

County shall perform periodic reasonable visual inspections of the Premises to identify any conditions that are dangerous or in need of maintenance or repair. County shall promptly provide Landlord with notice of any such conditions. County shall, at its sole cost and expense, perform all maintenance and repairs to the Premises that are not Landlord's express responsibility under this Lease (including any Outdoor Childcare Use area), and keep the Premises in good condition and repair, regardless of whether the need for such repairs or maintenance occurs as a result of County's use, any prior use, vandalism, acts of third parties, Force Majeure, or the age of the Premises, reasonable wear and tear excepted. County's repair and maintenance obligations include, without limitation, repairs to: (a) floor coverings; (b) interior partitions; (c) doors (including, without limitation, overhead and roll up doors); (d) the interior side of demising walls; (e) electronic, fiber, phone and data cabling and related equipment that is installed by or for the exclusive benefit of County; (f) supplemental air conditioning units, kitchens, including hot water heaters, plumbing, and similar facilities exclusively serving the Premises; and (g) County Improvements and Tenant Alterations. The standard for comparison of condition will be the condition of the Premises as of the original date of Landlord's delivery of the Premises and failure to meet such standard shall create the need to repair. If County does not perform required

maintenance or repairs, Landlord shall have the right, without waiver of Default or of any other right or remedy, to perform such obligations of County on County's behalf, and County will reimburse Landlord for any costs incurred upon demand.

### 8.3. Liens

County shall keep the Premises free from liens arising out of any work performed, material furnished or obligations incurred by County during the Term. Landlord shall have the right to post on the Premises any notices permitted or required by law or that are needed for the protection of Landlord, the Premises, or the Building, from mechanics' and material suppliers' liens. County shall give Landlord at least ten (10) days' prior written notice of commencement of any repair or construction by County on the Premises.

## 9. UTILITIES AND SERVICES

County shall pay the cost of all utilities and services required by County and provided to the Premises as identified in Section 1 Basic Lease Information.

## 10. COMPLIANCE WITH LAWS; PREMISES CONDITION

### 10.1. Premises Condition and Landlord's Compliance with Laws; Indemnity

Landlord represents and warrants to County that, to the best of Landlord's knowledge, the building is, or as of the completion of the Leasehold Improvements will be, in compliance with all applicable building safety codes and regulations. To the best of Landlord's knowledge, the Building Systems are in working order and there are no material latent structural defects in the Building, the Premises or the Property which would render the Building or the Premises unsafe for occupancy.

### 10.2. County's Compliance with Laws

County shall use the Premises during the Term in compliance with applicable present or future federal, state, local and administrative laws, rules, regulations, orders and requirements (collectively, "Laws"), except that County shall not be required to make any structural alterations, additions or other modifications in order to comply therewith unless such modifications are necessary solely because of County's particular use of the Premises as opposed to office users generally or any Alterations to the Premises made by County pursuant to Section 7 hereof. County shall be responsible for complying with any requirement of the Disabilities Laws relating to the placement of County's furniture or other County Personal Property and the operation of any programs in the Premises, other than any requirement relating to the physical structure, fixtures and permanent improvements of the Premises or portions of the Property or Building along the path of travel to the Premises, which are Landlord's obligation as provided in Section 10.1 above. Notwithstanding the foregoing, Landlord shall not be obligated to perform any such work if the requirement to do such work is triggered by Alterations performed by County.

## 11. SUBORDINATION

This Lease is and shall be subject and subordinate to the following (each an "Encumbrance"): (a) any reciprocal easement agreements and ground leases or other underlying leases that may now exist or hereafter be executed affecting Landlord's interest in the Property, or any portion thereof, and (b) the lien of any mortgage or deed of trust that may now exist or

hereafter be executed by Landlord in any amount for which any part of the Property, any ground leases or underlying leases, or Landlord's interest or estate therein, is specified as security; provided that as a condition to County's agreement to subordinate in writing its interest hereunder to any such Encumbrance hereafter placed on the Property, the holder of the Encumbrance shall, at County's request, enter into a subordination and no disturbance agreement with County in a form then commercially reasonable. Notwithstanding the foregoing, Landlord shall have the right to subordinate or cause to be subordinated to this Lease any Encumbrance. In the event that any ground lease or underlying lease terminates for any reason or any mortgage or deed of trust is foreclosed or a conveyance in lieu of foreclosure is made for any reason, County shall pay subsequent Rent and attorn to and become the tenant of such successor Landlord, at the option of such successor-in- interest, provided that County has received proper written notice of such succession and the name and address of the successor landlord, and further provided that, in the case of any Encumbrance hereafter executed, as a condition to such attornment the holder of such Encumbrance shall, at County's request, agree that so long as County is not in default hereunder, such holder shall recognize this Lease and shall not disturb County in its possession of the Premises for any reason other than one that would entitle Landlord to terminate this Lease or otherwise dispossess County of the Premises in accordance with the terms hereof. The provisions of this Section shall be self-operative and no further instrument shall be required other than as provided in this Section. County agrees, however, to execute upon request by Landlord and in a form reasonably acceptable to County, any additional documents evidencing the priority or subordination of this Lease with respect to any such Encumbrance as provided herein.

Landlord shall use commercially reasonable efforts to provide to County, within 30 days after execution of this Lease, executed non-disturbance and attornment agreements from the holder of any existing Encumbrance. The form of such agreement shall be subject to County's reasonable approval.

## 12. DAMAGE AND DESTRUCTION

If the Premises, the Building or any Building Systems are damaged by fire or other casualty, Landlord shall repair the same without unreasonable delay (and if Landlord is then carrying insurance on the Leasehold Improvements or if County at its sole option makes funds available to Landlord, Landlord shall also repair the Leasehold Improvements), provided that such repairs can be made under applicable laws within ninety (90) days after Landlord obtains all necessary permits for such repairs but not later than one hundred eighty (180) days after the date of such damage (the "Repair Period"). In such event, this Lease shall remain in full force and effect, except that County shall be entitled to an abatement of Rent while such repairs are being made. Such abatement in Rent shall be based upon the extent to which such damage and the making of such repairs materially interfere with County's business in the Premises. Landlord's repairs shall not include, and the Rent shall not be abated as a result of, any damage by fire or other cause to County's Personal Property or any damage caused by the negligence or willful misconduct of County or its employees or agents.

Within twenty (20) days after the date of such damage, Landlord shall notify County whether or not, in Landlord's reasonable judgment made in good faith, such repairs can be made within the Repair Period. If such repairs cannot be made within the Repair Period, then either party hereto may, by written notice to the other given within thirty (30) days after the date of such damage, terminate this Lease as of the date specified in such notice, which date shall be not less than thirty (30) nor more than sixty (60) days after notice is given by Landlord. In case of termination, the Rent shall be reduced by a proportionate amount based upon the extent to which such damage interferes with the conduct of County's business in the Premises, and County shall

pay such reduced Rent up to the date of termination. Landlord shall refund to County any Rent previously paid for any period of time subsequent to such date of termination.

Notwithstanding the foregoing, in the event the Premises are damaged or destroyed and insurance proceeds are not available to fully pay for restoration of the Premises, excluding any deductible, for which Landlord shall be responsible, except in the case of earthquake if Landlord carries earthquake insurance), Landlord may terminate this Lease by written notice to County within thirty (30) days of the date Landlord receives written notice that the cost of repairs are not fully covered by insurance. Such notice from Landlord shall include adequate written evidence of the denial of insurance coverage. If Landlord does not elect to terminate this Lease as provided above, the Lease shall remain in full force and effect, and Landlord shall repair and restore the Premises as provided above.

If at any time during the last twelve (12) months of the Term of this Lease there is substantial damage that Landlord would be required to repair hereunder, Landlord or County may, at the respective option of each, terminate this Lease as of the date such damage occurred by giving written notice to the other party of its election to do so within thirty (30) days after the date of such damage; provided, however, that neither party may terminate this Lease if it would take less than thirty (30) days from the date of the casualty to repair such damage and there are at least 6 months remaining in the lease term.

The parties intend that the provisions of this Section govern fully their rights and obligations in the event of damage or destruction, and Landlord and County each hereby waives and releases any right to terminate this Lease in whole or in part under Section 1932, subdivision 2, Section 1933, subdivision 4, and Sections 1941 and 1942 of the Civil Code of California or under any similar law, statute or ordinance now or hereafter in effect, to the extent such rights are inconsistent with the provisions hereof.

## 13. EMINENT DOMAIN

### 13.1. Definitions

"Taking" means a taking or damaging, including severance damage, by eminent domain, inverse condemnation or for any public or quasi-public use under law. A Taking may occur pursuant to the recording of a final order of condemnation, or by voluntary sale or conveyance in lieu of condemnation or in settlement of a condemnation action.

"Date of Taking" means the earlier of (i) the date upon which title to the portion of the Property taken passes to and vests in the condemner or (ii) the date on which County is dispossessed.

"Award" means all compensation, sums or anything of value paid, awarded or received for a Taking, whether pursuant to judgment, agreement, settlement or otherwise.

### 13.2. General

If during the Term or during the period between the execution of this Lease and the Commencement Date, there is any Taking of all or any part of the Premises or any interest in this Lease, the rights and obligations of the parties hereunder shall be determined pursuant to this Section. County and Landlord intend that the provisions hereof govern fully in the event of a Taking and accordingly, the parties each hereby waive any right to terminate this Lease in whole

or in part under Sections 1265.10, 1265.40, 1265.120 and 1265.130 of the California Code of Civil Procedure or under any similar law now or hereafter in effect.

### 13.3. Total Taking; Automatic Termination

If there is a total Taking of the Premises, then this Lease shall terminate as of the Date of Taking.

### 13.4. Partial Taking; Election to Terminate

If there is a Taking of any portion (but less than all) of the Premises, then this Lease shall terminate in its entirety if all of the following exist: (A) the partial Taking, in County's reasonable judgment, renders the remaining portion of the Premises untenantable or unsuitable for continued use by County for its intended purposes or otherwise materially adversely affect County's normal operations in the Premises, (B) the condition rendering the Premises untenantable or unsuitable either is not curable or is curable but Landlord is unwilling or unable to cure such condition, and (C) County elects to terminate.

In the case of a partial taking of a substantial portion of the Building or the Property, and if subsection (a) above does not apply, County and Landlord shall each have the right to terminate this Lease by written notice to the other within thirty (30) days after the Date of Taking, provided that, as a condition to County's right to terminate, the portion of the Building or the Property taken shall, in County's reasonable judgment, render the Premises unsuitable for continued use by County for its intended purposes or otherwise materially adversely affect County's normal operations in the Premises.

Either party electing to terminate under the provisions of this Section 13.4 shall do so by giving written notice to the other party before or within thirty (30) days after the Date of Taking, and thereafter this Lease shall terminate upon the later of the thirtieth (30th) day after such written notice is given or the Date of Taking.

### 13.5. Rent; Award

Upon termination of this Lease pursuant to an election under Section 13.4 above, then: (i) County's obligation to pay Rent shall continue up until the date of termination, and thereafter shall cease, except that Rent shall be reduced as provided in Section 13.6 below for any period during which this Lease continues in effect after the Date of Taking, and (ii) Landlord shall be entitled to the entire Award in connection therewith, except that County shall receive any Award made specifically for County's relocation expenses, the interruption of or damage to County's business, County's improvements pertaining to realty or damage to County's Personal Property.

### 13.6. Partial Taking; Continuation of Lease

If there is a partial Taking of the Premises under circumstances where this Lease is not terminated in its entirety under Section 13.4 above, then this Lease shall terminate as to the portion of the Premises so taken, but shall remain in full force and effect as to the portion not taken, and the rights and obligations of the parties shall be as follows: (a) Rent shall be reduced by an amount that is in the same ratio to the Rent as the area of the Premises taken bears to the area of the Premises prior to the Date of Taking, and (b) Landlord shall be entitled to the entire Award in connection therewith, provided that County shall receive any Award made specifically

for County's relocation expenses or the interruption of or damage to County's business or damage to County's Personal Property.

### 13.7. Temporary Taking

Notwithstanding anything to contrary in this Section, if a Taking occurs with respect to the Premises for a limited period of time not in excess of sixty (60) consecutive days, this Lease shall remain unaffected thereby, and County shall continue to pay Rent and to perform all of the terms, conditions and covenants of this Lease. In the event of such temporary Taking, County shall be entitled to receive that portion of any Award representing compensation for the use or occupancy of the Premises during the Term up to the total Rent owing by County for the period of the Taking.

## 14. ASSIGNMENT AND SUBLETTING

Except as provided in this Section below, County shall not directly or indirectly sell, assign, encumber, pledge or otherwise transfer or hypothecate all or any part of its interest in or rights with respect to the Premises or its leasehold estate hereunder or permit all or any portion of the Premises to be occupied by anyone other than itself or sublet all or any portion of the Premises, without Landlord's prior written consent in each instance, which shall not be unreasonably withheld or delayed. County shall have the right from time to time, upon notice to but without the consent of Landlord, to transfer this Lease or use and occupancy of all or any of the Premises to any department, commission or agency of the County of San Mateo for uses permitted under this Lease.

## 15. DEFAULT; REMEDIES

### 15.1. Events of Default by County

Any of the following shall constitute an event of default by County hereunder:

15.1.1 County's failure to make any timely payment of Rent and to cure such nonpayment within five (5) business days after receipt of written notice thereof from Landlord, provided that for the first monthly payment of Rent at the beginning of the Term and for the first monthly payment of Rent after the beginning of each new fiscal year for County, County shall have twenty (20) days to cure any such nonpayment after written notice thereof from Landlord;

15.1.2 County's abandonment of the Premises (within the meaning of California Civil Code Section 1951.3); or

15.1.3 County's failure to perform any other covenant or obligation of County hereunder (not involving the payment of money) and to cure such non-performance within thirty (30) days of the date of receipt of notice thereof from Landlord, provided that if more than thirty (30) days are reasonably required for such cure, no event of default shall occur if County commences such cure within such period and diligently prosecutes such cure to completion.

### 15.2. Landlord's Remedies

Upon the occurrence of any event of default by County that is not cured within the applicable grace period as provided above, Landlord shall have all rights and remedies available pursuant to law, at equity or granted hereunder, including, without limitation, the following:

The rights and remedies provided by California Civil Code Section 1951.2 (damages on termination for breach)), including, but not limited to, the right to terminate County's right to possession of the Premises and to recover the worth at the time of award of the amount by which the unpaid Rent for the balance of the Term after the time of award exceeds the amount of rental loss for the same period that County proves could be reasonably avoided, as computed pursuant to subsection (b) of such Section 1951.2.

The rights and remedies provided by California Civil Code Section 1951.4 (continuation of lease after breach and abandonment), which allows Landlord to continue this Lease in effect and to enforce all of its rights and remedies under this Lease, including the right to recover Rent as it becomes due, for so long as Landlord does not terminate County's right to possession, if County has the right to sublet or assign, subject only to reasonable limitations.

### 15.3. Landlord's Default

If Landlord fails to perform any of its material obligations under this Lease, and such failure materially impairs County's ability to conduct its business in the Premises, then (without limiting any of County's other rights under this Lease) County may, at its sole option, cure such default at Landlord's expense if such default continues after thirty (30) days from the date County gives written notice to Landlord of County's intention to perform such cure, and Landlord shall promptly reimburse County for the reasonable costs incurred by the County in curing such default. However, in the case of a material default which for causes beyond Landlord's control (excluding any financial inability to perform) cannot with due diligence be cured within such 30-day period, such 30-day period shall be extended if Landlord, promptly upon receipt of County's notice, advises County of Landlord's intention to take all steps reasonably required to cure such default, and Landlord promptly commences such cure and diligently prosecutes the same to completion. Notwithstanding the foregoing, if any such default by Landlord continues for ninety (90) days from the date County gives written notice as set forth hereinabove and materially impairs County's ability to conduct its business in the Premises, then County shall have the right to terminate this Lease upon written notice to Landlord within thirty (30) days after the expiration of such 90-day period. This provision shall not limit any other rights that the County may have at law or in equity; however, in no event shall County be entitled to consequential damages hereunder.

## 16. INDEMNITIES

### 16.1. County's Indemnity

County, as a material part of the consideration to be rendered to Landlord, waives any and all claims against Landlord for damages by reason of any death or injury to any person or persons, including County, County's agents, employees and invitees, or any injury to property of any kind whatsoever and to whomsoever belonging, including the property of County, arising at any time and from any cause other than by reason of the negligence or willful misconduct of Landlord, in, on or about the Premises or the Property, except as expressly set forth in Section 16.2. County shall indemnify, defend and hold harmless ("Indemnify") Landlord and its Agents from and against any and all claims, costs and expenses (collectively, "Claims"), incurred as a result of (a) County's use of the Premises, (b) any default by County in the performance of any of its material obligations under this Lease, or (c) any negligent acts or omissions of County or its Agents in, on or about the Premises or the Property; provided, however, County shall not be obligated to Indemnify Landlord or its Agents to the extent any Claim arises out of the negligence or willful misconduct of Landlord or its Agents. In any action or proceeding brought against Landlord or its Agents by reason of any Claim Indemnified by County hereunder, County

may, at its sole option, elect to defend such Claim by attorneys in County's Office of County Counsel, by other attorneys selected by County, or both. County shall have the right to control the defense and to determine the settlement or compromise of any action or proceeding, provided that Landlord shall have the right, but not the obligation, to participate in the defense of any such Claim at its sole cost. County's obligations under this Section shall survive the termination of the Lease.

## 16.2. Landlord's Indemnity

Except to the extent due to a default by County under this Lease or to the negligence or willful misconduct of County, its agents or employees, Landlord shall indemnify County and its Agents from and against any and all claims arising from personal injury or loss of life as a result of Landlord's negligence or willful misconduct or Default of its obligations hereunder (after expiration of any applicable notice and cure period), or any breach of any representations or warranties made by Landlord under this Lease, provided that in no event shall Landlord be liable for consequential damages or loss of business or income. In any action or proceeding brought against County or its Agents by reason of any Claim indemnified by Landlord hereunder, Landlord may, at its sole option, elect to defend such Claim by attorneys selected by Landlord. Landlord shall have the right to control the defense and to determine the settlement or compromise of any action or proceeding, provided that County shall have the right, but not the obligation, to participate in the defense of any such Claim at its sole cost. Landlord's obligations under this Section shall survive the termination of the Lease.

## 16.3. Concurrent Negligence

In the event of concurrent negligence of County, its officers and/or employees, and Landlord, its officers and/or employees, then the liability for any and all claims for injuries or damage to persons and/or property which arise out of terms and conditions of this Lease shall be apportioned according to the California theory of comparative negligence.

## 17. INSURANCE

### 17.1. County's Self-Insurance

Landlord acknowledges that County maintains a program of self-insurance and agrees that County shall not be required to carry any insurance with respect to this Lease. County assumes the risk of damage to any of County's Personal Property.

County is presently self-insured in the amount of $500,000,000 each occurrence giving rise to personal injury and property damage liabilities for which County could be held responsible. In addition, County presently has in force excess insurance in the amount of $55,000,000 annually in the aggregate. Said self-insurance and excess insurance provide coverage for personal injury and property damage liabilities arising out of the acts and/or omissions of County, its officers, agents, contractors and employees, while on the Premises. County upon request of Landlord shall furnish Landlord with a Certificate of Insurance that shall provide that Landlord would receive ten (10) days' prior notice of cancellation, change in scope or modification in coverage of such coverage. Nothing herein shall be interpreted to require County or its insurer to provide a defense for, to provide insurance for, or to indemnify Landlord except as may be otherwise required by law.

### 17.2. Landlord's Insurance

At all times during the Term, Landlord shall keep the Building (excluding the land upon which it is located) insured against damage and destruction by fire, vandalism, malicious mischief, sprinkler damage and other perils customarily covered under a causes of loss-special form property insurance policy (excluding earthquake, flood and terrorism) in an amount equal to one hundred percent of the full insurance replacement value (replacement cost new, including, debris removal and demolition) thereof. Landlord shall, upon request by County, provide to County a certificate of insurance issued by the insurance carrier, evidencing the insurance required above. The certificate shall expressly provide that the policy is not cancelable or subject to reduction of coverage or otherwise be subject to modification except after thirty (30) days prior written notice to County. Landlord hereby waives any rights against County for loss or damage to the Premises or any other part of the Property, to the extent covered by Landlord's property insurance.

### 17.3. Waiver of Subrogation

Notwithstanding anything to the contrary contained herein, Landlord hereby waives any right of recovery against County for any loss or damage sustained by Landlord with respect to the Property or the Premises or any portion thereof or the contents of the same or any operation therein, whether or not such loss is caused by the fault or negligence of County, to the extent (i) such loss or damage is actually recovered from valid and collectible insurance covering the Landlord, and (ii) the Landlord's insurance carrier agrees to its written waiver of right to recover such loss or damage.

## 18. ACCESS BY LANDLORD

Landlord reserves for itself and any designated agent the right to enter the Premises at all reasonable times and, except in cases of emergency (in which event Landlord shall give any reasonable notice), after giving County at least twenty four (24) hours' advance written or oral notice, for the purpose of (i) inspecting the Premises, (ii) supplying any service to be provided by Landlord hereunder, (iii) showing the Premises to any prospective purchasers, mortgagees or, during the last twelve (12) months of the Term of this Lease, tenants, (iv) posting notices of non-responsibility, and (v) altering, improving or repairing the Premises and any portion of the Building, and Landlord may for that purpose erect, use and maintain necessary structures in and through the Premises where reasonably required by the character of the work to be performed, provided that the entrance to the Premises shall not be blocked thereby, and further provided that County's use shall not be materially interfered with.

## 19. ESTOPPEL CERTIFICATES

Either party, from time to time during the Term upon not less than ten (10) days' prior written notice from the other party, shall execute, acknowledge and deliver to the other party, or such persons or entities designated by such other party, a certificate stating: (a) the Commencement Date and Expiration Date of this Lease, (b) that this Lease is unmodified and in full force and effect (or, if there have been modifications, that the Lease is in full force and effect as modified and stating the modifications), (c) that there are no defaults under this Lease (or if so, specifying the same), (d) the date to which Rent has been paid, and (e) any other information that may be reasonably required.

## 20. SURRENDER OF PREMISES

Upon the expiration or sooner termination of this Lease, County shall surrender the Premises to Landlord in good order and condition, reasonable use and wear and damage by fire or other casualty excepted. On or before the Expiration Date, County shall remove from the Premises all of County's Personal Property, County's telecommunications, data and computer facilities and any Alterations County desires or is required to remove from the Premises pursuant to the provisions of Section 7.1 (Alterations by County), above. County shall repair or pay the cost of repairing any damage to the Premises or the Building resulting from such removal. Notwithstanding anything to the contrary in this Lease, County shall not be required to demolish or remove from the Premises any of the Leasehold Improvements. County's obligations under this Section shall survive the expiration or earlier termination of this Lease.

## 21. HAZARDOUS MATERIALS

### 21.1. Definitions

As used in this Lease, the following terms shall have the meanings hereinafter set forth: "Environmental Laws" shall mean any federal, state, local or administrative law, rule, regulation, order or requirement relating to industrial hygiene, environmental conditions or Hazardous Material, whether now in effect or hereafter adopted.

"Hazardous Material" shall mean any material that, because of its quantity, concentration or physical or chemical characteristics, is deemed by any federal, state or local governmental authority to pose a present or potential hazard to human health or safety or to the environment. Hazardous Material includes, without limitation, any material or substance defined as a "hazardous substance," or "pollutant" or "contaminant" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA", also commonly known as the "Superfund" law), as amended, (42 U.S.C. Sections 9601 et seq.), or pursuant to Section 25316 of the California Health & Safety Code; any "hazardous waste" listed pursuant to Section 25140 of the California Health & Safety Code, any asbestos and asbestos containing materials whether or not such materials are part of the structure of the Building or are naturally occurring substances on or about the Property; and petroleum, including crude oil or any fraction thereof, natural gas or natural gas liquids.

"Release" when used with respect to Hazardous Material shall include any actual or imminent spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into or inside the Building, or in, on, under or about the Property.

### 21.2. Landlord's Representations and Covenants

Landlord represents and warrants to County that, to the best of Landlord's knowledge, the following statements are true and correct and will be true and correct as of the Commencement Date: (a) the Property is not in violation of any Environmental Laws; (b) the Property is not now, nor has it been, used for the manufacture, use, storage, discharge, deposit, transportation or disposal of any Hazardous Material, except for the use of such substances in such limited quantities as are customarily used in offices, which limited use has been and is in compliance with Environmental Laws; (c) the Property does not consist of any landfill or contain any underground storage tanks; (d) the Building does not consist of any asbestos-containing materials or building materials that contain any other Hazardous Material, nor do the Premises or the Common Areas contain any lead-based paints; (e) there has been and is no Release of any

Hazardous Material in the Building or in, on, under or about the Property, and (f) the Property is not subject to any claim by any governmental regulatory agency or third party related to the Release of any Hazardous Material, and there is no inquiry by any governmental agency (including, without limitation, the California Department of Toxic Substances Control or the Regional Water Quality Control Board) with respect to the presence of Hazardous Material in the Building or in, on, under or about the Property, or the migration of Hazardous Material from or to other real property. Subject to County's obligations under this Section below, Landlord shall maintain the Property throughout the Term in compliance with all Environmental Laws that could affect the health, safety and welfare of County's employees or County's use, occupancy or enjoyment of the Premises for their intended purposes.

### 21.3.  Landlord's Environmental Indemnity

Without limiting Landlord's Indemnity in Section 16.2 (Landlord's Indemnity), above, Landlord shall Indemnify County and its Agents against any and all Claims arising during or after the Term of this Lease (a) as a result of any breach of any of Landlord's representations, warranties or covenants in the preceding Section, or (b) in connection with any presence or Release of Hazardous Material in the Building or on, under or about the Property, unless County or its Agents caused such Release.

### 21.4.  County's Covenants

Neither County nor its agents shall cause any Hazardous Material to be brought upon, kept, used, stored, generated or disposed of in, on or about the Premises or the Property, or transported to or from the Premises or the Property, in violation of any Environmental Laws, provided that County may use, so long as such use is in compliance with all applicable Environmental Laws.

### 21.5.  County's Environmental Indemnity

If County breaches its obligations contained in the preceding Section 21.4, or if County or its Agents cause the Release of Hazardous Material from, in, on or about the Premises or the Property, then County shall Indemnify Landlord against any and all Claims arising during or after the Term of this Lease as a result of such Release, except to the extent Landlord or its Agents is responsible for the Release. The foregoing Indemnity shall not include any Claims resulting from the non-negligent aggravation by County, its Agents or Invitees of physical conditions of the Premises, or other parts of the Property, existing prior to County's occupancy.

## 22.  RIGHT OF FIRST REFUSAL

If Landlord determines, in its sole discretion, to sell the real property of which the Premises is a part at any time during the Initial Term, Landlord shall give notice to County of such determination ("Landlord's Sale Intention Notice"). Not later than sixty (60) days after Landlord's Sale Intention Notice (with time being of the essence), County shall be entitled to a one-time right to submit to Landlord a Letter of Intent ("LOI") of County's intent to purchase the Premises. The LOI shall include principal terms and conditions that may be included in a purchase and sale agreement ("PSA"). The LOI shall be non-binding, except that County's issuance of LOI shall preclude Landlord from (1) listing the Premises for sale by real estate broker listing, (2) accepting an offer from a third-party unaffiliated party during such period, or (3) otherwise holding out the Premises for sale to a third party during that period. Such preclusion shall automatically terminate without any further writing between parties upon (1) Landlord's rejection of County's LOI as

determined in Landlord's sole discretion, or (2) failure of Landlord and County to execute a mutually acceptable PSA within 45 days after Landlord's receipt of the County's LOI (with time being of the essence), or (3) County's failure to timely deliver an LOI. Thereafter, Landlord shall have no further right to provide a Landlord's Sale Intention Notice for the remainder of the Term.

During the period described in the prior paragraph, Landlord shall not (1) list the Premises for sale by real estate broker listing, (2) accept an offer from a third-party unaffiliated party, or (3) otherwise hold out the Premises for sale.

Notwithstanding the foregoing, the provisions of this Section 22 shall not apply to Excluded Transactions, which are defined as: (a) transfers to Affiliates of Landlord (as that term is defined herein. The term "Affiliates of Landlord" means (A) any company that owns 75% or more of the voting stock of Landlord; (B) any company 75% or more of whose voting stock is owned by Landlord; (C) any company 75% or more of the voting stock is owned by a corporation that also owns 50% or more of the voting stock of Landlord; or (D) JP DiNapoli Companies, Inc., or any entity whose majority of its ownership interest is directly or indirectly owned by JP DiNapoli Companies, Inc. or a principal thereof; (b) collateral security transfers in connection with any debt or equity financing, or transfers pursuant to a foreclosure or a deed in lieu thereof; (c) transfers to any joint venture or partnership into which Landlord, or any Affiliate of Landlord, enters or joins; (d) transfers in connection with any debt or equity financing, or transfers pursuant to a foreclosure or a deed in lieu thereof; or (e) the sale of Premises as part of a "portfolio" or "packaged" deal of properties that are owned by Landlord or Affiliates of Landlord.

## 23.    GENERAL PROVISIONS

### 23.1.   Notices

Except as otherwise specifically provided in this Lease, any notice given under this Lease shall be in writing and given by delivering the notice in person or by commercial courier, or by sending it by first-class mail, certified mail, return receipt requested, or Express Mail, return receipt requested, with postage prepaid, to: (a) County at County's address set forth in the Basic Lease Information; or (b) Landlord at Landlord's address set forth in the Basic Lease Information; or (c) such other address as either Landlord or County may designate as its new address for such purpose by notice given to the other in accordance with this Section. Any notice hereunder shall be deemed to have been given and received two (2) days after the date when it is mailed if sent by first-class, certified mail, one day after the date when it is mailed if sent by Express Mail, or upon the date personal delivery is made. For convenience of the parties, copies of notices may also be given by telephone facsimile to the facsimile number set forth in the Basic Lease Information or such other number as may be provided from time to time; however, neither party may give official or binding notice by telephone facsimile.

### 23.2.   No Implied Waiver

No failure by either party to insist upon the strict performance of any obligation of the other party under this Lease or to exercise any right, power or remedy consequent upon a breach thereof shall constitute a waiver of any such breach or of such term, covenant or condition. No acceptance of full or partial Rent by Landlord while County is in default hereunder shall constitute a waiver of such default by Landlord. No express written waiver of any default or the performance of any provision hereof shall affect any other default or performance, or cover any other period of time, other than the default, performance or period of time specified in such express waiver. One or more written waivers of a default or the performance of any provision hereof shall not be

deemed to be a waiver of a subsequent default or performance. The consent of Landlord or County given in one instance under the terms of this Lease shall not relieve the other party of any obligation to secure the consent to any other or future instance under the terms of the Lease.

### 23.3. Amendments

Neither this Lease nor any terms or provisions hereof may be changed, waived, discharged or terminated, except by a written instrument signed by the party against which the enforcement of the change, waiver, discharge or termination is sought. No waiver of any breach shall affect or alter this Lease, but each and every term, covenant and condition of this Lease shall continue in full force and effect with respect to any other then-existing or subsequent breach thereof. Whenever this Lease requires or permits the giving by County of its consent or approval, the County Executive, or his or her designee shall be authorized to provide such approval, except as otherwise provided by applicable law, including the County's Ordinance Code and Charter. Any amendments or modifications to this Lease, including, without limitation, amendments to or modifications to the exhibits to this Lease, shall be subject to the mutual written agreement of Landlord and County and may be made upon the sole approval of the County Executive, or his or her designee, provided, however, material amendments or modifications to this Lease which are not anticipated as specifically set forth in this Lease (i) changing the legal description of the Premises, (ii) increasing the Term, (iii) increasing the Rent, (iv) changing the general use of the Premises from the use authorized under Section 5.1 of this Lease, and (vii) any other amendment or modification which materially increases the County's liabilities or financial obligations under this Lease shall additionally require the approval of the County's Board of Supervisors.

### 23.4. Authority

Landlord represents and warrants to County that the execution and delivery of this Lease by Landlord has been duly authorized and does not violate any provision of any agreement, law or regulation to which Landlord or the Property is subject.

### 23.5. Parties and Their Agents; Approvals

If applicable, the word "Landlord" as used in this Lease shall include the plural as well as the singular. As used in this Lease, the term "Agents" when used with respect to either party shall include the agents, employees, officers and contractors of such party, and the term "Invitees" when used with respect to County shall include the clients, customers, invitees, guests, licensees, assignees or subtenants of County. All approvals, consents or other determinations permitted or required by County under this Lease shall be made by or through the County Executive, or his or her designee, unless otherwise provided in this Lease, subject to any applicable limitations in the Ordinance Code or the Charter of the County of San Mateo.

### 23.6. Interpretation of Lease

The captions preceding the articles and sections of this Lease and in the table of contents have been inserted for convenience of reference only and such captions shall in no way define or limit the scope or intent of any provision of this Lease. This Lease has been negotiated at arm's length and between persons sophisticated and knowledgeable in the matters dealt with herein and shall be interpreted to achieve the intent and purposes of the parties, without any presumption against the party responsible for drafting any part of this Lease. Except as otherwise specifically provided herein, wherever in this Lease Landlord or County is required or requested to give its consent or approval to any matter or action by the other, such consent or approval shall not be

unreasonably withheld or delayed and the reasons for disapproval of consent shall be stated in reasonable detail in writing. Provisions in this Lease relating to number of days shall be calendar days, unless otherwise specified, provided that if the last day of any period to give notice, reply to a notice or to undertake any other action occurs on a Saturday, Sunday or a bank or County holiday, then the last day for undertaking the action or giving or replying to the notice shall be the next succeeding business day. Use of the word "including" or similar words shall not be construed to limit any general term, statement or other matter in this Lease, whether or not language of non-limitation, such as "without limitation" or similar words, are used.

### 23.7. Successors and Assigns

Subject to the provisions of Section 14 relating to assignment and subletting, the terms, covenants and conditions contained in this Lease shall bind and inure to the benefit of Landlord and County and, except as otherwise provided herein, their personal representatives and successors and assigns. There are no third-party beneficiaries to this Lease.

### 23.8. Brokers

The broker, if any, identified in the Basic Lease Information, whose commission, if any is due, shall be the sole responsibility of Landlord pursuant to a separate written agreement between Landlord and such broker, and County shall have no liability therefor. In the event that any other broker or finder perfects a claim for a commission or finder's fee based upon any such contact, dealings or communication, the party through whom the broker or finder makes his claim shall be responsible for such commission or fee and shall indemnify the other party from any and all Claims incurred by the indemnified party in defending against the same. The provisions of this Section shall survive any termination of this Lease.

### 23.9. Severability

If any provision of this Lease or the application thereof to any person, entity or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such provision to persons, entities or circumstances other than those as to which it is invalid or unenforceable, shall not be affected thereby, and each other provision of this Lease shall be valid and be enforceable to the full extent permitted by law.

### 23.10. Governing Law

This Lease shall be construed and enforced in accordance with the laws of the State of California and the Ordinance Code and Charter of the County of San Mateo.

### 23.11. Entire Agreement

The parties intend that this Lease (including all of the attached exhibits, which are made a part of this Lease) shall be the final expression of their agreement with respect to the subject matter hereof and may not be contradicted by evidence of any prior or contemporaneous written or oral agreements or understandings. The parties further intend that this Lease shall constitute the complete and exclusive statement of its terms and that no extrinsic evidence whatsoever (including prior drafts hereof and changes therefrom) may be introduced in any judicial, administrative or other legal proceeding involving this Lease.

### 23.12. Holding Over

Should County hold over in possession of the Premises after the expiration of the Term with Landlord's consent, such holding over shall not be deemed to extend the Term or renew this Lease, but such tenancy thereafter shall continue as a month-to-month tenancy. Such tenancy shall be on all the terms and conditions set forth in this Lease and at the monthly Base Rent in effect during the last month of the Term of the Lease or such other rental as Landlord and County may mutually agree in writing as a condition to Landlord's consent to such holding over, and County shall continue as a month-to-month tenant until the tenancy shall be terminated by Landlord giving County or County giving Landlord at least thirty (30) days' prior written notice of termination. Should County hold over without Landlord's consent, the rent payable by County during the period of such holding over shall be one hundred ten percent (110%) of the monthly Base Rent in effect during the last month of the Term of this Lease, and such tenancy shall otherwise be on the terms and conditions contained herein.

### 23.13. Cumulative Remedies

All rights and remedies of either party hereto set forth in this Lease shall be cumulative, except as may otherwise be provided herein.

### 23.14. Time of Essence

Time is of the essence with respect to all provisions of this Lease in which a definite time for performance is specified.

### 23.15. Survival of Indemnities

Termination of this Lease shall not affect the right of either party to enforce any and all indemnities and representations and warranties given or made to the other party under this Lease, nor shall it affect any provision of this Lease that expressly states it shall survive termination hereof. Each party hereto specifically acknowledges and agrees that, with respect to each of the indemnities contained in this Lease, the indemnitor has an immediate and independent obligation to defend the indemnitees from any claim which actually or potentially falls within the indemnity provision even if such allegation is or may be groundless, fraudulent or false, which obligation arises at the time such claim is tendered to the indemnitor by the indemnitee and continues at all times thereafter.

### 23.16. Signs

County may erect or post signs on or about the Premises subject to Landlord's prior approval as provided below. Landlord reserves the right to review the placement, design, and plan for any such sign prior to its erection or posting and agrees that the approval thereof shall not be unreasonably withheld or delayed.

### 23.17. Quiet Enjoyment and Title

Landlord covenants and represents that it has full right, power and authority to grant the leasehold estate hereunder, and covenants that County, upon paying the Rent hereunder and performing the covenants hereof, shall peaceably and quietly have, hold and enjoy the Premises and all appurtenances during the full Term of this Lease as against all persons or entities claiming by and through Landlord or on account of any action, inaction or agreement of Landlord or its

Agents. Without limiting the provisions of Section 16.2 (Landlord's Indemnity), Landlord agrees to indemnify County and its Agents against Claims arising out of any assertion that would interfere with County's right to quiet enjoyment as provided in this Section.

### 23.18. Bankruptcy

Landlord represents and warrants to County that Landlord has neither filed nor been the subject of any filing of a petition under the federal bankruptcy law or any federal or state insolvency laws or laws for composition of indebtedness or for the reorganization of debtors, and, to the best of Landlord's knowledge, no such filing is threatened. Landlord and County agree that County's leasehold estate created hereby includes, without limitation, all rights to receive and enjoy all services, facilities and amenities of the Premises, the Building and the Property as provided herein, and that if any of such services, facilities or amenities are terminated, or materially limited or restricted on account of any such case or proceeding, or for any other reason, County shall have the right to (i) contract directly with any third-party provider of such services, facilities or amenities to obtain the same, and (ii) offset against the Base Rent or other charges payable hereunder any and all reasonable costs and expenses incurred by County in obtaining such services, facilities or amenities.

### 23.19. Transfer of Landlord's Interest

Landlord shall have the right to transfer its interest in the Property, the Building or this Lease to any other financially responsible person or entity. In the event of any such transfer, Landlord shall be relieved, upon notice to County of the name and address of Landlord's successor, of any obligations accruing hereunder from and after the date of such transfer and upon delivering to County an express assumption by the transferee of all of Landlord's obligations hereunder.

### 23.20. Non-Liability of County Officials, Employees and Agents

Notwithstanding anything to the contrary in this Lease, no elective or appointive board, commission, member, officer, employee or agent of County shall be personally liable to Landlord, its successors and assigns, in the event of any default or breach by County or for any amount which may become due to Landlord, its successors and assigns, or for any obligation of County under this Lease.

### 23.21. Counterparts

This Lease may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

### 23.22. Certification by Landlord

By executing this Lease, Landlord certifies that Landlord is not suspended, debarred or otherwise excluded from participation in federal assistance programs. Landlord acknowledges that this certification of eligibility to receive federal funds is a material term of this Lease.

### 23.23. Acceptance of Lease by Landlord

NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS LEASE, LANDLORD ACKNOWLEDGES AND AGREES THAT NO OFFICER OR EMPLOYEE OF

COUNTY HAS AUTHORITY TO COMMIT COUNTY HERETO UNLESS AND UNTIL THE COUNTY'S BOARD OF SUPERVISORS SHALL HAVE DULY ADOPTED A RESOLUTION APPROVING THIS LEASE AND AUTHORIZING CONSUMMATION OF THE TRANSACTION CONTEMPLATED HEREBY. THEREFORE, ANY OBLIGATIONS OR LIABILITIES OF COUNTY HEREUNDER ARE CONTINGENT UPON ADOPTION OF SUCH A RESOLUTION, AND THIS LEASE SHALL BE NULL AND VOID UNLESS COUNTY'S BOARD OF SUPERVISORS AUTHORIZES EXECUTION OF THIS LEASE, IN ITS RESPECTIVE SOLE AND ABSOLUTE DISCRETION, AND IN ACCORDANCE WITH ALL APPLICABLE LAWS. APPROVAL OF THIS LEASE BY ANY DEPARTMENT, COMMISSION OR AGENCY OF COUNTY SHALL NOT BE DEEMED TO IMPLY THAT SUCH RESOLUTION WILL BE ADOPTED NOR WILL ANY SUCH APPROVAL CREATE ANY BINDING OBLIGATIONS ON COUNTY.

Landlord and County have executed this Lease as of the date first written above.

**LANDLORD:**

DINAPOLI FAMILY LP

By: _J. Philip DiNapoli_

Name: _J. Philip Di Napoli_

Date: _July 6, 2023_

**COUNTY:**

COUNTY OF SAN MATEO, a political subdivision of
the State of California

By: _____
David Pine

President, Board of Supervisors

ATTESTED:

_____
Clerk of the Board of Supervisors
(Assistant)

# EXHIBIT A

## SITE PLAN OF PREMISES
### Page 1 of 3



4875-0928-4972.4/
142642.00116/7-6-237-5-23/saj/saj

# EXHIBIT A

## FLOOR PLAN OF SUITE 690 BROADWAY
### Page 2 of 3





4875-0928-4972 4/
142642.00116/7-6-237-5-23/saj/saj

## EXHIBIT A

### FLOOR PLAN OF SUITE 686 BROADWAY
### Page 3 of 3



FLOOR PLAN
A1.1

4875-0928-4972.4/
142642.00116/7-6-237 5 23/saj/saj

**EXHIBIT B**

**Notice of Commencement Date**

[Date]

Mr. Michael Callagy
County Executive
County of San Mateo
400 County Center
Redwood City, CA 94063

RE:    Acknowledgement of Commencement Date, Lease Between JP DiNapoli Companies, Inc. (Landlord), and the COUNTY OF SAN MATEO (County), for the premises known as 686 – 690 Broadway Street, in Redwood City

Dear Mr. Callagy:

      This letter will confirm that for all purposes of the Lease, the Rent Commencement Date (as defined in Section 3.2 of the Lease) is _____, 2023.

Please acknowledge your acceptance of this letter by signing and returning a copy of this letter.

Thank you,

_____

By: _____

Title: _____

Accepted and Agreed:

By:     _____
       Mike Callagy
       County Executive

**EXHIBIT 38**

**From:** Victor Aenlle <vaenlle@smcgov.org>
**Sent:** Monday, May 8, 2023 12:19 PM
**To:** Caroline Shaker <cshaker@smcgov.org>
**Subject:**

Caroline,

What about this one? Either for lease or for sale.

https://protect-us.mimecast.com/s/ry3pCxkz2qFEqn3ESvHktN



686-690 Broadway St, Redwood City, CA 94063 - Flex for Lease | LoopNet

686-690 Broadway St, Redwood City, CA 94063. This Flex space is available for lease.

protect-us.mimecast.com

Victor

**EXHIBIT 39**

**CBRE**

# 686 & 690 Broadway Street

Redwood City | CA 94063

5,875 RSF – 14,275 RSF



# 686 & 690 Broadway Street

5,975 RSF - 14,275 RSF



www.cbre.us

**CBRE**

# 690 Broadway St.


**360°**
VIRTUAL TOUR

## 8,400 RSF - Full Building

- 1st Floor: 6,375 RSF
- Mezzanine: 2,025 RSF
- Available Immediately – Market Ready Work Complete
- 9 Private Rooms – Mixture of Offices & Conference Rooms
- Sprinklered & Skylights

- $0.59 2023 Estimated OPEX/Month
- 200 Amps 120/240 Volt Single Phase 3-Wire
- 13' x 18' GL Rollup
- Approved Uses To Be Verified by Tenant
- Signage Available – Subject to City Approval



www.cbre.us

**CBRE**

# 690 Broadway Street






www.cbre.us

**CBRE**

# 686 Broadway St.


**360°** VIRTUAL TOUR

## 5,875 RSF - Full Building

+ Available Immediately – Improvements Available
+ Brand New Sprinkler System
+ New Restroom Core
+ Polished Concrete Flooring

+ $0.59 2023 Estimated OPEX/Month
+ 200 Amps 120/240 Volt Single Phase 3-Wire
+ 10' x 11' GL Rollup
+ Approved Uses: To Be Verified by Tenant
+ Signage Available – Subject to City Approval





© 2022 CBRE, Inc. All rights reserved. This information has been obtained from sources believed reliable but has not been verified for accuracy or completeness. CBRE, Inc. makes no guarantee, representation or warranty and accepts no responsibility or liability as to the accuracy, completeness, or reliability of the information contained herein. You should conduct a careful, independent investigation of the property and verify all information. Any reliance on this information is solely at your own risk. CBRE and the CBRE logo are service marks of CBRE, Inc. All other marks displayed on this document are the property of their respective owners, and the use of such marks does not imply any affiliation with or endorsement of CBRE. Photos herein are the property of their respective owners. Use of these images without the express written consent of the owner is prohibited.

www.cbre.us

**CBRE**

# 686 Broadway Street






## Contact Us

**Bob McSweeney**
Senior Vice President
+1 658 577 2928
Bob.McSweeney@cbre.com
Lic. 00934240

**Evan Chang**
Vice President
+1 650 577 2962
Evan.Chang@cbre.com
Lic. 02010044

**Matt Murray**
Associate
+1 408 781 9322
Matt.Murray@cbre.com
Lic. 02083830

www.cbre.us

**CBRE**

**EXHIBIT 40**

**Caroline Shaker**

**From:** Caroline Shaker
**Sent:** Friday, June 16, 2023 11:43 AM
**To:** Victor Aenlle; Christina Corpus
**Subject:** 686 and 690 Broadway Street, Redwood City
**Attachments:** COUNTY LOI EXEC JBD 61523.pdf

Good morning and happy Friday,

Finally we have a deal. Attached please find LL's signature on the LOI.

Best,

Caroline

**From:** Caroline Shaker
**Sent:** Thursday, June 15, 2023 10:30 PM
**To:** Victor Aenlle <vaenlle@smcgov.org>; Christina Corpus <CCorpus@smcgov.org>
**Subject:** RE: 686 and 690 Broadway Street, Redwood City - ADA Access

Hello again,

Hope all is well. We are getting there with negotiations. Please take a look at the attached revised LOI submitted to LL for review, approval and signature, and let me know your thoughts.

Thanks,

Caroline

**From:** Victor Aenlle <vaenlle@smcgov.org>
**Sent:** Wednesday, June 14, 2023 8:56 AM
**To:** Caroline Shaker <cshaker@smcgov.org>; Christina Corpus <CCorpus@smcgov.org>
**Subject:** Re: 686 and 690 Broadway Street, Redwood City - ADA Access

Good morning Caroline,

I will follow up with Tory this am. We will give them an answer this morning.

Best,

Victor

**From:** Caroline Shaker <cshaker@smcgov.org>
**Sent:** Wednesday, June 14, 2023 8:50 AM
**To:** Christina Corpus <CCorpus@smcgov.org>, Victor Aenlle <vaenlle@smcgov.org>
**Subject:** 686 and 690 Broadway Street, Redwood City - ADA Access

Good morning Sheriff Corpus and Victor,

I received the following message last night along with a call from Bob:
"Caroline
Thank you , can you give us an answer
Tomorrow morning. The other prospective tenant is pressuring the
Landlord - They are ready to sign a lease. Thanks Bob

Robert McSweeney | Senior Vice President
CBRE | Advisory & Transaction Services | Lic. 00934240
1450 Chapin Avenue, Suite 200 | Burlingame, CA 94010"

I checked with Tory and he was going to swing by yesterday, have you heard from him?

Thanks,

**Caroline Shaker, MBA**
Real Property Services Manager
**Real Property Services**
County Executive's Office
555 County Center, 4th Floor
Redwood City, CA 94063
Office (650) 363-4047
Cell   (650) 613-1864

2



Bob McSweeney
Senior Vice President
Lic. 00934240

CBRE, Inc.
Commercial Real Estate Services
DRE# 00409987

1450 Chapin Ave, Suite 200
Burlingame, CA 94010

+1 650 577 2928  Direct
+1 650 759 0202  Cell

Bob.McSweeny@cbre.com
www.cbre.com

June 15, 2023


JP DiNapoli Companies Inc.
Address: 686 – 690 Broadway St


Re: Proposal to Lease 686-690 Broadway St, Redwood City, CA 94063

JP DiNapoli Companies Inc.

On behalf of San Mateo County ("Lessee"), we are pleased to submit the following proposed terms to lease the premise referenced below from JP DiNapoli Companies, Inc. ("Lessor"):

| | | |
|---|---|---|
| 1. | **ADDRESS:** | 686 - 690 Broadway St, Redwood City, CA 94063 |
| 2. | PREMISES: | a) Approximately 14,275 rentable square feet consisting of 8,400 square feet in 690 Broadway and 5,875 square feet in 686 Broadway. |
| 3. | **TERM:** | 10 years with 2 - 5 years options |
| 4. | **COMMENCEMENT DATE:** | 7/27 if we have LL's signed lease by 6/26 to present to the BOS |
| 5. | **RENT COMMENCEMENT DATE:** | 8/1/2023 |
| 6. | **RENTAL RATE:** | $2.5/square foot per month. NNN |
| 7. | **ANNUAL RENT ESCALATIONS:** | 3% per annum |
| 8. | **OPTIONS TO EXTEND THE LEASE:** | Lessee shall have 2 - 5 years option(s) to extend the Lease at 95% the then "Fair Market Value", but in no event greater than a three (3%) increase over the rent for the last year of the initial term. The rent shall escalate by three (3%) percent per annum during the option term(s). To exercise the option(s), Lessee must give Lessor written notice no later than six months prior to Lease expiration. |
| 9. | **UTILITIES:** | Lessee shall contract directly for all separately metered utilities including water, electricity and natural gas.  If any utilities are |

NOT separately metered, please identify which and how the
billings are to be handled. Please identify any solar power
generating systems that serve the property and any emergency
generators that serve the property and premises.

10. JANITORIAL AND GARBAGE
DISPOSAL:

Lessee shall contract directly for its own janitorial services and
garbage removal

11. IMPROVEMENTS & DELIVERY
CONDITION:

Lessor shall deliver the premises in a clean condition and free of
all personal effects and debris. Restroom fixtures in good
shape. All lighting, electrical, HVAC, doors, windows, loading
doors and load leveler equipment and throughout the premises
to be in good, functional condition. Lessor to provide a
frost/glaze to the front windows of the Premises. Lessor to
restore entrance located towards the rear of 686 Broadway
Street, directly adjacent to the parking lot. Handicap stalls to be
configured prior to Lease Commencement.

12. AS-IS CONDITION:

Unless noted above in Section 11, Lessee hereby agrees to
accept the premises in "As-Is" condition.

13. PARKING:

Lessee to have ±31 unreserved parking stalls. Lessor to confirm
accurate number.

14. USE:

Lessee shall occupy 690 Broadway for office and warehouse use.
Lessee shall have the option to use all or a portion of 686
Broadway Ave for Childcare Services for the sole use of their
Employees. Lessee shall also have the option to use a portion of
the parking area to create an outdoor space for the Childcare
Services. In no way shall this impact the ingress or egress of
other tenants in the building. Lessee shall abide by all City and
Fire codes for the indoor and outdoor Childcare areas.

15. MAINTENANCE OBLIGATIONS:

During the term of the Lease, Lessee shall maintain the interior
of its premises, including the HVAC systems, doors windows,
basic electrical outlets and above ground plumbing and fixtures.
Lessee shall also maintain its loading doors, dock levelers and
dock bumpers. Lessor shall maintain the roof, sidewalls,
foundation, parking lots, landscaping, exterior paint, sewer
lateral and all underground utilities serving the premises. Lessor
shall also maintain the fire sprinkler systems and the main
electrical panel and its connection to the service provider.

16. REAL ESTATE REPRESENTATION
AND COMPENSATION:

CBRE Bob McSweeney, Evan Chang & Matt Murray represents
Lessee and CBRE Bob McSweeney, Evan Chang & Matt Murray
represents Lessor. Thus, CBRE is acting as an authorized "Dual
Agent". Lessor agrees to pay CBRE a leasing commission per the
CBRE standard Commission Schedule upon execution of a formal
Lease agreement.

**17. CBRE PROPERTY AND AGENCY DISCLOSURES:**
A copy of the CBRE, Inc. Sale/Lease Disclosure Form for the subject property is enclosed for your review. Internal policies require that this document be presented to all parties of a transaction in which CBRE, Inc. participates.

Per California law, a Broker Relationship Disclosure form and an Agency Representation Confirmation Disclosure form are enclosed for your review and signature.

CBRE © 2023 All Rights Reserved. All information included in this letter/proposal pertaining to CBRE, Inc.—including but not limited to its operations, employees, technology and clients—are proprietary and confidential and supplied with the understanding that such information will be held in confidence and not disclosed to any third party without CBRE's prior written consent. This letter/proposal is intended solely as a preliminary expression of general intentions, to be used for discussion purposes only, and does not create any agreement or obligation by CBRE to negotiate or continue negotiations. CBRE shall have no contractual obligation with respect to the matters referred to herein unless and until a definitive, fully executed agreement has been delivered by the parties. Prior to delivery of a definitive executed agreement, and without any liability to the other party, either party may (1) propose different terms from those summarized herein, (2) enter into negotiations with other parties and/or (3) unilaterally terminate all negotiations with the other party hereto.

If the Lessor is in agreement with the terms presented above, please have them acknowledge by signature below, return a copy to us and please commence drafting of a Lease. Thank you and please call us if you have any questions.

Sincerely,

*[signature]*

Bob McSweeney

READ AND AGREED:

Lessee:

By:_____

Name Printed: _____

Date:_____

Lessor:

By:_____

Name Printed: John B. DiNapoli

Date: June 15, 2023

**EXHIBIT 41**

# RE: Update



**Caroline Shaker**
To  Victor Aentle

🙂  ↩ Reply   ↩ Reply All   → Forward   [icon]   ⋯

Tue 5/23/2023 5:42 PM

Retention Policy  ( 30d 2 year delete (2 years)          Expires  5/22/2025

Hi Victor,

Please take a look and let me know if you need more info.

| Lease No | Facility Name & Address | Use | Area Sq Ft | Landlord | Start Date | Expiration Date | Option to renew | Base Rent | Price per Sq. Ft | Oper. Exp. | Oper. Exp. | Total | Annual Increase based upon |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1713 | Fair Oaks Substation 3121 Middlefield Rd Redwood City | Substation | 1886 | Furmen Properties | 5/23/1997 | 8/31/2026 | Yes - 15 yr - due 6/1/2026 | $ 4,456.20 | $ 2.39 | Gross | | $ 4,456.20 | Three Percent |
| 1294 | North Fair Oaks SAL Sale 3151 Edison Wy Redwood City | Office | 4232 | Synapse School | 10/24/2014 | 7/1/2023 | Mo. to Mo./30 days Notice Either Parties Terminate | $ 9,023.05 | $ 2.13 | Gross | | $ 9,023.05 | 3.5% annual increases |
| **Totals** | | | **6098** | | | | | $ 13,479.25 | | | | $ 13,479.25 | |
| | 686 & 690 Broadway | | | | | | | | | | | | |
| | 686 Broadway | | 5875 | | | | | $ 14,687.50 | 2.50 | $ 0.59 | $ 3,466.25 | 18,153.75 | TBD |
| | 690 Broadway | | 8400 | | | | | $ 21,000.00 | 2.50 | $ 0.59 | $ 4,956.00 | 25,956.00 | TBD |
| **Totals** | | | **14275** | | | | Total cost per SQ.FT= $ 3.09 | | | | | $ 44,109.75 | |

Thanks,

Caroline

**EXHIBIT 42**





**EXHIBIT 43**



**SHERIFF** | **CHRISTINA CORPUS**

SAN MATEO COUNTY SHERIFF'S OFFICE

| | |
|---|---|
| **DATE:** | October 26, 2023 |
| **TO:** | All Sheriff's Personnel |
| **FROM:** | Christina Corpus, Sheriff |
| **SUBJECT:** | Educational Degree Accomplishments |

Please join me in congratulating Executive Director of Administration Victor Aenile and Sergeant John Sabel for their dedication in furthering their education. Victor Aenile recently earned his Ph.D. in Interdisciplinary Studies specializing in Ethical and Creative Leadership. Sergeant John Sabel recently earned his Master's Degree in Organizational Leadership.

We applaud efforts to further personal and professional development as demonstrated by these two Sheriff's Office members. Please join me in congratulating them and we look forward to watching their continued growth and professional development in the future.

**EXHIBIT 44**



**EXHIBIT 45**



# ID and ACCESS Card
# Request Form

Card Requested: ☐ ID Card ☐ Access    Reason for New Card _____

| PERSONAL INFORMATION – To be filled out by Card Requestor |
|---|

Full Name  *Costanzo*          *Angelo*
           Last                          First                                    M.I.

DOB  ___/___/___        DL _____        Sex _____

Height *5'8*    Weight *170*    Hair Color *Grey*    Eye Color *Brown*

Cardholder Rank/Title:  *Special Deputy Sheriff*

| SUPERVISOR/PSB APPROVAL – To be filled out by Supervisor or PSB |
|---|

Employment Type:    ☐ Regular    ☐ Extra Help    ☑ Special
                             ☐ Volunteer    ☐ Retired    ☐ Contractor

Access Type:
    ☐ Deputy (Patrol, Courts, 4th Flr, Secure Parking, YSC, 3rd Flr)
    ☐ CO (3rd Floor, Patrol, Sheriff Elevator)
* Everyone    ☐ Civilian (3rd Floor)
receives HOJ +  ☐ Volunteer (OES + 3rd Floor)
Parking Garage  ☐ Records Tech (3rd Floor + Patrol)
    ☐ Crime Lab (3rd Floor Property Door + Crime Lab)
    ☐ Contractor/Volunteer (HOJ + Parking Only)
    ~~☐ NO ACCESS NEEDED~~

Access Hours:
    ☐ 6am to 6pm M-F
    ☐ 24/7

| PSB APPROVAL – To be filled out by Professional Standards Bureau |
|---|

Issue Date: _____        Card Issued:    ☑ ID Card

Created By: _____        Firearms  ☐ Yes    ☑ No

Signature: _____        ☐ Access#

| RETIRED ONLY |
|---|

Street Address _____
City, State, Zip _____
Telephone _____

**EXHIBIT 46**




🔍 Fuzz bumper  ⊗ Cancel 

## Messages                                    See All

**Sheriff Christina Corpus**                   8/15/22


**Fuzz bumper** reports the yellow phone outside the sub is not working. Who do we call for that

**Sheriff Christina Corpus**                   7/25/22

 **Fuzz bumper** is here

**Sheriff Christina Corpus**                   7/13/22


**Fuzz bumper**s sister is coming to get her done and my hairdresser place

**EXHIBIT 47**

RECORD REDACTED FOR PRIVACY