EXHIBIT 19

**NOTICE OF INTENT TO REMOVE SHERIFF**

Pursuant to Section 412.5 of the San Mateo County Charter and the County's Sheriff Removal Procedures ("Procedures"), the San Mateo County Board of Supervisors has duly approved the issuance of this Notice of Intent to Remove and initiated the Procedures to remove Sheriff Christina Corpus from the office of Sheriff based on the alleged grounds supporting removal set forth herein.

The Procedures afford Sheriff Corpus the right to a Pre-Removal Conference within five calendar days from receipt of this Notice of Intent. The Pre-Removal Conference shall take place as follows:

**Place:**   **Human Resources Department**            **Date:  Wednesday, June 11, 2025**
        **500 County Center, 4th Floor**
        **Redwood City, CA  94063**                **Time:  9:00 AM**

Under the Procedures, Sheriff Corpus has the right to a Removal Hearing. Failure to appear at the Pre-Removal Conference constitutes waiver of the right to a Removal Hearing. A copy of the Procedures is enclosed.

# TABLE OF CONTENTS

**Page(s)**

GROUNDS IN SUPPORT OF THE SHERIFF'S REMOVAL .......................................... 1

*Summary of grounds for removal from office* .......................................... 1

*The Cordell Report and Measure A* .......................................... 4

*This Investigation* .......................................... 5

*Other witnesses and reservation of rights* .......................................... 6

*Independence of bases for cause* .......................................... 6

I.    Grounds for Removal Relating to Victor Aenlle .......................................... 6

    A.    Introduction .......................................... 6

    B.    Victor Aenlle is a real estate broker and reserve deputy who worked on Sheriff Corpus's campaign. .......................................... 7

    C.    Sheriff Corpus and Mr. Aenlle have a close personal relationship, which they have taken steps to conceal. .......................................... 8

        1.    The relationship between Sheriff Corpus and Mr. Aenlle was evident during Sheriff Corpus's campaign. .......................................... 8

        2.    The relationship between Sheriff-elect Corpus and Mr. Aenlle was apparent in the months immediately following the election. .......................................... 9

        3.    Sheriff Corpus's then-husband reported that she was having an affair with Mr. Aenlle. .......................................... 10

        4.    In September 2022, Sheriff Corpus and Mr. Aenlle traveled to Hawaii and provided conflicting accounts of their trip. .......................................... 10

        5.    The relationship continued after Sheriff Corpus took office. .......... 11

        6.    Sheriff Corpus and Mr. Aenlle deny an "intimate relationship." ...... 12

    D.    Using public funds, Sheriff Corpus entered into two separate contractual arrangements and one employment relationship with Mr. Aenlle and repeatedly requested raises for Mr. Aenlle. .......................................... 13

    E.    Sheriff Corpus took steps to conceal potentially negative information about Mr. Aenlle. .......................................... 14

i

F.  Immediately after the Board of Supervisors voted to remove Mr. Aenlle as "Executive Director of Administration," Sheriff Corpus attempted to appoint him as an Assistant Sheriff. ......................................... 15

G.  Sheriff Corpus's decision to install Mr. Aenlle as a member of her Executive Team hurt the SMCSO. ................................................................. 16

1.  Sheriff Corpus's decision to install Victor Aenlle in a leadership position hurt morale in the SMCSO. ............................... 16

2.  Sheriff Corpus's Executive Team warned her about Mr. Aenlle's conduct and the effect it was having on the office. ............ 18

3.  Sheriff Corpus's close personal relationship with Mr. Aenlle and her decision to retain him on her Executive Team contributed to the departures of numerous senior advisors and Executive Team members. ............................................................... 18

H.  Grounds for Removal ...................................................................................... 19

I.  Supporting Evidence ....................................................................................... 21

II. Grounds for Removal Relating to the Investigation and Arrest of DSA President Carlos Tapia ........................................................................................... 23

A.  Introduction ..................................................................................................... 23

B.  Factual Background ......................................................................................... 24

1.  The MOU allows Dep. Tapia to bill for "release time" spent on DSA activities. ................................................................................. 24

2.  After Sheriff Corpus takes over the SMCSO, her relationship with the DSA deteriorates. ................................................................. 25

3.  Judge Cordell interviews Dep. Tapia. ............................................... 26

4.  The DSA and Sheriff Corpus have a contentious meeting concerning overtime policies. ............................................................ 26

5.  After the August 15, 2024 meeting, Dep. Tapia begins to receive messages from SMCSO's finance and human resources departments concerning his timecard practices ................. 27

6.  The DSA and OSS file a PERB complaint against Sheriff Corpus and declare "no confidence" in Mr. Aenlle. ......................... 28

7.     Sheriff Corpus inquired about Dep. Tapia's attendance in Transportation. ................................................................. 29

8.     Sheriff Corpus asks Acting Assistant Sheriff Fox to investigate Dep. Tapia. .................................................................... 29

9.     In violation of SMCSO policy, Sheriff Corpus conducts an in-house investigation into Dep. Tapia for potential criminal conduct. .......................................................................... 30

10.    Sheriff Corpus and her Executive Team limit the evidence available to Acting Assistant Sheriff Fox. ........................................ 30

11.    Sheriff Corpus orders Dep. Tapia to be arrested on November 12, 2024. ....................................................................... 32

12.    Mr. Aenlle uses Dep. Tapia's arrest to try to discourage the release of the Cordell Report. ............................................ 34

13.    After conducting an investigation, the District Attorney declines to prosecute Dep. Tapia. ...................................... 34

C.     Grounds for Removal ...................................................... 34

D.     Supporting Evidence ....................................................... 36

III.   Grounds for Removal Relating to Unlawful Punitive Action Taken Against Sgt. Javier Acosta. ....................................................... 38

A.     Introduction ................................................................ 38

B.     Sheriff Corpus began an investigation into Sgt. Javier Acosta within a week of the contentious August 15, 2024 meeting between the DSA, OSS, and the Sheriff. ..................................................... 38

C.     Sgt. Javier Acosta remains on administrative leave without explanation. ............................................................... 40

D.     Grounds for Removal ...................................................... 40

E.     Supporting Evidence ....................................................... 41

IV.   Grounds for Removal Relating to the Termination of Former Assistant Sheriff Ryan Monaghan ............................................................ 42

A.     Introduction ................................................................ 42

B.      Sheriff Corpus retaliated against Assistant Sheriff Monaghan days after learning that he had spoken to Judge Cordell as part of her investigation. ........................................................................... 42

C.      Grounds for Removal ................................................................... 44

D.      Supporting Evidence ................................................................... 45

V.      Grounds for Removal Relating to Unlawful Retaliatory Transfers and Terminations. ......................................................................................... 45

A.      Introduction ................................................................................. 45

B.      Sheriff Corpus retaliated against Capt. Philip for refusing to sign and serve the deficient Internal Affairs notice to Sgt. Javier Acosta. ................. 45

C.      Sheriff Corpus retaliated against Lt. Sebring after he advised an employee that she could file an HR complaint against Mr. Aenlle. ............. 47

D.      Sgt. Chan was transferred within hours of appearing at a press conference in support of Measure A. ............................................. 48

E.      Sheriff Corpus retaliated against Capt. Rebecca Albin for posting a message on social media. ............................................................. 48

F.      Grounds for Removal ................................................................... 49

G.      Supporting Evidence ................................................................... 50

VI.     Grounds for Removal Relating to the Professional Standards Bureau ................... 51

A.      Introduction ................................................................................. 51

B.      Overview of PSB functions .......................................................... 52

C.      Sheriff Corpus has inhibited PSB from fulfilling its investigative function. ....................................................................................... 53

D.      Sheriff Corpus's mismanagement of PSB has led to substantial delays in the investigative process and created significant negative effects. ........... 54

E.      Examples of Sheriff Corpus's failure to properly conduct PSB investigations. ............................................................................... 55

        1.      The Sheriff ignored a PSB recommendation to investigate serious misconduct by a deputy who supported her campaign. ........ 55

2.    The Sheriff has failed to conclude an investigation into a deputy trainee who left firearm in a public place............................. 56

3.    The Sheriff failed to conduct an investigation into serious allegations of excessive force by a correctional officer. ................... 56

4.    The Sheriff has failed to conduct or conclude investigations concerning a correctional officer despite repeated allegations of serious misconduct. ...................................................................... 57

F.    Grounds for Removal ..................................................................... 57

G.    Supporting Evidence ..................................................................... 58

VII.    Conclusion.................................................................................................... 59

VIII.    San Mateo County Sheriff Removal Procedures ...................................... 60

## GROUNDS IN SUPPORT OF THE SHERIFF'S REMOVAL

*Summary of grounds for removal from office*

Christina Corpus became the Sheriff of San Mateo County on January 3, 2023, having won a majority of votes cast in the June 7, 2022 election. On March 4, 2025, San Mateo County voters voted to amend the County Charter to add Section 412.5 and grant the Board of Supervisors authority to remove an elected sheriff from office for cause.

Throughout her tenure, Sheriff Corpus has violated laws related to the performance of her duties, flagrantly and repeatedly neglected her duties, and obstructed investigations into her conduct and at the San Mateo County Sheriff's Office ("SMCSO" or "Sheriff's Office"). Accordingly, cause exists under Section 412.5 of the County Charter to remove Sheriff Corpus from office.

*First*, Sheriff Corpus violated conflict of interest laws and neglected her duties as Sheriff by hiring, promoting, and relying on as her primary aide Victor Aenlle, an unqualified civilian with whom she has a close personal relationship. Sheriff Corpus's Executive Team has been comprised of herself, an undersheriff, assistant sheriffs, and, for a period of time, a civilian "Executive Director of Administration." Sheriff Corpus created the "Executive Director of Administration" position specifically for Mr. Aenlle after she took office. Indeed, the job was not posted, and he was the only applicant.

Mr. Aenlle is not qualified to serve in a leadership role in the SMCSO. He is a real estate broker and operates a private investigation service. He applied to become a full-time deputy with the SMCSO, but he failed to complete the field training program. While he has been a part-time reserve deputy with the SMCSO for many years, he has never been a full-time peace officer, and he has never worked full-time in any capacity, sworn or civilian, within a law enforcement agency. Despite Mr. Aenlle's lack of qualifications—and despite concerns communicated to her about her close personal relationship with Mr. Aenlle—Sheriff Corpus created the "Executive Director of Administration" position for Mr. Aenlle and repeatedly sought promotions and pay increases for him.

Sheriff Corpus enabled unprofessional conduct by Mr. Aenlle, who routinely undermined SMCSO officials and operations throughout his tenure. While under Sheriff Corpus's supervision, he hindered the professional peace officers who comprised the rest of the Sheriff's Executive Team from executing their duties. He impeded internal investigations into alleged deputy misconduct.

County and SMCSO personnel repeatedly brought specific examples of Mr. Aenlle's misconduct to the attention of Sheriff Corpus. Despite knowing about Mr. Aenlle's detrimental effect on SMCSO, Sheriff Corpus persistently sought to promote him and raise his salary. Between January 2023 and November 2024, Sheriff Corpus sought County permission to raise Mr. Aenlle's salary on at least five occasions. In November 2024, after the Board of Supervisors took the extraordinary step of terminating Mr. Aenlle's position and restricting his access to non-public County buildings, Sheriff Corpus announced that she would re-hire Mr. Aenlle as an Assistant Sheriff, even though he failed to meet the minimum qualifications for that position. The County notified the Sheriff that Mr. Aenlle could not be promoted to Assistant Sheriff

May 30, 2025
Page 2

because Mr. Aenlle failed to meet the minimum qualifications for the position. In April 2025, after she could not hire him as an assistant sheriff, Sheriff Corpus added Mr. Aenlle to the "active list" of deputies.

Sheriff Corpus's decision to hire, promote, and seek salary raises for Mr. Aenlle and to ignore multiple warnings about his detrimental effect on the SMCSO, while having a close personal relationship with him, violates California and County conflict-of-interest laws and constitutes repeated and flagrant neglect of her duties as defined by law. These actions constitute cause for removal.

*Second*, Sheriff Corpus has demonstrated a pattern of retaliating against SMCSO personnel who she perceives to threaten her or Mr. Aenlle's authority. The most egregious example of this pattern of retaliation was Sheriff Corpus's decision to investigate and, eventually, order the warrantless arrest of Deputy Carlos Tapia—the president of the deputy sheriff's union, the Deputy Sheriff's Association ("DSA")—on unsubstantiated criminal charges.

In August 2024, the DSA filed a complaint against Sheriff Corpus with the Public Employment Relations Board ("PERB"). The August 2024 PERB complaint included allegations of misconduct against Mr. Aenlle. Dep. Tapia submitted a declaration in support of the PERB complaint. In September 2024, the DSA and the sergeants' union, the Organization of Sheriffs' Sergeants ("OSS"), announced a vote of no-confidence in Mr. Aenlle's leadership.

The following month, Sheriff Corpus ordered then-Acting Assistant Sheriff Matthew Fox to investigate Dep. Tapia for timecard fraud. This order was contrary to SMCSO's policy of referring criminal investigations into its own deputies' conduct to the District Attorney or another outside agency. Sheriff Corpus misrepresented the basis for the investigation, suggesting to Acting Assistant Sheriff Fox that the lieutenant overseeing Dep. Tapia had complained about his attendance in the Transportation and Court Security Bureau ("Transportation Unit") when that never happened. Sheriff Corpus and Mr. Aenlle then limited the evidence available to Acting Assistant Sheriff Fox as he performed the investigation, including preventing him from reviewing timecard records and from speaking to a witness who would have provided exculpatory evidence. Likewise, Sheriff Corpus denied Acting Assistant Sheriff Fox's repeated recommendation to place Dep. Tapia on administrative leave to allow more time for the investigation. After carrying out the investigation based on the incomplete information provided to him, Acting Assistant Sheriff Fox eventually reported to Sheriff Corpus that he had found what he believed to be evidence of timecard fraud.

On November 12, 2024, Sheriff Corpus instructed Acting Assistant Sheriff Fox to inform the San Mateo County District Attorney that she intended to arrest Dep. Tapia. Acting Assistant Sheriff Fox conferred with the Chief Deputy District Attorney of San Mateo County, who urged him not to proceed with a warrantless arrest. Acting Assistant Sheriff Fox conveyed that information to Sheriff Corpus, who nevertheless ordered that Dep. Tapia be arrested without a warrant that day.

May 30, 2025
Page 3

The timing of Dep. Tapia's arrest is significant for at least two reasons. First, the County and the DSA were scheduled to resume their labor meet-and-confer on the afternoon of November 12, 2024. Sheriff Corpus ordered that Dep. Tapia's arrest take place at 1:00 p.m., an hour before the meet-and-confer was scheduled to start. Second, it was known throughout the SMCSO that the County had been planning to release the results of an independent investigation conducted by retired Judge LaDoris Cordell into the Sheriff's and Mr. Aenlle's conduct. (The Cordell Report, as it became known, is described in further detail below.) Members of the Sheriff's Executive Team suspected that Dep. Tapia had interviewed with Judge Cordell as part of her investigation. An arrest of the DSA President was a newsworthy event that could compete with the release of the Cordell Report for news coverage and, potentially, undermine it through the arrest of a participating witness.

Dep. Tapia did not commit a crime, as the District Attorney's ensuing independent investigation confirmed. Once District Attorney investigators looked at the full range of available evidence, they concluded that "there was no basis to believe any violation of law had occurred" and that "Deputy Tapia should not have been arrested." Yet Dep. Tapia remains on administrative leave today six months after the arrest, while the SMCSO purports to complete an Internal Affairs investigation into the same allegations.

In ordering Dep. Tapia's arrest, Sheriff Corpus violated the Penal Code and the Labor Code, flagrantly neglected the duties of her office, and obstructed an investigation into her conduct and the SMCSO. These actions constitute cause for removal.

Sheriff Corpus has engaged in other instances of retaliation. Shortly after she learned that Assistant Sheriff Monaghan participated in an interview with Judge Cordell, Sheriff Corpus removed him from his position. Sheriff Corpus has also retaliated against officers for perceived disloyalty by transferring them to unfavorable assignments. Sheriff Corpus also placed a sergeant who is the brother of the head of the OSS on administrative leave in August 2024, days after a contentious labor-management meet-and-confer and around the same time that the OSS filed a PERB complaint against the Sheriff. Following an improper Internal Affairs investigation, the sergeant remains on administrative leave nine months later. When a captain in the SMCSO's Professional Standards Bureau ("PSB") refused to sign or serve a defective Internal Affairs notice for the sergeant whose brother heads the OSS, Sheriff Corpus transferred him out of the PSB unit and stripped him of responsibilities. When the lieutenant who oversaw the PSB unit suggested that a civilian employee could file a human resources complaint regarding Mr. Aenlle, Sheriff Corpus transferred him to a less desirable post. And when a sergeant appeared off-duty at a press conference in support of the March 4, 2024 ballot initiative giving the Board of Supervisors the ability to terminate an elected sheriff, Sheriff Corpus transferred him that same day to a less desirable post. The Sheriff's actions violated the California Government and Labor Codes, the San Mateo County Code, and the SMCSO Policy Manual; her termination of Assistant Sheriff Monaghan amounted to obstruction of an investigation into the conduct of the SMCSO. These actions constitute cause for removal.

May 30, 2025
Page 4

*Third,* while Sheriff Corpus has shown a pattern of swift retaliation against personnel who she believes are challenging her or Mr. Aenlle's authority, she regularly hinders or neglects other disciplinary matters within SMCSO. PSB oversees hiring new peace officers and conducts investigations into allegations of misconduct within the SMCSO, including civilian complaints, use-of-force investigations, and Internal Affair investigations. Sheriff Corpus has prevented PSB personnel from promptly conducting and concluding investigations and has personally interfered in investigations, including investigations of excessive use of force in the jail, of a deputy contributing to the delinquency of a minor, of a deputy violating the County's civil service rules by interfering in SMCSO's hiring process, and of an off-duty deputy trainee who left a SMCSO firearm unattended in a public restaurant. In some instances, Sheriff Corpus's interference with investigations appears motivated by favoritism, where the investigation subject is perceived to support, or in fact financially supported, the Sheriff politically. Sheriff Corpus's mismanagement of PSB has prevented SMCSO from complying with its investigatory obligations under the Penal Code and constitutes flagrant or repeated neglect of the duties of her office. These actions constitute cause for removal.

*The Cordell Report and Measure A*

In July 2024, the County retained Judge Cordell to conduct an independent fact-finding investigation into complaints and concerns that current and former members of the SMCSO made about Mr. Aenlle. Over the course of the investigation, additional matters regarding the SMCSO—including allegations of misconduct committed by Sheriff Corpus—were added to the scope of the investigation. In performing her investigation, Judge Cordell interviewed 40 current and past sworn and civilian employees of the Sheriff's Office. Mr. Aenlle participated in a recorded interview with Judge Cordell. Sheriff Corpus declined Judge Cordell's invitation to interview. The Cordell Report was made public on November 12, 2024, sustaining several allegations of misconduct by Sheriff Corpus and Mr. Aenlle.

Thereafter, the Board of Supervisors called the March 4, 2025 special election so that county voters could consider Measure A. Measure A proposed to add section 412.5 to the County's Charter, which would authorize the Board to remove a sheriff from office for "cause." Section 412.5 defines "cause":

> b. For the purposes of this Section 412.5, "cause" shall mean any of the following:
>
> (1) Violation of any law related to the performance of a Sheriff's duties; or
>
> (2) Flagrant or repeated neglect of a Sheriff's duties as defined by law; or
>
> (3) Misappropriation of public funds or property as defined in California law; or
>
> (4) Willful falsification of a relevant official statement or document; or
>
> (5) Obstruction, as defined in federal, State, or local law applicable to a Sheriff,

May 30, 2025
Page 5

of any investigation into the conduct of a Sheriff and/or the San Mateo County Sheriff's Office by any government agency (including the County of San Mateo), office, or commission with jurisdiction to conduct such investigation.

Between the release of the Cordell Report and the Measure A election, the city councils of San Carlos, Millbrae, and San Mateo passed votes of no-confidence in Sheriff Corpus. The city/town councils of South San Francisco, Belmont, Redwood City, and Woodside endorsed Measure A. The DSA and the OSS had already passed no-confidence votes in Mr. Aenlle, and the SMCSO captains declared their lack of confidence in Sheriff Corpus on November 18, 2024. At the March 2025 election, the county's voters voted in favor of Measure A by a margin of 84% to 16%.

*This Investigation*

The Board of Supervisors, through the County Attorney, retained Keker, Van Nest & Peters LLP ("KVP") as outside counsel to investigate whether Sheriff Corpus had committed acts that constitute "cause" under Section 412.5 and, if so, to prepare a Notice of Intent pursuant to the Board-adopted procedures for removing a sheriff from office.

While KVP reviewed the Cordell Report, the firm conducted its own investigation into Sheriff Corpus's actions. KVP's independent investigation included conducting more than 40 interviews of current and former SMCSO and County personnel, including:

- **SMCSO sworn executive leadership** who served on Sheriff Corpus's Executive Team: KVP interviewed former Undersheriff Hsiung, former Assistant Sheriff Ryan Monaghan, and former Acting Assistant Sheriff Matthew Fox. KVP interviewed Paul Kunkel, a retired SMCSO captain who, as a contractor, functionally served as an assistant sheriff.

- **SMCSO command staff**: KVP interviewed 6 current or former captains and 4 current lieutenants who served under Sheriff Corpus.

- **SMCSO sworn personnel**: KVP interviewed 11 current sergeants, 2 current detectives, and 1 current deputy who served under Sheriff Corpus, including Sgt. Hector Acosta, Sgt. Javier Acosta, and Dep. Carlos Tapia.

- **SMCSO civilian staff**: KVP interviewed 8 current or former civilian personnel within the SMCSO.

- **Sheriff Corpus's transition team**: In addition to former Capt. Kunkel, who both served on Sheriff Corpus's transition team and on her Executive Team, KVP interviewed former Lt. Daniel Guiney and former Assistant Sheriff Jeff Kearnan.

- **County personnel**: KVP interviewed 3 County personnel, including County Executive Mike Callagy.

May 30, 2025
Page 6

- **District Attorney's Office staff**: KVP interviewed Chief Deputy District Attorney Shin-Mee Chang.

KVP also reviewed relevant documents provided by witnesses and the County.

*Other witnesses and reservation of rights*

KVP invited Sheriff Corpus and Mr. Aenlle through their counsel, to participate in voluntary interviews. Through their counsel, they declined to participate. KVP also invited Undersheriff Daniel Perea to a voluntary interview. To date, he has not yet agreed to be interviewed. KVP also requested voluntary interviews from SMCSO Finance Director Stacey Stevenson and SMCSO Human Resources staff member Connor Santos-Stevenson. Ms. Stevenson did not respond to multiple interview requests. Mr. Santos-Stevenson declined to participate in a voluntary interview.

The Procedures provide the Sheriff with the right to a removal hearing.  At the removal hearing or any subsequent stage of the removal process, KVP reserves the right to call witnesses and to introduce evidence in order to prove the allegations set forth in this Notice of Intent or to rebut the Sheriff's defenses including but not limited to five individuals who KVP sought to interview as part of its investigation, but who declined, or have not yet agreed, to speak with KVP as of the date KVP is submitting this Notice of Intent in its proposed form.  For avoidance of doubt, those individuals are: Sheriff Corpus, Undersheriff Perea, Mr. Aenlle, Ms. Stevenson, and Mr. Santos-Stevenson.

*Independence of bases for cause*

The grounds for removal discussed in this letter are not interdependent. Each of the grounds outlined below, independently and collectively, provide cause for removal under Section 412.5.

## I.     Grounds for Removal Relating to Victor Aenlle

### A.     Introduction

While both Sheriff Corpus and Victor Aenlle publicly deny having an intimate relationship, multiple witnesses observed conduct indicating that they have an extremely close personal relationship, and some witnesses have characterized it as intimate. In the context of that relationship, Sheriff Corpus has repeatedly appointed Mr. Aenlle to high-level positions at public expense, first on her transition team, then later as a contract consultant to the Sheriff's Office, then ultimately as her "Executive Director of Administration" or "Chief of Staff," a position that Sheriff Corpus specifically created for Mr. Aenlle. On multiple occasions, Sheriff Corpus also sought to increase Mr. Aenlle's compensation in these roles.

Mr. Aenlle is not qualified to hold the positions to which Sheriff Corpus appointed him or any other executive position within the Sheriff's Office. Prior to serving in the Sheriff's Office, he had no experience as a law enforcement executive. Nor has he ever been a full-time peace

May 30, 2025
Page 7

officer. Sheriff Corpus's repeated efforts to appoint (and re-appoint) an unqualified candidate to leadership positions in her office has undermined morale in the SMCSO and caused senior leaders to leave the Office. Mr. Aenlle's poor leadership skills have further reduced morale and hurt the effectiveness of the Sheriff's Office.

Given their close personal relationship, Sheriff Corpus has a conflict of interest with respect to Mr. Aenlle. She has failed to reconcile her personal relationship with Mr. Aenlle with her duty of loyalty to the public.

     **B.**    **Victor Aenlle is a real estate broker and reserve deputy who worked on Sheriff Corpus's campaign.**

Victor Aenlle is a commercial and residential real estate broker. He represents that he has been affiliated with Coldwell Banker since 1990. According to documents that Mr. Aenlle personally submitted to the County in 2023, he works full time for Coldwell Banker. According to the same documents, he operates a private investigation firm full time.

Mr. Aenlle became a reserve deputy with SMCSO in 2009. Reserve deputy is a part-time, volunteer position. In or around 2012 or 2013, Mr. Aenlle participated in the Sheriff's Office's field training program to become a full-time deputy. According to Capt. Mark Myers, Mr. Aenlle did not pass the field training program due to performance issues, including that he was not receptive to criticism, failed to perform well under stress, and struggled to make decisions. Thereafter, Mr. Aenlle remained a reserve deputy and was required to volunteer a minimum of 16 hours per month. *See* Policy Manual § 322.5.1.[1]

_____

[1] From January 2, 2024, through July 31, 2024, Mr. Aenlle logged a nearly uniform eight hours of volunteer time per business day. He explained these log entries by saying: "Since assuming the role of Executive Director, I have worked an average of 12 to 14 hours per day, six to seven days a week. Any hours allocated toward my volunteer service were in addition to the eight hours for which I was compensated, ensuring there was no 'double-dipping.'" There is reason to doubt that Mr. Aenlle fulfilled his volunteer hour commitment. *First*, if Mr. Aenlle worked an "average" of 12 to 14 hours per day, then he only "volunteered" an average of four to six hours per day, not the eight hours a day that he reported. *Second*, Mr. Aenlle was not volunteering while working as the Executive Director of Administration. As an exempt employee, he received financial compensation for all hours worked, including those worked in excess of 8 hours per day, through his $246,979 annual salary. *Third*, Mr. Aenlle's claim that overtime hours in a civilian role should qualify as volunteer hours as a reserve deputy is inconsistent with the purpose of the reserve deputy program, which is to "supplement and assist regular sworn sheriff's deputies in their duties" and to "provide professional, sworn volunteer reserve deputies who can augment regular staffing levels." SMCSO Policy Manual § 322.1. Work done as a civilian does not "augment" regular staffing levels of sworn personnel, nor does it "assist" sworn deputies in their duties.

May 30, 2025
Page 8

In or around 2021, Mr. Aenlle began volunteering on Sheriff Corpus's campaign.

> **C.**     **Sheriff Corpus and Mr. Aenlle have a close personal relationship, which they have taken steps to conceal.**

Throughout Sheriff Corpus's campaign, the transition period, and the course of her administration, it was evident to multiple witnesses that Sheriff Corpus and Mr. Aenlle have a close personal relationship. During the campaign, Sheriff Corpus was married. Her husband filed for divorce in April 2023, and the divorce became final later in 2023. Mr. Aenlle is married.

> **1.**     The relationship between Sheriff Corpus and Mr. Aenlle was evident during Sheriff Corpus's campaign.

Valerie Barnes is a long-time civilian SMCSO employee who has worked for San Mateo County since 2006. Ms. Barnes's roles included supporting the SMCSO personnel serving as the head law enforcement officers for the Cities of Millbrae and Half Moon Bay. (Both cities contract with the SMCSO to provide police services.) Ms. Barnes has known Sheriff Corpus for many years and worked for her when Sheriff Corpus led the SMCSO Millbrae office. While working together and during the course of Sheriff Corpus's campaign, the two became friends. Ms. Barnes considered herself a confidant for the Sheriff, and the two frequently texted about personal matters, including about Sheriff Corpus's marriage. Ms. Barnes was a frequent volunteer on Sheriff Corpus's campaign.

Mr. Aenlle was Sheriff Corpus's campaign manager. On several occasions during the campaign, Ms. Barnes witnessed Sheriff Corpus and Mr. Aenlle engaging in physical contact of an intimate nature. Ms. Barnes observed multiple instances of Mr. Aenlle massaging Sheriff Corpus's neck, shoulders, and feet and a single instance of them kissing on the lips. During the campaign, Mr. Aenlle told Ms. Barnes that he and Sheriff Corpus were "practicing a lot to have kids." Ms. Barnes saw intimate messages on Sheriff Corpus's Signal messaging app from Mr. Aenlle, including messages stating, "I love you" and messages using pet names such as "baby."

In or about January 2022, Sheriff Corpus told Ms. Barnes that she and Mr. Aenlle planned to marry after obtaining divorces. Sheriff Corpus asked Ms. Barnes to search for wedding venues for herself and Mr. Aenlle. Ms. Barnes sent Sheriff Corpus venue options via text message.

In late 2021 and early 2022, Sheriff Corpus told Ms. Barnes that Mr. Aenlle had purchased her luxury boots and a pair of $12,000 earrings. Sheriff Corpus told Ms. Barnes that Mr. Aenlle used $12,000 in cash to purchase the earrings. Mr. Aenlle later told Ms. Barnes that he used cash for big purchases so there would be nothing tying the purchases to him. Ms. Barnes understood this to mean that he wanted to avoid detection by his wife. After Mr. Aenlle and Sheriff Corpus completed the purchase of the earrings, Ms. Barnes texted Sheriff Corpus asking to see a picture of the earrings, and Sheriff Corpus contacted Ms. Barnes using a video calling application (FaceTime) to show them off. Ms. Barnes's mother participated in the call.

May 30, 2025
Page 9

Around this time, Ms. Barnes texted Sheriff Corpus and asked, "You at the ranch?" This was a reference to Mr. Aenlle's property near the coast. Sheriff Corpus responded, "I wish." Around this same time, Ms. Barnes texted Sheriff Corpus to "Be careful John isn't sniffing around to find you and VA," referring to Sheriff Corpus's then-husband John Kovach. Sheriff Corpus replied, "He won't find me with him."

On the night of the June 2022 election, Sheriff Corpus publicly thanked her then-husband Mr. Kovach, but did not thank Mr. Aenlle by name. Later that night, Ms. Barnes heard Mr. Aenlle say to Sheriff Corpus "This is over." This remark was also overheard by former SMCSO Capt. Paul Kunkel. Both Ms. Barnes and Mr. Kunkel understood Mr. Aenlle to be indicating he was ending his personal relationship with Sheriff Corpus. Sheriff Corpus called Ms. Barnes the following day to tell her that she and Mr. Aenlle had talked until 4:00 a.m., that she had apologized to Mr. Aenlle, and that "we're okay."

> 2.   The relationship between Sheriff-elect Corpus and Mr. Aenlle was
>       apparent in the months immediately following the election.

After she won the June 2022 election, Sheriff-elect Corpus put together a transition team that included Mr. Aenlle, Mr. Kunkel, former SMCSO Assistant Sheriff Jeff Kearnan, and former SMCSO Lt. Dan Guiney. Sheriff Corpus asked the County to hire Mr. Aenlle as a contractor so that his work on the transition would be paid. Although Sheriff Corpus's request for a paid transition team was out of the ordinary, County Executive Mike Callagy reported that he wanted to set Sheriff Corpus up for success. He therefore approved the transition team and Mr. Aenlle's contract, which paid him $105 per hour.

Mr. Kunkel, Mr. Guiney, and Mr. Kearnan each formed the impression that Sheriff Corpus and Mr. Aenlle shared a close personal relationship. Mr. Guiney and Mr. Kunkel stated that, during the transition, Sheriff Corpus and Mr. Aenlle would regularly appear together on Zoom calls, often from Mr. Aenlle's ranch. Mr. Kearnan and Mr. Kunkel witnessed Sheriff Corpus's and Mr. Aenlle's efforts to conceal their close personal relationship. For example, they both recall holding a videoconference call with Sheriff-elect Corpus in 2022, while she was in her car. They asked her if she was alone. She told them that she was. However, both Mr. Kunkel and Mr. Kearnan could see Mr. Aenlle's reflection in one of the car's windows in the background of the call.

Mr. Kearnan and Mr. Kunkel also reported that Mr. Aenlle would interrupt and redirect Sheriff Corpus in meetings as if he controlled the operation of the transition team. Both Mr. Kearnan and Mr. Kunkel came to understand that Mr. Aenlle (rather than Sheriff-elect Corpus or any other law enforcement professional) was leading the transition and preparations for Sheriff Corpus to assume her office.

Mr. Aenlle's involvement in transition planning extended to creating a draft organization chart for SMCSO's leadership structure. Mr. Aenlle advocated for a "chief of staff" position to replace one of the three sworn assistant sheriff positions. In at least some versions of the organizational chart under discussion, the chief of staff would have reported directly to the Sheriff, rather than

May 30, 2025
Page 10

to the Undersheriff, whereas assistant sheriffs report to the Undersheriff. When he later spoke with Judge Cordell, Mr. Aenlle referred to the chief of staff job as "my position" which "was created" by converting an assistant sheriff position to the chief of staff position.

> 3.    Sheriff Corpus's then-husband reported that she was having an affair with Mr. Aenlle.

During the transition, Mr. Kearnan noticed that Sheriff Corpus was often unavailable during working hours, and that she seemed never to be alone without Mr. Aenlle. Mr. Kearnan spoke to John Kovach, Sheriff Corpus's then-husband to discuss the relationship between Sheriff Corpus and Mr. Aenlle. Mr. Kovach told Mr. Kearnan that Sheriff Corpus was having an affair with Mr. Aenlle.

Mr. Guiney also recalls having multiple conversations with Mr. Kovach regarding the relationship between Sheriff Corpus and Mr. Aenlle. Mr. Kovach told Mr. Guiney that Sheriff Corpus would often come home very late or in the early hours of the morning and that she was not around very much. Mr. Kovach told Mr. Guiney that he suspected Sheriff Corpus was at Mr. Aenlle's ranch despite her denials.

Mr. Guiney also recalls Sheriff Corpus telling him that Mr. Kovach had given her a pair of boots, but when Mr. Guiney asked Mr. Kovach about the gift, he said that the boots were actually from Mr. Aenlle.

> 4.    In September 2022, Sheriff Corpus and Mr. Aenlle traveled to Hawaii and provided conflicting accounts of their trip.

In September 2022, Sheriff Corpus and Mr. Aenlle traveled to Hawaii. Sheriff Corpus and Mr. Aenlle have offered conflicting accounts of this trip.

**Valerie Barnes.** Before the trip, Sheriff Corpus told Ms. Barnes that she was going to Hawaii with Mr. Aenlle for a personal vacation. At Sheriff Corpus's request, Ms. Barnes assisted Sheriff Corpus in finding a rental property for her, her children, and Mr. Aenlle. Ms. Barnes also shared Sheriff Corpus's flight confirmation number and details with Mr. Aenlle.

**Jeff Kearnan.** After the trip, Mr. Kearnan spoke to Mr. Kovach who told Mr. Kearnan that he believed that Mr. Aenlle had traveled to Hawaii together with Sheriff Corpus. Mr. Kearnan then called Sheriff Corpus and asked her if she and Mr. Aenlle had traveled to Hawaii together. Sheriff Corpus denied having traveled to Hawaii with Mr. Aenlle. Ten minutes after that phone call ended, Mr. Aenlle called Mr. Kearnan. The phone call began with Mr. Aenlle accusing Mr. Kearnan of not liking him. Later in the call, Mr. Kearnan asked Mr. Aenlle about the Hawaii trip. Mr. Aenlle initially denied having traveled to Hawaii, but he later admitted that he had been in Hawaii. He claimed that he had been there on business unrelated to Sheriff Corpus. Shortly after this exchange, Mr. Kearnan resigned from Sheriff Corpus's transition team based on concerns about conflicts of interest, nepotism, and Sheriff Corpus's refusal to be honest regarding her relationship with Mr. Aenlle.

May 30, 2025
Page 11

**Mike Callagy.** After Mr. Kearnan resigned, County Executive Mike Callagy had a discussion with Sheriff Corpus about the Hawaii trip. During that conversation, Sheriff Corpus admitted to Mr. Callagy that she had traveled to Hawaii with Mr. Aenlle, and she acknowledged that she and Mr. Aenlle were good friends and that Mr. Aenlle had a relationship with her children. Mr. Callagy told Sheriff Corpus that it was inappropriate for her to have asked the County to pay Mr. Aenlle for his work on the transition team if she simultaneously had a personal relationship with him that was close enough such that they traveled to Hawaii together. Mr. Callagy terminated Mr. Aenlle's contract, explaining that the County could not tolerate even the perception of a conflict of interest.

**Dan Guiney.** Mr. Aenlle admitted to Mr. Guiney that he had traveled to Hawaii, though he claimed that he was there to provide security for Sheriff Corpus and support for her children.

**Carlos Tapia.** Mr. Aenlle told Dep. Tapia that he had flown to Hawaii to provide security for Sheriff Corpus.

**Judge Cordell.** Mr. Aenlle admitted to Judge Cordell that he had been in Hawaii at the same time as Sheriff Corpus, but he maintained that it was a coincidence, that he had been there to provide "covert" security to an unrelated third party, and that he "barely even saw" Sheriff Corpus while he was there.

In sum, Sheriff Corpus has both admitted (to Mr. Callagy) and denied (to Mr. Kearnan) having traveled to Hawaii with Mr. Aenlle. When she has admitted the trip, she has also acknowledged that the trip was personal and that she and her children spent time with Mr. Aenlle. Mr. Aenlle has both admitted (to Mr. Kearnan, to Judge Cordell, to Mr. Guiney, and to Dep. Tapia) and denied (to Mr. Kearnan) that he traveled to Hawaii. Mr. Aenlle has stated to some people (Mr. Guiney and Dep. Tapia) that he traveled to provide security to the Sheriff and to others (Judge Cordell and Mr. Kearnan) that his travel was unrelated to Sheriff Corpus.

5.    The relationship continued after Sheriff Corpus took office.

After Sheriff Corpus took office in January 2023, she appointed Christopher Hsiung as Undersheriff and Ryan Monaghan as an Assistant Sheriff. Sheriff Corpus recruited Undersheriff Hsiung. He had helped to reform the Mountain View police department, and, in recruiting him, Sheriff Corpus told him that "I want you to do in San Mateo as you did in Mountain View." Undersheriff Hsiung served the SMCSO from February 2023 to June 2024. Sheriff Corpus also recruited Assistant Sheriff Monaghan, who had served as the Tiburon Chief of Police. He served as Assistant Sheriff from February 2023 through September 2024. Thus, beginning in February 2023, Sheriff Corpus's Executive Team consisted of Mr. Aenlle, Undersheriff Hsiung, Assistant Sheriff Monaghan, and Mr. Kunkel.

Undersheriff Hsiung and Assistant Sheriff Monaghan witnessed conduct indicative of a close personal relationship between Sheriff Corpus and Mr. Aenlle. For example, they both saw Sheriff Corpus and Mr. Aenlle share entrees and drinks at restaurants. Other witnesses, including Ms. Barnes and another civilian SMCSO employee, Jennifer Valdez, also saw Sheriff

May 30, 2025
Page 12

Corpus and Mr. Aenlle share entrees and drinks. Undersheriff Hsiung and Assistant Sheriff Monaghan also both frequently observed Mr. Aenlle interrupt and/or redirect Sheriff Corpus in meetings.

While attending a professional conference in or about May 2024, Sheriff Corpus and Mr. Aenlle stood up former Undersheriff Hsiung on three separate occasions when they were scheduled to meet. Each time, he waited to meet them in the hotel lobby, but they never arrived and were evasive in explaining why they failed to meet him. Sheriff Corpus and Mr. Aenlle were also absent at the same times during the day, for periods of between one and two hours, and at unusual times of day.

Ms. Valdez, who worked in the Sheriff's Office for 18 years as an executive assistant before later transferring to the County Attorney's office, also observed conduct indicative of an intimate personal relationship between Sheriff Corpus and Mr. Aenlle. In 2024, Ms. Valdez saw Mr. Aenlle answer a call on his cell phone. Ms. Valdez noticed that the caller ID identified the caller as Sheriff Corpus. As the call concluded, Ms. Valdez heard Mr. Aenlle say "Te amo" to Sheriff Corpus. Ms. Valdez understood this to mean "I love you" in Spanish. On multiple occasions, Ms. Valdez saw Mr. Aenlle bring Sheriff Corpus's children to her office after school.

Sheriff Corpus lives in San Bruno in a house that is on the corner of a four-way intersection. Diagonally across the street from Sheriff Corpus's house (kitty-corner) is a house owned by the parents of Sgt. Gaby Chaghouri. Sgt. Chaghouri lives out-of-state and typically works lengthier shifts scheduled together. During these stretches, Sgt. Chaghouri drives in from out of state and stays at his parents' house.

Sgt. Chaghouri has seen Mr. Aenlle at Sheriff Corpus's house on multiple occasions beginning during the campaign and through March 2025. On at least two occasions, Mr. Aenlle appeared to recognize Sgt. Chaghouri. In one instance, Sgt. Chaghouri was parking his truck late at night after arriving from out of state and saw Mr. Aenlle emerge from Sheriff Corpus's home. Mr. Aenlle looked directly at Sgt. Chaghouri, tucked his head, and quickly got in his car to drive away. On another occasion, Sgt. Chaghouri, standing in his front yard, saw Mr. Aenlle come out of the front door of Sheriff Corpus's house, make eye contact, then abruptly turn around and go back inside.

> 6.    Sheriff Corpus and Mr. Aenlle deny an "intimate relationship."

Sheriff Corpus declined to be interviewed by Judge Cordell. Mr. Aenlle agreed to interview with Judge Cordell during which he described his relationship with Sheriff Corpus as a "strong friendship," but one that did not extend "beyond mere friendship." An April 25, 2025, report commissioned by Sheriff Corpus's counsel states that "[b]oth Sheriff Corpus and Mr. Aenlle expressly deny any intimate relationship." As noted above, Sheriff Corpus and Mr. Aenlle declined KVP's invitation for an interview.

May 30, 2025
Page 13

> **D.     Using public funds, Sheriff Corpus entered into two separate contractual arrangements and one employment relationship with Mr. Aenlle and repeatedly requested raises for Mr. Aenlle.**

**Consultant to Transition Team.** As discussed above, after Sheriff Corpus won the June 2022 election, she asked the County to fund a paid transition team. Although there was no known precedent for such a request, Mr. Callagy agreed to Sheriff Corpus's request, and the County offered Mr. Aenlle a contract that paid him $105 per hour. Mr. Callagy cancelled this contract in October 2022, after Sheriff Corpus confirmed that she had a personal relationship with Mr. Aenlle.

**Contractor and Special Projects Coordinator.** After Sheriff Corpus took office, she undertook a series of steps to ensure that Mr. Aenlle was employed in an executive role and repeatedly sought pay increases on his behalf. Immediately upon taking office in January 2023, Sheriff Corpus hired Mr. Aenlle as a contractor, paid $92.44 per hour or $192,275 per year. At the time, the Sheriff had authority to enter into contracts for less than $200,000 without Board approval. The amount of the contract was set just under the threshold that would require her to present the contract to the Board. Mr. Aenlle's contractor agreement was signed by Stacey Stevenson, the acting Director of Finance in the Sheriff's Office at that time.

Less than six weeks later, in March 2023, Sheriff Corpus requested that Mr. Aenlle be hired as an extra help Special Projects Coordinator at the hourly rate of $118. County Human Resources approved the conversion from contractor to temporary employee, but it set the rate of pay at $73 per hour, which it deemed "consistent with base pay of similar County positions." Human resources specifically noted that Mr. Aenlle's job was "not at the level of an Assistant Sheriff" and was "non-sworn and should not be aligned to a higher level sworn role/pay." According to Human Resources, "the work described is more in alignment with higher-level Analyst work or mid-level management work."

**Executive Director of Administration.** Then, in or around June 2023, Sheriff Corpus created a job listing for a full-time, unsworn position, the "Executive Director of Administration." The description was similar to the job descriptions of Mr. Aenlle's contract positions, which Human Resources had noted did not involve executive level duties. The "Executive Director of Administration" job was not publicly posted, and Mr. Aenlle was the only applicant for the position. He received the job, and his salary was set at $246,979.

Almost immediately, in July 2023, Sheriff Corpus sought a pay increase for Mr. Aenlle, submitting a memorandum which began:

May 30, 2025
Page 14

> I respectfully request that Mr. Victor Aenlle receive "Step E" compensation for his recent appointment to the Sheriff's Office Executive Director of Administration position, as it has been extended to him and accepted. Over the last 30 years, Mr. Aenlle has served in various leadership and management roles and gained significant exposure to administrative operations in various capacities. In addition to his substantial executive leadership experience, Mr. Aenlle has been an active member for 15 years with the San Mateo County Sheriff's Office.

The memorandum notes that Sheriff Corpus had already promised Mr. Aenlle a raise without authorization from Human Resources. The memorandum refers to Mr. Aenlle's "15 years with the San Mateo County Sheriff's Office," but it fails to note that this service consisted of part-time, volunteer reserve deputy service, as well as the short period of time when he was a full-time deputy candidate before failing the field training program.

County Human Resources approved the raise "given that the candidate ha[d] already been informed by the Sheriff's Office that [he] will receive" it, but also noted in a memorandum to Sheriff Corpus that Human Resources did "not believe that [increased compensation] is in alignment with the candidate's experience."

In the first four months of 2024, Sheriff Corpus made, or caused to be made, three further requests for a pay raise for Mr. Aenlle. In one instance, Sheriff Corpus ordered then-Undersheriff Hsiung to author and submit a raise request for Aenlle. The County denied each request as unjustified.

> **E.    Sheriff Corpus took steps to conceal potentially negative information about Mr. Aenlle.**

In the spring of 2023, it was well known within the SMCSO that Sheriff Corpus was considering creating a full-time position for Mr. Aenlle. As a result, Lt. Sebring, who at the time served as a lieutenant in PSB, thought that it was possible that Mr. Aenlle would have to go through a background check before assuming such an executive position. When he considered the possibility that Mr. Aenlle might have to go through a background check, Lt. Sebring recalled a piece of information he had previously seen in Mr. Aenlle's background file.

Lt. Sebring had been part of an Internal Affairs investigation of Mr. Aenlle years earlier, and, more recently, he had pulled Mr. Aenlle's background file at the request of the San Mateo Police Department which was conducting a background check on Mr. Aenlle. Lt. Sebring was thus aware that Mr. Aenlle's background file contains an old report from a local police department containing allegations of criminal conduct against Mr. Aenlle. As far as Lt. Sebring is aware, Mr. Aenlle was never charged in connection with those allegations.

Nonetheless, Lt. Sebring thought Sheriff Corpus should be aware of the contents of Mr. Aenlle's background file as she considered appointing him to a position on her Executive Team. Accordingly, he met with Sheriff Corpus and told her about the police report that was contained in Mr. Aenlle's background file.

May 30, 2025
Page 15

Approximately an hour later, Sheriff Corpus called Lt. Sebring and asked him who else knew about the report and who else had access to Mr. Aenlle's background file. Lt. Sebring told Sheriff Corpus that at least the PSB lieutenant, the PSB captain, the assistant sheriff overseeing PSB, SMCSO Human Resources Manager Heather Enders, and certain support staff had access to the background files of Sheriff's Office employees. Sheriff Corpus then directed Lt. Sebring to restrict access to Mr. Aenlle's background file such that only she and Lt. Sebring would be able to access it. Lt. Sebring coordinated with the Sheriff's Office Technical Services Unit to carry out Sheriff Corpus's direction and informed Sheriff Corpus when the file access restriction was complete.

Sheriff Corpus further directed Lt. Sebring to provide her with a copy of the police report from Mr. Aenlle's background on a thumb drive. Approximately one month later, Sheriff Corpus informed Lt. Sebring that Mr. Aenlle would not go through a background check prior to assuming his position on the Executive Team.

According to Lt. Sebring, it was unusual that Sheriff Corpus ordered him to limit access to Mr. Aenlle's background file. Lt. Sebring reported that this was the only time anyone has requested him to limit access to an individual's background file.

> **F.    Immediately after the Board of Supervisors voted to remove Mr. Aenlle as "Executive Director of Administration," Sheriff Corpus attempted to appoint him as an Assistant Sheriff.**

On November 13, 2024, the Board of Supervisors, in response to the Cordell Report, voted to eliminate Mr. Aenlle's "Executive Director of Administration" position and to bar him from unescorted access to non-public areas of County buildings. That same day, Sheriff Corpus announced her intention to appoint Mr. Aenlle to the position of Assistant Sheriff "effective immediately."

That night, Det. Mike Garcia called Det. Rick Chaput while Det. Chaput was at home and off-duty. Det. Chaput serves in PSB, where one of his responsibilities is to update the status of newly hired officers in the POST Electronic Data Interchange (EDI), the online system that SMCSO uses to communicate with the California Commission on Police Officer Standards and Training. Det. Garcia told Det. Chaput that "they want you to switch Victor to full-time in POST." Det. Chaput understood that Det. Garcia was referring to a request from the Executive Team to change Mr. Aenlle's status from a Reserve Deputy to a full-time peace officer in the POST EDI system.

Det. Chaput expressed to Det. Garcia that he was unwilling to make that change. He also explained to Det. Garcia that anyone updating Mr. Aenlle's status information in the POST EDI system would have to sign a form swearing under penalty of perjury that the updated information was accurate. After speaking with Det. Garcia, Det. Chaput called Lt. Irfan Zaidi. Lt. Zaidi said he was not aware of the request but would call Undersheriff Perea and then call Det. Chaput back. Shortly thereafter, Lt. Zaidi called Det. Chaput back; during this second call, Lt. Zaidi told Det. Chaput that Undersheriff Perea directed him to change Mr. Aenlle's status.

May 30, 2025
Page 16

Det. Chaput was concerned about the timing of the request, and he was not confident that Mr. Aenlle met the requirements for a full-time peace officer. Det. Chaput told Lt. Zaidi he would not change Mr. Aenlle's status. Det. Chaput then reported the incident to Sgt. Fava.

The following day, the County's Director of Human Resources, Rocio Kiryczun, communicated to Sheriff Corpus that Mr. Aenlle failed to meet the minimum qualifications for Assistant Sheriff. Ms. Kiryczun pointed out that, according to the job description for the Assistant Sheriff position, "Candidates must acquire an Advanced Certificate in law enforcement issued by [POST] within one year of appointment" and noted that "the requirements set forth by [POST] state that, in order to be eligible for an Advanced Certificate, a candidate must have a <u>minimum</u> of 4 years of full-time law enforcement experience." Ms. Kiryczun further noted that "Mr. Aenlle does not have 4 years of full-time law enforcement experience, nor even 1 year." Thereafter, Mr. Aenlle was not hired to an Assistant Sheriff position.

On April 17, 2025, a month and a half after the voters enacted Measure A, Sheriff Corpus directed that Mr. Aenlle be moved to the "active list" and assigned him to assist in the unit that processes concealed weapons permits.

### G. Sheriff Corpus's decision to install Mr. Aenlle as a member of her Executive Team hurt the SMCSO.

Sheriff Corpus installed Mr. Aenlle in an executive position that is typically filled by a career full-time law enforcement professional. Because of his lack of experience and his poor leadership skills, Mr. Aenlle was unable to provide effective leadership with the SMCSO, and his presence hurt morale across the organization. Sheriff Corpus's decision to keep Mr. Aenlle in his position, despite the warnings she received, further hurt the Office and led to the departures of senior leaders.

#### 1. Sheriff Corpus's decision to install Victor Aenlle in a leadership position hurt morale in the SMCSO.

Sheriff Corpus's decision to include Mr. Aenlle as part of her Executive Team hurt morale in the SMCSO because the sworn officers knew that he was not qualified to be a law enforcement leader. It is widely known in the Sheriff's Office, particularly among the more senior officers, that Mr. Aenlle had failed the field training program to become a full-time Sheriff's Deputy. Likewise, a number of senior officers are aware that the City of San Mateo Police Department recently rejected Mr. Aenlle's application for a position there.

Mr. Aenlle's attempts to supervise full-time sworn officers exacerbated this morale problem. Mr. Aenlle's role as the Executive Director of Administration was a civilian role, in which he was supposed to supervise civilian staff. Moreover, it is generally understood in the SMCSO that full-time sworn officers are not to be supervised by civilian executives. Nonetheless, Mr. Aenlle attempted to direct the work of full-time sworn officers, including captains in the Corrections Division.

May 30, 2025
Page 17

Mr. Aenlle also inappropriately interfered with the work of civilian employees in the SMCSO, including those involved in the hiring process. On or about November 7, 2024, PSB Sgt. Jimmy Chan and Ms. Barnes interviewed applicants for a deputy sheriff trainee position. The interview process is required by POST. Prior to the interview, Det. Mike Garcia told Sgt. Chan that he had personally worked to prepare one of the applicants that Sgt. Chan would interview that day. Det. Garcia identified the candidate by name and told Sgt. Chan that the candidate had been part of the Law Enforcement Candidate Scholars program. Thinking back on it, Sgt. Chan believes that Det. Garcia was trying to influence his assessment of the candidate. Det. Garcia is perceived within the SMCSO to be a favorite employee of Sheriff Corpus's; his mother, brother, and sister-in-law all contributed to Sheriff Corpus's 2022 campaign for Sheriff.

After interviewing the candidate, Sgt. Chan and Ms. Barnes each gave the candidate a non-passing score, based on her answers to their questions and her insufficient experience. They recommended that the candidate apply to become a Community Service Officer in order to gain relevant experience. Sgt. Chan told Det. Garcia and Lt. Zaidi that the candidate had not passed the interview.

Later that same day, Mr. Aenlle contacted Ms. Enders, the top civilian human resources employee within the SMCSO. Mr. Aenlle told Ms. Enders that Sheriff Corpus was upset because Ms. Barnes had been part of the interview panel and because the candidate had not passed the interview. Mr. Aenlle instructed Ms. Enders to rescind the interview results and to pass the applicant onto the next stage of the hiring process. Ms. Enders told Mr. Aenlle that she would not do so.

The following day, Undersheriff Perea instructed Lt. Zaidi to move the candidate forward in the hiring process. Lt. Zaidi informed Undersheriff Perea that the candidate had failed their interview, but Undersheriff Perea insisted, saying that Sheriff Corpus wanted the candidate moved through the process. Shortly thereafter, Lt. Zaidi instructed a civilian Management Analyst to change the candidate interview results in the application management system from "fail" to "pass" at the direction of the Sheriff and Undersheriff, and stood over her shoulder as she did so. Lt. Zaidi later informed Ms. Enders that he was told by Undersheriff Perea that Sheriff Corpus wanted the applicant to move forward in the hiring process.

Thereafter, Sgt. Fava and Sgt. Chan protested the decision to move the applicant forward in the hiring process notwithstanding the fact that the applicant had failed the interview. Ms. Enders ultimately refused to move the candidate forward in the process, writing that members of the Sheriff's Office should not "engage in actions that undermine or interfere with the integrity of the civil service process under any circumstances," and that "any deviation from" the interview and application process "would be inappropriate and unacceptable."

Mr. Aenlle's harsh treatment of SMCSO employees, and his generally poor leadership skills, further eroded morale. The example often cited by witnesses is Mr. Aenlle's treatment of long-time SMCSO civilian employee Jenna McAlpin. In April 2024, Mr. Aenlle confronted Ms. McAlpin concerning a rumor that she had posted denigrating content about Sheriff Corpus

May 30, 2025
Page 18

on social media. Mr. Aenlle confronted Ms. McAlpin about this rumor on or about her last day at the Sheriff's Office. Ms. McAlpin denied having anything to do with the social media posts, but Mr. Aenlle implied that she was not being truthful; in response, she swore on her children's lives that she was telling the truth, and offered to take a lie-detector test. Ms. McAlpin was very upset by this interaction, and she told Mr. Aenlle that he was making her emotionally and physically uncomfortable. As soon as Mr. Aenlle left her office, Ms. McAlpin began to cry.

> 2.     Sheriff Corpus's Executive Team warned her about Mr. Aenlle's conduct
>        and the effect it was having on the office.

Sheriff Corpus was aware of Mr. Aenlle's unprofessional conduct but refused to act. On multiple occasions, Undersheriff Hsiung warned Sheriff Corpus that Mr. Aenlle's unprofessional conduct and lack of experience as a law enforcement leader imperiled the Sheriff's Office's operational abilities. One example of this arose in the context of an Internal Affairs investigation that occurred in 2024. A sergeant made an allegation of misconduct against a captain. The sole witness was also a captain. Because of the high ranks of the principal witness and subject of the investigation, the Sheriff's Office outsourced the investigation. Undersheriff Hsiung instructed Mr. Aenlle not to discuss the underlying incident with either captain, so as not to taint the investigation or violate procedural rights. Ignoring that instruction, Mr. Aenlle discussed the incident with the captain who was a principal witness in the investigation. When Undersheriff Hsiung confronted Mr. Aenlle about his interference with the investigation, rather than to take responsibility for his conduct, Mr. Aenlle attempted to minimize the effect of his decision to discuss the incident with the witness. Undersheriff Hsiung later told Sheriff Corpus that Mr. Aenlle compromised the investigation. However, he did not have confidence that Sheriff Corpus would or could control Mr. Aenlle's future conduct given their personal relationship.

Likewise, Assistant Sheriff Monaghan advised Sheriff Corpus, on multiple occasions, that Mr. Aenlle's conduct, and his way of communicating with employees, was interfering with operations for both sworn and civilian employees. For example, Assistant Sheriff Monaghan spoke to Ms. McAlpin shortly after the incident with Mr. Aenlle described above, and Ms. McAlpin was visibly upset and appeared to have been crying. Assistant Sheriff Monaghan spoke to Sheriff Corpus about it, but she downplayed the seriousness of the incident and commented that Ms. McAlpin has a tendency to be "emotional" and might have overreacted.

> 3.     Sheriff Corpus's close personal relationship with Mr. Aenlle and her
>        decision to retain him on her Executive Team contributed to the
>        departures of numerous senior advisors and Executive Team members.

As described above, after Sheriff Corpus's election, she assembled a transition team of seasoned law enforcement officers with ties to the SMCSO office, including former Assistant Sheriff Jeff Kearnan, former Capt. Paul Kunkel, and former Lt. Dan Guiney. Mr. Kearnan left the transition team before Sheriff Corpus's inauguration due to his concerns about her relationship with

May 30, 2025
Page 19

Mr. Aenlle. Likewise, Mr. Guiney left shortly after Sheriff Corpus's inauguration based on concerns about Mr. Aenlle.

Mr. Kunkel stayed on after Sheriff Corpus's inauguration as a contractor to serve as the unofficial Assistant Sheriff for Corrections and to hire a full-time replacement for that position. Mr. Kunkel identified several promising candidates for leadership positions, including a police chief from within San Mateo County and a former assistant sheriff from Santa Clara County. Mr. Kunkel could not identify any opposition to those candidates other than Mr. Aenlle's. Neither was hired. Capt. Kunkel chose to leave the SMCSO in early 2024 in large part due to Mr. Aenlle's influence over the office. At the time he left, no assistant sheriff for Corrections had been hired. Sheriff Corpus has still never had a full-time assistant sheriff for Corrections.

Mr. Hsiung joined the SMCSO as Sheriff Corpus's first undersheriff because he wanted to help Sheriff Corpus reform the SMCSO. Undersheriff Hsiung eventually resigned in June 2024 because of Sheriff Corpus's inability to command the SMCSO at an executive level, her tendency to retaliate against personnel who disagreed with her or she believed had previously wronged her, and her continually allowing Mr. Aenlle to interfere with him and other sworn personnel in the performance of their duties.

Like Mr. Hsiung, Mr. Monaghan entered his position enthusiastic about the prospect of working for a new sheriff with a reform-minded agenda. However, Sheriff Corpus removed Assistant Sheriff Monaghan from his position in September 2024, and she has not hired a full-time replacement for his position.

As a result of these departures, the SMCSO is currently operating without critical leadership positions filled. The SCMSO is supposed to operate with a Sheriff, Undersheriff and three assistant sheriffs, including one devoted to overseeing the operation of the County's two jails. There are currently no assistant sheriffs.

### H.     Grounds for Removal

The foregoing conduct is, independently and collectively, grounds to remove Sheriff Corpus from office for cause for the following reasons.

Sheriff Corpus violated laws related to the performance of her duties as Sheriff. San Mateo County Charter Art. IV § 412.5(B)(1). *First*, California's conflict-of-interest law requires public officials to exercise authority "with disinterested skill, zeal, and diligence and primarily for the benefit of the public." *Clark v. City of Hermosa Beach*, 48 Cal. App. 4th 1152, 1170–71 (1996) (quoting *Noble v. City of Palo Alto* (1928) 89 Cal. App. 47, 51). The law "prohibits public officials from placing themselves in a position where their private, personal interests may conflict with their official duties." *Id.* (quoting (64 Ops. Cal. Atty. Gen. 795, 797 (1981)). The common law conflict-of-interest rule "extends to noneconomic conflicts of interest." *Id.* at 1171 n.18. This law, and "[a]ll laws pertaining to conflicts of interest," are "applicable to all officers, employees and members of boards and commissions" of San Mateo County. San Mateo County Charter, Art. V § 510. Further, it is "the policy of the County to recruit, select, retain and

May 30, 2025
Page 20

promote the best qualified officers and employees," and "[a]ppointments and promotions shall be made on the basis of merit and in conformity with the principles of equal opportunity." San Mateo County Charter, Art. V § 501. And "the selection and retention of employees" must be "on the basis of merit and fitness." *Id.* § 505. Sheriff Corpus's own Policy Manual provides that "Candidates for job openings will be selected based on merit, ability, competence and experience." SMCSO Policy Manual § 1000.2. The Policy Manual further prohibits employees "from directly supervising, occupying a position in the line of supervision or being directly supervised by any other employee … with whom they are involved in a personal or business relationship," *id.* § 1025.2(a), and prohibits "recommending promotions … or other personnel decisions affecting an employee … with whom they are involved in a personal or business relationship," *id.* § 1025.2(b). Sheriff Corpus has violated these laws with respect to her treatment of Mr. Aenlle, with whom she enjoys a close personal relationship, including by hiring and employing him at public expense in positions for which he is not qualified, by seeking promotions and salary increases for him, and by retaining him in those positions notwithstanding the fact that the County Executive and others advised Sheriff Corpus that doing so was improper. Moreover, Sheriff Corpus tolerated, enabled, and acquiesced to Mr. Aenlle's conduct that was detrimental to the morale and proper functioning of the Sheriff's office.

***Second***, pursuant to California Commission on Peace Officer Standards and Training ("POST") regulations, "[e]very peace officer candidate shall participate in an oral interview to determine suitability to perform the duties of a peace officer." Cal. Code Regs. tit. 11, § 1952(a). The SMCSO has an obligation to ensure that every peace officer candidate "satisfies all minimum selection requirements." Cal. Code Regs. tit. 11, § 1952(a). Further, as noted above, all "[a]ppointments and promotions [in the SMCSO] shall be made on the basis of merit and in conformity with the principles of equal opportunity," San Mateo County Charter, Art. V § 501, and "the selection and retention of employees" must be "on the basis of merit and fitness," *id.* § 505. Sheriff Corpus violated these laws by directing that SMCSO personnel advance a candidate who failed an oral examination and thus failed to satisfy the minimum selection requirement specified by law.

Sheriff Corpus has also flagrantly and repeatedly neglected her duties as defined by law. San Mateo County Charter Art. IV § 412.5(B)(2). California law requires that Sheriff Corpus preserve the peace in San Mateo County, operate the jails in the County, and hire necessary staff to execute her responsibilities. Gov't Code §§ 26600, 26604, 26605. Moreover, per Sheriff Corpus's own Policy Manual, the "Sheriff is responsible for planning, directing, coordinating, controlling and staffing all activities of the Sheriff's Office for its continued and efficient operation." Policy Manual § 201.1.1(a)(2). In addition, "[t]he Sheriff is responsible for administering and managing … the Administration and Support Services Division[,] Operations Division[, and] Corrections Division." *Id*. § 200.2. Each of the foregoing Divisions is to be commanded by an Assistant Sheriff. *Id.* §§ 200.2.1, 200.2.2, 200.2.3. Sheriff Corpus flagrantly neglected these duties by hiring, promoting and retaining Mr. Aenlle notwithstanding his lack of qualifications, his poor leadership skills, and the repeated warnings she received regarding the same. Indeed, as a result of Sheriff Corpus's actions, the SMCSO is currently without any of the three assistant sheriffs required by Sheriff Corpus's Policy Manual.

May 30, 2025
Page 21


I.       **Supporting Evidence**

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

• SMCSO Associate Management Analyst Valerie Barnes

• San Mateo County Executive Michael Callagy

• Sgt. Gaby Chaghouri

• Sgt. Jimmy Chan

• Det. Rick Chaput

• SMCSO Human Resources Manager Heather Enders

• Former Lt. Daniel Guiney

• Former Undersheriff Christopher Hsiung

• Former Assistant Sheriff Jeff Kearnan

• San Mateo County Human Resources Director Rocio Kiryczun

• Former Capt. Paul Kunkel

• Former Records Manager Jenna McAlpin

• Former Assistant Sheriff Ryan Monaghan

• Lt. Jonathan Sebring

• Dep. Carlos Tapia

• Executive Assistant Jennifer Valdez

• Lt. Irfan Zaidi

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

• November 26, 2021 Barnes-Sheriff Corpus Texts re: Sheriff Christina Corpus's relationship with Kovach

May 30, 2025
Page 22

- December 30, 2021 Barnes-Sheriff Corpus Texts re: Sheriff Christina Corpus's relationship with Kovach

- 2022 Draft Organizational Chart

- January 12, 2022 Barnes-Sheriff Corpus Texts re: Aenlle's Ranch

- January 18, 2022 Barnes-Sheriff Corpus Texts re: Sheriff Christina Corpus's relationship with Kovach

- January 27, 2022 Barnes-Sheriff Corpus Text re: Wedding Venues

- January 27, 2022 Barnes-Sheriff Corpus Texts re: Earrings

- January 31, 2022 Barnes-Sheriff Corpus Texts re: Aenlle

- February 26, 2022 Barnes-Sheriff Corpus Texts re: Aenlle Foot Massage

- May 11, 2022 Barnes-Sheriff Corpus Texts re: Airbnb in Hawaii

- August 30, 2022 Contract Between County of San Mateo and Victor Aenlle

- October 21, 2022 Email from Iliana Rodriguez to Aenlle re: Termination of Contract

- January 1, 2023 Contract Between County of San Mateo and Victor Aenlle

- 2023 Special Projects Coordinator I Job Description

- March 7, 2023 Email from County Human Resources Lisa Yapching to Joann Lov and Heather Enders re: Extra Help Positions

- July 6, 2023 Job Posting for Executive Director of Administration

- 2023 Victor Aenlle CV and Application for Executive Director of Administration

- July 31, 2023 Memo from Sheriff Christina Corpus to Rocio Kiryczun re: Victor Aenlle - Step E Request

- August 1, 2023 Email from Rocio Kiryczun to Sheriff Christina Corpus re: Victor Aenlle - Step E Request

- February 13, 2024 Memo from Sheriff Christina Corpus to Rocio Kiryczun re: Differential Request for Dr. Victor Aenlle

- March 8, 2024 Email from Sheriff Christina Corpus to Former Undersheriff Christopher

May 30, 2025
Page 23

       Hsiung re: Document

- March 12, 2024 Memo from Former Undersheriff Hsiung to Rocio Kiryczun re: Temporary Differential Pay

- March 13, 2024 Email from Rocio Kiryczun to Hsiung and Sheriff Christina Corpus re: Discretionary Pay for Victor Aenlle

- April 16, 2024 Memo from Sheriff Christina Corpus to Rocio Kiryczun re: Request for Aenlle Raise

- April 24, 2024 Email from Rocio Kiryczun to Sheriff Christina Corpus re: Request for Reconsideration of Allowance for Victor Aenlle

- September 25, 2024 Victor Aenlle Transcript of Interview with Judge Cordell

- November 13, 2024 Email from Sgt. Joe Fava and Sgt. Jimmy Chan to Lt. Irfan Zaidi re: Oral Board Concern

- November 13, 2024 Video Recording of Special Meeting of the Board of Supervisors

- November 14, 2024 Email from Rocio Kiryczun to Sheriff Christina Corpus re: Assistant Sheriff Job Classification Requirements

- November 18, 2024 Email from Heather Enders to Sheriff Christina Corpus, Undersheriff Perea, and Lt. Irfan Zaidi re: Concerns Regarding the Interview Process for Candidate

- 2024 Victor Aenlle Volunteer Hours

- April 17, 2025 Email from Sheriff Christina Corpus to Len Beato re: Reserve Deputy Victor Aenlle

## II. Grounds for Removal Relating to the Investigation and Arrest of DSA President Carlos Tapia

### A. Introduction

Dep. Carlos Tapia is the president of the DSA. The DSA is the recognized bargaining unit for San Mateo County deputies, correctional officers, and district attorney inspectors.

In 2024, the relationship between the DSA and Sheriff Corpus broke down due to several issues, including Mr. Aenlle's role in the SMCSO and negotiations related to the Sheriff's overtime policy. After the DSA began to criticize Sheriff Corpus, she ordered her Executive Team, and in particular then-Acting Assistant Sheriff Matthew Fox, to investigate how Dep. Tapia submitted

May 30, 2025
Page 24

his hours worked to the County. In ordering this investigation and then conducting it in-house, Sheriff Corpus did not follow the SMCSO's standard policy to refer investigations of potential criminal activity by members of the SMCSO to the San Mateo District Attorney. This policy is important to prevent the Sheriff from unilaterally conducting and acting on allegations of serious misconduct where conflicts of interest are present, such as in the investigation of a union leader by the Sheriff. Compounding her failure to refer the investigation to the District Attorney, Sheriff Corpus and Mr. Aenlle repeatedly and improperly limited the scope of the investigation, precluding her lead investigator from collecting relevant evidence and speaking to material witnesses.

On November 12, 2024, based on that restricted and therefore incomplete investigation, the Sheriff sent her lead investigator to meet with and inform the District Attorney of her plan to arrest Dep. Tapia that day. After the District Attorney declined to apply for an arrest warrant and advised against proceeding with a warrantless probable cause arrest, Sheriff Corpus nevertheless ordered her personnel to arrest Dep. Tapia that same day. A month later, the District Attorney's Office concluded its own investigation and exonerated Dep. Tapia, stating that "Deputy Tapia should not have been arrested" because "the complete investigation showed that there was no basis to believe any violation of law had occurred."

In ordering Dep. Tapia's investigation and arrest, Sheriff Corpus violated laws related to the performance of her duties, flagrantly neglected her duties, and obstructed an investigation into herself and the SMCSO, providing cause for her removal under Section 412.5(b)(1), (2), and (5).

**B.    Factual Background**

1.    The MOU allows Dep. Tapia to bill for "release time" spent on DSA activities.

The County and the DSA have entered into a Memorandum of Understanding ("MOU") that governs management and labor relations for the 2021–2026 period. Section 3 of the MOU provides the DSA President with 60 hours of "release time" per pay period, which equates to 30 hours of release time per week. The MOU explains that "[p]aid release time is intended to support the collaboration and cooperative spirit of labor relations by ensuring that Association members have access to resources designed to help support their continued success as public employees and that Association leaders have an opportunity to work together to support the success of their members." The MOU limits the DSA President's use of release time to delineated union-related activity. The MOU further states that all "approved release time will be coded appropriately on the employee's timecard using pay code RTE."

Former Acting Sgt. David Wozniak served as the DSA President for over a decade until mid-2022. Throughout his tenure, Mr. Wozniak did not use the "RTE" code, or any other code, to log release time spent on DSA activities when he submitted his timecards. Instead, he used the "001 – Regular Hour" code for his DSA-related work.

May 30, 2025
Page 25

Dep. Tapia became interim DSA President in July 2022. A few months after Dep. Tapia was elected DSA President, he was transferred to the Transportation Unit within the SMCSO. At the time Dep. Tapia was moved into the Transportation Unit, he was assigned a four-days-a-week, ten-hours-per-day schedule. Dep. Tapia conducted 30 hours of DSA business per week, typically on Tuesdays, Wednesdays, and Thursdays. On Fridays, Dep. Tapia was assigned to work a ten-hour shift in the Transportation Unit. Like his predecessor, Dep. Tapia used the "001 – Regular Hour" code for logging all of his work, whether for the DSA or the Transportation Unit, until August 2024 when, as discussed below, he was told to use a different code.

> 2.      After Sheriff Corpus takes over the SMCSO, her relationship with the DSA deteriorates.

After Sheriff Corpus took office in January 2023, she and her Executive Team began to confer with the DSA and OSS about labor relations. Those discussions became increasingly contentious and hostile over time.

In or around January 2024, Dep. Tapia began receiving complaints from DSA members about Mr. Aenlle. These complaints alleged, among other things, that Mr. Aenlle—who, as discussed above, had no experience in executive law enforcement before joining Sheriff Corpus's Executive Team—engaged in inappropriate behavior towards deputies and frequently made decisions outside the scope of his role as the Executive Director of Administration. Dep. Tapia periodically raised these issues with then-Undersheriff Hsiung, who relayed the complaints to Sheriff Corpus. Sheriff Corpus did not address or resolve those complaints, and Mr. Aenlle did not demonstrate a meaningful change in behavior.

In or around March 2024, Dep. Tapia conferred with Sheriff Corpus concerning overtime policies. The double overtime policy, which was in effect between December 2023 and June 2024, allowed officers to receive double time when they worked more than nine hours of overtime per week. Another overtime policy in place governed how overtime shifts would be scheduled. In the course of their discussions, Sheriff Corpus began asserting that she thought the policies were problematic and needed to be changed or discontinued, including because of her view that some deputies were excessively billing double overtime. Dep. Tapia disagreed and expressed that the policies were working as intended and helped the SMCSO with recruiting and retention.

Around the same time, Sheriff Corpus and her Executive Team tasked SMCSO Director of Finance Stacey Stevenson with tracking which deputies were submitting double overtime and how much double overtime they were submitting. At all relevant times, Ms. Stevenson reported directly to Mr. Aenlle. At the direction of Sheriff Corpus's Executive Team, Ms. Stevenson tracked the ongoing costs of double overtime and presented her analysis of those costs to the Executive Team on a bi-weekly basis. As Ms. Stevenson was preparing the double overtime reports, either she or a member of the Executive Team realized that Dep. Tapia and other union leaders were not using billing codes to differentiate between their regular hours and their release

May 30, 2025
Page 26

time spent on union activities. Ms. Stevenson would later inform investigators from the District Attorney's Office that this discovery was made in June or July 2024.

On or about June 21, 2024, it became public throughout the SMCSO that Undersheriff Hsiung had resigned from the SMCSO. As noted above, Undersheriff Hsiung reports that he resigned because of Sheriff Corpus's inability to command the SMCSO, her tendency to retaliate against personnel, and her refusal to stop Mr. Aenlle from interfering with sworn personnel in the performance of their duties.

On June 21, 2024, DSA Vice President Ephraim Cheever sent an email broadly distributed throughout the SMCSO stating that DSA leadership was "deeply saddened by this change, as [Undersheriff Hsiung] was a big supporter of our organization, our union, and us as employees." The email further stated that the DSA had "several projects, such as revisions to the overtime policy … that are now left in limbo."

Later that day, Sheriff Corpus sent Dep. Tapia a text message stating that she was "very disappointed at the email that was sent out by Cheever." Dep. Tapia responded by proposing that he and Sheriff Corpus have a meeting to discuss. At the meeting, Sheriff Corpus continued to stress her disappointment in DSA Vice President Cheever's email and asked Dep. Tapia to issue a statement to "retract" Cheever's email. Dep. Tapia declined to do so.

In or around July 2024, Dep. Tapia began to meet with Undersheriff Perea, who had replaced Undersheriff Hsiung, to discuss a potential renewal of an overtime policy, which was set to expire. Dep. Tapia and Undersheriff Perea had several meetings in which they discussed potential changes to the overtime policy, but they were unable to reach an agreement. The meetings became increasingly contentious and hostile as the parties were unable to reach an agreement.

3.      Judge Cordell interviews Dep. Tapia.

On or about August 12, 2024, Judge Cordell interviewed Dep. Tapia as part of her independent investigation.

4.      The DSA and Sheriff Corpus have a contentious meeting concerning overtime policies.

On or about August 15, 2024, Sheriff Corpus, Undersheriff Perea, Dep. Tapia, OSS President Hector Acosta, and Katy Roberts, a San Mateo County human relations official, along with others, held a labor meet-and-confer about the Sheriff's overtime policies and practices. The meet-and-confer was unsuccessful, and several attendees described the meeting as heated and contentious.

May 30, 2025
Page 27

     5.     After the August 15, 2024 meeting, Dep. Tapia begins to receive messages from SMCSO's finance and human resources departments concerning his timecard practices.

A few hours after the contentious August 15, 2024 meet-and-confer meeting ended, Dep. Tapia received an email from a member of the SMCSO's Human Resources staff, Connor Santos-Stevenson, instructing him to "please put something in the comments section [of his timecards] when you have a 015 line- for auditing purposes."[2]

After receiving the email, Dep. Tapia called Mr. Santos-Stevenson and asked him why Mr. Santos-Stevenson was auditing his timecards. Mr. Santos-Stevenson responded that he did not "want to be involved" and "was being asked to do this," but he declined to identify who had asked him to email Dep. Tapia. Mr. Santos-Stevenson appears to have known that Dep. Tapia did not use the 015 code when entering time since at least December 2023.[3]

The next day, on August 16, 2024, Ms. Stevenson emailed SMCSO Deputy Director of Finance Jason Cooksey to ask him to review the DSA union agreement "and find the language that allows" for the Sheriff's Office to "be reimbursed by the [DSA] for a portion of" Dep. Tapia's salary.

On August 19, 2024, Mr. Cooksey responded by saying he did not see "any specific language in the MOUs that mentions reimbursement for the paid release time." On August 19, 2024, after receiving Mr. Cooksey's message, Ms. Stevenson emailed the SMCSO Payroll Unit with the subject line "Check timecard." In the email, Ms. Stevenson stated that she had learned that Dep. Tapia should be using the "RTE" code in his timecard for time spent "conducting union business," and she asked the Payroll Unit to "please check … Carlos Tapia's timecards and let [her] know if he uses that code ever[.]" On August 21, 2024, SMCSO Payroll Supervisor Van Enriquez responded by stating that he had run "a quick audit and [did not] think [Carlos Tapia had] ever used that code before." Ms. Stevenson then asked Mr. Enriquez to email Dep. Tapia, copying Dep. Tapia's supervisor, and tell him that he should be using an "RTE" code to log his release time for DSA activities when submitting his timecards. She also asked Mr. Enriquez to "blind copy" or "forward the email" so she could "retain a record."

On August 23, 2024, as requested by Ms. Stevenson, Mr. Enriquez sent Dep. Tapia an email instructing him that he needed to change his practice and use the code "RTE" whenever he was logging release time on his timecard for DSA activity. Mr. Enriquez copied Dep. Tapia's supervisors, Lt. Brandon Hensel and Sgt. Steve Woelkers, on the correspondence.

---

[2] "015" is a code that the DSA President has traditionally used for specialty pay when submitting timecards.

[3] Mr. Santos-Stevenson is Ms. Stevenson's son.

May 30, 2025
Page 28

After receiving that email, Dep. Tapia called Mr. Enriquez and asked him who had instructed him to look into his timecards. Dep. Tapia reports that Mr. Enriquez responded by saying "I don't want to get involved." Dep. Tapia also told Mr. Enriquez that the County's payroll system did not permit him to use the "RTE" code. Mr. Enriquez then corresponded with the County's Human Resources Department, which confirmed that Dep. Tapia did not have the ability to use the "RTE" code but could use a "010" code to log release time.

On August 28, 2024, Mr. Enriquez emailed Dep. Tapia again and told him to instead use the code "010" to report his DSA time in light of the fact that he could not access the "RTE" code. Since then, Dep. Tapia has reported his DSA time using the "010" code as instructed by Mr. Enriquez.

Sgts. Chiu, Hallworth, and Woelkers were Dep. Tapia's direct supervisors in the Transportation Unit during the relevant time period. They regularly reviewed and approved Dep. Tapia's timecards. All of them reported that, prior to November 2024, they were unaware of a requirement that Dep. Tapia should have been logging DSA time using a specific release time code. Dep. Tapia has no recollection of his predecessor Mr. Wozniak, his supervising sergeants, or anyone else telling him that, as DSA President, he should log his DSA time in his timecards using a specific release time code before Mr. Enriquez instructed him to do so in August 2024.

Several members of SMCSO reported that coding errors in timecards are commonplace within the office. For example, SMCSO Human Resources Manager Heather Enders reported that issues with timecards like Dep. Tapia's are the sort of "human error" that are very common at the SMCSO. Ms. Enders noted that, despite her role in human resources, even she has had issues with correctly coding her timecards.

> 6.     The DSA and OSS file a PERB complaint against Sheriff Corpus and
>        declare "no confidence" in Mr. Aenlle.

After the August 15, 2024 meeting, relations between the DSA and OSS and Sheriff Corpus continued to deteriorate, and DSA and OSS leadership had by then begun considering a vote of no confidence against Mr. Aenlle. On August 26, 2024, Dep. Tapia received a text message from Det. Mike Garcia, who Dep. Tapia understood was a close ally of Sheriff Corpus, asking if he was available for a call. On that call, Det. Garcia said that he had heard that the DSA was planning to on hold a vote of no confidence against Sheriff Corpus. Dep. Tapia clarified that the no-confidence vote would be against Mr. Aenlle. Det. Garcia expressed disagreement with the planned vote and asked if Dep. Tapia had spoken to Sheriff Corpus about problems with Mr. Aenlle and DSA's intent to hold the vote of no confidence. Dep. Tapia said that he had tried but the Sheriff did not return his calls.

Later that same day, Dep. Tapia received a text message from Sheriff Corpus that said, "I haven't received any calls from you. We can meet off site in San Bruno on Monday." Dep. Tapia understood from Sheriff Corpus's text message that she had discussed the DSA's plans to hold a no-confidence vote concerning Mr. Aenlle with Det. Garcia and was offering to meet to discuss the planned vote.

May 30, 2025
Page 29

On or about August 30, the DSA filed a complaint to the California Public Employment Relations Board ("PERB") alleging that the County, through Sheriff Corpus, had engaged in unlawful labor practices, including failing to meet and confer in good faith concerning the overtime policy.[4] On September 6, 2024, the DSA and OSS began polling members regarding a vote of "no confidence" in Mr. Aenlle.

On September 17, 2024, the DSA and OSS publicly announced their vote of "no confidence" in Mr. Aenlle at a news conference.

> 7.    Sheriff Corpus inquired about Dep. Tapia's attendance in Transportation.

In August or September 2024, Sheriff Corpus called Lt. Hensel, who managed the Transportation Unit to which Dep. Tapia was assigned. According to Lt. Hensel, Sheriff Corpus asked him about Dep. Tapia's attendance in the Transportation Unit and told him that she may need him to start monitoring Dep. Tapia's attendance. Lt. Hensel told Sheriff Corpus that he was surprised by this because he was unaware of any issues with Dep. Tapia's attendance and had never reported any such issues up his chain of command. Sheriff Corpus responded that she wanted to make sure Dep. Tapia was showing up in Transportation when he was supposed to.

> 8.    Sheriff Corpus asks Acting Assistant Sheriff Fox to investigate
>        Dep. Tapia.

On or about October 14, 2024, Sheriff Corpus directed Acting Assistant Sheriff Fox to initiate an investigation into how Dep. Tapia recorded and coded his time on his timecards. Acting Assistant Sheriff Fox reports that Sheriff Corpus told him that she had decided to open this investigation because Lt. Hensel had reached out to her and told her that Dep. Tapia was "never here"—meaning, working in the Transportation Unit—and had asked whether Dep. Tapia's assigned day in the Transportation Unit could be changed from Friday to Monday.

Lt. Hensel, however, disputes this account. As noted above, Lt. Hensel recalls that Sheriff Corpus approached him and, to his surprise, told him that she may need him to monitor Dep. Tapia's attendance. Lt. Hensel is confident he would not have said or suggested that he was having issues with Dep. Tapia's attendance. Likewise, Lt. Hensel reports that he would not have said that he wanted to switch Dep. Tapia's assigned day in the Transportation Unit from Friday to Monday because Fridays tend to be difficult days to staff. Sgt. Woelkers, Sgt. Hallworth, and Sgt. Chiu all independently verified that Fridays are busy days for the Transportation Unit.

---

[4] On April 3, 2025, PERB issued its own complaint alleging that the County, through Sheriff Corpus, engaged in unfair labor practices by, among other things, failing to meet and confer in good faith regarding the overtime policy.

May 30, 2025
Page 30

9.      In violation of SMCSO policy, Sheriff Corpus conducts an in-house
        investigation into Dep. Tapia for potential criminal conduct.

In or around mid- or late October 2024, Acting Assistant Sheriff Fox met with Sheriff Corpus,
Undersheriff Perea, and Mr. Aenlle to review his preliminary investigative findings regarding
Dep. Tapia's timecards. Acting Assistant Sheriff Fox informed the Sheriff, the Undersheriff, and
Mr. Aenlle at this meeting that he had discovered that Dep. Tapia had abruptly changed his
coding behavior in August 2024. Sheriff Corpus and Mr. Aenlle responded that this timing
coincided with when Dep. Tapia and the DSA had begun to publicly criticize the Sheriff, and
they suggested to Acting Assistant Sheriff Fox that Dep. Tapia changed his timecard practices at
that time because he knew he would come under scrutiny given his increased public criticism of
the Sheriff. There was no mention at this meeting with Acting Assistant Sheriff Fox that
Mr. Enriquez, at Ms. Stevenson's direction, had told Mr. Tapia on August 28, 2024, that he
should change the billing code for reporting his release time.

At this meeting, Sheriff Corpus, Undersheriff Perea, Mr. Aenlle, and Acting Assistant Sheriff
Fox discussed potential options on how to proceed with the investigation in light of Acting
Assistant Sheriff Fox's preliminary findings. Acting Assistant Sheriff Fox and Undersheriff
Perea made several recommendations, one of which included transferring the investigation to the
District Attorney's Office. In a break with SMCSO policy,[5] Sheriff Corpus decided against that
recommendation, stating that she did not trust personnel within the District Attorney's Office.
Acting Assistant Sheriff Fox and Undersheriff Perea also suggested transferring the
investigation to PSB, which is responsible for Internal Affairs investigations within the SMCSO.
Sheriff Corpus also rejected that suggestion, stating that she did not trust the sworn officers
assigned to PSB. The Executive Team also discussed bringing in an outside investigator to take
over the investigation into Dep. Tapia's timecards. Sheriff Corpus rejected that suggestion as
well. Acting Assistant Sheriff Fox and Undersheriff Perea further recommended placing
Dep. Tapia on administrative leave, which is a common step taken by internal investigators
when the alleged misconduct is serious and, critically, would have allowed for more time for the
investigation. Again, Sheriff Corpus rejected this suggestion as well. The Sheriff ultimately
decided that Acting Assistant Sheriff Fox would complete the investigation himself.

10.     Sheriff Corpus and her Executive Team limit the evidence available to
        Acting Assistant Sheriff Fox.

According to Acting Assistant Sheriff Fox, neither Sheriff Corpus nor anyone else from the
Executive Team informed him at any time that Mr. Enriquez had instructed Dep. Tapia to begin
coding his release time with the 010 code in August 2024.

---

[5] Section 1011.9 of the SMCSO Policy Manual states: "Where a member is accused of potential
criminal conduct, the district attorney's office shall be requested to investigate the criminal
allegations apart from any administrative investigation. Any separate administrative
investigation may parallel a criminal investigation."

May 30, 2025
Page 31

Although Ms. Stevenson did not respond to multiple requests to be interviewed as part of our investigation in an interview with the District Attorney's Office on December 2, 2024, Ms. Stevenson told investigators that she was "sure" that she had told the Executive Team that she had discovered Dep. Tapia's coding error, and that she had asked Mr. Enriquez "to email [Dep. Tapia] to use proper coding" because the Executive Team had been "watching all of the overtime reports" and had discussed that "the union reps were not using their time and that [Ms. Stevenson] would need to clear it up with HR."

During the course of Acting Assistant Sheriff Fox's investigation, he informed Mr. Aenlle that he was planning to contact Mr. Enriquez to discuss Dep. Tapia's timecards. Mr. Aenlle, however, directed Acting Assistant Sheriff Fox to instead interview Joann Lov, another payroll staff member. Ms. Lov did not know that Mr. Enriquez had instructed Dep. Tapia to change his timecoding practices in August 2024. Heeding Mr. Aenlle's direction, Acting Assistant Sheriff Fox met with Ms. Lov, and not Mr. Enriquez.

Sometime in mid-October 2024, Acting Assistant Sheriff Fox asked to review Dep. Tapia's keycard records. Sheriff Corpus denied that request, stating to Acting Assistant Sheriff Fox that she did not trust the lieutenant who oversaw those records. As a result, Acting Assistant Sheriff Fox was unable to review keycard records to confirm whether Dep. Tapia was present for shifts in the Transportation Unit even when other scheduling materials may have suggested he was absent.

In late October and into November 2024, Acting Assistant Sheriff Fox provided near-daily updates to Sheriff Corpus, Undersheriff Perea, and Mr. Aenlle regarding his investigation into Dep. Tapia's timecards. On multiple occasions in late October and into November 2024, Acting Assistant Sheriff Fox repeated his suggestion to Sheriff Corpus that Dep. Tapia be placed on administrative leave, which would have allowed for more time for the investigation. Sheriff Corpus dismissed those recommendations and instead instructed Acting Assistant Sheriff Fox to complete the investigation.

Acting Assistant Sheriff Fox's investigation focused primarily on cross-referencing attendance information he obtained from Lt. Hensel based on daily scheduling materials from the Transportation Unit with Dep. Tapia's timecard records. Lt. Hensel informed Acting Assistant Sheriff Fox that the Transportation Unit's scheduling materials were potentially incomplete and subject to human error. Lt. Hensel further informed Acting Assistant Sheriff Fox that he was unaware of any attendance issues with Dep. Tapia and recommended to Acting Assistant Sheriff Fox that he speak with Dep. Tapia's direct supervisors in Transportation, which included Sgts. Woelkers, Hallworth, and Chiu. Acting Assistant Sheriff Fox did not interview any of the sergeants in the Transportation Unit.

Sgts. Woelkers, Hallworth, and Chiu, who were responsible for reviewing Dep. Tapia's timecards or overtime slips before he submitted them, do not recall having to correct any inaccuracies in the timecards or overtime slips. They further reported that Dep. Tapia is an exemplary and reliable employee who does not miss work without explanation, who typically

communicates about his availability, and who they can rely upon as a team player. None of them could recall a single instance of Dep. Tapia not showing up for an assigned shift in the Transportation Unit unless Dep. Tapia gave prior notice. All of them stated that, if Dep. Tapia had been absent unexpectedly, they would have known about it. Lt. Hensel also described Dep. Tapia as a "trustworthy and professional" employee, and he recalled consistently seeing Dep. Tapia working in the Transportation Unit when he was expected to be there.

11.     Sheriff Corpus orders Dep. Tapia to be arrested on November 12, 2024.

On or about Thursday, November 7, 2024, Acting Assistant Sheriff Fox met with Sheriff Corpus, Undersheriff Perea, and Mr. Aenlle and discussed his findings. Multiple times throughout his investigation, including in his report presented to the Executive Team that day, Acting Assistant Sheriff Fox made clear to Sheriff Corpus, Undersheriff Perea, and Mr. Aenlle that he believed Dep. Tapia had committed timecard fraud because of the abrupt change in Dep. Tapia's timecard practices in August 2024.

In the November 7 meeting, Acting Assistant Sheriff Fox and Undersheriff Perea again suggested placing Dep. Tapia on administrative leave. The Sheriff declined to do so. The Executive Team discussed other options, including obtaining an arrest warrant or conducting a probable cause arrest that day. Acting Assistant Sheriff Fox reports that Mr. Aenlle advocated for arresting Dep. Tapia that day, but Sheriff Corpus opted not to do so. Instead, the Executive Team agreed to meet again on Tuesday, November 12, 2024.

At that time, Sheriff Corpus and the Executive Team were aware that Judge Cordell was nearing the completion of her investigation. On November 7, after his meeting with Sheriff Corpus, Acting Assistant Sheriff Fox met separately with Undersheriff Perea and Mr. Aenlle and recalls that they discussed the forthcoming release of the Cordell Report. Mr. Aenlle was upset about the prospect of the report being released soon.

On the morning of November 12, 2024, Sheriff Corpus informed Acting Assistant Sheriff Fox of her decision to arrest Dep. Tapia and instructed him to notify the District Attorney's office that the SMCSO would proceed with the arrest. A meet-and-confer between the union and the Executive Team to discuss the overtime policy had previously been scheduled for the afternoon of November 12, 2024.

As instructed, Acting Assistant Sheriff Fox met with Chief Deputy District Attorney Shin-Mee Chang in person to discuss Acting Assistant Sheriff Fox's investigation of Dep. Tapia. During that meeting, Acting Assistant Sheriff Fox requested that the District Attorney seek an arrest warrant for Dep. Tapia. He further stated that if the District Attorney did not obtain a warrant, the SMCSO would proceed with its own, warrantless, probable cause arrest later that day. Chief Deputy District Attorney Chang told Acting Assistant Sheriff Fox that (1) the District Attorney would not seek an arrest warrant that day; (2) the District Attorney's Office had reviewed a number of timecard fraud cases over the years and it would not treat this one differently; and (3) timecard fraud cases tended to be complex and further investigation may be needed. She also told Acting Assistant Sheriff Fox that she urged the Sheriff's Office not to proceed with a

May 30, 2025
Page 33

warrantless arrest that day because, given the complexity of timecard fraud cases, the District Attorney's Office would not be able to complete its investigation within 48 hours—at which point Dep. Tapia would have to be released from custody under California law.[6] Acting Assistant Sheriff Fox responded by informing Chief Deputy District Attorney Chang that the Sheriff's Office would nevertheless proceed with a warrantless arrest that day and that he would let her know as soon as the arrest occurred.[7]

Following this meeting, Acting Assistant Sheriff Fox spoke with Sheriff Corpus and relayed to her the conversation he had had with Chief Deputy District Attorney Chang. Acting Assistant Sheriff Fox informed Sheriff Corpus that Chief Deputy District Attorney Chang had said that proceeding with a warrantless arrest of Dep. Tapia without allowing the District Attorney to first conduct its own investigation was "not ideal." The Sheriff nevertheless made the decision to go forward with the warrantless arrest. Acting Assistant Sheriff Fox reports that he, Undersheriff Perea, Mr. Aenlle, and SMCSO Director of Communications Gretchen Spiker were present at the meeting at which Sheriff Corpus made her decision to arrest Dep. Tapia.

Acting Assistant Sheriff Fox subsequently instructed Dep. Tapia (through his attorneys) to turn himself in for arrest at 1:00 p.m.—an hour before the previously scheduled meet-and-confer between the Sheriff and the DSA. SMCSO staff recorded Dep. Tapia self-surrendering for his arrest and shared the video with the media.[8] Members of the SMCSO then executed Sheriff Corpus's order, arrested Dep. Tapia, and took his mugshot before releasing him on bail. The arrest was made based on a probable cause declaration signed by Acting Assistant Sheriff Fox. The declaration supporting probable cause for the arrest states that Dep. Tapia's purported criminal intent "was apparent in August 2024 when he started to submit his timecards with Association business and made the distinction of billing appropriately." Acting Assistant Sheriff Fox since reported that, had he known about Mr. Enriquez's August 2024 emails with Dep. Tapia, he would not have believed that there was probable cause to arrest Dep. Tapia on November 12, 2024.

---

[6] California Penal Code section 825(a) requires a defendant to be taken before a magistrate judge and arraigned within 48 hours after his arrest.

[7] Acting Assistant Sheriff Fox also stated during this meeting that Sheriff Corpus was concerned that one of the District Attorney's investigators sat on the DSA Board. Chief Deputy District Attorney Chang assured Acting Assistant Sheriff Fox that, if the District Attorney investigated Deputy Tapia, they would make sure that no one that had a prior connection to Deputy Tapia or the DSA would be involved in the investigation.

[8] For example, this video published by the Mercury News states that the footage is "courtesy of San Mateo County's Sheriff's Department." Mercury News, San Mateo County Deputy Sheriff's Association President Carlos Tapia turns himself in, Youtube, https://www.youtube.com/watch?v=hr9cCuX0pvY.

May 30, 2025
Page 34

> 12.    Mr. Aenlle uses Dep. Tapia's arrest to try to discourage the release of the
>        Cordell Report.

A few hours after Dep. Tapia's arrest, Mr. Aenlle's personal attorney, Deborah Drooz, emailed San Mateo Supervisors Noelia Corzo and Ray Mueller to threaten litigation over purported "falsehoods" that she anticipated may soon be released in the Cordell report. Ms. Drooz stated that she was "advised that a source for such falsehoods may be DSA president Carolos [sic] Tapia, someone we believe has long been dedicated to ousting Sheriff Christina Corpus and her subordinates, including Mr. Aenlle. If that is the case, you should be advised that Mr. Tapia's reputation for honesty and reliability have [sic] come under law enforcement scrutiny. As we understand it, Mr. Tapia was arrested today for fraudulent timecard use."

The Cordell Report was released to the public that day.

> 13.    After conducting an investigation, the District Attorney declines to
>        prosecute Dep. Tapia.

The District Attorney's Office subsequently conducted a month-long investigation into Dep. Tapia's timecard practices. At the end of that investigation, the District Attorney concluded that "no crime was committed by Deputy Tapia, that the complete investigation showed that there was no basis to believe any violation of law had occurred, and finally that Deputy Tapia should not have been arrested." The District Attorney further concluded that the Sheriff's Office investigation had been "extraordinarily limited and did not involve necessary follow-up investigation to examine the accuracy of the allegations."

Despite this, Dep. Tapia remains on administrative leave to this day, more than six months after his improper arrest.

## C.    Grounds for Removal

The foregoing conduct related to Dep. Tapia is, independently and collectively, grounds to remove Sheriff Corpus from office for the following reasons.

***First***, Sheriff Corpus violated laws related to the performance of the Sheriff's duties. San Mateo County Charter Art. IV § 412.5(B)(1). Sheriff Corpus ordered Dep. Tapia arrested without probable cause to support that arrest in violation of Penal Code § 836. *See People v. Mower*, 28 Cal. 4th 457, 473 (2002) ("Reasonable or probable cause means such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused."); *Poldo v. United States*, 55 F.2d 866, 869 (9th Cir. 1932) ("Mere suspicion is not enough; there must be circumstances represented to the officers through the testimony of their senses sufficient to justify them in a good-faith belief that the defendant had violated the law.").

Additionally, Sheriff Corpus subjected Dep. Tapia to an investigation and arrest as the result of his engaging in protected union activity. This constitutes unlawful retaliation in violation of well-established California law. *See* Gov't Code § 3304(a) ("No public safety officer shall be subjected to punitive action … or be threatened with any such treatment, because of the lawful exercise of the rights granted under this chapter[.]");Gov't Code § 3502.1 ("No public employee shall be subject to punitive action … , or threatened with any such treatment, for the exercise of lawful action as an elected, appointed, or recognized representative of any employee bargaining unit."); Gov't Code § 3506 ("Public agencies and employee organizations shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under Section 3502."[9]); Gov't Code § 3506.5(a) ("A public agency shall not … impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter."); *see also* Cal. Code Regs. tit. 8, § 32603; Civ. Code § 51.7; San Mateo County Code § 2.14.090.

**Second**, in directing and overseeing a limited and therefore incomplete investigation of Dep. Tapia, Sheriff Corpus flagrantly neglected her duties as defined by law to preserve peace and investigate public offenses. San Mateo County Charter Art. IV § 412.5(B)(2); *see also* Gov't Code § 26600 (requiring the sheriff to preserve peace); *id.* § 26602 (requiring the sheriff to investigate public offenses); *Saunders v. Knight*, No. CV F 04-5924 LJO WMW, 2007 WL 3482047, at *18 (E.D. Cal. Nov. 13, 2007) ("[T]he sheriff has a duty imposed by statute to enforce the laws of the state and maintain public order and safety." (citing Gov't Code §§ 26600, 26602)); *Laurie Q.v. Contra Costa County*, 304 F. Supp. 2d 1185 (N.D. Cal. 2004) ("[S]heriffs are required under California law to … 'investigate public offenses which have been committed.' In other words, California's sheriffs are local, non-discretionary executors of a statewide criminal system[.]" (citing Gov't Code § 26602)); Gov't Code § 815.6 ("Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."); *Ramirez v. City of Buena Park,* 560 F.3d 1012, 1024 (9th Cir. 2009) (holding that officers "may not disregard facts tending to dissipate probable cause"). Sheriff Corpus, herself and through Mr. Aenlle, unreasonably restricted Acting Assistant Sheriff Fox from collecting relevant evidence and speaking to key witnesses in the course of his investigation into Dep. Tapia. Sheriff Corpus also insisted that the arrest proceed on November 12, 2024, against the advice of the District Attorney and despite Acting Assistant Sheriff Fox recommending that Dep. Tapia be placed on administrative leave to allow for additional time for the investigation. After the District Attorney refused to provide a warrant for the arrest, Sheriff Corpus ordered the arrest of Dep. Tapia, the DSA President, based purportedly on probable cause. Within a month, the District Attorney determined "there was no

---

[9] Section 3502 provides "public employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations." Gov't Code § 3502.

May 30, 2025
Page 36

basis to believe any violation of law had occurred, and … Dep. Tapia should not have been arrested."

***Third***, Sheriff Corpus obstructed an investigation into the conduct of the Sheriff and/or the SMCSO as authorized by the Board of Supervisors. San Mateo County Charter Art. IV § 412.5(B)(5); *see also People v. Belmares*, 130 Cal. Rptr. 2d 400, 404 (2003) (describing "obstruct" in the law enforcement context to mean "be or come in the way of," "hinder from passing, action, or operation," "impede," "retard," "shut out," and "place obstacles in the way"); *Lorenson v. Superior Court*, 35 Cal. 2d 49, 59 (1950) (defining obstruction as "malfeasance and nonfeasance by an officer in connection with the administration of his public duties, and also anything done by a person in hindering or obstructing an officer in the performance of his official obligations"); *People v. Martin*, 135 Cal. App. 3d 710, 726 (1982) (same). Acting Assistant Sheriff Fox recommended placing Dep. Tapia on administrative leave to allow more time for an investigation. Likewise, the District Attorney recommended allowing its office to conduct the investigation instead of proceeding with a probable cause arrest on November 12, 2024. Despite those recommendations, Sheriff Corpus ordered Dep. Tapia to be arrested on November 12, 2024, following an incomplete investigation. Then, within a few hours of the arrest, counsel representing Mr. Aenlle encouraged the Board of Supervisors not to release the Cordell Report and cited Dep. Tapia's recent arrest as evidence that he could not be trusted as a reliable informant.

### D.    Supporting Evidence

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- Sgt. Hector Acosta;
- Chief Deputy District Attorney Shin-Mee Chang;
- Sgt. Daniel Chiu;
- SMCSO Human Resources Manager Heather Enders;
- SMCSO Payroll Supervisor Van Enriquez;
- Former Acting Assistant Sheriff Matthew Fox;
- Sgt. Philip Hallworth;
- Lt. Brandon Hensel;
- Former Undersheriff Christopher Hsiung;
- San Mateo County Deputy Director of Human Resources Michelle Kuka;

May 30, 2025
Page 37

- SMCSO Management Analyst Joann Lov;

- San Mateo County Labor Relations Analyst Katy Roberts;

- Dep. Carlos Tapia; and

- Sgt. Steve Woelkers.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- 2021 Memorandum of Understanding Between County of San Mateo and Deputy Sheriff's Association (January 10, 2021 – January 10, 2026);

- January 2, 2024 Email from Connor Santos-Stevenson to Van Enriquez re: 015 No Comments Week Ending 12/30/2023;

- June 21, 2024 Email from DSA Vice President Ephraim Cheever to DSA Members re: DSA Response to Undersheriff Change;

- June 21, 2024 Text Message from Sheriff Christina Corpus to Dep. Carlos Tapia;

- August 15, 2024 Email Thread from Connor Santos-Stevenson to Dep. Carlos Tapia re: 015 Earning Type Comments Section;

- August 16, 2024–August 20, 2024 Email Thread from Stacey Stevenson to Jason Cooksey re: DSA/OSS MOU's;

- August 19, 2024 Email Thread from Stacey Stevenson to Michelle Kuka re: DSA/OSS Salary Reimbursement;

- August 19, 2024–September 12, 2024 Email Thread from Stacey Stevenson to Payroll/Van Enriquez re: Check Timecard;

- August 23, 2024–August 28, 2024 Email Thread from Enriquez to Dep. Carlos Tapia re: DSA President Release Time (Coding RTE);

- August 26, 2024 Text Messages from Det. Mike Garcia to Dep. Carlos Tapia;

- August 26, 2024 Text Message from Sheriff Christina Corpus to Dep. Carlos Tapia;

- August 26, 2024–August 27, 2024 Email Thread from Van Enriquez to Lisa Raiti and Katy Roberts re: DSA President Release Time (Coding RTE);

- August 30, 2024 DSA's Complaint, *San Mateo County Deputy Sheriff's Association v.*

May 30, 2025
Page 38

*County of San Mateo*, No. SF-CE-2224-M;

- November 12, 2024 Acting Assistant Sheriff Matthew Fox Probable Cause Declaration;

- November 12, 2024 Email from Deborah Drooz to Noelia Corzo and Ray Mueller re: Urgent Communication re: November 12, 2024 Press Conference;

- December 4, 2024 Stacey Stevenson Interview with the San Mateo County District Attorney's Office;

- December 9 2024 Acting Assistant Sheriff Matthew Fox Interview with the San Mateo County District Attorney's Office;

- December 16, 2024 Press Release, County of San Mateo District Attorney, Prosecution Decision Regarding Deputy Carlos Tapia;

- December 24, 2024 *Mercury News* Video, "San Mateo County Deputy Sheriff's Association President Carlos Tapia turns himself in," *available at:* https://www.youtube.com/watch?v=hr9cCuX0pvY;

- February 21, 2025 Dep. Carlos Tapia Civil Complaint against San Mateo County; and

- April 3, 2025 PERB Complaint, *San Mateo County Deputy Sheriff's Association v. County of San Mateo*, No. SF-CE-2224-M.

**III.     Grounds for Removal Relating to Unlawful Punitive Action Taken Against Sgt. Javier Acosta.**

**A.     Introduction**

Sgt. Hector Acosta is President of the OSS. Together with Dep. Tapia, Sgt. Hector Acosta participated in the contentious labor-management negotiations in 2024 that led up to and included the August 15, 2024, meet-and-confer meeting that included the DSA, OSS, OSS, Undersheriff Perea, and Sheriff Corpus. Shortly after the August 15, 2024 meeting, Sheriff Corpus initiated a retaliatory Internal Affairs investigation into Sgt. Hector Acosta's brother, Sgt. Javier Acosta. Sheriff Corpus's conduct violated the Government Code.

**B.     Sheriff Corpus began an investigation into Sgt. Javier Acosta within a week of the contentious August 15, 2024 meeting between the DSA, OSS, and the Sheriff.**

Sgt. Hector Acosta joined the Sheriff's Office in 1999. His brother, Sgt. Javier Acosta, began working for the Sheriff's Office in 2006 and was recognized as "Deputy of the Year" in 2016. Sgt. Javier Acosta was most recently assigned to the Sheriff's Community Engagement Unit.

May 30, 2025
Page 39

Following the contentious August 15, 2024, meet-and-confer meeting described above, Sgt. Hector Acosta and Dep. Tapia reported their concerns that Sheriff Corpus might retaliate against them to Katy Roberts. Sgt. Hector Acosta also warned his brother Sgt. Javier Acosta that Sheriff Corpus might target him for retaliation.

Five days later, on August 20, 2024, then-Captain Matthew Fox ordered Sgt. Javier Acosta into his office. Capt. Fox told Sgt. Javier Acosta that he was not in trouble and that he did not need a lawyer. During the meeting, Capt. Fox told Sgt. Javier Acosta that "they wanted to [Internal Affairs] you." Sgt. Javier Acosta understood this to mean that Sheriff Corpus, Undersheriff Perea, and/or Mr. Aenlle wanted to subject him to an Internal Affairs investigation. According to Sgt. Javier Acosta, Capt. Fox said that he told "them" that he would "handle it."

Capt. Fox then proceeded to ask Sgt. Javier Acosta about an August 15, 2024, dinner that Sgt. Javier Acosta had attended to celebrate the end of SMCSO's summer internship program. There was a report that an underaged intern had consumed alcohol at the event. Sgt. Javier Acosta told Capt. Fox what happened at the dinner, and Capt. Fox ended the meeting by saying that he considered the matter closed. Capt. Fox did not provide advance notice to Sgt. Javier Acosta of the subject of this meeting, nor did he afford Sgt. Javier Acosta an opportunity to consult with counsel or a union representative before or during the meeting.

Two days later, on August 22, 2025, Capt. Fox texted Sgt. Javier Acosta and asked him to meet outside a County building. When they met, Capt. Fox handed Sgt. Javier Acosta a letter notifying him that he was being placed on administrative leave and directing him to remain at his residence between the hours of 8:00 a.m. to 5:00 p.m., Monday through Friday, "with a one-hour meal break from noon to 1:00 p.m. during which you are at liberty to leave your residence." The letter further instructed Sgt. Javier Acosta that he would remain in this status while "the investigation into your misconduct is ongoing." The letter did not identify the subject matter of the investigation or provide Sgt. Javier Acosta with any means to appeal the SMCSO's decision. When Capt. Fox delivered the letter, he said words to the effect that he did not know what the letter was about but that "they asked me to come back and give it to you." Sgt. Javier Acosta understood that Capt. Fox was acting at the direction of Sheriff Corpus, Undersheriff Perea, and/or Mr. Aenlle.

Sometime between August 22, 2025, and September 3, 2025, Sheriff Corpus initiated an Internal Affairs investigation into Sgt. Javier Acosta. The policy and practice of the Sheriff's Office is for sworn officers in PSB to oversee Internal Affairs investigations or, when necessary, outsource the investigation to a neutral third-party investigator. With respect to Sgt. Javier Acosta, however, Sheriff Corpus bypassed the sworn PSB officers and did not initially outsource the investigation. Instead, at a meeting attended by Sheriff Corpus, Mr. Aenlle, Undersheriff Perea, Capt. Fox, and Heather Enders, Sheriff Corpus and Mr. Aenlle asked Ms. Enders to draft an Internal Affairs notice to Sgt. Javier Acosta containing allegations about the August 15 dinner and interactions between Sgt. Javier Acosta and a Sheriff's Office intern. Ms. Enders is a civilian employee with no experience or training regarding Internal Affairs investigations, and prior to this date, she had never drafted—or been asked to draft—an Internal Affairs notice.

May 30, 2025
Page 40

Nonetheless, Ms. Enders drafted the Internal Affairs notice as directed by Sheriff Corpus and Mr. Aenlle, but she could not sign it because she is not a sworn officer.

On or about September 3, 2024, Undersheriff Perea contacted Capt. Brian Philip, told him that Ms. Enders would be sending him the Internal Affairs notice, and ordered him to sign and serve it on Sgt. Javier Acosta. Capt. Philip had joined the Sheriff's Office in August 2023, after 19 years at the Palo Alto Police Department. Since joining the Sheriff's Office, Capt. Philip had overseen PSB. Until Undersheriff Perea contacted him, Capt. Philip had not been provided with any information regarding the investigation of Sgt. Javier Acosta and was entirely unaware of any such investigation.

Ms. Enders emailed Capt. Philip a copy of the Internal Affairs notice she had prepared at the direction of Sheriff Corpus and Mr. Aenlle. Capt. Philip reviewed the Internal Affairs notice that Ms. Enders prepared and notified her by email that the notice "fail[ed] to meet several POBAR requirements as referenced in Government Code section 3303." He also wrote that "Contrary to normal custom and practice at the San Mateo County Sheriff's Office, [PSB] was excluded from the intake of this complaint, and as such, [he did] not have the requisite information to properly serve this notice." Capt. Philip copied his supervisor, then-Assistant Sheriff Monaghan, on that email.

Sgt. Javier Acosta ultimately received the Internal Affairs notice on or about September 4, 2024, signed by Assistant Sheriff Monaghan. The notice lists several provisions of the Policy Manual that Sgt. Javier Acosta allegedly violated and contains a narrative regarding the August 15, 2024 dinner and Sgt. Javier Acosta's interactions with an intern. The notice indicates that Sgt. Javier Acosta would be subject to an interrogation, but it lacks an interview date, time, or location; nor does it identify an interviewer inconsistent with standard practice. The complainant is identified as Sheriff Corpus.

  **C.**  **Sgt. Javier Acosta remains on administrative leave without explanation.**

No member of PSB ever interviewed Sgt. Javier Acosta, and there is no PSB investigation open into Sgt. Javier Acosta. In December 2024, outside investigators at the firm Chaplin & Hill interviewed Sgt. Javier Acosta. In approximately March 2025, Sgt. Javier Acosta's attorney contacted the outside investigators at Chaplin & Hill to inquire into why the investigation was still unresolved six months after it began. The outside investigators informed Sgt. Javier Acosta's attorney that they had completed their investigation and submitted it to the Sheriff's Office. Nonetheless, Sgt. Javier Acosta remains on administrative leave.

  **D.**  **Grounds for Removal**

The foregoing conduct related to Sgt. Acosta is, independently and collectively, grounds to remove Sheriff Corpus from office for cause because she violated laws related to the performance of the Sheriff's duties. San Mateo County Charter Art. IV § 412.5(B)(1).

May 30, 2025
Page 41

***First***, Sheriff Corpus violated the Public Safety Officers Procedural Bill of Rights Act ("POBRA"), Gov't Code §§ 3300, *et seq*., by taking punitive action against Sgt. Javier Acosta without affording him the rights provided by Government Code Sections 3303 and 3304. For example, Sgt. Acosta was not informed prior to his interrogation "of the rank, name, and command of the officer in charge of the interrogation [or] the interrogating officers," Gov't Code 3303(b); was not "informed of the nature of the investigation prior to any interrogation," *id.* § 3303(c); was not afforded the right to be "represented by a representative of his or her choice who may be present at all times during the interrogation," *id*. § 3303(i); and was not afforded the opportunity for an administrative appeal, *id* § 3304(b).

***Second***, Sheriff Corpus violated California law by subjecting Sgt. Acosta to an improper investigation and imposing on him an extended administrative leave because of protected union activity. "Public employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations," Gov't Code § 3502, and "No public safety officer shall be subjected to punitive action … or be threatened with any such treatment, because of the lawful exercise of [such] rights." Gov't Code § 3304(a); *see also* Gov't Code § 3506 ("Public agencies and employee organizations shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under Section 3502."); Gov't Code § 3506.5(a) ("A public agency shall not … impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter."); Cal. Code Regs. tit. 8, § 32603 ("It shall be an unfair practice for a public agency to … [i]nterfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of rights guaranteed by Government Code section 3502.").

###    E.    Supporting Evidence

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- Sgt. Hector Acosta;

- Sgt. Javier Acosta;

- Dep. Carlos Tapia;

- Former Acting Assistant Sheriff Matthew Fox;

- SMCSO Human Resources Manager Heather Enders; and,

- Former Capt. Brian Philip.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

May 30, 2025
Page 42

- August 22, 2024 Letter from Capt. Matthew Fox to Sgt. Javier Acosta;

- September 3, 2024 Emails between Heather Enders and Capt. Brian Philip;

- September 4, 2024 Internal Affairs Notice to Sgt. Javier Acosta.

**IV.     Grounds for Removal Relating to the Termination of Former Assistant Sheriff Ryan Monaghan**

**A.     Introduction**

Ryan Monaghan served as an assistant sheriff and member of Sheriff Corpus's Executive Team from February 2023 through September 2024. Assistant Sheriff Monaghan was interviewed by Judge Cordell in the course of her investigation. Within 72 hours of learning that Assistant Sheriff Monaghan had talked to Judge Cordell, Sheriff Corpus removed him from his position as assistant sheriff. In removing Assistant Sheriff Monaghan from his position, Sheriff Corpus violated several anti-retaliation and public safety officer employment laws related to the performance of her duties.

**B.     Sheriff Corpus retaliated against Assistant Sheriff Monaghan days after learning that he had spoken to Judge Cordell as part of her investigation.**

In 2022, Sheriff Corpus recruited Ryan Monaghan, previously the Chief of Police in the City of Tiburon, to be an assistant sheriff in her administration and member of her Executive Team. Throughout 2023, Assistant Sheriff Monaghan, Undersheriff Hsiung, and Mr. Aenlle formed the core of Sheriff Corpus's Executive Team. In 2024, the relationship between Sheriff Corpus and Undersheriff Hsiung deteriorated, resulting in Undersheriff Hsiung resigning on June 21, 2024. This left Assistant Sheriff Monaghan as the sole sworn member of Sheriff Corpus's Executive Team.

Judge Cordell was retained and began her investigation in July 2024. The fact of her investigation was initially confidential. On September 12, 2024, the Board of Supervisors issued a public statement announcing that it had appointed Judge Cordell to conduct an independent investigation into the Sheriff's Office. Shortly thereafter, Judge Cordell interviewed Assistant Sheriff Monaghan. He reported to Judge Cordell two incidents in which he believed Sheriff Corpus had violated the law and violated Sheriff's Office policy. First, Assistant Sheriff Monaghan reported to Judge Cordell that he believed that Sheriff Corpus had retaliated against Capt. Rebecca Albin by revoking her worksite access the day before her official date of separation. Assistant Sheriff Monaghan believed that the Sheriff's actions were retaliatory and that they violated Capt. Albin's legal rights as set forth in the Sheriff's Office Policy Manual and as set forth in POBRA. Second, Assistant Sheriff Monaghan reported to Judge Cordell that he believed that Sheriff Corpus had retaliated against Capt. Philip by transferring him from PSB to Corrections. Assistant Sheriff Monaghan believed that the Sheriff's actions were retaliatory and violated Capt. Philip's legal rights as set forth in POBRA and the Sheriff's Office Policy Manual.

May 30, 2025
Page 43

On September 17, 2024, Assistant Sheriff Monaghan, Sheriff Corpus, Mr. Aenlle, and Undersheriff Perea attended a civic meeting in Half Moon Bay. After the meeting, in the presence of Undersheriff Perea, Mr. Aenlle asked Assistant Sheriff Monaghan whether he had spoken to Judge Cordell. Assistant Sheriff Monaghan answered that he had. Assistant Sheriff Monaghan recalls that Mr. Aenlle responded, sarcastically, "That's just great, when were you planning on telling the Sheriff and the rest of us?" Mr. Aenlle was visibly upset.

Shortly after the September 17, 2024 conversation with Mr. Aenlle, Assistant Sheriff Monaghan contacted Judge Cordell and informed her that Mr. Aenlle had asked him if he had spoken to her.

On September 18, 2024, Assistant Sheriff Monaghan told Sheriff Corpus that he had spoken to Judge Cordell. Sheriff Corpus complained to Assistant Sheriff Monaghan that Judge Cordell's investigation was a "witch hunt" and a "joke." Assistant Sheriff Monaghan also told Sheriff Corpus that he believed that it was inappropriate for Mr. Aenlle to question potential witnesses about their cooperation with Judge Cordell's investigation and that Sheriff Corpus should advise Mr. Aenlle not to question such witnesses. Sheriff Corpus disagreed and conveyed her view that Mr. Aenlle could inquire about rumors that he heard related to the investigation.

On September 19, 2024, Sheriff Corpus did not invite Assistant Sheriff Monaghan to a press conference. Before this instance, it had been Sheriff Corpus's general practice to invite her entire Executive Team to press conferences.

On September 20, 2024, Undersheriff Perea took Assistant Sheriff Monaghan into a meeting in Sheriff Corpus's office. During the ensuing meeting, Sheriff Corpus told Assistant Sheriff Monaghan that she was "really disappointed" and that she heard that he was saying things about her. She told Assistant Sheriff Monaghan that trust was important to her and that she no longer trusted him. She ended the meeting saying, "I don't think things are going to work out."

Undersheriff Perea then accompanied Assistant Sheriff Monaghan to his office and ordered him to turn in his badge, gun, and identification. Undersheriff Perea also told Assistant Sheriff Monaghan that he could not use his office computer. Assistant Sheriff Monaghan understood that his employment was being involuntarily terminated.

Prior to Assistant Sheriff Monaghan's termination, Sheriff Corpus had never conducted a performance review of him nor provided him with a written performance evaluation, much less one that criticized his work. Likewise, neither Undersheriff Hsiung nor Undersheriff Perea had ever conducted a performance review of Assistant Sheriff Monaghan nor provided him with a written performance review. To the contrary, Undersheriff Hsiung, who was Assistant Sheriff Monaghan's direct supervisor during most of his tenure with the Sheriff's Office, describes Assistant Sheriff Monaghan's performance during their time in the Sheriff's Office as "100% positive." Undersheriff Hsiung also reported that Sheriff Corpus never spoke negatively about Assistant Sheriff Monaghan's performance.

May 30, 2025
Page 44

In a September 22, 2024, letter to the Board of Supervisors, Sheriff Corpus described her intent as having been to terminate Mr. Monaghan's employment for "performance duplicity and failure to execute the goals of the Sheriff's Office expeditiously." However, despite stripping Assistant Sheriff Monaghan of his official duties, badge, and gun, Sheriff Corpus never submitted termination paperwork for Assistant Sheriff Monaghan to the County's human resources department. To this day, Assistant Sheriff Monaghan remains on administrative leave.

### C.    Grounds for Removal

The foregoing conduct related to Assistant Sheriff Monaghan is, independently and collectively, grounds to remove Sheriff Corpus from office for cause for the following reasons.

*First*, Sheriff Corpus violated laws related to the performance of her duties as Sheriff. San Mateo County Charter Art. IV § 412.5(B)(1). It is against California law to "retaliate against an employee … for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Labor Code § 1102.5(b). Moreover, "[a]ny retaliation or reprisal by any [San Mateo] County officer or employee against any complainant or informant is strictly prohibited" by the County Code. San Mateo County Code § 2.14.090. The County of San Mateo has asserted "a paramount interest in protecting the integrity of its governmental institutions," and, "[t]o further this interest," has declared that "individuals should be encouraged to report possible violations of laws, regulations and rules governing the conduct of County officers and employees." *Id.* § 2.14.060. And it is the intent of Section 2.14.090 to "to protect all complainants or informants from retaliation for filing a complaint with, or providing information about, improper government activity by County officers and employees." *Id.* The SMCSO Policy Manual likewise prohibits "retaliate[ion] against any person for … opposing a practice believed to be unlawful …; for reporting or making a complaint …; or for participating in any investigation." SMCSO Policy Manual § 1029.3. Indeed, the SMCSO has "zero tolerance for retaliation." *Id.* § 1029.2. Sheriff Corpus violated these laws by terminating and otherwise removing from office Assistant Sheriff Monaghan for cooperating with, and speaking to, Judge Cordell in the course of her investigation. Assistant Sheriff Monaghan had reason to believe that the information he provided to Judge Cordell included violations of state and local law, including POBRA.

*Second*, Sheriff Corpus obstructed an investigation into the conduct of the Sheriff and/or the SMCSO authorized by the Board of Supervisors. San Mateo County Charter Art. IV § 412.5(B)(5). State law applicable to the Sheriff defines "obstruct" in the law enforcement context to mean "be or come in the way of," "hinder from passing, action, or operation," "impede," "retard," "shut out," and "place obstacles in the way." *Belmares*, 130 Cal. Rptr. 2d at 404; *see also Lorenson*, 35 Cal. 2d at 59 (defining obstruction as "malfeasance and nonfeasance by an officer in connection with the administration of his public duties, and also anything done by a person in hindering or obstructing an officer in the performance of his official obligations"); *Martin*, 135 Cal. App. 3d at 726 (same). Sheriff Corpus obstructed Judge

May 30, 2025
Page 45

Cordell's investigation into the SMCSO by terminating Assistant Sherriff Monaghan for cooperating with, and speaking to, Judge Cordell in the course of her investigation.

### D.    Supporting Evidence

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- San Mateo County Executive Michael Callagy;

- Former Undersheriff Christopher Hsuing; and,

- Former Assistant Sheriff Ryan Monaghan.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- September 12, 2024 Statement from the Board of Supervisors Regarding the Sheriff's Office

- September 22, 2024 Letter from Sheriff Christina Corpus to Board of Supervisors President Warren Slocum

### V.    Grounds for Removal Relating to Unlawful Retaliatory Transfers and Terminations.

### A.    Introduction

Sheriff Corpus transferred Capt. Brian Philip, Lt. Jonathan Sebring, and Sgt. Jimmy Chan in retaliation for perceived disloyalty. Sheriff Corpus transferred Capt. Philip and Lt. Sebring from PSB duties to work in the jail. Capt. Philip was transferred shortly after he refused to participate in the investigation into Sgt. Javier Acosta and reported on the deficiencies in the proposed Internal Affairs notice. Lt. Sebring was transferred after taking steps to investigate misconduct by Mr. Aenlle. Sgt. Chan was transferred from PSB to an assignment at the San Francisco Airport ("SFO") within hours of participating in a press conference in support of Measure A. Sheriff Corpus also constructively terminated Capt. Rebecca Albin after she posted an innocuous message on social media that angered Sheriff Corpus.

### B.    Sheriff Corpus retaliated against Capt. Philip for refusing to sign and serve the deficient Internal Affairs notice to Sgt. Javier Acosta.

As described above, Undersheriff Perea contacted Capt. Philip on or about September 3, 2024, and ordered him to sign the Internal Affairs notice that Heather Enders had prepared at the direction of Sheriff Corpus and Mr. Aenlle. At the time, Capt. Philip knew nothing about the investigation of Sgt. Javier Acosta or about the Internal Affairs notice. After Capt. Philip

May 30, 2025
Page 46

received a copy of the Internal Affairs notice from Ms. Enders by email, he responded by noting that it "fail[ed] to meet several POBAR requirements as referenced in Government Code section 3303." He also explained that he did "not have the requisite information to properly serve this notice."

Shortly after Capt. Philip sent his email to Ms. Enders on September 3, 2024, Mr. Aenlle sent an after-hours text message to Ms. Enders asking if Capt. Philip had been with the Sheriff's Office for over a year. When she confirmed that Capt. Philip had been with the Sheriff's Office for over a year, Mr. Aenlle replied in a text message, "OK so he's past probation." Sheriff's Office employees like Capt. Philip who have worked for more than a year are protected by POBRA and cannot be terminated without cause. *See* Gov't Code § 3304(b). Ms. Enders understood that Mr. Aenlle was asking about Capt. Philip's work history to determine if Sheriff Corpus could fire him without cause, and she understood Mr. Aenlle's response as an acknowledgement that Sheriff Corpus could not fire him without cause.

After their text message exchange, Mr. Aenlle called Ms. Enders. Mr. Aenlle asked why Capt. Philip had written his September 3, 2024, email refusing to sign the Internal Affairs notice. Ms. Enders explained that Capt. Philip had no personal knowledge of the investigation, despite being in charge of PSB. Mr. Aenlle responded that he intended to remove Capt. Philip, saying, "We need someone we can trust." Ms. Enders understood Mr. Aenlle to mean that he and Sheriff Corpus wanted someone in charge of PSB who would do what they asked.

Shortly after Capt. Philip refused to sign the Internal Affairs notice, Undersheriff Perea called Capt. Philip into his office for a meeting. During this meeting, at which Assistant Sheriff Ryan Monaghan was present, Undersheriff Perea told Capt. Phillip that he was to be transferred from PSB to Corrections where he would report to Capt. William Fogarty, whom Capt. Philip was more senior than. At the time, Capt. Philip had no experience in the Corrections unit, and there were already captains in place supervising each of the jails. Undersheriff Perea offered no explanation for the transfer or its timing, and he would not say whether the transfer was permanent.

As a result of the transfer to the Corrections unit, Capt. Philip was stripped of certain responsibilities and duties, including overseeing the firing range and serving on task forces devoted to narcotics trafficking, vehicle theft, and the creation of the childcare substation.[10]

_____

[10] On November 12, Undersheriff Perea ordered Capt. Philip to arrest Deputy Tapia without a warrant or a probable cause statement. Capt. Philip had no knowledge as to why Deputy Tapia was being arrested and refused to participate in the arrest, citing his belief that the arrest was likely illegal. After Undersheriff Perea threatened Capt. Philip with an insubordination charge, Capt. Philip resigned from the Sheriff's Office.

May 30, 2025
Page 47

**C.    Sheriff Corpus retaliated against Lt. Sebring after he advised an employee that she could file an HR complaint against Mr. Aenlle.**

Lt. Jonathan Sebring was assigned to PSB from April 2018 until June 2024. In April 2023, Sheriff Corpus promoted Lt. Sebring from Sergeant to Acting Lieutenant, and he became a full Lieutenant in or about July 2023. From the beginning of the Corpus administration through his transfer, Lt. Sebring received positive performance reviews. In April 2024, Lt. Sebring took action within the scope of his duties in response to Mr. Aenlle's treatment of Jenna McAlpin. Approximately two months later, Sheriff Corpus abruptly and without explanation transferred Lt. Sebring out of PSB and into Corrections, a less desirable assignment.

As discussed above, Jenna McAlpin is a former long-tenured civilian employee within the Sheriff's Office. Ms. McAlpin was a Records Manager, but she was assigned to serve as Mr. Aenlle's administrative assistant. She announced her resignation in March 2024 and her last day of work was scheduled for April 4, 2024. On or about April 3, 2024, Mr. Aenlle confronted Ms. McAlpin about a rumor that she had posted denigrating content about Sheriff Corpus on social media. As described above, her interaction with Mr. Aenlle left Ms. McAlpin upset and in tears.

Lt. Sebring spoke to Ms. McAlpin shortly after her interaction with Mr. Aenlle. When he spoke to Ms. McAlpin, she was still visibly upset and was crying. Lt. Sebring told her that she could file a complaint with Human Resources. Ms. McAlpin subsequently reported the incident to Human Resources.

That same afternoon, Sheriff Corpus went to Lt. Sebring's office to discuss the incident. Lt. Sebring told Sheriff Corpus that he believed Mr. Aenlle's conduct was inappropriate and expressed that it was unfortunate that, due to Mr. Aenlle's behavior, a long-term employee like Ms. McAlpin would leave the Sheriff's Office under such difficult circumstances. After hearing Lt. Sebring recount what he had learned from Ms. McAlpin, Sheriff Corpus tried to justify Mr. Aenlle's actions, saying that he had simply been "direct."

Prior to that conversion, Sheriff Corpus regularly called Lt. Sebring to discuss PSB matters. Following that conversation, Sheriff Corpus stopped speaking to Lt. Sebring.

On or about June 19, 2024, Sheriff Corpus transferred Lt. Sebring out of PSB and into the Corrections Unit. This transfer was ordered outside the typical cycle for transfers. Additionally, there was not a staffing need for Lt. Sebring because there were several lieutenants already assigned to Corrections. Lt. Sebring considers the transfer a punitive action because Corrections is understood throughout the Sheriff's Office to be less prestigious and beneficial for career development than PSB.

May 30, 2025
Page 48

      **D.**     **Sgt. Chan was transferred within hours of appearing at a press conference in support of Measure A.**

Sgt. Jimmy Chan joined the Sheriff's Office in 2015 and was promoted to sergeant in 2022. In September 2024, he began work on a specialty assignment in PSB after a competitive interview process. Sgt. Chan understood that he would be in PSB for four to five years based on his understanding of how long specialty assignments typically last. Sgt. Chan understood that his position in PSB was a favorable one that would be helpful for future promotion opportunities.

On or about February 5, 2025, Sgt. Chan used an approved hour of vacation time to attend a press conference in support of Measure A during his lunch break. Sgt. Chan was visible in television footage of the press conference. That same day, Undersheriff Perea contacted Lt. Danield Reynolds to tell him that Sgt. Chan was to be transferred to SFO. Around 5:00 p.m. that day, Lt. Reynolds informed Sgt. Chan that he was being transferred to SFO. Lt. Reynolds told Sgt. Chan that he should assume that the transfer order came from Sheriff Corpus.

At the time, there was a waiting list of other sergeants who had applied for the position at SFO. Sgt. Chan was not provided an opportunity to contest or appeal the transfer decision, and he has not been given any updates to date as to when, if ever, he will return to PSB. Sgt. Chan views the transfer as unfavorable and as negatively affecting his future professionally.

      **E.**     **Sheriff Corpus retaliated against Capt. Rebecca Albin for posting a message on social media.**

Captain Rebecca Albin was assigned by Sheriff Corpus to serve as the commander of the Coastside Patrol Bureau; in that position she also functioned as the police chief for Half Moon Bay. In early May 2024, Capt. Albin gave notice that she was leaving the SMCSO to take a position with another law enforcement agency closer to her home in Morgan Hill; her last day was to be June 20, 2024.

On June 18, 2024, Capt. Albin posted a goodbye message to the Half Moon Bay community on NextDoor, a website that facilitates community-based communication. The post was complementary of the Half Moon Bay community; it did not denigrate the SMCSO or Sheriff Corpus; and it cited her desire for a reduced commute as the reason for her departure. Prior to this time, Capt. Albin, who had received praise in the SMCSO for her effective use of social media, had never been told that she needed permission before posting messages to NextDoor. Nonetheless, she notified the SMCSO and the Half Moon Bay City Manager that she intended to announce her departure on NextDoor.

Less than an hour after she posted her message on NextDoor, Capt. Albin received a phone call from Undersheriff Hsiung, who told her that Sheriff Corpus was upset with her about the post. Undersheriff Hsiung told Capt. Albin that the Sheriff was going to revoke Capt. Albin's access to her SMCSO email account, NextDoor, and Evertel (a law enforcement messaging application). Capt. Albin was also informed that her access to the Half Moon Bay substation and other county facilities would be revoked. That evening, Capt. Albin was not able to access her

May 30, 2025
Page 49

SMCSO email or the SMCSCO website used for entering timecards. When Capt. Albin returned to her office to gather her belongings on June 20, 2024, her building access had been turned off, and she was escorted by SMCSO personnel such that she was not left alone in the building.

Sheriff Corpus proceeded in the face of advice not to retaliate against Capt. Albin. On the evening of June 18, 2024, Undersheriff Hsiung cautioned Sheriff Corpus that, despite her anger towards Capt. Albin, she should not revoke Capt. Albin's access to SMCSO systems "before the agreed upon date or else it could be considered a de facto or constructive termination." Sheriff Corpus ignored Undersheriff Hsiung's advice and constructively terminated Capt. Albin's employment before her resignation was effective in retaliation for Capt. Albin's NextDoor post.

Sheriff Corpus's retaliation against Capt. Albin may also have been motivated by animus directed against Capt. Albin's religious background. Detective Jeff Morgan, who has worked for the SMCSO since 2017 after lateralling from the Daly City Police Department, recalls having a phone call with Sheriff Corpus in 2022. During the call, Sheriff Corpus referred to Capt. Albin as a "Jew b----."[11]

## F.    Grounds for Removal

Each instance of the foregoing retaliatory conduct against Capt. Philip, Capt. Albin, Lt. Sebring, and Sgt. Chan is, independently and collectively, grounds to remove Sheriff Corpus from office for cause because Sheriff Corpus has violated laws related to the performance of the Sheriff's duties. San Mateo County Charter Art. IV § 412.5(B)(1).

***First***, Sheriff Corpus unlawfully retaliated against Capt. Philip. It is unlawful to "retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Labor Code § 1102.5. Moreover, "[a]ny retaliation or reprisal by any [San Mateo] County officer or employee against any complainant or informant is strictly prohibited" by the County Code. San Mateo County Code § 2.14.090. And, as noted above, Section 2.14.090 "protect[s] all complainants or informants from retaliation for filing a complaint with, or providing information about, improper government activity by County officers and employees."

---

[11] Sheriff Corpus's use of a derogatory term to refer to Capt. Albin is consistent with her use of others slurs in the workplace. Both Det. Morgan and Ms. Barnes recall hearing Sheriff Corpus refer to prior Sheriff Bolanos as a "coconut," which Det. Morgan recalls Sheriff Corpus explaining that by that she meant "brown on the outside, white on the inside." Ms. Barnes also recalls hearing Sheriff Corpus refer to former Sheriff Bolanos using a slur commonly known as "the N-word." Ms. Barnes and Mr. Guiney also recall hearing Sheriff Corpus refer to a Millbrae City Council Member as a "fuzzbumper," a derogatory term for lesbians. Sheriff Corpus also used this term to refer to that same Millbrae City Council Member in text messages with Ms. Barnes.

May 30, 2025
Page 50

*Id*. § 2.14.060. Indeed, "individuals should be encouraged to report possible violations of laws, regulations and rules governing the conduct of County officers and employees." *Id*. § 2.14.060. The SMCSO Policy Manual likewise prohibits "retaliate[ion] against any person for … opposing a practice believed to be unlawful …; for reporting or making a complaint …; or for participating in any investigation." Sheriff Corpus violated these laws by transferring Capt. Philip to a less desirable and advantageous post in retaliation for refusing to sign and serve the deficient Internal Affairs notice to Sgt. Acosta and for reporting the improper Notice.

**Second**, Sheriff Corpus unlawfully retaliated against Sgt. Chan. It is unlawful to retaliate against an employee for engaging or participating in political activities. Labor Code § 1101 ("No employer shall make, adopt, or enforce any rule, regulation, or policy (a) [f]orbidding or preventing employees from engaging or participating in politics or from becoming candidates for public office [or] (b) [c]ontrolling or directing, or tending to control or direct the political activities or affiliations of employees."); Labor Code § 1102 ("No employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity."); *Ali v. L.A. Focus Publ'n*, 112 Cal. App. 4th 1477, 1487 (2003) (sections 1101 and 1102 protect employees' "fundamental right … to engage in political activity without … threat of retaliation from employers.") (internal quotations omitted); *see also* Gov't Code § 3302(a) ("No public safety officer shall be prohibited from engaging.in political activity.") Sheriff Corpus violated these laws by transferring Sgt. Chan to a less desirable and advantageous post in retaliation for his participation in the political rally in support of Measure A.

**Third**, Sheriff Corpus violated POBRA by taking punitive action against Capt. Philip, Lt. Sebring, Sgt. Chan and Capt. Albin without affording them the rights provided by Government Code Sections 3303 and 3304. A public safety officer cannot be subject to "punitive action … without providing the public safety officer with an opportunity for administrative appeal." Gov't Code § 3304(b). Sheriff Corpus took punitive action against Capt. Philip, Lt. Sebring, and Sgt. Chan by transferring them for participating in lawful conduct that the Sheriff disfavored. Likewise, Sheriff Corpus locked Capt. Albin out of her work site on the basis of her lawful conduct. Sheriff Corpus did not provide these officers with the right to an administrative appeal in violation of POBRA.

## G.    Supporting Evidence

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- Former Capt. Rebecca Albin;

- SMCSO Associate Management Analyst Valerie Barnes;

- Sgt. Jimmy Chan;

May 30, 2025
Page 51

- SMCSO Human Resources Manager Heather Enders;

- Former Lt. Daniel Guiney;

- Former Undersheriff Christopher Hsiung;

- Former Records Manager Jenna McAlpin;

- Former Assistant Sheriff Ryan Monaghan;

- Sgt. Jeffrey Morgan;

- Former Capt. Brian Philip;

- Lt. Daniel Reynolds; and,

- Lt. Jonathan Sebring.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- February 5, 2024 Memo from Lt. Jonathan Sebring to Assistant Sheriff Ryan Monaghan;

- June 18, 2024 Text message exchange between Former Undersheriff Christopher Hsiung and Sheriff Christina Corpus;

- July 5, 2024 Letter from Sgt. Jimmy Chan to Lt. Irfan Zaidi;

- September 3, 2024 Text message exchange between Victor Aenlle and Heather Enders;

- November 12, 2024 Chronology by Former Capt. Rebeca Albin; and,

- February 6, 2025 Video of DSA Support for Measure A depicting Sgt. Jimmy Chan.

## VI. Grounds for Removal Relating to the Professional Standards Bureau

### A. Introduction

The Sheriff has mandatory, statutory obligations to investigate allegations of officer misconduct. PSB implements these obligations by investigating citizen complaints and use-of-force complaints, and conducting Internal Affairs investigations, among other duties.

Sheriff Corpus has mismanaged PSB and inhibited the unit from effectively performing its core investigative functions, leading to a severe backlog of uncompleted investigations. PSB suffers from lack of executive leadership. Sheriff Corpus and Undersheriff Perea require PSB personnel

May 30, 2025
Page 52

to obtain executive authorization to undertake basic investigatory steps, including even the decision to initiate a preliminary inquiry to determine whether a formal investigation is warranted, but they also fail to act on requests incoming from PSB in a timely fashion. In addition, Sheriff Corpus has demonstrated a pattern of intervening and delaying some PSB investigations without apparent justification, particularly when she has a pre-existing personal relationship with the target of the investigation.

Sheriff Corpus's repeated and flagrant failure to maintain a functional PSB unit—which is itself an outgrowth of Sheriff Corpus's failure to maintain a functional executive management team—constitutes cause to terminate under Section 412.5(B)(2) of the County Charter.

> **B.    Overview of PSB functions**

PSB has multiple functions. One function is to oversee the SMCSO's efforts to hire sworn staff. PSB ensures that SMCSO's hiring adheres to the County's civil service rules. Sworn and non-sworn personnel both work on hiring matters within PSB. Another function of PSB is to administratively investigate allegations of wrongdoing within the SMCSO. PSB officers conduct investigations into, among other things, civilian complaints and use-of-force incidents. PSB officers also typically serve as the Internal Affairs investigators for the agency. While non-sworn staff provide support services to investigating officers, the investigations themselves are conducted by sworn personnel.

Traditionally, when PSB receives a misconduct allegation, a PSB sergeant performs a preliminary fact-finding inquiry to help determine whether further investigation is warranted. The sergeant will then provide an initial report based on her or his findings to a superior officer, usually a lieutenant with oversight over PSB. A lieutenant will then pass on those preliminary findings, at times with a recommendation on whether to open a formal investigation, to PSB's supervising officer, typically either a captain or an assistant sheriff. Past and current members of PSB report that the assistant sheriff overseeing PSB has traditionally had authority to open formal Internal Affairs investigations after receiving the preliminary report, though the assistant sheriff has sometimes consulted the Sheriff or Undersheriff in making this decision.

This process has permitted PSB to generally open and conduct Internal Affairs investigations while limiting the personal involvement of the Sheriff or the Undersheriff. Several current and former members of PSB report that limiting the Sheriff and Undersheriff's involvement in the pre-hearing investigative process is important for two reasons: (1) the Sheriff's and Undersheriff's schedules are often consumed with overseeing other divisions of the SMCSO, and (2) the Sheriff is the ultimate decision-maker with respect to personnel discipline and the Undersheriff almost always serves as the *Skelly* officer in any internal disciplinary hearing.[12]

---

[12] The function of a *Skelly* officer in public employee disciplinary matters is to provide a review of the employer's charge and the employee's response and to evaluate whether evidence supports the proposed disciplinary action.

May 30, 2025
Page 53


     **C.**    **Sheriff Corpus has inhibited PSB from fulfilling its investigative function.**

For more than six months, PSB has lacked executive-level and command-level leadership. In January 2023, Sheriff Corpus eliminated an assistant sheriff position to make room for Mr. Aenlle's civilian "chief of staff" position. Sheriff Corpus then hired Ryan Monaghan to fill one of the two remaining assistant sheriff positions but left the other assistant sheriff position unfilled.[13] Assistant Sheriff Monaghan oversaw PSB during his tenure at the SMCSO. In mid-2023, Sheriff Corpus also recruited Capt. Brian Philip to join the SMCSO and help Assistant Sheriff Monaghan in overseeing PSB.

In September 2024, Sheriff Corpus transferred Captain Philip out of PSB to a position in Corrections after Captain Philip refused to sign and serve a deficient Internal Affairs notice on Sgt. Javier Acosta. (*See supra* § III.B.) Since then, there has been no captain with oversight over PSB.

A few weeks later, in September 2024, Sheriff Corpus terminated Assistant Sheriff Monaghan in retaliation for his participation in Judge Cordell's investigation. (*See supra* § IV.) Assistant Sheriff Monaghan reports that, in the months preceding his termination, Undersheriff Perea limited his ability to open Internal Affairs investigations without first obtaining the Undersheriff's preapproval.

Following Sheriff Monaghan's termination, Sheriff Corpus promoted Capt. Matthew Fox to Acting Assistant Sheriff. In that role, he briefly oversaw PSB but resigned in November 2024. Since then, there has been no assistant sheriff or captain overseeing PSB and lieutenants in the unit have had to report directly to Undersheriff Perea.

Several members of PSB report that the Sheriff's failure to have an assistant sheriff in place for more than six months has resulted in significant delays for the unit's investigative work. The tasks of approving the initiation of every Internal Affairs investigation and reviewing every completed Internal Affairs investigation has fallen to Undersheriff Perea. PSB's sworn personnel also report that Undersheriff Perea rarely takes any action without obtaining approval from Sheriff Corpus, which has further slowed the investigative process. Moreover, in a break from historic practice, Sheriff Corpus and Undersheriff Perea have limited PSB sergeants' ability to engage in even initial fact-finding of verbal complaints without first obtaining their prior approval. As a result, the current process for opening investigations regularly results in significant and unacceptable delays.

Additionally, Sheriff Corpus has also introduced significant delay into completing investigations after they are initiated. As of May 2025, the Sheriff's Office has a backlog of at least 38 investigations that have been completed by PSB and are awaiting review by Undersheriff Perea

---

[13] As noted above, Mr. Kunkel unofficially served in an Assistant Sheriff for Corrections role on a contractor basis until early 2024 before resigning. Sheriff Corpus has never had a full-time Assistant Sheriff for Corrections.

May 30, 2025
Page 54

and Sheriff Corpus. Approximately 13 investigations into citizen complaints have been completed by PSB and are awaiting review by an SMCSO executive officer.[14] Approximately 13 investigations into the use of force have been completed by PSB and are awaiting review by an SMCSO executive officer.[15] Approximately 12 Internal Affairs investigations have been completed by PSB and are awaiting review by an SMCSO executive officer.[16]

### D.     Sheriff Corpus's mismanagement of PSB has led to substantial delays in the investigative process and created significant negative effects.

Current and former members of PSB report that delaying investigations and disciplinary decisions have significant detrimental effects. It can be harder to complete stale investigations because witness memories fade over time. Furthermore, a deputy who commits misconduct may not receive corrective training in a timely fashion or might be permitted to remain in their position while putting others at risk. Sgt. Fava reports that he often receives calls from citizens who have submitted complaints and are frustrated by the lack of resolution, thereby eroding public trust.

Delays can also result in unnecessary costs to the County and taxpayers. For example, San Mateo County Labor Relations Analyst Katy Roberts reports an incident where an officer was put on administrative leave in May 2024 and had a *Skelly* hearing in July 2024. Despite the recommendation that the officer be terminated, Sheriff Corpus did not serve a termination letter on the officer until May 2025—thereby allowing the officer to continue to receive salary for a full year while on administrative leave.

Finally, in some circumstances, the Public Safety Officers Procedural Bill of Rights Act can require the Sheriff's Office to issue a letter of intent to impose discipline within one year of learning of the alleged misconduct. *See* Gov't Code § 3304(d).[17] As a result, the County could lose the ability to impose discipline due to significant investigative delays. Lt. Reynolds and Sgt. Fava report that at least once in the past year the SMCSO was unable to impose discipline following an investigative process that took more than a year to conclude and that the one-year deadline is approaching quickly for at least one other investigation.

---

[14] Citizen complaint investigations are mandated by statute. *See* Cal. Pen. Code § 832.5.

[15] Every use of force is investigated to determine whether such use was permissible or potentially excessive. The SMCSO has a statutory duty to investigate instances of excessive force. *See* Cal. Pen. Code § 13510.8(b)(3); (c).

[16] Several Internal Affairs investigations involve "serious misconduct," which the SMCSO has a statutory duty to investigate. *See* Cal. Pen. Code § 13510.8(b)–(c).

[17] There are exceptions to the administrative statute of limitations, and the application of this statute can be nuanced.

May 30, 2025
Page 55

    **E.**        **Examples of Sheriff Corpus's failure to properly conduct PSB investigations.**

As discussed, Sheriff Corpus's mismanagement of PSB has led to the SMCSO's failure to timely complete investigations. Below are four non-exhaustive examples illustrating how Internal Affairs investigations have come to be delayed under Sheriff Corpus. The first and fourth examples also illustrate instances where Sheriff Corpus slowed PSB investigations on behalf of officers who she favors.

        1.    The Sheriff ignored a PSB recommendation to investigate serious misconduct by a deputy who supported her campaign.

In August 2024, a deputy permitted a gang-affiliated minor to smoke an electronic cigarette in the front passenger seat of a patrol car while the minor recorded themselves on a cellphone. The deputy and the deputy's spouse made campaign contributions to Sheriff Corpus, and the deputy is perceived within the SMCSO as a "favorite" of the Sheriff's. After obtaining the video, Sgt. Fava submitted a memorandum to Assistant Sheriff Monaghan that recommended that PSB open a formal Internal Affairs investigation due to the seriousness of the incident.

Shortly after receiving Sgt. Fava's report, Assistant Sheriff Monaghan discussed the incident with Undersheriff Perea and recommended immediately opening a formal Internal Affairs recommendation. Undersheriff Perea did not agree to open an Internal Affairs investigation at the time. Instead, Undersheriff Perea instructed Assistant Sheriff Monaghan to inquire with PSB whether the video of the minor smoking in the patrol car could be withheld from the District Attorney. Lt. Zaidi and Sgt. Fava explained to Assistant Sheriff Monaghan that the material "absolutely" had to be turned over to the District Attorney.

Despite the recommendations of Assistant Sheriff Monaghan and Sgt. Fava concerning the need for a formal investigation, Sheriff Corpus and Undersheriff Perea declined to open an investigation for months.

On November 12, 2024, the Cordell Report was published to the public. The Cordell Report discusses the incident as well as the interaction between Assistant Sheriff Monaghan and PSB concerning whether the video could be withheld from the District Attorney. At the time the Cordell Report was published, Sheriff Corpus and Undersheriff Perea still had not authorized an investigation into the deputy's conduct.

In December 2024, Sheriff Corpus and Undersheriff Perea finally approved opening an investigation. In doing so, they broke with standard practice of investigating deputy misconduct internally and instead outsourced the investigation to a third party. As of May 2025, members of PSB report that no resolution on this incident has been reached and no discipline has been imposed. Assistant Sheriff Monaghan and Sgt. Fava each report that they expected that the investigation into this incident should have taken no more than one to two weeks to complete.

May 30, 2025
Page 56

2.    The Sheriff has failed to conclude an investigation into a deputy trainee who left firearm in a public place.

In October 2024, a deputy trainee left an office-issued firearm unattended and unsecured in a public restaurant in Burlingame. The deputy trainee was a probationary employee of the SMCSO at time of the incident. SMCSO policy permits deputy trainees to use office-issued firearms during training on the shooting range only, and deputy trainees cannot carry them off Sheriff's Office property. The restaurant staff found the firearm and called local police, who returned it to SMCSO after tracing the firearm's serial number.

After discussing the incident with the Sheriff and Undersheriff, the Undersheriff informed Lt. Zaidi that PSB would conduct an investigation into the incident. But the Sheriff and Undersheriff directed that, unless new information arose, the deputy trainee would not be terminated for leaving the office-issued firearm in a public restaurant. Multiple current and former members of PSB report that probationary employees (like the deputy trainee involved in this incident) are routinely terminated for serious violations of the SMCSO policy rather than conducting formal Internal Affairs investigations.

On November 4, 2024, Sgt. Chan completed the investigation into this incident. Seven months later, members of PSB report that no discipline has been imposed on the deputy trainee. Instead, the deputy trainee continued in the training academy after the firearm incident. Then, after they failed out of the academy for reasons unrelated to the firearm incident, they nevertheless remained an SMCSO deputy trainee and were permitted to reenroll in the academy.

3.    The Sheriff failed to conduct an investigation into serious allegations of excessive force by a correctional officer.

In August 2024, an altercation occurred involving several correctional officers and an incarcerated person in one of the County's jail facilities. Sgt. Fava reports that he conducted a preliminary fact-finding inquiry into the altercation and determined that body camera footage revealed that one correctional officer had placed his hand and forearm across the incarcerated person's neck without apparent justification after the group of correctional officers had taken the incarcerated person to the ground. In January 2025, after completing his initial investigation, Sgt. Fava submitted a memorandum to Lt. Reynolds recommending that the correctional officer be dismissed immediately because they were a probationary employee and had more likely than not violated multiple Sheriff's Office policies in applying force to the incarcerated person's neck while they were on the ground, unarmed, and surrounded by correctional officers. Lt. Reynolds forwarded Sgt. Fava's memorandum to Undersheriff Perea and likewise recommended that the correctional officer be dismissed immediately.

For several months, Sheriff Corpus and Undersheriff Perea took no action with respect to this correctional officer. Instead, the correctional officer was permitted to continue in his position, complete the "CORE Academy" training program for correctional officers, and has received at least one performance award from the Sheriff. In mid-May 2025, rather than dismissing the correctional officer, PSB was told to open a formal Internal Affairs investigation.

May 30, 2025
Page 57

4.  The Sheriff has failed to conduct or conclude investigations concerning a
    correctional officer despite repeated allegations of serious misconduct.

In mid-2023, a correctional officer observed and failed to report another correctional officer
forcing incarcerated people to dance in degrading and provocative ways. Members of PSB report
that, after PSB conducted an Internal Affairs investigation, the correctional officer was served
with a letter of intent to impose a suspension and Undersheriff Perea conducted a *Skelly* hearing
in July 2024 concerning the misconduct. Members of PSB further report that, despite the
incident occurring nearly two years ago and the Skelly hearing concluding nearly one year ago,
Sheriff Corpus has yet to make a disciplinary decision and conclude the investigation.

In a separate, more-recent incident in August 2024, the same correctional officer was involved in
a physical altercation with a member of the public while off-duty in a public park. Sgt. Fava
conducted a preliminary investigation and submitted a memorandum stating that a formal
Internal Affairs investigation could be warranted. Despite this, Sheriff Corpus and Undersheriff
Perea declined to open an investigation for several months and only did so in December 2024
after the member of the public involved filed a civil rights lawsuit based on the incident against
the County. Nine months after this incident, the investigation has not been completed and no
disciplinary action has been determined.

Sgt. Fava reports that Sheriff Corpus previously supervised the correctional officer involved in
the above incidents when she was Captain of the Millbrae Police Bureau. Sgt. Fava further
reports that he has heard Sheriff Corpus make comments that she does not believe that the
correctional officer "would do something like this" and that it was "out of character."

F.      **Grounds for Removal**

The foregoing conduct is, independently and collectively, grounds to remove Sheriff Corpus
from office because she has failed to complete investigations into allegations of misconduct by
members of her office and thus has flagrantly and repeatedly neglect of her duties. San Mateo
County Charter Art. VI § 412.5(B)(2).

Penal Code section 13510.8(c)(1) requires the Sheriff and her Office to complete "investigations
of allegations of serious misconduct by a peace officer regardless of their employment status."
Government Code sections 26600, 26601, 26602 impose a duty on the Sheriff to preserve the
peace, arrest those who attempt or commit public offenses, and investigate public offenses
which have been committed. Penal Code section 832.5 requires law enforcement agencies to
"establish a procedure to investigate complaints by members of the public against the personnel
of these departments or agencies." Agencies have a "duty to follow the mandatory terms of the
department's published procedure for handling citizen complaints of police misconduct."
*Galzinski v. Somers*, 2 Cal. App. 5th 1164, 1174 (2016).

As described above, Sheriff Corpus has failed to properly initiate, support, oversee, and
conclude investigations into civilian, use-of-force incidents, and Internal Affairs investigations.
Sheriff Corpus's mismanagement of PSB has led to a significant backlog of incomplete

May 30, 2025
Page 58

investigations and unresolved open matters. The Sheriff also fails to dispense deputy discipline in an even-handed manner by engaging in favoritism. This conduct fails to uphold the Sheriff's duty to investigate and undermines California's comprehensive scheme for administering the standards and training of law enforcement officers, as set forth in Title 4, part 4 of the Penal Code. These failures constitute a flagrant and repeated neglect of Sheriff Corpus's duties as defined by law and constitute grounds for her removal under Section 412.5(b)(2) of Article IV of the County Charter. *See* San Mateo County Charter Art. IV § 412.5(B)(2); Penal Code §§ 832.5, 13510.8(c)(1); Gov't Code §§ 26600, 26601, 26602.

      **G.**    **Supporting Evidence**

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- Sgt. Jimmy Chan;

- Sgt. Joe Fava;

- Former Undersheriff Chistopher Hsiung;

- Former Assistant Sheriff Ryan Monaghan;

- Former Capt. Brian Philip;

- Lt. Daniel Reynolds;

- San Mateo County Labor Relations Analyst Katy Roberts;

- Lt. Jonathan Sebring; and,

- Lt. Irfan Zaidi.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- August 28, 2024 Memorandum from Sgt. Joe Fava to Former Capt. Brian Philip re: Deputy Incident;

- August 29, 2024 Memorandum from Sgt. Joe Fava to Lt. Irfan Zaidi re: Correctional Officer Off-Duty Incident;

- October 24, 2024 Notice of Internal Affairs Investigation from Sgt. Jimmy Chan to Deputy Sheriff Trainee;

May 30, 2025
Page 59

- October 28, 2024 Notice of Interview from Sgt. Jimmy Chan to Deputy Sheriff Trainee;

- January 29, 2025 Memorandum from Sgt. Joe Fava to Lt. Deniel Reynolds re: Correctional Officer Jail Incident; and,

- January 29, 2025 Email from Lt. Daniel Reynolds to Undersheriff Daniel Perea re: Correctional Officer Jail Incident.

**VII.    Conclusion**

For the foregoing reasons, cause exists to terminate Sheriff Corpus under Section 412.5.

## BOARD OF SUPERVISORS — SHERIFF REMOVAL PROCEDURES

### FOREWORD

The County of San Mateo ("the County") is one of 14 charter counties in California. The County adopted its Charter in 1932 after it was ratified by San Mateo County voters. As a charter county, the County has authority under Article II, Section 19 and Article XI, Section 4 of the California Constitution to provide, in its County Charter, removal procedures for an elected Sheriff.

On March 4, 2025, the County held a countywide special election for Measure A to amend the County's Charter to grant the County Board of Supervisors the authority, until December 31, 2028, to remove the elected Sheriff of San Mateo County ("Sheriff"), for cause, by a four-fifths vote of the Board. Measure A passed overwhelmingly and following action by the Board of Supervisors and submission to the Secretary of State is now effective, resulting in Section 412.5 being added to Article IV of the County Charter ("Section 412.5").

Section 412.5 reads, in its entirety, as follows:

>   a. The Board of Supervisors may remove a Sheriff from office for cause, by a four-fifths vote, after a Sheriff has been:
>   (1) Served with a written statement of alleged grounds for removal; and
>   (2) Provided a reasonable opportunity to be heard regarding any explanation or defense.
>
>   b. For the purposes of this Section 412.5, "cause" shall mean any of the following:
>   (1) Violation of any law related to the performance of a Sheriff's duties; or
>   (2) Flagrant or repeated neglect of a Sheriff's duties as defined by law; or
>   (3) Misappropriation of public funds or property as defined in California law; or
>   (4) Willful falsification of a relevant official statement or document; or
>   (5) Obstruction, as defined in federal, State, or local law applicable to a Sheriff, of any investigation into the conduct of a Sheriff and/or the San Mateo County Sheriff's Office by any government agency (including the County of San Mateo), office, or commission with jurisdiction to conduct such investigation.
>
>   c. The Board of Supervisors may provide for procedures by which a removal proceeding pursuant to this Section 412.5 shall be conducted.
>
>   d. This Section 412.5 shall not be applied to interfere with the independent and constitutionally and statutorily designated investigative function of a Sheriff.
>
>   e. This Section 412.5 shall sunset and be of no further force and effect as of December 31, 2028 unless extended by voters of San Mateo County.

Pursuant to Section 412.5, subsection (c), the County now establishes by Resolution, the following procedure for removing a Sheriff.

1

**I. Sheriff Removal Procedures and Hearing Timing**

1. Removal Procedures Initiation

> (A) In order to initiate the Sheriff Removal Procedures ("Sheriff Removal Procedures"), the Board of Supervisors ("the Board") must approve, by at least a four-fifths vote of its members, the issuance of a written Notice of Intent to Remove the Sheriff ("Notice of Intent").

2. Content and Service of Notice of Intent to Remove

> (A) Once the Board has initiated the Sheriff Removal Procedures, it must cause to be provided to the Sheriff's official work email address the Notice of Intent, that was approved by at least a four-fifths vote of the Board, which shall constitute adequate notice that the Board has initiated the removal process.

> (B) The Notice of Intent shall include all of the following:

>> (1)     A statement that the Board has initiated the Sheriff Removal Procedures;

>> (2)     A statement of the alleged grounds supporting the Sheriff's Removal; and

>> (3)     A statement that upon receipt of the Notice of Intent, the Sheriff shall have five (5) calendar days[3] to appear at the Pre-Removal Conference on the date identified in the Notice.

3. Pre-Removal Conference

> (A) Upon receipt of the Notice of Intent, the Sheriff shall have five (5) calendar days to appear at a Pre-Removal Conference – that the Chief Probation Officer of San Mateo County will preside over – for an opportunity to respond to the allegations against the Sheriff in support of the Sheriff's removal ("Pre-Removal Conference"). The Sheriff's failure to appear at the Pre-Removal Conference will be deemed a waiver of the right to a Removal Hearing. In the event the Chief Probation Officer is unable to preside over the Pre-Removal Conference, the County Coroner shall preside over the Pre-Removal Conference.  If neither the Chief Probation Officer nor the Coroner is able to preside over the Pre-Removal Conference, the President of the Board of Supervisors will designate an alternate to preside over the Pre-Removal Conference.

> (B) The Pre-Removal Conference will be recorded, unless either the Sheriff or the County (each a "Party," collectively "the Parties") objects to it being recorded.

> (C) The individual presiding over the Pre-Removal Conference shall consider the information presented at the Pre-Removal Conference and issue a recommendation, in writing, to the Board regarding whether to remove the Sheriff.

> (D) Upon receipt of the recommendation from the Pre-Removal Conference, the Board shall, as soon as practicable thereafter, render its decision (subject to an appeal via Removal Hearing, as set forth below) to either sustain or reject the recommendation. After review and

---

[3] All references to days contained herein are for calendar days, unless specified otherwise.

consideration of the recommendation, the Board must obtain at least a four-fifths vote to remove the Sheriff (subject to an appeal via Removal Hearing). After rendering its decision, the Board shall direct staff to provide to the Sheriff, in writing, the Board's "Final Notice of Decision."

<u>4. Final Notice of Decision (Subject to Appeal Via Removal Hearing)</u>

If the Board by a four-fifths vote determines to proceed with removal of the Sheriff, a Final Notice of Decision to remove the Sheriff (subject to appeal via Removal Hearing) shall include all of the following information:

(1)      The specific ground(s) enumerated in Section 412.5 that the Board has determined constitutes the ground(s) to remove the Sheriff;

(2)      That the Sheriff shall have the right to appeal the Board's decision and request an appeal hearing ("Removal Hearing") before a Hearing Officer;

(3)      That to exercise the right to appeal and receive a Removal Hearing, the Sheriff must provide written notice to the Assistant Clerk and Deputy Clerk of the Board of Supervisors (presently, Sukhmani Purewal and Sherry Golestan), at spurewal@smcgov.org and sgolestan@smcgov.org, within five (5) days of receiving the Final Notice of Decision; that the Sheriff must include in the request for a Removal Hearing a detailed statement of the facts and grounds for appealing the Final Notice of Decision; and that the Sheriff will be barred from raising any bases for appeal not contained therein;

(4)      That if the Sheriff fails to timely exercise the right to appeal, the Sheriff will be deemed to have waived the right to appeal and the Board's decision will be final and binding;

(5)      That if the Sheriff exercises the right to appeal, the Removal Hearing will be open to the public; unless the Sheriff, within five (5) days of receiving the Final Notice of Decision, formally objects, in the Sheriff's written request for an appeal, to an open hearing and requests a closed hearing; failure to timely object will result in the Removal Hearing being open to the public, and the Sheriff will be deemed to have waived any right to confidentiality that may exist in any documents presented at the open Removal Hearing;

(6)      That the Board will propose to the Sheriff a list of at least three (3) neutral Hearing Officers, with experience in public safety officer disciplinary matters, available to timely preside over the Removal Hearing, with a preference that such Hearing Officer who otherwise meets these criteria be a retired judge;

(7)      That at the conclusion of the Removal Hearing, the Hearing Officer will prepare and submit an advisory opinion to the Board; and

(8)      That upon receipt and consideration of the Hearing Officer's advisory opinion, the Board will make the Final Post-Hearing Decision for Removal of the Sheriff, with at least a four-fifths vote required to remove the Sheriff, and the Board's decision will be final and binding.

3

5. Removal Hearing Request

(A) The Sheriff must submit an appeal/request for a Removal Hearing, in writing, within five (5) days of the Board issuing its Final Notice of Decision, to Sukhmani Purewal at spurewal@smcgov.org, and Sherry Golestan at sgolestan@smcgov.org. The request must contain a detailed statement of the facts and grounds for the appeal; the Sheriff will be barred from raising any bases for appeal not contained therein.

(B) If the Sheriff exercises the right to appeal, the Removal Hearing will be open to the public, unless the Sheriff, within five (5) days of receiving the Final Notice of Decision, formally objects, in the Sheriff's written request for an appeal, to an open Removal Hearing and requests a closed Removal Hearing.

**II. Hearing Officer Selection**

1. Hearing Officer List

(A) If the Board approves of the Final Notice of Decision to Remove the Sheriff, the Board must thereafter provide to the Sheriff, and to the County, a list of at least (3) neutral Hearing Officers available to preside over the Sheriff's Removal Hearing ("Hearing Officer List").

(B) The Parties will have five (5) days after the Board provides the Hearing Officer List to meet and select a Hearing Officer from the Hearing Officer List. The Parties shall select the Hearing Officer either by mutual agreement or by alternately striking names from the Hearing Officer List until one Hearing Officer remains – wherein the remaining name shall be the Hearing Officer to preside over the Removal Hearing. Failure of the Sheriff to cooperate with the timely scheduling of this selection meeting or any other matter required by these procedures, shall be deemed a waiver of the right to appeal.

(C) On the same day the Parties select the Hearing Officer, they must notify the Assistant County Executive of their Hearing Officer selection. Upon receipt of notice of the Hearing Officer selection, the Assistant County Executive, or their designee, will notify the Hearing Officer of their selection to preside over the Removal Hearing.

**III. Removal Hearing**

1. Removal Hearing Scheduling

(A) Within five (5) days after the Hearing Officer receives notice of their selection, the Hearing Officer must set the dates and time for the Removal Hearing to proceed. Each Party shall have no more than five (5) full days to present its case at the Removal Hearing. A "full day" shall be at least seven (7) hours of proceedings before the Hearing Officer, not including breaks. The Hearing Officer shall afford each Party an equal amount of time to present its case (through direct and cross examination of witnesses), and the Hearing Officer shall have discretion to limit or grant additional time to either Party, based upon a showing of good cause. The Hearing Officer must schedule the Removal Hearing to be completed within 30 to 60 calendar days of the date they were notified of their selection to serve as the Hearing Officer.[2]

---

[2]  The Board may make an exception to this rule in the event of unavailability of the selected Hearing Officer.  However, it is the stated interest of the Board that any Removal Hearing be completed as quickly

(B) At the Removal Hearing, the County will present its case-in-chief first, and the Sheriff will present their case-in-chief second. Since the County bears the burden of proof, the County may reserve time after the Sheriff's case-in-chief for rebuttal.

## 2. The Removal Hearing

(A) At the Removal Hearing the Parties shall be entitled to:

(1) Be represented by counsel or by a representative of their choice;

(2) Submit an optional pre-hearing written brief at least five (5) days before the first day of the Removal Hearing;

(3) Be permitted to make opening and closing statements;

(4) Offer testimony under oath or affirmation;

(5) Subpoena material witnesses on their behalf;

(6) Cross-examine all witnesses appearing against them;

(7) Impeach any material witness before the Hearing Officer; and

(8) Present such relevant exhibits and other evidence as the Hearing Officer deems pertinent to the matter then before them, subject to the authority of the Hearing Officer to exclude irrelevant or cumulative evidence. The Hearing Officer shall also have the authority to issue a protective order as to any documents, testimony, or other evidence, as necessary to protect the privacy rights of third parties or to address any other issues of confidentiality or privilege that arise during the Removal Hearing.  Use of these proceedings, including the discovery process, for the purpose of harassment, undue delay, or for any other improper purpose will not be permitted, and may result in discovery sanctions/remedies being imposed by the Hearing Officer.

(B) The Sheriff shall personally appear for each day of the Removal Hearing. The County may either call the Sheriff to testify in its case-in-chief as an adverse witness, or may reserve its right to call the Sheriff at a later time in the proceeding. In the event the Sheriff refuses to testify, or otherwise becomes unavailable, the Hearing Officer shall have discretion to draw an adverse inference against the Sheriff, or to dismiss the Sheriff's appeal altogether.  The Hearing Officer shall also have discretion to consent to the absence of the Sheriff upon a showing of good cause. An unexcused absence of the Sheriff, whose presence is required at the Removal Hearing, may be deemed a withdrawal of the Sheriff's appeal.

(C) The Removal Hearing shall be informal and need not be conducted according to technical rules relating to evidence and witnesses. Any relevant evidence shall be admitted if it is the sort of evidence on which hearing officers are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule that might impact the admissibility of such evidence over objection in civil actions. Hearsay evidence may be admitted

_____

and efficiently as possible to ensure that the operations of the Sheriff's Office, and its service to the citizens of the County, are not impacted through protracted proceedings.

5

for any purpose, but shall not be sufficient, in itself, to support a material finding unless it would be admissible over objection in civil actions or if it is independently corroborated by reliable and credible evidence admitted during the Removal Hearing. The rules of privilege and of official or judicial notice shall be effective to the same extent as in civil actions. Irrelevant or cumulative evidence shall be excluded. Oral evidence shall be taken only under oath or affirmation.

(D) The Removal Hearing shall be electronically recorded or conducted with a stenographic reporter. The Parties may obtain a recording or transcript of the Removal Hearing by making independent arrangements with the recorder or reporter for the preparation thereof. The County shall bear the cost of the Hearing Officer.

(E) The Hearing Officer shall have discretion and authority to control the conduct of the Parties and any person present at the Removal Hearing. The Hearing Officer shall have the right to sequester from the Removal Hearing any witness(es) who has/have not yet provided testimony, and remove any person who the Hearing Officer finds to be unruly or who attempts to interfere with the Removal Hearing.

(F) At the conclusion of the evidentiary portion of the hearing, the Parties will be permitted to present oral closing arguments to the Hearing Officer.  As the County bears the burden of proof, it will present its closing argument first, followed by the Sheriff, with the County permitted to reserve time for rebuttal, if it so chooses. The Hearing Officer shall have discretion to place time limits on closing arguments. The Parties may, but will not be required, to submit closing written briefs, due within fourteen (14) days of the conclusion of the Removal Hearing.[3]  No extensions of time to submit the optional closing written briefs will be permitted.

3. Advisory Opinion of the Hearing Officer

(A) Once the Removal Hearing concludes, the Hearing Officer will have forty-five (45) days to submit a written advisory opinion to the Board.

(B) The Hearing Officer's advisory opinion shall:

(1) Employ the "preponderance of the evidence" standard of proof over the evidence presented;

(2) Analyze and issue an advisory opinion as to whether the County had cause, as defined in Section 412.5 of the County Charter, to remove the Sheriff; and

(3) Include findings of fact and a proposed advisory opinion to the Board, limited to the statement of the issue of whether the County had cause, under Section 412.5, to remove the Sheriff.

---

[3] The Parties may rely on daily or rough transcripts of the proceedings in preparing the optional supplemental closing written briefs.

identified in section VI.2 above, and shall be subject to the same meet and confer obligations and deadlines contained in section VI.3(B) above.

6. Relevance and Admissibility

(A) The Hearing Officer shall have discretion and authority to resolve any evidentiary issues or disputes before and during the Removal Hearing, and to take any action or ruling to ensure a fair, impartial, and efficient hearing in accordance with due process.

7. Exhibits and Witness Lists

(A) Each Party shall serve, on all Parties and the Hearing Officer, a written numbered list of exhibits (exchanged pursuant to section VI.2, above) and witnesses, including expert witnesses, at least five (5) days before the first day of the Removal Hearing. This requirement does not apply to impeachment or rebuttal exhibits or witnesses.

(B) Each Party shall serve, at least two (2) days before the first day of the Removal Hearing, exhibit binders on all Parties and the Hearing Officer, in accordance with the format or form set by the Hearing Officer.

(C) The Hearing Officer shall have discretion to exclude any exhibit or witness that was not included in the submitted exhibit binders or not disclosed in accordance with the applicable deadlines set forth above in VI.7(A), (B). This remedy does not apply to impeachment or rebuttal evidence.

(D) The Parties are encouraged to meet and confer in advance of the Removal Hearing date and to stipulate to exhibits or witness lists, as well as the admissibility of any exhibits and testimony prior to the commencement of the Removal Hearing.

**EXHIBITS TO NOI**

CONTAINS CONFIDENTIAL INFORMATION

# APPENDIX · LISTING OF ENCLOSED EXHIBITS

| Exhibit | Date | Description |
|---|---|---|
| 1 | n.d. | 2021 Memorandum of Understanding Between County of San Mateo and Deputy Sheriff's Association (January 10, 2021 – January 10, 2026); |
| 2 | November 26, 2021 | Barnes- Sheriff Corpus Texts re: Sheriff Corpus's Relationship with Kovach |
| 3 | December 30, 2021 | Barnes- Sheriff Corpus Texts re: Sheriff Corpus's Relationship with Kovach |
| 4 | n.d. (2022) | Draft Organizational Chart |
| 5 | January 12, 2022 | Barnes- Sheriff Corpus Texts re: Aenlle's Ranch |
| 6 | January 18, 2022 | Barnes- Sheriff Corpus Texts re: Sheriff Corpus's Relationship with Kovach |
| 7 | January 27, 2022 | Barnes- Sheriff Corpus Text re: Wedding Venues |
| 8 | January 27, 2022 | Barnes- Sheriff Corpus Texts re: Earrings |
| 9 | January 31, 2022 | Barnes- Sheriff Corpus Texts re: Aenlle |
| 10 | February 26, 2022 | Barnes- Sheriff Corpus Texts re: Aenlle Foot Massage |
| 11 | May 11, 2022 | Barnes- Sheriff Corpus Texts re: Airbnb in Hawaii |
| 12 | August 30, 2022 | Contract Between County of San Mateo and Aenlle |
| 13 | October 21, 2022 | Email from Rodriguez to Aenlle re: Termination of Contract |
| 14 | January 1, 2023 | 2023.01.01 Contract Between County of San Mateo and Aenlle |
| 15 | n.d. (approx. March 2023) | Special Projects Coordinator I Job Description |
| 16 | March 7, 2023 | 2023.03.07 Email From County Human Resources Yapching to Lov and Enders re Extra Help Positions |
| 17 | n.d. (approx. July 2023) | Aenlle CV and Application for Executive Director of Administration |
| 18 | July 6, 2023 | Job Posting for Executive Director of Administration |
| 19 | July 31, 2023 | Memo from Sheriff Corpus to Kiryczun re: Aenlle - Step E Request |
| 20 | August 1, 2023 | Email from Kiryczun to Sheriff Corpus re: Aenlle - Step E Request |
| 21 | n.d. (2024) | Aenlle Volunteer Hours |
| 22 | January 2, 2024 | Email from Santos-Stevenson to Enriquez re: 015 No Comments Week Ending 12/30/2023 |
| 23 | February 5, 2024 | Memo from Lt. Sebring to Assistant Sheriff Monaghan |
| 24 | February 13, 2024 | Memo from Sheriff Corpus to Kiryczun re: Differential Request for Aenlle |
| 25 | March 8, 2024 | Email from Sheriff Corpus to Undersheriff Hsiung re: Document |
| 26 | March 12, 2024 | Memo from Undersheriff Hsiung to Kiryczun re: Temporary Differential Pay |

CONTAINS CONFIDENTIAL INFORMATION

| Exhibit | Date | Description |
|---|---|---|
| 27 | March 13, 2024 | Email from Kiryczun to Undersheriff Hsiung and Sheriff Corpus re: Discretionary Pay for Aenlle |
| 28 | April 16, 2024 | Memo from Sheriff Corpus to Kiryczun re: Request for Aenlle Raise |
| 29 | April 24, 2024 | Email from Kiryczun to Sheriff Corpus re: Request for Reconsideration of Allowance for Aenlle |
| 30 | June 18, 2024 | Text message Exchange between Undersheriff Hsiung and Sheriff Corpus |
| 31 | June 21, 2024 | Email from DSA Vice President Cheever to DSA Members re: DSA Response to Undersheriff Change |
| 32 | June 21, 2024 | Text Message from Sheriff Corpus to Dep. Tapia |
| 33 | July 5, 2024 | Letter from Sgt. Chan to Lt. Irfan Zaidi |
| 34 | August 15, 2024 | Email from Santos-Stevenson to Dep. Tapia |
| 35 | August 20, 2024 | Email Thread from Stevenson to Cooksey re: DSA/OSS MOU's |
| 36 | September 12, 2024 | Email Thread from Stevenson to Payroll/Enriquez re: Check Timecard |
| 37 | August 19, 2024 | Email Thread from Stevenson to Kuka re: DSA/OSS Salary Reimbursement |
| 38 | August 22, 2024 | Letter from Capt. Matthew Fox to Sgt. Javier Acosta |
| 39 | August 28, 2024 | Email Thread from Enriquez to Dep. Tapia |
| 40 | August 26, 2024 | Text Messages from Det. Garcia to Dep. Tapia |
| 41 | August 26, 2024 | Text Message from Sheriff Corpus to Dep. Tapia |
| 42 | August 26, 2024– August 27, 2024 | Email Thread from Enriquez to Raiti and Roberts re: DSA President release Time (Coding RTE) |
| 43 | August 28, 2024 | Memorandum from Sgt. Fava to Capt. Philip re: Deputy Incident |
| 44 | August 29, 2024 | Memorandum from Sgt. Fava to Lt. Zaidi re: Correctional Officer Off-Duty Incident |
| 45 | August 30, 2024 | DSA's Complaint, *San Mateo County Deputy Sheriff's Association v. County of San Mateo*, No. SF-CE-2224-M |
| 46 | September 3, 2024 | Emails between Heather Enders and Capt. Philip re: IA Notice |
| 47 | September 3, 2024 | Text Message Exchange between Aenlle and Heather Enders |
| 48 | September 4, 2024 | Internal Affairs Notice to Sgt. Acosta |
| 49 | September 12, 2024 | Statement from the Board of Supervisors Regarding the Sheriff's Office |
| 50 | September 22, 2024 | Letter from Sheriff Corpus to Board of Supervisors President Slocum |
| 51 | September 25, 2024 | Aenlle Transcript of Interview with Judge Cordell |
| 52 | October 24, 2024 | Notice of Internal Affairs Investigation from Sgt. Chan to Deputy Sheriff Trainee |
| 53 | October 28, 2024 | Notice of Interview from Sgt. Chan to Deputy Sheriff Trainee |
| 54 | November 12, 2024 | Acting Assistant Sheriff Fox Probable Cause Declaration |

2

CONTAINS CONFIDENTIAL INFORMATION

| Exhibit | Date | Description |
|---|---|---|
| 55 | November 12, 2024 | Email from Drooz to Corzo and Mueller re: Urgent Communication re: November 12, 2024 Press Conference |
| 56 | November 12, 2024 | Chronology by Former Capt. Albin |
| 57 | November 13, 2024 | Email from Sgt. Fava and Sgt. Chan to Lt. Zaidi re: Oral Board Concern |
| 58 | November 13, 2024 | Video Recording of a Special Meeting of the Board of Supervisors |
| 59 | November 14, 2024 | Email from Kiryczun to Sheriff Corpus re: Assistant Sheriff Job Classification Requirements |
| 60 | November 18, 2024 | Email from Enders to Sheriff Corpus, Undersheriff Perea, Lt. Zaidi re: Concerns Regarding the Interview Process for Candidate |
| 61 | December 16, 2024 | Press Release, County of San Mateo District Attorney, Prosecution Decision Regarding Dep. Tapia |
| 62 | December 24, 2024 | *Mercury News* Video, "San Mateo County Deputy Sheriff's Association President Carlos Tapia turns himself in," *available at*: https://www.youtube.com/watch?v=hr9cCuX0pvY |
| 63 | January 29, 2025 | Memorandum from Sgt. Fava to Lt. Reynolds re: Correctional Officer Jail Incident |
| 64 | January 29, 2025 | Email from Lt. Reynolds to Undersheriff Perea re: Correctional Officer Jail Incident |
| 65 | February 6, 2025 | Video of DSA Support for Measure A depicting Sgt. Chan |
| 66 | February 21, 2025 | Dep. Tapia Civil Complaint against San Mateo County |
| 67 | April 3, 2025 | PERB Complaint, *San Mateo County Deputy Sheriff's Association v. County of San Mateo*, No. SF-CE-2224-M |
| 68 | April 17, 2025 | Email from Sheriff Corpus to Beato re: Reserve Deputy Aenlle |

3

# Exhibit 1

DocuSign Envelope ID: 2A2C4A26-8F3F-42411-9852-15FED0FB582A

# Memorandum of Understanding

between

## County of San Mateo

### and

## Deputy Sheriff's Association

(Deputy Sheriff, Sheriffs Correctional Officer and District Attorney Inspector)

~ ~ ¢ ~ ~

**January 10, 2021 - January 10, 2026**

1

# DEPUTY SHERIFF'S ASSOCIATION
## Memorandum of Understanding

### Table of Contents

Section 1. Recognition ................................................................................................................. 6

Section 2. Association Security ...................................................................................................... 6

    2.2    Dues Deduction ................................................................................................... 6

Section 3. Association Representatives ........................................................................................ 8

Section 4. County Rights .............................................................................................................. 10

Section 5. No Discrimination ....................................................................................................... 10

Section 6. Salaries ....................................................................................................................... 10

    6.1    Survey ................................................................................................................ 10

    6.2    Experience Pay and Safety Longevity Pay ......................................................... 12

    6.6    Salary Step When Salary Range Is Revised ........................................................ 13

    6.7    Salary Step After Promotion or Demotion ....................................................... 14

    6.8    Reclassification of Position ............................................................................... 14

    6.9    "Y" Rate Process ............................................................................................... 14

    6.10    Salary Step Defined ......................................................................................... 14

Section 7. Days and Hours of Work ............................................................................................. 14

Section 8. Overtime ..................................................................................................................... 14

    8.1 Authorization ........................................................................................................... 14

    8.2    Definition .......................................................................................................... 15

    8.3 Work Groups ............................................................................................................ 15

    8.4    Compensatory Time Off (CTO) .......................................................................... 16

Section 9. Shift Differential ......................................................................................................... 16

Section 10. Application of Differential ........................................................................................ 16

Section 11. On-Call Pay and Minimum Call Back ........................................................................ 17

2

Section 12. Bilingual Pay ................................................................................................................. 18

Section 13. Tuition Reimbursement .............................................................................................. 18

Section 14. Career Incentive Allowance for Law Enforcement Officers ...................................... 18

Section 15. Layoff and Reemployment ......................................................................................... 19

    15.1    Notice of Layoff ........................................................................................................ 19

    15.2    Precedence by Employment Status ......................................................................... 19

    15.3    Procedures ............................................................................................................... 20

    15.4    Names of Employees Laid Off to be Placed on Re-employment and General Eligible Lists ............ 20

    15.5    Abolition of Position ................................................................................................ 21

Section 16. Severance Pay ............................................................................................................ 21

Section 17. Holidays ..................................................................................................................... 21

    17.3    County Holidays ....................................................................................................... 21

Section 18. Vacations ................................................................................................................... 22

    18.1    Vacation Allowance .................................................................................................. 22

    18.2    Vacation Schedule ................................................................................................... 23

    18.3    Vacation Allowance for Separated Employees ........................................................ 23

    18.4    Vacation Pay ............................................................................................................ 23

Section 19. Sick Leave .................................................................................................................. 23

    19.1    Accrual ..................................................................................................................... 23

    19.2    "New" Sick Leave Usage .......................................................................................... 24

    19.3    Procedures for Requesting and Approving Sick Leave ............................................ 24

    19.4    Accounting for Sick Leave ........................................................................................ 25

    19.5    Credits ...................................................................................................................... 25

    19.6    Incapacity to Perform Duties ................................................................................... 25

    19.7    Use of Sick Leave While on Vacation ....................................................................... 25

    19.9    Catastrophic Leave .................................................................................................. 25

3

Section 20. Leaves of Absence ................................................................................................ 26

   20.1    General ...................................................................................................... 26

   20.2    Benefit Entitlement ...................................................................................... 27

   20.3    Seniority Rights and Salary Adjustments .......................................................... 27

   20.4 Job Incurred Disability Leave ......................................................................... 27

   20.5    Leave of Absence Without Pay ........................................................................ 28

   20.6    Military Leaves of Absence.............................................................................. 28

   20.7    Absence Due to Required Attendance in Court .................................................. 29

   20.8    Absence Without Leave ................................................................................ 29

   20.9    Educational Leave of Absence With Pay ........................................................... 29

        **Period of Obligated Employment** ................................................................. **30**

Section 21. Hospitalization and Medical Care.............................................................................. 30

   21.2    Retiree Health ............................................................................................ 31

Section 22. Dental Care ........................................................................................................ 37

Section 23. Vision Care ........................................................................................................ 37

Section 24. Change in Employee Benefit Plans .......................................................................... 37

Section 25. Life Insurance ..................................................................................................... 37

Section 26. Uniform Allowance/Safety Equipment ..................................................................... 38

Section 27. Promotion ......................................................................................................... 38

   27.1    Examinations ............................................................................................. 38

   27.2    Promotional Eligible Lists .............................................................................. 38

   27.3    Probationary Period .................................................................................... 39

Section 28. Reallocation of Position ........................................................................................ 39

Section 29. Change of Assigned Duties ..................................................................................... 39

Section 30. Pay for Work-Out-of-Classification........................................................................... 39

Section 31. Probationary Period ............................................................................................. 40

4

Section 32. Dismissal, Suspension Reduction in Step or Demotion for Cause ........................................ 41

Section 33. Grievance Procedures ................................................................................................................ 41

    33.4       Scope of Arbitration Decisions ............................................................................................ 42

    33.5       Compensation Complaints .................................................................................................. 43

    33.6       County Charter and Civil Service Commission ................................................................. 43

    33.7       Involuntary Transfers for the Alleged Purpose of Punishment ...................................... 43

Section 34. Retirement Plan ......................................................................................................................... 44

    34.1       Retirement Plan ................................................................................................................... 44

    34.2       Retirement COLA ................................................................................................................. 45

Section 35. Deferred Compensation Plan- Automatic Enrollment for New Employees ....................... 45

Section 36. Bereavement Leave .................................................................................................................. 46

Section 37. No Strike .................................................................................................................................... 46

Section 38. Severability of Provisions ........................................................................................................ 46

Section 39. Past Practices ............................................................................................................................ 46

CSM 00009

# MEMORANDUM OF UNDERSTANDING

The Deputy Sheriffs Association (DSA) and representatives of the County of San Mateo have met and conferred in good faith regarding wages, hours and other terms and conditions, have exchanged freely information, opinions and proposals and have endeavored to reach agreement on all matters relating to the employment conditions and employer-employee relations of such employees. This Memorandum of Understanding (MOU) is entered into pursuant to the Meyers-Milias-Brown Act (Government Code Sections 3500 et seq) and has been jointly prepared by the parties. This MOU shall be presented to the County Board of Supervisors and, if appropriate, to the Civil Service Commission as the joint recommendations of the undersigned for salary and employee benefit adjustments for the period commencing January 10, 2021 through January 10, 2026.

## Section 1. Recognition

The Deputy Sheriffs' Association, hereinafter referred to as the "DSA", is the recognized employee organization for this bargaining unit, certified pursuant to Resolution No. 38586, adopted by the Board of Supervisors on May 16, 1978. This MOU covers County probationary and regular employees employed in the classifications of Deputy Sheriff, Deputy Sheriff Trainee, Sheriff's Correctional Officer and District Attorney Inspector.

## Section 2. Association Security

The Association agrees that it has the duty to provide fair and non-discriminatory representation to all employees in the representation unit regardless of whether they are members of the Association.

2.1 Hold Harmless

   The Association shall indemnify, defend, and save the County harmless against any and all claims, demands, suits, orders, or judgments, or other forms of liability that arise out of or by reason of the Association Security and/or Dues Deduction provisions, or action taken or not taken by the County under one or both of these provisions. Indemnification and defense includes, but is not limited to, payment of the County's attorney's fees and costs.

2.2 Dues Deduction

   The Association may have the regular dues of its members within the representation unit deducted from employees' paychecks under procedures prescribed by the County Controller. The deduction shall be made only after the Association certifies to the County a list of workers who have authorized such deductions, and shall continue: (1) until such certification is revoked, in writing, by the Association; or (2) until the transfer of the employee to a unit represented by another employee organization.

   Employees may authorize dues deductions only for the organization certified as the recognized employee organization of the unit to which such employees are assigned.

   Not more than once per week (preferably bi-weekly on non-payroll Fridays), the Association will send a list of changes to its Union member listing by email to the Controller's Office at payroll@smcgov.org with the following Certification statement:

      "I, NAME, TITLE, hereby certify that Deputy Sheriffs Association possesses and will maintain an authorization (for dues deductions and/or voluntary political contribution deductions, as indicated) signed by the individuals on this list from whose salary or wages the deductions is to be made."

   Certified spreadsheets that arrive by the non-payday Friday will be processed for the following week's

6

payroll.

The County shall create up to five (5) additional dues deduction lines for members and Associate members of the Association who shall be allowed to have their dues deducted post tax from their paychecks. The amount of the deduction shall be determined by the Association, employees shall then authorize the county to deduct the stated amount.

If, after all other involuntary and insurance premium deductions are made in any pay period, the balance is not sufficient to pay the Association dues required by this Section, no such deduction shall be made for the current pay period.

## 2.3 Reinstatement

Employees who are separated from the representation unit, shall be reinstated upon the return of the employee to the representation unit. For the purpose of this Paragraph, the term separation includes transfer out of the representation unit, layoff, and leave of absence without pay.

## 2.4 Communications with Employees

The Association shall be allowed by County departments in which it represents employees use of available bulletin board space for communications having to do with official Association business, such as times and places of meetings, provided such use does not interfere with department needs.

The Association may distribute materials to unit employees through County mail and email distribution channels if approved by the Human Resources Director. This privilege may be revoked in the event of abuse after the Director consults with Association representatives. The content of any materials distributed to employees shall not relate to political activity or violate existing County policies. Employees shall not prepare Association-related emails during County work time without first obtaining approved release time.

Any Association representative shall give the Department Head or representative at least twenty-four (24) hours advance notice when contacting employees during the duty period, provided that solicitation for membership and other internal Association business shall be conducted only during the non-duty hours of all employees concerned. Prearrangement for routine contact may be made by agreement between the Association and the department head and when made shall continue until revoked.

## 2.5 Use of County Buildings

County buildings and facilities may be made available for use by County employees or the Association or its representatives in accordance with such administrative procedures as may be established by the County Manager or department head concerned.

## 2.6 Advance Notice

Except in cases of emergency as provided below in this subsection, the Association, if affected, shall be given reasonable advance written notice of any ordinance, resolution, policy, rule or regulation directly relating to matters within the scope of representation proposed to be adopted by the County and shall be given the opportunity to meet with the appropriate management representatives prior to adoption.

In cases of emergency when the foregoing procedure is not practical or in the best public interest, the County may adopt or put into practice immediately such measures as are required. At the earliest practical date

7

thereafter the Association shall be provided with the notice described in the preceding paragraph and be given an opportunity to meet with the appropriate management representatives.

## 2.7 New Employee Orientation

The County and the Association shall continue to work on best practices to ensure labor access to new employees for the purpose of educating them on their representation opportunities. Toward that goal, the County shall administer an opportunity for the Association to meet with new employees as follows:

All new employees are encouraged to attend the first new employee benefits orientation following the commencement of their employment. New employee Benefits Orientation is scheduled for every other week, and the Association will have up to thirty (30) minutes at the end of each session to provide information regarding its organization to its represented employees and members.

For employees who do not attend a benefits orientation within the first month of their employment, the Association may schedule, at the supervisor's discretion, up to thirty (30) minutes with each employee to meet directly with them to provide information. Release Time requested for this activity will be reviewed and approved by Employee Relations under normal Release Time processes.

## 2.8 Employee Roster

The County shall supply without cost to the Association a bi-weekly electronic and sortable data processing run of the names, classifications, work locations, work, home, and personal cellular telephone numbers on file with the County and personal email addresses on file with the County, and home addresses of all employees in the units represented by the Association. Such lists shall indicate hourly rates of pay, hours worked, gross pay, Association dues withheld from employees' checks as of the date the roster was prepared, membership status, the names added to or deleted from the previous list, and whether each such change in status was due to any type of leave of absence, termination, layoff, reemployment after layoff, retirement, or withdrawal from the Association. The County shall notify the Association of employees who are on an unpaid status in excess of twenty-eight (28) days.

## <u>Section 3. Association Representatives</u>

The County and Association agree that professional, productive, and positive labor relations can be accomplished when Association and County representatives work together to support the services we provide to the public. To support this philosophy, the parties have agreed to the provisions regarding attendance at meetings and handling of meetings. Paid release time is intended to support the collaboration and cooperative spirit of labor relations by ensuring that Association members have access to resources designed to help support their continued success as public employees and that Association leaders have an opportunity to work together to support the success of their members.

## 3.1 Release Time for Meet and Confer

County employees who are official representatives of the Association shall be given reasonable time off with pay, including reasonable travel time, to formally meet and confer or consult with management representatives on matters within the scope of representation; to be present at hearings where matters within the scope of representation are being considered; to testify or appear as the designated representative of the Association in settlement conferences, hearings, or other proceedings before PERB, in matters relating to an unfair practice charge; or to testify or appear as the designated representative of the Association in matters before the Civil Service Commission. The use of official time for this purpose shall be reasonable and shall

8

not interfere with the performance of County services as determined by the County. Such representatives shall submit written requests for excused absences to Employee Relations at least two (2) working days prior to the meeting whenever possible. Except by agreement with Employee Relations, the number of employees excused for such purposes shall not exceed three (3) at any one time. Any denial of requested time off may be appealed to the Human Resources Director whose decision shall be final.

## 3.2 President Release Time

The County agrees to provide the Association President with sixty (60) hours of release time each pay period. The Association agrees that the start of the term of office for a newly elected President will coincide with the start of a County pay period.

During this County paid release time, the Association President shall engage only in the following activities: (1) preparing for and participating in meet and confer or consultation with representatives of the County or Sheriff's Office on matters relating to employment conditions and employee relations, including wages, hours and other terms and conditions of employment; (2) investigating or processing grievances or appeals; (3) conducting Association business; (4) participation in Association Board and general membership meetings; (5) attendance at Association related training, conferences and workshops. All approved release time will be coded appropriately on the employee's timecard using pay code RTE.

While on release time, the President will utilize accrued leave in accordance with the terms of this agreement for any absences.

The Association President shall not participate in any other activity, including but not limited to political activity, during this County paid release time. Paid release time is not authorized to be used for political activity, any type of activity that is precluded by law or County policy as a conflict of interest, conducting membership drives, or soliciting membership from other County employees or applicants.

The Association President shall provide documentation to the Sheriff certifying that during each pay period, the Association President used the sixty (60) hours of County paid release time only for authorized purposes. The Association President shall provide this certification at the conclusion of each pay period. Use of the paid release time for unauthorized purposes may result in disciplinary action, up to and including termination of employment.

This agreement for sixty (60) hours of release time per pay period encompasses forty (40) hours per pay period of County-paid release time. In recognition of the Association's responsibility for payment for the remaining twenty (20) hours per pay period of release time for the Association President, effective upon Board of Supervisors' approval of the successor MOU in 2022, the February 12th (Lincoln's Birthday) holiday will be converted to a floating holiday, and the floating holiday will be reduced from eight (8) to six (6) paid hours.

The Sheriff shall fix the release time and work schedule hours of the Association President in accordance with Section 7 of the MOU. Release time shall be scheduled during regular business hours unless otherwise agreed to by the parties. Unused release time hours are not transferable. Unused release time hours resulting from approved time off or lack of Association business cannot be banked for later use, nor shall it be cashable at separation.

If Association representation expands, this agreement does not create precedence or provide guarantee of the addition of release time hours for the Association President or the Association Board.

## 3.3 Association Board Release Time

9

The County shall provide an annual Association release time bank of two hundred and forty (240) hours for use by the Association Board. The Association Board members may use these hours to perform their Association functions, or attend seminars, meetings and conferences designated by the Association for the purpose of professional development, and/or leadership training. The released Board member(s) shall not participate in any other activity, including but not limited to political activity, during this release time. Paid release time is not authorized to be used for political activity, any type of activity that is precluded by law or County policy as a conflict of interest, conducting membership drives, or soliciting membership from other County employees or applicants.

The Association President or designee, shall request use of this time from the Sheriff's Office and Employee Relations at least forty‑eight (48) hours in advance of the Board members who will be utilizing the release time. Release time may only be used by a sitting member of the Association Board. All approved release time will be coded appropriately on the employee's timecard using pay code RTE.

Release time for the Board may only be used during the calendar year in which it is provided. Release time for the Board shall not roll over year to year, shall not accrue to any individual employee, nor be cashable at separation.

## Section 4. County Rights

Except where modified by this MOU, the County retains the exclusive right to determine the methods, means and personnel by which County government operations are to be conducted; to determine the mission of each of its departments, boards and commissions; to set standards of service to be offered to the public; to administer the Civil Service system; to classify positions; to add or delete positions or classes to or from the salary ordinance; to establish standards for employment, promotion and transfer of employees; to direct its employees; to take disciplinary action for proper cause; to schedule work; and to relieve its employees from duty because of lack of work or other legitimate reasons.

The County reserves the right to take whatever action may be necessary in an emergency situation; however, the Association, if affected by the action, shall be promptly notified. The Human Resources Director shall, on request of either party, refer questions regarding the interpretation of this Section which cannot be resolved between employee and management representatives to either the Board of Supervisors or the Civil Service Commission for hearing and final determination, depending on which body has authority over the matter in dispute. In no event shall such dispute be subject to the grievance procedure of this MOU.

## Section 5. No Discrimination

There shall be no discrimination because of race, creed, color, national origin, sex, sexual orientation, legitimate employee organization activities, or on the basis of any other classification protected by law against any employee or applicant for employment by the Association, the County, or anyone employed by the County. To the extent prohibited by applicable state and federal law there shall be no discrimination because of age. There shall be no discrimination against any person with disabilities solely because of such disability unless that disability prevents the person from meeting the minimum standards established.

## Section 6. Salaries

6.1 Survey

In recognition of the additional ten percent (10%) differential pay, which is not base pay, paid to Deputy Sheriffs in Santa Clara County as of August 2022, the County and Association agree to the following salary

10

provisions, which shall resolve all current and potential issues/disputes related to the Santa Clara County ten percent (10%) differential for the purpose of the salary formula in Section 6.1 of the MOU between San Mateo County and the DSA entitled "Salary":

Effective the pay period in which the Board of Supervisors' approves a successor MOU in 2022, salary ranges for Deputy Sheriff will be increased by ten percent (10%).

On or before the first Monday in April in each year, commencing in the calendar year 2023, and ending in the calendar year 2024, the representatives of the County and the representatives of the Deputy Sheriffs Association shall jointly certify to the Board of Supervisors the highest pay rate in effect as of January 31 of that year for deputy sheriffs in the counties of Alameda, Contra Costa, Marin, Napa, San Francisco, Santa Clara, Solano and Sonoma. The terms "pay", "rates of pay", and "pay rates" are hereby defined and intended to include the maximum rate of base pay provided in each of the above jurisdictions for deputy sheriff positions equating to the classification of Deputy Sheriff in the County of San Mateo. Unresolved disputes regarding the interpretation or application of this paragraph shall be resolved by submission to a jointly chosen, neutral arbitrator whose decisions shall be final and binding on the parties and shall be submitted to the Board of Supervisors. The Board of Supervisors shall thereupon fix the rates of pay of the classification of Deputy Sheriff at 1% above the highest pay rate specified in this survey. In addition to 1% above the highest pay rate specified in the survey, the County will add an additional 3.3% equity adjustment for the 2023 and 2024 calendar years only. Such rates of pay shall be fixed to be effective as of the first day of the first full pay period in January of each year specified above (2023-2024). The County shall not reduce salaries during the term of this agreement.

On or before the first Monday in April of 2025, the representatives of the County and the representatives of the Deputy Sheriffs Association shall jointly certify to the Board of Supervisors the highest pay rate in effect as of January 31 of that year for deputy sheriffs in the counties of Alameda, Contra Costa, Marin, Napa, San Francisco, Santa Clara, Solano and Sonoma. The terms "pay", "rates of pay", and "pay rates" are hereby defined and intended to include the maximum rate of base pay provided in each of the above jurisdictions for deputy sheriff positions equating to the classification of Deputy Sheriff in the County of San Mateo. Unresolved disputes regarding the interpretation or application of this paragraph shall be resolved by submission to a jointly chosen, neutral arbitrator whose decisions shall be final and binding on the parties and shall be submitted to the Board of Supervisors. The Board of Supervisors shall thereupon fix the rates of pay of the classification of Deputy Sheriff at 1% above the highest pay rate specified in this survey. Such rates of pay shall be fixed to be effective as of the first day of the first full pay period in January of 2025. The County shall not reduce salaries during the term of this agreement.

Salary increases for the classification of Sheriff's Correctional Officer shall be set at eighty-five percent (85%) of the Deputy Sheriff's salary. In 2022, this salary adjustment will be effective the pay period in which the Board of Supervisors' approves a successor MOU . In calendar years 2023, 2024 and 2025, the salary adjustment will be effective in January of each year once the Deputy Sheriff's salary for the calendar year has been set.

Salary increases for the classification of District Attorney Inspector shall be the same percentage as that of Deputy Sheriffs, as described above. In 2022, this salary adjustment shall be effective the pay period in which the Board of Supervisors' approves a successor MOU in 2022. In calendar years 2023, 2024, and 2025, the salary adjustment will be effective the first full pay period in January of each year

Effective the first full pay period following Association ratification and Board of Supervisors' adoption of a successor MOU, each employee in active full time paid status will receive a lump sum payment of two thousand dollars ($2,000) as a non-discretionary incentive to ratify the agreement. It is the intent of the parties that the lump sum payments will not be treated as salary or wages, as the payments are not provided as

11

compensation for hours of employment or longevity pay. The lump sum payments will not be included in overtime/regular rate of pay calculations, will not be treated as pensionable compensation, and there will be no roll up effect of the lump sum payments. The County will withhold taxes from lump sum payments in accordance with federal and state requirements. The lump sum payments will be prorated for part-time employees.

## 6.2 Experience Pay and Safety Longevity Pay

In addition to the salary provisions described in Section 6.1 above, employees in the classifications of Deputy Sheriff, Sheriffs Correctional Officer and District Attorney Inspector shall receive experience pay at the following rates:

Effective the first full pay period following Association ratification and Board of Supervisors' adoption of a successor MOU, 2% at the beginning of the eighth (8th) year
3% at the beginning of the fifteenth (15th) year
4% at the beginning of the eighteenth (18th) year
5% at the beginning of the twentieth (20th) year

Such experience pay shall be paid bi-weekly, beginning on the first full pay period after the above periods of service with the County of San Mateo, for the classification of Deputy Sheriff and District Attorney Inspector based on total years of California Peace Officers Standards and Training (POST) qualified peace officer experience service for the County of San Mateo and/or on total years of qualified California correctional officer experience service for the County of San Mateo. Such experience pay shall be paid biweekly, beginning on the first full pay period after the above periods of service, for the classification of Sheriffs Correctional Officer based on total years of qualified California correctional officer experience service for the County of San Mateo. This experience pay shall be calculated as the above stated percentage of the employee's current step base pay. Base pay shall be defined as the base salary listed in the County salary schedules and shall not include employer pick up of the employee's retirement contribution or any differentials or premium pays.

Effective January 31, 2016 and for the term of this Agreement, employees in the classifications of Deputy Sheriff, Sheriff's Correctional Officer and District Attorney Inspector hired by the County of San Mateo into Retirement Tier 4 will receive one and nine-tenths percent (1.9%) Safety Longevity Pay; and employees in the classifications of Deputy Sheriff, Sheriff's Correctional Officer and District Attorney Inspector hired by the County of San Mateo into Retirement Tier 1 or Tier 2 will receive three and fifteen one hundredths percent (3.15%) Safety Longevity Pay.

6.3 Except as herein otherwise provided, the entrance salary for a new employee entering County service shall be the minimum salary for the class to which appointed. When circumstances warrant, the Human Resources Director may, upon recommendation of the department head, approve an entrance salary which is more than the minimum salary. The Human Resources Director's decision shall be final. Such a salary may not be more than the maximum salary for the class to which that employee is appointed unless such salary is designated as a Y rate by the Board of Supervisors.

6.4 Permanent and probationary employees serving in regular established positions shall be considered by the appointing authority on their salary anniversary dates for advancement to the next higher step in the salary schedule for their respective classes as follows. All increases shall be effective at the beginning of the next full pay period.

(1) After completion of 1040 regular hours satisfactory service in Step A of the salary schedule, and upon recommendation of the appointing authority, the employee shall be advanced to the next higher step

12

CSM 00016

in the salary schedule for the class. If an employee is appointed at a step higher than the first step of the salary range for that class, the first merit increase shall be after completion of 2080 regular hours of satisfactory service.

(2) After completion of 2080 regular hours satisfactory service in each of the salary steps above A, and upon recommendation of the appointing authority, the employee shall be advanced to the next higher step in the salary schedule for the class until the top of the range is reached.

(3) If an employee completes the 1040 or 2080 hours in the middle of a pay period, the employee shall be eligible for an increase as follows:

if the merit increase period is completed during the first week of a pay period the increase will be made effective the start of the then current pay period.

if the merit increase period is completed during the second week of a pay period the increase will be made effective with the start of the next period.

(4) Upon the recommendation of the appointing authority and approval by the Human Resources Director, employees may receive special merit increases at intervals other than those specified in this Section. The Human Resources Director's decision shall be final.

6.5 Employees shall be considered for salary step increases according to the date of their appointment or the revised salary adjustment hours balance. Changes in employees' salary because of promotion, upward reclassification, postponement of salary step increase or special merit increase will set a new salary adjustment hours balance for that employee, which balance shall be as stated in the preceding paragraph.

Employees who are rejected during the probationary period and revert to their former class shall return to the salary adjustment hours balance held in the former class unless otherwise determined by the Human Resources Director. The salary adjustment hours balance for an employee shall not be affected by a transfer, downward reclassification or a demotion.

A permanent employee accepting provisional employment in a higher or different class in the County Classified Service, who reverts to the former class, shall retain the salary adjustment hours balance in the former class on the same basis as if there had been no such provisional appointment.

Salary range adjustments for a class will not set a new salary adjustment hours balance for employees serving in that class.

Upon recommendation of the appointing authority and approval of the Human Resources Director provisional, temporary, seasonal and extra help employees shall be advanced to the next higher step in the salary schedule upon completion of the periods of service prescribed in this Section, provided that their service has been satisfactory. Also, upon recommendation of the appointing authority and approval by the Human Resources Director, continuous service in a provisional, temporary, or extra help capacity shall be added to service in a regular established position for purposes of determining an employee's salary adjustment hours balance, eligibility for salary increases, and vacation and sick leave accrual. However, such service may not be added if it preceded a period of over twenty-eight consecutive calendar days during which the employee was not in a pay status, except when the employee is absent due to an injury or disease for which they are entitled to and currently receiving Worker's Compensation benefits.

6.6 Salary Step When Salary Range Is Revised

13

Whenever the salary range for a class is revised, such incumbent in a position to which the revised schedule applies shall remain at the step in the previous range, unless otherwise specifically provided by the Board of Supervisors.

## 6.7 Salary Step After Promotion or Demotion

When an employee is promoted from a position in one class to a position in a higher class and at the time of promotion is receiving a base salary equal to or greater than the minimum base rate for the higher class, they shall be entitled to the next step in the salary schedule of the higher class which is at least one step above the rate they have been receiving, except that the next step shall not exceed the maximum salary of the higher class. When an employee is demoted, voluntarily or otherwise, that employee's compensation shall be adjusted to the salary prescribed for the class to which demoted, and the specific rate of pay within the range shall be determined by the Human Resources Director, whose decision shall be final; provided, however, that the Board of Supervisors may provide for a rate of pay higher than the maximum step of the schedule for the employee's class, and designate such rate of pay as a Y rate.

## 6.8 Reclassification of Position

An employee in a position reclassified downward shall have the right to either (1) transfer to a vacant position in their present class in the same or another department, provided the head of the department into which the transfer is proposed agrees, or (2) continue in the same position in the lower class at a "Y" rate of pay when their pay is higher than the maximum step of the salary range for the lower class.

## 6.9 "Y" Rate Process

When an employee is reclassified downward, they shall continue in their present salary range, with cost of living adjustments, for two years, at which point the employee's salary shall be frozen ("Y" - rated) until the salary assigned to the lower class equals or exceeds such "Y" rate. The "Y" rate provisions of this Section shall not apply to layoffs, demotions, or other personnel actions resulting in an incumbent moving from one position to another.

## 6.10  Salary Step Defined
For purposes of salary administration in this contract a step is defined as 5.74%.

## **Section 7. Days and Hours of Work**

The standard workweek for employees occupying full-time positions consists of forty (40) hours unless otherwise specified by the Board of Supervisors. The appointing authority shall fix the hours of work with due regard for the convenience of the public and the laws of the State and County. Employees occupying part-time positions shall work such hours and schedules as the Board and the appointing authority shall prescribe. Except as hereinafter provided, County offices shall be open for business from 8:00 a.m. to 5:00 p.m. every day except Saturdays, Sundays and holidays. With the County Manager's approval, department heads may make such changes to the schedule of office hours as public convenience or necessity may require.

## **Section 8. Overtime**

## 8.1 Authorization

All compensable overtime must be authorized by the appointing authority or designated representative prior to being worked. If prior authorization is not feasible due to emergency conditions, a confirming authorization

14

must be made on the next regular working day following the date on which the overtime was worked. Overtime worked must be in the job class in which the person is regularly employed or in a class for which the employee is authorized higher pay for work in a higher class.

## 8.2 Definition

Except as otherwise provided by Charter, or as defined herein, any authorized time worked in excess of a forty (40) hour weekly work schedule shall be considered overtime and shall be compensable at the rate of one and one-half times the overtime worked whether compensated by monetary payment or by the granting of compensatory time off.

For employees on a 12-hour shift schedule in classes permitted by the Fair Labor Standards Act, overtime shall be defined as hours worked in excess of one hundred sixty-eight (168) hours in a twenty-eight (28) day period.

For purposes of determining eligibility for overtime compensation, any absence with pay, except sick leave, shall be considered as time worked. Sick leave will be considered as time worked under the following conditions:

- The potential overtime hours occur due to the employee being called into work while officially assigned to be in an On-Call status. For example, the employee uses 8 hours of sick leave on Monday and is called into work from an On-Call status on Wednesday night and works 4 hours outside the regular shift. In this case, the employee will code 8 hours of sick leave on Monday and 4 hours of overtime on Wednesday.

- The potential overtime hours occur due to the employee being ordered or mandated to work the additional hours when not in an On-Call status. For example, the employee uses 8 hours of sick leave on Monday and is called on Wednesday night and ordered to report to work for 4 hours outside the regular shift. In this case, the employee will code 8 hours of sick leave on Monday and 4 hours of overtime on Wednesday.

Sick leave will not be considered as time worked under other circumstances. For example:
- If the employee is not in an On-Call status and is not ordered or mandated to work the additional hours, sick leave used in that overtime calculation period shall not be considered as time worked for the purpose of eligibility for overtime compensation. For example, an employee calls in sick for an 8-hour shift on Monday. The employee is not scheduled to work a regular shift on Wednesday, but has either previously signed up for 8 hours of voluntary overtime for that day, or is called at home and is asked to work an 8 hour shift that day and agrees to do so voluntarily. In this case, the employee would code no sick leave for Monday, but would, instead, code 8 hours of straight time for Wednesday. There would be no overtime and no deduction from sick leave balances.

The smallest increment of working time that may be credited as overtime is 6 minutes. Portions of 6 minutes worked at different times shall not be added together for the purpose of crediting overtime.

Employees who are regularly scheduled to work a biweekly overtime schedule will not receive overtime if they are receiving vacation or sick leave pay for the entire biweekly pay period during the time when the regularly scheduled overtime falls.

## 8.3 Work Groups

15

The Human Resources Director shall allocate all job classes to the following described work groups for purposes of determining categories of employees to be compensated by monetary payment or comp time off. The Director's decision shall be final; provided that prior to changing the work group of an existing class covered by this MOU the Director shall notify the Association of the contemplated change and if requested, discuss with the Association the reasons for the work group change.

<u>Work Group 1:</u> Employees in Work Group I are covered by the Fair Labor Standards Act (FLSA) and may be compensated for overtime worked either by monetary payment or by compensatory time off, up to the cap permissible under Section 8.3 of this MOU, at the option of the employee. All monetary payments for overtime must be paid not later than the next biweekly payroll following the pay period in which the overtime was worked. Should the County through some future Federal ruling be exempted from FLSA, the County shall revert to the base rate for the computation of overtime.

## 8.4 Compensatory Time Off (CTO)

Effective the first full pay period following Association ratification and Board of Supervisors' adoption of a successor MOU in 2022, the maximum compensatory time off accrual shall be ninety-six (96) hours.

CTO which accrues in excess of ninety-six (96) hours must be liquidated by monetary payment. Utilization of compensatory time off shall be by mutual agreement between the department head and the employee. The smallest increment of CTO which may be taken off is 6 minutes.

## **Section 9. Shift Differential**

9.1 Shift differential pay, for the purpose of this Section, is defined as pay at a rate which is one step above the employee's base pay in the salary range for their class. If the base pay is at the top step, shift differential pay shall be computed at one step above such base pay.

9.2 Employees shall be paid shift differential for all hours so worked between the hours of 6:00 p.m. and 6:00 a.m.

## **Section 10. Application of Differential**

For employees who have been:

(1) regularly working a shift described in Section 9, and/or

(2) assigned to and regularly working a special job assignment enumerated in Exhibit B of this Memorandum, and/or

(3) eligible for and receiving Career Incentive Allowance for Law Enforcement Officers as provided in Section 14, for 30 or more calendar days immediately preceding a paid holiday, the commencement of a vacation, paid sick leave period, or comp time off, as the case may be, the applicable differential shall be included in such employee's holiday pay, vacation pay, paid sick leave or paid comp time. The vacation, sick leave, holiday and comp time off pay of an employee on a rotating shift shall include the differential such employee would have received had they been working during such period. Shift differential does not apply when employees are assigned modified duty, unless their modified duty assignment requires them to work between 6:00 p.m. and 6:00 a.m.

16

## <u>Section 11. On-Call Pay and Minimum Call Back</u>

A.  Policy

When warranted and in the interest of County operations, the department head may assign employees to "on-call" status. This Section clarifies the existing process for the assignment of On-Call work for employees represented by the DSA sworn bargaining unit. For the purpose of this Section 11 only, each of the special assignments listed in subsection B below shall constitute an organizational unit.

B.  On-Call Assignments

1.  Regular and Required On-Call Assignments: All employees in the following special assignments are assigned regular and required on-call hours for which they earn on-call pay:
    a.  Detectives (including Detective Bureau, Airport Detectives, and Transit Detectives)
    b.  Bomb Squad
    c.  OES Liaison
    d.  DA Inspector

C.  Process for Assignment of On-Call Hours

1.  Regular and required on-call assignments, and re-assignments as needed due to employee absences, will be assigned on a rotating schedule and equitably distributed to all employees in the special assignment.

2.  For voluntary on-call assignments, the Department will solicit volunteers on a rolling basis, and assignments will be provided on a first come, first serve basis. Individual voluntary on-call assignments may be assigned in the absence of sufficient volunteers.

D.  On-Call Compensation

Effective the first pay period of January 2018, employees shall be paid an hourly rate of four dollars and forty cents ($4.40) for time in which they are required to be in an on-call status. Effective the first pay period following ratification and Board of Supervisors' approval of a successor MOU in 2021, employees shall be paid an hourly rate of five dollars and forty cents ($5.40) for time in which they are required to be in an on-call status.

E.  Minimum Call Back

Employees in an on-call status required to report back to work during off-duty hours shall be compensated for a minimum of two (2) hours.

Employees not in an on-call status required to report back to work during off-duty hours shall be compensated for a minimum of three (3) hours.

Hours worked contiguous with the employee's regular shift shall not be subject to call back pay. Employees receiving callback pay shall not be entitled to on-call pay simultaneously.

F.  Court Overtime

When an employee is assigned to Telephone Stand-by, is assigned to testify in any court proceeding as

17

DocuSign Envelope ID: 2A2C4A26-8F3F-42A1-9852-15FED0FB582A

part of their official duties, or is subpoenaed or required by the County to appear in Criminal Court, Civil Court, or a hearing board in the employee's capacity as a County employee, and is not scheduled to be on-duty during any portion of the appearance, upon reporting to the court or location of the hearing, the employee shall receive a minimum of four (4) hours pay at time and one-half (1.5) the employee's regular rate of pay, or the actual amount of time spent in court, whichever is greater.

## Section 12. Bilingual Pay

A salary differential of seventy dollars ($70.00) biweekly shall be paid incumbents or positions requiring bilingual proficiency as designated by the appointing authority and Human Resources Director. Said differential shall be prorated for employees working less than full-time or who are in an unpaid leave of absence status for a portion of any given pay period. Bilingual pay is effective the first pay period after Human Resources certifies the result of the bilingual exam. Under no circumstances is bilingual pay retroactive.

Designation of positions for which bilingual proficiency is required is the sole prerogative of the County and the decision of the Human Resources Director is final. Human Resources will oversee the bilingual examination, certify exam results and determine effective date of bilingual pay of any individual submitted by the Department for testing. The Association shall be notified when such designations are made.

Individuals who promote or transfer to another position or Department will be reevaluated by the receiving Department to determine if bilingual pay should be continued. Should bilingual pay be continued, Department must submit request for continuation with the Human Resources Department.

## Section 13. Tuition Reimbursement

Employees may be reimbursed for tuition and related fees paid for taking courses of study in an off-duty status if the subject matter content is closely related to present or probable future work assignments, and limited to programs of instruction that correspond to courses offered by independent bona fide institutions of learning. Limits to the amount of reimbursable expense may be set by the Human Resources Director with the County Manager's concurrence. There must be a reasonable expectation that the employee's work performance or value to the County will be enhanced as a result of the course. Courses taken as part of a program of study for a college undergraduate or graduate degree will be evaluated individually for job relatedness under the above-described criteria. The employee must both begin and successfully complete the course while employed by the County.

Employees must apply on the prescribed form with all information needed to evaluate the request to their department head who shall recommend approval or disapproval and forward the request to the Human Resources Director whose decision shall be final. To be reimbursed the application must have been approved before enrolling in the course. If a course is approved and later found to be unavailable, a substitute course may be approved after enrollment. Upon completion of the course the employee must submit a request for reimbursement accompanied by a copy of the school grade report or a certificate of completion to the Human Resources Department who shall, if the employee satisfactorily completes the course, forward it to the Controller for payment. Reimbursement may include the costs of tuition and related fees. The County will reimburse up to fifty dollars ($50.00) per course for books and other related course materials (excluding laptops and other electronic devices) under conditions specified in the Tuition Reimbursement program. Reimbursement for books will only be made for community college, undergraduate level or graduate level courses.

## Section 14. Career Incentive Allowance for Law Enforcement Officers

A. Employees in the classes of Deputy Sheriff, and District Attorney's Inspector who have successfully completed a probationary period of one of those classes and hold permanent status, shall be eligible to

18

CSM 00022

receive an incentive allowance equating to two and one-half percent (2.5%) of base pay per biweekly pay period in addition to all other compensation if they possess the intermediate Peace Officers Standards and Training (POST) Certificate.

B.   Employees in the classes of Deputy Sheriff, and District Attorney's Inspector who have successfully completed a probationary period of one of those classes and hold permanent status, shall be eligible to receive an incentive allowance equating to an additional five percent (5%) of base pay per biweekly pay period (for a total of seven and one-half percent (7.5%) if they possess the Advanced POST Certificate issued by the Commission of Peace Officer Standards and Training of the California State Department of Justice.

C.   These same incentive allowances will apply to Sheriff's Correctional Officers who possess the POST recognized equivalencies for the intermediate and advanced certificates. However, employees hired into the Correctional Officer classification who previously held the classification of Deputy Sheriff, shall have the time in the Deputy Sheriff classification count towards this incentive for Correctional Officer.

D.   The permanent status requirement shall not apply to probationary employees who have laterally transferred to San Mateo County positions from other jurisdictions.

## Section 15. Layoff and Reemployment

### 15.1   Notice of Layoff

The department head will give at least 14 days advance written notice to employees to be laid off unless a shorter period of time is authorized by the Human Resources Director.

### 15.2   Precedence by Employment Status

No permanent employee shall be laid off while employees working in an extra help, seasonal, temporary, provisional or probationary status are retained in the same class unless that employee has been offered the extra help, seasonal, temporary or provisional appointment. The order of layoff among employees not having permanent status shall be according to the following categories:

(1)  Extra help or seasonal
(2)  Temporary
(3)  Provisional
(4)  Probationary

Layoffs shall be by job class according to reverse order of seniority as determined by total continuous County civil service, except as specified above.

The following provisions shall apply in computing total continuous service:

(1)  The following shall count as County service:
    a.  Time spent on military leave,
    b.  Leaves to accept temporary employment of less than one (1) year outside the County government, and
    c.  Leave to accept a position in the unclassified service.

(2)  Periods of time during which an employee is required to be absent from their position due to an injury or disease for which they are entitled to and currently receiving Worker's Compensation benefits shall be included in computing length of service for purposes of determining seniority rights.

19

(3) Time worked as an extra help or seasonal shall not count as County service.

(4) Time worked in a permanent, probationary, provisional or temporary status shall count as County service. Part-time status shall count at the rate of one (1) year of continuous employment for each two thousand eighty (2080) straight-time hours worked.

If two (2) or more employees have the same seniority, the examination scores for their present classes shall determine seniority.

15.3  Procedures

(1) Employees who are laid off may take a voluntary demotion within the Sheriff's Office or District Attorney's Office to a class in which the employee had prior probationary or permanent status provided such a position is held by an employee with less seniority.

(2) Displaced employees may request the Human Resources Director to place their name on the promotional eligible list or open eligible list for any class for which, in the Director's opinion, the employee is qualified. The employee's name will be above the names of persons who have not been displaced, ranked in the order specified in subsection 15.2.

(3) Pursuant to the Civil Service Rules, an employee may with the approval of the Human Resources Director and the gaining department head demote or transfer to a vacant position in the Sheriff's Office or District Attorney's Office for which they possess the necessary skills and fitness.

At the sole discretion of the Human Resources Director, an employee may be allowed to transfer and displace a less senior employee in a position in the Sheriff's Office or District Attorney's Office in which they had prior probationary or permanent status and which the Director determines is equivalent with respect to duties and responsibilities to the position the employee presently occupies.

(4) A transfer is defined as a change from one position to another in the same class, the salary range of which is not more than 10.0% higher.

(5) Part-time employees shall not displace full-time employees, unless the part-time employee has held full-time status in the class.

(6) In addition to all other options, employees in classes at risk of being eliminated, as determined by the affected department head, may also be placed on the reinstatement list.

15.4  Names of Employees Laid Off to be Placed on Re-employment and General Eligible Lists

The names of employees laid off shall be placed on re-employment eligible lists as hereinafter specified. Former employees appointed from a re-employment eligible list shall be restored all rights accrued prior to being laid off, such as sick leave, vacation credits and credit for years of service. However, such reemployed employees shall not be eligible for benefits for which they received compensation at the time of, or subsequent to, the date they were laid off.

The departmental reemployment eligible list for each class shall consist of employees and former employees with probationary or permanent status who were laid off or whose positions were reclassified downward. The rank order on such lists shall be determined by relative seniority as specified in section 15.2. Such lists shall take precedence over all other eligible lists in making certifications to the department in which the employee worked. The general reemployment eligible list for each class shall consist of employees and

20

former employees with probationary or permanent status who were laid off or whose positions were reclassified downward. The rank order on such lists shall be determined by relative seniority. Such lists shall take precedence over all other eligible lists, except departmental reemployment eligible lists, in making certifications on a Countywide basis.

The provisions of this subsection 15.4 shall not apply to employees who have accepted severance pay upon termination of employment.

15.5    Abolition of Position

The provisions of Section 15 shall apply when an occupied position is abolished resulting in a classified employee losing status in their assigned class in their assigned department.

## Section 16. Severance Pay

If an employee's position is abolished and they are unable to displace another County employee as provided in Section 15, they shall receive reimbursement of fifty percent (50%) of the cash value of their unused sick leave; provided that such employee shall be eligible for reimbursement only if they remain in the service of the County until their services are no longer required by the department head. The County shall make every effort to secure comparable employment for the displaced employee in other agencies, and if such employment is secured, they will not be entitled to the aforementioned reimbursement.

## Section 17. Holidays

17.1    Regular full-time employees shall receive either eight (8) hours of pay or eight (8) hours of holiday leave for all authorized holidays listed in 17.3, provided they are in a full pay status on both their regularly scheduled workdays immediately preceding and following the holiday. An employee may carry a maximum of one hundred and twenty (120) hours of holiday leave on the books.

Part-time employees shall be entitled to holiday pay in proportion to the average percentage of full-time hours worked during the two (2) pay periods immediately preceding the pay period which includes the holiday.  If two or more holidays fall on succeeding or alternate pay periods, then the average full-time hours worked in the two (2) pay periods immediately preceding the first holiday shall be used in determining the holiday pay entitlement for the subsequent holiday.

17.2    Employees regularly scheduled to work a 9/80 or 4/10 schedule may use vacation, accrued holiday pay or compensatory time off to account for the additional one or two hours of their shift, or they can request to flex those hours within the same work week, with approval of their supervisor.

17.3    County Holidays
   (1)  January 1 (New Years' Day)
   (2)  Third Monday in January (Martin Luther King, Jr.'s Birthday)
   (3)  Third Monday in February (Washington's Birthday)
   (4)  Last Monday in May (Memorial Day)
   (5)  June 19 (Juneteenth)
   (6)  July 4 (Independence Day)
   (7)  First Monday in September (Labor Day)
   (8)  Second Monday in October (Indigenous Peoples' Day/Columbus Day)
   (9)  November 11 (Veterans Day)
   (10)  Fourth Thursday in November (Thanksgiving Day)

21

(11) Fourth Friday in November
(12) December 25 (Christmas Day)
(13) Every day appointed by the President of the United States or Governor of California to be a day of public mourning, thanksgiving or holiday. Granting of such holidays shall be discretionary with the Board of Supervisors.
(14) Effective upon Board of Supervisors' approval of a successor MOU in 2022, the Lincoln's birthday holiday will be converted to a floating holiday, for which Regular full-time employees shall receive six (6) hours of holiday leave which will accrue on February 12 each year. The floating holiday hours may be used starting the first pay period that begins after February 12 each year. The value of the holiday is reduced from eight (8) hours to six (6) hours as the Association's contribution to the President's Release Time.

17.4  If the Legislature or the Governor appoints a date different from the one shown above for the observance of one of these holidays, then San Mateo County shall observe the holiday on the date appointed by the Legislature or the Governor.

17.5  If one of the holidays listed above falls on Sunday, the holiday will be observed on Monday.

If any of the above holidays falls on a day other than Sunday and an employee is not regularly scheduled to work that day, or if an employee is required to work on a holiday, they shall be entitled to equivalent straight time off with pay. This equivalent straight time off is limited to one hundred twenty (120) hours with any time earned in excess of one hundred twenty (120) hours cashed out at the equivalent straight time rate. If an employee leaves County service with accrued hours, those hours will be cashed out. If, however, the department head determines, in their sole discretion, that in the case of an employee in Work Group 1 the requirements of the service make it not feasible to add equivalent straight time to the employee's vacation accumulation, the employee shall be paid for the holiday on the basis of straight time but not to exceed eight (8) hours for any one (1) holiday.

17.6  Employees working more than their regularly scheduled shift on a holiday shall be compensated for such excess time as provided in Section 8, Overtime.

## Section 18. Vacations

18.1  Vacation Allowance

Effective the first full pay period following Board of Supervisors' approval of a successor MOU in 2022, employees, excluding extra help or as herein otherwise provided, shall be entitled to vacation with pay in accordance with the following schedules. Such accrual shall be prorated for any employees, except extra help, who work less than full-time during a pay period.

(1) During the first five (5) years of continuous service, vacation will be accrued at the rate of 4.0 hours per biweekly pay period worked.
(2) After the completion of five (5) years of continuous service, vacation will be accrued at the rate of 5.0 hours per biweekly pay period worked.
(3) After the completion of ten (10) years of continuous service, vacation will be accrued at the rate of 6.0 hours per biweekly pay period worked.
(4) After the completion of fifteen (15) years of continuous service, vacation will be accrued at the rate of 7.0 hours per biweekly pay period worked.
(5) After the completion of twenty (20) years of continuous service, vacation will be accrued at the rate of 8.0 hours per biweekly pay period worked.
(6) After the completion of twenty-five (25) years of continuous service, vacation will be accrued at the

22

rate of 9.0 hours per biweekly pay period worked.

(7)   No employee may carry an accumulation of vacation hours exceeding the amount that can be accrued within fifty-two (52) biweekly pay periods at any one time. However, employees may accrue unlimited vacation time in excess of the maximum when such vacation accrues due to remaining in a pay status during periods of illness or injury which precluded liquidating vacation credits earned in excess of the maximum allowed.

(8)   No vacation will be permitted prior to the completion of thirteen (13) full biweekly pay periods of continuous service.

(9)   Vacation may be used in increments of six (6) minutes.

(10)  Extra help do not accrue vacation credits, except that the service of an employee in an extra help capacity may be included with service in a regular established position in computing vacation allowance for the purpose of this Section. However, such service in an extra help or seasonal capacity may not be included if it preceded a period of over thirty (30) days during which the employee was not in a pay status.

18.2  Vacation Schedule

The time at which employees shall be granted vacation shall be at the discretion of the appointing authority. Length of service and seniority of employees shall considered in scheduling vacations and in giving preference as to vacation time.

18.3  Vacation Allowance for Separated Employees

When an employee is separated from County service any remaining vacation allowance shall be added to the final compensation.

18.4  Vacation Pay

Payment for vacation shall be at the base pay of the employee plus applicable differential, if any, as provided in Section 10.

## Section 19. Sick Leave

19.1  Accrual

Effective until February 4, 2023, employees shall accrue "old sick leave" at the rate of three and seven-tenths (3.7) hours for each biweekly pay period of full-time work.  Such accrual shall be prorated for any employee who works less than full time during a pay period. For the purpose of this Section, absence in a pay status shall be considered work. Effective February 5, 2023, "old sick leave" will cease to accrue for all employees.

Effective February 5, 2023, all employees, except extra help or seasonal, shall accrue "new" sick leave at the rate of three and seven-tenths (3.7) hours for each biweekly pay period of full-time work. "New" sick leave will have no cash value and will not have conversion value for the purpose of sick leave conversion for retiree health coverage. Such accrual shall be pro-rated for employees, except extra help or seasonal employees, who work less than full-time during a pay period. For purposes of this Section absence in a pay status shall be considered work.

"New" sick leave can accrue up to a cap of nine hundred sixty (960) hours. Once an employee accrues up to the cap of nine hundred sixty (960) hours, the employee will cease to accrue sick leave until such time the employee uses sick leave to reduce accrued hours below the cap.

23

DocuSign Envelope ID: 2A2C4A26-0F3F-4341-8952-12FED0FD582A

A break in service of twenty-eight (28) days or more will result in the forfeiture of all accrued, unused old and new sick leave. An approved leave of absence, including FMLA/CFRA, disability, and pregnancy disability leave, will not constitute a break in service for the purpose of this section.

19.2  "New" Sick Leave Usage

"New" sick leave, plus up to one hundred ninety- two (192) hours of "old" sick leave, is accrued paid leave from work that can be used for any of the following purposes:

A.  Diagnosis, care, or treatment of an employee's illness, injury, health condition, or exposure to contagious disease which incapacitates them from performance of duties. This includes disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth, and recovery therefrom as determined by a licensed health care professional.

B.  The employee's receipt of preventative care or required medical or dental care or consultation.

C.  The employee's attendance, for the purpose of diagnosis, care, or treatment of an existing health condition of, or preventative care, on a member of the immediate family who is ill. For the purpose of this Section, immediate family means parent, spouse, registered domestic partner, child, stepchild, sibling, parent-in-law, grandparent or grandchild.  The employee's preparation for or attendance at the funeral of a member of the immediate family. For the purpose of preparation for or attendance at a funeral, immediate family also includes child-in-law, grandparent-in-law, and sibling-in-law.  Use of sick leave for this expanded definition is limited to a maximum of three (3) days if travel is required.

D.  The employee's attendance to an adoptive child or to a child born to the employee or the employee's spouse or registered domestic partner for up to six (6) weeks immediately after the birth or arrival of the child in the home.  Sick leave used concurrently with California Family Rights Act (CFRA) leave for the purpose of bonding following the birth, adoption or foster care placement of a child of the employee must be concluded within one (1) year of the birth or placement of the child. The basic minimum duration of such leave is two (2) weeks. However, an employee is entitled to leave for one of these purposes (e.g. bonding with a newborn) for less than two (2) weeks duration on any two (2) occasions.

E.  An employee who is a victim of domestic violence, sexual assault, or stalking may use up to one half (1/2) of their annual sick leave allotment to:

1.  Obtain or attempt to obtain a temporary restraining order or other court assistance to help ensure the health safety or welfare of the employee or their child; or

2.  Obtain medical attention or psychological counseling; services from a shelter; program or crisis center; or participate in safety planning or other actions to increase safety.

An employee may elect to use their full amount of "new" sick leave in advance of drawing on "old" sick leave accrued.

19.3  Procedures for Requesting and Approving Sick Leave

When the requirement for sick leave is known to the employee in advance of the absence, they shall request authorization for sick leave at such time, in the manner hereinafter specified. In all other instances the employee shall notify their supervisor as promptly as possible by telephone or other means. Before an employee may be paid for the use of accrued sick leave, they shall complete and submit to their department head a signed statement, on a prescribed form, stating the dates and hours of absence and such other information as is necessary for the request to be evaluated. If an employee does not return to work prior to the preparation of the payroll, other arrangements may be made with the approval of the department head

24

and the Controller.

The department head may require a physician's statement from an employee who applies for sick leave or make whatever investigation into the circumstances that appears warranted before taking action on the request.

19.4    Accounting for Sick Leave

Sick leave may be used in increments no smaller than six (6) minutes. Payment for sick leave used shall be at the employee's base pay plus applicable differential, if any, as provided in Section 10.

19.5    Credits

When an employee who has been working in a seasonal or extra help category is appointed to a permanent position they may receive credit for such extra help or seasonal period of service in computing accumulated sick leave, provided that no credit shall be given for service preceding any period of more than twenty-eight consecutive days in which an employee was not in a pay status.

If an employee who has unused sick leave accrued is laid off and subsequently reemployed in a permanent position, such sick leave credits shall be restored upon reemployment. No portion of sick leave credits for which an employee received compensation at the time of or subsequent to the day of layoff shall be restored.

19.6    Incapacity to Perform Duties

If the appointing authority has been informed through a doctor's report of a medical examination that an employee is not capable of properly performing their duties, they may require the employee to abstain  from work until the incapacity is remedied. During such absence the employee may utilize any accumulated sick leave, vacation, holiday and compensatory time.

19.7    Use of Sick Leave While on Vacation

An employee who is injured or becomes ill while on vacation may be paid for sick leave in lieu of vacation provided that the employee: (1) was hospitalized during the period for which sick leave is claimed, or (2) received medical treatment or diagnosis and presents a statement indicating illness or disability signed by a physician covering the period for which sick leave is claimed, or (3) was preparing for or attending the funeral of a member of the immediate family. No request to be paid for sick leave in lieu of vacation will be considered unless such request is made and the above substantiation is provided within the pay period during which the employee returns to work.

19.8 Sick Leave During Holiday

Paid holidays shall not be considered as part of any period of sick leave, unless the employee is scheduled to work on that holiday.

19.9    Catastrophic Leave

Leave credits may be transferred from one or more donating employees to another receiving employee under the following conditions:

(1) The receiving employee is a permanent full or part-time employee whose participation has been approved by their department head;

25

(2) The receiving employee or the receiving employee's spouse/domestic partner or direct family member has sustained a life threatening or debilitating illness, injury or condition. (The Department Head may require that the condition be confirmed by a doctor's report);

(3) The receiving employee has or will have exhausted all paid time off;

(4) The receiving employee must be prevented from returning to work for at least 30 days and must have applied for a medical leave of absence.

<u>Transferring Time</u>

Vacation and holiday time may be transferred by employees in all work groups. Comp time may be transferred only by employees in work groups 1, 4, and 5. Sick leave may be transferred at the rate of one hour of sick leave for every four hours of other time (i.e., holiday, vacation, or comp time). Donated time will be converted from the type of leave given to sick leave and credited to the receiving employee's sick leave balance on an hour-for-hour basis and shall be paid at the rate of pay of the receiving employee. Donations must be a minimum of 8 hours and thereafter in whole hour increments. The total leave credits received by the employee shall normally not exceed three months; however, if approved by the department head, the total leave credits received may be up to a maximum of one year.

Donations shall be made on a Catastrophic Leave Time Grant form signed by the donating employee and approved by the receiving employee's department head. Once posted, these donations are irrevocable except in the event of the untimely death of a Catastrophic Leave recipient, in which event, any excess leave will be returned to donating employees on a last in-first out basis (i.e., excess leave returned to the last employee(s) to have donated).

<u>Appeal Rights</u>

Employees denied participation in the program by the department head may appeal to the Human Resources Director and the County Manager whose decision shall be final.

## **Section 20. Leaves of Absence**

20.1   General

Employees shall not be entitled to leaves of absence as a matter of right, but only in accordance with the provisions of law and the County Ordinance Code. Unless otherwise provided, the granting of a leave of absence also grants to the employee the right to return to a position in the same or equivalent class, in the same department as held at the time the leave was granted. The granting of any leave of absence shall be based on the presumption that the employee intends to return to work upon the expiration of the leave. However, if a disability retirement application has been filed with the County Board of Retirement a leave may be granted pending decision by that Board. Nothing is this Section 20 shall abridge an employee's rights under the Family and Medical Leave Act.

Total Period of Leave: Except for Disability Leaves as provided above and in Section 20.4 (2) (c), no leave of absence or combination of leaves of absence when taken consecutively, shall exceed a total period of 26 biweekly pay periods.

Approval and Appeals: Initial approval or disapproval of any leave of absence shall be by the department head; leaves of absence of more than 2 biweekly pay periods must also be approved by the Human Resources Director. Denials in whole or in part at the department head level may be appealed to the Human

26

DocuSign Envelope ID: 2A2C4A26-0F3F-4341-8952-12FED0FD582A

Resources Director whose decision shall be final.

20.2   Benefit Entitlement

Employees on leaves of absence without pay for more than one (1) month shall not be entitled to payment by the County of their health, dental, vision, life or long term salary continuation insurance premiums, except as provided hereinafter. Entitlement to County payment of premiums shall end on the last day of the month in which the employee was absent one (1) full calendar month. An employee granted a leave of absence without pay due to their illness or accident shall be entitled to have one (1) month of the County's contribution to insurance premiums paid by the County for each year of County service, or major fraction thereof, to a maximum of twelve (12) months payment of premiums.

Where applicable, payment of the County's portion of the insurance premiums described in this Section 20.2 shall count concurrently toward fulfillment of statutory requirements for payment of the County's contributions toward health insurance, such as under the Family Medical Leave Act (FMLA), California Family Rights Act (CFRA), California Pregnancy Disability Leave (PDL), and military leave.

20.3   Seniority Rights and Salary Adjustments

Authorized absence without pay for either: (1) a leave of absence for personal reasons; (2) a leave of absence on account of illness or injury not compensated through Worker's Compensation benefits; or (3) a leave of absence to fill an unexpired term in an elective office shall not be included in determining salary adjustment rights or any seniority rights based on length of employment.

20.4 Job Incurred Disability Leave

(1)   Job Incurred Disability Leave With Pay

(A)   Definition: Disability leave with pay is an employee's absence from duty with pay due to disability caused by illness or injury arising out of and in the course of employment which has been declared compensable under the Workers' Compensation Law. Only permanent or probationary employees occupying permanent positions are eligible for disability leave with pay.

(B)   Payment: Payment of disability leave shall be at the base pay of the employee and shall be reduced by the amount of temporary disability indemnity received pursuant to Workers' Compensation Law.

(C)   Application for and Approval of Job Incurred Disability Leave With Pay: In order to receive pay for disability leave, an employee must submit a request on the prescribed form to the appointing authority describing the illness or accident and all information required for the department head to evaluate the request. The employee must attach a statement from a physician certifying to the nature, extent and probable period of illness or disability. No job incurred disability leave with pay may be granted until the State Compensation Insurance Fund or County Workers Compensation Adjuster has declared the illness or injury compensable under Workers Compensation Law and has accepted liability on behalf of the County, or the Workers Compensation Appeals Board has ordered benefits to be paid.

(D)   Length of Job Incurred Disability Leave With Pay: Eligible Safety employees, as defined in the Government Code and in determinations made by the San Mateo County Board of Retirement, shall be entitled to disability leave for the period of incapacity as determined by a physician, but not to exceed a maximum of 26 biweekly pay periods. Holidays falling within the period of disability shall extend the maximum days allowed by the number of such holidays.

27

(2)   Job Incurred Disability Leave Without Pay

    (A)   Definition: Disability leave without pay is an employee's absence from duty without County pay due to disability caused by illness or injury arising out of and in the course of employment which has been declared compensable under Workers' Compensation Law. Only permanent or probationary employees occupying permanent positions are eligible for disability leave without pay. Such leave is taken after the disabled employee has used up allowable disability leave with pay, as well as accrued credits for sick leave. At the employee's option, vacation and compensatory time off accruals may also be used.

    (B)   Application for and Approval of Job Incurred Disability Leave Without Pay: To receive disability leave without pay an eligible employee must submit a request on the prescribed form to the appointing authority describing the illness or accident and all information required for the appointing authority to evaluate the request. The employee must attach a physician's statement certifying to the nature, extent and probable period of illness or disability.

    (C)   Length and Amount of Job Incurred Disability Leave Without Pay: Job incurred disability leave without pay may not exceed a maximum of two years for eligible Safety members of the Retirement System for anyone injury. The combined total of disability leave with pay and disability leave without pay for one accident or illness may not exceed this two year period. If an employee is disabled and is receiving Workers' Compensation benefits this leave may be extended as long as such disability continues.

20.5   Leave of Absence Without Pay

(1)   Qualifying: Only permanent or probationary employees in permanent positions are eligible for leaves of absence without pay under this Section.

(2)   Granting of Leaves of Absence Without Pay: Appointing authorities may grant leave of absence without pay for personal reasons up to a maximum of two biweekly pay periods.

(3)   Leaves of Absence Without Pay for Non-Job Incurred Illness or Injury: Leaves of absence without pay for non-job incurred illness or injury, including disabilities caused or contributed to by pregnancy, miscarriage, abortion, childbirth and recovery therefore may be granted for a maximum of 26 full biweekly pay periods. Such leaves will be granted only after all accrued sick leave has been used and must be substantiated by a physician's statement.

(4)   Parental Leave: An employee/parent of either sex may be granted a leave of absence without pay for the purpose of fulfilling parenting responsibilities during the period of one year following the child's birth, or one year following the filing of application for adoption and actual arrival of child in the home. Such leave shall be for a maximum period of 13 biweekly pay periods. Use of accrued vacation, sick, compensatory time or holiday credits shall not be a pre-condition for the granting of such parental leave.

(5)   Leaves of Absence Without Pay for Personal Reasons: Leaves of absence without pay on account of personal reasons may be granted for a maximum period of 13 full biweekly pay periods. Such leaves shall only be granted after all accrued vacation and holiday credits have been used.

20.6   Military Leaves of Absence

The provisions of the Military and Veterans Code of the State of California shall govern military leave of County employees.

28

20.7   Absence Due to Required Attendance in Court

Upon approval by the department head, any employee, other than extra help or seasonal, shall be permitted absence from duty for appearance in Court because of jury service, in obedience to subpoena or by direction of proper authority, in accordance with the following provisions:

(1)   Absence from duty will be with full pay to a maximum of eight (8) hours for each day the employee serves on the jury or testifies as a witness in a criminal case, other than as a defendant, including necessary travel time. As a condition of receiving such full pay, the employee must remit to the County Treasurer, through the employee's department head, within 15 days after receipt, all fees received except those specifically allowed for mileage and expenses.

(2)   Attendance in Court in connection with an employee's usual official duties or in connection with a case in which the County of San Mateo is a party, together with travel time necessarily involved, shall not be considered absence from duty within the meaning of this Section.

(3)   Absence from duty will be without pay when the employee appears in private litigation to which the County of San Mateo is not party.

(4)   Any fees allowed, except for reimbursement of expenses incurred, shall be remitted to the County Treasurer through the employee's department head.

(5)    An employee required to appear in court in a matter unrelated to their County job duties or because of civil or administrative proceedings that they initiated does not receive compensation for time spent related to those proceedings. An employee may request to receive time off using vacation, compensatory, holiday or voluntary time off if accrued balances are available, or will be in an unpaid status, for time spent related to these proceedings. The time spent in these proceedings is not considered work time. This provision does not apply to grievance proceedings pursuant to this MOU, San Mateo County Civil Service Commission proceedings, EAP or Peninsula Conflict Resolution Center (PCRC) mediation proceedings, or administrative proceedings related to the Meyers-Milias-Brown Act or the MOU between the parties.

(6)   Notification to their supervisor is required within one business day of receipt of a subpoena or summons to appear.

20.8   Absence Without Leave

(1)   Refusal of Leave or Failure to Return After Leave: Failure to report for duty after a leave of absence request has been disapproved, revoked or canceled by the appointing authority, or at the expiration of a leave, shall be considered an absence without leave.

(2)   Absence Without Leave: Absence from duty without leave for any length of time without an explanation satisfactory to the appointing authority is cause for dismissal. Absence without leave for four or more consecutive days without an explanation satisfactory to the appointing authority shall be deemed a tender of resignation. If within thirty days after the first day of absence without leave a person makes an explanation satisfactory to the Board of Supervisors, the Board may reinstate such person.

20.9   Educational Leave of Absence With Pay

Educational leave of absence with pay may be granted to employees under the conditions specified in this

29

Section. In order to be granted educational leave of absence with pay employees must submit on the prescribed form a request to the appointing authority containing all information required to evaluate the request. The County may, after approval of an employee's application, grant leave of absence with pay for a maximum of sixty-five (65) working days during any fifty-two (52) biweekly pay periods for the purpose of attending a formal training or educational course of study. Eligibility for such leaves will be limited to employees with at least thirteen (13) biweekly pay periods of continuous service and who are not extra help, temporary or seasonal. Such leaves will be granted only in cases where there is a reasonable expectation that the employee's work performance or value to the County will be enhanced as a result of the course of study. Courses taken as part of a program of study for a college undergraduate or graduate degree will be evaluated individually for job-relatedness under the above described criteria. The employee must agree in writing to continue working for the County for at least the following minimum periods of time after expiration of the leave of absence:

| Length of Leave of Absence | Period of Obligated Employment |
|---|---|
| 44 to 65 workdays | Fifty-two biweekly pay periods |
| 22 to 43 workdays | Twenty-six biweekly pay periods |
| 6 to 21 workdays | Thirteen biweekly pay periods |

## Section 21. Hospitalization and Medical Care

21.1   Medical Insurance
(a) Employees Assigned to Work Eighty (80) Hours Per Pay Period:

The County pays eighty-five percent (85%) of the total premium for the County-offered group HMO and High Deductible Health plans (employees pay fifteen percent (15%) of the total premium.

For full time employees enrolled in the High Deductible Health Plan, the County will annually contribute fifty percent (50%) of the cost of the deductible amount for the plan to a Health Savings Account.

The County pays seventy-five percent (75%) of the total premium for the County-offered group PPO plan (employees pay twenty-five percent (25%) of the total premium).

(b) Employees Occupying Permanent Part-Time Positions Who Work Less Than Eighty (80) Hours Per Pay Period:

For employees occupying permanent part-time positions, who work a minimum of forty (40), but less than sixty (60) hours in a biweekly pay period, the County will pay one-half (1/2) of the County contribution to hospital and medical care premiums described above.

For employees occupying permanent part-time positions who work a minimum of sixty (60) but less than eighty (80) hours in a biweekly pay period, or qualify for health benefits under the Affordable Care Act (ACA) the County will pay eighty-five percent (85%) of the County-offered group High Deductible Health Plan (HDHP) or three-fourths (3/4) of the County contribution to hospital and medical care premiums described above.

For part time employees working half time or more who are enrolled in the High Deductible Health Plan, the County will annually contribute a pro-rated amount of fifty percent (50%) of the cost of the deductible amount for the plan to a Health Savings Account, based on the employee's part time status.

30

(c) Healthcare Legislation Changes

Upon request from the County or Union, the parties will reopen Section 21 during the term of the agreement to address changes (including changes to taxation) under the Affordable Care Act or other healthcare legislation.

21.2   Retiree Health

21.2.1   Retiree Medical Trust

Effective February 5, 2023, the Association will establish participation in the retiree medical expense reimbursement plan administered by the PORAC Retiree Medical Trust ("Trust"), to which the County and employees contribute to save, on a nontaxable basis, money to help pay the cost of eligible medical expenses after terminating from County employment. The Trust is intended to constitute a "health reimbursement arrangement" within the meaning of IRS Notice 2002-45.

The cost of establishing the Trust shall be at no cost to the County. The County is not a party to the Trust. Participation in the Trust shall be the complete and sole responsibility of the Association. Aside from transferring funds, the County has no obligations to the management, regulatory compliance or performance of the Trust. In the event the Trust becomes insolvent or unable to pay, the County has no financial obligation to the Trust, the employees covered by this Agreement, or the Association, including no obligation to provide a lifetime benefit to employees covered by this Agreement.

The Association agrees to defend, indemnify and hold the County, its agents, officers, and employees harmless from any liability of any nature which may arise as a result of employee participation in the PORAC RMT, including any and all claims or legal proceedings regarding the operation of the Trust, except for the obligation of the County to make and report employee and County contributions to the Trust as described in this MOU.

The monies contributed to the Trust on behalf of employees and retirees shall only be used for the sole purpose of providing funding for retiree health insurance premiums or reimbursement of retiree health care expenses, as permitted by law. The employee assumes full responsibility and liability for tax consequences related to contributions to and/or withdrawals from the PORAC Retiree Medical Trust. There shall be no employee election or option to take the contribution amount in cash. The Trust shall be and remain separate and apart from any of the County's health insurance funding programs.

A.   Contributions

The following contributions will be made to the Trust on behalf of each employee:

1.   County Contributions:

Effective February 5, 2023, for employees hired on or after February 5, 2023 who achieve five (5) years of continuous regular full-time service with the County, the County will contribute fifty dollars ($50) per month to each employee's account. In recognition of the first five (5) years of regular full-time service, upon the employee reaching such anniversary, the County will deposit in the Trust a

31

lump sum of three thousand dollars ($3,000) which is equivalent to fifty dollars ($50) for every month of service following February 5, 2023 up to the employee's five (5) year anniversary.

County contributions to the Trust will be made only during periods for which the employee is receiving County compensation. For example, an employee on unpaid leave will not be entitled to such County contributions. In addition, the $50 County contribution amount will apply to full-time employees; the contribution amounts for less-than-full-time employees will be pro-rated according to those employees' work schedules.

Upon an employee's separation from employment with the County, the County will cease contributions to the Trust on behalf of that individual.

Employees will have no vested right in ongoing County contributions to the Trust. The contributions may be increased, decreased or frozen at any time in accordance with future MOU's.

2. Mandatory Employee Contributions:
   Three types of employee contributions will be made to the Trust, as specified below. These employee contributions are mandatory. No employee will have any right to elect to receive cash or any benefit in lieu of the contributions. The contribution amount for employees represented by the Organization of Sheriffs Sergeants (OSS) will not exceed the contribution amount for employees represented by the DSA.

   a. Regular Contribution: Effective February 5, 2023, each employee regardless of hire date will contribute one hundred dollars ($100) per month to the employee's Trust. These contributions will be deducted from the employee's County compensation. The contribution amounts specified in this paragraph will apply to full-time employees; contribution amounts for less-than-full-time employees will be pro-rated according to those employees' work schedules. Contributions to the plan must be uniform across bargaining unit members. The Association may notify the County as to changes to employee contributions; the frequency of contribution changes is subject to approval by the Trust.

   b. Unused Vacation Accruals: At separation from County service, fifty percent (50%) of the employee's earned and unused vacation will be cashed out and deposited into the employee's Trust; except if the employee dies while in County employment, then vacation accruals will not be deposited into the employee's Trust and will instead be converted to cash and distributed to the employee's estate.

   c. Converted Old Sick Leave for Employees Hired Before February 5, 2023. Upon retirement from County service, contributions of "old" sick leave will be made to an eligible employee's Trust subject to the terms and conditions specified below.

B. Vesting

An employee's Trust contributions, including any allocable investment earnings, are 100% vested at all times.

32

To become vested in the County's contributions to the Trust, an employee must complete five (5) years of continuous, full time (or full time equivalent), paid County employment in a regular position. A break in service of twenty-eight (28) days or more will result in the exclusion of prior service in calculation of the employee's Trust vesting service requirement. If an employee's County employment terminates before completion of five (5) years of continuous County employment, all County contributions to the employee's Trust, including any allocable investment earnings, will be forfeited.

C.  Distributions

After an employee retires from County employment, the employee's Trust funds may be used for any eligible medical expenses incurred by the employee, the employee's spouse, or the employee's eligible dependents. "Eligible medical expenses" are expenses described in section 213(d) of the Internal Revenue Code, as amended from time to time, including but not limited to, qualifying insurance premiums. Trust funds may not be used for any other purpose.

In accordance with the federal tax laws, any Trust benefits cannot be provided with respect to a Trust participant's registered domestic partner, and thus such payments must be made out of pocket.

In addition, the use of the Trust funds will be subject to the terms of the governing Trust plan document.

The parties acknowledge that the Trust plan will be subject to non-discrimination testing. Non-compliance with non-discrimination rules may result in taxation of discriminatory coverage. In the event of taxation of discriminatory coverage, the parties will reevaluate and negotiate changes to the plan design to comply with non-discrimination rules.

21.2.2  Old" Sick Leave Conversion

**The following terms apply to employees hired by the County before February 5, 2023:**

A.  Effective February 5, 2023, all employees hired before February 5, 2023 will contribute two and eight-tenths percent (2.8%) of the employee's base wage rate each pay period for the duration of their employment with the County, to the County to offset the costs of retiree medical benefits described herein. These contributions are mandatory.

B.  "Old" sick leave will be defined as sick leave earned before February 5, 2023. Old Sick Leave will cease to accrue as of February 5, 2023 ("transition date"). For employees hired by the County before February 5, 2023, old sick leave accrued and unused as of February 5, 2023, with the exception of one hundred ninety-two (192) hours, will be removed from the employee's sick leave bank. A record of the number of frozen hours of old sick leave will be kept on file with the County, pending the employee's retirement from County service.

C.  Employees hired before February 5, 2023will retain up to one hundred ninety-two (192) hours of accrued, unused Old Sick Leave in their sick leave bank to use as needed.
   1.  Employees hired before February 5, 2023 who take long-term, FMLA, CFRA or disability (including pregnancy disability) leaves of absence on or after February 5, 2023, who exhaust their one hundred ninety-two (192) hours of Old Sick Leave hours, as well as their New Sick Leave

33

2A2C4A26-0F3F-4341-8952-15FED0FD582A

accrued after February 5, 2023, will be permitted to use additional hours of Old Sick Leave upon request for sick leave purposes listed in this MOU.

2. Employees hired before February 5, 2023 who have less than one hundred ninety-two (192) hours of accrued, unused Old Sick Leave in their sick leave bank will retain remaining Old Sick Leave in their sick leave bank to use as needed.

D. For the purpose of this Section 21.2.2 only, prior years of service with Half Moon Bay Police Department, Millbrae Police Department and San Carlos Police Department immediately prior to such cities contracting with the County for law enforcement services will count toward the calculation of County Service.

E. A break in service of twenty-eight (28) days or more will result in the exclusion of prior service in the calculation of hire date and service time for the purpose of this section.

F. "Severed by reason of retirement" is defined as an employee retiring and drawing pension benefits from SamCERA simultaneous with separation from the County employment.

Retirement from County service is defined as drawing SamCERA pension benefits via a service or disability retirement immediately upon separation from the County.

If an employee separates from County service without retiring and does not return to County service within twenty-eight (28) days or less, the employee will forfeit all converted "old" sick leave amounts listed in this section, and will forfeit entitlement to all retiree health benefits described herein, except for vested contributions to the Trust. The employee will not receive any Trust contributions or other benefit with respect to the forfeited amounts.

**G. For Employees Hired By The County Before February 5, 2023 With Less Than Fifteen (15) Years Of Service Whose Employment With The County Is Severed By Reason Of Retirement:**

For employees hired prior to February 5, 2023 whose employment with the County is severed by reason of retirement during the term of this MOU, and who have less than fifteen (15) years of continuous, full-time regular service at retirement, the County will contribute to the Trust on behalf of the retiree in the amount of the employee's unused, frozen, "old" sick leave at the time of retirement on the following basis:

- For Tier 1 employees (defined as employees hired by the County prior to April 1, 2011 (except for those employees described in Tier 2 below) who maintain continuous County service without a break in service of more than twenty-eight (28) days), who retire from the County on or after February 5, 2023, each eight (8) hours of unused "old" sick leave at the time of retirement from County service will be converted to six hundred seventy-five dollars ($675).
- For Tier 2 employees (defined as employees hired by the County between July 1, 2011 and February 5, 2023, and employees hired before April 1, 2011 who made a prior, irrevocable election to go into Tier 2, who maintain continuous County service without a break in service of more than twenty-eight (28) days), who retire from the County on or after February 5, 2023, each eight (8) hours of unused "old" sick leave at the time of retirement from County service will be converted to four hundred dollars ($400).

34

The remaining one hundred ninety-two (192) hours of "old" sick leave will be maintained in the employee's sick leave bank to use as sick leave. Upon retirement from County service concurrent with separation from the County, the County will deposit any of the remaining, unused portion of the one hundred ninety-two (192) hours of "old" sick leave into the retiree's Trust, using the following conversion formula:

- For Tier 1 employees, each eight (8) hours of unused "old" sick leave at the time of retirement from County service will be converted to six hundred seventy-five dollars ($675).
- For Tier 2 employees, each eight (8) hours of unused "old" sick leave at the time of retirement from County service will be converted to four hundred dollars ($400).

Following retirement, retirees and dependents will have only one opportunity to enroll in County medical, dental and vision insurance plans. If the retiree and/or their dependents opt out of any of the above benefits following enrollment, the individual will not have an opportunity to opt back in to County medical, dental and vision insurance plans at a later date. Nothing in this section prohibits a retiree from using the benefit(s) and amounts outlined above towards a market-based plan (non-county plan) should the retiree elect to do so, either at the time of retirement, or at a later date.

**H. For Employees Hired By The County Before February 5, 2023 Whose Employment with the County is Severed by Reason of Retirement, Who Retire with Between Fifteen (15) and Twenty Years Of Service:**

For an employee hired before February 5, 2023, who has between fifteen (15) and twenty (20) years of County service, and whose employment with the County is severed by reason of retirement:

1. From the date of retirement until the retiree reaches the age of Medicare eligibility, the County will contribute five hundred dollars ($500) per month to the retiree for the purchase of medical, dental and vision insurance through the County health plans. For retirees not enrolled in County benefit plans, the County will deposit the $500 into the Trust on behalf of the retiree on a monthly basis.
   a. If the retiree passes away before the age of 65, the benefits payable to a surviving spouse will be two hundred fifty dollars ($250) per month paid until the retiree would have reached the age of Medicare eligibility; except, if the retiree passes away before the age of 65, and the retiree's surviving spouse has one or more dependent(s), the benefits payable to a surviving spouse will be four hundred dollars ($400) per month paid until the retiree would have reached the age of Medicare eligibility.
   b. Retirees who retire at or after age 65 (the age of Medicare eligibility) will not be eligible to receive any portion of the pre-65 benefit.
2. When the retiree reaches the age of Medicare eligibility, the County contributions specified herein will cease.
3. Following retirement, retirees and dependents will have only one opportunity to enroll in County medical, dental and vision insurance plans. If the retiree and/or their dependents opt out of any of the above benefits following enrollment, the individual will not have an opportunity to opt back in to County medical, dental and vision insurance plans at a later date. Nothing in this section prohibits a retiree from using the benefit(s) and amounts outlined above towards a market-based plan (non-county plan) should the retiree elect to do so, either at the time of retirement, or at a later date.
4. For retirees enrolled in County benefit plans, the County will contribute the contribution specified in Section 21.2.2(H)(1) toward the benefit premiums for the County medical, dental and vision benefits elected by the retiree and qualified dependents. If the cost of the premium(s) is greater

35

than the County's contribution, the retiree will be required to pay the difference through an automatic ACH bank withdrawal.  If the cost of the premium(s) is less than the County's contribution, the County will deposit the difference in the retiree's Trust.

5. At the time of retirement, the County will deposit into the Trust on behalf of the retiree an amount equal to fifty percent (50%) of the unused, frozen Old Sick Leave hours (plus fifty percent (50%) of any remaining, unused hours from the 192 hours of old sick leave left in the employee's sick leave bank as of the transition date), multiplied by the rate of employee's base hourly wage.

I. **For Employees Hired By The County Before February 5, 2023 Whose Employment with the County is Severed by Reason of Retirement, Who Retire with Twenty or More Years Of Service:**
For an employee hired before February 5, 2023, who has twenty (20) or more years of County service, and whose employment with the County is severed by reason of retirement:

1. From the date of retirement until the retiree reaches the age of Medicare eligibility, the County will contribute one thousand dollars ($1,000) per month to the retiree for the purchase of medical, dental and vision insurance through the County health plans. For retirees not enrolled in County benefit plans, the County will deposit the $1,000 into the Trust on the retiree's behalf on a monthly basis.
   a. If the retiree passes away before the age of 65, the benefits payable to a surviving spouse will be five hundred dollars ($500) per month paid until the retiree would have reached the age of Medicare eligibility; except, if the retiree passes away before the age of 65, and the retiree's surviving spouse has one or more dependent(s), the benefits payable to a surviving spouse will be eight hundred dollars ($800) per month paid until the retiree would have reached the age of Medicare eligibility.
   b. Retirees who retire at or after age 65 (the age of Medicare eligibility) will not be eligible to receive any portion of the pre-65 benefit.
2. When the retiree reaches the age of Medicare eligibility, the County contributions specified herein will cease.
3. Following retirement, retirees and dependents will have only one opportunity to enroll in County medical, dental and vision insurance plans. If the retiree and/or their dependents opt out of any of the above benefits following enrollment, the individual will not have an opportunity to opt back in to County medical, dental and vision insurance plans at a later date. Nothing in this section prohibits a retiree from using the benefit(s) and amounts outlined above towards a market-based plan (non-county plan) should the retiree elect to do so, either at the time of retirement, or at a later date.
4. For retirees enrolled in County benefit plans, the County will contribute the contribution specified in Section 21.2.2(I)(1) toward the benefit premiums for the County medical, dental and vision benefits elected by the retiree and qualified dependents. If the cost of the premium(s) is greater than the County's contribution, the retiree will be required to pay the difference through an automatic ACH bank withdrawal.  If the cost of the premium(s) is less than the County's contribution, the County will deposit the difference in the retiree's Trust.
5. At the time of retirement, the County will deposit an amount into the Trust on behalf of the retiree equal to fifty percent (50%) of the unused, frozen Old Sick Leave hours (plus fifty percent (50%) of any remaining, unused hours from the 192 hours of old sick leave left in the employee's sick leave bank as of the transition date), multiplied by the rate of employee's base hourly wage.
6. For Tier 2 employees who retire from County service with twenty (20) or more years of service, the County will deposit into the Trust on behalf of the retiree fifty percent (50%) of the equivalent of two hundred eighty-eight (288) hours of "old" sick leave), multiplied by the rate of employee's base hourly wage into the retiree's Trust.

36

Effective February 5, 2023, "old" sick leave with a conversion value to retiree health dollars will cease to accrue for all employees.

21.3   The surviving spouse or registered domestic partner of an active employee hired before February 5, 2023 who dies may, if they elect a retirement allowance, convert the employee's accrued sick leave to the above specified limits providing that the employee was age fifty-five (55) or over with at least twenty (20) years of continuous service.

## Section 22. Dental Care

The County shall contribute a sum equal to ninety percent (90%) of the premium for the County Plan and the Delta Dental Plan for employees and eligible dependents, including young adult dependents and domestic partners. All employees must participate in one of these plans.

## Section 23. Vision Care

The County shall provide Vision care coverage for employees and eligible dependents including young adult dependents and domestic partners. The County will pay the entire premium for this coverage.

## Section 24. Change in Employee Benefit Plans

24.1   Benefits Committee
During the term of this MOU, the County and Unions shall convene the Benefits Committee for the following purposes:
A.  To continue ongoing discussions regarding cost structures as a part of an overall strategy to maintain balanced enrollment in County plans,

B.  To investigate the feasibility of revising medical and/or dental coverage and/or plan(s) and strategies to integrate wellness program participation into benefit insurance cost structure, and

C.  To address legislative changes to health insurance legislation, including, but not limited to, the Affordable Care Act.

The Benefits Committee will be composed of County and labor representatives, not to exceed two (2) representatives from each participating labor organization and four (4) County representatives.

24.2   Agreement Implementation
Agreements reached as part of the Benefits Committee may be implemented outside of negotiations if employee organizations representing a majority of employees agree, providing, however, all employee organizations are given an opportunity to meet and confer regarding such agreements.

## Section 25. Life Insurance

25.1   The County shall pay group life insurance premiums for the following plans:

A.  Life insurance for each employee with a maximum benefit amount of fifty thousand dollars ($50,000);
B.  Life insurance for the employee's spouse or registered domestic partner with a maximum benefit amount of two thousand dollars ($2000); and
C.  Life insurance for each of the employee's children depending on age up to a maximum benefit amount of two thousand dollars ($2000).

37

D. The County shall provide additional life insurance payable to the employee's beneficiary if the employee's death results from an accident either on or off the job up to a maximum benefit amount of one hundred ten thousand dollars ($110,000).

25.2 Employees, depending on pre-qualification, may purchase additional term life insurance to a maximum benefit of seven hundred fifty thousand dollars ($750,000) for employee, two hundred fifty thousand dollars ($250,000) for spouse or registered domestic partner, and ten thousand dollars ($10,000) for each qualifying dependent.

## Section 26. Uniform Allowance/Safety Equipment

26.1 Employees in the Sheriff's Office who must provide their own uniform and equipment shall receive an amount per annum in additional compensation to cover the cost of maintaining such uniforms and equipment. For new employees, such payment shall be made on the regular pay warrant that covers each new employee's date of employment. For current employees, such payment shall be made on the pay warrant for the first full pay period of each January, as follows:

2023: $1,300
2024: $1,400
2025: $1,500

26.2 The County will provide bulletproof vests to department personnel consistent with departmental general order.

## Section 27. Promotion

27.1 Examinations

(1) Open Examinations: Any person who meets the minimum qualifications for the job class may compete.

(2) General Promotional Examinations: Permanent and probationary employees who have served at least 6 months in such status prior to the date of the exam are eligible to compete. Persons who have been laid off whose names are on a reemployment list are also eligible provided they had served at least 6 months prior to layoff.

(3) Departmental Promotional Examinations: Permanent and probationary employees of the specific department in which a promotional opportunity exists who have served at least 6 months in such status prior to the date of the exam are eligible to compete. Persons who have been laid off whose names appear on the appropriate departmental reemployment eligible list are also eligible provided they had served at least 6 months prior to layoff.

(4) Open and Promotional Examinations: Any person who meets the minimum qualifications for the job class may compete. In addition, any person competing in this type of an examination, and who meets the criteria described in (2) above, shall have 5 points added to the final passing score.

(5) Veterans' preference shall not apply to promotional examinations.

27.2 Promotional Eligible Lists

(1) General Promotional Eligible Lists: The names of applicants successful in general promotional

examinations shall be placed on general promotional eligible lists for the classes examined.

(2) Departmental Promotional Eligible Lists: The names of applicants successful in departmental promotional examinations shall be placed on departmental promotional eligible lists for the classes examined.

(3) These lists shall take precedence over General Eligible Lists.

(4) If, at the time of termination, an employee's name appears on a promotional eligible list their name shall be removed from the promotional list and placed on the open competitive eligible list for that class in accordance with their final score.

27.3  Probationary Period

Permanent employees who are promoted to a higher class shall undergo the probationary period prescribed for the higher class, but shall have the right to demote to their former class in their former department if rejected during their probationary period if a vacancy in their former class exists. If no vacancy exists, such employees shall be placed in the longest standing vacancy, as determined by the requisition form date, Countywide. If no vacancy exists, such employees shall displace the least senior employee as determined by Rule XVI. If no less senior position exists, then the employee shall be removed from County service.

## Section 28. Reallocation of Position

Upon reclassification of filled positions, the Human Resources Director shall determine whether the action constitutes an upward, lateral or downward movement of the level of the position.

(1)  Downward: The incumbent will be assigned to a vacant position in the same department in the same class previously held. In lieu of reassignment, incumbents may accept a demotion in the reallocated position. If neither of these options are exercised, the layoff procedure in the Civil Service rules will be employed.

(2)  Lateral: The status of the incumbent will remain unchanged in the class to which the position is reallocated.

(3)  Upward: The Human Resources Director will grant status to the incumbent when either: 1) there has been no essential change in the duties and responsibilities of the position during the individual's incumbency; or 2) there has been a gradual change in the duties and the incumbent has satisfactorily performed the higher level tasks for at least 6 months. If neither of the conditions listed above exist, the incumbent may be transferred, demoted, laid off or compete for the reallocated position as specified in the Civil Service Rules.

## Section 29. Change of Assigned Duties

No employee shall be required regularly to perform duties of a position outside of the class to which appointed. However, employees may be assigned temporarily duties outside their classes. In addition, under the conditions described in the Rules of the Civil Service Commission, a department head may temporarily assign to employees whatever duties are necessary to meet the requirements of an emergency situation.

## Section 30. Pay for Work-Out-of-Classification

When an employee has been assigned in writing by the department head or designated representative to perform the work of a permanent position having a different class and being paid at a higher rate, and if they have worked

39

in such class for five (5) consecutive workdays, they shall be entitled to payment for the higher class, as prescribed for promotions in subsection 6.6 of this MOU, retroactive to the first workday and continuing during the period of temporary assignment, under the conditions specified below:

(1) The assignment is caused by the incumbent's temporary or permanent absence;

(2) The employee performs the duties regularly performed by the absent incumbent and such duties are clearly not included in the job description of their regular class;

(3) The temporary assignment to work out of classification which extends beyond twenty working days be approved by the Human Resources Director, a copy of the approval form to be given to the employee; and

(4) A copy of the department head's written approval must be submitted in advance to Human Resources. If Human Resources does not approve pay for work in the higher class which exceeds twenty (20) workdays, the employee will be so notified and have the opportunity to discuss this matter with the Human Resources Director whose decision shall be final.

## Section 31. Probationary Period

31.1 Probationary employees shall undergo a probationary period of six (6) months unless a longer period is prescribed by the Civil Service Commission for their classes. Individual probationary periods may be extended with good cause upon request of the department head and concurrence of the Human Resources Director; however, no probationary period shall exceed twelve (12) months except as stipulated below. If an employee is incapacitated due to medical conditions and is reassigned to work that is not part of their normal duties, the probation period for the primary job will be extended for the duration of the reassignment. The employee shall be notified in writing of the probationary extension at the time of the reassignment. Certain positions in the unit may have probation periods established by the Civil Service Commission of eighteen (18) months. If an employee is incapacitated due to medical conditions and is reassigned to work that is not part of their normal duties, the probation period for the primary job will be extended for the duration of the reassignment. If an employee is in a class that has an eighteen (18) month probation period there shall be no extension.

Time worked by an employee in a temporary, extra help, or provisional status shall not count towards completion of the probationary period. The probationary period shall start from the date of probationary appointment.

31.2 An employee who is not rejected prior to the completion of the prescribed probationary period shall acquire permanent status automatically. Former permanent employees appointed from a re-employment eligible list shall be given permanent appointments when reemployed. Permanent employees who are demoted to a lower class shall be given permanent appointments in the lower class.

31.3 An employee who is laid off and subsequently appointed as a result of certification from a general employment eligible list to a position in a different class than that from which laid off shall undergo the probationary period prescribed for the class to which appointed. Former probationary employees whose names were placed on a reemployment eligible list before they achieved permanent status shall start a new probationary period when appointed from a reemployment eligible list.

31.4 The appointing authority may terminate probationary employees at any time during the probationary period without right of appeal in any manner and without recourse to the procedures provided in Section 32, except when the employee alleges the termination was due to discrimination prohibited by county, state or federal

40

statutes or regulations. If discrimination is alleged, the appeal or grievance shall be decided solely on the basis of whether or not the termination was due to discrimination; and unless it is determined that there was discrimination, the person or persons hearing the appeal or grievance shall not substitute their judgment for that of the appointing authority. In case of rejections during probationary periods, employees shall be given written notice, with reasons therefore, at once. The Human Resources Director may, upon request by an employee rejected during the probationary period, restore their name to the eligible list for that class. However, the employee's name shall not be certified to the department from which rejected without approval of the department head.

31.5    Permanent employees who transfer to another position in the same class shall not be required to undergo a new probationary period in the position into which transferred. Employees who transfer to a class in another series or in another department may be required by the department head to start a new probationary period. If unsuccessful in the new probationary period, the employee will be terminated from County service. If a new probationary period is a condition for transfer, the employee must sign a statement indicating an understanding of this fact prior to the effective date of the transfer. At the discretion of the Human Resources Director, examinations to demonstrate qualifications may be required before transfers between separate classes can occur.

If a new probationary period is in force, the employee shall have a 28-day window period from the date of transfer to elect to return to their former position. If an employee is rejected at a point beyond the window period and they had prior permanent status, they shall have the right to return to their former department if a vacancy exists. If no vacancy exists, such employees shall be placed in the longest standing vacancy, as determined by the requisition form date, County-wide. If no vacancy exists, such employees shall displace the least senior employee as determined by Rule XVI. If no less senior position exists, the employee shall be removed from County service.

31.6    Probationary employees who are injured on the job and are off work receiving 4850 pay shall have any time off work in excess of 30 days added to their probation period. If an employee has not completed at least 90 days of service, the probation period will start over when the employee returns to work.

## Section 32. Dismissal, Suspension Reduction in Step or Demotion for Cause

The appointing authority may dismiss, suspend, reduce in step or demote any employee in the classified service provided the rules and regulations of the Civil Service Commission are followed. An employee may either appeal such dismissal, suspension or demotion to the Civil Service Commission or file a grievance in accordance with subsection 33.2. Appeal to the Civil Service Commission must be filed within the timelines established by the Commission rules. Grievances filed in accordance with subsection 33.2 must be filed within fourteen calendar days after receipt of written charges. No grievance involving demotion, suspension or dismissal of an employee will be entertained unless it is filed in writing with the Human Resources Director within fourteen (14) calendar days of the time at which the affected employee was notified of such action. An employee may not both appeal to the Civil Service Commission and file a grievance under subsection 33.2 of this MOU. A permanent classified employee may be dismissed, suspended or demoted for cause only.

## Section 33. Grievance Procedures

33.1    Grievance
A grievance is defined as any dispute which involves the interpretation or application of any provision of this MOU, excluding those provisions of this MOU which specifically provide that the decision of any County official shall be final, the interpretation or application of those provisions shall not be subject to the grievance procedure.

33.2    Grievant

41

The grievant is defined as the Association or the affected employee. The Association or any employee may file a grievance.

33.3  Grievance Process
The grievance must be filed at either Step 1 or Step 2 within twenty-eight (28) calendar days from the date of the employee's knowledge of the alleged grievance or within fourteen (14) calendar days if grieving a demotion, suspension or dismissal from employment. The grievant shall state the grievance in writing and the resolution desired.

Step 1. Department Head or Designee
The grievant may discuss the complaint with the department head or designee. The department head or designee shall provide the grievant a written or oral response within fourteen (14) calendar days from the grievance meeting. If the grievance is not resolved the grievant may move the grievance to Step 2 within fourteen (14) calendar days from issuance of the written or oral response from the department head or designee. However, all complaints involving or concerning the payment of compensation shall be in writing to the Human Resources Director. If the department head or designee does not provide a written or oral response within the fourteen (14) calendar day timeline, then the grievant may advance the grievance to Step 2.

Step 2. Human Resources Director
Any employee or official of the Association may notify the Human Resources Director in writing that a grievance exists, stating the particulars of the grievance and, if possible, the nature of the determination desired. Such notification must be received within fourteen (14) calendar days of the written or oral response of the department head or designee as described in Step 1. If the grievant did not file a Step 1 grievance but instead proceeded directly to Step 2, then such notification must be received within twenty-eight (28) calendar days from the date of the employee's knowledge of the alleged grievance. Any grievances involving demotion, suspension or dismissal must be received within fourteen (14) calendar days of the above specified action. If appropriate, the parties will then schedule a grievance meeting. The Human Resources Director or designee, who in the case of a grievance alleging discrimination shall be the Equal Employment Manager, shall have thirty-five (35) calendar days from the grievance meeting in which to investigate the merits of the grievance and to provide the grievant a written response. The County will notify the Association if a reasonable extension of this timeline is necessary. If the grievance is not resolved to the satisfaction of the grievant, then the Association may move the grievance to Step 3 within fourteen (14) calendar days from the issuance of the written response from the Human Resources Director or designee. No grievance may be processed under Step 3 which has not first been filed and investigated in accordance with Step 2.

Step 3. Arbitration
Either the Association or the County may require that the grievance be referred to an impartial arbitrator, if the moving party notifies the other in writing of its desire to arbitrate within fourteen (14) calendar days of the issuance of the Step 2 response. Only the Association or the County may maintain the grievance before the arbitrator. The grievance shall be submitted to an arbitrator mutually agreed upon by the parties or, failing mutual agreement, to that arbitrator who is selected by lot from an agreed upon panel. The fees and expenses of the arbitrator and of the court reporter shall be shared equally by the Association and the County. Each party shall bear the costs of its own presentation, including preparation and post-hearing briefs, if any.

33.4  Scope of Arbitration Decisions

(a)  Decisions of arbitrators on matters properly before them shall be final and binding on the parties hereto, to the extent permitted by the Charter of the County.

42

CSM 00046

(b) No arbitrator shall entertain, hear, decide or make recommendations on any dispute unless such dispute involves a position in a unit represented by the Association which has been certified as the recognized employee organization for such unit and unless such dispute falls within the definition of a grievance as set forth in subsection 33.1.

(c) Proposals to add to or change this MOU or written agreements or addenda supplementary hereto shall not be arbitrable and no proposal to modify, amend or terminate this MOU, nor any matter or subject arising out of or in connection with such proposals, may be referred to arbitration under this Section. The arbitrator shall not have the power to amend or modify this MOU or written agreements or to establish any new terms or conditions of employment.

(d) If the Human Resources Director or an arbitrator resolves a grievance which involves suspension or discharge, they may agree to payment for lost time or to reinstatement with or without payment for lost time.

(e) If any award by an arbitrator requires action by the Board of Supervisors or the Civil Service Commission before it can be placed in effect, the County Manager and the Human Resources Director will recommend to the Board of Supervisors or the Civil Service Commission that it follow the award.

(f) No change in this MOU or interpretations thereof (except interpretations resulting from arbitration proceedings hereunder) will be recognized unless agreed to by the County and the Association.

## 33.5   Compensation Complaints

Complaints involving or concerning payment of compensation shall be initially filed in writing with Employee Relations. Only complaints which allege employees are not being compensated in accordance with the provisions of this MOU shall be considered as grievances. Any other matters of compensation are to be resolved in the meet and confer process if not detailed in the MOU. No adjustment shall be retroactive for more than 60 days from the date upon which the complaint was filed.

## 33.6   County Charter and Civil Service Commission

(a) The provisions of this section shall not abridge any rights to which an employee may be entitled under the County Charter, nor shall it be administered in a manner which would abrogate any power which, under the County Charter, may be within the sole province and discretion of the Civil Service Commission.

(b) All grievances of employees in representation units represented by the Association shall be processed under this Section. If the County Charter requires that a differing option be available to the employee, no action under Step 2 of subsection 33.3 above shall be taken unless it is determined that the employee is not availing himself/herself of such option.

(c) No action under Section 33.3 Step 2 shall be taken if action on the complaint or grievance has been taken by the Civil Service Commission or if the complaint or grievance is pending before the Civil Service Commission.

## 33.7   Involuntary Transfers for the Alleged Purpose of Punishment

Any sworn peace officer in the Sheriff's Department who believes they have been subjected to a transfer for the purpose of punishment may appeal said transfer through the chain of command to the Sheriff (or, in cases where the Sheriff has been personally involved, to the Human Resources Director or designee). In

43

DocuSign Envelope ID: 2A2C4A26-0F3F-4341-8952-13FED0FD582A

cases where the transfer involves a loss of compensation, they shall have the option of appealing either to the Sheriff or to an ad hoc panel as described hereafter. All such appeals shall be filed, in writing, within five calendar days after the date of transfer. The following procedure shall apply:

Step 1. Human Resources Department
The employee or any official of the Association shall notify Employee Relations in writing of the alleged punitive transfer. Employee Relations shall have thirty-five (35) calendar days after the meeting in which to investigate and resolve the dispute informally. No appeal may be processed under Step 2 below which has not first been filed and investigated in accordance with Step 1.

Step 2. Advisory Panel
If the parties are unable to satisfactorily resolve the dispute, the employee may have the appeal submitted to a three (3) member panel comprised of two (2) members of the Civil Service Commission and one (1) individual who is not a Commission member. This panel will be charged with the responsibility of making findings of fact and recommendations in connection with the employee's appeal for presentation to the Sheriff and the Human Resources Director. Such recommendations shall be advisory in nature. If the employee elects to have their appeal heard before such a panel, the employee shall choose one (1) Civil Service Commissioner and the Sheriff shall choose a second Commissioner. These two (2) members shall select a third member of the panel, who shall be the panel's chairperson and cannot be a member of the Civil Service Commission. If the two (2) commissioners selected by the employee and the Sheriff cannot agree on a third member, the Human Resources Director shall choose the third member.

Upon conclusion of its hearing the panel shall present its finding of fact and recommendations to the Human Resources Director and Sheriff. If the Sheriff and Director reject the panel recommendation they must so inform the employee, with reasons in writing. Any decision reached by the Sheriff and the Human Resources Director shall be final.

## **Section 34. Retirement Plan**

34.1 Retirement Plan

(a) Employees Hired Before January 8, 2012

Effective January 2, 2005, the County implemented the 3% @ 50 retirement enhancement (Government Code section 31664.1) for employees in Plans 1, 2 or 4. The one year final average compensation for participants in the safety retirement Plan 1 or 2 will be calculated in accordance with Government Code section 31462.1. For those participants in the safety retirement Plan 4 in accordance with Government Code section 31462.

The enhancement will apply to all future safety service and all safety service back to the date of employment pursuant to the Board of Supervisor's authority under Government Code section 31678.2 (a). Government Code section 31678.2(b) authorizes the collection, from employees, of all or part of the contributions by a member or employer or both, that would have been required if either section 31664.1 had been in effect during the time period specified in the resolution adopting section 31664.1, and that the time period specified in the resolution will be all future and past safety service back to the date of employment. Based upon this understanding and agreement, employees will share in the cost of the enhancement through increased retirement contributions by way of payroll deductions and shall contribute a percentage of compensation earnable as defined by SamCERA, in the amounts set forth below:

• Employees with more than 15 years of County service or who are age 45 or older will contribute 4.5%.

44

• Employees with 5 to 15 years of County service will contribute 3.5%.
• Employees with 0 to 5 years of County service will contribute 3%.

(b)  Employees Hired on or after January 8, 2012 through December 31, 2012

Effective January 8, 2012, the County implemented the 3%@55 retirement enhancement (Government Code 31664.2) for employees in Plan 5. For those participants in the safety retirement Plan 5, their three year final average compensation will be calculated in accordance with Government Code section 31462.

The enhancement will apply to all future safety service and all safety service back to the date of employment pursuant to the Board of Supervisors' authority under Government Code section 31678.2 (a). Government Code section 31678.2(b) authorizes the collection, from employees, of all or part of the contributions by a member or employer or both, that would have been required if either section 31664.2 had been in effect during the time period specified in the resolution adopting section 31664.2, and that the time period specified in the resolution will be all future and past safety service back to the date of employment. Based upon this understanding and agreement, employees will share in the cost of the enhancement through increased retirement contributions by way of payroll deductions and shall contribute a percentage of compensation earnable as defined by SamCERA, in the amounts set forth below:

•  Employees with more than 15 years of County service or who are age 45 or older will contribute 4.5%.
•  Employees with 5 to 15 years of County service will contribute 3.5%.
•  Employees with 0 to 5 years of County service will contribute 3%.

(c) Employees hired on or after January 1, 2013

Employees hired on or after January 1, 2013 will be placed by SamCERA into Plan 5 or Plan 7  (2.7%@57) (Government Code section 7522.25) depending upon their eligibility.

Plan 5: Employees who are placed in Plan 5 by SamCERA will be subject to the applicable provisions of sections 34.1 (b) and 34.2.

Plan 7: Employees who are placed in Plan 7 by SamCERA will not be subject any provisions in sections 34.1 (b) or 34.2. The County will not make any contributions toward the employees' required contribution to the Retirement System for Plan 7 members.

34.2  Retirement COLA

Effective the first full pay period in July of 2016, all employees, regardless of plan or hire date, will pay a COLA cost share equal to fifty percent (50%) of the retirement COLA costs as determined by SamCERA. Plan 7 members do not pay a separate retirement COLA cost share as the Plan 7 COLA costs are part of the Plan 7 contributions.

## Section 35. Deferred Compensation Plan- Automatic Enrollment for New Employees

Subject to applicable federal regulations, the County agrees to provide a deferred compensation plan that allows employees to defer compensation on a pre-tax basis through payroll deduction.  Effective January 1, 2016, each new employee will be automatically enrolled in the County's Deferred Compensation program, at the rate of one percent (1%) of their pre-tax wages, unless they choose to opt out or to voluntarily change deferrals to greater than or less than the default one percent (>1%) as allowed in the plan or as allowed by law.  The pre-tax deduction will be invested in the target fund associated with the employees' date of birth. All deferrals are fully vested at

45

the time of deferrals; there will be no waiting periods for vesting rights. Escalation for new employees will be the same as existing employees, as described below.

Effective the first full pay period following Board of Supervisors' approval of this MOU in 2022, all employees will be enrolled in the deferred compensation program at the rate of one percent (1%) of their pre-tax wages, unless they choose to opt out or to voluntarily change deferrals to greater than or less than the default one percent (>1%) as allowed in the plan or as allowed by law. The pre-tax deduction will be invested in the target fund associated with the employees' date of birth. All deferrals are fully vested at the time of deferrals; there will be no waiting periods for vesting rights.

Concurrent with Cost of Living Adjustments (COLA) the deferrals will be increased in one percent (1%) increments to a maximum of five percent (5%).

The County will provide training to employees regarding how to make voluntary changes to deferrals.

## Section 36. Bereavement Leave

The County will provide up to twenty-four (24) hours paid bereavement leave upon the death of an employee's parents, spouse, domestic partner, child, (including through miscarriage or stillbirth), step-child, sibling, sibling-in-law, mother-in-law, father-in-law, grandparent, grandparent-in-law or grandchild.

In addition, employees may utilize accrued sick leave pursuant to Section 19.2-4.

## Section 37. No Strike

The Association, its members and representatives, agree that it and they will not engage in, authorize, sanction or support any strike, slowdown, stoppage of work, curtailment of production, concerted refusal of overtime work, refusal to operate designated equipment (provided such equipment is safe and sound) or to perform customary duties; and neither the Association nor any representatives thereof shall engage in job action for the purpose of effecting changes in the directives or decisions of management of the County, nor to effect a change of personnel of operations of management or of employees not covered by this MOU.

## Section 38. Severability of Provisions

If any provision of this MOU is declared illegal or unenforceable by a court of competent jurisdiction, that provision shall be null and void but such nullification shall not affect any other provision of the MOU, all of which other provisions shall remain in full force and effect.

## Section 39. Past Practices

Continuance of working conditions and practices not specifically authorized by ordinance or by resolution of the Board of Supervisors is not guaranteed by this MOU.

CSM 00050

**Made and entered into**

**For the Deputy Sheriff's Association:**

Carlos Tapia, DSA President

Stephen Leonesio, Mastagni Law

**For the County:**

Mike Callagy, County Executive

Rocio Kiryczun, Human Resources Director

Michelle Kuka, Deputy Director Human Resources

47

**EXHIBIT B**

1. Employees assigned to the following assignments shall be paid the hourly equivalent rate of one step (5.74%) in the salary range in addition to all other compensation. After the completion of two (2) years of consecutive service in the following assignments such employees shall receive an additional 5.74% step, for a maximum total of two (2) steps in addition to all other compensation. Temporary reassignment out of the special assignment, not to exceed sixty (60) days, will not be considered a break in the two-year consecutive period.

   The maximum specialty assignment pay an employee can receive at any one time is two (2) steps, not including canine pay.

| ASSIGNMENTS | STEP 1 | STEP 2 |
|---|---|---|
| All Detective Assignments* | X | X |
| Public Information Officer | X | X |
| Training Unit | X | X |
| Jail Classification Unit | X | X |
| Civil Enforcement Unit | X | X |
| HIDTA/NCRIC | X | X |
| Bomb Unit | X | X |
| Psychiatric Emergency Response Team (PERT) | X | X |
| Motor Deputies | X | |
| Release Deputy | X | X |

   *Detective Assignments are defined as Deputy Sheriff assigned to the Investigations Bureau (Redwood City and Airport), Gang Intelligence Unit, Narcotics Task Force, Vehicle Theft Task Force, Crime Suppression Unit, and the Cargo Theft Task Force.

2. Deputy Sheriffs and Correctional Officers assigned to Training Officer work shall be paid at the hourly equivalent rate of one (1) step in addition to all other compensation. Such compensation shall be paid only while the individual is actually assigned a trainee as a Jail Training Officer (JTO) or Field Training Officer (FTO). Deputy Sheriffs and Correctional Officers assigned to SWAT and ERT shall be paid at the hourly equivalent rate of one (1) step in addition to all other compensation. Such compensation shall be paid only while the individual is actually assigned working in, or training for, the SWAT or ERT assignment.

3. Incumbents in up to two (2) other assignments deemed appropriate by the Sheriff shall be paid at the hourly equivalent rate of one (1) step in addition to all other compensation. The step increases granted under this section will be effective for no more than one year and all will expire on December 31st of each calendar year. The Sheriff will review all step increases granted under this section each December to determine if the step increase

48

will be renewed for the following year. Step increases may be granted and removed anytime during the calendar year whenever there is a change in work assignment or assigned duties. All step increases will be granted or renewed only upon written authorization, signed by the Sheriff, and submitted to the payroll supervisor via the Bureau of Professional Standards Lieutenant. Deputy Sheriffs receiving the step increase granted under this section will be notified of the Sheriff's decision to grant, renew, or discontinue the step increase by the Bureau of Professional Standards Lieutenant.

If a step increase granted under this Section 3 of Exhibit B is removed, an employee may appeal the decision in accordance with Section 33.7 of the MOU (Involuntary Transfers for the Alleged Purpose of Punishment).

4. Employees in the class of District Attorney's Inspector shall receive Six Dollars ($6.00) per biweekly pay period.

5. The Sheriff's Office will advertise these assignments when they become available so that all staff have an opportunity to express their interest and be considered. In advertising assignments, the Sheriff's Office will list those criteria that they find desirable and which will be considered in making selections for these assignments. Temporary special assignments may be made at the discretion of the Sheriff pending the selection process.

49

**Side Letter Agreement Re: Work Shifts and Assignments:**

This letter shall confirm certain understandings reached in negotiations for a Memorandum of Understanding covering the period of January 31, 2016, through January 9, 2021.

1. <u>Work Shifts and Assignments</u>

    a.  Work shifts are subject to modification by the Sheriff should economic or staffing contingencies dictate revisions, or in the case of an emergency.  Should the Sheriff desire to effect a change they shall give advance written notice to the Association of the proposed change(s), the reason(s) therefore, the proposed schedule(s), and shall provide a reasonable opportunity to discuss such change(s) prior to implementation.

        Currently, the shifts and hours of work are as follows:
        - Court Services - the 5 x 8 work schedule.
        - Detention and Custody Division, and Patrol - the Twelve (12) work schedule
        - Training Bureau, Detective, Bureau of Professional Standards, School Resource Unit (SRU)/ Community Policing Unit (CPU), Civil Bureau, Admin Classification, and Transportation - the 4x10 work schedule

    b.  Employees assigned to the Patrol Division shall be allowed to continue to bid for their work shift assignment, in the same manner as in presently practiced, described as follows:

        1.  Seniority
            For the purposes of bidding for vacations, shifts (excluding the Detention Division), on call and overtime signups shall be based on classification seniority. For the purpose of this section, classification seniority is defined as time in class plus higher class.

        2.  Deputy Shift Bids
            Deputies shall bid annually during the month of January for their shifts within their assignment based on time in classification plus higher classification.

        3.  Detention Division Shift Bid
            Employees assigned to the Detention Division shall bid annually during the month of January for their shifts based on cumulative time in the classification of Correctional Officer, Deputy Sheriff and higher classifications.

        Such selection shall occur at least annually and normally on January 1 of each year.

    c.  The above procedure shall also be used for those employees assigned to the Detention and Custody Division and shall be applied within each facility in that division.

2. No written transfer policy exists at present and the Sheriff agrees not to implement a written transfer policy during the term of the MOU without the agreement of the Association.  As a matter of policy, however, employees shall be given two weeks' notice of a permanent transfer between divisions except in cases of emergency.

50

CSM 00054

If the foregoing is in accordance with your understanding, please indicate your acceptance and approval in the space provided below.

**APPROVED AND ACCEPTED:**

FOR THE COUNTY                              FOR THE ASSOCIATION

_____            _____

Date: _____              Date: _____

**SUPPLEMENTAL AGREEMENT**

SUPPLEMENTAL AGREEMENT BETWEEN SAN MATEO COUNTY SHERIFF'S OFFICE

AND

THE DEPUTY SHERIFF'S ASSOCIATION

The Sheriff's Office and Association agree to the use of extra help as follows:

The primary need/use is for Deputy Sheriffs to work as bailiffs when the incumbent deputies are off on vacation or leave. They will also be used for pro tems. In addition, they will work the fourth floor holding area (however, we will continue to utilize this position for suitable deputies who have a need for temporary light duty) and sick calls in transportation/court security after reasonable attempts to offer the overtime to full-time sheriff's deputies have failed.

The use of extra help Correctional Officers will be limited to filling vacant staff positions in Corrections.  Extra help Correctional Officers may be used to fill for sick calls and vacation relief at the detention facilities. The extra help positions may be filled by qualified former San Mateo County Deputy Sheriff's employees or other qualified persons (persons in possession of proper California certification).  The Sheriff's Office agrees that they will not reduce full time regular Correctional Officer positions and replace with extra help positions.

When extra help employees have worked 960 hours (for SamCERA retirees) or 1040 hours (for all other extra help) during a fiscal year they will no longer be utilized until they become eligible again, the next fiscal year.

Should circumstance arise (other than a declared emergency or a one-time use) where the Sheriff's Office wants to expand or change the above, it shall give advance notice to the Association of any such proposed change and the Sheriff's Office will satisfy its obligation to meet and confer with the Union on this subject.

# 1075

Carlos Tapia, DSA President      2/21/23

Christina Corpus, Sheriff      2/21/22

**Letter of Understanding Between**

**San Mateo County and Deputy Sheriffs Association**

**Re: K-9 Unit Compensation**

The following letter summarizes the parties' understanding regarding K-9 Unit Compensation.

Employees who are assigned to the K-9 Unit are entitled to compensation for the off-duty hours spent caring, grooming, feeding and one-on-one non-formal training of their canine and maintaining their canine vehicle/unit.  To receive such compensation, deputy sheriffs assigned to the K-9 Unit must have responsibility for caring, grooming, feeding and training of a canine. The parties acknowledge that the Fair Labor Standards Act, which governs the entitlement to compensation for canine duties, entitles the parties to agree to a reasonable number of hours per month for the performance of off-duty canine duties.  The hours in this agreement were determined after an actual inquiry by the deputy sheriffs and the Deputy Sheriff's Association.  The Fair Labor Standards Act also allows the parties to agree on appropriate compensation for the performance of canine duties.  It is the intent of the parties through the provisions of this article to fully comply with the requirements of the Fair Labor Standards Act.  In addition, both parties believe that the following agreement does comply with the requirements of the Fair Labor Standards Act.

Employees assigned to the K-9 Unit shall be paid an additional 5.74% of salary per month which is compensation for 15.21 hours per month (3.5 hours per calendar week) for off-duty K-9 Unit duties. (It is the intent of the parties that the regular rate of pay for these off-duty canine duties, determined for each canine deputy sheriff by dividing the K-9 pay of 5.74% of salary in a pay period by 7 hours of off-duty canine activities per pay period and then dividing that amount by 1.5, will meet or exceed County, State and Federal minimum wage).  This compensation compensates the K-9 Unit for the reasonable number of hours (determined after an actual inquiry of the K-9 Unit) per month which the canine deputy sheriff spends feeding, grooming and caring for the dog which has been assigned to the deputy sheriff as well as training the dog and maintaining the canine vehicle/unit off duty.  The parties agree that the foregoing compensation is intended to compensate the canine deputy sheriff for off-duty canine activities on an overtime basis at one and one half times the deputy sheriff's regular canine rate for canine duties.  It is expected that K-9 Unit will not work more than 15.21 hours per month performing off duty canine duties as described herein.

Employees assigned to the K-9 Unit who must take their canine to the veterinarian in an emergency shall submit a written request to the Sheriff or the Sheriff's assigned designee for additional compensation for the hours spent performing such work. Emergencies such as emergency veterinarian visits do not require advance approval because such work time is beyond the deputy sheriff's control. In addition, if a canine deputy sheriff will be required to perform duties (in rare occurrences) which causes a substantial increase in the normal off-duty hours worked for that month, they may request, in advance of the work, that additional compensation be provided.  Such additional compensation must be approved in advance before any such work is performed unless the additional work is an emergency beyond the deputy sheriff's control.   Any additional compensation for emergency veterinarian visits or other duties which result in a substantial increase in the normal off-duty hours worked for that month shall be at compensated at time and one half the employee's Deputy Sheriff

53

(non-K9) regular rate of pay. Call-Back Pay in accordance with Section 11 of the MOU between the parties shall apply to emergency veterinarian visits that occur. Routine veterinary visits by employees must occur on duty or on flex time with advance supervisory approval.

Effective July 1, 2016, employees who are assigned to the K-9 Unit shall receive one hundred and fifty dollars ($150) each month for the purchase of dog food, bedding and other dog supplies. Each month the Lieutenant in charge of the K-9 unit shall submit a memo to the fiscal department listing the active employees in the unit, who will in turn issue payment to each K-9 unit employee. Each July for the duration of the current MOU the amount for K-9 food and supplies will be increased by five dollars ($5).

Employees assigned to the K-9 Unit who receive advance approval for boarding of their dog shall be reimbursed for boarding expenses for the approved vendor and approved time of boarding.

APPROVED AND ACCEPTED:

Date: _12/15/16_

FOR THE COUNTY                    FOR THE ASSOCIATION

_Michelle Tribe_                  _Miller_

54

# Exhibit 2

CONFIDENTIAL

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

Ok.  John is pisses because who's bday is on Tuesday and he is mad that I will be leaving and he now wants me to retire instead of him

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 11/26/2021 11:28:58 AM(UTC-8) | |

**Status:** Read
**Platform:**

11/26/2021 11:28:39 AM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x17677C2 (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Gtfoh

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 11/26/2021 11:29:10 AM(UTC-8) | 11/26/2021 11:29:10 AM(UTC-8) | |

**Status:** Sent
**Platform:**

11/26/2021 11:29:09 AM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1768F41 (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

Said he knows I am
Going to leave him
And he is not going to be a babysitter

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 11/26/2021 11:29:47 AM(UTC-8) | |

**Status:** Read
**Platform:**

11/26/2021 11:29:47 AM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1768CD4 (Table: message, handle, Size: 275509248 bytes)

1607

CONFIDENTIAL                    CSM 00060

Exhibit 3

CONFIDENTIAL

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

No

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 12/30/2021 10:24:23 PM(UTC-8) | |

**Status:** Read
**Platform:**

12/30/2021 10:24:20 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x18502F0 (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

I am worried as the virus is canceling a lot of events

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 12/30/2021 10:24:48 PM(UTC-8) | |

**Status:** Read
**Platform:**

12/30/2021 10:24:47 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1851F3F (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Can you go to a hotel and just order room service and sleep

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 12/30/2021 10:24:52 PM(UTC-8) | 12/30/2021 10:24:56 PM(UTC-8) | |

**Status:** Sent
**Platform:**

12/30/2021 10:24:52 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1851CA1 (Table: message, handle, Size: 275509248 bytes)

CONFIDENTIAL                    CSM 00062

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

When is albi doing his fundraiser

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 12/30/2021 10:25:17 PM(UTC-8) | 12/30/2021 10:25:17 PM(UTC-8) | |

**Status:** Sent
**Platform:**

12/30/2021 10:25:17 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x18519C9 (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

That sounds lovely… not with John

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 12/30/2021 10:25:21 PM(UTC-8) | |

**Status:** Read
**Platform:**

12/30/2021 10:25:21 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1851724 (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

1/29

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 12/30/2021 10:25:28 PM(UTC-8) | |

**Status:** Read
**Platform:**

12/30/2021 10:25:28 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1852F3F (Table: message, handle, Size: 275509248 bytes)

1938

CONFIDENTIAL                    CSM 00063

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Definitely not with him

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 12/30/2021 10:25:37 PM(UTC-8) | | |

**Status:** Sent
**Platform:**

12/30/2021 10:25:37 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x18528ED (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Can Victor host a fundraiser at the club?

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 12/30/2021 10:26:02 PM(UTC-8) | 12/30/20 21 10:26:13 PM(UTC -8) | |

**Status:** Sent
**Platform:**

12/30/2021 10:26:01 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x185265E (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

They aren't allowing parties yet

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 12/30/20 21 10:26:23 PM(UTC -8) | |

**Status:** Read
**Platform:**

12/30/2021 10:26:23 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x18523AB (Table: message, handle, Size: 275509248 bytes)

1939

CONFIDENTIAL                    CSM 00064

# Exhibit 4



**NOTE: Boxes Reflect Captains or Civilian Directors and Above Only**

Sheriff

Homeland Security
NCRIC/ HIDTA

Chief of Staff
Media
Emergency Services Bureau
Training
Hiring/ Recruitment
Real Estate
Technology Services
Finance

Undersheriff

Assistant Sheriff Operations
Headquarters Patrol Command
Specialty Units
North County Area Command
Coastside Area Command
South County Area Command

IA/Professional Standards

Policy

Forensic Laboratory

Assistant Sheriff Corrections
Maguire & Maple Corrections Facilities

CSM 00066

CSM 00067

# Exhibit 5

CONFIDENTIAL

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

You at the ranch?

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/12/2022 7:03:13 PM(UTC-8) | | |

**Status:** Sent
**Platform:**

1/12/2022 7:03:13 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x18D3A90 (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/12/2022 7:03:17 PM(UTC-8) | 1/12/2022 7:34:08 PM(UTC-8) | |

**Status:** Sent
**Platform:**

1/12/2022 7:03:17 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x18D380F (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

I wish…. I had to go to my car to do the meeting in my driveway

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/12/2022 7:45:43 PM(UTC-8) | |

**Status:** Read
**Platform:**

1/12/2022 7:34:54 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x18D3300 (Table: message, handle, Size: 275509248 bytes)

2120

CONFIDENTIAL                    CSM 00069

Exhibit 6

CONFIDENTIAL

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/18/202 2 2:32:36 PM(UTC -8) | |

**Status:** Read
**Platform:**

1/18/2022 2:32:33 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1918F3F (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

My house is a mess and he won't lift a fucking finger

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/18/2022 6:43:00 PM(UTC- 8) | |

**Status:** Read
**Platform:**

1/18/2022 6:42:52 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1918D05 (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

He's making shit impossible for you

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/18/2022 6:43:38 PM(UTC-8) | 1/18/202 2 6:43:52 PM(UTC -8) | |

**Status:** Sent
**Platform:**

1/18/2022 6:43:37 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1918A65 (Table: message, handle, Size: 275509248 bytes)

2207

CONFIDENTIAL                    CSM 00071

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

Said it's not on his dna to be my bitch

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/18/2022 6:44:04 PM(UTC-8) | |

**Status:** Read
**Platform:**

1/18/2022 6:44:04 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x19187B8 (Table: message, handle, Size: 275509248 bytes)



From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

What in the actual fuck

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/18/2022 6:44:15 PM(UTC-8) | 1/18/2022 6:44:15 PM(UTC-8) | |

**Status:** Sent
**Platform:**

1/18/2022 6:44:15 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1918534 (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Jesus Christ.
What're you going to do?

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/18/2022 6:44:45 PM(UTC-8) | 1/18/2022 6:44:49 PM(UTC-8) | |

**Status:** Sent
**Platform:**

1/18/2022 6:44:45 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x19182A7 (Table: message, handle, Size: 275509248 bytes)

CONFIDENTIAL          CSM 00072

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Is there any way for you to live in a separate area of the house away from him?

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/18/2022 6:49:03 PM(UTC-8) | 1/18/2022 6:51:46 PM(UTC-8) | |

**Status:** Sent
**Platform:**

1/18/2022 6:49:02 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1919F41 (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

No because of the kids

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/18/2022 6:52:10 PM(UTC-8) | |

**Status:** Read
**Platform:**

1/18/2022 6:52:06 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1919C3F (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

What about them?

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/18/2022 6:52:31 PM(UTC-8) | 1/18/2022 6:53:28 PM(UTC-8) | |

**Status:** Sent
**Platform:**

1/18/2022 6:52:31 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x19199E1 (Table: message, handle, Size: 275509248 bytes)

CONFIDENTIAL

CSM 00073

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

I can sleep downstairs but he is doing nothing

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/18/202 2 6:55:00 PM(UTC-8) | |

**Status:** Read
**Platform:**

1/18/2022 6:54:58 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1919760 (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

He's going to continue to make it harder and harder on you

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/18/2022 6:55:16 PM(UTC-8) | 1/18/2022 6:58:07 PM(UTC-8) | |

**Status:** Sent
**Platform:**

1/18/2022 6:55:16 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x19194D2 (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

I know

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/18/202 2 6:58:17 PM(UTC -8) | |

**Status:** Read
**Platform:**

1/18/2022 6:58:11 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x19191F6 (Table: message, handle, Size: 275509248 bytes)

CONFIDENTIAL                    CSM 00074

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

How do I help?

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/18/2022 6:58:23 PM(UTC-8) | | |

**Status:** Sent

**Platform:**

1/18/2022 6:58:22 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x191AF49 (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Want me to talk to him?

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/18/2022 6:58:35 PM(UTC-8) | | |

**Status:** Sent

**Platform:**

1/18/2022 6:58:35 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x191ACD6 (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Man to man

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/18/2022 6:58:40 PM(UTC-8) | 1/18/2022 6:58:49 PM(UTC-8) | |

**Status:** Sent

**Platform:**

1/18/2022 6:58:40 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x191AA49 (Table: message, handle, Size: 275509248 bytes)

2211

CONFIDENTIAL                    CSM 00075

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

No

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/18/2022 6:58:57 PM(UTC-8) | |

**Status:** Read
**Platform:**

1/18/2022 6:58:55 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x191A7D2 (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

K

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/18/2022 6:59:00 PM(UTC-8) | 1/18/2022 6:59:00 PM(UTC-8) | |

**Status:** Sent
**Platform:**

1/18/2022 6:59:00 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x191A59C (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

CBO buying lots of ads on fb

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/18/2022 6:59:20 PM(UTC-8) | |

**Status:** Read
**Platform:**

1/18/2022 6:59:20 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x191A339 (Table: message, handle, Size: 275509248 bytes)

CONFIDENTIAL

CSM 00076

# Exhibit 7

CONFIDENTIAL

CSM 00077

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

**http://haikumill.com/**

**Attachments:**



Title: 2BE0E4F6-1753-4F3A-9D49-3D4261B0F418.8CD8372D-20C9-457C-B4DA-
0EE507424F3B.pluginPayloadAttachment
Size: 49126
File name: ~/Library/SMS/Attachments/59/09/FF124705-33E0-4B02-A13E-
183C11AC1924/2BE0E4F6-1753-4F3A-9D49-3D4261B0F418.8CD8372D-20C9-
457C-B4DA-0EE507424F3B.pluginPayloadAttachment
~/Library/SMS/Attachments/59/09/FF124705-33E0-4B02-A13E-
183C11AC1924/2BE0E4F6-1753-4F3A-9D49-
3D4261B0F418.8CD8372D-20C9-457C-B4DA-
0EE507424F3B.pluginPayloadAttachment



Title: 6FABC1A9-443B-4E32-B77D-6F080FA53DAD.pluginPayloadAttachment
Size: 49126
File name: ~/Library/SMS/Attachments/f2/02/at_1_90CD3E96-5FF6-4E0B-BB26-
CAA129A87443/6FABC1A9-443B-4E32-B77D-
6F080FA53DAD.pluginPayloadAttachment
~/Library/SMS/Attachments/f2/02/at_1_90CD3E96-5FF6-4E0B-
BB26-CAA129A87443/6FABC1A9-443B-4E32-B77D-
6F080FA53DAD.pluginPayloadAttachment

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/27/2022 11:57:03 AM(UTC-8) | | |

**Status:** Sent
**Platform:**

1/27/2022 11:57:01 AM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1972672 (Table: message, attachment, handle,
Size: 275509248 bytes)
VMB's PLUS/mobile/Library/SMS/Attachments/59/09/FF124705-33E0-4B02-A13E-
183C11AC1924/2BE0E4F6-1753-4F3A-9D49-3D4261B0F418.8CD8372D-20C9-457C-B4DA-
0EE507424F3B.pluginPayloadAttachment :

---

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

This is where your reception will be

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/27/2022 11:57:03 AM(UTC-8) | 1/27/2022 11:57:20 AM(UTC-8) | |

**Status:** Sent
**Platform:**

1/27/2022 11:57:01 AM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1973F41 (Table: message, handle, Size:
275509248 bytes)

2344

CONFIDENTIAL                    CSM 00078

# Exhibit 8

CONFIDENTIAL

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Have fun today
Enjoy being spoiled and doted on
You deserve to smile and be happy

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/27/2022 3:06:04 PM(UTC-8) | 1/27/2022 3:21:31 PM(UTC-8) | |

**Status:** Sent
**Platform:**

1/27/2022 3:06:03 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1973532 (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

**Attachments:**



Title: Irving  Torres.vcf
Size: 0
File name: ~/Library/SMS/Attachments/74/04/A8D5CB58-01AB-49A9-B71B-
1C9365D1E3CF/Irving  Torres.vcf
Path: https://p23-
content.icloud.com/MA96CC8008A0B335FE8DBC9377FEF5A9186967828685A66A9
008490B291C14385.C01USN00
~/Library/SMS/Attachments/74/04/A8D5CB58-01AB-49A9-B71B-
1C9365D1E3CF/Irving  Torres.vcf
[Empty File]

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/27/2022 3:21:45 PM(UTC-8) | |

**Status:** Read
**Platform:**

1/27/2022 3:21:33 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1974F3F (Table: message, handle, attachment,
Size: 275509248 bytes)

CONFIDENTIAL

CSM 00080

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Bring the AFSCME questions to go over on the ride down and make the changes so we can submit tonight:

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/27/2022 4:07:56 PM(UTC-8) | 1/27/2022 4:13:59 PM(UTC-8) | |

**Status:** Sent
**Platform:**

1/27/2022 4:07:55 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1974C4F (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

Ok

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/27/2022 4:14:43 PM(UTC-8) | |

**Status:** Read
**Platform:**

1/27/2022 4:14:01 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x19746AE (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Send me a pic of your sparklies in please.

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/27/2022 4:57:14 PM(UTC-8) | 1/27/2022 5:20:32 PM(UTC-8) | |

**Status:** Sent
**Platform:**

1/27/2022 4:57:13 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1974478 (Table: message, handle, Size: 275509248 bytes)

CONFIDENTIAL

CSM 00081

# Exhibit 9

CONFIDENTIAL

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

K

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/31/202 2 12:12:35 PM(UTC -8) | |

**Status:** Read
**Platform:**

1/31/2022 12:12:28 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x198B9CB (Table: message, handle, Size: 275509248 bytes)



From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Be careful John isn't sniffing around to find you and VA

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 1/31/2022 5:33:58 PM(UTC-8) | 1/31/2022 5:34:18 PM(UTC-8) | |

**Status:** Sent
**Platform:**

1/31/2022 5:33:58 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x198CC96 (Table: message, handle, Size: 275509248 bytes)



From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

He won't find me with him

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 1/31/202 2 5:35:56 PM(UTC -8) | |

**Status:** Read
**Platform:**

1/31/2022 5:34:32 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x198C9C0 (Table: message, handle, Size: 275509248 bytes)

CONFIDENTIAL                    CSM 00083

# Exhibit 10

CONFIDENTIAL

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

Give me 7

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 2/26/202 2 3:20:38 PM(UTC -8) | |

**Status:** Read
**Platform:**

2/26/2022 3:20:36 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1A5BA6F (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

Thanks for coming with me

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 2/26/202 2 5:15:29 PM(UTC -8) | |

**Status:** Read
**Platform:**

2/26/2022 5:14:10 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1A5B82B (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Loved "Thanks for coming with me "

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 2/26/2022 5:15:35 PM(UTC-8) | | |

**Status:** Sent
**Platform:**

2/26/2022 5:15:33 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1A5B575 (Table: message, handle, Size: 275509248 bytes)

CONFIDENTIAL

CSM 00085

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

**I got you boo**

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 2/26/2022 5:15:40 PM(UTC-8) | | |

**Status:** Sent
**Platform:**

2/26/2022 5:15:40 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1A5B2D1 (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

**Make victor rub your messed up toe nail polish tonifgt**

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 2/26/2022 5:15:59 PM(UTC-8) | | |

**Status:** Sent
**Platform:**

2/26/2022 5:15:59 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1A5CF49 (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

**You need a rest**

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 2/26/2022 5:16:02 PM(UTC-8) | 2/26/2022 5:16:15 PM(UTC-8) | |

**Status:** Sent
**Platform:**

2/26/2022 5:16:02 PM(UTC-8)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x1A5CC7E (Table: message, handle, Size: 275509248 bytes)

2692

Exhibit 11

CONFIDENTIAL



From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

See you soon

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 5/11/2022 12:57:04 PM(UTC-7) | | |

**Status:** Sent

**Platform:**

5/11/2022 12:57:03 PM(UTC-7)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x29AE215 (Table: message, handle, Size: 275509248 bytes)



From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Check out this home on Airbnb!

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 5/11/2022 6:08:34 PM(UTC-7) | | |

**Status:** Sent

**Platform:**

5/11/2022 6:08:33 PM(UTC-7)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x29B0F49 (Table: message, handle, Size: 275509248 bytes)

3156

CONFIDENTIAL

CSM 00088

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

https://abnb.me/N3MVpSaoXpb

Attachments:
_____



Title: 974EDEFF-2523-479E-AC09-F9F002979163.pluginPayloadAttachment
Size: 4104
File name: ~/Library/SMS/Attachments/fe/14/9951BB67-27D2-438E-82D7-50D8FCE266EC/974EDEFF-2523-479E-AC09-F9F002979163.pluginPayloadAttachment
~/Library/SMS/Attachments/fe/14/9951BB67-27D2-438E-82D7-50D8FCE266EC/974EDEFF-2523-479E-AC09-F9F002979163.pluginPayloadAttachment



Title: 3167F178-B31D-4186-99F5-931F41CFE959.pluginPayloadAttachment
Size: 106323
File name: ~/Library/SMS/Attachments/12/02/6CD2285E-2099-4E85-9EBD-8809228C0746/3167F178-B31D-4186-99F5-931F41CFE959.pluginPayloadAttachment
~/Library/SMS/Attachments/12/02/6CD2285E-2099-4E85-9EBD-8809228C0746/3167F178-B31D-4186-99F5-931F41CFE959.pluginPayloadAttachment

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 5/11/2022 6:08:40 PM(UTC-7) | | |

Status: Sent
Platform:

5/11/2022 6:08:39 PM(UTC-7)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x29B150C (Table: message, attachment, handle, Size: 275509248 bytes)
VMB's PLUS/mobile/Library/SMS/Attachments/fe/14/9951BB67-27D2-438E-82D7-50D8FCE266EC/974EDEFF-2523-479E-AC09-F9F002979163.pluginPayloadAttachment :
VMB's PLUS/mobile/Library/SMS/Attachments/12/02/6CD2285E-2099-4E85-9EBD-8809228C0746/3167F178-B31D-4186-99F5-931F41CFE959.pluginPayloadAttachment :

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

Yikes

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 5/11/2022 6:09:50 PM(UTC-7) | |

Status: Read
Platform:

5/11/2022 6:09:46 PM(UTC-7)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x29B2F3F (Table: message, handle, Size: 275509248 bytes)

3157

CONFIDENTIAL                    CSM 00089

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Sorry
Just noticed the price

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 5/11/2022 6:10:00 PM(UTC-7) | | |

**Status:** Sent
**Platform:**

5/11/2022 6:10:00 PM(UTC-7)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x29B2D0B (Table: message, handle, Size: 275509248 bytes)

From: +16503930183 Sheriff Christina Corpus
To: +16509224284 Valerie Barnes (owner)

6k

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16509224284 Valerie Barnes | | 5/11/2022 6:10:10 PM(UTC-7) | |

**Status:** Read
**Platform:**

5/11/2022 6:10:08 PM(UTC-7)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x29B2A70 (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Check out this home on Airbnb! https://abnb.me/jdbgWdpoXpb

Great reviews

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 5/11/2022 6:11:55 PM(UTC-7) | | |

**Status:** Sent
**Platform:**

5/11/2022 6:11:55 PM(UTC-7)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x29B2844 (Table: message, handle, Size: 275509248 bytes)

CONFIDENTIAL                    CSM 00090

3158

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

I sent three bullet points to choose from

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 5/11/2022 6:24:49 PM(UTC-7) | | |

**Status:** Sent
**Platform:**

5/11/2022 6:24:48 PM(UTC-7)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x29B22AE (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Who's fucking with you?

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 5/12/2022 2:02:26 PM(UTC-7) | | |

**Status:** Sent
**Platform:**

5/12/2022 2:02:25 PM(UTC-7)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x29B7A3E (Table: message, handle, Size: 275509248 bytes)

From: +16509224284 Valerie Barnes (owner)
To: +16503930183 Sheriff Christina Corpus

Do I need to fuck shit up?

**Priority:** Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +16503930183 Sheriff Christina Corpus | 5/12/2022 2:02:32 PM(UTC-7) | | |

**Status:** Sent
**Platform:**

5/12/2022 2:02:32 PM(UTC-7)

Source Info:
VMB's PLUS/mobile/Library/SMS/sms.db : 0x29B77B5 (Table: message, handle, Size: 275509248 bytes)

3159

CONFIDENTIAL                    CSM 00091

# Exhibit 12

DocuSign Envelope ID: 11735759-6F4C-4A3D-A690-F1D45EE95EF3

Agreement No. ___12000-23-D005___

## AGREEMENT BETWEEN THE COUNTY OF SAN MATEO AND VICTOR AENLLE

This Agreement is entered into this      day of AUGUST, 2022, by and between the County of San Mateo, a political subdivision of the state of California, hereinafter called "County," and Victor Aenlle, hereinafter called "Contractor."

*        *        *

Whereas, pursuant to Section 31000 of the California Government Code, County may contract with independent contractors for the furnishing of such services to or for County or any Department thereof; and

Whereas, it is necessary and desirable that Contractor be retained for the purpose of assisting the San Mateo County Sheriff Elect's Transition Team.

**Now, therefore, it is agreed by the parties to this Agreement as follows:**

### 1.    Exhibits and Attachments

The following exhibits and attachments are attached to this Agreement and incorporated into this Agreement by this reference:

Exhibit A—Services
Exhibit B—Payments and Rates

### 2.    Services to be performed by Contractor

In consideration of the payments set forth in this Agreement and in Exhibit B, Contractor shall perform services for County in accordance with the terms, conditions, and specifications set forth in this Agreement and in Exhibit A.

### 3.    Payments

In consideration of the services provided by Contractor in accordance with all terms, conditions, and specifications set forth in this Agreement and in Exhibit A, County shall make payment to Contractor based on the rates and in the manner specified in Exhibit B. County reserves the right to withhold payment if County determines that the quantity or quality of the work performed is unacceptable. In no event shall County's total fiscal obligation under this Agreement exceed THIRTY THOUSAND DOLLARS ($30,000.00). In the event that the County makes any advance payments, Contractor agrees to refund any amounts in excess of the amount owed by the County at the time of contract termination or expiration. Contractor is not entitled to payment for work not performed as required by this agreement.

### 4.    Term

Subject to compliance with all terms and conditions, the term of this Agreement shall be from September 1, 2022, through January 15, 2023.

5.    **Termination**

This Agreement may be terminated by Contractor or by the County Manager or his/her designee at any time without a requirement of good cause upon thirty (30) days' advance written notice to the other party. Subject to availability of funding, Contractor shall be entitled to receive payment for work/services provided prior to termination of the Agreement.  Such payment shall be that prorated portion of the full payment determined by comparing the work/services actually completed to the work/services required by the Agreement.

County may terminate this Agreement or a portion of the services referenced in the Attachments and Exhibits based upon the unavailability of Federal, State, or County funds by providing written notice to Contractor as soon as is reasonably possible after County learns of said unavailability of outside funding.

County may terminate this Agreement for cause.  In order to terminate for cause, County must first give Contractor notice of the alleged breach. Contractor shall have five business days after receipt of such notice to respond and a total of ten calendar days after receipt of such notice to cure the alleged breach. If Contractor fails to cure the breach within this period, County may immediately terminate this Agreement without further action. The option available in this paragraph is separate from the ability to terminate without cause with appropriate notice described above. In the event that County provides notice of an alleged breach pursuant to this section, County may, in extreme circumstances, immediately suspend performance of services and payment under this Agreement pending the resolution of the process described in this paragraph. County has sole discretion to determine what constitutes an extreme circumstance for purposes of this paragraph, and County shall use reasonable judgment in making that determination.

6.    **Contract Materials**

At the end of this Agreement, or in the event of termination, all finished or unfinished documents, data, studies, maps, photographs, reports, and other written materials (collectively referred to as "contract materials") prepared by Contractor under this Agreement shall become the property of County and shall be promptly delivered to County.  Upon termination, Contractor may make and retain a copy of such contract materials if permitted by law.

7.    **Relationship of Parties**

Contractor agrees and understands that the work/services performed under this Agreement are performed as an independent contractor and not as an employee of County and that neither Contractor nor its employees acquire any of the rights, privileges, powers, or advantages of County employees.

8.    **Hold Harmless**

    a.    **General Hold Harmless**

Contractor shall indemnify and save harmless County and its officers, agents, employees, and servants from all claims, suits, or actions of every name, kind, and description resulting from this Agreement, the performance of any work or services required of Contractor under this Agreement, or payments made pursuant to this Agreement brought for, or on account of, any of the following:

(A) injuries to or death of any person, including Contractor or its employees/officers/agents;

(B) damage to any property of any kind whatsoever and to whomsoever belonging;

(C) any sanctions, penalties, or claims of damages resulting from Contractor's failure to comply, if applicable, with the requirements set forth in the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and all Federal regulations promulgated thereunder, as amended; or

(D) any other loss or cost, including but not limited to that caused by the concurrent active or passive negligence of County and/or its officers, agents, employees, or servants. However, Contractor's duty to indemnify and save harmless under this Section shall not apply to injuries or damage for which County has been found in a court of competent jurisdiction to be solely liable by reason of its own negligence or willful misconduct.

The duty of Contractor to indemnify and save harmless as set forth by this Section shall include the duty to defend as set forth in Section 2778 of the California Civil Code.

## 9.    Assignability and Subcontracting

Contractor shall not assign this Agreement or any portion of it to a third party or subcontract with a third party to provide services required by Contractor under this Agreement without the prior written consent of County.  Any such assignment or subcontract without County's prior written consent shall give County the right to automatically and immediately terminate this Agreement without penalty or advance notice.

## 10.    Insurance

### a.    General Requirements

Contractor shall not commence work or be required to commence work under this Agreement unless and until all insurance required under this Section has been obtained and such insurance has been approved by County's Risk Management, and Contractor shall use diligence to obtain such insurance and to obtain such approval.  Contractor shall furnish County with certificates of insurance evidencing the required coverage, and there shall be a specific contractual liability endorsement extending Contractor's coverage to include the contractual liability assumed by Contractor pursuant to this Agreement.  These certificates shall specify or be endorsed to provide that thirty (30) days' notice must be given, in writing, to County of any pending change in the limits of liability or of any cancellation or modification of the policy.

### b.    Workers' Compensation and Employer's Liability Insurance

Contractor shall have in effect during the entire term of this Agreement workers' compensation and employer's liability insurance providing full statutory coverage.  In signing this Agreement, Contractor certifies, as required by Section 1861 of the California Labor Code, that (a) it is aware of the provisions of Section 3700 of the California Labor Code, which require every employer to be insured against liability for workers' compensation or to undertake self-insurance in accordance with the provisions of the Labor Code, and (b) it will comply with such provisions before commencing the performance of work under this Agreement.

### c.    Liability Insurance

Contractor shall take out and maintain during the term of this Agreement such bodily injury liability and property damage liability insurance as shall protect Contractor and all of its employees/officers/agents

CSM 00095

while performing work covered by this Agreement from any and all claims for damages for bodily injury, including accidental death, as well as any and all claims for property damage which may arise from Contractor's operations under this Agreement, whether such operations be by Contractor, any subcontractor, anyone directly or indirectly employed by either of them, or an agent of either of them. Such insurance shall be combined single limit bodily injury and property damage for each occurrence and shall not be less than the amounts specified below:

      (a)  Comprehensive General Liability...    $1,000,000

County and its officers, agents, employees, and servants shall be named as additional insured on any such policies of insurance, which shall also contain a provision that (a) the insurance afforded thereby to County and its officers, agents, employees, and servants shall be primary insurance to the full limits of liability of the policy and (b) if the County or its officers, agents, employees, and servants have other insurance against the loss covered by such a policy, such other insurance shall be excess insurance only.

In the event of the breach of any provision of this Section, or in the event any notice is received which indicates any required insurance coverage will be diminished or canceled, County, at its option, may, notwithstanding any other provision of this Agreement to the contrary, immediately declare a material breach of this Agreement and suspend all further work and payment pursuant to this Agreement.

## 11.    **Compliance With Laws**

All services to be performed by Contractor pursuant to this Agreement shall be performed in accordance with all applicable Federal, State, County, and municipal laws, ordinances, and regulations, including but not limited to the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the Federal Regulations promulgated thereunder, as amended (if applicable), the Business Associate requirements set forth in Attachment H (if attached), the Americans with Disabilities Act of 1990, as amended, and Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination on the basis of disability in programs and activities receiving any Federal or County financial assistance.  Such services shall also be performed in accordance with all applicable ordinances and regulations, including but not limited to appropriate licensure, certification regulations, provisions pertaining to confidentiality of records, and applicable quality assurance regulations.  In the event of a conflict between the terms of this Agreement and any applicable State, Federal, County, or municipal law or regulation, the requirements of the applicable law or regulation will take precedence over the requirements set forth in this Agreement.

Contractor will timely and accurately complete, sign, and submit all necessary documentation of compliance.

## 12.    **Non-Discrimination and Other Requirements**

### a.  **General Non-discrimination**

No person shall be denied any services provided pursuant to this Agreement (except as limited by the scope of services) on the grounds of race, color, national origin, ancestry, age, disability (physical or mental), sex, sexual orientation, gender identity, marital or domestic partner status, religion, political beliefs or affiliation, familial or parental status (including pregnancy), medical condition (cancer-related), military service, or genetic information.

**b. Equal Employment Opportunity**

Contractor shall ensure equal employment opportunity based on objective standards of recruitment, classification, selection, promotion, compensation, performance evaluation, and management relations for all employees under this Agreement.  Contractor's equal employment policies shall be made available to County upon request.

**c. Section 504 of the Rehabilitation Act of 1973**

Contractor shall comply with Section 504 of the Rehabilitation Act of 1973, as amended, which provides that no otherwise qualified individual with a disability shall, solely by reason of a disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination in the performance of any services this Agreement.  This Section applies only to contractors who are providing services to members of the public under this Agreement.

**d. Compliance with County's Equal Benefits Ordinance**

Contractor shall comply with all laws relating to the provision of benefits to its employees and their spouses or domestic partners, including, but not limited to, such laws prohibiting discrimination in the provision of such benefits on the basis that the spouse or domestic partner of the Contractor's employee is of the same or opposite sex as the employee.

**e. Discrimination Against Individuals with Disabilities**

The nondiscrimination requirements of 41 C.F.R. 60-741.5(a) are incorporated into this Agreement as if fully set forth here, and Contractor and any subcontractor shall abide by the requirements of 41 C.F.R. 60–741.5(a).  This regulation prohibits discrimination against qualified individuals on the basis of disability and requires affirmative action by covered prime contractors and subcontractors to employ and advance in employment qualified individuals with disabilities.

**f. History of Discrimination**

Contractor certifies that no finding of discrimination has been issued in the past 365 days against Contractor by the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or any other investigative entity.  If any finding(s) of discrimination have been issued against Contractor within the past 365 days by the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or other investigative entity, Contractor shall provide County with a written explanation of the outcome(s) or remedy for the discrimination prior to execution of this Agreement.  Failure to comply with this Section shall constitute a material breach of this Agreement and subjects the Agreement to immediate termination at the sole option of the County.

**g. Reporting; Violation of Non-discrimination Provisions**

Contractor shall report to the County Manager the filing in any court or with any administrative agency of any complaint or allegation of discrimination on any of the bases prohibited by this Section of the Agreement or the Section titled "Compliance with Laws".  Such duty shall include reporting of the filing of any and all charges with the Equal Employment Opportunity Commission, the California Department of Fair Employment and Housing, or any other entity charged with the investigation or adjudication of allegations covered by this subsection within 30 days of such filing, provided that within such 30 days such entity has not notified Contractor that such charges are dismissed or otherwise unfounded.  Such notification shall include a general description of the circumstances involved and a general description of

CSM 00097

the kind of discrimination alleged (for example, gender-, sexual orientation-, religion-, or race-based discrimination).

Violation of the non-discrimination provisions of this Agreement shall be considered a breach of this Agreement and subject the Contractor to penalties, to be determined by the County Manager, including but not limited to the following:

i.    termination of this Agreement;
ii.   disqualification of the Contractor from being considered for or being awarded a County contract for a period of up to 3 years;
iii.  liquidated damages of $2,500 per violation; and/or
iv.   imposition of other appropriate contractual and civil remedies and sanctions, as determined by the County Manager.

To effectuate the provisions of this Section, the County Manager shall have the authority to offset all or any portion of the amount described in this Section against amounts due to Contractor under this Agreement or any other agreement between Contractor and County.

## 13.    Compliance with County Employee Jury Service Ordinance

Contractor shall comply with Chapter 2.85 of the County's Ordinance Code, which states that Contractor shall have and adhere to a written policy providing that its employees, to the extent they are full-time employees and live in San Mateo County, shall receive from the Contractor, on an annual basis, no fewer than five days of regular pay for jury service in San Mateo County, with jury pay being provided only for each day of actual jury service. The policy may provide that such employees deposit any fees received for such jury service with Contractor or that the Contractor may deduct from an employee's regular pay the fees received for jury service in San Mateo County. By signing this Agreement, Contractor certifies that it has and adheres to a policy consistent with Chapter 2.85. For purposes of this Section, if Contractor has no employees in San Mateo County, it is sufficient for Contractor to provide the following written statement to County: "For purposes of San Mateo County's jury service ordinance, Contractor certifies that it has no full-time employees who live in San Mateo County. To the extent that it hires any such employees during the term of its Agreement with San Mateo County, Contractor shall adopt a policy that complies with Chapter 2.85 of the County's Ordinance Code." The requirements of Chapter 2.85 do not apply unless this Agreement's total value listed in the Section titled "Payments", exceeds two-hundred thousand dollars ($200,000); Contractor acknowledges that Chapter 2.85's requirements will apply if this Agreement is amended such that its total value exceeds that threshold amount.

## 14.    Retention of Records; Right to Monitor and Audit

(a) Contractor shall maintain all required records relating to services provided under this Agreement for three (3) years after County makes final payment and all other pending matters are closed, and Contractor shall be subject to the examination and/or audit by County, a Federal grantor agency, and the State of California.

(b) Contractor shall comply with all program and fiscal reporting requirements set forth by applicable Federal, State, and local agencies and as required by County.

(c) Contractor agrees upon reasonable notice to provide to County, to any Federal or State department having monitoring or review authority, to County's authorized representative, and/or to any of their respective audit agencies access to and the right to examine all records and documents necessary to

determine compliance with relevant Federal, State, and local statutes, rules, and regulations, to determine compliance with this Agreement, and to evaluate the quality, appropriateness, and timeliness of services performed.

## 15.  **Merger Clause; Amendments**

This Agreement, including the Exhibits and Attachments attached to this Agreement and incorporated by reference, constitutes the sole Agreement of the parties to this Agreement and correctly states the rights, duties, and obligations of each party as of this document's date.  In the event that any term, condition, provision, requirement, or specification set forth in the body of this Agreement conflicts with or is inconsistent with any term, condition, provision, requirement, or specification in any Exhibit and/or Attachment to this Agreement, the provisions of the body of the Agreement shall prevail.  Any prior agreement, promises, negotiations, or representations between the parties not expressly stated in this document are not binding.  All subsequent modifications or amendments shall be in writing and signed by the parties.

## 16.  **Controlling Law; Venue**

The validity of this Agreement and of its terms, the rights and duties of the parties under this Agreement, the interpretation of this Agreement, the performance of this Agreement, and any other dispute of any nature arising out of this Agreement shall be governed by the laws of the State of California without regard to its choice of law or conflict of law rules.  Any dispute arising out of this Agreement shall be venued either in the San Mateo County Superior Court or in the United States District Court for the Northern District of California.

## 17.  **Notices**

Any notice, request, demand, or other communication required or permitted under this Agreement shall be deemed to be properly given when transmitted via email to the email address listed below

In the case of County, to:

| | |
|---|---|
| Name/Title: | Iliana Rodriguez, Deputy County Executive |
| Address: | 400 County Center, 1st Floor |
| | Redwood City, CA 94063 |
| Telephone: | (650) 363-4130 |
| Email: | irodriguez@smcgov.org |

In the case of Contractor, to:

| | |
|---|---|
| Name/Title: | Victor Aenlle |
| Address: | 1145 Drake Ave. |
| | Burlingame, CA 94010 |
| | 650-222-8189 |
| Email: | victor@aenllefamily.com |

18.    **Electronic Signature**

Both County and Contractor wish to permit this Agreement and future documents relating to this Agreement to be digitally signed in accordance with California law and County's Electronic Signature Administrative Memo. Any party to this Agreement may revoke such agreement to permit electronic signatures at any time in relation to all future documents by providing notice pursuant to this Agreement.

19.    **Reimbursable Travel Expenses**

To the extent that this Agreement authorizes reimbursements to Contractor for travel, lodging, and other related expenses as defined in this section, the Contractor must comply with all the terms of this section in order to be reimbursed for travel.

a.    Estimated travel expenses must be submitted to authorized County personnel for advanced written authorization before such expenses are incurred. Significant differences between estimated and actual travel expenses may be grounds for denial of full reimbursement of actual travel expenses.

b.    Itemized receipts (copies accepted) for all reimbursable travel expenses are required to be provided as supporting documentation with all invoices submitted to the County.

c.    Unless otherwise specified in this section, and subject to prior approval as described above, the County will reimburse Contractor for reimbursable travel expenses for days when services were provided to the County. Contractor must substantiate in writing to the County the actual services rendered and the specific dates. The County will reimburse for travel at 75% of the maximum reimbursement amount for the actual costs of meals and incidental expenses on the day preceding and/or the day following days when services were provided to the County, provided that such reimbursement is reasonable, in light of travel time and other relevant factors, and is approved in writing by authorized County personnel.

d.    Unless otherwise specified within the contract, reimbursable travel expenses shall not include Local Travel. "Local Travel" means travel entirely within a fifty-mile radius of the Contractor's office and travel entirely within a fifty-mile radius of San Mateo County. Any mileage reimbursements for a Contractor's use of a personal car for reimbursable travel shall be reimbursed based on the Federal mileage reimbursement rate.

e.    The maximum reimbursement amount for the actual lodging, meal and incidental expenses is limited to the then-current Continental United States ("CONUS") rate for the location of the work being done (i.e., Redwood City for work done in Redwood City, San Mateo for work done at San Mateo Medical Center) as set forth in the Code of Federal Regulations and as listed by the website of the U.S. General Services Administration (available online at http://www.gsa.gov/portal/content/104877 or by searching www.gsa.gov for the term 'CONUS'). County policy limits the reimbursement of lodging in designated high cost of living metropolitan areas to a maximum of double the then-current CONUS rate; for work being done outside of a designated high cost of living metropolitan area, the maximum reimbursement amount for lodging is the then-current CONUS rate.

f.    The maximum reimbursement amount for the actual cost of airfare shall be limited to fares for Economy Class or below. Air travel fares will not be reimbursed for first class, business class, "economy-plus," or other such classes. Reimbursable car rental rates are restricted to the mid-level

CSM 00100

size range or below (i.e. standard size, intermediate, compact, or subcompact); costs for specialty, luxury, premium, SUV, or similar category vehicles are not reimbursable. Reimbursable ride-shares are restricted to standard or basic size vehicles (i.e., non-premium vehicles unless it results in a cost-saving to the County). Exceptions may be allowed under certain circumstances, such as unavailability of the foregoing options, with written approval from authorized County personnel. Other related travel expenses such as taxi fares, ride-shares, parking costs, train or subway costs, etc. shall be reimbursable on an actual-cost basis. Reimbursement of tips for taxi fare, or ride-share are limited to no more than 15% of the fare amount.

g.    Travel-related expenses are limited to: airfare, lodging, car rental, taxi/ride-share plus tips, tolls, incidentals (e.g. porters, baggage carriers or hotel staff), breakfast, lunch, dinner, mileage reimbursement based on Federal reimbursement rate. The County will not reimburse for alcohol.

h.    Reimbursement of tips are limited to no more than 15 percent. Non-reimbursement items (i.e., alcohol) shall be excluded when calculating the amount of the tip that is reimbursable.

*        *        *

CSM 00101

**THIS CONTRACT IS NOT VALID UNTIL SIGNED BY ALL PARTIES. NO WORK WILL COMMENCE UNTIL THIS DOCUMENT HAS BEEN SIGNED BY THE COUNTY PURCHASING AGENT OR AUTHORIZED DESIGNEE.**

**For Contractor:**

DocuSigned by:

_____
2D99A4F9E*A54E8

Contractor Signature

8/30/2022

Date

Victor Aenlle

_____
Contractor Name (please print)

**For County:**

DocuSigned by:

_____
4F48F899DAB94EF...

Purchasing Agent Signature
(Department Head or
**Authorized** Designee)
County of San Mateo

9/20/2022

Date

Michael P. Callagy

Purchasing Agent Name (please print)
(Department Head or **Authorized** Designee)
County of San Mateo

County Executive Officer

Purchasing Agent or **Authorized** Designee
Job Title (please print)
County of San Mateo

Contract Template v.DEBUGBP
may 2022

Page 10

## Exhibit A

## SCOPE OF WORK

In June 2022, San Mateo County held its primary elections which resulted in the election of a new sheriff. Given that it has been several years since an incumbent County elected official did not win a contested election, there is a need for a transition team to be put in place now to ensure that the new Sheriff is able to begin serving without disruption on January 2, 2023. The Sheriff Elect's transition team will assist in planning, organizing, directing and reviewing of current budgets, contracts and other initiatives necessary. The transition team will also be tasked with translating the Sheriff Elect's vision into concrete policies, initiatives, and recruitment of staff to make this vision a reality.

In consideration of the payments set forth in Exhibit B, Contractor will serve on the Sheriff Elect's transition team and shall provide the following services:

1. Use his previous experience in organizational leadership to advise Sheriff Elect Corpus and the rest of the transition team on the following:
   o Advise on budget development, grants and contracts.
   o Review existing grants for compliance with all reporting requirements.

2. Capital Planning: Monitor the contractor work on remodeling of the Old McGuire Jail, which is currently being converted into administrative office space for the Sheriff's Department and keep Sheriff Elect informed of progress and concerns.

3. Review existing contracts and make appropriate recommendations to the Sheriff Elect regarding these contracts and increasing office contract efficiency.

4. Assist in the identification, vetting, and selection of key members of the Sheriff Elect's Executive Team.

5. Perform other duties that may be assigned from the Sheriff Elect to assist with transition work.

## Exhibit B

In consideration of the services provided by Contractor described in Exhibit A and subject to the terms of the Agreement, County shall pay Contractor $105.00 per hour.

Under no circumstances shall the total cost for the services provided by Contractor pursuant to this Agreement exceed $30,000.00.

Contractor shall invoice the County on a monthly basis, and all invoices from Contractor shall include, at minimum: (a) a description of services provided; (b) the time spent on such services; and (c) the employee/professional providing such services with applicable rate(s). Invoices shall be provided to Sheriff Elect Christina Corpus, at: ccorpus@smcgov.org

Exhibit 13

CONFIDENTIAL

| | |
|---|---|
| **From:** | Iliana Rodriguez |
| **To:** | Michael Callagy |
| **Cc:** | John Nibbelin |
| **Subject:** | FW: Termination of Contract |
| **Date:** | Friday, October 21, 2022 10:54:59 AM |
| **Attachments:** | image001.png |

FYI

Iliana Rodriguez (she/her/ella)

Deputy County Executive

County Executive's Office

400 County Center, 1st Floor

Redwood City, CA 94063

Phone I 650-363-4130

Email I irodriguez@smcgov.org



**From:** Iliana Rodriguez <IRodriguez@smcgov.org>

**Sent:** Friday, October 21, 2022 10:54 AM

**To:** Victor Aenlle <victor@aenllefamily.com>

**Subject:** Termination of Contract

Dear Mr. Aenlle,

This e-mail is a follow up to our phone conversation earlier this morning and serves as our official notification of our decision to terminate our contract for your services effective immediately. Please submit your final invoice to our office by Monday, October 24, 2022.

Thank you for your services.

Sincerely,

Iliana Rodriguez (she/her/ella)

Deputy County Executive

County Executive's Office

400 County Center, 1st Floor

Redwood City, CA 94063

Phone I 650-363-4130

Email I irodriguez@smcgov.org



CONFIDENTIAL                    CSM 00106

# Exhibit 14

**EXAMPLES OF DUTIES:**

Duties may include, but are not limited to the following:

1. Review, develop, and propose action plans to ensure policies and initiatives align with the Sheriff's strategic plan. Establish specific goals to put the strategy into action and divide resources for the strategy's execution. Receive general direction from the Sheriff or Undersheriff.

2. Consult with Sheriff's office staff on policies and programs. Develop standards and programs relating to these policies. Check-in with the executive team for a monthly progress report.

3. Track current and proposed federal, state, and local legislation. Assess impacts and develop the County's legislative response.

4. Plan and evaluate the operation of assigned area.  Coordinate the work of the various subdivisions. Advise and consult with section managers.  Meet with appropriate staff to identify and resolve problems or conflicts. Make or recommend final decisions regarding policy, operations, and administrative procedures.

5. Oversee various support services divisions. Ensure legal compliance in Records division. Seek efficiencies in Records leveraging technology and innovative strategies. Collaborate with the Director of IT in the strategic implementation of advanced technology to foster transparency with the public. Oversee the Crime Lab and it's use of state-of-the-art technology and modern policing and crime solving practices.

6. Develop, implement and maintain procedures. coordinate work activities between divisions within the department to prevent delays. Improve programs or services. Assist in the identification, development and implementation of departmental goals, objectives, policies, and priorities.

7. Develop policy and procedures that demonstrate transparency at all levels within the organization.

8. Receive and analyze division and departmental reports. Direct the preparation of monthly and annual reports. Direct the gathering and analysis of information necessary to document and evaluate processes.

9. Monitor and evaluate the effectiveness and efficiency of the division's service delivery. Develop the organizational structure. Determine staffing needs. Identify and recommend alternative approaches or improvements; implement revisions, and changes.

10. Serve as liaison for the Department with a variety of other City/County staff, policy-making officials, and officials of outside agencies. Explain and justify Departmental or administrative procedures, policies, or programs. Negotiate and resolve difficult

and complex issues and problems.

11. Plan, develop, implement or direct major or complex projects or programs which span a number of the department's established sections or divisions. Direct the research of complex, highly technical issues. Analyze alternative solutions or approaches; recommend most effective course of action.

12. Develop and streamline the CCW approval process. Create efficiencies in the application process. Work with the Range staff to ensure qualifications are being met.

13. Assist with developing the Community Advisory for Responsible Engagement, participate in developing the related standards and policies, and process applications.

14. Perform related duties as assigned.

**Knowledge of:**

- Applicable federal, state and local laws, codes, ordinances and court decisions applicable to the assigned division.
- Principles of financial administration, including budgeting and financial analysis.
- Computer systems and applications as used within the County.
- Principles of personnel training, supervision and evaluation.

**Skill/Ability to:**

- Direct and participate in advanced administration and operational activities related to the divisions.
- Coordinate program area activities with other divisions, departments, programs and/or outside agencies.
- Direct and participate in the analysis of a wide variety of moderate to complex administrative/operational problems and make effective operational and/or procedural recommendations.
- Develop and administer policies, guidelines and procedures related to the divisions.
- Use the appropriate interpersonal style and methods of communication to gain acceptance, cooperation, or agreement of a plan, activity, and/or program idea.
- Negotiate agreements between differing individuals and groups of individuals.
- Monitor current and proposed federal, state and local legislation that impact on the division.
- Communicate effectively both orally and in writing.
- Establish and maintain effective work relationships with those contacted in the performance of required duties.

**Education and Experience:**
Any combination of education and experience that would likely provide the required knowledge, skills and abilities is qualifying. A typical way to qualify is:

Five years of increasingly responsible experience performing a wide variety of administrative and managerial duties in a large agency including two years in a senior level administrative or management position.

**Licensure/Certification:**

- Possession of a Class C California driver license or equivalent.

# Exhibit 15

**EXAMPLES OF DUTIES:**

Duties may include, but are not limited to the following:

1. Review, develop, and propose action plans to ensure policies and initiatives align with the Sheriff's strategic plan. Establish specific goals to put the strategy into action and divide resources for the strategy's execution. Receive general direction from the Sheriff or Undersheriff.

2. Consult with Sheriff's office staff on policies and programs. Develop standards and programs relating to these policies. Check-in with the executive team for a monthly progress report.

3. Track current and proposed federal, state, and local legislation. Assess impacts and develop the County's legislative response.

4. Plan and evaluate the operation of assigned area. Coordinate the work of the various subdivisions. Advise and consult with section managers. Meet with appropriate staff to identify and resolve problems or conflicts. Make or recommend final decisions regarding policy, operations, and administrative procedures.

5. Oversee various support services divisions. Ensure legal compliance in Records division. Seek efficiencies in Records leveraging technology and innovative strategies. Collaborate with the Director of IT in the strategic implementation of advanced technology to foster transparency with the public. Oversee the Crime Lab and it's use of state-of-the-art technology and modern policing and crime solving practices.

6. Develop, implement and maintain procedures. coordinate work activities between divisions within the department to prevent delays. Improve programs or services. Assist in the identification, development and implementation of departmental goals, objectives, policies, and priorities.

7. Develop policy and procedures that demonstrate transparency at all levels within the organization.

8. Receive and analyze division and departmental reports. Direct the preparation of monthly and annual reports. Direct the gathering and analysis of information necessary to document and evaluate processes.

9. Monitor and evaluate the effectiveness and efficiency of the division's service delivery. Develop the organizational structure. Determine staffing needs. Identify and recommend alternative approaches or improvements; implement revisions, and changes.

10. Serve as liaison for the Department with a variety of other City/County staff, policy-making officials, and officials of outside agencies. Explain and justify Departmental or administrative procedures, policies, or programs. Negotiate and resolve difficult

and complex issues and problems.

11. Plan, develop, implement or direct major or complex projects or programs which span a number of the department's established sections or divisions. Direct the research of complex, highly technical issues. Analyze alternative solutions or approaches; recommend most effective course of action.

12. Develop and streamline the CCW approval process. Create efficiencies in the application process. Work with the Range staff to ensure qualifications are being met.

13. Assist with developing the Community Advisory for Responsible Engagement, participate in developing the related standards and policies, and process applications.

14. Perform related duties as assigned.

**Knowledge of:**

- Applicable federal, state and local laws, codes, ordinances and court decisions applicable to the assigned division.
- Principles of financial administration, including budgeting and financial analysis.
- Computer systems and applications as used within the County.
- Principles of personnel training, supervision and evaluation.

**Skill/Ability to:**

- Direct and participate in advanced administration and operational activities related to the divisions.
- Coordinate program area activities with other divisions, departments, programs and/or outside agencies.
- Direct and participate in the analysis of a wide variety of moderate to complex administrative/operational problems and make effective operational and/or procedural recommendations.
- Develop and administer policies, guidelines and procedures related to the divisions.
- Use the appropriate interpersonal style and methods of communication to gain acceptance, cooperation, or agreement of a plan, activity, and/or program idea.
- Negotiate agreements between differing individuals and groups of individuals.
- Monitor current and proposed federal, state and local legislation that impact on the division.
- Communicate effectively both orally and in writing.
- Establish and maintain effective work relationships with those contacted in the performance of required duties.

**Education and Experience:**
Any combination of education and experience that would likely provide the required knowledge, skills and abilities is qualifying. A typical way to qualify is:

Five years of increasingly responsible experience performing a wide variety of administrative and managerial duties in a large agency including two years in a senior level administrative or management position.

**Licensure/Certification:**

- Possession of a Class C California driver license or equivalent.

# Exhibit 16

**From:** Lisa Yapching <lyapching@smcgov.org>
**Sent:** Tuesday, March 7, 2023 6:16 PM
**To:** Joann Lov <jlov@smcgov.org>; Heather Enders <henders@smcgov.org>
**Subject:** Fw: 2 EH positions - Correction

I apologize - for Special Project #1 our position for Victor, the most I can actually recommend is $73 per hour consistent with base pay of similar County positions. I was reminded that for contract to extra help conversion, we don't include benefits. We certainly aren't doing it in the case of Project 2. Thanks.


**Lisa Yapching, MSHR, PHR, IPMA-SCP**
Classification/Compensation Manager
San Mateo County Human Resources
P: (650) 363-4381 E: lyapching@smcgov.org
W: http://hr.smcgov.org
Follow us on Twitter @SMCountyJobs

*This e-mail message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and protected information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient please contact the sender by reply e-mail and destroy all copies of the original message.*

---

**From:** Lisa Yapching
**Sent:** Tuesday, March 7, 2023 5:12 PM
**To:** Joann Lov <jlov@smcgov.org>; Heather Enders <henders@smcgov.org>
**Subject:** RE: 2 EH positions

Hi, Heather and Joann.

First of all thanks for sending us the job descriptions. I've had a chance to review the proposed duties and responsibilities and have discussed this with the HR Director.

We approve the use of the Special Projects Coordinator classification for the work described for the duration that work would be assigned to extra help.

We can justify approving a $118/hour rate for the work associated to Special Projects #2 (Paul). It is our opinion that the work described is appropriate for pay close to the Assistant Sheriff level as he will be taking on work in support of the Corrections Division under direction from the Sheriff/Undersheriff, among other things and consistent with previous Assistant Sheriff roles. I'm sure SamCERA will not have an issue with rate of pay for a retiree doing this body of work.

CONFIDENTIAL                    CSM 00116

Unfortunately, we cannot support nor justify a $118/hour rate for the work described in Special Projects #1 (Victor). It is not at the level of an Assistant Sheriff (that pays $119+/hour at the E step) nor does it have the same scope and breadth as Specialist Projects #2. Furthermore, this second position is non-sworn and should not be aligned to a higher level sworn role/pay. And with all due respect, the work described is more in alignment with higher-level Analyst work or mid-level management work (i.e. wide variety of high-level administrative, analytical, and work-flow and special project support work impacting organizational, operational, and policy change and implementation; and community engagement and maintaining close contact/relations with regulatory agencies). For this body of work, I recommend pay rate of $100/hour (equivalent to Senior MA + cost of benefits since extra helps do not get benefits). If Sheriff is amenable to this pay rate please note that approval to hire at that pay rate is not precedence-setting if and when this body of work is incorporated into the Chief of Staff position that I know that Sheriff is looking to create.

Lastly, it is best practice to not have extra help staff manage/supervise divisions and staff so while we can Paul heavily coordinating direction of corrections with the Sheriff or Undersheriff, and with management staff in Corrections, and I can see Victor coordinating projects with service division managers, both of these positions should not be managing/supervising staff while in extra help capacity (and most especially while on contract).

Thanks for consulting with us on this. You can certainly forward this message to the Sheriff, or if you want me to send it directly to her, let me know.

Thanks,
LY

**LISA YAPCHING (She/Her), MSHR, PHR**
Classification/Compensation Manager
San Mateo County Human Resources
(650) 363-4381
lyapching@smcgov.org
www.smcgov.org/hr

**From:** Joann Lov <jlov@smcgov.org>
**Sent:** Thursday, March 2, 2023 2:23 PM
**To:** Lisa Yapching <lyapching@smcgov.org>; Heather Enders <henders@smcgov.org>
**Subject:** 2 EH positions

Hi Lisa,

CONFIDENTIAL                           CSM 00117

Attached are the duties/job description of the 2 positions, requested hourly amount is $118/hour.

Number 1: Victor Aenlle

Number 2: Paul Kunkel (samcera retiree)

Thank you Lisa!
Joann

CONFIDENTIAL

# Exhibit 17

# VICTOR G. AENLLE

## PROFESSIONAL SUMMARY

Real Estate business professional and private investigator with over 15 years of Law Enforcement experience and extensive training in investigations, conflict resolution and public service.

## EDUCATION

**Union Institute & University, Sacramento, CA**
Doctor of Philosophy in Interdisciplinary Studies                                          Expected: August 2023
Master of Science in Organizational Leadership                                              June 2018
Bachelor of Science in Criminal Justice                                                     June 2016

**South Bay Regional Public Safety, San Jose, CA**
Basic Police Academy Level 1                                                                August 2009

**College of San Mateo, San Mateo, CA**
Administration of Justice - Module II                                                       December 2008
Administration of Justice – Module III                                                      June 2008

## WORK EXPERIENCE

**San Mateo County Sheriff's Office**, Redwood City, CA                                     2023-Present
*Executive Consultant*

**Aenlle Investigative Services**, Burlingame, CA                                           2018- Present
*California Licensed Private Investigator PI-188650*
- Conduct background investigations, criminal investigations, executive protection, and surveillance details

**San Mateo County Sheriff's Office**, Redwood City, CA                                     2009-Present
*Reserve Deputy Sheriff, LD1*
- Perform all law enforcement related duties including, patrol (as a solo level-one deputy), investigations, jail, gang unit detail, warrant service, and specialized details
- Conduct investigations involving narcotics, warrant arrests, stolen vehicles, coroner cases, and mentally challenged subjects
- Respond to and resolve over 450 documented calls for service which resulted in police reports.

**Coldwell Banker and Coldwell Commercial NRT**, San Mateo, CA                              1990-Present
*Broker Associate- Commercial and Residential / Global Luxury Realtor*
- Ranked among the top 2% of Coldwell Banker Nationwide
- Recommend acquisition, lease disposition, improvement, property management, and other action consistent with the best interest clients Real Estate portfolios
- Negotiate contracts with sellers and buyers of Real Estate holdings involving both commercial and residential properties

## LEADERSHIP EXPERIENCE

**San Mateo County Sheriff's Office**, Redwood City, CA
*Post Certified Firearms Instructor Range Master*                                           2015- Present
- Teach, qualify, and supervise all activities taking place at the Range
*Mounted Search and Rescue Member*                                                          2013-Present
- Conduct search and rescue operations in remote areas on horseback
*President of Reserve Unit RDSA*                                                             2014-2015
- Worked collaboratively to disseminate the funds for the unit
- Organized and orchestrated routine meetings and duty assignments for the Reserves

**Mounted Patrol of San Mateo County**, Woodside, CA                                        2010- Present

CSM 00120

*Captain / Commander-in-Chief 2016-17*
- Supervised and oversaw the affairs of the Mounted Patrol
- Exercised the exclusive powers and discharged the duties of the office

## ADDITIONAL TRAINING

**Progressive Force Concepts**
- Tactical Firearms Instructor Certification- Handgun (TFIC-H)
- Certificate of completion of Emergency Response Training (ERT)
- Certificate of completion of Protective Security Operations certificate course (PSOC)
- Certificate of completion of Tactical Combat Casualty Care (TCCC)

**Peace Officer Standards of Training Certified Instructor**
- Certificate of Completion of Post Certified Instructor Course- AICC
- Certified Background Investigator
- Certified Firearms Instructor - specializing in handguns and rifles
- Crisis Intervention Training (CIT) Course- critical incident management

**Alameda County Sheriff's Office**
- Certificate of Completion of Post Certified Firearms Instructor Course - Handguns and Rifles

**San Mateo County Sheriff's Office**
- Certificates of Completion for Tactical Patrol Rifle, Gang Investigations, Emergency Vehicle Operations (EVOC), and Intelligence Unit
- Certificate of Completion of Crisis Intervention Training Program (CIT)

**Smith & Wesson**
- Certificate of Completion of Smith & Wesson M&P Armorer Program

**California Mounted Officers Association**
- Certificate of Attendance of Mounted Police & Horsemanship

**California Narcotic Officers Association**
- Certificate of Completion of Narcotic Enforcement

**Public Safety Training Institute**
- Certificate of Completion of Tactical Response to School/Community Violence

**Northern California HIDTA**
- Certificate of Achievement of Detecting Deception

**California Reserve Peace Officer Association**
- Certificate of Completion of the following courses: ARIDE, Express Interrogation, Deadly Weapons Law in California, Carrying Concealed Weapons, Officer Safety, Communications

**Calibre Press**
- Certificate of Completion of Street Survival Seminar

**Front Sight Firearms Institute, Las Vegas**
- Certificates of distinguished graduate of the following courses: Defensive Handgun, Advanced Tactical Handgun, Practical Rifle, Practical Shotgun

## LICENSE AND AFFILIATIONS

- California Real Estate Broker License
- Certified Commercial Investment Member
- Appointed to Trial Judge for Masonic Trials
- Captain of the San Mateo County Mounted Patrol
- San Mateo County Latino Leadership Council

- Shriners Hospital for Children, Member
- 8 Ball Bay Area Law Enforcement Member
- Post Reserve Officer Certificate
- Basic Post Level 1 Academy Certificate
- LEOSA / CCW Permit  - CA, NV, FL

## RELEVANT SKILLS

Firearm Safety, Self-defense, Negotiations, Legal Agreements, Public Safety & Service, Bilingual (Spanish)

CONFIDENTIAL

EXHLP-SO   Extra-Help, Per Diem, Temporary and Other Special Appointments (Sheriff's Office Only)

## Contact Information -- Person ID: 53308045

| | | | |
|---|---|---|---|
| Name: | Victor G. Aenlle | Address: | ▇▇▇▇▇▇▇▇▇▇▇▇ |
| | | | US |
| Home Phone: | ▇▇▇▇▇ | Alternate Phone: | |
| Text Messaging Mobile No: | ▇▇▇▇▇ | Email: | ▇▇▇▇▇▇▇ |
| Former Last Name: | | Month and Day of Birth: | ▇▇▇ |

### Personal Information

| | |
|---|---|
| Driver's License: | Yes, California , ▇▇▇▇▇▇▇ |
| Can you, after employment, submit proof of your legal right to work in the United States? | Yes |
| What is your highest level of education? | Doctorate |

### Preferences

Are you willing to relocate?

Types of positions you will accept:
Types of work you will accept:
Types of shifts you will accept:

### Objective

### Education

**Professional**
*Union Institute & University*
-
Cincinnati , Ohio

Did you graduate: No
Major/Minor: Doctor of Philosophy
Degree Received: Professional

**Graduate School**
*Union Institute & University*
-
Cincinnati , Ohio

Did you graduate: Yes
Major/Minor: Master of Science
Degree Received: Master's

**College/University**
*Union Institute & University*
-
Cincinnati , California

Did you graduate: Yes
Major/Minor: Bachelor of Science
Degree Received: Bachelor's

**Professional**
*Public Safety Training Institute*
-
San Jose, California

Did you graduate: Yes
Major/Minor: Certificate of Completion
Degree Received: Professional

**Professional**
*Front Sight Firearms Institute*
-
Las Vegas, California

Did you graduate: Yes
Major/Minor: Certificate of Completion
Degree Received: Professional

### Work Experience

CONFIDENTIAL                          CSM 00122

**Coldwell Banker**
2/1990 - Present

Hours worked per week: 40
May we contact this employer?

Commercial NRT
San Mateo, California

**Duties**
Coldwell Commercial NRT, Broker Associate- Commercial and Residential / Global Luxury Realtor
-------
* Ranked among the top 2% of Coldwell Banker Nationwide
* Recommend acquisition, lease disposition, improvement, property management, and other action consistent with the best interest clients Real Estate portfolios
* Negotiate contracts with sellers and buyers of Real Estate holdings involving both commercial and residential properties

LEADERSHIP EXPERIENCE

**Firearms Instructor/ POST certified trainor**
3/2015 - Present

Hours worked per week: 10
May we contact this employer?

San Mateo County Sheriff's Office
Redwood City, California 94063

**Duties**
San Mateo County Sheriff's Office, Post Certified Firearms Instructor/Range Master -------
* Teach, qualify, and supervise all activities taking place at the Range

**Mounted Reserve Deputy – Horseback**
8/2014 - Present

Hours worked per week: 3
May we contact this employer?

San Mateo County Sheriff's Office- Mounted Search and Rescue
Redwood City, California 94063

**Duties**
* Conduct search and rescue operations in remote areas on horseback
-------
* Worked collaboratively to disseminate the funds for the unit
* Organized and orchestrated routine meetings and duty assignments for the Reserves

**Captain**
1/2010 - Present

Hours worked per week: 40
May we contact this employer?

Mounted Patrol of San Mateo County
Woodside, California

**Duties**
Mounted Patrol of San Mateo County, -------
* Supervised and oversaw the affairs of the Mounted Patrol
* Exercised the exclusive powers and discharged the duties of the office

**California Licensed Private Investigator**
3/2018 - Present

Hours worked per week: 40
# of Employees Supervised: 3
Name of Supervisor: Victor Aenlle
May we contact this employer?

APIS

**Duties**

CONFIDENTIAL        CSM 00123

All aspects of civil, criminal, and background investigations.

| | |
|---|---|
| **Reserve Deputy Designated level 1** | Hours worked per week: 16 |
| 8/2009 - Present | May we contact this employer? Yes |

San Mateo County Sheriff's Office
400 County Center
Redwood City, California 94063

**Duties**
San Mateo County Sheriff's Office, -------
* Perform all law enforcement-related duties including patrol (as a solo level-one deputy), investigations, jail, gang unit detail, warrant service, and specialized details
* Conduct investigations involving narcotics, warrant arrests, stolen vehicles, coroner cases, and mentally challenged subjects
* Respond to and resolved over 450 documented calls for service which resulted in police reports

**Certificates and Licenses**

**Skills**

Office Skills

Typing:
Data Entry:

Languages

Spanish - Speak, Read, Write

**Additional Information**

**References**

Professional
**Tresmontan, Dave**
Investigator
█████████

Professional
**Marinaro, Frank**
Wealth Manager
█████████

**Resume**

**Text Resume**

**Attachments**

| **Attachment** | **File Name** | **File Type** | **Created By** |
|---|---|---|---|
| V-Aenlle- Resume-May23.docx.pdf | V-Aenlle- Resume-May23.docx.pdf | **Resume** | Job Seeker |

**Agency-Wide Questions**

1. Q: Do you claim veteran service preference?
   A: No

2. Q: How did you learn about this position?
   A: Other

CONFIDENTIAL                 CSM 00124

**3.** Q: If you answered "Other" to the above question, please indicate below how you learned about this job. Your response to this question will help us in better marketing County jobs. Type NA if not applicable.

    A: Employee

**4.** Q: Select the language(s) in which you are fluent, other than English. **To select more than one choice, hold the Control Key, and click on the language(s) you want to select.**

    A: Spanish

**5.** Q: PLEASE READ THE FOLLOWING QUESTION AND OPTIONS CAREFULLY AND SELECT ALL THE OPTIONS THAT APPLY: Are you currently a County of San Mateo employee? (A "no" response will not affect the status of your application.)

    A: No, I am not a County employee at this time but I was previously a regular employee in the County.

**6.** Q: If you are currently a County employee, please indicate your Employee ID Number (9-digit number located on the upper left side of your pay stub). This number will be used to check your promotional points, if applicable. **IMPORTANT: Enter the 9-digit number only! Do not enter any other text.**

    A:

**7.** Q: Are you related by blood or marriage to anyone currently employed in the County of San Mateo? (A "Yes" answer will not disqualify you from this recruitment.)

    A: No

**8.** Q: If you are related by blood or marriage to a current County employee, please indicate in the space below the (A) employee's name and (B) your relationship with employee, for example: daughter, son, aunt, cousin, etc. If you are not related to anyone by blood or marriage, type NA below.

    A: NA

**9.** Q: If you were referred to this position by a current San Mateo County employee, please indicate the name of the employee in the space provided. Type NA if you were not referred.

    A: NA

**10.** Q: San Mateo County departments sometimes need the following temporary workers, in addition to regular employees:
    **Extra Help** - Extra-help positions are short-term employment for up to 1040 hours which is equivalent to about six months; however, employment might end sooner depending on the needs of the hiring departments. Extra-help positions are non-benefitted and are paid on an hourly rate basis.
    **Unclassified** - Unclassified positions are at-will for a limited duration, typically associated with grant or other special funding. These positions are not covered by San Mateo County Civil Service Rules; and there is no formal probation period. The following are the same for classified and unclassified positions: salary, increases and other forms of compensation; accrual of sick leave, vacation, overtime, holiday and leaves of absence; health, dental, vision, long & short term disability, and retirement.
    **Limited Term** - Limited Term positions are designated for a specific and limited period of time, anywhere from 6 months to a maximum of 3 years depending on the assignment. Benefits package for term positions are similar to regular positions EXCEPT for retirement. Term employees receive a 401A retirement package and are not eligible for retiree health benefits or a defined benefit pension.
    **Relief** - Relief positions are short-term and are utilized on a per diem basis. Relief employees are expected to work at least two major holidays in the year, and are expected to be willing to cover shifts that come up on an emergent basis as well as on a

CONFIDENTIAL

pre-designated basis, in order to meet the needs of the facility. Shifts include: days, swings, overnights, holidays and weekends for a 24-hour facility. Relief positions are non-benefitted and are paid hourly at a rate that is 5% above salary rate of regular positions.

Using the above descriptions as a guide, please indicate which temporary positions you would like to be considered for employment. Make sure to check all that apply.

A:  None of the above. Interested in regular employment only.

**Supplemental Questions**

1.  Q:  IMPORTANT: Applicants for Extra-help, per diem, temporary or other special assignments are required to submit full responses on the application and to the following supplemental questions. Your application and responses will give us additional information about your background and experience related to this position and will be used in the selection process. Be sure to indicate on the application which specific licenses and certificates you possess that qualify you or are required for the position. **Be concise and specific. Neatness, clarity of expression, grammar, spelling and ability to follow instructions will be considered in the evaluation process. A resume will not be accepted as a substitute for your completed application or responses to the supplemental questions.**

    A:  Proceed to supplemental questions.

2.  Q:  Indicate the **Position Title** of the extra-help, per diem, or temporary position you were offered.

    A:  Executive Director of Administration

3.  Q:  Enter the name of the **Hiring Manager** who offered you the extra-help, per diem, or temporary position.

    A:  Sheriff Christina Corpus

4.  Q:  Please enter the **Requisition Number** provided to you.

    A:  25107

5.  Q:  Please indicate the name of the **Personnel Clerk** that has provided you with this application link.

    A:  Lavinia Prema

CONFIDENTIAL

CSM 00126

# Exhibit 18

County of San Mateo

## Sheriff's Executive Director of Administration - Unclassified

| | |
|---|---|
| **CLASS CODE** B421 | **SALARY** $95.00 - $118.74 Hourly |
| | $7,600.00 - $9,499.20 Biweekly |
| | $16,466.67 - $20,581.60 Monthly |
| | $197,600.00 - $246,979.20 Annually |

### Definition

Under general direction, plan, organize, direct, and coordinate activities of the Sheriff's Office Support Services Division; develop and implement division goals, policies, and priorities; and provide highly responsible and complex administrative support to senior level management within assigned area of specialization.; and perform related duties as assigned.

### SUPERVISION RECEIVED AND EXERCISED

Receive general direction from the Sheriff or Undersheriff. Exercise direct and indirect supervision over lower level supervisory, professional, technical, and clerical employees.

### Examples Of Duties

Duties may include, but are not limited to, the following:

- Plan, organize, coordinate, and direct the programs and activities across the Support Services Division within the Sheriff's Office which includes Professional Standards, the Forensic Laboratory, Fiscal Services, Technology Services, Training, Payroll, Records, Property, and Civil.
- Monitor current and proposed federal, state, and local legislation to assess its impact and to develop the County's legislative response either in support of or opposition to such legislation; make recommendations and initiate changes in practices and policies as needed.
- Plan, monitor, evaluate, and supervise the operations of the assigned areas; coordinate the priorities and direction on behalf of the Sheriff; coordinate the work of the various subdivisions; advise and consult with section managers; meet with appropriate staff to identify and resolve problems or conflicts; make or recommend final decisions regarding policy, operations, and administrative procedures.
- Develop, implement, and maintain procedures; coordinate work activities between divisions within the department to prevent delays in required actions or to improve programs or services; assist in the identification, development, and implementation of departmental goals, objectives, policies, and priorities; assist in the determination of resource allocation and levels of service according to established policies.
- Direct subordinate managers in the development, maintenance, and evaluation of systems and analyze outcome data in order to evaluate, plan, and implement Sheriff's Office goals and objectives and to plan for future needs; conduct or direct and evaluate complex studies pertaining to a variety of administrative and operational problems and develop and implement effective solutions.
- Direct and counsel assigned staff in the planning, budgeting, and systems needed to monitor and evaluate the effectiveness of the assigned program responsibilities.
- Assist in the preparation and administration of the budget.
- Perform a variety of special assignments, prepare complex analytical, and statistical reports in any of several areas of planning, as assigned.
- Receive and analyze division and departmental reports; direct the preparation of monthly and annual reports; direct the gathering and analysis of information necessary to document and evaluate efficiency in processes.
- Monitor and evaluate the organizational structure, staffing levels, technology needs, financial systems, and other internal operations; identify and recommend alternative solutions or improvements; implement revisions or changes as needed.
- Consult with and advise other County staff and the public regarding pertinent policy issues and participate in the development of standards and programs relating to these policies.
- Provide oversight for fiscal and analytical operations, which may include, but are not limited to, the functions of fiscal control, accounting, purchasing, personnel, grant preparation and analysis, contract administration, and capital improvement.
- Assist with negotiations and monitoring of city and/or special district contracts for services.
- Perform related duties as assigned.

### Qualifications

Note: The level and scope of the knowledge and skills listed below are related to job duties as defined under Distinguishing Characteristics.

### Knowledge of:

- Applicable federal, state, and local laws, codes, ordinances, and court decisions relevant to the assigned division.
- Principles and practices of public administration and organizational management necessary to plan, organize, direct, manage, and evaluate the staff and functions of the financial, human resources, information systems, and administrative functions of a large governmental department providing criminal justice services.
- Principles of management and coaching, including training, directing, evaluating, and supervising subordinate staff.
- Budget, management analysis, supervision, personnel management, employee relations, training, and information systems.
- Administrative and financial problems common to the operation of a criminal justice agency.

- Analysis and resolution of problems related to budget, project management, organization, personnel, systems, and policy governance.
- Advanced principles and practices of modern law enforcement administration and criminal Investigation.
- Principles of financial administration, including public budgeting and financial analysis.
- Computer systems and applications as used within the County.

Skill/Ability to:

- Direct and participate in advanced administration and operational activities related to Support Services.
- Coordinate program area activities with other divisions, departments, programs and/or outside agencies.
- Direct and participate in the analysis of a wide variety of moderate to complex administrative/operational problems and make effective operational and/or procedural recommendations.
- Develop and administer policies, guidelines, and procedures related to the divisions.
- Use the appropriate interpersonal style and methods of communication to gain acceptance, cooperation, or agreement of a plan, activity, and/or program idea.
- Negotiate agreements between differing individuals and groups of individuals.
- Monitor current and proposed federal, state, and local legislation that impacts the Office.
- Supervise, evaluate, and train assigned personnel.
- Audit and evaluate processes to determine efficiency; make recommendations accordingly.
- Communicate concisely and effectively both orally and in writing; have ability to make effective presentations of information, findings, and recommendations.
- Establish and maintain effective work relationships with those contacted in the performance of required duties.
- Effectively represent the Sheriff and department on a variety of matters with other County agencies and departments, the public, media, and other organizations.
- Apply sound supervisory and managerial principles and techniques.

Education and Experience:

Any combination of education and experience that would likely provide the required knowledge and skills is qualifying. A typical way to qualify is an advanced degree, as well as experience specific to the criminal justice system, law enforcement issues, and public safety operations is highly desired.

Licensure/Certification:

Possession of a class C California driver license or equivalent.

**Date Established/Revised**

Established 7-6-23

# Exhibit 19

CONFIDENTIAL

# SHERIFF

# CHRISTINA CORPUS

### SAN MATEO COUNTY SHERIFF'S OFFICE

**DATE:**     July 31, 2023

**TO:**        Rocio Kiryczun, Director of Human Relations

**FROM:**   Christina Corpus, Sheriff

**SUBJECT:**  Victor Aenlle – Step E Request

---

I respectfully request that Mr. Victor Aenlle receive "Step E" compensation for his recent appointment to the Sheriff's Office Executive Director of Administration position, as it has been extended to him and accepted. Over the last 30 years, Mr. Aenlle has served in various leadership and management roles and gained significant exposure to administrative operations in various capacities. In addition to his substantial executive leadership experience, Mr. Aenlle has been an active member for 15 years with the San Mateo County Sheriff's Office.

Throughout his expansive and diverse career, Mr. Aenlle has managed and directed operations for large teams and companies in the areas of sales, marketing, asset acquisition, business development, property management, investments, and investigative and protective services. In each of these roles, he has acquired and demonstrated extensive executive experience in the development of processes, operational oversight, conflict resolution, fiscal management, strategic planning, policy governance, and personnel recruitment, retention, training, and evaluation. Mr. Aenlle has also served as the Captain/CEO for the Mounted Patrol of San Mateo County. In this role, he was responsible for the administration of all facets and provided direction and support to its 140 members.

In his time as a contracted "Executive Consultant" with the Sheriff's Office, Mr. Aenlle has made significant contributions spanning across all divisions and bureaus. Mr. Aenlle's strong aptitude for complex analytical processes and his solution-based mindset have allowed for an expansion of services provided to those we serve. He has worked tirelessly to ensure that the Sheriff's Office is as fiscally responsible as possible, while also enhancing the level of support we provide to the public and members of our office.

While Mr. Aenlle's professional background is noteworthy, he has also successfully pursued and achieved significant educational goals. Mr. Aenlle holds a Bachelor of Science degree in Criminal Justice Management as well as a Master of Science degree in Organizational Leadership. He is a doctoral candidate focusing on Ethical and Creative Leadership as it applies to public safety, community resiliency, and law enforcement training. He has also completed numerous training programs related to public safety.

CONFIDENTIAL

The precedent for the Step E request is firmly established in our standard hiring practices for lateral candidates with significant law enforcement experience. As the Executive Director of Administration position holds the same equivalence as an Assistant Sheriff, we have consistently employed a practice of offering Step E salaries to lateral hires with over 5 years of law enforcement expertise. Victor Aenlle, having accumulated an impressive 15 years of experience with the San Mateo County Sheriff's Office and executive-level experience, should be treated no differently in his appointment to this role than other executives brought in as laterals with extensive experience. Therefore, it is only fair and justified that he receives the same consideration and compensation as his counterparts.

My recommendation of "Step E" compensation is clearly supported by Mr. Aenlle's extensive leadership experience, his in-depth knowledge as it relates to public safety and the San Mateo County Sheriff's Office, and his strong educational pursuits and accomplishments. I would be happy to discuss any additional questions you may have.

CONFIDENTIAL

CSM 00132

# Exhibit 20

CONFIDENTIAL

| From: | Rocio Kiryczun |
|---|---|
| Sent: | Tuesday, August 1, 2023 2:10 PM |
| To: | Christina Corpus |
| Subject: | RE: Step E Request |

Good afternoon,

Given that the candidate has already been informed by the Sheriff's Office that they will receive the top step of the Executive Director of Administration-Unclassified position, HR will honor this commitment as a one-time non-precedent setting exception. However, as I've shared with the Undersheriff, based on our assessment of the candidate's application and resume, as well as our broader experience reviewing advanced step requests countywide, we do not believe Step E is in alignment with the candidate's experience.

I'll ask Ximena to work with your team to process the approval.

Thanks.
Rocio


**From:** Christina Corpus <CCorpus@smcgov.org>
**Sent:** Monday, July 31, 2023 1:53 PM
**To:** Rocio Kiryczun <rkiryczun@smcgov.org>
**Subject:** Step E Request

Rocio,

Please see the attached memo regarding the request for E step for Victor Aenlle.

I appreciate your consideration.

Regards,

Christina

**Christina Corpus, Sheriff**

San Mateo County Sheriff's Office

400 County Center

Redwood City, CA 94063

1

CSM 00134

(650) 599-1664

ccorpus@smcgov.org

http://www.smcsheriff.com

DIGNITY ★ COMPASSION ★ RESPECT

CONFIDENTIAL                    CSM 00135

# Exhibit 21

CONFIDENTIAL



# Volunteer Hour Database

**Sheriff's Office Reserves**

| | | | |
|---|---|---|---|
| 9/16/2024 17:13:09 Aenile,Victor | 1/5/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenile,Victor | 1/8/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenile,Victor | 1/9/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenile,Victor | 1/10/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenile,Victor | 1/11/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenile,Victor | 1/12/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenile,Victor | 1/16/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenile,Victor | 1/17/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenile,Victor | 1/18/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenile,Victor | 1/19/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenile,Victor | 1/22/2024 | 8 | Headquarters |

2024 | 2023 | 2022 | 2021 | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | 2014 | 2013 | 2012 | 2011 | 2010

CONFIDENTIAL

CSM 00137



# Volunteer Hour Database

Sheriff's Office Reserves

| | | | |
|---|---|---|---|
| 9/16/2024 17:13:09 Aenlle,Victor | 1/19/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 1/22/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 1/23/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 1/24/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 1/25/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 1/26/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 1/29/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 1/30/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 1/31/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 2/1/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 2/2/2024 | 8 | Headquarters |

2024  2023  2022  2021  2020  2019  2018  2017  2016  2015  2014  2013  2012  2011  2010

CONFIDENTIAL

CSM 00138



# Volunteer Hour Database

**Sheriff's Office Reserves**

| | | |
|---|---|---|
| 9/16/2024 17:13:09 Aenlle, Victor | 4/19/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 4/22/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 4/23/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 4/24/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 4/25/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 4/26/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 4/29/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/1/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/2/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/3/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/6/2024 | 8 Headquarters |

2024 2023 2022 2021 2020 2019 2018 2017 2016 2015 2014 2013 2012 2011 2010



CONFIDENTIAL

CSM 00140



# Volunteer Hour Database

Sheriff's Office Reserves

| | | |
|---|---|---|
| 9/16/2024 17:13:09 Aenlle, Victor | 5/13/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/14/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/15/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/16/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/17/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/20/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/21/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/22/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/23/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/24/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 Aenlle, Victor | 5/28/2024 | 8 Headquarters |

2024 2023 2022 2021 2020 2019 2018 2017 2016 2015 2014 2013 2012 2011 2010

CONFIDENTIAL

CSM 00141



# Volunteer Hour Database

Sheriff's Office Reserves

| | | | | |
|---|---|---|---|---|
| 9/16/2024 17:13:09 Aenlle,Victor | 5/29/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 5/30/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 5/31/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 6/3/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 6/4/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 6/5/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 6/6/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 6/7/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 6/10/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 6/11/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 6/12/2024 | 8 | Headquarters |

2024  2023  2022  2021  2020  2019  2018  2017  2016  2015  2014  2013  2012  2011  2010

CONFIDENTIAL

CSM 00142



# Volunteer Hour Database

**Sheriff's Office Reserves**

| | | | |
|---|---|---|---|
| 9/16/2024 17:13:09 | Aenlle, Victor | 6/11/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle, Victor | 6/12/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle, Victor | 6/13/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle, Victor | 6/14/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle, Victor | 6/17/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle, Victor | 6/18/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle, Victor | 6/20/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle, Victor | 6/21/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle, Victor | 6/24/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle, Victor | 6/25/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle, Victor | 6/26/2024 | 8 Headquarters |

2024 2023 2022 2021 2020 2019 2018 2017 2016 2015 2014 2013 2012 2011 2010

CSM 00143



# Volunteer Hour Database

**Sheriff's Office Reserves**

| 9/16/2024 17:13:09 | Aenlle,Victor | 6/20/2024 | 8 | Headquarters |
|---|---|---|---|---|
| 9/16/2024 17:13:09 | Aenlle,Victor | 6/21/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 | Aenlle,Victor | 6/24/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 | Aenlle,Victor | 6/25/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 | Aenlle,Victor | 6/26/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 | Aenlle,Victor | 6/27/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 | Aenlle,Victor | 6/28/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 | Aenlle,Victor | 7/1/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 | Aenlle,Victor | 7/2/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 | Aenlle,Victor | 7/3/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 | Aenlle,Victor | 7/8/2024 | 8 | Headquarters |

2024  2023  2022  2021  2020  2019  2018  2017  2016  2015  2014  2013  2012  2011  2010

CONFIDENTIAL

CSM 00144



# Volunteer Hour Database

| Sheriff's Office Reserves | | | |
|---|---|---|---|
| 9/16/2024 17:13:09 | Aenle, Victor | 7/9/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenle, Victor | 7/10/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenle, Victor | 7/11/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenle, Victor | 7/12/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenle, Victor | 7/15/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenle, Victor | 7/16/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenle, Victor | 7/17/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenle, Victor | 7/18/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenle, Victor | 7/19/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenle, Victor | 7/22/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenle, Victor | 7/23/2024 | 8 Headquarters |

2024 2023 2022 2021 2020 2019 2018 2017 2016 2015 2014 2013 2012 2011 2010

CONFIDENTIAL

CSM 00145



# Volunteer Hour Database

Sheriff's Office Reserves

| | | | |
|---|---|---|---|
| 9/16/2024 17:13:09 Aenlle,Victor | 7/17/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 7/18/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 7/19/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 7/22/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 7/23/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 7/24/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 7/25/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 7/26/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 7/29/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 7/30/2024 | 8 | Headquarters |
| 9/16/2024 17:13:09 Aenlle,Victor | 7/31/2024 | 8 | Headquarters |

2024  2023  2022  2021  2020  2019  2018  2017  2016  2015  2014  2013  2012  2011  2010

CONFIDENTIAL

CSM 00146



# Volunteer Hour Database

**Sheriff's Office Reserves**

| | | | |
|---|---|---|---|
| 9/7/2024 17:31:21 Claytor,Kermit | 9/7/0024 | 10 | Meeting / Trair |
| 9/8/2024 12:40:05 Zado,Pierre | 9/7/2024 | 10.5 | Meeting / Trair |
| 9/8/2024 22:47:31 Zado,Pierre | 1/13/2024 | 8 | Other |
| 9/8/2024 22:49:32 Zado,Pierre | 1/26/2024 | 2.5 | Meeting / Trair |
| 9/11/2024 7:25:40 Moore,Dylan | 9/7/2024 | 11 | Meeting / Trair |
| 9/15/2024 7:05:08 McCarville,Tom | 8/30/2024 | 3 | Meeting / Trair |
| 9/15/2024 7:06:07 McCarville,Tom | 9/7/2024 | 10 | Meeting / Trair |
| 9/15/2024 8:45:15 Moore,Dylan | 9/14/2024 | 8 | Millbrae |
| 9/15/2024 10:56:18 Zado,Pierre | 9/14/2024 | 10 | Millbrae |
| 9/16/2024 17:13:09 Aenlle,Victor | 1/2/2024 | 8 | Headquarters |
| 9/17/2024 1:16:25 Husain, Syed | 9/7/2024 | 8 | Meeting / Trair |

2024  2023  2   2019  2018  2017  2016  2015  2014  2013  2012  2011  2010

CONFIDENTIAL       CSM 00147



# Volunteer Hour Database

### Sheriff's Office Reserves

| | | | |
|---|---|---|---|
| 9/15/2024 7:06:07 | McCarville,Tom | 9/7/2024 | 10 Meeting / Trair |
| 9/15/2024 8:45:15 | Moore,Dylan | 9/14/2024 | 8 Millbrae |
| 9/15/2024 10:56:18 | Zado,Pierre | 9/14/2024 | 10 Millbrae |
| 9/16/2024 17:13:09 | Aenlle,Victor | 1/2/2024 | 8 Headquarters |
| 9/17/2024 1:16:25 | Husain, Syed | 9/7/2024 | 8 Meeting / Trair |
| 9/18/2024 8:57:43 | Khedr, Victor | 9/7/2024 | 8.5 Meeting / Trair |
| 9/18/2024 8:58:22 | Khedr, Victor | 9/16/2024 | 9.5 Corrections |
| 9/16/2024 17:13:09 | Aenlle,Victor | 1/3/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle,Victor | 1/4/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle,Victor | 1/5/2024 | 8 Headquarters |
| 9/16/2024 17:13:09 | Aenlle,Victor | 1/8/2024 | 8 Headquarters |

2024  2023  2022  2021  2020  2019  2018  2017  2016  2015  2014  2013  2012  2011  2010

CSM 00148

# Exhibit 22

CSM 00149

 Outlook

**015 no comments week ending 12/30/2023**

**From** Connor Santos-Stevenson </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=25C36F9B7931430192440BAFD080816D-CSANTOSSTEV>

**Date** Tue 1/2/2024 8:28 AM

**To** Van Enriquez <venriquez@smcgov.org>

Scott Berberian
Lisandro Lopez
Preston Lindsey
Brett Murphy
Natasha Andreatta
Christopher Leddy
Joseph Baker
Sean Lundin-Weston
Francis Arqueza
John Barrett
Matthew West
Carlos Tapia
Karla Montejano

# Exhibit 23

CONFIDENTIAL

# CHRISTINA CORPUS

## SHERIFF

### SAN MATEO COUNTY SHERIFF'S OFFICE

**DATE:**      February 5, 2024

**TO:**        Assistant Sheriff Monaghan

**FROM:**      Lieutenant Jonathan Sebring

**SUBJECT:**   Responses to Preferred Assignment Questions

---

The propose of this memo is to provide responses to the questionnaire sent out to all Sheriff's Lieutenants on January 26, 2024.  My responses are in *italic.*

## 1. Briefly explain how your professional traits and qualities align with your current assignment.

*I am currently assigned as the Lieutenant in the Professional Standards Bureau (PSB).  As a Sergeant, I was assigned to PSB from April of 2018 through my promotion to Acting Lieutenant in January of 2023.  Other than three months as a Sergeant assigned to Corrections, and several overtime shifts, I have spent the majority of my time as a supervisor in PSB.*

*Some professional traits I possess that align with my current assignment are integrity, empathy, communication, reliability, honesty and accountability.  I utilize these traits on a daily basis, whether it is with members of the public, Sheriff's personnel, or our partner agencies like the District Attorney's Office.  Accountability in all directions is crucial to success and my ability to effectively communicate, whether it be giving praise, problem solving or having those tough conversations that need to be had from time to time, has helped ensure our PSB team is moving forward at the direction of the Sheriff.*

## 2. What assignment or assignments would you like to do next? If more than one, please order sequentially with the first being your first choice and so on.

*When the Sheriff promoted me to Lieutenant on July 12, 2023, there was mention about me being able to move on to something new since I have been in PSB for so long.  I would like to first thank you and the rest of the Executive Team for the trust you had in me, first to promote me and then as a new Lieutenant, entrust me with one of the most important positions in the Office.*

*We have some exciting new programs and initiatives coming up in PSB and I am proud of the direction we are moving.  The Sheriff also allowed for the long overdue expansion of PSB last year and I was glad to be a part of that.  If it is possible, I would like to stay in PSB for another year (July 2025) to see through some of these new projects and to maintain continuity within the unit.  For a long time, the Lieutenant position in PSB was a revolving door.  The position was used as a steppingstone to Captain.  I would also like to see our hiring and retention plans through to the end, or at least to where our staffing shortage is no longer a crisis.  We are trending in the right direction.*

CONFIDENTIAL                                      CSM 00152

*If it is decided that it is best for my professional development and the Office to go in another direction for PSB, I would like to be considered for the following assignments (in order by preference) with the full understanding that the needs of the Office take priority over my personal preferences:*

*1.) Patrol Lieutenant*
*2.) Investigations*
*3.) Transit Bureau*
*4.) Corrections Team Lieutenant*

**3. Briefly explain how your professional traits and qualities will allow you to be successful in your next role of choice. If more than one, please limit the response to your top choice.**

*The last 12 years of my career have been spent in an investigative role (PSB and Investigations). I can utilize my experience to help develop the next generation of law enforcement professionals and investigators. My ability to effectively communicate coupled with my ability to hold myself and others accountable, are traits that will carry over well as we continue to develop and enhance our relationship with the community and other stakeholders. My established relationships with the Executive Staff and my understanding of the inner workings of the County and Office will be valuable as I work as the conduit between the line level supervisors and the Command Staff.*

**4. Briefly explain how this role will advance your professional development.**

*As stated above, I have spent the past 12 years of my career working on the 3rd floor in some sort of an investigative role. Being selected as a Patrol Lieutenant would take me out of my comfort zone and allow me to get exposed to things like town hall meetings, critical incident management and special projects as assigned by the Command and Executive Staffs. My investigative and PSB experience will enable me to be successful with those tasks utilizing my professional traits as described above.*

**5. Briefly explain how this role will benefit our Office.**

*I can utilize my experience both as an investigator and in PSB to effectively communicate the goals and vision of the Office and be the conduit between the Executive/Command Staff and the line level supervisors. The experience I have, especially that in PSB, is unique and I will be able to bring a different perspective to the line level staff and supervisors. I will be able to use my experience to assist line level supervisors with their own administrative investigations, ensuring quality control at the field level for those important documents.*

**6. Please list the training courses and/or conferences you attended this past year.**
- *Peer Support Conference*
- *CCW Conference*
- *Management School (Module #1 2/12/2024)*

Page **2** of 3

CONFIDENTIAL                         CSM 00153

**7. Which one had the biggest impact on your professional development? Briefly explain why.**

*My training courses and conferences were limited this past year, but the Peer Support Conference had a lasting impact when it pertains to wellness. Taking care of each other and ourselves while looking out for warning signs are crucial in this profession. The conference was a good reminder that although we do a lot of positive things at the Office with respect to wellness, there is always room for improvement, and we can never be content. As an active member and leader of the Peer Support Group, I brought ideas back with me from this conference and shared them with the other leadership within the group as well as the unions.*

**8. What did you implement or change because of what you learned in any of the trainings/conferences you attended?**

*I provided information to the unions regarding in-patient care facilities for wellness and recovery should a situation arise where those services are needed. For the CCW Conference, this was informative as I did not have much knowledge about the topic prior to taking my position. Mostly, our CCW process changed as we utilized retired personnel to run the day to day processes of our CCW program, freeing up our range sergeant to focus on his primary workload. Additionally, we implemented change in our CCW process, expanding on the applicant interviews and background investigations.*

**9. What training/conferences would you like to attend this year?**

*Beside completing my last two management course modules, I would like to be considered for the following training/conferences:*
- *CCW Conference (SB2 updates specifically)*
- *POST Training Manager Course*
- *Leading in Crisis: Response and Mitigation of Critical Incidents*
- *POST Leadership Development Program*

CONFIDENTIAL

CSM 00154

Exhibit 24

CONFIDENTIAL

**SHERIFF**

# CHRISTINA CORPUS

### SAN MATEO COUNTY SHERIFF'S OFFICE

**DATE:** February 13, 2024

**TO:** Rocio Kiryczun, Director of Human Resources

**FROM:** Christina Corpus, Sheriff

**SUBJECT:** Differential Request for Dr. Victor Aenlle

---

Dr. Victor Aenlle was appointed to the Executive Director of Administration/Chief of Staff position in July 2023. In this role, he oversees several bureaus including Technology Services, Records, Property, Professional Standards, Finance, Payroll, the Forensic Laboratory, the Sheriff's Activities League, and the CCW unit.

In addition to his role as Executive Director of Administration/Chief of Staff, Dr. Aenlle has been temporarily assigned to manage over ten million dollars in special projects and initiatives that require considerable expertise, time, and experience.

Some of these projects include:

- Managing the planning and logistics for the new childcare center for employees
- Developing enhanced swim safety programs throughout San Mateo County, focusing on underserved areas
- Managing the acquisition, planning, and logistics for the new Sheriff's Activities League building in Half Moon Bay
- Managing and directing the acquisition and renovation of the old fire station on the coast to be used for emergency equipment/EVOC/ and emergency operations
- Acquiring, planning, and building the new Sheriff's Office substation in North Fair Oaks
- Overseeing the logistics and remodel of the Moss Beach Substation
- Overseeing community outreach initiatives including "Lights On!", and "Project Guardian"
- Creating the San Mateo County Home Buying Assistance Program
- Creating the Sheriff's Office nonprofit foundation

During this time, Dr. Aenlle is being asked to fulfill the duties of his Executive Director of Administration/Chief of Staff role, and also to take ownership of various projects and initiatives that fall outside the scope of his primary position. Additionally, the Sheriff's Office Corrections Division has been temporarily reassigned to the Undersheriff. This will require several areas of responsibility and oversight previously assigned to the Undersheriff to be transitioned to Dr. Aenlle, effective immediately.

Dr. Aenlle is a valued member of the Executive Team who has the breadth of knowledge and experience necessary to move these projects from conception to completion. This temporary differential will help recognize the substantive and highly demanding additional workload.

CONFIDENTIAL                                    CSM 00156

# Exhibit 25

CONFIDENTIAL

CSM 00157

Tuesday, April 8, 2025 at 17:38:41 Pacific Daylight Time

**Subject:** Document
**Date:** Friday, March 8, 2024 at 10:25:00 AM Pacific Standard Time
**From:** Christina Corpus
**To:** Chris Hsiung
**Attachments:** Outlook-55oqr4dp.jpg

Dr. Victor Aenlle was appointed to the Executive Director of Administration/Chief of Staff position in July 2023. In this role, he oversees several bureaus including Technology Services, Records, Property, Professional Standards, Finance, Payroll, the Forensic Laboratory, the Sheriff's Activities League, and the CCW unit.

In addition to his role as Executive Director of Administration/Chief of Staff, Dr. Aenlle has been temporarily assigned to manage over ten million dollars in special projects and initiatives that require considerable expertise, time, and experience.

Some of these projects include:

- Managing the planning and logistics for the new childcare center for employees
- Developing enhanced swim safety programs throughout San Mateo County, focusing on underserved areas
- Managing the acquisition, planning, and logistics for the new Sheriff's Activities League building in Half Moon Bay
- Managing and directing the acquisition and renovation of the old fire station on the coast to be used for emergency equipment/EVOC/ and emergency operations
- Acquiring, planning, and building the new Sheriff's Office substation in North Fair Oaks
- Overseeing the logistics and remodel of the Moss Beach Substation
- Overseeing community outreach initiatives including "Lights On!", and "Project Guardian"
- Creating the San Mateo County Home Buying Assistance Program
- Creating the Sheriff's Office nonprofit foundation
- PIO transition

During this time, Dr. Aenlle is being asked to fulfill the duties of his Executive Director of Administration/Chief of Staff role, and to take ownership of various projects and initiatives that fall outside the scope of his primary position. Additionally, the Sheriff's Office Corrections Division has been temporarily reassigned to the Undersheriff. This will require several areas of responsibility and oversight previously assigned to the Undersheriff to be transitioned to Dr. Aenlle, effective immediately.

1 of 2

CONFIDENTIAL

Dr. Aenlle is a valued member of the Executive Team who has the breadth of knowledge and experience necessary to move these projects from conception to completion.  This temporary differential will help recognize the substantive and highly demanding additional workload.



**Christina Corpus, Sheriff**
*San Mateo County Sheriff's Office*
*400 County Center*
*Redwood City, CA 94063*
*(650) 599-1664*
*ccorpus@smcgov.org*
*http://www.smcsheriff.com*
***DIGNITY ★ COMPASSION ★ RESPECT***

2 of 2

CONFIDENTIAL                    CSM 00159

# Exhibit 26

CONFIDENTIAL



# SHERIFF

# CHRISTINA CORPUS

### SAN MATEO COUNTY SHERIFF'S OFFICE

**DATE:**       March 12, 2024
**TO:**         Rocio Kiryczun, Director of Human Resources
**FROM:**       Chris Hsiung, Undersheriff
**SUBJECT:**    Temporary Differential Pay

---

Dr. Victor Aenlle was appointed to the Executive Director of Administration/Chief of Staff position in July 2023.  In this role, he oversees several bureaus including Technology Services, Records, Property, Professional Standards, Finance, Payroll, the Forensic Laboratory, the Sheriff's Activities League, and the CCW unit.

In addition to his role as Executive Director of Administration/Chief of Staff, Dr. Aenlle has been temporarily assigned to manage over ten million dollars in special projects and initiatives that require considerable expertise, time, and experience.

Some of these projects include:

- Managing the planning and logistics for the new childcare center for employees
- Developing enhanced swim safety programs throughout San Mateo County, focusing on underserved areas
- Managing the acquisition, planning, and logistics for the new Sheriff's Activities League building in Half Moon Bay
- Managing and directing the acquisition and renovation of the old fire station on the coast to be used for emergency equipment/EVOC/ and emergency operations
- Acquiring, planning, and building the new Sheriff's Office substation in North Fair Oaks
- Overseeing the logistics and remodel of the Moss Beach Substation
- Overseeing community outreach initiatives including "Lights On!", and "Project Guardian"
- Creating the San Mateo County Home Buying Assistance Program
- Creating the Sheriff's Office nonprofit foundation
- Assisting with the PIO team

During this time, Dr. Aenlle is being asked to fulfill the duties of his Executive Director of Administration/Chief of Staff role, and to take ownership of various projects and initiatives that fall outside the scope of his primary position.  Additionally, the Sheriff's Office Corrections Division has been temporarily reassigned to me, which has taken up a lot of bandwidth and

*CONFIDENTIAL*
For San Mateo County Sheriff's Office Internal Use Only

resources. As such, Dr. Aenlle has assisted the executive leadership team by taking on projects, as listed above, to help with the Office's goal's and vision.

Dr. Aenlle is a valued member of the Executive Team who has the breadth of knowledge and experience necessary to move these projects from conception to completion. This temporary 10% differential will help recognize the substantive and highly demanding additional workload.

CONFIDENTIAL

CSM 00162

# Exhibit 27

CONFIDENTIAL

| From: | Rocio Kiryczun |
|---|---|
| To: | Chris Hsiung |
| Cc: | Christina Corpus |
| Subject: | RE: Discretionary Pay for Victor Aenlle |
| Date: | Wednesday, March 13, 2024 2:17:00 PM |
| Attachments: | image001.png |
| | image002.png |

Good afternoon,

We had a chance to review your request to offer Victor Aenlle a 10% management differential. Based on our review of the projects listed on the memo, we believe that they all fall under the scope of his position. The job title is Executive Director of Administration, and definition is to "plan, organize, direct, and coordinate activities of the Sheriff's Office Support Services Division; develop and implement division goals, policies, and priorities; and provide highly responsible and complex administrative support to senior level management within assigned area of specialization; and perform related duties as assigned."

The projects listed all fall under the umbrella of administration and so by default are within his scope already. The management differential criteria cites 2 scenarios where a management allowance is applicable:

- To appropriately compensate current classified employees who accept a short-term project or assignment, which is critical to the continued business operations and overall strategic effectiveness of the organization, and the short-term project/assignment **is not customarily assigned to the position or an expected part of the regular assignment**. **It is distinctly outside the scope of the regular assignment, short-term, and critical to the mission of the department.** This is not intended to reward tenured staff or as a promotion; and/or

- To compensate current classified employees **for temporarily assuming the full set of duties from a higher-level vacant position or from a higher-level encumbered position whose incumbent is on an extended leave**. It is not a substitution for the promotional or allocation process.

If the role and assignment is led by a lower level position, it might make sense to give an allowance because some of these projects should sit at a higher level manager that has authority to speak on behalf of the Sheriff and the organization. But because Mr. Aenlle's classification is set a high/executive level, these projects do not exceed his scope.

CONFIDENTIAL                                    CSM 00164

Please let me know if you have any questions.

Thanks.

Rocio

---

**From:** Chris Hsiung <chsiung@smcgov.org>
**Sent:** Tuesday, March 12, 2024 2:09 PM
**To:** Rocio Kiryczun <rkiryczun@smcgov.org>
**Cc:** Christina Corpus <CCorpus@smcgov.org>
**Subject:** Discretionary Pay for Victor Aenlle

Rocio,

Thank you for taking the time to chat with me. As promised, I'm attaching the memo outlining the projects I described on the phone call. Please let me know if you have any questions.

Thanks!

-Chris

**Chris Hsiung, Undersheriff**
**San Mateo County Sheriff's Office**
County Government Center
400 County Center, 3rd Floor
Redwood City, CA 94063
650-599-1662
www.smcsheriff.com
X | Facebook | Instagram | LinkedIn
**PEOPLE FIRST – SERVICE ABOVE SELF**

CONFIDENTIAL                    CSM 00165

Exhibit 28

CONFIDENTIAL



# SHERIFF

# CHRISTINA CORPUS

### SAN MATEO COUNTY SHERIFF'S OFFICE

**DATE:**  April 16, 2024 Updated

**TO:**  Rocio Kiryczun, Director of Human Resources

**FROM:**  Christina Corpus, Sheriff

**SUBJECT:**  Differential Request for Dr. Victor Aenlle

---

Dr. Victor Aenlle was appointed to the Executive Director of Administration/Chief of Staff position in July 2023. In this role, he oversees several bureaus including Technology Services, Records, Property, Professional Standards, Finance, Payroll, the Forensic Laboratory, the Sheriff's Activities League, and the CCW unit.

In addition to his role as Executive Director of Administration/Chief of Staff, Dr. Aenlle has been temporarily assigned to manage over ten million dollars in special projects and initiatives that require considerable expertise, time, and experience. I am asking for the management differential in the amount of 10% for Dr. Aenlle for the duration of one year. During this time frame, he will be performing the duties outlined in the job description for Executive Director or Administration as well as one-time projects and initiatives that fall outside the scope of his assigned position. The alternative to Dr. Aenlle managing these projects would be for the County to hire several consultants and/or project managers, which would likely be cost prohibitive. The following assigned projects are estimated to take up approximately 25% of Dr. Aenlle's time.

Some of these projects include:

- Managing the planning and logistics for the new childcare center for employees
- Developing enhanced swim safety programs throughout San Mateo County, focusing on underserved areas
- Managing the acquisition, planning, and logistics for the new Sheriff's Activities League building in Half Moon Bay
- Managing and directing the acquisition and renovation of the old fire station on the coast to be used for emergency equipment/EVOC/ and emergency operations
- Acquiring, planning, and building the new Sheriff's Office substation in North Fair Oaks
- Overseeing the logistics and remodel of the Moss Beach Substation
- Overseeing community outreach initiatives, including "Lights On!" and "Project Guardian."
- Creating the San Mateo County Home Buying Assistance Program
- Creating the Sheriff's Office Nonprofit Foundation

During this time, Dr. Aenlle is being asked to fulfill the duties of his Executive Director of Administration/Chief of Staff role and take ownership of various projects and initiatives that fall outside the scope of his primary position.

Though the job description for Executive Director of Administration includes highlights the "analysis and resolution of problems related to…project management", there is no mention about planning, coordinating, and managing several office-wide and county-wide projects and initiatives.

The job description for the Executive Director of Administration position very clearly outlines operational oversight over Professional Standards, the Forensic Laboratory, Fiscal Services, Technology Services, Training, Payroll, Records, Property, and Civil.  At this time, Dr. Aenlle has also taken on oversight for the Sheriff's Activities League and has assumed the duties of the interim Director.

Additionally, the Sheriff's Office Corrections Division has been temporarily reassigned to the Undersheriff.  This will require several areas of responsibility and oversight previously assigned to the Undersheriff to be transitioned to Dr. Aenlle, effective immediately.

Dr. Aenlle is a valued member of the Executive Team who has the breadth of knowledge and experience necessary to move these projects from conception to completion.  This temporary differential will help recognize the substantive and highly demanding additional workload.

CONFIDENTIAL                    CSM 00168

Exhibit 29

CONFIDENTIAL

| | |
|---|---|
| **From:** | Rocio Kiryczun |
| **To:** | Christina Corpus |
| **Subject:** | Request for Reconsideration of Allowance for Victor Aenlle |
| **Date:** | Wednesday, April 24, 2024 11:54:00 AM |
| **Attachments:** | Outlook-oebwkvhz |
| | RE Discretionary Pay for Victor Aenlle.msg |

Good Morning Sheriff,

Hope you are doing well... I wanted to reiterate HR's position on the management differential request for Victor Aenlle for overseeing projects that are within scope of his executive level position. As per our previous response (attached) the listed projects fall under the administration umbrella which he has ultimate responsibility for. This includes overseeing SAL after the Executive Director position vacated. For this reason, and because the work described does not fall under either of the criteria for management allowance, we cannot support the allowance.

With regards to covering for the vacated SAL Director position, it is not uncommon for managers to step in when there is a vacancy if other backfilling options (such as working someone else out of class into the position) is not viable, however the manager would not be entitled to extra compensation for doing so as it is expected of a manager to take over a function they oversee when needed. Our Talent Acquisition team is ready to work with you or Victor on a recruitment to fill that vacancy immediately so as to minimize the impact on his workload.

Thank you.

Rocio

**From:** Victor Aenlle <vaenlle@smcgov.org>
**Sent:** Monday, April 22, 2024 12:24 PM
**To:** Christina Corpus <CCorpus@smcgov.org>
**Cc:** Rocio Kiryczun <rkiryczun@smcgov.org>
**Subject:**

Hello Sheriff,

I hope you are doing well. I am resubmitting my request for Management Differential Pay. I have thoroughly reviewed the Management Differential Criteria and find that my request falls within the scope and requirements outlined (attached for reference). Additionally, with the untimely departure of the SAL Executive director, I have assumed those responsibilities and am the acting/interim SAL Executive Director. For context, we have recently approved and granted differential pay when one of our directors assumed the duties of a vacant position and, to this day, continues to receive their differential pay

CONFIDENTIAL     CSM 00170

while training the new hire.

I hope you and the Director of Human Services find my request acceptable. If this is not the case, I would like a written response outlining the reasons for the denial.

Respectfully,

Victor



**Victor Aenlle, Ph.D.**

Chief of Staff

Executive Director of Administration

**San Mateo County Sheriff's Office**

County Government Center

400 County Center, 3rd Floor

Redwood City, CA 94063

650.363.4045

http://www.smcsheriff.com

DIGNITY ★ COMPASSION ★ RESPECT

CONFIDENTIAL

CSM 00171

# Exhibit 30

CONFIDENTIAL

20:29

**Christina Corpus** 

that                                              47m

Today

I knew it that's why I asked for
her to be off boarded ahead of
time                                              12m

We can't really off board before
the agreed upon date or else it
could be considered a de facto
or constructive termination
though.                                          10m

I know you're really mad, trust
me, I get it, but we need to be
careful not to set up that de
facto termination case because
that could open you up to
liability. She's gone in two days
and I don't think she's going to
send anything else. I made that
clear                                            8m

I am so sick of people stepping
all over us in fear of retaliation.
She has already proven us
wrong                                            7m

  

Message

CONFIDENTIAL

Exhibit 31

CONFIDENTIAL

SAN MATEO COUNTY
**DSA**
**DEPUTY SHERIFF'S**
**ASSOCIATION**

Member Login

Home    DSA In The Community    DSA In the News    Retired Member Sign Up    Contact Us    POA Resource    Links    Calendar    Smart Saver Blue Pages

Home    Emailings

Date: 6/21/2024
Subject: DSA Response to Undersheriff Change
From: Ephraim Cheever



### DSA Response to Separation of Undersheriff Hsiung

To All DSA Members,

This morning, it was announced via your county email that Undersheriff Chris Hsiung has left our organization. The timing of this news came as a shock and surprise to the board, although we had heard rumors that this might be coming at some point. We are deeply saddened by this change, as Chris was a big supporter of our organization, our union, and us as employees.

We know that with morale being incredibly low, this uncertainty and change makes morale go even lower. There are many questions that we need to ask as a union – why did this happen? What strategic changes will occur as a result? Are any other changes coming that we need to know about? We also have several projects, such as revisions to the overtime policy and shift bid process, that are now left in limbo.

As our new undersheriff comes on board, we are going to start asking these questions and getting this information back to you all as soon as possible. As the line staff of the Sheriff's Office, as well as our members in the Coroner's and DA's offices, this information is critical to the stability of our organizations and to our day to day operations across all bureaus.

Help

CONFIDENTIAL

Please know that our board is working hard to get answers and solutions, as many of these issues are time sensitive. Please keep an eye out for more information as it becomes available to us. If you have any questions, please feel free to reach out to any board member and we will provide whatever information that we can. Thank you.

Sincerely,

Ephraim Cheever, Vice President
On Behalf of the DSA Board of Directors

San Mateo County Deputy Sheriff's Association
2421 Broadway Street
Redwood City CA 94063
650-261-1081



Return to Previous Page

CONFIDENTIAL                           CSM 00176

# Exhibit 32

CONFIDENTIAL



CONFIDENTIAL    CSM 00178

Exhibit 33

CONFIDENTIAL

# CHRISTINA CORPUS

**SHERIFF**

## SAN MATEO COUNTY SHERIFF'S OFFICE
330 Bradford Street, Redwood City, CA 94063
Telephone: (650) 363-4911

Date:  July 5, 2024

To:     Lieutenant Irfan Zaidi – Professional Standards Bureau

From:  Sergeant Jimmy Chan #S305

Re:     Letter of Interest – Detective Sergeant, Professional Standards Bureau

Dear Lt. Zaidi:

Please accept this letter as my official Letter of Interest for consideration for the position of Detective Sergeant with the San Mateo County Sheriff's Office – Professional Standards Bureau.  My law enforcement career encompasses the following:

- San Mateo County Sheriff's Office
  - Sergeant – Courts and Transportation (April 2024 – Present)
  - Detective Sergeant - Investigations Bureau (2022 – 2024) – Assigned to the Airport Investigations Division.
  - Detective – Investigations Bureau (2018 – 2022) – Assigned to the Airport Investigations Division.
  - Deputy Sheriff
    - Patrol Division (2016 - 2018) – Assigned to the Millbrae Patrol Bureau
    - Corrections Division (2015 - 2016) – Assigned to the Maguire Correctional Facility

- San Mateo Police Department (2004 - 2015)
  - Police Officer
    - Specialty Assignments include:  Canine Handler and Field Training Officer

- San Francisco Police Department
  - Inspector (1999 - 2000) - Vice / Narcotics Division
  - Police Officer (1994 - 1999) – Assigned to the Bayview Police District
    - Specialty Assignment:  Plainclothes Unit Providing Station Level Investigations

CONFIDENTIAL                                           CSM 00180

- California Highway Patrol (1991- 1994)
  - State Traffic Officer – Assigned to the South Los Angeles Area Office

I have completed the following as it directly applies to the position:

- POST Supervisor's School (2 Year Supervisory Certification received)
- POST Internal Affairs Investigation School
- POST Background Investigations School

I understand that this position encompasses administrative investigations, intaking citizen complaints, the supervision and management of the recruitment, testing and background processes, administrative review of records and close partnership with County Counsel, Human Resources and other government and community entities. I further understand the responsibility of being available for callouts after hours and on weekends.

In my 28+ years as a law enforcement official, I have thoroughly enjoyed the team environment that law enforcement requires for success and have always maintained a positive working relationship with the courts, the District Attorney's Office, allied agencies, and the public.

Thank you for your consideration and I look forward to hearing from you.

Sincerely,

Jimmy Chan, Sergeant
San Mateo County Sheriff's Office

# Exhibit 34

CONFIDENTIAL

 Outlook

---

**Re: 015 earning type comments section**

**From** Connor Santos-Stevenson <csantosstevenson@smcgov.org>
**Date** Thu 8/15/2024 4:27 PM
**To**    Carlos Tapia <ctapia@smcgov.org>

Of course!

Feel free to call me at my desk - 650-599-7367


**Connor Santos-Stevenson, WOC Payroll/Personnel Coordinator IV** *(he/him)*
**San Mateo County Sheriff's Office**
Sheriff's Payroll
330 Bradford Street
Redwood City, CA 94063
650-599-7367
www.smcsheriff.com
**PEOPLE FIRST – SERVICE ABOVE SELF**

---

**From:** Carlos Tapia <ctapia@smcgov.org>
**Sent:** Thursday, August 15, 2024 2:32 PM
**To:** Connor Santos-Stevenson <csantosstevenson@smcgov.org>
**Subject:** Re: 015 earning type comments section

Hello Connor,

Can I call you regarding this ?

Thank you,

Carlos Tapia
650-784-1931 cell

Get Outlook for iOS

**From:** Connor Santos-Stevenson <csantosstevenson@smcgov.org>
**Sent:** Thursday, August 15, 2024 2:26:10 PM
**To:** Carlos Tapia <ctapia@smcgov.org>
**Subject:** 015 earning type comments section

Good afternoon, Deputy Tapia,

Hope this email finds you well.

Just a kind reminder to please put something in the **comments section** when you have an 015 line- for auditing purposes.

Please let me know if you have any questions.

CONFIDENTIAL                          CSM 00183



Thank you,



**Connor Santos-Stevenson, WOC Payroll/Personnel Coordinator IV** *(he/him)*
**San Mateo County Sheriff's Office**
Sheriff's Payroll
330 Bradford Street
Redwood City, CA 94063
650-599-7367
www.smcsheriff.com
**PEOPLE FIRST – SERVICE ABOVE SELF**

CONFIDENTIAL

Exhibit 35

CONFIDENTIAL

 **Outlook**

---

**RE: DSA/OSS MOU's**

---

**From** Stacey Stevenson </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=15678E2543824FE2AD5205A06A47E266-SSTEVENSON>

**Date** Tue 8/20/2024 7:55 AM

**To** Jason Cooksey <jcooksey@smcgov.org>

Carlos Tapia.

He did not use the RTE code as far as I can tell on reports. I've asked Payroll to check too.

Stacey

---

**From:** Jason Cooksey <jcooksey@smcgov.org>
**Sent:** Tuesday, August 20, 2024 7:40 AM
**To:** Stacey Stevenson <sstevenson@smcgov.org>
**Subject:** RE: DSA/OSS MOU's

Good Morning Stacey,

I didn't mention that section since it only applies to the Association President, which I assumed the Reps were not. Do you know who is the President?

Thanks

Jason

---

**From:** Stacey Stevenson <sstevenson@smcgov.org>
**Sent:** Monday, August 19, 2024 5:24 PM
**To:** Jason Cooksey <jcooksey@smcgov.org>
**Subject:** RE: DSA/OSS MOU's

County HR referred me to section 3.2 of the DSA MOU. I'm confirming with them that with the reduction to 6 hours for Lincoln holiday, no billing-repayment is needed.
They also said 010 is a code no longer used, and Release time should be coded to RTE.

I ran a report on code RTE, and I don't see anything coded there either. We may need to have payroll push out a memo to union reps and Presidents.

Thanks,
Stacey

---

**From:** Jason Cooksey <jcooksey@smcgov.org>
**Sent:** Monday, August 19, 2024 1:35 PM
**To:** Stacey Stevenson <sstevenson@smcgov.org>
**Subject:** RE: DSA/OSS MOU's

Hi Stacey,

I don't see any specific language in the MOUs that mentions reimbursement for the paid release time. Both MOUs only state, *"representatives of the Association shall be given reasonable time off with*

CONFIDENTIAL    CSM 00186

*pay, including reasonable travel time... Such representatives shall submit written requests for excused absences to Employee Relations at least two (2) working days prior to the meeting whenever possible."*

Would you like me to reach out to County HR see if there's anything formalized in writing on the reimbursement?

Also, I am thinking our Payroll team should be able to pull a report for code 010 Release Time with Pay, which I believe is used for union Rep time.

Thanks

Jason

---

**From:** Jason Cooksey
**Sent:** Monday, August 19, 2024 11:41 AM
**To:** Stacey Stevenson <sstevenson@smcgov.org>
**Subject:** RE: DSA/OSS MOU's

Hi Stacey,

Sure thing.  Let me see what I can find within the language, as well as come up with the estimated costs.

Thanks

Jason

---

**From:** Stacey Stevenson <sstevenson@smcgov.org>
**Sent:** Friday, August 16, 2024 3:35 PM
**To:** Jason Cooksey <jcooksey@smcgov.org>
**Subject:** DSA/OSS MOU's

Hi Jason,

I recall a conversation where County HR told me that the SO should be reimbursed by the two unions for a portion of the salaries of the DSA rep and the OSS rep.  Can you please read through the two union agreements, and find the language that allows for that?
And then calculate what we would be owed annually under that agreement, or specifically for FY23-24 and FY24-25.
DSA rep – Carlos Tapia
OSS rep – Jeffrey Carr

Thanks,
Stacey

CONFIDENTIAL

Exhibit 36

CSM 00188

 Outlook

---

**RE: Check timecard**

---

**From** Stacey Stevenson </O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=15678E2543824FE2AD5205A06A47E266-SSTEVENSON>

**Date** Thu 9/12/2024 12:53 PM

**To** SHERIFFS_Payroll <SHERIFFS_Payroll@smcgov.org>

And the others? Are they all using the proper release time codes?

Thanks,
Stacey

**From:** SHERIFFS_Payroll <SHERIFFS_Payroll@smcgov.org>
**Sent:** Thursday, September 12, 2024 12:40 PM
**To:** Stacey Stevenson <sstevenson@smcgov.org>
**Subject:** Re: Check timecard

Hi Stacey,

Yes, Carlos has been told. He has been updating his timecard with the release time code.

Thanks,



**Sheriff's Office Payroll Unit**

**San Mateo County Sheriff's Office**

330 Bradford Street 4th Floor

Redwood City, CA 94063
www.smcsheriff.com

**PEOPLE FIRST – SERVICE ABOVE SELF**

"This e-mail message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and
protected information. Any unauthorized review; use, disclosure or distribution is prohibited. If you are not the intended recipient please
contact the sender by reply e-mail and destroy all copies of the original message. This e-mail is covered by the Electronic
Communications Privacy Act, 18 U.S.C. 2510-2521, and is legally privileged."

**From:** Stacey Stevenson <sstevenson@smcgov.org>
**Sent:** Wednesday, September 11, 2024 7:54 PM
**To:** SHERIFFS_Payroll <SHERIFFS_Payroll@smcgov.org>
**Subject:** RE: Check timecard

Hi there,

CSM 00189

Can you confirm that the union presidents are now correctly using the RTE code? Carlos Tapia, Hector Acosta, Laura Sparks, etc.  I think it would be good to send an email uniformly to all union presidents/reps to let them know the proper coding to use on their timecards.

Thanks,
Stacey

---

**From:** Stacey Stevenson
**Sent:** Wednesday, August 21, 2024 12:12 PM
**To:** SHERIFFS_Payroll <SHERIFFS_Payroll@smcgov.org>
**Subject:** RE: Check timecard

Hi Van,

County HR informed me this week that he should be using that code. I think this will be better received if he hears it from you in Payroll.  Can you please send him an email and cc his ATKS supervisor and let him know that he should be using the RTE code for any time he is spending on union duties. Please also ask him to submit a spreadsheet of the hours he spent on union duties since 7/1/24 as we will likely need to do an RA to make corrections so we have accurate records.  If possible, maybe Payroll staff can spot check his timecard occasionally to ensure he is doing it correctly.

Please blind copy me or forward the email to me so I can retain a record of this.

Thanks,
Stacey

---

**From:** SHERIFFS_Payroll <SHERIFFS_Payroll@smcgov.org>
**Sent:** Wednesday, August 21, 2024 11:51 AM
**To:** Stacey Stevenson <sstevenson@smcgov.org>
**Subject:** Re: Check timecard

Hi Stacey,

The others in the union (ie L. Sparks, J. Yujuico etc..) has been using RTE.  As for Carlos, I know he mentioned it awhile back with their new contract in 2022, just ran a quick audit and I don't think he's ever used that code before.

Thanks,
Van



**Sheriff's Office Payroll Unit**

**San Mateo County Sheriff's Office**

330 Bradford Street 4th Floor

Redwood City, CA 94063
www.smcsheriff.com

**PEOPLE FIRST – SERVICE ABOVE SELF**

CONFIDENTIAL

"This e-mail message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and protected information. Any unauthorized review; use, disclosure or distribution is prohibited. If you are not the intended recipient please contact the sender by reply e-mail and destroy all copies of the original message. This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and is legally privileged."

**From:** Stacey Stevenson <sstevenson@smcgov.org>
**Sent:** Monday, August 19, 2024 5:27 PM
**To:** SHERIFFS_Payroll <SHERIFFS_Payroll@smcgov.org>
**Subject:** RE: Check timecard

Here is the snippet from the DSA MOU:

## 3.2 President Release Time

The County agrees to provide the Association President with sixty (60) hours of release time each pay period. The Association agrees that the start of the term of office for a newly elected President will coincide with the start of a County pay period.

During this County paid release time, the Association President shall engage only in the following activities: (1) preparing for and participating in meet and confer or consultation with representatives of the County or Sheriff's Office on matters relating to employment conditions and employee relations, including wages, hours and other terms and conditions of employment; (2) investigating or processing grievances or appeals; (3) conducting Association business; (4) participation in Association Board and general membership meetings; (5) attendance at Association related training, conferences and workshops. All approved release time will be coded appropriately on the employee's timecard using pay code RTE.

While on release time, the President will utilize accrued leave in accordance with the terms of this agreement for any absences.

The Association President shall not participate in any other activity, including but not limited to political activity, during this County paid release time. Paid release time is not authorized to be used for political activity, any type of activity that is precluded by law or County policy as a conflict of interest, conducting membership drives, or soliciting membership from other County employees or applicants.

The Association President shall provide documentation to the Sheriff certifying that during each pay period, the Association President used the sixty (60) hours of County paid release time only for authorized purposes. The Association President shall provide this certification at the conclusion of each pay period. Use of the paid release time for unauthorized purposes may result in disciplinary action, up to and including termination of employment.

This agreement for sixty (60) hours of release time per pay period encompasses forty (40) hours per pay period of County-paid release time. In recognition of the Association's responsibility for payment for the remaining twenty (20) hours per pay period of release time for the Association President, effective upon Board of Supervisors' approval of the successor MOU in 2022, the February 12th (Lincoln's Birthday) holiday will be converted to a floating holiday, and the floating holiday will be reduced from eight (8) to six (6) paid hours.

The Sheriff shall fix the release time and work schedule hours of the Association President in accordance with Section 7 of the MOU. Release time shall be scheduled during regular business hours unless otherwise agreed to by the parties. Unused release time hours are not transferable. Unused release time hours resulting from approved time off or lack of Association business cannot be banked for later use, nor shall it be cashable at separation.

If Association representation expands, this agreement does not create precedence or provide guarantee of the addition of release time hours for the Association President or the Association Board.

CONFIDENTIAL                    CSM 00191

County HR told me that code 010 is no longer in use, and all employees conducting union business should be coding to code "RTE".  Can you let me know if that is being used?  If not, you may need to write a memo to all staff to remind folks they need to use that.  Let me know what you find out about Carlos Tapia's timecard though.

Thanks,
Stacey

---

**From:** Stacey Stevenson
**Sent:** Monday, August 19, 2024 5:12 PM
**To:** SHERIFFS_Payroll <SHERIFFS_Payroll@smcgov.org>
**Subject:** Check timecard
**Importance:** High

I spoke to county HR about union president timecards. They informed me that the DSA union president should be coding their timecard with code "RTE" when they are conducting union business, as per MOU agreement.  Can you please check of Carlos Tapia's timecards and let me know if he uses that code ever?  You may need to do an RA to correctly capture this time, but let me know what you find out first.

Thanks,
Stacey

CONFIDENTIAL                                CSM 00192

# Exhibit 37

CONFIDENTIAL

 Outlook

---

**RE: DSA/OSS salary reimbursement**

---

**From** Stacey Stevenson <sstevenson@smcgov.org>
**Date** Mon 8/19/2024 5:20 PM
**To** Michelle Kuka <mkuka@smcgov.org>

Thanks, Michelle!

I know we initially talked about a billing and money transfer between DSA and the SO-County. But instead of the money transfer, the members are only receiving 6 hours of floating time for Lincoln's holiday. So no exchange of money is needed, am I understanding that correctly?

I don't see the union President using the RTE code, so I will have the Payroll unit remind them of that.

Thanks again,
Stacey

---

**From:** Michelle Kuka <mkuka@smcgov.org>
**Sent:** Monday, August 19, 2024 4:23 PM
**To:** Stacey Stevenson <sstevenson@smcgov.org>
**Subject:** Re: DSA/OSS salary reimbursement

Hi Stacey,

Section 3.2 of the DSA MOU discusses the agreement regarding DSA President Release Time. In the last round of neogitations we agreed that the County would pay for 50% of the DSA President Release time and the remaining time is being paid by the members only receiving 6 hours of floating holiday time for Lincoln's Holiday. OSS does not have any President Release Time.

Any County employee on approved release time should be using timecard code RTE for tracking purposes (it used to be code 010).

Thanks,
Michelle

---

**From:** Stacey Stevenson <sstevenson@smcgov.org>
**Sent:** Monday, August 19, 2024 3:19 PM
**To:** Michelle Kuka <mkuka@smcgov.org>
**Subject:** DSA/OSS salary reimbursement

Hi Michelle,

Hope you're doing well! I was going through some old notes and was reminded of a conversation that our prior Director, Pam Deal, and I had with you. You had met with us to review and discuss a potential process for the DSA and OSS to reimburse the County for a

---

   CSM 00194

portion of the DSA rep and the OSS rep salary.  At the time, I think we were discussing language that included a reimbursement of 25% or 50% of the time.

I don't see anything in the current MOU's, but I am unsure if there is any other agreement in place between the DSA/OSS and the County.  Was the discussion we had back then just preemptive planning just in case the language had been approved?  Or is there actual reimbursement language in existence somewhere?  Just trying to make sure I am not missing something.

Also, should those employees be using the 010 Release Time Earnings Code?

Thanks for your help,
Stacey

# Exhibit 38

CONFIDENTIAL



**SHERIFF**

# CHRISTINA CORPUS

**SAN MATEO COUNTY SHERIFF'S OFFICE**
330 Bradford Street, Redwood City, CA 94063
Telephone: (650) 363-4911

August 22, 2024

Javier Acosta
145 Red River Way
San Jose, CA 95136

(Hand-delivered)

Dear Sgt. Acosta:

Effective immediately, you are temporarily assigned to work at home until further notice (Administrative Leave). You are directed to remain at your home between the hours of 8:00 a.m. to 5:00 p.m., Monday through Friday, with a one-hour meal break from noon to 1:00 p.m. during which you are at liberty to leave your residence. If you are unable to be reached by telephone during those hours while on this assignment, the time that you are unavailable will be considered Absence without Leave (AWOL) and disciplinary action will be taken.

You are not to act in any official capacity while on Administrative Leave. You are also not permitted to enter any Sheriff's Office worksite, except portions of worksites that are otherwise open to the public. You are hereby ordered to surrender your badge, ID card, access card, station and other work-related keys, take home car and all issued electronics.

You will remain in this status while the investigation into your misconduct is ongoing, at which time you will be contacted with further directions. While you are on this assignment, you will continue to receive your normal pay and benefits.

Should you wish to conduct personal business away from your home or attend a medical appointment during the period you are assigned to work at home, please call me to let me know the day and hours to code to vacation or sick leave, as appropriate.

CONFIDENTIAL                    CSM 00197

Javier Acosta
August 22, 2024
Page 2

While this investigation is ongoing, you are instructed not to interfere with the investigation in any way. This includes tampering with evidence and/or attempting to influence potential witnesses. You are further directed not to access your work computer system, other than Workday, while on this temporary assignment without receiving advance permission from me. Should you need to retrieve any personal belongings from the office, you are to call me. Failure to comply with these requirements will constitute insubordination.

Sincerely,

Christina Corpus, Sheriff

By _____
Matthew Fox, Captain
Headquarters Patrol

cc: Christina Corpus, Sheriff
    Undersheriff Dan Perea
    Assistant Sheriff Ryan Monaghan
    Captain Brian Philip, Professional Services Bureau
    Lieutenant Irfan Zaidi, Professional Services Bureau
    Rocio Kiryczun, Human Resources Director
    Katy Roberts, Employee and Labor Relations Analyst
    Civil Service and Department Personnel Files

CONFIDENTIAL                                    CSM 00198

# Exhibit 39

CONFIDENTIAL

 **Outlook**

---

**Fw: DSA President Release Time (Coding RTE)**

---

**From** Van Enriquez <venriquez@smcgov.org>
**Date** Wed 8/28/2024 9:03 AM
**To** Carlos Tapia <ctapia@smcgov.org>

Good morning Deputy Tapia,

Confirmed with HR, please use code **010**.

Thank you,



**Van Enriquez,**
**San Mateo County Sheriff's Office**
Payroll Unit
330 Bradford Street- 4th Floor
Redwood City, CA 94063
650-599-1742
www.smcsheriff.com
DIGNITY ★ COMPASSION ★ RESPECT

"This e-mail message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and protected information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient please contact the sender by reply e-mail and destroy all copies of the original message. This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and is legally privileged."

"People First- Service Above Self"-

---

**From:** Van Enriquez
**Sent:** Friday, August 23, 2024 4:05 PM
**To:** Carlos Tapia <ctapia@smcgov.org>
**Cc:** Steve Woelkers <swoelkers@smcgov.org>; Brandon Hensel <BHensel@smcgov.org>
**Subject:** DSA President Release Time (Coding RTE)

Good afternoon Deputy Tapia,

I hope this email finds you well.

I'm just relaying this message from HR, that as the DSA president you will need to code **RTE** in your ATKS timecard whenever you're engaged doing activities as describe in section "3.2 President Release Time" of your MOU (snipped below).

Please let me know if you had any association related activity going back from July 01, 2024 to present. We will need to submit a retro adjustment to get that corrected.

Thank you and please let me know if you have any question.

**3.2 President Release Time**

The County agrees to provide the Association President with sixty (60) hours of release time each pay period. The Association agrees that the start of the term of office for a newly elected President will coincide with the start of a County pay period.

During this County paid release time, the Association President shall engage only in the following activities: (1) preparing for and participating in meet and confer or consultation with representatives of the County or Sheriff's Office on matters relating to employment conditions and employee relations, including wages, hours and other terms and conditions of employment; (2) investigating or processing grievances or appeals; (3) conducting Association business; (4) participation in Association Board and general membership meetings; (5) attendance at Association related training, conferences and workshops. All approved release time will be coded appropriately on the employee's timecard using pay code RTE.

While on release time, the President will utilize accrued leave in accordance with the terms of this agreement for any absences.

The Association President shall not participate in any other activity, including but not limited to political activity, during this County paid release time. Paid release time is not authorized to be used for political activity, any type of activity that is precluded by law or County policy as a conflict of interest, conducting membership drives, or soliciting membership from other County employees or applicants.

The Association President shall provide documentation to the Sheriff certifying that during each pay period, the Association President used the sixty (60) hours of County paid release time only for authorized purposes. The Association President shall provide this certification at the conclusion of each pay period. Use of the paid release time for unauthorized purposes may result in disciplinary action, up to and including termination of employment.

This agreement for sixty (60) hours of release time per pay period encompasses forty (40) hours per pay period of County-paid release time. In recognition of the Association's responsibility for payment for the remaining twenty (20) hours per pay period of release time for the Association President, effective upon Board of Supervisors' approval of the successor MOU in 2022, the February 12th (Lincoln's Birthday) holiday will be converted to a floating holiday, and the floating holiday will be reduced from eight (8) to six (6) paid hours.

The Sheriff shall fix the release time and work schedule hours of the Association President in accordance with Section 7 of the MOU. Release time shall be scheduled during regular business hours unless otherwise agreed to by the parties. Unused release time hours are not transferable. Unused release time hours resulting from approved time off or lack of Association business cannot be banked for later use, nor shall it be cashable at separation.

If Association representation expands, this agreement does not create precedence or provide guarantee of the addition of release time hours for the Association President or the Association Board.

**3.3 Association Board Release Time**

9

Respectfully,



**Van Enriquez,**
**San Mateo County Sheriff's Office**
Payroll Unit
330 Bradford Street- 4th Floor
Redwood City, CA 94063
650-599-1742
www.smcsheriff.com
**DIGNITY ★ COMPASSION ★ RESPECT**

"This e-mail message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and protected information. Any unauthorized review; use, disclosure or distribution is prohibited. If you are not the intended recipient please contact the sender by reply e-mail and destroy all copies of the original message.  This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and is legally privileged."

"People First- Service Above Self"-

CONFIDENTIAL                          CSM 00201

Exhibit 40

CONFIDENTIAL



CONFIDENTIAL      CSM 00203

# Exhibit 41

CONFIDENTIAL



CONFIDENTIAL CSM 00205

Exhibit 42

CONFIDENTIAL

 Outlook

**Re: DSA President Release Time (Coding RTE)**

**From** Van Enriquez <venriquez@smcgov.org>
**Date** Tue 8/27/2024 11:40 AM
**To** Lisa Raiti <lraiti@smcgov.org>; Katy Roberts <kroberts@smcgov.org>

Thank you Lisa and Katy!

That was a great historical reference to it. Really love learning how these things came about.

Best regards,



**Van Enriquez,**
**San Mateo County Sheriff's Office**
Payroll Unit
330 Bradford Street- 4th Floor
Redwood City, CA 94063
650-599-1742
www.smcsheriff.com
DIGNITY ★ COMPASSION ★ RESPECT

"This e-mail message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and protected information. Any unauthorized review; use, disclosure or distribution is prohibited. If you are not the intended recipient please contact the sender by reply e-mail and destroy all copies of the original message. This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and is legally privileged."

"People First- Service Above Self"-

**From:** Lisa Raiti <lraiti@smcgov.org>
**Sent:** Tuesday, August 27, 2024 10:37 AM
**To:** Katy Roberts <kroberts@smcgov.org>
**Cc:** Van Enriquez <venriquez@smcgov.org>
**Subject:** RE: DSA President Release Time (Coding RTE)

Thank you Katy – glad to help.

**From:** Katy Roberts <kroberts@smcgov.org>
**Sent:** Tuesday, August 27, 2024 10:22 AM
**To:** Lisa Raiti <lraiti@smcgov.org>
**Cc:** Van Enriquez <venriquez@smcgov.org>
**Subject:** RE: DSA President Release Time (Coding RTE)

Perfect!
Thank you for clarifying.
I just want to make sure we are doing it right

**From:** Lisa Raiti <lraiti@smcgov.org>
**Sent:** Tuesday, August 27, 2024 10:18 AM
**To:** Katy Roberts <kroberts@smcgov.org>

**Cc:** Van Enriquez <venriquez@smcgov.org>
**Subject:** RE: DSA President Release Time (Coding RTE)

Hi Katy,

Earning code 010 is the official "release time with pay" code and how it shows in Workday. The Sheriff's Office historically was the only department allowed to use code 010 (created for D Wozniak to use). When this was opened up to more unions and departments "RTE" was created for everyone else to use because 010 was too close to 001 and there was an opinion that we would have more problems and confusion if that was the code used. "RTE" was created in ATKS but moves over to Workday as code 010.

I believe we gave instructions to all departments except Sheriff's to use RTE but Sheriff's is to continue to use 010. I believe Carlos should be coded 010 as SHF was not set up to use RTE.

I hope this helps.

Thanks,
Lisa

---

**From:** Katy Roberts <kroberts@smcgov.org>
**Sent:** Tuesday, August 27, 2024 8:56 AM
**To:** Lisa Raiti <lraiti@smcgov.org>
**Cc:** Van Enriquez <venriquez@smcgov.org>
**Subject:** FW: DSA President Release Time (Coding RTE)

Hi Lisa,
I thought that we switched over to RTE from 010 earning code.
Is there a way that we can add RTE for Carlos Tapia?
Thanks,
Katy

---

**From:** Van Enriquez <venriquez@smcgov.org>
**Sent:** Tuesday, August 27, 2024 7:53 AM
**To:** Katy Roberts <kroberts@smcgov.org>
**Subject:** Fw: DSA President Release Time (Coding RTE)

Hi Katy,

I need help with this.

Earning code (010) I suppose is fine per Luong's below email, I think Stacey was talking to someone in HR and she was told that employee's conducting union business need to use RTE as 010 is no longer use, but Carlos does not have that code available in his timecard. Is 010 still fine in this case and Luong's explanation?

Thanks,



**Van Enriquez,**
**San Mateo County Sheriff's Office**
Payroll Unit
330 Bradford Street- 4th Floor
Redwood City, CA 94063
650-599-1742
www.smcsheriff.com
**DIGNITY ★ COMPASSION ★ RESPECT**

CONFIDENTIAL                                                    CSM 00208

"This e-mail message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and protected information. Any unauthorized review; use, disclosure or distribution is prohibited. If you are not the intended recipient please contact the sender by reply e-mail and destroy all copies of the original message.  This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and is legally privileged."

"People First- Service Above Self"-

**From:** Luong Tran <ltran@smcgov.org>
**Sent:** Monday, August 26, 2024 1:21 PM
**To:** Van Enriquez <venriquez@smcgov.org>; Tanya Stulken Duarte <tstulkenduarte@smcgov.org>
**Cc:** Heather Enders <henders@smcgov.org>; Katy Roberts <kroberts@smcgov.org>; Marie Biehler <mbiehler@smcgov.org>
**Subject:** RE: DSA President Release Time (Coding RTE)

Hi Van.

I am confirming that the employee should use earn code 010 in the timesheet.

Earn code *010 Release Time with Pay* and earn code *RTE Release Time with Pay*  are effectively the same as they are both exported out of ATKS as 010 and processed in Workday as 010.

Thanks,
Luong Tran
Controller's Office – Payroll Division

**From:** Van Enriquez <venriquez@smcgov.org>
**Sent:** Monday, August 26, 2024 12:20 PM
**To:** Tanya Stulken Duarte <tstulkenduarte@smcgov.org>; Luong Tran <ltran@smcgov.org>
**Cc:** Heather Enders <henders@smcgov.org>; Katy Roberts <kroberts@smcgov.org>; Marie Biehler <mbiehler@smcgov.org>
**Subject:** Fw: DSA President Release Time (Coding RTE)

Hello Tanya/Luong,

The employee was trying to add this RTE code in his timecard but it is not available.

This is his current earning code available only 010 that relates to rte, can the RTE earning code be added asap please?

Thank you,



This is from another union rep.



Respectfully,

CONFIDENTIAL          CSM 00210



**Van Enriquez,**
**San Mateo County Sheriff's Office**
Payroll Unit
330 Bradford Street- 4th Floor
Redwood City, CA 94063
650-599-1742
www.smcsheriff.com
**DIGNITY ★ COMPASSION ★ RESPECT**

"This e-mail message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and protected information. Any unauthorized review; use, disclosure or distribution is prohibited. If you are not the intended recipient please contact the sender by reply e-mail and destroy all copies of the original message. This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and is legally privileged."

"People First- Service Above Self"-

**From:** Van Enriquez
**Sent:** Friday, August 23, 2024 4:05 PM
**To:** Carlos Tapia <ctapia@smcgov.org>
**Cc:** Steve Woelkers <swoelkers@smcgov.org>; Brandon Hensel <BHensel@smcgov.org>
**Subject:** DSA President Release Time (Coding RTE)

Good afternoon Deputy Tapia,

I hope this email finds you well.

I'm just relaying this message from HR, that as the DSA president you will need to code **RTE** in your ATKS timecard whenever you're engaged doing activities as describe in section "3.2 President Release Time" of your MOU (snipped below).

Please let me know if you had any association related activity going back from July 01, 2024 to present.  We will need to submit a retro adjustment to get that corrected.

Thank you and please let me know if you have any question.

CONFIDENTIAL

CSM 00211

3.2 President Release Time

The County agrees to provide the Association President with sixty (60) hours of release time each pay period. The Association agrees that the start of the term of office for a newly elected President will coincide with the start of a County pay period.

During this County paid release time, the Association President shall engage only in the following activities: (1) preparing for and participating in meet and confer or consultation with representatives of the County or Sheriff's Office on matters relating to employment conditions and employee relations, including wages, hours and other terms and conditions of employment; (2) investigating or processing grievances or appeals; (3) conducting Association business; (4) participation in Association Board and general membership meetings; (5) attendance at Association related training, conferences and workshops. All approved release time will be coded appropriately on the employee's timecard using pay code RTE.

While on release time, the President will utilize accrued leave in accordance with the terms of this agreement for any absences.

The Association President shall not participate in any other activity, including but not limited to political activity, during this County paid release time. Paid release time is not authorized to be used for political activity, any type of activity that is precluded by law or County policy as a conflict of interest, conducting membership drives, or soliciting membership from other County employees or applicants.

The Association President shall provide documentation to the Sheriff certifying that during each pay period, the Association President used the sixty (60) hours of County paid release time only for authorized purposes. The Association President shall provide this certification at the conclusion of each pay period. Use of the paid release time for unauthorized purposes may result in disciplinary action, up to and including termination of employment.

This agreement for sixty (60) hours of release time per pay period encompasses forty (40) hours per pay period of County-paid release time. In recognition of the Association's responsibility for payment for the remaining twenty (20) hours per pay period of release time for the Association President, effective upon Board of Supervisors' approval of the successor MOU in 2022, the February 12th (Lincoln's Birthday) holiday will be converted to a floating holiday, and the floating holiday will be reduced from eight (8) to six (6) paid hours.

The Sheriff shall fix the release time and work schedule hours of the Association President in accordance with Section 7 of the MOU. Release time shall be scheduled during regular business hours unless otherwise agreed to by the parties. Unused release time hours are not transferable. Unused release time hours resulting from approved time off or lack of Association business cannot be banked for later use, nor shall it be cashable at separation.

If Association representation expands, this agreement does not create precedence or provide guarantee of the addition of release time hours for the Association President or the Association Board.

3.3 Association Board Release Time

9

Respectfully,



**Van Enriquez,**
**San Mateo County Sheriff's Office**
Payroll Unit
330 Bradford Street- 4th Floor
Redwood City, CA 94063
650-599-1742
www.smcsheriff.com
**DIGNITY ★ COMPASSION ★ RESPECT**

CONFIDENTIAL

CSM 00212

"This e-mail message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and protected information. Any unauthorized review; use, disclosure or distribution is prohibited. If you are not the intended recipient please contact the sender by reply e-mail and destroy all copies of the original message. This e-mail is covered by the Electronic Communications Privacy Act, 18 U.S.C. 2510-2521, and is legally privileged."

"People First- Service Above Self"-

CONFIDENTIAL

Exhibit 43

CONFIDENTIAL



# SHERIFF

# CHRISTINA CORPUS

### SAN MATEO COUNTY SHERIFF'S OFFICE

**DATE:**       August 28, 2024

**TO:**          Captain Brian Philip

**FROM:**       Sergeant Joe Fava

**SUBJECT:**   Deputy Dominguez Incident

---

On July 30, 2024, I was contacted by Detective Sergeants Carr and Burnett regarding concerning behavior identified during a criminal investigation. They informed me that Detective West was investigating a hate crime that occurred in Half Moon Bay, involving a suspect named Kayler Gonzalez.

Detective Sergeants Carr and Burnett explained that Gonzalez, a 14-year-old validated Sureno gang member, is the suspect in the hate crime investigation led by Detective West. As part of the investigation, Detective West conducted a download of Gonzalez's cellphone. During the review of the downloaded content, Detective West discovered a concerning video.

According to Detective Sergeants Carr and Burnett, the video showed Gonzalez smoking an electronic cigarette while seated in Deputy Dominguez's patrol car. I inquired how they confirmed it was Deputy Dominguez's patrol car. Detective Sergeant Carr stated that the video clearly showed Deputy Dominguez in full uniform, and it was evident that they were in a patrol vehicle. Additionally, they informed me that Gonzalez had Deputy Dominguez's personal cellphone number saved in his phone. I was subsequently provided with a copy of the video for review.

Upon reviewing the video, I observed that it lasts only a few seconds but unmistakably shows Gonzalez seated in the passenger seat of a vehicle, with Deputy Dominguez driving. I was able to identify the vehicle as a Sheriff's Office patrol vehicle, as it contained a patrol rifle positioned between Gonzalez and Deputy Dominguez, the patrol car's computer keyboard was visible, and Deputy Dominguez was in full Sheriff's Office uniform. The video also showed Gonzalez holding an orange electronic cigarette to his mouth, panning to Deputy Dominguez, and exhaling smoke.

*CONFIDENTIAL*
For San Mateo County Sheriff's Office Internal Use Only





Page **2** of **3**

CONFIDENTIAL                    CSM 00216



**Smoke can be seen more clearly in the video**

I searched Gonzalez's name in RIMS and saw the following information:

- Gonzalez is 14 years old.
- Gonzalez was validated as a Coast Side Locos Sureno gang member on April 16, 2024.
- Gonzalez has an extensive criminal history which started in 2017. The criminal history includes 288(a) PC (lewd acts with a person under 14 years of age), 243.4(e)(1) PC (sexual battery), 243(e)(1) PC (domestic battery), 601 W&I (a) and (b) (incorrigible minor and truancy), 422.6(b) PC-(Vandalism to violate civil rights), 594(b)(1) PC (felony vandalism), 148(a)(1) PC (resisting arrest), 242 PC (battery), 422.7(b) (hate crime).
- I also saw the Gonzalez was mentioned in a gang related attempted murder, which he was present for.

Based on the information provided, I recommend initiating an internal affairs investigation into Deputy Dominguez's conduct.

_____

Joe Fava, Sergeant
Professional Standards Bureau

Page **3** of **3**

CONFIDENTIAL                    CSM 00217

Exhibit 44

CONFIDENTIAL

# CHRISTINA CORPUS

### SHERIFF

**SAN MATEO COUNTY SHERIFF'S OFFICE**

**DATE:**      August 29, 2024

**TO:**        Lieutenant Irfan Zaidi

**FROM:**      Sergeant Joe Fava

**SUBJECT:**   Avendano Off-duty Incident

---

On August 17, 2024, I was contacted by Lieutenant Myers regarding an off-duty incident involving one of her correctional officers. Lieutenant Myers informed me that Correctional Officer Avendano was involved in an off-duty situation where he detained an individual who had spat on his daughter. Lieutenant Myers said the Redwood City Police Department (RCPD) was on scene. She also mentioned that Sergeant Koehler was en route to the scene and would provide further details.

Shortly thereafter, I spoke with Sergeant Koehler regarding the incident. He informed me that Correctional Officer Avendano's wife was in labor, and he was with her at the hospital. Meanwhile, their other two children, Eli (12 years old) and Aria (4 years old), were with their grandmother, who had taken them to Palm Park at 1425 Hudson St., Redwood City, CA.

While at the park, Aria became involved in a physical altercation with another child, Jerimiah (4 years old). Jerimiah's father, Ernesto Vargas, allegedly intervened and spat on Aria. Eli immediately contacted Correctional Officer Avendano to inform him of what had occurred. Correctional Officer Avendano then called the Redwood City Police Department and proceeded to the scene.

According to Sergeant Koehler, upon arrival, Eli identified Vargas to Correctional Officer Avendano. When Correctional Officer Avendano called out to Vargas, he began to walk away. As a result, Correctional Officer Avendano pursued Vargas, applied a control hold, and detained him on the ground until RCPD officers arrived. At some point during the incident, Correctional Officer Avendano identified himself as a correctional officer.

To my knowledge, no one else contacted Correctional Officer Avendano regarding this incident.

On August 20, 2024, I contacted RCPD and obtained the report and body-worn camera (BWC) footage related to the incident. I reviewed the report authored by RCPD Officer Stamps.

On August 17, 2024, at 1446 hours, Officer Stamps and his partners responded to Palm Park following a report of a disturbance. RCPD dispatch informed Officer Stamps that Correctional Officer Avendano, an off-duty Deputy Sheriff, was detaining the subject.

Upon arrival, Officer Stamps located Vargas lying face down, with Correctional Officer Avendano holding his left wrist. Officer Stamps asked if Avendano wanted Vargas detained, to which Avendano responded by saying, yes.

Correctional Officer Avendano explained to Officer Stamps that his wife was in labor at a nearby hospital. Eli contacted him, reporting that Vargas had called Aria a "pendeja" and spat on her. Avendano instructed Eli to call 911 and informed him that he was on his way to the scene. Upon arrival at the park, Eli pointed out Vargas, who was sitting on a nearby bench.

Correctional Officer Avendano approached Vargas and gestured for him to come over towards him. Vargas responded by walking away, which led Avendano to believe that Vargas was attempting to flee. Avendano then "quickly approached Vargas and took hold of him to prevent him from fleeing the scene."

Officer Stamps reported that Correctional Officer Avendano employed a "takedown technique to bring Vargas to the ground." Once on the ground, Vargas reportedly said, "I don't want to go to jail. I'm sorry I spit on her. They are going to take my son away." Despite Avendano's attempts to detain him, Vargas resisted and tried to get up.

Officer Stamps also interviewed a witness, Obed Raymundo, who stated that while he did not see Vargas spit on Aria, he did observe the altercation between Avendano and Vargas. Raymundo noted that Correctional Officer Avendano appeared angry and "took Vargas to the ground."

When interviewed by Officer Stamps, Vargas claimed that he was at the park with Jeremiah when Correctional Officer Avendano approached and "threw him on the ground." Vargas also alleged that Avendano dragged him towards the tanbark near the playground after he was on the ground. Vargas denied spitting on Aria, claiming that he had only told her to calm down. Vargas he would never spit on a child, as he would be upset if someone did that to his own child.

Page **2** of **4**

Vargas reported no injuries but mentioned a burning sensation on his face. Officer Stamps observed a ½" x ¼" red mark above Vargas' left eyebrow, which appeared to be a result of the incident.

Ultimately, Officer Stamps released Vargas from the scene without an arrest or citation and referred the case to the District Attorney's Office for review under 242 PC.

I also reviewed the BWC footage from Officer Stamps. While much of the incident was detailed in his report, the following information, though possibly irrelevant to the criminal investigation, may have implications for any potential administrative inquiry:

Upon arrival, the footage showed Correctional Officer Avendano squatting over Vargas, who was on the ground, holding Vargas' left wrist. Vargas' young son was kneeling nearby, crying. After taking control of Vargas and placing him in handcuffs, Officer Stamps observed Avendano attempting to calm Vargas' son and inquired about his mother's name. The child identified his mother as Danisha Banks. Correctional Officer Avendano said he knew Banks from high school, asked Jerimiah where Banks worked, and Correctional Officer Avendano called Banks at work.

During their conversation, Officer Stamps referred to Correctional Officer Avendano as a deputy and asked where he worked. Avendano confirmed that he worked for the Sheriff's Office. When asked if he intended to place Vargas under citizen's arrest, Avendano provided his work ID and driver's license. When asked, Correctional Officer Avendano said he was acting as a private citizen, but did tell Vargas he worked in the jail.

Shortly afterward, Banks and her parents arrived on the scene. Banks loudly questioned why Vargas was the only one in handcuffs if Avendano had "thrown" him to the ground. She also remarked, "Of course, you're just going to believe the Sheriff's Deputy." Banks added, "Damn, off duty. That's what they can do to people?"

Officer Stamps' report omitted some details from Raymundo's statement. Raymundo mentioned, "He (Correctional Officer Avendano) came mad, you know? He took him down, forcefully." When asked how Avendano brought Vargas to the ground, Raymundo responded, "He brought him down with all his strength. Attacked him."

In addition to what is written in the report, Vargas also stated that he was walking towards his son to play with a ball at the park when Avendano approached and threw him to the ground. He claimed that Avendano did not say anything to him before taking him down.

Page **3** of **4**

While Officer Stamps was speaking with Vargas, I could see the small injury described by Officer Stamps.

I reviewed an unknown officer's BWC that was sent with Officer Stamps' BWC recording. The video shows a subject, referred to by the officers as "Mr. Glover" Glover makes several rude comments towards Correctional Officer Avendano and eventually said that Aria shouldn't have been playing with Jerimiah. At that point, Correctional Officer Avendano engages in a verbal argument with Glover in front of the RCPD officers.

**Conclusion:**

Correctional Officer Avendano claimed to be acting as a private citizen, but there is some uncertainty as to whether and when he identified himself to Vargas as a Sheriff's Office employee. Although Banks seemingly knew that Avendano worked for the Sheriff's Office, it is unclear how she obtained this information. Correctional Officer Avendano took enforcement action by placing Vargas in a control hold, taking him to the ground, and detaining him until police arrived. Correctional Officer Avendano detained Vargas for a misdemeanor not committed in his presence. This action resulted in Vargas sustaining a minor injury. As a correctional officer, Avendano does not have police powers under 835 PC, which could potentially expose the Sheriff's Office to liability.

Throughout the investigation, Officer Stamps interviewed Raymundo, who described Avendano as being angry and "attacking" Vargas. Vargas claimed that Avendano did not say anything to him before taking him to the ground.

Based on the information obtained from the police report and the BWC footage, it is reasonable to believe that one or more Sheriff's Office policies may have been violated. Therefore, I believe an administrative investigation could be warranted.

There have been no formal complaint made about this incident at this time.

At the time of this memorandum, Correctional Officer Avendano has a pending 12-hour suspension for CUBO, neglect of duty, and unsatisfactory performance. Correctional Officer Avendano is also in backgrounds to promote to deputy sheriff.

_____
Joe Fava, Sergeant
Professional Standards Bureau

CONFIDENTIAL

CSM 00222

# Exhibit 45

CONFIDENTIAL



STATE OF CALIFORNIA
PUBLIC EMPLOYMENT RELATIONS BOARD

# UNFAIR PRACTICE CHARGE

| DO NOT WRITE IN THIS SPACE: Case No: | Date Filed: 08/30/2024 |
|---|---|

**INSTRUCTIONS:** File the original and one copy of this charge form in the appropriate PERB regional office (see PERB Regulation 32075), with proof of service attached to each copy. Proper filing includes concurrent service and proof of service of the charge as required by PERB Regulation 32615(c). All forms are available from the regional offices or PERB's website at www.perb.ca.gov. If more space is needed for any item on this form, attach additional sheets and number items.

IS THIS AN AMENDED CHARGE?    YES ☐    If so, Case No    NO ☒

1. CHARGING PARTY:    EMPLOYEE ☐    EMPLOYEE ORGANIZATION ☒    EMPLOYER ☐    PUBLIC[1] ☐

| | | |
|---|---|---|
| a. | Full name: | San Mateo County Deputy Sheriff's Association |
| b. | Mailing Address: | c/o Mastagni Holstedt, A.P.C, 1912 I Street, Sacramento, CA 95811 |
| c. | Telephone number: | (916) 446-4692 |
| d. | Name and title of agent to contact: | Garrett R. Porter, Attorney for Charging Party    E-mail Address:    gporter@mastagni.com |
| | Telephone number: | (916) 491-4217    Fax No.: |
| e. | Bargaining Unit(s) involved: | Deputy Sheriffs' Association |

2. CHARGE FILED AGAINST: (mark one only)   EMPLOYEE ORGANIZATION ☐    EMPLOYER ☒

| | | |
|---|---|---|
| a. | Full name: | County of San Mateo |
| b. | Mailing Address: | County Executive's Office, 500 County Center 5th Floor, Redwood City, CA 94063 |
| c. | Telephone number: | (650) 363-4123 |
| d. | Name and title of agent to contact: | Mike Callagy, County Executive Officer    E-mail Address:    mcallagy@smcgov.org |
| | Telephone number: | (650) 363-4123    Fax No.: |

3. NAME OF EMPLOYER (Complete this section only if the charge is filed against an employee organization.)

a. Full name:
b. Mailing address:

4. APPOINTING POWER: (Complete this section only if the employer is the State of California. See Gov. Code, § 18524.)

a. Full name:
b. Mailing Address:
c. Agent:

5. GRIEVANCE PROCEDURE

---

[1] An affected member of the public may only file a charge relating to an alleged public notice violation, pursuant to Government Code section 3523, 3547, 3547.5, or 3595, or Public Utilities Code section 99569

PERB-61 (4/3/2020)    SEE REVERSE SIDE

CONFIDENTIAL    CSM 00224

| | |
|---|---|
| Are the parties covered by an agreement containing a grievance procedure which ends in binding arbitration? <br> Yes ☒  No ☐  Unknown ☐ | |

PERB Received<br>08/30/24 17:46 PM

**6. STATEMENT OF CHARGE**

a.  The charging party hereby alleges that the above-named respondent is under the jurisdiction of: (check one)

☐ Educational Employment Relations Act (EERA) (Gov. Code, § 3540 et seq.)

☐ Ralph C. Dills Act (Gov. Code, § 3512 et seq.)

☐ Higher Education Employer-Employee Relations Act (HEERA) (Gov. Code, § 3560 et seq.)

☒ Meyers-Milias-Brown Act (MMBA) (Gov. Code, § 3500 et seq.)

☐ Los Angeles County Metropolitan Transportation Authority Transit Employer-Employee Relations Act (TEERA) (Pub. Utilities Code, § 99560 et seq.)

☐ One of the following Public Utilities Code Transit District Acts: San Francisco Bay Area Rapid Transit District Act (SFBART Act) (Pub. Util. Code, § 28848 et seq.), Orange County Transit District Act (OCTDA) (Pub. Util. Code, § 40000 et seq.), Sacramento Regional Transit District Act (Sac RTD Act) (Pub. Util. Code, § 102398 et seq.), Santa Clara VTA, (Pub. Util. Code, § 100300 et seq.), and Santa Cruz Metro (Pub. Util. Code., § 98160 et seq.)

☐ Trial Court Employment Protection and Governance Act (Trial Court Act) (Article 3; Gov. Code, § 71630 – 71639.5)

☐ Trial Court Interpreter Employment and Labor Relations Act (Court Interpreter Act) (Gov. Code, § 71800 et seq.)

b.  The specific Government or Public Utilities Code section(s) or PERB regulation section(s) alleged to have been violated is/are:

Gov. Code sections 3502, 3502.1, 3503, 3505, 3506, 3506.5, 3507 and PERB Regulation 32603

c.  For MMBA, Trial Court Act and Court Interpreter Act cases, if applicable, the specific local rule(s) alleged to have been violated is/are (*a copy of the applicable local rule(s) MUST be attached to the charge*):

d.  Provide a clear and concise statement of the conduct alleged to constitute an unfair practice including, where known, the time and place of each instance of respondent's conduct, and the name and capacity of each person involved.  This must be a statement of the facts that support your claim and *not conclusions of law*. A statement of the remedy sought must also be provided. (*Use and attach additional sheets of paper if necessary*.)

Please see attached.

**DECLARATION**

I declare under penalty of perjury that I have read the above charge and that the statements herein are true and complete to the best of my knowledge and belief. (A Declaration will be included in the e-mail you receive from PERB once you have completed this screen. The person filing this Unfair Practice Charge is required to return a properly filled out and signed original Declaration to PERB pursuant to PERB Regulations 32140 and 32135.)

| _____ | _/s/_ | 08/30/2024 |
|---|---|---|
| (Type or Print Name) | (Signature) | Date |

## STATE OF CALIFORNIA
## PUBLIC EMPLOYMENT RELATIONS BOARD
# UNFAIR PRACTICE CHARGE

| DO NOT WRITE IN THIS SPACE: | Case No: | | Date Filed: |
|---|---|---|---|

**INSTRUCTIONS:** File this charge form via the e-PERB Portal, with proof of service. Parties exempt from using the e-PERB Portal may file the original charge in the appropriate PERB regional office (see PERB Regulation 32075), with proof of service attached. Proper filing includes concurrent service and proof of service of the charge as required by PERB Regulation 32615(c). All forms are available from the regional offices or PERB's website at **www.perb.ca.gov**. If more space is needed for any item on this form, attach additional sheets and number items.

| IS THIS AN AMENDED CHARGE? | YES | If so, Case No. | | NO |
|---|---|---|---|---|

**1. CHARGING PARTY:**   EMPLOYEE    EMPLOYEE ORGANIZATION    EMPLOYER    PUBLIC[1]

**a. Full name:**  San Mateo County Deputy Sheriffs' Association

**b. Mailing address:**  c/o Mastagni Holstedt, APC, 1912 I Street, Sacramento, California 95811

**c. Telephone number:**  (916) 446-4692

**d. Name and title of person filing charge:**  Garrett R. Porter, Attorney for Charging Party
    **E-mail Address:**  gporter@mastagni.com
    **Telephone number:**  (916) 491-4217

**e. Bargaining unit(s) involved:**  Deputy Sheriffs' Association

**2. CHARGE FILED AGAINST: (mark one only)**    EMPLOYEE ORGANIZATION ☐    EMPLOYER ☑

**a. Full name:**  County of San Mateo

**b. Mailing address:**  County Executive's Office, 500 County Center, 5th Floor, Redwood City, California 94063

**c. Telephone number:**  (650) 363-4123

**d. Name and title of agent to contact:**  Mike Callagy, County Executive Officer
    **E-mail Address:**  mcallagy@smcgov.org
    **Telephone number:**  (650) 363-4123

**3. NAME OF EMPLOYER (Complete this section only if the charge is filed against an employee organization.)**

**a. Full name:**

**b. Mailing address:**

**4. APPOINTING POWER: (Complete this section only if the employer is the State of California. See Gov. Code, § 18524.)**

**a. Full name:**

**b. Mailing address:**

**c. Agent:**

---

[1] An affected member of the public may only file a charge relating to an alleged public notice violation, pursuant to Government Code section 3523, 3547, 3547.5, or 3595, or Public Utilities Code section 99569.

PERB-61 (08/2022)                                        SEE REVERSE SIDE

CONFIDENTIAL                        CSM 00226

**5. GRIEVANCE PROCEDURE**

PERB Received
08/30/24 1:45 PM

Are the parties covered by an agreement containing a grievance procedure which ends in binding arbitration?

Yes          No          Unknown ☐

**6. STATEMENT OF CHARGE**

a.   The charging party hereby alleges that the above-named respondent is under the jurisdiction of: (check one)

☐   Educational Employment Relations Act (EERA) (Gov. Code, § 3540 et seq.)

☐   Ralph C. Dills Act (Gov. Code, § 3512 et seq.)

☐   Higher Education Employer-Employee Relations Act (HEERA) (Gov. Code, § 3560 et seq.)

☑   Meyers-Milias-Brown Act (MMBA) (Gov. Code, § 3500 et seq.)

☐   One of the following Public Utilities Code Transit District Acts: San Francisco Bay Area Rapid Transit District Act (SFBART Act) (Pub. Util. Code, § 28848 et seq.), Orange County Transit District Act (OCTDA) (Pub. Util. Code, § 40000 et seq.), Sacramento Regional Transit District Act (Sac RTD Act) (Pub. Util. Code, § 102398 et seq.), Santa Clara VTA, (Pub. Util. Code, § 100300 et seq.), and Santa Cruz Metro (Pub. Util. Code., § 98160 et seq.)

☐   The Los Angeles County Metropolitan Transportation Authority Transit Employer-Employee Relations Act (TEERA) (Supervisory Employees of the Los Angeles County Metropolitan Authority (Pub. Util. Code, § 99560 et seq.)

☐   Trial Court Employment Protection and Governance Act (Trial Court Act) (Article 3; Gov. Code, § 71630 – 71639.5)

☐   Trial Court Interpreter Employment and Labor Relations Act (Court Interpreter Act) (Gov. Code, § 71800 et seq.)

b.   The specific Government or Public Utilities Code section(s), or PERB regulation section(s) alleged to have been violated is/are:  Gov. Code sections 3502, 3502.1, 3503, 3505, 3506, 3506.5, 3507 and PERB Regulation 32603                   Unknown ☐

c.   For MMBA, Trial Court Act and Court Interpreter Act cases, if applicable, the specific local rule(s) alleged to have been violated is/are (*a copy of the applicable local rule(s) MUST be attached to the charge*):

d.   Provide a clear and concise statement of the conduct alleged to constitute an unfair practice including, where known, the time and place of each instance of respondent's conduct, and the name and capacity of each person involved. This must be a statement of the facts that support your claim and *not conclusions of law*.  A statement of the remedy sought must also be provided.  (*Use and attach additional sheets of paper if necessary*.)     See attached ☑

---

**DECLARATION**

I declare under penalty of perjury that I have read the above charge and that the statements herein are true and complete to the best of my knowledge and belief and that this declaration was executed on  08/30/2024

(Date)

at  Sacramento, California
        (City and State)

Garret R. Porter                              *Garrett Porter*
(Type or Print Name and Title, if any)          (Signature)

Mailing Address:  Mastagni Holstedt, APC, 1912 I Street, Sacramento, California 95811

E-Mail Address:  gporter@mastagni.com          Telephone Number:  (916) 491-4217

CONFIDENTIAL               CSM 00227

## PROOF OF SERVICE

I declare that I am a resident of or employed in the County of _____,

State of _____.  I am over the age of 18 years.  The name and address of my

Residence or business is _____

_____

On _____, I served the _____
(*Date*)                                          (*Description of document(s)*)

_____ in Case No. _____.
(*Description of document(s) continued*)                      (PERB Case No., if known)

on the parties listed below by (check the applicable method(s)):

placing a true copy thereof enclosed in a sealed envelope for collection and delivery by the United States Postal Service or private delivery service following ordinary business practices with postage or other costs prepaid;

personal delivery;

electronic service - I served a copy of the above-listed document(s) by transmitting via electronic mail (e-mail) or via e-PERB to the electronic service address(es) listed below on the date indicated.  (*May be used only if the party being served has filed and served a notice consenting to electronic service or has electronically filed a document with the Board.  See PERB Regulation 32140(b).*)

(*Include here the name, address and/or e-mail address of the Respondent and/or any other parties served.*)

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration was executed on _____,
(*Date*)

at _____.
(*City*)                                    (*State*)

*Taylor Dorn*

| (*Type or print name*) | (*Signature*) |

1  GARRETT R. PORTER, ESQ. (SBN 341880)
2  **MASTAGNI HOLSTEDT**
   *A Professional Corporation*
3  1912 "I" Street
   Sacramento, California 95811
4  Telephone: (916) 446-4692
   Facsimile: (916) 447-4614
5

6  Attorney for Charging Party
   SAN MATEO COUNTY DEPUTY
7  SHERIFF'S ASSOCIATION

8  **BEFORE THE PUBLIC EMPLOYMENT RELATIONS BOARD**

9  **OF THE STATE OF CALIFORNIA**

10

11  SAN MATEO COUNTY DEPUTY          )    PERB Case No.
12  SHERIFF'S ASSOCIATION,           )
                                     )    **UNFAIR LABOR PRACTICE CHARGE**
13            Charging Party,        )
                                     )
14       vs.                         )
                                     )
15  COUNTY OF SAN MATEO,             )
                                     )
16            Respondent.            )
17  _____)

18

19

20                    **I.    INTRODUCTION**

21        This unfair practice charge arises out of the County of San Mateo's ("County") violations

22  of the Meyers-Milias-Brown Act ("MMBA"). First, the County refused to negotiate and walked

23  away from the negotiation table regarding the mandatory overtime policies which violated its duty

24  to meet and confer in good faith. Second, the County unilaterally changed the policy regarding

25  minimum staffing without meeting and conferring with the San Mateo Deputy Sheriff's Association

26  ("DSA"). Third, the County violated its duty of strict neutrality, interfering with and coercing the

27  DSA while retaliating against the DSA for engaging in protected activity. (Gov. Code, §§ 3502,

28  3502.1, 3503, 3506, 3506.5 and PERB Regulation 32603.)

---

Unfair Labor Practice Charge               1               *San Mateo DSA v. County of San Mateo*

CONFIDENTIAL

## II.    PARTIES

DSA is a recognized employee organization within the meaning of Government Code section 3501(b) and is a recognized exclusive representative under PERB Regulation 32016(b). DSA represents employees in the San Mateo Sheriff's Department ("Department"), employed by the County of San Mateo.

The County is a public agency within the meaning of Government Code section 3501(c) and PERB Regulation 32016(a). The County is subject to PERB's authority under Government Code section 3509(b).

## III.    STATEMENT OF FACTS

### A. County's Refusal to Negotiate Regarding the Expiring Mandatory Overtime Policy

During July and into August 2024, the DSA and the County met and conferred multiple times to negotiate about the mandatory overtime policy, which was going to expire on August 7, 2024. (Decl. of Carlos Tapia ¶ 6; Decl. of Matthew Silano ¶ 6.) On July 17, 2024, Undersheriff Perea sent an email to DSA President Carlos Tapia that thanked DSA President Tapia for talking to the Undersheriff about a proposed new Special Order for Overtime. (Decl. of Stephen Leonesio ¶ 5; Exh. C.) On or about July 18, 2024, Undersheriff Perea had spoken to DSA President Tapia about changing the Department's Overtime Special Order. (Decl. of Stephen Leonesio ¶ 6.) On July 18, 2024, DSA President Tapia advised Undersheriff Perea, in an email, that he had contacted Katy Roberts with the San Mateo County Human Resources Department and requested a meet and confer over the Sheriff Department's proposed "Special Order for Overtime." (Decl. of Stephen Leonesio ¶ 7; Exh. C.) 8. On July 19, 2024, DSA Negotiator Stephen Leonesio ("Leonesio") received an email from San Mateo County Human Resources employee Katy Roberts indicating the Sheriff's Department was going to implement the proposed Special Order for Overtime on Tuesday, July 23, 2024. (Decl. of Stephen Leonesio ¶ 8; Exh. C.) On July 19, 2024, Leonesio sent San Mateo County Human Resources employee Katy Roberts and Undersheriff Perea an email advising that there should be no changes to the status quo until the meet and confer process, including impasse procedures, were completed. Leonesio also requested dates to start the meet and confer process. (Decl. of Stephen Leonesio ¶ 9; Exh. C.) 10.  On July 22, 2024, Leonesio received an email from

---

1  San Mateo County Human Resources employee Katy Roberts which indicated the Sheriff's

2  Department was going to extend the previously negotiated Special Order for Overtime until August

3  7, 2024. (Decl. of Stephen Leonesio ¶ 10; Exh. C.) On July 29, 2024, DSA President Tapia,

4  Leonesio, San Mateo County Human Resources employee Katy Roberts, Undersheriff Perea, Sheriff

5  Corpus and members of the Sergeants Association met virtually to discuss the Sheriff Department's

6  proposed Special Order OT Revisions. During this meeting the parties discuss the current negotiated

7  minimum staffing levels. Sheriff Corpus indicated she did not negotiate the minimum staffing levels.

8  Members from the Sergeants Association indicated the minimum staffing levels were negotiated

9  with prior Sheriff's Department Management. Undersheriff Perea indicated the Department did not

10 have minimum staffing levels. The County, Sheriff and Undersheriff were provided a copy of the

11 minimum staffing levels document. (Decl. of Stephen Leonesio ¶ 11; Exh. D.) On July 29, 2024,

12 Leonesio sent an email requesting information from the County/Sheriff's Department that is

13 pertinent to the meet and confer process. County Human Resources employee Katy Roberts

14 responded and indicated they will be working on getting the information to Leonesio. (Decl. of

15 Stephen Leonesio ¶ 12; Exh. E.) On August 1, 2024, the parties met virtually to continue to discuss

16 the proposed Special Order for Overtime. Undersheriff Perea indicated there were no minimum

17 staffing levels for the Department. Sheriff Corpus stated the Department is hiring more employees

18 and patrol should be fully staffed by the end of August, 2024. (Decl. of Stephen Leonesio ¶ 13; Decl.

19 of Matthew Silano ¶ 7.) On August 3, 2024, Leonesio sent an Overtime Policy proposal to County

20 Human Resources employee Katy Roberts, Undersheriff Perea and Sheriff Corpus. (Decl. of Stephen

21 Leonesio ¶ 14; Exh. F.) On August 4, 2024, County Human Resources employee Katy Roberts sent

22 Leonesio an email indicating the Sheriff's Department rejected our proposal. Leonesio responded

23 clarifying the DSA was rejecting the Sheriff's Department's proposal and requested additional dates

24 to continue the meet and confer process. (Decl. of Stephen Leonesio ¶ 15; Exh. E.) On August 5,

25 2024, the County Undersheriff Dan Parea notified DSA President Tapia with the County's initial

26 unchanged offer regarding the mandatory overtime policy. (Decl. of Carlos Tapia ¶ 7.) The DSA

27 rejected the County's August 5, 2024, offer regarding the mandatory overtime policy and demanded

28 that the County meet and confer before the mandatory policy expired. (Decl. of Carlos Tapia ¶ 8 and

CONFIDENTIAL

1  9.) The County did not provide a response regarding the DSA's demand to meet and confer over the

2  mandatory overtime policy and the policy expired on August 7, 2024. (Decl. of Stephen Leonesio ¶

3  16; Decl. of Carlos Tapia ¶ 9 and 10; Decl. of Matthew Silano ¶ 8.) The County refused to negotiate

4  in good faith and failed to exhaust impasse procedures regarding the mandatory overtime policy for

5  sworn DSA members. (Decl. of Carlos Tapia ¶ 11; Decl. of Matthew Silano ¶ 9.) The County did

6  not provide the DSA with advance notice or the opportunity to meet and confer about the change to

7  the mandatory overtime policy. (Decl. of Stephen Leonesio ¶ 29 and 36.)

8

9  **B. County's August 9, 2024, Interference and Retaliation for Protected Union Activity**

10  On August 8, 2024, the DSA board sent out an email to all DSA members where the DSA

11  board provided information to DSA members regarding the expired mandatory overtime policy, the

12  negotiation history of the mandatory overtime policy, and the DSA board's position/goals regarding

13  the mandatory overtime policy. (Decl. of Stephen Leonesio ¶ 17; Decl. of Carlos Tapia ¶ 12; Decl.

14  of Matthew Silano ¶ 10; Exh. A.) On August 9, 2024, County Sheriff Christina Corpus ("Sheriff")

15  sent an email to "All Sheriff's Personnel" which included over two-hundred County employees.

16  (Decl. of Stephen Leonesio ¶ 18; Decl. of Carlos Tapia ¶ 13; Decl. of Matthew Silano ¶ 11; Exh. B.)

17  The Sheriff states that the August 9, 2024, email was specifically sent to "address any

18  misunderstandings regarding recent communications from the DSA leadership." (Decl. of Stephen

19  Leonesio ¶ 19; Decl. of Carlos Tapia ¶ 14; Decl. of Matthew Silano ¶ 12; Exhibit B.) In the August

20  9, 2024, email, the Sheriff states that, regarding negotiating a new mandatory overtime policy, the

21  County "made [itself] available, but the urgency was not reciprocated." (Decl. of Stephen Leonesio

22  ¶ 20; Decl. of Carlos Tapia ¶ 15; Decl. of Matthew Silano ¶ 13; Exhibit B.) The Sheriff's email also

23  states that "[t]his crisis is the result of years of neglect and inaction" and that the DSA board's claim

24  to its members that "the overtime policy is flawed … is a significant misrepresentation." (Decl. of

25  Stephen Leonesio ¶ 21; Decl. of Carlos Tapia ¶ 16; Decl. of Matthew Silano ¶ 14; Exhibit B.) The

26  Sheriff's August 9, 2024, email directly communicated to DSA members that the DSA board is

27  misunderstood by the membership, not addressing the staffing issues with urgency, neglecting and

28  failing to take action regarding staffing issues, and misrepresenting information to the membership.

CONFIDENTIAL          CSM 00232

1  (Decl. of Stephen Leonesio ¶ 22; Decl. of Carlos Tapia ¶ 17; Decl. of Matthew Silano ¶ 15; Exhibit

2  B.)

3      **C. County's Unilateral Change to the Minimum Staffing Policy**

4          Over the weekend of August 10 and 11, 2024, the County unilaterally changed the minimum

5  and maximum staffing levels at the Maguire Correctional Facility and Maple Street Correctional

6  Center for sworn DSA members. (Decl. of Stephen Leonesio ¶ 23; Decl. of Carlos Tapia ¶ 18; Decl.

7  of Matthew Silano ¶ 16.) On August 19, 2024, the COUNTY sent a memorandum to all Sheriff's

8  Office Personnel confirming that sworn staff members are required to complete their jail overtime

9  per pay period. (Decl. of Stephen Leonesio ¶ 24; Exh. J.) The policies regarding minimum staffing

10 levels directly control the schedules of DSA members and are mandatory subjects of bargaining.

11 Historically, policies regarding minimum staffing levels were negotiated between the DSA and the

12 County. (Decl. of Stephen Leonesio ¶ 25; Decl. of Carlos Tapia ¶ 19; Decl. of Matthew Silano ¶ 17.)

13 The County did not provide the DSA with advance notice or opportunity to meet and confer about

14 the change to minimum/maximum staffing levels. (Decl. of Stephen Leonesio ¶ 26 and 34; Decl. of

15 Carlos Tapia ¶ 20; Decl. of Matthew Silano ¶ 18.) Over the weekend of August 10 and 11, 2024, the

16 County unilaterally changed the mandatory overtime policy for sworn DSA members. (Decl. of

17 Stephen Leonesio ¶ 27.) The County did not provide the DSA with advance notice or the opportunity

18 to meet and confer about the change to the mandatory overtime policy. (Decl. of Stephen Leonesio

19 ¶ 28.) On August 12, 2024, Leonesio sent an email to County Human Resources employee Katy

20 Roberts, Undersheriff Perea and Sheriff Corpus advising them that he had been informed that the

21 Sheriff's Department had unilaterally changed the minimum staffing levels as well as the overtime

22 process/procedures. Leonesio indicated in my email that the DSA had not agreed to these unilateral

23 changes. Leonesio requested a response from the County and/or Department on whether these

24 changes had, in fact, been implemented. Leonesio did not receive a response from either the County

25 or Department. (Decl. of Stephen Leonesio ¶ 30; Exh. G.) On August 15, 2024, Leonesio sent a

26 follow up email requesting a response to his August 12, 2024 email. Leonesio also requested a

27 response for my information request that he had sent on July 29, 2024. Leonesio also requested

28 additional information that is pertinent to the meet and confer process. (Decl. of Stephen Leonesio

CONFIDENTIAL                                        CSM 00233

¶ 31; Exh. H.) On August 15, 2024, County Human Resources employee Katy Roberts sent an updated proposal but did not respond to Leonesio's request about the unilateral changes nor the information requests. (Decl. of Stephen Leonesio ¶ 32; Exh. E.) On August 26, 2024, DSA President Tapia advised Leonesio that San Mateo County Sheriff Captain Fogarty sent an email to members of the Sergeants Association, again indicating the minimum staffing level at one of the jail facilities (MCF) is 35 DSA members. (Decl. of Stephen Leonesio ¶ 33.) On August 26, 2024, On August 26, 2024, DSA President Tapia advised Leonesio that the Management of the Sheriff's Department sent a memorandum to "All Sheriff's Office Personnel" indicating that DSA members are required to work jail overtime each pay period. (Decl. of Stephen Leonesio ¶ 35.) On August 28, 2024, Leonesio sent a follow-up email to County Human Resources employee Katy Roberts, Undersheriff Perea and Sheriff Corpus asking about the unilateral changes to staffing levels, the unilateral changes requiring employees to sign up for a minimum amount of overtime per pay period, as well as the status of my information requests. To date, Leonesio has not received any responses to these requests. (Decl. of Stephen Leonesio ¶ 37; Exh. I.) The County has frustrated the meet and confer process because it has not provided responses to information requests the DSA submitted. The DSA needs the information to better understand and prepare for the meet and confer process. (Decl. of Stephen Leonesio ¶ 38.)

**D. County's August 13, 2024, Interference and Retaliation for Protected Union Activity**

On August 13, 2024, the County held a regularly occurring meeting with several administrative personnel and DSA members to discuss emergency staffing policies for the San Mateo County Jail. (Decl. Joseph Fava ¶ 3.) At the August 13, 2024 meeting, there were approximately ten individuals in attendance, including Executive Director of Administration/Chief of Staff Victor Aenlle ("Aenlle". (Decl. Joseph Fava ¶ 4.) Aenlle is a manager over the DSA members and is a representative of the County. (Decl. Joseph Fava ¶ 5.) During the meeting, when discussing the mandatory overtime policies and negotiations between the County and the DSA, Aenlle directly said to a DSA member in attendance: "… If you aren't happy with how the [DSA] board is handling the situation, you should encourage the membership to vote them out." (Decl.

---

Joseph Fava ¶ 6.) In making this comment, those attending the meeting understood Aenlle to be telling the DSA members to recall the current DSA board. (Decl. Joseph Fava ¶ 7.)

## IV.    ARGUMENT

The County violated the Meyers-Milias-Brown Act ("MMBA") by failing to provide the DSA with advanced written notice or the opportunity to meet and confer over its decision to change the policy regarding minimum staffing levels, which effects the work schedules of DSA members. Additionally, the County violated the MMBA by refusing to meet and confer in good faith over the expiring mandatory overtime policy, which effects the work schedules of DSA members. Lastly, the County interfered with the DSA and its members' representational rights under the MMBA in two specific instances where the County violated its duty of strict neutrality by engaging in unlawful communications with DSA members, where the County undermined the DSA board and encouraged DSA members to recall the DSA board for engaging in protected union activity.

## A. THE COUNTY COMMITTED AN UNFAIR LABOR PRACTICE BY UNILATERALLY IMPLEMENTING CHANGES AFFECTING ISSUES WITHIN THE SCOPE OF BARGAINING

To prove a unilateral change in violation of the MMBA, the charging party must establish that: (1) the employer took action to change policy; (2) the change in policy concerns a matter within the scope of representation; (3) the action was taken without giving the exclusive representative notice or opportunity to bargain over the change; and (4) the employer took unilateral action to change policy that has a generalized effect and continuing impact on terms and conditions of employment. (*Fairfield-Suisun Unified School District* (2012) PERB Decision No. 2262, citing *Walnut Valley Unified School District* (1981) PERB Decision No.160; *Grant Joint Union High School District* (1982) PERB Decision No. 196.)

### 1.   The Changes in Policy Concerns Matters Within the Scope of Representation

Assignments of overtime and employee work schedules directly relate to hours of employment and are within the scope of representation. (*Salinas Valley Memorial HealthCare System* (2017) PERB Decision No. 2524-M, p. 21; *Oakland Unified School 18 District* (1983) PERB

---

CONFIDENTIAL                      CSM 00235

Decision No. 367.) Here, the mandatory overtime and minimum staffing policies each dictate how a DSA member's schedule is and relate to hours of employment. Therefore, each of the policies are within the scope of representation.

### 2. *The County Did Not Provide the DSA Reasonable Advance Notice of the Changes in Policy or Meet and Confer in Good Faith*

The County's failure to provide written notice to DSA prior to changing the minimum staffing policy violated the MMBA. MMBA section 3505 provides in relevant part:

> "Meet and confer in good faith" means that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within scope of representation prior to the adoption of the public agency of its final budget for the ensuing year. The process should include adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation, or ordinance, or when such procedures are utilized by mutual consent.

The duty to provide reasonable written notice and an opportunity to bargain is the same regardless of whether the parties are bargaining over a decision or the impacts and effects of a managerial action. (*Santa Clara District Correctional Peace Officers' Association* (2013) PERB Decision No. 2321-M, p. 21-23.)   PERB has held that "when an exclusive representative first learns of a change after the employer's decision has been made, by definition, there has been inadequate notice." (*Modoc County Office of Education* (2019) PERB Decision No. 2684.)

Here, the County unilaterally implemented the change to the minimum staffing policy regarding DSA bargaining unit assignments. The County failed to provide the DSA with any advance notice of its intent to change the minimum staffing policy. The County's failure to notify DSA of the change violates the Meyers-Milias-Brown meet and confer notice requirement. (Gov. Code, § 3504.5.) As discussed above, the County's decision to adjust minimum staffing levels is

---

1   within the scope of representation. Therefore, as a recognized employee organization within the

2   meaning of Government Code section 3501(c) and PERB Regulation 32016(a), the County had a

3   duty to provide the DSA reasonable advance notice of any changes before implementation. (Gov.

4   Code, § 3501(c) and 3504.5; PERB Regulation 32016(a).) The County did not provide reasonable

5   advance notice to the DSA about the change in the minimum staffing levels. While, during a meet

6   and confer in July 2024 about mandatory overtime, the County briefly mentioned the need to address

7   the minimum staffing policy, the DSA only became aware of the actual change made to the minimum

8   staffing policy after the County had already made the decision to change the policy. Further, the

9   actual change the County made to the minimum staffing policy or when it would be implemented

10  was never discussed or disclosed to the DSA until the change was already implemented. Thus, the

11  County failed to provide the DSA advance written notice as required by Government Code section

12  3504.5 and committed an unfair labor practice.

13      Moreover, the County did not declare impasse or allow sufficient time to exhaust impasse

14  procedures before implementing the minimum staffing policy. Meeting and conferring on the

15  implementation and effects of a decision must allow enough time to complete negotiations, including

16  impasse procedures, before implementing. (*National Union of Healthcare Workers v. Salinas Valley*

17  *Memorial Healthcare System* (2012) PERB Decision No. 2298-M.) Under the EERR, impasse

18  requires an impasse meeting between the parties, a writing identifying the issues at impasse and a

19  fact finding. The County did not exhaust impasse procedures or even declare impasse before

20  implementing the changes. Therefore, the County failed to allow sufficient time for the parties to

21  meet and confer in good faith and exhaust impasse procedures over the impacts and effects of its

22  decision to change the minimum staffing policy.

23      Likewise, the County did not negotiate in good faith or exhaust impasse procedures

24  regarding the mandatory overtime policy. As discussed above, while the County and the DSA had

25  met several times to negotiate the mandatory overtime schedule, on August 1, 2024, the DSA and

26  the County met and conferred to negotiate about the mandatory overtime policy, which ended with

27  the County refusing to negotiate further and leaving without exhausting impasse procedures. (Decl.

28  of Matthew Silano ¶ 7.) Several days after the County walked away from the negotiation table, the

1  County re-presented its initial unchanged offer regarding the mandatory overtime policy, which the

2  DSA rejected and demanded that the County meet and confer before the mandatory policy expired.

3  (Decl. of Carlos Tapia ¶ 7, 8 and 9.) However, the County did not provide a response regarding the

4  DSA's demand to meet and confer over the mandatory overtime policy and the policy expired on

5  August 7, 2024. (Decl. of Stephen Leonesio ¶ 15 and 16; Decl. of Carlos Tapia ¶ 9 and 10; Decl. of

6  Matthew Silano ¶ 8; Exh. E.) Therefore, the County failed to meet and confer in good faith and

7  exhaust impasse procedures over the impacts and effects of the change to the mandatory overtime

8  policy.

9        Accordingly, the County's change to the minimum staffing policy and mandatory overtime

10  policy is a mandatory subject of bargaining. The County's failure to provide written notice to and/or

11  engage in the bargaining process with the DSA over the changes in minimum staffing and mandatory

12  overtime policies accordingly constitute unfair labor practices in violation of the MMBA.

13  **B. THE COUNTY UNILATERALLY INTERFERED WITH REPRESENTATION**

14      **RIGHTS GUARANTEED UNDER MMBA SECTIONS 3502 AND 3503.**

15        Under sections 3502 and 3503, the County has a duty to not interfere with the DSA's right

16  to represent its members and not to interfere with the members' right to be represented by the DSA.

17  (Gov. Code, §§ 3502-3503.)

18        Section 3502 provides in relevant part:

19              Except as otherwise provided by the Legislature, public employees

20              shall have the right to form, join, and participate in the activities of
                 employee organizations of their own choosing for the purpose of

21              representation on all matters of employer-employee relations.

22        Section 3503 provides in relevant part:

23              Recognized employee organizations shall have the right to represent

24              their members in their employment relations with public agencies.

25        The DSA has a right to the County's performance of its duty under Government Code

26  sections 3502 and 3503. (*Id.*) The County's unilateral action circumvents the DSA's right to

27  represent its members in matters within the scope of representation. Likewise, the County violates

28  the members' rights to be represented. The County's unilateral action runs counter to the purposes

---

CONFIDENTIAL          CSM 00238

1  of the MMBA to promote full communication and improve employer-employee relations. (*People*

2  *ex rel. Seal Beach Police Officers Association v. City of Seal Beach* (1984) 36 Cal.3d 591, 596.)

3  Thus, the County violated sections 3502 and 3503.

4       **C. THE COUNTY VIOLATED ITS DUTY OF STRICT NEUTRALITY AND**

5         **ENGAGED IN UNLAWFUL INTERFERENCE WITH DSA MEMBERS AND**

6         **THEIR REPRESENTATIVES.**

7       An employer and its agents are prohibited from interfering with, intimidating, restraining,

8  coercing, or discrimination against DSA members and representatives because of their exercise of

9  rights under the MMBA. (Gov. Code, § 356.5(a)(b).) Further, an employer and its agents cannot

10 dominate or interfere with the formation *or administration* of any employee organization. (Gov.

11 Code, § 3506.5(d).)

12      The Sheriff's August 9, 2024, department-wide email (Exhibit B) that was in response to

13 the DSA's August 8, 2024 email to all members, undermines the DSA's leadership and trust with its

14 members by alleging that the DSA leadership is: misunderstood by the membership, not addressing

15 the staffing issues with urgency, neglecting and failing to take action regarding staffing issues, and

16 misrepresenting information to the membership. (Decl. of Stephen Leonesio ¶ 22; Decl. of Carlos

17 Tapia ¶ 17; Decl. of Matthew Silano ¶ 15; Exhibit B.) The Sheriff's email has the clear goal and

18 impact of creating distrust between the DSA members and the DSA board. This is evidence that the

19 Sheriff's conduct is interfering with the DSA concerted activities.

20      Additionally, at the County meeting on August 13, 2024, Aenlle attempted to coerce the

21 DSA members in attendance to recall the DSA board. (Decl. Joseph Fava ¶ 6.) Aenlle is a high-level

22 manager who has authority over the DSA members who attended the meeting. Aenlle's comment

23 was to a DSA member and was directly in response to how the DSA leadership was engaging the

24 protected activity of negotiating regarding the mandatory overtime policy. Aenlle's comment has the

25 clear goal and impact of creating pressure from the employer upon the DSA membership to work

26 against the DSA leadership who were only the duly elected/re-elected in July 2024. This is evidence

27 that Aenlle's comment is interfering with the DSA concerted activities.

28   /// 

---

**D. THE COUNTY RETALIATED AGAINST THE DSA BASED ON PROTECTED ACTIVITY.**

Both the Sheriff's and Aenlle's communications are retaliatory. A prima facie case of retaliation is proven where (1) the employee/union engaged in protected activity; (2) the persons who made the decision that resulted in harm were aware of the protected activity; and (3) there is a nexus between the employer's conduct and the exercise of a protected right, resulting in potential harm to that right. (*Novato Unified School District* (1982) PERB Decision No. 210.)

Relating to Aenlle's communication, the DSA leadership is engaging in protected activity by negotiating as the exclusive bargaining representative for the membership. As an agent of the County, Aenlle's communication regarding a protected DSA activity of negotiating on behalf of the membership harms the DSA by undermining the negotiation process. Further, Aenlle's attempt to coerce the DSA members into recalling the DSA board so that new DSA leadership which might be more favorable for the County to negotiate with, might be elected is a brazen and horrific violation of the MMBA where the County is clearly retaliating against and attempting to control the DSA.

## V.    CONCLUSION

Based on the foregoing, the DSA has established the County committed unfair labor practices by unilaterally by changing the minimum staffing policy and refusing to negotiate the expiring mandatory overtime policy which violated the DSA and members' representational rights. Further, the DSA has established the County interfered with protected rights of the DSA members and representatives through coercion and undermining. The DSA has also established the County retaliated against the DSA and its elected officials on the basis of protected activity.

## VI.    REMEDY REQUESTED

For the forgoing reasons, DSA respectfully requests PERB:

1) Issue a Complaint against the County for refusing to meet and confer in good faith over the decision and impacts and effects of the decision to increase minimum staffing for the DSA member assignments in violation of Government Code section 3505 and PERB Regulation 32603(c);

///

---

CONFIDENTIAL                     CSM 00240

2) Issue a Complaint against the County for refusing to meet and confer in good faith over the decision and impacts and effects of the decision regarding mandatory overtime for the DSA member assignments in violation of Government Code section 3505 and PERB Regulation 32603(c);

3) Issue a Complaint against the County for failing to exhaust impasse procedures in violation of Government Code section 3507;

4) Issue a Complaint against the County for interfering with the rights of bargaining unit employees to be represented by the DSA in violation of Government Code sections 3502, 3503, 3506 and 3506.5(a);

5) Issue a Complaint against the County for unlawfully interfering with the DSA members' rights under Government Code sections 3502, 3506.5(a), and PERB Regulations 32603(a).

6) Issue a Complaint against the County for unlawfully interfering with the DSA members' rights under Government Code sections 3503, 3506.5(b) and (d), and PERB Regulation 32603(b) and (d).

7) Issue a Complaint against the County for retaliating against the DSA under Government Code sections 3502.1, 3506, 3506.5(a), and PERB Regulation 32603(a).

8) Order the County to cease and desist from engaging in said unlawful conduct in violation of the MMBA;

9) Issue a notice posting reflecting the unlawful conduct committed by the County;

10) Grant attorney fees at the appropriate lodestar rate; and

11) Issue any other remedies that would effectuate the purposes of the MMBA.

Respectfully Submitted:

DATED: August 30, 2024

**MASTAGNI HOLSTEDT, A.P.C.**

_____
GARRETT R. PORTER, ESQ.
Attorney for Charging Party

---

Unfair Labor Practice Charge                13                *San Mateo DSA v. County of San Mateo*

CONFIDENTIAL                CSM 00241

# EXHIBIT A

CONFIDENTIAL

CSM 00242





Member Login

Home    DSA In The Community    DSA In the News    Retired Member Sign Up    Contact Us    POA Resource    Links    Calendar    Smart Saver Blue Pages

Home    Emailings

Date: 8/8/2024
Subject: Mandatory Overtime
From: Eliot I Storch



DSA Members,

On 08/07/2024, the mandatory overtime policy expired. This means that, starting today, all previous rules regarding mandatory OT are no longer in effect. You must follow all other policies that relate to overtime. We want to inform you how this happened, and what the DSA is doing about it.

**How this happened:**
The original policy expired on 07/06/2024. Unbeknownst to the DSA Board, Admin had created a brand new policy that they presented to the DSA. This policy was highly flawed and had several changes that would have negatively affected DSA members. Among those flaws was raising the mandatory number of hours in the jail from 12 hours to 18 hours and removing exemptions for court and training. Naturally, the DSA Board did not agree to these changes. The existing policy was extended and discussions between the DSA and Admin were held. No agreement was reached during those discussions.

A "meet and confer" was held. Meet and confer refers to the legal requirement that a public agency and unions have to meet and openly discuss matters within the scope of representation (for example, working conditions and mandatory overtime). During this process, the DSA gave a counter-offer. The DSA agreed to raise the amount of jail OT from 12 hours to 18 hours, however the DSA also said the total amount of OT should be lowered to 18 hours from 24 hours due to safety concerns of members working too much. Admin has rejected those changes. We have requested to continue to meet over the proposed policy but do not have any additional meetings scheduled yet.

Help

CONFIDENTIAL                    CSM 00243

PERB Received
08/30/24 17:46 PM

**What the DSA is doing:**
The DSA is working with the OSS, and asking that they still respect seniority and the number of hours worked, as well as using the minimum and maximum numbers when considering when to mandatory people in.

**What you can do:**
Per Lexipol policy 1021.3.1, supervisors can order personnel to work OT "when they believe conditions exist that require such measures." However, personnel can be excused by the ordering supervisor for good cause. DO NOT disobey orders (a concerted refusal to work OT could be a violation of the "no strike" provision of our MOU). However, we DO encourage people to be open with their sergeants about conflicts if they are ordered to work. Tell them about childcare issues, pre-planned and pre-paid events, and so on. If you are ordered in and you notify the sergeant of a conflict, and
are still told to work, you must obey the direct order and work. If this does occur, please contact a DSA Board member ASAP.

We all know we are short-handed and there are many vacant positions throughout the Office. We need to continue to look out for each other and help where we can. We can only get through this if we continue to work as a team. Let's continue to sign up for OT when and where we can. No one wants to be mandated to work.

We also want to emphasize taking care of yourself. It can be a challenge when there's so much overtime, but it's essential. Please take a look at the link below for programs the County offers, and try and find something that can be beneficial for you. Also note that, per County HR, wellness programs are to be conducted on County time with supervisor approval. If we have to be here a lot, we should spend some of that time taking care of ourselves!

https://www.smcgov.org/hr/about-employee-wellness-work-life-services-program

Lastly, please know that we are working hard to try and fix this. As always, don't hesitate to contact us if there are questions or concerns.

Thank you,

The DSA Board

San Mateo County Deputy Sheriff's Association
2421 Broadway Street
Redwood City CA 94063
650-261-1081



---

Return to Previous Page

Powered By 

CONFIDENTIAL    CSM 00244

PDF Produced
08/30/24 17:46 PM

# EXHIBIT B

CONFIDENTIAL

CSM 00245

# SHERIFF

# CHRISTINA CORPUS

### SAN MATEO COUNTY SHERIFF'S OFFICE

**DATE:**     August 9, 2024

**TO:**        All Sheriff's Personnel

**FROM:**    Christina Corpus, Sheriff

**SUBJECT:**  A Message from the Sheriff

---

I am writing to address any misunderstandings regarding recent communications from the DSA leadership. As your Sheriff, my top priority is your safety and well-being. I bring a unique perspective to this role, being the first Sheriff in several administrations to have risen through the ranks, starting in corrections. I understand the challenges with corrections, the demands, and the needs of this job because I've lived them.

While the overtime policy has recently expired, I want to emphasize that the executive team and I made every effort in good faith to find a reasonable solution. We made ourselves available, but the urgency was not reciprocated. Addressing the staffing crisis has been a central focus since I took office. This crisis is the result of years of neglect and inaction, but we have made significant strides. Over the past year and a half, we have recruited 110 new employees who will significantly contribute to the staffing crisis—a feat unprecedented in the history of our office.

Let me be clear: I am your Sheriff. You are, first and foremost, an employee of the Sheriff's Office, and I am fully committed to your safety and well-being. I take this responsibility seriously, and my actions reflect that. From new wellness programs and family days to providing access to therapists, I have consistently prioritized your well-being.

However, we cannot continue to operate corrections at unsafe staffing levels. We must remember that our core function as a sheriff's office is corrections. An internal audit by the payroll department revealed that 106 employees are either not contributing to the minimum overtime requirements or are working substantial overtime without supporting the essential needs of corrections. This is unacceptable.

We must all contribute. It is unfair for a few to shoulder the burden while others choose their overtime based on preference rather than need. This is not who we are, and it sends the wrong message.

*CONFIDENTIAL*
For San Mateo County Sheriff's Office Internal Use Only

There have been claims that the overtime policy is flawed, but this is a significant misrepresentation. In the spirit of transparency, I am making the proposed policy available for your review. The core requirement of 24 hours, which has been in place for over five years, remains unchanged. The only adjustment was a modest increase from 12 to 18 hours (A shift of 6 hours to meet the safety needs) dedicated to corrections, where there's a clear and substantial need.

Additionally, we removed the loopholes that allowed individuals to disregard the safety needs associated with corrections. Members of the DSA leadership acknowledged and confirmed this flaw of the previous policy, stating that the policy had "no teeth." The conditions in corrections are serious and require our full support. Recently, an employee was rushed to the hospital due to exposure to a dangerous drug, and we have seen an increase in confrontations with the incarcerated population.

The root cause of these incidents is inadequate staffing. The composition of our correctional facilities has evolved. We now house state prisoners, a significant number of individuals suffering from mental illness, and those battling drug and alcohol addiction. Simply meeting minimum standards is not sufficient. We must implement safe staffing levels that allow our employees to take proper breaks and receive the relief they desperately need. I know firsthand what it's like to work a POD without anyone to relieve you. That's why I am advocating so strongly for your safety and well-being.

To those who have been doing their part, thank you. I also extend my gratitude to your families, and I know your colleagues are thankful as well. This is about working together, not against one another.

The Overtime Policy was a temporary measure, lasting only three months (with an option for review after 60 days), and it included just six additional hours for corrections to address our most pressing needs. It did not increase the longstanding 24-hour requirement. This isn't about words—it's about actions. If we all agree that safety is our primary goal, then there should be no argument against dedicating additional hours where they are most needed to ensure the safety of our employees.

In closing, I pledge that I will not allow politics or other interests to compromise your safety. As I've said before, every decision I make is guided by how it will affect you—the most valuable asset of this office. Many involved in these discussions lack experience in corrections or have not served in this office for years. We currently have over sixty employees in training, representing much-needed relief in the near future. Soon, the staffing crisis will be a thing of the past, thanks to your dedication and commitment.

Thank you for your continued support and service. Your contributions do not go unnoticed.

Sheriff Corpus

CONFIDENTIAL

CSM 00247

PFP-B-05962
08/30/24 17:46 PM

# EXHIBIT C

CONFIDENTIAL

PERB Received
08/30/24 17:46 PM

| | |
|---|---|
| **From:** | Stephen D. Leonesio |
| **To:** | Katy Roberts; Carlos Tapia; Daniel Perea; Hector Acosta; Jeffrey Carr; Matthew Silano |
| **Cc:** | Sean D. Currin |
| **Subject:** | RE: Special Order OT Revision |
| **Date:** | Tuesday, July 23, 2024 12:56:00 PM |
| **Attachments:** | image001.png |
| | image002.png |

Hi Katy,

We are available virtually on the following dates and times;  after 3pm on the 29th, after 1pm on the 30th, after 1pm on August 7th. Please let me know if meeting virtually on any of these dates works for you and your team. As far as what we want to meet and confer over, I received the proposed policy from Carlos yesterday and noticed the policy is definitely different from the current policy, as there is one less page. However, the proposed policy that I received does not show the redlined changes, so I will find time in the next couple of days to identify what the changes are. Once I do that, I will let you know of any issues and/or questions that we have with the proposed policy.


Thank you,


## Stephen D. Leonesio | Managing Labor Relations Consultant
### MASTAGNI HOLSTEDT, A.P.C.
**Labor and Employment Department**
**1912 I Street, Sacramento, CA 95811**
*Cell: (916) 790-7646*
*www.mastagni.com*

CONFIDENTIALITY NOTICE - This e-mail message, including any attachments, is a private communication sent by a law firm, Mastagni Holstedt, A.P.C., and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, any use, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system. Thank you.

**From:** Katy Roberts <kroberts@smcgov.org>
**Sent:** Monday, July 22, 2024 11:54 AM
**To:** Stephen D. Leonesio <sleonesio@mastagni.com>; Carlos Tapia <ctapia@smcgov.org>; Daniel Perea <dperea@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>
**Cc:** Sean D. Currin <scurrin@mastagni.com>
**Subject:** RE: Special Order OT Revision

CAUTION: External Email.


Good Morning,

The Sheriff's Office is going to extend the current special order regarding overtime until August 7, 2024 in order to provide time for us to schedule a meeting.
We remain available tomorrow July 23, 2024 to meet, however we are unavailable Wed July 24 and Thurs July 25.

PERB Received
08/30/24 17:46 PM

Can you please provide your availability for either tomorrow or other dates (except 7/24 and 7/25)?

In addition, can you please identify what you believe to be the bargainable issue(s) in this new special order? The number of required OT hours has not changed, and where OT is offered and needed is at the discretion of the Sheriff's Office based on their evaluation of staffing shortages/business need.

Thank you,
Katy

**From:** Stephen D. Leonesio <sleonesio@mastagni.com>
**Sent:** Friday, July 19, 2024 3:48 PM
**To:** Katy Roberts <kroberts@smcgov.org>; Carlos Tapia <ctapia@smcgov.org>; Daniel Perea <dperea@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>
**Cc:** Sean D. Currin <scurrin@mastagni.com>
**Subject:** RE: Special Order OT Revision

**CAUTION:** This email originated from outside of San Mateo County. Unless you recognize the sender's email address and know the content is safe, do not click links, open attachments or reply.

Hi Katy,

As you know, the law is very clear and this proposed change may not occur until either an agreement between the parties has been reached or all impasse procedures, as outlined in the MMBA, have been exhausted. In addition, the case law is also clear what an emergency is and when an employer can bypass their obligation to meet and confer prior to implementing a change in scheduling, and this is not one of those circumstances. The Department has known about their staffing shortages for years. In fact, the DSA and Department met and conferred for the Special Order that you indicate is going to expire, showing how long the Department has known about their staffing issues. It is unfortunate that the Department waited until the last minute to revisit this issue, however, because of the Department's failure to act during the temporary Special Order does not make this issue an emergency as described under the law. Therefore, the DSA is putting the Department and County on notice that there shall be no changes to current staffing and/or scheduling until there is either an agreement between the parties or until all impasse procedures are met, after the mandated meet and confer process.

I am not available on Monday, since this, again, was a last minute request. However, if you and your team send me some other dates and times that you are available, I will let you know what works for my team.

Feel free to reach out to me should you have any questions or if you would like to discuss this issue further.

PERB Received
08/30/24 17:46 PM

Thank you

## Stephen D. Leonesio | Managing Labor Relations Consultant

☐ MASTAGNI HOLSTEDT, A.P.C.
**Labor and Employment Department**
**1912 I Street, Sacramento, CA 95811**
*Cell: (916) 790-7646*
*www.mastagni.com*

CONFIDENTIALITY NOTICE - This e-mail message, including any attachments, is a private communication sent by a law firm, Mastagni Holstedt, A.P.C., and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, any use, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system. Thank you.

**From:** Katy Roberts <kroberts@smcgov.org>
**Sent:** Friday, July 19, 2024 3:34 PM
**To:** Carlos Tapia <ctapia@smcgov.org>; Daniel Perea <dperea@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>
**Cc:** Stephen D. Leonesio <sleonesio@mastagni.com>
**Subject:** RE: Special Order OT Revision

CAUTION: External Email.

HI there,

The Special Order that was previously extended for 2 weeks now expires on Monday July 22, 2024 at midnight.  I have discussed the staffing situation with the Sheriff's Executive Team, and the staffing in Corrections is at a critical level which necessitates implementing the new special order with the new parameters focused on Corrections.

To this end, we are requesting to schedule this meeting for Monday morning, at any time that works for DSA and OSS to further discuss the concerns and attempt to resolve them.  We can schedule the meeting in person or via Teams, depending on availability.

The new Special Order is scheduled to begin on Tuesday July 23, 2024.  If we are unable to meet prior to  the expiration of the current Special Order, the Sheriff's Office remains willing to meet and confer over the concerns and evaluate the new Special Order, but will move forward with the new Special Order while we continue to discuss, in order to maintain safe staffing levels.

Please let me know if you are available for a meeting on Monday and the times that will work best for your teams.
Thank you,
Katy

CONFIDENTIAL                              CSM 00251

PERB Received
08/30/24 17:46 PM

**From:** Carlos Tapia <ctapia@smcgov.org>
**Sent:** Thursday, July 18, 2024 12:09 PM
**To:** Daniel Perea <dperea@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>
**Cc:** Katy Roberts <kroberts@smcgov.org>
**Subject:** Re: Special Order OT Revision

Hello Sir,

Again thank you for listening and having a discussion with the DSA & OSS on the Special Order OT Revision. I have contacted HR (Katy Roberts) and I have requested a meet & confer to have further discussions on this matter.

Thank you,


Deputy Carlos J. Tapia #1075
San Mateo County Sheriff's Office
Transportation/ Court Security
ctapia@smcgov.org
650-784-1931

---

**From:** Daniel Perea <dperea@smcgov.org>
**Sent:** Wednesday, July 17, 2024 3:08 PM
**To:** Carlos Tapia <ctapia@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>
**Subject:** Special Order OT Revision

 Good afternoon,

   Thank you for the opportunity to sit down for lunch with all of you on Monday. I am writing to follow up on our discussion regarding the Special Order for the Overtime Policy. I heard your concerns and questions regarding this necessary revision to the existing Special Order.

   In response to the issues raised:

   1.   This revised Special Order is issued to address a current staffing hour availability shortage and will be in effect for 90 days. Although I understand "double overtime" would be well received, it is neither available nor viable. This is not an opportunity to negotiate for additional financial incentives.

CONFIDENTIAL                    CSM 00252

PERB Received
08/30/24 17:46 PM

2.  The 24 hours of overtime are delineated in the order as 18 hours in corrections and 6 hours in patrol. Members may work all 24 hours in corrections if they wish. Only these hours meet the special order requirements.

3.  "Bumping" by Sgts of Deputy Sheriffs from specific or preferred assignments is possible. However, this is an opportunity for all Sgts to lead by exemplifying "People First. Service Above Self." Their leadership actions will inspire participation and contribution by our entire team.

This revised Special Order will be in effect for only 90 days. I will monitor the efficacy of our personnel's response and evolving staffing resources. The successful completion of training by 60 of our newest personnel should offer a positive contribution to addressing our staffing need over the next few months.

Thank you.

**Dan Perea**

Undersheriff

**San Mateo County Sheriff's Office**



330 Bradford Street, 5rd Floor

Redwood City, CA 94063

650.363-4025 desk

650.649.8610 cell

http://www.smcsheriff.com

**DIGNITY ★ COMPASSION ★ RESPECT**

CONFIDENTIAL

CSM 00253

E  HI  IT D

CONFIDENTIAL                    CSM 00254

PERB Received
08/30/24 17:46 PM

SAN MATEO COUNTY DSA DEPUTY SHERIFF'S ASSOCIATION

Carlos Tapia
SMCDSA President
tapia@mydsa.com
www.mydsa.com
2421 Broadway Street
Redwood City, CA 94063
650.888.0480

# Minimum Staffing and Maximum Staffing Levels for San Mateo County Sheriff's Office Correctional Facilities.

## MAGUIRE CORRECTIONAL FACILITY

MCF Minimum Staffing of 26 Sworn Staff on Dayshift
MCF Maximum Staffing of 28 Sworn Staff on Dayshift (Sun-Thurs)
MCF Maximum Staffing of 32 Sworn Staff on Dayshift (Fri-Sat)

MCF Minimum Staffing of 25 Sworn Staff on **Nightshift**
MCF Maximum Staffing of 27 Sworn Staff on **Nightshift** (Sun-Thurs)
MCF Maximum Staffing of 30 Sworn Staff on Nightshift (Fri- Sat)

## MAPLE STREET CORRECTIONAL CENTER

MSCC Minimum Staffing of 21 Sworn Staff on Dayshift
MSCC Maximum Staffing of 23 Sworn Staff on Dayshift

MSCC Minimum Staffing of 16 Sworn Staff on **Nightshif**t
MSCC Maximum Staffing of 20 Sworn Staff on **Nightshift**

After speaking to many veteran sworn staff members and collecting line-level Supervisory input, these were the minimum/maximum numbers recommended to allow each facility and shift to properly staff all current functions adequately and allow for proper relief of staff members. It is recommended that the DSA move forward in presenting this to the current SMCSO administration for review and approval. The minimum number may change based on inmate population.

E  HI  IT E

CONFIDENTIAL

CSM 00256

PERB Received
08/30/24 17:46 PM

| | |
|---|---|
| **From:** | Stephen D. Leonesio |
| **To:** | Katy Roberts; Carlos Tapia; Hector Acosta; Jeffrey Carr; Matthew Silano; Daniel Perea |
| **Cc:** | Christina Corpus |
| **Subject:** | RE: SO/DSA/OSS Meeting re: Special Order |
| **Date:** | Monday, August 19, 2024 12:01:00 PM |
| **Attachments:** | image001.png |
| | image002.jpg |

Hi Katy,

Could you please let me know why the Department is still requiring overtime signups for patrol in their proposed overtime policy? During our meeting on July 29th, the Sheriff indicated that patrol would be fully staffed in August. We all understand that even with a fully staffed patrol, there will be some vacancies due to vacations, sick leave and injuries, but we don't understand how this would justify making every employee sign up for an additional 6 hours of overtime each pay period.

Thank you,

## Stephen D. Leonesio | Managing Labor Relations Consultant

MASTAGNI HOLSTEDT, A.P.C.
**Labor and Employment Department**
**1912 I Street, Sacramento, CA 95811**
**Cell: (916) 790-7646**
www.mastagni.com

CONFIDENTIALITY NOTICE - This e-mail message, including any attachments, is a private communication sent by a law firm, Mastagni Holstedt, A.P.C., and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, any use, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system. Thank you.

**From:** Katy Roberts <kroberts@smcgov.org>
**Sent:** Friday, August 16, 2024 4:16 PM
**To:** Stephen D. Leonesio <sleonesio@mastagni.com>; Carlos Tapia <ctapia@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>; Daniel Perea <dperea@smcgov.org>
**Cc:** Christina Corpus <CCorpus@smcgov.org>
**Subject:** RE: SO/DSA/OSS Meeting re: Special Order

CAUTION: External Email.

Hi Stephen,
The number of hours for those on a 4/10 and 9/80 are per month (like the 5/8). I neglected to put that in my summary but in the originally proposed revised special order, it is listed under the "exemptions" section.

Thank you,
Katy

CONFIDENTIAL

PERB Received
08/30/24 17:46 PM

**From:** Stephen D. Leonesio <sleonesio@mastagni.com>
**Sent:** Friday, August 16, 2024 3:43 PM
**To:** Katy Roberts <kroberts@smcgov.org>; Carlos Tapia <ctapia@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>; Daniel Perea <dperea@smcgov.org>
**Cc:** Christina Corpus <CCorpus@smcgov.org>
**Subject:** RE: SO/DSA/OSS Meeting re: Special Order

**CAUTION:** This email originated from outside of San Mateo County. Unless you recognize the sender's email address and know the content is safe, do not click links, open attachments or reply.

---

Hi Katy,

Could you please tell me if the amount of overtime listed for the employees working 4/10 and 9/80 schedules is per month or pay period? The reason I am asking is because it states the hours for 12 hour shifts is per pay period and the hours for 5/8 schedules is per month.

Thank you,

S          D  L          M          L        R        C
☐ MASTAGNI HOLSTEDT  A P C
L          E          D
    I S          S          CA
Cell: (916) 790-7646
www.mastagni.com

CONFIDENTIALITY NOTICE - This e-mail message, including any attachments, is a private communication sent by a law firm, Mastagni Holstedt, A.P.C., and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, any use, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system. Thank you.

**From:** Katy Roberts <kroberts@smcgov.org>
**Sent:** Thursday, August 15, 2024 6:45 PM
**To:** Stephen D. Leonesio <sleonesio@mastagni.com>; Carlos Tapia <ctapia@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>; Daniel Perea <dperea@smcgov.org>
**Cc:** Christina Corpus <CCorpus@smcgov.org>
**Subject:** RE: SO/DSA/OSS Meeting re: Special Order

CAUTION: External Email.

Hi Stephen,

I spoke to the Sheriff this afternoon, and she would like to offer the following counterproposal on the Special OT Order:
The request is that staff sign up for 24 hours per pay period for OT, with 18 hours being in

PERB Received
08/30/24 17:46 PM

Corrections/Court Security/Transportation. The other 6 hours can be in any capacity (including training, their own units, etc).

Those on 5/8 schedules- minimum of 20 hours of OT per month, with 10 being in Corrections/Court Security Transportation.

Those on 4/10 or 9/80- total of 24 hours of OT with a minimum of 12 being in Corrections/Court Security/Transportation.

Added exemption that those required to work special events or court or mandatory training will receive credit for those hours.

Revisit the special order in 60 days at which time we can discuss staffing, trainees being cleared, and discuss the progress of the scheduling software.

Please let me know if you have any additional questions.

Thank you,

Katy

---

**From:** Stephen D. Leonesio <sleonesio@mastagni.com>
**Sent:** Sunday, August 4, 2024 2:12 PM
**To:** Katy Roberts <kroberts@smcgov.org>; Carlos Tapia <ctapia@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>; Daniel Perea <dperea@smcgov.org>
**Cc:** Christina Corpus <CCorpus@smcgov.org>
**Subject:** RE: SO/DSA/OSS Meeting re: Special Order

> **CAUTION: This email originated from outside of San Mateo County. Unless you recognize the sender's email address and know the content is safe, do not click links, open attachments or reply.**

---

Hi Katy,

Thank you for getting back to me earlier today. We thought our proposal was a reasonable compromise to reach an agreement before the County's self-imposed deadline of Monday the 5th. Unfortunately, the DSA is not willing to accept the County's current proposal. Will you please provide some dates/times when you and your team are available so that we can continue the meet and confer process.

Thanks again,

S        D L        M        L        R        C
MASTAGNI HOLSTEDT, A.P.C.
Labor and Employment Department
1912 I Street, Sacramento, CA 95811
Cell: (916) 790-7646
www.mastagni.com

CONFIDENTIALITY NOTICE - This e-mail message, including any attachments, is a private communication sent by a law firm, Mastagni Holstedt, A.P.C., and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, any use, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete

PERB Received
08/30/24 17:46 PM

the e-mail and any attachments from your system. Thank you.

**From:** Katy Roberts <kroberts@smcgov.org>
**Sent:** Sunday, August 4, 2024 10:27 AM
**To:** Stephen D. Leonesio <sleonesio@mastagni.com>; Carlos Tapia <ctapia@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>; Daniel Perea <dperea@smcgov.org>
**Cc:** Christina Corpus <CCorpus@smcgov.org>
**Subject:** RE: SO/DSA/OSS Meeting re: Special Order

CAUTION: External Email.

Hi Stephen,

Thank you for sending the proposal. At this time, the Sheriff's Office continues to need 24 hours of OT from staff in order to operate safely. They do see relief in sight with trainees completing training, so they are willing to revisit the 24 hours in 60 days.

The request is that staff work 24 hours of OT with at least 18 in Corrections/Court Security/Transportation.
Those on 5/8 schedules- minimum of 20 hours of OT per month, with 10 being in Corrections/Court Security Transportation.
Those on 4/10 or 9/80- total of 24 hours of OT with a minimum of 12 being in Corrections/Court Security/Transportation.
Added exemption that those required to work special events or court or mandatory training will receive credit for those hours.
Revisit the special order in 60 days (October 6, 2024) at which time we can discuss staffing, trainees being cleared, and discuss the progress of the scheduling software.

Please let me know if you have any additional questions.
Thank you,
Katy

**From:** Stephen D. Leonesio <sleonesio@mastagni.com>
**Sent:** Saturday, August 3, 2024 9:55 AM
**To:** Katy Roberts <kroberts@smcgov.org>; Carlos Tapia <ctapia@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>; Daniel Perea <dperea@smcgov.org>
**Cc:** Christina Corpus <CCorpus@smcgov.org>
**Subject:** RE: SO/DSA/OSS Meeting re: Special Order

**CAUTION: This email originated from outside of San Mateo County. Unless you recognize the sender's email address and know the content is safe, do not click links, open attachments or reply.**

CONFIDENTIAL                          CSM 00260

PERB Received
08/30/24 17:46 PM

Happy Saturday everyone,

I apologize for sending this later than we had all hoped. However, I think this counterproposal will work to address the needs of both the Department and the Association. The DSA is also interested in revisiting the overtime issues once the tracking software is in place and there is enough data to analyze whether or not this Special Order needs to be tweaked. Please review the attached document and let me know if you have any questions or would like to discuss further. I know the Department would like to have this Special Order take effect on Monday so I can make myself available this weekend to meet if we need to.

Thanks,

**S        D  L        M        L        R        C**
☐ **MASTAGNI HOLSTEDT A P C**
**L              E              D**
    **I   S        S              CA**
*Cell:* (916) 790-7646
[www.mastagni.com](www.mastagni.com)

CONFIDENTIALITY NOTICE - This e-mail message, including any attachments, is a private communication sent by a law firm, Mastagni Holstedt, A.P.C., and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, any use, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system. Thank you.

**From:** Katy Roberts <kroberts@smcgov.org>
**Sent:** Friday, August 2, 2024 10:02 AM
**To:** Stephen D. Leonesio <sleonesio@mastagni.com>; Carlos Tapia <ctapia@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>; Daniel Perea <dperea@smcgov.org>
**Cc:** Christina Corpus <CCorpus@smcgov.org>
**Subject:** RE: SO/DSA/OSS Meeting re: Special Order

CAUTION: External Email.

Good Morning,
Per our discussion in the meeting yesterday, the Sheriff's Office has agreed to and added the additional exemption (highlighted in the attached) to the special order that we discussed.
Please let us know if you have additional questions.
Thank you,
Katy

**From:** Stephen D. Leonesio <sleonesio@mastagni.com>
**Sent:** Monday, July 29, 2024 5:07 PM
**To:** Katy Roberts <kroberts@smcgov.org>; Carlos Tapia <ctapia@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>; Daniel Perea <dperea@smcgov.org>
**Cc:** Christina Corpus <CCorpus@smcgov.org>

CONFIDENTIAL

PERB Received
08/30/24 17:46 PM

**Subject:** RE: SO/DSA/OSS Meeting re: Special Order

> **CAUTION:** This email originated from outside of San Mateo County. Unless you recognize the sender's email address and know the content is safe, do not click links, open attachments or reply.

Yes, that works. Thank you

**S      D L      M      L      R      C**

☐ MASTAGNI HOLSTEDT, A.P.C.
**Labor and Employment Department**
**1912 I Street, Sacramento, CA 95811**
*Cell: (916) 790-7646*
[www.mastagni.com](http://www.mastagni.com)

CONFIDENTIALITY NOTICE - This e-mail message, including any attachments, is a private communication sent by a law firm, Mastagni Holstedt, A.P.C., and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, any use, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system. Thank you.

**From:** Katy Roberts <kroberts@smcgov.org>
**Sent:** Monday, July 29, 2024 5:00 PM
**To:** Stephen D. Leonesio <sleonesio@mastagni.com>; Carlos Tapia <ctapia@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>; Daniel Perea <dperea@smcgov.org>
**Cc:** Christina Corpus <CCorpus@smcgov.org>
**Subject:** RE: SO/DSA/OSS Meeting re: Special Order

> CAUTION: External Email.

Thank you Stephen.  We will work on getting the information to you as soon as possible.
We are available on Thursday at 8:30 am if that still works for you.
Thank you,
Katy

**From:** Stephen D. Leonesio <sleonesio@mastagni.com>
**Sent:** Monday, July 29, 2024 4:57 PM
**To:** Katy Roberts <kroberts@smcgov.org>; Carlos Tapia <ctapia@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>; Jeffrey Carr <jcarr@smcgov.org>; Matthew Silano <msilano@smcgov.org>; Daniel Perea <dperea@smcgov.org>
**Cc:** Christina Corpus <CCorpus@smcgov.org>
**Subject:** RE: SO/DSA/OSS Meeting re: Special Order

> **CAUTION:** This email originated from outside of San Mateo County. Unless you recognize the sender's email address and know the content is safe, do not click links, open attachments or reply.

Hello everyone,

CONFIDENTIAL                                    CSM 00262

PERB Received
08/30/24 17:46 PM

Thank you for the discussion today. As I mentioned during our meeting, I have a items that I would like additional information on. First, could you tell me how many employees have been mandated to work overtime, per month, from January 2024 through June 2024. Second, could you provide some additional information or guidelines as to the minimum and maximum number of employees for each Corrections facility/unit as well as for Court Security/Transportation Unit. I understand these numbers can fluctuate based on many factors, but I also understand that there is a minimum number of employees that must staff each facility/unit for it to operate safely. I also understand there is generally a maximum number of employees at each facility/unit that, if staffed, would not be efficient. Please let me know if you need additional information regarding this request.


Thank you,


S        D    L        M        L    R        C
MASTAGNI HOLSTEDT A P C
L      IS      S          D      CA
Cell: (916) 790-7646
www.mastagni.com

CONFIDENTIALITY NOTICE - This e-mail message, including any attachments, is a private communication sent by a law firm, Mastagni Holstedt, A.P.C., and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, any use, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system. Thank you.

-----Original Appointment-----
**From:** Katy Roberts <kroberts@smcgov.org>
**Sent:** Wednesday, July 24, 2024 9:24 AM
**To:** Katy Roberts; Stephen D. Leonesio; Carlos Tapia; Hector Acosta; Jeffrey Carr; Matthew Silano; Daniel Perea
**Cc:** Christina Corpus
**Subject:** SO/DSA/OSS Meeting re: Special Order
**When:** Monday, July 29, 2024 3:00 PM-4:00 PM (UTC-08:00) Pacific Time (US & Canada).
**Where:** Microsoft Teams Meeting

CAUTION: External Email.

---

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: 248 085 198 806
Passcode: prDQTX

CONFIDENTIAL                                   CSM 00263

PERB Received
08/30/24 17:46 PM

---

**Dial in by phone**

+1 628-212-0105,,860346358# United States, San Francisco

Find a local number

Phone conference ID: 860 346 358#

For organizers: Meeting options | Reset dial-in PIN



_____

CONFIDENTIAL

CSM 00264

# EXHIBIT F

CONFIDENTIAL

| San Mateo County Sheriff's Office **Special Order** *Christina Corpus, Sheriff* | SECTION:          2024-01 | | PAGE 1 OF 4 |
|---|---|---|---|
| | RELATED STANDARDS:   LEXIPOL POLICY 1021.1 | | |
| | ISSUE DATE:    12-1-14 | | REVISION DATE:    7-7-24 |
| CHAPTER:      REVISED SPECIAL OVERTIME POLICY/MANDATORY OVERTIME | SUBJECT:          DUTY HOURS | | |

## PURPOSE

This Special Order provides clear guidance on overtime requirements and sets parameters for when employees are mandated to perform overtime. It revises the April 25th, 2023 Special Order to clarify its meaning without adding new requirements or obligations. This comprehensive policy ensures clarity, fairness, and efficiency in managing overtime and staffing needs.

T    S    O        M    A
T        N

## BACKGROUND

Maintaining adequate staffing in core service areas (Patrol, Corrections, and Court Security/Transportation) often requires mandating employees to work on scheduled days off. Voluntary overtime sign-ups are encouraged to prevent last-minute involuntary holdovers or mandated overtime. Staff should aim to sign up for 18 hours of overtime per pay period, in Corrections and Court Security/Transportation.

## POLICY

This Special Order establishes guidelines for voluntary and mandatory overtime:

- **V        O**        All Sergeants, Deputy Sheriffs, and Correctional Officers are strongly encouraged to sign up for 18 hours of overtime per pay period in Corrections and Court Security/Transportation. Volunteers will not be subject to mandatory overtime.
- **M**        This Special Order can only be modified with the Sheriff and Undersheriff's approval.

CONFIDENTIAL
CSM 00266

**OVERTIME SIGN UP PROCEDURE**

Monthly voluntary overtime sign-ups will be completed based on Sheriff's Office seniority (most senior to least senior).

**MANDATING STAFFF TO WORK OVERTIME**

Mandatory overtime is used only when staffing levels fall below the minimum required for safe, effective operations. The process for mandating overtime will be done by reverse seniority (newest hire to most senior hire).

- **E**
  - Employees who have worked  a  minimum of 18 hours in corrections or Court Security/Transportation.
  - Employees in assignments with a 5/8 (i.e., Bailiffs, etc.) who have worked 18  hours of overtime per month with a minimum of  9 hours per pay period in Corrections or Court Security/Transportation.
  - Employees in assignments with a 4/10 or 9/80 schedule (i.e., Investigations, etc.) who have worked  18 hours of overtime per month with a minimum of  9 hours per pay period in Corrections or Court Security/Transportation.
  - Employees who are required to work special events in their assigned bureau, or are required to appear in court or required to attend mandatory POST or SCT training, will receive credit for the hours worked.

**MANDATE PROCESS**

1. **N**          Supervisors will first notify staff of open shifts via email, phone calls, text messages, etc., allowing for voluntary overtime. They will give staff as much advance notice as possible based on the circumstances.
2. **E          V          O**          If voluntary sign-ups are insufficient, supervisors will mandate overtime using a seniority list accessible in SharePoint.
3. **C**          Supervisors will communicate mandates via official email with specific needs.
4. **S          L**          Mandates will be completed by the seniority of each team, not just each division. The seniority list will cycle continuously, pausing and resuming as necessary to ensure fair distribution.

**A          E**

- **Y          S**          Employees with 25+ years of service who have worked 12 hours of overtime per pay period in a core position are exempt from mandatory overtime.
- **U          A**          Employees in undercover or covert assignments will be

CONFIDENTIAL                              CSM 00267

PERB Received
08/30/24 17:46 PM

exempt from working overtime in an assignment involving direct contact with incarcerated persons

- **A        T        O**        Employees with approved vacation, other time off, FMLA, or mandated training are exempt during the approved period.
- **P        E**        Employees who have confirmed plans on their days off for which they are able to provide verification of being secured or reserved at least two (2) weeks prior to the mandated shift date.
  - **S        U                E**        The Sheriff/Undersheriff may exempt any staff member from mandated overtime based on the Office's needs.

**A        R**

- Employees with outside employment permits, who do not meet the mandated or voluntary overtime expectations, may have their outside employment permit suspended or revoked pursuant to Sheriff's Office Policy 1022.2.2.
- Employees with ancillary duty assignments, who do not meet the mandated or voluntary overtime expectations, may be precluded from working overtime in their ancillary position.

**ACCOUNTABILITY**

All supervisors will review timecards via ATKS and overtime sign-up lists to ensure compliance. Intentional violations or dishonesty will result in disciplinary action.

**N**
**C**                                                        **S        O**
**S**

        **E**

CONFIDENTIAL                                        CSM 00268

E  HI  IT G

CONFIDENTIAL                    CSM 00269

PERB Received
08/30/24 17:46 PM

| **From:** | Stephen D. Leonesio |
|---|---|
| **To:** | Katy Roberts; Daniel Perea; Christina Corpus |
| **Cc:** | Sean D. Currin; Carlos Tapia |
| **Subject:** | Minimum Staffing |
| **Date:** | Monday, August 12, 2024 7:03:00 PM |
| **Attachments:** | image001.png |
| | 2023 MINMAX FINAL 3.pdf |

Hi Katy,

      I was informed that the Sheriff's Department has recently made a couple of unilateral changes without either notifying the DSA nor giving the DSA the opportunity to meet and confer over the changes. I have just been advised of these changes and was told that they occurred over the weekend. The DSA was informed of these changes from various sergeants and not management.

The first change that I was told about is a change to the previously negotiated Minimum Staffing Levels. As you may recall, during our meetings over the Department's proposed Overtime Policy, the subject of minimum staffing levels came up. The parties discussed what the levels were and how they were determined (through a meeting with management and the rank and file employees, including the sergeants). I have attached the document that I received from the DSA for reference. The Change in staffing levels is a mandatory subject of bargaining because it also changes schedules, which are a mandatory subject of bargaining. The Department can't increase the minimum numbers of staffing without either changing employees' schedules or covering the shifts with mandatory overtime (also a mandatory subject of bargaining). As you know, the Department is required to notify the DSA prior to making any changes and cannot unilaterally make changes to staffing levels until the entire meet and confer process has been completed, including impasse procedures.

The second change that I was told about is a change to the way overtime is being filled. If true, this is very disturbing and a clear unfair labor practice, as we have been discussing the Department's proposed overtime policy. I was told that the Department has gathered data on which employees have worked overtime, and at what amount, and which employees haven't. The Department then told its managers and supervisors to make those employees, who haven't met a certain criteria, work overtime. I was told this threshold was based off of the "old" overtime policy that has already expired. Again, if true, this is also an unfair labor practice as the Department has not notified the DSA of these proposed changes and the Department is trying to enforce a policy that has since expired and no agreement for a subsequent policy has been reached.

These are both serious accusations that our firm does not take lightly. I demand a response from the County and/or Department by the end of business on Tuesday, August 13th, as to if these changes have in fact been made. If any of these allegations are true, I demand the County/Department immediately cease these changes and go back to the status quo. If the County/Department want to make these changes, they must first notify the DSA of any proposed changes and then, if the DSA requests, meet and confer with the DSA until either an

CONFIDENTIAL

PBR25-5-05961
08/30/24 17:46 PM

# EXHIBIT H

CONFIDENTIAL

CSM 00272

PERB Received
08/30/24 17:46 PM

| From: | Stephen D. Leonesio |
|---|---|
| To: | Katy Roberts; Christina Corpus; Daniel Perea |
| Cc: | Carlos Tapia; Hector Acosta; Jeffrey Carr; Sean D. Currin; Garrett Porter |
| Subject: | DSA Information Request |
| Date: | Thursday, August 15, 2024 2:10:00 PM |
| Attachments: | image001.png |

Hi Katy,

Will you please give me an update on my email that I had sent on 8/12. In that email, I advised the County and Department that I was advised that the Department has changed the staffing levels for each of the jail facilities. Could you please tell me if that is true, and if so, why wasn't the DSA notified prior to the change. During our meeting this morning, I heard discussions from the members of the OSS Association and the Sheriff and Undersheriff about a number of 35. The Department stated this was a safety number, not a minimum staffing number. However, the OSS and the Department stated that number was how many people should be working on a shift at a facility. The OSS Association complained to the Department that they were having trouble mandating that many people to work. The Department, when asked, did not provide a reason there had to be 35 employees working on a shift, other than it was for safety reasons. We would like to know both how and why 35 employees was the number that was arbitrarily chosen.  In addition, the DSA is still demanding that if it is true that the Department is now arbitrarily mandating at least 35 employees work per shift at the jails, they immediately stop enforcing this change until there is either an agreement or all impasse procedures are completed.

The other item that I had listed in my 8/12 email was whether or not the Department is now basing its mandatory overtime off of amounts of volunteered overtime hours worked. I was advised by the DSA that the Department has begun auditing the amount of overtime hours an employee has been working. If, in the eyes of the Department, an employee doesn't work enough overtime (whatever that number is), the supervisors have been directed to order those employees to work more overtime. This is not in the current overtime policy and therefore, if true, is a change that the DSA was not informed of, nor given the opportunity to meet and confer over. Again, in our meeting this morning, I heard the OSS Association indicate that the Department is keeping a list of which employees are working overtime, and how much, and which employees are not. In fact, the Sheriff sent out a "Message from the Sheriff" dated August 9, 2024, that indicates the Department did in fact research how many employees were working the minimum amount of overtime hours. Paragraph four of the message reads, in part, "An internal audit by the payroll department revealed that 106 employees are either not contributing to the minimum overtime requirements or are working substantial overtime without supporting the essential needs of corrections. This is unacceptable." I am not aware of any current policy that requires an employee work a certain amount of overtime. I know we have been meeting and conferring over a proposed policy that would dictate how many hours an employee would be required to work and in what areas of the Department. However, if the Department has arbitrarily implemented this, or any other policy, prior to completing the meet and confer process, up to and including all impasse procedures, this is an unlawful action.

CONFIDENTIAL                                    CSM 00273

PERB Received
08/30/24 17:46 PM

In addition to the responses that I am still waiting for on the two above issues, will you please provide me with the following information to help the DSA better understand the County's position with its proposed overtime policy. This information will help the DSA expedite the meet and confer process by allowing the DSA to see the data that would support the Department's proposed changes to overtime.

- All hours employees have been mandated to work overtime from January 1, 2024 through July 31. 2024
- All supervisor reports documenting the mandated overtime, as required by Department Policy 1021.3.1
- What the current minimum, or safe, staffing levels are for the Maguire Correctional Facility
  - Why has that number of staff been selected
- What the current minimum, or safe, staffing levels are for the Maple Street Correctional Center
  - Why has that number of staff been selected
- What the current minimum, or safe, staffing levels are for patrol (broken down by area if necessary)
  - Why has that number of staff been selected

Please let me know if you have any questions or would like more information.

Thank you,

S     D L     M     L     R     C

MASTAGNI HOLSTEDT, A.P.C.
Labor and Employment Department
1912 I Street, Sacramento, CA 95811
Cell: (916) 790-7646
www.mastagni.com

CONFIDENTIALITY NOTICE - This e-mail message, including any attachments, is a private communication sent by a law firm, Mastagni Holstedt, A.P.C., and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, any use, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system. Thank you.

E  HI  IT I

CONFIDENTIAL

CSM 00275

PERB Received
08/30/24 17:46 PM

| | |
|---|---|
| **From:** | Stephen D. Leonesio |
| **To:** | Katy Roberts; Christina Corpus; Daniel Perea |
| **Cc:** | Carlos Tapia; Hector Acosta; Jeffrey Carr; Matthew Silano; Sean D. Currin |
| **Subject:** | Mandatory Overtime |
| **Date:** | Wednesday, August 28, 2024 3:20:00 PM |
| **Attachments:** | image001.png |

Hi Katy,

I'm just following up on a couple of outstanding items. First, can you please tell me why the Sheriff's Department is still requiring a minimum of 35 employees work at MCF. I was advised that as recent as this past weekend the Department's management was requiring this new minimum amount of employees at the facility. As you are aware, I've asked numerous times if the Department has changed the minimum staffing numbers and if so, to meet and confer over this proposed change, ***before*** the change actually takes place. Many times during our meetings, the Department representatives have indicated there are no minimum staffing requirements. If this is true, why then do the Department managers continue to require Sergeants staff the facilities with a certain amount of DSA members? This number of 35 is different than what was previously negotiated, which the Department and County have been advised of numerous times during our meetings. If the Department is in fact requiring 35 employees work at MCF, or any other facility, I demand the Department cease this requirement until they have properly noticed the DSA of any proposed changes and negotiate with the DSA for any proposed changes to the amount of employees required to work at any facility or assignment.

Second, will you please tell me why the Department managers are still requiring DSA members work a certain amount of overtime per pay period. The mandatory overtime policy, as you and the Department are aware, has expired and there is no new negotiated policy in place. I have received a memorandum from the Department indicating sworn staff members are required to complete jail overtime. When did this requirement come into effect? Again, there has been no negotiated changes. I am demanding the Department cease any requirement for DSA members to work a certain amount of overtime until any proposed changes are negotiated up to and including the impasse procedures.

Lastly, I am following up on my information requests that I have sent to you and the Department. I have not received the information. Please provide a date when the information will be provided. If you need additional information or have questions about any of my requests, please let me know.

Thank you,

S     D L     M     L     R     C
**MASTAGNI HOLSTEDT A P C**
L     E     D
IS     S     CA
*Cell: (916) 790-7646*
*www.mastagni.com*

CONFIDENTIAL

CSM 00276

PERB Received
08/30/24 17:46 PM

CONFIDENTIALITY NOTICE - This e-mail message, including any attachments, is a private communication sent by a law firm, Mastagni Holstedt, A.P.C., and may contain confidential, legally privileged information meant solely for the intended recipient. If you are not the intended recipient, any use, distribution, or copying of this communication is strictly prohibited. Please notify the sender immediately by replying to this message, then delete the e-mail and any attachments from your system. Thank you.

CONFIDENTIAL

E HI IT

CONFIDENTIAL                    CSM 00278

# SHERIFF

# CHRISTINA CORPUS

## SAN MATEO COUNTY SHERIFF'S OFFICE

**DATE:** August 19, 2024

**TO:** All Sheriff's Office Personnel

**FROM:** Professional Standards Bureau

**SUBJECT:** Corrections Division Bureaus and Overtime

---

This memo is to notify all Sheriff's Office personnel that the Corrections Division of the Sheriff's Office is comprised of two jail facilities, Maguire Correctional Facility and Maple Street Correctional Center.  Within this Division, there is the Alternative Sentencing Bureau, which includes the Sheriff's Work Program, Electronic Monitoring and Work Furlough Programs. Furthermore, the Transportation and Court Security Bureau is included in the Corrections Division.

Sworn staff members who are required to complete their jail overtime per pay period can do so in any bureau under the banner of the Corrections Division, including the Transportation and Court Security Bureau.

If you have any questions about this memo, please contact Captain William Fogarty or Captain Frank Dal Porto.

*CONFIDENTIAL*
For San Mateo County Sheriff's Office Internal Use Only

1    GARRETT R. PORTER, ESQ. (SBN 341880)
     **MASTAGNI HOLSTEDT**
2    *A Professional Corporation*
     1912 I Street
3    Sacramento, California 95811-3151
     Telephone:   (916) 446-4692
4    Facsimile:   (916) 447-4614
5
     Attorney for Charging Party
6

7

8              **BEFORE THE PUBLIC EMPLOYMENT RELATIONS BOARD**
9                        **OF THE STATE OF CALIFORNIA**
10

11
     SAN MATEO DEPUTY SHERIFFS            )    **DECLARATION OF CARLOS TAPIA IN**
12   ASSOCIATION,                         )    **SUPPORT OF UNFAIR LABOR**
                                          )    **PRACTICE CHARGE**
13                                        )
                  Charging Party,         )
14        v.                              )
                                          )
15   COUNTY OF SAN MATEO,                 )
                                          )
16              Respondent.               )
                                          )
17   ─────────────────────────────────── )

18   I, CARLOS TAPIA, declare as follows:

19        1.    I am over the age of eighteen years old. I have personal knowledge of the matters herein,

20             and if called upon to do so, I could and would completely testify thereto.

21        2.    I was sworn in as a Correctional Officer in the San Mateo County Sheriff's Office on

22             November 9, 2009, and on May 21, 2017, I was promoted to a Deputy Sheriff and

23             continue to work in that capacity today.

24        3.    I am the current President of the San Mateo Deputy Sheriffs Association ("SMDSA"). I

25             have served in this role since 2022.

26        4.    The San Mateo Deputy Sheriffs Association ("DSA") represents San Mateo County

27             ("COUNTY") employees in the following classifications: Deputy Sheriff, Deputy

28             Sheriff Trainee, Sheriff's Correctional Officer, and District Attorney Inspector.

─────────────────────────────────────────────────────────────────────
Declaration of Carlos Tapia in Support of Unfair        1        *San Mateo County Deputy Sheriffs Association*
Labor Practice Charge                                             *v. San Mateo County*

CONFIDENTIAL

5. As President, I represent members in contract negotiations, grievances, disciplinary matters, and employer-employee relations related to wages, hours, and working conditions.

6. During July and into August 2024, the DSA and the COUNTY met and conferred multiple times to negotiate about the mandatory overtime policy, which was going to expire on August 7, 2024.

7. On August 5, 2024, the COUNTY Undersheriff Dan Parea notified me with the COUNTY's initial unchanged offer regarding the mandatory overtime policy.

8. The DSA rejected the COUNTY's August 5, 2024, offer regarding the mandatory overtime policy.

9. Between August 5, 2024, and August 7, 2024, the DSA requested to meet and confer with the COUNTY regarding the expiring mandatory overtime policy multiple times, but the COUNTY did not provide a response before the existing policy expired.

10. On August 7, 2024, the previously negotiated mandatory overtime policy between the DSA and the COUNTY expired.

11. The COUNTY refused to negotiate in good faith and failed to exhaust impasse procedures regarding the mandatory overtime policy for sworn DSA members.

12. On August 8, 2024, the DSA board sent out an email to all DSA members where the DSA board provided information to DSA members regarding the expired mandatory overtime policy, the negotiation history of the mandatory overtime policy, and the DSA board's position/goals regarding the mandatory overtime policy. (See Exhibit A.)

13. On August 9, 2024, San Mateo COUNTY Sheriff Christina Corpus was sent an email to "All Sheriff's Personnel" which included over two-hundred county employees. (See Exhibit B.)

14. The Sheriff states that the August 9, 2024 email was specifically sent to "address any misunderstandings regarding recent communications from the DSA leadership." (See Exhibit B.)

---

Declaration of Carlos Tapia in Support of Unfair
Labor Practice Charge

2

*San Mateo County Deputy Sheriffs Association
v. San Mateo County*

CONFIDENTIAL

15.  In the August 9, 2024 email, the Sheriff states that, in regards to negotiating a new mandatory overtime policy, the COUNTY "made [itself] available, but the urgency was not reciprocated." (See Exhibit B.)

16.  The Sheriff's email states that "[t]his crisis is the result of years of neglect and inaction" and that the DSA board's claim to its members that "the overtime policy is flawed … is a significant misrepresentation." (See Exhibit B.)

17.  The Sheriff's August 9, 2024, email directly communicated to DSA members that the DSA board is: misunderstood by the membership, not addressing the staffing issues with urgency, neglecting and failing to take action regarding staffing issues, and misrepresenting information to the membership.

18.  Over the weekend of August 10 and 11, 2024, the COUNTY unilaterally changed the minimum and maximum staffing levels at the Maguire Correctional Facility and Maple Street Correctional Center for sworn DSA members.

19.  The policies regarding minimum staffing levels directly controls the schedules of DSA members and are mandatory subjects of bargaining. Historically, the policies regarding minimum staffing levels were negotiated between the DSA and the COUNTY.

20.  The COUNTY did not provide the DSA with reasonable advance notice or opportunity to meet and confer about the change to minimum/maximum staffing levels.

I declare under penalty of perjury that the foregoing is true and correct, except where alleged on information and belief. Executed this 27th day of August 2024, in San Bruno, California.

_____
CARLOS TAPIA

---

Declaration of Carlos Tapia in Support of Unfair    3    *San Mateo County Deputy Sheriffs Association*
Labor Practice Charge                                    *v. San Mateo County*

CONFIDENTIAL
CSM 00282

1  GARRETT R. PORTER, ESQ. (SBN 341880)
   **MASTAGNI HOLSTEDT**
2  *A Professional Corporation*
   1912 I Street
3  Sacramento, California 95811-3151
   Telephone:  (916) 446-4692
4  Facsimile:  (916) 447-4614

5  Attorney for Charging Party

6

7

8              **BEFORE THE PUBLIC EMPLOYMENT RELATIONS BOARD**

9                     **OF THE STATE OF CALIFORNIA**

10

11

12  SAN MATEO DEPUTY SHERIFFS        )    **DECLARATION OF JOSEPH FAVA IN**
    ASSOCIATION,                     )    **SUPPORT OF UNFAIR LABOR**
                                     )    **PRACTICE CHARGE**
13
              Charging Party,        )
14                                   )
    v.                               )
15                                   )
    COUNTY OF SAN MATEO,             )
16                                   )
              Respondent.            )
17  _____  )

18  I, JOSEPH FAVA, declare as follows:

19     1.   I am over the age of eighteen years old. I have personal knowledge of the matters herein,

20          and if called upon to do so, I could and would completely testify thereto.

21     2.   I became sworn in as a deputy sheriff in the San Mateo County Sheriff's Office

22          ("COUNTY") in 2013. I am currently assigned as a Detective Sergeant.

23     3.   On August 13, 2024, I attended a regularly occurring meeting with several other

24          COUNTY administrative personnel and San Mateo Deputy Sheriffs Association

25          ("DSA") members to discuss emergency staffing policies for the San Mateo County Jail.

26     4.   At the August 13, 2024, meeting, there were approximately ten individuals in attendance,

27          including Executive Director of Administration/Chief of Staff Victor Aenlle.

28

---

Declaration of Joseph Fava in Support of Unfair          1          *San Mateo Sheriffs Association v. County of*
Labor Practice Charge                                                                                        *San Mateo*

CONFIDENTIAL                    CSM 00283

PERB Received
08/30/24 17:46 PM

5.  Executive Director of Administration/Chief of Staff Victor Aenlle is a manager over the DSA members and is a representative of the COUNTY.

6.  During the August 13, 2024, meeting, when discussing the mandatory overtime policies and negotiations between the COUNTY and the DSA, Executive Director of Administration/Chief of Staff Victor Aenlle directly said to a DSA member in attendance: "… If you aren't happy with how the [DSA] board is handling the situation, you should encourage the membership to vote them out."

7.  In making this comment, I understood Chief of Staff Victor Aenlle to be telling the DSA members at the meeting to recall the current SMDSA board.


Executed this 27th day of August, 2024 in  REDWOOD CITY , California.


_____
JOSEPH FAVA

---

Declaration of Joseph Fava in Support of Unfair Labor Practice Charge                     2          *San Mateo Sheriffs Association v. County of San Mateo*

CONFIDENTIAL                                           CSM 00284

1  GARRETT R. PORTER, ESQ. (SBN 341880)
   **MASTAGNI HOLSTEDT**
2  *A Professional Corporation*
   1912 I Street
3  Sacramento, California 95811-3151
   Telephone:  (916) 446-4692
4  Facsimile:  (916) 447-4614
5
   Attorney for Charging Party
6

7

8          **BEFORE THE PUBLIC EMPLOYMENT RELATIONS BOARD**

9                    **OF THE STATE OF CALIFORNIA**

10

11
   SAN MATEO DEPUTY SHERIFFS          )  **DECLARATION OF MATTHEW SILANO**
12 ASSOCIATION,                       )  **IN SUPPORT OF UNFAIR LABOR**
                                      )  **PRACTICE CHARGE**
13            Charging Party,          )
                                      )
14      v.                            )
                                      )
15 COUNTY OF SAN MATEO,               )
                                      )
16            Respondent.             )
                                      )
17 _____)

18 I, MATTHEW SILANO, declare as follows:

19   1.   I am over the age of eighteen years old. I have personal knowledge of the matters herein,

20        and if called upon to do so, I could and would completely testify thereto.

21   2.   I was sworn in as a Deputy Sheriff in the San Mateo County Sheriff's Office in 2017 and

22        continue to work in that capacity today.

23   3.   I am the current Vice President of the San Mateo Deputy Sheriffs Association

24        ("SMDSA"). I have served in this role since July of 2024.

25   4.   The San Mateo Deputy Sheriffs Association ("DSA") represents San Mateo County

26        ("COUNTY") employees in the following classifications: Deputy Sheriff, Deputy

27        Sheriff Trainee, Sheriff's Correctional Officer, and District Attorney Inspector.

28

---

Declaration of Matthew Silano in Support of Unfair          1          *San Mateo County Deputy Sheriffs Association*
Labor Practice Charge                                                              *v. San Mateo County*

5. As Vice President, I represent members in contract negotiations, grievances, disciplinary matters, and employer-employee relations related to wages, hours, and working conditions.

6. During July and into August 2024, the DSA and the COUNTY met and conferred multiple times to negotiate about the mandatory overtime policy, which was going to expire on August 7, 2024.

7. On August 1, 2024, I attended a meet an confer between the DSA and the COUNTY to negotiate about the mandatory overtime policy which ended with the COUNTY refusing to negotiate further and leaving without exhausting impasse procedures.

8. On August 7, 2024, the previously negotiated mandatory overtime policy between the DSA and the COUNTY expired.

9. The COUNTY refused to negotiate in good faith and failed to exhaust impasse procedures regarding the mandatory overtime policy for sworn DSA members.

10. On August 8, 2024, the DSA board sent out an email to all DSA members where the DSA board provided information to DSA members regarding the expired mandatory overtime policy, the negotiation history of the mandatory overtime policy, and the DSA board's position/goals regarding the mandatory overtime policy. (See Exhibit A.)

11. On August 9, 2024, San Mateo COUNTY Sheriff Christina Corpus was sent an email to "All Sheriff's Personnel" which included over two-hundred county employees. (See Exhibit B.)

12. The Sheriff states that the August 9, 2024 email was specifically sent to "address any misunderstandings regarding recent communications from the DSA leadership." (See Exhibit B.)

13. In the August 9, 2024 email, the Sheriff states that, in regards to negotiating a new mandatory overtime policy, the COUNTY "made [itself] available, but the urgency was not reciprocated." (See Exhibit B.)

Declaration of Matthew Silano in Support of Unfair Labor Practice Charge     2     *San Mateo County Deputy Sheriffs Association v. San Mateo County*

CONFIDENTIAL     CSM 00286

14. The Sheriff's email states that "[t]his crisis is the result of years of neglect and inaction" and that the DSA board's claim to its members that "the overtime policy is flawed ... is a significant misrepresentation." (See Exhibit B.)

15. The Sheriff's August 9, 2024, email directly communicated to DSA members that the DSA board is: misunderstood by the membership, not addressing the staffing issues with urgency, neglecting and failing to take action regarding staffing issues, and misrepresenting information to the membership.

16. Over the weekend of August 10 and 11, 2024, the COUNTY unilaterally changed the minimum and maximum staffing levels at the Maguire Correctional Facility and Maple Street Correctional Center for sworn DSA members.

17. The policies regarding minimum staffing levels directly controls the schedules of DSA members and are mandatory subjects of bargaining. Historically, the policies regarding minimum staffing levels were negotiated between the DSA and the COUNTY.

18. The COUNTY did not provide the DSA with reasonable advance notice or opportunity to meet and confer about the change to minimum/maximum staffing levels.

I declare under penalty of perjury that the foregoing is true and correct, except where alleged on information and belief. Executed this 27th day of August 2024 in Redwood City, California.


_Matthew R. Silano_____
MATTHEW SILANO

Declaration of Matthew Silano in Support of Unfair    3    *San Mateo County Deputy Sheriffs Association*
Labor Practice Charge                                          *v. San Mateo County*

CONFIDENTIAL                                    CSM 00287

GARRETT R. PORTER, ESQ. (SBN 341880)
**MASTAGNI HOLSTEDT**
  *o essional Co  o ation*
1912 I Street
Sacramento, California 95811-3151
Telephone:   (916) 446-4692
Facsimile:   (916) 447-4614

Attorney for Charging Party

E ORE THE P    LIC EMPLO  MENT RELATIONS    OARD

O   THE STATE O   CALI ORNIA

| | |
|---|---|
| SAN MATEO DEPUTY SHERIFFS ASSOCIATION, | ) DECLARATION O   STEPHEN<br>) LEONESIO IN S  PPORT O     N AIR<br>) LA  OR PRACTICE CHARGE |
|            Charging Party, | ) |
|   v. | ) |
| COUNTY OF SAN MATEO, | ) |
|           Respondent. | ) |

I, STEPHEN LEONESIO, declare as follows:

1. I am over the age of eighteen years old. I have personal knowledge of the matters herein, and if called upon to do so, I could and would completely testify thereto.

2. I am employed by the Mastagni Holstedt law firm as a Labor Relations Consultant and have been continuously employed in this capacity since January 7, 2013.  In this capacity I provide a wide range of labor relations and representation services to Firm clients which include, but are not limited to; negotiating collective bargaining agreements, meeting and conferring on mandatory subjects of bargaining, contract enforcement, policy adoption, Association governance, individual employee assistance, general day-to-day labor relations issues, and overall employer/employee relations.

Declaration of Stephen Leonesio in Support of          1          *an  ateo Co  nt    e  t   e i s  ssociation*
Unfair Labor Practice Charge                                                *.  an  ateo Co  nt*

CONFIDENTIAL                                    CSM 00288

3. The San Mateo Deputy Sheriffs Association ("DSA") represents San Mateo County ("COUNTY") employees in the following classifications: Deputy Sheriff, Deputy Sheriff Trainee, Sheriff's Correctional Officer, and District Attorney Inspector.

4. I have been providing labor relations services to the DSA since November 3, 2021. As a Labor Relations Consultant, I represent the DSA in contract negotiations and employer-employee relations related to wages, hours, and working conditions.

5. On July 17, 2024, Undersheriff Perea sent an email to DSA President Carlos Tapia that thanked DSA President Tapia for talking to the Undersheriff about a proposed new Special Order for Overtime. (See "RE Special Order OT Revision" attached as Exh. C.)

6. On or about July 18, 2024, I was advised by DSA President Carlos Tapia that Under Sheriff Perea had talked to DSA President Tapia about changing the Department's Overtime Special Order.

7. On July 18, 2024, DSA President Tapia advised Undersheriff Perea, in an email, that he had contacted Katy Roberts with the San Mateo County Human Resources Department and requested a meet and confer over the Sheriff Department's proposed Special Order for Overtime. (See Exh. C.)

8. On July 19, 2024, I received an email from San Mateo County Human Resources employee Katy Roberts indicating the Sheriff's Department was going to implement the proposed Special Order for Overtime on Tuesday, July 23, 2024. (See Exh. C.)

9. On July 19, 2024, I sent San Mateo County Human Resources employee Katy Roberts and Undersheriff Perea an email advising that there should be no changes to the status quo until the meet and confer process, including impasse procedures, were completed. I also requested dates to start the meet and confer process. (See Exh. C.)

10. On July 22, 2024, I received an email from San Mateo County Human Resources employee Katy Roberts which indicated the Sheriff's Department was going to extend the previously negotiated Special Order for Overtime until August 7, 2024. (See Exh. C.)

11. On July 29, 2024, DSA President Tapia, myself, San Mateo County Human Resources employee Katy Roberts, Undersheriff Perea, Sheriff Corpus and members of the Sergeants Association met virtually to discuss the Sheriff Department's proposed Special Order OT Revisions. During this meeting the parties discussed the current negotiated minimum staffing levels. Sheriff Corpus indicated she did not negotiate the minimum staffing levels. Members from the Sergeants Association indicated the minimum staffing levels were negotiated with prior Sheriff's Department Management. Undersheriff Perea indicated the Department did not have minimum staffing levels. The County, Sheriff and Undersheriff were provided with a copy of the negotiated minimum staffing levels document. (See "2023 MINIMAX FINAL 3" attached as Exh. D.)

12. On July 29, 2024, I sent an email requesting information from the County/Sheriff's Department that is pertinent to the meet and confer process. County Human Resources employee Katy Roberts responded and indicated they will be working on getting the information to me. (See "SODSAOSS Meeting re_Special Order" attached as Exh. E.)

13. On August 1, 2024, the parties met virtually to continue to discuss the proposed Special Order for Overtime. Undersheriff Perea indicated there were no minimum staffing levels for the Department. Sheriff Corpus stated the Department is hiring more employees and patrol should be fully staffed by the end of August, 2024.

14. On August 3, 2024, I sent an Overtime Policy proposal to County Human Resources employee Katy Roberts, Undersheriff Perea and Sheriff Corpus. (Please see "DSA Edits - Special Order 2024-01 - Overtime Policy_Revision" attached as Exh. F.)

15. On August 4, 2024, County Human Resources employee Katy Roberts sent me an email indicating the Sheriff's Department rejected our proposal. I responded clarifying the DSA was rejecting the Sheriff's Department's proposal and requested additional dates to continue the meet and confer process. (See Exh. E.)

16. On August 7, 2024, the previously negotiated mandatory overtime policy between the DSA and the COUNTY expired.

Declaration of Stephen Leonesio in Support of          3          an ateo Co nt   e t   e i s ssociation
Unfair Labor Practice Charge                                                  .  an ateo Co nt

CONFIDENTIAL                                          CSM 00290

17. On August 8, 2024, the DSA board sent out an email to all DSA members where the DSA board provided information to DSA members regarding the expired mandatory overtime policy, the negotiation history of the mandatory overtime policy, and the DSA board's position/goals regarding the mandatory overtime policy. (Please see "Emailing – San Mateo County Deputy Sheriff's Association" attached as Exh. A.)

18. On August 9, 2024, San Mateo COUNTY Sheriff Christina Corpus sent an email to "All Sheriff's Personnel." (Please see "A Message from the Sheriff" attached as Exh. B.)

19. The Sheriff states that the August 9, 2024 email was specifically sent to "address any misunderstandings regarding recent communications from the DSA leadership." (See Exh. B.)

20. In the August 9, 2024 email, the Sheriff states that, in regards to negotiating a new mandatory overtime policy, the COUNTY "made [itself] available, but the urgency was not reciprocated." (See Exh. B.)

21. The Sheriff's email states that "[t]his crisis is the result of years of neglect and inaction" and that the DSA board's claim to its members that "the overtime policy is flawed … is a significant misrepresentation." (See Exh. B.)

22. The Sheriff's August 9, 2024 email directly communicated to DSA members that the DSA board is: misunderstood by the membership, not addressing the staffing issues with urgency, neglecting and failing to take action regarding staffing issues, and misrepresenting information to the membership.

23. Over the weekend of August 10 and 11, 2024, the COUNTY unilaterally changed the minimum and maximum staffing levels at the Maguire Correctional Facility and Maple Street Correctional Center for sworn DSA members.

24. On August 19, 2024, the COUNTY sent a memorandum to all Sheriff's Office Personnel confirming that sworn staff members are required to complete their jail overtime per pay period. (See "Memo – Correctional Division Overtime" attached as Exh. J.)

---

Declaration of Stephen Leonesio in Support of     4     *an ateo Co nt     e t     e i s sociation*
Unfair Labor Practice Charge                                    *.  an ateo Co nt*

25. The policies regarding minimum staffing levels directly controls the schedules of DSA members and are mandatory subjects of bargaining. Historically, the policies regarding minimum staffing levels were negotiated between the DSA and the COUNTY.

26. The COUNTY did not provide the DSA with advance notice or the opportunity to meet and confer about the change to minimum/maximum staffing levels.

27. The policies regarding mandatory overtime directly control the schedules of DSA members and are mandatory subjects of bargaining. Historically, the policies regarding mandatory overtime were negotiated between the DSA and the COUNTY.

28. Over the weekend of August 10 and 11, 2024, the COUNTY unilaterally changed the mandatory overtime policy for sworn DSA members.

29. The COUNTY did not provide the DSA with advance notice or the opportunity to meet and confer about the change to the mandatory overtime policy.

30. On August 12, 2024, I sent an email to County Human Resources employee Katy Roberts, Undersheriff Perea and Sheriff Corpus advising them that I had been informed that the Sheriff's Department had unilaterally changed the minimum staffing levels as well as the overtime process/procedures. I indicated in my email that the DSA had not agreed to these unilateral changes. I requested a response from the County and/or Department on whether these changes had, in fact, been implemented. I did not receive a response from either the County or Department. (See "Minimum Staffing" attached as Exh. G.)

31. On August 15, 2024, I sent a follow up email requesting a response to my August 12, 2024 email. I also requested a response for my information request that I had sent on July 29, 2024. I also requested additional information that is pertinent to the meet and confer process. (See "DSA Information Request" attached as Exh. H.)

32. On August 15, 2024, County Human Resources employee Katy Roberts sent an updated proposal but did not respond to my request about the unilateral changes nor my information requests. (See Exh. E.)

Declaration of Stephen Leonesio in Support of    5    _an_ _ateo Co_ _nt_ _e_ _t_ _e i s_ _ssociation_
Unfair Labor Practice Charge                                                    _._ _an_ _ateo Co_ _nt_

CONFIDENTIAL                    CSM 00292

33. On August 26, 2024, I was advised by DSA President Tapia that San Mateo County Sheriff Captain Fogarty sent an email to members of the Sergeants Association again indicating the minimum staffing level at one of the jail facilities (MCF) is 35 DSA members.

34. The COUNTY did not provide the DSA with advance notice or the opportunity to meet and confer about the change to minimum/maximum staffing levels.

35. On August 26,2024, I was advised by DSA President Tapia that the Management of the Sheriff's Department sent a memorandum to "All Sheriff's Office Personnel" indicating DSA members are required to work jail overtime each pay period.

36. The COUNTY did not provide the DSA with advance notice or the opportunity to meet and confer about the change to the mandatory overtime policy.

37. On August 28, 2024, I sent a follow-up email to County Human Resources employee Katy Roberts, Undersheriff Perea and Sheriff Corpus asking about the unilateral changes to staffing levels, the unilateral changes requiring employees to sign up for a minimum amount of overtime per pay period, as well as the status of my information requests. I did not receive any responses to these requests. (See "Mandatory Overtime" attached as Exh. I.)

38. The COUNTY has frustrated the meet and confer process because it has not provided responses to information requests the DSA submitted. The DSA needs the information to better understand and prepare for the meet and confer process.

I declare under penalty of perjury that the foregoing is true and correct, except where alleged on information and belief. Executed this 30 day of August, 2024 in San Diego County, California.

*Stephen Leonesio*
STEPHEN LEONESIO

Declaration of Stephen Leonesio in Support of    6    an ateo Co nt  e t  e i s ssociation
Unfair Labor Practice Charge                                    . an ateo Co nt

CONFIDENTIAL                        CSM 00293

Exhibit 46

CONFIDENTIAL

## Heather Enders

| | |
|---|---|
| **From:** | Brian Philip |
| **Sent:** | Tuesday, September 3, 2024 5:06 PM |
| **To:** | Heather Enders |
| **Cc:** | Ryan Monaghan |
| **Subject:** | Re: IA Notice |

Heather, although I have been ordered by Undersheriff Parea to provide Sergeant Javier Acosta with notice of this complaint, it fails to meet several POBAR requirements as referenced in Government Code section 3303. Please return this notice to the author and provide the IA number, date and time of the interview, and the identity of the interviewer. Contrary to normal custom and practice at the San Mateo County Sheriff's Office, the Professional Standards Bureau was excluded from the intake of this complaint, and as such, I do not have the requisite information to properly serve this notice. Please return the notice when it is compliant with the Government Code.



**Brian Philip, Captain**
**San Mateo County Sheriff's Office**
Professional Standards Bureau
330 Bradford Street, 5th Floor
Redwood City, CA 94063
bphilip@smcgov.org
http://www.smcsheriff.com
PEOPLE FIRST – SERVICE ABOVE SELF

---

**From:** Heather Enders <henders@smcgov.org>
**Sent:** Tuesday, September 3, 2024 1:36 PM
**To:** Brian Philip <bphilip@smcgov.org>
**Subject:** IA Notice

Dear Captain Philip,

Per direction from U/S Perea, I am forwarding you this letter for your signature.

Best,



**Heather Enders, Human Resources Manager**
**San Mateo County Sheriff's Office**
Professional Standards Bureau
330 Bradford Street 5th Floor
Redwood City, CA 94063
650-363-4872
www.smcsheriff.com
PEOPLE FIRST – SERVICE ABOVE SELF

1

CONFIDENTIAL                    CSM 00295

# Exhibit 47

CONFIDENTIAL



CONFIDENTIAL

# Exhibit 48

CONFIDENTIAL

# SHERIFF
# CHRISTINA CORPUS
### SAN MATEO COUNTY SHERIFF'S OFFICE

**DATE:**     September 4, 2024

**TO:**     Javier Acosta

**FROM:**     Assistant Sheriff Monaghan

**SUBJECT:**     24IA-012

---

This is to notify you that a complaint has been filed against you. You must appear for an interview at the time and place listed below.

**Complainant:** Sheriff Christina Corpus

**Complaint:** Violations including but not limited to:

## POLICY 313 – Discriminatory Harassment

## 313.2 POLICY

The San Mateo County Sheriff's Office is an equal opportunity employer and is committed to creating and maintaining a work environment that is free of all forms of discriminatory harassment, including sexual harassment and retaliation (Government Code § 12940(k); 2 CCR 11023). The Office will not tolerate discrimination against a member in hiring, promotion, discharge, compensation, fringe benefits and other privileges of employment. The Office will take preventive and corrective action to address any behavior that violates this policy or the rights it is designed to protect.

The nondiscrimination policies of the Office may be more comprehensive than state or federal law. Conduct that violates this policy may not violate state or federal law but still could subject a member to discipline.

## 313.3.1 DISCRIMINATION

The Office prohibits all forms of discrimination, including any employment related action by a member that adversely affects an applicant or member and is based on actual or perceived race, ethnicity, national origin, religion, sex, sexual orientation, gender identity or expression, age, disability, pregnancy, genetic information, veteran status, marital status, and any other classification or status protected by law.

Discriminatory harassment, including sexual harassment, is verbal or physical conduct that demeans or shows hostility or aversion toward an individual based upon that individual's protected class. It has the effect of interfering with an individual's work performance or creating a hostile or abusive work environment.

Conduct that may, under certain circumstances, constitute discriminatory harassment can include making derogatory comments; making crude and offensive statements or remarks; making slurs or off-color jokes, stereotyping; engaging in threatening acts; making indecent gestures, pictures, cartoons, posters, or material; making inappropriate physical contact; or using written material or office equipment and/or systems to transmit or receive offensive material, statements, or pictures. Such conduct is contrary to office policy and to a work environment that is free of discrimination.

### 313.3.2 SEXUAL HARASSMENT

The Office prohibits all forms of discrimination and discriminatory harassment, including sexual harassment. It is unlawful to harass an applicant or a member because of that person's sex. Sexual harassment includes but is not limited to unwelcome sexual advances, requests for sexual favors, or other verbal, visual, or physical conduct of a sexual nature when:

(a) Submission to such conduct is made either explicitly or implicitly a term or condition of employment, position, or compensation.

(c) Such conduct has the purpose or effect of substantially interfering with a member's work performance or creating an intimidating, hostile, or offensive work environment.

### 313.4.2 SUPERVISOR'S ROLE

Supervisors and managers shall be aware of the following:

(a) Behavior of supervisors and managers should represent the values of the Office and professional standards.

### 318.5.2 ETHICS

G. Any other failure to abide by the standards of ethical conduct.

### 318.5.3  DISCRIMINATION, OPPRESSION OR FAVORITISM

Discriminating against, oppressing or providing favoritism to any person because of age, race, color, creed, religion, sex, sexual orientation, gender identity or expression, national origin, ancestry, marital status, physical or mental disability, medical condition or other classification

CONFIDENTIAL                    CSM 00300

protected by law, or intentionally denying or impeding another in the exercise or enjoyment of any right, privilege, power or immunity, knowing the conduct is unlawful.

## 318.5.4  RELATIONSHIPS

A. Unwelcome solicitation of a personal or sexual relationship while on-duty or through the use of one's official capacity.

## 318.3.2 SUPERVISOR RESPONSIBILITIES

Supervisors and managers are required to follow all policies and procedures and may be subject to discipline for:

D. The unequal or disparate exercise of authority on the part of a supervisor toward any member for malicious or other improper purpose.

I. Any act on-duty or off--duty that brings discredit to this Office.

## 318.5.9 CONDUCT

G. Criminal, dishonest, or disgraceful conduct, whether on- or off-duty, that adversely affects the member's relationship with this department.

J. Activity that is incompatible with a member's conditions of employment or appointment as established by law or that violates a provision of any memorandum of understanding or contract to include fraud in securing the appointment or hire.

L. Any other on- or off--duty conduct which any member knows or reasonably should know is unbecoming a member of this Office, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this Office or its members.

**Date of Incident: June 3, 2024 - August 22, 2024**

**Complaint Summary:**

It has been reported that on Thursday, August 15, 2024, you attended a social dinner outside of business hours with colleagues and interns from the Community Engagement Unit and Sheriff's Activities League unit. The purpose of the dinner was to celebrate the conclusion of the interns' summer employment. Among the attendees were sworn and civilian staff members. Allegedly, prior to the dinner, individuals took turns speaking about each other in a group setting.

Page **3** of **5**

Specifically, it is alleged that you made the following remarks to 21-year-old intern Priscyla Avalos: upon meeting her, you said you felt "like you won the lottery" and you remarked on her appearance, telling her she was pretty and comparing her to Kim K[ardashian]. This comment appeared to make several interns uncomfortable, as evidenced by their reactions. When discussing Breanna Rivera, you reportedly expressed a perceived "lack of connection" with her.

During this dinner, you were informed that a 16-year-old intern had consumed alcohol and then vomited on another patron at the restaurant. You allegedly asked Priscyla Avalos to accompany you in driving the underage intern home. Witnesses claim alcohol was detectable on your breath and that they observed you consuming alcoholic beverages, including a shot, during the evening. A third intern reportedly chose to accompany you due to concerns over the unfolding events.

It was further alleged that, prior to this dinner, on an unspecified occasion at the offices located at 3151 Edison Way, Redwood City, CA 94063, you made inappropriate comments about Priscyla Avalos' physical appearance in the presence of other sworn and civilian staff. You additionally asked out loud at this location, "Is Priscyla here? (inhales) I can smell her."

On Tuesday, August 20, 2024, you hand-delivered gifts to Priscyla Avalos, which reportedly included hundreds of dollars' worth of gift cards to Burke Williams, a high-end spa, similar amounts in gift cards to a facial spa, and a bag of Lululemon athletic wear, including leggings, a sweatshirt, and two sports bras.

Additionally, it has been brought to our attention that during S.T.A.R. camp, other staff remarked that you were frequently in the company of another young employee, Isabell, and that you "never hung out with any staff your own age." Ms. Avalos also expressed concern about this behavior, finding it concerning that you seemed to be drawn to much younger women.

The cumulative effect of these alleged actions, particularly the repeated and unwanted attention directed towards 21-year-old Priscyla Avalos, prompted concerns among staff and intern witnesses. As a result, it was deemed necessary to place you on administrative leave pending an investigation by the San Mateo County Sheriff's Office. This measure aims to safeguard Ms. Avalos and any other potentially affected staff from further inappropriate behavior.

**Interview Date & Time:** TBD

**Interview Location:** TBD

**Interviewer:** TBD

CONFIDENTIAL                CSM 00302

This interview is part of an administrative investigation regarding the complaint filed against you. You do not have the right to remain silent. If you refuse to submit to any interview or answer the investigator's questions that are directly related to this investigation you may be subject to disciplinary action.

You have the right to be represented by the person of your choice as long as that person is not a party to this complaint. If the scheduled interview date and/or time is inconvenient or undesirable to you or your representative, please contact me and the interview will be rescheduled without prejudice.

As a superior officer, I am ordering you not to speak with anyone regarding this ongoing investigation, other than your legal representative, until the investigation is completed.

Ryan Monaghan, Assistant Sheriff
San Mateo County Sheriff's Office

CONFIDENTIAL

CSM 00303

# Exhibit 49

Case 3:25-cv-05962-VC    Document 27-19    Filed 07/24/25    Page 379 of 678



 

## County Executive's Office

Home    Divisions    Clerk of the Board    Budget Central    Commissions    Reports    Communications    About Us

County Executive's Office

# Statement from the Board of Supervisors Regarding the Sheriff's Office

**September 12, 2024**

**Share This Article**    Facebook    Twitter    Email    Print

The San Mateo County Board of Supervisors is aware of multiple personnel allegations related to the San Mateo County Sheriff's Office. We take these allegations very seriously. At the same time, we want to ensure an impartial investigation and assessment of these allegations, to afford all parties fairness and due process. As has been reported, we have commissioned Judge LaDoris Cordell to lead an independent investigation into the numerous complaints brought forward by both sworn and professional staff members of the San Mateo County Sheriff's Office. This investigation is distinct and separate from the ongoing inquiries into unfair labor practice complaints filed with the Public Employment Relations Board.

San Mateo County Supervisors Noelia Corzo and Ray Mueller have been appointed by the Board of Supervisors to serve as spokespersons on this matter.

The Board of Supervisors is committed to leveraging every resource available to ensure that the residents of San Mateo County receive the highest standards of professionalism and ethical conduct in County services. We are also dedicated to ensuring that County employees are treated fairly, with dignity, and in accordance with the law. We expect the ongoing investigation to be completed soon, after which we will use the findings to guide our next steps. Our goal is to ensure a thorough and independent review of all allegations, to bring the facts to light, and to uphold accountability and integrity as our highest priorities—for both the members of the San Mateo County Sheriff's Office and our community.

Thank you for your patience as we follow due process. We are committed to keeping you informed of any significant findings. Our priority remains ensuring that the residents of

CSM 00305

San Mateo County and all who visit continue to have confidence in those who protect and serve our community.



500 County Center
Redwood City, CA 94063
(650) 363-4000

News
_____

Events
_____

Jobs
_____

For Employees
_____

Office Locations
_____

Accessibility

Site Map

Privacy Policy

Endorsement Disclaimers

Copyright © 2025 County of San Mateo. All rights reserved.

CSM 00306

# Exhibit 50



# SHERIFF

# CHRISTINA CORPUS

**SAN MATEO COUNTY SHERIFF'S OFFICE**
330 Bradford Street, Redwood City, CA 94063
Telephone: (650) 363-4911

September 22, 2024

President Warren Slocum,

I write to you with the voice and support of the overwhelming majority of the residents of San Mateo County, who elected me, Sheriff. I am writing to you with grave concerns about the abuse of power and persistent interference I have endured from County Executive Mike Callagy's conduct that is undermining the authority vested in me as Sheriff and compromising the effectiveness of my office. I write to you with an immediate call to action to address the retaliation, abuse of power, sexual discrimination, and bullying tactics of your employee, County Executive Mike Callagy. These are not isolated incidents but part of a broader pattern that I can no longer ignore, and I am calling on you and the Board of Supervisors to take immediate action to address this.

Executive Callagy's email triggered deeply rooted emotions stemming from my first meeting with him after I was elected Sheriff. Mr. Callagy treated me not as an elected official but as if I were one of his subordinates. During that meeting, he made an inappropriate and offensive request. Mr. Callagy told me that I had to inform him of when and who I dated within the county—a request I found not only offensive but demeaning and discriminatory. As a woman of color who has endured sexual harassment in this very county, I was shocked and appalled by his inappropriate conduct. I cannot imagine he would have made such a request of my predecessors, all of whom were men. However, in the best interest of the county, I initially chose to silence this offensive and traumatic experience. But his demeaning behavior and ongoing attempts to undermine me have now escalated beyond what can be ignored.

Since day one, Mr. Callagy has continued to overstep his authority, routinely inserting himself into the operations of the Sheriff's Office. He has supported the group of employees referred to as the good ol boy system from the previous administration and has empowered them.

One glaring example is the decision to approve double overtime without having me at the table. I was never consulted before the final agreement for the double overtime. This decision has cost the county and taxpayers $17 million, and we are still facing the same challenges. This act of interference not only bypassed my authority but set a dangerous precedent. Mr. Callagy's actions have destabilized labor relations, undermining my ability to lead effectively and jeopardizing safety in our correctional facilities. With Mr. Callagy's support, the unions have developed a misconception that their negotiations extend beyond labor issues and into personnel matters– not acceptable. The burden of the current situation with the unions is directly attributable to Mr. Callagy's inappropriate backdoor interference. It is clear that the six hours allocated to corrections I attempted to negotiate to ensure the safety of our employees and incarcerated persons is not the issue here.

GSM 00308

Recipient Name
Date
Page 2


Mr. Callagy has also intervened in contract city police services negotiations and undermined the process. This type of interference is unprecedented and hasn't taken place under previous Sheriffs.

Most troubling of all is Mr. Callagy's latest directive to block the process of the termination of Assistant Sheriff Ryan Monaghan, a decision squarely within my authority and purview as the elected Sheriff and involving an at-will and unclassified employee. Mr. Callagy's justification is unfounded and appears to be a blatant attempt to exert control over my office. He should have solicited additional information from me prior to making inaccurate assumptions. Mr. Callagy also violated the rights of everyone involved, including the terminated individual. The confidential process to determine what actions, if any, should be taken was not honored as required. To also suggest that Dr. Aenlle's benign conversation regarding Monaghan's participation in Judge Cordell's inquiry constitutes retaliation is an extraordinary stretch, particularly when it went no further than small talk. The brief casual encounter in the presence of the Undersheriff was innocuous and in passing.

My decision to separate from at-will employee Assistant Sheriff Monaghan was not only a long time coming but something into which I put significant thought and deliberation. After much consideration, I made the decision consistent with my authority as the Sheriff to separate from Mr. Monaghan. Had Mr. Callagy or any member of the Board reached out to me to garner a better understanding of this significant administrative move, all would have learned that it had nothing to do with Mr. Monaghan's involvement in the inquiry conducted by Judge Cordell and everything to do with his performance duplicity and failure to execute the goals of the Sheriff's Office expeditiously. This decision had nothing to do with retaliation. I understand that may be a visceral assumption for you, given the practices of my predecessor, but that is not in line with my philosophy or my practical experience as Sheriff.

It is crucial to ask: Where was Mr. Callagy's concern for retaliation and county liability when sexual harassment claims were brought forward under the previous administration? Instead of independent investigations into such claims, the harassers were often protected, and victims were either silenced or paid off. Mr. Callagy's willingness to defend certain individuals while undermining my decisions suggests a clear double standard. To move forward, we must accept our mistakes and injustices and take corrective action to ensure a better path to the future.

I was elected by the people of San Mateo County to enact necessary reforms in the Sheriff's Office. Culture change is never easy, and resistance from certain individuals—rooted in outdated practices from previous administrations—is expected. But what is unacceptable is Mr. Callagy's support of this resistance, his interference with personnel decisions, and his continuous efforts to undermine my leadership. The integrity of this office and public safety depends on my ability to manage my staff without unlawful influence from non-elected officials who lack the legal standing or firsthand knowledge to make informed decisions and do not seek to learn or understand before taking action themselves.

Recipient Name
Date
Page 3

Balancing the push for modernizing the law enforcement profession while addressing these internal challenges requires a firm but collaborative approach from county leaders. We must commit to dialogue, consistent communication, and support.

Mr. Callagy's actions raise significant concerns about an abuse of power. Mr. Callagy is a non-elected county official, attempting to override decisions made by the highest law enforcement elected official in this county— the Sheriff. This is not just an administrative overstep—it's a direct challenge to the autonomy granted to the Sheriff's Office under law and the voters of San Mateo County. Mr. Callagy's interference in internal personnel matters is not only inappropriate but without legal standing and attempts to undermine the democratic process, setting a dangerous precedent that could lead to further destabilization of county governance.

Let me be clear: the authority to manage my staff and maintain the integrity of this office rests solely with me, as the elected Sheriff. Mr. Callagy's continued interference in this matter undermines the public trust, damages employee morale, and exposes the county to unnecessary legal and financial risks. It is well known and important to highlight that Mr. Callagy has a long personal relationship with former Assistant Sheriff Monaghan dating back to the San Mateo Police Department. Former Assistant Sheriff Monaghan has often referred to Mr. Callagy as a mentor. It is inappropriate for Mr. Callagy to initiate such accusations and act as the sole finder of facts without even a conversation with me—it is a clear conflict of interest, and he should have recused himself.

Moreover, Mr. Callagy's assumption that I, as a woman in a leadership role, would engage in retaliation, reveals a deep-seated bias that cannot be ignored. His actions exemplify the very challenges that women—particularly women of color—continue to face in leadership positions, especially in male-dominated environments like law enforcement. Mr. Callagy's pattern of behavior and bullying tactics by using the weight of county counsel has repeatedly demonstrated a lack of respect for my role and authority. It is clear that Mr. Callagy did not and would not have treated my male predecessors in this manner.

As for Mr. Callagy's claim that this inquiry is being conducted independently, I have been informed by multiple employees that their attempts to contact Judge Cordell and County Counsel to provide a statement have gone unanswered. I want to bring this to your attention because it raises serious concerns about the integrity of the investigation, further casting doubt on the fairness of the process. It is clear that the Board of Supervisors does not have authority over the Sheriff's Office. This third-party inquiry, which should have been handled at the county HR level, is just another attempt to undermine my role. If Mr. Callagy were genuinely concerned about limiting liability, he would have afforded Dr. Aenlle the rights provided under the Peace Officer's Bill of Rights and the Human Resources procedural fairness to protect his good name, which he respectfully deserves and has been afforded in past practice. Dr. Aenlle is a fully accredited peace officer, sworn as a designated level 1, under this office for the last 16 years and validated by POST. The violation of Peace Officer Rights is not something we should take lightly and comes with many ramifications under the color of authority and abuse of government power.

Recipient Name
Date
Page 4


Therefore, I formally request that the Board of Supervisors initiate an independent investigation into Mr. Callagy's conduct and collusion into my office. This investigation should cover his attempts to conspire against an elected Sheriff, discrimination, sexual harassment, abuse of power, and persistent interference with the operations of the San Mateo County Sheriff's Office. Should the Board fail to act, I will have no choice but to escalate this matter to the state level.

Additionally, given the clear conflict of interest and the County Counsel's failure to represent me in good faith, I also request the immediate funding for a charter to provide independent legal counsel to represent the Sheriff's Office going forward, as it is clear that the County Counsel's office has a conflict of interest and is not providing adequate representation.

In closing, let me make this clear: I will not tolerate further interference in my lawful duties as Sheriff. Any further efforts to undermine the termination of former Assistant Sheriff Ryan Monaghan, will be met with legal action to protect the integrity of my office and my responsibility to keep the residents of San Mateo County safe.

Sincerely,

Christina Corpus
Sheriff of San Mateo County

# Exhibit 51

CONFIDENTIAL

CONFIDENTIAL

INVESTIGATION OF SAN MATEO COUNTY SHERIFFS OFFICE



TRANSCRIPT OF

RECORDED INTERVIEW OF VICTOR AENLLE

BY JUDGE LaDORIS CORDELL

VIA PHONE

File:  Aenlle Interview Recording LaDoris Cordell.m4a

Date:          September 25, 2024

Time:          3:53 PM

Transcribed by:  Denise C. Shuey, CSR
                 License No. CSR-6814

CONFIDENTIAL

```
 1            JUDGE CORDELL:  All right.  So this is
 2   Judge Cordell.  It is 3:53 PM on Wednesday, September
 3   the 25th, 2024.  I am in a conversation with Victor
 4   Aenlle, and James Touchstone is an attorney who is
 5   recording this interview, and I do consent to the
 6   recording of this interview.  Only one condition, and
 7   that is that Mr. Touchstone has agreed to send me the
 8   recording -- a copy of the recording and that I get it
 9   today.
10            Mr. Touchstone, are you able to do that, to get
11   me the recording today, the tape?
12            MR. TOUCHSTONE:  Yes, ma'am.  I believe so.
13            JUDGE CORDELL:  Thank you so much.  So with
14   those conditions, I'm fine with having the interview.
15            And I guess, Mr. Aenlle, maybe you might want
16   to state on the record that you're okay being recorded.
17            MR. AENLLE:  I do consent to this conversation
18   being recorded.
19            JUDGE CORDELL:  Thank you so much.
20            I have been retained by County Counsel, San
21   Mateo County, to investigate complaints, concerns,
22   allegations that have been lodged against Mr. Aenlle,
23   against Sheriff Corpus, and leadership in the office.
24   My job is fact-finding.  I want you both to know that
25   when County Counsel reached out to me, I had never -- I
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

2

```
 1   didn't know him.  I do not know County Executive.  I do

 2   not know anyone in the Sheriff's Office.  So I live in

 3   Santa Clara County, and so I agreed to do this

 4   investigation as a factfinder and to do one that is

 5   objective and unbiased.  I have no axe to grind, and I

 6   greatly appreciate that Mr. Aenlle has agreed to -- to

 7   speak with me.

 8            Because you have no obligation whatsoever to do

 9   so.  So thank you again for giving me your time -- to

10   both of you.

11            So what I would like to do -- and, by the way,

12   Mr. Aenlle, if there's any questions that you don't want

13   to answer, that's fine.  That's fine.  I will take --

14   I'm not recording on my end.  I am going to take some

15   notes, but I am going to, as you are, rely on -- on the

16   recording that Mr. Touchstone's making.

17            So the first thing I'd -- I'd like to ask you

18   is if you could tell me about how you first came to even

19   know Sheriff Corpus and, you know, be employed

20   eventually at the Sheriff's Office.  And can you just

21   kind of start there for me.

22            MR. AENLLE:  Yes, Judge Cordell.  And, by the

23   way, thank you.  You pronounced my name perfectly.  Most

24   people do not pronounce my name correctly.  So I

25   appreciate that.  Thank you so much.
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

3

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1           JUDGE CORDELL:  Sure.

2           MR. AENLLE:  I met Sheriff Corpus 16 years ago,

3    maybe closer to 17 at this point, here at the Sheriff's

4    Office.  I have been a designated Level 1 Reserve Deputy

5    with the office since '09.  And through that capacity,

6    I've worked with Sheriff Corpus in -- in many different

7    things in the office, details or patrol, and just

8    different areas of the office, and that's how I first

9    got to know her.

10          I've also been a range instructor, Range

11   Master, at the Sheriff's Office for nine of those years,

12   and I would participate in the training and qualify and

13   so forth.  So my professional and friendship with the

14   sheriff dates back to that time.

15          JUDGE CORDELL:  Got it.

16          And I understand that you were a part of her

17   campaign and also on her transition team.  Can you tell

18   me about -- just a little bit about that.

19          MR. AENLLE:  Yes, ma'am.  When Sheriff Corpus

20   decided to run, she approached me to see if I would help

21   or be part of her campaign, and I gladly accepted, as I

22   felt that new leadership could benefit our community

23   just in the office.  So it was a non-paid position,

24   completely volunteer, and that went successful, as --

25   as -- as you can see.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900                                      4

CONFIDENTIAL                    CSM 00316

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1          And then I was further asked, because of my
 2   experience, institution, and knowledge of the office, my
 3   business experience, to be part of her transition team.
 4   And one of the biggest projects that I took on was the
 5   new building of 50,000 square feet, five stories, that
 6   needed to be reviewed and make sure it was safe for the
 7   employees to occupy.
 8          JUDGE CORDELL:  Got it.
 9          So if I could go back a little bit.  She
10   approached you -- her campaign -- she was elected in
11   June, 2022.  So her campaign got going in 2021?
12          MR. AENLLE:  Yes, ma'am.
13          JUDGE CORDELL:  So that --
14          MR. AENLLE:  I had been campaigning for about a
15   year and a half, I believe.
16          JUDGE CORDELL:  Okay.  Got it.  That helps.
17          And then the transition team.  That -- that
18   transition team went from -- what? -- after her election
19   till she was sworn in?
20          MR. AENLLE:  Shortly after her election, a few
21   months after.  I don't think it -- it got put together
22   right away.  I think there needed some County approvals.
23   But shortly thereafter.
24          JUDGE CORDELL:  Got it.  Got it.
25          Did you have a contract for -- to be on the
```



**TALTY COURT REPORTERS, INC.**                              5
taltys.com - 408.244.1900

1    transition team?  A contract, meaning with the County?

2          MR. AENLLE:  Yes, ma'am, I did.

3          JUDGE CORDELL:  And was that contract

4    terminated by the County Exec?

5          MR. AENLLE:  It was terminated by the County

6    Executive.  And --

7          JUDGE CORDELL:  Can you tell me about that.

8    Yeah.

9          MR. AENLLE:  Yes.  Yes.  And, by the way, I

10   even have -- I still have a copy of that contract, and

11   it was terminated illegally, even by their own contract.

12         But, basically, I got a call from the --

13   Rodriguez.  I can't picture her first name now.  Iliana

14   Rodriguez.

15         JUDGE CORDELL:  Okay.

16         MR. AENLLE:  But there was a conflict in the

17   contract, and -- and the County Executive decided to

18   cancel it --

19         JUDGE CORDELL:  Did --

20         MR. AENLLE:  -- without -- without any process,

21   due notice, nothing.

22         JUDGE CORDELL:  Was the conflict ever explained

23   to you?

24         MR. AENLLE:  Never explained.

25         JUDGE CORDELL:  So you were just told, "It's



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

6

1    terminated.  There's a conflict."  And that's it?

2          MR. AENLLE:  That's it.

3          JUDGE CORDELL:  Okay.  So were you subsequently

4    employed by the sheriff?

5          MR. AENLLE:  Not employed, ma'am.  I was -- I

6    was the reserve.  I was in a reserve, which is a

7    non-paid --

8          JUDGE CORDELL:  Okay.

9          MR. AENLLE:  -- position.

10         JUDGE CORDELL:  Right.  I guess what I'm

11   talking about is were you ever employed by -- let's call

12   it were you ever a contractor with either the County or

13   the Sheriff's Office after the County Exec terminated

14   your employment -- your contract?

15         MR. AENLLE:  Yes.

16         JUDGE CORDELL:  Did you have --

17         MR. AENLLE:  Yes.

18         JUDGE CORDELL:  So that's what I'm asking

19   about.  You know, was it -- I think one was a special

20   projects coordinator.  Again, I need all this explained.

21   That's why I'm glad you're talking to me.

22         MR. AENLLE:  Yeah.  I will do my best, ma'am.

23   There were two contracts.  One was for part of the

24   transition team.  That's the one that was canceled --

25         JUDGE CORDELL:  Right.



**TALTY COURT REPORTERS, INC.**
taltys.com · 408.244.1900

7

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1              MR. AENLLE:   -- really against the terms of the

2    contract.  The other one was when the sheriff came in,

3    she still needed my services, and she made a petition to

4    HR to convert one of the assistant sheriff positions,

5    which we've never had three assistant sheriffs.  That

6    was more of a recent move by the prior -- former sheriff

7    and to make that a civilian position, adopting the LAPD

8    models and San Francisco models, which she wanted to

9    bring talent and for her professional staff, which

10   encompasses half of the department to have

11   representation in the executive team.

12              JUDGE CORDELL:  Right.

13              MR. AENLLE:  And -- and that took about six

14   months and a lot of effort during that time because I

15   was actually working.  The Sheriff's Office initiated a

16   contract to make sure I got compensated while my

17   official position that is an appointed position got

18   created.

19              JUDGE CORDELL:  Okay.  So -- just so I've got

20   it right, first you were on the transition team.  You

21   had a contract.  County Exec terminates the contract.

22              Do you know when that was terminated, by the

23   way?  What month, anyway?

24              MR. AENLLE:  No, ma'am.  But it -- you know, it

25   must have been late 2022.  Somewhere --



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

8

CONFIDENTIAL                          CSM 00320

TRANSCRIPT OF RECORDING                              09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1              JUDGE CORDELL:  That's okay.  I mean, I'm

 2   just --

 3              MR. AENLLE:  -- in that range.

 4              JUDGE CORDELL:  That's fine.

 5              MR. AENLLE:  Yeah.

 6              JUDGE CORDELL:  That's fine.

 7              So just so I get the chronology, transition

 8   team.  You had a contract with the County.  The County

 9   Exec terminates it.  Then I -- I believe -- and, again,

10   I don't have my notes in front of me -- that that

11   contract was terminated in October, 2022.  2022.  So

12   that would leave November -- if I'm right, November,

13   December.

14              During that two -- those two months there, were

15   you under contract with the sheriff or the County under

16   any other contract?

17              MR. AENLLE:  No.  Not -- not for the transition

18   team.

19              JUDGE CORDELL:  Got it.

20              Well, how about not through the transition

21   team?  Did you have any kind of a separate contract?

22   The reason I'm asking is that there -- were you ever

23   a -- let's see -- a special projects person?  Do you

24   know what I mean?  Have a contract as a -- under a

25   special projects with the Sheriff's Office?
```



**TALTY COURT REPORTERS, INC.**
taltys.com · 408.244.1900

9

CONFIDENTIAL                      CSM 00321

1          MR. AENLLE:  I can't -- I can't recall.  I

2    can't tell you what the contract name is.  I don't think

3    we put names on things.  I've done a --

4          JUDGE CORDELL:  Okay.

5          MR. AENLLE:  -- billion of those already for

6    the Sheriff's Office.

7          JUDGE CORDELL:  Got it.

8          MR. AENLLE:  It's just a third party --

9    third-party contract.  I don't know --

10         JUDGE CORDELL:  Okay.

11         MR. AENLLE:  Some of them are to handle special

12   projects, for sure --

13         JUDGE CORDELL:  Uh-huh.

14         MR. AENLLE:  -- but I don't think they're

15   necessarily named.  It is just basically an independent,

16   third-party contract.  But they're all --

17         JUDGE CORDELL:  Okay.  Right.

18         MR. AENLLE:  -- standard templates.

19         JUDGE CORDELL:  So you were never a schedule

20   project coordinator in, let's say, 2022?

21         MR. AENLLE:  No, not in 2022.  Again, I

22   didn't --

23         JUDGE CORDELL:  Got it.  Okay.  That's fine.

24         So --

25         MR. AENLLE:  2022 would be under transition.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

10

CONFIDENTIAL                    CSM 00322

TRANSCRIPT OF RECORDING                                09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1           JUDGE CORDELL:  Right.  Right.

2           So in 2023 were you -- did you have a contract,

3    or were you employed in the Sheriff's Office starting --

4           MR. AENLLE:  In 2023 when I came in, yes, I had

5    a -- I had a contract with the Sheriff's Office, like a

6    third-party contract, while my position was created.

7           JUDGE CORDELL:  That's what I needed cleared

8    up.

9           So you had a contract that kind of got you from

10   when she was sworn in to when you got this position that

11   eliminated an assistant sheriff's position and instead

12   put you in?  Fair?

13          MR. AENLLE:  Fair.  And it wasn't eliminated.

14   It was just converted.

15          JUDGE CORDELL:  Changed or transformed?

16          MR. AENLLE:  Yes.

17          JUDGE CORDELL:  Right.  Okay.

18          So in -- so that contract you had from January

19   to when you became executive director.  And then after

20   you became this next position, which is executive

21   director, and that contract ended, and you began the

22   full-time in the position you're in now?

23          MR. AENLLE:  Yes, ma'am.

24          JUDGE CORDELL:  Okay.  Got it.

25          All right.  So in the transition team, when



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

11

CONFIDENTIAL                    CSM 00323

TRANSCRIPT OF RECORDING
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE                09/25/2024

```
 1    that team existed, did you ask the transition team, each
 2    of the members, to sign non-disclosure agreements?
 3              MR. AENLLE:  I believe we did.  I don't know
 4    if -- I know we had a discussion.  I don't know if all
 5    of them got signed.
 6              JUDGE CORDELL:  Uh-huh.
 7              MR. AENLLE:  And that was not necessarily me,
 8    but that was at the direction of the strategist that was
 9    helping us along and was part of the team.
10              JUDGE CORDELL:  Right.  So do you re- -- do you
11    recall why they wanted -- this person wanted an NDA?
12              MR. AENLLE:  Normal business practice.  I think
13    any person in -- in the political world --
14              JUDGE CORDELL:  Uh-huh.
15              MR. AENLLE:  -- has a theme.  It's -- it's -- I
16    believe she did that also in the campaign.  The campaign
17    manager --
18              JUDGE CORDELL:  Uh-huh.
19              MR. AENLLE:  -- consultant asked everybody to
20    do that.
21              JUDGE CORDELL:  Got it.  Got it.
22              Were -- so you were -- I have heard --
23              MR. AENLLE:  Uh-huh.
24              JUDGE CORDELL:  -- you referred to as the
25    campaign manager.  Were you her campaign manager or --
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

12

CONFIDENTIAL                CSM 00324

TRANSCRIPT OF RECORDING                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1            MR. AENLLE:  I never took that title
 2   officially.  I did a lot.  I was the lawn sign person.
 3   I was the errand person.  I was many, many things.  I
 4   never took officially --
 5            JUDGE CORDELL:  Okay.
 6            MR. AENLLE:  -- that role in any capacity.
 7            JUDGE CORDELL:  Do you know who was officially
 8   her campaign manager?  Any --
 9            MR. AENLLE:  I don't think we ever did.  I
10   think the consultant -- the campaign consultant really
11   filled that hole.
12            JUDGE CORDELL:  Got it.
13            And was that Mr. Szabo (phonetic) or something?
14   Does that --
15            MR. AENLLE:  Szabo was one of the --
16            JUDGE CORDELL:  -- sound about right?
17            MR. AENLLE:  Yeah.  Szabo was the main -- no.
18   Szabo came in afterwards.
19            JUDGE CORDELL:  Okay.
20            MR. AENLLE:  He was not -- she had already won
21   the campaign.
22            JUDGE CORDELL:  Got it.
23            MR. AENLLE:  His name --
24            JUDGE CORDELL:  Okay.
25            MR. AENLLE:  Like I --
```



**TALTY COURT REPORTERS, INC.**                          13
taltys.com - 408.244.1900

TRANSCRIPT OF RECORDING
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE                    09/25/2024

1              JUDGE CORDELL:  That's okay.  It --

2              MR. AENLLE:  It will come -  it will come to

3      me.

4              JUDGE CORDELL:  All right.

5              MR. AENLLE:  It's been a little while.

6              JUDGE CORDELL:  It's not really important.  I

7      appreciate that, and it's not important.

8              Okay.  So you are currently the executor

9      director -- the executive director of administration; is

10     that correct?

11             MR. AENLLE:  Yes, ma'am.

12             JUDGE CORDELL:  All right.  I've also heard you

13     referred to as "Chief of Staff."  Is that --

14             MR. AENLLE:  Yes.

15             JUDGE CORDELL:  -- in the executive director

16     job description, or is that -- where did that title come

17     from, "Chief of Staff"?

18             MR. AENLLE:  So -- yeah, that's a working title

19     that I have.  There's a lot of positions in the county

20     that, if you look at them, they do not make any sense.

21     They were just created because that's -- that's the

22     proper format.

23             JUDGE CORDELL:  Uh-huh.

24             MR. AENLLE:  You know, my IT director's like

25     that and many others.  But my role has always been



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900                                    14

CONFIDENTIAL                    CSM 00326

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    "Chief of Staff."

2          JUDGE CORDELL:  So the title came from where?

3    I mean, was it --

4          MR. AENLLE:  It was a working title.

5          JUDGE CORDELL:  But I don't know what that

6    means, I guess, is what I'm saying.  It's like did you

7    just say, "Okay.  I'm the executive director, but I want

8    you all to know I'm the chief of staff," or is that --

9    did someone else give you that?  That's all I'm --

10          MR. AENLLE:  No, ma'am.  The -- the sheriff

11    assigned that.

12          JUDGE CORDELL:  Okay.

13          MR. AENLLE:  That's -- that's my role in the

14    office, yeah.

15          JUDGE CORDELL:  Got it.

16          Now, let's follow up on that.  Can you talk to

17    me now about what your role is in the office.

18          MR. AENLLE:  I oversee the civilian

19    departments.  There's a number of -- of them under me.

20    So directors report to me, and I have a couple managers

21    that do as well, and I basically represent and oversee

22    that.  I'm also part of the executive team, and I assist

23    the sheriff with whatever she assigns me --

24          JUDGE CORDELL:  Got it.

25          MR. AENLLE:  -- which --



**TALTY COURT REPORTERS, INC.**                                15
taltys.com - 408.244.1900

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1          JUDGE CORDELL:  And -- go right ahead.  I don't

2   want to cut you off.  Go right ahead.

3          MR. AENLLE:  No, no.  It just involves

4   projects.  It involves programs, community programs,

5   community relations.  I -- basically anything that has

6   to do with the -- the sheriff's communication with the

7   community.

8          JUDGE CORDELL:  Gotcha.

9          Okay.  Have you ever said to anyone that you

10  are third in command?

11         MR. AENLLE:  The only time I can recall

12  anything like that --

13         JUDGE CORDELL:  Okay.

14         MR. AENLLE:  -- and I remember the

15  experience -- was in Santa Clara County, there was a

16  Academy graduation.  We were at that, and I was speaking

17  to one of their people in command.

18         JUDGE CORDELL:  Okay.

19         MR. AENLLE:  A lady.  I can't recall her name,

20  but she's one of the -- the female assistant sheriffs

21  there.

22         JUDGE CORDELL:  Okay.

23         MR. AENLLE:  And I introduced -- we were

24  meeting each other.  I'm like, "I'm the chief of staff."

25         And we're talking, and she goes, "What does


CONFIDENTIAL                    CSM 00328

TRANSCRIPT OF RECORDING                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    that mean?  What level is that?  Is that lieutenant

2    level?"

3              And I said, "No.  In our department, that's --

4    that's executive team level.  It sits at -- it's an

5    assistant sheriff's level, which is considered the line

6    of -- of -- of third in command."

7              JUDGE CORDELL:  Uh-huh.

8              MR. AENLLE:  Aside from that --

9              JUDGE CORDELL:  But -- uh-huh.

10             MR. AENLLE:  Aside from that, no.

11             JUDGE CORDELL:  So do you consider yourself,

12   then, third in command in the office?

13             MR. AENLLE:  I consider myself a member of the

14   executive team, ma'am.

15             JUDGE CORDELL:  So let's just take it a step

16   further.  I -- I -- I did some work as --

17             MR. AENLLE:  Yes.

18             JUDGE CORDELL:  -- as a police auditor for

19   the -- in the City of San Jose and dealt a lot with the

20   San Jose PD.  And I know a PD's office is different from

21   Sheriff's Office, but there's still a hierarchy, and

22   there's still --

23             MR. AENLLE:  Sure.

24             JUDGE CORDELL:  -- something called a chain of

25   command; right?



**TALTY COURT REPORTERS, INC.**                       17
taltys.com - 408.244.1900

CONFIDENTIAL              CSM 00329

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1          MR. AENLLE:  Yes.

2          JUDGE CORDELL:  So can you tell me, then,

3  what -- what is the chain of command in the Sheriff's

4  Office?  Your --

5          MR. AENLLE:  Sure.

6          JUDGE CORDELL:  -- description of what it is.

7          MR. AENLLE:  Yeah.  Per our org chart is the

8  sheriff, undersheriff, and then the assistant sheriff,

9  and chief of staff is the next line and everything else

10 below.

11         JUDGE CORDELL:  Got it.

12         And how many assistant sheriffs are there now?

13         MR. AENLLE:  Two.  Well --

14         JUDGE CORDELL:  Two.

15         MR. AENLLE:  -- currently -- currently there is

16 a position vacant.  We have one assistant sheriff.

17         JUDGE CORDELL:  Got it.

18         But there's one vacant, and -- and do you

19 anticipate that will be filled?  So there will be two

20 assistant sheriffs and then chief of staff?  Is that --

21         MR. AENLLE:  Yeah.  Absolutely, ma'am.

22         JUDGE CORDELL:  Okay.

23         MR. AENLLE:  But the sheriff is being very

24 diligent about that, and she's just trying to find the

25 right person for --



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

18

CONFIDENTIAL                    CSM 00330

1              JUDGE CORDELL:  Go ahead.

2              MR. AENLLE:  -- the right fit for the office.

3              JUDGE CORDELL:  Got it.

4              So you mentioned an org chart, an

5     organizational chart.  I looked online, anyway, to try

6     to find it, and I can't find an organizational chart.

7     Can you tell me where I can find it.

8              MR. AENLLE:  I can send it to you.  It's also

9     part of the Meliora report that was done.  It was that

10    third-party investigation into the office, and the goal

11    was to make it more efficient.  And I know they have a

12    copy of our initial, still in the work- --

13    work-in-process, org chart.  But --

14             JUDGE CORDELL:  So that's fine.  I can -- I can

15    get ahold of the report.  I have seen it.

16             So is there -- but the organizational chart is

17    not on the sheriff's website or anything?  Because I

18    looked, and I couldn't find it.

19             MR. AENLLE:  I can tell you that that's been a

20    work in progress.  I can tell you we're working on it.

21             JUDGE CORDELL:  Sure.

22             MR. AENLLE:  I just -- I can't confirm whether

23    it's on the website or not, but I can -- I can check and

24    verify that.

25             JUDGE CORDELL:  Okay.  That's fine.



**TALTY COURT REPORTERS, INC.**                          **19**
taltys.com - 408.244.1900

CONFIDENTIAL              CSM 00331

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1              And you say it's a work in progress.  What do

2    you mean?  Like what's --

3              MR. AENLLE:  It hasn't been finalized yet.  I

4    think -- I think we're -- the undersheriff is getting

5    close.  I know he's working on that but --

6              JUDGE CORDELL:  Okay.

7              MR. AENLLE:  Yeah.

8              JUDGE CORDELL:  That's fine.  Because I was

9    looking, and I couldn't find it.  So I appreciate your

10   telling me it's coming.

11             MR. TOUCHSTONE:  Judge Cordell, I'm sorry to

12   interrupt, ma'am.  This is Jim Touchstone.  I would note

13   that there is reference to these positions in the San

14   Mateo County Sheriff's Office policies, which are

15   online.

16             JUDGE CORDELL:  When you say "reference to

17   these," what do you mean?  The chain of command, for

18   example?

19             MR. TOUCHSTONE:  Yes.  Yes, ma'am.

20             JUDGE CORDELL:  Yeah.  Good.

21             MR. TOUCHSTONE:  And the positions have been

22   identified.

23             JUDGE CORDELL:  Absolutely, yes.  And I'm aware

24   of that, and thank you.

25             So, Mr. Aenlle, I'd like to -- to -- to ask --



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

20

CONFIDENTIAL                    CSM 00332

TRANSCRIPT OF RECORDING                            09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    move now to questions about outside employment, and it's

2    just a very straightforward question.

3            Do you have any outside employment?

4            MR. AENLLE:  No, ma'am.  I -- my real estate

5    business, I pretty much stopped doing it.  I'm still

6    licensed.  But as of 2023, my involvement with the

7    Sheriff's Office -- it demanded too much of my time.  I

8    am no longer practicing real estate.

9            As far as my PPO, my private security company,

10   I have also, as of 2023, when I got involved with the

11   Sheriff's Office, I've not engaged in -- in -- in those

12   activities as well.

13           JUDGE CORDELL:  Got it.

14           So let's just -- I just want to nail it down,

15   and this is important.  When you say you stopped in

16   2023, can you tell me when in 2023?

17           MR. AENLLE:  A few months -- a few months into

18   it when I started.  When my position -- I believe it was

19   closer when my position got finalized.

20           JUDGE CORDELL:  So -- and when was that?

21   Because I forgot to ask you that when you said you

22   converted the --

23           MR. AENLLE:  It took a long time.  I want to

24   say somewhere in -- this is not a hundred percent -- but

25   somewhere around July, I believe.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900                              21

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1          JUDGE CORDELL:  Of 2023?

2          MR. AENLLE:  Yes, ma'am.

3          JUDGE CORDELL:  So between January, 2023, and

4    July, did you have any outside employment?

5          MR. AENLLE:  Well, I've contracted maybe a few

6    security details of close friends or of old clients.

7    Real estate, I referred out.

8          JUDGE CORDELL:  So when you say "referred out,"

9    if you got someone who was interested in some real

10   estate --

11         MR. AENLLE:  Yes, ma'am.

12         JUDGE CORDELL:  -- you would not -- you would

13   not accept it and -- and just give it to someone else in

14   your office --

15         MR. AENLLE:  Yes, ma'am.

16         JUDGE CORDELL:  -- in the office?

17         Got it.

18         So -- and can you tell me when you were doing

19   real estate, did you work for a company?

20         MR. AENLLE:  Yeah.  Even though I'm a broker, I

21   did -- I've always hung my license with Coldwell Banker.

22         JUDGE CORDELL:  So you -- I'm sorry.  And you

23   are a broker, which is different from --

24         MR. AENLLE:  Also a broker, ma'am.

25         JUDGE CORDELL:  Right?  That's different from



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00334

1    being a real estate salesperson?  Is that --

2           MR. AENLLE:  Yes, ma'am.

3           JUDGE CORDELL:  Am I getting that right?  Okay.

4           MR. AENLLE:  Yes.

5           JUDGE CORDELL:  So you were with Coldwell

6    Banker.  And did you work out of any particular office?

7    This is, again, before you began your executive director

8    work or chief of staff work.

9           MR. AENLLE:  Yes.  I was out of the San Mateo

10   office, which -- which closed, and then everybody merged

11   into San Carlos or Burlingame.  I hung my license in San

12   Carlos.

13          JUDGE CORDELL:  San Carlos.  Okay.

14          Were you ever in -- work out of the Half Moon

15   Bay office?

16          MR. AENLLE:  I never worked there.

17          JUDGE CORDELL:  Uh-huh.

18          MR. AENLLE:  My -- they could have transferred

19   my license there to -- I think my manager was in both.

20   My manager was in San Carlos and Half Moon Bay.

21          JUDGE CORDELL:  Uh-huh.

22          MR. AENLLE:  In the past, I did do a lot of

23   business there.  So . . .

24          JUDGE CORDELL:  Got it.

25          MR. AENLLE:  But I've never actually done



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

23

CONFIDENTIAL                    CSM 00335

1  business out of San Carlos -- out of Half Moon Bay.

2           JUDGE CORDELL:  Got it.

3           MR. AENLLE:  I've never had an office there, a

4  desk there, nothing like that.

5           JUDGE CORDELL:  I've got you.

6           You used the words "pretty much stopped doing

7  the real estate."  I'm not sure what you mean by that.

8  So -- so the question is, you know, did you have any

9  outside employment?  And, by the way, it's not a bad

10  thing.  I'm just asking.  Did you have --

11           MR. AENLLE:  No.  I understand.

12           JUDGE CORDELL:  -- also have employment when

13  you were employed by either the Sheriff's Office or the

14  County or had a contract with them?  Doing business with

15  the County or the Sheriff's Office, did you have any

16  outside employment?

17           MR. AENLLE:  Just to be clear, while I was

18  waiting for my position to open --

19           JUDGE CORDELL:  Uh-huh.

20           MR. AENLLE:  -- you know, ma'am, I have to be

21  honest with you.  Even back when we started the

22  campaign, there was so much involvement and it took so

23  much time that even -- even back then, I started

24  referring business out and was not accepting.  I can

25  tell you that when I started even as a contractor here



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

24

CONFIDENTIAL                    CSM 00336

TRANSCRIPT OF RECORDING                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

 1  from January, 2023 --

 2          JUDGE CORDELL:  Yeah.

 3          MR. AENLLE:  -- it was very, very minimal.  And

 4  by the time I took my position, I'm basically doing the

 5  job of three people here.

 6          JUDGE CORDELL:  Uh-huh.

 7          MR. AENLLE:  I stopped doing everything

 8  altogether.

 9          JUDGE CORDELL:  Got it.

10          So -- okay.  I've got it.

11          Did you go through any kind of an approval

12  process in -- when you had the outside employment and

13  when you were, at least January maybe until July, doing

14  some outside work, employment?

15          MR. AENLLE:  I think as a contractor, that was

16  not a requirement.

17          JUDGE CORDELL:  Got it.  Okay.

18          MR. AENLLE:  But the sheriff was aware, and --

19          JUDGE CORDELL:  Okay.

20          MR. AENLLE:  -- it was approved.

21          JUDGE CORDELL:  And when you say "it was

22  approved," do you mean the sheriff gave her approval?

23  Like, "It's okay.  You can do it"?

24          MR. AENLLE:  Yeah.  Many people in the office

25  have outside businesses and outside employment.



**TALTY COURT REPORTERS, INC.**                      25
taltys.com · 408.244.1900

CONFIDENTIAL                    CSM 00337

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
1              JUDGE CORDELL:  Right.

2              MR. AENLLE:  I just -- we just have to make the

3    sheriff aware.

4              JUDGE CORDELL:  Uh-huh.  And you said you did

5    make her aware, and she was okay with it?

6              MR. AENLLE:  Again, she was okay with it, but

7    I -- again, I was not really doing -- my business took

8    so much time by that point.

9              JUDGE CORDELL:  Uh-huh.  Okay.

10             But she was aware, and the only way she could

11   be aware is if you told her; right?  And --

12             MR. AENLLE:  That's correct.

13             JUDGE CORDELL:  Yeah.  And then she was -- she

14   gave her approval?  I don't want to put words in your

15   mouth.  So I'm just -- I'm just trying to understand how

16   you knew that it was okay with her.  So either she did

17   something in writing, or she told you.  I don't know.

18             Can you tell me that?

19             MR. AENLLE:  Yes.  She's aware, and I -- well,

20   and I asked her.  I said, "My business -- as you know,

21   I'm moving away from it.  There might be some -- a

22   couple last-minute deals or something that I have to

23   finish, just so you're aware that I would do that.  It

24   would not be during the time of -- of my work

25   responsibilities or interfere at all in any type of the
```



**TALTY COURT REPORTERS, INC.**                                    **26**
taltys.com · 408.244.1900

TRANSCRIPT OF RECORDING                              09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    work that I'm doing at the Sheriff's Office.  It would

2    be on my own time and possibly weekends."

3              JUDGE CORDELL:  Gotcha.

4              And when you had this conversation with her,

5    that would have been at the beginning of 2023?

6              MR. AENLLE:  At some point around 2023, yes.

7              JUDGE CORDELL:  Okay.

8              MR. AENLLE:  Prior to me accepting the -- the

9    full-time position.

10             JUDGE CORDELL:  Gotcha.

11             So back to the full-time position.  You said to

12   me it's a civilian position.  I guess that also means

13   unclassified.  And so -- okay.  So executive director.

14   Got it.

15             Do you in your job -- you mentioned it, and I'm

16   just going to go back to it now.

17             You said something about the building that

18   the -- the Sheriff's Office is now in, that new

19   building, and that you were involved in that.  So can

20   you just talk to me.  Just first generally, are you

21   involved in any real estate transactions that involve --

22   not -- not as a Realtor.  I'm not talking about that.

23             I mean in your role as the chief of staff,

24   executive director, have you been and are you engaged in

25   any kind of real estate transactions in that role?



**TALTY COURT REPORTERS, INC.**
taltys.com · 408.244.1900

27

CONFIDENTIAL                    CSM 00339

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1           MR. AENLLE:  Yes.

2           JUDGE CORDELL:  Can you talk to me about that.

3           MR. AENLLE:  Engage- -- yeah.  The engagement

4    part is basically working with the real estate

5    department of the County.  But that -- that would be my

6    involvement.

7           JUDGE CORDELL:  And when you say your

8    involvement, what -- what do you do as executive

9    director with the real estate office?

10          MR. AENLLE:  Oversee; make sure things are

11   right; answer the questions; facilitate; review

12   documents, leases.  Basically help facilitate the needs

13   of the office.

14          JUDGE CORDELL:  Got it.

15          MR. AENLLE:  So, for example, Judge Cordell,

16   the transition team -- the sheriff wanted me to look at

17   the plans for the building because nobody's ever looked

18   at them.  I have experience not just in real estate.  My

19   real estate involvement goes much deeper.  It goes into

20   development, construction, commercial.

21          So one of the first things that we -- I

22   notified when I saw the plans is that there was no

23   security plan at all.  That entire building was built

24   like an office space with no key cards, no cameras, no

25   safety features, no safety doors, no metal detectors.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900                                  28

CONFIDENTIAL                    CSM 00340

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1   Zero.

 2           JUDGE CORDELL:  That's the building --

 3           MR. AENLLE:  I'm talking about --

 4           JUDGE CORDELL:  -- that -- excuse me.

 5           That's the building you're in now?

 6           MR. AENLLE:  Yes, ma'am.

 7           JUDGE CORDELL:  Go ahead.  Go ahead.

 8           MR. AENLLE:  So that's one -- that's one of the

 9   things I did.  When I discovered that, I made that -- I

10   brought it to the sheriff's attention, and then we had

11   to get working on it because it was not a safe building

12   to be in as far as conducting law enforcement services.

13           JUDGE CORDELL:  Got it.

14           MR. AENLLE:  As far as any of the other

15   projects, clearly I've been around the business world

16   and in real estate for 30 years.  I know contracts.

17           JUDGE CORDELL:  Got it.

18           MR. AENLLE:  I know leases.  So I helped -- I

19   worked -- I was the contact, along with the sheriff,

20   with the office -- County office, which is called Real

21   Property Services.  They're engaged in negotiating the

22   current lease for the sheriff, doing extensions,

23   acquiring new property under lease, and so forth.

24   Everything that I've done or helped with was -- was with

25   them involved.
```



**TALTY COURT REPORTERS, INC.**                            **29**
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00341

1    JUDGE CORDELL:  And is that group you're

2    talking about a part of the Sheriff's Office?

3    MR. AENLLE:  No, ma'am.  It's part of the

4    County.

5    JUDGE CORDELL:  Right.  So --

6    MR. AENLLE:  It's a County department.

7    JUDGE CORDELL:  Right.  So I'm just trying to

8    get these levels straight.

9    First you said there's a real estate office,

10   and that's the County's real es- -- has a real estate

11   office; right?

12   MR. AENLLE:  And I wouldn't -- yeah.  It's a

13   real estate unit.  Real estate -- it's called "Real

14   Property Services."

15   JUDGE CORDELL:  Oh, that's right.

16   MR. AENLLE:  And they basically manage all the

17   leases and so forth for the County.

18   JUDGE CORDELL:  Got it.

19   So you have been working with Real Property

20   Services in buildings or transactions that involve the

21   Sheriff's Office?

22   MR. AENLLE:  Yes.

23   JUDGE CORDELL:  Is that -- is that good?

24   MR. AENLLE:  Yeah.

25   JUDGE CORDELL:  Okay.  Got it.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

30

CONFIDENTIAL                    CSM 00342

```
 1            And one of them was -- you said the building
 2    you're in now, they -- they were lacking in all of those
 3    areas you just mentioned.  You brought it to their
 4    attention, and then that's --
 5            MR. AENLLE:  Sorry, ma'am.  Let me correct --
 6    let me back up for a second.
 7            JUDGE CORDELL:  Okay.
 8            MR. AENLLE:  This building --
 9            JUDGE CORDELL:  Uh-huh.
10            MR. AENLLE:  -- (unintelligible) involvement.
11    This is -- this is, you know, a contractor, and this
12    is -- this is in a level different than -- than real
13    property.  And -- and my involvement -- involvement in
14    this building was initiated during the transition period
15    when we discovered the deficiencies.
16            JUDGE CORDELL:  Oh.
17            MR. AENLLE:  That's it.  That's it.
18            JUDGE CORDELL:  Got it.
19            MR. AENLLE:  So two -- two separate -- two
20    separate things.
21            JUDGE CORDELL:  I've gotcha.
22            So when you were on the transition -- when the
23    transition was being made, you spot this and brought
24    it --
25            MR. AENLLE:  Yeah.
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

31

CONFIDENTIAL                CSM 00343

```
1              JUDGE CORDELL:  -- to the attention of the

2     sheriff.  And then I -- I'm assume, I hope, things got

3     remedied.

4              MR. AENLLE:  They did.  We had to add an

5     additional $750,000 of security features to the building

6     in order to make it safe for the employees.

7              JUDGE CORDELL:  And that's only because you

8     spotted it and brought it to their attention?

9              MR. AENLLE:  Yes, ma'am.  I'm not here to toot

10    my own horn, but, yes, that is -- I know construction,

11    and it was missing, and it was an oversight.

12             JUDGE CORDELL:  Okay.  So I have a question.

13             Did you ever approach anyone in the Sheriff's

14    Office and say something like, "Do you -- we're short on

15    money for the building, and I have someone, a donor, who

16    has $20 million.  And can you take that money and then

17    somehow -- as a donation but then give the money back"?

18             Have you had any conversation like that with

19    anybody?

20             MR. AENLLE:  That's absurd, ma'am.  No.

21             JUDGE CORDELL:  Okay.

22             MR. AENLLE:  No.

23             JUDGE CORDELL:  All right.  And so I want to

24    talk a little more, if we can, about the -- the real

25    estate transaction.
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

32

CONFIDENTIAL                     CSM 00344

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1         So one was the administrative building that

2    you're in now.  So are you involved at all -- or were

3    you involved at all in the lease of the building in

4    Redwood City for a substation and possibly a child care

5    center?

6         MR. AENLLE:  Yes, ma'am.

7         JUDGE CORDELL:  Okay.  So can you talk to me

8    about that now, please.

9         MR. AENLLE:  My involvement is it was just the

10   Sheriff's Office needed to grow.  The substation in

11   North Fair Oaks was subpar.  She had been looking for a

12   property for a long time, and one of her sergeants that

13   works in the area sent her a flyer and said, "What about

14   this?"  So she showed it to me, and I said, "Yeah.

15   Let's -- let's investigate."  And we moved it over to

16   the Real Property Services department for him to -- to

17   look into it.

18        JUDGE CORDELL:  Okay.  And -- and was that the

19   extent of your involvement?

20        MR. AENLLE:  I mean, I reviewed their -- some

21   of their leases, and I helped with information to help.

22   But, yes, pretty much that was it.  That's the

23   involvement.

24        JUDGE CORDELL:  Got it.

25        So do you have -- did you -- the lease is with



**TALTY COURT REPORTERS, INC.**                              33
**taltys.com - 408.244.1900**

CONFIDENTIAL                    CSM 00345

```
 1   the DiNapoli Family LP.  Did you have any -- did you

 2   assist at all in getting -- getting that lease?

 3          MR. AENLLE:  Not at all, ma'am.

 4          JUDGE CORDELL:  Do you know the --

 5          MR. AENLLE:  That was Real Property Services.

 6   I do not know the owners.  I do not know the agents.

 7   I've never been there and met the agent with Real

 8   Property Services with me.  Zero.

 9          JUDGE CORDELL:  Got it.

10          So you don't -- you had nothing to do with

11   getting -- getting the -- locating this property; right?

12          MR. AENLLE:  The property was actually located

13   by Lilian Tashiro.  She's a sergeant, and she --

14          JUDGE CORDELL:  Right.

15          MR. AENLLE:  -- set the fire to the sheriff.

16          JUDGE CORDELL:  Got it.

17          And you had nothing to do with contacting the

18   lessor -- that would be the DiNapoli family --

19   getting -- had anything to do with them at all?

20          MR. AENLLE:  The first time that I heard that

21   name is -- is right here with you today.

22          JUDGE CORDELL:  Got it.

23          And do you -- did you have anything to do with

24   brokering the lease?  Because there -- there -- the

25   lease was brokered by a real estate company.
```


CONFIDENTIAL                    CSM 00346

TRANSCRIPT OF RECORDING                                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1              Did you have anything to do with that?

2              MR. AENLLE:  Absolutely not, ma'am.

3              JUDGE CORDELL:  All right.

4              MR. AENLLE:  Absolutely not.  That lease was --

5              JUDGE CORDELL:  So --

6              MR. AENLLE:  -- was negotiated and brokered

7    through the County.

8              JUDGE CORDELL:  Got it.

9              The reason I ask -- and -- and, again, I am

10   not -- please understand, Mr. Aenlle, I'm not making any

11   accusations.  I am, again, trying to get facts.

12             MR. AENLLE:  I understand, ma'am.

13             JUDGE CORDELL:  There are allegations, and

14   that's why I'm trying to get facts.  So just --

15             MR. AENLLE:  Yeah.

16             JUDGE CORDELL:  -- bear with me on this,

17   please.  And I --

18             MR. AENLLE:  Absolutely.

19             JUDGE CORDELL:  Please do not take personal

20   offense at this because it's not my intention at all.

21             MR. AENLLE:  I don't.  I understand your

22   position.  Thank you.

23             JUDGE CORDELL:  Okay.  But I -- I know it's

24   hard.  I know this is hard.

25             MR. AENLLE:  Yes, ma'am.



**TALTY COURT REPORTERS, INC.**                          35
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00347

TRANSCRIPT OF RECORDING
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE                    09/25/2024

```
 1                  JUDGE CORDELL:  It must be hard for you to
 2    hear.
 3                  MR. AENLLE:  I'm not here to steal from anybody
 4    or do any shitty deals, believe me.  It's -- it's --
 5    that's not me.
 6                  JUDGE CORDELL:  So my question -- and, again,
 7    just bear with me on this -- is do you know -- and bear
 8    with me a second.  There were three individuals who were
 9    the brokers for this lease, and they are people who work
10    for Coldwell Banker.
11                  So my question to you is did you know that
12    Coldwell Banker was the broker for this lease?
13                  MR. AENLLE:  Ma'am, I don't think that is
14    correct.
15                  JUDGE CORDELL:  Okay.
16                  MR. AENLLE:  I don't remember Coldwell Banker
17    being there.  I thought it was Wakefield or something
18    or -- so the answer to your question is, "No."  Yeah.
19                  JUDGE CORDELL:  So my question was do you
20    know -- all right.  So let me go back.  I'll reask it.
21                  MR. AENLLE:  Yeah.
22                  JUDGE CORDELL:  Do you know if Coldwell Banker
23    brokered that lease for the -- the -- the building for
24    the substation?  Do you know whether or not they did?
25                  MR. AENLLE:  No, I do not.
```



CONFIDENTIAL                    CSM 00348

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1              JUDGE CORDELL:  Okay.  Do you know who --

2              MR. AENLLE:  I --

3              JUDGE CORDELL:  Go ahead.

4              MR. AENLLE:  I thought it was Wakefield or

5    something like that.  I met the guy once or -- or twice

6    there when he opened up the building for all of us when

7    we were there.  But I -- off the top of my head, I don't

8    think he was Coldwell Banker.

9              JUDGE CORDELL:  Okay.  And do you -- do you --

10   so you're not -- but you don't know who the broker is?

11             MR. AENLLE:  I don't recall the broker.  I want

12   to say Wakefield, maybe, but I really do not.

13             JUDGE CORDELL:  Got it.

14             MR. AENLLE:  I didn't know -- I didn't know the

15   agents before.  I never met them before.  I've never

16   done business with them before.  Coldwell Banker

17   residential is big in our area.  Coldwell Banker

18   Commercial is not.  And I don't recall Coldwell Banker

19   Commercial handling that, per my recollection.

20             JUDGE CORDELL:  Got it.  Okay.

21             I was just trying to get the names of the --

22   what I believe to be of the brokers on that property,

23   and there were three last names, and I'm just curious if

24   any of them ring a bell for you.

25             MR. AENLLE:  Yeah.  Okay.  Go ahead.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

37

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1              JUDGE CORDELL:  No, no, no.  Go ahead because

2     I -- I don't have it right in front of me.

3              MR. AENLLE:  Yeah.  Yeah.  They -- they don't.

4     So in commercial, the way it works is like you have one

5     main guy, and then all those additional names are

6     just -- like just got out of college kind of guys.

7     They're just there to kind of assist.

8              I don't remember -- I can kind of see his face.

9     I really don't remember his name, but I can tell you

10    that the County has done business with him before on

11    other buildings and other leases.

12             JUDGE CORDELL:  And the "him" --

13             MR. AENLLE:  He's the real- --

14             JUDGE CORDELL:  -- you're talking about -- I'm

15    sorry.

16             The "him" you're talking about is not someone

17    connected with -- with Coldwell Banker?

18             MR. AENLLE:  No, no.

19             JUDGE CORDELL:  Got it.  Okay.  I've got it.

20             And if I can get --

21             MR. AENLLE:  If I can look it up on the

22    Internet and -- and see if I can pull up the old slide

23    (phonetic) if you'd like me to.

24             JUDGE CORDELL:  No, no, no.  It's fine.  And

25    I -- you know, I appreciate.  I just want to -- first of



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

38

CONFIDENTIAL                    CSM 00350

TRANSCRIPT OF RECORDING                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    all, I'm making sure I'm asking you the questions that,

2    you know, people are -- have been raising, and I want to

3    make sure I hear from you about it.  And if I dig up the

4    names, I'll run them by you, and you can let me know if

5    you've ever --

6            MR. AENLLE:  Yeah.

7            JUDGE CORDELL:  -- heard of them.

8            MR. AENLLE:  Absolutely.

9            JUDGE CORDELL:  Okay.  Bear with me one second

10   here.  And, again, I'm taking a one-pass look to see if

11   I can come up with the names.  Bear with me one second.

12   I have not seen it.  Okay.  Let me keep moving.  And --

13   and I appreciate your patience.

14           MR. AENLLE:  Of course.

15           JUDGE CORDELL:  Okay.  Other -- were you

16   involved in any real estate transaction in Half Moon

17   Bay?

18           MR. AENLLE:  Yes, ma'am.

19           JUDGE CORDELL:  Can you talk to me about that,

20   please.

21           MR. AENLLE:  So my -- my involvement is not me

22   as a Realtor or as a broker or -- it's always been

23   through Real Property Services.  The -- so the Sheriff's

24   Office is actually a nonprofit.  It's -- it's the

25   Sheriff's Activities League.  It's basically programs



**TALTY COURT REPORTERS, INC.**                    39
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00351

TRANSCRIPT OF RECORDING                                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1   for un- -- for underserved communities, for kids, and

2   things like that.

3          The -- the previous location in Half Moon Bay

4   was over by -- by the harbor kind of like in a -- in

5   more of a commercial district away from school, away

6   from services, and it was next to bars and a hotel,

7   which is not great for -- the majority of the kids at

8   that time were females.  The sheriff found a location

9   that was not suitable.

10         By coincidence, the county supervisor in that

11  district, Mueller, was looking for an office, and he

12  actually liked that space.  So Supervisor Mueller

13  absorbed that lease and made it his office, and then the

14  sheriff went out to look for a better location that

15  served -- better served the community.

16         She found a -- a location in downtown Half Moon

17  Bay that was -- used to be a Chamber of Commerce

18  building, which is a couple blocks from all the schools,

19  really centrally located, and she thought that would be

20  a perfect location for -- for the nonprofit.  Real

21  Property Services and the attorneys liked it.  They

22  negotiated the lease with the owner.  I reviewed

23  documents.  I -- I gave my two cents to make sure things

24  were done properly.  I thought I added value.  And the

25  lease was ratified --



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

40

CONFIDENTIAL                    CSM 00352

TRANSCRIPT OF RECORDING                            09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1              JUDGE CORDELL:  So this was --

 2              MR. AENLLE:  -- and went through the process of

 3    remodeling.

 4              JUDGE CORDELL:  So this was a lease?  And Half

 5    Moon Bay, then, was a lease?

 6              MR. AENLLE:  Yes, ma'am.

 7              JUDGE CORDELL:  Right.

 8              MR. AENLLE:  There's been no acquisitions.

 9    It's all been leases.

10              JUDGE CORDELL:  Right.  Do you know who

11    brokered that lease?

12              MR. AENLLE:  There was no broker, ma'am, on the

13    other side --

14              JUDGE CORDELL:  No broker?

15              MR. AENLLE:  No.  The -- the -- the County

16    services, the Real Property Services, actually has

17    leases with this owner in other locations, and there was

18    no -- no broker involved.  It was just the property

19    sales County and the owners directly.

20              JUDGE CORDELL:  Got it.

21              So it was basically -- this was the sheriff who

22    identified this property, pretty much?

23              MR. AENLLE:  Yeah, yeah.  Pretty much.

24              JUDGE CORDELL:  Well --

25              MR. AENLLE:  And --
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

41

CONFIDENTIAL                            CSM 00353

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1                    JUDGE CORDELL:  Okay.

 2               MR. AENLLE:  And she actually -- we went there,

 3   and there was a sign there that the Chamber of Commerce

 4   is moving.  And luckily the lady was there, and the

 5   sheriff walked in, and then she gave her all the

 6   information.  So then when we contacted Real Property

 7   Services, it was learned that they had worked with this

 8   owner before.

 9                    JUDGE CORDELL:  Oh.  And why --

10               MR. AENLLE:  He's very well known on the coast,

11   and he has a lot of property.  So --

12                    JUDGE CORDELL:  Got it.

13               MR. AENLLE:  -- I'm not surprised the County

14   has other things with him.

15                    JUDGE CORDELL:  Right.  Do you know his last

16   name, by any chance?

17               MR. AENLLE:  Nurhan (phonetic).

18                    JUDGE CORDELL:  I'm sorry.  Say it again.

19               MR. AENLLE:  Nurhan.

20                    JUDGE CORDELL:  Nurhan?

21               MR. AENLLE:  Yeah.  Pete Nurhan.

22                    JUDGE CORDELL:  Do you know -- oh, why were you

23   out there in Half Moon Bay that time when you said --

24               MR. AENLLE:  We have a substation there.

25                    JUDGE CORDELL:  Right.
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

42

CONFIDENTIAL                                    CSM 00354

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
1              MR. AENLLE:  We have a substation there.

2              JUDGE CORDELL:  Uh-huh.

3              MR. AENLLE:  We've been looking for property

4    there.  Real Property Services -- we were actually just

5    about to ratify a lease in a different building.  So we

6    have been looking there for a long time.  We have been

7    asking community members.  We have been asking everybody

8    because Half Moon Bay is pretty small.

9              JUDGE CORDELL:  Right.

10             MR. AENLLE:  It's a tight-knit community.  So

11   everybody knew that the sheriff's looking for a

12   location.  We almost signed a lease.  We were actually

13   just about to ratify it.  Again, when I say "we," it's

14   Real Property Services unit.  I was not acting in any

15   other capacity.

16             JUDGE CORDELL:  Sure.

17             MR. AENLLE:  And at the last minute, the owner

18   pulled some underhanded stuff, and we all agreed that

19   it's better to pull -- pull back, and -- and we lost

20   that location.  We walked from that location.  It was

21   right by the substation.

22             JUDGE CORDELL:  Got it.

23             MR. AENLLE:  And then doing that subsequent

24   search, we came across this other location.  It was not

25   listed.  It was not on the market.  It was not on the
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

43

1    MLS.  It was not in any venue.  The -- the Chamber of

2    Commerce was still occupying it, and they just had a

3    sign out there that they're moving to the new location.

4              JUDGE CORDELL:  Got it.

5              Who's your -- the person you work with at

6    Real -- at the real estate -- Real Property Services

7    unit?

8              MR. AENLLE:  Yeah.  The main person -- I can

9    see her face.  I haven't talked to her in a little bit.

10   We do a lot of work out front.  Let me look at my emails

11   real quick.

12             JUDGE CORDELL:  If you want to let me know it,

13   maybe you can send me -- you can text me --

14             MR. AENLLE:  Caroline Shaker.

15             JUDGE CORDELL:  There you go.  Thank you.

16             MR. AENLLE:  Caroline Shaker.  And there's an

17   attorney in that office that I've dealt with, as well,

18   for reviewing leasing because there was other leases

19   that -- that we also ratified.  There's -- there's

20   another location.  Let me see if he's copied here.  I

21   know he sent emails.  Fox is his last name.

22             JUDGE CORDELL:  And first name?

23             MR. AENLLE:  And he's in Real Property -- oh.

24             JUDGE CORDELL:  That's all right.  That's okay.

25   The person's in Real Property Services?



**TALTY COURT REPORTERS, INC.**                              44
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00356

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1          MR. AENLLE:  Yeah.  Yeah.

2          JUDGE CORDELL:  Okay.

3          MR. AENLLE:  He's the attorney that oversees

4    the leases.  Besides the sale, the nonprofit, the

5    Sheriff's Office also secured a lease in El Granada.

6    It's a -- it's going to be a center, basically, to -- to

7    have emergency equipment for the coast because during

8    the fires and all the emergencies out there -- a lot of

9    times many, too, shut down -- it's hard to get equipment

10   through there.  So that was done.  They did that lease.

11   My involvement is I -- I oversee -- I overlook things to

12   make sure that the best interest of the sheriff is

13   re- -- is -- is represented, and that's about it.

14          JUDGE CORDELL:  Okay.  And can you tell me -- I

15   have never heard -- this is my ignorance.  El Granada.

16   Where is that?

17          MR. AENLLE:  It's a little south -- a little

18   north of Half Moon Bay.

19          JUDGE CORDELL:  Huh.  I've never heard of it.

20          MR. AENLLE:  It's right across from the harbor.

21          JUDGE CORDELL:  Never heard of it.

22          Okay.  And, once again, your involvement --

23   this is at -- is it -- okay.  Two questions.

24          Is your involvement in these real estate

25   transactions -- is that a part in your -- let me go



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00357

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1   back.

 2          Is there a job description for your position as

 3   chief of staff and executive director?  Is there a job

 4   description that exists somewhere?

 5          MR. AENLLE:  Yeah.  Part of that job -- there

 6   is a job description.  It's quite lengthy but also is in

 7   projects at the direction of the sheriff.

 8          JUDGE CORDELL:  Got it.

 9          MR. AENLLE:  Since -- I mean, why not use the

10   talent that you have and the expertise to make sure that

11   everything looks good?  That's it.

12          JUDGE CORDELL:  Got it.

13          MR. AENLLE:  If you --

14          JUDGE CORDELL:  So --

15          MR. AENLLE:  If you look at some of my

16   correspondence with the real estate attorney, you can

17   see that my recommendations on the lease or things that

18   I brought forth had a lot of value that was over- --

19   overlooked.

20          JUDGE CORDELL:  Got it.

21          So your involvement in the real estate

22   transactions is at the behest of the sheriff --

23          MR. AENLLE:  Correct.

24          JUDGE CORDELL:  -- given your expertise in real

25   estate and development?
```



**TALTY COURT REPORTERS, INC.**                               46
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00358

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1              MR. AENLLE:  Yep.

2              JUDGE CORDELL:  Okay.

3              MR. AENLLE:  And in working along with -- with

4    Real Property Services from -- from the County.

5              JUDGE CORDELL:  Got it.

6              MR. AENLLE:  But not in the capacity of a

7    broker or an agent or being involved in any of that or

8    benefiting at all from it.

9              JUDGE CORDELL:  Okay.

10             I found the three names that I just want to run

11   by you and -- and ask you if these names ring a bell.

12   These were the names that I believe -- and I could be

13   wrong on this -- but were part of brokering the -- the

14   lease in Redwood City for the substation and the child

15   care center.  So I'm just going to --

16             MR. AENLLE:  Okay.

17             JUDGE CORDELL:  -- see if you -- if you know

18   these names.

19             The first name is Bob McSweeney.  Does that

20   ring a bell with you at all?

21             MR. AENLLE:  It is.  That's the guy that --

22   that I met there.

23             JUDGE CORDELL:  And when you say you met there,

24   you met at the building when you did a --

25             MR. AENLLE:  At the building --


**TALTY COURT REPORTERS, INC.**                          47
taltys.com - 408.244.1900

```
 1              JUDGE CORDELL:  -- walk-through?

 2              MR. AENLLE:  At the building with --

 3              JUDGE CORDELL:  Yes.

 4              MR. AENLLE:  -- Real Property itself with

 5    Caroline Shaker, yes.

 6              JUDGE CORDELL:  Got it.

 7              And did you know Mr. McSweeney before that

 8    walk-through?

 9              MR. AENLLE:  I've never met Mr. McSweeney

10    before in my life before that day.

11              JUDGE CORDELL:  Got it.

12              MR. AENLLE:  I've never done any transaction

13    with him, never met him.

14              JUDGE CORDELL:  Okay.  The next name is Evan

15    Chang.  Does that ring a bell?

16              MR. AENLLE:  No.  Not at all.

17              JUDGE CORDELL:  And the next one is Matt

18    Murray.  Does that ring a bell?

19              MR. AENLLE:  No.

20              JUDGE CORDELL:  Okay.  Got it.

21              All right.  Any other real estate transactions

22    you want to tell me about at all?  So we've talked about

23    Half Moon Bay, El Granada, the building that you're in

24    now, the -- and the Redwood City building.

25              Anything else --
```



**TALTY COURT REPORTERS, INC.**
**taltys.com - 408.244.1900**

48

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1              MR. AENLLE:  No, ma'am.

 2              JUDGE CORDELL:  -- that you made an --

 3              MR. AENLLE:  Not that I can think of.

 4              JUDGE CORDELL:  Okay.  That's fine.

 5              MR. AENLLE:  No.  And just for the record,

 6   ma'am, because I want to make sure that it is

 7   understood.  I've never in any capacity or by myself,

 8   and I've never benefited from any -- any deals or been

 9   representing myself as a broker or an agent at all

10   whatsoever.

11              JUDGE CORDELL:  Right.  Because that would be a

12   conflict of interest.  I mean, that would be a problem.

13   Sure.

14              MR. AENLLE:  That's something I would just not

15   do, yeah.

16              JUDGE CORDELL:  Yeah.

17              Okay.  Now, have you ever been involved -- and

18   you talked about the real estate.  I'm also curious

19   about contracts such as -- there's a contract with Edgar

20   Lopez & Associates.

21              Does that ring a bell?

22              MR. AENLLE:  Yes, it does ring a bell.

23              JUDGE CORDELL:  Can you talk to me about that

24   and your involvement with that one.

25              MR. AENLLE:  Yes, ma'am.
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

49

CONFIDENTIAL                    CSM 00361

1          JUDGE CORDELL:  Sure.

2          MR. AENLLE:  When we -- when we -- when the

3     sheriff executed the lease for the substation and child

4     care center, then we needed to go and basically upgrade,

5     or remodel, and do the tenant improvements that needed

6     to be done.  We -- we started the RFP process, which is

7     normal here in -- in -- in -- in the county, as far as,

8     you know, obtaining contractors and so forth.  I put one

9     of my managers that's -- that's very detail oriented in

10    charge of the project --

11         JUDGE CORDELL:  Can you tell me who that --

12         MR. AENLLE:  -- along with --

13         JUDGE CORDELL:  Excuse me.  Can you tell me the

14    name of that person, please.

15         MR. AENLLE:  Heather Enders.

16         JUDGE CORDELL:  Got it.  Okay.  Sorry to

17    interrupt.  Go ahead.

18         MR. AENLLE:  That's okay.  She's exceptional.

19    As well as we put a captain to work with her because

20    he's got construction experience.  And, again --

21         JUDGE CORDELL:  And who was the captain?

22         MR. AENLLE:  Captain Philip.

23         JUDGE CORDELL:  Got it.

24         MR. AENLLE:  Brian Philip.

25         JUDGE CORDELL:  All right.



CONFIDENTIAL                    CSM 00362

TRANSCRIPT OF RECORDING                                        09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1          MR. AENLLE:   The captain.   And then they

2     basically reported to me on -- on the project:   how

3     things are going, major decisions, and things like that.

4          So the project was going well.   Both Philip and

5     Enders did a great job.   They completed a successful RFP

6     process, and a contractor won -- won the process, and it

7     was the contractor actually that built this building.

8     They're very reputable, and --

9          JUDGE CORDELL:   Got it.

10         MR. AENLLE:   -- it was great.

11         When it came down to County Counsel approval,

12    they found that a small statue that had to do with

13    notice or something like that was not followed.   When we

14    looked into it, that statue was -- it was an oversight.

15    It was not listed anywhere in any documents in the

16    county or in the process itself or any of the documents

17    in the process of RFP.

18         We also learned that we had switched over to a

19    new system, NEOGOV, for all county RFP processes, and we

20    learned that even though you check the box just like a

21    city planning, you know, building process works when we

22    check the box, documents go to certain departments for

23    approval.   Even though our box is being checked, it

24    never notified those documents, one being legal counsel.

25         So they kind of learned about this RFP process



**TALTY COURT REPORTERS, INC.**                                   **51**
taltys.com - 408.244.1900

CONFIDENTIAL                        CSM 00363

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    and -- you know, at the tail end, and they were not

2    comfortable that that statue, which was small in nature

3    but nevertheless was a statue, was overlooked.

4          We brought it to the County Executive's

5    attention and the attorneys, and they recommended we

6    basically redo the entire process through a QRF

7    design-build process, and they also recommended that we

8    hire a project manager.

9          Edgar Lopez -- I don't know him.  Never -- I

10   met him just recently.  Never done any business with him

11   at all whatsoever.  He came at the recommendation -- the

12   County Manager's office, Adam Eli -- I have emails from

13   him -- basically gave us a bunch of names that they've

14   used, and they think they're good.

15         We selected a couple of them.  My manager,

16   Heather Enders, and Captain Philips interviewed them.

17   They came back and gave me the -- their -- their

18   findings, and we selected Edgar Lopez & Associate.

19   That's how that came about.

20         JUDGE CORDELL:  So that was a competitive bid,

21   then, or not?

22         MR. AENLLE:  That's correct.

23         JUDGE CORDELL:  Okay.

24         MR. AENLLE:  Yeah.

25         JUDGE CORDELL:  It was a competitive bid.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

52

CONFIDENTIAL                    CSM 00364

TRANSCRIPT OF RECORDING                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    Good.  I just need clarification on all of this.

2              Are you seeking to increase, now, the contract

3    to -- to Lopez & Associates?

4              MR. AENLLE:  There was an increase from their

5    original bid.  I'm not looking to do that, but that

6    was -- that was -- that's what it required for some of

7    the steps.

8              JUDGE CORDELL:  Okay.  Do you recall the amount

9    of the contract to Edgar Lopez & Associates?

10             MR. AENLLE:  I think -- I think it increased to

11   300,000.

12             JUDGE CORDELL:  Okay.  Can -- all right.  So

13   the next question -- again, this is dealing with the

14   building in Redwood City on Broadway.

15             MR. AENLLE:  Uh-huh.

16             JUDGE CORDELL:  Did you have any interaction

17   with contracting with West Coast Security?

18             MR. AENLLE:  West Coast Security --

19             JUDGE CORDELL:  Yes.

20             MR. AENLLE:  -- is one of our vendors.  And we

21   also did -- they have different areas of the Sheriff's

22   Office, and we also asked them for a bid.  But, again,

23   nothing's been finalized until we go through this entire

24   process.

25             JUDGE CORDELL:  Got it.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900                                    53

CONFIDENTIAL                          CSM 00365

1     So there is no contract right now or an
2  agreement with West Coast Security?
3     MR. AENLLE:  Not -- not for that building,
4  ma'am.
5     JUDGE CORDELL:  And is it -- is there a
6  contract with them for another building?  Maybe I'm
7  getting the wrong information but --
8     MR. AENLLE:  Yeah.  I -- I believe -- I believe
9  there is, and it's been in place for many, many years.
10     JUDGE CORDELL:  I see.
11     MR. AENLLE:  I don't know which one.  There's
12  of lot of them that they monitor.
13     JUDGE CORDELL:  Got it.
14     So there is no agreement right now with West
15  Coast for the Broadway building?
16     MR. AENLLE:  No, ma'am.
17     JUDGE CORDELL:  Okay.  All right.  Two more
18  just on service contracts.  I don't have a lot of
19  detail, and if you don't recall, that's fine.  But I'm
20  curious if you recall a service contract with a vendor
21  to provide food at the jails that eventually fell
22  through.
23     Does that ring a bell with you at all?  That
24  would have been in 2023.
25     MR. AENLLE:  Yeah, very slightly.  Again, I was



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900
54

TRANSCRIPT OF RECORDING                                09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1   not part of that.  So I have very limited information

2   available.  But I was not part of initiating that

3   contract or anything like that.

4               JUDGE CORDELL:  Right.

5               Did you ever, though, say -- accuse the

6   contractor of being a crook?

7               MR. AENLLE:  No.

8               JUDGE CORDELL:  Do you recall -- let me put it

9   this way:  Do you recall getting any information that

10  might have caused you to believe that that contractor

11  should not have a contract?

12              MR. AENLLE:  I --

13              JUDGE CORDELL:  Again, if you don't remember --

14              MR. AENLLE:  I can't speak to that.

15              JUDGE CORDELL:  That's fine.  And when you say

16  you can't speak to it, does that mean you don't remember

17  it or you just don't want to talk about it?

18              MR. AENLLE:  No, no, no.  It's not that I don't

19  want to talk about it.  I really don't remember that --

20              JUDGE CORDELL:  Okay.

21              MR. AENLLE:  -- what you're asking me.  And

22  that -- that contract was not initiated by me.

23              JUDGE CORDELL:  But you had nothing to do --

24  you didn't get involved in it at all subsequently?

25              MR. AENLLE:  At some point, with the advice of



**TALTY COURT REPORTERS, INC.**                              55
taltys.com - 408.244.1900

CONFIDENTIAL              CSM 00367

TRANSCRIPT OF RECORDING                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1    legal counsel, I got involved.

 2              JUDGE CORDELL:  Talk to me about that.

 3              MR. AENLLE:  Just to make sure that the

 4    separation was proper and was done accordingly.

 5              JUDGE CORDELL:  Okay.  And when you say "legal

 6    counsel," can you recall who --

 7              MR. AENLLE:  David Silberman.

 8              JUDGE CORDELL:  David Silberman?

 9              MR. AENLLE:  Yes.

10              JUDGE CORDELL:  Okay.  All right.

11              So you reached out to him, or he reached out to

12    you?

13              MR. AENLLE:  I don't recall who reached out to

14    whom.

15              JUDGE CORDELL:  All right.  And one last one

16    about contracts.  Do you recall entering -- you now,

17    not --

18              MR. AENLLE:  Yes.

19              JUDGE CORDELL:  -- the office but you --

20    entering -- when you were, obviously, in the position

21    you're in now, did you recall entering into a contract

22    with a woman that you brought in to write grants -- do

23    grant writing for the Sheriff's Office?

24              MR. AENLLE:  Yes, ma'am.

25              JUDGE CORDELL:  Can you talk to me about that
```



**TALTY COURT REPORTERS, INC.**
**taltys.com - 408.244.1900**
                                                          56

TRANSCRIPT OF RECORDING                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1   and what happened and your involvement in it.

2           MR. AENLLE:  We were looking for opportunities

3   to increase the revenue for the office, and we felt that

4   there was a lot of potential grants available, and we

5   had nothing set up in the office.  The only contract

6   that we had set up was with a lobbyist in Washington,

7   D.C., from the prior administration, and basically he

8   was just taking money and not providing any results.

9   Out of four or five years of paying him a very large

10  amount of money, he only materialized with one grant

11  that, again, we were not able to correctly use.

12          So I looked for opportunities at the direction

13  of the sheriff.  "Let's see if we can get some people

14  that can -- can really go after this -- the grant so we

15  can supplement the department and get -- get more

16  training or -- or whatever else the department needs."

17          It didn't -- it didn't work.  I thought she was

18  good, but nothing ever came of it.

19          JUDGE CORDELL:  Got it.

20          MR. AENLLE:  She never secured anything.

21          JUDGE CORDELL:  Right.  How was she even

22  brought into it?  I guess that's really what I'm asking

23  now.  Who brought her in, and who did the contract?

24          MR. AENLLE:  Word -- word of mouth.  We -- we

25  asked some recommendations, you know, some people that



**TALTY COURT REPORTERS, INC.**
taltys.com · 408.244.1900                           57

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    are using.  She was out of Las Vegas, and she came

2    highly recommended.  I don't recall the -- the actual

3    details, but I initiated that contract.

4              JUDGE CORDELL:  Got it.

5              MR. AENLLE:  Like I --

6              JUDGE CORDELL:  And then what --

7              MR. AENLLE:  Like I've done many, just at the

8    direction of the office.

9              JUDGE CORDELL:  So when you say "the office,"

10   you mean the sheriff?

11             MR. AENLLE:  Yes.

12             JUDGE CORDELL:  Again, I'm not trying to put

13   words in your mouth, but I want -- I just want to be --

14             MR. AENLLE:  The sheriff, the undersheriff.  I

15   have -- I have -- I report directly to the undersheriff.

16             JUDGE CORDELL:  Right.  But I think your job

17   description says you can also -- you report to the

18   undersheriff and to the sheriff.

19             MR. AENLLE:  Absolutely, ma'am.  We all do.

20             JUDGE CORDELL:  Okay.  I've got you.

21             MR. AENLLE:  So let me -- let me make one thing

22   clear.  They contract with the -- with that specific

23   person -- actually, I -- ma'am, can we go back for one

24   second?

25             JUDGE CORDELL:  Absolutely.  Absolutely.



**TALTY COURT REPORTERS, INC.**                              58
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00370

TRANSCRIPT OF RECORDING                                09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1              MR. AENLLE:  I want to make sure that I'm

2     giving you the right information and it's not getting

3     mixed up because there's been two contracts with grant

4     writers with a woman.  So I want to make sure that I'm

5     speaking to what you're asking me of.

6              JUDGE CORDELL:  Yeah.  The one I'm asking about

7     is the one that got canceled.

8              MR. AENLLE:  None of them got canceled, but I'm

9     only going to go with the one in Vegas, yeah.  So the

10    contract stopped monetarily.  She was only going to get

11    paid if she got -- if she got -- it was a commission

12    based, if she actually was able to secure grants for us.

13    That's it.

14             JUDGE CORDELL:  Got it.

15             Is there a -- is there a process or protocol

16    for contracting with -- either for services or whatever?

17    Do you have to follow certain procedures or what?  Can

18    you explain to me, like, how that works.

19             MR. AENLLE:  Yeah.  It -- it depends, ma'am.

20    If -- if we're going for a vendor or something like

21    that --

22             JUDGE CORDELL:  Yes.

23             MR. AENLLE:  -- we follow an RFP process.  If

24    it has to do for -- you know, something for the

25    sheriff's -- for the Sheriff's Office -- for example, a



**TALTY COURT REPORTERS, INC.**
taltys.com · 408.244.1900

59

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1    personnel that has an expertise that's needed in the

 2    office that we don't have the -- the upper staff or we

 3    need an expertise, no.  The sheriff has the ability

 4    to -- to hire that person --

 5              JUDGE CORDELL:  So you --

 6              MR. AENLLE:  -- under a separate contract.

 7              JUDGE CORDELL:  Got it.

 8              So when we're talking about the vendor for the

 9    food that was going to be for the jails and that got --

10    and you had legal counsel advise you about that one, was

11    that a contract, or was that a -- did that have to go

12    through an RFP, or how did that have to -- how did that

13    work?

14              MR. AENLLE:  Ma'am, I just want you to know

15    that that contract never went through.  We were never --

16              JUDGE CORDELL:  Oh.

17              MR. AENLLE:  -- in contract with that person.

18              JUDGE CORDELL:  Got it.  Okay.

19              MR. AENLLE:  And just so you know, we were

20    never in contract with that person.

21              JUDGE CORDELL:  Do you know if the sheriff

22    approved it verbally, and then it was subsequently

23    then -- do you know anything about that?  Again, I don't

24    want to put words in your mouth.  I'm just trying to --

25              MR. AENLLE:  And I don't want to speak for the
```



**TALTY COURT REPORTERS, INC.**                            60
taltys.com · 408.244.1900

CONFIDENTIAL                    CSM 00372

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1   sheriff.  But I can tell you that how she is, she would

2   not have said -- approved anything verbally like that.

3               JUDGE CORDELL:  Okay.

4               MR. AENLLE:  I know I'm not speaking --

5               JUDGE CORDELL:  Sure.

6               MR. AENLLE:  This is just from my -- from my

7   point of view.

8               JUDGE CORDELL:  Got it.

9          Okay.  So I'm going to go back to the chain of

10  command when you were describing to me where you are and

11  how it all works.

12         So I'm going to ask you some questions.  Again,

13  these are not -- I'm -- how do I say this?  I'm the

14  messenger.  I just want to ask you about things that

15  people are saying, and --

16              MR. AENLLE:  Sure.

17              JUDGE CORDELL:  -- and then I'd love to get

18  your feedback.  And anything you're uncomfortable with

19  answering, then it's fine.  You don't have to answer.

20         So have you ever in your role as -- and I'll

21  just call you "chief of staff/executive director."

22         Have you ever required any sworn officers to

23  report to you?

24              MR. AENLLE:  No, ma'am.

25              JUDGE CORDELL:  Okay.  So you've never required



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

61

CONFIDENTIAL                          CSM 00373

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    any, for example, captains?  Ever told them they have to

2    now report to you?

3              MR. AENLLE:  No, ma'am.

4              JUDGE CORDELL:  Have you ever been involved in

5    any confidential sworn officer investigations conducted

6    through Internal Affairs in the Professional Standards

7    Bureau?

8              MR. AENLLE:  Absolutely not, ma'am.

9              JUDGE CORDELL:  Have you ever given any

10   directives or any kind of orders to Sheriff Corpus?

11             MR. AENLLE:  What?  No.

12             JUDGE CORDELL:  Just answer.  Listen, man,

13   just --

14             MR. AENLLE:  Okay.  The answer is, "No."

15             JUDGE CORDELL:  Okay.  Have you -- all right.

16   Have you ever been involved in personnel decisions

17   concerning sworn officers?  And let me be a little more

18   specific.

19             MR. AENLLE:  Please.

20             JUDGE CORDELL:  If a sworn officer wants a

21   certain individual to be that sworn officer's secretary

22   or administrative assistant, have you ever been involved

23   in, like, vetoing that decision of a sworn officer to

24   bring in somebody for that sworn officer?

25             MR. AENLLE:  So if I may --


CONFIDENTIAL                    CSM 00374

TRANSCRIPT OF RECORDING                              09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1           JUDGE CORDELL:  Sure.

2           MR. AENLLE:  -- I want to -- I want to dispel

3    something just to make sure that -- that you're aware

4    that -- that -- the stance that a civilian can't tell a

5    sworn what to do or -- or likewise, vice versa, is -- is

6    not in any policy of the Sheriff's Office.  It's

7    actually, you know, old-time mentality of law

8    enforcement.  It's not -- it's not written anywhere.

9    It's a lack of understanding.

10           LAPD, which started this many, many years ago,

11   and it's, basically, best practice, they actually hire

12   an employee -- civilians in an executive level, and

13   actually law -- sworn officers actually report to them.

14   It's the same thing with the Chief of the San Francisco

15   PD.  He brought that model over, and many other police

16   departments and sheriff's office structures that way.

17           But to your -- your point of question, I am

18   involved in meetings at the -- in the executive level

19   that has to do with operational needs.  It has to do

20   with employee (unintelligible) and many things.  In that

21   meet, I have a voice, but ultimately it's just one voice

22   of four, and decisions are made at that level like that,

23   whether they're civilian, whether they're sworn.

24           But have I told a captain or somebody they

25   can't have -- that's not -- I've never taken that role.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

63

CONFIDENTIAL                    CSM 00375

TRANSCRIPT OF RECORDING                        09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    I've never done anything like that.

2            JUDGE CORDELL:  Okay.  Is it your view that in

3    your position that you can, in certain circumstances,

4    give orders to and direct sworn officers?  I'm talking

5    about captains, lieutenants, sergeants, deputies.

6            MR. AENLLE:  No, ma'am.  And I'd like to say

7    that the way we conduct and -- and at the division of

8    the Sheriff's Office and the sheriff is, you know, if

9    you know -- we don't really go around ordering people.

10   That's not the way we talk to people or conduct

11   ourselves.

12           JUDGE CORDELL:  So how do --

13           MR. AENLLE:  We try to create --

14           JUDGE CORDELL:  How do you conduct yourselves?

15           MR. AENLLE:  I mean, people, like humans.

16   Like -- like being part of a team, being part of the

17   group.

18           So to answer the question, I don't -- there's

19   no sworn cop that reports to me at all whatsoever.  A

20   lot of them will come to me for questions about

21   something or advice on something or help on something,

22   and I'm happy to work with them.  These are people that

23   I've known for 16 years since I've been here; right?

24           JUDGE CORDELL:  Right.

25           MR. AENLLE:  But there's no orders being given.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

64

CONFIDENTIAL                    CSM 00376

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1   With that said, if the sheriff says, "Victor, I need you

2   to go take care of this right now," am I going to call a

3   captain or say, "Hey, on behalf of the sheriff, she

4   would like this done"?  Yes, I've done that.

5           JUDGE CORDELL:  Right.  But that's different.

6   "I would like" -- "On behalf of the sheriff, I would

7   like this done" versus you directing somebody to do

8   something; right?

9           MR. AENLLE:  Absolutely.  Absolutely, ma'am.

10          JUDGE CORDELL:  Got it.

11          MR. AENLLE:  A different thing.  So if -- to

12  your -- to your questions, no, ma'am.  I have always

13  worked, and I'm very clear that I work at the direction

14  of the sheriff.  I'm here to advance her vision and

15  improve this organization, and I've done that from day

16  one.

17          JUDGE CORDELL:  Have you ever been involved in

18  signing off on budget items on -- in a sworn officer's

19  budget?

20          MR. AENLLE:  Ma'am, I oversee a fiscal -- I'm

21  very -- I'm a numbers person.  I'm very conscious and

22  very conservative on spending.  Anybody -- if you talk

23  to any of my -- my directors that have to do with money,

24  they'll tell you that.

25          One of the first things that I did when I came



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

65

TRANSCRIPT OF RECORDING                                     09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1   to the Sheriff's Office was review all the contracts
 2   that were done, and we were able to -- to save about
 3   $1.5 million of the Sheriff's Office budget.  No company
 4   comes directly to me or anything like that about their
 5   budget.  I will have meetings with the undersheriff.
 6   I'll be present at meetings with other sworn people.
 7   Half of our department are sworn people, and we go over
 8   the budgets and so forth.  And when they don't
 9   understand it, I -- I help with the numbers.  But it's
10   not my role to deny any kind of a budget.  That's not
11   even within my -- my capacity.  That doesn't happen.
12            JUDGE CORDELL:  I understand.  And I'll be a
13   little more specific.
14            MR. AENLLE:  Yes.
15            JUDGE CORDELL:  If there was a -- was there
16   ever a budget item in, let's say, a captain's budget
17   and -- and a captain had a budget, and there was a
18   budget item.  The captain said, "I don't even know what
19   that is," and it's an item that you signed off on?  Has
20   that ever happened?
21            MR. AENLLE:  I'm sorry, ma'am.  Can you repeat
22   that one more time.
23            JUDGE CORDELL:  Sure.
24            MR. AENLLE:  I'm not -- I'm not following,
25   yeah.
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

66

CONFIDENTIAL                    CSM 00378

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1        JUDGE CORDELL:  Sure.  Let us say a captain has

2   a budget.  So a captain's at -- at a -- let's make a

3   bureau.  We'll do one of the bureaus.  So there's Half

4   Moon Bay.  There's San Carlos.  Whatever.  One of them.

5   All right?  So there's a captain.

6        MR. AENLLE:  Uh-huh.

7        JUDGE CORDELL:  And they -- and they -- they're

8   actually also called the -- the chief because they're

9   kind of the --

10        MR. AENLLE:  Correct.

11        JUDGE CORDELL:  -- chief for that; right?

12        MR. AENLLE:  Yeah.

13        JUDGE CORDELL:  Okay.

14        MR. AENLLE:  Okay.

15        JUDGE CORDELL:  All right.  So if a captain has

16   a budget there and there's a budget item that the

17   captain doesn't even know why it's there, have you ever

18   said to a captain, for example -- you know, have you

19   ever signed off on a budget item where a captain didn't

20   even know why the item was even in that captain's

21   budget?

22        MR. AENLLE:  Ma'am, that's not even in my

23   realm.  That's not even anything I would do.  I don't

24   sign off anything that I don't understand or isn't

25   clearly defined.



**TALTY COURT REPORTERS, INC.**                              67
taltys.com - 408.244.1900

TRANSCRIPT OF RECORDING                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1          I can recall -- you know, you're putting this

2    about a captain and a bureau and so forth.  And when we

3    have -- we have our meetings, and I'm not alone at these

4    meetings.  I'm with the sheriff, undersheriff, and

5    assistant sheriff.  That said captain didn't even

6    understand her -- her own numbers.  And the only thing I

7    pointed out was that it seemed like it was done in

8    error; that org -- org chart, because numbers stick in

9    my head, not did belong to that bureau.  But at no

10   time --

11          JUDGE CORDELL:  I think we know who we're --

12   right.

13          MR. AENLLE:  Yeah.

14          JUDGE CORDELL:  I think we know who we're

15   talking about; right?

16          MR. AENLLE:  Oh, absolutely.  At no time did I

17   approve something like that.  It's not even me for -- I

18   do not approve the chief's budgets or independent

19   bureau's budgets.  It doesn't work that way.

20          JUDGE CORDELL:  And can you tell me why you are

21   involved in meetings about a captain's budget if it's

22   the captain's budget.

23          MR. AENLLE:  I'm involved in all meetings that

24   pertain to the Sheriff's Office.  I'm part of the

25   executive team.  So I'm involved to have outside input



**TALTY COURT REPORTERS, INC.**                    68
**taltys.com - 408.244.1900**

TRANSCRIPT OF RECORDING                              09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    to use expertise on numbers and finances because it's

2    part of the Sheriff's Office everyday business.

3              JUDGE CORDELL:  Got it.

4              MR. AENLLE:  It has nothing to do with sworn

5    and non-sworn.

6              JUDGE CORDELL:  Okay.

7              MR. AENLLE:  If it's the bottom line, I oversee

8    fiscal and at the will of the sheriff.  That's who she

9    wants present during these budget meetings.

10             JUDGE CORDELL:  Okay.  Got it.

11             Have you ever directed civilian personnel to

12   always address you as "Dr. Aenlle"?

13             MR. AENLLE:  No, ma'am.  Not at all.

14             JUDGE CORDELL:  Have you ever --

15             MR. AENLLE:  Not at all.

16             JUDGE CORDELL:  Have you ever requested or

17   directed any sworn personnel to address you always as

18   "Dr. Aenlle"?

19             MR. AENLLE:  No, ma'am.  Not at all.

20             JUDGE CORDELL:  Do you act as the sheriff's

21   personal body guard?

22             MR. AENLLE:  No.  No.  But every -- anybody --

23   anybody in this department -- when the sheriff is out,

24   everybody should be her body guard.  Everybody should

25   watch out for the sheriff.  She's a very well-known



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

69

CONFIDENTIAL                    CSM 00381

1    political figure in the county, and at the current times

2    in law enforcement, I would hope that anybody that works

3    for this department would always watch out for their

4    sheriff's safety.

5            JUDGE CORDELL:  So my question is not so much

6    everybody cares about the sheriff.  And I understand.

7    She's high profile.

8            Is -- have you ever said that you were her

9    dignitary protection?

10           MR. AENLLE:  No.  There's no dignitary

11   protection.  Am I -- when I attend -- when I attend

12   political things or go with the -- with the sheriff to

13   political things, am I looking out for her safety?

14   Absolutely, ma'am.  Every time.

15           JUDGE CORDELL:  But you have never said you

16   were her personal body guard?

17           MR. AENLLE:  I've never said I was her body

18   guard.

19           JUDGE CORDELL:  Okay.

20           MR. AENLLE:  Do I provide security for the

21   sheriff, or do I make sure she's safe when she has

22   meetings or different areas in different cities where

23   the tensions are a little high?  Absolutely.  Everybody

24   should.  Anybody in uniform or not in uniform should do

25   that for the sheriff.



**TALTY COURT REPORTERS, INC.**                              **70**
**taltys.com - 408.244.1900**

CONFIDENTIAL                    CSM 00382

TRANSCRIPT OF RECORDING                                      09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1          JUDGE CORDELL:  So does that mean that if the

2   sheriff is attending a meeting somewhere out of the

3   office that you will be there to give her protection

4   or --

5          MR. AENLLE:  I'm there -- I'm to support.  I'm

6   there to engage for the community.  I'm there for

7   whatever she needs.

8          JUDGE CORDELL:  Right.  I -- right.  But I

9   guess my question's a little different.

10          When the sheriff has to go to a meeting and

11   that meeting doesn't involve you, do you still go,

12   though, to make sure she has protection?

13          MR. AENLLE:  If the -- if the meeting doesn't

14   involve me and she doesn't need me, I don't go.

15          JUDGE CORDELL:  Okay.  With regard to

16   recruitment of sworn personnel, have you ever been

17   involved in recruitment decisions regarding recruiting

18   for sworn personnel?

19          MR. AENLLE:  Again, ma'am, my involvement would

20   be at the executive team level, discussions about, "What

21   do we need?"  "Where should we go?"  "What are we

22   missing?"  "Let's -- let's -- let's look for people

23   where we've never looked before."  "Let's think outside

24   the box."  "What support do they need?"  "Do we need to

25   hire more -- more background investigators?"  "Do we



**TALTY COURT REPORTERS, INC.**                              **71**
**taltys.com - 408.244.1900**

CONFIDENTIAL                          CSM 00383

TRANSCRIPT OF RECORDING
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE
09/25/2024

1   have enough?"  Yes, I am involved in those decisions,

2   regardless of sworn or non-sworn, because we're also

3   hiring for -- for civilian staff as well; right?

4           JUDGE CORDELL:  Right.

5           MR. AENLLE:  Recruitment for it.

6           JUDGE CORDELL:  Right.

7           MR. AENLLE:  But yes.

8           JUDGE CORDELL:  By "recruitment decisions," I

9   also mean picking people.  Like, "No.  That's the

10  person" --

11          MR. AENLLE:  No, ma'am.

12          JUDGE CORDELL:  -- "that I want it to be."

13          MR. AENLLE:  No.  No, ma'am.

14          JUDGE CORDELL:  Got it.  Okay.

15          MR. AENLLE:  Not at all.  That's -- that's --

16  I've never been involved in that.  That's completely

17  outside.  I don't -- I'm not even in the queue for that.

18          JUDGE CORDELL:  Okay.

19          MR. AENLLE:  I'm not anywhere near part of that

20  process.

21          JUDGE CORDELL:  Okay.  Have you ever directed

22  sworn personnel to issue special badges to anyone?

23          MR. AENLLE:  I don't have the power to do that.

24          JUDGE CORDELL:  Okay.

25          MR. AENLLE:  And I have not.



CONFIDENTIAL                    CSM 00384

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1          JUDGE CORDELL:  Have you ever ordered a secret

2    background check for sworn personnel?  Somebody you

3    maybe wanted to bring in, somebody that maybe the

4    sheriff was looking at.  Have you ever directed that

5    there be a background check but that it be done

6    secretly?

7          MR. AENLLE:  There have been background checks

8    that have been more confidential that were taken, that

9    were done, but that was not done by me.

10         JUDGE CORDELL:  Okay.

11         MR. AENLLE:  Confidentiality around here is

12   very important.

13         JUDGE CORDELL:  Right.

14         MR. AENLLE:  I mean, these were very

15   high-level-type positions and backgrounds.  But -- but

16   every -- every process, every -- every procedure,

17   everything was done to meet policy of the office and

18   POST standards.  I can tell you that.

19         JUDGE CORDELL:  Okay.  Have you and in your

20   role as executive director ever been involved in any

21   background checks --

22         MR. AENLLE:  No, ma'am.

23         JUDGE CORDELL:  -- for sworn personnel?

24         MR. AENLLE:  For any personnel.  I'm not

25   involved in that.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900                                    73

CONFIDENTIAL                    CSM 00385

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1          JUDGE CORDELL:  Got it.

2              There are trainings for sworn personnel.  They

3     have to go through certain trainings.  Have you ever

4     been involved such that you've directed that trainings

5     happen at a certain time when they're for sworn

6     personnel, not for civilians?

7          MR. AENLLE:  Ma'am, I think I know what you're

8     referring to.  So I'll just speak to that.

9          JUDGE CORDELL:  Yeah, let's be up front because

10    I --

11         MR. AENLLE:  Yeah.

12         JUDGE CORDELL:  -- you know, I want to be as up

13    front with you as I can.  So I'm talking about --

14         MR. AENLLE:  Absolutely.

15         JUDGE CORDELL:  Sure.  So I'm talking about the

16    active shoot- -- let's see.  Yeah.

17         MR. AENLLE:  Sure.

18         JUDGE CORDELL:  The active shooter training

19    that was set for October and then was changed to August.

20         Can you talk to me about that?

21         MR. AENLLE:  Absolutely.  I would be happy to.

22         JUDGE CORDELL:  Okay.

23         MR. AENLLE:  This -- so this training initiated

24    after -- we go back to the Half Moon Bay shooting, the

25    massacre that took place basically 21 days into the



**TALTY COURT REPORTERS, INC.**                                74
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00386

1   sheriff's tenure.  The findings from that really

2   identified that -- that we needed more training.  The

3   Sheriff's Office went out and -- and researched certain

4   companies.  There was a company.  We had done business

5   with them in the past, and they trained our SWAT team.

6   She approached them, and -- and we identified some of

7   the needs that -- that were identified.  There was a

8   class put together which -- which was done in

9   partnership with the fire department, with AMR, with the

10  school district because we felt that training for such

11  incidents in a collaborative way provides better

12  results.

13          So that training was -- was conducted.  It

14  was -- it was done on the coast, and it was a complete

15  success.  People were thrilled.  The community was also

16  appreciative of being included, and it was a success.

17          The sheriff's wishes was that we had to do that

18  same training on this side of the bay.  On this side.

19  It was -- and it was -- and that was the direction.

20  Somehow training fell behind, whatever the case was, and

21  it was not -- it was not done.  When the sheriff found

22  out that it was pushed back all the way to October, with

23  the tensions and the recent mass shootings and the

24  elections coming up, she wanted to make sure that her --

25  her employees were prepared.  So she asked the company



**TALTY COURT REPORTERS, INC.**                          **75**
taltys.com - 408.244.1900

CONFIDENTIAL                          CSM 00387

TRANSCRIPT OF RECORDING                                09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    to see if they could move up the training as she wanted

2    to because October was going to be too late with the

3    current tensions.

4            The training -- that training was to be done in

5    our facility.  We didn't need to rent anything.  That

6    training was to be done in our range.  There was --

7    there was nothing needed, and there was like two weeks'

8    advance notice for that training to take place to only

9    better prepare our employees for anything major like

10   that.  That's it.

11           So she instructed the training unit to go ahead

12   and get this ready, and so that's as far as it went.  It

13   had nothing to do with me, ma'am.

14           JUDGE CORDELL:  So you had no --

15           MR. AENLLE:  It --

16           JUDGE CORDELL:  I'm sorry.  So I just want

17   to -- that's exactly what you were getting ready to say,

18   but I want to clarify that the directive to move it up,

19   have it in August, everything -- that was all at the

20   sheriff's initiative, not yours?

21           MR. AENLLE:  Of course, ma'am.  Absolutely.

22           JUDGE CORDELL:  Okay.

23           MR. AENLLE:  Absolutely.

24           JUDGE CORDELL:  Then -- got it.

25           Do you know whether or not the sheriff had



**TALTY COURT REPORTERS, INC.**                     76
taltys.com - 408.244.1900

TRANSCRIPT OF RECORDING                                        09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    approved that training for October?

2            MR. AENLLE:  To my knowledge, she had not.  She

3    was not even aware.  That day -- she was -- she was told

4    about that, and that's why she wanted to move it up.

5    She was told about that later.  She was surprised that

6    they had not been scheduled sooner.

7            JUDGE CORDELL:  I see.  And you know she was

8    surprised because she told you this?

9            MR. AENLLE:  I know because I was in a meeting

10   when that came up.  And she goes, "Can't they do it any

11   sooner?  This is -- this is -- I asked this" -- so just

12   to put it in perspective, ma'am, the last time any

13   training like that was done was in January -- in, I want

14   to say, March of 2023.  What's that?  16 months, 18

15   months with no training for a critical incident?  So she

16   felt that it was really important, and she had to

17   elevate it.  She wanted to make sure that if something

18   happened, her employees, who she cares about deeply,

19   were well-trained and prepared.

20           JUDGE CORDELL:  So --

21           MR. AENLLE:  16 to 18 months without having any

22   type of training like that.

23           JUDGE CORDELL:  Got it.

24           So the meeting where she was -- got this

25   information, was surprised, what meeting -- when does --


CONFIDENTIAL                    CSM 00389

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    tell me about that meeting -- when it was and who was

2    there.

3             MR. AENLLE:  It was one of the executive-level

4    meetings.

5             JUDGE CORDELL:  But who was there?

6             MR. AENLLE:  So the -- the former undersheriff

7    and former assistant sheriff.

8             JUDGE CORDELL:  And you?  Were you there?

9             MR. AENLLE:  Of course.  Of course, yeah.

10            JUDGE CORDELL:  So you're -- okay.

11            And so that would have been -- okay.  And the

12   sheriff, obviously.

13            So do you know who told her, "This is scheduled

14   for October"?

15            MR. AENLLE:  I believe it was the assistant

16   sheriff, (unintelligible), yeah.

17            JUDGE CORDELL:  Got it.  Okay.  Thank you for

18   clarifying that.

19            MR. AENLLE:  Yeah.  My pleasure.

20            JUDGE CORDELL:  Have you ever disparaged or

21   said or bad-mouthed any sworn personnel?  Like calling

22   them names, the -- you know, that's about it.  Have you

23   ever done that?

24            MR. AENLLE:  Calling people names?

25            JUDGE CORDELL:  Or putting them down.  You



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

78

TRANSCRIPT OF RECORDING                                09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    know, just --

2             MR. AENLLE:  No.  No.  I'm not putting anybody

3    down.

4             JUDGE CORDELL:  Okay.  Have you ever been or

5    are you now the director of or running the corrections

6    operation?

7             MR. AENLLE:  No, ma'am.

8             JUDGE CORDELL:  You've never, ever been in

9    charge of corrections?

10            MR. AENLLE:  I've never been in charge of

11   corrections, ma'am.

12            JUDGE CORDELL:  And you've never told

13   anybody --

14            MR. AENLLE:  I --

15            JUDGE CORDELL:  Sorry.  Go ahead.

16            MR. AENLLE:  I've helped -- I help -- I help

17   the sheriff and undersheriff to make sure that

18   information doesn't get lost.  So I -- I -- I inform

19   them.  I -- I share information just to make sure

20   everybody's aware, but I don't run any facilities.  I

21   don't run any correction facilities.

22            JUDGE CORDELL:  So you've never told --

23            MR. AENLLE:  I run the departments that I'm

24   assigned.

25            JUDGE CORDELL:  So you've never told anyone,



**TALTY COURT REPORTERS, INC.**                         79
taltys.com - 408.244.1900

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1   "I'm -- I'm running corrections now"?

2            MR. AENLLE:  No, ma'am.

3            JUDGE CORDELL:  Okay.  Have you ever gained

4   access to and searched an electronic device of any sworn

5   personnel?

6            MR. AENLLE:  I'm sorry?

7            JUDGE CORDELL:  Have you ever gained access to

8   and then searched electronic device of a sworn

9   personnel?

10           MR. AENLLE:  No.  And I don't -- and to be

11  clear, can you -- are we talking about -- what are we

12  talking about here?

13           JUDGE CORDELL:  I'm talking about either a

14  phone or a laptop.

15           MR. AENLLE:  No.

16           JUDGE CORDELL:  Have you ever gained access to

17  and searched the electronic device of a sworn personnel

18  after the person left the Sheriff's Office?

19           MR. AENLLE:  I was instructed to collect the

20  things and by the undersheriff to go ahead and have ISD

21  process it so we can wipe it and reassign the equipment.

22           JUDGE CORDELL:  Can you tell me --

23           MR. AENLLE:  I did not search --

24           JUDGE CORDELL:  I'm sorry.  Go ahead.

25           MR. AENLLE:  But I did not search any devices



**TALTY COURT REPORTERS, INC.**                            80
taltys.com · 408.244.1900

CONFIDENTIAL                      CSM 00392

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    at all whatsoever.

2            JUDGE CORDELL:  So when you said "ISD," what is

3    that?

4            MR. AENLLE:  It's -- it's the County's official

5    IT department.

6            JUDGE CORDELL:  Got it.

7            MR. AENLLE:  It handles all our stuff.

8            JUDGE CORDELL:  I --

9            MR. AENLLE:  It's a process.  I go through my

10   IT department.  I am the director, the DSU of the IT

11   department.  So I give them the equipment, just like

12   we've done in the past, and they do what they need to

13   do, and then they get cleared, and they get reissued.

14           JUDGE CORDELL:  Have you ever given a directive

15   not for an -- for a phone and a laptop from an

16   officer -- from a sworn personnel who has left -- have

17   you ever given a directive to anyone to say, "Give

18   me" -- you.  That is you, Mr. Aenlle -- "the phone and

19   the laptop"?

20           MR. AENLLE:  No, ma'am.

21           JUDGE CORDELL:  Okay.  Have you -- and I'm --

22   I'm -- I'm going to use a name here.

23           MR. AENLLE:  Yes.

24           JUDGE CORDELL:  Specifically, have you ever

25   requested that the phone and the laptop of Chris Hsiung,



**TALTY COURT REPORTERS, INC.**                              81
taltys.com - 408.244.1900

CONFIDENTIAL

1    who was the undersheriff who left -- have you ever

2    directed that you be given his two -- those two devices?

3         MR. AENLLE:  No, not to my recollection.

4    Not -- not at all.

5         JUDGE CORDELL:  Have you ever looked into Chris

6    Hsiung's cell phone after he left?

7         MR. AENLLE:  Not that I can recall.  There's

8    nothing I would look in there for (unintelligible).

9         JUDGE CORDELL:  Okay.  No problem.

10        Have you ever -- ever -- inquired about any

11   private conversation that Chris Hsiung may have had with

12   East Palo Alto Police Chief?

13        MR. AENLLE:  Can you repeat that again.

14        JUDGE CORDELL:  Sure.

15        Have you ever inquired about a conversation

16   that Chris Hsiung, the former undersheriff, had with the

17   Chief of East Palo Alto Police Department?

18        MR. AENLLE:  Oh, absolutely.  I had a

19   conversation with Chris Hsiung.

20        JUDGE CORDELL:  And can you please tell me

21   about that.

22        MR. AENLLE:  "Chris, I heard that you're saying

23   not so nice things about me; that you're claiming that

24   you left the Sheriff's Office because of me."

25        And he basically told me, "No, Victor.  That's



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

82

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    not true.  I didn't leave because of you."

2          JUDGE CORDELL:  And when you called -- I'm not

3    going to make any assumptions.

4          MR. AENLLE:  Yeah.

5          JUDGE CORDELL:  Either he called you or you

6    called him.  I don't know.

7          MR. AENLLE:  I called him.

8          JUDGE CORDELL:  All right.  And did you -- did

9    you call him and ask him about speaking with the Police

10   Chief in East Palo Alto?

11         MR. AENLLE:  No.  He already knew.  I just

12   called him and said, "I understand that you're not

13   saying nice things about me."  We had a nice talk.  He

14   understood.  He agreed.

15         He said, "Hey, this is not between us.  We

16   don't have to say that."  He -- he was upset that he

17   thought I was saying something about him.  And we

18   cleared -- cleared it up, and that was it.

19         JUDGE CORDELL:  Did you --

20         MR. AENLLE:  But, yes, I called him and had a

21   conversation with him.

22         JUDGE CORDELL:  Got it.

23         Did you know that he was meeting with the

24   police chief of East Palo Alto?

25         MR. AENLLE:  Yes.  I -- I knew he was



**TALTY COURT REPORTERS, INC.**                              83
taltys.com - 408.244.1900

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1   meeting -- that he had met with him.

2              JUDGE CORDELL:  How did you know that?

3              MR. AENLLE:  I don't recall how I learned that.

4              JUDGE CORDELL:  Okay.

5              MR. AENLLE:  I don't recall.

6              JUDGE CORDELL:  That's -- that's okay.  I

7   mean --

8              MR. AENLLE:  Some -- one of the people in -- in

9   East Palo Alto.

10             JUDGE CORDELL:  I'm sorry.  I didn't

11  understand.

12             MR. AENLLE:  It could have been one -- one of

13  the employees in East Palo Alto.

14             JUDGE CORDELL:  Who did what?

15             MR. AENLLE:  That mentioned that to me; that

16  somebody was not talking very nicely about me.

17             JUDGE CORDELL:  Okay.  And so your purpose

18  in -- in calling Chris was -- was what?

19             MR. AENLLE:  Have a conversation with him, just

20  clear it up, see if he really had a problem with me, see

21  if there was anything I could do.  Because it's not -- I

22  didn't -- Chris and I didn't have a relationship like

23  that.  I'd work -- we had our differences, but as

24  people, we got along just fine.

25             JUDGE CORDELL:  Okay.  But he had left; right?



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

84

TRANSCRIPT OF RECORDING                               09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

 1   He had left your office.
 2          MR. AENLLE:  Yes, he had left.  He was no
 3   longer an employee, yeah.
 4          JUDGE CORDELL:  Okay.  So have you ever --
 5   okay.  Let me just -- I'm just -- I'm going through my
 6   list.  So just bear with me here.
 7          MR. AENLLE:  Sure.
 8          JUDGE CORDELL:  I want to make sure every
 9   concern, every allegation that I'm aware of that you're
10   aware of.  That's why I'm -- I'm doing -- I'm doing
11   this, and I appreciate your patience.
12          MR. AENLLE:  Yeah.
13          JUDGE CORDELL:  Have -- do you know whether or
14   not Sheriff Corpus called the Police Chief of East Palo
15   Alto?
16          MR. AENLLE:  Ma'am, I'm not aware of what calls
17   the sheriff made or didn't make.  I know -- I know that
18   they're friends, but I don't know how much they talk or
19   so forth.
20          JUDGE CORDELL:  Okay.  All right.
21          Have you ever authored any memos with the
22   sheriff's letterhead on it that -- under her name but
23   you wrote it?  Have you ever done that?
24          MR. AENLLE:  All the memos in the office have
25   the letterhead of the sheriff.

CONFIDENTIAL                CSM 00397

1          JUDGE CORDELL:  Right.  Have you --

2          MR. AENLLE:  Can you be more specific.

3          JUDGE CORDELL:  Sure.

4          My question is are you the one that wrote the

5   memos and --

6          MR. AENLLE:  Typically, the --

7          JUDGE CORDELL:  In other words, it went out

8   under the sheriff's name, but actually you're the one

9   who wrote them.  Have you ever done that?

10          MR. AENLLE:  Most of the memos goes -- go out

11   by the admin assistants.  Do I sometimes review, edit

12   things for anybody in the executive teams?  Yes.  But

13   not -- I do not insert my information or my authority

14   over them.

15          JUDGE CORDELL:  Got it.

16          Have you ever initiated the writing of a memo

17   and then had it sent out under the sheriff's name?  Now,

18   the sheriff may have known about it.  That's not what

19   I'm -- I'm not saying you're sneaky or doing anything

20   without her knowing.  But have you ever done that?  In

21   other words, you're the author.  You wrote it, and it

22   went out under the sheriff's name.

23          MR. AENLLE:  Ma'am, anything that I write or

24   edit or whatever is at the sheriff's directions or her

25   telling me what to put on it or a dictation that I take



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

86

CONFIDENTIAL                    CSM 00398

TRANSCRIPT OF RECORDING                                  09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1   or something like that.  It's not authored by me.  It's

 2   not my ideas.  It's not authored by me.

 3              JUDGE CORDELL:  Okay.

 4              MR. AENLLE:  So when I hear "authored," I --

 5   it -- it is my assertion or influence or ideas, and my

 6   answer would be, "No."

 7              JUDGE CORDELL:  Right.  Okay.

 8              So there was a -- an overtime -- a memo that

 9   went out on the sheriff's letterhead about overtime

10   that --

11              MR. AENLLE:  Yes, ma'am.

12              JUDGE CORDELL:  -- caused a big carfuffle

13   because --

14              MR. AENLLE:  Yes.

15              JUDGE CORDELL:  -- then the DSA got upset and

16   everything.

17              Did you write that memo?

18              MR. AENLLE:  I did not write it.  I helped edit

19   it and -- and grammar.  And it was not only me.  It was

20   the former assistant sheriff, undersheriff, and myself.

21   We worked under a Google document at the direction of

22   the sheriff just cleaning up.  It had outdated language

23   like "jail."  It referred to "jail" as opposed to

24   "correctional facility."  It was -- it was a bunch of

25   different things that she wanted to make simple.  It was
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

87

CONFIDENTIAL                    CSM 00399

1    a five-page overtime policy, and she wanted to clean it

2    up.  She instructed the undersheriff, former assistant

3    sheriff, myself to look at this and clean it up and --

4    and put it together.

5              JUDGE CORDELL:  But did --

6              MR. AENLLE:  The description that I authored

7    that paper and I -- I mean, it -- it's wrong.

8              JUDGE CORDELL:  Okay.

9              MR. AENLLE:  And untrue.

10             JUDGE CORDELL:  Okay.  Got it.  So noted.

11             Have you taken control ever or now of Sheriff

12   Corpus's calendar?  Do you control it?

13             MR. AENLLE:  Not at all.  I can -- I can add

14   and -- and do some things.  And when she needs me, I

15   make sure that, you know, she -- she doesn't forget

16   certain meetings because she's got a lot on her plate.

17   But her admin assistant has a hundred percent and -- and

18   primary function of her schedule.

19             JUDGE CORDELL:  Got it.

20             Do you have the access code to Sheriff Corpus's

21   cell phone?

22             MR. AENLLE:  No.

23             JUDGE CORDELL:  Have you ever texted from her

24   phone without letting anyone know that you were texting

25   it and not the sheriff?



**TALTY COURT REPORTERS, INC.**                    88
taltys.com · 408.244.1900

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1              MR. AENLLE:  Ma'am, I would never do that, and
 2    the sheriff knows that.  And -- and -- and that's -- no.
 3    The answer is, "No."
 4              JUDGE CORDELL:  No problem.  No problem.
 5              Have you ever attempted to change the
 6    resignation of a sworn officer to a firing of that
 7    officer?
 8              MR. AENLLE:  No.
 9              JUDGE CORDELL:  And I'll be specific.  I'm
10    talking about Chris Hsiung.
11              Did he resign, or did he -- was he fired?
12              MR. AENLLE:  My understanding is -- my
13    understanding is that he resigned.  What Chris told me
14    is, "I beat her to the punch by two -- you know, by a
15    couple hours," or something like that.  I did not ask.
16    I didn't inquire about the sheriff.  It was not my
17    business.  She -- she can fire and hire whoever she
18    wants.  It was not my role.  I learned from that from --
19    from -- from Chris Hsiung.
20              JUDGE CORDELL:  Got it.
21              So you never said to anybody, "He was fired.
22    It's not 'resigned.'  He was fired"?
23              MR. AENLLE:  No.
24              JUDGE CORDELL:  Got it.
25              Okay.  Moving right along.  And, again, I
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

89

CONFIDENTIAL                    CSM 00401

TRANSCRIPT OF RECORDING                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    appreciate your patience.

2            Have you asked anyone, sworn or civilian, in

3    the office if they have been questioned by me?

4            MR. AENLLE:  Yes.

5            JUDGE CORDELL:  And can you tell me who you

6    asked?

7            MR. AENLLE:  Former Assistant Sheriff Monaghan.

8            JUDGE CORDELL:  Anyone else?

9            MR. AENLLE:  No, not that I can think of.

10           JUDGE CORDELL:  And why did you ask him why --

11           MR. AENLLE:  It was in passing.  I was actually

12   kind of glad.  We were having a short talk -- a small

13   talk with the undersheriff, non-confrontational.  I

14   said, "Hey, Ron, have you -- have you -- have you talked

15   to her?"

16           And he's like, "Yeah, I have."

17           I'm like, "Whoa.  Wow.  Great."

18           And then I went to the bathroom.  That was it.

19   I didn't ask, "What did you tell her?"  I didn't ask,

20   "What was it about?"  Zero.  I didn't ask any further

21   questions at all whatsoever.  I was kind of glad to hear

22   that somebody on my team that had seen what I've done

23   and not done here at least had a chance to speak to you.

24           JUDGE CORDELL:  In that conversation with then

25   Assistant Sheriff Monaghan, did you say to him, "Why



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

90

1  didn't you tell us"?

2          MR. AENLLE:  No.  I said, "I thought you would

3  tell me."

4          And he goes, "No.  I thought it was implied."

5          I'm like, "Oh, okay."  That was it.

6          JUDGE CORDELL:  And the reason --

7          MR. AENLLE:  He said, "I thought it was

8  implied.  I thought it was" --

9          JUDGE CORDELL:  Sure.

10          MR. AENLLE:  -- "kind of a given," or something

11  like that.  That's what he said.

12          I said, "Okay."  That was it.

13          JUDGE CORDELL:  So the reason you asked him was

14  why?

15          MR. AENLLE:  Curiosity, ma'am.  There was a lot

16  of rumors in the office.  There have been a lot of

17  rumors for quite some time now, and, you know, I'm sure

18  the rumors got blown up, and -- and it was more of a

19  curiosity than anything else.  There was no malice

20  behind it.  I wasn't upset.  It was -- it was literally

21  a couple words, and I kept going about my business.  No

22  big deal.  I was kind of glad that he got interviewed by

23  you.

24          JUDGE CORDELL:  Got it.

25          So it was curiosity, not about retaliation?



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900                                    91

CONFIDENTIAL                    CSM 00403

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1              MR. AENLLE:  Oh, ma'am, absolutely not.

2              JUDGE CORDELL:  Okay.

3              MR. AENLLE:  I -- I -- I just want to make that

4    clear.  Absolutely not.

5              JUDGE CORDELL:  Okay.

6              MR. AENLLE:  And -- and my demeanor was very

7    calm, and I really just -- I -- I was -- actually,

8    inside I was actually kind of glad.  I'm like, "Okay.

9    Good.  At least she talked to you."

10             Because the information that was coming back to

11   me, ma'am, to be honest, is that you were only talking

12   to the people that you were instructed to talk to; that

13   there was other people that reached out to you, captains

14   and manager and people to -- that wanted to be

15   interviewed and -- and share their experience with me,

16   and they never got a call back.  And -- and that's some

17   of the rumors that were taking place.

18             JUDGE CORDELL:  Got it.

19             When you had the conversation with Ryan

20   Monaghan --

21             MR. AENLLE:  Yes.

22             JUDGE CORDELL:  -- was -- was the sheriff there

23   during that conversation?

24             MR. AENLLE:  The undersheriff was there, ma'am.

25             JUDGE CORDELL:  But the sheriff was not?



**TALTY COURT REPORTERS, INC.**                            92
taltys.com · 408.244.1900

CONFIDENTIAL                    CSM 00404

TRANSCRIPT OF RECORDING                                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1           MR. AENLLE:  No.  Not at all.

2           JUDGE CORDELL:  Did you -- did you tell the

3    sheriff later that you had asked Ryan and what Ryan

4    said, he had talked to me?  Did you tell her that?

5           MR. AENLLE:  Yeah.  I think in a conversation

6    with the undersheriff and sheriff, I said, "Oh."  I

7    mentioned Ryan.  "He got interviewed."

8           It was like, "Oh, okay.  Cool."

9           That was it.  It was not a big discussion.  It

10   was not -- actually, I take it back.  I think it was

11   Ryan that told her, and then she kind of mentioned that

12   Ryan mentioned it to her.

13          I said, "Yeah, he was."

14          JUDGE CORDELL:  Got it.  Okay.

15          MR. AENLLE:  Yeah.

16          JUDGE CORDELL:  Now, so --

17          MR. AENLLE:  Yeah.  Ryan -- Ryan was the one

18   that told her.

19          JUDGE CORDELL:  Got it.

20          A subject that's, you know, not one of your

21   favorites, but can we talk for just a bit about ████

22   ████████ please?

23          MR. AENLLE:  Yes, please.  Absolutely.

24          JUDGE CORDELL:  All right.  So --

25          MR. AENLLE:  And, Judge Cordell, I'm open to



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00405

TRANSCRIPT OF RECORDING                                      09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1   talk whatever it is you want to talk about.  There's
 2   nothing I'm hiding, and -- and I really do want to clear
 3   my name.
 4            JUDGE CORDELL:  I appreciate it.
 5            ███████████   Has she -- after an interaction
 6   with you, she filed a complaint with HR.  She's no
 7   longer there at the Sheriff's Office.  Her complaint is
 8   that you, without any evidence at all, accused her of
 9   posting criticism, bad stuff, about the sheriff, posting
10   online, and -- and that your doing this was really
11   retaliation because she was leaving, and you didn't
12   really want her to be leaving the position.
13            Can you talk to me about that, your -- your --
14   your side of this.
15            MR. AENLLE:  I would love to, ma'am.
16            That never happened.  And -- and just to back
17   up, ██████ is a wonderful person.  I -- she was probably
18   one of the best admin assistants that I had while here.
19   I consider her a friend.  Over the top.  I can't give
20   her enough.  I don't know who put her up to this or why
21   she did this because this is completely false, and I'll
22   share with you why.
23            In my computer, I have a folder saved with
24   1,000 emails that I was going to make available to you
25   of how wonderful of a boss and how incredible I've been
```



CONFIDENTIAL                    CSM 00406

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

 1   with her.  A thousand emails.  On my phone, I also

 2   wanted to share with you -- let me back up and -- and

 3   tell you.

 4           I was in my office.  I think it was like the

 5   last day she was going to be there, and -- and she came

 6   in.  I'm like, "Hey, ███████ check out this email -- this

 7   text."  It was that lady from -- from one of the

 8   organizations that said, "Hey, it's a good thing that,

 9   you know, your assistant is leaving because she's

10   talking pretty -- pretty bad about you and the sheriff."

11           And I'm like, "What?"

12           And literally my text says, "No, not ███████

13   Impossible."  It's in my phone.

14           So she came in.  I'm like, "Hey, I just want to

15   make you aware that whoever these silly people are that

16   are posting things online, like the comments on the

17   article, they're -- they're making it sound like you."

18           But I told this lady, "No way.  Not █████   I

19   don't believe it for one second."  That was it.  That

20   was it.

21           And like -- and she made a comment like, "God,

22   people are horrible, Victor."

23           I'm like, "Yeah, I know."

24           And then she left my office, and then she went

25   to her office or whatever.  A short time later, I



**TALTY COURT REPORTERS, INC.**                              95
taltys.com - 408.244.1900

CONFIDENTIAL                        CSM 00407

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1   stopped by her office because I wanted her to mentor one

2   of the intern -- interns to cover until I got a

3   full-time person, and I had another chat with her.  I

4   sat on the chair.  And then at that time, I could see

5   that she was -- had a little bit of watery eyes, and she

6   was crying.

7          I'm like, "████ don't -- don't worry about

8   it.  I -- I -- just -- just don't even -- don't even

9   think twice about it.  People are like that.  I -- not

10  for a moment did I even think it was you."

11         And then she just -- she goes, "I know, Victor,

12  but it's hard."

13         And -- and I left there.  She was crying a

14  little bit.  ████ tends to -- just to put things in

15  con- -- in context, ████ a wonderful person, but she

16  does run a little bit high on anxiety.

17         For example, when the sheriff was -- was doing

18  a "Shop with a Cop," ████ was in charge of the

19  decorations for the building with one of our other

20  admins here.  And when the sheriff went by to visit it

21  and she looked at it, she goes, "Oh, no.  It's -- I -- I

22  really" -- she didn't like it.  She wanted more

23  decorations.

24         ████ went into the bathroom and -- and started

25  crying.  And I was later told by the other admin that



**TALTY COURT REPORTERS, INC.**                            96
taltys.com - 408.244.1900

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    she didn't eat or sleep for three days because of that.

2    So she's a little bit sensitive; right?

3          So I -- I left her office.  Everything was

4    fine.  I came in my office, and then I hear that she's

5    not doing well and she's crying or whatever.

6          Former Assistant Sheriff Monaghan apparently

7    went to go see her, which I don't know why he would do

8    that, but he went to go see her.  And then he came by my

9    office literally after that, and he said, "Hey, Victor,

10   ██████ is really upset," whatever, "but I told her just

11   to come and talk to you."

12         That's directly from Sheriff -- Assistant

13   Sheriff Monaghan.  "But I told her to come talk to you."

14         So if -- if -- if the allegations that I

15   berated her and I screamed and whatever were true, why

16   would he ask her to come and talk to me?  It's

17   impossible.

18         So she did come back to my office and talked to

19   me, and -- and she was upset.  And I'm like, "██████ I

20   never thought about it again.  I wish you didn't take

21   this so hard.  I'm really sorry, but you don't have any

22   issues with me.  I never believed it."

23         So I want to read to you, Judge Cordell --

24         JUDGE CORDELL:  Uh-huh.

25         MR. AENLLE:  -- two -- two of the texts that I



CONFIDENTIAL                    CSM 00409

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1   saved on my phone that I shared with -- with Jim

2   Touchstone because he asked me to look through some

3   texts, and I never even thought about it.

4           So on March, 2021, at 2- -- at 12:51 -- so

5   after the alleged incident in her office -- sorry.  I

6   take it back.  April 3rd at 1:44 PM.  That was her last

7   day there.  After the incident in her office or

8   whatever -- this is closer to the afternoon right before

9   she was leaving because she got off at 3:00 or 2:00 or

10  whatever it was.

11          She says, "Are you in your office?"

12          And I said, "Yes, I'm here.  You want to" --

13  "I heard you want to stop by."

14          And she said, "Yeah.  It's okay.  I just needed

15  to calm down a little bit.  I don't know why that person

16  would say those things.  I just needed to re- --

17  reiterate that those are total lies, and I don't

18  appreciate her saying them."

19          And I said, "█████ forget it.  Stop by.  Come

20  see me," or whatever I said.

21          Jim then asked me, "What about a couple weeks

22  before?"

23          And I found another text --

24          MR. TOUCHSTONE:  Hey --

25          MR. AENLLE:  -- in which she said --



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900                                      98

TRANSCRIPT OF RECORDING                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1              MR. TOUCHSTONE:  Hey, let me interrupt you for

2    a minute, Victor.  Please don't discuss our

3    conversations.

4              JUDGE CORDELL:  Right.

5              MR. TOUCHSTONE:  I mean --

6              JUDGE CORDELL:  Correct.

7              MR. TOUCHSTONE:  -- discuss --

8              JUDGE CORDELL:  Yes.

9              MR. TOUCHSTONE:  -- what you have in your phone

10   without reference to what you and I may have discussed.

11   Okay?

12             MR. AENLLE:  Yes.  I'm sorry about that, Jim.

13   I apologize.

14             MR. TOUCHSTONE:  No.  That's fine.

15             MR. AENLLE:  I went back on my -- on my texts,

16   and I found -- there's many of them, but one

17   specifically is two weeks before is when she had to give

18   me her -- her two weeks' notice.

19             And she said, "I'm sorry I had to email that

20   letter.  I was going to give it to you in our meeting

21   yesterday.  I know there's lots to discuss, and I will

22   do whatever possible to make this perfect -- make this

23   the perfect transition for you," exclamation mark.

24             And I said, "I understand."

25             And then she texted, "You've always been kind



**TALTY COURT REPORTERS, INC.**                    99
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00411

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    to me.  I will never forget that."

2           I would be more than happy to share those texts

3    with you.

4           JUDGE CORDELL:  Sure.  Absolutely.  Absolutely.

5    And maybe Mr. Touchstone can forward them to me,

6    whatever.  That's fine.  Thank you.

7           So anything else you want to add about ████

8           MR. AENLLE:  Nothing.  I think she's wonderful.

9    I'm -- I'm really surprised that she did this.  I don't

10   know what -- what the motive is behind it.  I've never

11   had anything bad with her.  I care deeply about her.  I

12   thought she was great, and I really enjoyed my time with

13   her, honestly.  It was -- I was very saddened to -- to

14   really see this because it -- I've never been mean to

15   her.  I never raised my voice.  I never accused her

16   of -- of -- that it was her.  Not at all whatsoever.  I

17   only made her aware of it just because I know that she's

18   sensitive and if she learned that from somebody else or

19   somebody said to her, I knew it was going affect her.

20   So I wanted to give her the heads-up.  But at no time

21   did I accuse her of anything, ma'am.

22          JUDGE CORDELL:  Yeah.  So that was really --

23   the last question I want to ask about that incident is

24   that you got a text, and you knew --

25          MR. AENLLE:  Yes.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

100

CONFIDENTIAL

CSM 00412

TRANSCRIPT OF RECORDING                                        09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1           JUDGE CORDELL:  -- there was no merit to it.

2    Why would you tell her at all?

3           MR. AENLLE:  Because she's my friend.  I wanted

4    to share it with her.  That's -- that's -- that's the

5    only reason why.  Because she was going to find out

6    anyways because, you know -- ma'am, the Sheriff's Office

7    is -- is a tunnel, I mean, of rumors and everything

8    else.  Once something is found out, it literally takes

9    seconds to fly through the entire office, whether it's

10   good or bad, ma'am.

11          JUDGE CORDELL:  Got it.

12          MR. AENLLE:  Normally the bad goes a little

13   further and faster.

14          JUDGE CORDELL:  Right.

15          Did you have any involvement in the firing of

16   Ryan Monaghan?

17          MR. AENLLE:  Not at all, ma'am.  Not at all.

18          JUDGE CORDELL:  Did you advise -- did you

19   advise the sheriff that she should fire him?

20          MR. AENLLE:  No.  The sheriff makes her own

21   decisions on firing and hiring.

22          JUDGE CORDELL:  Did she come to you for advice

23   about whether or not she should fire Ryan Monaghan?

24          MR. AENLLE:  That's not -- she -- the sheriff

25   does not seek advice of me about firing people.



**TALTY COURT REPORTERS, INC.**                              **101**
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00413

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1              JUDGE CORDELL:  So that answer is, "No"?

2              MR. AENLLE:  The answer is, "No."

3              JUDGE CORDELL:  Got it.

4         Have you ever been involved in changing

5    assignments of sworn personnel as retaliation?

6              MR. AENLLE:  I have never retaliated in any

7    form of anybody in -- in the office at all.

8              JUDGE CORDELL:  Okay.

9              MR. AENLLE:  Ma'am, I -- and just to put that

10   in context, I know what it feels like, ma'am.  When --

11   when I supported the sheriff and initially came out, the

12   information that I was going to be helping her with the

13   campaign, I was kicked out of the range staff after nine

14   years of -- of working for free, and I was one of the

15   top trainers.  I'm a POST-certified trainer.  I was

16   kicked out of there.  And -- and -- and the sheriff at

17   that time told -- told the sergeant, "He needs to be

18   shut down."  If that's not retaliation, I don't know.

19             So I know what -- I know what it feels like,

20   and -- and that's not the kind of person I am, which a

21   lot of people here -- they've done a lot of bad things.

22   Neither the sheriff or myself at any given point have

23   retaliated against anybody.  They've actually been

24   promoted.

25             One of the things I admire about the sheriff



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900                                  102

CONFIDENTIAL                    CSM 00414

TRANSCRIPT OF RECORDING                              09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    the most is -- is that she separates, and she's very

2    good to people.

3              JUDGE CORDELL:  Have you -- do you have an

4    opinion about the firing of Ryan Monaghan?  And, again,

5    if you don't want to share it with me, it's fine.  I'm

6    just curious, given what you've just told me about

7    retaliation, what your view is about his firing.

8              MR. TOUCHSTONE:  Well, I think an opinion --

9              MR. AENLLE:  My view is --

10             MR. TOUCHSTONE:  Excuse me.  I'm going to

11   interrupt.

12             JUDGE CORDELL:  Sure.

13             MR. TOUCHSTONE:  I think any opinion that

14   Victor may have on this issue is irrelevant to these

15   proceedings.  Frankly, that is the sheriff's decision,

16   as I pointed out in a letter to County Counsel today.

17             JUDGE CORDELL:  I -- I haven't -- I didn't know

18   of your letter.  So --

19             MR. TOUCHSTONE:  Yeah.  Well, Victor --

20             JUDGE CORDELL:  -- I don't want to -- I don't

21   want to -- absolutely, I don't want to intrude into

22   areas that -- you know, that border that.  So no

23   problem.

24             Don't answer that one, Mr. Aenlle.  Don't even

25   answer it, and we'll move on.  And I'm getting -- we're



**TALTY COURT REPORTERS, INC.**                          103
taltys.com - 408.244.1900

CONFIDENTIAL                   CSM 00415

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    getting close.  So just bear with me.

2              Do you wear a badge?

3              MR. AENLLE:  Yes, ma'am.

4              JUDGE CORDELL:  And can you please describe the

5    badge.

6              MR. AENLLE:  It is a Sheriff's Office badge

7    with a rocker that says "Chief of Staff."

8              JUDGE CORDELL:  Okay.  And does -- and can you

9    tell me what color it is.

10             MR. AENLLE:  The same color as all the other

11   badges.  It's a gold badge.

12             JUDGE CORDELL:  Gold badge.

13             And who issued you the badge?

14             MR. AENLLE:  The sheriff issues badges, ma'am.

15             JUDGE CORDELL:  So the sheriff directed that

16   you have that badge?

17             MR. AENLLE:  Correct.

18             JUDGE CORDELL:  Okay.  And do -- isn't it --

19   and, again, I'm just trying to get clarification on

20   things.  It is my understanding that all sworn personnel

21   have gold badges.

22             Is that true?

23             MR. AENLLE:  That is true.

24             JUDGE CORDELL:  Right.

25             MR. AENLLE:  That's a true statement.


CONFIDENTIAL                    CSM 00416

TRANSCRIPT OF RECORDING                                09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1           JUDGE CORDELL:  Right.

2           And yours -- does your gold badge look like the

3     badge of -- of a sworn personnel?

4           MR. AENLLE:  Can I bring some -- a little bit

5     more clarity into this?

6           JUDGE CORDELL:  Please.

7           MR. AENLLE:  So all sworn personnel and

8     civilian staff have gold badges.  I have directors that

9     work way below me that have a gold badge.  So, again,

10    this is a misconception.  And I'm going to take it one

11    step further because in this office, I'm a little bit of

12    an anomaly.  I am still a sworn peace officer under

13    this -- in this department.  I'm still listed -- in the

14    roster, I am still listed under POST as a sworn peace

15    officer with 24-hour authority.  All the reserves in

16    this department -- every reserve as a Level I has a gold

17    badge.  The same gold badge every -- the full-timers

18    have.  Same gold badges.  Gold.  We only have maybe one

19    or two reserves that have silver badges because they're

20    Level IIs.  That's it.

21          JUDGE CORDELL:  Got it.  Got it.

22          MR. AENLLE:  So -- so in this department, we

23    have civilian directors that have gold badges.  We have

24    reserves that have gold badges.

25          The badge thing is -- is there's no staining



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

105

CONFIDENTIAL                          CSM 00417

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    to it.  Many agencies -- and I'll go back to San

2    Francisco PD.  Civilian staff, they have badges just

3    like the full-timers because they're assigned by the

4    Chief because it's the way you identify yourself.

5            The sheriff can assign whatever badge she wants

6    to whomever, and she has the ability to do that.  It's

7    very clear.  So, yes, I wear a badge that was -- that I

8    was assigned to by the sheriff.  It signifies that I'm

9    the chief of staff in the office.  My director from the

10   forensic lab has that badge, and she's the director of

11   the -- of the forensic lab, and her badge says that.  So

12   I don't understand -- I'll stop there.  I hope that

13   was -- that was helpful.

14           JUDGE CORDELL:  Absolutely helpful.

15           And you said you are sworn personnel.  So you

16   have a civilian position --

17           MR. AENLLE:  Correct.

18           JUDGE CORDELL:  -- right?

19           And you said you are also sworn personnel

20   because you are reserve.  Is that -- am I --

21           MR. AENLLE:  Correct, ma'am.

22           JUDGE CORDELL:  -- understanding?

23           MR. AENLLE:  I'm still a -- I'm still listed as

24   a reserve in this department, ma'am --

25           JUDGE CORDELL:  Right.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

106

CONFIDENTIAL                    CSM 00418

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1              MR. AENLLE:  -- as a designated Level I

2    reserve.

3              JUDGE CORDELL:  Right.  So if you're a

4    designated Level I reserve, your -- you -- to be a

5    reserve, this -- again, basic understanding here is that

6    that's different from your being the executive director.

7    That's two different things --

8              MR. AENLLE:  That's two different --

9              JUDGE CORDELL:  -- correct?

10              MR. AENLLE:  -- things, ma'am, yeah.

11              JUDGE CORDELL:  Right.

12              MR. AENLLE:  Two different things.

13              JUDGE CORDELL:  Got it.

14              And so you are -- you are both?  You are a

15    reserve, and you are executive director/chief of staff?

16              MR. AENLLE:  Yes.  At the reserve, I don't do

17    regular duties reserves any longer because of my

18    position; right?  But I do not lose my police powers;

19    right?  I'm still listed -- I'm still -- I still have my

20    post is what it's called, yeah.

21              JUDGE CORDELL:  Okay.  Do you carry a gun, a

22    firearm?

23              MR. AENLLE:  Yes.

24              JUDGE CORDELL:  And do you carry it openly or

25    concealed?



**TALTY COURT REPORTERS, INC.**                              107
taltys.com - 408.244.1900

CONFIDENTIAL                CSM 00419

TRANSCRIPT OF RECORDING                              09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1           MR. AENLLE:  No, ma'am.  I carry a concealed --
2    I wear office attire every day.  I'm wearing a suit
3    right now, and that's what I normally wear every single
4    day.
5           JUDGE CORDELL:  Uh-huh.  All right.
6           MR. AENLLE:  I only wear my uniform on special
7    occasions, parades or at the direction of the sheriff,
8    depending on what we're involved in, and I'll wear my
9    regular uniform that I was assigned by this office, and
10   I carry a gun that's assigned to me by the range by this
11   office initially.
12          JUDGE CORDELL:  When you are in your street
13   clothes, do you carry a gun?
14          MR. AENLLE:  Yes.
15          JUDGE CORDELL:  And do you carry it concealed,
16   or do you carry it openly?
17          MR. AENLLE:  Ma'am, always concealed.  Always.
18          JUDGE CORDELL:  Okay.
19          MR. AENLLE:  If I'm -- if I'm in professional
20   attire, always concealed, ma'am.  Always.  Most people
21   here in this department -- even my colleagues don't even
22   know I have a gun.  I've never -- ma'am, besides my
23   police power, I have a CCW in San Mateo County that I've
24   had since I was 24 years old.  I have a C- -- a BCSI,
25   which is the Bureau of Investigations.  I have a guard



TALTY COURT REPORTERS, INC.                          108
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00420

TRANSCRIPT OF RECORDING                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1    card.  I have an exposed permit card.  So if I wanted to
 2    carry exposed, I could.  I have a PI license, and I have
 3    a PPO.  I'm also a certified trainer, firearms, for
 4    VSIS.  I have every single license and permit that
 5    anyone could absolutely obtain.
 6              JUDGE CORDELL:  But you -- you don't -- do you
 7    have a permit for --
 8              MR. AENLLE:  I don't --
 9              JUDGE CORDELL:  Got it.
10              Do you have a permit for open carry?
11              MR. AENLLE:  I do.
12              JUDGE CORDELL:  And --
13              MR. AENLLE:  I don't use it.  Nobody does.  To
14    wear a gun openly is meant for if you're doing a
15    security detail or something like that --
16              JUDGE CORDELL:  Got it.
17              MR. AENLLE:  -- and you have a little sense of
18    security.  Do you know what I mean?
19              JUDGE CORDELL:  Right.  Yes.
20              MR. AENLLE:  But most people that have an
21    exposed card, unless they're in a uniform or something,
22    they will not carry it.
23              JUDGE CORDELL:  I understand -- yeah, I
24    understand it is unusual to have -- not a lot of people
25    have an open carry permit.
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

109

CONFIDENTIAL                    CSM 00421

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1          Do you --

2          MR. AENLLE:  Everybody -- everybody that --

3    that works on the security field at any higher level has

4    to have it, and what they do is they marry it with a

5    CCW, and that's been the -- the -- the standard in --

6    in -- in that industry.

7          JUDGE CORDELL:  You don't need, then, separate

8    approval or separate permit to open carry?

9          MR. AENLLE:  You do.  You do.  You have -- you

10   have to have it.  It has to go through BSIS, not -- not

11   through a Sheriff's Office or a CCW process, ma'am.

12         JUDGE CORDELL:  Got it.

13         So --

14         MR. AENLLE:  It's a DOJ.

15         JUDGE CORDELL:  So if someone said, "I saw

16   Victor Aenlle in street clothes and with a firearm

17   holstered right on his waist," would that be true?

18         MR. AENLLE:  Complete lie, ma'am.  Complete

19   lie.

20         JUDGE CORDELL:  And when you carry concealed in

21   street clothes, where is your weapon concealed?

22         MR. AENLLE:  On my left hip.  I'm left-handed.

23         JUDGE CORDELL:  So if someone so concealed --

24   and, again, this is again clarification for me because

25   I'm not a firearms person.



**TALTY COURT REPORTERS, INC.**
taltys.com · 408.244.1900                              110

CONFIDENTIAL                    CSM 00422

1            MR. AENLLE:  Yes.

2            JUDGE CORDELL:  If you are carrying a weapon

3    and it's on your waistband in a holster --

4            MR. AENLLE:  Yes.

5            JUDGE CORDELL:  -- and if your jacket is over

6    it, is that considered concealed?

7            MR. AENLLE:  Absolutely, ma'am.

8            JUDGE CORDELL:  Because you --

9            MR. AENLLE:  Your jacket, your shirt, your

10   vest, yes.

11           JUDGE CORDELL:  Got it.

12           As long as it can't be seen?

13           MR. AENLLE:  As long as it can't be --

14           JUDGE CORDELL:  Is that fair?

15           MR. AENLLE:  -- seen.  Correct.  Yeah.  Yeah.

16           JUDGE CORDELL:  So if someone said you were

17   carrying this firearm in a holster or on a waist and it

18   was not concealed -- you did not have a jacket on, for

19   example -- would that be true?

20           MR. AENLLE:  No, ma'am.

21           JUDGE CORDELL:  Got it.

22           MR. AENLLE:  That is -- that is the furthest

23   from the truth.  And it's even a liability; right?

24   Having a gun on your hip without, you know, being in a

25   uniform, it's a liability.  It's worth more than a



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

111

CONFIDENTIAL                    CSM 00423

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1   Rolex.  It's silliness.  It -- ma'am, I've never done
 2   that.  I never would.
 3                JUDGE CORDELL:  Do you -- do you carry -- and
 4   this is clarification.  Do you carry a concealed weapon
 5   in -- in headquarters when you're working as executive
 6   director and chief of staff?
 7                MR. AENLLE:  I carry a concealed weapon 24
 8   hours, 7.
 9                JUDGE CORDELL:  Got it.
10                Do you have a -- an ID card, sheriff's ID card?
11                MR. AENLLE:  Yes, I do.
12                JUDGE CORDELL:  And is it a sworn ID card?
13                MR. AENLLE:  It's an ID card from the office
14   that says I'm the chief of staff.
15                JUDGE CORDELL:  Right.  Does it have any
16   indication that you are a sworn personnel --
17                MR. AENLLE:  It has --
18                JUDGE CORDELL:  -- with (unintelligible)?
19                MR. AENLLE:  It has the LEOSA writing in the
20   back that allows you to carry; right?  And -- and all
21   reserves have that.  That's part of being a peace
22   officer.  You have the ability to carry.  It's called --
23                JUDGE CORDELL:  So there's --
24                MR. AENLLE:  -- LEOSA.
25                JUDGE CORDELL:  Right.  So there's something on
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

112

CONFIDENTIAL                    CSM 00424

1   the back of your ID card that says what?  That you can

2   carry a firearm --

3           MR. AENLLE:  It will have LEOSA, yeah.  It will

4   have, yes.

5           JUDGE CORDELL:  And I -- I interrupted you.  I

6   didn't quite hear what you said.

7           So on the back of the ID card, it says what?

8           MR. AENLLE:  "LEOSA."

9           JUDGE CORDELL:  And what does that mean?

10          MR. AENLLE:  It -- the ability to carry.

11          JUDGE CORDELL:  Got it.

12          Okay.  But that -- that's -- and do sworn

13  officers like a captain or lieutenant, their ID cards --

14  do they have the same thing on the back of theirs?

15          MR. AENLLE:  It's the same thing.  Anybody

16  that's -- that's qualified by -- by the State of

17  California, under 832 point whatever it is, has LEOSA,

18  has that.

19          JUDGE CORDELL:  Got it.

20          MR. AENLLE:  So whether -- whatever it is.

21  Because if you ever get stopped or whatever and you have

22  a gun on you, you have to have the little -- to have

23  that.

24          JUDGE CORDELL:  Got it.

25          Moving to another subject.  Have you earned --



CONFIDENTIAL                        CSM 00425

1    in fact, earned a PhD?

2          MR. AENLLE:  Yes, ma'am.  Of course.

3          JUDGE CORDELL:  So you -- and when did you

4    finally get your PhD?

5          MR. AENLLE:  2023 sometime midyear.  At some

6    point around there.

7          JUDGE CORDELL:  Okay.  And I do understand that

8    the place from which you earned your PhD is no longer in

9    existence.

10         MR. AENLLE:  That is correct.

11         JUDGE CORDELL:  Right.

12         Are you able still to get your transcript if

13   you were asked?

14         MR. AENLLE:  Yes, ma'am.  I would be able to,

15   yeah.

16         JUDGE CORDELL:  Okay.

17         MR. AENLLE:  Union -- Union Institute and

18   University is -- is geared towards law enforcement.

19   Many people in this department have at least a bachelor

20   or whatever they finished through there, and throughout

21   the law enforcement community, it is very well-known.

22   Like anything else through COVID, they went through

23   financial.  Their PhD program is one of the top and the

24   best in this country, and it was actually -- it didn't

25   go under.  It was moved to another college.  So this

    **TALTY COURT REPORTERS, INC.**                **114**
                         **taltys.com - 408.244.1900**

CONFIDENTIAL                      CSM 00426

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1  same program still lives today.  So -- and, yes, I can

2  still have -- get transcripts, I'm sure, and whatever

3  else you need.  I earned my PhD, ma'am.

4         I -- I'm an immigrant.  I came here when -- on

5  a -- on a -- on a boat with a single mom and a brother

6  with the clothes on my back when I was 12 years old.  I

7  learned English at 13.  I was -- I went to communist

8  school all the way till -- till I was in the fifth

9  grade.  Top of my class.  I came to this country, and

10 everything went to hell.  So I was not great in school

11 and -- and barely graduated high school.

12        But I -- I figured out life and made a great

13 life for myself and learned the value.  And I -- I

14 couldn't push education on my kids if -- if I had -- had

15 not done it myself; right?  I'd be a hypocrite.  So I --

16 I -- and I wanted to help people after my brother was

17 killed.  That's the only reason why I'm in this

18 department.  And I made it a point, and I got my

19 bachelor's in criminal justice, and I got my master's in

20 organizational leadership, and I went further and got my

21 PhD.  And I would have been done sooner.  I should

22 probably -- I got my PhD in -- in -- in three and a

23 half, four years, but the sheriff campaign took a lot of

24 time, and I couldn't keep writing 60-page papers every

25 night, and it got delayed.  Once she was -- once she



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

115

CONFIDENTIAL                    CSM 00427

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1  won, then I took a step back and focused on -- on what I

 2  needed to finish and defended my -- my dissertation --

 3  successfully defended my dissertation.

 4       So anybody that tries to dimin- -- diminish my

 5  work, my investment, and my hard work to earn a PhD that

 6  not everybody has is shame- -- should be shame- --

 7  shameful.

 8       JUDGE CORDELL:  And, by the way, I did not

 9  know, and I'm sorry.  You mentioned about your brother.

10  I did not know until you said --

11       MR. AENLLE:  My brother was killed 16 years

12  ago, and I --

13       JUDGE CORDELL:  And I'm sorry.

14       MR. AENLLE:  Yeah.  I didn't -- I didn't turn

15  out to be -- go into this field, but it needed change.

16  I was actually affected by that in this very

17  department -- in this very department, and that's what

18  motivated me to go into public service.

19       Maybe people don't like me here because I tell

20  the truth, and -- and -- and -- I'll just leave it

21  there.

22       JUDGE CORDELL:  Okay.  Again, I'm sorry.

23       MR. AENLLE:  Thank you, ma'am.

24       JUDGE CORDELL:  Have you ever been involved in

25  or assisted in giving a concealed carry permit to a
```



**TALTY COURT REPORTERS, INC.**                              116
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00428

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    terminated sheriff's sergeant whose name is ███ -- and

2    I'll spell the last name -- ███████, ██████

3    ███

4            MR. AENLLE:  I oversee the CCW permit.

5            JUDGE CORDELL:  Right.

6            MR. AENLLE:  ███ was an applicant here.  He

7    did not have anything in his background.  Per law, they

8    would -- would not permit him to have a CCW.

9            JUDGE CORDELL:  Okay.

10           MR. AENLLE:  He was treated like any other

11   members of -- of the community.  There's a lot of

12   members that I think they should be denied, and I

13   struggle with that every day.  But the way that the

14   current laws are, we have very limited reasons to deny

15   somebody a CCW in today's environment.

16           JUDGE CORDELL:  Hmm.

17           MR. AENLLE:  ███ met every qualification.  He

18   was not afforded anything special and -- and qualified

19   to get his permit.  I personally did not approve it.

20   I'm part of the chain that makes sure that -- that

21   everything's followed and corrections done, and the

22   final decision is made by the sheriff.

23           JUDGE CORDELL:  So it was the sheriff who had

24   the final say with that particular permit?

25           MR. AENLLE:  Every permit, it gets -- it gets



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

117

TRANSCRIPT OF RECORDING
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE
09/25/2024

1    approved by the sheriff.  It doesn't matter --

2         JUDGE CORDELL:  Did you --

3         MR. AENLLE:  -- who it is.

4         JUDGE CORDELL:  Sure.

5         Did you recommend that it be approved?

6         MR. AENLLE:  I -- I rec- -- I don't recommend

7    or not.  I move them up the chain.  So once -- once I

8    see it in my level and make sure that everything's been

9    uploaded, that everything's been done, that the

10   psych- -- psychological testing has been done, that all

11   the guns have been run, I check for facts; that it

12   doesn't have any qualifying factors that has to be

13   dismissed almost like, you know, arrest or, you know,

14   something major in their record.  I make sure the DOJ is

15   cleared.  Then I move it on to the sheriff, and she

16   makes all the decisions on every single CCW.

17        JUDGE CORDELL:  So if something had been wrong,

18   you -- and you saw it, you could have flagged it then;

19   right?  That you would do?

20        MR. AENLLE:  Anything that I see that's wrong

21   that --

22        JUDGE CORDELL:  Yeah.

23        MR. AENLLE:  And let me -- let me -- let me

24   correct "wrong."  That -- that -- that is outside within

25   the -- the legal limits of issuing a CCW, yes, I flag



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

118

TRANSCRIPT OF RECORDING                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1   and make sure that it's -- it's looked at further and

2   evaluated.

3            JUDGE CORDELL:  Got it.

4            Does that --

5            MR. AENLLE:  Sometimes I'll pull in legal

6   counsel for advice.  We've done that many times.

7   Sometimes I'll call a unit meeting with all the

8   background investigators to -- to -- and the -- the

9   lieutenant to review those, and that's part of the

10  process.

11           JUDGE CORDELL:  Got it.

12           Did you approve a CCW permit for your son?

13           MR. AENLLE:  I wasn't even an employee.

14           JUDGE CORDELL:  Is the answer --

15           MR. AENLLE:  My son --

16           JUDGE CORDELL:  Go ahead.  Go right ahead.

17           MR. AENLLE:  The answer is, "No."  I could not

18  have approved that.  My son applied just like anybody

19  else, went through the process like anybody else, met

20  the law, met all the requirements, and that permit was

21  not approved by me.  I was not employed in the Sheriff's

22  Office.

23           JUDGE CORDELL:  Okay.  Got it.

24           And let's see.

25           MR. AENLLE:  Boy, Judge Cordell.



**TALTY COURT REPORTERS, INC.**                    119
taltys.com - 408.244.1900

```
 1            JUDGE CORDELL:  Yes?  I know --
 2            MR. AENLLE:  You're throwing as many bumps as
 3    possible.  This is a --
 4            JUDGE CORDELL:  No, no.
 5            MR. AENLLE:  This is -- wow.
 6            JUDGE CORDELL:  Mr. Aenlle, I'm telling you I'm
 7    trying to make sure that --
 8            MR. AENLLE:  I know.  This is --
 9            JUDGE CORDELL:  Okay.
10            MR. AENLLE:  Somebody took a lot of extra time
11    to do that.  Do you know what I mean?  Because this
12    is --
13            JUDGE CORDELL:  Just hang in.
14            Have you ever directed that any social media
15    posts such as Instagram, for example, be blocked or
16    taken down?
17            MR. AENLLE:  I --
18            JUDGE CORDELL:  And, again, this is in
19    connection with the Sheriff's Office.
20            MR. AENLLE:  Yeah, yeah.  I'm sure there was --
21    there was some discussions.  I -- I -- I never ran the
22    social media before.  It was Chris Hsiung, and there
23    were some voices made because it met certain
24    requirements, but we don't make a habit of that.
25            JUDGE CORDELL:  But have you ever done that?
```



CONFIDENTIAL                          CSM 00432

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    Have you ever directed it be done?

2         MR. AENLLE:  I -- what I directed to be done --

3    and I think it was once, and I think it was discussed

4    with legal counsel -- is a nature that was -- that met

5    the requirements to be at least removed or blocked

6    for -- for some reason.  But I can tell you that I was

7    not the only one part of that decision.

8         JUDGE CORDELL:  Uh-huh.

9         MR. AENLLE:  That was -- that was -- Chris

10   Hsiung was involved in that.

11        JUDGE CORDELL:  Okay.

12        MR. AENLLE:  No, ma'am, we don't make a habit

13   of doing that.  I think was a -- a one case.  In one of

14   them, somebody threatened his life.  Something like

15   that.  Or it was -- it was just one of those weird

16   things.

17        JUDGE CORDELL:  But if there were comments --

18   have there been negative comments online about the

19   sheriff or about you, the Sheriff's Office?  Have you

20   been a part of directing that negative comments -- I'm

21   not talking about threats -- be blocked or removed?

22        MR. AENLLE:  I think there was one that crossed

23   the line that was talking about the sheriff's kids,

24   ma'am, if you're speaking to that, and Chris Hsiung was

25   involved in that, and I was involved, and it was a



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

121

1  decision to -- to block that person.  And I believe that

2  was brought up to legal counsel as well.

3          JUDGE CORDELL:  Okay.  Have you and the

4  sheriff -- when you go to conferences having to do with

5  the Sheriff's Office, do you travel -- have you ever

6  traveled first class?

7          MR. AENLLE:  I -- we both have upgraded in --

8  in different scenarios.  But I can tell you -- and not

9  to sound off -- I don't travel with anything less than

10 first class.  I'm not a child anymore.  I have back

11 pain.  I don't -- I don't like people in close proximity

12 to me.  So if I can't upgrade, I won't travel.

13         JUDGE CORDELL:  So --

14         MR. AENLLE:  And I do that on my own -- my own

15 money.  And when the sheriff wants to and can, that's --

16 has she done that before?  Yes, she has.  Does she do --

17 does that all the time?  Not that I'm aware of.  But I

18 will not travel unless I can upgrade to first class.

19         JUDGE CORDELL:  Got it.

20         When the two of you do go to a meeting or

21 conference together, do you -- do you -- since you fly

22 first -- first class, does she fly first class with you?

23         MR. AENLLE:  Not all the time.  There's been

24 like a couple instances.  But I can tell you that just

25 most recently, the last trip, I was in first class.  She



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

122

CONFIDENTIAL                    CSM 00434

TRANSCRIPT OF RECORDING                              09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1   was in the back of the plane.

 2           JUDGE CORDELL:  And what trip was that?  Was

 3   that a business -- I don't want to get in your personal

 4   business.  Was this a -- a business trip?

 5           MR. AENLLE:  The only trips -- yeah, it's a

 6   business trip.  It's --

 7           JUDGE CORDELL:  Okay.

 8           MR. AENLLE:  It was a WLLE conference.

 9           JUDGE CORDELL:  And I don't -- say it again.

10           MR. AENLLE:  It's a Women for Leadership.

11           JUDGE CORDELL:  Yes.

12           MR. AENLLE:  W- --

13           JUDGE CORDELL:  Yes.

14           MR. AENLLE:  -- double L-E.

15           JUDGE CORDELL:  Right.  And so you traveled

16   first class?

17           MR. AENLLE:  Oh, yeah.

18           JUDGE CORDELL:  And she did not?

19           MR. AENLLE:  Correct.

20           JUDGE CORDELL:  Okay.  Have you ever paid for

21   her to fly first class?

22           MR. AENLLE:  No, ma'am.

23           JUDGE CORDELL:  We're almost there.  Just bear

24   with me now.  Okay.

25           MR. AENLLE:  And if I've ever paid for
```



**TALTY COURT REPORTERS, INC.**                            123
taltys.com - 408.244.1900

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1   something for the sheriff, she always gives me the money

2   back.  If it's something like -- you know, something

3   that we're doing or something's happened, and -- and we

4   do that for each other.  I do that with the

5   undersheriff.  I've done that -- we just Venmo each

6   other back whatever it is that -- whoever is picking it

7   up, whether it's a lunch or --

8              JUDGE CORDELL:  Right.

9              MR. AENLLE:  -- a dinner or something.  We

10  always do that.

11             JUDGE CORDELL:  Okay.  We're getting now to the

12  end.  And, again, thank you for your patience.

13             Do you have -- and I'm going to say since 2021.

14  At least since then.  Do you have a personal

15  relationship with Sheriff Corpus?  Let me just finish

16  the whole thing.  Personal relationship is defined as

17  any intimate relationship beyond mere friendship.  And

18  let me go a step further.  It's also defined as a very

19  personal or of a private nature, not necessarily of a

20  sexual nature.

21             So with that, have -- do you have -- let's do

22  it in two parts.  Do you have a personal relationship

23  with Sheriff Corpus?

24             MR. AENLLE:  No.  I have a professional

25  relationship with Sheriff Corpus.  I admire that woman.



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

124

TRANSCRIPT OF RECORDING                              09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    She has inspired me.  I've known her for a long time.

2    She's a beautiful human being, and I'm -- and I'm

3    honored to work for her and to push forward her vision

4    in modernizing this department and the services that she

5    provides to this community, and I respect her incredibly

6    and just admire her to no end, and that's why I'm so

7    honored to work for her and have been here by her side

8    from day one.

9        JUDGE CORDELL:  Do -- I asked the question.  I

10   thank you for your answer.  I did ask do you -- are you

11   in a personal relationship?

12       Have you ever been in a personal relationship

13   with Sheriff Corpus, as I've defined it?

14       MR. AENLLE:  I've always had a strong

15   friendship with her, but it's been a professional

16   relationship.

17       JUDGE CORDELL:  Is it one that is beyond mere

18   friendship?

19       MR. AENLLE:  It is not one that's beyond mere

20   friendship.

21       JUDGE CORDELL:  Got it.

22       MR. AENLLE:  I've been married for 30 years,

23   and my wife --

24       JUDGE CORDELL:  And you still --

25       MR. AENLLE:  -- knows the sheriff.



**TALTY COURT REPORTERS, INC.**                      **125**
taltys.com - 408.244.1900

CONFIDENTIAL

CSM 00437

1      JUDGE CORDELL:  And you still are?  And you
2   still are married?  Okay.
3      MR. AENLLE:  And my wife knows the sheriff very
4   well.
5      JUDGE CORDELL:  Did you and the sheriff and her
6   children travel together to Maui in 2022?
7      MR. AENLLE:  The sheriff went to Maui with her
8   family, her kids, and her brother.  I was in Maui at the
9   same time.  I was on a security detail.  Barely even saw
10  each other.  I think we crossed paths, but she was there
11  with her family and her brother.
12     JUDGE CORDELL:  Do you know -- and, again, if
13  you don't know, it's fine.  Do you know why her husband
14  was not there?
15     MR. AENLLE:  They were already having problems.
16  I believe they were going through their issues.  I can't
17  speak to --
18     JUDGE CORDELL:  Got it.  That's fine.
19     MR. AENLLE:  Yeah.
20     JUDGE CORDELL:  What -- can you explain more
21  the security detail you were on in Maui.
22     MR. AENLLE:  Yes, ma'am.  I -- I -- I was doing
23  covert detail for a high-net-worth individual.
24     JUDGE CORDELL:  And it's someone you can't
25  disclose?


CONFIDENTIAL            CSM 00438

TRANSCRIPT OF RECORDING                          09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1              MR. AENLLE:  Of course, ma'am.

2              JUDGE CORDELL:  Okay.  So you were doing high

3    security for somebody worth a lot?  Is that fair?

4              MR. AENLLE:  Yeah, that's fair.

5              JUDGE CORDELL:  Okay.  All right.

6              MR. AENLLE:  That's fair.

7              JUDGE CORDELL:  All right.  So you were

8    privately retained by that person?

9              MR. AENLLE:  Yeah.

10             JUDGE CORDELL:  And when did that security

11   detail end?

12             MR. AENLLE:  I think I was in Maui for four

13   days or something like that, ma'am.

14             JUDGE CORDELL:  Got it.

15             Did anyone else know that you were there on a

16   security detail?

17             MR. AENLLE:  My --

18             JUDGE CORDELL:  For example, did the sheriff

19   know?

20             MR. AENLLE:  Oh, sure.  The sheriff knew, yeah.

21   I -- yeah.

22             JUDGE CORDELL:  All right.  Okay.  Did anyone

23   else know?

24             MR. AENLLE:  No, ma'am.  I don't -- I don't

25   discuss that with anybody.  I have my network of



**TALTY COURT REPORTERS, INC.**                    127
taltys.com - 408.244.1900

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1    friends.  It's pretty small and tight.

2             JUDGE CORDELL:  Right.

3             MR. AENLLE:  That's not something I discuss,

4    actually, the nature.  Most of my stuff, you know, that

5    we do in that realm, it's -- you know, you sign NDAs and

6    all kinds of things.

7             JUDGE CORDELL:  Right.

8             MR. AENLLE:  It's not something I go around and

9    advertise, especially when it's a covert detail --

10            JUDGE CORDELL:  Got it.

11            MR. AENLLE:  -- which is what I specialized in.

12            JUDGE CORDELL:  Okay.  And did you and the

13   sheriff sit together on the flight to Maui?

14            MR. AENLLE:  I don't think we were together.  I

15   think we were close.

16            JUDGE CORDELL:  But you were not seated next to

17   each other?

18            MR. AENLLE:  No.  No.

19            JUDGE CORDELL:  Okay.

20            MR. AENLLE:  It's been a couple years, but I

21   can tell you that -- that it was in a close proximity,

22   but I don't recall being next to her.

23            JUDGE CORDELL:  Okay.  That's fine.

24            I don't think that I have anything else to ask

25   you.  You have been so patient.  We have been talking



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

128

CONFIDENTIAL                    CSM 00440

TRANSCRIPT OF RECORDING                                        09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

```
 1   two hours and seven minutes, and --

 2           MR. AENLLE:  That is incredible.

 3           JUDGE CORDELL:  -- you --

 4           MR. AENLLE:  I'm -- I'm -- I'm exhausted.  I

 5   feel it.  But --

 6           JUDGE CORDELL:  You've been forthright.

 7           MR. AENLLE:  -- the unfortunate thing is, like,

 8   there's somebody really bad out to get me because the

 9   nature of your question, the length of it -- man, I --

10   wow.  But I'm glad I was able to talk to you.

11           JUDGE CORDELL:  Well, I appreciate -- again,

12   you didn't even have to talk to me, and you've been

13   forthright and patient for two hours, and I greatly

14   appreciate it.  So thank you very much.

15           If anything else comes to mind that, you know,

16   I've touched on and you're like, "Oh, you know, I didn't

17   give her this information," all you have to do -- you

18   can reach me if you're working through your lawyer or

19   through Mr. Touchstone, and you can get directly to me.

20   I don't mind, by the way, if you text me directly, but,

21   again, you work that out with your lawyer.  It's fine.

22   But if something comes up -- and I hope that, as I'm

23   putting this report together, something comes up and I'm

24   like, "Oh, you know, I didn't ask -- ask him," that I

25   can reach out again.  Nowhere near as long as this, I
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

129

CONFIDENTIAL                           CSM 00441

TRANSCRIPT OF RECORDING                                09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1   promise.

2          MR. AENLLE:  Okay.  Ma'am, with all due -- due

3   respect, would you kindly -- is there a possibility that

4   you can interview some of the people that reached out to

5   you just to be fair and get --

6          JUDGE CORDELL:  I --

7          MR. AENLLE:  You know, for example, I know

8   that, like, Captain Fox reached out to you for -- for

9   his comment.  I worked with him for -- for a long time.

10  Yeah, Mike Garcia reached out as well.  You have Heather

11  Enders, which is one of my female managers that works

12  for me.  From day one, she's been -- and she's known me

13  here in the Sheriff's Office, whether under contract or

14  my position.  You have, you know, people like Van

15  (phonetic) and -- I mean, there's a number of them that

16  I think that they can see what kind of value I bring to

17  this office and what I've done from day one.  It is --

18  it's just been fun to improve the work environment and

19  create programs.

20          I mean, the records department alone, 13 years

21  you try to -- which ████ was the manager of, 13 she

22  tried to get a raise for -- for her employees that we

23  were losing.  It took me two months, and I got them a

24  raise that they needed.  I mean, everything that we've

25  done here is -- is to better this department and -- and



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00442

```
 1   the people that -- that really stand up the Sheriff's

 2   Office, and I think --

 3           JUDGE CORDELL:  I hear you.  And there are,

 4   again, other people that have reached out, and I haven't

 5   talked to everybody.  I can't talk to everyone.  I

 6   appreciate that.  I have made note of who you are --

 7   want me to talk to.  So that's all I can tell you.  I've

 8   never told anyone to whom I've spoken that I've spoken

 9   to anybody else.

10           MR. AENLLE:  Yeah.

11           JUDGE CORDELL:  So I'm keeping that -- like

12   you're confidential with the person you were out doing

13   the security detail, I'm trying to do the same thing.  I

14   am doing the same thing.  So I haven't told anybody that

15   I'm talking to -- "Oh, I talked to."  I haven't done

16   that, and I'm not doing that.  So I --

17           MR. AENLLE:  Yeah.

18           JUDGE CORDELL:  -- appreciate -- and let me

19   just put it this way:  I hear you.  I'll just leave it

20   at that.

21           MR. AENLLE:  Okay.  And, ma'am, I didn't mean

22   to -- these are the people that I want you to talk to.

23   These are people that come to me and say, "I want to

24   talk to this person because I'm hearing she's

25   interviewing."
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

131

CONFIDENTIAL                          CSM 00443

```
 1              JUDGE CORDELL:  I hear you.

 2              MR. AENLLE:  So I don't want you to think that

 3     I'm sending anybody that I --

 4              JUDGE CORDELL:  No.  I hear you.

 5              MR. AENLLE:  I know and I'm comfortable with

 6     what I've done and how I conduct myself that I don't

 7     need anybody, but these are the people that came forth

 8     and says, "Hey, we really want to -- we really want to

 9     talk to this person because we -- we -- we know you, and

10     we -- I want to talk to her."  So it's not that I'm

11     directing you to --

12              JUDGE CORDELL:  I hear you.

13              MR. AENLLE:  Do you know what I mean?  I just

14     want you to understand.

15              JUDGE CORDELL:  Absolutely.  I understand.  So

16     thank you so much for your time and your patience and

17     answering every question I asked.

18              Mr. Touchstone, thank you for hanging in here

19     with us, and I will look forward to receiving the

20     recording this evening.

21              MR. TOUCHSTONE:  I -- yes, ma'am.  I'm going to

22     do my best.  I am what one would term technologically

23     challenged.

24              JUDGE CORDELL:  You and me both.  You and me

25     both.
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00444

TRANSCRIPT OF RECORDING                                    09/25/2024
INVESTATION OF SAN MATEO COUNTY SHERIFFS OFFICE

1          MR. TOUCHSTONE:  We have a

2   two-hour-ten-minute-and-14-second-and-counting recording

3   here.  I may have to get some direction on how to get it

4   to you.

5          JUDGE CORDELL:  Sure.

6          MR. TOUCHSTONE:  I'm going to try to put it in

7   a Google drive.  You will see something --

8          JUDGE CORDELL:  Whatever --

9          MR. TOUCHSTONE:  -- from a gmail.

10          JUDGE CORDELL:  Whatever works.

11          MR. TOUCHSTONE:  Yeah.

12          JUDGE CORDELL:  Whatever works for you.  And I

13   appreciate it.  Thank you so very much, both of you.

14          MR. TOUCHSTONE:  Yes, ma'am.  Thank you.

15          MR. AENLLE:  Thank you.

16          MR. AENLLE:  We appreciate your

17   professionalism.

18          JUDGE CORDELL:  All right.  All right.  Take

19   care.  Bye.

20          MR. TOUCHSTONE:  Have a good evening.

21                    --o0o--

22

23

24

25



**TALTY COURT REPORTERS, INC.**                          133
taltys.com - 408.244.1900

CONFIDENTIAL                    CSM 00445

```
1    STATE OF CALIFORNIA    )
2                           ) ss.
     COUNTY OF SANTA CLARA  )
3

4         I, Denise C. Shuey, Certified Shorthand Reporter,

5    do hereby certify:

6         That said confidential recording was transcribed

7    into typewriting, to the best of my ability;

8         I further certify that I am neither counsel for,

9    nor related to, any parties to said proceedings, nor in

10   anywise interested in the outcome thereof.

11        In witness whereof, I have hereunto subscribed my

12   name.

13   Dated:  October 6, 2024

14

15                    Denise C. Shuey

16

17                    _____
                      DENISE C. SHUEY, CSR
18                    License No. CSR-6814

19

20

21

22

23

24

25
```



**TALTY COURT REPORTERS, INC.**
taltys.com - 408.244.1900                                      134

# Exhibit 52

CONFIDENTIAL

# SHERIFF

## CHRISTINA CORPUS

**SAN MATEO COUNTY SHERIFF'S OFFICE**

**DATE:**      October 24, 2024

**TO:**        Deputy Sheriff Trainee Genesis Serrano

**FROM:**      Sergeant Jimmy Chan #S305

**SUBJECT:**   24IA-017

---

The Public Safety Officers Procedural Bill of Rights Act Section 3303 (b) and 3303(c) states:

> *(b) The public safety officer under investigation shall be informed prior to the interrogation of the rank, name, and command of the officer in charge of the interrogation, the interrogating officers, and all other persons to be present during the interrogation. All questions directed to the public safety officer under interrogation shall be asked by and through no more than two interrogators at one time.*

> *(c) The public safety officer under investigation shall be informed of the nature of the investigation prior to any interrogation.*

In accordance with the Public Safety Officers Procedural Bill of Rights Act, the following case is under investigation:

**Complainant:** Sheriff Christina Corpus

**I.A. Case Number:** 24IA-017

**Date of Complaint:** October 17, 2024

**I.A. Investigator:** Sgt. Jimmy Chan #S305

**Complaint:** Violations including but not limited to:

**318 – STANDARDS OF CONDUCT**

318.5.1 LAWS, RULES AND ORDERS

    C.  Violation of federal, state, local or administrative laws, rules or regulations.

318.5.7 EFFICIENCY

    A.  Neglect of duty.

CONFIDENTIAL                        CSM 00448

318.5.8– PERFORMANCE

I. Any act on-duty or off-duty that brings discredit to this Office.

## 306 – FIREARMS

306.3.6 AUTHORIZED OFF-DUTY FIREARMS

(i) Deputy Sheriff Trainees are prohibited from carrying concealed weapons off-duty until they have successfully completed a basic academy and have been promoted to the rank of Deputy Sheriff. This policy does not apply to Deputy Sheriff Trainees who have obtained a CCW license.

306.4.3 CONTROL

(a) It is the responsibility of every sworn staff member who has been issued a firearm(s) to, at all times, maintain positive control of each firearm issued or assigned.

## 700 – SHERIFF'S OFFICE OWNED AND PERSONAL PROPERTY

700.2 – CARE OF SHERIFF'S OFFICE PROPERTY

Members shall be responsible for the safekeeping, serviceable condition, proper care, use and replacement of Sheriff's Office property assigned or entrusted to them. Any member's intentional or negligent abuse or misuse of office property may lead to discipline including, but not limited to the cost of repair or replacement. I am reviewing the case and will contact you shortly to schedule an interview.

If you have any questions in regard to this memo, please contact me at (650) 363-4844.

_J Chan #S305_

Jimmy Chan, Sergeant
San Mateo County Sheriff's Office

Page **2** of **2**

CONFIDENTIAL

# Exhibit 53

CONFIDENTIAL

# SHERIFF

## CHRISTINA CORPUS

### SAN MATEO COUNTY SHERIFF'S OFFICE

**DATE:**      October 28, 2024

**TO:**         Deputy Sheriff Trainee Genesis Serrano

**FROM:**     Sergeant Jimmy Chan #S305

**SUBJECT:**  IA #24IA-017

---

This is to notify you that a complaint has been filed against you. You must appear for an interview at the time and place listed below.

**Complainant:** Sheriff Christina Corpus

**Complaint:**  Violations including but not limited to:

## 318 – STANDARDS OF CONDUCT

318.5.1 LAWS, RULES AND ORDERS

C.  Violation of federal, state, local or administrative laws, rules or regulations.

318.5.7 EFFICIENCY

A.  Neglect of duty.

318.5.8– PERFORMANCE

I.  Any act on-duty or off-duty that brings discredit to this Office.

## 306 – FIREARMS

306.3.6 AUTHORIZED OFF-DUTY FIREARMS

(i)  Deputy Sheriff Trainees are prohibited from carrying concealed weapons off-duty until they have successfully completed a basic academy and have been promoted to the rank of Deputy Sheriff. This policy does not apply to Deputy Sheriff Trainees who have obtained a CCW license.

306.4.3 CONTROL

> (a) It is the responsibility of every sworn staff member who has been issued a firearm(s) to, at all times, maintain positive control of each firearm issued or assigned.

## 700 – SHERIFF'S OFFICE OWNED AND PERSONAL PROPERTY

700.2 – CARE OF SHERIFF'S OFFICE PROPERTY

Members shall be responsible for the safekeeping, serviceable condition, proper care, use and replacement of Sheriff's Office property assigned or entrusted to them. Any member's intentional or negligent abuse or misuse of office property may lead to discipline including, but not limited to the cost of repair or replacement.

**Date of Incident:** October 17th, 2024

**Complaint Summary:**

It is alleged that on the evening of October 17th, 2024, you were off-duty and in civilian attire at an address of 1310 Burlingame Avenue in the city of Burlingame, CA. The Crepevine Restaurant is located at this address, which you were a customer of at the time of this incident. You were in possession of your Sheriff's Office issued firearm and upon leaving the restaurant, you left your firearm behind. The firearm was located unattended and unsecured by an employee of the business and was ultimately turned over to the Burlingame Police Department.

**Interview Date & Time:** **October 30, 2024** at **1200** hours.

**Interview Location: CSM Academy Office, 1700 W Hillsdale Blvd, Bldg. #35, San Mateo, CA.**

**Interviewer:** Sergeant Jimmy Chan #S305

This interview is part of an administrative investigation regarding the complaint filed against you. You do not have the right to remain silent. If you refuse to submit to any interview or answer the investigator's questions that are directly related to this investigation you may be subject to disciplinary action.

Page **2** of **3**

You have the right to be represented by the person of your choice as long as that person is not a party to this complaint. If the scheduled interview date and/or time is inconvenient or undesirable to you or your representative, please contact me and the interview will be rescheduled without prejudice.

As a superior officer, I am ordering you not to speak with anyone regarding this on-going investigation, other than your legal representative, until the investigation is completed.

Jimmy Chan, Sergeant
San Mateo County Sheriff's Office

Page **3** of **3**

# Exhibit 54

CONFIDENTIAL

CSM 00454

## SUPERIOR COURT, SAN MATEO COUNTY
## CRIME SUMMARY INFORMATION

# PROBABLE CAUSE DECLARATION

| SHERIFF'S CASE NUMBER: **24-08495** | | BOOKING NO. **1253176** |
|---|---|---|
| ARRESTEE: **Carlos Tapia** | | DOB: **11/13/1973** |
| ADDRESS: **2421 Braodway, Redwood City CA 94063** | | |
| BOOKING CHARGES: **487(A) Grand Theft (F), 532 (A) Theft by false Pretenses (F)** SUPPLEMENTAL HOLDS: | | |
| DATE & TIME OF ARREST: **11/12/2024@1305** | | 48 HOURS EXPIRES ( D & T): **11/14/2024@1305** |

ARRESTING AGENCY & DIVISION:  **SAN MATEO COUNTY SHERIFF'S OFFICE**
ARRESTING OFFICER: **A/Acting Assistant Sheriff Fox**
FACTS ESTABLISHING ELEMENTS AND IDENTIFICATION OF DEFENDANT:

In October 2024, I received information regarding irregularities regarding the shift schedule of Carlos Tapia (Current Sheriff's Deputy with San Mateo County Sheriff's Office). The information was related to timecard discrepancies between his verified timecards and the use Release Time (010) and Regular Time (001) and the coding used by Carlos Tapia who is also the President of the Deputy Sheriff's Association. An audit was conducted from January 1, 2024, through October 18, 2024, along with County Payroll to verify if Carlos Tapia was billing accordingly based upon his time conducting Association Business and not his normal shift in Transportation.

After this audit, we uncovered over (50) preliminary shifts where there was no record of him working in Transportation, courts or otherwise listed on his verified and submitted timecards. It appeared he was absent from work under the guise of Association business and continuing to credit his timecard for Transportation. This was apparent in August 2024 when he started to submit his timecards with Association business and made the distinction of billing appropriately. Up until this time, he never made the distinction and thereby represented he was working Transportation when he was listed as being off.

This audit is continuing, but all the shifts listed in the report were checked against Lieutenant Hensel's memorandum, daily board schedules, Transportation Schedules and payroll. It should also be noted that during the months of January–June, all members of the organization were in an agreement for double overtime, which makes the amount of theft on Carlos Tapia's behalf very concerning. At this point, the estimated theft will exceed over $25,000 dollars and could triple by the end of the audit into the past year.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE AND BELIEF.

EXECUTED ON __11/12/2024_____, AT SAN MATEO COUNTY, CALIFORNIA.

BY: _____     BADGE #: **3**
              SIGNATURE

ON THE BASIS OF [   ] THE OFFICER'S DECLARATION [   ] REPORTS REVIEWED, I HEREBY DETERMINE THAT THERE [   ] IS [   ] IS NOT PROBABLE CAUSE TO BELIEVE THIS ARRESTEE HAS COMMITTED A CRIME.

_____        _____        _____
        DATE                          TIME                SIGNATURE OF JUDICIAL OFFICER

CONFIDENTIAL                     CSM 00455

# Exhibit 55

CONFIDENTIAL

| | |
|---|---|
| **From:** | Deb Drooz |
| **To:** | Ray Mueller; Noelia Corzo |
| **Subject:** | Urgent communication re: Nov. 12, 2024 Press conference |
| **Date:** | Tuesday, November 12, 2024 3:25:33 PM |

**CAUTION:** This email originated from outside of San Mateo County. Unless you recognize the sender's email address and know the content is safe, do not click links, open attachments or reply.

*Privileged Communications Under Civil Code Sec. 47(b), Communication in Anticipation of Litigation*

## **Immediate attention required**

*Re: Victor Aenlle*

Dear Supervisors Mueller and Corzo,

This office represents the San Mateo County Sheriff's Office's Director of Administration and Chief of Staff, Victor Aenlle.

It has come to our attention that, at or about 4:00 PM today, November 12, 2024, you plan to give a press conference for the ostensible purpose of announcing the finalization of Judge La Dorris Cordell's investigation of several unfounded complaints against Mr. Aenlle. We are advised that you may use the press conference as a rostrum to slander Mr. Aenlle or portray him in a false light. Specifically, we anticipate that you will unjustly accuse him of having a propensity for violence, of abusing his staff members and of inciting fear of retaliation and of physical harm among those who work with him.

In the context of a press conference, such statements would be unprivileged, false, and defamatory. Mr. Aenlle an experienced highly trained professional. He has never used threats, bullying or intimidation to carry out his duties. There is no evidence whatsoever to support the accusations to the contrary.

We are further advised that a source for such falsehoods *may* be DSA president Carolos Tapia, someone we believe has long been dedicated to ousting Sheriff Christina Corpus and her subordinates, including Mr. Aenlle. *If* that is the case, you should be advised that Mr. Tapia's reputation for honesty and reliability have come under law enforcement scrutiny. As we understand it, Mr. Tapia was arrested today for fraudulent timecard use.

Any statements by you or either of you at today's press conference that expressly or implicitly accuse Mr. Aenlle of violence, bullying, retaliatory conduct or threat thereof, intimidation or abuse of staff or

CONFIDENTIAL                                        CSM 00457

colleagues will cause irreparable reputational injury to Mr. Aenlle and will be met with swift, vigorous legal action.

This is not a complete statement of our client's rights and remedies, all of which are hereby reserved.

Deborah Drooz

DroozLegal

**Deborah Drooz, Esq.**
1910 West Sunset Blvd., Suite 740
Los Angeles, CA 90026
Cell: 323.337.2092
Office: 323.900-0931

This e-mail may contain confidential and/or privileged material. Any review or distribution by anyone other than the intended recipient is strictly prohibited. If you are not the intended recipient, please contact the sender and delete all copies of this e-mail immediately. This email establishes no attorney-client relationship. To ensure compliance with requirements imposed by the IRS, any U.S. federal tax advice communicated by way of this document is not intended to be used, and cannot be used, by you or anyone else to avoid penalties under the Internal Revenue Code, or promoting or recommending anything to another party.

CONFIDENTIAL

# Exhibit 56

CONFIDENTIAL

*Historical:*

The Sheriff's Office runs several contract city police bureaus in San Mateo County. Half Moon Bay opted to enter into such an agreement with the Sheriff's Office in 2011, and for the past 2 years (apx.) I have been assigned in my capacity as a Sheriff's Captain, to act as the Police Chief in Half Moon Bay, overseeing municipal police operations as well as overseeing the Unincorporated San Mateo County Coastline from the City limits with Pacifica to the Santa Cruz Countyline.

Despite being the senior Captain amongst all of us of the same rank, I was assigned to the Coast when the Sheriff took office, despite her knowing I had a toddler and an infant at home and lived 60 miles from where she was sending me. My commute to and from work has been approximately 4 hours every day that I worked, for the past 2 years. And every time I asked to be moved to an assignment closer to home (which would have been literally any other Captain position) I was told it was not the right timing or that "I was a victim of my own success," and that I had done such a good job, they could not move me.

All that said, the following is what occurred after notifying the Sheriff (on Monday, May 6, 2024) that I was in backgrounds with another police agency, had been offered a conditional offer, and should a final offer come, it would be my intention to accept.

- With a 6-week notification of conditional offerings, regular ridicule on text and phone calls about the process...even though I had not been officially hired.
- Regular communication from Assistant Sheriff Monaghan (at the Sheriff's direction) about giving "appropriate" notice and insistent pressure to provide information about process, even though the process was not complete.
- After being told that I would be attending the Cal Chiefs conference in Palm Springs, making arrangements to attend, completing the travel paperwork, and having hotel and plane reservations, the Sheriff rescinded the travel (just a few days prior to the conference) as I was told it was her position that the spot would be better given to someone who was not leaving the office. Again, no official offer of employment was provided and/or guaranteed.
- Even being given 6-weeks' notice of potential offerings, the command staff refused to work with me about the transition and movement of new personnel and instead regularly told me I should have given them more notice and urging me to stay on longer to help with staffing coverage.
- Once I was given the offer and submitted my official notice, the notice was specific that my last day of work was June 21, 2024. That was given to personnel and HR, after which I was told to resubmit another notice indicating my last day of work would be June 20, and that I would physically come into the office to train my replacement on that day.

*June 18, 2024:*

- 5:18pm I drafted and posted a NextDoor goodbye post telling the community that I would be taking a position outside the County and saying they would be in good hands with the next Captain. This was immediately after my City Manager told me he had informed Assistant

1

Sheriff Monaghan that he had approved selection of the new Captain. Below is the post for reference as well as the comments I was able to initially capture.



- 6:09pm I received a phone call while at the park with my kids, from Undersheriff Hsiung asking me who gave me permission to post on Nextdoor, a platform I post on regularly without asking for permission and which the Command staff has asked me to teach to the other Captains because I have had so much success with Community Engagement using the platform.
  - I told the Undersheriff that the Sheriff's Office Communications Director knew I was going to post something this week as it had been discussed just prior to my going on vacation. The Undersheriff told me the Sheriff had not known I was posting the letter and it put them in an awkward position. I told them that was a conversation they should have with their communications Director, since she works directly for the Executive Team, and asked why the post was problematic.
  - The Undersheriff told me the administration was not ready to publicly speak about my leaving or who would be replacing me. I informed him I would no longer be working for the Sheriff's Office in 2 days, and asked how much longer they would have wanted me to wait to tell the Community I have been serving that I will no longer be there when they call.
  - He told me they would have put out a prepared message maybe next week... which I pointed out would be after I had already left giving me no time to say goodbye to my community members.

2

- 6:20pm I sent the Undersheriff a screenshot of the email from our Communications Director, dated May 31, 2024, laying out the communications plan, including this NextDoor post, regarding my leaving my position. This was to show him this had been in the works, and she had known about it, since he told me the Communications Director said she knew nothing about my plans to post anything online. It was at this time I was told that the email was up for interpretation, and I should have asked before posting, something which I have never previously had to do and have been told many times by the Executive Team they trust me to know my community and post as I see fit. I also have an email from the Communications Director that had been cc the Undersheriff from moths ago outlining that Bureau Chiefs are expected to utilize NextDoor to share information with Community members as they see fit and urging us all to do so.
- The Undersheriff asked me if my City Manager knew I had posted this open letter and I told the Undersheriff he did know and had no issues with it.
- 7:13pm I received a text message from Captain Philip asking me to let him know what time on Thursday I would be coming into work so he could meet me and take my badge, since I am leaving and not retiring, which I know to be incongruent with past practice, as Captain Kristina Bell, did not retire, but left to become the Redwood City Police Chief and was allowed to keep her badge. Additionally, this only came up tonight in response to the Sheriff being upset I posted on Nextdoor. A post which, at last viewing had many positive and thankful comments from Community members wishing me well.
- 7:23pm I received a call from the Undersheriff telling me he was speaking on behalf of the Sheriff and that she was having my access to Nextdoor and Evertel revoked and I was not to come back to work unless I was under another employee's supervision. I was also told not to send anyone any emails and not to post on social media. I reminded him I am still an employee of the Sheriff's Office and this was completely unreasonable to do to me as a current employee and in retaliation for something I did that violated no policies and I had not been investigated for.
- 8:44pm I called Captain Philip back on the phone after missing a few calls and was told my access to department email had been revoked in addition to Evertel and Nextdoor. I informed him this was not right as I am still an employee and he told me knew that it was wrong but he learned of it from Acting Lt. Zaidi, as Captain Philip was left out of the decision.
- 9:03pm I tried to access my Nextdoor page and received a message stating there was an error loading the feed, verifying I no longer had access. I screen shotted this.
- 9:04pm I tried to access my work email and received a message saying my account had been locked. I screen shotted this.
- At 9:32 I called Assistant Sheriff Monaghan back after missing a call from him a short time before. He told me he had just learned of what had been done to me (He was out of town for a family member's funeral) and he told me on a personal note he was appalled at what was being done to me and that this was not how treat someone who had been a loyal and hardworking employee on their way out. He told me if you look at every line of the Sheriff's Office retaliation policy, that this was not right and he did not agree with it.
- 10:31pm I tried to login to the County website so I could check my timecard but I am unable to access the site, despite still currently working for the County. I took a screen shot of this.

CONFIDENTIAL     CSM 00462

- I was still being paid and I am on vacation
- I still have personal items in my office that belong to me (e.g., refrigerator, clothing, items in my storage cabinet, etc.)
- I have never been required to retain approval for a Next Door Post in the past.
- Capt. Philps was told by an acting Lt. that I was no longer allowed to be on campus without escort, though I am still employed.
- The same person told Capt. Philip that I no longer had access to my email and NextDoor accounts.
  - o Confirmed on this date via screen shots.
  - o Also confirmed with a phone conversation to Capt. Philip.
- Was told that I would not have access to the building, though I was still employed with the County despite not having been accused of punitive action (civil) or violations despite yet was being administratively locked out of email and told to come back to County premises. Additionally, since my email had been locked, I could not access any County Systems, like the county payroll system or benefits, so at that time I was not even sure I would be getting paid my last week of work.

*June 19, 2024*

- 8:53am I called Assistant County Manager Iliana Rodriguez, and told her I had tried to reach County HR but given it was Juneteenth no one was in the office, and shared with her all that had occurred. She asked that I send her the screenshot of the Nextdoor post that had started all this and if it would be ok to share with the County Manager. I told her that would be fine and sent her the screen shot.
- 9:24am texted me that she had spoken to the County Manager and he would be contacting County HR about my disparate treatment.
- 11:22am I was told there was no trace of my post on Nextdoor from someone in Half Moon Bay.
- 11:50am I was texted a link to an Instagram story about Captain Cheechov being the new Coastside Captain and Chief of Half Moon Bay, effective immediately. Which I found odd considering it was still my position and I still worked here.
- 2:23pm I texted Undersheriff Hsiung to ask if my Nextdoor post had been taken down, and was told when my Nextdoor access was revoked by Sheriff's Administration, it had inadvertently taken down every post I ever made along with all the comments from community members, but that this was an unintended consequence, and he felt really bad and was going to work with Nextdoor to reinstate the posts.
- 3:14pm I called Acting Captain Cheechov, who told me he received a call from Sheriffs Administration last night (6/18/2024) telling him effective immediately he was the Chief of Half Moon Bay. I received no such notification and again, was still currently employed by the Sheriff's Office so another coworker of mine was told he was taking over my position while I was on vacation and no one told me I was relieved of my position. Additionally, the Acting-Captain mentioned the fact that I had personal items in the office I would need to get and it was told to him that I may be able to retrieve my items as long as someone was there

4

monitoring me. We were supposed to meet the following morning (June 20) so I could send him emails to follow up on and let him know what he needed to know taking over the Bureau but he understood that would not be possible since I had been locked out of my email and was ordered not to email anyone regardless.

*June 20, 2024*

- I met Captain Philip at the Half Moon Bay substation around 10am, and when I got there I tried to put the code into the door to enter but it did not work. I then tried the other door to the substation, however that door would not open as well. An overtime Sergeant was working and had a key, and therefore was able to let us in. Once inside I was told the key code to the bureau doors had been changed the previous day.
- I provided Captain Philip with my office issued equipment, and it was at that time he told me the Sheriff had changed her mind about taking both of my badges but wanted one to make into a plaque for me. As I did not have them on me at the time I could not provide them, but noted the reasoning for taking the one back in the last hour of my last day seemed a bit preposterous, especially given no one else in my same position had ever been made to turn their badges in previously, and the Sheriff had known I was leaving for 6 weeks, and had ample opportunity to do something to denote my service in the lead up to my exit.
- As I was in my office, one of the deputies (Lomu) was lurking in the doorway and thinking he was there to say goodbye, I invited him in. I asked if he needed something, and he shut the door and then told me all the Sergeants had been told I was not to be on the premises and if they saw me to keep an eye on me. The deputy told me everyone that worked for me didn't feel good about this and the Sergeants had told the deputies if they saw me to give me some space, but that he would be in the next room and to just let him know when I was done. Prior to leaving he asked why this was being done to me specifically and I told him I didn't know.

*Final Thoughts-*

- I was not an "At Will" employee.
- I was administratively locked out of Sheriff's Headquarters in Redwood City and was told if I tried to enter any County Building my ID card would not work, and therefore did not feel comfortable returning there on my last day of work, knowing I was not welcome at my own workplace.
- I felt worried (at the time) that I was administratively locked out of the County work systems as I recognized that to be something congruent with suspension/discipline/termination, and as the former commander for professional standards, I was concerned.
- Failure of Due Process
- No Violations of Policy / Procedures
- I have an Unblemished Record
- Calls/texts from Command Staff and members of Professional Standards, saying this was wrong and they were embarrassed and appalled.

POBAR Violation 3304(d)(1) admin disciplined without being any type of investigation

Labor Law Violation... you can't take away my access to email with no cause and no notice

CONFIDENTIAL                CSM 00464

The Sheriff has exhibited similar retaliatory behavior to several current and former managers who work/worked at the Sheriff's Office, from her Executive Assistant baselessly accusing our former Records Manager of secretly posting negative things about himself and the Sheriff online to the point he had her sobbing in her office in front of everyone who worked for her, embarrassing her and humiliating her on her last day at work. The Sheriff also caught wind of a Lieutenant sending a personal email on her days off to other mid-level managers, suggesting they might want to form a union so they could have some rights for themselves, and subsequently informed that Lieutenant's boss that she was going to be transferred, despite the fact the Lieutenant was nearing retirement and that it would take approximately a year to get someone else the necessary clearances to do this Lieutenant's job. The Sheriff was convinced to walk that threat back but has still indicated this Lieutenant will likely be transferred at some point.

It is sad to me that after almost 20 years with the County, this is how I was treated. I filed a formal complaint with County HR but as of now have yet to hear what, if anything, that will result in. I am not optimistic however, as many complaints have been filed with the Couty regarding the Sheriff's behavior, and aside from several law suits she is now facing, it seems her behavior is just getting worse and worse.

CONFIDENTIAL

CSM 00465

# Exhibit 57

CONFIDENTIAL

**From:** Jimmy Chan
**To:** Joe Fava; Irfan Zaidi
**Cc:** Katy Roberts; Hector Acosta
**Subject:** Re: Oral Board Concern
**Date:** Wednesday, November 13, 2024 9:50:03 AM
**Attachments:** Outlook-rvxjyqvy.png
Outlook-auvik1lz.png

Lt. Zaidi,

I too share the same concerns.  I was very surprised to hear that Ashley Razo was moved onto the backgrounds portion of the hiring process even though both myself and the other rater did not give her a passing score in the interview.  Additionally, I was approached by you in regards to Ms. Razo and you had Deputy Garcia on the phone at the time and put him on speaker phone.  I explained to the both of you with detail why I did not pass her and you both stated that you understood.  I even went so far as to suggest you have mock interviews with your LECS students to better prepare them, which you stated was a good idea to Deputy Garcia.

Sir, if the interview process is not one of filtering out and identifying those that are not good candidates versus those that are for the Sheriff's Office, then what is its purpose?



**Jimmy Chan, Detective Sergeant #S305**

San Mateo County Sheriff's Office

Professional Standards Bureau

330 Bradford Street

Redwood City, CA 94063

*Office: (650) 363-4844*

*Fax :  (650) 363-1813*

*Email: jichan@smcgov.org*

*http://www.smcsheriff.com*

**PEOPLE FIRST – SERVICE ABOVE SELF**

***Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and protected information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.***

**From:** Joe Fava <jfava@smcgov.org>
**Sent:** Wednesday, November 13, 2024 9:07 AM
**To:** Irfan Zaidi <izaidi@smcgov.org>

CONFIDENTIAL                                    CSM 00467

**Cc:** Katy Roberts <kroberts@smcgov.org>; Jimmy Chan <jichan@smcgov.org>; Hector Acosta <HAcosta@smcgov.org>
**Subject:** Oral Board Concern

Lieutenant Zaidi,

It was brought to my attention that a person, Ashley Razo, interviewed last week for DST. Prior to the interview, I personally heard Mike approach Jimmy and inform Jimmy that Ms. Razo was interviewing with him at 1330 hours. Mike went on to say Ms. Razo is a LECS student and he personally prepared her for the interview and that he expected her to do very well. I later saw in the attached interview results that Ms. Razo failed the interview.

Yesterday, I was approached by an Sheriff's Office employee and told Ms. Razo was moved to backgrounds despite failing the interview. I believe this is to incredibly unethical, promotes favoritism, and is a violation of county policy. I am also extremely concerned because this is not the first time something like this has occurred. If this is true, I believe this needs to be remedied immediately.

As a reminder two weeks ago, you assured Jimmy and I that PSB would be run with integrity. Moves like this not only lack integrity, they violate the same policies that we are entrusted to investigate.

Please let me know of the outcome in a meeting, with a witness, or in writing.



**Joe Fava, Detective Sergeant**
**San Mateo County Sheriff's Office**
Professional Standards Bureau
330 Bradford Street
Redwood City, CA 94063
650-599-1518
www.smcsheriff.com
**PEOPLE FIRST – SERVICE ABOVE SELF**

**Confidentiality Notice: This e-mail message, including any attachments, is for the sole use of intended recipient(s) and may contain confidential and protected information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.**

CONFIDENTIAL                              CSM 00468

# Exhibit 58

Special Meeting of the Board of Supervisors on 2024-11-13 4:00 PM

https://sanmateocounty.granicus.com/player/clip/1528?view_id=1&redirect=true

Exhibit 59

CONFIDENTIAL

| | |
|---|---|
| **From:** | Rocio Kiryczun |
| **To:** | Christina Corpus |
| **Subject:** | Assistant Sheriff Job Classification Requirements |
| **Attachments:** | Assistant Sheriff Job Description.pdf |

Hello Sheriff,

At the Special Meeting of the San Mateo County Board of Supervisors yesterday, November 13, 2024, you announced your intention to appoint Victor Aenlle to the position of Assistant Sheriff.  Respectfully, that is not possible.  Having reviewed the matter, I conclude that you cannot make this appointment because, among other possible reasons, Mr. Aenlle  does not meet the qualifications for the position.

Attached is the job classification for an Assistant Sheriff position at the County of San Mateo.  As stated in the classification, "Candidates must acquire an Advanced Certificate in law enforcement issued by the State of California Commission on Peace Officer Standards and Training within one year of appointment."

My understanding is that the requirements set forth by the Commission on Peace Officer Standards and Training (POST) state that, in order to be eligible for an Advanced Certificate, a candidate must have a <u>minimum</u> of 4 years of full-time law enforcement experience. In addition, those same POST requirements state that a candidate can only obtain an Advanced Certificate after holding an Intermediate Certificate, and, in turn, a candidate must possess a Basic Certificate to be eligible to obtain an Intermediate Certificate.

In order to obtain a Basic Certificate, a candidate must serve at least a 12 month probationary period. (Please note, there are additional requirements as well, such as completing a Regular Basic Course and meeting certain educational and training requirements).

Based on your prior communications with my office when you were seeking to create the non-sworn Executive Director of Administration position for Mr. Aenlle, it was my impression you were not considering Mr. Aenlle for

CONFIDENTIAL                              CSM 00472

placement into a sworn position because you recognized he did not meet the minimum qualifications.  It is also my understanding that Mr. Aenlle does not have 4 years of full-time law enforcement experience, nor even 1 year.  As a result, he would not meet the Assistant Sheriff Job Classification requirement of having an Advanced POST Certificate, nor could he obtain one within one year.

If I am mistaken and Mr. Aenlle will be able to meet the requirements for an Advanced POST Certificate within one year, please provide his Basic POST Certificate and proof of his years of full-time law enforcement experience (as well as proof that he can meet all of the requirements of a Basic, Intermediate and Advanced Certificate within one year).  Until we receive that documentation, you will not be able to place him into the Assistant Sheriff position.

Thanks,
Rocio



County of San Mateo

# Assistant Sheriff - Unclassified

| | | | |
|---|---|---|---|
| **CLASS CODE** | B245 | **SALARY** | $99.73 - $124.68 Hourly |
| | | | $7,978.40 - $9,974.40 Biweekly |
| | | | $17,286.53 - $21,611.20 Monthly |
| | | | $207,438.40 - $259,334.40 Annually |
| **REVISION DATE** | August 24, 2004 | | |

---

## Definition

Plan, organize, direct and coordinate multiple major divisions of the Sheriff's Department which include operations, detention, custody, support and administration; develop and implement program goals, policies and priorities; and provide highly responsible and complex administrative support to senior level management within assigned area of specialization.

## SUPERVISION RECEIVED AND EXERCISED

Receive general direction from the Sheriff or Undersheriff. Exercise direct and indirect supervision over lower level supervisory, professional, technical and clerical employees.

## Examples Of Duties

**Duties may include, but not limited to, the following:**

- Plan, organize, coordinate and direct the programs and activities of multiple divisions of the Sheriff's Department.
- Consult with and advise other County staff and the public regarding pertinent policy issues and participate in the development of standards and programs relating to these policies.
- Monitor current and proposed federal, state, and local legislation to assess its impact and to develop the County's legislative response either in support of or opposition to such legislation.
- Consult and cooperate with other department managers on relevant aspects of the department; discuss organization problems, develop alternative strategies for dealing with those problems; assist in implementation of solutions, as necessary.
- Direct and counsel assigned staff in the planning, budgeting and record systems needed to monitor and evaluate the effectiveness of the assigned program responsibilities.
- Assist in the preparation and administration of the Department budget.

- Perform a variety of special assignments, prepare complex analytical and statistical reports in any of several areas of human resource planning, as assigned.
- Perform related duties as assigned.

## Qualifications

**Knowledge of:**

CONFIDENTIAL    CSM 00474

- Applicable federal, state and local laws, codes, ordinances and court decisions applicable to the assigned division.
- Advanced principles and practices of modern law enforcement administration and criminal investigation.
- Principles of financial administration, including public budgeting and financial analysis.
- Computer systems and applications as used within the County.
- Principles of personnel training, supervision and evaluation.

**Skill/Ability to:**

- Direct and participate in advanced administration and operational activities related to the divisions.
- Coordinate program area activities with other divisions, departments, programs and/or outside agencies.
- Direct and participate in the analysis of a wide variety of moderate to complex administrative/operational problems and make effective operational and/or procedural recommendations.
- Develop and administer policies, guidelines and procedures related to the divisions.
- Use the appropriate interpersonal style and methods of communication to gain acceptance, cooperation, or agreement of a plan, activity, and/or program idea.
- Negotiate agreements between differing individuals and groups of individuals.

- Monitor current and proposed federal, state and local legislation that impact on the division.
- Supervise, evaluate and train assigned personnel.
- Communicate effectively both orally and in writing.
- Establish and maintain effective work relationships with those contacted in the performance of required duties.
- Meet State of California POST medical and physical standards for law enforcement personnel.

**Education and Experience:**

Any combination of education and experience that would likely provide the required knowledge, skills and abilities is qualifying. A typical way to qualify is:

Five years of increasingly responsible experience performing a wide variety of administrative and managerial duties in a large, protective services agency including two years in a senior level administrative or management position.

**Licensure/Certification:**

- Possession of a Class C California driver license or equivalent.
- Candidates must acquire an Advanced Certificate in law enforcement issued by the State of California Commission on Peace Officer Standards and Training within one year of appointment.

**Other Requirements:**

Refrain from using tobacco products at anytime for employees hired by the County after October 1, 2004.

**Previous Classification**

Sheriff's Commander

CONFIDENTIAL                                        CSM 00475

# Exhibit 60

CONFIDENTIAL

CSM 00476

| | |
|---|---|
| **From:** | SHERIFFS_Backgrounds |
| **To:** | Dorothy Brandt |
| **Subject:** | FW: Concerns Regarding the Interview Process for Ashley Razo |
| **Date:** | Monday, November 18, 2024 12:42:37 PM |
| **Attachments:** | image001.png |

---

**From:** Heather Enders <henders@smcgov.org>
**Sent:** Monday, November 18, 2024 12:31 PM
**To:** Christina Corpus <CCorpus@smcgov.org>
**Cc:** Daniel Perea <dperea@smcgov.org>; Irfan Zaidi <izaidi@smcgov.org>; Ximena Burns <xburns@smcgov.org>; SHERIFFS_Backgrounds <SHERIFFS_Backgrounds@smcgov.org>
**Subject:** Concerns Regarding the Interview Process for Ashley Razo

Dear Sheriff Corpus,

I hope this message finds you well. I am writing to address a series of concerning events related to the interview and subsequent handling of LECS student Ashley Razo.

As you know, on November 7th, we conducted an interview with Ms. Razo as part of her application process. The interview panel included Sgt. Jimmy Chan and Valerie Barnes, both of whom ultimately determined that Ms. Razo was not suitable to move forward in the process. However, earlier that day, Detective Mike Garcia approached Sgt. Chan to inform him that Ms. Razo, being a LECS student, had been personally prepared for the interview by Detective Garcia, and that he expected her to perform well.

That same evening, at 6:21 pm, then Chief of Staff Victor Aenlle contacted me to convey that you were upset for several reasons:

1. That Valerie Barnes was part of the panel and could "not be trusted."
2. That the interview results for Ms. Razo should be rescinded and that she should be "passed."
3. That you wished for Dorothy Brandt to be removed from interview duties, which currently make up about 25% of her weekly responsibilities.

Shocked by the conversation, I asked for time to look into the matter. After reviewing the situation, I called back and explained that the proper course of action would be to maintain the "failed interview" outcome, and that Ms. Razo could re-apply for the Correctional Officer position if she chose to do so. I also expressed that any other course of action would put our office in a very difficult and legally compromising position.

Subsequently, I learned from Dorothy that Ms. Razo had already been placed in the backgrounds process. According to Nicole Mejia, a Management Analyst, Lt. Zaidi instructed her to change the interview results in NeoGov, our application management system. Nicole mentioned that Lt. Zaidi stood over her shoulder while she altered the interview outcome. Although Nicole felt uncomfortable doing so, she felt pressured to comply. However, she later changed the results back to "failed interview".

Most recently, today, Lt. Zaidi informed me that he was told by Undersheriff Perea that you still wish for Ms. Razo to move forward in the background process.

CONFIDENTIAL

At this point, I must make it clear that no member of the Professional Standards Bureau will engage in actions that undermine or interfere with the integrity of the civil service process under any circumstances. The interview and application process for Deputy Sheriff Trainee positions must be upheld, and any deviation from this would be inappropriate and unacceptable.

As such, Ms. Razo will be removed from Guardian, and her application will not proceed. If she wishes to reapply, she is welcome to pursue the position of Correctional Officer, where she may be reconsidered in the future.

I trust you understand the seriousness of this matter, and I appreciate your attention to the importance of maintaining the integrity of our hiring and promotion processes.

Thank you for your time and consideration.

Sincerely,



**Heather Enders, Human Resources Manager**
**San Mateo County Sheriff's Office**
Professional Standards Bureau
330 Bradford Street 5th Floor
Redwood City, CA 94063
650-363-4872
www.smcsheriff.com
**PEOPLE FIRST – SERVICE ABOVE SELF**

CONFIDENTIAL                    CSM 00478

# Exhibit 61



**Stephen M. Wagstaffe, District Attorney**
# COUNTY OF SAN MATEO

**SHIN-MEE CHANG**                    **REBECCA L. BAUM • MORRIS MAYA • JOSHUA K. STAUFFER**
CHIEF DEPUTY                          ASSISTANT DISTRICT ATTORNEYS

500 COUNTY CENTER, 3rd FLOOR, REDWOOD CITY, CALIFORNIA 94063 (650) 363-4636

FOR IMMEDIATE RELEASE

DATE:    Monday, December 16, 2024

TO:      Media Members

FROM:    Stephen M. Wagstaffe, District Attorney

SUBJECT: Prosecution Decision Regarding Deputy Carlos Tapia

On Tuesday afternoon, November 12, 2024 the San Mateo County Sheriff's Office conducted a warrantless arrest of Deputy Carlos Tapia for felony charges of timecard fraud in violation of Penal Code sections 487(A) grand theft and 532(A) obtaining money by false pretenses, occurring between January 1, 2024 and October 18, 2024. The Sheriff's Office submitted the case to the District Attorney's Office for review and prosecution the next morning, Wednesday, November 13, 2024. This was the first time the case was submitted to the District Attorney's Office for review.

Over the course of the following month the District Attorney's Office conducted a thorough and detailed investigation into the allegations. We have concluded based on the follow-up investigation that no crime was committed by Deputy Carlos Tapia, that the complete investigation showed that there was no basis to believe any violation of law had occurred, and finally that Deputy Tapia should not have been arrested.

The Sheriff's Office investigation was conducted entirely by an assigned Acting Assistant Sheriff who reviewed timecard records for Deputy Tapia. The Acting Assistant Sheriff's investigation was extraordinarily limited and did not involve necessary follow-up investigation to examine the accuracy of the allegations. The Acting Assistant Sheriff noted in his report that the investigation was on-going and more needed to be done. Nevertheless, the Assistant Sheriff reported that the Sheriff's Office executive leadership directed that Deputy Tapia be arrested on November 12, 2024 without that additional investigation being conducted.

After the Assistant Sheriff submitted the case for prosecution on November 13, 2024, District Attorney's Office investigators proceeded over the next month to conduct the complete investigation. This included interviews of the investigating Acting Assistant Sheriff, of the Sergeants and Lieutenant who supervised Deputy Tapia and verified his work schedule and work assignments, Human Resources Management Analysts who

CSM 00480

verified the MOU rules allowing Deputy Tapia release time for his Deputy Sheriff's Association work, the Assistant County Controller regarding payroll rules, the Sheriff's Office Director of Finance and payroll coordinators, and County Public Works staff regarding building log-ins and log-outs. Additionally, a full interview of Deputy Carlos Tapia himself was conducted. Documentary evidence was collected to corroborate verbal statements and interviews were recorded.

At the conclusion of the interview of the investigating Acting Assistant Sheriff, District Attorney investigators discussed with the Acting Assistant Sheriff the additional information learned during the course of the District Attorney's Office follow-up investigation. The Acting Assistant Sheriff repeated several times that the follow-up investigation definitively established that there is no case against Deputy Tapia and he is not guilty of any criminal conduct.

It is my conclusion that the evidence establishes without question that Deputy Carlos Tapia did not commit grand theft, theft by false pretenses or any sort of timecard fraud. There were clerical errors in the manner in which work hours were coded but nothing showing criminal intent or criminal conduct. Additionally there was no monetary loss to the Sheriff's Office by the miscoding. Therefore, we deem this matter closed.

I will be available in the afternoon of December 16, 2024 for any interviews or questions regarding the Deputy Carlos Tapia case. Please direct any questions to District Attorney Stephen Wagstaffe (650) 363-4752.

# Exhibit 62

2024-12-24 Mercury News, San Mateo County Deputy Sheriff's Association President Carlos Tapia turns himself in, Youtube

https://www.youtube.com/watch?v=hr9cCuX0pvY

# Exhibit 63

CONFIDENTIAL

| | |
|---|---|
| **From:** | Daniel Reynolds |
| **To:** | Daniel Perea |
| **Subject:** | Sheriff's decision requested |
| **Date:** | Wednesday, January 29, 2025 4:42:00 PM |
| **Attachments:** | image001.jpg |
| | 01292025_rCHRISTINA CORPUS.pdf |

US PEREA:

I respectfully request the Sheriff's decision regarding the employee's actions detailed in the attached.  I concur with Sgt Fava's recommendation of immediate termination.  The CO was hired on 04/15/24, so probation will end 10/15/25.

Respectfully,
Dan

Dan Reynolds
Lieutenant
San Mateo County Sheriff's Office
Professional Standards Bureau
(650) 363-4692
dreynolds@smcgov.org
**DIGNITY ★ COMPASSION ★ RESPECT**



CONFIDENTIAL



# SHERIFF

# CHRISTINA CORPUS

### SAN MATEO COUNTY SHERIFF'S OFFICE

**DATE:**     January 29, 2025

**TO:**     Lieutenant Dan Reynolds

**FROM:**     Sergeant Joe Fava

**SUBJECT:**     24UOF-051 Recommendation

On August 17, 2024, at approximately 0130 hours, Shawn Bell-Jones was re-housed from the Maple Street Correctional Center (MSCC) to the Maguire Correctional Facility (MCF) due to his disruptive behavior at MSCC. Upon his arrival at MCF, Bell-Jones was brought to a search cell, where he was searched by Correctional Officer Martinez-Torres.

During the search, Bell-Jones was uncooperative and did not follow staff directions. Due to his refusal to comply, Correctional Officer Martinez-Torres instructed Bell-Jones to turn around and place his hands behind his back so he could be placed in handcuffs. Bell-Jones tensed up and pulled away from Martinez-Torres. At this time, Martinez-Torres requested assistance from other jail staff. Correctional Officers Garcia, Ross, Deputy Sheriff Trainee S. Dominguez, and Deputy Tehan responded to assist.

Bell-Jones continued to resist correctional staff and was eventually placed on the ground. In reviewing the video of the incident, I observed a gloved hand (later determined to be that of Correctional Officer Martinez-Torres) cupped around Bell-Jones' neck. Martinez-Torres had four fingers on the right side of Bell-Jones' neck and his thumb on the left side. I recognized this hand positioning as consistent with strangulation. The hand remained on the neck for approximately four seconds. While Martinez-Torres' hand was on his neck, Bell-Jones can be heard saying, "Get your hand off me!"

*CONFIDENTIAL*
For San Mateo County Sheriff's Office Internal Use Only



A few moments later, Martinez-Torres placed his left forearm across Bell-Jones' neck for approximately two seconds. While Martinez-Torres' arm was across his neck, Bell-Jones can be heard saying, "Get your hand off my neck!"

CONFIDENTIAL                     CSM 00487



Initially, I was unable to determine who the gloved hand belonged to, but after reviewing body-worn camera (BWC) footage from Correctional Officer Ross and Deputy Tehan, I was able to confirm that it was Martinez-Torres' hand and arm.

It was noted that when Martinez-Torres had his hand on Bell-Jones' neck, Bell-Jones was being given commands to turn over. However, the placement of Martinez-Torres' hand on Bell-Jones' neck would have prevented him from rolling over.

I also reviewed the report for this incident. Martinez-Torres did not document placing his hand on Bell-Jones' neck or provide an explanation as to why he believed it was necessary.

In reviewing the video, Bell-Jones is seen resisting staff, but there is no apparent justification for staff to place their hands or arms on the front of his neck. At the time of the incident, at least four staff members were present in the search cell, Bell-Jones was on the ground, and he was naked (with no place to conceal a weapon). There is no indication in the video or the reports that Bell-Jones was armed. Based on my training and experience, I know that the front of the neck—especially the throat—is a prohibited impact area, and staff are not trained to touch or apply force to the front of the neck unless it is a deadly force situation.

Page **3** of **4**

CONFIDENTIAL                          CSM 00488

The incident was documented by Sergeant Kellie under 24UOF-051. The report was reviewed by Captain Fogarty, who requested further investigation.

**Conclusion:**

Correctional Officer Martinez-Torres is a probationary employee and has more likely than not violated multiple Sheriff's Office policies. Additionally, Martinez-Torres' hand placement, which appears consistent with strangulation, would likely shock the conscience of the public if seen. Given that this incident occurred several months ago, I recommend that Correctional Officer Martinez-Torres be released from probation immediately.

Joe Fava, Sergeant
Professional Standards Bureau

Page **4** of **4**

CONFIDENTIAL                    CSM 00489

Exhibit 64

CONFIDENTIAL

# SHERIFF
## CHRISTINA CORPUS

### SAN MATEO COUNTY SHERIFF'S OFFICE

**DATE:**      January 29, 2025

**TO:**        Lieutenant Dan Reynolds

**FROM:**      Sergeant Joe Fava

**SUBJECT:**   24UOF-051 Recommendation

---

On August 17, 2024, at approximately 0130 hours, Shawn Bell-Jones was re-housed from the Maple Street Correctional Center (MSCC) to the Maguire Correctional Facility (MCF) due to his disruptive behavior at MSCC. Upon his arrival at MCF, Bell-Jones was brought to a search cell, where he was searched by Correctional Officer Martinez-Torres.

During the search, Bell-Jones was uncooperative and did not follow staff directions. Due to his refusal to comply, Correctional Officer Martinez-Torres instructed Bell-Jones to turn around and place his hands behind his back so he could be placed in handcuffs. Bell-Jones tensed up and pulled away from Correctional Officer Martinez-Torres. At this time, Correctional Officer Martinez-Torres requested assistance from other jail staff. Correctional Officers Garcia, Ross, Deputy Sheriff Trainee S. Dominguez, and Deputy Tehan responded to assist.

Bell-Jones continued to resist correctional staff and was eventually placed on the ground. In reviewing the video of the incident, I observed a gloved hand (later determined to be that of Correctional Officer Martinez-Torres) cupped around Bell-Jones' neck. Correctional Officer Martinez-Torres had four fingers on the right side of Bell-Jones' neck and his thumb on the left side. I recognized this hand positioning as consistent with strangulation. The hand remained on the neck for approximately four seconds. While Correctional Officer Martinez-Torres' hand was on his neck, Bell-Jones can be heard saying, "Get your hand off me!"

*CONFIDENTIAL*
For San Mateo County Sheriff's Office Internal Use Only



A few moments later, Correctional Officer Martinez-Torres placed his left forearm across Bell-Jones' neck for approximately two seconds. While Correctional Officer Martinez-Torres' arm was across his neck, Bell-Jones can be heard saying, "Get your hand off my neck!"

Page **2** of **5**



Initially, I was unable to determine who the gloved hand belonged to, but after reviewing body-worn camera (BWC) footage from Correctional Officer Ross and Deputy Tehan, I was able to confirm that it was Correctional Officer Martinez-Torres' hand and arm. I made this determination, by watching the video from different angles. In both angles, I was able to see that Correctional Officers Martinez-Torres, Ross, and Deputy Sheriff Trainee Dominguez are controlling Bell-Jones' upper body. Correctional Officer Martinez-Torres is the only person wearing gloves, not only near the upper portion of Bell-Jones' body but also seems to be the only staff member wearing gloves in the search cell at the time. Correctional Officer Ross' and Deputy Sheriff Trainee Dominguez's ungloved hands are seen above. Additionally, I was able to see a portion of Correctional Officer Martinez-Torres' nametag with his gloved hand in the frame of Correctional Officer Ross' BWC.

CONFIDENTIAL                    CSM 00493



Link to Correctional Officer Ross' BWC (observations detailed above are made in the first minute of the video):
https://sanmateocountyso.evidence.com/axon/evidence?evidence_id=a5b247a71b7143e7996f0efa55b9a343&partner_id=92b33fa776744db49d575527e507193e

Link to Deputy Tehan's BWC (observations made detailed above are after the first minute of the video):

https://sanmateocountyso.evidence.com/axon/evidence?evidence_id=06df7791020f4a44a4044e83027cddb6&partner_id=92b33fa776744db49d575527e507193e

It was noted that when Correctional Officer Martinez-Torres had his hand on Bell-Jones' neck, Bell-Jones was being given commands to turn over. However, the placement of Correctional Officer Martinez-Torres' hand on Bell-Jones' neck would have prevented him from rolling over.

I also reviewed the report for this incident. Correctional Officer Martinez-Torres did not document placing his hand on Bell-Jones' neck or provide an explanation as to why he believed it was necessary.

Page **4** of **5**

CONFIDENTIAL                    CSM 00494

In reviewing the video, Bell-Jones is seen resisting staff, but there is no apparent justification for staff to place their hands or arms on the front of his neck. At the time of the incident, at least four staff members were present in the search cell, Bell-Jones was on the ground, and he was naked (with no place to conceal a weapon). There is no indication in the video or the reports that Bell-Jones was armed. Based on my training and experience, I know that the front of the neck—especially the throat—is a prohibited impact area, and staff are not trained to touch or apply force to the front of the neck unless it is a deadly force situation.

The incident was documented by Sergeant Kellie under 24UOF-051. The report was reviewed by Captain Fogarty, who requested further investigation.

**Conclusion:**

Correctional Officer Martinez-Torres is a probationary employee and has more likely than not violated multiple Sheriff's Office policies. Additionally, Correctional Officer Martinez-Torres' hand placement, which appears consistent with strangulation, would likely shock the conscience of the public if seen. Given that this incident occurred several months ago, I recommend that Correctional Officer Martinez-Torres be released from probation immediately.


_____
Joe Fava, Sergeant
Professional Standards Bureau

CONFIDENTIAL                        CSM 00495

# Exhibit 65

2025.02.06 Video of DSA Support for Measure A

https://www.ktvu.com/news/san-mateo-county-leaders-urge-residents-remove-sheriff-christina-corpus

# Exhibit 66

CSM 00498

# CLAIM AGAINST THE COUNTY OF SAN MATEO

### *(Please print legibly or type.  Please do not use pencil)*

| | |
|---|---|
| Claimant's Name: | Carlos Tapia |
| Claimant's Address: | Contact Grant Winter, Mastagni Holstedt, APC, 1912 I Street |

| City: Sacramento | State: CA | ZIP Code: 95811 | Phone: 916-491-4252 |
|---|---|---|---|

| Amount of Claim: | $ Exceeds $10,000 |
|---|---|

Address to which notices are to be sent (if different than above):

Same as above.

RECEIVED
IN THE OFFICE OF

**FEB 2 1 2025**

CLERK OF THE
BOARD OF SUPERVISORS

| Date of incident: | 11/12/2024 | Location of Incident: San Mateo County Sheriff's Office |
|---|---|---|

How did it occur (describe damage or loss):

See Attachment.

Name of Public Employee(s) causing injury, damage, or loss (if known):

1. See Attachment for identification of known public employees.

2.

Itemization of Claim: List Item(s) that total the amount above:

| | | |
|---|---|---|
| 1. See Attachment. | $ | |
| 2. | $ | |
| 3. | $ | |
| 4. | $ | |
| | TOTAL | $ |

I declare under penalty of perjury that the foregoing is true and correct:

Dated at _____ Sacramento _____, California, on _____ February 18th _____, 2025

Signature of Claimant: _____ Grant A. Winter, attorney for Carlos Tapia

CSM 00499

**Return to:  CLAIMS, Board of Supervisors, 500 County Center, 5th FL., Redwood City, CA 94063**

DAVID P. MASTAGNI (SBN 57721)
GRANT A. WINTER (SBN 266329)
**MASTAGNI HOLSTEDT, A.P.C.**
1912 I Street
Sacramento, CA 95811
Telephone: (916) 446-4692
Facsimile: (916) 447-4614
*Email: gwinter@mastagni.com*

Attorneys for Claimant Carlos Tapia

CARLOS TAPIA, an individual; SAN
MATEO COUNTY DEPUTY SHERIFF'S
ASSOCIATION

      Claimant,

      vs.

COUNTY OF SAN MATEO, a municipal
corporation; CHRISTINA CORPUS,
individually and in her official capacity;
VICTOR AENLLE, individually and in his
official capacity; DAN PEREA, individually
and in his official capacity; MATTHEW FOX,
individually and in his official capacity; and
DOES 1 through 100 inclusive,

      Respondents.

**ATTACHMENT TO CLAIM AGAINST
THE COUNTY OF SAN MATEO**

## **INTRODUCTION**

1.   The filing of this Government Claim should not be construed as waiving Claimant's right to file any claims excluded under California Government Code (Cal. Gov. Code) § 905, including but not limited to claims brought under 42 U.S.C. § 1983. Claimant makes the following claim for damages pursuant to Cal. Gov. Code § 905.

2.   Claimant is a peace officer with privacy protections that do not allow for the public posting of his address or telephone number pursuant to Cal. Gov. Code §§ 6254.21 and 6254.24. Claimant may

-1-

1  be reached through his attorney, Grant A. Winter at 1912 I Street, Sacramento, CA 958311 or via

2  telephone at 916-491-4252.

3       3. Claimant CARLOS TAPIA is, and was at all times relevant to this complaint, a resident of

4  the State of California.

5       4. Respondent COUNTY OF SAN MATEO is a "local public entity" within the meaning of

6  Cal. Gov. Code § 940.4. It is duly organized and existing under the laws of the State of California and

7  manages and operates the San Mateo County Sheriff's Office.

8       5. Respondent CHRISTINA CORPUS is, and was at all times relevant to this complaint, the

9  Sheriff for the San Mateo County Sheriff's Office. For all events cited in this complaint, she was acting

10  within the scope of her employment. This complaint is brought against her in both her official and

11  individual capacities. Sheriff Corpus is a final decision and policy maker for the San Mateo County

12  Sheriff's Office, given that she makes official and independent determinations about discipline,

13  promotions, demotions, training, supervision, and other personnel matters for the San Mateo County

14  Sheriff's Office. She is also authorized to order arrests of individuals within the San Mateo County

15  Sheriff's Office's jurisdiction.

16       6. Respondent VICTOR AENLLE is, and was at all times relevant to this complaint, an

17  Executive Consultant or Executive Director or Chief of Staff at the San Mateo County Sheriff's Office.

18  For all events cited in this complaint, he was acting within the scope of his employment. This

19  complaint is brought against him in both his official and individual capacities. Mr. Aenlle is a final

20  decision maker for the San Mateo County Sheriff's Office, given that he served as Sheriff Corpus's

21  Chief of Staff and advised her on all major decisions regarding actions taken by the San Mateo County

22  Sheriff's Office, to include personnel decisions.

23       7. Respondent MATTHEW FOX is, and was at all times relevant to this complaint, employed

24  by the San Mateo County Sheriff's Office. From September 2024, until the end of his employment in

25  November 2024, Mr. Fox served as the Acting Assistant Sheriff for the San Mateo County Sheriff's

26  Office. For all events cited in this complaint, he was acting within the scope of his employment. This

27  complaint is brought against him in both his official and individual capacities. Mr. Fox was a final

28  decision maker for the San Mateo County Sheriff's Office, given his position as part of the Sheriff's

-2-

Executive Staff.

8. Respondent DAN PEREA is, and was at all times relevant to this complaint, employed by the San Mateo County Sheriff's Office. Mr. PEREA served as the Undersheriff for the San Mateo County Sheriff's Office. For all events cited in this complaint, he was acting within the scope of his employment. This complaint is brought against him in both his official and individual capacities. Mr. Perea was a final decision maker for the San Mateo County Sheriff's Office, given his position as part of the Sheriff's Executive Staff.

9. Mr. Tapia is ignorant of the true names and capacities of respondents identified herein as DOES 1 through 100, inclusive, and therefore brings this complaint against said respondents by such fictitious names. Mr. Tapia will amend this complaint to allege their true names and capacities when ascertained.  Mr. Tapia is informed and believes, and therefore alleges, that each of the DOE respondents is legally responsible and liable for the incidents, injuries, and damages set forth in this complaint. Each respondent proximately caused injuries and damages because of their actions, omissions, negligence, breach of duty, negligent supervision, management, or control. This occurred and in violation of law and of public policy. Each respondent is liable for their personal conduct, vicarious and/or imputed negligence, fault, or breach of duty, whether severally or jointly, or whether based upon agency, employment, ownership, entrustment, custody, care, control, or upon any other act or omission, including policy or custom.

10. In committing the acts and/or omissions alleged in this complaint, respondents, and each of them, acted within the course and scope of their employment as hired, elected, or appointed employees of the County of San Mateo.

11. In committing the acts and/or omissions alleged in this complaint, respondents, and each of them, acted under color of authority and/or color of law.

12. Due to the acts and/or omission alleged in this complaint, respondents, and each of them, acted as the agent, servant, and employee, and/or in concert with every other respondent. The term "respondent" or "respondents" in this complaint shall be inclusive of each of the respondents, to include both named and DOE respondents.

**STATEMENT OF FACTS**

13.  Claimant Carlos Tapia (hereafter, "Mr. Tapia") has served the San Mateo County Sheriff's Office (hereafter, "Sheriff's Office") in varying capacities for the past 15 years. Mr. Tapia has served in roles ranging from a Correctional Officer to a Deputy Sheriff.

14.  Mr. Tapia has also served as the President of the San Mateo County Deputy Sheriff's Association ("DSA") since August 2022. The DSA is the official union for all Deputy Sheriffs and Correctional Officers in San Mateo County. The Sheriff directly oversees all the Deputy Sheriffs and Correctional Officers in the County of San Mateo.

15.  The Sheriff of San Mateo County is a voter-elected position. The most recent election for the office of Sheriff was in June 2022. The race was between the incumbent, Carlos Bolanos (hereafter, "Mr. Bolanos"), and Respondent Christina Corpus (hereafter, "Sheriff Corpus"). Mr. Bolanos and Sheriff Corpus possessed a great deal of animosity towards each other and ran for the position of Sheriff on opposing platforms. The election was, in general, contentious. The DSA declined to endorse Sheriff Corpus during the election, despite her request that they do so.

16.  Mr. Tapia became Acting President of the DSA in August 2022, after David Wozniak (hereafter, "Mr. Wozniak") stepped down. In addition to serving as President of the DSA during the election, Mr. Wozniak had also organized a preexisting Political Action Committee which ultimately endorsed Mr. Bolanos. Sheriff Corpus reacted negatively to this, calling the process by which the Political Action Committee decided on its endorsement a "charade orchestrated by my opponent, which is little more than an extension of the existing power structure." Sheriff Corpus also expressed personal dislike for Mr. Wozniak. Mr. Wozniak remained on the Board as Vice President of the DSA to assist Mr. Tapia with the transition.

17.  At some point between the June 2022 election and taking office in January of 2023, Sheriff Corpus formed a team to assist with her transition into the Office of the Sheriff (hereinafter, "the Transition Team"). One of the members named to the Transition Team was Respondent Victor Aenlle (hereafter, "Mr. Aenlle"). Mr. Aenlle had worked on Sheriff Corpus's campaign during the election and was subsequently appointed as an "Executive Consultant" to the Transition Team. When Corpus took office in January 2023 she made Aenlle a member of her "Executive Staff" including giving him

-4-

the role of "Chief of Staff."  In approximately July 2023, Mr. Aenlle was promoted to the newly-created position of "Executive Director of Administration", a position he assumed in approximately August 2023, he remained in his position as "Chief of Staff."

18.  In approximately September 2022, Mr. Aenlle expressed to Mr. Tapia that Mr. Tapia "did not deserve" the position of President of the DSA. Further, that Mr. Aenlle was disappointed that Mr. Wozniak remained on the Board, as Mr. Aenlle believed that Mr. Wozniak was too supportive of Mr. Bolanos and would be hostile to Sheriff Corpus's administration.

19.  In approximately October 2022, Mr. Aenlle approached Mr. Tapia about an incident where an employee of the Sheriff's Office had witnessed Mr. Aenlle boarding a plane to Hawaii with Sheriff Corpus. Both Mr. Aenlle and Sheriff Corpus were married at the time, but neither of their spouses were on the flight. Mr. Aenlle stated to Mr. Tapia that there were rumors being spread that Mr. Aenlle and Sheriff Corpus were having an affair. Mr. Aenlle stated that he hoped Mr. Tapia would help dispel those rumors.

20.  In approximately November 2022, Sheriff Corpus called Mr. Tapia in tears, stating that Respondent Matthew Fox (hereafter, "Mr. Fox")—at the time, an employee of the Daly City Police Department—had informed her that an employee of the Sheriff's Office accused Sheriff Corpus and Mr. Aenlle of having an affair during a conversation where Mr. Tapia was present. Sheriff Corpus felt that Mr. Tapia should have done more to intervene and stop the conversation because Tapia was president of the San Mateo County Deputy Sheriff's Association and Corpus wanted Tapia to exercise his power in that way – stopping members from speaking about the Sheriff. Mr. Tapia subsequently received a phone call from Mr. Aenlle, who also expressed his "disappointment" with Mr. Tapia for not doing more to "handle the situation."

21.  In approximately January 2023, Mr. Aenlle approached Mr. Tapia about some text messages Mr. Aenlle had seen in a DSA Board group text, in which a member of the Board accused Mr. Aenlle of not having the requisite qualifications for his job. Mr. Aenlle was upset with Mr. Tapia for not exercising his power as DSA president to stop his members from speaking unfavorably about Aenlle.

22.  In the summer and fall of 2024, the San Mateo County Board of Supervisors commissioned

-5-

an independent investigation into the Sheriff's Office, including allegations against Corpus and Aenlle. In the investigative report issued by retired judge LaDoris Cordell (hereafter, "Judge Cordell"), described in paragraph 39 of this complaint, Mr. Aenlle was described as "the third in command", with both sworn and civilian employees in the Sheriff's Office being ordered to report to him. Mr. Aenlle reportedly stated to an employee: "If I give you an order, it's as if it is coming directly from the Sheriff." Mr. Aenlle is further cited as having given Sheriff Corpus directives on personnel decisions, to include advising her on whether to fire various Deputy Sheriffs, weighing in on Internal Affairs investigations, making pronouncements about the handling of relations with the DSA during negotiations over the new overtime policy, and participating in the drafting of a memorandum detailing the new overtime policy. In her report, Judge Cordell concluded: "It is abundantly clear that Sheriff Corpus and Victor Aenlle have a personal relationship, beyond mere friendship. It is also clear that that relationship has led Sheriff Corpus to relinquish control of the San Mateo County Sheriff's Office to Victor Aenlle, someone who has far more experience as a Coldwell Banker associate real estate broker than he has in law enforcement."

23. Also in approximately March 2023, Mr. Wozniak filed suit against San Mateo County, Sheriff Corpus, and Mr. Aenlle.

24. Between approximately March 2023 and April 2024, Mr. Tapia was made privy to a number of complaints from employees of the Sheriff's Office about working conditions, including their treatment by Mr. Aenlle. Mr. Tapia told employees who came to him with complaints that, if they wished to file an official complaint, the appropriate way to do so was through Human Resources.

25. In approximately April 2024, Mr. Aenlle approached Mr. Tapia and asked what Mr. Tapia thought of "the lawsuit". Mr. Tapia asked Mr. Aenlle to specify, as various lawsuits had been filed against the County regarding the Sheriff's Office. Mr. Aenlle specified that he meant Mr. Wozniak's lawsuit. Mr. Tapia responded that Mr. Wozniak's lawsuit was none of Mr. Tapia's business. Mr. Aenlle went on to state that Mr. Wozniak had "fucked up", was "going to pay" for going after Mr. Aenlle, and that Mr. Aenlle had "a lot of money".

26. In approximately July 2024, Dan Perea (hereafter, "Undersheriff Perea") was hired as the Undersheriff of San Mateo County. That same month, Undersheriff Perea approached Mr. Tapia about

-6-

the mandatory overtime policy for employees of the Sheriff's Office. Undersheriff Perea expressed a desire to scrap the existing policy and replace it with a new one. Mr. Tapia, in his capacity as President of the DSA, disagreed with this proposal and asked for further discussions prior to any changes. Mr. Tapia later learned that the new policy was created by Mr. Aenlle and Mr. Fox, and Mr. Aenlle had ordered Undersheriff Perea to speak with Mr. Tapia about it.

27. On or about August 9, 2024, Mr. Tapia was contacted by Judge Cordell. Judge Cordell stated that she had been hired by the County of San Mateo to conduct an independent investigation into complaints against Sheriff Corpus and Mr. Aenlle. Mr. Tapia agreed to participate in Judge Cordell's information-gathering on working conditions at the Sheriff's Office. He provided Judge Cordell an interview for her report.

28. On or about August 15, 2024, Mr. Tapia attended a meet and confer with Undersheriff Perea and Sheriff Corpus. Mr. Tapia attended in his capacity as President of the DSA. Hector Acosta was also present in his capacity as President of the Organization of Sheriff's Sergeants (hereafter, "OSA"). The purpose of the meet and confer was to discuss the mandatory overtime policy. The meeting became heated and ended without resolution of the mandatory overtime policy question. A few hours after the meeting ended, Mr. Tapia received an email from the Payroll Unit, requesting that he properly code his timecards for auditing purposes.

29. On or about August 23, 2024, Mr. Tapia received an e-mail from the Payroll Unit, stating that he had not properly coded his timecard. Mr. Tapia called Van Enriquez (hereafter, "Mr. Enriquez"), the employee who sent the e-mail, to inquire as to who had asked Mr. Enriquez to relay that message. Mr. Enriquez declined to answer, stating that he did not want to get involved. Mr. Tapia called Katy Roberts in Human Resources, who stated that she did not ask for Payroll to contact Mr. Tapia.

30. On or about August 30, 2024, California Public Employment Relations Board (PERB) complaints were filed against the Sheriff's Office on behalf of the DSA and OSA, alleging that Sheriff Corpus and Mr. Aenlle had created a toxic work environment, failed to meet and confer with the unions in good faith, and were retaliating against union members. The same day, the DSA sent an e-mail to its membership, explaining the PERB process and holding a vote of no confidence against Mr.

-7-

Aenlle.

31. On or about September 11, 2024, the no confidence vote against Mr. Aenlle was completed. Of the 318 members of the DSA who voted, 306 (96.23%) were in favor of the resolution expressing no confidence in Mr. Aenlle. An e-mail was sent by the DSA to the Sheriff's Office leadership based on these results.

32. On or about September 12, 2024, Mr. Aenlle was reported as saying to the San Mateo Daily Journal: "They think that the only people they need to report to or answer to have to be sworn and carry a big badge on them. I am Chief of Staff. The Undersheriff is her right hand, I'm her left hand."

33. On or about September 17, 2024, a DSA, OSS, and Labor Council press conference was held. Mr. Tapia was in attendance, in his capacity as President of the DSA, and spoke during the press conference. During the press conference, the results of the vote of no confidence against Mr. Aenlle were reported, as well as the violations alleged in the PERB complaint.

34. On or about September 20, 2024, Assistant Sheriff Ryan Monaghan (hereafter, "Mr. Monaghan") was fired after confirming to Sheriff Corpus that he was interviewed by Judge Cordell on September 17, 2024. Mr. Monaghan was replaced as Assistant Sheriff by Mr. Fox. Mr. Fox, at some point between January 2023 and September 2024, had transitioned from the Daly City Police Department to a role as Captain at the Sheriff's Office.

35. On or about October 4, 2024, the DSA and OSS received an e-mail from an attorney representing Mr. Aenlle, demanding both unions retract the statements they had made during the September 2024 press conference or face legal action. The PERB complaint was subsequently amended to include an additional allegation that Mr. Aenlle, based on the letter, was continuing to intimidate and retaliate against union members.

36. On or about November 12, 2024, Mr. Tapia was informed by Mr. Fox—through Mr. Tapia's attorneys—that Mr. Tapia needed to surrender his service weapon and badge and turn himself in to the Sheriff's Office. When Mr. Tapia arrived at the Sheriff's Office, he was advised that he was under arrest for violating California Penal Code Section 487a (Grand Theft) and California Penal Code Section 532 (Theft Under False Pretenses). Mr. Tapia was then escorted to jail and booked.

-8-

37. Also on or about November 12, 2024, Sheriff Corpus conducted a press conference regarding Mr. Tapia's arrest, in which she stated: "I will not turn a blind eye when credible evidence supports that a crime has been committed, whether it be a member of the public or a trusted member of our office. There has been speculation and concern regarding potential conflicts of interest involving internal and external figures who have been vocal about this inquiry." Mr. Tapia was released later that day, on bail of $10,000. His bail was paid for by the DSA.

38. Also on or about November 12, 2024, Mr. Tapia was served with paperwork notifying him that he was being placed on administrative leave. The notification stated, among other provisions, that: "You are directed to remain at your home between the hours of 8:00 a.m. to 5 p.m., Tuesday through Friday, with a one-hour meal break from noon to 1:00 p.m. during which you are at liberty to leave your residence. If you are unable to be reached by telephone during those hours while on this assignment, the time that you are unavailable will be considered Absence without Leave (AWOL) and disciplinary action will be taken." The letter was signed by Mr. Fox on behalf of Sheriff Corpus.

39. Also on or about November 12, 2024, a few hours after Mr. Tapia's arrest, Judge Cordell's report was released to the public. The report alleged, among other allegations, that Sheriff Corpus had an inappropriate relationship with Mr. Aenlle, that Sheriff Corpus and Mr. Aenlle retaliated against officers and employees of the Sheriff's Office, and that Mr. Aenlle had exceeded the scope of his employment. Judge Cordell sustained nearly all of the fifteen allegations made against Sheriff Corpus and Mr. Aenlle in her 408-page report. Judge Cordell noted a pattern of retaliatory actions by Sheriff Corpus and Mr. Aenlle against Sheriff's Office employees perceived as criticizing Sheriff Corpus or Mr. Aenlle or otherwise pushing back against their personal and professional agendas. The report received media coverage.

40. The independent investigator issued a report, which has been made public and is published on the San Mateo County Board of Supervisor's website. The independent investigator's report and conclusions included, among other things:

a. Corpus and Aenlle, who is described as her chief of staff, have a "personal relationship" beyond mere friendship that creates a conflict of interest.

b. Corpus has uttered and texted racial and homophobic slurs in the workplace.

-9-

c.    Corpus and her executive team, including Anelle engaged in retaliation and intimidation.

d.    Aenlle has exceeded and/or abused his authority with the approval of Corpus.

e.    Aenlle exercises authority well beyond that of supervising civilian personnel. With the sheriff's approval, Aenlle has moved himself to the top of the chain of command so that he exercises wide-ranging and sometimes abusive authority over both civilian and sworn employees.

f.    Aenlle is not authorized to wear a badge that resembles the gold badges of sworn employees and by doing so he has likely committed a misdemeanor for willfully wearing a facsimile badge that could deceive a civilian into believing he is a sworn officer with full police powers. Corpus, by issuing the gold badge to Aenlle, may have committed a misdemeanor, as well.

41.    The independent investigator's report states the following, among other things: "Despite their denials, there is factual evidence that Sheriff Corpus and Victor Aenlle have a personal relationship, beyond mere friendship. In fact, the evidence establishes that they have had an intimate relationship. This relationship has led Sheriff Corpus to relinquish control of the San Mateo County Sheriff's Office to Aenlle, someone who has far more experience as a Coldwell Banker associate real estate broker than he has in law enforcement."

42.    The independent investigator's report states the following, among other things: "Aenlle exercises authority well beyond that of supervising civilian personnel. With the Sheriff's approval, Aenlle has moved himself to the top of the Chain of Command so that he exercises wide-ranging and sometimes abusive authority over both civilian and sworn employees."

43.    The independent investigator's report states the following, among other things: "Aenlle interferes in personnel decisions concerning sworn employees."

44.    The independent investigator's report states the following, among other things: "Aenlle improperly gives directives to Sheriff Corpus."

45.    The independent investigator's report states the following, among other things: "Aenlle's actual authority is limited to the supervision of civilian personnel, yet his work at the Sheriff's Office has far exceeded the responsibilities described in his job description. Aenlle's approach to his responsibilities is best described in his statement to a sworn employee shortly after

-10-

1    Sheriff Corpus was elected: 'If I give you an order, it's as if it is coming directly from the Sheriff.'

2    With this statement, Aenlle, early on, signaled his intention to assume the power of the Sheriff. Aenlle

3    frequently invokes the phrase, 'at the direction of the Sheriff' in exercising his authority. By doing so,

4    Aenlle has succeeded in moving himself to the top of the Chain of Command. Unfortunately, Sheriff

5    Corpus has elected not to speak with this investigator. Even so, whether or not Sheriff Corpus has

6    explicitly given Aenlle this wide-ranging power over her Office is not the point. That the Sheriff

7    permits him to engage in this conduct is clear."

8        46. On or about November 15, 2024, Mr. Fox resigned from the Sheriff's Office. Mr. Fox was

9    responsible for the Sheriff's Office investigation into whether Mr. Tapia had committed a crime related

10   to his timecards. According to various news sources, Mr. Fox's report included statements that more

11   work needed to be done on the investigation. Mr. Fox's report was incomplete and his investigation

12   was ongoing at the time of Mr. Tapia's arrest. Although Sheriff Corpus's statement to the press

13   affirmed that Mr. Tapia's arrest had been coordinated with the District Attorney's Office, the District

14   Attorney's Office released a statement on December 16, 2024 noting that: "The Sheriff's Office

15   submitted the case to the District Attorney's Office for review and prosecution the next morning,

16   Wednesday, November 13, 2024. This was the first time the case was submitted to the District

17   Attorney's Office for review."

18       47. On or about November 18, 2024, Brian Philip (hereafter, "Mr. Philip") filed a claim against

19   the County of San Mateo. Mr. Philip had been an employee of the Sheriff's Office since August 2023.

20   Among his complaints to the County, Mr. Philip stated that he was forced to resign after refusing to

21   effectuate the November 12, 2024 arrest of Mr. Tapia. Mr. Philip stated that Undersheriff Perea had

22   ordered him to effectuate the arrest but would not provide a factual basis to warrant the arrest. Further,

23   Undersheriff Perea—upon Mr. Philip refusing the order, believing the arrest to be improper and illegal

24   retaliation against Mr. Tapia for exercising his union rights—ordered Mr. Philip to neither report the

25   arrest to Human Resources nor to the District Attorney's Office.

26       48. On or about December 16, 2024, District Attorney Steve Wagstaffe announced that no

27   charges would be filed against Mr. Tapia. He released the following statement to the press: "The

28   complete investigation showed that there was no basis to believe any violation of law had occurred,

and finally that deputy Tapia should not have been arrested." Mr. Wagstaffe further stated: "The Acting Assistant Sheriff's investigation was extraordinarily limited and did not involve necessary follow-up investigation to examine the accuracy of the allegations." In a separate statement to a new organization, Mr. Wagstaffe noted: "We think that it is best for public confidence that a law enforcement agency contact us as soon as they believe criminal conduct and let us investigate it...rather than the agency investigating it themselves. But this is a choice to be made by the police chief or sheriff. There is no rule or law requiring the referral to my office."

49.    Also on or about December 16, 2024, Sheriff Corpus announced that there would be a separate internal review into Mr. Tapia's actions. She said of the District Attorney's decision: "I'm disappointed. But I'm not surprised. He has an independent office, and I didn't have to respect his decision. But you know, with the information that I was presented. I felt that we had overwhelming evidence."

50.    As of the filing of this complaint, Mr. Tapia remains on administrative leave and under an Internal Affairs investigation. Due to his inability to assume special duties and overtime, this has significantly reduced the amount of money Mr. Tapia is able to earn during every two-week pay period. For example, comparing Mr. Tapia's first pay period prior to placement on administrative leave with his first complete pay period after placement on administrative leave, Mr. Tapia lost over $2,000 in pay. To date, Mr. Tapia has been on administrative leave for at least five pay periods. There has been no indication of when or if Mr. Tapia can expect to resume his normal duties.

51.    The actions taken by the respondents, to include an unlawful arrest and retaliatory placement on administrative leave/initiation of an Internal Affairs investigation, have caused Mr. Tapia great personal distress. Following his arrest and placement on administrative leave, Mr. Tapia began seeking mental health treatment and was prescribed medication for anxiety and sleep deprivation. Mr. Tapia's administrative leave order originally required him to remain inside of his residence from 8 A.M. until 5 P.M. (with the exception of a 12:00 A.M. To 1:00 P.M.) lunch break. Mr. Tapia was also ordered to be constantly and immediately available at home, or else be docked pay for any amount of time he cannot be reached. Effectively, Mr. Tapia was on a monitored house arrest 40 hours a week, which has contributed to his distress. Subsequently he was given leave to conduct

-12-

DSA business on a very limited basis outside of his house – mostly limited to inside of the DSA office. He is banned from entering Sheriff's Office facilities and is therefore effectively banned from representing DSA members if they need representation or assistance within the Sheriff's Office premises.

52.    The actions taken by the respondents, to include an unlawful arrest and retaliatory placement on administrative leave/initiation of an Internal Affairs investigation, have caused damage to Mr. Tapia's reputation. Footage of his arrest was published in the news and is still readily available online to anyone who searches Mr. Tapia's name on the Internet. Even after the District Attorney's Office declined to pursue charges against Mr. Tapia, citing the absence of any evidence that Mr. Tapia committed a crime, respondents refused to clear Mr. Tapia's name. Instead, Sheriff Corpus publicly cited a continued belief that Mr. Tapia may have committed a crime. Further, disparaging the finding of the District Attorney and stating that Mr. Tapia would be subject to an Internal Affairs investigation. Indeed, Sheriff Corpus has made numerous statements to the media—in her capacity as Sheriff of San Mateo County—indicating a belief that Mr. Tapia engaged in criminal misconduct.

53.    On account of the actions taken by the respondents, the DSA has incurred numerous expenses. This has included hiring attorneys to represent the DSA, hiring political and Public Relations consultants to assist the DSA in its efforts to effectuate Sheriff Corpus's removal from office, and paying Mr. Tapia's bail after his unlawful arrest.

54.    The actions taken by the respondents constitute violations of Mr. Tapia's constitutional rights, to include his First Amendment right to freedom of speech, First Amendment right to freedom of association, Fourth Amendment right to be free of unlawful searches and seizures, and Fourteenth Amendment right to procedural due process. Mr. Tapia has been targeted for a deprivation of these rights by respondents for no other reason than his lawful exercise of the rights and responsibilities associated with his role as President of the DSA.

55.    The actions taken by the respondents constitute violations of various labor laws. This includes laws meant to protect Mr. Tapia's right to engage in union activities, Mr. Tapia's right to represent members of the DSA in their employment relations with the Sheriff's Office, Mr. Tapia's right to expect the Sheriff's Office to comply with meet and confer requirements, and Mr. Tapia's

-13-

1    right to be free from discrimination or retaliation for engaging in union activities. *See, e.g.,* Cal. Gov.

2    Code §§ 3502, 3503, 3504, 3505, and 3506. Further, the actions taken by respondents constitute a

3    violation of labor laws meant to protect whistleblowers, such as Mr. Tapia, who participate in

4    investigations into an employer's noncompliance with with local, state, or federal rules or regulations.

5    *See, e.g.,* Cal. Lab. Code § 1102.5.

6                                    **DAMAGES CLAIMED**

7        56. As a result of the Respondents' conduct and/or omissions Mr. Tapia suffered the following

8    damages, both past and future, including but not limited to:

9            a. Loss of wages and earning opportunities, including but not limited to regular pay,

10           special duty pay, all other types of pay, at times past present and future;

11           b. Loss of holiday work pay, at times past present and future;

12           c. Loss of overtime pay, at times past present and future

13           d. Punitive damages;

14           e. Past, present, and future medical expenses;

15           f. All other special damages not yet incurred or herein cited;

16           g. General damages, including but not limited to loss of reputation and emotional

17           distress;

18           h. Statutory damages arising from violations of State and Federal Constitutional

19           rights;

20           i Statutory damages arising from violations of other federal and State Statutory

21           violations;

22           j. All damages, penalties, attorney's fees and costs recoverable under 42 U.S.C. §

23           1983, and as otherwise allowed under California and United States statutes, codes,

24           and common law;

25           k. The costs of the suit herein incurred;

26           l. Any other relief not cited herein that could be deemed just and proper.

27       Taking into account the foregoing, the claim exceeds $10,000 pursuant to Cal. Gov. Code §

28    910(f) and would constitute an unlimited civil case. Accordingly, Mr. Tapia requests the following

                                        -14-

remedies:

     a.  Compensation for all damages suffered;

     b.  Compensation of expenses incurred by the DSA;

     c.  Immediate reinstatement from administrative leave;

     d.  A public statement clearing him of any wrongdoing.

DATED: 2/18/2025          MASTAGNI HOLSTEDT, A.P.C.

                             By: _____
                                   GRANT A. WINTER
                                   Attorney for Claimant

-15-



US POSTAGE
quadient
FIRST-CLASS MAIL
$007.16¹
IMI
02210202S ZIP 95811
043M3123S205

7003 0500 0003 1192 1835

Mastagni Holstedt
A Professional Corporation
1912 I Street
Sacramento, CA 95811

MASTAGNI HOLSTEDT
A PROFESSIONAL CORPORATION

1912 I STREET
SACRAMENTO, CA 95811

RECEIVED
IN THE OFFICE OF

FEB 21 2025

CLERK OF THE
BOARD OF SUPERVISORS

Claims, Board of Supervisors
500 County Center, 5th Floor
Redwood City, CA 94063

# Exhibit 67

STATE OF CALIFORNIA                                                                GAVIN NEWSOM, Governor


**PERB**
California Public Employment
Relations Board

San Francisco Regional Office
1515 Clay Street, Suite 2206
Oakland, CA, 94612-1403
Telephone: (415) 654-2358
Jeremy.Zeitlin@perb.ca.gov

April 3, 2025

Garrett Porter, Attorney
Mastagni Holstedt, A.P.C.
1912 I Street
Sacramento, CA 95811

Timothy Yeung, Attorney
Sloan Sakai Yeung & Wong LLP
555 Capitol Mall, Suite 600
Sacramento, CA 95814

Re:    San Mateo County Deputy Sheriff's Association v. County of San Mateo
       Unfair Practice Charge No. SF-CE-2224-M
       **COMPLAINT**

Dear Parties:

The Office of the General Counsel has issued the enclosed COMPLAINT in the
above-entitled matter.  The Respondent is required to file an **ANSWER** within twenty
(20) calendar days from the date of service of the COMPLAINT, pursuant to PERB
Regulation 32644.[1]  The required contents of the **ANSWER** are described in PERB
Regulation 32644(b).

If you have not filed a Notice of Appearance form, one should be completed and
returned with your **ANSWER**.  Please be aware that once legal counsel is designated,
PERB will only correspond with that individual(s).

An informal settlement conference will be scheduled shortly.  Please direct all
inquiries, filings and correspondence to the undersigned.  Designated legal counsel
who do not attend the Informal Conference for any reason, must designate in writing
consent that the meeting go forward in their absence, including, but not limited to the

---
        [1] PERB's Regulations are codified at California Code of Regulations, title 8,
section 31001 et seq.  The text of PERB's Regulations may be found at
www.perb.ca.gov.

Unfair Practice Charge No. SF-CE-2224-M
April 3, 2025
Page 2


execution of a settlement agreement.

Sincerely,

/s/ Jeremy Zeitlin

Jeremy Zeitlin
Senior Regional Attorney


Enclosure

STATE OF CALIFORNIA

PUBLIC EMPLOYMENT RELATIONS BOARD

| | |
|---|---|
| SAN MATEO COUNTY DEPUTY SHERIFF'S ASSOCIATION,<br><br>      Charging Party,<br><br>    v.<br><br>COUNTY OF SAN MATEO,<br><br>      Respondent. | Case No. SF-CE-2224-M<br><br>COMPLAINT |

It having been charged by Charging Party that Respondent engaged in unfair practices in violation of Government Code section 3500 et seq., the General Counsel of the Public Employment Relations Board (PERB), pursuant to Government Code sections 3509(b) and 3541.3(i) and California Code of Regulations, title 8, section 32640, issues this COMPLAINT on behalf of PERB and ALLEGES:

1.    Respondent is a public agency within the meaning of Government Code section 3501(c) and PERB Regulation 32016(a).

2.    Charging Party is the exclusive representative, within the meaning of PERB Regulation 32016(b), of a bargaining unit that includes a number of Deputy Sheriffs at Respondent's Sheriff's Office.

**UNILATERAL CHANGE – MANDATORY OVERTIME**

3.    Before August 8, 2024, Respondent's temporary policies, effective July 23 through August 7, 2024, contained in Special Orders (e.g., 2024-01, 2024-02, and/or 2024-03) providing, for example, that bargaining unit employees were: (a)"strongly encouraged to voluntarily sign up for 24 hours of overtime per pay period [every two weeks]" and (b) serve at least 12 of the 24 hours in the jail/correctional facility.

4.      On or about August 8, 2024, Respondent changed or deviated from the status quo by, among other things, continuing to apply overtime policies contained in Special Orders 2024-01, 2024-02 and/or 2024-03 after they expired on August 7, 2024 and increasing the number of overtime hours worked at a correctional facility to 18 of 24 additional duty hours.

5.      Respondent engaged in the conduct described in paragraph 4 without having negotiated with Charging Party to agreement or through completion of negotiations concerning the decision to change the status quo or implement the change in policy and/or the effects thereof.

6.      By the acts and conduct described in paragraphs 4 and 5, Respondent failed and refused to meet and confer in good faith in violation of Government Code sections 3505 and 3506.5(c), and committed an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(c).

7.      This conduct also interfered with the rights of bargaining unit employees to be represented by Charging Party in violation of Government Code sections 3506 and 3506.5(a), and is an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(a).

8.      This conduct also denied Charging Party its right to represent bargaining unit employees in violation of Government Code sections 3503 and 3506.5(b), and is an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(b).

## UNILATERAL CHANGE – MINIMUM STAFFING

9.      Before August 10, 2024, Respondent maintained an established minimum staffing policy at its jail facilities, for example, a minimum/maximum staffing level of

25/32 for the day shift and 25/30 for the night shift, at the Maguire Correctional Facility (MCF).

10.    On or about August 10, 2024, Respondent deviated from the status quo by changing the staffing levels at some jails, for example, by increasing to 35 employees per work shift at MCF.

11.    Respondent engaged in the conduct described in paragraph 10 without prior notice to Charging Party and without having afforded Charging Party an opportunity to meet and confer over the decision to change the status quo and/or the effects of its decision to do so.

12.    By the acts and conduct described in paragraphs 10 and 11, Respondent adopted an ordinance, rule, resolution or regulation in violation of Government Code section 3504.5(a), failed and refused to meet and confer in good faith in violation of Government Code sections 3505 and 3506.5(c), and committed an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(c).

13.    This conduct also interfered with the rights of bargaining unit employees to be represented by Charging Party in violation of Government Code sections 3506 and 3506.5(a), and is an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(a).

14.    This conduct also denied Charging Party its right to represent unit members in violation of Government Code sections 3503 and 3506.5(b), and is an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(b).

**INTERFERENCE AND DOMINATION**

15.    During an August 13, 2024 meeting with bargaining unit employees to discuss emergency staffing policies and the status of negotiations, Respondent's

Executive Director of Administration and Chief of Staff Victor Aenlle stated: "… If you aren't happy with how the [Charging Party's] Board is handling the situation, you should encourage the membership to vote them out."

16.    By the acts and conduct described in paragraph 15, Respondent interfered with employee rights guaranteed by the Meyers-Milias-Brown Act in violation of Government Code sections 3506 and 3506.5(a), and committed an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(a).

17.    By the acts and conduct described in paragraph 15, Respondent also dominated or interfered with the administration of Charging Party in violation of Government Code sections 3502 and 3506.5(d), and committed an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(d).

18.    This conduct also denied Charging Party its right to represent bargaining unit employees in violation of Government Code sections 3503 and 3506.5(b), and is an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(b).

## BYPASSING THE EXCLUSIVE REPRESENTATIVE

19.    On or about August 9, 2024, Respondent, acting through Sheriff Christina Corpus, issued "A Message from the Sheriff" to "All Sheriff's Personnel" informing them, in relevant part, that:

(a) "While the overtime policy has recently expired, I want to emphasize that the executive team and I made every effort in good faith to find a reasonable solution.  We made ourselves available, but the urgency was not reciprocated";

(b) "An internal audit by the payroll department revealed 106 employees are

4

CSM 00522

either not contributing to the minimum overtime requirements or are working

substantial overtime without supporting the essential needs of corrections.

This is unacceptable"; and

(c) "There have been claims that the overtime policy is flawed, but this is a

significant misrepresentation. In the spirit of transparency, I am making the

proposed policy available for your review.  The core requirement of 24

hours, which has been in place for over five years remains unchanged. The

only adjustment was a modest increase from 12 to 18 hours (A shift of 6

hours to meet the safety needs) dedicated to corrections, where there's a

clear and substantial need."

20.    By the acts and conduct described in paragraph 19, Respondent attempted

to bypass, undermine and derogate the authority of Charging Party in violation of

Government Code sections 3505 and 3506.5(c), and committed an unfair practice

under Government Code section 3509(b) and PERB Regulation 32603(c).

21.    This conduct interfered with the rights of bargaining unit employees to be

represented by Charging Party in violation of Government Code sections 3506 and

3506.5(a), and is an unfair practice under Government Code section 3509(b) and

PERB Regulation 32603(a).

22.    This conduct also denied Charging Party its right to represent bargaining

unit employees in violation of Government Code sections 3503 and 3506.5(b), and is

an unfair practice under Government Code section 3509(b) and PERB Regulation

32603(b).

## INTERFERENCE

23.    On October 4, 2024, Mr. Aenlle, by and through his attorney, sent a letter to

Charging Party threatening litigation in response to, in part, Charging Party's letter announcing an employee vote of no confidence against Mr. Aenlle and the filing of the instant charge.

24.     By the acts and conduct described in paragraph 23, Respondent interfered with employee rights guaranteed by the Meyers-Milias-Brown Act in violation of Government Code sections 3506 and 3506.5(a), and committed an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(a).

25.     This conduct also denied Charging Party its right to represent employees in violation of Government Code sections 3503 and 3506.5(b), and is an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(b).

## DISCRIMINATION/RETALIATION

26.     Carlos Tapia is a public employee within the meaning of Government Code section 3501(d) and within PERB's jurisdiction.

27.     Mr. Tapia exercised rights guaranteed by the Meyers-Milias-Brown Act by serving as President of Charging Party, and in this capacity, making media statements, serving as a witness in an August 2024 investigation against Mr. Aenlle, and participating in filing the instant charge that same month.

28.     On or about November 12, 2024, Respondent, acting through its agents, took adverse action against Mr. Tapia by ordering his arrest, placing him on administrative leave, and initiating an internal affairs administrative investigation.

29.     Respondent took the actions described in paragraph 28 because of the employee's activities described in paragraph 27, and thus violated Government Code sections 3506 and 3506.5(a), and committed an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(a).

30.     This conduct also interfered with Charging Party's right to represent employees in violation of Government Code sections 3503 and 3506.5(b), and is an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(b).

## PUNITIVE ACTION AGAINST UNION OFFICIAL

31.     Respondent took the disciplinary actions described in paragraph 28 because Mr. Tapia exercised lawful action as an elected, appointed, or recognized representative of Charging Party in violation of Government Code section 3502.1, and thereby committed an unfair practice under Government Code section 3509(b) and PERB Regulation 32603(a).

Any amendment to the complaint shall be processed pursuant to California Code of Regulations, title 8, sections 32647 and 32648.

DATED:  April 3, 2025

J. Felix De La Torre
General Counsel


By   /s/ Yaron Partovi_____
        Yaron Partovi
        Principal Attorney Supervisor

**PROOF OF SERVICE**

I declare that I am a resident of or employed in the County of Los Angeles, California. I am over the age of 18 years and not a party to the within entitled cause. The name and address of my residence or business is Public Employment Relations Board, Los Angeles Regional Office, 425 W. Broadway, Suite 400, Glendale, CA, 91204-1269.

On April 3, 2025, I served the Complaint and Cover Letter regarding Case No. SF-CE-2224-M on the parties listed below by

_____ I am personally and readily familiar with the business practice of the Public Employment Relations Board for collection and processing of correspondence for mailing with the United States Postal Service, and I caused such envelope(s) with postage thereon fully prepaid to be placed in the United States Postal Service at Los Angeles, California.

_____ Personal delivery.

_X_ Electronic service (e-mail).

Garrett Porter, Attorney
Mastagni Holstedt, A.P.C.
1912 I Street
Sacramento, CA  95811
Email: gporter@mastagni.com

Timothy Yeung, Attorney
Sloan Sakai Yeung & Wong LLP
555 Capitol Mall, Suite 600
Sacramento, CA  95814
Email: tyeung@sloansakai.com

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on April 3, 2025, at Glendale, California.

| J. Carter | /s/ J. Carter |
|---|---|
| (Type or print name) | (Signature) |

# Exhibit 68

CSM 00527



**From:** Christina Corpus <CCorpus@smcgov.org>
**Sent:** Thursday, April 17, 2025 11:38 AM
**To:** Len Beato <lbeato@smcgov.org>
**Cc:** Daniel Perea <dperea@smcgov.org>; William Young <wyoung@smcgov.org>
**Subject:** Reserve Deputy Victor Aenlle

Sgt. Beato,

Reserve Deputy Aenlle will be assisting in our CCW Unit effective immediately.  Please move him over to the active list and please ensure he is receiving all correspondence related to the reserve unit.  Please let me or U/S Perea know if you have any questions.

Regards,

Sheriff Corpus



*Christina Corpus, Sheriff*
San Mateo County Sheriff's  ffice
400 County Center
Redwood City, C    40 3
(   0)    -1    4
ccorpus _smcgov.org
http://www.smcsheriff.com
DIGNITY • COMPASSION • RESPECT

**ENCLOSURE B**



Keker, Van Nest & Peters LLP
633 Battery Street
San Francisco, CA 94111-1809
415 391 5400
keker.com

**Jan Nielsen Little**
(415) 676-2211
jlittle@keker.com

May 30, 2025

John D. Nibbelin
County Attorney
San Mateo County
500 County Center
Redwood City, CA  94063
jnibbelin@smcgov.org

Re:     Sheriff Christina Corpus

Dear Mr. Nibbelin:

The County retained us to investigate whether cause exists to remove Sheriff Christina Corpus from office under Section 412.5 of the San Mateo County Charter. We have conducted an investigation, and we believe that such cause exists.

Enclosed please find a proposed Notice of Intent to remove Sheriff Corpus from office, which includes the grounds supporting the Sheriff's Removal, for the Board of Supervisors' consideration pursuant to Section I of the County's Sheriff Removal Procedures.

Very truly yours,

KEKER, VAN NEST & PETERS LLP

Jan Nielsen Little
Brook Dooley
Travis Silva
Franco Muzzio

JNL:ts

**[PROPOSED] NOTICE OF INTENT TO REMOVE SHERIFF**

Pursuant to Section 412.5 of the San Mateo County Charter and the County's Sheriff Removal Procedures ("Procedures"), the San Mateo County Board of Supervisors has duly approved the issuance of this Notice of Intent to Remove and initiated the Procedures to remove Sheriff Christina Corpus from the office of Sheriff.

The Procedures afford Sheriff Corpus the right to a Pre-Removal Conference within five calendar days from receipt of this Notice of Intent. The Pre-Removal Conference shall take place as follows:

**Place:**   **Human Resources Department**    **Date:**  _____
            **500 County Center, 4th Floor**
            **Redwood City, CA  94063**         **Time:**  _____

Under the Procedures, Sheriff Corpus has the right to a Removal Hearing. Failure to appear at the Pre-Removal Conference constitutes waiver of the right to a Removal Hearing. A copy of the Procedures is enclosed.

# TABLE OF CONTENTS

**Page(s)**

GROUNDS IN SUPPORT OF THE SHERIFF'S REMOVAL ......................................... 1

*Summary of grounds for removal from office* ........................................... 1

*The Cordell Report and Measure A* .......................................................... 4

*This Investigation* ....................................................................................... 5

*Other witnesses and reservation of rights* ............................................... 6

*Independence of bases for cause* .............................................................. 6

I.     Grounds for Removal Relating to Victor Aenlle ................................... 6

    A.     Introduction ................................................................................ 6

    B.     Victor Aenlle is a real estate broker and reserve deputy who worked
           on Sheriff Corpus's campaign. ................................................... 7

    C.     Sheriff Corpus and Mr. Aenlle have a close personal relationship,
           which they have taken steps to conceal. ...................................... 8

          1.     The relationship between Sheriff Corpus and Mr. Aenlle was
               evident during Sheriff Corpus's campaign. ..................... 8

          2.     The relationship between Sheriff-elect Corpus and Mr. Aenlle
               was apparent in the months immediately following the
               election. .......................................................................... 9

          3.     Sheriff Corpus's then-husband reported that she was having an
               affair with Mr. Aenlle. ................................................... 10

          4.     In September 2022, Sheriff Corpus and Mr. Aenlle traveled to
               Hawaii and provided conflicting accounts of their trip. ................... 10

          5.     The relationship continued after Sheriff Corpus took office. ........... 11

          6.     Sheriff Corpus and Mr. Aenlle deny an "intimate relationship." ...... 12

    D.     Using public funds, Sheriff Corpus entered into two separate
           contractual arrangements and one employment relationship with Mr.
           Aenlle and repeatedly requested raises for Mr. Aenlle. ............................. 13

    E.     Sheriff Corpus took steps to conceal potentially negative information
           about Mr. Aenlle. ........................................................................ 14

F. Immediately after the Board of Supervisors voted to remove Mr. Aenlle as "Executive Director of Administration," Sheriff Corpus attempted to appoint him as an Assistant Sheriff. ......................................... 15

G. Sheriff Corpus's decision to install Mr. Aenlle as a member of her Executive Team hurt the SMCSO. ............................................................ 16

  1. Sheriff Corpus's decision to install Victor Aenlle in a leadership position hurt morale in the SMCSO. ............................... 16

  2. Sheriff Corpus's Executive Team warned her about Mr. Aenlle's conduct and the effect it was having on the office. ............ 18

  3. Sheriff Corpus's close personal relationship with Mr. Aenlle and her decision to retain him on her Executive Team contributed to the departures of numerous senior advisors and Executive Team members. ............................................................... 18

H. Grounds for Removal ...................................................................... 19

I. Supporting Evidence ....................................................................... 21

II. Grounds for Removal Relating to the Investigation and Arrest of DSA President Carlos Tapia ........................................................................... 23

A. Introduction ................................................................................... 23

B. Factual Background ........................................................................ 24

  1. The MOU allows Dep. Tapia to bill for "release time" spent on DSA activities. .................................................................. 24

  2. After Sheriff Corpus takes over the SMCSO, her relationship with the DSA deteriorates. ................................................. 25

  3. Judge Cordell interviews Dep. Tapia. .............................. 26

  4. The DSA and Sheriff Corpus have a contentious meeting concerning overtime policies. .......................................... 26

  5. After the August 15, 2024 meeting, Dep. Tapia begins to receive messages from SMCSO's finance and human resources departments concerning his timecard practices ................ 27

  6. The DSA and OSS file a PERB complaint against Sheriff Corpus and declare "no confidence" in Mr. Aenlle. ........................ 28

7.    Sheriff Corpus inquired about Dep. Tapia's attendance in Transportation. ................................................................... 29

8.    Sheriff Corpus asks Acting Assistant Sheriff Fox to investigate Dep. Tapia. ..................................................................... 29

9.    In violation of SMCSO policy, Sheriff Corpus conducts an in-house investigation into Dep. Tapia for potential criminal conduct. .......................................................................... 30

10.    Sheriff Corpus and her Executive Team limit the evidence available to Acting Assistant Sheriff Fox. ........................................ 30

11.    Sheriff Corpus orders Dep. Tapia to be arrested on November 12, 2024. ...................................................................... 32

12.    Mr. Aenlle uses Dep. Tapia's arrest to try to discourage the release of the Cordell Report. ............................................. 34

13.    After conducting an investigation, the District Attorney declines to prosecute Dep. Tapia. ................................................. 34

C.    Grounds for Removal .................................................... 34

D.    Supporting Evidence ..................................................... 36

III.    Grounds for Removal Relating to Unlawful Punitive Action Taken Against Sgt. Javier Acosta. ..................................................... 38

A.    Introduction ............................................................ 38

B.    Sheriff Corpus began an investigation into Sgt. Javier Acosta within a week of the contentious August 15, 2024 meeting between the DSA, OSS, and the Sheriff. ................................................... 38

C.    Sgt. Javier Acosta remains on administrative leave without explanation. ........................................................... 40

D.    Grounds for Removal .................................................... 40

E.    Supporting Evidence ..................................................... 41

IV.    Grounds for Removal Relating to the Termination of Former Assistant Sheriff Ryan Monaghan ............................................................. 42

A.    Introduction ............................................................ 42

B.      Sheriff Corpus retaliated against Assistant Sheriff Monaghan days after learning that he had spoken to Judge Cordell as part of her investigation. .......................................................................... 42

C.      Grounds for Removal .................................................................... 44

D.      Supporting Evidence .................................................................... 45

V.      Grounds for Removal Relating to Unlawful Retaliatory Transfers and Terminations. ...................................................................................... 45

A.      Introduction .................................................................................. 45

B.      Sheriff Corpus retaliated against Capt. Philip for refusing to sign and serve the deficient Internal Affairs notice to Sgt. Javier Acosta. ................. 45

C.      Sheriff Corpus retaliated against Lt. Sebring after he advised an employee that she could file an HR complaint against Mr. Aenlle. ............. 47

D.      Sgt. Chan was transferred within hours of appearing at a press conference in support of Measure A. ............................................. 48

E.      Sheriff Corpus retaliated against Capt. Rebecca Albin for posting a message on social media. ............................................................. 48

F.      Grounds for Removal .................................................................... 49

G.      Supporting Evidence .................................................................... 50

VI.     Grounds for Removal Relating to the Professional Standards Bureau ..................... 51

A.      Introduction .................................................................................. 51

B.      Overview of PSB functions........................................................... 52

C.      Sheriff Corpus has inhibited PSB from fulfilling its investigative function. ........................................................................................ 53

D.      Sheriff Corpus's mismanagement of PSB has led to substantial delays in the investigative process and created significant negative effects. ............ 54

E.      Examples of Sheriff Corpus's failure to properly conduct PSB investigations................................................................................ 55

████  ████████████████████████████████████ . ........ 55

█ ██████████████████████████ ............................ 56

█. ██████████████████████████ ................... 56

█ ████████████████████████████
████████████ ...................................................... 57

F.      Grounds for Removal .................................................................... 57

G.      Supporting Evidence .................................................................... 58

VII.    Conclusion.......................................................................................... 59

VIII.   San Mateo County Sheriff Removal Procedures ...................................... 60

## GROUNDS IN SUPPORT OF THE SHERIFF'S REMOVAL

*Summary of grounds for removal from office*

Christina Corpus became the Sheriff of San Mateo County on January 3, 2023, having won a majority of votes cast in the June 7, 2022 election. On March 4, 2025, San Mateo County voters voted to amend the County Charter to add Section 412.5 and grant the Board of Supervisors authority to remove an elected sheriff from office for cause.

Throughout her tenure, Sheriff Corpus has violated laws related to the performance of her duties, flagrantly and repeatedly neglected her duties, and obstructed investigations into her conduct and at the San Mateo County Sheriff's Office ("SMCSO" or "Sheriff's Office"). Accordingly, cause exists under Section 412.5 of the County Charter to remove Sheriff Corpus from office.

*First*, Sheriff Corpus violated conflict of interest laws and neglected her duties as Sheriff by hiring, promoting, and relying on as her primary aide Victor Aenlle, an unqualified civilian with whom she has a close personal relationship. Sheriff Corpus's Executive Team has been comprised of herself, an undersheriff, assistant sheriffs, and, for a period of time, a civilian "Executive Director of Administration." Sheriff Corpus created the "Executive Director of Administration" position specifically for Mr. Aenlle after she took office. Indeed, the job was not posted, and he was the only applicant.

Mr. Aenlle is not qualified to serve in a leadership role in the SMCSO. He is a real estate broker and operates a private investigation service. He applied to become a full-time deputy with the SMCSO, but he failed to complete the field training program. While he has been a part-time reserve deputy with the SMCSO for many years, he has never been a full-time peace officer, and he has never worked full-time in any capacity, sworn or civilian, within a law enforcement agency. Despite Mr. Aenlle's lack of qualifications—and despite concerns communicated to her about her close personal relationship with Mr. Aenlle—Sheriff Corpus created the "Executive Director of Administration" position for Mr. Aenlle and repeatedly sought promotions and pay increases for him.

Sheriff Corpus enabled unprofessional conduct by Mr. Aenlle, who routinely undermined SMCSO officials and operations throughout his tenure. While under Sheriff Corpus's supervision, he hindered the professional peace officers who comprised the rest of the Sheriff's Executive Team from executing their duties. He impeded internal investigations into alleged deputy misconduct.

County and SMCSO personnel repeatedly brought specific examples of Mr. Aenlle's misconduct to the attention of Sheriff Corpus. Despite knowing about Mr. Aenlle's detrimental effect on SMCSO, Sheriff Corpus persistently sought to promote him and raise his salary. Between January 2023 and November 2024, Sheriff Corpus sought County permission to raise Mr. Aenlle's salary on at least five occasions. In November 2024, after the Board of Supervisors took the extraordinary step of terminating Mr. Aenlle's position and restricting his access to non-public County buildings, Sheriff Corpus announced that she would re-hire Mr. Aenlle as an Assistant Sheriff, even though he failed to meet the minimum qualifications for that position. The County notified the Sheriff that Mr. Aenlle could not be promoted to Assistant Sheriff

May 30, 2025
Page 2

because Mr. Aenlle failed to meet the minimum qualifications for the position. In April 2025, after she could not hire him as an assistant sheriff, Sheriff Corpus added Mr. Aenlle to the "active list" of deputies.

Sheriff Corpus's decision to hire, promote, and seek salary raises for Mr. Aenlle and to ignore multiple warnings about his detrimental effect on the SMCSO, while having a close personal relationship with him, violates California and County conflict-of-interest laws and constitutes repeated and flagrant neglect of her duties as defined by law. These actions constitute cause for removal.

*Second*, Sheriff Corpus has demonstrated a pattern of retaliating against SMCSO personnel who she perceives to threaten her or Mr. Aenlle's authority. The most egregious example of this pattern of retaliation was Sheriff Corpus's decision to investigate and, eventually, order the warrantless arrest of Deputy Carlos Tapia—the president of the deputy sheriff's union, the Deputy Sheriff's Association ("DSA")—on unsubstantiated criminal charges.

In August 2024, the DSA filed a complaint against Sheriff Corpus with the Public Employment Relations Board ("PERB"). The August 2024 PERB complaint included allegations of misconduct against Mr. Aenlle. Dep. Tapia submitted a declaration in support of the PERB complaint. In September 2024, the DSA and the sergeants' union, the Organization of Sheriffs' Sergeants ("OSS"), announced a vote of no-confidence in Mr. Aenlle's leadership.

The following month, Sheriff Corpus ordered then-Acting Assistant Sheriff Matthew Fox to investigate Dep. Tapia for timecard fraud. This order was contrary to SMCSO's policy of referring criminal investigations into its own deputies' conduct to the District Attorney or another outside agency. Sheriff Corpus misrepresented the basis for the investigation, suggesting to Acting Assistant Sheriff Fox that the lieutenant overseeing Dep. Tapia had complained about his attendance in the Transportation and Court Security Bureau ("Transportation Unit") when that never happened. Sheriff Corpus and Mr. Aenlle then limited the evidence available to Acting Assistant Sheriff Fox as he performed the investigation, including preventing him from reviewing timecard records and from speaking to a witness who would have provided exculpatory evidence. Likewise, Sheriff Corpus denied Acting Assistant Sheriff Fox's repeated recommendation to place Dep. Tapia on administrative leave to allow more time for the investigation. After carrying out the investigation based on the incomplete information provided to him, Acting Assistant Sheriff Fox eventually reported to Sheriff Corpus that he had found what he believed to be evidence of timecard fraud.

On November 12, 2024, Sheriff Corpus instructed Acting Assistant Sheriff Fox to inform the San Mateo County District Attorney that she intended to arrest Dep. Tapia. Acting Assistant Sheriff Fox conferred with the Chief Deputy District Attorney of San Mateo County, who urged him not to proceed with a warrantless arrest. Acting Assistant Sheriff Fox conveyed that information to Sheriff Corpus, who nevertheless ordered that Dep. Tapia be arrested without a warrant that day.

May 30, 2025
Page 3

The timing of Dep. Tapia's arrest is significant for at least two reasons. First, the County and the DSA were scheduled to resume their labor meet-and-confer on the afternoon of November 12, 2024. Sheriff Corpus ordered that Dep. Tapia's arrest take place at 1:00 p.m., an hour before the meet-and-confer was scheduled to start. Second, it was known throughout the SMCSO that the County had been planning to release the results of an independent investigation conducted by retired Judge LaDoris Cordell into the Sheriff's and Mr. Aenlle's conduct. (The Cordell Report, as it became known, is described in further detail below.) Members of the Sheriff's Executive Team suspected that Dep. Tapia had interviewed with Judge Cordell as part of her investigation. An arrest of the DSA President was a newsworthy event that could compete with the release of the Cordell Report for news coverage and, potentially, undermine it through the arrest of a participating witness.

Dep. Tapia did not commit a crime, as the District Attorney's ensuing independent investigation confirmed. Once District Attorney investigators looked at the full range of available evidence, they concluded that "there was no basis to believe any violation of law had occurred" and that "Deputy Tapia should not have been arrested." Yet Dep. Tapia remains on administrative leave today six months after the arrest, while the SMCSO purports to complete an Internal Affairs investigation into the same allegations.

In ordering Dep. Tapia's arrest, Sheriff Corpus violated the Penal Code and the Labor Code, flagrantly neglected the duties of her office, and obstructed an investigation into her conduct and the SMCSO. These actions constitute cause for removal.

Sheriff Corpus has engaged in other instances of retaliation. Shortly after she learned that Assistant Sheriff Monaghan participated in an interview with Judge Cordell, Sheriff Corpus removed him from his position. Sheriff Corpus has also retaliated against officers for perceived disloyalty by transferring them to unfavorable assignments. Sheriff Corpus also placed a sergeant who is the brother of the head of the OSS on administrative leave in August 2024, days after a contentious labor-management meet-and-confer and around the same time that the OSS filed a PERB complaint against the Sheriff. Following an improper Internal Affairs investigation, the sergeant remains on administrative leave nine months later. When a captain in the SMCSO's Professional Standards Bureau ("PSB") refused to sign or serve a defective Internal Affairs notice for the sergeant whose brother heads the OSS, Sheriff Corpus transferred him out of the PSB unit and stripped him of responsibilities. When the lieutenant who oversaw the PSB unit suggested that a civilian employee could file a human resources complaint regarding Mr. Aenlle, Sheriff Corpus transferred him to a less desirable post. And when a sergeant appeared off-duty at a press conference in support of the March 4, 2024 ballot initiative giving the Board of Supervisors the ability to terminate an elected sheriff, Sheriff Corpus transferred him that same day to a less desirable post. The Sheriff's actions violated the California Government and Labor Codes, the San Mateo County Code, and the SMCSO Policy Manual; her termination of Assistant Sheriff Monaghan amounted to obstruction of an investigation into the conduct of the SMCSO. These actions constitute cause for removal.

May 30, 2025
Page 4

*Third,* while Sheriff Corpus has shown a pattern of swift retaliation against personnel who she believes are challenging her or Mr. Aenlle's authority, she regularly hinders or neglects other disciplinary matters within SMCSO. PSB oversees hiring new peace officers and conducts investigations into allegations of misconduct within the SMCSO, including civilian complaints, use-of-force investigations, and Internal Affair investigations. Sheriff Corpus has prevented PSB personnel from promptly conducting and concluding investigations and has personally interfered in investigations, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ In some instances, Sheriff Corpus's interference with investigations appears motivated by favoritism, ████████████████████████████ ████████████████████████████ Sheriff Corpus's mismanagement of PSB has prevented SMCSO from complying with its investigatory obligations under the Penal Code and constitutes flagrant or repeated neglect of the duties of her office. These actions constitute cause for removal.

*The Cordell Report and Measure A*

In July 2024, the County retained Judge Cordell to conduct an independent fact-finding investigation into complaints and concerns that current and former members of the SMCSO made about Mr. Aenlle. Over the course of the investigation, additional matters regarding the SMCSO—including allegations of misconduct committed by Sheriff Corpus—were added to the scope of the investigation. In performing her investigation, Judge Cordell interviewed 40 current and past sworn and civilian employees of the Sheriff's Office. Mr. Aenlle participated in a recorded interview with Judge Cordell. Sheriff Corpus declined Judge Cordell's invitation to interview. The Cordell Report was made public on November 12, 2024, sustaining several allegations of misconduct by Sheriff Corpus and Mr. Aenlle.

Thereafter, the Board of Supervisors called the March 4, 2025 special election so that county voters could consider Measure A. Measure A proposed to add section 412.5 to the County's Charter, which would authorize the Board to remove a sheriff from office for "cause." Section 412.5 defines "cause":

> b. For the purposes of this Section 412.5, "cause" shall mean any of the following:
>
> (1) Violation of any law related to the performance of a Sheriff's duties; or
>
> (2) Flagrant or repeated neglect of a Sheriff's duties as defined by law; or
>
> (3) Misappropriation of public funds or property as defined in California law; or
>
> (4) Willful falsification of a relevant official statement or document; or
>
> (5) Obstruction, as defined in federal, State, or local law applicable to a Sheriff,

May 30, 2025
Page 5

of any investigation into the conduct of a Sheriff and/or the San Mateo County Sheriff's Office by any government agency (including the County of San Mateo), office, or commission with jurisdiction to conduct such investigation.

Between the release of the Cordell Report and the Measure A election, the city councils of San Carlos, Millbrae, and San Mateo passed votes of no-confidence in Sheriff Corpus. The city/town councils of South San Francisco, Belmont, Redwood City, and Woodside endorsed Measure A. The DSA and the OSS had already passed no-confidence votes in Mr. Aenlle, and the SMCSO captains declared their lack of confidence in Sheriff Corpus on November 18, 2024. At the March 2025 election, the county's voters voted in favor of Measure A by a margin of 84% to 16%.

*This Investigation*

The Board of Supervisors, through the County Attorney, retained Keker, Van Nest & Peters LLP ("KVP") as outside counsel to investigate whether Sheriff Corpus had committed acts that constitute "cause" under Section 412.5 and, if so, to prepare a Notice of Intent pursuant to the Board-adopted procedures for removing a sheriff from office.

While KVP reviewed the Cordell Report, the firm conducted its own investigation into Sheriff Corpus's actions. KVP's independent investigation included conducting more than 40 interviews of current and former SMCSO and County personnel, including:

- **SMCSO sworn executive leadership** who served on Sheriff Corpus's Executive Team: KVP interviewed former Undersheriff Hsiung, former Assistant Sheriff Ryan Monaghan, and former Acting Assistant Sheriff Matthew Fox. KVP interviewed Paul Kunkel, a retired SMCSO captain who, as a contractor, functionally served as an assistant sheriff.

- **SMCSO command staff**: KVP interviewed 6 current or former captains and 4 current lieutenants who served under Sheriff Corpus.

- **SMCSO sworn personnel**: KVP interviewed 11 current sergeants, 2 current detectives, and 1 current deputy who served under Sheriff Corpus, including Sgt. Hector Acosta, Sgt. Javier Acosta, and Dep. Carlos Tapia.

- **SMCSO civilian staff**: KVP interviewed 8 current or former civilian personnel within the SMCSO.

- **Sheriff Corpus's transition team**: In addition to former Capt. Kunkel, who both served on Sheriff Corpus's transition team and on her Executive Team, KVP interviewed former Lt. Daniel Guiney and former Assistant Sheriff Jeff Kearnan.

- **County personnel**: KVP interviewed 3 County personnel, including County Executive Mike Callagy.

May 30, 2025
Page 6

- **District Attorney's Office staff**: KVP interviewed Chief Deputy District Attorney Shin-Mee Chang.

KVP also reviewed relevant documents provided by witnesses and the County.

*Other witnesses and reservation of rights*

KVP invited Sheriff Corpus and Mr. Aenlle through their counsel, to participate in voluntary interviews. Through their counsel, they declined to participate. KVP also invited Undersheriff Daniel Perea to a voluntary interview. To date, he has not yet agreed to be interviewed. KVP also requested voluntary interviews from SMCSO Finance Director Stacey Stevenson and SMCSO Human Resources staff member Connor Santos-Stevenson. Ms. Stevenson did not respond to multiple interview requests. Mr. Santos-Stevenson declined to participate in a voluntary interview.

The Procedures provide the Sheriff with the right to a removal hearing. At the removal hearing or any subsequent stage of the removal process, KVP reserves the right to call witnesses and to introduce evidence in order to prove the allegations set forth in this Notice of Intent or to rebut the Sheriff's defenses including but not limited to five individuals who KVP sought to interview as part of its investigation, but who declined, or have not yet agreed, to speak with KVP as of the date KVP is submitting this Notice of Intent in its proposed form. For avoidance of doubt, those individuals are: Sheriff Corpus, Undersheriff Perea, Mr. Aenlle, Ms. Stevenson, and Mr. Santos-Stevenson.

*Independence of bases for cause*

The grounds for removal discussed in this letter are not interdependent. Each of the grounds outlined below, independently and collectively, provide cause for removal under Section 412.5.

## I.    Grounds for Removal Relating to Victor Aenlle

### A.    Introduction

While both Sheriff Corpus and Victor Aenlle publicly deny having an intimate relationship, multiple witnesses observed conduct indicating that they have an extremely close personal relationship, and some witnesses have characterized it as intimate. In the context of that relationship, Sheriff Corpus has repeatedly appointed Mr. Aenlle to high-level positions at public expense, first on her transition team, then later as a contract consultant to the Sheriff's Office, then ultimately as her "Executive Director of Administration" or "Chief of Staff," a position that Sheriff Corpus specifically created for Mr. Aenlle. On multiple occasions, Sheriff Corpus also sought to increase Mr. Aenlle's compensation in these roles.

Mr. Aenlle is not qualified to hold the positions to which Sheriff Corpus appointed him or any other executive position within the Sheriff's Office. Prior to serving in the Sheriff's Office, he had no experience as a law enforcement executive. Nor has he ever been a full-time peace

May 30, 2025
Page 7

officer. Sheriff Corpus's repeated efforts to appoint (and re-appoint) an unqualified candidate to leadership positions in her office has undermined morale in the SMCSO and caused senior leaders to leave the Office. Mr. Aenlle's poor leadership skills have further reduced morale and hurt the effectiveness of the Sheriff's Office.

Given their close personal relationship, Sheriff Corpus has a conflict of interest with respect to Mr. Aenlle. She has failed to reconcile her personal relationship with Mr. Aenlle with her duty of loyalty to the public.

**B.      Victor Aenlle is a real estate broker and reserve deputy who worked on Sheriff Corpus's campaign.**

Victor Aenlle is a commercial and residential real estate broker. He represents that he has been affiliated with Coldwell Banker since 1990. According to documents that Mr. Aenlle personally submitted to the County in 2023, he works full time for Coldwell Banker. According to the same documents, he operates a private investigation firm full time.

Mr. Aenlle became a reserve deputy with SMCSO in 2009. Reserve deputy is a part-time, volunteer position. In or around 2012 or 2013, Mr. Aenlle participated in the Sheriff's Office's field training program to become a full-time deputy.

Thereafter, Mr. Aenlle remained a reserve deputy and was required to volunteer a minimum of 16 hours per month. *See* Policy Manual § 322.5.1.[1]

_____

[1] From January 2, 2024, through July 31, 2024, Mr. Aenlle logged a nearly uniform eight hours of volunteer time per business day. He explained these log entries by saying: "Since assuming the role of Executive Director, I have worked an average of 12 to 14 hours per day, six to seven days a week. Any hours allocated toward my volunteer service were in addition to the eight hours for which I was compensated, ensuring there was no 'double-dipping.'" There is reason to doubt that Mr. Aenlle fulfilled his volunteer hour commitment. *First*, if Mr. Aenlle worked an "average" of 12 to 14 hours per day, then he only "volunteered" an average of four to six hours per day, not the eight hours a day that he reported. *Second*, Mr. Aenlle was not volunteering while working as the Executive Director of Administration. As an exempt employee, he received financial compensation for all hours worked, including those worked in excess of 8 hours per day, through his $246,979 annual salary. *Third*, Mr. Aenlle's claim that overtime hours in a civilian role should qualify as volunteer hours as a reserve deputy is inconsistent with the purpose of the reserve deputy program, which is to "supplement and assist regular sworn sheriff's deputies in their duties" and to "provide professional, sworn volunteer reserve deputies who can augment regular staffing levels." SMCSO Policy Manual § 322.1. Work done as a civilian does not "augment" regular staffing levels of sworn personnel, nor does it "assist" sworn deputies in their duties.

May 30, 2025
Page 8

In or around 2021, Mr. Aenlle began volunteering on Sheriff Corpus's campaign.

**C.    Sheriff Corpus and Mr. Aenlle have a close personal relationship, which they have taken steps to conceal.**

Throughout Sheriff Corpus's campaign, the transition period, and the course of her administration, it was evident to multiple witnesses that Sheriff Corpus and Mr. Aenlle have a close personal relationship. During the campaign, Sheriff Corpus was married. Her husband filed for divorce in April 2023, and the divorce became final later in 2023. Mr. Aenlle is married.

**1.    The relationship between Sheriff Corpus and Mr. Aenlle was evident during Sheriff Corpus's campaign.**

Valerie Barnes is a long-time civilian SMCSO employee who has worked for San Mateo County since 2006. Ms. Barnes's roles included supporting the SMCSO personnel serving as the head law enforcement officers for the Cities of Millbrae and Half Moon Bay. (Both cities contract with the SMCSO to provide police services.) Ms. Barnes has known Sheriff Corpus for many years and worked for her when Sheriff Corpus led the SMCSO Millbrae office. While working together and during the course of Sheriff Corpus's campaign, the two became friends. Ms. Barnes considered herself a confidant for the Sheriff, and the two frequently texted about personal matters, including about Sheriff Corpus's marriage. Ms. Barnes was a frequent volunteer on Sheriff Corpus's campaign.

Mr. Aenlle was Sheriff Corpus's campaign manager. On several occasions during the campaign, Ms. Barnes witnessed Sheriff Corpus and Mr. Aenlle engaging in physical contact of an intimate nature. Ms. Barnes observed multiple instances of Mr. Aenlle massaging Sheriff Corpus's neck, shoulders, and feet and a single instance of them kissing on the lips. During the campaign, Mr. Aenlle told Ms. Barnes that he and Sheriff Corpus were "practicing a lot to have kids." Ms. Barnes saw intimate messages on Sheriff Corpus's Signal messaging app from Mr. Aenlle, including messages stating, "I love you" and messages using pet names such as "baby."

In or about January 2022, Sheriff Corpus told Ms. Barnes that she and Mr. Aenlle planned to marry after obtaining divorces. Sheriff Corpus asked Ms. Barnes to search for wedding venues for herself and Mr. Aenlle. Ms. Barnes sent Sheriff Corpus venue options via text message.

In late 2021 and early 2022, Sheriff Corpus told Ms. Barnes that Mr. Aenlle had purchased her luxury boots and a pair of $12,000 earrings. Sheriff Corpus told Ms. Barnes that Mr. Aenlle used $12,000 in cash to purchase the earrings. Mr. Aenlle later told Ms. Barnes that he used cash for big purchases so there would be nothing tying the purchases to him. Ms. Barnes understood this to mean that he wanted to avoid detection by his wife. After Mr. Aenlle and Sheriff Corpus completed the purchase of the earrings, Ms. Barnes texted Sheriff Corpus asking to see a picture of the earrings, and Sheriff Corpus contacted Ms. Barnes using a video calling application (FaceTime) to show them off. Ms. Barnes's mother participated in the call.

May 30, 2025
Page 9

Around this time, Ms. Barnes texted Sheriff Corpus and asked, "You at the ranch?" This was a reference to Mr. Aenlle's property near the coast. Sheriff Corpus responded, "I wish." Around this same time, Ms. Barnes texted Sheriff Corpus to "Be careful John isn't sniffing around to find you and VA," referring to Sheriff Corpus's then-husband John Kovach. Sheriff Corpus replied, "He won't find me with him."

On the night of the June 2022 election, Sheriff Corpus publicly thanked her then-husband Mr. Kovach, but did not thank Mr. Aenlle by name. Later that night, Ms. Barnes heard Mr. Aenlle say to Sheriff Corpus "This is over." This remark was also overheard by former SMCSO Capt. Paul Kunkel. Both Ms. Barnes and Mr. Kunkel understood Mr. Aenlle to be indicating he was ending his personal relationship with Sheriff Corpus. Sheriff Corpus called Ms. Barnes the following day to tell her that she and Mr. Aenlle had talked until 4:00 a.m., that she had apologized to Mr. Aenlle, and that "we're okay."

> 2. The relationship between Sheriff-elect Corpus and Mr. Aenlle was apparent in the months immediately following the election.

After she won the June 2022 election, Sheriff-elect Corpus put together a transition team that included Mr. Aenlle, Mr. Kunkel, former SMCSO Assistant Sheriff Jeff Kearnan, and former SMCSO Lt. Dan Guiney. Sheriff Corpus asked the County to hire Mr. Aenlle as a contractor so that his work on the transition would be paid. Although Sheriff Corpus's request for a paid transition team was out of the ordinary, County Executive Mike Callagy reported that he wanted to set Sheriff Corpus up for success. He therefore approved the transition team and Mr. Aenlle's contract, which paid him $105 per hour.

Mr. Kunkel, Mr. Guiney, and Mr. Kearnan each formed the impression that Sheriff Corpus and Mr. Aenlle shared a close personal relationship. Mr. Guiney and Mr. Kunkel stated that, during the transition, Sheriff Corpus and Mr. Aenlle would regularly appear together on Zoom calls, often from Mr. Aenlle's ranch. Mr. Kearnan and Mr. Kunkel witnessed Sheriff Corpus's and Mr. Aenlle's efforts to conceal their close personal relationship. For example, they both recall holding a videoconference call with Sheriff-elect Corpus in 2022, while she was in her car. They asked her if she was alone. She told them that she was. However, both Mr. Kunkel and Mr. Kearnan could see Mr. Aenlle's reflection in one of the car's windows in the background of the call.

Mr. Kearnan and Mr. Kunkel also reported that Mr. Aenlle would interrupt and redirect Sheriff Corpus in meetings as if he controlled the operation of the transition team. Both Mr. Kearnan and Mr. Kunkel came to understand that Mr. Aenlle (rather than Sheriff-elect Corpus or any other law enforcement professional) was leading the transition and preparations for Sheriff Corpus to assume her office.

Mr. Aenlle's involvement in transition planning extended to creating a draft organization chart for SMCSO's leadership structure. Mr. Aenlle advocated for a "chief of staff" position to replace one of the three sworn assistant sheriff positions. In at least some versions of the organizational chart under discussion, the chief of staff would have reported directly to the Sheriff, rather than

May 30, 2025
Page 10

to the Undersheriff, whereas assistant sheriffs report to the Undersheriff. When he later spoke with Judge Cordell, Mr. Aenlle referred to the chief of staff job as "my position" which "was created" by converting an assistant sheriff position to the chief of staff position.

> 3.      Sheriff Corpus's then-husband reported that she was having an affair with Mr. Aenlle.

During the transition, Mr. Kearnan noticed that Sheriff Corpus was often unavailable during working hours, and that she seemed never to be alone without Mr. Aenlle. Mr. Kearnan spoke to John Kovach, Sheriff Corpus's then-husband to discuss the relationship between Sheriff Corpus and Mr. Aenlle. Mr. Kovach told Mr. Kearnan that Sheriff Corpus was having an affair with Mr. Aenlle.

Mr. Guiney also recalls having multiple conversations with Mr. Kovach regarding the relationship between Sheriff Corpus and Mr. Aenlle. Mr. Kovach told Mr. Guiney that Sheriff Corpus would often come home very late or in the early hours of the morning and that she was not around very much. Mr. Kovach told Mr. Guiney that he suspected Sheriff Corpus was at Mr. Aenlle's ranch despite her denials.

Mr. Guiney also recalls Sheriff Corpus telling him that Mr. Kovach had given her a pair of boots, but when Mr. Guiney asked Mr. Kovach about the gift, he said that the boots were actually from Mr. Aenlle.

> 4.      In September 2022, Sheriff Corpus and Mr. Aenlle traveled to Hawaii and provided conflicting accounts of their trip.

In September 2022, Sheriff Corpus and Mr. Aenlle traveled to Hawaii. Sheriff Corpus and Mr. Aenlle have offered conflicting accounts of this trip.

**Valerie Barnes**. Before the trip, Sheriff Corpus told Ms. Barnes that she was going to Hawaii with Mr. Aenlle for a personal vacation. At Sheriff Corpus's request, Ms. Barnes assisted Sheriff Corpus in finding a rental property for her, her children, and Mr. Aenlle. Ms. Barnes also shared Sheriff Corpus's flight confirmation number and details with Mr. Aenlle.

**Jeff Kearnan**. After the trip, Mr. Kearnan spoke to Mr. Kovach who told Mr. Kearnan that he believed that Mr. Aenlle had traveled to Hawaii together with Sheriff Corpus. Mr. Kearnan then called Sheriff Corpus and asked her if she and Mr. Aenlle had traveled to Hawaii together. Sheriff Corpus denied having traveled to Hawaii with Mr. Aenlle. Ten minutes after that phone call ended, Mr. Aenlle called Mr. Kearnan. The phone call began with Mr. Aenlle accusing Mr. Kearnan of not liking him. Later in the call, Mr. Kearnan asked Mr. Aenlle about the Hawaii trip. Mr. Aenlle initially denied having traveled to Hawaii, but he later admitted that he had been in Hawaii. He claimed that he had been there on business unrelated to Sheriff Corpus. Shortly after this exchange, Mr. Kearnan resigned from Sheriff Corpus's transition team based on concerns about conflicts of interest, nepotism, and Sheriff Corpus's refusal to be honest regarding her relationship with Mr. Aenlle.

May 30, 2025
Page 11

**Mike Callagy.** After Mr. Kearnan resigned, County Executive Mike Callagy had a discussion with Sheriff Corpus about the Hawaii trip. During that conversation, Sheriff Corpus admitted to Mr. Callagy that she had traveled to Hawaii with Mr. Aenlle, and she acknowledged that she and Mr. Aenlle were good friends and that Mr. Aenlle had a relationship with her children. Mr. Callagy told Sheriff Corpus that it was inappropriate for her to have asked the County to pay Mr. Aenlle for his work on the transition team if she simultaneously had a personal relationship with him that was close enough such that they traveled to Hawaii together. Mr. Callagy terminated Mr. Aenlle's contract, explaining that the County could not tolerate even the perception of a conflict of interest.

**Dan Guiney.** Mr. Aenlle admitted to Mr. Guiney that he had traveled to Hawaii, though he claimed that he was there to provide security for Sheriff Corpus and support for her children.

**Carlos Tapia.** Mr. Aenlle told Dep. Tapia that he had flown to Hawaii to provide security for Sheriff Corpus.

**Judge Cordell.** Mr. Aenlle admitted to Judge Cordell that he had been in Hawaii at the same time as Sheriff Corpus, but he maintained that it was a coincidence, that he had been there to provide "covert" security to an unrelated third party, and that he "barely even saw" Sheriff Corpus while he was there.

In sum, Sheriff Corpus has both admitted (to Mr. Callagy) and denied (to Mr. Kearnan) having traveled to Hawaii with Mr. Aenlle. When she has admitted the trip, she has also acknowledged that the trip was personal and that she and her children spent time with Mr. Aenlle. Mr. Aenlle has both admitted (to Mr. Kearnan, to Judge Cordell, to Mr. Guiney, and to Dep. Tapia) and denied (to Mr. Kearnan) that he traveled to Hawaii. Mr. Aenlle has stated to some people (Mr. Guiney and Dep. Tapia) that he traveled to provide security to the Sheriff and to others (Judge Cordell and Mr. Kearnan) that his travel was unrelated to Sheriff Corpus.

<p style="text-align:center">5.     The relationship continued after Sheriff Corpus took office.</p>

After Sheriff Corpus took office in January 2023, she appointed Christopher Hsiung as Undersheriff and Ryan Monaghan as an Assistant Sheriff. Sheriff Corpus recruited Undersheriff Hsiung. He had helped to reform the Mountain View police department, and, in recruiting him, Sheriff Corpus told him that "I want you to do in San Mateo as you did in Mountain View." Undersheriff Hsiung served the SMCSO from February 2023 to June 2024. Sheriff Corpus also recruited Assistant Sheriff Monaghan, who had served as the Tiburon Chief of Police. He served as Assistant Sheriff from February 2023 through September 2024. Thus, beginning in February 2023, Sheriff Corpus's Executive Team consisted of Mr. Aenlle, Undersheriff Hsiung, Assistant Sheriff Monaghan, and Mr. Kunkel.

Undersheriff Hsiung and Assistant Sheriff Monaghan witnessed conduct indicative of a close personal relationship between Sheriff Corpus and Mr. Aenlle. For example, they both saw Sheriff Corpus and Mr. Aenlle share entrees and drinks at restaurants. Other witnesses, including Ms. Barnes and another civilian SMCSO employee, Jennifer Valdez, also saw Sheriff

May 30, 2025
Page 12


Corpus and Mr. Aenlle share entrees and drinks. Undersheriff Hsiung and Assistant Sheriff Monaghan also both frequently observed Mr. Aenlle interrupt and/or redirect Sheriff Corpus in meetings.

While attending a professional conference in or about May 2024, Sheriff Corpus and Mr. Aenlle stood up former Undersheriff Hsiung on three separate occasions when they were scheduled to meet. Each time, he waited to meet them in the hotel lobby, but they never arrived and were evasive in explaining why they failed to meet him. Sheriff Corpus and Mr. Aenlle were also absent at the same times during the day, for periods of between one and two hours, and at unusual times of day.

Ms. Valdez, who worked in the Sheriff's Office for 18 years as an executive assistant before later transferring to the County Attorney's office, also observed conduct indicative of an intimate personal relationship between Sheriff Corpus and Mr. Aenlle. In 2024, Ms. Valdez saw Mr. Aenlle answer a call on his cell phone. Ms. Valdez noticed that the caller ID identified the caller as Sheriff Corpus. As the call concluded, Ms. Valdez heard Mr. Aenlle say "Te amo" to Sheriff Corpus. Ms. Valdez understood this to mean "I love you" in Spanish. On multiple occasions, Ms. Valdez saw Mr. Aenlle bring Sheriff Corpus's children to her office after school.

Sheriff Corpus lives in San Bruno in a house that is on the corner of a four-way intersection. Diagonally across the street from Sheriff Corpus's house (kitty-corner) is a house owned by the parents of Sgt. Gaby Chaghouri. Sgt. Chaghouri lives out-of-state and typically works lengthier shifts scheduled together. During these stretches, Sgt. Chaghouri drives in from out of state and stays at his parents' house.

Sgt. Chaghouri has seen Mr. Aenlle at Sheriff Corpus's house on multiple occasions beginning during the campaign and through March 2025. On at least two occasions, Mr. Aenlle appeared to recognize Sgt. Chaghouri. In one instance, Sgt. Chaghouri was parking his truck late at night after arriving from out of state and saw Mr. Aenlle emerge from Sheriff Corpus's home. Mr. Aenlle looked directly at Sgt. Chaghouri, tucked his head, and quickly got in his car to drive away. On another occasion, Sgt. Chaghouri, standing in his front yard, saw Mr. Aenlle come out of the front door of Sheriff Corpus's house, make eye contact, then abruptly turn around and go back inside.

            6.      Sheriff Corpus and Mr. Aenlle deny an "intimate relationship."

Sheriff Corpus declined to be interviewed by Judge Cordell. Mr. Aenlle agreed to interview with Judge Cordell during which he described his relationship with Sheriff Corpus as a "strong friendship," but one that did not extend "beyond mere friendship." An April 25, 2025, report commissioned by Sheriff Corpus's counsel states that "[b]oth Sheriff Corpus and Mr. Aenlle expressly deny any intimate relationship." As noted above, Sheriff Corpus and Mr. Aenlle declined KVP's invitation for an interview.

May 30, 2025
Page 13

      **D.**      **Using public funds, Sheriff Corpus entered into two separate contractual arrangements and one employment relationship with Mr. Aenlle and repeatedly requested raises for Mr. Aenlle.**

**Consultant to Transition Team.** As discussed above, after Sheriff Corpus won the June 2022 election, she asked the County to fund a paid transition team. Although there was no known precedent for such a request, Mr. Callagy agreed to Sheriff Corpus's request, and the County offered Mr. Aenlle a contract that paid him $105 per hour. Mr. Callagy cancelled this contract in October 2022, after Sheriff Corpus confirmed that she had a personal relationship with Mr. Aenlle.

**Contractor and Special Projects Coordinator.** After Sheriff Corpus took office, she undertook a series of steps to ensure that Mr. Aenlle was employed in an executive role and repeatedly sought pay increases on his behalf. Immediately upon taking office in January 2023, Sheriff Corpus hired Mr. Aenlle as a contractor, paid $92.44 per hour or $192,275 per year. At the time, the Sheriff had authority to enter into contracts for less than $200,000 without Board approval. The amount of the contract was set just under the threshold that would require her to present the contract to the Board. Mr. Aenlle's contractor agreement was signed by Stacey Stevenson, the acting Director of Finance in the Sheriff's Office at that time.

Less than six weeks later, in March 2023, Sheriff Corpus requested that Mr. Aenlle be hired as an extra help Special Projects Coordinator at the hourly rate of $118. County Human Resources approved the conversion from contractor to temporary employee, but it set the rate of pay at $73 per hour, which it deemed "consistent with base pay of similar County positions." Human resources specifically noted that Mr. Aenlle's job was "not at the level of an Assistant Sheriff" and was "non-sworn and should not be aligned to a higher level sworn role/pay." According to Human Resources, "the work described is more in alignment with higher-level Analyst work or mid-level management work."

**Executive Director of Administration.** Then, in or around June 2023, Sheriff Corpus created a job listing for a full-time, unsworn position, the "Executive Director of Administration." The description was similar to the job descriptions of Mr. Aenlle's contract positions, which Human Resources had noted did not involve executive level duties. The "Executive Director of Administration" job was not publicly posted, and Mr. Aenlle was the only applicant for the position. He received the job, and his salary was set at $246,979.

Almost immediately, in July 2023, Sheriff Corpus sought a pay increase for Mr. Aenlle, submitting a memorandum which began:

May 30, 2025
Page 14

> I respectfully request that Mr. Victor Aenlle receive "Step E" compensation for his recent appointment to the Sheriff's Office Executive Director of Administration position, as it has been extended to him and accepted. Over the last 30 years, Mr. Aenlle has served in various leadership and management roles and gained significant exposure to administrative operations in various capacities. In addition to his substantial executive leadership experience, Mr. Aenlle has been an active member for 15 years with the San Mateo County Sheriff's Office.

The memorandum notes that Sheriff Corpus had already promised Mr. Aenlle a raise without authorization from Human Resources. The memorandum refers to Mr. Aenlle's "15 years with the San Mateo County Sheriff's Office," but it fails to note that this service consisted of part-time, volunteer reserve deputy service, as well as the short period of time when he was a full-time deputy candidate before failing the field training program.

County Human Resources approved the raise "given that the candidate ha[d] already been informed by the Sheriff's Office that [he] will receive" it, but also noted in a memorandum to Sheriff Corpus that Human Resources did "not believe that [increased compensation] is in alignment with the candidate's experience."

In the first four months of 2024, Sheriff Corpus made, or caused to be made, three further requests for a pay raise for Mr. Aenlle. In one instance, Sheriff Corpus ordered then-Undersheriff Hsiung to author and submit a raise request for Aenlle. The County denied each request as unjustified.

### E. Sheriff Corpus took steps to conceal potentially negative information about Mr. Aenlle.

In the spring of 2023, it was well known within the SMCSO that Sheriff Corpus was considering creating a full-time position for Mr. Aenlle. As a result, Lt. Sebring, who at the time served as a lieutenant in PSB, thought that it was possible that Mr. Aenlle would have to go through a background check before assuming such an executive position. When he considered the possibility that Mr. Aenlle might have to go through a background check, Lt. Sebring recalled a piece of information he had previously seen in Mr. Aenlle's background file.



Nonetheless, Lt. Sebring thought Sheriff Corpus should be aware of the contents of Mr. Aenlle's background file as she considered appointing him to a position on her Executive Team. Accordingly, he met with Sheriff Corpus and told her about

May 30, 2025
Page 15

Approximately an hour later, Sheriff Corpus called Lt. Sebring ███████████████ ████████████████████████████████████████ Lt. Sebring told Sheriff Corpus that at least the PSB lieutenant, the PSB captain, the assistant sheriff overseeing PSB, SMCSO Human Resources Manager Heather Enders, and certain support staff had access to the background files of Sheriff's Office employees. Sheriff Corpus then directed Lt. Sebring to restrict access to Mr. Aenlle's background file such that only she and Lt. Sebring would be able to access it. Lt. Sebring coordinated with the Sheriff's Office Technical Services Unit to carry out Sheriff Corpus's direction and informed Sheriff Corpus when the file access restriction was complete.

Sheriff Corpus further directed Lt. Sebring to provide her with a ████████████████████ ███████████████████████████████ Approximately one month later, Sheriff Corpus informed Lt. Sebring that Mr. Aenlle would not go through a background check prior to assuming his position on the Executive Team.

According to Lt. Sebring, it was unusual that Sheriff Corpus ordered him to limit access to Mr. Aenlle's background file. Lt. Sebring reported that this was the only time anyone has requested him to limit access to an individual's background file.

**F.    Immediately after the Board of Supervisors voted to remove Mr. Aenlle as "Executive Director of Administration," Sheriff Corpus attempted to appoint him as an Assistant Sheriff.**

On November 13, 2024, the Board of Supervisors, in response to the Cordell Report, voted to eliminate Mr. Aenlle's "Executive Director of Administration" position and to bar him from unescorted access to non-public areas of County buildings. That same day, Sheriff Corpus announced her intention to appoint Mr. Aenlle to the position of Assistant Sheriff "effective immediately."

That night, Det. Mike Garcia called Det. Rick Chaput while Det. Chaput was at home and off-duty. Det. Chaput serves in PSB, where one of his responsibilities is to update the status of newly hired officers in the POST Electronic Data Interchange (EDI), the online system that SMCSO uses to communicate with the California Commission on Police Officer Standards and Training. Det. Garcia told Det. Chaput that "they want you to switch Victor to full-time in POST." Det. Chaput understood that Det. Garcia was referring to a request from the Executive Team to change Mr. Aenlle's status from a Reserve Deputy to a full-time peace officer in the POST EDI system.

Det. Chaput expressed to Det. Garcia that he was unwilling to make that change. He also explained to Det. Garcia that anyone updating Mr. Aenlle's status information in the POST EDI system would have to sign a form swearing under penalty of perjury that the updated information was accurate. After speaking with Det. Garcia, Det. Chaput called Lt. Irfan Zaidi. Lt. Zaidi said he was not aware of the request but would call Undersheriff Perea and then call Det. Chaput back. Shortly thereafter, Lt. Zaidi called Det. Chaput back; during this second call, Lt. Zaidi told Det. Chaput that Undersheriff Perea directed him to change Mr. Aenlle's status.

May 30, 2025
Page 16

Det. Chaput was concerned about the timing of the request, and he was not confident that Mr. Aenlle met the requirements for a full-time peace officer. Det. Chaput told Lt. Zaidi he would not change Mr. Aenlle's status. Det. Chaput then reported the incident to Sgt. Fava.

The following day, the County's Director of Human Resources, Rocio Kiryczun, communicated to Sheriff Corpus that Mr. Aenlle failed to meet the minimum qualifications for Assistant Sheriff. Ms. Kiryczun pointed out that, according to the job description for the Assistant Sheriff position, "Candidates must acquire an Advanced Certificate in law enforcement issued by [POST] within one year of appointment" and noted that "the requirements set forth by [POST] state that, in order to be eligible for an Advanced Certificate, a candidate must have a <u>minimum</u> of 4 years of full-time law enforcement experience." Ms. Kiryczun further noted that "Mr. Aenlle does not have 4 years of full-time law enforcement experience, nor even 1 year." Thereafter, Mr. Aenlle was not hired to an Assistant Sheriff position.

On April 17, 2025, a month and a half after the voters enacted Measure A, Sheriff Corpus directed that Mr. Aenlle be moved to the "active list" and assigned him to assist in the unit that processes concealed weapons permits.

> **G.      Sheriff Corpus's decision to install Mr. Aenlle as a member of her Executive Team hurt the SMCSO.**

Sheriff Corpus installed Mr. Aenlle in an executive position that is typically filled by a career full-time law enforcement professional. Because of his lack of experience and his poor leadership skills, Mr. Aenlle was unable to provide effective leadership with the SMCSO, and his presence hurt morale across the organization. Sheriff Corpus's decision to keep Mr. Aenlle in his position, despite the warnings she received, further hurt the Office and led to the departures of senior leaders.

> > 1.      Sheriff Corpus's decision to install Victor Aenlle in a leadership position hurt morale in the SMCSO.

Sheriff Corpus's decision to include Mr. Aenlle as part of her Executive Team hurt morale in the SMCSO because the sworn officers knew that he was not qualified to be a law enforcement leader.

Mr. Aenlle's attempts to supervise full-time sworn officers exacerbated this morale problem. Mr. Aenlle's role as the Executive Director of Administration was a civilian role, in which he was supposed to supervise civilian staff. Moreover, it is generally understood in the SMCSO that full-time sworn officers are not to be supervised by civilian executives. Nonetheless, Mr. Aenlle attempted to direct the work of full-time sworn officers, including captains in the Corrections Division.

Mr. Aenlle also inappropriately interfered with the work of civilian employees in the SMCSO, including those involved in the hiring process. On or about November 7, 2024, PSB Sgt. Jimmy Chan and Ms. Barnes interviewed applicants for a deputy sheriff trainee position. The interview process is required by POST. Prior to the interview, Det. Mike Garcia told Sgt. Chan that he had personally worked to prepare one of the applicants that Sgt. Chan would interview that day. Det. Garcia identified the candidate by name and told Sgt. Chan that the candidate had been part of the Law Enforcement Candidate Scholars program. Thinking back on it, Sgt. Chan believes that Det. Garcia was trying to influence his assessment of the candidate. Det. Garcia is perceived within the SMCSO to be a favorite employee of Sheriff Corpus's; his mother, brother, and sister-in-law all contributed to Sheriff Corpus's 2022 campaign for Sheriff.

After interviewing the candidate, Sgt. Chan and Ms. Barnes each gave the candidate a non-passing score, based on her answers to their questions and her insufficient experience. They recommended that the candidate apply to become a Community Service Officer in order to gain relevant experience. Sgt. Chan told Det. Garcia and Lt. Zaidi that the candidate had not passed the interview.

Later that same day, Mr. Aenlle contacted Ms. Enders, the top civilian human resources employee within the SMCSO. Mr. Aenlle told Ms. Enders that Sheriff Corpus was upset because Ms. Barnes had been part of the interview panel and because the candidate had not passed the interview. Mr. Aenlle instructed Ms. Enders to rescind the interview results and to pass the applicant onto the next stage of the hiring process. Ms. Enders told Mr. Aenlle that she would not do so.

The following day, Undersheriff Perea instructed Lt. Zaidi to move the candidate forward in the hiring process. Lt. Zaidi informed Undersheriff Perea that the candidate had failed their interview, but Undersheriff Perea insisted, saying that Sheriff Corpus wanted the candidate moved through the process. Shortly thereafter, Lt. Zaidi instructed a civilian Management Analyst to change the candidate interview results in the application management system from "fail" to "pass" at the direction of the Sheriff and Undersheriff, and stood over her shoulder as she did so. Lt. Zaidi later informed Ms. Enders that he was told by Undersheriff Perea that Sheriff Corpus wanted the applicant to move forward in the hiring process.

Thereafter, Sgt. Fava and Sgt. Chan protested the decision to move the applicant forward in the hiring process notwithstanding the fact that the applicant had failed the interview. Ms. Enders ultimately refused to move the candidate forward in the process, writing that members of the Sheriff's Office should not "engage in actions that undermine or interfere with the integrity of the civil service process under any circumstances," and that "any deviation from" the interview and application process "would be inappropriate and unacceptable."

Mr. Aenlle's harsh treatment of SMCSO employees, and his generally poor leadership skills, further eroded morale. The example often cited by witnesses is Mr. Aenlle's treatment of long-time SMCSO civilian employee Jenna McAlpin. In April 2024, Mr. Aenlle confronted Ms. McAlpin concerning a rumor that she had posted denigrating content about Sheriff Corpus

May 30, 2025
Page 18

on social media. Mr. Aenlle confronted Ms. McAlpin about this rumor on or about her last day at the Sheriff's Office. Ms. McAlpin denied having anything to do with the social media posts, but Mr. Aenlle implied that she was not being truthful; in response, she swore on her children's lives that she was telling the truth, and offered to take a lie-detector test. Ms. McAlpin was very upset by this interaction, and she told Mr. Aenlle that he was making her emotionally and physically uncomfortable. As soon as Mr. Aenlle left her office, Ms. McAlpin began to cry.

> 2.    Sheriff Corpus's Executive Team warned her about Mr. Aenlle's conduct and the effect it was having on the office.

Sheriff Corpus was aware of Mr. Aenlle's unprofessional conduct but refused to act. On multiple occasions, Undersheriff Hsiung warned Sheriff Corpus that Mr. Aenlle's unprofessional conduct and lack of experience as a law enforcement leader imperiled the Sheriff's Office's operational abilities. One example of this arose in the context of an Internal Affairs investigation that occurred in 2024. A sergeant made an allegation of misconduct against a captain. The sole witness was also a captain. Because of the high ranks of the principal witness and subject of the investigation, the Sheriff's Office outsourced the investigation. Undersheriff Hsiung instructed Mr. Aenlle not to discuss the underlying incident with either captain, so as not to taint the investigation or violate procedural rights. Ignoring that instruction, Mr. Aenlle discussed the incident with the captain who was a principal witness in the investigation. When Undersheriff Hsiung confronted Mr. Aenlle about his interference with the investigation, rather than to take responsibility for his conduct, Mr. Aenlle attempted to minimize the effect of his decision to discuss the incident with the witness. Undersheriff Hsiung later told Sheriff Corpus that Mr. Aenlle compromised the investigation. However, he did not have confidence that Sheriff Corpus would or could control Mr. Aenlle's future conduct given their personal relationship.

Likewise, Assistant Sheriff Monaghan advised Sheriff Corpus, on multiple occasions, that Mr. Aenlle's conduct, and his way of communicating with employees, was interfering with operations for both sworn and civilian employees. For example, Assistant Sheriff Monaghan spoke to Ms. McAlpin shortly after the incident with Mr. Aenlle described above, and Ms. McAlpin was visibly upset and appeared to have been crying. Assistant Sheriff Monaghan spoke to Sheriff Corpus about it, but she downplayed the seriousness of the incident and commented that Ms. McAlpin has a tendency to be "emotional" and might have overreacted.

> 3.    Sheriff Corpus's close personal relationship with Mr. Aenlle and her decision to retain him on her Executive Team contributed to the departures of numerous senior advisors and Executive Team members.

As described above, after Sheriff Corpus's election, she assembled a transition team of seasoned law enforcement officers with ties to the SMCSO office, including former Assistant Sheriff Jeff Kearnan, former Capt. Paul Kunkel, and former Lt. Dan Guiney. Mr. Kearnan left the transition team before Sheriff Corpus's inauguration due to his concerns about her relationship with

May 30, 2025
Page 19

Mr. Aenlle. Likewise, Mr. Guiney left shortly after Sheriff Corpus's inauguration based on concerns about Mr. Aenlle.

Mr. Kunkel stayed on after Sheriff Corpus's inauguration as a contractor to serve as the unofficial Assistant Sheriff for Corrections and to hire a full-time replacement for that position. Mr. Kunkel identified several promising candidates for leadership positions, including a police chief from within San Mateo County and a former assistant sheriff from Santa Clara County. Mr. Kunkel could not identify any opposition to those candidates other than Mr. Aenlle's. Neither was hired. Capt. Kunkel chose to leave the SMCSO in early 2024 in large part due to Mr. Aenlle's influence over the office. At the time he left, no assistant sheriff for Corrections had been hired. Sheriff Corpus has still never had a full-time assistant sheriff for Corrections.

Mr. Hsiung joined the SMCSO as Sheriff Corpus's first undersheriff because he wanted to help Sheriff Corpus reform the SMCSO. Undersheriff Hsiung eventually resigned in June 2024 because of Sheriff Corpus's inability to command the SMCSO at an executive level, her tendency to retaliate against personnel who disagreed with her or she believed had previously wronged her, and her continually allowing Mr. Aenlle to interfere with him and other sworn personnel in the performance of their duties.

Like Mr. Hsiung, Mr. Monaghan entered his position enthusiastic about the prospect of working for a new sheriff with a reform-minded agenda. However, Sheriff Corpus removed Assistant Sheriff Monaghan from his position in September 2024, and she has not hired a full-time replacement for his position.

As a result of these departures, the SMCSO is currently operating without critical leadership positions filled. The SCMSO is supposed to operate with a Sheriff, Undersheriff and three assistant sheriffs, including one devoted to overseeing the operation of the County's two jails. There are currently no assistant sheriffs.

## H.     Grounds for Removal

The foregoing conduct is, independently and collectively, grounds to remove Sheriff Corpus from office for cause for the following reasons.

Sheriff Corpus violated laws related to the performance of her duties as Sheriff. San Mateo County Charter Art. IV § 412.5(B)(1). *First*, California's conflict-of-interest law requires public officials to exercise authority "with disinterested skill, zeal, and diligence and primarily for the benefit of the public." *Clark v. City of Hermosa Beach*, 48 Cal. App. 4th 1152, 1170–71 (1996) (quoting *Noble v. City of Palo Alto* (1928) 89 Cal. App. 47, 51). The law "prohibits public officials from placing themselves in a position where their private, personal interests may conflict with their official duties." *Id.* (quoting (64 Ops. Cal. Atty. Gen. 795, 797 (1981)). The common law conflict-of-interest rule "extends to noneconomic conflicts of interest." *Id.* at 1171 n.18. This law, and "[a]ll laws pertaining to conflicts of interest," are "applicable to all officers, employees and members of boards and commissions" of San Mateo County. San Mateo County Charter, Art. V § 510. Further, it is "the policy of the County to recruit, select, retain and

May 30, 2025
Page 20

promote the best qualified officers and employees," and "[a]ppointments and promotions shall be made on the basis of merit and in conformity with the principles of equal opportunity." San Mateo County Charter, Art. V § 501. And "the selection and retention of employees" must be "on the basis of merit and fitness." *Id.* § 505. Sheriff Corpus's own Policy Manual provides that "Candidates for job openings will be selected based on merit, ability, competence and experience." SMCSO Policy Manual § 1000.2. The Policy Manual further prohibits employees "from directly supervising, occupying a position in the line of supervision or being directly supervised by any other employee … with whom they are involved in a personal or business relationship," *id.* § 1025.2(a), and prohibits "recommending promotions … or other personnel decisions affecting an employee … with whom they are involved in a personal or business relationship," *id.* § 1025.2(b). Sheriff Corpus has violated these laws with respect to her treatment of Mr. Aenlle, with whom she enjoys a close personal relationship, including by hiring and employing him at public expense in positions for which he is not qualified, by seeking promotions and salary increases for him, and by retaining him in those positions notwithstanding the fact that the County Executive and others advised Sheriff Corpus that doing so was improper. Moreover, Sheriff Corpus tolerated, enabled, and acquiesced to Mr. Aenlle's conduct that was detrimental to the morale and proper functioning of the Sheriff's office.

**Second**, pursuant to California Commission on Peace Officer Standards and Training ("POST") regulations, "[e]very peace officer candidate shall participate in an oral interview to determine suitability to perform the duties of a peace officer." Cal. Code Regs. tit. 11, § 1952(a). The SMCSO has an obligation to ensure that every peace officer candidate "satisfies all minimum selection requirements." Cal. Code Regs. tit. 11, § 1952(a). Further, as noted above, all "[a]ppointments and promotions [in the SMCSO] shall be made on the basis of merit and in conformity with the principles of equal opportunity," San Mateo County Charter, Art. V § 501, and "the selection and retention of employees" must be "on the basis of merit and fitness," *id.* § 505. Sheriff Corpus violated these laws by directing that SMCSO personnel advance a candidate who failed an oral examination and thus failed to satisfy the minimum selection requirement specified by law.

Sheriff Corpus has also flagrantly and repeatedly neglected her duties as defined by law. San Mateo County Charter Art. IV § 412.5(B)(2). California law requires that Sheriff Corpus preserve the peace in San Mateo County, operate the jails in the County, and hire necessary staff to execute her responsibilities. Gov't Code §§ 26600, 26604, 26605. Moreover, per Sheriff Corpus's own Policy Manual, the "Sheriff is responsible for planning, directing, coordinating, controlling and staffing all activities of the Sheriff's Office for its continued and efficient operation." Policy Manual § 201.1.1(a)(2). In addition, "[t]he Sheriff is responsible for administering and managing … the Administration and Support Services Division[,] Operations Division[, and] Corrections Division." *Id*. § 200.2. Each of the foregoing Divisions is to be commanded by an Assistant Sheriff. *Id.* §§ 200.2.1, 200.2.2, 200.2.3. Sheriff Corpus flagrantly neglected these duties by hiring, promoting and retaining Mr. Aenlle notwithstanding his lack of qualifications, his poor leadership skills, and the repeated warnings she received regarding the same. Indeed, as a result of Sheriff Corpus's actions, the SMCSO is currently without any of the three assistant sheriffs required by Sheriff Corpus's Policy Manual.

May 30, 2025
Page 21


## I.    Supporting Evidence

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- SMCSO Associate Management Analyst Valerie Barnes

- San Mateo County Executive Michael Callagy

- Sgt. Gaby Chaghouri

- Sgt. Jimmy Chan

- Det. Rick Chaput

- SMCSO Human Resources Manager Heather Enders

- Former Lt. Daniel Guiney

- Former Undersheriff Christopher Hsiung

- Former Assistant Sheriff Jeff Kearnan

- San Mateo County Human Resources Director Rocio Kiryczun

- Former Capt. Paul Kunkel

- Former Records Manager Jenna McAlpin

- Former Assistant Sheriff Ryan Monaghan

- Lt. Jonathan Sebring

- Dep. Carlos Tapia

- Executive Assistant Jennifer Valdez

- Lt. Irfan Zaidi

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- November 26, 2021 Barnes-Sheriff Corpus Texts re: Sheriff Christina Corpus's relationship with Kovach

May 30, 2025
Page 22

- December 30, 2021 Barnes-Sheriff Corpus Texts re: Sheriff Christina Corpus's relationship with Kovach

- 2022 Draft Organizational Chart

- January 12, 2022 Barnes-Sheriff Corpus Texts re: Aenlle's Ranch

- January 18, 2022 Barnes-Sheriff Corpus Texts re: Sheriff Christina Corpus's relationship with Kovach

- January 27, 2022 Barnes-Sheriff Corpus Text re: Wedding Venues

- January 27, 2022 Barnes-Sheriff Corpus Texts re: Earrings

- January 31, 2022 Barnes-Sheriff Corpus Texts re: Aenlle

- February 26, 2022 Barnes-Sheriff Corpus Texts re: Aenlle Foot Massage

- May 11, 2022 Barnes-Sheriff Corpus Texts re: Airbnb in Hawaii

- August 30, 2022 Contract Between County of San Mateo and Victor Aenlle

- October 21, 2022 Email from Iliana Rodriguez to Aenlle re: Termination of Contract

- January 1, 2023 Contract Between County of San Mateo and Victor Aenlle

- 2023 Special Projects Coordinator I Job Description

- March 7, 2023 Email from County Human Resources Lisa Yapching to Joann Lov and Heather Enders re: Extra Help Positions

- July 6, 2023 Job Posting for Executive Director of Administration

- 2023 Victor Aenlle CV and Application for Executive Director of Administration

- July 31, 2023 Memo from Sheriff Christina Corpus to Rocio Kiryczun re: Victor Aenlle - Step E Request

- August 1, 2023 Email from Rocio Kiryczun to Sheriff Christina Corpus re: Victor Aenlle - Step E Request

- February 13, 2024 Memo from Sheriff Christina Corpus to Rocio Kiryczun re: Differential Request for Dr. Victor Aenlle

- March 8, 2024 Email from Sheriff Christina Corpus to Former Undersheriff Christopher

May 30, 2025
Page 23

           Hsiung re: Document

- March 12, 2024 Memo from Former Undersheriff Hsiung to Rocio Kiryczun re: Temporary Differential Pay

- March 13, 2024 Email from Rocio Kiryczun to Hsiung and Sheriff Christina Corpus re: Discretionary Pay for Victor Aenlle

- April 16, 2024 Memo from Sheriff Christina Corpus to Rocio Kiryczun re: Request for Aenlle Raise

- April 24, 2024 Email from Rocio Kiryczun to Sheriff Christina Corpus re: Request for Reconsideration of Allowance for Victor Aenlle

- September 25, 2024 Victor Aenlle Transcript of Interview with Judge Cordell

- November 13, 2024 Email from Sgt. Joe Fava and Sgt. Jimmy Chan to Lt. Irfan Zaidi re: Oral Board Concern

- November 13, 2024 Video Recording of Special Meeting of the Board of Supervisors

- November 14, 2024 Email from Rocio Kiryczun to Sheriff Christina Corpus re: Assistant Sheriff Job Classification Requirements

- November 18, 2024 Email from Heather Enders to Sheriff Christina Corpus, Undersheriff Perea, and Lt. Irfan Zaidi re: Concerns Regarding the Interview Process for Candidate

- 2024 Victor Aenlle Volunteer Hours

- April 17, 2025 Email from Sheriff Christina Corpus to Len Beato re: Reserve Deputy Victor Aenlle

## II.    Grounds for Removal Relating to the Investigation and Arrest of DSA President Carlos Tapia

### A.    Introduction

Dep. Carlos Tapia is the president of the DSA. The DSA is the recognized bargaining unit for San Mateo County deputies, correctional officers, and district attorney inspectors.

In 2024, the relationship between the DSA and Sheriff Corpus broke down due to several issues, including Mr. Aenlle's role in the SMCSO and negotiations related to the Sheriff's overtime policy. After the DSA began to criticize Sheriff Corpus, she ordered her Executive Team, and in particular then-Acting Assistant Sheriff Matthew Fox, to investigate how Dep. Tapia submitted

May 30, 2025
Page 24

his hours worked to the County. In ordering this investigation and then conducting it in-house, Sheriff Corpus did not follow the SMCSO's standard policy to refer investigations of potential criminal activity by members of the SMCSO to the San Mateo District Attorney. This policy is important to prevent the Sheriff from unilaterally conducting and acting on allegations of serious misconduct where conflicts of interest are present, such as in the investigation of a union leader by the Sheriff. Compounding her failure to refer the investigation to the District Attorney, Sheriff Corpus and Mr. Aenlle repeatedly and improperly limited the scope of the investigation, precluding her lead investigator from collecting relevant evidence and speaking to material witnesses.

On November 12, 2024, based on that restricted and therefore incomplete investigation, the Sheriff sent her lead investigator to meet with and inform the District Attorney of her plan to arrest Dep. Tapia that day. After the District Attorney declined to apply for an arrest warrant and advised against proceeding with a warrantless probable cause arrest, Sheriff Corpus nevertheless ordered her personnel to arrest Dep. Tapia that same day. A month later, the District Attorney's Office concluded its own investigation and exonerated Dep. Tapia, stating that "Deputy Tapia should not have been arrested" because "the complete investigation showed that there was no basis to believe any violation of law had occurred."

In ordering Dep. Tapia's investigation and arrest, Sheriff Corpus violated laws related to the performance of her duties, flagrantly neglected her duties, and obstructed an investigation into herself and the SMCSO, providing cause for her removal under Section 412.5(b)(1), (2), and (5).

**B.    Factual Background**

1.    The MOU allows Dep. Tapia to bill for "release time" spent on DSA activities.

The County and the DSA have entered into a Memorandum of Understanding ("MOU") that governs management and labor relations for the 2021–2026 period. Section 3 of the MOU provides the DSA President with 60 hours of "release time" per pay period, which equates to 30 hours of release time per week. The MOU explains that "[p]aid release time is intended to support the collaboration and cooperative spirit of labor relations by ensuring that Association members have access to resources designed to help support their continued success as public employees and that Association leaders have an opportunity to work together to support the success of their members." The MOU limits the DSA President's use of release time to delineated union-related activity. The MOU further states that all "approved release time will be coded appropriately on the employee's timecard using pay code RTE."

Former Acting Sgt. David Wozniak served as the DSA President for over a decade until mid-2022. Throughout his tenure, Mr. Wozniak did not use the "RTE" code, or any other code, to log release time spent on DSA activities when he submitted his timecards. Instead, he used the "001 – Regular Hour" code for his DSA-related work.

May 30, 2025
Page 25

Dep. Tapia became interim DSA President in July 2022. A few months after Dep. Tapia was elected DSA President, he was transferred to the Transportation Unit within the SMCSO. At the time Dep. Tapia was moved into the Transportation Unit, he was assigned a four-days-a-week, ten-hours-per-day schedule. Dep. Tapia conducted 30 hours of DSA business per week, typically on Tuesdays, Wednesdays, and Thursdays. On Fridays, Dep. Tapia was assigned to work a ten-hour shift in the Transportation Unit. Like his predecessor, Dep. Tapia used the "001 – Regular Hour" code for logging all of his work, whether for the DSA or the Transportation Unit, until August 2024 when, as discussed below, he was told to use a different code.

> 2.    After Sheriff Corpus takes over the SMCSO, her relationship with the DSA deteriorates.

After Sheriff Corpus took office in January 2023, she and her Executive Team began to confer with the DSA and OSS about labor relations. Those discussions became increasingly contentious and hostile over time.

In or around January 2024, Dep. Tapia began receiving complaints from DSA members about Mr. Aenlle. These complaints alleged, among other things, that Mr. Aenlle—who, as discussed above, had no experience in executive law enforcement before joining Sheriff Corpus's Executive Team—engaged in inappropriate behavior towards deputies and frequently made decisions outside the scope of his role as the Executive Director of Administration. Dep. Tapia periodically raised these issues with then-Undersheriff Hsiung, who relayed the complaints to Sheriff Corpus. Sheriff Corpus did not address or resolve those complaints, and Mr. Aenlle did not demonstrate a meaningful change in behavior.

In or around March 2024, Dep. Tapia conferred with Sheriff Corpus concerning overtime policies. The double overtime policy, which was in effect between December 2023 and June 2024, allowed officers to receive double time when they worked more than nine hours of overtime per week. Another overtime policy in place governed how overtime shifts would be scheduled. In the course of their discussions, Sheriff Corpus began asserting that she thought the policies were problematic and needed to be changed or discontinued, including because of her view that some deputies were excessively billing double overtime. Dep. Tapia disagreed and expressed that the policies were working as intended and helped the SMCSO with recruiting and retention.

Around the same time, Sheriff Corpus and her Executive Team tasked SMCSO Director of Finance Stacey Stevenson with tracking which deputies were submitting double overtime and how much double overtime they were submitting. At all relevant times, Ms. Stevenson reported directly to Mr. Aenlle. At the direction of Sheriff Corpus's Executive Team, Ms. Stevenson tracked the ongoing costs of double overtime and presented her analysis of those costs to the Executive Team on a bi-weekly basis. As Ms. Stevenson was preparing the double overtime reports, either she or a member of the Executive Team realized that Dep. Tapia and other union leaders were not using billing codes to differentiate between their regular hours and their release

May 30, 2025
Page 26

time spent on union activities. Ms. Stevenson would later inform investigators from the District Attorney's Office that this discovery was made in June or July 2024.

On or about June 21, 2024, it became public throughout the SMCSO that Undersheriff Hsiung had resigned from the SMCSO. As noted above, Undersheriff Hsiung reports that he resigned because of Sheriff Corpus's inability to command the SMCSO, her tendency to retaliate against personnel, and her refusal to stop Mr. Aenlle from interfering with sworn personnel in the performance of their duties.

On June 21, 2024, DSA Vice President Ephraim Cheever sent an email broadly distributed throughout the SMCSO stating that DSA leadership was "deeply saddened by this change, as [Undersheriff Hsiung] was a big supporter of our organization, our union, and us as employees." The email further stated that the DSA had "several projects, such as revisions to the overtime policy … that are now left in limbo."

Later that day, Sheriff Corpus sent Dep. Tapia a text message stating that she was "very disappointed at the email that was sent out by Cheever." Dep. Tapia responded by proposing that he and Sheriff Corpus have a meeting to discuss. At the meeting, Sheriff Corpus continued to stress her disappointment in DSA Vice President Cheever's email and asked Dep. Tapia to issue a statement to "retract" Cheever's email. Dep. Tapia declined to do so.

In or around July 2024, Dep. Tapia began to meet with Undersheriff Perea, who had replaced Undersheriff Hsiung, to discuss a potential renewal of an overtime policy, which was set to expire. Dep. Tapia and Undersheriff Perea had several meetings in which they discussed potential changes to the overtime policy, but they were unable to reach an agreement. The meetings became increasingly contentious and hostile as the parties were unable to reach an agreement.

       3.    Judge Cordell interviews Dep. Tapia.

On or about August 12, 2024, Judge Cordell interviewed Dep. Tapia as part of her independent investigation.

       4.    The DSA and Sheriff Corpus have a contentious meeting concerning overtime policies.

On or about August 15, 2024, Sheriff Corpus, Undersheriff Perea, Dep. Tapia, OSS President Hector Acosta, and Katy Roberts, a San Mateo County human relations official, along with others, held a labor meet-and-confer about the Sheriff's overtime policies and practices. The meet-and-confer was unsuccessful, and several attendees described the meeting as heated and contentious.

May 30, 2025
Page 27

     5.      After the August 15, 2024 meeting, Dep. Tapia begins to receive messages from SMCSO's finance and human resources departments concerning his timecard practices.

A few hours after the contentious August 15, 2024 meet-and-confer meeting ended, Dep. Tapia received an email from a member of the SMCSO's Human Resources staff, Connor Santos-Stevenson, instructing him to "please put something in the comments section [of his timecards] when you have a 015 line- for auditing purposes."[2]

After receiving the email, Dep. Tapia called Mr. Santos-Stevenson and asked him why Mr. Santos-Stevenson was auditing his timecards. Mr. Santos-Stevenson responded that he did not "want to be involved" and "was being asked to do this," but he declined to identify who had asked him to email Dep. Tapia. Mr. Santos-Stevenson appears to have known that Dep. Tapia did not use the 015 code when entering time since at least December 2023.[3]

The next day, on August 16, 2024, Ms. Stevenson emailed SMCSO Deputy Director of Finance Jason Cooksey to ask him to review the DSA union agreement "and find the language that allows" for the Sheriff's Office to "be reimbursed by the [DSA] for a portion of" Dep. Tapia's salary.

On August 19, 2024, Mr. Cooksey responded by saying he did not see "any specific language in the MOUs that mentions reimbursement for the paid release time." On August 19, 2024, after receiving Mr. Cooksey's message, Ms. Stevenson emailed the SMCSO Payroll Unit with the subject line "Check timecard." In the email, Ms. Stevenson stated that she had learned that Dep. Tapia should be using the "RTE" code in his timecard for time spent "conducting union business," and she asked the Payroll Unit to "please check … Carlos Tapia's timecards and let [her] know if he uses that code ever[.]" On August 21, 2024, SMCSO Payroll Supervisor Van Enriquez responded by stating that he had run "a quick audit and [did not] think [Carlos Tapia had] ever used that code before." Ms. Stevenson then asked Mr. Enriquez to email Dep. Tapia, copying Dep. Tapia's supervisor, and tell him that he should be using an "RTE" code to log his release time for DSA activities when submitting his timecards. She also asked Mr. Enriquez to "blind copy" or "forward the email" so she could "retain a record."

On August 23, 2024, as requested by Ms. Stevenson, Mr. Enriquez sent Dep. Tapia an email instructing him that he needed to change his practice and use the code "RTE" whenever he was logging release time on his timecard for DSA activity. Mr. Enriquez copied Dep. Tapia's supervisors, Lt. Brandon Hensel and Sgt. Steve Woelkers, on the correspondence.

---

[2] "015" is a code that the DSA President has traditionally used for specialty pay when submitting timecards.

[3] Mr. Santos-Stevenson is Ms. Stevenson's son.

May 30, 2025
Page 28

After receiving that email, Dep. Tapia called Mr. Enriquez and asked him who had instructed him to look into his timecards. Dep. Tapia reports that Mr. Enriquez responded by saying "I don't want to get involved." Dep. Tapia also told Mr. Enriquez that the County's payroll system did not permit him to use the "RTE" code. Mr. Enriquez then corresponded with the County's Human Resources Department, which confirmed that Dep. Tapia did not have the ability to use the "RTE" code but could use a "010" code to log release time.

On August 28, 2024, Mr. Enriquez emailed Dep. Tapia again and told him to instead use the code "010" to report his DSA time in light of the fact that he could not access the "RTE" code. Since then, Dep. Tapia has reported his DSA time using the "010" code as instructed by Mr. Enriquez.

Sgts. Chiu, Hallworth, and Woelkers were Dep. Tapia's direct supervisors in the Transportation Unit during the relevant time period. They regularly reviewed and approved Dep. Tapia's timecards. All of them reported that, prior to November 2024, they were unaware of a requirement that Dep. Tapia should have been logging DSA time using a specific release time code. Dep. Tapia has no recollection of his predecessor Mr. Wozniak, his supervising sergeants, or anyone else telling him that, as DSA President, he should log his DSA time in his timecards using a specific release time code before Mr. Enriquez instructed him to do so in August 2024.

Several members of SMCSO reported that coding errors in timecards are commonplace within the office. For example, SMCSO Human Resources Manager Heather Enders reported that issues with timecards like Dep. Tapia's are the sort of "human error" that are very common at the SMCSO. Ms. Enders noted that, despite her role in human resources, even she has had issues with correctly coding her timecards.

> 6.    The DSA and OSS file a PERB complaint against Sheriff Corpus and
>        declare "no confidence" in Mr. Aenlle.

After the August 15, 2024 meeting, relations between the DSA and OSS and Sheriff Corpus continued to deteriorate, and DSA and OSS leadership had by then begun considering a vote of no confidence against Mr. Aenlle. On August 26, 2024, Dep. Tapia received a text message from Det. Mike Garcia, who Dep. Tapia understood was a close ally of Sheriff Corpus, asking if he was available for a call. On that call, Det. Garcia said that he had heard that the DSA was planning to on hold a vote of no confidence against Sheriff Corpus. Dep. Tapia clarified that the no-confidence vote would be against Mr. Aenlle. Det. Garcia expressed disagreement with the planned vote and asked if Dep. Tapia had spoken to Sheriff Corpus about problems with Mr. Aenlle and DSA's intent to hold the vote of no confidence. Dep. Tapia said that he had tried but the Sheriff did not return his calls.

Later that same day, Dep. Tapia received a text message from Sheriff Corpus that said, "I haven't received any calls from you. We can meet off site in San Bruno on Monday." Dep. Tapia understood from Sheriff Corpus's text message that she had discussed the DSA's plans to hold a no-confidence vote concerning Mr. Aenlle with Det. Garcia and was offering to meet to discuss the planned vote.

May 30, 2025
Page 29

On or about August 30, the DSA filed a complaint to the California Public Employment Relations Board ("PERB") alleging that the County, through Sheriff Corpus, had engaged in unlawful labor practices, including failing to meet and confer in good faith concerning the overtime policy.[4] On September 6, 2024, the DSA and OSS began polling members regarding a vote of "no confidence" in Mr. Aenlle.

On September 17, 2024, the DSA and OSS publicly announced their vote of "no confidence" in Mr. Aenlle at a news conference.

7.    Sheriff Corpus inquired about Dep. Tapia's attendance in Transportation.

In August or September 2024, Sheriff Corpus called Lt. Hensel, who managed the Transportation Unit to which Dep. Tapia was assigned. According to Lt. Hensel, Sheriff Corpus asked him about Dep. Tapia's attendance in the Transportation Unit and told him that she may need him to start monitoring Dep. Tapia's attendance. Lt. Hensel told Sheriff Corpus that he was surprised by this because he was unaware of any issues with Dep. Tapia's attendance and had never reported any such issues up his chain of command. Sheriff Corpus responded that she wanted to make sure Dep. Tapia was showing up in Transportation when he was supposed to.

8.    Sheriff Corpus asks Acting Assistant Sheriff Fox to investigate Dep. Tapia.

On or about October 14, 2024, Sheriff Corpus directed Acting Assistant Sheriff Fox to initiate an investigation into how Dep. Tapia recorded and coded his time on his timecards. Acting Assistant Sheriff Fox reports that Sheriff Corpus told him that she had decided to open this investigation because Lt. Hensel had reached out to her and told her that Dep. Tapia was "never here"—meaning, working in the Transportation Unit—and had asked whether Dep. Tapia's assigned day in the Transportation Unit could be changed from Friday to Monday.

Lt. Hensel, however, disputes this account. As noted above, Lt. Hensel recalls that Sheriff Corpus approached him and, to his surprise, told him that she may need him to monitor Dep. Tapia's attendance. Lt. Hensel is confident he would not have said or suggested that he was having issues with Dep. Tapia's attendance. Likewise, Lt. Hensel reports that he would not have said that he wanted to switch Dep. Tapia's assigned day in the Transportation Unit from Friday to Monday because Fridays tend to be difficult days to staff. Sgt. Woelkers, Sgt. Hallworth, and Sgt. Chiu all independently verified that Fridays are busy days for the Transportation Unit.

---

[4] On April 3, 2025, PERB issued its own complaint alleging that the County, through Sheriff Corpus, engaged in unfair labor practices by, among other things, failing to meet and confer in good faith regarding the overtime policy.

May 30, 2025
Page 30

9.      In violation of SMCSO policy, Sheriff Corpus conducts an in-house
        investigation into Dep. Tapia for potential criminal conduct.

In or around mid- or late October 2024, Acting Assistant Sheriff Fox met with Sheriff Corpus, Undersheriff Perea, and Mr. Aenlle to review his preliminary investigative findings regarding Dep. Tapia's timecards. Acting Assistant Sheriff Fox informed the Sheriff, the Undersheriff, and Mr. Aenlle at this meeting that he had discovered that Dep. Tapia had abruptly changed his coding behavior in August 2024. Sheriff Corpus and Mr. Aenlle responded that this timing coincided with when Dep. Tapia and the DSA had begun to publicly criticize the Sheriff, and they suggested to Acting Assistant Sheriff Fox that Dep. Tapia changed his timecard practices at that time because he knew he would come under scrutiny given his increased public criticism of the Sheriff. There was no mention at this meeting with Acting Assistant Sheriff Fox that Mr. Enriquez, at Ms. Stevenson's direction, had told Mr. Tapia on August 28, 2024, that he should change the billing code for reporting his release time.

At this meeting, Sheriff Corpus, Undersheriff Perea, Mr. Aenlle, and Acting Assistant Sheriff Fox discussed potential options on how to proceed with the investigation in light of Acting Assistant Sheriff Fox's preliminary findings. Acting Assistant Sheriff Fox and Undersheriff Perea made several recommendations, one of which included transferring the investigation to the District Attorney's Office. In a break with SMCSO policy,[5] Sheriff Corpus decided against that recommendation, stating that she did not trust personnel within the District Attorney's Office. Acting Assistant Sheriff Fox and Undersheriff Perea also suggested transferring the investigation to PSB, which is responsible for Internal Affairs investigations within the SMCSO. Sheriff Corpus also rejected that suggestion, stating that she did not trust the sworn officers assigned to PSB. The Executive Team also discussed bringing in an outside investigator to take over the investigation into Dep. Tapia's timecards. Sheriff Corpus rejected that suggestion as well. Acting Assistant Sheriff Fox and Undersheriff Perea further recommended placing Dep. Tapia on administrative leave, which is a common step taken by internal investigators when the alleged misconduct is serious and, critically, would have allowed for more time for the investigation. Again, Sheriff Corpus rejected this suggestion as well. The Sheriff ultimately decided that Acting Assistant Sheriff Fox would complete the investigation himself.

10.     Sheriff Corpus and her Executive Team limit the evidence available to
        Acting Assistant Sheriff Fox.

According to Acting Assistant Sheriff Fox, neither Sheriff Corpus nor anyone else from the Executive Team informed him at any time that Mr. Enriquez had instructed Dep. Tapia to begin coding his release time with the 010 code in August 2024.

---

[5] Section 1011.9 of the SMCSO Policy Manual states: "Where a member is accused of potential criminal conduct, the district attorney's office shall be requested to investigate the criminal allegations apart from any administrative investigation. Any separate administrative investigation may parallel a criminal investigation."

May 30, 2025
Page 31

Although Ms. Stevenson did not respond to multiple requests to be interviewed as part of our investigation in an interview with the District Attorney's Office on December 2, 2024, Ms. Stevenson told investigators that she was "sure" that she had told the Executive Team that she had discovered Dep. Tapia's coding error, and that she had asked Mr. Enriquez "to email [Dep. Tapia] to use proper coding" because the Executive Team had been "watching all of the overtime reports" and had discussed that "the union reps were not using their time and that [Ms. Stevenson] would need to clear it up with HR."

During the course of Acting Assistant Sheriff Fox's investigation, he informed Mr. Aenlle that he was planning to contact Mr. Enriquez to discuss Dep. Tapia's timecards. Mr. Aenlle, however, directed Acting Assistant Sheriff Fox to instead interview Joann Lov, another payroll staff member. Ms. Lov did not know that Mr. Enriquez had instructed Dep. Tapia to change his timecoding practices in August 2024. Heeding Mr. Aenlle's direction, Acting Assistant Sheriff Fox met with Ms. Lov, and not Mr. Enriquez.

Sometime in mid-October 2024, Acting Assistant Sheriff Fox asked to review Dep. Tapia's keycard records. Sheriff Corpus denied that request, stating to Acting Assistant Sheriff Fox that she did not trust the lieutenant who oversaw those records. As a result, Acting Assistant Sheriff Fox was unable to review keycard records to confirm whether Dep. Tapia was present for shifts in the Transportation Unit even when other scheduling materials may have suggested he was absent.

In late October and into November 2024, Acting Assistant Sheriff Fox provided near-daily updates to Sheriff Corpus, Undersheriff Perea, and Mr. Aenlle regarding his investigation into Dep. Tapia's timecards. On multiple occasions in late October and into November 2024, Acting Assistant Sheriff Fox repeated his suggestion to Sheriff Corpus that Dep. Tapia be placed on administrative leave, which would have allowed for more time for the investigation. Sheriff Corpus dismissed those recommendations and instead instructed Acting Assistant Sheriff Fox to complete the investigation.

Acting Assistant Sheriff Fox's investigation focused primarily on cross-referencing attendance information he obtained from Lt. Hensel based on daily scheduling materials from the Transportation Unit with Dep. Tapia's timecard records. Lt. Hensel informed Acting Assistant Sheriff Fox that the Transportation Unit's scheduling materials were potentially incomplete and subject to human error. Lt. Hensel further informed Acting Assistant Sheriff Fox that he was unaware of any attendance issues with Dep. Tapia and recommended to Acting Assistant Sheriff Fox that he speak with Dep. Tapia's direct supervisors in Transportation, which included Sgts. Woelkers, Hallworth, and Chiu. Acting Assistant Sheriff Fox did not interview any of the sergeants in the Transportation Unit.

Sgts. Woelkers, Hallworth, and Chiu, who were responsible for reviewing Dep. Tapia's timecards or overtime slips before he submitted them, do not recall having to correct any inaccuracies in the timecards or overtime slips. They further reported that Dep. Tapia is an exemplary and reliable employee who does not miss work without explanation, who typically

May 30, 2025
Page 32

communicates about his availability, and who they can rely upon as a team player. None of them could recall a single instance of Dep. Tapia not showing up for an assigned shift in the Transportation Unit unless Dep. Tapia gave prior notice. All of them stated that, if Dep. Tapia had been absent unexpectedly, they would have known about it. Lt. Hensel also described Dep. Tapia as a "trustworthy and professional" employee, and he recalled consistently seeing Dep. Tapia working in the Transportation Unit when he was expected to be there.

           11.     Sheriff Corpus orders Dep. Tapia to be arrested on November 12, 2024.

On or about Thursday, November 7, 2024, Acting Assistant Sheriff Fox met with Sheriff Corpus, Undersheriff Perea, and Mr. Aenlle and discussed his findings. Multiple times throughout his investigation, including in his report presented to the Executive Team that day, Acting Assistant Sheriff Fox made clear to Sheriff Corpus, Undersheriff Perea, and Mr. Aenlle that he believed Dep. Tapia had committed timecard fraud because of the abrupt change in Dep. Tapia's timecard practices in August 2024.

In the November 7 meeting, Acting Assistant Sheriff Fox and Undersheriff Perea again suggested placing Dep. Tapia on administrative leave. The Sheriff declined to do so. The Executive Team discussed other options, including obtaining an arrest warrant or conducting a probable cause arrest that day. Acting Assistant Sheriff Fox reports that Mr. Aenlle advocated for arresting Dep. Tapia that day, but Sheriff Corpus opted not to do so. Instead, the Executive Team agreed to meet again on Tuesday, November 12, 2024.

At that time, Sheriff Corpus and the Executive Team were aware that Judge Cordell was nearing the completion of her investigation. On November 7, after his meeting with Sheriff Corpus, Acting Assistant Sheriff Fox met separately with Undersheriff Perea and Mr. Aenlle and recalls that they discussed the forthcoming release of the Cordell Report. Mr. Aenlle was upset about the prospect of the report being released soon.

On the morning of November 12, 2024, Sheriff Corpus informed Acting Assistant Sheriff Fox of her decision to arrest Dep. Tapia and instructed him to notify the District Attorney's office that the SMCSO would proceed with the arrest. A meet-and-confer between the union and the Executive Team to discuss the overtime policy had previously been scheduled for the afternoon of November 12, 2024.

As instructed, Acting Assistant Sheriff Fox met with Chief Deputy District Attorney Shin-Mee Chang in person to discuss Acting Assistant Sheriff Fox's investigation of Dep. Tapia. During that meeting, Acting Assistant Sheriff Fox requested that the District Attorney seek an arrest warrant for Dep. Tapia. He further stated that if the District Attorney did not obtain a warrant, the SMCSO would proceed with its own, warrantless, probable cause arrest later that day. Chief Deputy District Attorney Chang told Acting Assistant Sheriff Fox that (1) the District Attorney would not seek an arrest warrant that day; (2) the District Attorney's Office had reviewed a number of timecard fraud cases over the years and it would not treat this one differently; and (3) timecard fraud cases tended to be complex and further investigation may be needed. She also told Acting Assistant Sheriff Fox that she urged the Sheriff's Office not to proceed with a

May 30, 2025
Page 33

warrantless arrest that day because, given the complexity of timecard fraud cases, the District Attorney's Office would not be able to complete its investigation within 48 hours—at which point Dep. Tapia would have to be released from custody under California law.[6] Acting Assistant Sheriff Fox responded by informing Chief Deputy District Attorney Chang that the Sheriff's Office would nevertheless proceed with a warrantless arrest that day and that he would let her know as soon as the arrest occurred.[7]

Following this meeting, Acting Assistant Sheriff Fox spoke with Sheriff Corpus and relayed to her the conversation he had had with Chief Deputy District Attorney Chang. Acting Assistant Sheriff Fox informed Sheriff Corpus that Chief Deputy District Attorney Chang had said that proceeding with a warrantless arrest of Dep. Tapia without allowing the District Attorney to first conduct its own investigation was "not ideal." The Sheriff nevertheless made the decision to go forward with the warrantless arrest. Acting Assistant Sheriff Fox reports that he, Undersheriff Perea, Mr. Aenlle, and SMCSO Director of Communications Gretchen Spiker were present at the meeting at which Sheriff Corpus made her decision to arrest Dep. Tapia.

Acting Assistant Sheriff Fox subsequently instructed Dep. Tapia (through his attorneys) to turn himself in for arrest at 1:00 p.m.—an hour before the previously scheduled meet-and-confer between the Sheriff and the DSA. SMCSO staff recorded Dep. Tapia self-surrendering for his arrest and shared the video with the media.[8] Members of the SMCSO then executed Sheriff Corpus's order, arrested Dep. Tapia, and took his mugshot before releasing him on bail. The arrest was made based on a probable cause declaration signed by Acting Assistant Sheriff Fox. The declaration supporting probable cause for the arrest states that Dep. Tapia's purported criminal intent "was apparent in August 2024 when he started to submit his timecards with Association business and made the distinction of billing appropriately." Acting Assistant Sheriff Fox since reported that, had he known about Mr. Enriquez's August 2024 emails with Dep. Tapia, he would not have believed that there was probable cause to arrest Dep. Tapia on November 12, 2024.

---

[6] California Penal Code section 825(a) requires a defendant to be taken before a magistrate judge and arraigned within 48 hours after his arrest.

[7] Acting Assistant Sheriff Fox also stated during this meeting that Sheriff Corpus was concerned that one of the District Attorney's investigators sat on the DSA Board. Chief Deputy District Attorney Chang assured Acting Assistant Sheriff Fox that, if the District Attorney investigated Deputy Tapia, they would make sure that no one that had a prior connection to Deputy Tapia or the DSA would be involved in the investigation.

[8] For example, this video published by the Mercury News states that the footage is "courtesy of San Mateo County's Sheriff's Department." Mercury News, San Mateo County Deputy Sheriff's Association President Carlos Tapia turns himself in, Youtube, https://www.youtube.com/watch?v=hr9cCuX0pvY.

May 30, 2025
Page 34

       12.     Mr. Aenlle uses Dep. Tapia's arrest to try to discourage the release of the Cordell Report.

A few hours after Dep. Tapia's arrest, Mr. Aenlle's personal attorney, Deborah Drooz, emailed San Mateo Supervisors Noelia Corzo and Ray Mueller to threaten litigation over purported "falsehoods" that she anticipated may soon be released in the Cordell report. Ms. Drooz stated that she was "advised that a source for such falsehoods may be DSA president Carolos [sic] Tapia, someone we believe has long been dedicated to ousting Sheriff Christina Corpus and her subordinates, including Mr. Aenlle. If that is the case, you should be advised that Mr. Tapia's reputation for honesty and reliability have [sic] come under law enforcement scrutiny. As we understand it, Mr. Tapia was arrested today for fraudulent timecard use."

The Cordell Report was released to the public that day.

       13.     After conducting an investigation, the District Attorney declines to prosecute Dep. Tapia.

The District Attorney's Office subsequently conducted a month-long investigation into Dep. Tapia's timecard practices. At the end of that investigation, the District Attorney concluded that "no crime was committed by Deputy Tapia, that the complete investigation showed that there was no basis to believe any violation of law had occurred, and finally that Deputy Tapia should not have been arrested." The District Attorney further concluded that the Sheriff's Office investigation had been "extraordinarily limited and did not involve necessary follow-up investigation to examine the accuracy of the allegations."

Despite this, Dep. Tapia remains on administrative leave to this day, more than six months after his improper arrest.

### C.    Grounds for Removal

The foregoing conduct related to Dep. Tapia is, independently and collectively, grounds to remove Sheriff Corpus from office for the following reasons.

***First***, Sheriff Corpus violated laws related to the performance of the Sheriff's duties. San Mateo County Charter Art. IV § 412.5(B)(1). Sheriff Corpus ordered Dep. Tapia arrested without probable cause to support that arrest in violation of Penal Code § 836. *See People v. Mower*, 28 Cal. 4th 457, 473 (2002) ("Reasonable or probable cause means such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused."); *Poldo v. United States*, 55 F.2d 866, 869 (9th Cir. 1932) ("Mere suspicion is not enough; there must be circumstances represented to the officers through the testimony of their senses sufficient to justify them in a good-faith belief that the defendant had violated the law.").

May 30, 2025
Page 35

Additionally, Sheriff Corpus subjected Dep. Tapia to an investigation and arrest as the result of his engaging in protected union activity. This constitutes unlawful retaliation in violation of well-established California law. *See* Gov't Code § 3304(a) ("No public safety officer shall be subjected to punitive action … or be threatened with any such treatment, because of the lawful exercise of the rights granted under this chapter[.]");Gov't Code § 3502.1 ("No public employee shall be subject to punitive action … , or threatened with any such treatment, for the exercise of lawful action as an elected, appointed, or recognized representative of any employee bargaining unit."); Gov't Code § 3506 ("Public agencies and employee organizations shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under Section 3502."[9]); Gov't Code § 3506.5(a) ("A public agency shall not … impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter."); *see also* Cal. Code Regs. tit. 8, § 32603; Civ. Code § 51.7; San Mateo County Code § 2.14.090.

**Second**, in directing and overseeing a limited and therefore incomplete investigation of Dep. Tapia, Sheriff Corpus flagrantly neglected her duties as defined by law to preserve peace and investigate public offenses. San Mateo County Charter Art. IV § 412.5(B)(2); *see also* Gov't Code § 26600 (requiring the sheriff to preserve peace); *id.* § 26602 (requiring the sheriff to investigate public offenses); *Saunders v. Knight*, No. CV F 04-5924 LJO WMW, 2007 WL 3482047, at *18 (E.D. Cal. Nov. 13, 2007) ("[T]he sheriff has a duty imposed by statute to enforce the laws of the state and maintain public order and safety." (citing Gov't Code §§ 26600, 26602)); *Laurie Q.v. Contra Costa County*, 304 F. Supp. 2d 1185 (N.D. Cal. 2004) ("[S]heriffs are required under California law to … 'investigate public offenses which have been committed.' In other words, California's sheriffs are local, non-discretionary executors of a statewide criminal system[.]" (citing Gov't Code § 26602)); Gov't Code § 815.6 ("Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."); *Ramirez v. City of Buena Park,* 560 F.3d 1012, 1024 (9th Cir. 2009) (holding that officers "may not disregard facts tending to dissipate probable cause"). Sheriff Corpus, herself and through Mr. Aenlle, unreasonably restricted Acting Assistant Sheriff Fox from collecting relevant evidence and speaking to key witnesses in the course of his investigation into Dep. Tapia. Sheriff Corpus also insisted that the arrest proceed on November 12, 2024, against the advice of the District Attorney and despite Acting Assistant Sheriff Fox recommending that Dep. Tapia be placed on administrative leave to allow for additional time for the investigation. After the District Attorney refused to provide a warrant for the arrest, Sheriff Corpus ordered the arrest of Dep. Tapia, the DSA President, based purportedly on probable cause. Within a month, the District Attorney determined "there was no

---

[9] Section 3502 provides "public employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations." Gov't Code § 3502.

May 30, 2025
Page 36

basis to believe any violation of law had occurred, and … Dep. Tapia should not have been arrested."

***Third***, Sheriff Corpus obstructed an investigation into the conduct of the Sheriff and/or the SMCSO as authorized by the Board of Supervisors. San Mateo County Charter Art. IV § 412.5(B)(5); *see also People v. Belmares*, 130 Cal. Rptr. 2d 400, 404 (2003) (describing "obstruct" in the law enforcement context to mean "be or come in the way of," "hinder from passing, action, or operation," "impede," "retard," "shut out," and "place obstacles in the way"); *Lorenson v. Superior Court*, 35 Cal. 2d 49, 59 (1950) (defining obstruction as "malfeasance and nonfeasance by an officer in connection with the administration of his public duties, and also anything done by a person in hindering or obstructing an officer in the performance of his official obligations"); *People v. Martin*, 135 Cal. App. 3d 710, 726 (1982) (same). Acting Assistant Sheriff Fox recommended placing Dep. Tapia on administrative leave to allow more time for an investigation. Likewise, the District Attorney recommended allowing its office to conduct the investigation instead of proceeding with a probable cause arrest on November 12, 2024. Despite those recommendations, Sheriff Corpus ordered Dep. Tapia to be arrested on November 12, 2024, following an incomplete investigation. Then, within a few hours of the arrest, counsel representing Mr. Aenlle encouraged the Board of Supervisors not to release the Cordell Report and cited Dep. Tapia's recent arrest as evidence that he could not be trusted as a reliable informant.

### D.    Supporting Evidence

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- Sgt. Hector Acosta;

- Chief Deputy District Attorney Shin-Mee Chang;

- Sgt. Daniel Chiu;

- SMCSO Human Resources Manager Heather Enders;

- SMCSO Payroll Supervisor Van Enriquez;

- Former Acting Assistant Sheriff Matthew Fox;

- Sgt. Philip Hallworth;

- Lt. Brandon Hensel;

- Former Undersheriff Christopher Hsiung;

- San Mateo County Deputy Director of Human Resources Michelle Kuka;

May 30, 2025
Page 37

- SMCSO Management Analyst Joann Lov;

- San Mateo County Labor Relations Analyst Katy Roberts;

- Dep. Carlos Tapia; and

- Sgt. Steve Woelkers.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- 2021 Memorandum of Understanding Between County of San Mateo and Deputy Sheriff's Association (January 10, 2021 – January 10, 2026);

- January 2, 2024 Email from Connor Santos-Stevenson to Van Enriquez re: 015 No Comments Week Ending 12/30/2023;

- June 21, 2024 Email from DSA Vice President Ephraim Cheever to DSA Members re: DSA Response to Undersheriff Change;

- June 21, 2024 Text Message from Sheriff Christina Corpus to Dep. Carlos Tapia;

- August 15, 2024 Email Thread from Connor Santos-Stevenson to Dep. Carlos Tapia re: 015 Earning Type Comments Section;

- August 16, 2024–August 20, 2024 Email Thread from Stacey Stevenson to Jason Cooksey re: DSA/OSS MOU's;

- August 19, 2024 Email Thread from Stacey Stevenson to Michelle Kuka re: DSA/OSS Salary Reimbursement;

- August 19, 2024–September 12, 2024 Email Thread from Stacey Stevenson to Payroll/Van Enriquez re: Check Timecard;

- August 23, 2024–August 28, 2024 Email Thread from Enriquez to Dep. Carlos Tapia re: DSA President Release Time (Coding RTE);

- August 26, 2024 Text Messages from Det. Mike Garcia to Dep. Carlos Tapia;

- August 26, 2024 Text Message from Sheriff Christina Corpus to Dep. Carlos Tapia;

- August 26, 2024–August 27, 2024 Email Thread from Van Enriquez to Lisa Raiti and Katy Roberts re: DSA President Release Time (Coding RTE);

- August 30, 2024 DSA's Complaint, *San Mateo County Deputy Sheriff's Association v.*

May 30, 2025
Page 38

> *County of San Mateo*, No. SF-CE-2224-M;

- November 12, 2024 Acting Assistant Sheriff Matthew Fox Probable Cause Declaration;

- November 12, 2024 Email from Deborah Drooz to Noelia Corzo and Ray Mueller re: Urgent Communication re: November 12, 2024 Press Conference;

- December 4, 2024 Stacey Stevenson Interview with the San Mateo County District Attorney's Office;

- December 9 2024 Acting Assistant Sheriff Matthew Fox Interview with the San Mateo County District Attorney's Office;

- December 16, 2024 Press Release, County of San Mateo District Attorney, Prosecution Decision Regarding Deputy Carlos Tapia;

- December 24, 2024 *Mercury News* Video, "San Mateo County Deputy Sheriff's Association President Carlos Tapia turns himself in," *available at:* https://www.youtube.com/watch?v=hr9cCuX0pvY;

- February 21, 2025 Dep. Carlos Tapia Civil Complaint against San Mateo County; and

- April 3, 2025 PERB Complaint, *San Mateo County Deputy Sheriff's Association v. County of San Mateo*, No. SF-CE-2224-M.

**III.    Grounds for Removal Relating to Unlawful Punitive Action Taken Against Sgt. Javier Acosta.**

      **A.    Introduction**

Sgt. Hector Acosta is President of the OSS. Together with Dep. Tapia, Sgt. Hector Acosta participated in the contentious labor-management negotiations in 2024 that led up to and included the August 15, 2024, meet-and-confer meeting that included the DSA, OSS, OSS, Undersheriff Perea, and Sheriff Corpus. Shortly after the August 15, 2024 meeting, Sheriff Corpus initiated a retaliatory Internal Affairs investigation into Sgt. Hector Acosta's brother, Sgt. Javier Acosta. Sheriff Corpus's conduct violated the Government Code.

      **B.    Sheriff Corpus began an investigation into Sgt. Javier Acosta within a week of the contentious August 15, 2024 meeting between the DSA, OSS, and the Sheriff.**

Sgt. Hector Acosta joined the Sheriff's Office in 1999. His brother, Sgt. Javier Acosta, began working for the Sheriff's Office in 2006 and was recognized as "Deputy of the Year" in 2016. Sgt. Javier Acosta was most recently assigned to the Sheriff's Community Engagement Unit.

May 30, 2025
Page 39

Following the contentious August 15, 2024, meet-and-confer meeting described above, Sgt. Hector Acosta and Dep. Tapia reported their concerns that Sheriff Corpus might retaliate against them to Katy Roberts. Sgt. Hector Acosta also warned his brother Sgt. Javier Acosta that Sheriff Corpus might target him for retaliation.

Five days later, on August 20, 2024, then-Captain Matthew Fox ordered Sgt. Javier Acosta into his office. Capt. Fox told Sgt. Javier Acosta that he was not in trouble and that he did not need a lawyer. During the meeting, Capt. Fox told Sgt. Javier Acosta that "they wanted to [Internal Affairs] you." Sgt. Javier Acosta understood this to mean that Sheriff Corpus, Undersheriff Perea, and/or Mr. Aenlle wanted to subject him to an Internal Affairs investigation. According to Sgt. Javier Acosta, Capt. Fox said that he told "them" that he would "handle it."

Capt. Fox then proceeded to ask Sgt. Javier Acosta about an August 15, 2024, dinner that Sgt. Javier Acosta had attended to celebrate the end of SMCSO's summer internship program. There was a report that an underaged intern had consumed alcohol at the event. Sgt. Javier Acosta told Capt. Fox what happened at the dinner, and Capt. Fox ended the meeting by saying that he considered the matter closed. Capt. Fox did not provide advance notice to Sgt. Javier Acosta of the subject of this meeting, nor did he afford Sgt. Javier Acosta an opportunity to consult with counsel or a union representative before or during the meeting.

Two days later, on August 22, 2025, Capt. Fox texted Sgt. Javier Acosta and asked him to meet outside a County building. When they met, Capt. Fox handed Sgt. Javier Acosta a letter notifying him that he was being placed on administrative leave and directing him to remain at his residence between the hours of 8:00 a.m. to 5:00 p.m., Monday through Friday, "with a one-hour meal break from noon to 1:00 p.m. during which you are at liberty to leave your residence." The letter further instructed Sgt. Javier Acosta that he would remain in this status while "the investigation into your misconduct is ongoing." The letter did not identify the subject matter of the investigation or provide Sgt. Javier Acosta with any means to appeal the SMCSO's decision. When Capt. Fox delivered the letter, he said words to the effect that he did not know what the letter was about but that "they asked me to come back and give it to you." Sgt. Javier Acosta understood that Capt. Fox was acting at the direction of Sheriff Corpus, Undersheriff Perea, and/or Mr. Aenlle.

Sometime between August 22, 2025, and September 3, 2025, Sheriff Corpus initiated an Internal Affairs investigation into Sgt. Javier Acosta. The policy and practice of the Sheriff's Office is for sworn officers in PSB to oversee Internal Affairs investigations or, when necessary, outsource the investigation to a neutral third-party investigator. With respect to Sgt. Javier Acosta, however, Sheriff Corpus bypassed the sworn PSB officers and did not initially outsource the investigation. Instead, at a meeting attended by Sheriff Corpus, Mr. Aenlle, Undersheriff Perea, Capt. Fox, and Heather Enders, Sheriff Corpus and Mr. Aenlle asked Ms. Enders to draft an Internal Affairs notice to Sgt. Javier Acosta containing allegations about the August 15 dinner and interactions between Sgt. Javier Acosta and a Sheriff's Office intern. Ms. Enders is a civilian employee with no experience or training regarding Internal Affairs investigations, and prior to this date, she had never drafted—or been asked to draft—an Internal Affairs notice.

May 30, 2025
Page 40

Nonetheless, Ms. Enders drafted the Internal Affairs notice as directed by Sheriff Corpus and Mr. Aenlle, but she could not sign it because she is not a sworn officer.

On or about September 3, 2024, Undersheriff Perea contacted Capt. Brian Philip, told him that Ms. Enders would be sending him the Internal Affairs notice, and ordered him to sign and serve it on Sgt. Javier Acosta. Capt. Philip had joined the Sheriff's Office in August 2023, after 19 years at the Palo Alto Police Department. Since joining the Sheriff's Office, Capt. Philip had overseen PSB. Until Undersheriff Perea contacted him, Capt. Philip had not been provided with any information regarding the investigation of Sgt. Javier Acosta and was entirely unaware of any such investigation.

Ms. Enders emailed Capt. Philip a copy of the Internal Affairs notice she had prepared at the direction of Sheriff Corpus and Mr. Aenlle. Capt. Philip reviewed the Internal Affairs notice that Ms. Enders prepared and notified her by email that the notice "fail[ed] to meet several POBAR requirements as referenced in Government Code section 3303." He also wrote that "Contrary to normal custom and practice at the San Mateo County Sheriff's Office, [PSB] was excluded from the intake of this complaint, and as such, [he did] not have the requisite information to properly serve this notice." Capt. Philip copied his supervisor, then-Assistant Sheriff Monaghan, on that email.

Sgt. Javier Acosta ultimately received the Internal Affairs notice on or about September 4, 2024, signed by Assistant Sheriff Monaghan. The notice lists several provisions of the Policy Manual that Sgt. Javier Acosta allegedly violated and contains a narrative regarding the August 15, 2024 dinner and Sgt. Javier Acosta's interactions with an intern. The notice indicates that Sgt. Javier Acosta would be subject to an interrogation, but it lacks an interview date, time, or location; nor does it identify an interviewer inconsistent with standard practice. The complainant is identified as Sheriff Corpus.

      **C.     Sgt. Javier Acosta remains on administrative leave without explanation.**

No member of PSB ever interviewed Sgt. Javier Acosta, and there is no PSB investigation open into Sgt. Javier Acosta. In December 2024, outside investigators at the firm Chaplin & Hill interviewed Sgt. Javier Acosta. In approximately March 2025, Sgt. Javier Acosta's attorney contacted the outside investigators at Chaplin & Hill to inquire into why the investigation was still unresolved six months after it began. The outside investigators informed Sgt. Javier Acosta's attorney that they had completed their investigation and submitted it to the Sheriff's Office. Nonetheless, Sgt. Javier Acosta remains on administrative leave.

      **D.     Grounds for Removal**

The foregoing conduct related to Sgt. Acosta is, independently and collectively, grounds to remove Sheriff Corpus from office for cause because she violated laws related to the performance of the Sheriff's duties. San Mateo County Charter Art. IV § 412.5(B)(1).

May 30, 2025
Page 41

***First***, Sheriff Corpus violated the Public Safety Officers Procedural Bill of Rights Act ("POBRA"), Gov't Code §§ 3300, *et seq.*, by taking punitive action against Sgt. Javier Acosta without affording him the rights provided by Government Code Sections 3303 and 3304. For example, Sgt. Acosta was not informed prior to his interrogation "of the rank, name, and command of the officer in charge of the interrogation [or] the interrogating officers," Gov't Code 3303(b); was not "informed of the nature of the investigation prior to any interrogation," *id.* § 3303(c); was not afforded the right to be "represented by a representative of his or her choice who may be present at all times during the interrogation," *id.* § 3303(i); and was not afforded the opportunity for an administrative appeal, *id* § 3304(b).

***Second***, Sheriff Corpus violated California law by subjecting Sgt. Acosta to an improper investigation and imposing on him an extended administrative leave because of protected union activity. "Public employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations," Gov't Code § 3502, and "No public safety officer shall be subjected to punitive action … or be threatened with any such treatment, because of the lawful exercise of [such] rights." Gov't Code § 3304(a); *see also* Gov't Code § 3506 ("Public agencies and employee organizations shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under Section 3502."); Gov't Code § 3506.5(a) ("A public agency shall not … impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter."); Cal. Code Regs. tit. 8, § 32603 ("It shall be an unfair practice for a public agency to … [i]nterfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of rights guaranteed by Government Code section 3502.").

E.     **Supporting Evidence**

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- Sgt. Hector Acosta;

- Sgt. Javier Acosta;

- Dep. Carlos Tapia;

- Former Acting Assistant Sheriff Matthew Fox;

- SMCSO Human Resources Manager Heather Enders; and,

- Former Capt. Brian Philip.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

May 30, 2025
Page 42

- August 22, 2024 Letter from Capt. Matthew Fox to Sgt. Javier Acosta;

- September 3, 2024 Emails between Heather Enders and Capt. Brian Philip;

- September 4, 2024 Internal Affairs Notice to Sgt. Javier Acosta.

**IV.    Grounds for Removal Relating to the Termination of Former Assistant Sheriff Ryan Monaghan**

    **A.    Introduction**

Ryan Monaghan served as an assistant sheriff and member of Sheriff Corpus's Executive Team from February 2023 through September 2024. Assistant Sheriff Monaghan was interviewed by Judge Cordell in the course of her investigation. Within 72 hours of learning that Assistant Sheriff Monaghan had talked to Judge Cordell, Sheriff Corpus removed him from his position as assistant sheriff. In removing Assistant Sheriff Monaghan from his position, Sheriff Corpus violated several anti-retaliation and public safety officer employment laws related to the performance of her duties.

    **B.    Sheriff Corpus retaliated against Assistant Sheriff Monaghan days after learning that he had spoken to Judge Cordell as part of her investigation.**

In 2022, Sheriff Corpus recruited Ryan Monaghan, previously the Chief of Police in the City of Tiburon, to be an assistant sheriff in her administration and member of her Executive Team. Throughout 2023, Assistant Sheriff Monaghan, Undersheriff Hsiung, and Mr. Aenlle formed the core of Sheriff Corpus's Executive Team. In 2024, the relationship between Sheriff Corpus and Undersheriff Hsiung deteriorated, resulting in Undersheriff Hsiung resigning on June 21, 2024. This left Assistant Sheriff Monaghan as the sole sworn member of Sheriff Corpus's Executive Team.

Judge Cordell was retained and began her investigation in July 2024. The fact of her investigation was initially confidential. On September 12, 2024, the Board of Supervisors issued a public statement announcing that it had appointed Judge Cordell to conduct an independent investigation into the Sheriff's Office. Shortly thereafter, Judge Cordell interviewed Assistant Sheriff Monaghan. He reported to Judge Cordell two incidents in which he believed Sheriff Corpus had violated the law and violated Sheriff's Office policy. First, Assistant Sheriff Monaghan reported to Judge Cordell that he believed that Sheriff Corpus had retaliated against Capt. Rebecca Albin by revoking her worksite access the day before her official date of separation. Assistant Sheriff Monaghan believed that the Sheriff's actions were retaliatory and that they violated Capt. Albin's legal rights as set forth in the Sheriff's Office Policy Manual and as set forth in POBRA. Second, Assistant Sheriff Monaghan reported to Judge Cordell that he believed that Sheriff Corpus had retaliated against Capt. Philip by transferring him from PSB to Corrections. Assistant Sheriff Monaghan believed that the Sheriff's actions were retaliatory and violated Capt. Philip's legal rights as set forth in POBRA and the Sheriff's Office Policy Manual.

May 30, 2025
Page 43

On September 17, 2024, Assistant Sheriff Monaghan, Sheriff Corpus, Mr. Aenlle, and Undersheriff Perea attended a civic meeting in Half Moon Bay. After the meeting, in the presence of Undersheriff Perea, Mr. Aenlle asked Assistant Sheriff Monaghan whether he had spoken to Judge Cordell. Assistant Sheriff Monaghan answered that he had. Assistant Sheriff Monaghan recalls that Mr. Aenlle responded, sarcastically, "That's just great, when were you planning on telling the Sheriff and the rest of us?" Mr. Aenlle was visibly upset.

Shortly after the September 17, 2024 conversation with Mr. Aenlle, Assistant Sheriff Monaghan contacted Judge Cordell and informed her that Mr. Aenlle had asked him if he had spoken to her.

On September 18, 2024, Assistant Sheriff Monaghan told Sheriff Corpus that he had spoken to Judge Cordell. Sheriff Corpus complained to Assistant Sheriff Monaghan that Judge Cordell's investigation was a "witch hunt" and a "joke." Assistant Sheriff Monaghan also told Sheriff Corpus that he believed that it was inappropriate for Mr. Aenlle to question potential witnesses about their cooperation with Judge Cordell's investigation and that Sheriff Corpus should advise Mr. Aenlle not to question such witnesses. Sheriff Corpus disagreed and conveyed her view that Mr. Aenlle could inquire about rumors that he heard related to the investigation.

On September 19, 2024, Sheriff Corpus did not invite Assistant Sheriff Monaghan to a press conference. Before this instance, it had been Sheriff Corpus's general practice to invite her entire Executive Team to press conferences.

On September 20, 2024, Undersheriff Perea took Assistant Sheriff Monaghan into a meeting in Sheriff Corpus's office. During the ensuing meeting, Sheriff Corpus told Assistant Sheriff Monaghan that she was "really disappointed" and that she heard that he was saying things about her. She told Assistant Sheriff Monaghan that trust was important to her and that she no longer trusted him. She ended the meeting saying, "I don't think things are going to work out."

Undersheriff Perea then accompanied Assistant Sheriff Monaghan to his office and ordered him to turn in his badge, gun, and identification. Undersheriff Perea also told Assistant Sheriff Monaghan that he could not use his office computer. Assistant Sheriff Monaghan understood that his employment was being involuntarily terminated.

Prior to Assistant Sheriff Monaghan's termination, Sheriff Corpus had never conducted a performance review of him nor provided him with a written performance evaluation, much less one that criticized his work. Likewise, neither Undersheriff Hsiung nor Undersheriff Perea had ever conducted a performance review of Assistant Sheriff Monaghan nor provided him with a written performance review. To the contrary, Undersheriff Hsiung, who was Assistant Sheriff Monaghan's direct supervisor during most of his tenure with the Sheriff's Office, describes Assistant Sheriff Monaghan's performance during their time in the Sheriff's Office as "100% positive." Undersheriff Hsiung also reported that Sheriff Corpus never spoke negatively about Assistant Sheriff Monaghan's performance.

May 30, 2025
Page 44

In a September 22, 2024, letter to the Board of Supervisors, Sheriff Corpus described her intent as having been to terminate Mr. Monaghan's employment for "performance duplicity and failure to execute the goals of the Sheriff's Office expeditiously." However, despite stripping Assistant Sheriff Monaghan of his official duties, badge, and gun, Sheriff Corpus never submitted termination paperwork for Assistant Sheriff Monaghan to the County's human resources department. To this day, Assistant Sheriff Monaghan remains on administrative leave.

### C.    Grounds for Removal

The foregoing conduct related to Assistant Sheriff Monaghan is, independently and collectively, grounds to remove Sheriff Corpus from office for cause for the following reasons.

***First***, Sheriff Corpus violated laws related to the performance of her duties as Sheriff. San Mateo County Charter Art. IV § 412.5(B)(1). It is against California law to "retaliate against an employee … for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Labor Code § 1102.5(b). Moreover, "[a]ny retaliation or reprisal by any [San Mateo] County officer or employee against any complainant or informant is strictly prohibited" by the County Code. San Mateo County Code § 2.14.090. The County of San Mateo has asserted "a paramount interest in protecting the integrity of its governmental institutions," and, "[t]o further this interest," has declared that "individuals should be encouraged to report possible violations of laws, regulations and rules governing the conduct of County officers and employees." *Id.* § 2.14.060. And it is the intent of Section 2.14.090 to "to protect all complainants or informants from retaliation for filing a complaint with, or providing information about, improper government activity by County officers and employees." *Id.* The SMCSO Policy Manual likewise prohibits "retaliate[ion] against any person for … opposing a practice believed to be unlawful …; for reporting or making a complaint …; or for participating in any investigation." SMCSO Policy Manual § 1029.3. Indeed, the SMCSO has "zero tolerance for retaliation." *Id.* § 1029.2. Sheriff Corpus violated these laws by terminating and otherwise removing from office Assistant Sheriff Monaghan for cooperating with, and speaking to, Judge Cordell in the course of her investigation. Assistant Sheriff Monaghan had reason to believe that the information he provided to Judge Cordell included violations of state and local law, including POBRA.

***Second***, Sheriff Corpus obstructed an investigation into the conduct of the Sheriff and/or the SMCSO authorized by the Board of Supervisors. San Mateo County Charter Art. IV § 412.5(B)(5). State law applicable to the Sheriff defines "obstruct" in the law enforcement context to mean "be or come in the way of," "hinder from passing, action, or operation," "impede," "retard," "shut out," and "place obstacles in the way." *Belmares*, 130 Cal. Rptr. 2d at 404; *see also Lorenson*, 35 Cal. 2d at 59 (defining obstruction as "malfeasance and nonfeasance by an officer in connection with the administration of his public duties, and also anything done by a person in hindering or obstructing an officer in the performance of his official obligations"); *Martin*, 135 Cal. App. 3d at 726 (same). Sheriff Corpus obstructed Judge

May 30, 2025
Page 45

Cordell's investigation into the SMCSO by terminating Assistant Sherriff Monaghan for cooperating with, and speaking to, Judge Cordell in the course of her investigation.

### D.    Supporting Evidence

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- San Mateo County Executive Michael Callagy;

- Former Undersheriff Christopher Hsuing; and,

- Former Assistant Sheriff Ryan Monaghan.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- September 12, 2024 Statement from the Board of Supervisors Regarding the Sheriff's Office

- September 22, 2024 Letter from Sheriff Christina Corpus to Board of Supervisors President Warren Slocum

### V.    Grounds for Removal Relating to Unlawful Retaliatory Transfers and Terminations.

### A.    Introduction

Sheriff Corpus transferred Capt. Brian Philip, Lt. Jonathan Sebring, and Sgt. Jimmy Chan in retaliation for perceived disloyalty. Sheriff Corpus transferred Capt. Philip and Lt. Sebring from PSB duties to work in the jail. Capt. Philip was transferred shortly after he refused to participate in the investigation into Sgt. Javier Acosta and reported on the deficiencies in the proposed Internal Affairs notice. Lt. Sebring was transferred after taking steps to investigate misconduct by Mr. Aenlle. Sgt. Chan was transferred from PSB to an assignment at the San Francisco Airport ("SFO") within hours of participating in a press conference in support of Measure A. Sheriff Corpus also constructively terminated Capt. Rebecca Albin after she posted an innocuous message on social media that angered Sheriff Corpus.

### B.    Sheriff Corpus retaliated against Capt. Philip for refusing to sign and serve the deficient Internal Affairs notice to Sgt. Javier Acosta.

As described above, Undersheriff Perea contacted Capt. Philip on or about September 3, 2024, and ordered him to sign the Internal Affairs notice that Heather Enders had prepared at the direction of Sheriff Corpus and Mr. Aenlle. At the time, Capt. Philip knew nothing about the investigation of Sgt. Javier Acosta or about the Internal Affairs notice. After Capt. Philip

May 30, 2025
Page 46

received a copy of the Internal Affairs notice from Ms. Enders by email, he responded by noting that it "fail[ed] to meet several POBAR requirements as referenced in Government Code section 3303." He also explained that he did "not have the requisite information to properly serve this notice."

Shortly after Capt. Philip sent his email to Ms. Enders on September 3, 2024, Mr. Aenlle sent an after-hours text message to Ms. Enders asking if Capt. Philip had been with the Sheriff's Office for over a year. When she confirmed that Capt. Philip had been with the Sheriff's Office for over a year, Mr. Aenlle replied in a text message, "OK so he's past probation." Sheriff's Office employees like Capt. Philip who have worked for more than a year are protected by POBRA and cannot be terminated without cause. *See* Gov't Code § 3304(b). Ms. Enders understood that Mr. Aenlle was asking about Capt. Philip's work history to determine if Sheriff Corpus could fire him without cause, and she understood Mr. Aenlle's response as an acknowledgement that Sheriff Corpus could not fire him without cause.

After their text message exchange, Mr. Aenlle called Ms. Enders. Mr. Aenlle asked why Capt. Philip had written his September 3, 2024, email refusing to sign the Internal Affairs notice. Ms. Enders explained that Capt. Philip had no personal knowledge of the investigation, despite being in charge of PSB. Mr. Aenlle responded that he intended to remove Capt. Philip, saying, "We need someone we can trust." Ms. Enders understood Mr. Aenlle to mean that he and Sheriff Corpus wanted someone in charge of PSB who would do what they asked.

Shortly after Capt. Philip refused to sign the Internal Affairs notice, Undersheriff Perea called Capt. Philip into his office for a meeting. During this meeting, at which Assistant Sheriff Ryan Monaghan was present, Undersheriff Perea told Capt. Phillip that he was to be transferred from PSB to Corrections where he would report to Capt. William Fogarty, whom Capt. Philip was more senior than. At the time, Capt. Philip had no experience in the Corrections unit, and there were already captains in place supervising each of the jails. Undersheriff Perea offered no explanation for the transfer or its timing, and he would not say whether the transfer was permanent.

As a result of the transfer to the Corrections unit, Capt. Philip was stripped of certain responsibilities and duties, including overseeing the firing range and serving on task forces devoted to narcotics trafficking, vehicle theft, and the creation of the childcare substation.[10]

_____

[10] On November 12, Undersheriff Perea ordered Capt. Philip to arrest Deputy Tapia without a warrant or a probable cause statement. Capt. Philip had no knowledge as to why Deputy Tapia was being arrested and refused to participate in the arrest, citing his belief that the arrest was likely illegal. After Undersheriff Perea threatened Capt. Philip with an insubordination charge, Capt. Philip resigned from the Sheriff's Office.

May 30, 2025
Page 47

     **C.**     **Sheriff Corpus retaliated against Lt. Sebring after he advised an employee that she could file an HR complaint against Mr. Aenlle.**

Lt. Jonathan Sebring was assigned to PSB from April 2018 until June 2024. In April 2023, Sheriff Corpus promoted Lt. Sebring from Sergeant to Acting Lieutenant, and he became a full Lieutenant in or about July 2023. From the beginning of the Corpus administration through his transfer, Lt. Sebring received positive performance reviews. In April 2024, Lt. Sebring took action within the scope of his duties in response to Mr. Aenlle's treatment of Jenna McAlpin. Approximately two months later, Sheriff Corpus abruptly and without explanation transferred Lt. Sebring out of PSB and into Corrections, a less desirable assignment.

As discussed above, Jenna McAlpin is a former long-tenured civilian employee within the Sheriff's Office. Ms. McAlpin was a Records Manager, but she was assigned to serve as Mr. Aenlle's administrative assistant. She announced her resignation in March 2024 and her last day of work was scheduled for April 4, 2024. On or about April 3, 2024, Mr. Aenlle confronted Ms. McAlpin about a rumor that she had posted denigrating content about Sheriff Corpus on social media. As described above, her interaction with Mr. Aenlle left Ms. McAlpin upset and in tears.

Lt. Sebring spoke to Ms. McAlpin shortly after her interaction with Mr. Aenlle. When he spoke to Ms. McAlpin, she was still visibly upset and was crying. Lt. Sebring told her that she could file a complaint with Human Resources. Ms. McAlpin subsequently reported the incident to Human Resources.

That same afternoon, Sheriff Corpus went to Lt. Sebring's office to discuss the incident. Lt. Sebring told Sheriff Corpus that he believed Mr. Aenlle's conduct was inappropriate and expressed that it was unfortunate that, due to Mr. Aenlle's behavior, a long-term employee like Ms. McAlpin would leave the Sheriff's Office under such difficult circumstances. After hearing Lt. Sebring recount what he had learned from Ms. McAlpin, Sheriff Corpus tried to justify Mr. Aenlle's actions, saying that he had simply been "direct."

Prior to that conversion, Sheriff Corpus regularly called Lt. Sebring to discuss PSB matters. Following that conversation, Sheriff Corpus stopped speaking to Lt. Sebring.

On or about June 19, 2024, Sheriff Corpus transferred Lt. Sebring out of PSB and into the Corrections Unit. This transfer was ordered outside the typical cycle for transfers. Additionally, there was not a staffing need for Lt. Sebring because there were several lieutenants already assigned to Corrections. Lt. Sebring considers the transfer a punitive action because Corrections is understood throughout the Sheriff's Office to be less prestigious and beneficial for career development than PSB.

May 30, 2025
Page 48

### D.      Sgt. Chan was transferred within hours of appearing at a press conference in support of Measure A.

Sgt. Jimmy Chan joined the Sheriff's Office in 2015 and was promoted to sergeant in 2022. In September 2024, he began work on a specialty assignment in PSB after a competitive interview process. Sgt. Chan understood that he would be in PSB for four to five years based on his understanding of how long specialty assignments typically last. Sgt. Chan understood that his position in PSB was a favorable one that would be helpful for future promotion opportunities.

On or about February 5, 2025, Sgt. Chan used an approved hour of vacation time to attend a press conference in support of Measure A during his lunch break. Sgt. Chan was visible in television footage of the press conference. That same day, Undersheriff Perea contacted Lt. Danield Reynolds to tell him that Sgt. Chan was to be transferred to SFO. Around 5:00 p.m. that day, Lt. Reynolds informed Sgt. Chan that he was being transferred to SFO. Lt. Reynolds told Sgt. Chan that he should assume that the transfer order came from Sheriff Corpus.

At the time, there was a waiting list of other sergeants who had applied for the position at SFO. Sgt. Chan was not provided an opportunity to contest or appeal the transfer decision, and he has not been given any updates to date as to when, if ever, he will return to PSB. Sgt. Chan views the transfer as unfavorable and as negatively affecting his future professionally.

### E.      Sheriff Corpus retaliated against Capt. Rebecca Albin for posting a message on social media.

Captain Rebecca Albin was assigned by Sheriff Corpus to serve as the commander of the Coastside Patrol Bureau; in that position she also functioned as the police chief for Half Moon Bay. In early May 2024, Capt. Albin gave notice that she was leaving the SMCSO to take a position with another law enforcement agency closer to her home in Morgan Hill; her last day was to be June 20, 2024.

On June 18, 2024, Capt. Albin posted a goodbye message to the Half Moon Bay community on NextDoor, a website that facilitates community-based communication. The post was complementary of the Half Moon Bay community; it did not denigrate the SMCSO or Sheriff Corpus; and it cited her desire for a reduced commute as the reason for her departure. Prior to this time, Capt. Albin, who had received praise in the SMCSO for her effective use of social media, had never been told that she needed permission before posting messages to NextDoor. Nonetheless, she notified the SMCSO and the Half Moon Bay City Manager that she intended to announce her departure on NextDoor.

Less than an hour after she posted her message on NextDoor, Capt. Albin received a phone call from Undersheriff Hsiung, who told her that Sheriff Corpus was upset with her about the post. Undersheriff Hsiung told Capt. Albin that the Sheriff was going to revoke Capt. Albin's access to her SMCSO email account, NextDoor, and Evertel (a law enforcement messaging application). Capt. Albin was also informed that her access to the Half Moon Bay substation and other county facilities would be revoked. That evening, Capt. Albin was not able to access her

May 30, 2025
Page 49

SMCSO email or the SMCSCO website used for entering timecards. When Capt. Albin returned to her office to gather her belongings on June 20, 2024, her building access had been turned off, and she was escorted by SMCSO personnel such that she was not left alone in the building.

Sheriff Corpus proceeded in the face of advice not to retaliate against Capt. Albin. On the evening of June 18, 2024, Undersheriff Hsiung cautioned Sheriff Corpus that, despite her anger towards Capt. Albin, she should not revoke Capt. Albin's access to SMCSO systems "before the agreed upon date or else it could be considered a de facto or constructive termination." Sheriff Corpus ignored Undersheriff Hsiung's advice and constructively terminated Capt. Albin's employment before her resignation was effective in retaliation for Capt. Albin's NextDoor post.

Sheriff Corpus's retaliation against Capt. Albin may also have been motivated by animus directed against Capt. Albin's religious background. Detective Jeff Morgan, who has worked for the SMCSO since 2017 after lateralling from the Daly City Police Department, recalls having a phone call with Sheriff Corpus in 2022. During the call, Sheriff Corpus referred to Capt. Albin as a "Jew b----."[11]

   F.    Grounds for Removal

Each instance of the foregoing retaliatory conduct against Capt. Philip, Capt. Albin, Lt. Sebring, and Sgt. Chan is, independently and collectively, grounds to remove Sheriff Corpus from office for cause because Sheriff Corpus has violated laws related to the performance of the Sheriff's duties. San Mateo County Charter Art. IV § 412.5(B)(1).

***First***, Sheriff Corpus unlawfully retaliated against Capt. Philip. It is unlawful to "retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Labor Code § 1102.5. Moreover, "[a]ny retaliation or reprisal by any [San Mateo] County officer or employee against any complainant or informant is strictly prohibited" by the County Code. San Mateo County Code § 2.14.090. And, as noted above, Section 2.14.090 "protect[s] all complainants or informants from retaliation for filing a complaint with, or providing information about, improper government activity by County officers and employees."

---

[11] Sheriff Corpus's use of a derogatory term to refer to Capt. Albin is consistent with her use of others slurs in the workplace. Both Det. Morgan and Ms. Barnes recall hearing Sheriff Corpus refer to prior Sheriff Bolanos as a "coconut," which Det. Morgan recalls Sheriff Corpus explaining that by that she meant "brown on the outside, white on the inside." Ms. Barnes also recalls hearing Sheriff Corpus refer to former Sheriff Bolanos using a slur commonly known as "the N-word." Ms. Barnes and Mr. Guiney also recall hearing Sheriff Corpus refer to a Millbrae City Council Member as a "fuzzbumper," a derogatory term for lesbians. Sheriff Corpus also used this term to refer to that same Millbrae City Council Member in text messages with Ms. Barnes.

May 30, 2025
Page 50

*Id*. § 2.14.060. Indeed, "individuals should be encouraged to report possible violations of laws, regulations and rules governing the conduct of County officers and employees." *Id*. § 2.14.060. The SMCSO Policy Manual likewise prohibits "retaliate[ion] against any person for … opposing a practice believed to be unlawful …; for reporting or making a complaint …; or for participating in any investigation." Sheriff Corpus violated these laws by transferring Capt. Philip to a less desirable and advantageous post in retaliation for refusing to sign and serve the deficient Internal Affairs notice to Sgt. Acosta and for reporting the improper Notice.

***Second***, Sheriff Corpus unlawfully retaliated against Sgt. Chan. It is unlawful to retaliate against an employee for engaging or participating in political activities. Labor Code § 1101 ("No employer shall make, adopt, or enforce any rule, regulation, or policy (a) [f]orbidding or preventing employees from engaging or participating in politics or from becoming candidates for public office [or] (b) [c]ontrolling or directing, or tending to control or direct the political activities or affiliations of employees."); Labor Code § 1102 ("No employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity."); *Ali v. L.A. Focus Publ'n*, 112 Cal. App. 4th 1477, 1487 (2003) (sections 1101 and 1102 protect employees' "fundamental right … to engage in political activity without … threat of retaliation from employers.") (internal quotations omitted); *see also* Gov't Code § 3302(a) ("No public safety officer shall be prohibited from engaging.in political activity.") Sheriff Corpus violated these laws by transferring Sgt. Chan to a less desirable and advantageous post in retaliation for his participation in the political rally in support of Measure A.

***Third***, Sheriff Corpus violated POBRA by taking punitive action against Capt. Philip, Lt. Sebring, Sgt. Chan and Capt. Albin without affording them the rights provided by Government Code Sections 3303 and 3304. A public safety officer cannot be subject to "punitive action … without providing the public safety officer with an opportunity for administrative appeal." Gov't Code § 3304(b). Sheriff Corpus took punitive action against Capt. Philip, Lt. Sebring, and Sgt. Chan by transferring them for participating in lawful conduct that the Sheriff disfavored. Likewise, Sheriff Corpus locked Capt. Albin out of her work site on the basis of her lawful conduct. Sheriff Corpus did not provide these officers with the right to an administrative appeal in violation of POBRA.

### G.    Supporting Evidence

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- Former Capt. Rebecca Albin;

- SMCSO Associate Management Analyst Valerie Barnes;

- Sgt. Jimmy Chan;

May 30, 2025
Page 51

- SMCSO Human Resources Manager Heather Enders;

- Former Lt. Daniel Guiney;

- Former Undersheriff Christopher Hsiung;

- Former Records Manager Jenna McAlpin;

- Former Assistant Sheriff Ryan Monaghan;

- Sgt. Jeffrey Morgan;

- Former Capt. Brian Philip;

- Lt. Daniel Reynolds; and,

- Lt. Jonathan Sebring.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- February 5, 2024 Memo from Lt. Jonathan Sebring to Assistant Sheriff Ryan Monaghan;

- June 18, 2024 Text message exchange between Former Undersheriff Christopher Hsiung and Sheriff Christina Corpus;

- July 5, 2024 Letter from Sgt. Jimmy Chan to Lt. Irfan Zaidi;

- September 3, 2024 Text message exchange between Victor Aenlle and Heather Enders;

- November 12, 2024 Chronology by Former Capt. Rebeca Albin; and,

- February 6, 2025 Video of DSA Support for Measure A depicting Sgt. Jimmy Chan.

## VI.    Grounds for Removal Relating to the Professional Standards Bureau

### A.    Introduction

The Sheriff has mandatory, statutory obligations to investigate allegations of officer misconduct. PSB implements these obligations by investigating citizen complaints and use-of-force complaints, and conducting Internal Affairs investigations, among other duties.

Sheriff Corpus has mismanaged PSB and inhibited the unit from effectively performing its core investigative functions, leading to a severe backlog of uncompleted investigations. PSB suffers from lack of executive leadership. Sheriff Corpus and Undersheriff Perea require PSB personnel

May 30, 2025
Page 52

to obtain executive authorization to undertake basic investigatory steps, including even the decision to initiate a preliminary inquiry to determine whether a formal investigation is warranted, but they also fail to act on requests incoming from PSB in a timely fashion. In addition, Sheriff Corpus has demonstrated a pattern of intervening and delaying some PSB investigations without apparent justification, particularly when she has a pre-existing personal relationship with the target of the investigation.

Sheriff Corpus's repeated and flagrant failure to maintain a functional PSB unit—which is itself an outgrowth of Sheriff Corpus's failure to maintain a functional executive management team—constitutes cause to terminate under Section 412.5(B)(2) of the County Charter.

    **B.    Overview of PSB functions**

PSB has multiple functions. One function is to oversee the SMCSO's efforts to hire sworn staff. PSB ensures that SMCSO's hiring adheres to the County's civil service rules. Sworn and non-sworn personnel both work on hiring matters within PSB. Another function of PSB is to administratively investigate allegations of wrongdoing within the SMCSO. PSB officers conduct investigations into, among other things, civilian complaints and use-of-force incidents. PSB officers also typically serve as the Internal Affairs investigators for the agency. While non-sworn staff provide support services to investigating officers, the investigations themselves are conducted by sworn personnel.

Traditionally, when PSB receives a misconduct allegation, a PSB sergeant performs a preliminary fact-finding inquiry to help determine whether further investigation is warranted. The sergeant will then provide an initial report based on her or his findings to a superior officer, usually a lieutenant with oversight over PSB. A lieutenant will then pass on those preliminary findings, at times with a recommendation on whether to open a formal investigation, to PSB's supervising officer, typically either a captain or an assistant sheriff. Past and current members of PSB report that the assistant sheriff overseeing PSB has traditionally had authority to open formal Internal Affairs investigations after receiving the preliminary report, though the assistant sheriff has sometimes consulted the Sheriff or Undersheriff in making this decision.

This process has permitted PSB to generally open and conduct Internal Affairs investigations while limiting the personal involvement of the Sheriff or the Undersheriff. Several current and former members of PSB report that limiting the Sheriff and Undersheriff's involvement in the pre-hearing investigative process is important for two reasons: (1) the Sheriff's and Undersheriff's schedules are often consumed with overseeing other divisions of the SMCSO, and (2) the Sheriff is the ultimate decision-maker with respect to personnel discipline and the Undersheriff almost always serves as the *Skelly* officer in any internal disciplinary hearing.[12]

_____

[12] The function of a *Skelly* officer in public employee disciplinary matters is to provide a review of the employer's charge and the employee's response and to evaluate whether evidence supports the proposed disciplinary action.

May 30, 2025
Page 53

 

 

 

**C.     Sheriff Corpus has inhibited PSB from fulfilling its investigative function.**

For more than six months, PSB has lacked executive-level and command-level leadership. In January 2023, Sheriff Corpus eliminated an assistant sheriff position to make room for Mr. Aenlle's civilian "chief of staff" position. Sheriff Corpus then hired Ryan Monaghan to fill one of the two remaining assistant sheriff positions but left the other assistant sheriff position unfilled.[13] Assistant Sheriff Monaghan oversaw PSB during his tenure at the SMCSO. In mid-2023, Sheriff Corpus also recruited Capt. Brian Philip to join the SMCSO and help Assistant Sheriff Monaghan in overseeing PSB.

In September 2024, Sheriff Corpus transferred Captain Philip out of PSB to a position in Corrections after Captain Philip refused to sign and serve a deficient Internal Affairs notice on Sgt. Javier Acosta. (*See supra* § III.B.) Since then, there has been no captain with oversight over PSB.

A few weeks later, in September 2024, Sheriff Corpus terminated Assistant Sheriff Monaghan in retaliation for his participation in Judge Cordell's investigation. (*See supra* § IV.) Assistant Sheriff Monaghan reports that, in the months preceding his termination, Undersheriff Perea limited his ability to open Internal Affairs investigations without first obtaining the Undersheriff's preapproval.

Following Sheriff Monaghan's termination, Sheriff Corpus promoted Capt. Matthew Fox to Acting Assistant Sheriff. In that role, he briefly oversaw PSB but resigned in November 2024. Since then, there has been no assistant sheriff or captain overseeing PSB and lieutenants in the unit have had to report directly to Undersheriff Perea.

Several members of PSB report that the Sheriff's failure to have an assistant sheriff in place for more than six months has resulted in significant delays for the unit's investigative work. The tasks of approving the initiation of every Internal Affairs investigation and reviewing every completed Internal Affairs investigation has fallen to Undersheriff Perea. PSB's sworn personnel also report that Undersheriff Perea rarely takes any action without obtaining approval from Sheriff Corpus, which has further slowed the investigative process. Moreover, in a break from historic practice, Sheriff Corpus and Undersheriff Perea have limited PSB sergeants' ability to engage in even initial fact-finding of verbal complaints without first obtaining their prior approval. As a result, the current process for opening investigations regularly results in significant and unacceptable delays.

Additionally, Sheriff Corpus has also introduced significant delay into completing investigations after they are initiated. As of May 2025, the Sheriff's Office has a backlog of at least 38 investigations that have been completed by PSB and are awaiting review by Undersheriff Perea

---

[13] As noted above, Mr. Kunkel unofficially served in an Assistant Sheriff for Corrections role on a contractor basis until early 2024 before resigning. Sheriff Corpus has never had a full-time Assistant Sheriff for Corrections.

May 30, 2025
Page 54

and Sheriff Corpus. Approximately 13 investigations into citizen complaints have been completed by PSB and are awaiting review by an SMCSO executive officer.[14] Approximately 13 investigations into the use of force have been completed by PSB and are awaiting review by an SMCSO executive officer.[15] Approximately 12 Internal Affairs investigations have been completed by PSB and are awaiting review by an SMCSO executive officer.[16]

      **D.**    **Sheriff Corpus's mismanagement of PSB has led to substantial delays in the investigative process and created significant negative effects.**

Current and former members of PSB report that delaying investigations and disciplinary decisions have significant detrimental effects. It can be harder to complete stale investigations because witness memories fade over time. Furthermore, a deputy who commits misconduct may not receive corrective training in a timely fashion or might be permitted to remain in their position while putting others at risk. Sgt. Fava reports that he often receives calls from citizens who have submitted complaints and are frustrated by the lack of resolution, thereby eroding public trust.

Delays can also result in unnecessary costs to the County and taxpayers.



Finally, in some circumstances, the Public Safety Officers Procedural Bill of Rights Act can require the Sheriff's Office to issue a letter of intent to impose discipline within one year of learning of the alleged misconduct. *See* Gov't Code § 3304(d).[17]

---

[14] Citizen complaint investigations are mandated by statute. *See* Cal. Pen. Code § 832.5.

[15] Every use of force is investigated to determine whether such use was permissible or potentially excessive. The SMCSO has a statutory duty to investigate instances of excessive force. *See* Cal. Pen. Code § 13510.8(b)(3); (c).

[16] Several Internal Affairs investigations involve "serious misconduct," which the SMCSO has a statutory duty to investigate. *See* Cal. Pen. Code § 13510.8(b)–(c).

[17] There are exceptions to the administrative statute of limitations, and the application of this statute can be nuanced.

May 30, 2025
Page 55

 

 

**E.      Examples of Sheriff Corpus's failure to properly conduct PSB investigations.**

As discussed, Sheriff Corpus's mismanagement of PSB has led to the SMCSO's failure to timely complete investigations. Below are four non-exhaustive examples illustrating how Internal Affairs investigations have come to be delayed under Sheriff Corpus. The first and fourth examples also illustrate instances where Sheriff Corpus slowed PSB investigations on behalf of officers who she favors.



May 30, 2025
Page 56



May 30, 2025
Page 57



### F.    Grounds for Removal

The foregoing conduct is, independently and collectively, grounds to remove Sheriff Corpus from office because she has failed to complete investigations into allegations of misconduct by members of her office and thus has flagrantly and repeatedly neglect of her duties. San Mateo County Charter Art. VI § 412.5(B)(2).

Penal Code section 13510.8(c)(1) requires the Sheriff and her Office to complete "investigations of allegations of serious misconduct by a peace officer regardless of their employment status." Government Code sections 26600, 26601, 26602 impose a duty on the Sheriff to preserve the peace, arrest those who attempt or commit public offenses, and investigate public offenses which have been committed. Penal Code section 832.5 requires law enforcement agencies to "establish a procedure to investigate complaints by members of the public against the personnel of these departments or agencies." Agencies have a "duty to follow the mandatory terms of the department's published procedure for handling citizen complaints of police misconduct." *Galzinski v. Somers*, 2 Cal. App. 5th 1164, 1174 (2016).

As described above, Sheriff Corpus has failed to properly initiate, support, oversee, and conclude investigations into civilian, use-of-force incidents, and Internal Affairs investigations. Sheriff Corpus's mismanagement of PSB has led to a significant backlog of incomplete

May 30, 2025
Page 58

investigations and unresolved open matters. The Sheriff also fails to dispense deputy discipline in an even-handed manner by engaging in favoritism. This conduct fails to uphold the Sheriff's duty to investigate and undermines California's comprehensive scheme for administering the standards and training of law enforcement officers, as set forth in Title 4, part 4 of the Penal Code. These failures constitute a flagrant and repeated neglect of Sheriff Corpus's duties as defined by law and constitute grounds for her removal under Section 412.5(b)(2) of Article IV of the County Charter. *See* San Mateo County Charter Art. IV § 412.5(B)(2); Penal Code §§ 832.5, 13510.8(c)(1); Gov't Code §§ 26600, 26601, 26602.

        **G.**      **Supporting Evidence**

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- Sgt. Jimmy Chan;

- Sgt. Joe Fava;

- Former Undersheriff Chistopher Hsiung;

- Former Assistant Sheriff Ryan Monaghan;

- Former Capt. Brian Philip;

- Lt. Daniel Reynolds;

- San Mateo County Labor Relations Analyst Katy Roberts;

- Lt. Jonathan Sebring; and,

- Lt. Irfan Zaidi.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:



May 30, 2025
Page 59



**VII.    Conclusion**

For the foregoing reasons, cause exists to terminate Sheriff Corpus under Section 412.5.

## BOARD OF SUPERVISORS — SHERIFF REMOVAL PROCEDURES

### FOREWORD

The County of San Mateo ("the County") is one of 14 charter counties in California. The County adopted its Charter in 1932 after it was ratified by San Mateo County voters. As a charter county, the County has authority under Article II, Section 19 and Article XI, Section 4 of the California Constitution to provide, in its County Charter, removal procedures for an elected Sheriff.

On March 4, 2025, the County held a countywide special election for Measure A to amend the County's Charter to grant the County Board of Supervisors the authority, until December 31, 2028, to remove the elected Sheriff of San Mateo County ("Sheriff"), for cause, by a four-fifths vote of the Board. Measure A passed overwhelmingly and following action by the Board of Supervisors and submission to the Secretary of State is now effective, resulting in Section 412.5 being added to Article IV of the County Charter ("Section 412.5").

Section 412.5 reads, in its entirety, as follows:

> a. The Board of Supervisors may remove a Sheriff from office for cause, by a four-fifths vote, after a Sheriff has been:
> > (1) Served with a written statement of alleged grounds for removal; and
> > (2) Provided a reasonable opportunity to be heard regarding any explanation or defense.
>
> b. For the purposes of this Section 412.5, "cause" shall mean any of the following:
> > (1) Violation of any law related to the performance of a Sheriff's duties; or
> > (2) Flagrant or repeated neglect of a Sheriff's duties as defined by law; or
> > (3) Misappropriation of public funds or property as defined in California law; or
> > (4) Willful falsification of a relevant official statement or document; or
> > (5) Obstruction, as defined in federal, State, or local law applicable to a Sheriff, of any investigation into the conduct of a Sheriff and/or the San Mateo County Sheriff's Office by any government agency (including the County of San Mateo), office, or commission with jurisdiction to conduct such investigation.
>
> c. The Board of Supervisors may provide for procedures by which a removal proceeding pursuant to this Section 412.5 shall be conducted.
>
> d. This Section 412.5 shall not be applied to interfere with the independent and constitutionally and statutorily designated investigative function of a Sheriff.
>
> e. This Section 412.5 shall sunset and be of no further force and effect as of December 31, 2028 unless extended by voters of San Mateo County.

Pursuant to Section 412.5, subsection (c), the County now establishes by Resolution, the following procedure for removing a Sheriff.

**I. Sheriff Removal Procedures and Hearing Timing**

1. Removal Procedures Initiation

    (A) In order to initiate the Sheriff Removal Procedures ("Sheriff Removal Procedures"), the Board of Supervisors ("the Board") must approve, by at least a four-fifths vote of its members, the issuance of a written Notice of Intent to Remove the Sheriff ("Notice of Intent").

2. Content and Service of Notice of Intent to Remove

    (A) Once the Board has initiated the Sheriff Removal Procedures, it must cause to be provided to the Sheriff's official work email address the Notice of Intent, that was approved by at least a four-fifths vote of the Board, which shall constitute adequate notice that the Board has initiated the removal process.

    (B) The Notice of Intent shall include all of the following:

        (1)    A statement that the Board has initiated the Sheriff Removal Procedures;

        (2)    A statement of the alleged grounds supporting the Sheriff's Removal; and

        (3)    A statement that upon receipt of the Notice of Intent, the Sheriff shall have five (5) calendar days[3] to appear at the Pre-Removal Conference on the date identified in the Notice.

3. Pre-Removal Conference

    (A) Upon receipt of the Notice of Intent, the Sheriff shall have five (5) calendar days to appear at a Pre-Removal Conference – that the Chief Probation Officer of San Mateo County will preside over – for an opportunity to respond to the allegations against the Sheriff in support of the Sheriff's removal ("Pre-Removal Conference"). The Sheriff's failure to appear at the Pre-Removal Conference will be deemed a waiver of the right to a Removal Hearing. In the event the Chief Probation Officer is unable to preside over the Pre-Removal Conference, the County Coroner shall preside over the Pre-Removal Conference. If neither the Chief Probation Officer nor the Coroner is able to preside over the Pre-Removal Conference, the President of the Board of Supervisors will designate an alternate to preside over the Pre-Removal Conference.

    (B) The Pre-Removal Conference will be recorded, unless either the Sheriff or the County (each a "Party," collectively "the Parties") objects to it being recorded.

    (C) The individual presiding over the Pre-Removal Conference shall consider the information presented at the Pre-Removal Conference and issue a recommendation, in writing, to the Board regarding whether to remove the Sheriff.

    (D) Upon receipt of the recommendation from the Pre-Removal Conference, the Board shall, as soon as practicable thereafter, render its decision (subject to an appeal via Removal Hearing, as set forth below) to either sustain or reject the recommendation. After review and

---

[3] All references to days contained herein are for calendar days, unless specified otherwise.

consideration of the recommendation, the Board must obtain at least a four-fifths vote to remove the Sheriff (subject to an appeal via Removal Hearing). After rendering its decision, the Board shall direct staff to provide to the Sheriff, in writing, the Board's "Final Notice of Decision."

4. Final Notice of Decision (Subject to Appeal Via Removal Hearing)

If the Board by a four-fifths vote determines to proceed with removal of the Sheriff, a Final Notice of Decision to remove the Sheriff (subject to appeal via Removal Hearing) shall include all of the following information:

(1)     The specific ground(s) enumerated in Section 412.5 that the Board has determined constitutes the ground(s) to remove the Sheriff;

(2)     That the Sheriff shall have the right to appeal the Board's decision and request an appeal hearing ("Removal Hearing") before a Hearing Officer;

(3)     That to exercise the right to appeal and receive a Removal Hearing, the Sheriff must provide written notice to the Assistant Clerk and Deputy Clerk of the Board of Supervisors (presently, Sukhmani Purewal and Sherry Golestan), at spurewal@smcgov.org and sgolestan@smcgov.org, within five (5) days of receiving the Final Notice of Decision; that the Sheriff must include in the request for a Removal Hearing a detailed statement of the facts and grounds for appealing the Final Notice of Decision; and that the Sheriff will be barred from raising any bases for appeal not contained therein;

(4)     That if the Sheriff fails to timely exercise the right to appeal, the Sheriff will be deemed to have waived the right to appeal and the Board's decision will be final and binding;

(5)     That if the Sheriff exercises the right to appeal, the Removal Hearing will be open to the public; unless the Sheriff, within five (5) days of receiving the Final Notice of Decision, formally objects, in the Sheriff's written request for an appeal, to an open hearing and requests a closed hearing; failure to timely object will result in the Removal Hearing being open to the public, and the Sheriff will be deemed to have waived any right to confidentiality that may exist in any documents presented at the open Removal Hearing;

(6)     That the Board will propose to the Sheriff a list of at least three (3) neutral Hearing Officers, with experience in public safety officer disciplinary matters, available to timely preside over the Removal Hearing, with a preference that such Hearing Officer who otherwise meets these criteria be a retired judge;

(7)     That at the conclusion of the Removal Hearing, the Hearing Officer will prepare and submit an advisory opinion to the Board; and

(8)     That upon receipt and consideration of the Hearing Officer's advisory opinion, the Board will make the Final Post-Hearing Decision for Removal of the Sheriff, with at least a four-fifths vote required to remove the Sheriff, and the Board's decision will be final and binding.

3

5. Removal Hearing Request

(A) The Sheriff must submit an appeal/request for a Removal Hearing, in writing, within five (5) days of the Board issuing its Final Notice of Decision, to Sukhmani Purewal at spurewal@smcgov.org, and Sherry Golestan at sgolestan@smcgov.org. The request must contain a detailed statement of the facts and grounds for the appeal; the Sheriff will be barred from raising any bases for appeal not contained therein.

(B) If the Sheriff exercises the right to appeal, the Removal Hearing will be open to the public, unless the Sheriff, within five (5) days of receiving the Final Notice of Decision, formally objects, in the Sheriff's written request for an appeal, to an open Removal Hearing and requests a closed Removal Hearing.

**II. Hearing Officer Selection**

1. Hearing Officer List

(A) If the Board approves of the Final Notice of Decision to Remove the Sheriff, the Board must thereafter provide to the Sheriff, and to the County, a list of at least (3) neutral Hearing Officers available to preside over the Sheriff's Removal Hearing ("Hearing Officer List").

(B) The Parties will have five (5) days after the Board provides the Hearing Officer List to meet and select a Hearing Officer from the Hearing Officer List. The Parties shall select the Hearing Officer either by mutual agreement or by alternately striking names from the Hearing Officer List until one Hearing Officer remains – wherein the remaining name shall be the Hearing Officer to preside over the Removal Hearing. Failure of the Sheriff to cooperate with the timely scheduling of this selection meeting or any other matter required by these procedures, shall be deemed a waiver of the right to appeal.

(C) On the same day the Parties select the Hearing Officer, they must notify the Assistant County Executive of their Hearing Officer selection. Upon receipt of notice of the Hearing Officer selection, the Assistant County Executive, or their designee, will notify the Hearing Officer of their selection to preside over the Removal Hearing.

**III. Removal Hearing**

1. Removal Hearing Scheduling

(A) Within five (5) days after the Hearing Officer receives notice of their selection, the Hearing Officer must set the dates and time for the Removal Hearing to proceed. Each Party shall have no more than five (5) full days to present its case at the Removal Hearing. A "full day" shall be at least seven (7) hours of proceedings before the Hearing Officer, not including breaks. The Hearing Officer shall afford each Party an equal amount of time to present its case (through direct and cross examination of witnesses), and the Hearing Officer shall have discretion to limit or grant additional time to either Party, based upon a showing of good cause. The Hearing Officer must schedule the Removal Hearing to be completed within 30 to 60 calendar days of the date they were notified of their selection to serve as the Hearing Officer.[2]

---

[2]  The Board may make an exception to this rule in the event of unavailability of the selected Hearing Officer.  However, it is the stated interest of the Board that any Removal Hearing be completed as quickly

(B) At the Removal Hearing, the County will present its case-in-chief first, and the Sheriff will present their case-in-chief second. Since the County bears the burden of proof, the County may reserve time after the Sheriff's case-in-chief for rebuttal.

2. The Removal Hearing

(A) At the Removal Hearing the Parties shall be entitled to:

(1) Be represented by counsel or by a representative of their choice;

(2) Submit an optional pre-hearing written brief at least five (5) days before the first day of the Removal Hearing;

(3) Be permitted to make opening and closing statements;

(4) Offer testimony under oath or affirmation;

(5) Subpoena material witnesses on their behalf;

(6) Cross-examine all witnesses appearing against them;

(7) Impeach any material witness before the Hearing Officer; and

(8) Present such relevant exhibits and other evidence as the Hearing Officer deems pertinent to the matter then before them, subject to the authority of the Hearing Officer to exclude irrelevant or cumulative evidence. The Hearing Officer shall also have the authority to issue a protective order as to any documents, testimony, or other evidence, as necessary to protect the privacy rights of third parties or to address any other issues of confidentiality or privilege that arise during the Removal Hearing. Use of these proceedings, including the discovery process, for the purpose of harassment, undue delay, or for any other improper purpose will not be permitted, and may result in discovery sanctions/remedies being imposed by the Hearing Officer.

(B) The Sheriff shall personally appear for each day of the Removal Hearing. The County may either call the Sheriff to testify in its case-in-chief as an adverse witness, or may reserve its right to call the Sheriff at a later time in the proceeding. In the event the Sheriff refuses to testify, or otherwise becomes unavailable, the Hearing Officer shall have discretion to draw an adverse inference against the Sheriff, or to dismiss the Sheriff's appeal altogether. The Hearing Officer shall also have discretion to consent to the absence of the Sheriff upon a showing of good cause. An unexcused absence of the Sheriff, whose presence is required at the Removal Hearing, may be deemed a withdrawal of the Sheriff's appeal.

(C) The Removal Hearing shall be informal and need not be conducted according to technical rules relating to evidence and witnesses. Any relevant evidence shall be admitted if it is the sort of evidence on which hearing officers are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule that might impact the admissibility of such evidence over objection in civil actions. Hearsay evidence may be admitted

---

and efficiently as possible to ensure that the operations of the Sheriff's Office, and its service to the citizens of the County, are not impacted through protracted proceedings.

for any purpose, but shall not be sufficient, in itself, to support a material finding unless it would be admissible over objection in civil actions or if it is independently corroborated by reliable and credible evidence admitted during the Removal Hearing. The rules of privilege and of official or judicial notice shall be effective to the same extent as in civil actions. Irrelevant or cumulative evidence shall be excluded. Oral evidence shall be taken only under oath or affirmation.

(D) The Removal Hearing shall be electronically recorded or conducted with a stenographic reporter. The Parties may obtain a recording or transcript of the Removal Hearing by making independent arrangements with the recorder or reporter for the preparation thereof. The County shall bear the cost of the Hearing Officer.

(E) The Hearing Officer shall have discretion and authority to control the conduct of the Parties and any person present at the Removal Hearing. The Hearing Officer shall have the right to sequester from the Removal Hearing any witness(es) who has/have not yet provided testimony, and remove any person who the Hearing Officer finds to be unruly or who attempts to interfere with the Removal Hearing.

(F) At the conclusion of the evidentiary portion of the hearing, the Parties will be permitted to present oral closing arguments to the Hearing Officer.  As the County bears the burden of proof, it will present its closing argument first, followed by the Sheriff, with the County permitted to reserve time for rebuttal, if it so chooses. The Hearing Officer shall have discretion to place time limits on closing arguments. The Parties may, but will not be required, to submit closing written briefs, due within fourteen (14) days of the conclusion of the Removal Hearing.[3]  No extensions of time to submit the optional closing written briefs will be permitted.

3. Advisory Opinion of the Hearing Officer

(A) Once the Removal Hearing concludes, the Hearing Officer will have forty-five (45) days to submit a written advisory opinion to the Board.

(B) The Hearing Officer's advisory opinion shall:

(1) Employ the "preponderance of the evidence" standard of proof over the evidence presented;

(2) Analyze and issue an advisory opinion as to whether the County had cause, as defined in Section 412.5 of the County Charter, to remove the Sheriff; and

(3) Include findings of fact and a proposed advisory opinion to the Board, limited to the statement of the issue of whether the County had cause, under Section 412.5, to remove the Sheriff.

---

[3] The Parties may rely on daily or rough transcripts of the proceedings in preparing the optional supplemental closing written briefs.

**IV. Board of Supervisors Final Decision After Removal Hearing**

1. Board of Supervisors Review Period

   (A) The Board will have up to 30 days from the date of receipt of the Hearing Officer's advisory opinion to independently review the Hearing Officer's advisory opinion and the administrative record.

2. Board of Supervisors Vote – Final Post-Hearing Decision

   (A) At a Board meeting following receipt and review of the Hearing Officer's advisory opinion, the Board must vote on whether, by a preponderance of the evidence, there was "cause," as defined Section 412.5, to remove the Sheriff.

   (B) The Board shall have the authority to remove the Sheriff for cause only if it obtains at least a four-fifths vote in support of removal.

   (C) Upon the Board obtaining at least a four-fifths vote to remove the Sheriff for cause, the Board will cause to be prepared the Board's Final Decision After Removal Hearing, in writing, wherein the Board will provide its rationale in support of its vote. The Board will review and approve the Final Decision After Removal Hearing at a Board meeting, making the Sheriff's removal effective immediately and final. The Final Decision After Removal Hearing shall be served on the Sheriff by mail to the Sheriff's last known home address of record.

**V. Post-Removal Procedures**

Should the Board, by at least a four-fifths vote, agree to remove the Sheriff for cause, the Board will proceed pursuant to County Charter section 415 (as amended in 2010) to fill the vacancy created by the Sheriff's removal.

**VI. Discovery and Other Rules Governing the Removal Hearing**

1. Scope of Discovery

   (A) In general, discovery shall be very limited in scope and permitted only if it is relevant, material, and directly pertains to the specific allegation(s), charge(s), or complaint(s) contained in the Notice of Intent to Remove.  Discovery shall be permitted only as specifically allowed in this Section VI.

   (B) Discovery shall be reciprocal between the Parties.

   (C) All discovery requests must be narrowly tailored to avoid unreasonable burden, harassment, remoteness, or the production of irrelevant or cumulative evidence.

      (1)  Voluminous discovery requests are generally disfavored and should not be granted.

      (2)  Abuse of the discovery process for the purpose of harassment is prohibited.

      (3)  The Hearing Officer has discretion to sanction either Party for abuse of the discovery process.

2. Initial Exchange of Exhibits

    (A) Within five (5) days after the Hearing Officer is appointed, the Parties must exchange all exhibits (other than those that will be used for impeachment or rebuttal evidence) they intend to offer or introduce at the Removal Hearing.

3. Limited Additional Discovery

    (A) Within five (5) days after the initial exchange of exhibits, a Party may request additional written discovery, limited in scope and to requests for production of documents, and only for relevant and material evidence. However, because the Parties must exchange all exhibits they intend to offer or introduce at the Removal Hearing, document requests will be deemed presumptively in violation of Section VI.1(C), above, and may only be permitted at the discretion of the Hearing Officer upon a showing of good cause pursuant to the dispute process provided in subsection (B), below. No depositions, requests for admission, interrogatories, or other type(s) of discovery shall be permitted and all testimony must be offered live before the Hearing Officer.

    (B) If a dispute arises:

        (1) The Parties must meet and confer, in good faith, within five (5) days of the discovery response date to attempt resolution.

        (2) If any dispute remains unresolved at the conclusion of the five (5) day meet-and-confer period, the Parties must each submit the outstanding discovery issues in writing to the Hearing Officer by end of the following business day. Failure to timely submit discovery disputes to the Hearing Officer are sufficient grounds for rejection of the request. After reviewing the submission(s) of the Parties, the Hearing Officer shall issue a written ruling to the Parties within five (5) days.

    (C) The responding Party shall have five (5) days to respond to any Hearing Officer approved document request.

4. Testimony

    (A) All testimony must be taken live before the Hearing Officer under oath or affirmation. Declarations or affidavits shall not substitute for live testimony and cross-examination.

    (B) If good cause is shown for the unavailability of a witness to appear in-person, including that the witness does not reside in California, the Hearing Officer, at their discretion, may choose to receive live testimony remotely or by video conference.[4]

5. Subpoenas

    (A) A Party may request the Hearing Officer to issue administrative subpoenas, limited in scope to compel the appearance of witnesses only, and whose testimony is relevant and material to the allegation(s), charge(s), or complaint(s) in the Notice of Intent to Remove. Requests for administrative subpoenas shall be made concurrently with the initial exhibit disclosures as

---

[4] The Hearing Officer may opt to preside by videoconference.

identified in section VI.2 above, and shall be subject to the same meet and confer obligations and deadlines contained in section VI.3(B) above.

6. Relevance and Admissibility

(A) The Hearing Officer shall have discretion and authority to resolve any evidentiary issues or disputes before and during the Removal Hearing, and to take any action or ruling to ensure a fair, impartial, and efficient hearing in accordance with due process.

7. Exhibits and Witness Lists

(A) Each Party shall serve, on all Parties and the Hearing Officer, a written numbered list of exhibits (exchanged pursuant to section VI.2, above) and witnesses, including expert witnesses, at least five (5) days before the first day of the Removal Hearing.  This requirement does not apply to impeachment or rebuttal exhibits or witnesses.

(B) Each Party shall serve, at least two (2) days before the first day of the Removal Hearing, exhibit binders on all Parties and the Hearing Officer, in accordance with the format or form set by the Hearing Officer.

(C) The Hearing Officer shall have discretion to exclude any exhibit or witness that was not included in the submitted exhibit binders or not disclosed in accordance with the applicable deadlines set forth above in VI.7(A), (B).  This remedy does not apply to impeachment or rebuttal evidence.

(D) The Parties are encouraged to meet and confer in advance of the Removal Hearing date and to stipulate to exhibits or witness lists, as well as the admissibility of any exhibits and testimony prior to the commencement of the Removal Hearing.