# REPORT OF INDEPENDENT INVESTIGATION

**TABLE OF CONTENTS**

I.    EXECUTIVE SUMMARY ................................................................1

II.   INVESTIGATIVE REPORT INTO ALLEGATIONS OF MISCONDUCT BY
      VICTOR AENLLE, SHERIFF CHRISTINA CORPUS, AND LEADERSHIP OF
      THE SAN MATEO COUNTY SHERIFF'S OFFICE........................................3

      A.    INTRODUCTION .............................................................3

            1.    Purpose of the Investigation: . ....................................3

            2.    The Investigator: ..................................................3

      B.    INVESTIGATION AND FINDINGS: ..............................................3

            a)    The Fact-Finding Process ...........................................4

            b)    Interviewees .......................................................4

            c)    Interview of Victor Aenlle .........................................4

            d)    Offer to Interview Sheriff Christina Corpus ........................4

            e)    The Policy Manual ..................................................5

            f)    Organizational Chart for the San Mateo County Sheriff's Office .....6

            g)    Election of Christina Corpus .......................................6

            h)    Aenlle Contract #1 .................................................7

            i)    Termination of Aenlle Contract #1 ..................................7

            j)    Aenlle Consultant Contract .........................................8

            k)    Aenlle Extra-Help Position Request .................................9

            l)    Aenlle Executive Director of Administration Position ...............9

            m)    Sheriff Corpus' Request for Highest Pay Level for Aenlle ..........10

            n)    Multiple Requests for Aenlle Pay Increase .........................10

            o)    The Allegations ...................................................11

                  1.    Allegation #1: Sheriff Corpus and Aenlle have a "personal
                        relationship" that creates a conflict of interest...........11

                  2.    Allegation #2: Aenlle has not met the Policy Manual's
                        duty requirements for a Level I Reserve Deputy. ............21

i

3.    Allegation #3: Aenlle has exceeded and/or abused his
      authority with the approval of Sheriff Corpus...............................25

4.    Allegation #4: Sheriff Corpus, Aenlle and the Executive
      Team engage in retaliation and intimidation ................................40

5.    Allegation #5: Aenlle has outside employment that has not
      been approved. ...............................................................................61

6.    Allegation #6: Aenlle had a conflict of interest when
      negotiating the lease for the Broadway Property...........................66

7.    Allegation #7: Aenlle did not follow the proper protocol
      for the selection of a construction contractor for the
      Broadway Property. .......................................................................71

8.    Allegation #8: Aenlle does not follow the County's
      procurement policies......................................................................73

9.    Allegation #9: Sheriff Corpus and Aenlle improperly
      issued Concealed Carry Weapon permits .....................................78

10.   Allegation #10: Aenlle has improperly removed social
      media posts criticizing Aenlle and Sheriff Corpus ......................80

11.   Allegation #11: Aenlle, Sheriff Corpus and her Executive
      Team improperly possess suppressed rifles ..................................82

12.   Allegation #12: Aenlle has misrepresented that he earned a
      Ph.D. ..............................................................................................84

13.   Allegation #13: Aenlle is not authorized to wear a badge
      that resembles the gold badges of sworn employees ...................86

14.   Allegation #14: Aenlle and Sheriff Corpus improperly
      issued honorary badges and an identification card to
      civilians ..........................................................................................88

15.   Allegation #15: Sheriff Corpus has uttered and texted
      racial and homophobic slurs in the workplace..............................90

III.   CONCLUSION:.............................................................................................91

# EXECUTIVE SUMMARY

On July 10, 2024, John Nibbelin, the County Counsel of San Mateo County, retained Judge LaDoris H. Cordell (Ret.) to conduct an independent fact-finding investigation into complaints and concerns that current and former members of the Sheriff's Office have about Victor Aenlle, who serves on the Executive Team of Sheriff Christina Corpus. Over the course of the investigation, additional matters regarding the Sheriff's Office were identified and added to the scope of the investigation.

Judge Cordell interviewed 40 current and past sworn and civilian employees, the great majority of whom were complainants. Interviews were conducted via phone and were not recorded. Judge Cordell offered to interview Victor Aenlle and Sheriff Corpus. Mr. Aenlle accepted the offer and spoke to Judge Cordell in a recorded phone call. Sheriff Corpus did not respond to Judge Cordell's offer to be interviewed.

Judge Cordell investigated fifteen (15) allegations ranging from whether Mr. Aenlle and Sheriff Corpus have a personal relationship beyond mere friendship, to retaliation and abuse of authority, to exploring Mr. Aenlle's claim that he is a reserve deputy sheriff. This Executive Summary highlights seven (7) of the allegations with their abbreviated findings.

- **Allegation:** Sheriff Corpus and Aenlle have a "personal relationship" that creates a conflict of interest.
  **Findings:** Despite their denials, there is factual evidence that Sheriff Corpus and Victor Aenlle have a personal relationship, beyond mere friendship. In fact, the evidence establishes that they have had an intimate relationship. This relationship has led Sheriff Corpus to relinquish control of the San Mateo County Sheriff's Office to Aenlle, someone who has far more experience as a Coldwell Banker associate real estate broker than he has in law enforcement. Sheriff Corpus violated the Office's conflict of interest policy when she hired Aenlle; she violated the policy by having Aenlle directly report to her; and she violated the policy when she repeatedly recommended pay increases for him. **Sustained.**

- **Allegation:** Aenlle has not met the duty requirements for a Reserve Deputy Sheriff.
  **Findings:** Aenlle is out of compliance with the requirements to maintain his status as a Level I Reserve Deputy because he claimed that his hours working as Executive Director also served as his volunteer duty hours required for Reserve Deputies. **Sustained.**

- **Allegation:** Sheriff Corpus and her Executive Team engage in retaliation and intimidation.
  **Findings:** Fear of retaliation is rampant in the organization. In one instance, Sheriff Corpus fired an Assistant Sheriff for cooperating with this investigation. In another instance, the Sheriff improperly locked out a Captain when she had given notice of her resignation; and in yet another instance, Aenlle demeaned and criticized a female civilian

employee for her decision to move to another agency. Other employees described similar retaliatory and abusive behaviors under Corpus/Aenlle's leadership. **Sustained.**

- **Allegation:** Aenlle has exceeded and/or abused his authority with the approval of Sheriff Corpus.
  **Findings:** Aenlle exercises authority well beyond that of supervising civilian personnel. With the Sheriff's approval, Aenlle has moved himself to the top of the Chain of Command so that he exercises wide-ranging and sometimes abusive authority over both civilian and sworn employees.
  **Sustained.**

- **Allegation:** Aenlle had a conflict of interest when negotiating the lease for the Broadway Property.
  **Findings:** Aenlle played a major role in securing a lease of property for a new substation brokered by Coldwell Banker Real Estate ("CBRE"). Aenlle, who is an associate broker with CBRE, had a conflict of interest and should not have participated in the lease negotiations. Sheriff Corpus knew or should have known of Aenlle's connection to CBRE and should have removed Aenlle from participating in the transaction.
  **Sustained.**

- **Allegation:** Aenlle is not authorized to wear a badge that resembles the gold badges of sworn employees.
  **Findings:** Aenlle is a full-time, salaried civilian employee, not a full-time, salaried sworn peace officer. By wearing a gold badge, he has likely committed a misdemeanor for willfully wearing a facsimile badge that could deceive a civilian into believing he is a sworn officer with full police powers. Sheriff Corpus, by issuing the gold badge to Aenlle, may have committed a misdemeanor, as well.
  **Sustained.**

- **Allegation:** Sheriff Corpus has uttered and texted racial and homophobic slurs in the workplace.
  **Findings:** When Sheriff Corpus texted several homophobic slurs about a local city official to an employee, and when she uttered a racial slur in the presence of an employee, she violated the County's Equal Employment Opportunity policy's commitment to a workplace free of discrimination and harassment.
  **Sustained.**

Lies, secrecy, intimidation, retaliation, conflicts of interest, and abuses of authority are the hallmarks of the Corpus administration. Sheriff Corpus should step down and Victor Aenlle's employment with the Sheriff's Office should be terminated immediately. Nothing short of new leadership can save this organization that is in turmoil, and its personnel demoralized.

**INVESTIGATIVE REPORT INTO ALLEGATIONS OF MISCONDUCT BY VICTOR AENLLE, SHERIFF CHRISTINA CORPUS, AND LEADERSHIP OF THE SAN MATEO COUNTY SHERIFF'S OFFICE**

## A. INTRODUCTION

1. **Purpose of the Investigation:** On July 10, 2024, John Nibbelin, the County Counsel of San Mateo County, retained Judge LaDoris H. Cordell (Ret.) to conduct a fact-finding investigation into complaints and concerns that current and former members of the Sheriff's Office have about Victor Aenlle, who serves on the Executive Team of Sheriff Christina Corpus. Over the course of the investigation, additional matters regarding the Sheriff's Office were identified and added to the scope of this investigation.

2. **The Investigator:** LaDoris H. Cordell is a 1974 graduate of Stanford Law School. She is a retired Superior Court Judge who served on the Santa Clara County bench from 1982-2001. Her work in academia included positions as Assistant Dean of Stanford Law School (1978-1982) and Vice Provost & Special Counselor to the President of Stanford University (2001-2009). From 2010-2015, she was the Independent Police Auditor for the City of San Jose where her office engaged in civilian oversight of the San Jose Police Department. She chaired Santa Clara County's Blue Ribbon Commission that evaluated the county's jails in the aftermath of the murder of a mentally ill inmate by jail guards. She was one of three judges who served on a Blue Ribbon Panel that evaluated the San Francisco Police Department in the aftermath of the racist texting scandal involving several officers. She currently serves on the San Francisco District Attorney's Innocence Commission. Judge Cordell is the author of a recently published memoir *Her Honor: My Life on the Bench. . . What Works, What's Broken, How to Change It.*

## B. INVESTIGATION AND FINDINGS:

1. Review of complaints and concerns about Sheriff Corpus, Victor Aenlle, and members of her Executive Team.
2. Review of the Administrative Memorandum, Number B-1: Soliciting, Selecting and Developing Agreements with Providers of Goods and Services (5/9/2022)
3. Review of the San Mateo County EEO Policy: Board of Supervisors' Commitment to Equal Employment Opportunity (Approved 1/11/2022)
4. Review of the San Mateo County Ethics Policy
5. Review of the San Mateo County Departmental Social Media Policy (revised April 2015)
6. Review of the San Mateo County Violence in the Workplace Policy (Approved 1/9/2021)
7. Review of relevant provisions of the San Mateo County Sheriff's Office Policy Manual
8. Review of the San Mateo County Sheriff's Office Organizational Assessment by Meliora Public Safety Consulting
9. Interviews of current and former sworn employees of the San Mateo County Sheriff's Office
10. Interviews of current and former non-sworn/civilian employees of the San Mateo County Sheriff's Office
11. Interviews of other County employees
12. Interview of Executive Director Aenlle

**a)  The Fact-Finding Process:**

The investigator's fact-finding process was based upon (1) interviewees' descriptions of their interactions with leadership of the Office, (2) interview of Victor Aenlle, (3) review of relevant documents. Rumors and innuendos were deemed irrelevant and excluded from this investigation.

The investigator finds that all of the current and former sworn and civilian complainant-interviewees were credible in their responses to the investigators' questions. This investigator also finds that the great majority of the interviewees harbor fears of retaliation by Sheriff Corpus, Victor Aenlle and her current Executive Team for speaking with this investigator and for not supporting her during her campaign for Sheriff. For this reason, with few exceptions, the names of interviewees are not included in this report; instead, they will be described as "current or former sworn employees" and "current or former civilian employees." Their identities will remain confidential, revealed only to the County Counsel and his designees.

**b)  Interviewees:**

Interviewees, the great majority of whom were complainants, consisted of 25 current and past sworn employees, and 15 civilian current and past employees of the Sheriff's Office. All of the civilian interviewees are female. Interviews were conducted via phone and were not recorded. The investigator expended more than 60 hours speaking with the 40 interviewees.

Sworn interviewees have a combined total of more than 450 years of law enforcement experience, with a great majority of that time at the San Mateo County Sheriff's Office. Civilian interviewees have a combined total of more than 146 years of service to the Sheriff's Office.

**c)  Interview of Victor Aenlle:**

On September 12, 2024, this investigator emailed Victor Aenlle a request for an interview. On September 16, 2024, James Touchstone, an attorney who had been retained by Mr. Aenlle, responded and subsequently scheduled the interview. On September 25, 2024, this investigator conducted a phone interview of Mr. Aenlle for two hours, 15 minutes. Mr. Touchstone, who participated in the call, asked to record the interview. This investigator had no objection and consented to the recording. Mr. Touchstone subsequently provided the recording to this investigator who had the recording transcribed. The transcript is attached to this report as "**Exhibit 1: Aenlle Transcript.**"

**d)  Offer to Interview Sheriff Christina Corpus:**

On October 2, 2024, at 12: 48 pm, this investigator emailed Sheriff Christina Corpus offering her an opportunity to be interviewed:

*Dear Sheriff Corpus:*

*I have been retained by the San Mateo County Counsel to investigate circumstances surrounding the employment of Victor Aenlle in your office. The Board of Supervisors has additionally, asked me to investigate the circumstances surrounding your termination from employment of Assistant Sheriff Ryan Monaghan.*

*Although you are not obligated to speak with me, I offer you an opportunity to do so before I complete my investigation. I am available today (10/2) through Friday (10/4) between 3pm - 5 pm. Please let me know what works for you. Our conversation will be via phone. My cellphone: ▮▮▮▮▮▮. I look forward to hearing from you.*

*Sincerely,*
*Judge Cordell (Ret.)*

At 4:14 pm that same day, Sheriff Corpus emailed this response:

*Judge Cordell,*

*I am in receipt of your email. I am considering your request and will be in contact with you.*

*Regards,*
*Sheriff Corpus*

Sheriff Corpus did not contact this investigator after the Sheriff sent the email of October 2, 2024, and has never responded to this investigator's request for an interview.

**e) The Policy Manual**

Each law enforcement agency in California, including every Sheriff's office, is governed by rules, policies and procedures that are contained in a manual, frequently titled "Policy Manual" or "Duty Manual." Any law enforcement personnel who fail to adhere to the policies and procedures can be subject to internal investigations and possible discipline.

The Policy Manual governing the San Mateo County Sheriff's Office is available online: https://www.smcsheriff.com/sites/default/files/resources_files/SMCSO-Lexipol-Policy-Manual-7.9.2024.pdf

The most recent version of the Policy Manual, with an introduction by Sheriff Corpus states, "The San Mateo County Sheriff's Office Policy Manual provides the framework for performing our law enforcement mission. . . Employees shall utilize this manual coupled with the Lexipol Daily Training Bulletins to stay up to date and knowledgeable on the policies of this Office. Christina Corpus, Sheriff, January 1, 2023." (Emphasis added.) (Policy Manual, Policy Statement, pg. 1)

The Policy Manual also contains the Mission and Core Values of the San Mateo County Sheriff's Office, to wit, "As stewards of our community, we envision a world where all humanity is valued and respected. We recognize our role as leaders in this effort and commit to seeking creative and effective ways to work with and listen to the needs of our residents, businesses and stakeholders. We do this with the passion to preserve safety for all who live visit or work in San Mateo County. Core Values: Dignity, Compassion, and Respect." (Mission Statement & Core Values, Policy Manual, pg. 2)

**f) Organizational Chart for the San Mateo County Sheriff's Office**

There are 58 Sheriffs in California---one in each of the state's 58 counties. Sheriff's Offices are hierarchical, with the Sheriff at the head of the organization. The typical Chain of Command is the Sheriff, Undersheriff, Assistant Sheriffs, with a Professional Standards Bureau that includes an Internal Affairs Unit, reporting directly to the Sheriff. For example, see the organizational chart on the website of  the Santa Clara County Sheriff's Office:
https://files.santaclaracounty.gov/2024-09/updated-organizational-chart.pdf?VersionId=E7w99OgfyjCBFGUfsBYLLZvUFtNf_97J

Another example is the organizational chart on the website of the San Diego County Sheriff's Office that includes an Executive Director of Management Services (comprised of civilian staff) who reports directly to the Undersheriff:
Organizational Chart | San Diego County Sheriff

A search for "organizational chart" on the San Mateo County Sheriff's Office website leads to a page that states, "*Your search yielded no results." (*See
https://www.smcsheriff.com/search/node?keys=organizational+chart)

The Office's Policy Manual, Section 200.2.4 at pg. 23, titled "Organizational Chart" reads as follows: "See the Sheriff's Office website for an organizational chart of the Sheriff's:
https://www.smcsheriff.com/administration/organizational-chart"
However, that link leads to a page that reads, "ACCESS DENIED. You are not authorized to access this page."

On September 25, 2024, this investigator said to Mr. Aenlle, "The organizational chart is not on the sheriff's website or anything. Because I looked, and I couldn't find it."

Mr. Aenlle answered, "I can tell you that that's been a work in progress. I can tell you we're working on it. . . It hasn't been finalized yet. I think . . . I think we're . . . the undersheriff is getting close. I know he's working on that but. . ." (Aenlle transcript at pgs. 19, 20.)

<u>As of the writing of this report, the administration does not have an official organizational chart.</u>

**g) Election of Christina Corpus:**

On June 7, 2022, following a contested county-wide race, Christina Corpus was voted in as the first female and first Latina to the position of Sheriff, replacing the incumbent Sheriff Carlos Bolanos.

Prior to assuming office as the Sheriff, Corpus was a captain assigned to the Millbrae substation. (Pursuant to contracts, the Sheriff's Office provides law enforcement services to Millbrae, Half Moon Bay, San Carlos, Portola Valley and Woodside.)  Some former and present, sworn and unsworn employees supported Corpus in her campaign for Sheriff. Some employees supported her opponent Bolanos, while others remained neutral.

Victor Aenlle was a part of her campaign team, dubbed "Team Revolution," and was viewed by some as Corpus' campaign manager. In response to this investigator's question, "Were you her campaign manager or?" Aenlle responded, "I never took that title officially. I did a lot. I was the lawn sign person. I was the errand person. I was many, many things. I never took officially that role in any capacity. . . I think the consultant . . . the campaign consultant really filled that hole." (Aenlle Transcript at pg. 13.)

The interviewees who had been Corpus' supporters were thrilled and excited about the "culture change" that she promised to bring to the Office.  The interviewees who did not initially support Corpus' election, to a person, adopted the attitude of a willingness to support her given that she had been elected Sheriff.

### h) Aenlle Contract #1:

During the six-month period between Corpus' election in June 2022 and January 2023, when she officially began her role as Sheriff, she was stationed at the Millbrae Office serving as a Captain and Millbrae's Police Chief. (The City of Millbrae has a contract with the Sheriff's Office to provide law enforcement services.) Corpus sought and received the approval of the County Executive Mike Callagy to fund a transition team on the condition that the transition team would complete its work within six months. Callagy found the request to be unprecedented, but because he "wanted to make sure that the Sheriff succeeded," agreed to fund the transition team contracts. Aenlle signed his transition team contract on August 30, 2022; Callagy signed off on it for the County on September 20, 2022. **(Exhibit 2: Transition Team Contract) (Exhibit 3: Aenlle Contract #1)**

The transition team was comprised of five individuals: two civilians (Victor Aenlle and Max Szabo), two retired sworn peace officers, and one current peace officer. **(Exhibit 4: Transition Team Meeting Notes)**

Aenlle described his work on the transition team to this investigator:

"When Sheriff Corpus decided to run, she approached me to see if I would help or be part of her campaign, and I gladly accepted, as I felt that new leadership could benefit our community just in the office. So it was a non-paid position, completely volunteer, and that went successful, as, as, as you can see. And then I was further asked, because of my experience, institution, and knowledge of the office, my business experience, to be part of her transition team. And one of the biggest projects that I took on was the new building of 50,000 square feet, five stories, that needed to be reviewed and make sure it was safe for the employees to occupy."

(Aenlle Transcript at pgs. 4-5)

### i) Termination of Aenlle Contract #1:

According to a civilian employee (#3), at an early meeting of the transition team in the Millbrae briefing room, Aenlle required the transition team to sign Non-Disclosure Agreements ("NDA") to ensure that the transition was maintained in secrecy, stating that if anyone were to leak information, "We'll come after you; you'll get sued." Aenlle also signed the NDA. Sheriff-elect Corpus, who was present, did not sign the NDA. The civilian employee was required to

sign the NDA at this meeting, as well. According to the civilian employee, all of the signed NDAs were handed to Corpus who maintained them in her Millbrae office.

When asked by this investigator if he requested the transition team to sign non-disclosure agreements, Aenlle said, "I believe we did. I don't know if . . . I know we had a discussion. I don't know if all of them got signed. And that was not necessarily me, but that was at the direction of the strategist that was helping us along and was part of the team. . . Normal business practice. I think any person in . . . in the political world has a theme. It's . . . it's . . . I believe she did that also in the campaign. The campaign manager . . . consultant asked everybody to do that." (Aenlle Transcript at p.12)

According to County Executive Callagy, in late October 2022, he heard rumors that Corpus and Aenlle had traveled together to Hawaii. Callagy called Corpus to his office and asked, "Hey, did you go to Hawaii with Victor Aenlle on vacation?" to which Corpus responded, "Yes, I did. We are good friends. Victor is good with my son. He went to help with my kids. If this were Bolanos [previous Sheriff whom Corpus defeated in the 2022 election], no one would care. It's the good ole' boys spreading rumors about me because I'm Latina." Callagy disagreed and told her, "You didn't tell me Victor was a good friend. I wouldn't have approved his contract. It's the perception that I hired a contractor who went to Hawaii with the Sheriff-elect." That same day, on October 21, 2022, the County Executive's Office terminated Aenlle's contract. **(Exhibit 5: Email from Iliana Rodriguez to Aenlle terminating his contract)**

In response to this investigator's question about the termination of his transition team contract, Aenlle said, "It was terminated by the County Executive. . .And, by the way, I even have---I still have a copy of that contract, and it was terminated illegally, even by their own contract. But basically, I got a call from. . . Iliana Rodriguez. But there was a conflict in the contract and and, the County Executive decided to cancel it, without, without any process, due notice, nothing." (Aenlle Transcript at pg. 6)

**j) Aenlle Consultant Contract:**

On January 31, 2023, shortly after Corpus had been officially sworn into office as Sheriff, Aenlle signed a one-year agreement for the period from January 1, 2023, to December 31, 2023, as an independent contractor for the Sheriff's Office. This contract provided that Aenlle would fulfill thirteen tasks that included, "translating the Sheriff's vision into concrete policies and initiatives. Receive general direction from the Sheriff or Undersheriff." His compensation under this one-year agreement was $92.44 per hour, not to exceed $192,275.00. (Emphasis added.) **(Exhibit 6: 2023 Aenlle one-year contract)**

When this investigator asked Aenlle about this contract he said:

"In 2023 when I came in, yes, I had a . . . I had a contract with the Sheriff's Office, like a third-party contract, while my position was created." This investigator then asked, "So you had a contract that kind of got you from when she was sworn in to when you got this position that eliminated an assistant sheriff's position and instead put you in? Fair? Aenlle responded, "Fair. And it wasn't eliminated. It was just converted." (Aenlle Transcript at pg. 11)

**k) Aenlle Extra-Help Position Request:**

On or about March 7, 2023, Sheriff Corpus directed submission to the County's Human Resources Office a request for a Special Projects Coordinator I position. This was an extra-help position with a requested hourly rate of $118/hour. The job description is nearly identical to the job description of Aenlle's one-year contract, including the provisions that Aenlle "receive general direction from the Sheriff or Undersheriff."**(Exhibit 7: Special Projects Coordinator I Job Description)**

Aenlle submitted an application and a resume for this extra-help position. While the application is undated, given the fact that the Sheriff's request to fill the position was made on March 7, 2023, Aenlle must have submitted it sometime after that date. **(Exhibit 8: Aenlle Application for Special Projects Coordinator I).** On his application Aenlle stated that he worked 40 hours per week for Coldwell Banker as an Associate Broker and worked 40 hours per week supervising three employees in his private investigation business.

Human Resources understood this request to be a "contract to extra help conversion," since Aenlle was already working under a one-year contract (Contract #2) that would not end until December 31, 2023. **(Exhibit 9: Email exchange (3/7/23) from Lisa Yapching)**

Human Resources approved the extra-help position for Aenlle, but at an hourly rate of $73 and no benefits. On March 17, 2023, Sheriff's Office Internal Human Resources personnel raised a question about how to conduct a background check on Aenlle because they were unfamiliar with "how we normally process the backgrounds for folks transitioning from reserve deputy (non paid positions) to county paid employees if there is no break in service." (**Exhibit 10: Email (3/17/23) from Joann Lov)**

It is unclear why, after the Sheriff hired Aenlle as an independent contractor in January 2023 for a one-year period, that three months later, she submitted a request to hire him as an extra-help Special Projects Coordinator. What is very clear is that it was important to Sheriff Corpus that Aenlle remain employed by her office as a direct report.

**l) Aenlle Executive Director of Administration Position:**

Three months later, in June 2023, Sheriff Corpus worked with the County's Human Resources Department ("Human Resources") to create a job description for a new full-time, unsworn/unclassified position for Aenlle--- Sheriff's Executive Director of Administration. This description was similar to the job descriptions of the previous two positions. **(Exhibit 11: Job Description for Executive Director of Administration)** The date on which this position was established was July 6, 2023, as noted on the final page of the job description.

At one point, a Human Resources employee (#21) was asked by a civilian employee (#15) in the Sheriff's Office, if a reserve deputy could be hired into a non-sworn position. The Human Resources employee was also told that the Sheriff's Office needed to "get this done." She understood this to mean that the Sheriff wanted to fill the position quickly. The Human Resources employee checked with her supervisor and informed the civilian employee that a reserve deputy could fill a non-sworn position.

Aenlle applied for this position. **(Exhibit 12: Aenlle Application for Executive Director of Administration & Resume)** In response to the question on the application "How did you learn about this position?" Aenlle wrote "Other." To the next question, "If you answered 'Other' to the above question, please indicate below how you learned about his job," Aenlle responded, "Employee. On the last page of his application in the section "Supplemental Questions," he listed "Sheriff Christina Corpus" as the person who offered him this position.

Aenlle noted on his application that he was not interested in an extra help position but instead, was "Interested in regular employment only." And once again, he listed his outside employment with Coldwell Banker (40 hours per week) and with his private security business (40 hours per week).

This application is undated, but could not have been submitted before July 6, 2023, when the job description was published.

In July 2023, Aenlle was hired by Sheriff Corpus as Executive Director of Administration. His annual salary is approximately $246,979 plus benefits. There was no announcement of this job opening, and no applicants other than Aenlle.

**m) Sheriff Corpus' Request for Highest Pay Level for Aenlle:**

On July 31, 2023, immediately after Aenlle accepted the position of Executive Director, but before he actually began working at the Sheriff's Office, Sheriff Corpus requested that his starting salary be set at Step E, the level of an Assistant Sheriff.

In a glowing memorandum requesting the highest possible pay for Aenlle, she wrote, "I respectfully request that Mr. Victor Aenlle receive "Step E" compensation for his recent appointment to the Sheriff's Office Executive Director of Administration position, as it has been extended to him and accepted. . . As the Executive Director of Administration position holds the same equivalence as an Assistant Sheriff, we have consistently employed a practice of offering Step E salaries to lateral hires with over 5 years of law enforcement expertise. Victor Aenlle, having accumulated an impressive 15 years of experience with the San Mateo County Sheriff's Office and executive-level experience, should be treated no differently in his appointment to this role than other executives brought in as laterals with extensive experience. Therefore, it is only fair and justified that he receives the same consideration and compensation as his counterparts." (Emphasis added.) **(Exhibit 13: Sheriff 2023 Memo for Aenlle Pay Step E)**

Given the fact that Sheriff Corpus had promised the Step E pay increase to Aenlle before requesting approval from Human Resources, Human Resources honored the request "as a one-time non-precedent setting exception." **(Exhibit 14: 2023 Kiryczun Email)**

**n) Multiple Requests for Aenlle Pay Increase:**

Before Aenlle had completed his first year as Executive Director, Sheriff Corpus submitted at least two requests to increase Aenlle's pay: (1) February 2024, **(Exhibit 15: Corpus February 2024 Request for Aenlle Pay Increase);** (2) March 2024 (**Exhibit 16: Corpus March 2024 Request for Aenlle Pay Increase)** and (3) April 2024 (**Exhibit 17: Corpus April 2024 Request for Aenlle Pay Increase).**

- 10 -

According to then-Undersheriff Chris Hsiung, Sheriff Corpus actually authored the March 2024 pay increase request. She then ordered Hsiung to edit and send the request to Human Resources under Hsiung's name.

Each time, the Sheriff's requests were denied by the Human Resources Department and by the County Executive. **(Exhibit 18: HR Denial of March 2024 Pay Increase Request)**; **(Exhibit 19: HR Denial of April 2024 Pay Increase Request)**

**o)  The Allegations:**

This investigator examined fifteen (15) allegations lodged by former and current civilian and sworn employees against Aenlle, Sheriff Corpus and her Executive Team. What follows are the results of the investigation into these allegations.

**1.  Allegation #1: Sheriff Corpus and Aenlle have a "personal relationship" that creates a conflict of interest.**

Policy 1025 of the Policy Manual defines "Personal Relationship" as "marriage, cohabitation, dating or <u>any other intimate relationship beyond mere friendship.</u>" (Emphasis added.) Webster's Dictionary defines an intimate relationship as, "of a very personal or private nature," "suggesting informal warmth or privacy" or **"**engaged in, involving, or marked by sex or sexual relations." The Policy 1025's phrasing, "any other intimate relationship beyond mere friendship" makes it clear that an intimate relationship can exist without sexual intimacy.

Therefore, the inquiry is not narrowly focused on whether Sheriff Corpus and Aenlle have a sexual relationship, but whether, prior to her election campaign to the present time, their relationship is one of a "very personal or private nature, beyond mere friendship."

The Sheriff's Office Policy 1025, "Nepotism and Conflicting Relationships," <u>prohibits conflicts of interest in hiring, recruitment, and supervision</u>:

"1025.1 PURPOSE AND SCOPE
The purpose of this policy is to ensure equal opportunity and effective employment practices by avoiding actual or perceived favoritism, discrimination or actual or potential conflicts of interest by or between Sheriff's Office employees. These employment practices include: <u>recruiting</u>, testing, <u>hiring</u>, <u>compensation</u>, assignment, use of facilities, access to training opportunities, <u>supervision</u>, performance appraisal, discipline and workplace safety and security. (Emphasis added.)

Section 1025.1.1 (at pg. 703) defines conflict of interest as "Any actual, perceived or potential conflict of interest in which it reasonably appears that a department employee's action, inaction or decisions are or may be influenced by the employee's personal or business relationship. . .Personal relationship: Includes marriage, cohabitation, dating or <u>any other intimate relationship beyond mere friendship.</u>" (Emphasis added.)

Section 1025.2(a) (at pg. 704) makes it clear that anyone in a supervisory position may not supervise an employee with whom the supervisor has a personal relationship: "<u>(a) Employees are</u>

prohibited from directly supervising, occupying a position in the line of supervision or being directly supervised by any other employee who is a relative or with whom they are involved in a personal or business relationship." (Emphasis added.)

Additionally, the Sheriff's Office conflict of interest code prohibits employees "from participating in, contributing to or recommending promotions, assignments, performance evaluations, transfers or other personnel decisions affecting an employee who is a relative or with whom they are involved in a personal or business relationship." (Emphasis added.) (Section 1025.2 (b) at pg. 704)

Former and current sworn and civilian employees of the Sheriff's Office described to this investigator the following interactions involving Sheriff Corpus and Aenlle that they witnessed or statements that they heard in support of the allegation that Sheriff Corpus and Aenlle have a personal relationship that constitutes a conflict of interest.

- In 2022, Corpus told a civilian employee (#3), "If he [Victor Aenlle] ever leaves me, I don't know how I'll make it. I won't survive."

- A civilian employee (#3) frequently saw Aenlle rubbing Corpus' neck, shoulders and feet in Corpus' Millbrae office. These observations occurred in 2021 and 2022, when Corpus was assigned to the Millbrae Substation.

- In September or October 2021, when Corpus left her cellphone on her desk at the Millbrae Substation, a civilian employee (#3) saw on it a text from "Campaign Manager" [whom she knew to be Aenlle] that read, "Baby, I love you, I miss you so much."

- In September 2021, civilian employee (#3) saw Corpus and Aenlle sitting together on a couch in Corpus' office at the Millbrae Substation giving each other a peck on the lips.

- Sworn employee (#30) said that on September 7, 2021, Aenlle and Corpus came to the firing range at Coyote Point for a private session to qualify the Sheriff.  Corpus was wearing a knee-length lavender dress, matching lavender high heels, and a gun belt around her waist. Aenlle ordered the sworn employee to leave, saying, "I got it from here. You can go." The sworn employee left, leaving Aenlle and Corpus alone at the range. At the end of the session, the qualification sheet that was returned to the sworn employee appears to have been signed by Aenlle, qualifying Corpus. The sworn employee questioned whether Corpus actually met the qualification requirements since there was no one there to observe her other than Aenlle. The sworn employee (#30) also said that in early 2023, he ended the practice of allowing private qualification sessions at the range. **(Exhibit 20: Corpus qualification sheet)**

- One week after the Millbrae Art & Wine Festival in September 2021, on a Wednesday evening, a civilian employee (#3) was on a Zoom call and could see that Aenlle and Corpus were at Aenlle's ranch house at the San Mateo County coastside. The two were feeding each other in an intimate fashion, touching and rubbing each other, and "playing footsie."

- In October 2021, a civilian employee attended a dinner but could not recall if the location was the Green Hills Country Club or the 100 Club. The civilian employee (#3) drove her car and picked up Corpus who was "bent out of shape." Corpus told the civilian employee, "Victor won't sit with us." Aenlle was seated with the San Mateo Police Department Chief Ed Barbarini [sic]. At the dinner, Aenlle texted Corpus, "Tell [the name of the civilian employee (#3)] to switch seats so I can see you." Corpus showed the civilian employee the text message; the civilian employee declined to switch seats.

- In the Fall of 2021, a civilian employee (#3) was in Corpus' office. Corpus was wearing a V-neck blouse. Corpus told the civilian employee, "Victor told me never to wear a V-neck. Corpus further stated that Aenlle said, "'I'm the only one who should see this.'" Corpus continued, "That's why I never dated Hispanic men; they are too controlling. But I like that he's so jealous and protective."

- In December 2021, the Day Sergeant told a civilian employee (#3) that Corpus "rolled in at 4:30 a.m." wearing the same clothes from the previous day. The Night Sergeant also saw it and said to the civilian employee, "You won't believe it. . ." The next day, Corpus and the civilian employee were talking in the civilian employee's office. Corpus was seated in a yellow chair. When the civilian employee brought up the subject of the "same clothes" incident, Corpus said, "[First name of her then-spouse] dropped me off." When the civilian employee reminded Corpus that her car had been parked at the station and that Corpus was wearing the same clothes from the previous day, Corpus remained silent.

- Civilian employee (#3) reported to this investigator that in late December 2021, Aenlle bought Corpus a $1,200 pair of red-bottomed Christian Louboutin boots. Corpus showed the boots to the civilian employee (#3) who saw the receipt showing that they were paid for in cash. The boots were in a black box and purchased at Nordstrom's at Hillsdale or Stanford. Corpus placed the box with the boots in the back of her hatchback van which was where Corpus showed them to the civilian employee. Corpus said to the civilian employee, "I'm keeping them back here for now so [First name of her then-spouse] won't see them." Civilian employee (#3) provided to this investigator a link to an advertisement with an image of the boots that were gifted to Corpus: https://www.nordstrom.com/s/5194699?color=001&size=8us%20/%2038eu

- At the end of 2021 or in early 2022, Corpus was sitting in her office in Millbrae. Aenlle was there, standing behind Corpus. A civilian employee (#3) was in the office. Aenlle said, "We're practicing a lot to have kids." The civilian employee responded, "Gross. I don't want to hear this. Don't ever say anything like that to me again." Corpus did not say anything in response, but chuckled.

- In November or December 2021, Corpus and a civilian employee (#3) were together in the Millbrae Substation. Corpus told the civilian employee that she and her then-spouse had an argument, and that Corpus told Aenlle about it. Corpus said that Aenlle's response was, "I'll put a bullet in [Name of Corpus' then-spouse]'s head."

- On January 27, 2022, Sheriff Corpus told a civilian employee (#3) that both Aenlle and Corpus were going to divorce. Corpus asked the civilian employee to find wedding sites for Aenlle and Corpus, saying, "We're going to get married." The civilian employee found some venues online on Maui and gave the information to Corpus via "Signal." Corpus responded, "Great!"

  Aenlle texted the civilian employee (#3) via Signal, "Those are great venues." Signal is a secure messaging app. Communications on Signal are end-to-end encrypted, which means only the people in messages can see the content of those messages. As well, messages can be set to disappear after a certain period of time. Aenlle required the Sheriff and the civilian employee (#3) to communicate with each other via Signal.

- On January 27, 2022, Corpus told a civilian employee (#3) that Aenlle handed her $12,000 in cash to buy a pair of diamond earrings at Tiffany's at Stanford Shopping Center. Corpus, on a Facetime call, told the civilian employee and the civilian employee's mother about the purchase, adding, "I got $11k earrings." The civilian employee (#3) provided to this investigator a link to an advertisement with an image of the earrings that were gifted to Corpus: https://www.tiffany.com/jewelry/earrings/tiffany-victoria-earrings-GRP11459/ According to the civilian employee, Corpus wears the diamond earrings every day. (**Exhibit 21: Photos of Corpus Wearing Earrings**) The civilian employee (#3) texted Corpus that she should "Enjoy being spoiled and doted on," and requested Corpus to "Send me a pic of your sparklies[.] **(Exhibit 22: Text message re diamond earrings)**

- In March or April 2022, Corpus called a civilian employee (#3) from a department store where Corpus was with her two children. Corpus told the civilian employee to get Aenlle "right now." Corpus told the civilian employee that Corpus' husband knew that she and Aenlle were having an affair and that her husband was upset. Immediately thereafter, the civilian employee called and texted Aenlle more than 10 times. When Aenlle finally called, the civilian employee told him that Corpus was "in bad shape." Corpus later told the civilian employee that she had gotten a room with her children at a hotel in Burlingame.

- A civilian employee (#3) knows that Aenlle has the code to access Corpus' phone because the civilian employee saw Aenlle logging into Corpus' phone at a party announcing Corpus' candidacy for Sheriff at the Masonic Lodge #40 in Burlingame, on September 28, 2021.

- According to a civilian employee (#3), starting in January 2022, Corpus and Aenlle left the Millbrae Substation together after work nearly every night in Aenlle's car, while Corpus' van remained parked at the Substation.

- In 2021 and 2022, Corpus told a civilian employee (#3) that Corpus and Corpus' then-spouse argued nights when Aenlle drove Corpus to her home, sometimes as late as 11:30 pm and midnight. Corpus said that her then-spouse was waiting for her and was "so mad," and told her, "I know you were with Victor." The civilian employee urged Aenlle

to drop Corpus at her home earlier in the evenings, to which Aenlle responded, "She [Corpus] doesn't want to go home. She doesn't want me to drop her off early."

- On June 7, 2022, which was election night for the 2022 primary election, Corpus had a watch party on the roof top of Union Bank (now US Bank) in San Mateo (4th & El Camino). At the watch party, Corpus gave a victory speech thanking her "Team Revolution" as well as her then-husband. Afterward, a civilian employee (#3) witnessed and was involved in the following exchange between Aenlle and Corpus:

  - o Aenlle (to Corpus): "How dare you thank [Name of Corpus ex-husband]!"
  - o Corpus: "I had no choice."
  - o Aenlle: "It's over. It's over. We're done."
  - o Interviewee #3 (to Aenlle): "It's not about you!"
  - o Aenlle: "Yes, it is."
  - o Corpus was crying and following Aenlle pleading with him, "Please don't do this, baby!"

  The civilian employee was able to move Corpus and Aenlle away from the gathering at the watch party to Aenlle's car and asked Corpus, "Are you okay?" Corpus answered, "No. we're going to his mom's house to talk." The next day, when the civilian employee was off work, Corpus called the civilian employee and said that she and Aenlle had talked until 4 a.m., that Corpus apologized to him, and said that "We're okay."

- Before and after the election in June 2022, Corpus told a civilian employee (#3) that she and Aenlle spent a lot of time at Aenlle's ranch on the San Mateo County coastside. Corpus told the civilian employee, "The ranch is beautiful" and that she has brought her children there. On June 30, 2022, Corpus texted the civilian employee a video of herself at the ranch in which Aenlle can be heard talking in the background. **(Exhibit 23: Video of Corpus at the ranch)**

- On Wednesday, September 21, 2022, a former sworn employee (#25), employed for 29 years by the San Mateo County Sheriff's Office, and his wife flew Hawaiian Airlines from SFO to Maui. They flew annually to Maui and always traveled first class. As they were boarding the plane, he saw Corpus and said to his spouse "Oh, that's our new Sheriff!" Corpus saw him and immediately turned away. He then saw Aenlle 10 to 12 feet ahead. Aenlle was with Corpus' son. He made eye contact with Aenlle who said nothing, then "walked fast," toward the gate, along with Corpus.

  That same day, the former sworn employee texted a civilian employee (#3), "I just saw Victor and the Sheriff in Maui." Thereafter, the civilian employee texted Corpus using "Signal," an encrypted message system required by Aenlle for the transition team, "You were seen." Even though the civilian employee had texted Corpus, <u>Aenlle responded to the text, using the Sheriff's cellphone number, writing, "I'm doing security detail in Maui. I'm protecting the Sheriff."</u>

One week later, Sheriff Corpus texted the former sworn employee (#25) writing, "I don't appreciate you spreading rumors about me." He texted back, "I didn't spread a rumor. I saw you at the airport. That's not a rumor." When the former sworn employee returned home, <u>Aenlle called him and said, "We were in a big hurry. I didn't see you. I went there to have the Sheriff be on vacation. I watch the kids.</u>" The sworn employee had made eye contact with Aenlle when boarding the plane and was standing 10 to 12 feet away from Aenlle.

- In 2022 Corpus' then-husband, also a sworn member of the Office, told a former sworn employee (#4) that Corpus was having an affair with Aenlle and that he did not go on the Hawaii trip because Corpus told him that the flight was full and that there wasn't a plane ticket available for him. Corpus traveled to Hawaii with the couple's son and daughter. Upon Corpus' return, Corpus' then-husband told the former sworn employee that his daughter tearfully reported to him that Aenlle was on the plane "in her dad's seat." The former sworn employee supported Corpus' campaign for Sheriff and had agreed to serve on her transition team.

  In November or December 2022, the former sworn employee (#4) called Corpus and said, "I want honesty and transparency. I don't want you to lie. What's going on with you and Victor?" Corpus told him that nothing was going on. <u>He asked Corpus, "Why did Victor go to Hawaii with you?" Corpus responded, "He didn't".</u>" The former sworn employee said, "I don't agree with Victor being in the place of the undersheriff. Think about it and let me know what you are going to do." Corpus did not thereafter respond to the former sworn employee.

  After this conversation, Aenlle called the former sworn employee (#4) and said, "What is your problem? You never liked me." The former sworn employee said, "You need to back out because of nepotism and conflicts of interest." <u>Aenlle then denied going to Hawaii with Corpus.</u> The former sworn employee said, "You just lied to me. You were in Hawaii. I can't work with a liar. Own up. I can find out. I have a friend who works at the airport. If you are on the leadership team, I'm out."
  Two weeks later, Aenlle called the former sworn employee and threatened him, saying, "I'm going to sue you for defamation and slander if you keep talking about me." *After this interaction, the sworn employee left the transition team.*

- In October 2022, County Counsel Nibbelin came to meet Corpus at her Millbrae office. Corpus told Nibbelin, "<u>I just got back from Hawaii with my husband.</u>" A civilian employee (#3) heard Corpus say this. As noted, Corpus' husband did not, in fact, travel to Hawaii with Corpus.

- In 2022, before Corpus assumed the office of Sheriff, approximately 15 employees of the Sheriff's Office flew to Anaheim to attend a Women Leaders in Law Enforcement conference. Corpus and Aenlle also went. Aenlle and Corpus flew first class. The rest of the employees flew economy class.

- In October 2022, a civilian employee (#3) and Corpus were in Corpus' Millbrae office. The civilian employee told Corpus, "You can't hire your lover. It will ruin everything that

we worked toward. He'll ruin you." Corpus responded, "He deserves it; he worked so hard for my campaign." The civilian employee said, "I disagree. Keep the two separate. You can't bring your lover on. It's a bad look." Corpus said, "I have to."

- On the Sheriff's birthday, on March 20, 2023, Aenlle called a civilian employee (#1) and told her to cancel all of his meetings that day. The civilian employee could hear Corpus talking in the background.

- Aenlle told a civilian employee (#1), "I love her [Sheriff Corpus]. I love who she is. I love what she stands for."

- In 2022, Aenlle and a former sworn employee (#17) had drinks in Burlingame where he accused Aenlle of having an affair with Corpus. Aenlle said, "No, I'm a married man." The former sworn employee replied, "You can't be in the administration." Aenlle said, "Yes, I can."

- At a conference in Texas where there was an outdoor concert for "Country Night Out," Corpus wore a pair of new cowboy boots. A former sworn employee (#17) told Corpus that he liked her boots. Corpus volunteered, "[First name of her then-husband] got them for me." Shortly thereafter, the former sworn employee asked Corpus' then-husband if he had bought the boots for Corpus and was told, "I didn't buy them. Victor bought them."

- In late December 2022, Sheriff Corpus was in the Deputy Sheriff's Association (hereinafter "DSA") office speaking with Interviewee (#5), a sworn employee. Another sworn employee was also present. Aenlle came in, shut the door and said, "There's a rumor that the Sheriff and I were together and seen on a plane. It's true. I'm her security."

- In late 2023, Aenlle and a sworn employee (#18), spoke in Aenlle's office. When the sworn officer asked Aenlle if he knew why Corpus was avoiding him, as the two had been long-time friends, Aenlle said, "I don't know anything about you. You gave $50 to the Sheriff's campaign. It's creepy how you text her. Trust me, I know how the Sheriff thinks. I'm with the Sheriff all of the time."

- A sworn employee (#18) has seen Aenlle regularly park in the Sheriff's parking spot at the Sheriff's weapons range in Coyote Point.

- A sworn employee (#23) was told by Sheriff Corpus' ex-spouse that "she just wants the money. She just wants the money."

- Sometime between June and August 2024, a civilian employee (#6) heard Aenlle say "Te amo." [I love you] when he ended a phone conversation with Sheriff Corpus. The civilian employee knew that Aenlle was talking to Corpus because she was in Aenlle's office and saw Corpus' name on Aenlle's cellphone.

- On July 16, 2024, in the evening, during the first Independent Citizen

Advisory Committee (ICAC) meeting, Sheriff Corpus introduced the Captains, Undersheriff Dan Perea and Assistant Sheriff Ryan Monaghan.  Sheriff Corpus did not mention Aenlle in the introduction. Monaghan could see that Aenlle was upset. When Sheriff Corpus sat down next to Aenlle, he said something to her. In response, Sheriff Corpus said to Aenlle, "Sorry, I'm human." She then returned to the podium and introduced Aenlle.

- A sworn employee (#23) resides with a relative in San Mateo County when he is on duty. The home is kitty-corner from the home of Sheriff Corpus. Approximately three to four months ago, at 9:30 pm, as he was backing his car into the driveway, with headlights on, he saw Aenlle walk out of the Sheriff's home. He observed Aenlle look directly at him, tuck his head, and get in his car and drive away.

- A civilian (#29), who operates a handyman business with his brother and cousin said that in July 2024, his brother and his cousin, who are primarily Spanish-speakers, were power-washing the home of Sheriff Corpus. The civilian was told the following by his brother:

  At some point, Aenlle arrived and "walked into Corpus' home like he owned it." When Aenlle returned outside, he asked the men, in Spanish, "What are you doing?" His brother said, in Spanish, that Christina [Sheriff Corpus] had okay'd them to do the power washing job. Aenlle responded, "Don't talk to Christina. Ask me first. Don't do any work here unless I tell you to." Aenlle appeared to be angry when he said this.

**Victor Aenlle's response:**
This investigator: "Since 2021, do you have a personal relationship with Sheriff Corpus? Personal relationship is defined as any intimate relationship beyond mere friendship. It's also defined as a very personal or of a private nature, not necessarily of a sexual nature."

Aenlle: "No. I have a professional relationship with Sheriff Corpus. I admire that woman. She has inspired me. I've known her for a long time. She's a beautiful human being, and I'm honored to work for her and to push forward her vision in modernizing this department and the services that she provides to this community, and I respect her incredibly and just admire her to no end, and that's why I'm so honored to work for her and have been here by her side from day one. . . I've always had a strong friendship with her, but it's been a professional relationship. It is not one that's beyond mere friendship. I've been married for 30 years, and my wife knows the sheriff. And my wife knows the sheriff very well."

This investigator: "Have you and the sheriff, when you go to conferences having to do with the Sheriff's Office, do you travel, have you ever traveled first class?"
Aenlle: "I, we both have upgraded in different scenarios. But I can tell you, and not to sound off, I don't travel with anything less than first class. I'm not a child anymore. I have back pain. I don't, I don't like people in close proximity to me, So if I can't upgrade, I won't travel. And I do that on my own, my own money. And when the sheriff wants to and can, that's, has she done that before? Yes, she has. Does she do, does that all the time?  Not that I'm aware of. But I will not travel unless I can upgrade to first class."

- 18 -

This investigator: "When the two of you do go to a meeting or conference together, do you, do you, since you fly first class, does she fly first class with you?"

Aenlle: "Not all the time. There's been like a couple of instances. But I can tell you that just most recently, the last trip, I was in first class. She was in the back of the plane. . . The only trips, yeah, it's a business trip. It was a WLLE. It's a Women for Leadership."

This investigator: "And so you traveled first class? And she did not?"

Aenlle: "Oh, yeah. Correct."

This investigator: "Have you ever paid for her to fly first class?

Aenlle: "No, ma'am. And if I've ever paid for something for the sheriff, she always gives me the money back. If it's something like, you know, something that we're doing or something's happened, and, and we do that for each other. I do that with the undersheriff. I've done that, we just Venmo each other back whatever it is that, whoever is picking it up, whether it's lunch or a dinner or something. We always do that."

This investigator: "Did you and the sheriff and her children travel together to Maui in 2022?"

Aenlle: "<u>The sheriff went to Maui with her family, her kids, and her brother. I was in Maui at the same time. I was on a security detail. Barely even saw each other. I think we crossed paths, but she was there with her family and her brother.</u>"

This investigator: "Do you know why her husband was not there?"

Aenlle: "They were already having problems. I believe they were going through their issues."

This investigator: "Can you explain more the security detail you were on in Maui?"
Aenlle: "Yes, ma'am. I, I, I was doing covert detail for a high-net-worth individual.

This investigator: "So you were privately retained by that person?"

Aenlle: "Yeah."

This investigator: "And when did that security detail end?"

Aenlle: "I think I was in Maui for four days or something like that, ma'am."
This investigator: "Did anyone else know that you were there on a security detail? For example, did the sheriff know?"

Aenlle: "Oh, sure. The sheriff knew, yeah, I, yeah.

This investigator: "Did anyone else know.?"

- 19 -

Aenlle: "No, ma'am. I don't, I don't discuss that with anybody. I have my network of friends. It's pretty small and tight. That's not something I discuss, actually, the nature. Most of my stuff, you know that we do in that realm, it's, you know, you sign NDAs and all kinds of things. It's not something I go around and advertise, especially when it's a covert detail which is what I specialized in."

This investigator: "And did you and the sheriff sit together on the flight to Maui?"

Aenlle: "I don't think we were together. I think we were close."

This investigator: "But you were not seated next to each other?"

Aenlle: "No. No. It's been a couple of years, but I can tell you that, that it was in a close proximity, but I don't recall being next to her." (Aenlle Transcript at pgs. 122-128)

**Findings:**

Despite Aenlle's and Sheriff Corpus' denials, there is overwhelming factual evidence that Aenlle and Sheriff Corpus have continuously been in a personal relationship. Unsettling are the various explanations offered by Aenlle about the trip to Hawaii ranging from an outright denial of being in Hawaii, to being there to protect the Sheriff, to being there to watch the Sheriff's children, to telling this investigator that it was a coincidence that the two of them happened to be on the same flight to Maui.

As well, Aenlle's explanations contradict statements that Sheriff Corpus made to various interviewees when she told one person that she did not go to Hawaii, while telling others that she was accompanied by Aenlle who assisted with her children. And there was her lie to County Counsel Nibbelin that she went to Hawaii with her husband. Her then-spouse did not go on that trip.

When Aenlle and Corpus were spotted in the San Francisco Airport about to board the plane to Hawaii, a retired sworn employee made eye contact with Aenlle who turned away and hurriedly walked with Corpus toward the boarding area. It is clear that Corpus and Aenlle have tried to cover up the fact that they were together on a vacation. Why? Because they knew that their relationship was personal, beyond "mere friendship," and therefore, a violation of County and Policy Manual rules.

There were Aenlle's gifts to Corpus of $11,000 diamond earrings from Tiffany's and $1,000 Christian Louboutin boots that she concealed from her then-husband, their late-night rides together to her home, their constant companionship that Aenlle attributed to his protection of the Sheriff, Aenlle's taking charge of repairs on Corpus' home "like he owns it," their personal text messages, their discussion about a wedding site for them in Maui, the Sheriff's meltdown at her election night watch party when Aenlle berated her for thanking her then-spouse. These, and so many more observations reported by interviewees demonstrate that Aenlle and Sheriff Corpus are not engaged in a "mere friendship."

Finally, there were Sheriff Corpus' relentless efforts to hire Aenlle as her direct report right after her election in 2022, culminating in her securing Aenlle's full-time employment, followed by her repeated attempts to increase Aenlle's compensation. These are not the actions of "mere friends."

There is overwhelming factual evidence that Sheriff Corpus and Victor Aenlle have been and continue to be in a personal relationship as defined in Policy 1025.

With respect to a conflict of interest, the following facts are not in dispute:  (1) Sheriff Corpus hired Aenlle as Executive Director of Administration; (2) Sheriff Corpus is Aenlle's supervisor; (3) Aenlle is Sheriff Corpus' subordinate; (4), from the time that Sheriff Corpus first hired Aenlle as a member on her transition team to her employment of Aenlle as her Executive Director, Sheriff Corpus has maintained a personal relationship with Aenlle; and (5) Sheriff Corpus and Aenlle failed to disclose their personal relationship.

Sheriff Corpus violated the Office's conflict of interest code when she hired Aenlle; she violated the policy by having Aenlle directly report to her; and she violated the policy when she repeatedly recommended pay increases for him.

There is overwhelming factual evidence that Sheriff Corpus and Aenlle continue to be in a personal relationship since 2021, and that Sheriff Corpus has an actual conflict of interest, in violation of Policy 1025.

**Allegation #1 is SUSTAINED.**

2.  **Allegation #2: Aenlle has not met the Policy Manual's duty requirements for a Level I Reserve Deputy.**

California Penal Code Section 832.6 provides, in pertinent part, "(a) Every person deputized or appointed, as described in subdivision (a) of Section 830.6, shall have the powers of a peace officer <u>only when the person is any of the following</u>:

> (1) A level I reserve officer deputized or appointed pursuant to paragraph (1) or (2) of subdivision (a) or subdivision (b) of Section 830.6 and assigned to the prevention and detection of crime and the general enforcement of the laws of this state, whether or not working alone, and the person has completed the basic training course for deputy sheriffs and police officers prescribed by the Commission on Peace Officer Standards and Training. . . . <u>Reserve officers appointed pursuant to this paragraph shall satisfy the continuing professional training requirement prescribed by the commission.</u>" (Emphasis added.)

The Policy Manual provides that the applicant for a Reserve deputy "must meet the standards defined by the San Mateo County Sheriff's Office as they apply to the position of full-time Deputy Sheriff to include a background investigation conducted by the Professional Standards Bureau." (Policy Manual, Section 322.4.2 (f), at pg. 200.)

There are four levels of Reserve Deputies: Designated Level I, Level I, Level II, and Level III. (Policy Manual, Section 322.4.7, at pg. 204). "Designated Level I" must have three years as a Level I Reserve Deputy and "shall, at the discretion of the Sheriff or his designee, have 24-hour police powers, may perform general law enforcement duties without immediate supervision and must comply with CPT [California POST Training] requirements." (Policy Manual, Section 322.4.7, at pg. 203)

This investigator: "So, if you're a designated Level I reserve, . . . is that different from your being the Executive Director . . .And so you are, you are both? You are a reserve, and you are executive director/chief of staff?

Aenlle: "Yes. As the reserve, I don't do regular duties reserves any longer because of my position, right? But I do not lose my police powers, right? I'm still listed, I'm still, I still have my post [POST]is what it's called, yeah. . ." (Aenlle Transcript at pg. 107)

On his application for the Executive Director position, Aenlle described himself as a designated Level I Reserve since 2009.

**Exhibit 23-A:**

The California Commission on Peace Officer Standards and Training (POST) requires that "Level I and II reserve officers shall satisfy the same Continuing Professional Training (CPT) requirement as full-time regular officers (24 hours every two years). (https://post.ca.gov/reserve-officer-program )

Policy Manual Section 322.5.1 describes the <u>minimum duty requirements for</u> all Reserve Deputies, in part,

"(a) Reserve Deputies are required to volunteer a minimum of 16 hours per month or the equivalent averaged over the year, for a total of 192 hours. . .
(b) All Reserve Deputy Sheriffs are required to attend 75% of the scheduled regular monthly training meetings. Exceptions will be reviewed on a case-by-case basis and must be approved by the Coordinator or Assistant Coordinator.
(c) Compliance for Reserve Deputy Sheriffs includes, but is not limited to, meetings, P.O.S.T. continuing professional training (CPT) requirements, other training, firearms qualification and duty hours. Compliance records will be generated and reviewed by the Reserve Coordinator quarterly and provided to the Homeland Security Division/ESB Sergeant annually.
 (d) If a Reserve Deputy fails to meet the minimum standards at any time they may be subject to discipline including documentation of counseling, a performance improvement plan, formal discipline, suspension or dismissal from the Reserve Deputy Program." (Emphasis added.)

Complainants allege that Aenlle has not fulfilled the requirements to maintain his status as a Reserve Deputy:

- A sworn employee interviewee (#16) who is a member of the Emergency Services Bureau tracks compliance with all Reserve deputy duty requirements. The sworn employee regularly sends emails to all Reserves, including Aenlle, requesting proof of their mandatory hours of service and classes as required by POST and the Policy Manual. The sworn employee reported to this investigator that since Aenlle began his job as Executive Director, in August 2023, Aenlle has ignored numerous emails from the sworn employee and has not provided proof of compliance as required for all Reserve deputy sheriffs, --- until September 16, 2024.

- On September 16, 2024, at 5:13 pm, Aenlle made numerous entries into the Sheriff's Office "Volunteer Hour Database," showing the hours that he claimed to have volunteered as a Reserve deputy for the period from January 2024 through July 2024. He entered "Headquarters" as the location of service for all of this reported reserve duty. Specifically, he reported that he performed eight (8) hours of Reserve duty on each of the following days:

  January 2024: 2, 3, 4, 5, 8, 9, 10, 11, 12, 16, 17, 18, 19, 22, 23, 24, 25, 26, 29, 30, 31
  February 2024: 1, 2, 5, 6, 7, 8, 9,12,13,14, 15, 16, 20, 21, 22, 23, 26, 27, 28, 29
  March 2024: 1, 4, 5, 6, 7, 8, 11, 12, 13, 14, 15, 18, 19, 20, 21, 22, 25, 26, 27, 28
  April 2024: 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 29
  May 2024: 1, 2, 3, 6, 8, 9, 10, 13, 14, 15, 16, 17, 20, 21, 22, 23, 24, 28, 29, 30, 31
  June 2024: 4, 5, 6, 7, 10, 11, 12, 13, 14, 17, 18, 20, 21, 24, 25, 26, 27, 28
  July 2024: 1, 2, 3, 8, 9, 10, 11, 12, 15, 16, 17, 18, 19, 22, 23, 24, 25, 26, 29, 30, 31
  **(Exhibit 24: Aenlle Reserve Volunteer Duty Database Entries)**

- "Headquarters" refers to the Sheriff's Office headquarters building, located at 330 Bradford Street, Redwood City, which is where Aenlle's Executive Director office is located. A sworn employee (#22) stated that Level I Reserve deputies are to perform16 hours per month of volunteer Reserve level work in core areas such as patrol, working events, transit and the jails.

**Findings:**

The Policy Manual mandates that Reserve deputies are to perform their volunteer hours <u>in uniform</u>. (See Policy Manual Section 1024.2: Wearing and Condition of Uniform and Equipment at pg. 684.) Employees situated near Aenlle's office have never seen him in uniform when working at his office.

Per Policy Manual Section 322.1, the Reserve Unit "was established to <u>supplement and assist regular sworn sheriff's deputies</u> in their duties. This unit will provide professional, <u>sworn volunteer reserve deputies who can augment regular staffing levels.</u>" (Policy Manual, Section

- 23 -

322.1, at pg. 199.) (Emphasis added.) As the Executive Director of Administration, Aenlle fills a full-time, salaried civilian position whose subordinates are exclusively civilian employees. This position does not appear to "augment regular staffing levels" nor does it "supplement and assist regular sworn sheriff's deputies." When Aenlle entered the volunteer hours into the database, he knew or should have known that those hours were not spent augmenting regular staffing levels nor were they supplementing and assisting regular sheriff's deputies.

According to civilian employee (#6) who maintains his calendar, on the dates he entered into the Reserve database, Aenlle was at work at his headquarters office, had meetings or other business, and was not in uniform.

It appears that Aenlle has used his full-time, salaried position as Executive Director to fulfill his obligation to perform Reserve deputy work hours. In other words, Aenlle is double-dipping.

Significant is the fact that on September 10, 2024, in a San Mateo Daily Journal article, Aenlle stated that once he began his employment as Executive Director in August 2023, he was no longer a Reserve deputy. "Once he assumed the chief of staff position, Aenlle said he no longer served in a reserve deputy capacity, but maintained, 'you don't stop wearing the badge' and is still a sworn peace officer with 'full 24-hour police powers. That entitles me to my badge or my gun.'" (https://www.smdailyjournal.com/news/local/no-confidence-vote-brought-against-the-san-mateo-countys-sheriff-s-chief-of-staff/article_aa5f2e04-6f27-11ef-bd4f-0775d39e7527.html ) This makes no sense. If he is no longer a Reserve deputy, then he no longer has the right to wear a Reserve deputy badge, nor have the police powers of a sworn peace officer.

And yet, as recently as October 30, 2024, Aenlle told the *Daily Post* that he continues to serve as a sworn reserve deputy. (https://padailypost.com/2024/10/31/the-other-side-of-the-story-sheriff-chief-of-staff-aenlle-gives-his-side-of-unions-allegations/ )

Also significant, as a matter of timing, is that on September 12, 2024, this investigator reached out to Aenlle requesting an interview. Four days later, on September 16, 2024, Aenlle entered his Reserve deputy volunteer hours into the database.

Aenlle's database entries show that he is claiming his hours as a full-time, salaried, civilian employee at Headquarters, and also as his Reserve deputy volunteer hours. Common-sense and the Policy Manual suggest otherwise. There is sufficient evidence to establish that Aenlle is out of compliance with the Policy Manual's duty requirements to maintain his status as a Level I Reserve Deputy. Even worse, it appears that he likely falsified his volunteer hours when he entered them into the database.

**Allegation #2 is SUSTAINED.**

3.  **Allegation #3: Aenlle has exceeded and/or abused his authority with the approval of Sheriff Corpus.**

Historically, there were three civilian directors in the Sheriff's Office: Directors of Finance, IT and Food & Nutrition Services. With Sheriff Corpus' creation of the Executive Director of Administration position in 2023, there are now four civilian directors in the Sheriff's Office.

"The Sheriff exercises command over all personnel in the Office. During planned absences the Sheriff will designate the Undersheriff to serve as the acting Sheriff." (Section 200.3, Policy Manual, pg. 23) "[T]he order of command authority <u>in the absence or unavailability of the Sheriff</u> is as follows:

(a)  Sheriff
(b)  Undersheriff
(c)  Assistant Sheriff-Corrections
(d)  Assistant Sheriff-Administration & Support Services
(e)  Assistant Sheriff -Operations
(f)  Captain/Civilian Director
(g)  Lieutenant/Civilian Manager
(h)  Sergeant/Civilian Supervisor
(i)  Deputy/Correctional Officer/Civilian Employee" (Emphasis added.)

This means that Aenlle, along with the Sheriff's Office three civilian directors, are sixth in the chain of command, after the Assistant Sheriffs and the Captains.

This investigator: "Can you talk to me now about what your role is in the office."

Aenlle: "I oversee the civilian departments. There's a number of, of them under me. So directors report to me, and I have a couple managers that do as well, and I basically represent and oversee that. I'm also part of the executive team, and <u>I assist the sheriff with whatever she assigns me. . . It just involves projects. It involves programs, community programs, community relations. I-- basically anything that has to do with the sheriff's communication with the community</u>." (Emphasis added.) (Aenlle Transcript at pgs.15-16.)

A sworn employee (#22) told this investigator that he attended an academy graduation in early 2024 where Aenlle introduced himself to other law enforcement personnel in attendance as "Chief of Staff."  When a law enforcement officer from another agency, a female, asked Aenlle if he was a sworn officer, Aenlle said, "I'm third in command." The sworn employee who witnessed this conversation was taken aback by Aenlle's statement.

This investigator: "Have you ever said to anyone that you are third in command?"
Aenlle: "The only time I can recall anything like that and I remember the experience was in Santa Clara County, there was a Academy graduation. We were at that, and I was speaking to one of their people in command. A lady. I can't recall her name, but she's one of the, the female assistant sheriffs there. And I introduced, we were meeting each other. I'm like, 'I'm the chief of staff.' And we're talking, and she goes, 'What does that mean? What level is

- 25 -

that? Is that lieutenant level?' And I said, 'No. In our department, that's, that's executive team level. It sits at, it's an assistant sheriff's level, which is considered the line of, of, of third in command.' Aside from that, no."

This investigator: "So do you consider yourself, then, third in command in the office?"

Aenlle: "I consider myself a member of the executive team, ma'am."

This investigator: "So can you tell me, then, what, what is the chain of command in the Sheriff's Office?"

Aenlle: "Yeah. Per our org. chart is the sheriff, undersheriff, and then the assistant sheriff, and chief of staff is the next line and everything else below." (Aenlle Transcript at pgs. 16-17)

Policy Manual Section 201.1 states that "<u>The Assistant Sheriff is third in command</u> in the Office and is appointed by the Sheriff." (Emphasis added.)

Aenlle identifies himself as "Chief of Staff," a title that appears nowhere in the Executive Director job description.

This investigator: [W]here did that title come from, 'Chief of Staff'?"

Aenlle: "So, yeah, that's a working title that I have. There's a lot of positions in the county that, if you look at them, they do not make any sense. They were just created because that's, that's the proper format. You know, my IT directors like that and many others. But my role has always been 'Chief of Staff.' It was a working title."

This investigator: "But I don't know what that means, I guess, is what I'm saying. It's like did you just say, 'Okay. I'm the Executive Director, but I want you all to know I'm the Chief of Staff, or did someone else give you that?"

Aenlle: "No, ma'am. <u>The, the sheriff assigned that</u>. That's, that's my role in the office, yeah." (Aenlle Transcript at pgs.14-15)

Complainants described the following conduct to support the allegation that Aenlle exceeds/abuses his authority as a civilian director:

### a. Allegation 3(a): Requiring sworn employees to report to Aenlle:
o  In July 2022, after the election of Corpus and before she was sworn into office, Aenlle told a sworn employee (#30) in a face-to-face conversation, "<u>The Sheriff is untouchable. The Sheriff can do whatever she wants. If I give you an order, it's as if it is coming directly from the Sheriff.</u>"

o  On July 11, 2024, then-Assistant Sheriff Monaghan, was told by a captain that both he and another captain were to report directly to Aenlle.

o   In July or August 2024, a sworn employee (#15), spoke with a Captain who told her that Aenlle required him and another Captain to report to Aenlle because, according to Aenlle, the new Undersheriff (Perea) "is too busy."

o   A retired sworn employee (#10) was told by two Captains, after the abrupt departure of Undersheriff Hsiung, that Aenlle ordered the Captains to report to Aenlle.

o   On August 19, 2024, there was a morning meeting of the Executive Team that included Sheriff Corpus and Aenlle. Aenlle asked then-Assistant Sheriff Monaghan for updates on projects assigned to him, as well as other matters within Monaghan's area of responsibility. Aenlle instructed Monaghan on how he should prioritize the Sheriff's wishes.

**Aenlle's response to allegation 3(a):**

In a September 12, 2024, San Mateo Daily Journal article, Aenlle is quoted as saying that "he 'has every right' to question personnel on higher level, operational needs, regardless if they are professional or sworn, and that he doesn't need to make anybody report to him. . . 'They think that the only people they need to report to or answer to have to be sworn and carry a big badge on them,' Aenlle said. 'I am chief of staff. The undersheriff is her right hand, I'm her left hand.'" (Emphasis added.)

(https://www.smdailyjournal.com/news/local/no-confidence-vote-brought-against-the-san-mateo-countys-sheriff-s-chief-of-staff/article_aa5f2e04-6f27-11ef-bd4f-0775d39e7527.html )

This Investigator: "Have you ever in your role as, and I'll just call you 'chief of staff/executive director', have you ever required any sworn officers to report to you?"

Aenlle: "No, ma'am." (Aenlle Transcript at pg. 61)

Aenlle: "I want to dispel something just to make sure that, that you're aware that, that the stance that a civilian can't tell a sworn what to do or, or likewise, vice versa, is, is not in any policy of the Sheriff's Office. It's actually, you know, old-time mentality of law enforcement. It's not, not written anywhere. It's a lack of understanding." (Aenlle Transcript at pg. 63)

This Investigator: "Okay. So, you've never required any, for example, captains? Ever told them they have to now report to you?"

Aenlle: "No, ma'am." (Aenlle Transcript at pg. 62)

This Investigator: Is it your view that in your position that you can, in certain circumstances, give orders to and direct sworn officers? I'm talking about captains, lieutenants, sergeants, deputies."

Aenlle: "No, ma'am. And. I'd like to say that the way we conduct and, and at the division of the Sheriff's Office and the Sheriff s, you know, you know, we don't really go around ordering people. That's not the way we talk to people or conduct ourselves. . .

"So, to answer the question, I don't, there's no sworn cop that reports to me at all whatsoever. A lot of them will come to me for questions about something or advice on something or help on something, and I'm happy to work with them. These are people that I've known for 16 years since I've been here, right? But there's no orders being given.

"With that said, if the sheriff says, 'Victor, I need you to go take care of this right now,' am I going to call a captain or say, 'Hey, on behalf of the sheriff, she would like this done'? Yes, I've done that."

This Investigator: "But that's different. 'I would like'---'On behalf of the sheriff, I would like this done' versus you directing somebody to do something, right?"

Aenlle: "I have always worked, and I'm very clear that I work at the direction of the sheriff. I'm here to advance her vision and improve this organization, and I've done that from day one." (Aenlle Transcript at pgs. 63-65)

### b. Allegation 3(b): Interfering in confidential Internal Affairs investigations concerning sworn employees:

- In March 2022, when Corpus was then the Captain assigned to the Millbrae Substation, she had prepared on her laptop, a confidential report about a Sergeant who was to be investigated by the Sheriff Office's Professional Standards Bureau's (hereinafter, "PSB") Internal Affairs Unit. Corpus asked Aenlle, who was in her office, to read the report. A civilian employee (#3) was also present and said to Aenlle, "You can't read it. It's confidential," after which Aenlle sat in Corpus' chair, read the report, and then said to Corpus, "This looks good."

- A high-ranking sworn employee (#8) authored a 9-page memo **(Exhibit 25: 9-page memo)** describing what the employee considered potentially improper conduct of a deputy who had, on behalf of Sheriff Corpus, interjected himself into a Professional Standards Bureau interview panel in an effort to manipulate the testing process. In preparing the memorandum, the sworn employee conducted an Internal Affairs investigation that included statements from witnesses. He subsequently learned from a Captain, that at the direction of Sheriff Corpus and Aenlle, the deputy was not disciplined. The sworn employee said that the deputy's brother had sponsored a fundraiser for Sheriff Corpus' election campaign.

- Within the last three to four months, a deputy who was on probation uttered a racial slur that was recorded on his body camera. The Professional Standards Bureau decided that the deputy should be released, but should be given the opportunity to resign, rather than be fired. When the deputy was contemplating what he would do, a sworn employee (#13) who was a member of the PSB, went to the 5th floor in the Sheriff's Office administration

building. There he observed Undersheriff Perea, Sheriff Corpus and Aenlle in the waiting area outside the Sheriff's office at about 5 pm.

When Sheriff Corpus asked, "How's it going?" The sworn employee said, "Not great. He's not happy. [referring to the deputy who was on probation]. Aenlle then yelled, "Sheriff, just fucking fire him! This is what you get for being nice!" Corpus said nothing. The sworn employee said, "Sheriff, generally it's better if he resigns to avoid litigation." Aenlle then said, "I completely disagree," and asked the Undersheriff, "What do you think?" The Undersheriff responded, "I defer to you, Sheriff." Sheriff Corpus then said, "Okay, just fire him."

However, this decision to fire the deputy occurred *after* the deputy had already resigned and signed his resignation letter. The deputy had to be informed by the PSB member who signed off on the resignation letter that the deputy could not resign and was, instead, fired. **(Exhibit 26: Revoked signed resignation letter)**

- On August 7, 2024, then-Assistant Sheriff Monaghan informed Undersheriff Perea of a notice to interview a Captain who was the subject of an Internal Affairs investigation involving serious allegations lodged by a Sergeant. An outside subject-matter expert was recommended to be the investigator. Aenlle told Monaghan that he, Aenlle, disapproved of the Captain being the subject of the investigation. After Undersheriff Perea met with Aenlle, the Undersheriff took over the internal affairs investigation. Monaghan was never updated, even though as Assistant Sheriff, he had oversight of Internal Affairs matters.

- On August 28, 2024, a sworn employee (#13) who is a member of the Professional Standards Bureau authored a memorandum that described a disturbing incident involving a deputy ███████████████████████████ including a video of the deputy's actions. **(Exhibit 27: August 2024 PSB Memo)** The sworn employee sent the memorandum to his Captain who briefed then-Assistant Sheriff Monaghan. After speaking with Undersheriff Perea, Monaghan told the sworn employee, "The Undersheriff has instructed me to find out if there is any way that we not provide the video to the District Attorney." The sworn employee replied, "No. you can't do that. This is exculpatory (Brady) material." Monaghan said, "Okay, I'll tell the Undersheriff." The sworn employee is unaware of the status of the investigation into the deputy's misconduct. The sworn employee knows that the subject deputy is "one of the Sheriff's favorites."

- According to then-Undersheriff Chris Hsiung, in March 2024, two Captains had a conversation with a Sergeant over a personnel issue. The conversation got heated, voices were raised such that the Sergeant filed a complaint about this interaction with the Captains.

Because this incident involved two Captains, the Executive Team comprised of Hsiung, then-Assistant Sheriff Monaghan, Aenlle and Sheriff Corpus, discussed retaining an outside investigator to look into the complaint because no one in the PSB was of higher

- 29 -

rank than the Captains. They also discussed not tainting the investigation by speaking with the two Captains who were the subjects of the complaint.

To Hsiung's dismay, he learned that Aenlle subsequently spoke to one of the subject Captains and asked the Captain specific questions about the incident.

Sometime in April 2024, Hsiung told Sheriff Corpus about Aenlle's interactions with the Captain, and telling her that it was completely inappropriate for Aenlle to interfere with an ongoing Internal Affairs investigation. Specifically, Hsiung told Sheriff Corpus that Aenlle tainted the investigation by speaking to a witness, that he had created POBAR (Public Safety Officers Procedural Bill of Rights Act) issues, and that Aenlle had potentially jeopardized the outcome of the investigation, up to and including any discipline that might be imposed.

Hsiung, who has attended POST certified Internal Affairs classes and has conducted an Internal Affairs investigation, told Sheriff Corpus that Aenlle had not taken a class nor conducted an Internal Affairs investigation. Hsiung stated that Sheriff Corpus said that she would talk to Aenlle.  Thereafter, Hsiung's relationship with Aenlle and the Sheriff took a turn for the worse, with both growing increasingly distant and cold to him.

Later, in April 2024, Hsiung had a discussion with Aenlle and then- Assistant Sheriff Monaghan in Hsiung's office. Hsiung informed Aenlle that he was going to leave the Sheriff's Office. During this conversation, Hsiung told Aenlle, directly and bluntly, how inappropriate it was for Aenlle to meddle in the Captains' Internal Affairs investigation and that Aenlle's conduct could adversely affect the outcome of that investigation.

**Aenlle's response to allegation 3(b):**
This Investigator: "Have you ever been involved in any confidential sworn officer investigations conducted through Internal Affairs in the Professional Standards Bureau?"

Aenlle: "Absolutely not, ma'am." (Aenlle Transcript at pg. 62)

### c.  Allegation 3(c): Aenlle improperly gives directives to Sheriff Corpus:
o   Aenlle told a civilian employee (#1) that he tells Sheriff Corpus what to do.

o   More than ten times, a civilian employee (#6) heard Aenlle say to Sheriff Corpus words to the effect, "You better do something. Stop being nice to these people. You're the Sheriff, you can do whatever you want."

o   When a civilian employee (#15) was in a hallway in the Hall of Justice, she saw and heard Aenlle telling Sheriff Corpus, "This is why you can't be so nice. They just take advantage."

o   In 2023, a sworn employee (#13) was with Sheriff Corpus and Aenlle, either in the Sheriff's office or Aenlle's office, discussing a personnel matter in which Sheriff Corpus

was reluctant to terminate a sworn officer.  Aenlle told her, "I don't know why we don't do this. They are all expendable. Just get rid of him."

**Aenlle's response to allegation 3(c):**
This Investigator: "Have you ever given any directives or any kind of orders to Sheriff Corpus?"

Aenlle: "What? No… Okay. The answer is 'No.'" (Aenlle Transcript at pg. 62)

### d.  Allegation 3(d): Aenlle interferes in personnel decisions concerning sworn employees:

o  When Captain ▮▮▮▮▮▮ wanted to hire an individual as her executive assistant, Aenlle intervened and made it clear to her that he wanted someone else to fill the position.

o  A sworn employee (#18), a Lieutenant, and a civilian employee (#15) interviewed three candidates for the Professional Standards Bureau, one of whom was a sworn employee (#30) identified as Candidate #3.  They selected Candidate #3 as best qualified for the position.

However, they were informed by Undersheriff Perea that it couldn't be Candidate #3 and that they had to choose another candidate. The sworn employee (#18) believed that Candidate #3 had previously failed Aenlle in the Field Training Program. In the presence of the sworn employee (#18) and Sheriff Corpus, Aenlle said, "We're going to move him [Referring to Candidate #3]."

**Aenlle's response to allegation 3(d):**
This Investigator: "If a sworn officer wants a certain individual to be that sworn officer's secretary or administrative assistant, have you ever been involved in, like, vetoing that decision of a sworn officer?"

Aenlle: "But have I told a captain or somebody they can't have, that's not, I've never taken that role. I've never done anything like that." (Aenlle Transcript at pgs. 63-64)

### e.  Allegation 3(e): Aenlle interferes in budgets under the control of sworn employees:

o  Captain ▮▮▮▮▮▮ was in a meeting to discuss her budget where she was the Police Chief in Half Moon Bay. In attendance was Sheriff Corpus, the Undersheriff, an Assistant Sheriff, and Aenlle. Aenlle ran the meeting and at one point said to Cpt. ▮▮▮ "You have a $1 million surplus."  Captain ▮▮▮ subsequently spoke with the Sheriff's Office Finance Director who advised her that there was no such surplus.



At that meeting, Captain ▮▮▮ did not recognize a particular budget item and asked Aenlle about it. Aenlle told her "<u>It's the Sheriff's budget and she can do what she wants with all of the money.</u>" That item in Captain ▮▮▮ budget was subsequently signed off by Aenlle, not by Captain ▮▮▮

After that budget meeting, Captain ███ advised the other captains to bring the Finance Director with them to their budget meetings with the Sheriff. Shortly thereafter, when Captain ███ was in Aenlle's office, he told her, "I heard you were not happy about the budget meeting." She understood his comment to be one of disapproval of her alerting the other captains.

**Aenlle's response to allegation 3(e):**
This Investigator: "Have you ever been involved in signing off on budget items on, in a sworn officer's budget?"

Aenlle: "Ma'am, I oversee a fiscal, I'm very, I'm a numbers person. I'm very conscious and very conservative on spending. Anybody, if you talk to any of my, my directors that have to do with money, they'll tell you that. One of the first things that I did when I came to the Sheriff's Office was review all the contracts that were done, and we were able to, to save about $1.5 million of the Sheriff's Office budget. No company comes directly to me or anything like that about their budget. I will have meetings with the undersheriff. I'll be present at meetings with other sworn people. Half of our department are sworn people, and we go over the budgets and so forth. And when they don't understand it, I, I help with the numbers. But it's not my role to deny any kind of budget. That's not even within my, my capacity. That doesn't happen."

This Investigator: So if a captain has a budget there and there's a budget item that the captain doesn't even know why it's there, have you ever said to a captain, for example---you know, have you ever signed off on a budget item where a captain didn't even know why the item was even in that captain's budget?"

Aenlle: "Ma'am, that's not even in my realm. That's not even anything I would do. I don't sign off anything that I don't understand or isn't clearly defined. . . And when we have, we have our meetings, and I'm not alone at these meetings. I'm with the sheriff, undersheriff and assistant sheriff. That said captain didn't even understand her, her own numbers. And the only thing I pointed out was that it seemed like it was done in error; that org---org chart, because numbers stick in my head, not did belong to the bureau. But at no time. . . At no time did I approve something like that. it's not even me for---I do not approve the chief's budgets or independent bureau's budgets. It doesn't work that way."

This Investigator: "And can you tell me why you are involved in meetings about a captain's budget if it's the captain's budget?"

Aenlle: <u>I'm involved in all meetings that pertain to the Sheriff's Office</u>. I'm part of the executive team. So I'm involved to have outside input to use expertise on numbers and finances because it's part of the Sheriff's Office everyday business. . . It has nothing to do with sworn or non-sworn. If it's the bottom line, <u>I oversee fiscal and at the will of the sheriff</u>. That's who she wants present during these budget meetings." (Aenlle Transcript pgs. 65-69)

    **f.  Allegation 3(f): Aenlle directs sworn and/or civilian personnel to address Aenlle as "Dr.":**

o  At a large dinner gathering, Aenlle directed a sworn employee (#16), "Call me Dr."  The sworn officer responded, "Unless you are a medical doctor, I'm not calling you Dr." Twice more during the dinner, Aenlle told the sworn employee, "You need to call me Dr."

o  Several female civilian personnel stated that Aenlle requires them to address him as "Dr. Aenlle."

**Aenlle's response to allegation 3(f):**

This Investigator: Have you ever directed civilian personnel to always address you as "Dr. Aenlle?"

Aenlle: No, ma'am. Not at all. Not at all.

This Investigator: Have you ever requested or directed any sworn personnel to address you always as "Dr. Aenlle?"

Aenlle: No, ma'am. Not at all.  (Aenlle Transcript at pg. 69)

    **g.  Allegation 3(g): Aenlle is a civilian director and improperly acts as the Sheriff's personal bodyguard:**

o  Aenlle told then-Assistant Sheriff Monaghan that he travels with Sheriff Corpus to give her "dignitary protection."

o  After a civilian employee (#3), texted Corpus using "Signal," an encrypted message system required by Aenlle for the transition team, "You were seen," Aenlle responded to the text, writing, "I'm doing security detail in Maui. I'm protecting the Sheriff."

o  Aenlle told a former sworn employee (#17), "I have to be with her [Sheriff Corpus] all of the time. The Sheriff needs my protection."

o  Almost every interviewee stated that Aenlle is constantly at Sheriff Corpus' side, whether in the workplace, at official events, or in the community.

**Aenlle's response to allegation 3(g):**

This Investigator: "Do you act as the sheriff's personal bodyguard?"

Aenlle: "No. No. but every, anybody, anybody in this department---when the sheriff is out, everybody should be her bodyguard. Everybody should watch out for the sheriff. She's a very well-known political figure in the county, and at the current times in law enforcement, I would hope that anybody that works for this department would always watch out for their sheriff's safety."

This Investigator: "So my question is not so much everybody cares about the sheriff. And I understand she's high profile. Is, have you ever said that you are her dignitary protection?"

Aenlle: "No. there's no dignitary protection. Am I, when I attend, when I attend political things or go with the, with the sheriff to political things, am I looking out for her safety? Absolutely, ma'am. Every time."

This Investigator: "But you have never said you were her personal bodyguard?"

Aenlle: "I've never said I was her bodyguard. Do I provide security for the sheriff, or do I make sure she's safe when she has meetings or different areas in different cities where the tensions are a little high? Absolutely. Everybody should. Anybody in uniform or not in uniform should do that for the sheriff."

This Investigator: So does that mean that if the sheriff is attending a meeting somewhere out of the office that you will be there to give her protection or. . ."

Aenlle: "I'm there, I'm to support. I'm there to engage for the community. I'm there for whatever she needs."

This Investigator: "Right. I, right. But I guess my question's a little different. When the sheriff has to go to a meeting and that meeting doesn't involve you, do you still go, though, to make sure she has protection?"

Aenlle: "If the, if the meeting doesn't involve me and she doesn't need me, I don't go." (Aenlle Transcript at pgs. 69-71)

> **h. Allegation 3(h): Aenlle is a civilian director who supervises civilian employees only, but interferes with the recruitment of sworn employees:**

- o In 2024, a sworn employee (#8), attended a meeting convened by Aenlle who questioned how the recruitment/selection panels for sworn officers were conducted. Aenlle directed the sworn employee to tell all recruitment panelists that they were "looking for good people with good hearts."

**Aenlle response to allegation 3(h):**
This Investigator: "With regard to recruitment of sworn personnel, have you ever been involved in recruitment decisions regarding recruiting for sworn personnel?"

Aenlle: "Again, ma'am, my involvement would be at the executive team level, discussion about 'What do you need?' 'Where should we go?' 'What are we missing?' 'Let's, let's, let's look for people where we've never looked before.' 'Let's think outside the box.' 'What support do they need?' 'Do we need to hire more, more background investigators?' 'Do we have enough?' Yes, I am involved in those decisions, regardless of sworn or non-sworn, because we're also hiring for, for civilian staff as well, right?"

This Investigator: "Right."

Aenlle: "Recruitment for it."

This Investigator: "Right."

Aenlle: "But yes."

This Investigator: "By 'recruitment decisions' I also mean picking people. Like, 'No. that's the person.'"

Aenlle: "No, ma'am. . . Not at all. That's, that's I've never been involved in that. That's completely outside. I don't, I'm not even in the queue for that. . . I'm not anywhere near part of that process." (Aenlle Transcript at pgs. 71-72)

### i.   Allegation 3(i): Aenlle interfered in trainings for sworn personnel:

o  On or about August 1, 2024, Aenlle ordered then-Assistant Sheriff Ryan Monaghan to move an active shooter training set for October 2024, a date that had already been approved by Sheriff Corpus, to August 2024. According to Monaghan, that same day, Aenlle called the owner of the company that provided the training and got the owner to agree to an August date, leaving just two weeks to enroll sworn officers for the training, at a time when the Sheriff's Office was facing a major staffing shortage. A sworn employee (#26) believes that Aenlle has a relationship with the company's owner.

o  According to Monaghan, changing the training to August took huge amounts of time for Monaghan and the Captains, and caused tremendous stress on them and on sworn employees, some of whom had to change their vacations and work plans to attend. There was no apparent reason to change the time of the training other than Aenlle's decision to move the date.

**Aenlle's response to allegation 3(i):**
This Investigator: "There are trainings for sworn personnel. They have to go through certain trainings. Have you ever been involved such that you've directed that trainings happen at a certain time when they're for sworn personnel, not for civilians? . . . The active shooter training that was set for October and then was changed to August. Can you talk to me about that?"

Aenlle: "Ma'am, I think I know what you're referring to. So I'll just speak to that. . . This— so this training initiated after—we go back to the Half Moon Bay shooting, the massacre that took place basically 21 days into the sheriff's tenure. The findings from that really identified that-- that we needed more training. . .

"So that training was—was conducted. It was—it was done on the coast, and it was a complete success. People were thrilled. The sheriff's wishes was that we had to do that same training on this side of the bay. On this side. It was—and it was—and that was the direction. Somehow training fell behind, whatever the case was, and it was not—it was not done.

"When the sheriff found out that it was pushed back all the way to October, with the tensions and the recent mass shootings and the elections coming up, she wanted to make sure that her—her employees were prepared. So she asked the company to see if they could move up

- 35 -

the training as she wanted to because October was going to be too late with the current tensions. . . There was—there was nothing needed, and there was like two weeks' advance notice for that training to take place to only better prepare our employees for anything major like that. That's it."

This Investigator: "So I just want to. . . but I want to clarify that the directive to move it up, have it in August, everything—that was all at the sheriff's initiative, not yours?"

Aenlle: "Of course, ma'am. Absolutely. . . Absolutely."
This Investigator: "Do you know whether or not the sheriff had approved that training for October?"

Aenlle: "To my knowledge, she had not. She was not even aware. That day—she was—she was told about that, and that's why she wanted to move it up. She was told about that later. She was surprised that they had not been scheduled sooner."

This Investigator: "I see. And you know she was surprised because she told you this?"

Aenlle: I know because I was in a meeting when that came up. And she goes, 'Can't they do it any sooner?' . . . So she felt that it was really important, and she had to elevate it. She wanted to make sure that if something happened, her employees, who she cares about deeply, were well-trained and prepared."

This Investigator: "So the meeting where she was—got this information, was surprised, what meeting—when does—tell me about that meeting—when it was and who was there."

Aenlle: "It was one of the executive-level meetings."

This Investigator: "But who was there?"

Aenlle: "So the—the former undersheriff and former assistant sheriff."

This Investigator: "And you? Were you there?"

Aenlle: "Of course. Of course, yeah."

This Investigator: "And the sheriff, obviously. So do you know who told her, 'This is scheduled for October'?"
Aenlle: "I believe it was the assistant sheriff [Monaghan], yeah." (Aenlle Transcript at pgs. 74-78)

> **j.  Allegation 3(j): Aenlle makes disparaging comments:**
> o  Aenlle criticized Meloria Consulting, a company retained by the County to evaluate the operation of the Sheriff's Office. According to then-Undersheriff Hsiung, Aenlle told him, "This outfit doesn't know what they are doing. This is a waste of time."  Sheriff Corpus, a civilian employee, and a sworn employee were present when Aenlle said this.

o  Many times, Aenlle told Chris Hsiung, the then-Undersheriff, "You don't understand the Sheriff's Office. The Undersheriff has to be a hammer." Hsiung replied, "I disagree. My job is to inspire." Aenlle disagreed with him. Hsiung said that Aenlle was repeatedly dismissive of him. Hsiung is a nationally and highly respected leader in law enforcement who had been recruited by Sheriff Corpus.

o  A civilian employee (#1) said that Aenlle was very vocal about employees whom he disliked. She heard Aenlle disparage sworn and civilian employees, including then-Assistant Sheriff Ryan Monaghan and then-Undersheriff Chris Hsiung, referring to all of these employees as disloyal and "Fuck them."

o  Aenlle was so fixated on a female civilian employee that he directed a civilian employee (#1) to "triple-check" the employee's work.

**Aenlle's response to Allegation 3(j):**
This Investigator: "Have you ever disparaged or said or bad-mouthed any sworn personnel? Like calling them names, the -- you know, that's about it. Have you ever done that?"

Aenlle: "Calling people names?"

This Investigator: "Or putting them down. You know, just—"

Aenlle: "No. No.· I'm not putting anybody down." (Aenlle Transcript at 78-79)

**k.  Allegation 3(k): Aenlle has improperly taken over Corrections:**
o  Then-Undersheriff Hsiung said that on or about April 2023, Aenlle took over management of Corrections.

o  Assistant Sheriff Monaghan saw emails from Aenlle to Sheriff Corpus about Corrections assignments.

**Aenlle's Response to Allegation 3(k):**
This Investigator: "Have you ever been or are you now the director of or running the Corrections operation?"

Aenlle: "No, ma'am."

This Investigator: "You've never, ever been in charge of Corrections?"

Aenlle: "I've never been in charge of Corrections, ma'am. . . I've helped—I help—I help the sheriff and undersheriff to make sure that information doesn't get lost. So I—I—I inform them. I—I share information just to make sure everybody's aware, but I don't run any facilities. I don't run any Correction facilities. . . I run the departments that I'm assigned."

This Investigator: "So you've never told anyone, 'I'm—I'm running Corrections now'?"

- 37 -

Aenlle: "No, ma'am." (Aenlle Transcript at pgs. 79-80)

**l.  Allegation 3(l): Aenlle has Authored Memoranda in the name of Sheriff Corpus:**
o  On August 9, 2024, at 7 pm, Aenlle called a civilian employee (#6) at her home and directed her to send out an office-wide memorandum about overtime that he then emailed to her. The memorandum was directed to all sworn officers and was on Sheriff Corpus' letterhead and was under the Sheriff's name. The civilian employee believes that Aenlle actually wrote the memorandum after Aenlle told her during the phone call, "What a $100k doctorate gets you is good writing." Sheriff Corpus does not have a Ph.D. Aenlle claims to have earned a Ph.D. He then asked the employee, "Does it [the memorandum] look okay?"

**Aenlle's Response to Allegation 3(l):**
This investigator: "Have you ever initiated the writing of a memo and then had it sent out under the sheriff's name? Now, the sheriff may have known about it. That's not what I'm—I'm not saying you're sneaky or doing anything without her knowing. But have you ever done that? In other words, you're the author. You wrote it, and it went out under the sheriff's name."

Aenlle: "Ma'am, anything that I write or edit or whatever is at the sheriff's directions or her telling me what to put on it or a dictation that I take or something like that. it's not authored by me. It's not my ideas. It's not authored by me. . . So when I hear 'authored,' I—it—it is my assertion or influence or ideas, and my answer would be, 'No.'"

This investigator: "So there was a—an overtime—a memo that went out on the sheriff's letterhead about overtime that caused a big kerfuffle because. . . then the DSA got upset and everything. Did you write that memo?"

Aenlle: "I did not write it. I helped edit it and –and grammar. And it was not only me. It was the former assistant sheriff, undersheriff, and myself. We worked under a Google document at the direction of the sheriff just cleaning up. It had outdated language like 'jail.' it referred to 'jail' as opposed to 'correctional facility.' It was—it was a bunch of different things that she wanted to make simple. It was a five-page overtime policy, and she wanted to clean it up. She instructed the undersheriff, former assistant sheriff, myself to look at this and clean it up and—and put it together. . . The description that I authored that paper and I—I mean, it—it's wrong. . . And untrue." (Aenlle's Transcript at pgs. 86-88)

**m.  Allegation 3(m): Aenlle has improperly taken control of the Sheriff's calendar, cellphone, and emails:**
o  Aenlle told a civilian employee (#11) to block off Sheriff Corpus' calendar on Tuesdays and Thursdays, saying, "Do not schedule any meetings---nothing." The civilian employee felt that it was strange that Sheriff Corpus did not, herself, make this request.

o  Sometime during the first three months of 2023, Aenlle told a civilian employee (#11) to copy him on all of Sheriff Corpus' emails, including her upcoming events and any

requests for items such as Corpus' bio. The civilian employee felt that it was strange that Sheriff Corpus did not, herself, make this request.

o   A civilian employee (#3) knows that Aenlle has the code to access Corpus' phone because the civilian employee saw Aenlle logging into Corpus' phone at a party announcing Corpus' candidacy for Sheriff at the Masonic Lodge #40 in Burlingame, on September 28, 2021. The civilian employee has seen Aenlle carrying Corpus' purse.

**Aenlle's Response to Allegation 3(m):**
This Investigator: "Have you taken control ever or now of Sheriff Corpus' calendar? Do you control it?"

Aenlle: "Not at all. I can—I can add and—and do some things. And when she needs me, I make sure that, you know, she—she doesn't forget certain meetings because she's got a lot on her plate. But her admin assistant has a hundred percent and—and primary function of her schedule."

This Investigator: "Do you have the access code to Sheriff Corpus' cellphone?"

Aenlle: "No."

This Investigator: "Have you ever texted from her phone without letting anyone know that you were texting it and not the sheriff?"

Aenlle: "Ma'am, I would never do that, and the sheriff knows that. And -- and -- and that's -- no. The answer is, 'No'" (Aenlle Transcript at pgs. 88-89)

**Findings:**
Aenlle's actual authority is limited to the supervision of civilian personnel, yet his work at the Sheriff's Office has far exceeded the responsibilities described in his job description.

Aenlle's approach to his responsibilities is best described in his statement to a sworn employee shortly after Sheriff Corpus was elected: "If I give you an order, it's as if it is coming directly from the Sheriff."  With this statement, Aenlle, early on, signaled his intention to assume the power of the Sheriff.

Aenlle frequently invokes the phrase, "at the direction of the Sheriff" in exercising his authority. By doing so, Aenlle has succeeded in moving himself to the top of the Chain of Command. Unfortunately, Sheriff Corpus has elected not to speak with this investigator. Even so, whether or not Sheriff Corpus has explicitly given Aenlle this wide-ranging power over her Office is not the point. That the Sheriff *permits him* to engage in this conduct is clear.

The complainant/interviewees gave detailed descriptions of their observations, with many of them facing the real risk of retaliation as discussed below in Allegation #4. This investigator finds the interviewees to be credible. In light of his false statements to this investigator and to others about his personal relationship with Sheriff Corpus, Aenlle is not credible on this subject.

- 39 -

At best, his words are suspect; at worst, they are simply not believable. Aenlle has repeatedly exceeded and abused his authority, with the knowledge and approval of Sheriff Corpus.

**Allegation #3 is SUSTAINED.**

4. **Allegation #4: Sheriff Corpus, Aenlle and the Executive Team engage in retaliation and intimidation.**

San Mateo County Ordinance 2.14.060-2.14.090, sometime called the "Whistleblower Ordinance," provides, for investigations of alleged improper governmental activity and also prohibits retaliation: "Any retaliation or reprisal by any County officer or employee against any complainant or informant is strictly prohibited; provided, however, if it is determined that a complaint was filed by a County employee in bad faith, said employee may be subject to appropriate disciplinary action. This prohibition against retaliation is in addition to the protections contained in California Labor Code section 1102.5, and any amendment thereto."

San Mateo County's Equal Employment Opportunity (EEO) policy, adopted by the Board of Supervisors, prohibits retaliation, to wit, "Retaliation is defined as unlawful punishment or adverse action against an employee because that employee reported unlawful discriminatory conduct, participated in an investigation of discrimination, or engaged in other protected conduct. The most obvious types of retaliation include denial of promotion, refusal to hire, denial of job benefits, demotion, suspension and discharge. Other types of retaliation may include threats, reprimands, or negative evaluations.

"The County does not tolerate any acts of retaliation. County employees are prohibited from retaliation against the efforts of any employee or applicant in reporting any violation of this EEO Policy. Corrective action, up to and including dismissal, shall be taken against individuals in violation of any provision of this policy." (County EEO Policy, Section II-E: Policy on Retaliation)

As well, Policy #1029 (at pgs. 713-716) in the Policy Manual directs its members to prohibit retaliation:

"1029.2: The San Mateo County Sheriff's Office has a zero tolerance for retaliation and is committed to taking reasonable steps to protect from retaliation members who, in good faith, engage in permitted behavior or who report or participate in the reporting or investigation of workplace issues. All complaints of retaliation will be taken seriously and will be promptly and appropriately investigated." (Emphasis added.)

"1029.3: No member may retaliate against any person for engaging in lawful or otherwise permitted behavior; for opposing a practice believed to be unlawful, unethical, discriminatory or retaliatory; for reporting or making a complaint under this policy; or for participating in any investigation related to a complaint under this or any other policy.

"Retaliation includes any adverse action or conduct, including but not limited to:

- Refusing to hire or denying a promotion.
- Extending the probationary period.
- Unjustified reassignment of duties or change of work schedule.
- Real or implied threats or other forms of intimidation to dissuade the reporting of wrongdoing or filing of a complaint, or as a consequence of having reported or participated in protected activity.
- Taking unwarranted disciplinary action.
- Spreading rumors about the person filing the complaint or about the alleged wrongdoing.
- Shunning or unreasonably avoiding a person because he/she has engaged in protected activity."

San Mateo County has a Code of Ethical Conduct that states, in part, "Always treat members of the public and fellow co-workers with courtesy and respect. . . No abuse of authority will be tolerated. . . Contribute to a safe and productive work environment by promoting open and honest communication, and freely voicing ethical concerns." (https://www.smcgov.org/hr/ethics-policy)

A review of the Policy Manual reveals that the San Mateo County Sheriff's Office does not have its own Code of Ethical Conduct.

Interviewees reported the following instances in which they allege that Executive Director Aenlle, Sheriff Corpus, and/or the Sheriff's Executive Team engaged in retaliation and intimidation:

- Then-Undersheriff Chris Hsiung complained to Sheriff Corpus about Aenlle's conduct, telling her, "Victor is wholly unqualified to weigh in on executive decisions due to his lack of experience."  Sheriff Corpus did not agree.

- On April 23, 2024, Hsiung had a lunch meeting with Sheriff Corpus at the Broadway Masala restaurant in Redwood City when he told her that he was not a good fit for the Office and was leaving, but would stay on a few months for the transition for his replacement. He also told the Sheriff, "Victor treats people like shit and makes them feel like garbage." The Sheriff's response was that she would talk to Aenlle.

- On June 21, 2024, Hsiung handed his official resignation to Sheriff Corpus and asked if he could say his goodbyes that day. Sheriff Corpus told him "No," and directed him to come in to remove his belongings on Saturday when none of the employees would be present. Sheriff Corpus asked Hsiung to sign a Non-Disclosure Agreement ("NDA"); Hsiung refused to sign it. **(Exhibit 28: Non-Disclosure Agreement)**

- On June 21,2024, Aenlle ordered a civilian employee (#15) to collect the badge, computer, and phone from Chris Hsiung who had just resigned as Undersheriff, and to

"watch him as he packs up." Aenlle also told the civilian employee, "I don't want him [Chris Hsiung] accessing his computer or anything else." Aenlle also directed the civilian employee to make sure that the devices were not wiped.

- The civilian employee did what Aenlle ordered, met with Hsiung on Saturday, and retrieved his devices and badge. Hsiung also handed the civilian employee a copy of his resignation letter. **(Exhibit 29: Resignation letter)**

- The following Monday, the civilian employee, following an established protocol for employee resignations, sent an email to payroll, Sheriff Corpus, and the PSB members, notifying them of Hsiung's resignation. Aenlle called the civilian employee and yelled, "Get that fucking thing off the computer system! He didn't resign. The Sheriff let him go. Call IT and tell them to erase it from the system. Call Julio Flores (IT)."

- The civilian employee called Flores in IT and said, "Victor directed me to erase the email from the system. I'm a messenger for Victor." Flores told her, "I don't think that we can do this. It's not a good idea." The civilian employee said, "I agree."

- Chris Hsiung learned that after he resigned in June 2024, Aenlle took possession of his work cell phone and laptop. Hsiung learned that Aenlle instructed IT, "don't wipe the phone," and that Aenlle took the phone and subsequently accessed it.

- Not long after Hsiung resigned from the Sheriff's Office, he had lunch with his friend East Palo Alto Police Chief Jeff Liu. Shortly after their lunch, Aenlle called Hsiung and said, "You are talking crap about me. Did you have lunch with Jeff Liu? Did you talk bad about me?"

- Subsequently, East Palo Alto Police Chief Liu told Hsiung that *before* their lunch, Sheriff Corpus called him to ask if he was having lunch with Hsiung. Chief Liu also told Hsiung that *after* their lunch, Sheriff Corpus again called him and asked, "What did you talk about?" Hsiung believes that Aenlle learned of his lunch appointment with Chief Liu by accessing his cellphone and then sharing this information with Sheriff Corpus.

- On September 3, 2024, at 1:51 pm, a sworn employee (#18) was ordered by Undersheriff Perea to serve a notice of discipline on a deputy. The sworn employee refused because he believed that the proper protocol had not been followed. According to the sworn employee, a complaint is first lodged with the Professional Standards Bureau (PSB), followed by an investigation, culminating in a memorandum recommending a formal investigation for misconduct that is submitted to the Assistant Sheriff for approval. In this instance, the Undersheriff reviewed the investigation, bypassing then-Assistant Sheriff Monaghan who was in charge of the PSB. The sworn employee believed that the Undersheriff improperly runs everything by Aenlle and that Aenlle was inappropriately involved in the investigation process.

- On September 4, 2024, at 9 pm, Aenlle called a civilian employee (#15) at her home and asked if the sworn employee (#18) who had refused to serve the notice of discipline was

still on probation. Aenlle said to her, "Is there something I'm missing? Why would he disobey a direct order, get IA'd [investigated by Internal Affairs] and be fired?" The civilian employee subsequently texted Aenlle that the sworn employee was not on probation. **(Exhibit 30 Screenshot of text messages between Aenlle and the civilian employee)**

- In January 2023, a sworn employee (#24) told a civilian employee (#3), "The Sheriff told me to take away your overtime on Fridays, and that you are taking too many vacation days." The civilian employee asked the sworn employee if he knew why the Sheriff was doing this to her. He said, "No, I don't."  The civilian employee was entitled to 18 days of vacation per year and had accumulated several days of vacation time and had never abused her use of vacation time.

- In April 2023, the sworn employee (#24) told the civilian employee (#3), "Check it out. I'm giving your overtime back," adding, "If [the Sheriff] has a problem, we'll cross that bridge when we get to it. I'm running the bureau."  The civilian employee had previously advised Sheriff Corpus not to hire Aenlle and believes that Sheriff Corpus retaliated against her for opposing Aenlle's employment in her administration.

- A civilian employee (#1) was terrified to tell Aenlle that she had secured another job at a different agency for fear of retaliation. Aenlle considered her to be his "eyes and ears" and his "right hand." When she told Aenlle that she was leaving, Aenlle repeatedly asked her to reconsider and remain as his assistant.

- In early April, 2024, at her farewell party in the Sheriff's Office, Aenlle, without any evidence, confronted her and accused her of posting negative comments online about Sheriff Corpus. She denied doing this, was devastated and reduced to tears by Aenlle's accusation, thereby ruining her departure from the Office.

- Then-Assistant Sheriff Monaghan and another sworn employee (#8) spoke with the civilian employee (#1) and consoled her. He told her that she had the option of filing a complaint with Human Resources about Aenlle's conduct. The civilian employee subsequently filed a complaint.

- Two days before she left the Sheriff's Office in 2024, Aenlle told her, "We have a "problem," and to keep what he had to tell her "internal." Aenlle said that he had learned that a civilian employee, who was being considered for a promotion had, in 2022, taken down Corpus' campaign sign from a body shop owned by Victor Khedr. Aenlle told her that no way was the employee going to get the promotion. When the civilian employee said that what the employee did during the campaign was not relevant, Aenlle said, "She's out."

- In late April 2024, after the civilian employee (#1) had left the Sheriff's Office, and while her complaint against Aenlle was pending with Human Resources, Aenlle came to Monaghan's office, closed the door and said, "Can we talk about the [Name of civilian employee (#1)] thing?" Aenlle said that he didn't do anything wrong and that he wanted

to "clear the air" with the civilian employee who had filed a complaint with Human Resources. Aenlle said, "Everyone thinks [name of civilian employee (#1)] is meek; she's not. She's emotional and mentally unstable." Aenlle went on to say that he had evidence about her. He raised his voice and said that he was prepared to sue her for defamation if she bad-mouthed him," adding "I have evidence. I will sue her." Aenlle complained, "I have a problem with the way this was handled in the beginning." Monaghan told him, "It was handled appropriately."

- On June 24, 2024, the civilian employee (#1) attended a public swearing-in event with a police chief of a local law enforcement agency, who was her new boss. Aenlle was there, standing with Sheriff Corpus Assistant Sheriff Monaghan, and another member of the Executive Team. When Aenlle saw the civilian employee (#1), Monaghan heard Aenlle say, "How dare she show up here. I'd like to smash her face in."

- On June 13, 2024, a sworn employee (#8) refused to accept an application for a "special deputy sheriff" non-access ID card because he did not know the applicant. He subsequently learned that the application was for a friend of Aenlle. Aenlle was upset about the sworn employee's refusal to sign off on the application and said to Monaghan "Who the fuck is [Name of sworn employee (#8)] to question this?!"

- On June 19, 2024, the sworn employee (#8) was transferred to the jails, without being given the standard 2-weeks' notice for transfers. He believes that his assignment to the jails was retaliation by Aenlle for the sworn employee's refusal to sign off on the application. He also believes that his immediate transfer was retaliation for how he handled the civilian employee's (#1) complaint against Aenlle, and for pursuing an Internal Affairs investigation into the misconduct of a deputy who is a close ally of Sheriff Corpus.

- On April 3, 2024, a civilian employee (#1), who was visibly upset and crying, told the sworn employee (#8) about a disturbing interaction she had just experienced with Aenlle at her going away party. The civilian employee said that she felt that Aenlle's conduct toward her was workplace harassment. The sworn employee told her that she could file a complaint against Aenlle with Human Resources. The sworn employee then reported the interaction to then-Assistant Sheriff Monaghan. On April 5, 2024, the sworn employee told Monaghan that the civilian employee was still upset and that he believed that Aenlle's behavior had been inappropriate.

- Later that month, after the civilian employee had left her employment at the Sheriff's Office, Aenlle confronted the sworn employee (#8) about the incident. According to the sworn employee, Aenlle said that he didn't do anything wrong and that he wanted "to clear the air" with the sworn employee. Aenlle said, "I have a problem with the way this was handled in the beginning. It was handled appropriately. We need to be more careful about believing the first person who comes forward with a complaint." The sworn employee stated that Aenlle raised his voice and was angry.

- On April 24, 2024, the sworn employee (#8) was told by another sworn employee (#19) that a deputy had improperly intervened in a Zoom meeting of employee-panelists whose job was to interview applicants seeking employment with the Sheriff's Office. The sworn employee subsequently conducted an investigation that included witnesses to the incident and concluded that the deputy's conduct was egregious. He wrote a 9-page memorandum documenting his investigation; on April 29, 2024, he sent the memorandum to a Captain (#18), then-Assistant Sheriff Monaghan and to then-Undersheriff Hsiung.  On May 2, 2024, the sworn employee was informed by Hsiung that there would be no formal investigation. He subsequently learned that the deputy received verbal counseling.  The sworn employee believed that the deputy was given favorable treatment because the deputy's brother had sponsored a fundraiser for Sheriff Corpus' election campaign.

- In June 2024, a sworn employee who is an officer with the Deputy Sheriff's Association ("DSA") (#5) graduated from the County's year-long leadership program. He attended the graduation ceremony with his spouse, his mother, and his three adult children. Aenlle was at the ceremony. After the ceremony, an adult son of the sworn employee asked who the guy in the cowboy hat was. The sworn employee said that it was Aenlle. His son then described his handshake with Aenlle, saying, "He [Aenlle] shook my hand and wouldn't let it go. He kept squeezing it so hard that I had to use my other hand to get out of it. The whole time he stared into my eyes."  The sworn employee believes that Aenlle's threatening conduct toward his son was an attempt to intimidate the sworn employee for his leadership position with the DSA and for Aenlle's hostility toward the union.

- Aenlle had made it clear to a civilian employee (#12), that he doesn't think that the labor unions should be running the Sheriff's Office. Aenlle told her, "You can't have the tail wag the dog." When the civilian employee responded, "This is California law---bargaining in good faith," Aenlle said, "We already met. We're not going to give the DSA anything they want. We're giving them nothing."

- Tuesday, August 13, 2024, there was a Professional Standards Bureau meeting at which Undersheriff Perea, sworn employee (#13), a Lieutenant, a sworn employee (#18), and two deputies were present, along with a civilian employee (#12).  Aenlle ran the meeting. When the overtime issue came up, Aenlle said, "If people don't like it, they can just leave. We can hire 110 more people." Aenlle told Deputies ████ and ████ "You are DSA members; you should take over the DSA."

- In early August 2024, at 11 a.m., there was a second emergency staffing meeting in the 4th floor conference room. At the meeting were Aenlle, Undersheriff Perea, then-Assistant Sheriff Monaghan, a Captain, a civilian employee (#15), a Lieutenant,  a Deputy, and two sworn employees (#18) and (#13). Sheriff Corpus was not in attendance. According to a sworn employee (#13), Aenlle ran the meeting. When someone asked, "People are asking how many hours do they need to work before being mandated?" Aenlle responded, "You're looking at the wrong thing. The power of the DSA isn't with the board; it's with the members. I encourage you to tell people to vote out the DSA Board."

- In December 2023, a sworn employee who is a female (#20), authored and circulated an email opposing the Sheriff's proposed budget cuts that would adversely impact salaries of the Lieutenants. Shortly thereafter, the sworn employee received a call from her immediate supervisor who told her that Sheriff Corpus had called him and ordered the sworn employee transferred from her special assignment with the Command of Crisis Negotiation Unit, a position that she had successfully held for three years and that required a special FBI security clearance. The sworn employee believed that the Sheriff's order for her transfer was retaliation for circulating the email.

- For Women's History Month in March 2024, Aenlle approved a post on the Office's Instagram with photos showcasing the Office's women of rank. However, when the photos were posted, they excluded <u>the longest ranking female in the Office</u>--- the sworn employee (#20) who had circulated the email. She subsequently learned from a Captain that it was Aenlle's decision not to include her photograph in the post.

- On Thursday, September 12, 2024, the sworn employee (#20) was assigned by Assistant Sheriff Monaghan to ride in the motorcade detail for candidate Trump's visit to Woodside. The assignment was confirmed by another sworn employee (#16) who provided her with the Secret Service plans for the detail. Later that day, her assignment was abruptly switched to providing security at the perimeter, a less prestigious assignment. She believes that the reassignment was continued retaliation by the Sheriff. The sworn employee was also advised to attend an 8am briefing the next morning at Woodside Town Hall.

- That evening, at 8:52 pm, Undersheriff Perea called the sworn employee (#20) at her home and asked who had assigned her to the motorcade detail. He repeatedly questioned whether she intended to be at the 8 am briefing. Assistant Sheriff Monaghan was also on this call because he had been ordered by the Undersheriff to do so. The sworn employee found the Undersheriff's tone of voice to be "aggressive, accusatory, and condescending." She subsequently lodged a complaint against Undersheriff Perea with the County's Human Resources department. The sworn employee believes that her reassignment to the perimeter of the Trump detail and the harassing call from the Undersheriff were retaliation for her circulating the email. **(Exhibit 31: Complaint of sworn employee (#20)**

- Sheriff Corpus was asked by federal security personnel to designate two people from her security detail to be photographed with presidential candidate Donald Trump on Friday, September 13, 2024. The Sheriff designated a Captain and a Deputy. The day after the event in Woodside, on Saturday, September 14, 2024, at10:45 a.m., then-Assistant Sheriff Ryan Monaghan received a call from a friend who was an FBI special agent in San Francisco, and who had been assigned to the Trump detail.
The agent described the following interaction that he had with Aenlle at the event: The special agent had the names of the two individuals that Sheriff Corpus had selected for the photo-ops. He was approached by Aenlle who said, "I'm here to take the photo for the Sheriff. I'm the Chief of Staff." The agent told Aenlle that he wasn't on the list and that

the Sheriff had already selected the two people for the photos and gave Aenlle the names. Aenlle then said, "Who? A deputy getting a photo over me?!" The agent told Monaghan that Aenlle was "one of the most arrogant pricks I've ever seen." He called Aenlle an "arrogant asshole" and said that Aenlle was "poor representation of your Office." Because Aenlle "made a scene," the special agent reluctantly acceded to Aenlle's demand and allowed him to be photographed instead of Deputy ██████ **(Exhibit 32: Photo of Aenlle with Donald Trump)**

- As noted in Allegation 3(d), a sworn lieutenant employee (#18) and a civilian employee (#15) interviewed three candidates for the Professional Standards Bureau, they selected Candidate #3 as best qualified for the position. However, they were informed by Undersheriff Perea that it couldn't be Candidate #3 and that it had to be another candidate. Candidate #3 had previously failed Aenlle in the Field Training Program. In the presence of the sworn employee (#18) and Sheriff Corpus, Aenlle said, "We're going to move him [Candidate #3]."

- According to a civilian employee (#1), Aenlle and Sheriff Corpus are obsessed with loyalty. Aenlle, on several occasions, told the civilian employee the names of employees whom he disliked and hated, telling her that they were disloyal and "fuck them." The civilian employee said nothing because she was fearful of Aenlle.

- In May 2024, the Sheriff's Office relocated to the new administration building in Redwood City. A civilian employee (#6) was involved in the move-in on a Friday. At 4:30 pm Aenlle, who had not been there all day, came in and asked if all of his personal "stuff" had been hung on the wall (pictures, his mirror, etc.). The civilian employee was extremely tired after having stacked 30 bins. Aenlle ordered her to look through all of the bins for a hammer to hang his items. She did so because she feared Aenlle. It was not until 6 pm before she was able to leave. Aenlle did not hang his personal items; instead, he directed two Captains to do it for him.

- In March 2024, there was a training at a conference in Vacaville that 9-10 employees of the Sheriff's Office attended, including, a civilian employee (#6). During a break, the civilian employee bought coffee from Starbucks for the team and placed the drinks on a table in an empty room. Aenlle walked in and bumped the table with his backpack, spilling all of the coffee on the floor and on his clothing. Aenlle did not apologize. Aenlle grabbed some paper towels and tossed them at the civilian employee, saying, "Here you go, [name of the civilian employee (#6)]." Aenlle then walked to the bathroom to wipe the coffee that had splashed on his clothing. The civilian employee cleaned up the coffee, fearing that if she said anything to Aenlle, he would retaliate.

- Four to five times, Aenlle told a civilian employee (#6), "There's a rat in this office. I'm gonna' find out who it is."

- In early 2023, before the move to the new administration building, a sworn employee (#23), walked on to the 3rd floor of the Hall of Justice where he saw Aenlle and Sheriff Corpus standing in front of the Sheriff's door. Aenlle glanced at him then turned his back.

Aenlle repeated this conduct and turned his back when the sworn employee passed him upon leaving the floor.

- Several interviewees stated that Aenlle raises his voice and becomes angry when sworn and civilian employees do not agree with him. Almost to a person, female civilian employee interviewees reported being intimidated by Aenlle.

- In December 2023 there was a toy wrapping event in Redwood City. Then-Undersheriff Hsiung was there, along with Sheriff Corpus and Aenlle who was in uniform. At one point, Sheriff Corpus said to Hsiung, "[Name of a sworn employee (#19)] didn't say hi to me. He wouldn't have done that to Bolanos."

- The next day, Sheriff Corpus ordered Hsiung to write up the sworn employee (#19) for misconduct. Hsiung asked her, "What's the policy violation?" to which the Sheriff responded, "I don't know." Hsiung said that he told the sworn employee what the Sheriff had directed him to do, whereupon the sworn employee said, "You've got to be kidding me."

- On April 17, 2024, Hsiung attended a public event at which several sworn employees were texting one another using Evertel, an app for secure law enforcement messaging. One of the texts read, "[Name of sworn employee (#19)] took a screenshot of this chat." The chat was critical of Aenlle's and the Sheriff's relationship. Thereafter, Sheriff Corpus said to Hsiung, "I want [Name of sworn employee (#19)] written up." Once again, Hsiung asked her, "What's the policy?" Sheriff Corpus told Hsiung, "Make one up or add a policy."

- Captain ████████ had nearly 20 years with the Sheriff's Office. She documented interactions of retaliation against her by Sheriff Corpus and by individuals under the direction of Sheriff Corpus after she gave notice in June 2024 that she was leaving her position with the Sheriff's office for employment with another law enforcement agency. She had been serving as Captain at the Half Moon Bay Substation.  **(Exhibit 33: Cpt. ████████ chronology of retaliation)**

- Among the acts of retaliation documented in Captain ████ chronology that occurred while she was still employed at the Sheriff's Office are (1) deleting her NextDoor goodbye post to the Half Moon Bay/Coastside community, (2) revoking her access to NextDoor, (3) revoking her access to Evertel (a secure law enforcement communications system to share critical information), (4) locking her out of her email account, (5) denying her access to the Sheriff's Office website, (6) locking her out of her Half Moon Bay Substation, (7) prohibiting her from using any social media, (8) prohibiting her from sending emails, and (9) requiring a monitor to be present when she removed her personal belongings.

- County Executive Callagy spoke to Sheriff Corpus and suggested that she reconsider locking out Captain ████ Sheriff Corpus told Callagy that she would reverse her decision to lock out Captain ████ However, Sheriff Corpus did not change her order,

with the result that Captain ██ was improperly denied access to her office. Then-Undersheriff Hsiung texted Sheriff Corpus, advising against the lock out of Captain ██ **(Exhibit 34: Cpt. ██ lock out text messages)**

- On August 13, 2024, Aenlle summoned a civilian employee, (#15) and told her, "The County is investigating me. I believe the County Executive is targeting me so he can remove me and weaken the Sheriff's stance. She didn't get here alone. I helped her get elected. I own the third largest parcel in San Mateo County. It's worth $60 million. The County Executive has tagged a bunch of buildings on my properties as a way of messing with me."

- A few weeks ago, a civilian employee (#15) was directed by Aenlle to request that all Captains donate $500 gift baskets to the upcoming SAL fundraiser. She relayed the message to each Captain, being sure to state that the request was from Aenlle, adding, "I'm just the messenger." A sworn employee (#18) a Captain, and former Assistant Sheriff Monaghan believe that the request is inappropriate and that donating is a test of loyalty to the Sheriff and Aenlle. When two Captains subsequently declined to make the $500 donations, the civilian employee (#15) heard Aenlle say, "Hmmm. . . that's very telling. It's disappointing." Sheriff Corpus asked the civilian employee, "Is it true that [names of two captains] refused to give a gift basket? When the civilian employee said, "Yes," Sheriff Corpus responded, "After everything I've done for them."

- In August or early September 2024, sworn employee (#24), was requested to donate a $500 basket for a SAL fundraiser. A civilian employee (#15) made the request and told the sworn employee that she was making the request "on behalf of Victor." He could see that the civilian employee was uncomfortable making the request. The sworn employee felt like this request was an inappropriate and an unethical "pay to play," and a loyalty test. He told the civilian employee, "Victor has my number. He can ask me." He then told the civilian employee that he "respectfully declined to donate."

- The first week of September 2024, at 9:30 am, Undersheriff Perea, Aenlle and the Captains were in a briefing meeting in the Sheriff's conference room. When Aenlle and the Undersheriff arrived, they sat next to each other. The Undersheriff said, "These briefings are high level, and succinct. It's 9:34 and this meeting will be over at 10 a.m." While the Undersheriff did most of the talking, Aenlle stared at the sworn employee (#24) and said, "Thank you to those of you who donated." The sworn employee stared back at Aenlle. The sworn employee felt that retaliation was coming because he declined to donate the $500.

- The sworn employee (#24) attended the DSS/OSS press conference in September 2024. He had emailed a request to Assistant Sheriff Monaghan for one-hour vacation time, a request that Monaghan approved. At the press conference, the sworn employee wore a "cover coat" that covered his badges and patches because he did not want anyone to think that he was there while on duty. At the press conference, he saw a Deputy milling about in the rear while talking on his cellphone. The sworn employee believed that the Deputy, favored by Sheriff Corpus, was identifying for Sheriff Corpus and/or Aenlle employees who were in attendance so that they could retaliate against the employees.

- 49 -

- The day after the press conference, the sworn employee (#24) learned that two Internal Affairs file numbers were pulled for an investigation into two Captains. The names of the Captains were not attached. The sworn employee found this to be unusual because the names of the subject officers are typically attached to Internal Affairs investigations. The sworn employee (#24) is a Captain. He and another Captain (#19) were the only Captains who attended the press conference. The sworn employee knew that that the other Captain had also taken vacation time and was wearing a cover coat. The sworn employee (#24) believes that Sheriff Corpus and Aenlle are gearing up to demote or fire him and the other Captain in retaliation for their attendance at the press conference and for refusing to donate $500 baskets for the SAL fundraiser.

- The next morning, there was a swearing-in ceremony in Millbrae. When the sworn employee (#24) and his administrative assistant (#3) walked to the entrance of the building, Sheriff Corpus was seated in her car, talking on her phone. The sworn employee was in uniform. He learned later that the Sheriff uttered a profanity at his administrative assistant for not saying "Hi" to the Sheriff. Inside, he saw Aenlle and said "Hi" to him. Aenlle shook his hand by grabbing it tightly and shaking it back and forth, as if to say, "I see you!" Aenlle was not in uniform and was wearing a suit. The sworn employee did not notice if Aenlle was wearing a firearm or a badge.

- When the sworn employee was seated, Undersheriff Perea walked up to him, stood very close so that Perea's crotch was in close proximity to the sworn employee's face. Undersheriff Perea looked down at the sworn employee and said, "Hello, Captain." The sworn employee, who is 6'4" tall, slowly stood up and shook the Undersheriff's hand. The two were nose to nose as the sworn employee said, "Hello, Undersheriff." The sworn employee believes that Undersheriff Perea was trying to intimidate him.

- After the ceremony, there was a debrief meeting about the Millbrae Arts and Wine Festival. The Millbrae City Manager was present. The City Manager told the sworn employee (#24) that he had received a call from Sheriff Corpus about a "meeting," referring to the press conference that the sworn employee attended the day before. The sworn employee felt that the Sheriff was laying the groundwork to retaliate against him.

- On Thursday, September 19, 2024, the sworn employee (#24) attended a 10 a.m. press conference convened by Sheriff Corpus at which Aenlle was present. The announcement of the press conference was not office-wide; however, the sworn employee had heard about it and arrived at 9:45 a.m. The sworn employee approached Sheriff Corpus who immediately turned her back on him. He then shook hands with Aenlle. He subsequently said "Hello" to the Sheriff. A short time later, Sheriff Corpus asked to speak with the sworn employee. She told him, "You don't need to stay. You can go." The sworn employee said "Okay" and left. The press conference was an outdoor public event.

- On Friday, September 20, 2024, the day after Assistant Sheriff Monaghan was fired by Sheriff Corpus, Monaghan spoke with the sworn employee (#24) telling him, "Hey, last week I spoke to [name of civilian employee (#33)] who said that she heard that the City

Manager [of Millbrae] was upset with the sworn employee attending the press conference." Thereafter, the sworn employee called the City Manager and told him what he had been told by Monaghan. The City Manager was livid and said, "If Victor messes with you, I will form a new Millbrae Police Department and hire you as the police chief." The sworn employee feels that Sheriff Corpus and Aenlle are defaming him and harming his reputation, as well as retaliating against him.

- A few weeks ago, a civilian employee (#15) associated with Human Resources, noticed a man whom she did not recognize sitting in a nearby office. She asked him who he was and was told that this was his first day as a new hire in the Professional Standards Bureau. He told her that he was an extra-help deputy from the San Francisco Police Department. His hiring was not announced to the civilian employee or to her team. The deputy had an access card and an ID card. Despite there being an empty office at the end of the hall, he was seated outside her door. The civilian employee had no idea what the extra-help deputy's role is in the PSB since he had no desk and no assigned duties. The civilian employee was concerned because she is obligated to give the deputy full access to everything on the Professional Standards Bureau. The civilian employee subsequently learned that the deputy is a good friend of Undersheriff Perea. The civilian employee felt intimidated having an unfamiliar sworn staff member parked outside of her door.

- Ryan Monaghan was an Assistant Sheriff and a member of the Sheriff's Executive Team. He has 30 years of law enforcement experience, with 26 of those years at San Mateo Police Department. He also served as a Police Chief. Monaghan directly reported to the Undersheriff. Monaghan documented interactions of retaliation and intimidation by Sheriff Corpus, Aenlle, Undersheriff Perea and by other individuals under the direction of Sheriff Corpus. **(Exhibit 35: Monaghan's chronology of retaliation)**

- Among the acts of retaliation and intimidation by Sheriff Corpus and her Executive Team documented in Monaghan's chronology are (1) repeated criticism of him by Sheriff Corpus and Aenlle about the handling of a civilian employee's (#1) complaint against Aenlle, (2) belittling him, (3) badmouthing him to civilian employees and to sworn employees, (4) accusing him of sharing "private" information with the County Executive, (5) being treated as Aenlle's subordinate, (6) excluding him from Executive Team meetings, (7) excluding him from meetings involving his subordinates, (8) excluding him from Internal Affairs investigations over which he was responsible, (9) receiving a bizarre "haters" video from Sheriff Corpus' personal Instagram account (**Exhibit 36: Sheriff Corpus Instagram "haters" post to Monaghan**), and (10) questioning by Sheriff Corpus and Aenlle about his speaking with this investigator.

- On Tuesday, September 17, 2024, Monaghan attended a city council meeting in Half Moon Bay. Present at the meeting were Aenlle, Sheriff Corpus and Undersheriff Perea. After the meeting, in the parking lot, Aenlle, in the presence of Undersheriff Perea, asked Monaghan if he had spoken to this investigator. Monaghan responded, "Yes." Aenlle asked, "When were you going to let us know?" Monaghan told Aenlle that it should have been understood that he, Monaghan, would cooperate with the investigation.

- On Wednesday, September 18, 2024, at 9:45 am, Monaghan was at the Millbrae Recreation Center to attend a Sheriff's Office ceremony at which Sheriff Corpus was present. Monaghan told the Sheriff that Aenlle had asked him if he had spoken to the investigator and told her that it was inappropriate for Aenlle to have asked him. Sheriff Corpus disagreed and said that Aenlle had been hearing things and was just asking a question. Sheriff Corpus referred to the investigation as a "witch hunt."

- Two days later, on Friday, September 20, 2024, after directing her civilian employees to go home early, Sheriff Corpus called Monaghan into her office and fired him. Undersheriff Perea was present. Sheriff Corpus told Monaghan that she no longer trusted him because "people" said that he wasn't loyal. Monaghan was not given an opportunity to resign. Instead, he was escorted to his office by Undersheriff Perea who took possession of Monaghan's firearm, badge and ID card. Monaghan was walked out of the Administration Building by Undersheriff Perea. Monaghan believes that Sheriff Corpus fired him in retaliation for cooperating with the investigation and for standing up to Aenlle.

**Aenlle's Response to Allegation #4:**
This investigator: "Have you ever attempted to change the resignation of a sworn officer to a firing of that officer?"

Aenlle: "No."

This investigator: "And I'll be specific. I'm talking about Chris Hsiung. Did he resign, or did he -- was he fired?"

Aenlle: "My understanding is – my understanding is that he resigned. What Chris told me is, 'I beat her to the punch by two -- you know, by a couple hours,' or something like that. I did not ask. I didn't inquire about the sheriff. It was not my business. She -- she can fire and hire whoever she wants. It was not my role. I learned from that from --from -- from Chris Hsiung."

This investigator: "So you never said to anybody, 'He was fired.' It's not 'resigned.' He was fired"?

Aenlle: "No." (Aenlle Transcript at pg. 89)
                    . . .      . . .     . .
This investigator: "Have you asked anyone, sworn or civilian, in the office if they have been questioned by me?"

Aenlle: "Yes."
This investigator: "And can you tell me who you asked?"

Aenlle: "Former Assistant Sheriff Monaghan."

This investigator: "Anyone else?"

Aenlle: "No, not that I can think of."

This investigator: "And why did you ask him why –"

Aenlle: "It was in passing. I was actually kind of glad. We were having a short talk -- a small talk with the undersheriff, non-confrontational.  I said, 'Hey, [Ryan], have you -- have you -- have you talked to her?' And he's like, 'Yeah, I have.' I'm like, 'Whoa. Wow. Great.' And then I went to the bathroom. That was it. I didn't ask, 'What did you tell her? I didn't ask, 'What was it about?' Zero. I didn't ask any further questions at all whatsoever. I was kind of glad to hear that somebody on my team that had seen what I've done and not done here at least had a chance to speak to you."

This investigator: "In that conversation with then Assistant Sheriff Monaghan, did you say to him, 'Why didn't you tell us?'"

Aenlle: "No. I said, 'I thought you would tell me.' And he goes, 'No. I thought it was implied.' I'm like, 'Oh, okay.' That was it."

This Investigator:  . . . "So the reason you asked him was why?"

Aenlle:  Curiosity, ma'am. There was a lot of rumors in the office. There have been a lot of rumors for quite some time now, and, you know, I'm sure the rumors got blown up, and -- and it was more of a curiosity than anything else. There was no malice behind it. I wasn't upset. It was -- it was literally a couple words, and I kept going about my business. No big deal. I was kind of glad that he got interviewed by you."

This investigator: "So it was curiosity, not about retaliation?"

Aenlle: "Oh, ma'am, absolutely not. . . I -- I -- I just want to make that clear. Absolutely not. . . And -- and my demeanor was very calm, and I really just -- I -- I was -- actually, inside I was actually kind of glad. I'm like, 'Okay. Good. At least she talked to you.' Because the information that was coming back to me, ma'am, to be honest, is that you were only talking to the people that you were instructed to talk to; that there was other people that reached out to you, captains and manager and people to -- that wanted to be interviewed and -- and share their experience with me, and they never got a call back.· And -- and that's some of the rumors that were taking place."
This investigator: "Got it. When you had the conversation with Ryan Monaghan."

Aenlle: "Yes."

This investigator: "was -- was the sheriff there during that conversation?"

Aenlle: "The undersheriff was there, ma'am."

This investigator: "But the sheriff was not?"

- 53 -

Aenlle: "No. Not at all."

This investigator: "Did you -- did you tell the sheriff later that you had asked Ryan and what Ryan said, he had talked to me? Did you tell her that?"

Aenlle: "Yeah. I think in a conversation with the undersheriff and sheriff, I said, 'Oh.' I mentioned Ryan. 'He got interviewed.' It was like, 'Oh, okay. Cool.' That was it. It was not a big discussion. It was not -- actually, I take it back. I think it was Ryan that told her, and then she kind of mentioned that Ryan mentioned it to her. I said, 'Yeah, he was.'" (Aenlle Transcript pgs. 89-93)

. . .     . . .     . . .

This investigator: "A subject that's, you know, not one of your favorites, but can we talk for just a bit about [Name of civilian employee (#1)] please?"

Aenlle: "Yes, please. Absolutely. . . And, Judge Cordell, I'm open to talk whatever it is you want to talk about. There's nothing I'm hiding, and -- and I really do want to clear my name."

This Investigator: "[Name of civilian employee #1]. Has she -- after an interaction with you, she filed a complaint with HR. She's no longer there at the Sheriff's Office. Her complaint is that you, without any evidence at all, accused her of posting criticism, bad stuff, about the sheriff, posting online, and -- and that your doing this was really retaliation because she was leaving, and you didn't really want her to be leaving the position. Can you talk to me about that, your -- your --your side of this."

Aenlle: "I would love to, ma'am. That never happened. And -- and just to back up, [Name of civilian employee #1] is a wonderful person. I -- she was probably one of the best admin assistants that I had while here. I consider her a friend. Over the top. I can't give her enough. I don't know who put her up to this or why she did this because this is completely false, and I'll share with you why. In my computer, I have a folder saved with1,000 emails that I was going to make available to you of how wonderful of a boss and how incredible I've been with her. A thousand emails. On my phone, I also wanted to share with you -- let me back up and – and tell you.
"I was in my office. I think it was like the last day she was going to be there, and -- and she came in. I'm like, 'Hey, [Name of civilian employee (#1)] check out this email – this text.' It was that lady from -- from one of the organizations that said, 'Hey, it's a good thing that, you know, your assistant is leaving because she's talking pretty -- pretty bad about you and the sheriff.' And I'm like, 'What?' And literally my text says, 'No, not [Name of civilian employee #1]. Impossible.' It's in my phone.

"So she came in. I'm like, 'Hey, I just want to make you aware that whoever these silly people are that are posting things online, like the comments on the article, they're -- they're making it sound like you.' But I told this lady, 'No way. Not [Name of civilian employee (#1)]. I don't believe it for one second.' That was it. That was it. And like -- and she made a comment like, 'God, people are horrible, Victor. I'm like, 'Yeah, I know.' And then she left my office, and then she went to her office or whatever.

- 54 -

"A short time later, I stopped by her office because I wanted her to mentor one of the intern - - interns to cover until I got a full-time person, and I had another chat with her.  I sat on the chair. And then at that time, I could see that she was -- had a little bit of watery eyes, and she was crying. I'm like, '[Name of civilian employee (#1)], don't -- don't worry about it. I -- I -- just -- just don't even -- don't even think twice about it. People are like that. I – not for a moment did I even think it was you.'

"And then she just -- she goes, 'I know, Victor, but it's hard.' And -- and I left there. She was crying a little bit. [Name of civilian employee (#1)] tends to -- just to put things in con- -- in context, [Name of civilian employee (#1)]'s a wonderful person, but she does run a little bit high on anxiety. For example, when the sheriff was -- was doing a 'Shop with a Cop,' [Name of civilian employee #1] was in charge of the decorations for the building with one of our other admins here. And when the sheriff went by to visit it and she looked at it, she goes, 'Oh, no. It's -- I – I really' -- she didn't like it. She wanted more decorations. [Name of civilian employee (#1)] went into the bathroom and -- and started crying. And I was later told by the other admin that she didn't eat or sleep for three days because of that. So she's a little bit sensitive; right?

"So I -- I left her office. Everything was fine. I came in my office, and then I hear that she's not doing well and she's crying or whatever. Former Assistant Sheriff Monaghan apparently went to go see her, which I don't know why he would do that, but he went to go see her. And then he came by my office literally after that, and he said, 'Hey, Victor, [Name of civilian employee (#1)] is really upset,' whatever, 'but I told her just to come and talk to you.' That's directly from Sheriff – Assistant Sheriff Monaghan. 'But I told her to come talk to you.'

"So if -- if -- if the allegations that I berated her and I screamed and whatever were true, why would he ask her to come and talk to me? It's impossible. So she did come back to my office and talked to me, and -- and she was upset. And I'm like, '[Name of civilian employee (#1)], I never thought about it again. I wish you didn't take this so hard.' I'm really sorry, but you don't have any issues with me. I never believed it. So I want to read to you, Judge Cordell, -- two -- two of the texts that I saved on my phone.

". . . So on March, 2021, at 2- -- at 12:51 – so after the alleged incident in her office -- sorry. I take it back. April 3rd at 1:44 PM. That was her last day there. After the incident in her office or whatever -- this is closer to the afternoon right before she was leaving because she got off at 3:00 or 2:00 or whatever it was. She says, 'Are you in your office?' And I said, 'Yes, I'm here. You want to --I heard you want to stop by.' And she said, 'Yeah. It's okay. I just needed to calm down a little bit. I don't know why that person would say those things. I just needed to re- --reiterate that those are total lies, and I don't appreciate her saying them.' And I said, '[Name of civilian employee (#1)], forget it. Stop by. Come see me,' or whatever I said.

"I went back on my -- on my texts, and I found -- there's many of them, but one specifically is two weeks before is when she had to give me her -- her two weeks' notice. And she said, 'I'm sorry I had to email that letter. I was going to give it to you in our meeting yesterday. I

know there's lots to discuss, and I will do whatever possible to make this perfect -- make this the perfect transition for you,' exclamation mark. And I said, 'I understand.' And then she texted, 'You've always been kind to me. I will never forget that.' I would be more than happy to share those texts with you."

This investigator: "So anything else you want to add about [Name of civilian employee (#1)]?"

Aenlle: "Nothing. I think she's wonderful. I'm -- I'm really surprised that she did this. I don't know what -- what the motive is behind it. I've never had anything bad with her. I care deeply about her. I thought she was great, and I really enjoyed my time with her, honestly. It was -- I was very saddened to – to really see this because it -- I've never been mean to her. I never raised my voice. I never accused her of -- of -- that it was her. Not at all whatsoever.  I only made her aware of it just because I know that she's sensitive and if she learned that from somebody else or somebody said to her, I knew it was going affect her. So I wanted to give her the heads-up. But at no time did I accuse her of anything, ma'am."

This investigator: "So that was really --the last question I want to ask about that incident is that you got a text, and you knew –there was no merit to it."

Aenlle: "Because she's my friend. I wanted to share it with her. That's -- that's -- that's the only reason why. Because she was going to find out anyways because, you know -- ma'am, the Sheriff's Office is -- is a tunnel, I mean, of rumors and everything else. Once something is found out, it literally takes seconds to fly through the entire office, whether it's good or bad, ma'am." (Aenlle Transcript pgs. 93-101)

· · ·        · · ·        · · ·

This investigator: "Have you ever been involved in changing assignments of sworn personnel as retaliation?"

Aenlle: "I have never retaliated in any form of anybody in -- in the office at all. Ma'am, I -- and just to put that in context, I know what it feels like, ma'am. When --when I supported the sheriff and initially came out, the information that I was going to be helping her with the campaign, I was kicked out of the range staff after nine years of -- of working for free, and I was one of the top trainers. I'm a POST-certified trainer. I was kicked out of there. And -- and -- and the sheriff at that time told -- told the sergeant, 'He needs to be shut down.' If that's not retaliation, I don't know. So I know what -- I know what it feels like, and -- and that's not the kind of person I am, which a lot of people here -- they've done a lot of bad things. Neither the sheriff or myself at any given point have retaliated against anybody. They've actually been promoted.  One of the things I admire about the sheriff the most is -- is that she separates, and she's very good to people." (Aenlle Transcript at pgs. 102-103)

…                    …

This investigator: "Have you ever gained access to and then searched electronic device of a sworn personnel?"

Aenlle: "No. And I don't -- and to be clear, can you -- are we talking about -what are we talking about here?"

This investigator: "I'm talking about either a phone or a laptop."

Aenlle: "No."

This investigator: "Have you ever gained access to and searched the electronic device of a sworn personnel after the person left the Sheriff's Office?"

Aenlle: "I was instructed to collect the things and by the undersheriff to go ahead and have ISD process it so we can wipe it and reassign the equipment. . . But I did not search any devices at all whatsoever."

This investigator: "So when you said "ISD," what is that? "

Aenlle: "It's -- it's the County's official IT department. It handles all our stuff. . .
It's a process. I go through my IT department. I am the director, the DSU of the IT department. So I give them the equipment, just like we've done in the past, and they do what they need to do, and then they get cleared, and they get reissued."

This investigator: "Have you ever given a directive not for an -- for a phone and a laptop from an officer -- from a sworn personnel who has left -- have
you ever given a directive to anyone to say, 'Give me' -- you. That is you, Mr. Aenlle – 'the phone and the laptop'?"

Aenlle: "No, ma'am."

This investigator: ". . . Specifically, have you ever requested that the phone and the laptop of Chris Hsiung, who was the undersheriff who left -- have you ever directed that you be given his two -- those two devices?"

Aenlle: "No, not to my recollection. Not -- not at all."

This investigator: "Have you ever looked into Chris Hsiung's cell phone after he left?"

Aenlle: "Not that I can recall. There's nothing I would look in there for (unintelligible)."

This investigator: "Have you ever inquired about a conversation that Chris Hsiung, the former undersheriff, had with the Chief of East Palo Alto Police Department?"

Aenlle: "Oh, absolutely. I had a conversation with Chris Hsiung."

This investigator: "And can you please tell me about that."

Aenlle: "'Chris, I heard that you're saying not so nice things about me; that you're claiming that you left the Sheriff's Office because of me.' And he basically told me, 'No, Victor. That's not true. I didn't leave because of you.'"

This investigator: "Either he called you or you called him. I don't know."

Aenlle: "I called him."

This investigator: "All right. And did you – did you call him and ask him about speaking with the Police Chief in East Palo Alto?"

Aenlle: "He already knew. I just called him and said, 'I understand that you're not saying nice things about me.' We had a nice talk. He understood. He agreed. He said, 'Hey, this is not between us. We don't have to say that.' He -- he was upset that he thought I was saying something about him. And we cleared -- cleared it up, and that was it. . . But, yes, I called him and had a conversation with him."

This investigator: "Did you know that he was meeting with the police chief of East Palo Alto?"

Aenlle: "Yes. I -- I knew he was meeting -- that he had met with him."

This investigator: "How did you know that?"

Aenlle: "I don't recall how I learned that. . . I don't recall. . . Some -- one of the people in – in East Palo Alto."

This investigator: "I'm sorry. I didn't understand."

Aenlle: "It could have been one -- one of the employees in East Palo Alto."

This investigator: "Who did what?"

Aenlle: "That mentioned that to me; that somebody was not talking very nicely about me."

This investigator: "Okay. And so your purpose in -- in calling Chris was -- was what?"

Aenlle: "Have a conversation with him, just clear it up, see if he really had a problem with me, see if there was anything I could do. Because it's not – I didn't -- Chris and I didn't have a relationship like that. I'd work -- we had our differences, but as people, we got along just fine."

This investigator: "Okay. But he had left; right? He had left your office."

Aenlle: "Yes, he had left. He was no longer an employee, yeah."

This investigator: "Have -- do you know whether or not Sheriff Corpus called the Police Chief of East Palo Alto?"

Aenlle: "Ma'am, I'm not aware of what calls the sheriff made or didn't make.  I know -- I know that they're friends, but I don't know how much they talk or so forth." (Aenlle Transcript at pgs. 80-85)

 **Findings:**

On the eve of a civilian employee's departure from the Office at her farewell party, Aenlle felt it important to tell her about a rumor about her that even he didn't believe. His explanation for doing so was, "Because she's my friend. I wanted to share it with her. . . Because she was going to find out anyways[.]" This investigator does not find this explanation to be credible.

The civilian employee's belief that Aenlle did this to retaliate against her for leaving her job as his "eyes and ears" makes far more sense. Then, after she filed a complaint against Aenlle and had left the Sheriff's Office, he denigrated her to a sworn employee and at one point, said that he wanted to "smash her face in." The civilian employee, when recounting the events to this investigator was clear and cogent. This investigator's subsequent conversation with the civilian employee's supervisor, the Redwood City Police Chief, confirmed the civilian employee's competence, stability, and honesty. This investigator finds that Aenlle is not credible and that he did, in fact, retaliate against the civilian employee by making an accusation about her that he knew to be false.

When then-Assistant Sheriff Ryan Monaghan spoke with this investigator, he had the protected status of an "informant," under San Mateo County's Whistleblower Ordinance.

Aenlle explained that when he asked Monaghan if he had spoken with this investigator, his inquiry was motivated by "curiosity," and that the inquiry was "in passing," that "there was no malice behind it," and that he "was actually kind of glad. . . I was kind of glad that he got interviewed by you." However, the timing of Monaghan's firing suggests otherwise.

On September 17, 2024, Monaghan told Aenlle and Undersheriff Perea that he had spoken with this investigator. On September 18, 2024, Monaghan informed Sheriff Corpus that he had spoken with this investigator. Two days later, on September 20, 204, Sheriff Corpus fired Monaghan in the presence of Undersheriff Perea.

The County's Whistleblower ordinance prohibits adverse action against an employee who engages in protected conduct. As well, the Sheriff's Office Policy 1029.3 prohibits retaliation against any person "for participating in any investigation related to a complaint under this policy or any other policy" and engaging in "lawful or otherwise permitted behavior." The Sheriff's termination of Monaghan's employment was an adverse action. Monaghan's speaking with this investigator was the protected conduct of free speech.

The history of Monaghan's mistreatment by Aenlle and Sheriff Corpus as described in his detailed chronology, and the events that transpired between September 17th and September 20th that culminated in his firing, lead to the inescapable conclusion that when Sheriff Corpus' terminated Monaghan's employment was retaliation.

The retaliation by Sheriff Corpus against Captain ███ could not be clearer. The Sheriff acknowledged to County Executive Callagy that she had ordered Captain ███ locked out of her

office at a time when the captain was still employed by the Sheriff's Office. The text message exchange between Sheriff Corpus and then-Undersheriff Hsiung confirm this. And after telling Callagy that she would reverse her lock-out order, Sheriff Corpus did not do so. Captain ██ detailed chronology of the retaliatory conduct directed against her by Sheriff Corpus is credible. It is clear that Sheriff Corpus retaliated against Captain ██ in violation of San Mateo County Ordinance 2.14.090, County EEO Policy, Section II-E, and Policy Manual, and Policy 1029 of the Sheriff's Office Policy Manual.

The alleged retaliation against then-Undersheriff Chris Hsiung took the forms of (1) Sheriff Corpus denying Hsiung the opportunity to say goodbye to his colleagues, (2) Aenlle taking control of and accessing Hsiung's cellphone, (3) interrogating Hsiung and Chief Jeff Liu about their private conversations after Hsiung had left his employment with the Sheriff's Office, and (4) Aenlle's effort to change Hsiung's resignation to a termination of his employment.

Aenlle couldn't recall if he looked into Hsiung's cellphone; and he couldn't recall how he learned of Hsiung's private meeting with Chief Jeff Liu. Neither Hsiung nor Chief Liu told Aenlle about their meeting. Therefore, it is reasonable to conclude that Aenlle knew about the meeting because he accessed Hsiung's cellphone and/or laptop and saw the scheduled meeting.

Aenlle gave this reason for contacting Hsiung: "Have a conversation with him, just that he clear it up, see if he really had a problem with me, see if there was anything I could do. Because it's not – I didn't -- Chris and I didn't have a relationship like that. I'd work -- we had our differences, but as people, we got along just fine." Nothing could be further from the truth. Hsiung made it clear to this investigator that he did not get along with Aenlle and that he complained to Sheriff Corpus about Aenlle's disruptive conduct.

Aenlle's and the Sheriff's inquiries about a former employee's private affairs are the behaviors of individuals who cannot abide being criticized and who have no compunctions about confronting those critical of them, within or outside of the Sheriff's Office and no matter how inappropriate. The only reasonable explanation for this kind of conduct is intimidation and retaliation.

In addition to the incidents summarized above, Aenlle, Sheriff Corpus and her Executive Team retaliated against and/or intimidated employees with a crushing handshake, hard stares at employees, loyalty tests in the form of SAL donations, back turning on disfavored employees, spying on former employees, omitting from a Women's History post showcasing photos of the Office's sworn females, the longest ranking female, and demeaning female civilian employees.

This investigator finds that the complainants/interviewees' allegations of retaliation and intimidation are credible, and that many, if not most of Aenlle's responses to these allegations are not credible. This investigator finds that Aenlle and/or Sheriff Corpus engaged in retaliation against Ryan Monaghan, Chris Hsiung, Captain ██ Sworn Employee (#20), Sworn Employee (#8), Sworn Employee (#5), Sworn Employee (#18), Civilian Employee (#3), Civilian Employee (#1), Civilian Employee (#6), Sworn Employee (#24), and Civilian Employee (#15).

**Allegation #4 is SUSTAINED.**

**5.  Allegation #5: Aenlle has outside employment that has not been approved.**

The Board of Supervisors of San Mateo County enacted Section 2.75.020 of the San Mateo County Ordinance Code that requires each Department Head formulate rules relating to incompatible activities and outside employment.  (https://www.smcgov.org/hr/regulations-governing-incompatible-activities-and-outside-employment-adopted-board-supervisors)

As well, the Sheriff's Office Policy 1022 (at pgs. 676-680) sets forth rules that apply to its employees who engage in "any outside employment," regardless of the hours devoted to that employment. The policy mandates that all employees undergo an approval process before they can engage in outside employment:

"1022.1 PURPOSE AND SCOPE
In order to avoid actual or perceived conflicts of interest for employees engaging in outside employment, all employees shall obtain written approval from the Sheriff prior to engaging in any outside employment. Approval of outside employment shall be at the discretion of the Sheriff in accordance with the provisions of this policy.

"1022.1.1 DEFINITIONS
Outside Employment - Any employee who receives wages, compensation or other consideration of value from another employer, organization or individual not affiliated directly with this Office for services, product(s) or benefits rendered. For purposes of this section, the definition of outside employment includes those employees who are self-employed and not affiliated directly with this Office for services, product(s) or benefits rendered.

"1022.2 OBTAINING APPROVAL
No Sheriff's Office employee may engage in any outside employment without first obtaining prior written approval of the Sheriff. Failure to obtain prior written approval for outside employment or engaging in outside employment prohibited by this policy may lead to disciplinary action. (Emphasis added.)

"In order to obtain approval for outside employment, the employee must complete the Sheriff's Office "Application for Permission to Engage in Off-Duty Employment" and the County of San Mateo Human Resources' "Incompatible Activities Form" which shall be submitted to the employee's immediate supervisor. The applications will then be forwarded through the chain of command to the Support Services Division Assistant Sheriff and then presented to the Sheriff for consideration. (Emphasis added.)

"If approved, the employee will be provided with a copy of the approved application. Unless otherwise indicated in writing on the approved application, an approved application will be valid through the end of the calendar year in which the application is approved. Any employee seeking to renew their approval to work shall submit a new "Application for Permission to Engage in Off- Duty Employment" and "Incompatible Activities Form" in a

timely manner." (Emphasis added.)
([https://www.smcsheriff.com/sites/default/files/resources_files/SMCSO-Lexipol-Policy-Manual-7.9.2024.pdf](https://www.smcsheriff.com/sites/default/files/resources_files/SMCSO-Lexipol-Policy-Manual-7.9.2024.pdf) )

The complainants allege that Aenlle engages in outside employment that he has failed to disclose.

**Aenlle's Response to Allegation #5:**
This investigator: "Do you have any outside employment?"

Aenlle: "No, ma'am. I -- my real estate business, I pretty much stopped doing it. I'm still licensed. But as of 2023, my involvement with the Sheriff's Office -- it demanded too much of my time. I am no longer practicing real estate. As far as my PPO, my private security company, I have also, as of 2023, when I got involved with the Sheriff's Office, I've not engaged in -- in -- in those activities as well."

This investigator: "Got it. So let's just -- I just want to nail it down, and this is important. When you say you stopped in 2023, can you tell me when in 2023?"

Aenlle: "A few months -- a few months into it when I started. When my position -- I believe it was closer when my position got finalized."

This investigator: "So -- and when was that? Because I forgot to ask you that when you said you converted the –"

Aenlle: "It took a long time. I want to say somewhere in -- this is not a hundred percent – but somewhere around July, I believe."

This investigator: "Of 2023?"

Aenlle: "Yes, ma'am."

This investigator: "So between January 2023, and July, did you have any outside employment?"

Aenlle: Well, I've contracted maybe a few security details of close friends or of old clients. Real estate, I referred out."

This investigator: "So when you say 'referred out,' if you got someone who was interested in some real estate -- you would not -- you would not accept it and -- and just give it to someone else in your office –"

Aenlle: "Yes, ma'am."
This investigator: "And can you tell me when you were doing real estate, did you work for a company?"

Aenlle: "Yeah. Even though I'm a broker, I did -- I've always hung my license with Coldwell Banker."

This investigator: "So you -- I'm sorry. And you are a broker, which is different from –"

Aenlle: "Also a broker, ma'am."

This investigator: "Right? That's different from being a real estate salesperson?· Is that . . ."

Aenlle: "Yes, ma'am."

This investigator: "Am I getting that right? Okay."

Aenlle: "Yes."

This investigator: "So you were with Coldwell Banker. And did you work out of any particular office? This is, again, before you began your executive director work or chief of staff work."

Aenlle: "Yes. I was out of the San Mateo office, which -- which closed, and then everybody merged into San Carlos or Burlingame. I hung my license in San Carlos."

This investigator: "San Carlos. Okay. Were you ever in -- work out of the Half Moon Bay office?"

Aenlle: "I never worked there. My -- they could have transferred my license there to -- I think my manager was in both. My manager was in San Carlos and Half Moon Bay. In the past, I did do a lot of business there. So . . .But I've never actually done business out of San Carlos -- out of Half Moon Bay. I've never had an office there, a desk there, nothing like that."

This investigator: "You used the words 'pretty much stopped doing the real estate.' I'm not sure what you mean by that. So -- so the question is, you know, did you have any outside employment? And, by the way, it's not a bad thing. I'm just asking. Did you have –"

Aenlle: "No. I understand."

This investigator: "also have employment when you were employed by either the Sheriff's Office or the County or had a contract with them? Doing business with the County or the Sheriff's Office, did you have any outside employment?"

Aenlle: "Just to be clear, while I was waiting for my position to open --you know, ma'am, I have to be honest with you. Even back when we started the campaign, there was so much involvement and it took so much time that even -- even back then, I started referring business out and was not accepting. I can tell you that when I started even as a contractor here from

January 2023 --it was very, very minimal. And by the time I took my position, I'm basically doing the job of three people here. I stopped doing everything altogether."

This investigator: "Did you go through any kind of an approval process in -- when you had the outside employment and when you were, at least January maybe until July, doing some outside work, employment?"

Aenlle: "I think as a contractor, that was not a requirement. But the sheriff was aware, and -- it was approved."

This investigator: "And when you say, 'it was approved,' do you mean the sheriff gave her approval? Like, "It's okay. You can do it'?"

Aenlle: "Yeah. Many people in the office have outside businesses and outside employment. I just -- we just have to make the sheriff aware."

This investigator: "Uh-huh. And you said you did make her aware, and she was okay with it?"

Aenlle: "Again, she was okay with it, but I -- again, I was not really doing -- my business took so much time by that point."

This investigator: "But she was aware, and the only way she could be aware is if you told her; right? And –"

Aenlle: "That's correct."

This investigator: "Yeah. And then she was – she gave her approval? I don't want to put words in your mouth. So I'm just -- I'm just trying to understand how you knew that it was okay with her. So either she did something in writing, or she told you. I don't know. Can you tell me that?"

Aenlle: "Yes. She's aware, and I -- well, and I asked her. I said, 'My business -- as you know, I'm moving away from it. There might be some – a couple last-minute deals or something that I have to finish, just so you're aware that I would do that. It would not be during the time of -- of my work responsibilities or interfere at all in any type of the work that I'm doing at the Sheriff's Office. It would be on my own time and possibly weekends.'"

This investigator: "And when you had this conversation with her, that would have been at the beginning of 2023?"

Aenlle: "At some point around 2023, yes. Prior to me accepting the—the full-time position. (Aenlle Transcript at pgs. 21-27)

**Findings:**

- 64 -

Aenlle's LinkedIn page, under "Experience," states, "Broker Associate- Commercial and Residential/ Global Luxury Realtor, Coldwell Banker Commercial NRTColdwell Banker Commercial NRT/ <u>1990 - Present 34 yrs 9 mos</u>
  • Certified Commercial Investment Member
  • Ranked among the top 2% of Coldwell Banker Nationwide
  • Recommend acquisition, lease disposition, improvement, property management, and other action consistent with the best interest clients Real Estate portfolios
  • Negotiate contracts with sellers and buyers of Real Estate holdings involving commercial and residential properties." (Emphasis added.)
(https://www.linkedin.com/in/victor-aenlle-ph-d-916aa5266/?trk=public_profile_browsemap-profile)

Aenlle's LinkedIn page includes his work as a private investigator:
"Private Investigator/Aenlle Investigative and Protective Services <u>2018 - Present · 6 yrs 9 mos</u>/ Conduct investigations, criminal investigations, executive protection, and surveillance details." (https://www.linkedin.com/in/victor-aenlle-ph-d-916aa5266/?trk=public_profile_browsemap-profile)

Aenlle Investigative and Protective Services is listed on the Guard Guru website:
https://guardguru.com/company/aenlle-protective-and-investigative-services-burlingame-california-121257/

Aenlle did not list any outside employment in his profile that is posted on the Sheriff's Office website. (https://www.smcsheriff.com/executive-director-of-administration-chief-of-staff-victor-aenlle) According to civilian employee (#15), Aenlle has an active private investigator's license: #188650.

Aenlle's image and profile as an associate real estate broker with Coldwell Banker is posted on the company's Half Moon Bay website: (https://www.coldwellbankerhomes.com/ca/half-moon-bay/agent/victor-aenlle/aid_3152/ )  This investigator placed a phone call to the Coldwell Banker Half Moon Bay office on <u>August 15, 2024</u>, at 4:32 pm. It was answered by a woman who confirmed that Aenlle "doesn't work there as much as he used to but that yes, he is still here." She also provided Aenlle's direct phone number: ████████

In 2024, Aenlle told a civilian employee (#15) that he was out showing houses and that he was disappointed because he turned down an opportunity to buy commercial property in Pacifica.

On his job application for the Executive Director position that had to have been submitted <u>after July 6, 2023,</u> the date that the job description for the position was published, Aenlle listed his outside employment as "Coldwell Banker 2/1990 – Present, Commercial NRT, San Mateo, California, Hours worked per week: 40."

If, as it appears, Aenlle has had outside employment since 2023, when he began work as the Executive Director of Administration, he would have been obligated to complete the Sheriff's Office "Application for Permission to Engage in Off-Duty Employment," and the County of San

Mateo Human Resources' "Incompatible Activities Form," both of which had to be approved by the Undersheriff and Sheriff Corpus and filed with Human Resources.

Chris Hsiung, the Undersheriff in 2023 through June 2024, told this investigator that he did not receive either of these applications from Aenlle for his approval. Further, a civilian employee (#12) in the Human Resources Department, confirmed that these outside employment applications are maintained in the applicants' personnel files, and that neither of these applications are in Aenlle's personnel file.

It is reasonable to conclude that Aenlle had and continues to have outside employment since 2023 when he was hired as the Executive Director of Administration. As such, Aenlle failed to comply with the County's and the Policy Manual's requirements to engage in outside employment.

**Allegation #5 is SUSTAINED.**

6. **Allegation #6: Aenlle had a conflict of interest when negotiating the lease for the Broadway Property:**

California Government Code Section 1126 prohibits any employee of a governmental agency from engaging "in any employment, activity, or enterprise for compensation which is inconsistent, incompatible, in conflict with, or inimical to his or her duties as a local agency officer or employee or with the duties, functions, or responsibilities of his or her appointing power or the agency by which he or she is employed. (https://casetext.com/statute/california-codes/california-government-code/title-1-general/division-4-public-officers-and-employees/chapter-1-general/article-47-incompatible-activities/section-1126-generally )

As noted in the "Outside Employment" section above, the Sheriff's Office enacted Policy 1022 to address actual or perceived conflicts of interest for employees engaging in outside employment. Section 1022.3 of that policy states, "Consistent with the provisions of Government Code Section 1126. . . the Sheriff's Office prohibits the employee's use of departmental time, facilities, equipment or supplies, the use of the Department badge, uniform, prestige or influence for private gain or advantage. (Emphasis added.)

Several complainants alleged that Aenlle had a conflict of interest when he negotiated the lease for the Broadway Property.

On September 1, 2023, the County secured a 10-year lease agreement for a building located at 686-690 Broadway Street in Redwood City ("Broadway Property") to house a Sheriff's Office Substation and childcare center. The new substation will replace the existing substation in North Fair Oaks, situated in the jurisdiction of the Sheriff's Office. The site for the new substation is not located in the Sheriff's Office jurisdiction. The property is owned by the DiNapoli Family LP, the lessor. **(Exhibit 37: DiNapoli Lease Agreement)**

Complainants allege that Aenlle's involvement in negotiating the lease was improper because of his close ties to Coldwell Banker Real Estate who brokered the lease.

The terms of the lease provide that the County (Lessee), is to pay monthly rent of approximately $35,000. According to a civilian employee (#37) who works in the County's Real Estate Properties Department, the lease is a "triple-net lease" which means that in addition to the monthly rent, the County is obligated to pay all of the lessor's expenses such as property taxes, property insurance, and all maintenance. In this instance, the triple-net lease" added $9,000 to the monthly rent. According to the civilian employee, a "triple-net lease" greatly favors the landlord, to the detriment of the lessee.

The civilian employee (#37) had been contacted by Aenlle who emailed her a flyer advertising the availability of the Broadway Property. He told her that the Sheriff was looking for a property where childcare could be provided for her employees and that he wanted a location in Redwood City. Thereafter, she contacted Bob McSweeney, a well-known Coldwell Banker commercial real estate broker in San Mateo County listed on the flyer, to let him know of the Sheriff's interest in the property. (**Exhibit 38: Email and Flyer for Broadway Property**) (**Exhibit 39: Broadway Property Brochure**)

Three to four weeks later, Sheriff Corpus, Aenlle, McSweeney and the civilian employee went to view the Broadway Property. Aenlle said, "It's perfect; the location is great." He told the civilian employee to "Wrap it up. We want it."

Subsequently, in a phone call to Aenlle, the civilian employee suggested that they negotiate a lower price with the owner.  Aenlle dismissed it and told her that it wasn't a good move. One of the civilian employee's responsibilities is to negotiate leases to ensure that the best use is made of the taxpayers' money. However, in light of Aenlle's instance on moving forward, the civilian employee refrained from negotiating a lower price for the lease.

The civilian employee did, however, negotiate other terms, such as for the duration of the lease. She was able to secure a 10-year lease, with two five-year extension options, for a total of 20 years. The civilian employee said that she "pushed back hard" on provisions that the owner wanted, eventually securing terms more favorable to the County.

In a June 15, 2023, email to Aenlle and Sheriff Corpus, the civilian employee attached a proposed Letter of Intent from Bob McSweeney on letterhead that prominently displayed "CBRE," initials, and also appeared directly under Mr. McSweeney's name.  (**Exhibit 40: CBRE Letter of Intent**) In September 2023, the lease was signed off by all parties. Since that time, the Sheriff's Office has spent approximately $572,000 to lease the Broadway Property that continues to be vacant.

The civilian employee stated that although the County is the signatory on the lease, all payments on the lease are the responsibility of the various departments or offices that occupy the premises.  In this instance, payment of the monthly rent and triple-net expenses for the Broadway Property totaling approximately $44,000 must be paid from the Sheriff's Office budget.

On pg. 4 of the lease agreement, "CBRE" is listed as the <u>dual broker</u> for the lease: "CBRE Bob McSweeney, Evan Chang & Matt Murray represents County and CBRE Bob McSweeney, Evan Chang & Matt Murray represents Landlord." As well, the owner of the property agreed to

pay CBRE a commission: "Landlord agrees to pay CBRE a leasing commission per the CBRE standard Commission Schedule upon execution of a formal Lease agreement." A Google search revealed that Bob McSweeney, Evan Chang & Matt Murray are Coldwell Banker employees. It is clear, then, that "CBRE" stands for Coldwell Banker Real Estate, and that, given the dual brokerage fees and the commission, this agreement was likely a lucrative one for Coldwell Banker.

The civilian employee told this investigator that there are three Sheriff's Office leases over which Aenlle has asserted supervisory authority, the terms of which are as follows:
  (1) Fair Oaks Substation: $4,456.20 per month; <u>expiration date is 6/1/2026;</u>
  (2) North Fair Oaks SAL site: $9,023.05 per month; <u>a month-to-month lease that can be terminated anytime without penalty;</u>
  (3) Broadway Property: $35,000 per month plus $9,000 per month for the triple-net lease provision= $44,000 per month; 10-year lease plus 5 yr + 5 yr extension option; <u>vacant since September 2023</u>

The Sheriff's Office payments on all of these leases total $57,456 per month. In 2023, the Sheriff's Office paid nearly $700,000 for these leased properties. In 2024, the Sheriff's Office has paid more than $500,000 for the leases. **(Exhibit 41: Lease Summary)**

**Aenlle's Response to Allegation #6:**
This investigator: "Is your involvement in these real estate transactions -- is that a part in your -- let me go back. Is there a job description for your position as chief of staff and executive director? Is there a job description that exists somewhere?"

Aenlle: "Yeah. Part of that job – there is a job description. It's quite lengthy but also is in projects at the direction of the sheriff. Since -- I mean, why not use the talent that you have and the expertise to make sure that everything looks good? That's it. . . If you look at some of my correspondence with the real estate attorney, you can see that my recommendations on the lease or things that I brought forth had a lot of value that was over- --overlooked."

This investigator: "So your involvement in the real estate transactions is at the behest of the sheriff –"

Aenlle: "Correct."  (Aenlle Transcript at pgs. 45-46)

Aenlle: "My involvement is it was just the Sheriff's Office needed to grow. The substation in North Fair Oaks was subpar. She had been looking for a property for a long time, and one of her sergeants that works in the area sent her a flyer and said, 'What about this?' So she showed it to me, and I said, 'Yeah. Let's -- let's investigate.' And we moved it over to the Real Property Services department for him to – to look into it."

This investigator: "Okay. And -- and was that the extent of your involvement?"

Aenlle: "I mean, I reviewed their – some of their leases, and I helped with information to help. But, yes, pretty much that was it. That's the involvement."

This investigator: "So do you have -- did you -- the lease is with the DiNapoli Family LP. Did you have any -- did you assist at all in getting -- getting that lease?"

Aenlle: "Not at all, ma'am. That was Real Property Services. I do not know the owners. I do not know the agents. I've never been there and met the agent with Real Property Services with me. Zero."

This investigator: "Got it. So you don't -- you had nothing to do with getting -- getting the -- locating this property; right?"

Aenlle: "The property was actually located by Lilian Tashiro. She's a sergeant, and she --- set the fire to the sheriff."

This investigator: "Got it. And you had nothing to do with contacting the lessor -- that would be the DiNapoli family --getting -- had anything to do with them at all?"

Aenlle: "The first time that I heard that name is -- is right here with you today."

This investigator: "Got it. And do you -- did you have anything to do with brokering the lease? Because there -- there – the lease was brokered by a real estate company. Did you have anything to do with that?"

Aenlle: "Absolutely not, ma'am. Absolutely not. That lease was --- was negotiated and brokered through the County. . . I'm not here to steal from anybody or do any shitty deals, believe me. It's—it's—that's not me."

This investigator: ". . . So my question -- and, again, just bear with me on this -- is do you know -- and bear with me a second. There were three individuals who were the brokers for this lease, and they are people who work for Coldwell Banker. "So my question to you is did you know that Coldwell Banker was the broker for this lease?"

Aenlle: "Ma'am, I don't think that is correct. I don't remember Coldwell Banker being there. I thought it was Wakefield or something or -- so the answer to your question is, "No."· Yeah."

This investigator: ". . . Do you know if Coldwell Banker brokered that lease for the -- the -- the building for the substation? Do you know whether or not they did?"

Aenlle: "No, I do not. I thought it was Wakefield or something like that. I met the guy once or -- or twice there when he opened up the building for all of us when we were there. But I -- off the top of my head, I don't think he was Coldwell Banker."

This investigator: "Okay. And do you -- do you --so you're not -- but you don't know who the broker is?"

Aenlle: "I don't recall the broker. I want to say Wakefield, maybe, but I really do not. I didn't know -- I didn't know the agents before. I never met them before. I've never done business with them before. Coldwell Banker residential is big in our area. Coldwell Banker Commercial is not. And I don't recall Coldwell Banker Commercial handling that, per my recollection. . . So in commercial, the way it works is like you have one main guy, and then all those additional names are just -- like just got out of college kind of guys. They're just there to kind of assist. I don't remember -- I can kind of see his face. I really don't remember his name, but I can tell you that the County has done business with him before on other buildings and other leases."

This investigator: "And the 'him' – . . .The 'him' you're talking about is not someone connected with -- with Coldwell Banker?"

Aenlle: "No, no."

This investigator: ". . . I found the three names that I just want to run by you and -- and ask you if these names ring a bell. These were the names that I believe -- and I could be wrong on this -- but were part of brokering the – the lease in Redwood City for the substation and the child care center.· So I'm just going to --- see if you -- if you know these names. The first name is Bob McSweeney. Does that ring a bell with you at all?"

Aenlle: "It is. That's the guy that --that I met there."

This investigator: "And when you say you met there, you met at the building when you did a _"

Aenlle: "At the building—"

This investigator: "-- walk-through?"

Aenlle: "At the building with –"

This investigator: "Yes."

Aenlle: "Real Property itself with Caroline Shaker, yes."

This investigator: "Got it. And did you know Mr. McSweeney before that walk-through?"

Aenlle: I've never met Mr. McSweeney before in my life before that day. I've never done any transaction with him, never met him."

This investigator: "Okay. The next name is Evan Chang. Does that ring a bell?"

Aenlle: "No. Not at all."

This investigator: "And the next one is Matt Murray. Does that ring a bell?"

- 70 -

Aenlle: "No." (Aenlle Transcript at pgs. 33-39; 47-48)

**Findings:**

(1) Aenlle is an associate broker with Coldwell Banker Real Estate, (2) Aenlle initiated and played a major role in securing the Broadway lease, (3) Sheriff Corpus participated in the negotiations and approved the lease, and (4) Coldwell Banker Real Estate brokered the lease agreement, earning dual brokers' fees.

Aenlle has denied knowing that the broker for the lease was Coldwell Banker. However, his words and at least one document emailed to him cast doubt on his denial. At one point, Aenlle told this investigator, "[C]early, I've been around the business world and in real estate for 30 years. I know contracts. I know leases." (Aenlle Transcript at pg. 29) It is reasonable to believe that Aenlle would have, at a minimum, heard of Bob McSweeney's extensive commercial real estate transactions with the County.

More compelling is the fact that the initials "CBRE" appear prominently at the top of the Letter of Intent (LOI) that was emailed to Aenlle; the initials also appear directly beneath Bob McSweeney's name on that document. It stretches credulity to believe that Aenlle, a longtime associate real estate broker with Coldwell Banker did not know that "CBRE" is the acronym for Coldwell Banker Real Estate. As well, Aenlle stated that when he viewed the Broadway location with Sheriff Corpus, the Coldwell Banker broker who represented the owner, Bob McSweeney, was there to show the property. Once again, it is difficult to believe that Aenlle had no idea that Mr. McSweeney represented Coldwell Banker in the Broadway lease negotiations.

At the very least, Aenlle's involvement in the lease negotiations for the Broadway Property created a *perception* of a conflict of interest because of his long-standing association with Coldwell Banker. At most, if he financially benefitted from the transaction, his involvement would constitute an actual conflict of interest. In either instance, Aenlle appears to have violated Government Code 1126 and the Sheriff's Office Policy 1022 by not disclosing his employment with Coldwell Banker.

Finally, if Sheriff Corpus knew or should have known of Aenlle's connection to Coldwell Banker, she would have been obligated to remove Aenlle from participating in the negotiations for the property to avoid violating Government Code 1126 and Policy 1022.

**Allegation #6 is SUSTAINED.**

7. **Allegation #7: Aenlle did not follow the proper protocol for the selection of a construction contractor for the Broadway Property.**

San Mateo County Administrative Memorandum B-21 prescribes the requirements regarding contracts for construction and public works: (https://elr-smcgov.org/selection-of-construction-contractors/) "A public construction project as defined by the Public Contract Code, includes

construction, reconstruction, erection, alteration, renovation, improvement, demolitions, and repair work, painting or repainting."

For construction contracts valued at $100,001 and greater, "DPW [Department of Public Works] or County Manager's Office Capital Projects (CMOCP) staff must manage these projects regardless if the facility is maintained by DPW. These projects will go through a formal bid process and must be approved by the Board of Supervisors and comply with other applicable sections of the Public Contract Code." (Administrative Memorandum B-21, Section III).

Complainants allege that Aenlle did not follow the County's procedures for the construction contract to renovate the Broadway Property.

- A civilian employee (#14) facilitates the County's contracts and ensures compliance with procurement policies. She said that there are strict rules for public construction projects, that must include properly executed Requests For Proposals ("RFP"). After the Broadway Property lease was signed, according to the civilian employee, Aenlle rushed the construction/renovation process for the property, so that there is insufficient time to properly execute the RFP. The civilian employee told Aenlle that more time was needed. In response, Aenlle said that he didn't care.

  There was a Zoom meeting about the RFP for the Broadway Property attended by the civilian employee (#14), another civilian employee (#15), a sworn employee (#18), and one other civilian employee. Aenlle ran the meeting. At one point, a civilian employee said to Aenlle, "We will get crap if we rush [the RFP]." Aenlle cut him off, raised his voice and said, "I don't need a lesson in county policy!"

  The civilian employee (#14) understood that RFPs with a value of $500,000 or more must be reviewed by County Counsel and so advised Aenlle. In response, Aenlle instructed the civilian employee to use an estimated value of $450,000. The civilian employee believes that Aenlle set this value in order to bypass County Counsel review. The civilian employee believes that the estimated value of the construction contract for the Broadway Property is considerably higher than Aenlle's estimated value for the renovations.

  The civilian employee stated that the RFP was subsequently cancelled, and the process re-started. The civilian employee believes that it was Aenlle's rush to process the RFP and his failure to heed staff's advice that resulted in cancellation of the RFP.

**Aenlle's Response to Allegation #7:**
Aenlle: "When it came down to County Counsel approval, they found that a small statute that had to do with notice or something like that was not followed. When we looked into it, that statute was -- it was an oversight. It was not listed anywhere in any documents in the county or in the process itself or any of the documents in the process of RFP.

"We also learned that we had switched over to a new system, NEOGOV, for all county RFP processes, and we learned that even though you check the box just like a city planning, you

know, building process works when we check the box, documents go to certain departments for approval. Even though our box is being checked, it never notified those documents, one being legal counsel.

"So they kind of learned about this RFP process and -- you know, at the tail end, and they were not comfortable that that statute, which was small in nature but nevertheless was a statute, was overlooked. We brought it to the County Executive's attention and the attorneys, and they recommended we basically redo the entire process through a QRF design-build process, and they also recommended that we hire a project manager." (Aenlle Transcript at pgs. 51-52)

**Findings:**
According to Aenlle, the cancellation of the RFP was because of his staff's "oversight." The civilian employees stated that it was Aenlle's refusal to listen to their advice that caused the RFP to be cancelled. A civilian employee's (#14) responsibility is to facilitate County contracts and ensure compliance with County rules. Her position requires her to be well-versed in the County's compliance rules. Aenlle's does not have a background in the County's compliance procedures and does not appear to be interested in acquiring that information. Therefore, it is reasonable to find that the civilian employee's explanation is credible.

**Allegation #7 is SUSTAINED.**

8.  **Allegation #8: Aenlle does not follow the County's procurement policies:**
The County has established rules for soliciting, selecting and developing agreements with providers of good and services. (See Administrative Memorandum, Number B-1, issued May 9, 2022.) Those rules require that "all procurements should adhere to the County's Procurement Ethics Policy" and emphasize that "<u>competitive procurement is the County's preferred method of procurement.</u>" (At pg. 1) (Emphasis added.)

The County's Procurement Ethics Policy addresses procurement activities:
"Public employees are stewards of public funds and must ensure that expenditures of public funds, such as through the procurement and contracting process, occur in an ethical and responsible manner. . . Solicitations for procurement should be conducted in a fair, open, consistent and transparent manner. Information regarding the manner in which goods and services are procured should be available to all parties at the same time. Once the solicitation process has been completed, the information about the solicitation should be available to the public." (https://www.smcgov.org/ceo/procurement-ethics)

Complainants allege that Aenlle did not follow the County's procurement rules for service contracts.
- A civilian employee (#14) facilitates County contracts and ensures compliance with contracting rules. According to her, the normal process is for the requestor to complete a contract form that is submitted to her. However, she said that Aenlle is reluctant to put his requests in writing. She noted that several times, Aenlle bypassed her review and, instead, executed contracts on his own. As a consequence, on at least five occasions, the civilian

employee received invoices from the Sheriff's Office that the County was not authorized to pay because Aenlle had not followed the proper procedures.

- According to a civilian employee (#14), in 2023, Sheriff Corpus verbally agreed to a service contract with a business to provide food for Corrections. Civilian employee (#14) prepared the contract and sent it to the Sheriff for her approval. Sheriff Corpus subsequently refused to sign the contract even though the contractor had begun working. Aenlle told the civilian employee, "That guy's a crook," referring to the contractor. Aenlle refused to allow the contractor to continue working. The contractor became upset and told the civilian employee, "I started working. How do I get compensated?" The matter was eventually resolved with a financial settlement paid by the County to the contractor.

- A civilian employee (#14) said that Aenlle, on his own, and without submitting the proper paperwork to the civilian employee, entered into a contract with a woman to write grants for the Sheriff's Office. The civilian employee knew nothing about the woman, and yet was forced to grant the woman access to the County's grant data. It quickly became clear to the civilian employee that the woman did not know what she was doing. Subsequently, the civilian employee's supervisor ordered the woman's access to be blocked. The woman's contract was eventually cancelled.

**Aenlle's Response to Allegation #8:**
This investigator: "Two more just on service contracts. I don't have a lot of detail, and if you don't recall, that's fine. But I'm curious if you recall a service contract with a vendor to provide food at the jails that eventually fell through. Does that ring a bell with you at all? That would have been in 2023."

Aenlle: "Yeah, very slightly. Again, I was not part of that. So I have very limited information available. But I was not part of initiating that contract or anything like that."

This investigator: "Right. Did you ever, though, say -- accuse the contractor of being a crook?"

Aenlle: "No."

This investigator: "Do you recall -- let me put it this way: Do you recall getting any information that might have caused you to believe that that contractor should not have a contract?"

Aenlle: "I –"

This investigator: "Again, if you don't remember –"

Aenlle: "I can't speak to that."

This investigator: "That's fine. And when you say you can't speak to it, does that mean you don't remember it or you just don't want to talk about it?"

Aenlle: "No, no, no. It's not that I don't want to talk about it. I really don't remember that –"

This investigator: "Okay."

Aenlle: "what you're asking me. And that -- that contract was not initiated by me."

This investigator: "But you had nothing to do --you didn't get involved in it at all subsequently?"

Aenlle: "At some point, with the advice of legal counsel, I got involved."

This investigator: "Talk to me about that."

Aenlle: "Just to make sure that the separation was proper and was done accordingly."

This investigator: "Okay. And when you say 'legal counsel,' can you recall who"

Aenlle: "David Silberman."

This investigator: "David Silberman?"

Aenlle: "Yes."

This investigator: "Okay. All right." So you reached out to him, or he reached out to you?"

Aenlle: "I don't recall who reached out to whom."

This investigator: "[D]id you recall entering into a contract with a woman that you brought in to write grants – do grant writing for the Sheriff's Office?"

Aenlle: "Yes, ma'am."

This investigator: "Can you talk to me about that and what happened and your involvement in it."

Aenlle: "We were looking for opportunities to increase the revenue for the office, and we felt that there was a lot of potential grants available, and we had nothing set up in the office. The only contract that we had set up was with a lobbyist in Washington, D.C., from the prior administration, and basically he was just taking money and not providing any results.

"Out of four or five years of paying him a very large amount of money, he only materialized with one grant that, again, we were not able to correctly use. So I looked for opportunities at the direction of the sheriff. 'Let's see if we can get some people that can -- can really go after

this -- the grant so we can supplement the department and get -- get more training or -- or whatever else the department needs.' It didn't -- it didn't work. I thought she was good, but nothing ever came of it. She never secured anything."

This investigator: "Right. How was she even brought into it? I guess that's really what I'm asking now. Who brought her in, and who did the contract?"

Aenlle: "Word -- word of mouth. We – we asked some recommendations, you know, some people that are using. She was out of Las Vegas, and she came highly recommended. I don't recall the -- the actual details, but I initiated that contract."

This investigator: "Got it."

Aenlle: "Like I –"

This investigator: "And then what –"

Aenlle: "Like I've done many, just at the direction of the office."

This investigator: "So when you say "the office," you mean the sheriff?"

Aenlle: "Yes."

This investigator: "Again, I'm not trying to put words in your mouth, but I want -- I just want to be –"

Aenlle: "The sheriff, the undersheriff. I have -- I have -- I report directly to the undersheriff."

This investigator: "Right. But I think your job description says you can also -- you report to the undersheriff and to the sheriff."

Aenlle: "Absolutely, ma'am. We all do."

This investigator: "Okay. I've got you."

Aenlle: "So let me -- let me make one thing clear. They contract with the -- with that specific person -- actually, I -- ma'am, can we go back for one second?"

This investigator: "Absolutely. Absolutely."

Aenlle: "I want to make sure that I'm giving you the right information and it's not getting mixed up because there's been two contracts with grant writers with a woman. So I want to make sure that I'm speaking to what you're asking me of."

This investigator: "Yeah. The one I'm asking about is the one that got canceled."

Aenlle: "None of them got canceled, but I'm only going to go with the one in Vegas, yeah. So the contract stopped monetarily. She was only going to get paid if she got -- if she got -- it was a commission based, if she actually was able to secure grants for us. That's it."

This investigator: "Got it. Is there a -- is there a process or protocol for contracting with -- either for services or whatever? Do you have to follow certain procedures or what? Can you explain to me, like, how that works."

Aenlle: "Yeah. It -- it depends, ma'am. If -- if we're going for a vendor or something like that --"
This investigator: "Yes."

Aenlle: "-- we follow an RFP process. If it has to do for -- you know, something for the sheriff's -- for the Sheriff's Office -- for example, a personnel that has an expertise that's needed in the office that we don't have the -- the upper staff or we need an expertise, no. The sheriff has the ability to -- to hire that person --"

This investigator: "So you --"

Aenlle: "under a separate contract."

This investigator: "Got it. So when we're talking about the vendor for the food that was going to be for the jails and that got --and you had legal counsel advise you about that one, was that a contract, or was that a -- did that have to go through an RFP, or how did that have to -- how did that work?"

Aenlle: "Ma'am, I just want you to know that that contract never went through. We were never in contract with that person. And just so you know, we were never in contract with that person."

This investigator: "Do you know if the sheriff approved it verbally, and then it was subsequently then -- do you know anything about that? Again, I don't want to put words in your mouth. I'm just trying to --"

Aenlle: "And I don't want to speak for the sheriff. But I can tell you that how she is, she would not have said -- approved anything verbally like that I know I'm not speaking --This is just from my -- from my point of view." (Aenlle Transcript at pgs. 54-61)

**Findings:**
When Aenlle was asked by this investigator to describe the County's process for securing service contracts, he said, "It -- it depends, ma'am. If -- if we're going for a vendor or something like that we follow an RFP process. If it has to do for -- you know, something for the sheriff's -- for the Sheriff's Office -- for example, a personnel that has an expertise that's needed in the office that we don't have the -- the upper staff or we need an expertise, no. The sheriff has the ability to -- to hire that person under a separate contract." Aenlle did not even mention the rules that are clearly delineated in the County's Administrative Memorandum. It is clear that Aenlle is not

familiar with the County's procurement rules for soliciting and selecting providers of services, and that he has no interest in learning them.

**Allegation #8 is SUSTAINED.**

### 9. Allegation #9: Sheriff Corpus and Aenlle improperly issued Concealed Carry Weapon permits.

California Penal Code sections 26150 and 26155 provide that a Sheriff of a county or the Chief or other head of municipal police department of any city, or city and county, shall issue or renew a license to carry a pistol, revolver, or other firearm capable of being concealed upon the person (Concealed Carry Weapon license).

Effective January 1st, 2024, Senate Bill 2 requires that the firearms training course for initial CCW applications be a minimum of 16 hours and for CCW renewal applications be a minimum of 8 hours - Penal Code 26165.

The California Department of Justice Bureau of Firearms lists the categories of individuals who are prohibited from receiving CCW permits. (https://oag.ca.gov/system/files/media/Firearms-Prohibited-Categories.pdf)

Complainants alleged that Sheriff Corpus and Aenlle improperly issued concealed carry weapon ("CCW") permits to Aenlle's son and to a Sergeant who had been terminated from the Sheriff's Office for egregious misconduct.

- A sworn employee (#30) stated that after the election of Sheriff Corpus, he was in charge of reviewing requests for CCW permits. He "cleaned up" the CCW procedures that had been in effect under the Bolanos administration and explained the new procedures to Aenlle. In March or April 2023, Aenlle or the Sheriff removed the sworn employee (#30) from operating the CCW program and hired a retired sworn employee, who had been the range master under Bolanos, as his replacement. The retired sworn employee is an "extra-help" senior management analyst, whose pay is an additional cost for the Sheriff's Office, as opposed to the sworn employee (#30), a salaried, full-time peace officer who operated the CCW program as part of his official duties. The sworn employee (#30) believes that his replacement follows Aenlle's orders, such that Aenlle has control of the CCWs.

- According to an anonymous sworn employee, Sheriff Corpus, with the assistance of Aenlle, "possibly" issued a CCW permit to Sergeant ██████ ██████ who had been terminated from the Sheriff's Office for several "egregious" violations and should not have been issued the permit. The anonymous sworn employee also complained that Aenlle issued a CCW permit to his own son.

**Aenlle's Response to Allegation #9:**

This investigator: "Have you ever been involved in or assisted in giving a concealed carry permit to a terminated sheriff's sergeant whose name is ██████ – and I'll spell the last name -- ████████

Aenlle: "I oversee the CCW permit. ██████ was an applicant here. He did not have anything in his background. Per law, they would -- would not permit him to have a CCW."

This investigator: "Okay."

Aenlle: "He was treated like any other members of -- of the community. There's a lot of members that I think they should be denied, and I struggle with that every day. But the way that the current laws are, we have very limited reasons to deny somebody a CCW in today's environment. ██████ met every qualification. He was not afforded anything special and -- and qualified to get his permit. I personally did not approve it. I'm part of the chain that makes sure that – that everything's followed and corrections done, and the final decision is made by the sheriff."

This investigator: "So it was the sheriff who had the final say with that particular permit?"

Aenlle: "Every permit, it gets -- it gets approved by the sheriff. It doesn't matter –"

This investigator: "Did you –"

Aenlle: "-- who it is."

This investigator: "Sure. Did you recommend that it be approved?"

Aenlle: "I -- I rec- -- I don't recommend or not. I move them up the chain. So once -- once I see it in my level and make sure that everything's been uploaded, that everything's been done, that the psych- -- psychological testing has been done, that all the guns have been run, I check for facts; that it doesn't have any qualifying factors that has to be dismissed almost like, you know, arrest or, you know, something major in their record. I make sure the DOJ is cleared. Then I move it on to the sheriff, and she makes all the decisions on every single CCW."

This investigator: "So if something had been wrong, you -- and you saw it, you could have flagged it then; right? That you would do?"

Aenlle: "Anything that I see that's wrong that -- And let me -- let me -- let me correct "wrong." That -- that -- that is outside within the -- the legal limits of issuing a CCW, yes, I flag and make sure that it's -- it's looked at further and evaluated. Sometimes I'll pull in legal counsel for advice. We've done that many times. Sometimes I'll call a unit meeting with all the background investigators to -- to -- and the – the lieutenant to review those, and that's part of the process."

This investigator: "Got it. Did you approve a CCW permit for your son?"

Aenlle: "I wasn't even an employee."

This investigator: "Is the answer –"

Aenlle: "My son –"

This investigator: "Go ahead. Go right ahead."

Aenlle: "The answer is, "No." I could not have approved that. My son applied just like anybody else, went through the process like anybody else, met the law, met all the requirements, and that permit was not approved by me.  I was not employed in the Sheriff's Office." (Aenlle Transcript at pgs. 116-119)

**Findings:**
Aenlle oversees the CCW permit program; and as he noted, final approval for the issuance of all CCW permits rests solely with Sheriff Corpus. Aenlle acknowledged that he reviewed former Sgt. ████ permit request and did not flag it as being problematic. Only those individuals who fall within the prohibited categories designated by California Department of Justice Bureau of Firearms prohibited categories, can be denied CCW permits. Those categories include certain criminal convictions and mental health adjudications. That ████ may have been fired by the Sheriff's Office for egregious conduct would not, alone, be sufficient reason to deny him a CCW permit. Aenlle stated that when his son was issued a CCW permit, he was not employed by the Sheriff's Office.

**Allegation #9 is UNFOUNDED.**

**10. Allegation #10: Aenlle has improperly removed social media posts criticizing Aenlle and Sheriff Corpus.**
The Sheriff's Office maintains an Instagram account:
https://www.instagram.com/smcsheriff/?hl=en
The account has nearly 12,000 followers and more than 1,500 posts. Its purposes appear to be to support its personnel and to keep the public informed about the work of the Office. The Sheriff's Office Instagram account also provides a forum for public comment. As such, comments posted to the account are speech protected by the First Amendment, even those comments that are critical of the Office.

As the U.S. Supreme Court has explained, "[i]f there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." (*Texas v. Johnson, 491 U.S. 397 1989*); *https://supreme.justia.com/cases/federal/us/491/397/#tab-opinion-1958036* However, hate speech and threatening speech may be regulated by government.

An anonymous complainant alleged that several of his comments on the San Mateo County Sheriff's Office Instagram page that were critical of the Sheriff and Aenlle were removed and that on March 19, 2024, he was banned from posting comments.

- The complainant stated that in the comments section, he was "critical of Sheriff Corpus and her Boyfriend Mr. Aenlle. I have pointed out that she is having an affair with Aenlle and that she uses county funds to go away on "work trips" with Mr. Aenlle" and that "Aenlle uses the funds Corpus pays him to rebate back to Sheriff Corpus."

    Further, the complainant stated that Aenlle paid for first class airline upgrades, bought the Sheriff $12,000 earrings from Tiffany, expensive shoes and clothing worth tens of thousands of dollars, "in exchange for her hiring him for a job she made up." The complainant stated that all of these comments were deleted by the Sheriff's Office.

    According to the complainant, on March 19th, 2024, after the Sheriff's Office Instagram account posted a photo of Sheriff Corpus and Aenlle, the complainant posted the comment, "Does she go to ANY event without her boyfriend?" A few hours later, the complainant was blocked from posting comments on the San Mateo County Sheriff's Office Instagram page.

**Aenlle's Response to Allegation #10:**
This investigator: "Have you ever directed that any social media posts such as Instagram, for example, be blocked or taken down? And, again, this is in connection with the Sheriff's Office."

Aenlle: "Yeah, yeah. I'm sure there was --there was some discussions. I -- I -- I never ran the social media before. It was Chris Hsiung, and there were some voices made because it met certain requirements, but we don't make a habit of that."

This investigator: "But have you ever done that? Have you ever directed it be done?"

Aenlle: "I -- what I directed to be done --and I think it was once, and I think it was discussed with legal counsel -- is a nature that was -- that met the requirements to be at least removed or blocked for -- for some reason. But I can tell you that I was not the only one part of that decision. That was -- that was – Chris Hsiung was involved in that."

This investigator: "Okay."

Aenlle: No, ma'am, we don't make a habit of doing that. I think was a -- a one case. In one of them, somebody threatened his life. Something like that. Or it was -- it was just one of those weird things."

This investigator: "But if there were comments --have there been negative comments online about the sheriff or about you, the Sheriff's Office? Have you been a part of directing that negative comments -- I'm not talking about threats -- be blocked or removed?"

Aenlle: "I think there was one that crossed the line that was talking about the sheriff's kids, ma'am, if you're speaking to that, and Chris Hsiung was involved in that, and I was involved,

and it was a decision to -- to block that person. And I believe that was brought up to legal counsel as well." (Aenlle Transcript at pgs. 120-122)

**Findings:**

While the complainant's comments were disagreeable to Aenlle and Sheriff Corpus, they were neither hateful nor threatening. Therefore, the deletion of the complainant's comments and blocking the complainant's access to the account by someone in the Sheriff's Office likely violated the complainant's First Amendment right of free speech.

Aenlle has denied directing the removal from the Office's Instagram account of any critical comments or blocking any individuals from posting on the account. He did state that the Office removed a life-threatening comment and another comment that was abusive of the Sheriff's children, actions that were likely appropriate under the First Amendment.

While this investigator has no reason to doubt that the complainant's comments were deleted and that the complainant was blocked from accessing the Office's Instagram account, there is insufficient evidence to establish that Aenlle was directly responsible for deleting the complainant's comments and blocking the complainant from the account.

**Allegation #10 is NOT SUSTAINED**

11. **Allegation #11: Aenlle, Sheriff Corpus and her Executive Team improperly possess suppressed rifles.**
    *Note: This allegation arose after Aenlle's interview with this investigator.*
    Penal Code section 33410 makes it a felony to illegally possess a silencer or suppressor.  Penal Code section 33415 (b) exempts "regular, salaried, full-time peace officers employed by an agency listed in Section 830.1, or by the military or naval forces of this state or of the United States, when on duty and when the use of silencers is authorized by the agency and is within the course and scope of their duties."

A complainant alleged that Aenlle, Sheriff Corpus and her Executive Team are unauthorized to possess suppressed rifles.
- On September 24, 2024, at 16:47 hrs., a sworn employee (#30) received a call from a Captain who directed him to give three suppressed rifles to the Sheriff, the Undersheriff and Assistant Sheriff Fox.

- According to the sworn employee who is assigned to the firing range, suppressed rifles are rifles with silencers. In 2023, the Sheriff's Office purchased 220 suppressed rifles that arrived approximately four months ago.

- The sworn employee told the Captain that Aenlle could not have a suppressed rifle because he was a civilian, and that neither the Sheriff, Undersheriff nor the Assistant Sheriff could lawfully possess the rifles because they were out of compliance due to their lack of mandatory training.

- In response, the Captain laughed and said, "You can arrest Victor. Just do it anyway. Bring the three rifles next week. Also, print out labels and put the names of the Sheriff, Undersheriff and Assistant Sheriff on each rifle." The sworn employee said that he would do as ordered and also that would report the transfer of the rifles in RIMS (a reporting system that tracks Sheriff's Office property).

- On Monday, September 30, 2024, at 11:17 hrs., the sworn employee spoke with the Acting Assistant Sheriff and told him that the Sheriff, Undersheriff and he, the Acting Assistant Sheriff, had not attended classes to qualify to possess the rifles. In response, the Acting Assistant Sheriff said, "I know. I never attended class in Daly City. If Armageddon hits, we'll pass them [the rifles] out."

- The Acting Assistant Sheriff also told the sworn employee that he had just installed a gun safe on the 5th floor of Headquarters near the offices of the Sheriff, the Undersheriff and Aenlle.

- That same day, on September 30th, Aenlle called the sworn employee and said, "[Name of a Captain] said something about a problem with the rifles." The sworn employee told Aenlle that the Sheriff, Undersheriff and Assistant Sheriff could not possess the rifles and that he, Aenlle, could not have one either because "you are a civilian now." Aenlle told him, "I'm a designated Level I reserve, I've been to rifle class, I'm still registered in POST as a Designated Level I." The sworn employee believes that Reserves cannot possess suppressed rifles, even if they are Designated Level I.

- At approximately 9:40 a.m. on Tuesday, October 8, 2024, the sworn employee delivered three suppressed rifles to the 5th floor of Headquarters. He saw Sheriff Corpus in the hallway near the reception area and said hello. The Sheriff asked him, "What are you doing?" The sworn employee said, "I'm delivering the rifles." The Sheriff responded, "Okay. Thank you," and walked away.

- Aenlle was in the reception area and said, "Hey, [first name of the sworn employee (#30)]." The sworn employee said, "Per your request, here are the rifles," to which Aenlle responded, "Oh, thank you." Aenlle then walked over and touched the rifles, saying, "Oh, these are them?" A gun safe was bolted to the floor just outside Aenlle's office and was open. The sworn employee said, "I put labels on them" and then placed the suppressed rifles in the safe, with the muzzles up. The sworn employee had labeled each rifle "Sheriff," "Undersheriff," and "Assistant Sheriff" as he had been instructed by the Captain. **(Exhibit 42: Photos of Suppressed Rifles)**

- Aenlle lifted one of the rifles without removing it from the safe and inspected it. The sworn employee asked Aenlle, "Do you have the code to the safe?" Aenlle said, "I have the combination." The sworn employee closed the safe and asked Aenlle to open it to confirm that he, in fact, had the code. Aenlle entered the code and opened the safe.

- The sworn employee believes that the Sheriff, Undersheriff, Assistant Sheriff and Aenlle are not qualified to possess rifles with or without silencers/suppressors. According to the

sworn employee, if a rifle is assigned to a specific person, no one else can use that rifle, unless the person assigned to the rifle gives it to someone who is qualified, and the assignment is documented.

**Findings:**

Aenlle is not a "regular, salaried, full-time peace officer." He is a salaried, full-time <u>civilian</u>. If he were a reserve deputy, which is questionable, he still would not be a "regular, salaried, full-time peace officer." As such, he is prohibited by Penal Code Sections 33410 and 33415(b) from possessing a suppression rifle. Aenlle has the code to the gun safe where the rifles are stored, and given his interest in securing the weapons, he now has easy access to the suppressed rifles.

POST requires a 2-day training for certification to possess a rifle. According to the sworn employee, the Undersheriff, the Assistant Sheriff and the Sheriff have not taken any such training. And even though these three individuals are "regular, salaried, full-time peace officers," under Penal Code section 33415(b), if they are not in compliance with POST and with Policy Manual training requirements for the suppressed rifles, it would seem that they are not qualified to possess them. Until that matter is clarified, the three suppressed rifles should be immediately removed from the gun safe and returned to proper storage at the firing range.

**Allegation #11 is SUSTAINED with respect to Aenlle.**
**Allegation #11 is NOT SUSTAINED with respect to Sheriff Corpus, Undersheriff Perea, and Assistant Sheriff Fox.**

**12. Allegation #12: Aenlle has misrepresented that he earned a Ph.D.**

Complainants alleged that Aenlle has lied about earning a Ph.D.

- As noted earlier in this report, a civilian employee reported that Aenlle insists that staff address him as "Dr. Aenlle." And at least one sworn employee was repeatedly told by Aenlle to address him as "Dr."

- On October 26, 2023, Sheriff Corpus sent a memo to all personnel in which she congratulated Aenlle for earning a Ph.D. **(Exhibit 43: Corpus Ph.D. Memo)**

**Aenlle's Response to Allegation #12:**

This investigator: "Have you earned -- in fact, earned a PhD?"

Aenlle: "Yes, ma'am. Of course."

This investigator: "So you -- and when did you finally get your PhD?"

Aenlle: "2023 sometime midyear. At some point around there."

This investigator: "Okay. And I do understand that the place from which you earned your PhD is no longer in existence."

Aenlle: "That is correct."

- 84 -

This investigator: "Right. Are you able still to get your transcript if you were asked?"

Aenlle: "Yes, ma'am. I would be able to, yeah. Union -- Union Institute and University is -- is geared towards law enforcement. Many people in this department have at least a bachelor or whatever they finished through there, and throughout the law enforcement community, it is very well-known. Like anything else through COVID, they went through financial. Their PhD program is one of the top and the best in this country, and it was actually -- it didn't go under. It was moved to another college. So this same program still lives today. So -- and, yes, I can still have -- get transcripts, I'm sure, and whatever else you need. I earned my PhD, ma'am. . . so So I --I -- and I wanted to help people after my brother was killed. That's the only reason why I'm in this department.

"And I made it a point, and I got my bachelor's in criminal justice, and I got my master's in organizational leadership, and I went further and got my PhD. And I would have been done sooner. I should probably -- I got my PhD in -- in -- in three and a half, four years, but the sheriff campaign took a lot of
time, and I couldn't keep writing 60-page papers every night, and it got delayed. Once she was -- once she won, then I took a step back and focused on -- on what I needed to finish and defended my -- my dissertation -- successfully defended my dissertation. So anybody that tries to dimin- -- diminish my work, my investment, and my hard work to earn a PhD that not everybody has is shame- -- should be shame- -- shameful." (Aenlle Transcript at pgs. 114-116)

**Findings:**
Aenlle's biography on the Sheriff's Office website includes his photograph and directly beneath it, his name "Victor Aenlle, Ph.D." This biography also includes the following educational information: "Victor returned to school to study at Union Institute & University, earning a Bachelor of Science in Criminal Justice Management, a Master of Science in Organizational Leadership, and Ph.D. in Interdisciplinary Studies specializing in Ethical and Creative Leadership."(Source: https://www.smcsheriff.com/executive-director-of-administration-chief-of-staff-victor-aenlle )

On the website Experience.com, his profile includes the following description of his educational background: "Education: Doctor of Philosophy in Interdisciplinary Studies (In Progress), Master of Science Degree in Organizational Leadership, Bachelor of Science Degree Professional Philosophy."  (Source: https://www.experience.com/reviews/victor-3918456 ) On his LinkedIn page, Aenlle's description of his educational background is as follows: "Victor has earned a bachelor's degree in criminal justice management, a master's in organizational leadership, and is now a doctoral candidate specializing in creative and ethical leadership." This page is up-to-date because on it he includes his length of employment as Executive Director, to wit, "Chief of Staff, Executive Director of Administration, August 2023-Present- 1 yr. 2 mos." (Source: https://www.linkedin.com/in/victor-aenlle-ph-d-916aa5266/?trk=public_profile_browsemap-profile) (Emphasis added.)

The resume that Aenlle submitted along with his application for his current position with the Sheriff's Office, states that in 2016 and 2018, he received his bachelor's and master's degrees

from Union Institute & University in Sacramento, California, and that he "expected" to receive his doctorate in August 2023.

On his application for the Executive Director position, he answered, "No" when asked did he graduate with a Doctor of Philosophy.

Union Institute & University was a private nonprofit online institution, having permanently closed its doors on June 30, 2024.  It is currently facing a class action lawsuit by disgruntled students and has been fined $4.3 million by the U.S. Department of Education for misappropriating federal funds. (https://www.classaction.org/news/union-institute-and-university-sued-by-students-graduates-beset-by-consequences-of-alleged-financial-mismanagement)

Contrary to Aenlle's assertion, Union Institute & University has not simply relocated. It is permanently closed due to financial mismanagement.  Whether Aenlle possesses a Ph.D. is questionable. Since transcripts of former students of the now-defunct Union Institute & University can be obtained using this link: https://myunion.edu/request-transcript/, Aenlle should allow County Counsel or his designee access to Aenlle's transcripts to establish what are his actual educational credentials.

**Allegation #12 is NOT SUSTAINED.**

**13. Allegation #13: Aenlle is not authorized to wear a badge that resembles the gold badges of sworn employees.**

California Penal Code Section 538d(b)(2) imposes criminal penalties on anyone who ". . . willfully. . . uses any badge. . . which so resembles the authorized badge of a peace officer as would deceive any ordinary reasonable person into believing that it is authorized for the use of one who by law is given the authority of a peace officer, for the purpose of fraudulently impersonating a peace officer, or of fraudulently inducing the belief that he or she is a peace officer."

This prohibition on facsimile badges is a misdemeanor, punishable by imprisonment in a county jail not to exceed one year, a fine not to exceed $2,000, or both. (Penal Code Section 538d(b)(2))

Furthermore, any who issues such badges is guilty of a misdemeanor, to wit, "[Anyone]. . . who willfully. . . gives, or transfers to another, any badge . . . which so resembles the authorized badge. . . of a peace officer as would deceive an ordinary reasonable person into believing that it is authorized for the use of one who by law is given the authority of a peace officer, is guilty of a misdemeanor. (Penal Code Section 538d(c))

The Sheriff's Office Policy 1026.2 states, "The uniform badge shall be issued to Office members as a symbol of authority and the use and display of Office badges shall be in strict compliance with this policy. Only authorized badges issued by this Office shall be displayed, carried or worn by members while on duty or otherwise acting in an official or authorized capacity." (Emphasis added.)

With respect to civilian personnel, "Badges and Office identification cards issued to non-sworn personnel <u>shall be clearly marked to reflect the position of the assigned employee</u>. (a) Non-sworn personnel shall not display any badge except as part of his/her uniform and while on duty, or otherwise acting in an official and authorized capacity. (b) <u>Non-sworn personnel shall not display any badge or represent him/herself on or off duty, in such a manner which would cause a reasonable person to believe that he/she is a sworn peace officer.</u>" (Emphasis added.)

Several interviewees reported that Aenlle wears a gold badge on his waistband when in street clothes and that the badge is identical in size and shape to the gold badges issued to regular sworn members of the Office. Aenlle's gold badge has the words "Chief of Staff" on it.

Some interviewees complained that at a distance, the words "Chief of Staff" on his badge are not readily visible so that without closely examining Aenlle's gold badge, it looks like the badge of a regular sworn employee of the Sheriff's Office.

**Aenlle's Response to Allegation #13:**
This investigator: "Do you wear a badge?"

Aenlle: "Yes, ma'am."

This investigator: "And can you please describe the badge."

Aenlle: "It is a Sheriff's Office badge with a rocker that says, 'Chief of Staff."

This investigator: "Okay. And does -- and can you tell me what color it is."

Aenlle: "The same color as all the other badges. It's a gold badge."

This investigator: "Gold badge. And who issued you the badge?"

Aenlle: "The sheriff issues badges, ma'am."

This investigator: "So the sheriff directed that you have that badge?"

Aenlle: "Correct."

This investigator: "Okay. And do -- isn't it -- and, again, I'm just trying to get clarification on things. It is my understanding that all sworn personnel have gold badges. Is that true?"

Aenlle: "That is true."

This investigator: "Right."

Aenlle: "That's a true statement." (Aenlle Transcript at pg. 104)

- 87 -

**Findings:**

Aenlle is a full-time, salaried civilian employee in the Sheriff's Office. His claim to be a Reserve deputy, even if true, does not transform him into a full-time, salaried sworn peace officer. Aenlle, by his own admission and supported by the observations of numerous civilian and sworn employees, wears a gold badge that closely resembles the gold badges worn by all of the full-time, salaried sworn peace officers of the Sheriff's Office. **(Exhibit 44: Aenlle Wearing Gold Badge)** Aenlle's badge has the words "Chief of Staff," a civilian position, printed in small print at the top of the badge, rendering it virtually indistinguishable from the gold badges of the full-time, sworn employees.

Aenlle's Chief of Staff gold badge could easily deceive any civilian into believing that Aenlle has the authority of a peace officer. Aenlle is likely in violation of Penal Code Section 538d(b)(2), a misdemeanor, for willfully wearing a facsimile badge that allows him to impersonate a full-time, salaried sworn employee with full police powers.

Aenlle stated that Sheriff Corpus issued the facsimile gold Chief of Staff badge to him. If this is true, then Sheriff Corpus is in violation of Penal Code Section 538d(c), a misdemeanor, for willfully giving the facsimile badge to Aenlle.

**Allegation #13 is SUSTAINED as to Aenlle and Sheriff Corpus.**

### 14. Allegation #14: Aenlle and Sheriff Corpus improperly issued honorary badges and an identification card to civilians.

In 2007, the California's Office of the Attorney General ("AG") issued an opinion that addressed a sheriff's issuance of an honorary badge to a private individual, stating, in part, "A sheriff's gift of an honorary badge to a private citizen violates California law if (1) the badge falsely purports to be authorized, or would deceive an ordinary reasonable person into believing that it is authorized, for use by a peace officer, or (2) the badge indicates membership in an organization whose name would reasonably be understood to imply that the organization is composed of law enforcement personnel when, in fact, less than 80 percent of the members of the organization are law enforcement personnel, active or retired, and the sheriff has knowledge of such fact."

As important is the AG opinion that the sheriff and the county could be subject to civil liability "for an injury suffered in connection with a recipient's subsequent misuse of the badge if the injury is proximately caused by the sheriff's own negligent or wrongful act in providing the badge; the county's civil liability would depend upon whether the sheriff's negligent or wrongful act occurred within the scope of his or her employment." (The Honorable Rod Pacheco, 90 Ops. Cal. Atty. Gen. 57 (2007))

The Sheriff's Office issues honorary or special deputy identification cards and badges. Complainants allege that the issuance of these cards and badges by Sheriff Corpus and Aenlle is improper.

- A sworn employee (#16) is in charge of the 360 volunteers in the Emergency Services Bureau. At the end of 2023, the sworn employee retrieved honorary badges that had been

issued by Sheriff Corpus or Aenlle to some of the retiree volunteers. He advised them that the badges would be installed on plaques to avoid any inadvertent misuse of the badges. The sworn employee told then-Undersheriff Hsiung and then-Assistant Sheriff Monaghan what he had done. They told him that they approved of his approach.

After Hsiung informed Sheriff Corpus about the retrieved badges, the sheriff told Hsiung to order the sworn employee to return the badges to the volunteers. The sworn employee believes that it was Aenlle who directed the Sheriff to order the badges returned. The sworn employee said that he has no control over the issuance of the badges under the Corpus administration.

- There is an animal rescue group in Half Moon Bay. According to a sworn employee (#16), in mid-2023, Aenlle met with the group's leaders and told them they could become a part of the Sheriff's Office saying, "I'll get you badges." Subsequently, the sworn employee re-contacted the group's leaders to let them know that they could not be issued badges, saying, "This is not how it works."

- Aenlle ordered a sworn employee (#8) to sign an application for a non-access ID card, for Angelo Costanzo, designating him as a "Special Deputy Sheriff." The sworn employee did not know this person. The sworn employee was told by a civilian employee (#6) that the person was a life-long friend of Aenlle. The sworn employee refused to sign the application and instead took it to then-Assistant Sheriff Monaghan who, similarly, knew nothing about it. After Monaghan spoke with Aenlle, he told the sworn employee that Aenlle said, "Who the fuck is [Name of the sworn employee] to question this?!" Aenlle also said, "It needs to be authorized. He already has the badge." The sworn employee did not sign the application and does not know who eventually did. **(Exhibit 45: ID Application for Special Deputy Sheriff)**

**Aenlle response to Allegation #14:**
This Investigator: "Have you ever directed sworn personnel to issue special badges to anyone?"

Aenlle: "I don't have the power to do that. And I have not." (Aenlle Transcript at pg. 72)

**Findings:**
This investigator's search of the Sheriff's Office website failed to disclose any reference to a Special Deputy program. It appears that the Office does not have a formal written policy for the distribution of honorary badges and identification cards. In light of the civil liability facing the Sheriff and the County were an honorary badge to be misused, it is imperative that the Sheriff's Office create a written policy for the distribution of these badges and identification cards, and that the policy be reviewed for approval by County Counsel. The Office should also consider eliminating the distribution of these honorary badges and cards entirely.

Aenlle has denied issuing special or honorary badges. The interviewees claim that they were directed by Aenlle and Sheriff Corpus to distribute these badges. With respect to the application for the non-access card, this investigator learned that Aenlle and Angelo Costanzo served

together in San Mateo County Mounted Patrol Troop 1, a 501(c)(4) nonprofit. Records maintained by ProPublica's Nonprofit Explorer show that in 2014, Aenlle was Secretary of the Troop when Costanzo was a Captain. In 2017, Aenlle was a Director of the Troop and when Costanzo was a Mess Sergeant.
(https://projects.propublica.org/nonprofits/organizations/946106865)

It is reasonable to conclude that Aenlle had an interest in providing a Sheriff's Office identification card to his friend and that he ordered a sworn employee to approve his friend's application.

This investigator finds that the sworn employees' statements are credible, and that Aenlle and Sheriff Corpus ordered the distribution of honorary badges and an identification card to civilians without considering the legal ramifications in doing so.

**Allegation #14 is SUSTAINED.**

### 15. Allegation #15: Sheriff Corpus has uttered and texted racial and homophobic slurs in the workplace.

The County's Equal Employment Opportunity Policy ("EEO"), approved by the San Mateo County Board of Supervisors on January 11, 2022, recognizes the County's commitment to "an inclusive, results-oriented, equal employment environment aimed at a diverse workforce free of illegal discrimination and harassment." (Section II-A: EEO Policy).

As well, "The County considers violation of this policy, on the basis of any EEO-protected categories, to constitute misconduct that undermines the integrity of the employment relationship. Corrective action up to and including dismissal shall be taken against individuals who violate any provision of this policy." (EEO Policy Introduction)

A complainant alleged that Sheriff Corpus violated the County's EEO Policy by using racial and homophobic epithets.

o   In January or February 2022, a civilian employee (#3) watched a Zoom meeting in her Millbrae office in which then-Sheriff Bolanos and County Executive Callagy were discussing a matter that may have had to do with ICE. The civilian employee's screen was muted as she watched the meeting. Then-Cpt. Corpus walked into the employee's office, stood behind her, looked at the screen and uttered near the civilian employee's ear, "Nigger" at Sheriff Bolanos-- twice. The civilian employee's adult son is biracial— (African American/Caucasian) and identifies as African American. Corpus knows her son because he volunteered for Corpus' campaign for Sheriff. The civilian employee was stunned and upset yet remained silent out of fear of retaliation.

o   On July 13, 25, 2022 and August 15, 2022, Sheriff Corpus sent the civilian employee (#3) text messages criticizing a local City Council member by calling her "Fuzz Bumper," a homophobic slur directed at lesbians. **(Exhibit 46: Corpus homophobic texts)**

**Findings:**

Sheriff Corpus' racial and homophobic slurs have no place in the workplace. That she had no compunction about uttering and texting these slurs to an employee is alarming and disgraceful.

**Allegation #15 is SUSTAINED.**

### CONCLUSION:

It is abundantly clear that Sheriff Corpus and Victor Aenlle have a personal relationship, beyond mere friendship. It is also clear that that relationship has led Sheriff Corpus to relinquish control of the San Mateo County Sheriff's Office to Victor Aenlle, someone who has far more experience as a Coldwell Banker associate real estate broker than he has in law enforcement. Indeed, Aenlle has no experience running a law enforcement agency.

There is substantial evidence that Corpus/Aenlle leadership has created a hostile, retaliatory and abusive work environment, leaving the Office's civilian and sworn employees severely demoralized. Since Sheriff Corpus took office in January 2023, at least 106 sworn staff members, from Correctional officers to the rank of Undersheriff, have departed the Office. **(Exhibit 47: Separation List)** Of those 106 employees who separated from the agency, 51 were not even eligible to retire. As well, the recent Deputy Sheriff's Association's overwhelming vote of "no confidence" (96% of 318 members) in Victor Aenlle attests to the extreme level of discontent with their leadership.

Fear of retaliation is rampant in the organization. In one instance, Sheriff Corpus fired an Assistant Sheriff for cooperating with this investigation. In another instance, the Sheriff improperly locked out a Captain when she had given notice of her resignation; and in yet another instance, Aenlle demeaned and criticized a female civilian employee for her decision to move to another agency. Other employees described similar retaliatory and abusive behaviors under Corpus/Aenlle leadership.

The Corpus/Aenlle administration is obsessed with loyalty that borders on paranoia. One civilian employee (#6) described Aenlle's demand that his office be swept for bugging devices because he thought that people were out to get him. Another civilian employee (#7) reported that when Aenlle saw that there was a hole "the size of a silver dollar" in a closet ceiling in Aenlle's office, he told her to call public works because of his concern that it might be a security issue. And Aenlle told a civilian employee (#7), "We think someone is leaking information. We have to keep things confidential. We shouldn't be dealing with the public when they want to meet with the Sheriff."

Aenlle's and Sheriff Corpus' dishonesty about their personal relationship, their incompetent management of the Sheriff's Office, and Sheriff Corpus' shocking willingness to relinquish control of the Office to a real-estate-broker- turned-Reserve-Deputy, who failed to complete the Field Officer Training Program, have combined to leave the Sheriff's Office in utter disarray.

After publicly decrying this investigation as a "witch hunt," Sheriff Corpus refused the offer of this investigator to respond to the serious allegations lodged against her and her leadership team. Her silence speaks volumes.

As the first female/Latina Sheriff of San Mateo County, Christina Corpus could have taken the Sheriff's Office in a new and positive direction. Sadly, she has done no such thing. Rather, under her leadership, morale at the Sheriff's Office is at an all-time low, staffing shortages are at an all-time high, leaving public safety at risk.

Lies, secrecy, intimidation, retaliation, conflicts of interest, and abuses of authority are the hallmarks of the Corpus administration. This investigator takes no pleasure in recommending that Sheriff Corpus step down and that Victor Aenlle's employment with the Sheriff's Office be terminated immediately. Nothing short of new leadership can save this organization.

Submitted by Judge LaDoris H. Cordell (Ret.)