**NOTICE OF INTENT TO REMOVE SHERIFF**

Pursuant to Section 412.5 of the San Mateo County Charter and the County's Sheriff Removal Procedures ("Procedures"), the San Mateo County Board of Supervisors has duly approved the issuance of this Notice of Intent to Remove and initiated the Procedures to remove Sheriff Christina Corpus from the office of Sheriff based on the alleged grounds supporting removal set forth herein.

The Procedures afford Sheriff Corpus the right to a Pre-Removal Conference within five calendar days from receipt of this Notice of Intent. The Pre-Removal Conference shall take place as follows:

**Place:** **Human Resources Department**
**500 County Center, 4th Floor**
**Redwood City, CA 94063**

**Date: Wednesday, June 11, 2025**

**Time: 9:00 AM**

Under the Procedures, Sheriff Corpus has the right to a Removal Hearing. Failure to appear at the Pre-Removal Conference constitutes waiver of the right to a Removal Hearing. A copy of the Procedures is enclosed.

## TABLE OF CONTENTS

**Page(s)**

GROUNDS IN SUPPORT OF THE SHERIFF'S REMOVAL .......................................... 1

*Summary of grounds for removal from office* ........................................................... 1

*The Cordell Report and Measure A* ........................................................................ 4

*This Investigation* ..................................................................................................... 5

*Other witnesses and reservation of rights* ................................................................ 6

*Independence of bases for cause* .............................................................................. 6

I.    Grounds for Removal Relating to Victor Aenlle ................................................ 6

    A.    Introduction .................................................................................................. 6

    B.    Victor Aenlle is a real estate broker and reserve deputy who worked
        on Sheriff Corpus's campaign ...................................................................... 7

    C.    Sheriff Corpus and Mr. Aenlle have a close personal relationship,
        which they have taken steps to conceal ....................................................... 8

        1.    The relationship between Sheriff Corpus and Mr. Aenlle was
            evident during Sheriff Corpus's campaign. ..................................... 8

        2.    The relationship between Sheriff-elect Corpus and Mr. Aenlle
            was apparent in the months immediately following the
            election. ........................................................................................... 9

        3.    Sheriff Corpus's then-husband reported that she was having an
            affair with Mr. Aenlle. ................................................................... 10

        4.    In September 2022, Sheriff Corpus and Mr. Aenlle traveled to
            Hawaii and provided conflicting accounts of their trip .................... 10

        5.    The relationship continued after Sheriff Corpus took office. ........... 11

        6.    Sheriff Corpus and Mr. Aenlle deny an "intimate relationship." ...... 12

    D.    Using public funds, Sheriff Corpus entered into two separate
        contractual arrangements and one employment relationship with Mr.
        Aenlle and repeatedly requested raises for Mr. Aenlle. ............................. 13

    E.    Sheriff Corpus took steps to conceal potentially negative information
        about Mr. Aenlle. ....................................................................................... 14

F.    Immediately after the Board of Supervisors voted to remove Mr. Aenlle as "Executive Director of Administration," Sheriff Corpus attempted to appoint him as an Assistant Sheriff. .......................................... 15

G.    Sheriff Corpus's decision to install Mr. Aenlle as a member of her Executive Team hurt the SMCSO. ............................................................... 16

1.    Sheriff Corpus's decision to install Victor Aenlle in a leadership position hurt morale in the SMCSO. ............................... 16

2.    Sheriff Corpus's Executive Team warned her about Mr. Aenlle's conduct and the effect it was having on the office. ............ 18

3.    Sheriff Corpus's close personal relationship with Mr. Aenlle and her decision to retain him on her Executive Team contributed to the departures of numerous senior advisors and Executive Team members. ............................................................... 18

H.    Grounds for Removal .................................................................................. 19

I.    Supporting Evidence .................................................................................. 21

II.    Grounds for Removal Relating to the Investigation and Arrest of DSA President Carlos Tapia ......................................................................................... 23

A.    Introduction ................................................................................................ 23

B.    Factual Background .................................................................................... 24

1.    The MOU allows Dep. Tapia to bill for "release time" spent on DSA activities. .................................................................................. 24

2.    After Sheriff Corpus takes over the SMCSO, her relationship with the DSA deteriorates. ............................................................... 25

3.    Judge Cordell interviews Dep. Tapia. ............................................. 26

4.    The DSA and Sheriff Corpus have a contentious meeting concerning overtime policies. ........................................................... 26

5.    After the August 15, 2024 meeting, Dep. Tapia begins to receive messages from SMCSO's finance and human resources departments concerning his timecard practices ................ 27

6.    The DSA and OSS file a PERB complaint against Sheriff Corpus and declare "no confidence" in Mr. Aenlle. ......................... 28

7.    Sheriff Corpus inquired about Dep. Tapia's attendance in Transportation. ................................................................. 29

8.    Sheriff Corpus asks Acting Assistant Sheriff Fox to investigate Dep. Tapia. ................................................................. 29

9.    In violation of SMCSO policy, Sheriff Corpus conducts an in-house investigation into Dep. Tapia for potential criminal conduct. ................................................................................. 30

10.   Sheriff Corpus and her Executive Team limit the evidence available to Acting Assistant Sheriff Fox. ........................... 30

11.   Sheriff Corpus orders Dep. Tapia to be arrested on November 12, 2024. ............................................................................. 32

12.   Mr. Aenlle uses Dep. Tapia's arrest to try to discourage the release of the Cordell Report. .............................................. 34

13.   After conducting an investigation, the District Attorney declines to prosecute Dep. Tapia. ....................................... 34

C.    Grounds for Removal .......................................................................... 34

D.    Supporting Evidence .......................................................................... 36

III.  Grounds for Removal Relating to Unlawful Punitive Action Taken Against Sgt. Javier Acosta. ............................................................................ 38

A.    Introduction ......................................................................................... 38

B.    Sheriff Corpus began an investigation into Sgt. Javier Acosta within a week of the contentious August 15, 2024 meeting between the DSA, OSS, and the Sheriff. ........................................................................... 38

C.    Sgt. Javier Acosta remains on administrative leave without explanation. ......................................................................................... 40

D.    Grounds for Removal .......................................................................... 40

E.    Supporting Evidence .......................................................................... 41

IV.   Grounds for Removal Relating to the Termination of Former Assistant Sheriff Ryan Monaghan .......................................................................... 42

A.    Introduction ......................................................................................... 42

B.     Sheriff Corpus retaliated against Assistant Sheriff Monaghan days after learning that he had spoken to Judge Cordell as part of her investigation. ........................................................................................... 42

C.     Grounds for Removal ................................................................................... 44

D.     Supporting Evidence .................................................................................... 45

V.     Grounds for Removal Relating to Unlawful Retaliatory Transfers and Terminations. ..................................................................................................... 45

A.     Introduction ................................................................................................ 45

B.     Sheriff Corpus retaliated against Capt. Philip for refusing to sign and serve the deficient Internal Affairs notice to Sgt. Javier Acosta. ................... 45

C.     Sheriff Corpus retaliated against Lt. Sebring after he advised an employee that she could file an HR complaint against Mr. Aenlle. ............. 47

D.     Sgt. Chan was transferred within hours of appearing at a press conference in support of Measure A. .............................................................. 48

E.     Sheriff Corpus retaliated against Capt. Rebecca Albin for posting a message on social media. ............................................................................ 48

F.     Grounds for Removal ................................................................................... 49

G.     Supporting Evidence ................................................................................... 50

VI.     Grounds for Removal Relating to the Professional Standards Bureau ..................... 51

A.     Introduction ................................................................................................ 51

B.     Overview of PSB functions......................................................................... 52

C.     Sheriff Corpus has inhibited PSB from fulfilling its investigative function. ...................................................................................................... 53

D.     Sheriff Corpus's mismanagement of PSB has led to substantial delays in the investigative process and created significant negative effects. ........... 54

E.     Examples of Sheriff Corpus's failure to properly conduct PSB investigations............................................................................................... 55

      1.     The Sheriff ignored a PSB recommendation to investigate serious misconduct by a deputy who supported her campaign. ........ 55

2.     The Sheriff has failed to conclude an investigation into a deputy trainee who left firearm in a public place............................. 56

3.     The Sheriff failed to conduct an investigation into serious allegations of excessive force by a correctional officer. ................... 56

4.     The Sheriff has failed to conduct or conclude investigations concerning a correctional officer despite repeated allegations of serious misconduct....................................................................... 57

F.     Grounds for Removal ..................................................................... 57

G.     Supporting Evidence ..................................................................... 58

VII.     Conclusion.......................................................................................... 59

VIII.     San Mateo County Sheriff Removal Procedures ...................................... 60

## GROUNDS IN SUPPORT OF THE SHERIFF'S REMOVAL

*Summary of grounds for removal from office*

Christina Corpus became the Sheriff of San Mateo County on January 3, 2023, having won a majority of votes cast in the June 7, 2022 election. On March 4, 2025, San Mateo County voters voted to amend the County Charter to add Section 412.5 and grant the Board of Supervisors authority to remove an elected sheriff from office for cause.

Throughout her tenure, Sheriff Corpus has violated laws related to the performance of her duties, flagrantly and repeatedly neglected her duties, and obstructed investigations into her conduct and at the San Mateo County Sheriff's Office ("SMCSO" or "Sheriff's Office"). Accordingly, cause exists under Section 412.5 of the County Charter to remove Sheriff Corpus from office.

*First*, Sheriff Corpus violated conflict of interest laws and neglected her duties as Sheriff by hiring, promoting, and relying on as her primary aide Victor Aenlle, an unqualified civilian with whom she has a close personal relationship. Sheriff Corpus's Executive Team has been comprised of herself, an undersheriff, assistant sheriffs, and, for a period of time, a civilian "Executive Director of Administration." Sheriff Corpus created the "Executive Director of Administration" position specifically for Mr. Aenlle after she took office. Indeed, the job was not posted, and he was the only applicant.

Mr. Aenlle is not qualified to serve in a leadership role in the SMCSO. He is a real estate broker and operates a private investigation service. He applied to become a full-time deputy with the SMCSO, but he failed to complete the field training program. While he has been a part-time reserve deputy with the SMCSO for many years, he has never been a full-time peace officer, and he has never worked full-time in any capacity, sworn or civilian, within a law enforcement agency. Despite Mr. Aenlle's lack of qualifications—and despite concerns communicated to her about her close personal relationship with Mr. Aenlle—Sheriff Corpus created the "Executive Director of Administration" position for Mr. Aenlle and repeatedly sought promotions and pay increases for him.

Sheriff Corpus enabled unprofessional conduct by Mr. Aenlle, who routinely undermined SMCSO officials and operations throughout his tenure. While under Sheriff Corpus's supervision, he hindered the professional peace officers who comprised the rest of the Sheriff's Executive Team from executing their duties. He impeded internal investigations into alleged deputy misconduct.

County and SMCSO personnel repeatedly brought specific examples of Mr. Aenlle's misconduct to the attention of Sheriff Corpus. Despite knowing about Mr. Aenlle's detrimental effect on SMCSO, Sheriff Corpus persistently sought to promote him and raise his salary. Between January 2023 and November 2024, Sheriff Corpus sought County permission to raise Mr. Aenlle's salary on at least five occasions. In November 2024, after the Board of Supervisors took the extraordinary step of terminating Mr. Aenlle's position and restricting his access to non-public County buildings, Sheriff Corpus announced that she would re-hire Mr. Aenlle as an Assistant Sheriff, even though he failed to meet the minimum qualifications for that position. The County notified the Sheriff that Mr. Aenlle could not be promoted to Assistant Sheriff

May 30, 2025
Page 2

because Mr. Aenlle failed to meet the minimum qualifications for the position. In April 2025, after she could not hire him as an assistant sheriff, Sheriff Corpus added Mr. Aenlle to the "active list" of deputies.

Sheriff Corpus's decision to hire, promote, and seek salary raises for Mr. Aenlle and to ignore multiple warnings about his detrimental effect on the SMCSO, while having a close personal relationship with him, violates California and County conflict-of-interest laws and constitutes repeated and flagrant neglect of her duties as defined by law. These actions constitute cause for removal.

*Second*, Sheriff Corpus has demonstrated a pattern of retaliating against SMCSO personnel who she perceives to threaten her or Mr. Aenlle's authority. The most egregious example of this pattern of retaliation was Sheriff Corpus's decision to investigate and, eventually, order the warrantless arrest of Deputy Carlos Tapia—the president of the deputy sheriff's union, the Deputy Sheriff's Association ("DSA")—on unsubstantiated criminal charges.

In August 2024, the DSA filed a complaint against Sheriff Corpus with the Public Employment Relations Board ("PERB"). The August 2024 PERB complaint included allegations of misconduct against Mr. Aenlle. Dep. Tapia submitted a declaration in support of the PERB complaint. In September 2024, the DSA and the sergeants' union, the Organization of Sheriffs' Sergeants ("OSS"), announced a vote of no-confidence in Mr. Aenlle's leadership.

The following month, Sheriff Corpus ordered then-Acting Assistant Sheriff Matthew Fox to investigate Dep. Tapia for timecard fraud. This order was contrary to SMCSO's policy of referring criminal investigations into its own deputies' conduct to the District Attorney or another outside agency. Sheriff Corpus misrepresented the basis for the investigation, suggesting to Acting Assistant Sheriff Fox that the lieutenant overseeing Dep. Tapia had complained about his attendance in the Transportation and Court Security Bureau ("Transportation Unit") when that never happened. Sheriff Corpus and Mr. Aenlle then limited the evidence available to Acting Assistant Sheriff Fox as he performed the investigation, including preventing him from reviewing timecard records and from speaking to a witness who would have provided exculpatory evidence. Likewise, Sheriff Corpus denied Acting Assistant Sheriff Fox's repeated recommendation to place Dep. Tapia on administrative leave to allow more time for the investigation. After carrying out the investigation based on the incomplete information provided to him, Acting Assistant Sheriff Fox eventually reported to Sheriff Corpus that he had found what he believed to be evidence of timecard fraud.

On November 12, 2024, Sheriff Corpus instructed Acting Assistant Sheriff Fox to inform the San Mateo County District Attorney that she intended to arrest Dep. Tapia. Acting Assistant Sheriff Fox conferred with the Chief Deputy District Attorney of San Mateo County, who urged him not to proceed with a warrantless arrest. Acting Assistant Sheriff Fox conveyed that information to Sheriff Corpus, who nevertheless ordered that Dep. Tapia be arrested without a warrant that day.

May 30, 2025
Page 3

The timing of Dep. Tapia's arrest is significant for at least two reasons. First, the County and the DSA were scheduled to resume their labor meet-and-confer on the afternoon of November 12, 2024. Sheriff Corpus ordered that Dep. Tapia's arrest take place at 1:00 p.m., an hour before the meet-and-confer was scheduled to start. Second, it was known throughout the SMCSO that the County had been planning to release the results of an independent investigation conducted by retired Judge LaDoris Cordell into the Sheriff's and Mr. Aenlle's conduct. (The Cordell Report, as it became known, is described in further detail below.) Members of the Sheriff's Executive Team suspected that Dep. Tapia had interviewed with Judge Cordell as part of her investigation. An arrest of the DSA President was a newsworthy event that could compete with the release of the Cordell Report for news coverage and, potentially, undermine it through the arrest of a participating witness.

Dep. Tapia did not commit a crime, as the District Attorney's ensuing independent investigation confirmed. Once District Attorney investigators looked at the full range of available evidence, they concluded that "there was no basis to believe any violation of law had occurred" and that "Deputy Tapia should not have been arrested." Yet Dep. Tapia remains on administrative leave today six months after the arrest, while the SMCSO purports to complete an Internal Affairs investigation into the same allegations.

In ordering Dep. Tapia's arrest, Sheriff Corpus violated the Penal Code and the Labor Code, flagrantly neglected the duties of her office, and obstructed an investigation into her conduct and the SMCSO. These actions constitute cause for removal.

Sheriff Corpus has engaged in other instances of retaliation. Shortly after she learned that Assistant Sheriff Monaghan participated in an interview with Judge Cordell, Sheriff Corpus removed him from his position. Sheriff Corpus has also retaliated against officers for perceived disloyalty by transferring them to unfavorable assignments. Sheriff Corpus also placed a sergeant who is the brother of the head of the OSS on administrative leave in August 2024, days after a contentious labor-management meet-and-confer and around the same time that the OSS filed a PERB complaint against the Sheriff. Following an improper Internal Affairs investigation, the sergeant remains on administrative leave nine months later. When a captain in the SMCSO's Professional Standards Bureau ("PSB") refused to sign or serve a defective Internal Affairs notice for the sergeant whose brother heads the OSS, Sheriff Corpus transferred him out of the PSB unit and stripped him of responsibilities. When the lieutenant who oversaw the PSB unit suggested that a civilian employee could file a human resources complaint regarding Mr. Aenlle, Sheriff Corpus transferred him to a less desirable post. And when a sergeant appeared off-duty at a press conference in support of the March 4, 2024 ballot initiative giving the Board of Supervisors the ability to terminate an elected sheriff, Sheriff Corpus transferred him that same day to a less desirable post. The Sheriff's actions violated the California Government and Labor Codes, the San Mateo County Code, and the SMCSO Policy Manual; her termination of Assistant Sheriff Monaghan amounted to obstruction of an investigation into the conduct of the SMCSO. These actions constitute cause for removal.

May 30, 2025
Page 4

*Third,* while Sheriff Corpus has shown a pattern of swift retaliation against personnel who she believes are challenging her or Mr. Aenlle's authority, she regularly hinders or neglects other disciplinary matters within SMCSO. PSB oversees hiring new peace officers and conducts investigations into allegations of misconduct within the SMCSO, including civilian complaints, use-of-force investigations, and Internal Affair investigations. Sheriff Corpus has prevented PSB personnel from promptly conducting and concluding investigations and has personally interfered in investigations, including investigations of excessive use of force in the jail, of a deputy contributing to the delinquency of a minor, of a deputy violating the County's civil service rules by interfering in SMCSO's hiring process, and of an off-duty deputy trainee who left a SMCSO firearm unattended in a public restaurant. In some instances, Sheriff Corpus's interference with investigations appears motivated by favoritism, where the investigation subject is perceived to support, or in fact financially supported, the Sheriff politically. Sheriff Corpus's mismanagement of PSB has prevented SMCSO from complying with its investigatory obligations under the Penal Code and constitutes flagrant or repeated neglect of the duties of her office. These actions constitute cause for removal.

### *The Cordell Report and Measure A*

In July 2024, the County retained Judge Cordell to conduct an independent fact-finding investigation into complaints and concerns that current and former members of the SMCSO made about Mr. Aenlle. Over the course of the investigation, additional matters regarding the SMCSO—including allegations of misconduct committed by Sheriff Corpus—were added to the scope of the investigation. In performing her investigation, Judge Cordell interviewed 40 current and past sworn and civilian employees of the Sheriff's Office. Mr. Aenlle participated in a recorded interview with Judge Cordell. Sheriff Corpus declined Judge Cordell's invitation to interview. The Cordell Report was made public on November 12, 2024, sustaining several allegations of misconduct by Sheriff Corpus and Mr. Aenlle.

Thereafter, the Board of Supervisors called the March 4, 2025 special election so that county voters could consider Measure A. Measure A proposed to add section 412.5 to the County's Charter, which would authorize the Board to remove a sheriff from office for "cause." Section 412.5 defines "cause":

> b. For the purposes of this Section 412.5, "cause" shall mean any of the following:
>
> (1) Violation of any law related to the performance of a Sheriff's duties; or
>
> (2) Flagrant or repeated neglect of a Sheriff's duties as defined by law; or
>
> (3) Misappropriation of public funds or property as defined in California law; or
>
> (4) Willful falsification of a relevant official statement or document; or
>
> (5) Obstruction, as defined in federal, State, or local law applicable to a Sheriff,

of any investigation into the conduct of a Sheriff and/or the San Mateo County
Sheriff's Office by any government agency (including the County of San Mateo),
office, or commission with jurisdiction to conduct such investigation.

Between the release of the Cordell Report and the Measure A election, the city councils of San
Carlos, Millbrae, and San Mateo passed votes of no-confidence in Sheriff Corpus. The city/town
councils of South San Francisco, Belmont, Redwood City, and Woodside endorsed Measure A.
The DSA and the OSS had already passed no-confidence votes in Mr. Aenlle, and the SMCSO
captains declared their lack of confidence in Sheriff Corpus on November 18, 2024. At the
March 2025 election, the county's voters voted in favor of Measure A by a margin of 84% to
16%.

*This Investigation*

The Board of Supervisors, through the County Attorney, retained Keker, Van Nest & Peters LLP
("KVP") as outside counsel to investigate whether Sheriff Corpus had committed acts that
constitute "cause" under Section 412.5 and, if so, to prepare a Notice of Intent pursuant to the
Board-adopted procedures for removing a sheriff from office.

While KVP reviewed the Cordell Report, the firm conducted its own investigation into Sheriff
Corpus's actions. KVP's independent investigation included conducting more than 40 interviews
of current and former SMCSO and County personnel, including:

- **SMCSO sworn executive leadership** who served on Sheriff Corpus's Executive Team:
  KVP interviewed former Undersheriff Hsiung, former Assistant Sheriff Ryan Monaghan,
  and former Acting Assistant Sheriff Matthew Fox. KVP interviewed Paul Kunkel, a
  retired SMCSO captain who, as a contractor, functionally served as an assistant sheriff.

- **SMCSO command staff**: KVP interviewed 6 current or former captains and 4 current
  lieutenants who served under Sheriff Corpus.

- **SMCSO sworn personnel**: KVP interviewed 11 current sergeants, 2 current detectives,
  and 1 current deputy who served under Sheriff Corpus, including Sgt. Hector Acosta,
  Sgt. Javier Acosta, and Dep. Carlos Tapia.

- **SMCSO civilian staff**: KVP interviewed 8 current or former civilian personnel within
  the SMCSO.

- **Sheriff Corpus's transition team**: In addition to former Capt. Kunkel, who both served
  on Sheriff Corpus's transition team and on her Executive Team, KVP interviewed former
  Lt. Daniel Guiney and former Assistant Sheriff Jeff Kearnan.

- **County personnel**: KVP interviewed 3 County personnel, including County Executive
  Mike Callagy.

May 30, 2025
Page 6

- **District Attorney's Office staff**: KVP interviewed Chief Deputy District Attorney Shin-Mee Chang.

KVP also reviewed relevant documents provided by witnesses and the County.

*Other witnesses and reservation of rights*

KVP invited Sheriff Corpus and Mr. Aenlle through their counsel, to participate in voluntary interviews. Through their counsel, they declined to participate. KVP also invited Undersheriff Daniel Perea to a voluntary interview. To date, he has not yet agreed to be interviewed. KVP also requested voluntary interviews from SMCSO Finance Director Stacey Stevenson and SMCSO Human Resources staff member Connor Santos-Stevenson. Ms. Stevenson did not respond to multiple interview requests. Mr. Santos-Stevenson declined to participate in a voluntary interview.

The Procedures provide the Sheriff with the right to a removal hearing.  At the removal hearing or any subsequent stage of the removal process, KVP reserves the right to call witnesses and to introduce evidence in order to prove the allegations set forth in this Notice of Intent or to rebut the Sheriff's defenses including but not limited to five individuals who KVP sought to interview as part of its investigation, but who declined, or have not yet agreed, to speak with KVP as of the date KVP is submitting this Notice of Intent in its proposed form.  For avoidance of doubt, those individuals are: Sheriff Corpus, Undersheriff Perea, Mr. Aenlle, Ms. Stevenson, and Mr. Santos-Stevenson.

*Independence of bases for cause*

The grounds for removal discussed in this letter are not interdependent. Each of the grounds outlined below, independently and collectively, provide cause for removal under Section 412.5.

## I.    Grounds for Removal Relating to Victor Aenlle

### A.    Introduction

While both Sheriff Corpus and Victor Aenlle publicly deny having an intimate relationship, multiple witnesses observed conduct indicating that they have an extremely close personal relationship, and some witnesses have characterized it as intimate. In the context of that relationship, Sheriff Corpus has repeatedly appointed Mr. Aenlle to high-level positions at public expense, first on her transition team, then later as a contract consultant to the Sheriff's Office, then ultimately as her "Executive Director of Administration" or "Chief of Staff," a position that Sheriff Corpus specifically created for Mr. Aenlle. On multiple occasions, Sheriff Corpus also sought to increase Mr. Aenlle's compensation in these roles.

Mr. Aenlle is not qualified to hold the positions to which Sheriff Corpus appointed him or any other executive position within the Sheriff's Office. Prior to serving in the Sheriff's Office, he had no experience as a law enforcement executive. Nor has he ever been a full-time peace

May 30, 2025
Page 7

officer. Sheriff Corpus's repeated efforts to appoint (and re-appoint) an unqualified candidate to leadership positions in her office has undermined morale in the SMCSO and caused senior leaders to leave the Office. Mr. Aenlle's poor leadership skills have further reduced morale and hurt the effectiveness of the Sheriff's Office.

Given their close personal relationship, Sheriff Corpus has a conflict of interest with respect to Mr. Aenlle. She has failed to reconcile her personal relationship with Mr. Aenlle with her duty of loyalty to the public.

> **B.     Victor Aenlle is a real estate broker and reserve deputy who worked on Sheriff Corpus's campaign.**

Victor Aenlle is a commercial and residential real estate broker. He represents that he has been affiliated with Coldwell Banker since 1990. According to documents that Mr. Aenlle personally submitted to the County in 2023, he works full time for Coldwell Banker. According to the same documents, he operates a private investigation firm full time.

Mr. Aenlle became a reserve deputy with SMCSO in 2009. Reserve deputy is a part-time, volunteer position. In or around 2012 or 2013, Mr. Aenlle participated in the Sheriff's Office's field training program to become a full-time deputy. According to Capt. Mark Myers, Mr. Aenlle did not pass the field training program due to performance issues, including that he was not receptive to criticism, failed to perform well under stress, and struggled to make decisions. Thereafter, Mr. Aenlle remained a reserve deputy and was required to volunteer a minimum of 16 hours per month. *See* Policy Manual § 322.5.1.[1]

---

[1] From January 2, 2024, through July 31, 2024, Mr. Aenlle logged a nearly uniform eight hours of volunteer time per business day. He explained these log entries by saying: "Since assuming the role of Executive Director, I have worked an average of 12 to 14 hours per day, six to seven days a week. Any hours allocated toward my volunteer service were in addition to the eight hours for which I was compensated, ensuring there was no 'double-dipping.'" There is reason to doubt that Mr. Aenlle fulfilled his volunteer hour commitment. *First*, if Mr. Aenlle worked an "average" of 12 to 14 hours per day, then he only "volunteered" an average of four to six hours per day, not the eight hours a day that he reported. *Second*, Mr. Aenlle was not volunteering while working as the Executive Director of Administration. As an exempt employee, he received financial compensation for all hours worked, including those worked in excess of 8 hours per day, through his $246,979 annual salary. *Third*, Mr. Aenlle's claim that overtime hours in a civilian role should qualify as volunteer hours as a reserve deputy is inconsistent with the purpose of the reserve deputy program, which is to "supplement and assist regular sworn sheriff's deputies in their duties" and to "provide professional, sworn volunteer reserve deputies who can augment regular staffing levels." SMCSO Policy Manual § 322.1. Work done as a civilian does not "augment" regular staffing levels of sworn personnel, nor does it "assist" sworn deputies in their duties.

May 30, 2025
Page 8

In or around 2021, Mr. Aenlle began volunteering on Sheriff Corpus's campaign.

   **C.    Sheriff Corpus and Mr. Aenlle have a close personal relationship, which they
           have taken steps to conceal.**

Throughout Sheriff Corpus's campaign, the transition period, and the course of her
administration, it was evident to multiple witnesses that Sheriff Corpus and Mr. Aenlle have a
close personal relationship. During the campaign, Sheriff Corpus was married. Her husband
filed for divorce in April 2023, and the divorce became final later in 2023. Mr. Aenlle is
married.

           1.    The relationship between Sheriff Corpus and Mr. Aenlle was evident
                 during Sheriff Corpus's campaign.

Valerie Barnes is a long-time civilian SMCSO employee who has worked for San Mateo County
since 2006. Ms. Barnes's roles included supporting the SMCSO personnel serving as the head
law enforcement officers for the Cities of Millbrae and Half Moon Bay. (Both cities contract
with the SMCSO to provide police services.) Ms. Barnes has known Sheriff Corpus for many
years and worked for her when Sheriff Corpus led the SMCSO Millbrae office. While working
together and during the course of Sheriff Corpus's campaign, the two became friends.
Ms. Barnes considered herself a confidant for the Sheriff, and the two frequently texted about
personal matters, including about Sheriff Corpus's marriage. Ms. Barnes was a frequent
volunteer on Sheriff Corpus's campaign.

Mr. Aenlle was Sheriff Corpus's campaign manager. On several occasions during the campaign,
Ms. Barnes witnessed Sheriff Corpus and Mr. Aenlle engaging in physical contact of an intimate
nature. Ms. Barnes observed multiple instances of Mr. Aenlle massaging Sheriff Corpus's neck,
shoulders, and feet and a single instance of them kissing on the lips. During the campaign,
Mr. Aenlle told Ms. Barnes that he and Sheriff Corpus were "practicing a lot to have kids."
Ms. Barnes saw intimate messages on Sheriff Corpus's Signal messaging app from Mr. Aenlle,
including messages stating, "I love you" and messages using pet names such as "baby."

In or about January 2022, Sheriff Corpus told Ms. Barnes that she and Mr. Aenlle planned to
marry after obtaining divorces. Sheriff Corpus asked Ms. Barnes to search for wedding venues
for herself and Mr. Aenlle. Ms. Barnes sent Sheriff Corpus venue options via text message.

In late 2021 and early 2022, Sheriff Corpus told Ms. Barnes that Mr. Aenlle had purchased her
luxury boots and a pair of $12,000 earrings. Sheriff Corpus told Ms. Barnes that Mr. Aenlle used
$12,000 in cash to purchase the earrings. Mr. Aenlle later told Ms. Barnes that he used cash for
big purchases so there would be nothing tying the purchases to him. Ms. Barnes understood this
to mean that he wanted to avoid detection by his wife. After Mr. Aenlle and Sheriff Corpus
completed the purchase of the earrings, Ms. Barnes texted Sheriff Corpus asking to see a picture
of the earrings, and Sheriff Corpus contacted Ms. Barnes using a video calling application
(FaceTime) to show them off. Ms. Barnes's mother participated in the call.

Around this time, Ms. Barnes texted Sheriff Corpus and asked, "You at the ranch?" This was a reference to Mr. Aenlle's property near the coast. Sheriff Corpus responded, "I wish." Around this same time, Ms. Barnes texted Sheriff Corpus to "Be careful John isn't sniffing around to find you and VA," referring to Sheriff Corpus's then-husband John Kovach. Sheriff Corpus replied, "He won't find me with him."

On the night of the June 2022 election, Sheriff Corpus publicly thanked her then-husband Mr. Kovach, but did not thank Mr. Aenlle by name. Later that night, Ms. Barnes heard Mr. Aenlle say to Sheriff Corpus "This is over." This remark was also overheard by former SMCSO Capt. Paul Kunkel. Both Ms. Barnes and Mr. Kunkel understood Mr. Aenlle to be indicating he was ending his personal relationship with Sheriff Corpus. Sheriff Corpus called Ms. Barnes the following day to tell her that she and Mr. Aenlle had talked until 4:00 a.m., that she had apologized to Mr. Aenlle, and that "we're okay."

      2.      The relationship between Sheriff-elect Corpus and Mr. Aenlle was apparent in the months immediately following the election.

After she won the June 2022 election, Sheriff-elect Corpus put together a transition team that included Mr. Aenlle, Mr. Kunkel, former SMCSO Assistant Sheriff Jeff Kearnan, and former SMCSO Lt. Dan Guiney. Sheriff Corpus asked the County to hire Mr. Aenlle as a contractor so that his work on the transition would be paid. Although Sheriff Corpus's request for a paid transition team was out of the ordinary, County Executive Mike Callagy reported that he wanted to set Sheriff Corpus up for success. He therefore approved the transition team and Mr. Aenlle's contract, which paid him $105 per hour.

Mr. Kunkel, Mr. Guiney, and Mr. Kearnan each formed the impression that Sheriff Corpus and Mr. Aenlle shared a close personal relationship. Mr. Guiney and Mr. Kunkel stated that, during the transition, Sheriff Corpus and Mr. Aenlle would regularly appear together on Zoom calls, often from Mr. Aenlle's ranch. Mr. Kearnan and Mr. Kunkel witnessed Sheriff Corpus's and Mr. Aenlle's efforts to conceal their close personal relationship. For example, they both recall holding a videoconference call with Sheriff-elect Corpus in 2022, while she was in her car. They asked her if she was alone. She told them that she was. However, both Mr. Kunkel and Mr. Kearnan could see Mr. Aenlle's reflection in one of the car's windows in the background of the call.

Mr. Kearnan and Mr. Kunkel also reported that Mr. Aenlle would interrupt and redirect Sheriff Corpus in meetings as if he controlled the operation of the transition team. Both Mr. Kearnan and Mr. Kunkel came to understand that Mr. Aenlle (rather than Sheriff-elect Corpus or any other law enforcement professional) was leading the transition and preparations for Sheriff Corpus to assume her office.

Mr. Aenlle's involvement in transition planning extended to creating a draft organization chart for SMCSO's leadership structure. Mr. Aenlle advocated for a "chief of staff" position to replace one of the three sworn assistant sheriff positions. In at least some versions of the organizational chart under discussion, the chief of staff would have reported directly to the Sheriff, rather than

May 30, 2025
Page 10

to the Undersheriff, whereas assistant sheriffs report to the Undersheriff. When he later spoke with Judge Cordell, Mr. Aenlle referred to the chief of staff job as "my position" which "was created" by converting an assistant sheriff position to the chief of staff position.

3.    Sheriff Corpus's then-husband reported that she was having an affair with Mr. Aenlle.

During the transition, Mr. Kearnan noticed that Sheriff Corpus was often unavailable during working hours, and that she seemed never to be alone without Mr. Aenlle. Mr. Kearnan spoke to John Kovach, Sheriff Corpus's then-husband to discuss the relationship between Sheriff Corpus and Mr. Aenlle. Mr. Kovach told Mr. Kearnan that Sheriff Corpus was having an affair with Mr. Aenlle.

Mr. Guiney also recalls having multiple conversations with Mr. Kovach regarding the relationship between Sheriff Corpus and Mr. Aenlle. Mr. Kovach told Mr. Guiney that Sheriff Corpus would often come home very late or in the early hours of the morning and that she was not around very much. Mr. Kovach told Mr. Guiney that he suspected Sheriff Corpus was at Mr. Aenlle's ranch despite her denials.

Mr. Guiney also recalls Sheriff Corpus telling him that Mr. Kovach had given her a pair of boots, but when Mr. Guiney asked Mr. Kovach about the gift, he said that the boots were actually from Mr. Aenlle.

4.    In September 2022, Sheriff Corpus and Mr. Aenlle traveled to Hawaii and provided conflicting accounts of their trip.

In September 2022, Sheriff Corpus and Mr. Aenlle traveled to Hawaii. Sheriff Corpus and Mr. Aenlle have offered conflicting accounts of this trip.

**Valerie Barnes.** Before the trip, Sheriff Corpus told Ms. Barnes that she was going to Hawaii with Mr. Aenlle for a personal vacation. At Sheriff Corpus's request, Ms. Barnes assisted Sheriff Corpus in finding a rental property for her, her children, and Mr. Aenlle. Ms. Barnes also shared Sheriff Corpus's flight confirmation number and details with Mr. Aenlle.

**Jeff Kearnan.** After the trip, Mr. Kearnan spoke to Mr. Kovach who told Mr. Kearnan that he believed that Mr. Aenlle had traveled to Hawaii together with Sheriff Corpus. Mr. Kearnan then called Sheriff Corpus and asked her if she and Mr. Aenlle had traveled to Hawaii together. Sheriff Corpus denied having traveled to Hawaii with Mr. Aenlle. Ten minutes after that phone call ended, Mr. Aenlle called Mr. Kearnan. The phone call began with Mr. Aenlle accusing Mr. Kearnan of not liking him. Later in the call, Mr. Kearnan asked Mr. Aenlle about the Hawaii trip. Mr. Aenlle initially denied having traveled to Hawaii, but he later admitted that he had been in Hawaii. He claimed that he had been there on business unrelated to Sheriff Corpus. Shortly after this exchange, Mr. Kearnan resigned from Sheriff Corpus's transition team based on concerns about conflicts of interest, nepotism, and Sheriff Corpus's refusal to be honest regarding her relationship with Mr. Aenlle.

May 30, 2025
Page 11

**Mike Callagy.** After Mr. Kearnan resigned, County Executive Mike Callagy had a discussion with Sheriff Corpus about the Hawaii trip. During that conversation, Sheriff Corpus admitted to Mr. Callagy that she had traveled to Hawaii with Mr. Aenlle, and she acknowledged that she and Mr. Aenlle were good friends and that Mr. Aenlle had a relationship with her children. Mr. Callagy told Sheriff Corpus that it was inappropriate for her to have asked the County to pay Mr. Aenlle for his work on the transition team if she simultaneously had a personal relationship with him that was close enough such that they traveled to Hawaii together. Mr. Callagy terminated Mr. Aenlle's contract, explaining that the County could not tolerate even the perception of a conflict of interest.

**Dan Guiney.** Mr. Aenlle admitted to Mr. Guiney that he had traveled to Hawaii, though he claimed that he was there to provide security for Sheriff Corpus and support for her children.

**Carlos Tapia.** Mr. Aenlle told Dep. Tapia that he had flown to Hawaii to provide security for Sheriff Corpus.

**Judge Cordell.** Mr. Aenlle admitted to Judge Cordell that he had been in Hawaii at the same time as Sheriff Corpus, but he maintained that it was a coincidence, that he had been there to provide "covert" security to an unrelated third party, and that he "barely even saw" Sheriff Corpus while he was there.

In sum, Sheriff Corpus has both admitted (to Mr. Callagy) and denied (to Mr. Kearnan) having traveled to Hawaii with Mr. Aenlle. When she has admitted the trip, she has also acknowledged that the trip was personal and that she and her children spent time with Mr. Aenlle. Mr. Aenlle has both admitted (to Mr. Kearnan, to Judge Cordell, to Mr. Guiney, and to Dep. Tapia) and denied (to Mr. Kearnan) that he traveled to Hawaii. Mr. Aenlle has stated to some people (Mr. Guiney and Dep. Tapia) that he traveled to provide security to the Sheriff and to others (Judge Cordell and Mr. Kearnan) that his travel was unrelated to Sheriff Corpus.

> 5.    The relationship continued after Sheriff Corpus took office.

After Sheriff Corpus took office in January 2023, she appointed Christopher Hsiung as Undersheriff and Ryan Monaghan as an Assistant Sheriff. Sheriff Corpus recruited Undersheriff Hsiung. He had helped to reform the Mountain View police department, and, in recruiting him, Sheriff Corpus told him that "I want you to do in San Mateo as you did in Mountain View." Undersheriff Hsiung served the SMCSO from February 2023 to June 2024. Sheriff Corpus also recruited Assistant Sheriff Monaghan, who had served as the Tiburon Chief of Police. He served as Assistant Sheriff from February 2023 through September 2024. Thus, beginning in February 2023, Sheriff Corpus's Executive Team consisted of Mr. Aenlle, Undersheriff Hsiung, Assistant Sheriff Monaghan, and Mr. Kunkel.

Undersheriff Hsiung and Assistant Sheriff Monaghan witnessed conduct indicative of a close personal relationship between Sheriff Corpus and Mr. Aenlle. For example, they both saw Sheriff Corpus and Mr. Aenlle share entrees and drinks at restaurants. Other witnesses, including Ms. Barnes and another civilian SMCSO employee, Jennifer Valdez, also saw Sheriff

May 30, 2025
Page 12

Corpus and Mr. Aenlle share entrees and drinks. Undersheriff Hsiung and Assistant Sheriff Monaghan also both frequently observed Mr. Aenlle interrupt and/or redirect Sheriff Corpus in meetings.

While attending a professional conference in or about May 2024, Sheriff Corpus and Mr. Aenlle stood up former Undersheriff Hsiung on three separate occasions when they were scheduled to meet. Each time, he waited to meet them in the hotel lobby, but they never arrived and were evasive in explaining why they failed to meet him. Sheriff Corpus and Mr. Aenlle were also absent at the same times during the day, for periods of between one and two hours, and at unusual times of day.

Ms. Valdez, who worked in the Sheriff's Office for 18 years as an executive assistant before later transferring to the County Attorney's office, also observed conduct indicative of an intimate personal relationship between Sheriff Corpus and Mr. Aenlle. In 2024, Ms. Valdez saw Mr. Aenlle answer a call on his cell phone. Ms. Valdez noticed that the caller ID identified the caller as Sheriff Corpus. As the call concluded, Ms. Valdez heard Mr. Aenlle say "Te amo" to Sheriff Corpus. Ms. Valdez understood this to mean "I love you" in Spanish. On multiple occasions, Ms. Valdez saw Mr. Aenlle bring Sheriff Corpus's children to her office after school.

Sheriff Corpus lives in San Bruno in a house that is on the corner of a four-way intersection. Diagonally across the street from Sheriff Corpus's house (kitty-corner) is a house owned by the parents of Sgt. Gaby Chaghouri. Sgt. Chaghouri lives out-of-state and typically works lengthier shifts scheduled together. During these stretches, Sgt. Chaghouri drives in from out of state and stays at his parents' house.

Sgt. Chaghouri has seen Mr. Aenlle at Sheriff Corpus's house on multiple occasions beginning during the campaign and through March 2025. On at least two occasions, Mr. Aenlle appeared to recognize Sgt. Chaghouri. In one instance, Sgt. Chaghouri was parking his truck late at night after arriving from out of state and saw Mr. Aenlle emerge from Sheriff Corpus's home. Mr. Aenlle looked directly at Sgt. Chaghouri, tucked his head, and quickly got in his car to drive away. On another occasion, Sgt. Chaghouri, standing in his front yard, saw Mr. Aenlle come out of the front door of Sheriff Corpus's house, make eye contact, then abruptly turn around and go back inside.

> 6.    Sheriff Corpus and Mr. Aenlle deny an "intimate relationship."

Sheriff Corpus declined to be interviewed by Judge Cordell. Mr. Aenlle agreed to interview with Judge Cordell during which he described his relationship with Sheriff Corpus as a "strong friendship," but one that did not extend "beyond mere friendship." An April 25, 2025, report commissioned by Sheriff Corpus's counsel states that "[b]oth Sheriff Corpus and Mr. Aenlle expressly deny any intimate relationship." As noted above, Sheriff Corpus and Mr. Aenlle declined KVP's invitation for an interview.

May 30, 2025
Page 13

    **D.**      **Using public funds, Sheriff Corpus entered into two separate contractual arrangements and one employment relationship with Mr. Aenlle and repeatedly requested raises for Mr. Aenlle.**

<u>**Consultant to Transition Team.**</u> As discussed above, after Sheriff Corpus won the June 2022 election, she asked the County to fund a paid transition team. Although there was no known precedent for such a request, Mr. Callagy agreed to Sheriff Corpus's request, and the County offered Mr. Aenlle a contract that paid him $105 per hour. Mr. Callagy cancelled this contract in October 2022, after Sheriff Corpus confirmed that she had a personal relationship with Mr. Aenlle.

<u>**Contractor and Special Projects Coordinator.**</u> After Sheriff Corpus took office, she undertook a series of steps to ensure that Mr. Aenlle was employed in an executive role and repeatedly sought pay increases on his behalf. Immediately upon taking office in January 2023, Sheriff Corpus hired Mr. Aenlle as a contractor, paid $92.44 per hour or $192,275 per year. At the time, the Sheriff had authority to enter into contracts for less than $200,000 without Board approval. The amount of the contract was set just under the threshold that would require her to present the contract to the Board. Mr. Aenlle's contractor agreement was signed by Stacey Stevenson, the acting Director of Finance in the Sheriff's Office at that time.

Less than six weeks later, in March 2023, Sheriff Corpus requested that Mr. Aenlle be hired as an extra help Special Projects Coordinator at the hourly rate of $118. County Human Resources approved the conversion from contractor to temporary employee, but it set the rate of pay at $73 per hour, which it deemed "consistent with base pay of similar County positions." Human resources specifically noted that Mr. Aenlle's job was "not at the level of an Assistant Sheriff" and was "non-sworn and should not be aligned to a higher level sworn role/pay." According to Human Resources, "the work described is more in alignment with higher-level Analyst work or mid-level management work."

<u>**Executive Director of Administration.**</u> Then, in or around June 2023, Sheriff Corpus created a job listing for a full-time, unsworn position, the "Executive Director of Administration." The description was similar to the job descriptions of Mr. Aenlle's contract positions, which Human Resources had noted did not involve executive level duties. The "Executive Director of Administration" job was not publicly posted, and Mr. Aenlle was the only applicant for the position. He received the job, and his salary was set at $246,979.

Almost immediately, in July 2023, Sheriff Corpus sought a pay increase for Mr. Aenlle, submitting a memorandum which began:

May 30, 2025
Page 14

> I respectfully request that Mr. Victor Aenlle receive "Step E" compensation for his recent appointment to the Sheriff's Office Executive Director of Administration position, as it has been extended to him and accepted.  Over the last 30 years, Mr. Aenlle has served in various leadership and management roles and gained significant exposure to administrative operations in various capacities.  In addition to his substantial executive leadership experience, Mr. Aenlle has been an active member for 15 years with the San Mateo County Sheriff's Office.

The memorandum notes that Sheriff Corpus had already promised Mr. Aenlle a raise without authorization from Human Resources. The memorandum refers to Mr. Aenlle's "15 years with the San Mateo County Sheriff's Office," but it fails to note that this service consisted of part-time, volunteer reserve deputy service, as well as the short period of time when he was a full-time deputy candidate before failing the field training program.

County Human Resources approved the raise "given that the candidate ha[d] already been informed by the Sheriff's Office that [he] will receive" it, but also noted in a memorandum to Sheriff Corpus that Human Resources did "not believe that [increased compensation] is in alignment with the candidate's experience."

In the first four months of 2024, Sheriff Corpus made, or caused to be made, three further requests for a pay raise for Mr. Aenlle. In one instance, Sheriff Corpus ordered then-Undersheriff Hsiung to author and submit a raise request for Aenlle. The County denied each request as unjustified.

> **E.     Sheriff Corpus took steps to conceal potentially negative information about Mr. Aenlle.**

In the spring of 2023, it was well known within the SMCSO that Sheriff Corpus was considering creating a full-time position for Mr. Aenlle. As a result, Lt. Sebring, who at the time served as a lieutenant in PSB, thought that it was possible that Mr. Aenlle would have to go through a background check before assuming such an executive position. When he considered the possibility that Mr. Aenlle might have to go through a background check, Lt. Sebring recalled a piece of information he had previously seen in Mr. Aenlle's background file.

Lt. Sebring had been part of an Internal Affairs investigation of Mr. Aenlle years earlier, and, more recently, he had pulled Mr. Aenlle's background file at the request of the San Mateo Police Department which was conducting a background check on Mr. Aenlle. Lt. Sebring was thus aware that Mr. Aenlle's background file contains an old report from a local police department containing allegations of criminal conduct against Mr. Aenlle. As far as Lt. Sebring is aware, Mr. Aenlle was never charged in connection with those allegations.

Nonetheless, Lt. Sebring thought Sheriff Corpus should be aware of the contents of Mr. Aenlle's background file as she considered appointing him to a position on her Executive Team. Accordingly, he met with Sheriff Corpus and told her about the police report that was contained in Mr. Aenlle's background file.

May 30, 2025
Page 15

Approximately an hour later, Sheriff Corpus called Lt. Sebring and asked him who else knew about the report and who else had access to Mr. Aenlle's background file. Lt. Sebring told Sheriff Corpus that at least the PSB lieutenant, the PSB captain, the assistant sheriff overseeing PSB, SMCSO Human Resources Manager Heather Enders, and certain support staff had access to the background files of Sheriff's Office employees. Sheriff Corpus then directed Lt. Sebring to restrict access to Mr. Aenlle's background file such that only she and Lt. Sebring would be able to access it. Lt. Sebring coordinated with the Sheriff's Office Technical Services Unit to carry out Sheriff Corpus's direction and informed Sheriff Corpus when the file access restriction was complete.

Sheriff Corpus further directed Lt. Sebring to provide her with a copy of the police report from Mr. Aenlle's background on a thumb drive. Approximately one month later, Sheriff Corpus informed Lt. Sebring that Mr. Aenlle would not go through a background check prior to assuming his position on the Executive Team.

According to Lt. Sebring, it was unusual that Sheriff Corpus ordered him to limit access to Mr. Aenlle's background file. Lt. Sebring reported that this was the only time anyone has requested him to limit access to an individual's background file.

> **F.    Immediately after the Board of Supervisors voted to remove Mr. Aenlle as "Executive Director of Administration," Sheriff Corpus attempted to appoint him as an Assistant Sheriff.**

On November 13, 2024, the Board of Supervisors, in response to the Cordell Report, voted to eliminate Mr. Aenlle's "Executive Director of Administration" position and to bar him from unescorted access to non-public areas of County buildings. That same day, Sheriff Corpus announced her intention to appoint Mr. Aenlle to the position of Assistant Sheriff "effective immediately."

That night, Det. Mike Garcia called Det. Rick Chaput while Det. Chaput was at home and off-duty. Det. Chaput serves in PSB, where one of his responsibilities is to update the status of newly hired officers in the POST Electronic Data Interchange (EDI), the online system that SMCSO uses to communicate with the California Commission on Police Officer Standards and Training. Det. Garcia told Det. Chaput that "they want you to switch Victor to full-time in POST." Det. Chaput understood that Det. Garcia was referring to a request from the Executive Team to change Mr. Aenlle's status from a Reserve Deputy to a full-time peace officer in the POST EDI system.

Det. Chaput expressed to Det. Garcia that he was unwilling to make that change. He also explained to Det. Garcia that anyone updating Mr. Aenlle's status information in the POST EDI system would have to sign a form swearing under penalty of perjury that the updated information was accurate. After speaking with Det. Garcia, Det. Chaput called Lt. Irfan Zaidi. Lt. Zaidi said he was not aware of the request but would call Undersheriff Perea and then call Det. Chaput back. Shortly thereafter, Lt. Zaidi called Det. Chaput back; during this second call, Lt. Zaidi told Det. Chaput that Undersheriff Perea directed him to change Mr. Aenlle's status.

May 30, 2025
Page 16

Det. Chaput was concerned about the timing of the request, and he was not confident that Mr. Aenlle met the requirements for a full-time peace officer. Det. Chaput told Lt. Zaidi he would not change Mr. Aenlle's status. Det. Chaput then reported the incident to Sgt. Fava.

The following day, the County's Director of Human Resources, Rocio Kiryczun, communicated to Sheriff Corpus that Mr. Aenlle failed to meet the minimum qualifications for Assistant Sheriff. Ms. Kiryczun pointed out that, according to the job description for the Assistant Sheriff position, "Candidates must acquire an Advanced Certificate in law enforcement issued by [POST] within one year of appointment" and noted that "the requirements set forth by [POST] state that, in order to be eligible for an Advanced Certificate, a candidate must have a <u>minimum</u> of 4 years of full-time law enforcement experience." Ms. Kiryczun further noted that "Mr. Aenlle does not have 4 years of full-time law enforcement experience, nor even 1 year." Thereafter, Mr. Aenlle was not hired to an Assistant Sheriff position.

On April 17, 2025, a month and a half after the voters enacted Measure A, Sheriff Corpus directed that Mr. Aenlle be moved to the "active list" and assigned him to assist in the unit that processes concealed weapons permits.

### G.    Sheriff Corpus's decision to install Mr. Aenlle as a member of her Executive Team hurt the SMCSO.

Sheriff Corpus installed Mr. Aenlle in an executive position that is typically filled by a career full-time law enforcement professional. Because of his lack of experience and his poor leadership skills, Mr. Aenlle was unable to provide effective leadership with the SMCSO, and his presence hurt morale across the organization. Sheriff Corpus's decision to keep Mr. Aenlle in his position, despite the warnings she received, further hurt the Office and led to the departures of senior leaders.

1.    Sheriff Corpus's decision to install Victor Aenlle in a leadership position hurt morale in the SMCSO.

Sheriff Corpus's decision to include Mr. Aenlle as part of her Executive Team hurt morale in the SMCSO because the sworn officers knew that he was not qualified to be a law enforcement leader. It is widely known in the Sheriff's Office, particularly among the more senior officers, that Mr. Aenlle had failed the field training program to become a full-time Sheriff's Deputy. Likewise, a number of senior officers are aware that the City of San Mateo Police Department recently rejected Mr. Aenlle's application for a position there.

Mr. Aenlle's attempts to supervise full-time sworn officers exacerbated this morale problem. Mr. Aenlle's role as the Executive Director of Administration was a civilian role, in which he was supposed to supervise civilian staff. Moreover, it is generally understood in the SMCSO that full-time sworn officers are not to be supervised by civilian executives. Nonetheless, Mr. Aenlle attempted to direct the work of full-time sworn officers, including captains in the Corrections Division.

Mr. Aenlle also inappropriately interfered with the work of civilian employees in the SMCSO, including those involved in the hiring process. On or about November 7, 2024, PSB Sgt. Jimmy Chan and Ms. Barnes interviewed applicants for a deputy sheriff trainee position. The interview process is required by POST. Prior to the interview, Det. Mike Garcia told Sgt. Chan that he had personally worked to prepare one of the applicants that Sgt. Chan would interview that day. Det. Garcia identified the candidate by name and told Sgt. Chan that the candidate had been part of the Law Enforcement Candidate Scholars program. Thinking back on it, Sgt. Chan believes that Det. Garcia was trying to influence his assessment of the candidate. Det. Garcia is perceived within the SMCSO to be a favorite employee of Sheriff Corpus's; his mother, brother, and sister-in-law all contributed to Sheriff Corpus's 2022 campaign for Sheriff.

After interviewing the candidate, Sgt. Chan and Ms. Barnes each gave the candidate a non-passing score, based on her answers to their questions and her insufficient experience. They recommended that the candidate apply to become a Community Service Officer in order to gain relevant experience. Sgt. Chan told Det. Garcia and Lt. Zaidi that the candidate had not passed the interview.

Later that same day, Mr. Aenlle contacted Ms. Enders, the top civilian human resources employee within the SMCSO. Mr. Aenlle told Ms. Enders that Sheriff Corpus was upset because Ms. Barnes had been part of the interview panel and because the candidate had not passed the interview. Mr. Aenlle instructed Ms. Enders to rescind the interview results and to pass the applicant onto the next stage of the hiring process. Ms. Enders told Mr. Aenlle that she would not do so.

The following day, Undersheriff Perea instructed Lt. Zaidi to move the candidate forward in the hiring process. Lt. Zaidi informed Undersheriff Perea that the candidate had failed their interview, but Undersheriff Perea insisted, saying that Sheriff Corpus wanted the candidate moved through the process. Shortly thereafter, Lt. Zaidi instructed a civilian Management Analyst to change the candidate interview results in the application management system from "fail" to "pass" at the direction of the Sheriff and Undersheriff, and stood over her shoulder as she did so. Lt. Zaidi later informed Ms. Enders that he was told by Undersheriff Perea that Sheriff Corpus wanted the applicant to move forward in the hiring process.

Thereafter, Sgt. Fava and Sgt. Chan protested the decision to move the applicant forward in the hiring process notwithstanding the fact that the applicant had failed the interview. Ms. Enders ultimately refused to move the candidate forward in the process, writing that members of the Sheriff's Office should not "engage in actions that undermine or interfere with the integrity of the civil service process under any circumstances," and that "any deviation from" the interview and application process "would be inappropriate and unacceptable."

Mr. Aenlle's harsh treatment of SMCSO employees, and his generally poor leadership skills, further eroded morale. The example often cited by witnesses is Mr. Aenlle's treatment of long-time SMCSO civilian employee Jenna McAlpin. In April 2024, Mr. Aenlle confronted Ms. McAlpin concerning a rumor that she had posted denigrating content about Sheriff Corpus

May 30, 2025
Page 18

on social media. Mr. Aenlle confronted Ms. McAlpin about this rumor on or about her last day at the Sheriff's Office. Ms. McAlpin denied having anything to do with the social media posts, but Mr. Aenlle implied that she was not being truthful; in response, she swore on her children's lives that she was telling the truth, and offered to take a lie-detector test. Ms. McAlpin was very upset by this interaction, and she told Mr. Aenlle that he was making her emotionally and physically uncomfortable. As soon as Mr. Aenlle left her office, Ms. McAlpin began to cry.

2.  Sheriff Corpus's Executive Team warned her about Mr. Aenlle's conduct and the effect it was having on the office.

Sheriff Corpus was aware of Mr. Aenlle's unprofessional conduct but refused to act. On multiple occasions, Undersheriff Hsiung warned Sheriff Corpus that Mr. Aenlle's unprofessional conduct and lack of experience as a law enforcement leader imperiled the Sheriff's Office's operational abilities. One example of this arose in the context of an Internal Affairs investigation that occurred in 2024. A sergeant made an allegation of misconduct against a captain. The sole witness was also a captain. Because of the high ranks of the principal witness and subject of the investigation, the Sheriff's Office outsourced the investigation. Undersheriff Hsiung instructed Mr. Aenlle not to discuss the underlying incident with either captain, so as not to taint the investigation or violate procedural rights. Ignoring that instruction, Mr. Aenlle discussed the incident with the captain who was a principal witness in the investigation. When Undersheriff Hsiung confronted Mr. Aenlle about his interference with the investigation, rather than to take responsibility for his conduct, Mr. Aenlle attempted to minimize the effect of his decision to discuss the incident with the witness. Undersheriff Hsiung later told Sheriff Corpus that Mr. Aenlle compromised the investigation. However, he did not have confidence that Sheriff Corpus would or could control Mr. Aenlle's future conduct given their personal relationship.

Likewise, Assistant Sheriff Monaghan advised Sheriff Corpus, on multiple occasions, that Mr. Aenlle's conduct, and his way of communicating with employees, was interfering with operations for both sworn and civilian employees. For example, Assistant Sheriff Monaghan spoke to Ms. McAlpin shortly after the incident with Mr. Aenlle described above, and Ms. McAlpin was visibly upset and appeared to have been crying. Assistant Sheriff Monaghan spoke to Sheriff Corpus about it, but she downplayed the seriousness of the incident and commented that Ms. McAlpin has a tendency to be "emotional" and might have overreacted.

3.  Sheriff Corpus's close personal relationship with Mr. Aenlle and her decision to retain him on her Executive Team contributed to the departures of numerous senior advisors and Executive Team members.

As described above, after Sheriff Corpus's election, she assembled a transition team of seasoned law enforcement officers with ties to the SMCSO office, including former Assistant Sheriff Jeff Kearnan, former Capt. Paul Kunkel, and former Lt. Dan Guiney. Mr. Kearnan left the transition team before Sheriff Corpus's inauguration due to his concerns about her relationship with

May 30, 2025
Page 19

Mr. Aenlle. Likewise, Mr. Guiney left shortly after Sheriff Corpus's inauguration based on concerns about Mr. Aenlle.

Mr. Kunkel stayed on after Sheriff Corpus's inauguration as a contractor to serve as the unofficial Assistant Sheriff for Corrections and to hire a full-time replacement for that position. Mr. Kunkel identified several promising candidates for leadership positions, including a police chief from within San Mateo County and a former assistant sheriff from Santa Clara County. Mr. Kunkel could not identify any opposition to those candidates other than Mr. Aenlle's. Neither was hired. Capt. Kunkel chose to leave the SMCSO in early 2024 in large part due to Mr. Aenlle's influence over the office. At the time he left, no assistant sheriff for Corrections had been hired. Sheriff Corpus has still never had a full-time assistant sheriff for Corrections.

Mr. Hsiung joined the SMCSO as Sheriff Corpus's first undersheriff because he wanted to help Sheriff Corpus reform the SMCSO. Undersheriff Hsiung eventually resigned in June 2024 because of Sheriff Corpus's inability to command the SMCSO at an executive level, her tendency to retaliate against personnel who disagreed with her or she believed had previously wronged her, and her continually allowing Mr. Aenlle to interfere with him and other sworn personnel in the performance of their duties.

Like Mr. Hsiung, Mr. Monaghan entered his position enthusiastic about the prospect of working for a new sheriff with a reform-minded agenda. However, Sheriff Corpus removed Assistant Sheriff Monaghan from his position in September 2024, and she has not hired a full-time replacement for his position.

As a result of these departures, the SMCSO is currently operating without critical leadership positions filled. The SCMSO is supposed to operate with a Sheriff, Undersheriff and three assistant sheriffs, including one devoted to overseeing the operation of the County's two jails. There are currently no assistant sheriffs.

### H.    Grounds for Removal

The foregoing conduct is, independently and collectively, grounds to remove Sheriff Corpus from office for cause for the following reasons.

Sheriff Corpus violated laws related to the performance of her duties as Sheriff. San Mateo County Charter Art. IV § 412.5(B)(1). *First*, California's conflict-of-interest law requires public officials to exercise authority "with disinterested skill, zeal, and diligence and primarily for the benefit of the public." *Clark v. City of Hermosa Beach*, 48 Cal. App. 4th 1152, 1170–71 (1996) (quoting *Noble v. City of Palo Alto* (1928) 89 Cal. App. 47, 51). The law "prohibits public officials from placing themselves in a position where their private, personal interests may conflict with their official duties." *Id.* (quoting (64 Ops. Cal. Atty. Gen. 795, 797 (1981)). The common law conflict-of-interest rule "extends to noneconomic conflicts of interest." *Id.* at 1171 n.18. This law, and "[a]ll laws pertaining to conflicts of interest," are "applicable to all officers, employees and members of boards and commissions" of San Mateo County. San Mateo County Charter, Art. V § 510. Further, it is "the policy of the County to recruit, select, retain and

May 30, 2025
Page 20

promote the best qualified officers and employees," and "[a]ppointments and promotions shall be made on the basis of merit and in conformity with the principles of equal opportunity." San Mateo County Charter, Art. V § 501. And "the selection and retention of employees" must be "on the basis of merit and fitness." *Id.* § 505. Sheriff Corpus's own Policy Manual provides that "Candidates for job openings will be selected based on merit, ability, competence and experience." SMCSO Policy Manual § 1000.2. The Policy Manual further prohibits employees "from directly supervising, occupying a position in the line of supervision or being directly supervised by any other employee … with whom they are involved in a personal or business relationship," *id.* § 1025.2(a), and prohibits "recommending promotions … or other personnel decisions affecting an employee … with whom they are involved in a personal or business relationship," *id.* § 1025.2(b). Sheriff Corpus has violated these laws with respect to her treatment of Mr. Aenlle, with whom she enjoys a close personal relationship, including by hiring and employing him at public expense in positions for which he is not qualified, by seeking promotions and salary increases for him, and by retaining him in those positions notwithstanding the fact that the County Executive and others advised Sheriff Corpus that doing so was improper. Moreover, Sheriff Corpus tolerated, enabled, and acquiesced to Mr. Aenlle's conduct that was detrimental to the morale and proper functioning of the Sheriff's office.

***Second***, pursuant to California Commission on Peace Officer Standards and Training ("POST") regulations, "[e]very peace officer candidate shall participate in an oral interview to determine suitability to perform the duties of a peace officer." Cal. Code Regs. tit. 11, § 1952(a). The SMCSO has an obligation to ensure that every peace officer candidate "satisfies all minimum selection requirements." Cal. Code Regs. tit. 11, § 1952(a). Further, as noted above, all "[a]ppointments and promotions [in the SMCSO] shall be made on the basis of merit and in conformity with the principles of equal opportunity," San Mateo County Charter, Art. V § 501, and "the selection and retention of employees" must be "on the basis of merit and fitness," *id.* § 505. Sheriff Corpus violated these laws by directing that SMCSO personnel advance a candidate who failed an oral examination and thus failed to satisfy the minimum selection requirement specified by law.

Sheriff Corpus has also flagrantly and repeatedly neglected her duties as defined by law. San Mateo County Charter Art. IV § 412.5(B)(2). California law requires that Sheriff Corpus preserve the peace in San Mateo County, operate the jails in the County, and hire necessary staff to execute her responsibilities. Gov't Code §§ 26600, 26604, 26605. Moreover, per Sheriff Corpus's own Policy Manual, the "Sheriff is responsible for planning, directing, coordinating, controlling and staffing all activities of the Sheriff's Office for its continued and efficient operation." Policy Manual § 201.1.1(a)(2). In addition, "[t]he Sheriff is responsible for administering and managing … the Administration and Support Services Division[,] Operations Division[, and] Corrections Division." *Id.* § 200.2. Each of the foregoing Divisions is to be commanded by an Assistant Sheriff. *Id.* §§ 200.2.1, 200.2.2, 200.2.3. Sheriff Corpus flagrantly neglected these duties by hiring, promoting and retaining Mr. Aenlle notwithstanding his lack of qualifications, his poor leadership skills, and the repeated warnings she received regarding the same. Indeed, as a result of Sheriff Corpus's actions, the SMCSO is currently without any of the three assistant sheriffs required by Sheriff Corpus's Policy Manual.

May 30, 2025
Page 21


I.        **Supporting Evidence**

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- SMCSO Associate Management Analyst Valerie Barnes

- San Mateo County Executive Michael Callagy

- Sgt. Gaby Chaghouri

- Sgt. Jimmy Chan

- Det. Rick Chaput

- SMCSO Human Resources Manager Heather Enders

- Former Lt. Daniel Guiney

- Former Undersheriff Christopher Hsiung

- Former Assistant Sheriff Jeff Kearnan

- San Mateo County Human Resources Director Rocio Kiryczun

- Former Capt. Paul Kunkel

- Former Records Manager Jenna McAlpin

- Former Assistant Sheriff Ryan Monaghan

- Lt. Jonathan Sebring

- Dep. Carlos Tapia

- Executive Assistant Jennifer Valdez

- Lt. Irfan Zaidi

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- November 26, 2021 Barnes-Sheriff Corpus Texts re: Sheriff Christina Corpus's relationship with Kovach

May 30, 2025
Page 22

- December 30, 2021 Barnes-Sheriff Corpus Texts re: Sheriff Christina Corpus's relationship with Kovach

- 2022 Draft Organizational Chart

- January 12, 2022 Barnes-Sheriff Corpus Texts re: Aenlle's Ranch

- January 18, 2022 Barnes-Sheriff Corpus Texts re: Sheriff Christina Corpus's relationship with Kovach

- January 27, 2022 Barnes-Sheriff Corpus Text re: Wedding Venues

- January 27, 2022 Barnes-Sheriff Corpus Texts re: Earrings

- January 31, 2022 Barnes-Sheriff Corpus Texts re: Aenlle

- February 26, 2022 Barnes-Sheriff Corpus Texts re: Aenlle Foot Massage

- May 11, 2022 Barnes-Sheriff Corpus Texts re: Airbnb in Hawaii

- August 30, 2022 Contract Between County of San Mateo and Victor Aenlle

- October 21, 2022 Email from Iliana Rodriguez to Aenlle re: Termination of Contract

- January 1, 2023 Contract Between County of San Mateo and Victor Aenlle

- 2023 Special Projects Coordinator I Job Description

- March 7, 2023 Email from County Human Resources Lisa Yapching to Joann Lov and Heather Enders re: Extra Help Positions

- July 6, 2023 Job Posting for Executive Director of Administration

- 2023 Victor Aenlle CV and Application for Executive Director of Administration

- July 31, 2023 Memo from Sheriff Christina Corpus to Rocio Kiryczun re: Victor Aenlle - Step E Request

- August 1, 2023 Email from Rocio Kiryczun to Sheriff Christina Corpus re: Victor Aenlle - Step E Request

- February 13, 2024 Memo from Sheriff Christina Corpus to Rocio Kiryczun re: Differential Request for Dr. Victor Aenlle

- March 8, 2024 Email from Sheriff Christina Corpus to Former Undersheriff Christopher

Hsiung re: Document

- March 12, 2024 Memo from Former Undersheriff Hsiung to Rocio Kiryczun re: Temporary Differential Pay

- March 13, 2024 Email from Rocio Kiryczun to Hsiung and Sheriff Christina Corpus re: Discretionary Pay for Victor Aenlle

- April 16, 2024 Memo from Sheriff Christina Corpus to Rocio Kiryczun re: Request for Aenlle Raise

- April 24, 2024 Email from Rocio Kiryczun to Sheriff Christina Corpus re: Request for Reconsideration of Allowance for Victor Aenlle

- September 25, 2024 Victor Aenlle Transcript of Interview with Judge Cordell

- November 13, 2024 Email from Sgt. Joe Fava and Sgt. Jimmy Chan to Lt. Irfan Zaidi re: Oral Board Concern

- November 13, 2024 Video Recording of Special Meeting of the Board of Supervisors

- November 14, 2024 Email from Rocio Kiryczun to Sheriff Christina Corpus re: Assistant Sheriff Job Classification Requirements

- November 18, 2024 Email from Heather Enders to Sheriff Christina Corpus, Undersheriff Perea, and Lt. Irfan Zaidi re: Concerns Regarding the Interview Process for Candidate

- 2024 Victor Aenlle Volunteer Hours

- April 17, 2025 Email from Sheriff Christina Corpus to Len Beato re: Reserve Deputy Victor Aenlle

## II.  Grounds for Removal Relating to the Investigation and Arrest of DSA President Carlos Tapia

### A.  Introduction

Dep. Carlos Tapia is the president of the DSA. The DSA is the recognized bargaining unit for San Mateo County deputies, correctional officers, and district attorney inspectors.

In 2024, the relationship between the DSA and Sheriff Corpus broke down due to several issues, including Mr. Aenlle's role in the SMCSO and negotiations related to the Sheriff's overtime policy. After the DSA began to criticize Sheriff Corpus, she ordered her Executive Team, and in particular then-Acting Assistant Sheriff Matthew Fox, to investigate how Dep. Tapia submitted

May 30, 2025
Page 24

his hours worked to the County. In ordering this investigation and then conducting it in-house, Sheriff Corpus did not follow the SMCSO's standard policy to refer investigations of potential criminal activity by members of the SMCSO to the San Mateo District Attorney. This policy is important to prevent the Sheriff from unilaterally conducting and acting on allegations of serious misconduct where conflicts of interest are present, such as in the investigation of a union leader by the Sheriff. Compounding her failure to refer the investigation to the District Attorney, Sheriff Corpus and Mr. Aenlle repeatedly and improperly limited the scope of the investigation, precluding her lead investigator from collecting relevant evidence and speaking to material witnesses.

On November 12, 2024, based on that restricted and therefore incomplete investigation, the Sheriff sent her lead investigator to meet with and inform the District Attorney of her plan to arrest Dep. Tapia that day. After the District Attorney declined to apply for an arrest warrant and advised against proceeding with a warrantless probable cause arrest, Sheriff Corpus nevertheless ordered her personnel to arrest Dep. Tapia that same day. A month later, the District Attorney's Office concluded its own investigation and exonerated Dep. Tapia, stating that "Deputy Tapia should not have been arrested" because "the complete investigation showed that there was no basis to believe any violation of law had occurred."

In ordering Dep. Tapia's investigation and arrest, Sheriff Corpus violated laws related to the performance of her duties, flagrantly neglected her duties, and obstructed an investigation into herself and the SMCSO, providing cause for her removal under Section 412.5(b)(1), (2), and (5).

### B.    Factual Background

1.    The MOU allows Dep. Tapia to bill for "release time" spent on DSA activities.

The County and the DSA have entered into a Memorandum of Understanding ("MOU") that governs management and labor relations for the 2021–2026 period. Section 3 of the MOU provides the DSA President with 60 hours of "release time" per pay period, which equates to 30 hours of release time per week. The MOU explains that "[p]aid release time is intended to support the collaboration and cooperative spirit of labor relations by ensuring that Association members have access to resources designed to help support their continued success as public employees and that Association leaders have an opportunity to work together to support the success of their members." The MOU limits the DSA President's use of release time to delineated union-related activity. The MOU further states that all "approved release time will be coded appropriately on the employee's timecard using pay code RTE."

Former Acting Sgt. David Wozniak served as the DSA President for over a decade until mid-2022. Throughout his tenure, Mr. Wozniak did not use the "RTE" code, or any other code, to log release time spent on DSA activities when he submitted his timecards. Instead, he used the "001 – Regular Hour" code for his DSA-related work.

May 30, 2025
Page 25

Dep. Tapia became interim DSA President in July 2022. A few months after Dep. Tapia was elected DSA President, he was transferred to the Transportation Unit within the SMCSO. At the time Dep. Tapia was moved into the Transportation Unit, he was assigned a four-days-a-week, ten-hours-per-day schedule. Dep. Tapia conducted 30 hours of DSA business per week, typically on Tuesdays, Wednesdays, and Thursdays. On Fridays, Dep. Tapia was assigned to work a ten-hour shift in the Transportation Unit. Like his predecessor, Dep. Tapia used the "001 – Regular Hour" code for logging all of his work, whether for the DSA or the Transportation Unit, until August 2024 when, as discussed below, he was told to use a different code.

> 2.    After Sheriff Corpus takes over the SMCSO, her relationship with the DSA deteriorates.

After Sheriff Corpus took office in January 2023, she and her Executive Team began to confer with the DSA and OSS about labor relations. Those discussions became increasingly contentious and hostile over time.

In or around January 2024, Dep. Tapia began receiving complaints from DSA members about Mr. Aenlle. These complaints alleged, among other things, that Mr. Aenlle—who, as discussed above, had no experience in executive law enforcement before joining Sheriff Corpus's Executive Team—engaged in inappropriate behavior towards deputies and frequently made decisions outside the scope of his role as the Executive Director of Administration. Dep. Tapia periodically raised these issues with then-Undersheriff Hsiung, who relayed the complaints to Sheriff Corpus. Sheriff Corpus did not address or resolve those complaints, and Mr. Aenlle did not demonstrate a meaningful change in behavior.

In or around March 2024, Dep. Tapia conferred with Sheriff Corpus concerning overtime policies. The double overtime policy, which was in effect between December 2023 and June 2024, allowed officers to receive double time when they worked more than nine hours of overtime per week. Another overtime policy in place governed how overtime shifts would be scheduled. In the course of their discussions, Sheriff Corpus began asserting that she thought the policies were problematic and needed to be changed or discontinued, including because of her view that some deputies were excessively billing double overtime. Dep. Tapia disagreed and expressed that the policies were working as intended and helped the SMCSO with recruiting and retention.

Around the same time, Sheriff Corpus and her Executive Team tasked SMCSO Director of Finance Stacey Stevenson with tracking which deputies were submitting double overtime and how much double overtime they were submitting. At all relevant times, Ms. Stevenson reported directly to Mr. Aenlle. At the direction of Sheriff Corpus's Executive Team, Ms. Stevenson tracked the ongoing costs of double overtime and presented her analysis of those costs to the Executive Team on a bi-weekly basis. As Ms. Stevenson was preparing the double overtime reports, either she or a member of the Executive Team realized that Dep. Tapia and other union leaders were not using billing codes to differentiate between their regular hours and their release

May 30, 2025
Page 26

time spent on union activities. Ms. Stevenson would later inform investigators from the District Attorney's Office that this discovery was made in June or July 2024.

On or about June 21, 2024, it became public throughout the SMCSO that Undersheriff Hsiung had resigned from the SMCSO. As noted above, Undersheriff Hsiung reports that he resigned because of Sheriff Corpus's inability to command the SMCSO, her tendency to retaliate against personnel, and her refusal to stop Mr. Aenlle from interfering with sworn personnel in the performance of their duties.

On June 21, 2024, DSA Vice President Ephraim Cheever sent an email broadly distributed throughout the SMCSO stating that DSA leadership was "deeply saddened by this change, as [Undersheriff Hsiung] was a big supporter of our organization, our union, and us as employees." The email further stated that the DSA had "several projects, such as revisions to the overtime policy … that are now left in limbo."

Later that day, Sheriff Corpus sent Dep. Tapia a text message stating that she was "very disappointed at the email that was sent out by Cheever." Dep. Tapia responded by proposing that he and Sheriff Corpus have a meeting to discuss. At the meeting, Sheriff Corpus continued to stress her disappointment in DSA Vice President Cheever's email and asked Dep. Tapia to issue a statement to "retract" Cheever's email. Dep. Tapia declined to do so.

In or around July 2024, Dep. Tapia began to meet with Undersheriff Perea, who had replaced Undersheriff Hsiung, to discuss a potential renewal of an overtime policy, which was set to expire. Dep. Tapia and Undersheriff Perea had several meetings in which they discussed potential changes to the overtime policy, but they were unable to reach an agreement. The meetings became increasingly contentious and hostile as the parties were unable to reach an agreement.

        3.    Judge Cordell interviews Dep. Tapia.

On or about August 12, 2024, Judge Cordell interviewed Dep. Tapia as part of her independent investigation.

        4.    The DSA and Sheriff Corpus have a contentious meeting concerning overtime policies.

On or about August 15, 2024, Sheriff Corpus, Undersheriff Perea, Dep. Tapia, OSS President Hector Acosta, and Katy Roberts, a San Mateo County human relations official, along with others, held a labor meet-and-confer about the Sheriff's overtime policies and practices. The meet-and-confer was unsuccessful, and several attendees described the meeting as heated and contentious.

May 30, 2025
Page 27

      5.      After the August 15, 2024 meeting, Dep. Tapia begins to receive messages from SMCSO's finance and human resources departments concerning his timecard practices.

A few hours after the contentious August 15, 2024 meet-and-confer meeting ended, Dep. Tapia received an email from a member of the SMCSO's Human Resources staff, Connor Santos-Stevenson, instructing him to "please put something in the comments section [of his timecards] when you have a 015 line- for auditing purposes."[2]

After receiving the email, Dep. Tapia called Mr. Santos-Stevenson and asked him why Mr. Santos-Stevenson was auditing his timecards. Mr. Santos-Stevenson responded that he did not "want to be involved" and "was being asked to do this," but he declined to identify who had asked him to email Dep. Tapia. Mr. Santos-Stevenson appears to have known that Dep. Tapia did not use the 015 code when entering time since at least December 2023.[3]

The next day, on August 16, 2024, Ms. Stevenson emailed SMCSO Deputy Director of Finance Jason Cooksey to ask him to review the DSA union agreement "and find the language that allows" for the Sheriff's Office to "be reimbursed by the [DSA] for a portion of" Dep. Tapia's salary.

On August 19, 2024, Mr. Cooksey responded by saying he did not see "any specific language in the MOUs that mentions reimbursement for the paid release time." On August 19, 2024, after receiving Mr. Cooksey's message, Ms. Stevenson emailed the SMCSO Payroll Unit with the subject line "Check timecard." In the email, Ms. Stevenson stated that she had learned that Dep. Tapia should be using the "RTE" code in his timecard for time spent "conducting union business," and she asked the Payroll Unit to "please check … Carlos Tapia's timecards and let [her] know if he uses that code ever[.]" On August 21, 2024, SMCSO Payroll Supervisor Van Enriquez responded by stating that he had run "a quick audit and [did not] think [Carlos Tapia had] ever used that code before." Ms. Stevenson then asked Mr. Enriquez to email Dep. Tapia, copying Dep. Tapia's supervisor, and tell him that he should be using an "RTE" code to log his release time for DSA activities when submitting his timecards. She also asked Mr. Enriquez to "blind copy" or "forward the email" so she could "retain a record."

On August 23, 2024, as requested by Ms. Stevenson, Mr. Enriquez sent Dep. Tapia an email instructing him that he needed to change his practice and use the code "RTE" whenever he was logging release time on his timecard for DSA activity. Mr. Enriquez copied Dep. Tapia's supervisors, Lt. Brandon Hensel and Sgt. Steve Woelkers, on the correspondence.

---

[2] "015" is a code that the DSA President has traditionally used for specialty pay when submitting timecards.

[3] Mr. Santos-Stevenson is Ms. Stevenson's son.

May 30, 2025
Page 28

After receiving that email, Dep. Tapia called Mr. Enriquez and asked him who had instructed him to look into his timecards. Dep. Tapia reports that Mr. Enriquez responded by saying "I don't want to get involved." Dep. Tapia also told Mr. Enriquez that the County's payroll system did not permit him to use the "RTE" code. Mr. Enriquez then corresponded with the County's Human Resources Department, which confirmed that Dep. Tapia did not have the ability to use the "RTE" code but could use a "010" code to log release time.

On August 28, 2024, Mr. Enriquez emailed Dep. Tapia again and told him to instead use the code "010" to report his DSA time in light of the fact that he could not access the "RTE" code. Since then, Dep. Tapia has reported his DSA time using the "010" code as instructed by Mr. Enriquez.

Sgts. Chiu, Hallworth, and Woelkers were Dep. Tapia's direct supervisors in the Transportation Unit during the relevant time period. They regularly reviewed and approved Dep. Tapia's timecards. All of them reported that, prior to November 2024, they were unaware of a requirement that Dep. Tapia should have been logging DSA time using a specific release time code. Dep. Tapia has no recollection of his predecessor Mr. Wozniak, his supervising sergeants, or anyone else telling him that, as DSA President, he should log his DSA time in his timecards using a specific release time code before Mr. Enriquez instructed him to do so in August 2024.

Several members of SMCSO reported that coding errors in timecards are commonplace within the office. For example, SMCSO Human Resources Manager Heather Enders reported that issues with timecards like Dep. Tapia's are the sort of "human error" that are very common at the SMCSO. Ms. Enders noted that, despite her role in human resources, even she has had issues with correctly coding her timecards.

> 6.    The DSA and OSS file a PERB complaint against Sheriff Corpus and
>         declare "no confidence" in Mr. Aenlle.

After the August 15, 2024 meeting, relations between the DSA and OSS and Sheriff Corpus continued to deteriorate, and DSA and OSS leadership had by then begun considering a vote of no confidence against Mr. Aenlle. On August 26, 2024, Dep. Tapia received a text message from Det. Mike Garcia, who Dep. Tapia understood was a close ally of Sheriff Corpus, asking if he was available for a call. On that call, Det. Garcia said that he had heard that the DSA was planning to on hold a vote of no confidence against Sheriff Corpus. Dep. Tapia clarified that the no-confidence vote would be against Mr. Aenlle. Det. Garcia expressed disagreement with the planned vote and asked if Dep. Tapia had spoken to Sheriff Corpus about problems with Mr. Aenlle and DSA's intent to hold the vote of no confidence. Dep. Tapia said that he had tried but the Sheriff did not return his calls.

Later that same day, Dep. Tapia received a text message from Sheriff Corpus that said, "I haven't received any calls from you. We can meet off site in San Bruno on Monday." Dep. Tapia understood from Sheriff Corpus's text message that she had discussed the DSA's plans to hold a no-confidence vote concerning Mr. Aenlle with Det. Garcia and was offering to meet to discuss the planned vote.

May 30, 2025
Page 29

On or about August 30, the DSA filed a complaint to the California Public Employment Relations Board ("PERB") alleging that the County, through Sheriff Corpus, had engaged in unlawful labor practices, including failing to meet and confer in good faith concerning the overtime policy.[4] On September 6, 2024, the DSA and OSS began polling members regarding a vote of "no confidence" in Mr. Aenlle.

On September 17, 2024, the DSA and OSS publicly announced their vote of "no confidence" in Mr. Aenlle at a news conference.

   7. Sheriff Corpus inquired about Dep. Tapia's attendance in Transportation.

In August or September 2024, Sheriff Corpus called Lt. Hensel, who managed the Transportation Unit to which Dep. Tapia was assigned. According to Lt. Hensel, Sheriff Corpus asked him about Dep. Tapia's attendance in the Transportation Unit and told him that she may need him to start monitoring Dep. Tapia's attendance. Lt. Hensel told Sheriff Corpus that he was surprised by this because he was unaware of any issues with Dep. Tapia's attendance and had never reported any such issues up his chain of command. Sheriff Corpus responded that she wanted to make sure Dep. Tapia was showing up in Transportation when he was supposed to.

   8. Sheriff Corpus asks Acting Assistant Sheriff Fox to investigate Dep. Tapia.

On or about October 14, 2024, Sheriff Corpus directed Acting Assistant Sheriff Fox to initiate an investigation into how Dep. Tapia recorded and coded his time on his timecards. Acting Assistant Sheriff Fox reports that Sheriff Corpus told him that she had decided to open this investigation because Lt. Hensel had reached out to her and told her that Dep. Tapia was "never here"—meaning, working in the Transportation Unit—and had asked whether Dep. Tapia's assigned day in the Transportation Unit could be changed from Friday to Monday.

Lt. Hensel, however, disputes this account. As noted above, Lt. Hensel recalls that Sheriff Corpus approached him and, to his surprise, told him that she may need him to monitor Dep. Tapia's attendance. Lt. Hensel is confident he would not have said or suggested that he was having issues with Dep. Tapia's attendance. Likewise, Lt. Hensel reports that he would not have said that he wanted to switch Dep. Tapia's assigned day in the Transportation Unit from Friday to Monday because Fridays tend to be difficult days to staff. Sgt. Woelkers, Sgt. Hallworth, and Sgt. Chiu all independently verified that Fridays are busy days for the Transportation Unit.

---

[4] On April 3, 2025, PERB issued its own complaint alleging that the County, through Sheriff Corpus, engaged in unfair labor practices by, among other things, failing to meet and confer in good faith regarding the overtime policy.

May 30, 2025
Page 30

      9.     In violation of SMCSO policy, Sheriff Corpus conducts an in-house investigation into Dep. Tapia for potential criminal conduct.

In or around mid- or late October 2024, Acting Assistant Sheriff Fox met with Sheriff Corpus, Undersheriff Perea, and Mr. Aenlle to review his preliminary investigative findings regarding Dep. Tapia's timecards. Acting Assistant Sheriff Fox informed the Sheriff, the Undersheriff, and Mr. Aenlle at this meeting that he had discovered that Dep. Tapia had abruptly changed his coding behavior in August 2024. Sheriff Corpus and Mr. Aenlle responded that this timing coincided with when Dep. Tapia and the DSA had begun to publicly criticize the Sheriff, and they suggested to Acting Assistant Sheriff Fox that Dep. Tapia changed his timecard practices at that time because he knew he would come under scrutiny given his increased public criticism of the Sheriff. There was no mention at this meeting with Acting Assistant Sheriff Fox that Mr. Enriquez, at Ms. Stevenson's direction, had told Mr. Tapia on August 28, 2024, that he should change the billing code for reporting his release time.

At this meeting, Sheriff Corpus, Undersheriff Perea, Mr. Aenlle, and Acting Assistant Sheriff Fox discussed potential options on how to proceed with the investigation in light of Acting Assistant Sheriff Fox's preliminary findings. Acting Assistant Sheriff Fox and Undersheriff Perea made several recommendations, one of which included transferring the investigation to the District Attorney's Office. In a break with SMCSO policy,[5] Sheriff Corpus decided against that recommendation, stating that she did not trust personnel within the District Attorney's Office. Acting Assistant Sheriff Fox and Undersheriff Perea also suggested transferring the investigation to PSB, which is responsible for Internal Affairs investigations within the SMCSO. Sheriff Corpus also rejected that suggestion, stating that she did not trust the sworn officers assigned to PSB. The Executive Team also discussed bringing in an outside investigator to take over the investigation into Dep. Tapia's timecards. Sheriff Corpus rejected that suggestion as well. Acting Assistant Sheriff Fox and Undersheriff Perea further recommended placing Dep. Tapia on administrative leave, which is a common step taken by internal investigators when the alleged misconduct is serious and, critically, would have allowed for more time for the investigation. Again, Sheriff Corpus rejected this suggestion as well. The Sheriff ultimately decided that Acting Assistant Sheriff Fox would complete the investigation himself.

      10.    Sheriff Corpus and her Executive Team limit the evidence available to Acting Assistant Sheriff Fox.

According to Acting Assistant Sheriff Fox, neither Sheriff Corpus nor anyone else from the Executive Team informed him at any time that Mr. Enriquez had instructed Dep. Tapia to begin coding his release time with the 010 code in August 2024.

---

[5] Section 1011.9 of the SMCSO Policy Manual states: "Where a member is accused of potential criminal conduct, the district attorney's office shall be requested to investigate the criminal allegations apart from any administrative investigation. Any separate administrative investigation may parallel a criminal investigation."

May 30, 2025
Page 31

Although Ms. Stevenson did not respond to multiple requests to be interviewed as part of our investigation in an interview with the District Attorney's Office on December 2, 2024, Ms. Stevenson told investigators that she was "sure" that she had told the Executive Team that she had discovered Dep. Tapia's coding error, and that she had asked Mr. Enriquez "to email [Dep. Tapia] to use proper coding" because the Executive Team had been "watching all of the overtime reports" and had discussed that "the union reps were not using their time and that [Ms. Stevenson] would need to clear it up with HR."

During the course of Acting Assistant Sheriff Fox's investigation, he informed Mr. Aenlle that he was planning to contact Mr. Enriquez to discuss Dep. Tapia's timecards. Mr. Aenlle, however, directed Acting Assistant Sheriff Fox to instead interview Joann Lov, another payroll staff member. Ms. Lov did not know that Mr. Enriquez had instructed Dep. Tapia to change his timecoding practices in August 2024. Heeding Mr. Aenlle's direction, Acting Assistant Sheriff Fox met with Ms. Lov, and not Mr. Enriquez.

Sometime in mid-October 2024, Acting Assistant Sheriff Fox asked to review Dep. Tapia's keycard records. Sheriff Corpus denied that request, stating to Acting Assistant Sheriff Fox that she did not trust the lieutenant who oversaw those records. As a result, Acting Assistant Sheriff Fox was unable to review keycard records to confirm whether Dep. Tapia was present for shifts in the Transportation Unit even when other scheduling materials may have suggested he was absent.

In late October and into November 2024, Acting Assistant Sheriff Fox provided near-daily updates to Sheriff Corpus, Undersheriff Perea, and Mr. Aenlle regarding his investigation into Dep. Tapia's timecards. On multiple occasions in late October and into November 2024, Acting Assistant Sheriff Fox repeated his suggestion to Sheriff Corpus that Dep. Tapia be placed on administrative leave, which would have allowed for more time for the investigation. Sheriff Corpus dismissed those recommendations and instead instructed Acting Assistant Sheriff Fox to complete the investigation.

Acting Assistant Sheriff Fox's investigation focused primarily on cross-referencing attendance information he obtained from Lt. Hensel based on daily scheduling materials from the Transportation Unit with Dep. Tapia's timecard records. Lt. Hensel informed Acting Assistant Sheriff Fox that the Transportation Unit's scheduling materials were potentially incomplete and subject to human error. Lt. Hensel further informed Acting Assistant Sheriff Fox that he was unaware of any attendance issues with Dep. Tapia and recommended to Acting Assistant Sheriff Fox that he speak with Dep. Tapia's direct supervisors in Transportation, which included Sgts. Woelkers, Hallworth, and Chiu. Acting Assistant Sheriff Fox did not interview any of the sergeants in the Transportation Unit.

Sgts. Woelkers, Hallworth, and Chiu, who were responsible for reviewing Dep. Tapia's timecards or overtime slips before he submitted them, do not recall having to correct any inaccuracies in the timecards or overtime slips. They further reported that Dep. Tapia is an exemplary and reliable employee who does not miss work without explanation, who typically

communicates about his availability, and who they can rely upon as a team player. None of them could recall a single instance of Dep. Tapia not showing up for an assigned shift in the Transportation Unit unless Dep. Tapia gave prior notice. All of them stated that, if Dep. Tapia had been absent unexpectedly, they would have known about it. Lt. Hensel also described Dep. Tapia as a "trustworthy and professional" employee, and he recalled consistently seeing Dep. Tapia working in the Transportation Unit when he was expected to be there.

11.    Sheriff Corpus orders Dep. Tapia to be arrested on November 12, 2024.

On or about Thursday, November 7, 2024, Acting Assistant Sheriff Fox met with Sheriff Corpus, Undersheriff Perea, and Mr. Aenlle and discussed his findings. Multiple times throughout his investigation, including in his report presented to the Executive Team that day, Acting Assistant Sheriff Fox made clear to Sheriff Corpus, Undersheriff Perea, and Mr. Aenlle that he believed Dep. Tapia had committed timecard fraud because of the abrupt change in Dep. Tapia's timecard practices in August 2024.

In the November 7 meeting, Acting Assistant Sheriff Fox and Undersheriff Perea again suggested placing Dep. Tapia on administrative leave. The Sheriff declined to do so. The Executive Team discussed other options, including obtaining an arrest warrant or conducting a probable cause arrest that day. Acting Assistant Sheriff Fox reports that Mr. Aenlle advocated for arresting Dep. Tapia that day, but Sheriff Corpus opted not to do so. Instead, the Executive Team agreed to meet again on Tuesday, November 12, 2024.

At that time, Sheriff Corpus and the Executive Team were aware that Judge Cordell was nearing the completion of her investigation. On November 7, after his meeting with Sheriff Corpus, Acting Assistant Sheriff Fox met separately with Undersheriff Perea and Mr. Aenlle and recalls that they discussed the forthcoming release of the Cordell Report. Mr. Aenlle was upset about the prospect of the report being released soon.

On the morning of November 12, 2024, Sheriff Corpus informed Acting Assistant Sheriff Fox of her decision to arrest Dep. Tapia and instructed him to notify the District Attorney's office that the SMCSO would proceed with the arrest. A meet-and-confer between the union and the Executive Team to discuss the overtime policy had previously been scheduled for the afternoon of November 12, 2024.

As instructed, Acting Assistant Sheriff Fox met with Chief Deputy District Attorney Shin-Mee Chang in person to discuss Acting Assistant Sheriff Fox's investigation of Dep. Tapia. During that meeting, Acting Assistant Sheriff Fox requested that the District Attorney seek an arrest warrant for Dep. Tapia. He further stated that if the District Attorney did not obtain a warrant, the SMCSO would proceed with its own, warrantless, probable cause arrest later that day. Chief Deputy District Attorney Chang told Acting Assistant Sheriff Fox that (1) the District Attorney would not seek an arrest warrant that day; (2) the District Attorney's Office had reviewed a number of timecard fraud cases over the years and it would not treat this one differently; and (3) timecard fraud cases tended to be complex and further investigation may be needed. She also told Acting Assistant Sheriff Fox that she urged the Sheriff's Office not to proceed with a

May 30, 2025
Page 33

warrantless arrest that day because, given the complexity of timecard fraud cases, the District Attorney's Office would not be able to complete its investigation within 48 hours—at which point Dep. Tapia would have to be released from custody under California law.[6] Acting Assistant Sheriff Fox responded by informing Chief Deputy District Attorney Chang that the Sheriff's Office would nevertheless proceed with a warrantless arrest that day and that he would let her know as soon as the arrest occurred.[7]

Following this meeting, Acting Assistant Sheriff Fox spoke with Sheriff Corpus and relayed to her the conversation he had had with Chief Deputy District Attorney Chang. Acting Assistant Sheriff Fox informed Sheriff Corpus that Chief Deputy District Attorney Chang had said that proceeding with a warrantless arrest of Dep. Tapia without allowing the District Attorney to first conduct its own investigation was "not ideal." The Sheriff nevertheless made the decision to go forward with the warrantless arrest. Acting Assistant Sheriff Fox reports that he, Undersheriff Perea, Mr. Aenlle, and SMCSO Director of Communications Gretchen Spiker were present at the meeting at which Sheriff Corpus made her decision to arrest Dep. Tapia.

Acting Assistant Sheriff Fox subsequently instructed Dep. Tapia (through his attorneys) to turn himself in for arrest at 1:00 p.m.—an hour before the previously scheduled meet-and-confer between the Sheriff and the DSA. SMCSO staff recorded Dep. Tapia self-surrendering for his arrest and shared the video with the media.[8] Members of the SMCSO then executed Sheriff Corpus's order, arrested Dep. Tapia, and took his mugshot before releasing him on bail. The arrest was made based on a probable cause declaration signed by Acting Assistant Sheriff Fox. The declaration supporting probable cause for the arrest states that Dep. Tapia's purported criminal intent "was apparent in August 2024 when he started to submit his timecards with Association business and made the distinction of billing appropriately." Acting Assistant Sheriff Fox since reported that, had he known about Mr. Enriquez's August 2024 emails with Dep. Tapia, he would not have believed that there was probable cause to arrest Dep. Tapia on November 12, 2024.

---

[6] California Penal Code section 825(a) requires a defendant to be taken before a magistrate judge and arraigned within 48 hours after his arrest.

[7] Acting Assistant Sheriff Fox also stated during this meeting that Sheriff Corpus was concerned that one of the District Attorney's investigators sat on the DSA Board. Chief Deputy District Attorney Chang assured Acting Assistant Sheriff Fox that, if the District Attorney investigated Deputy Tapia, they would make sure that no one that had a prior connection to Deputy Tapia or the DSA would be involved in the investigation.

[8] For example, this video published by the Mercury News states that the footage is "courtesy of San Mateo County's Sheriff's Department." Mercury News, San Mateo County Deputy Sheriff's Association President Carlos Tapia turns himself in, Youtube, https://www.youtube.com/watch?v=hr9cCuX0pvY.

12.     Mr. Aenlle uses Dep. Tapia's arrest to try to discourage the release of the Cordell Report.

A few hours after Dep. Tapia's arrest, Mr. Aenlle's personal attorney, Deborah Drooz, emailed San Mateo Supervisors Noelia Corzo and Ray Mueller to threaten litigation over purported "falsehoods" that she anticipated may soon be released in the Cordell report. Ms. Drooz stated that she was "advised that a source for such falsehoods may be DSA president Carolos [sic] Tapia, someone we believe has long been dedicated to ousting Sheriff Christina Corpus and her subordinates, including Mr. Aenlle. If that is the case, you should be advised that Mr. Tapia's reputation for honesty and reliability have [sic] come under law enforcement scrutiny. As we understand it, Mr. Tapia was arrested today for fraudulent timecard use."

The Cordell Report was released to the public that day.

13.     After conducting an investigation, the District Attorney declines to prosecute Dep. Tapia.

The District Attorney's Office subsequently conducted a month-long investigation into Dep. Tapia's timecard practices. At the end of that investigation, the District Attorney concluded that "no crime was committed by Deputy Tapia, that the complete investigation showed that there was no basis to believe any violation of law had occurred, and finally that Deputy Tapia should not have been arrested." The District Attorney further concluded that the Sheriff's Office investigation had been "extraordinarily limited and did not involve necessary follow-up investigation to examine the accuracy of the allegations."

Despite this, Dep. Tapia remains on administrative leave to this day, more than six months after his improper arrest.

### C.     Grounds for Removal

The foregoing conduct related to Dep. Tapia is, independently and collectively, grounds to remove Sheriff Corpus from office for the following reasons.

***First***, Sheriff Corpus violated laws related to the performance of the Sheriff's duties. San Mateo County Charter Art. IV § 412.5(B)(1). Sheriff Corpus ordered Dep. Tapia arrested without probable cause to support that arrest in violation of Penal Code § 836. *See People v. Mower*, 28 Cal. 4th 457, 473 (2002) ("Reasonable or probable cause means such a state of facts as would lead a man of ordinary caution or prudence to believe, and consciently entertain a strong suspicion of the guilt of the accused."); *Poldo v. United States*, 55 F.2d 866, 869 (9th Cir. 1932) ("Mere suspicion is not enough; there must be circumstances represented to the officers through the testimony of their senses sufficient to justify them in a good-faith belief that the defendant had violated the law.").

May 30, 2025
Page 35

Additionally, Sheriff Corpus subjected Dep. Tapia to an investigation and arrest as the result of his engaging in protected union activity. This constitutes unlawful retaliation in violation of well-established California law. *See* Gov't Code § 3304(a) ("No public safety officer shall be subjected to punitive action … or be threatened with any such treatment, because of the lawful exercise of the rights granted under this chapter[.]");Gov't Code § 3502.1 ("No public employee shall be subject to punitive action … , or threatened with any such treatment, for the exercise of lawful action as an elected, appointed, or recognized representative of any employee bargaining unit."); Gov't Code § 3506 ("Public agencies and employee organizations shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under Section 3502."[9]); Gov't Code § 3506.5(a) ("A public agency shall not … impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter."); *see also* Cal. Code Regs. tit. 8, § 32603; Civ. Code § 51.7; San Mateo County Code § 2.14.090.

**Second**, in directing and overseeing a limited and therefore incomplete investigation of Dep. Tapia, Sheriff Corpus flagrantly neglected her duties as defined by law to preserve peace and investigate public offenses. San Mateo County Charter Art. IV § 412.5(B)(2); *see also* Gov't Code § 26600 (requiring the sheriff to preserve peace); *id.* § 26602 (requiring the sheriff to investigate public offenses); *Saunders v. Knight*, No. CV F 04-5924 LJO WMW, 2007 WL 3482047, at *18 (E.D. Cal. Nov. 13, 2007) ("[T]he sheriff has a duty imposed by statute to enforce the laws of the state and maintain public order and safety." (citing Gov't Code §§ 26600, 26602)); *Laurie Q.v. Contra Costa County*, 304 F. Supp. 2d 1185 (N.D. Cal. 2004) ("[S]heriffs are required under California law to … 'investigate public offenses which have been committed.' In other words, California's sheriffs are local, non-discretionary executors of a statewide criminal system[.]" (citing Gov't Code § 26602)); Gov't Code § 815.6 ("Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."); *Ramirez v. City of Buena Park,* 560 F.3d 1012, 1024 (9th Cir. 2009) (holding that officers "may not disregard facts tending to dissipate probable cause"). Sheriff Corpus, herself and through Mr. Aenlle, unreasonably restricted Acting Assistant Sheriff Fox from collecting relevant evidence and speaking to key witnesses in the course of his investigation into Dep. Tapia. Sheriff Corpus also insisted that the arrest proceed on November 12, 2024, against the advice of the District Attorney and despite Acting Assistant Sheriff Fox recommending that Dep. Tapia be placed on administrative leave to allow for additional time for the investigation. After the District Attorney refused to provide a warrant for the arrest, Sheriff Corpus ordered the arrest of Dep. Tapia, the DSA President, based purportedly on probable cause. Within a month, the District Attorney determined "there was no

---

[9] Section 3502 provides "public employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations." Gov't Code § 3502.

May 30, 2025
Page 36

basis to believe any violation of law had occurred, and … Dep. Tapia should not have been arrested."

**Third**, Sheriff Corpus obstructed an investigation into the conduct of the Sheriff and/or the SMCSO as authorized by the Board of Supervisors. San Mateo County Charter Art. IV § 412.5(B)(5); *see also People v. Belmares*, 130 Cal. Rptr. 2d 400, 404 (2003) (describing "obstruct" in the law enforcement context to mean "be or come in the way of," "hinder from passing, action, or operation," "impede," "retard," "shut out," and "place obstacles in the way"); *Lorenson v. Superior Court*, 35 Cal. 2d 49, 59 (1950) (defining obstruction as "malfeasance and nonfeasance by an officer in connection with the administration of his public duties, and also anything done by a person in hindering or obstructing an officer in the performance of his official obligations"); *People v. Martin*, 135 Cal. App. 3d 710, 726 (1982) (same). Acting Assistant Sheriff Fox recommended placing Dep. Tapia on administrative leave to allow more time for an investigation. Likewise, the District Attorney recommended allowing its office to conduct the investigation instead of proceeding with a probable cause arrest on November 12, 2024. Despite those recommendations, Sheriff Corpus ordered Dep. Tapia to be arrested on November 12, 2024, following an incomplete investigation. Then, within a few hours of the arrest, counsel representing Mr. Aenlle encouraged the Board of Supervisors not to release the Cordell Report and cited Dep. Tapia's recent arrest as evidence that he could not be trusted as a reliable informant.

### D.    Supporting Evidence

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- Sgt. Hector Acosta;

- Chief Deputy District Attorney Shin-Mee Chang;

- Sgt. Daniel Chiu;

- SMCSO Human Resources Manager Heather Enders;

- SMCSO Payroll Supervisor Van Enriquez;

- Former Acting Assistant Sheriff Matthew Fox;

- Sgt. Philip Hallworth;

- Lt. Brandon Hensel;

- Former Undersheriff Christopher Hsiung;

- San Mateo County Deputy Director of Human Resources Michelle Kuka;

May 30, 2025
Page 37

- SMCSO Management Analyst Joann Lov;

- San Mateo County Labor Relations Analyst Katy Roberts;

- Dep. Carlos Tapia; and

- Sgt. Steve Woelkers.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- 2021 Memorandum of Understanding Between County of San Mateo and Deputy Sheriff's Association (January 10, 2021 – January 10, 2026);

- January 2, 2024 Email from Connor Santos-Stevenson to Van Enriquez re: 015 No Comments Week Ending 12/30/2023;

- June 21, 2024 Email from DSA Vice President Ephraim Cheever to DSA Members re: DSA Response to Undersheriff Change;

- June 21, 2024 Text Message from Sheriff Christina Corpus to Dep. Carlos Tapia;

- August 15, 2024 Email Thread from Connor Santos-Stevenson to Dep. Carlos Tapia re: 015 Earning Type Comments Section;

- August 16, 2024–August 20, 2024 Email Thread from Stacey Stevenson to Jason Cooksey re: DSA/OSS MOU's;

- August 19, 2024 Email Thread from Stacey Stevenson to Michelle Kuka re: DSA/OSS Salary Reimbursement;

- August 19, 2024–September 12, 2024 Email Thread from Stacey Stevenson to Payroll/Van Enriquez re: Check Timecard;

- August 23, 2024–August 28, 2024 Email Thread from Enriquez to Dep. Carlos Tapia re: DSA President Release Time (Coding RTE);

- August 26, 2024 Text Messages from Det. Mike Garcia to Dep. Carlos Tapia;

- August 26, 2024 Text Message from Sheriff Christina Corpus to Dep. Carlos Tapia;

- August 26, 2024–August 27, 2024 Email Thread from Van Enriquez to Lisa Raiti and Katy Roberts re: DSA President Release Time (Coding RTE);

- August 30, 2024 DSA's Complaint, *San Mateo County Deputy Sheriff's Association v.*

May 30, 2025
Page 38

> *County of San Mateo*, No. SF-CE-2224-M;

- November 12, 2024 Acting Assistant Sheriff Matthew Fox Probable Cause Declaration;

- November 12, 2024 Email from Deborah Drooz to Noelia Corzo and Ray Mueller re: Urgent Communication re: November 12, 2024 Press Conference;

- December 4, 2024 Stacey Stevenson Interview with the San Mateo County District Attorney's Office;

- December 9 2024 Acting Assistant Sheriff Matthew Fox Interview with the San Mateo County District Attorney's Office;

- December 16, 2024 Press Release, County of San Mateo District Attorney, Prosecution Decision Regarding Deputy Carlos Tapia;

- December 24, 2024 *Mercury News* Video, "San Mateo County Deputy Sheriff's Association President Carlos Tapia turns himself in," *available at:* https://www.youtube.com/watch?v=hr9cCuX0pvY;

- February 21, 2025 Dep. Carlos Tapia Civil Complaint against San Mateo County; and

- April 3, 2025 PERB Complaint, *San Mateo County Deputy Sheriff's Association v. County of San Mateo*, No. SF-CE-2224-M.

## III. Grounds for Removal Relating to Unlawful Punitive Action Taken Against Sgt. Javier Acosta.

### A. Introduction

Sgt. Hector Acosta is President of the OSS. Together with Dep. Tapia, Sgt. Hector Acosta participated in the contentious labor-management negotiations in 2024 that led up to and included the August 15, 2024, meet-and-confer meeting that included the DSA, OSS, OSS, Undersheriff Perea, and Sheriff Corpus. Shortly after the August 15, 2024 meeting, Sheriff Corpus initiated a retaliatory Internal Affairs investigation into Sgt. Hector Acosta's brother, Sgt. Javier Acosta. Sheriff Corpus's conduct violated the Government Code.

### B. Sheriff Corpus began an investigation into Sgt. Javier Acosta within a week of the contentious August 15, 2024 meeting between the DSA, OSS, and the Sheriff.

Sgt. Hector Acosta joined the Sheriff's Office in 1999. His brother, Sgt. Javier Acosta, began working for the Sheriff's Office in 2006 and was recognized as "Deputy of the Year" in 2016. Sgt. Javier Acosta was most recently assigned to the Sheriff's Community Engagement Unit.

May 30, 2025
Page 39

Following the contentious August 15, 2024, meet-and-confer meeting described above, Sgt. Hector Acosta and Dep. Tapia reported their concerns that Sheriff Corpus might retaliate against them to Katy Roberts. Sgt. Hector Acosta also warned his brother Sgt. Javier Acosta that Sheriff Corpus might target him for retaliation.

Five days later, on August 20, 2024, then-Captain Matthew Fox ordered Sgt. Javier Acosta into his office. Capt. Fox told Sgt. Javier Acosta that he was not in trouble and that he did not need a lawyer. During the meeting, Capt. Fox told Sgt. Javier Acosta that "they wanted to [Internal Affairs] you." Sgt. Javier Acosta understood this to mean that Sheriff Corpus, Undersheriff Perea, and/or Mr. Aenlle wanted to subject him to an Internal Affairs investigation. According to Sgt. Javier Acosta, Capt. Fox said that he told "them" that he would "handle it."

Capt. Fox then proceeded to ask Sgt. Javier Acosta about an August 15, 2024, dinner that Sgt. Javier Acosta had attended to celebrate the end of SMCSO's summer internship program. There was a report that an underaged intern had consumed alcohol at the event. Sgt. Javier Acosta told Capt. Fox what happened at the dinner, and Capt. Fox ended the meeting by saying that he considered the matter closed. Capt. Fox did not provide advance notice to Sgt. Javier Acosta of the subject of this meeting, nor did he afford Sgt. Javier Acosta an opportunity to consult with counsel or a union representative before or during the meeting.

Two days later, on August 22, 2025, Capt. Fox texted Sgt. Javier Acosta and asked him to meet outside a County building. When they met, Capt. Fox handed Sgt. Javier Acosta a letter notifying him that he was being placed on administrative leave and directing him to remain at his residence between the hours of 8:00 a.m. to 5:00 p.m., Monday through Friday, "with a one-hour meal break from noon to 1:00 p.m. during which you are at liberty to leave your residence." The letter further instructed Sgt. Javier Acosta that he would remain in this status while "the investigation into your misconduct is ongoing." The letter did not identify the subject matter of the investigation or provide Sgt. Javier Acosta with any means to appeal the SMCSO's decision. When Capt. Fox delivered the letter, he said words to the effect that he did not know what the letter was about but that "they asked me to come back and give it to you." Sgt. Javier Acosta understood that Capt. Fox was acting at the direction of Sheriff Corpus, Undersheriff Perea, and/or Mr. Aenlle.

Sometime between August 22, 2025, and September 3, 2025, Sheriff Corpus initiated an Internal Affairs investigation into Sgt. Javier Acosta. The policy and practice of the Sheriff's Office is for sworn officers in PSB to oversee Internal Affairs investigations or, when necessary, outsource the investigation to a neutral third-party investigator. With respect to Sgt. Javier Acosta, however, Sheriff Corpus bypassed the sworn PSB officers and did not initially outsource the investigation. Instead, at a meeting attended by Sheriff Corpus, Mr. Aenlle, Undersheriff Perea, Capt. Fox, and Heather Enders, Sheriff Corpus and Mr. Aenlle asked Ms. Enders to draft an Internal Affairs notice to Sgt. Javier Acosta containing allegations about the August 15 dinner and interactions between Sgt. Javier Acosta and a Sheriff's Office intern. Ms. Enders is a civilian employee with no experience or training regarding Internal Affairs investigations, and prior to this date, she had never drafted—or been asked to draft—an Internal Affairs notice.

May 30, 2025
Page 40

Nonetheless, Ms. Enders drafted the Internal Affairs notice as directed by Sheriff Corpus and Mr. Aenlle, but she could not sign it because she is not a sworn officer.

On or about September 3, 2024, Undersheriff Perea contacted Capt. Brian Philip, told him that Ms. Enders would be sending him the Internal Affairs notice, and ordered him to sign and serve it on Sgt. Javier Acosta. Capt. Philip had joined the Sheriff's Office in August 2023, after 19 years at the Palo Alto Police Department. Since joining the Sheriff's Office, Capt. Philip had overseen PSB. Until Undersheriff Perea contacted him, Capt. Philip had not been provided with any information regarding the investigation of Sgt. Javier Acosta and was entirely unaware of any such investigation.

Ms. Enders emailed Capt. Philip a copy of the Internal Affairs notice she had prepared at the direction of Sheriff Corpus and Mr. Aenlle. Capt. Philip reviewed the Internal Affairs notice that Ms. Enders prepared and notified her by email that the notice "fail[ed] to meet several POBAR requirements as referenced in Government Code section 3303." He also wrote that "Contrary to normal custom and practice at the San Mateo County Sheriff's Office, [PSB] was excluded from the intake of this complaint, and as such, [he did] not have the requisite information to properly serve this notice." Capt. Philip copied his supervisor, then-Assistant Sheriff Monaghan, on that email.

Sgt. Javier Acosta ultimately received the Internal Affairs notice on or about September 4, 2024, signed by Assistant Sheriff Monaghan. The notice lists several provisions of the Policy Manual that Sgt. Javier Acosta allegedly violated and contains a narrative regarding the August 15, 2024 dinner and Sgt. Javier Acosta's interactions with an intern. The notice indicates that Sgt. Javier Acosta would be subject to an interrogation, but it lacks an interview date, time, or location; nor does it identify an interviewer inconsistent with standard practice. The complainant is identified as Sheriff Corpus.

      **C.**      **Sgt. Javier Acosta remains on administrative leave without explanation.**

No member of PSB ever interviewed Sgt. Javier Acosta, and there is no PSB investigation open into Sgt. Javier Acosta. In December 2024, outside investigators at the firm Chaplin & Hill interviewed Sgt. Javier Acosta. In approximately March 2025, Sgt. Javier Acosta's attorney contacted the outside investigators at Chaplin & Hill to inquire into why the investigation was still unresolved six months after it began. The outside investigators informed Sgt. Javier Acosta's attorney that they had completed their investigation and submitted it to the Sheriff's Office. Nonetheless, Sgt. Javier Acosta remains on administrative leave.

      **D.**      **Grounds for Removal**

The foregoing conduct related to Sgt. Acosta is, independently and collectively, grounds to remove Sheriff Corpus from office for cause because she violated laws related to the performance of the Sheriff's duties. San Mateo County Charter Art. IV § 412.5(B)(1).

May 30, 2025
Page 41

**First**, Sheriff Corpus violated the Public Safety Officers Procedural Bill of Rights Act ("POBRA"), Gov't Code §§ 3300, *et seq*., by taking punitive action against Sgt. Javier Acosta without affording him the rights provided by Government Code Sections 3303 and 3304. For example, Sgt. Acosta was not informed prior to his interrogation "of the rank, name, and command of the officer in charge of the interrogation [or] the interrogating officers," Gov't Code 3303(b); was not "informed of the nature of the investigation prior to any interrogation," *id.* § 3303(c); was not afforded the right to be "represented by a representative of his or her choice who may be present at all times during the interrogation," *id*. § 3303(i); and was not afforded the opportunity for an administrative appeal, *id* § 3304(b).

**Second**, Sheriff Corpus violated California law by subjecting Sgt. Acosta to an improper investigation and imposing on him an extended administrative leave because of protected union activity. "Public employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations," Gov't Code § 3502, and "No public safety officer shall be subjected to punitive action … or be threatened with any such treatment, because of the lawful exercise of [such] rights." Gov't Code § 3304(a); *see also* Gov't Code § 3506 ("Public agencies and employee organizations shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under Section 3502."); Gov't Code § 3506.5(a) ("A public agency shall not … impose or threaten to impose reprisals on employees, to discriminate or threaten to discriminate against employees, or otherwise to interfere with, restrain, or coerce employees because of their exercise of rights guaranteed by this chapter."); Cal. Code Regs. tit. 8, § 32603 ("It shall be an unfair practice for a public agency to … [i]nterfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of rights guaranteed by Government Code section 3502.").

### E.    Supporting Evidence

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- Sgt. Hector Acosta;

- Sgt. Javier Acosta;

- Dep. Carlos Tapia;

- Former Acting Assistant Sheriff Matthew Fox;

- SMCSO Human Resources Manager Heather Enders; and,

- Former Capt. Brian Philip.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

May 30, 2025
Page 42

- August 22, 2024 Letter from Capt. Matthew Fox to Sgt. Javier Acosta;

- September 3, 2024 Emails between Heather Enders and Capt. Brian Philip;

- September 4, 2024 Internal Affairs Notice to Sgt. Javier Acosta.

**IV.    Grounds for Removal Relating to the Termination of Former Assistant Sheriff Ryan Monaghan**

    **A.    Introduction**

Ryan Monaghan served as an assistant sheriff and member of Sheriff Corpus's Executive Team from February 2023 through September 2024. Assistant Sheriff Monaghan was interviewed by Judge Cordell in the course of her investigation. Within 72 hours of learning that Assistant Sheriff Monaghan had talked to Judge Cordell, Sheriff Corpus removed him from his position as assistant sheriff. In removing Assistant Sheriff Monaghan from his position, Sheriff Corpus violated several anti-retaliation and public safety officer employment laws related to the performance of her duties.

    **B.    Sheriff Corpus retaliated against Assistant Sheriff Monaghan days after learning that he had spoken to Judge Cordell as part of her investigation.**

In 2022, Sheriff Corpus recruited Ryan Monaghan, previously the Chief of Police in the City of Tiburon, to be an assistant sheriff in her administration and member of her Executive Team. Throughout 2023, Assistant Sheriff Monaghan, Undersheriff Hsiung, and Mr. Aenlle formed the core of Sheriff Corpus's Executive Team. In 2024, the relationship between Sheriff Corpus and Undersheriff Hsiung deteriorated, resulting in Undersheriff Hsiung resigning on June 21, 2024. This left Assistant Sheriff Monaghan as the sole sworn member of Sheriff Corpus's Executive Team.

Judge Cordell was retained and began her investigation in July 2024. The fact of her investigation was initially confidential. On September 12, 2024, the Board of Supervisors issued a public statement announcing that it had appointed Judge Cordell to conduct an independent investigation into the Sheriff's Office. Shortly thereafter, Judge Cordell interviewed Assistant Sheriff Monaghan. He reported to Judge Cordell two incidents in which he believed Sheriff Corpus had violated the law and violated Sheriff's Office policy. First, Assistant Sheriff Monaghan reported to Judge Cordell that he believed that Sheriff Corpus had retaliated against Capt. Rebecca Albin by revoking her worksite access the day before her official date of separation. Assistant Sheriff Monaghan believed that the Sheriff's actions were retaliatory and that they violated Capt. Albin's legal rights as set forth in the Sheriff's Office Policy Manual and as set forth in POBRA. Second, Assistant Sheriff Monaghan reported to Judge Cordell that he believed that Sheriff Corpus had retaliated against Capt. Philip by transferring him from PSB to Corrections. Assistant Sheriff Monaghan believed that the Sheriff's actions were retaliatory and violated Capt. Philip's legal rights as set forth in POBRA and the Sheriff's Office Policy Manual.

May 30, 2025
Page 43

On September 17, 2024, Assistant Sheriff Monaghan, Sheriff Corpus, Mr. Aenlle, and Undersheriff Perea attended a civic meeting in Half Moon Bay. After the meeting, in the presence of Undersheriff Perea, Mr. Aenlle asked Assistant Sheriff Monaghan whether he had spoken to Judge Cordell. Assistant Sheriff Monaghan answered that he had. Assistant Sheriff Monaghan recalls that Mr. Aenlle responded, sarcastically, "That's just great, when were you planning on telling the Sheriff and the rest of us?" Mr. Aenlle was visibly upset.

Shortly after the September 17, 2024 conversation with Mr. Aenlle, Assistant Sheriff Monaghan contacted Judge Cordell and informed her that Mr. Aenlle had asked him if he had spoken to her.

On September 18, 2024, Assistant Sheriff Monaghan told Sheriff Corpus that he had spoken to Judge Cordell. Sheriff Corpus complained to Assistant Sheriff Monaghan that Judge Cordell's investigation was a "witch hunt" and a "joke." Assistant Sheriff Monaghan also told Sheriff Corpus that he believed that it was inappropriate for Mr. Aenlle to question potential witnesses about their cooperation with Judge Cordell's investigation and that Sheriff Corpus should advise Mr. Aenlle not to question such witnesses. Sheriff Corpus disagreed and conveyed her view that Mr. Aenlle could inquire about rumors that he heard related to the investigation.

On September 19, 2024, Sheriff Corpus did not invite Assistant Sheriff Monaghan to a press conference. Before this instance, it had been Sheriff Corpus's general practice to invite her entire Executive Team to press conferences.

On September 20, 2024, Undersheriff Perea took Assistant Sheriff Monaghan into a meeting in Sheriff Corpus's office. During the ensuing meeting, Sheriff Corpus told Assistant Sheriff Monaghan that she was "really disappointed" and that she heard that he was saying things about her. She told Assistant Sheriff Monaghan that trust was important to her and that she no longer trusted him. She ended the meeting saying, "I don't think things are going to work out."

Undersheriff Perea then accompanied Assistant Sheriff Monaghan to his office and ordered him to turn in his badge, gun, and identification. Undersheriff Perea also told Assistant Sheriff Monaghan that he could not use his office computer. Assistant Sheriff Monaghan understood that his employment was being involuntarily terminated.

Prior to Assistant Sheriff Monaghan's termination, Sheriff Corpus had never conducted a performance review of him nor provided him with a written performance evaluation, much less one that criticized his work. Likewise, neither Undersheriff Hsiung nor Undersheriff Perea had ever conducted a performance review of Assistant Sheriff Monaghan nor provided him with a written performance review. To the contrary, Undersheriff Hsiung, who was Assistant Sheriff Monaghan's direct supervisor during most of his tenure with the Sheriff's Office, describes Assistant Sheriff Monaghan's performance during their time in the Sheriff's Office as "100% positive." Undersheriff Hsiung also reported that Sheriff Corpus never spoke negatively about Assistant Sheriff Monaghan's performance.

May 30, 2025
Page 44

In a September 22, 2024, letter to the Board of Supervisors, Sheriff Corpus described her intent as having been to terminate Mr. Monaghan's employment for "performance duplicity and failure to execute the goals of the Sheriff's Office expeditiously." However, despite stripping Assistant Sheriff Monaghan of his official duties, badge, and gun, Sheriff Corpus never submitted termination paperwork for Assistant Sheriff Monaghan to the County's human resources department. To this day, Assistant Sheriff Monaghan remains on administrative leave.

### C.    Grounds for Removal

The foregoing conduct related to Assistant Sheriff Monaghan is, independently and collectively, grounds to remove Sheriff Corpus from office for cause for the following reasons.

***First***, Sheriff Corpus violated laws related to the performance of her duties as Sheriff. San Mateo County Charter Art. IV § 412.5(B)(1). It is against California law to "retaliate against an employee … for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Labor Code § 1102.5(b). Moreover, "[a]ny retaliation or reprisal by any [San Mateo] County officer or employee against any complainant or informant is strictly prohibited" by the County Code. San Mateo County Code § 2.14.090. The County of San Mateo has asserted "a paramount interest in protecting the integrity of its governmental institutions," and, "[t]o further this interest," has declared that "individuals should be encouraged to report possible violations of laws, regulations and rules governing the conduct of County officers and employees." *Id.* § 2.14.060. And it is the intent of Section 2.14.090 to "to protect all complainants or informants from retaliation for filing a complaint with, or providing information about, improper government activity by County officers and employees." *Id.* The SMCSO Policy Manual likewise prohibits "retaliate[ion] against any person for … opposing a practice believed to be unlawful …; for reporting or making a complaint …; or for participating in any investigation." SMCSO Policy Manual § 1029.3. Indeed, the SMCSO has "zero tolerance for retaliation." *Id.* § 1029.2. Sheriff Corpus violated these laws by terminating and otherwise removing from office Assistant Sheriff Monaghan for cooperating with, and speaking to, Judge Cordell in the course of her investigation. Assistant Sheriff Monaghan had reason to believe that the information he provided to Judge Cordell included violations of state and local law, including POBRA.

***Second***, Sheriff Corpus obstructed an investigation into the conduct of the Sheriff and/or the SMCSO authorized by the Board of Supervisors. San Mateo County Charter Art. IV § 412.5(B)(5). State law applicable to the Sheriff defines "obstruct" in the law enforcement context to mean "be or come in the way of," "hinder from passing, action, or operation," "impede," "retard," "shut out," and "place obstacles in the way." *Belmares*, 130 Cal. Rptr. 2d at 404; *see also Lorenson*, 35 Cal. 2d at 59 (defining obstruction as "malfeasance and nonfeasance by an officer in connection with the administration of his public duties, and also anything done by a person in hindering or obstructing an officer in the performance of his official obligations"); *Martin*, 135 Cal. App. 3d at 726 (same). Sheriff Corpus obstructed Judge

May 30, 2025
Page 45

Cordell's investigation into the SMCSO by terminating Assistant Sherriff Monaghan for cooperating with, and speaking to, Judge Cordell in the course of her investigation.

### D.    Supporting Evidence

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- San Mateo County Executive Michael Callagy;

- Former Undersheriff Christopher Hsuing; and,

- Former Assistant Sheriff Ryan Monaghan.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- September 12, 2024 Statement from the Board of Supervisors Regarding the Sheriff's Office

- September 22, 2024 Letter from Sheriff Christina Corpus to Board of Supervisors President Warren Slocum

### V.    Grounds for Removal Relating to Unlawful Retaliatory Transfers and Terminations.

### A.    Introduction

Sheriff Corpus transferred Capt. Brian Philip, Lt. Jonathan Sebring, and Sgt. Jimmy Chan in retaliation for perceived disloyalty. Sheriff Corpus transferred Capt. Philip and Lt. Sebring from PSB duties to work in the jail. Capt. Philip was transferred shortly after he refused to participate in the investigation into Sgt. Javier Acosta and reported on the deficiencies in the proposed Internal Affairs notice. Lt. Sebring was transferred after taking steps to investigate misconduct by Mr. Aenlle. Sgt. Chan was transferred from PSB to an assignment at the San Francisco Airport ("SFO") within hours of participating in a press conference in support of Measure A. Sheriff Corpus also constructively terminated Capt. Rebecca Albin after she posted an innocuous message on social media that angered Sheriff Corpus.

### B.    Sheriff Corpus retaliated against Capt. Philip for refusing to sign and serve the deficient Internal Affairs notice to Sgt. Javier Acosta.

As described above, Undersheriff Perea contacted Capt. Philip on or about September 3, 2024, and ordered him to sign the Internal Affairs notice that Heather Enders had prepared at the direction of Sheriff Corpus and Mr. Aenlle. At the time, Capt. Philip knew nothing about the investigation of Sgt. Javier Acosta or about the Internal Affairs notice. After Capt. Philip

received a copy of the Internal Affairs notice from Ms. Enders by email, he responded by noting that it "fail[ed] to meet several POBAR requirements as referenced in Government Code section 3303." He also explained that he did "not have the requisite information to properly serve this notice."

Shortly after Capt. Philip sent his email to Ms. Enders on September 3, 2024, Mr. Aenlle sent an after-hours text message to Ms. Enders asking if Capt. Philip had been with the Sheriff's Office for over a year. When she confirmed that Capt. Philip had been with the Sheriff's Office for over a year, Mr. Aenlle replied in a text message, "OK so he's past probation." Sheriff's Office employees like Capt. Philip who have worked for more than a year are protected by POBRA and cannot be terminated without cause. *See* Gov't Code § 3304(b). Ms. Enders understood that Mr. Aenlle was asking about Capt. Philip's work history to determine if Sheriff Corpus could fire him without cause, and she understood Mr. Aenlle's response as an acknowledgement that Sheriff Corpus could not fire him without cause.

After their text message exchange, Mr. Aenlle called Ms. Enders. Mr. Aenlle asked why Capt. Philip had written his September 3, 2024, email refusing to sign the Internal Affairs notice. Ms. Enders explained that Capt. Philip had no personal knowledge of the investigation, despite being in charge of PSB. Mr. Aenlle responded that he intended to remove Capt. Philip, saying, "We need someone we can trust." Ms. Enders understood Mr. Aenlle to mean that he and Sheriff Corpus wanted someone in charge of PSB who would do what they asked.

Shortly after Capt. Philip refused to sign the Internal Affairs notice, Undersheriff Perea called Capt. Philip into his office for a meeting. During this meeting, at which Assistant Sheriff Ryan Monaghan was present, Undersheriff Perea told Capt. Phillip that he was to be transferred from PSB to Corrections where he would report to Capt. William Fogarty, whom Capt. Philip was more senior than. At the time, Capt. Philip had no experience in the Corrections unit, and there were already captains in place supervising each of the jails. Undersheriff Perea offered no explanation for the transfer or its timing, and he would not say whether the transfer was permanent.

As a result of the transfer to the Corrections unit, Capt. Philip was stripped of certain responsibilities and duties, including overseeing the firing range and serving on task forces devoted to narcotics trafficking, vehicle theft, and the creation of the childcare substation.[10]

---

[10] On November 12, Undersheriff Perea ordered Capt. Philip to arrest Deputy Tapia without a warrant or a probable cause statement. Capt. Philip had no knowledge as to why Deputy Tapia was being arrested and refused to participate in the arrest, citing his belief that the arrest was likely illegal. After Undersheriff Perea threatened Capt. Philip with an insubordination charge, Capt. Philip resigned from the Sheriff's Office.

### C.    Sheriff Corpus retaliated against Lt. Sebring after he advised an employee that she could file an HR complaint against Mr. Aenlle.

Lt. Jonathan Sebring was assigned to PSB from April 2018 until June 2024. In April 2023, Sheriff Corpus promoted Lt. Sebring from Sergeant to Acting Lieutenant, and he became a full Lieutenant in or about July 2023. From the beginning of the Corpus administration through his transfer, Lt. Sebring received positive performance reviews. In April 2024, Lt. Sebring took action within the scope of his duties in response to Mr. Aenlle's treatment of Jenna McAlpin. Approximately two months later, Sheriff Corpus abruptly and without explanation transferred Lt. Sebring out of PSB and into Corrections, a less desirable assignment.

As discussed above, Jenna McAlpin is a former long-tenured civilian employee within the Sheriff's Office. Ms. McAlpin was a Records Manager, but she was assigned to serve as Mr. Aenlle's administrative assistant. She announced her resignation in March 2024 and her last day of work was scheduled for April 4, 2024. On or about April 3, 2024, Mr. Aenlle confronted Ms. McAlpin about a rumor that she had posted denigrating content about Sheriff Corpus on social media. As described above, her interaction with Mr. Aenlle left Ms. McAlpin upset and in tears.

Lt. Sebring spoke to Ms. McAlpin shortly after her interaction with Mr. Aenlle. When he spoke to Ms. McAlpin, she was still visibly upset and was crying. Lt. Sebring told her that she could file a complaint with Human Resources. Ms. McAlpin subsequently reported the incident to Human Resources.

That same afternoon, Sheriff Corpus went to Lt. Sebring's office to discuss the incident. Lt. Sebring told Sheriff Corpus that he believed Mr. Aenlle's conduct was inappropriate and expressed that it was unfortunate that, due to Mr. Aenlle's behavior, a long-term employee like Ms. McAlpin would leave the Sheriff's Office under such difficult circumstances. After hearing Lt. Sebring recount what he had learned from Ms. McAlpin, Sheriff Corpus tried to justify Mr. Aenlle's actions, saying that he had simply been "direct."

Prior to that conversion, Sheriff Corpus regularly called Lt. Sebring to discuss PSB matters. Following that conversation, Sheriff Corpus stopped speaking to Lt. Sebring.

On or about June 19, 2024, Sheriff Corpus transferred Lt. Sebring out of PSB and into the Corrections Unit. This transfer was ordered outside the typical cycle for transfers. Additionally, there was not a staffing need for Lt. Sebring because there were several lieutenants already assigned to Corrections. Lt. Sebring considers the transfer a punitive action because Corrections is understood throughout the Sheriff's Office to be less prestigious and beneficial for career development than PSB.

May 30, 2025
Page 48

### D.     Sgt. Chan was transferred within hours of appearing at a press conference in support of Measure A.

Sgt. Jimmy Chan joined the Sheriff's Office in 2015 and was promoted to sergeant in 2022. In September 2024, he began work on a specialty assignment in PSB after a competitive interview process. Sgt. Chan understood that he would be in PSB for four to five years based on his understanding of how long specialty assignments typically last. Sgt. Chan understood that his position in PSB was a favorable one that would be helpful for future promotion opportunities.

On or about February 5, 2025, Sgt. Chan used an approved hour of vacation time to attend a press conference in support of Measure A during his lunch break. Sgt. Chan was visible in television footage of the press conference. That same day, Undersheriff Perea contacted Lt. Danield Reynolds to tell him that Sgt. Chan was to be transferred to SFO. Around 5:00 p.m. that day, Lt. Reynolds informed Sgt. Chan that he was being transferred to SFO. Lt. Reynolds told Sgt. Chan that he should assume that the transfer order came from Sheriff Corpus.

At the time, there was a waiting list of other sergeants who had applied for the position at SFO. Sgt. Chan was not provided an opportunity to contest or appeal the transfer decision, and he has not been given any updates to date as to when, if ever, he will return to PSB. Sgt. Chan views the transfer as unfavorable and as negatively affecting his future professionally.

### E.     Sheriff Corpus retaliated against Capt. Rebecca Albin for posting a message on social media.

Captain Rebecca Albin was assigned by Sheriff Corpus to serve as the commander of the Coastside Patrol Bureau; in that position she also functioned as the police chief for Half Moon Bay. In early May 2024, Capt. Albin gave notice that she was leaving the SMCSO to take a position with another law enforcement agency closer to her home in Morgan Hill; her last day was to be June 20, 2024.

On June 18, 2024, Capt. Albin posted a goodbye message to the Half Moon Bay community on NextDoor, a website that facilitates community-based communication. The post was complementary of the Half Moon Bay community; it did not denigrate the SMCSO or Sheriff Corpus; and it cited her desire for a reduced commute as the reason for her departure. Prior to this time, Capt. Albin, who had received praise in the SMCSO for her effective use of social media, had never been told that she needed permission before posting messages to NextDoor. Nonetheless, she notified the SMCSO and the Half Moon Bay City Manager that she intended to announce her departure on NextDoor.

Less than an hour after she posted her message on NextDoor, Capt. Albin received a phone call from Undersheriff Hsiung, who told her that Sheriff Corpus was upset with her about the post. Undersheriff Hsiung told Capt. Albin that the Sheriff was going to revoke Capt. Albin's access to her SMCSO email account, NextDoor, and Evertel (a law enforcement messaging application). Capt. Albin was also informed that her access to the Half Moon Bay substation and other county facilities would be revoked. That evening, Capt. Albin was not able to access her

May 30, 2025
Page 49

SMCSO email or the SMCSCO website used for entering timecards. When Capt. Albin returned to her office to gather her belongings on June 20, 2024, her building access had been turned off, and she was escorted by SMCSO personnel such that she was not left alone in the building.

Sheriff Corpus proceeded in the face of advice not to retaliate against Capt. Albin. On the evening of June 18, 2024, Undersheriff Hsiung cautioned Sheriff Corpus that, despite her anger towards Capt. Albin, she should not revoke Capt. Albin's access to SMCSO systems "before the agreed upon date or else it could be considered a de facto or constructive termination." Sheriff Corpus ignored Undersheriff Hsiung's advice and constructively terminated Capt. Albin's employment before her resignation was effective in retaliation for Capt. Albin's NextDoor post.

Sheriff Corpus's retaliation against Capt. Albin may also have been motivated by animus directed against Capt. Albin's religious background. Detective Jeff Morgan, who has worked for the SMCSO since 2017 after lateralling from the Daly City Police Department, recalls having a phone call with Sheriff Corpus in 2022. During the call, Sheriff Corpus referred to Capt. Albin as a "Jew b----."[11]

### F.    Grounds for Removal

Each instance of the foregoing retaliatory conduct against Capt. Philip, Capt. Albin, Lt. Sebring, and Sgt. Chan is, independently and collectively, grounds to remove Sheriff Corpus from office for cause because Sheriff Corpus has violated laws related to the performance of the Sheriff's duties. San Mateo County Charter Art. IV § 412.5(B)(1).

***First***, Sheriff Corpus unlawfully retaliated against Capt. Philip. It is unlawful to "retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation." Labor Code § 1102.5. Moreover, "[a]ny retaliation or reprisal by any [San Mateo] County officer or employee against any complainant or informant is strictly prohibited" by the County Code. San Mateo County Code § 2.14.090. And, as noted above, Section 2.14.090 "protect[s] all complainants or informants from retaliation for filing a complaint with, or providing information about, improper government activity by County officers and employees."

---

[11] Sheriff Corpus's use of a derogatory term to refer to Capt. Albin is consistent with her use of others slurs in the workplace. Both Det. Morgan and Ms. Barnes recall hearing Sheriff Corpus refer to prior Sheriff Bolanos as a "coconut," which Det. Morgan recalls Sheriff Corpus explaining that by that she meant "brown on the outside, white on the inside." Ms. Barnes also recalls hearing Sheriff Corpus refer to former Sheriff Bolanos using a slur commonly known as "the N-word." Ms. Barnes and Mr. Guiney also recall hearing Sheriff Corpus refer to a Millbrae City Council Member as a "fuzzbumper," a derogatory term for lesbians. Sheriff Corpus also used this term to refer to that same Millbrae City Council Member in text messages with Ms. Barnes.

May 30, 2025
Page 50

*Id*. § 2.14.060. Indeed, "individuals should be encouraged to report possible violations of laws, regulations and rules governing the conduct of County officers and employees." *Id*. § 2.14.060. The SMCSO Policy Manual likewise prohibits "retaliate[ion] against any person for … opposing a practice believed to be unlawful …; for reporting or making a complaint …; or for participating in any investigation." Sheriff Corpus violated these laws by transferring Capt. Philip to a less desirable and advantageous post in retaliation for refusing to sign and serve the deficient Internal Affairs notice to Sgt. Acosta and for reporting the improper Notice.

**Second**, Sheriff Corpus unlawfully retaliated against Sgt. Chan. It is unlawful to retaliate against an employee for engaging or participating in political activities. Labor Code § 1101 ("No employer shall make, adopt, or enforce any rule, regulation, or policy (a) [f]orbidding or preventing employees from engaging or participating in politics or from becoming candidates for public office [or] (b) [c]ontrolling or directing, or tending to control or direct the political activities or affiliations of employees."); Labor Code § 1102 ("No employer shall coerce or influence or attempt to coerce or influence his employees through or by means of threat of discharge or loss of employment to adopt or follow or refrain from adopting or following any particular course or line of political action or political activity."); *Ali v. L.A. Focus Publ'n*, 112 Cal. App. 4th 1477, 1487 (2003) (sections 1101 and 1102 protect employees' "fundamental right … to engage in political activity without … threat of retaliation from employers.") (internal quotations omitted); *see also* Gov't Code § 3302(a) ("No public safety officer shall be prohibited from engaging.in political activity.") Sheriff Corpus violated these laws by transferring Sgt. Chan to a less desirable and advantageous post in retaliation for his participation in the political rally in support of Measure A.

**Third**, Sheriff Corpus violated POBRA by taking punitive action against Capt. Philip, Lt. Sebring, Sgt. Chan and Capt. Albin without affording them the rights provided by Government Code Sections 3303 and 3304. A public safety officer cannot be subject to "punitive action … without providing the public safety officer with an opportunity for administrative appeal." Gov't Code § 3304(b). Sheriff Corpus took punitive action against Capt. Philip, Lt. Sebring, and Sgt. Chan by transferring them for participating in lawful conduct that the Sheriff disfavored. Likewise, Sheriff Corpus locked Capt. Albin out of her work site on the basis of her lawful conduct. Sheriff Corpus did not provide these officers with the right to an administrative appeal in violation of POBRA.

> ### G.    Supporting Evidence

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- Former Capt. Rebecca Albin;

- SMCSO Associate Management Analyst Valerie Barnes;

- Sgt. Jimmy Chan;

May 30, 2025
Page 51

- SMCSO Human Resources Manager Heather Enders;

- Former Lt. Daniel Guiney;

- Former Undersheriff Christopher Hsiung;

- Former Records Manager Jenna McAlpin;

- Former Assistant Sheriff Ryan Monaghan;

- Sgt. Jeffrey Morgan;

- Former Capt. Brian Philip;

- Lt. Daniel Reynolds; and,

- Lt. Jonathan Sebring.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- February 5, 2024 Memo from Lt. Jonathan Sebring to Assistant Sheriff Ryan Monaghan;

- June 18, 2024 Text message exchange between Former Undersheriff Christopher Hsiung and Sheriff Christina Corpus;

- July 5, 2024 Letter from Sgt. Jimmy Chan to Lt. Irfan Zaidi;

- September 3, 2024 Text message exchange between Victor Aenlle and Heather Enders;

- November 12, 2024 Chronology by Former Capt. Rebeca Albin; and,

- February 6, 2025 Video of DSA Support for Measure A depicting Sgt. Jimmy Chan.

**VI.    Grounds for Removal Relating to the Professional Standards Bureau**

    **A.    Introduction**

The Sheriff has mandatory, statutory obligations to investigate allegations of officer misconduct. PSB implements these obligations by investigating citizen complaints and use-of-force complaints, and conducting Internal Affairs investigations, among other duties.

Sheriff Corpus has mismanaged PSB and inhibited the unit from effectively performing its core investigative functions, leading to a severe backlog of uncompleted investigations. PSB suffers from lack of executive leadership. Sheriff Corpus and Undersheriff Perea require PSB personnel

May 30, 2025
Page 52

to obtain executive authorization to undertake basic investigatory steps, including even the decision to initiate a preliminary inquiry to determine whether a formal investigation is warranted, but they also fail to act on requests incoming from PSB in a timely fashion. In addition, Sheriff Corpus has demonstrated a pattern of intervening and delaying some PSB investigations without apparent justification, particularly when she has a pre-existing personal relationship with the target of the investigation.

Sheriff Corpus's repeated and flagrant failure to maintain a functional PSB unit—which is itself an outgrowth of Sheriff Corpus's failure to maintain a functional executive management team—constitutes cause to terminate under Section 412.5(B)(2) of the County Charter.

### B.      Overview of PSB functions

PSB has multiple functions. One function is to oversee the SMCSO's efforts to hire sworn staff. PSB ensures that SMCSO's hiring adheres to the County's civil service rules. Sworn and non-sworn personnel both work on hiring matters within PSB. Another function of PSB is to administratively investigate allegations of wrongdoing within the SMCSO. PSB officers conduct investigations into, among other things, civilian complaints and use-of-force incidents. PSB officers also typically serve as the Internal Affairs investigators for the agency. While non-sworn staff provide support services to investigating officers, the investigations themselves are conducted by sworn personnel.

Traditionally, when PSB receives a misconduct allegation, a PSB sergeant performs a preliminary fact-finding inquiry to help determine whether further investigation is warranted. The sergeant will then provide an initial report based on her or his findings to a superior officer, usually a lieutenant with oversight over PSB. A lieutenant will then pass on those preliminary findings, at times with a recommendation on whether to open a formal investigation, to PSB's supervising officer, typically either a captain or an assistant sheriff. Past and current members of PSB report that the assistant sheriff overseeing PSB has traditionally had authority to open formal Internal Affairs investigations after receiving the preliminary report, though the assistant sheriff has sometimes consulted the Sheriff or Undersheriff in making this decision.

This process has permitted PSB to generally open and conduct Internal Affairs investigations while limiting the personal involvement of the Sheriff or the Undersheriff. Several current and former members of PSB report that limiting the Sheriff and Undersheriff's involvement in the pre-hearing investigative process is important for two reasons: (1) the Sheriff's and Undersheriff's schedules are often consumed with overseeing other divisions of the SMCSO, and (2) the Sheriff is the ultimate decision-maker with respect to personnel discipline and the Undersheriff almost always serves as the *Skelly* officer in any internal disciplinary hearing.[12]

---

[12] The function of a *Skelly* officer in public employee disciplinary matters is to provide a review of the employer's charge and the employee's response and to evaluate whether evidence supports the proposed disciplinary action.

May 30, 2025
Page 53

###### C.    Sheriff Corpus has inhibited PSB from fulfilling its investigative function.

For more than six months, PSB has lacked executive-level and command-level leadership. In January 2023, Sheriff Corpus eliminated an assistant sheriff position to make room for Mr. Aenlle's civilian "chief of staff" position. Sheriff Corpus then hired Ryan Monaghan to fill one of the two remaining assistant sheriff positions but left the other assistant sheriff position unfilled.[13] Assistant Sheriff Monaghan oversaw PSB during his tenure at the SMCSO. In mid-2023, Sheriff Corpus also recruited Capt. Brian Philip to join the SMCSO and help Assistant Sheriff Monaghan in overseeing PSB.

In September 2024, Sheriff Corpus transferred Captain Philip out of PSB to a position in Corrections after Captain Philip refused to sign and serve a deficient Internal Affairs notice on Sgt. Javier Acosta. (*See supra* § III.B.) Since then, there has been no captain with oversight over PSB.

A few weeks later, in September 2024, Sheriff Corpus terminated Assistant Sheriff Monaghan in retaliation for his participation in Judge Cordell's investigation. (*See supra* § IV.) Assistant Sheriff Monaghan reports that, in the months preceding his termination, Undersheriff Perea limited his ability to open Internal Affairs investigations without first obtaining the Undersheriff's preapproval.

Following Sheriff Monaghan's termination, Sheriff Corpus promoted Capt. Matthew Fox to Acting Assistant Sheriff. In that role, he briefly oversaw PSB but resigned in November 2024. Since then, there has been no assistant sheriff or captain overseeing PSB and lieutenants in the unit have had to report directly to Undersheriff Perea.

Several members of PSB report that the Sheriff's failure to have an assistant sheriff in place for more than six months has resulted in significant delays for the unit's investigative work. The tasks of approving the initiation of every Internal Affairs investigation and reviewing every completed Internal Affairs investigation has fallen to Undersheriff Perea. PSB's sworn personnel also report that Undersheriff Perea rarely takes any action without obtaining approval from Sheriff Corpus, which has further slowed the investigative process. Moreover, in a break from historic practice, Sheriff Corpus and Undersheriff Perea have limited PSB sergeants' ability to engage in even initial fact-finding of verbal complaints without first obtaining their prior approval. As a result, the current process for opening investigations regularly results in significant and unacceptable delays.

Additionally, Sheriff Corpus has also introduced significant delay into completing investigations after they are initiated. As of May 2025, the Sheriff's Office has a backlog of at least 38 investigations that have been completed by PSB and are awaiting review by Undersheriff Perea

---

[13] As noted above, Mr. Kunkel unofficially served in an Assistant Sheriff for Corrections role on a contractor basis until early 2024 before resigning. Sheriff Corpus has never had a full-time Assistant Sheriff for Corrections.

May 30, 2025
Page 54

and Sheriff Corpus. Approximately 13 investigations into citizen complaints have been completed by PSB and are awaiting review by an SMCSO executive officer.[14] Approximately 13 investigations into the use of force have been completed by PSB and are awaiting review by an SMCSO executive officer.[15] Approximately 12 Internal Affairs investigations have been completed by PSB and are awaiting review by an SMCSO executive officer.[16]

### D.    Sheriff Corpus's mismanagement of PSB has led to substantial delays in the investigative process and created significant negative effects.

Current and former members of PSB report that delaying investigations and disciplinary decisions have significant detrimental effects. It can be harder to complete stale investigations because witness memories fade over time. Furthermore, a deputy who commits misconduct may not receive corrective training in a timely fashion or might be permitted to remain in their position while putting others at risk. Sgt. Fava reports that he often receives calls from citizens who have submitted complaints and are frustrated by the lack of resolution, thereby eroding public trust.

Delays can also result in unnecessary costs to the County and taxpayers. For example, San Mateo County Labor Relations Analyst Katy Roberts reports an incident where an officer was put on administrative leave in May 2024 and had a *Skelly* hearing in July 2024. Despite the recommendation that the officer be terminated, Sheriff Corpus did not serve a termination letter on the officer until May 2025—thereby allowing the officer to continue to receive salary for a full year while on administrative leave.

Finally, in some circumstances, the Public Safety Officers Procedural Bill of Rights Act can require the Sheriff's Office to issue a letter of intent to impose discipline within one year of learning of the alleged misconduct. *See* Gov't Code § 3304(d).[17] As a result, the County could lose the ability to impose discipline due to significant investigative delays. Lt. Reynolds and Sgt. Fava report that at least once in the past year the SMCSO was unable to impose discipline following an investigative process that took more than a year to conclude and that the one-year deadline is approaching quickly for at least one other investigation.

---

[14] Citizen complaint investigations are mandated by statute. *See* Cal. Pen. Code § 832.5.

[15] Every use of force is investigated to determine whether such use was permissible or potentially excessive. The SMCSO has a statutory duty to investigate instances of excessive force. *See* Cal. Pen. Code § 13510.8(b)(3); (c).

[16] Several Internal Affairs investigations involve "serious misconduct," which the SMCSO has a statutory duty to investigate. *See* Cal. Pen. Code § 13510.8(b)–(c).

[17] There are exceptions to the administrative statute of limitations, and the application of this statute can be nuanced.

May 30, 2025
Page 55

### E.    Examples of Sheriff Corpus's failure to properly conduct PSB investigations.

As discussed, Sheriff Corpus's mismanagement of PSB has led to the SMCSO's failure to timely complete investigations. Below are four non-exhaustive examples illustrating how Internal Affairs investigations have come to be delayed under Sheriff Corpus. The first and fourth examples also illustrate instances where Sheriff Corpus slowed PSB investigations on behalf of officers who she favors.

>    1.    The Sheriff ignored a PSB recommendation to investigate serious misconduct by a deputy who supported her campaign.

In August 2024, a deputy permitted a gang-affiliated minor to smoke an electronic cigarette in the front passenger seat of a patrol car while the minor recorded themselves on a cellphone. The deputy and the deputy's spouse made campaign contributions to Sheriff Corpus, and the deputy is perceived within the SMCSO as a "favorite" of the Sheriff's. After obtaining the video, Sgt. Fava submitted a memorandum to Assistant Sheriff Monaghan that recommended that PSB open a formal Internal Affairs investigation due to the seriousness of the incident.

Shortly after receiving Sgt. Fava's report, Assistant Sheriff Monaghan discussed the incident with Undersheriff Perea and recommended immediately opening a formal Internal Affairs recommendation. Undersheriff Perea did not agree to open an Internal Affairs investigation at the time. Instead, Undersheriff Perea instructed Assistant Sheriff Monaghan to inquire with PSB whether the video of the minor smoking in the patrol car could be withheld from the District Attorney. Lt. Zaidi and Sgt. Fava explained to Assistant Sheriff Monaghan that the material "absolutely" had to be turned over to the District Attorney.

Despite the recommendations of Assistant Sheriff Monaghan and Sgt. Fava concerning the need for a formal investigation, Sheriff Corpus and Undersheriff Perea declined to open an investigation for months.

On November 12, 2024, the Cordell Report was published to the public. The Cordell Report discusses the incident as well as the interaction between Assistant Sheriff Monaghan and PSB concerning whether the video could be withheld from the District Attorney. At the time the Cordell Report was published, Sheriff Corpus and Undersheriff Perea still had not authorized an investigation into the deputy's conduct.

In December 2024, Sheriff Corpus and Undersheriff Perea finally approved opening an investigation. In doing so, they broke with standard practice of investigating deputy misconduct internally and instead outsourced the investigation to a third party. As of May 2025, members of PSB report that no resolution on this incident has been reached and no discipline has been imposed. Assistant Sheriff Monaghan and Sgt. Fava each report that they expected that the investigation into this incident should have taken no more than one to two weeks to complete.

May 30, 2025
Page 56

      2.   The Sheriff has failed to conclude an investigation into a deputy trainee who left firearm in a public place.

In October 2024, a deputy trainee left an office-issued firearm unattended and unsecured in a public restaurant in Burlingame. The deputy trainee was a probationary employee of the SMCSO at time of the incident. SMCSO policy permits deputy trainees to use office-issued firearms during training on the shooting range only, and deputy trainees cannot carry them off Sheriff's Office property. The restaurant staff found the firearm and called local police, who returned it to SMCSO after tracing the firearm's serial number.

After discussing the incident with the Sheriff and Undersheriff, the Undersheriff informed Lt. Zaidi that PSB would conduct an investigation into the incident. But the Sheriff and Undersheriff directed that, unless new information arose, the deputy trainee would not be terminated for leaving the office-issued firearm in a public restaurant. Multiple current and former members of PSB report that probationary employees (like the deputy trainee involved in this incident) are routinely terminated for serious violations of the SMCSO policy rather than conducting formal Internal Affairs investigations.

On November 4, 2024, Sgt. Chan completed the investigation into this incident. Seven months later, members of PSB report that no discipline has been imposed on the deputy trainee. Instead, the deputy trainee continued in the training academy after the firearm incident. Then, after they failed out of the academy for reasons unrelated to the firearm incident, they nevertheless remained an SMCSO deputy trainee and were permitted to reenroll in the academy.

      3.   The Sheriff failed to conduct an investigation into serious allegations of excessive force by a correctional officer.

In August 2024, an altercation occurred involving several correctional officers and an incarcerated person in one of the County's jail facilities. Sgt. Fava reports that he conducted a preliminary fact-finding inquiry into the altercation and determined that body camera footage revealed that one correctional officer had placed his hand and forearm across the incarcerated person's neck without apparent justification after the group of correctional officers had taken the incarcerated person to the ground. In January 2025, after completing his initial investigation, Sgt. Fava submitted a memorandum to Lt. Reynolds recommending that the correctional officer be dismissed immediately because they were a probationary employee and had more likely than not violated multiple Sheriff's Office policies in applying force to the incarcerated person's neck while they were on the ground, unarmed, and surrounded by correctional officers. Lt. Reynolds forwarded Sgt. Fava's memorandum to Undersheriff Perea and likewise recommended that the correctional officer be dismissed immediately.

For several months, Sheriff Corpus and Undersheriff Perea took no action with respect to this correctional officer. Instead, the correctional officer was permitted to continue in his position, complete the "CORE Academy" training program for correctional officers, and has received at least one performance award from the Sheriff. In mid-May 2025, rather than dismissing the correctional officer, PSB was told to open a formal Internal Affairs investigation.

May 30, 2025
Page 57

4.  The Sheriff has failed to conduct or conclude investigations concerning a correctional officer despite repeated allegations of serious misconduct.

In mid-2023, a correctional officer observed and failed to report another correctional officer forcing incarcerated people to dance in degrading and provocative ways. Members of PSB report that, after PSB conducted an Internal Affairs investigation, the correctional officer was served with a letter of intent to impose a suspension and Undersheriff Perea conducted a *Skelly* hearing in July 2024 concerning the misconduct. Members of PSB further report that, despite the incident occurring nearly two years ago and the Skelly hearing concluding nearly one year ago, Sheriff Corpus has yet to make a disciplinary decision and conclude the investigation.

In a separate, more-recent incident in August 2024, the same correctional officer was involved in a physical altercation with a member of the public while off-duty in a public park. Sgt. Fava conducted a preliminary investigation and submitted a memorandum stating that a formal Internal Affairs investigation could be warranted. Despite this, Sheriff Corpus and Undersheriff Perea declined to open an investigation for several months and only did so in December 2024 after the member of the public involved filed a civil rights lawsuit based on the incident against the County. Nine months after this incident, the investigation has not been completed and no disciplinary action has been determined.

Sgt. Fava reports that Sheriff Corpus previously supervised the correctional officer involved in the above incidents when she was Captain of the Millbrae Police Bureau. Sgt. Fava further reports that he has heard Sheriff Corpus make comments that she does not believe that the correctional officer "would do something like this" and that it was "out of character."

F.    Grounds for Removal

The foregoing conduct is, independently and collectively, grounds to remove Sheriff Corpus from office because she has failed to complete investigations into allegations of misconduct by members of her office and thus has flagrantly and repeatedly neglect of her duties. San Mateo County Charter Art. VI § 412.5(B)(2).

Penal Code section 13510.8(c)(1) requires the Sheriff and her Office to complete "investigations of allegations of serious misconduct by a peace officer regardless of their employment status." Government Code sections 26600, 26601, 26602 impose a duty on the Sheriff to preserve the peace, arrest those who attempt or commit public offenses, and investigate public offenses which have been committed. Penal Code section 832.5 requires law enforcement agencies to "establish a procedure to investigate complaints by members of the public against the personnel of these departments or agencies." Agencies have a "duty to follow the mandatory terms of the department's published procedure for handling citizen complaints of police misconduct." *Galzinski v. Somers*, 2 Cal. App. 5th 1164, 1174 (2016).

As described above, Sheriff Corpus has failed to properly initiate, support, oversee, and conclude investigations into civilian, use-of-force incidents, and Internal Affairs investigations. Sheriff Corpus's mismanagement of PSB has led to a significant backlog of incomplete

May 30, 2025
Page 58

investigations and unresolved open matters. The Sheriff also fails to dispense deputy discipline in an even-handed manner by engaging in favoritism. This conduct fails to uphold the Sheriff's duty to investigate and undermines California's comprehensive scheme for administering the standards and training of law enforcement officers, as set forth in Title 4, part 4 of the Penal Code. These failures constitute a flagrant and repeated neglect of Sheriff Corpus's duties as defined by law and constitute grounds for her removal under Section 412.5(b)(2) of Article IV of the County Charter. *See* San Mateo County Charter Art. IV § 412.5(B)(2); Penal Code §§ 832.5, 13510.8(c)(1); Gov't Code §§ 26600, 26601, 26602.

      **G.    Supporting Evidence**

The witnesses who can testify to the facts detailed above include, but are not limited to, the following individuals:

- Sgt. Jimmy Chan;

- Sgt. Joe Fava;

- Former Undersheriff Chistopher Hsiung;

- Former Assistant Sheriff Ryan Monaghan;

- Former Capt. Brian Philip;

- Lt. Daniel Reynolds;

- San Mateo County Labor Relations Analyst Katy Roberts;

- Lt. Jonathan Sebring; and,

- Lt. Irfan Zaidi.

The documents that support the facts detailed above include, but are not limited to, the following documents, which are attached as exhibits hereto:

- August 28, 2024 Memorandum from Sgt. Joe Fava to Former Capt. Brian Philip re: Deputy Incident;

- August 29, 2024 Memorandum from Sgt. Joe Fava to Lt. Irfan Zaidi re: Correctional Officer Off-Duty Incident;

- October 24, 2024 Notice of Internal Affairs Investigation from Sgt. Jimmy Chan to Deputy Sheriff Trainee;

May 30, 2025
Page 59

- October 28, 2024 Notice of Interview from Sgt. Jimmy Chan to Deputy Sheriff Trainee;

- January 29, 2025 Memorandum from Sgt. Joe Fava to Lt. Deniel Reynolds re: Correctional Officer Jail Incident; and,

- January 29, 2025 Email from Lt. Daniel Reynolds to Undersheriff Daniel Perea re: Correctional Officer Jail Incident.

**VII.    Conclusion**

For the foregoing reasons, cause exists to terminate Sheriff Corpus under Section 412.5.