This transcript was exported on Jun 12, 2025 - view latest version here.

| | | |
|---|---|---|
| Alfonso Estrada: | 00:00:01 | Okay. We are on date- uh, on tape, excuse me. Today's date is June 11 of 2025, and the time is 9:07 a.m. We are appearing here at Murphy Pearson's offices, um, uh, in, uh, San Francisco, 550 California Street, uh, for the purpose of conducting the Pre-Removal Conference. |
| | 00:00:22 | Uh, present is Sheriff Corpus. Thank you very much for being here, uh, and her counsel. Does everybody wanna go around and state their appearances for the record and for the purpose of accurate transcription? |
| Thomas Mazzucco: | 00:00:30 | Sure. Good morning, Thomas Mazzucco for Sheriff Corpus. M-A-Z-Z-U-C-C-O. |
| Mariah Cooks: | 00:00:37 | Mariah Cooks for Sheriff Christina Corpus. That's M-A-R-I-A-H C-O-O-K-S. |
| James Lassart: | 00:00:49 | Uh, James Lassart, um, on behalf of the Sheriff. It's L-A-S-S-A-R-T. |
| Christopher Ulr...: | 00:00:50 | Christopher Ulrich, also on behalf of Sheriff. Last name U-L-R-I-C-H. |
| Christopher Ulr...: | 00:00:56 | Wilson Leung, last name L-E-U-N-G, also on behalf of Sheriff Christina Corpus. |
| Alfonso Estrada: | 00:01:01 | And our Peer Removal Conference Officer. |
| John Keene: | 00:01:03 | Yes. And my name is John Keene, uh, K-E-E-N-E. I'm the Chief Probation Officer in San Mateo County. But today, I'm serving as, uh, the Skelly Officer, uh, on behalf of the County of San Mateo. |
| Alfonso Estrada: | 00:01:15 | And my name is Alfonso Estrada from Hanson Bridgett. I'm a special outside counsel to the County, uh, specific to the purpose of just making sure, one, developing the procedures, uh, for this process, and two, making sure they're complied with here today and throughout the process. Thank you, everybody, for being here. I'll turn it now over to Chief Keene. |
| John Keene: | 00:01:34 | Good morning, everyone. Um, my purpose today in serving as the Skelly Officer is to give the Sheriff an opportunity to state her side of the facts. Um, obviously, you've seen the Notice of Intent. Uh, my purpose is to take forth the information, take back the information that you provide today, uh, for that purpose. Uh, certainly, I'm open to hearing, uh, your side of the story. So that- and if there's anything that you want me to |

This transcript was exported on Jun 12, 2025 - view latest version here.

consider, um, in terms of the information that you provide, uh, Mr. Estrada also is going to assist in, uh, helping me take that information in.

00:02:08     And so, um, I'm open to information. I have, uh, no interest in, uh, or any blocks in any, uh, information on the perception in this space. And so I'm happy to be here today. And I'll leave it at that, and leave the room in time for you all to- to start your conversation.

Alfonso Estrada:     00:02:27     And I'll just add one more thing to what the Chief said. We're here, uh, pursuant to Skelly v. State Personnel Board. Uh, obviously, um, charges have been...

John Keene:     00:02:36     Mm-hmm.

Alfonso Estrada:     00:02:36     ... uh, articulated in the Notice of Intent to Remove. Um, but those are just tard- charges at this point for the purpose of Chief Keene's analysis. Um, and, uh, the purpose of this meeting is, uh, for the Sheriff to appear with her representatives, and to, um, provide any information, uh, potentially mitigation of the proposed decision...

John Keene:     00:02:54     Mm-hmm.

Alfonso Estrada:     00:02:55     ... uh, for the Chief to consider before he renders his recommendation.

Thomas Mazzucco:     00:03:01     Great.

Alfonso Estrada:     00:03:01     The floor is yours.

Thomas Mazzucco:     00:03:02     As we move forward, we've reviewed, uh, the Notice of Intent provided by the Kecker Law Firm, and there's recommendations of potential charges. But they're not very succinct, and they're not to the point. Can you give us a summary of what the charges are so we can proceed with our response today?

Alfonso Estrada:     00:03:19     Uh, the summary is in the Notice of Intent that was drafted and provided, uh, to your office, uh, for Sheriff Corpus.

Thomas Mazzucco:     00:03:27     Okay. And those are kind of wide open, and they're somewhat vague and definitely ambiguous. Uh, so with that in mind, we're just gonna assert that for the record, that ordinarily there's a charging document that says Count One, Count Two, Count Three, Count four. We have the large Kecker Report, and I understand they lack familiarity with what those documents

This transcript was exported on Jun 12, 2025 - view latest version here.

generally look like and, uh, involving police officers and law enforcement officers under the Police Officers' Bill of Rights, Government Code Sections 3301 [inaudible 00:03:57].

00:03:57     Um, and, uh, so they're very ambiguous, but we'll do our best to respond to the broad, wide-ranging allegations that are rift with hearsay, gossip, and rumors. But, um, I think we could start with more of a general approach, and we appreciate hearing Officer Keene has familiarity with count- the County and some of those folks involved in this matter.

00:04:18     So, um, do you wanna direct us to any particular charge you'd like for us to start discussing, or for the Sheriff?

John Keene:     00:04:25     No, sir.

Thomas Mazzucco:     00:04:26     No. So you'd like for us to answer- ask the questions?

John Keene:     00:04:31     Yes. I'd like for you to take the direction of which you would like to pursue.

Alfonso Estrada:     00:04:37     The floor is yours.

Thomas Mazzucco:     00:04:41     Sheriff Corpus, would you like to tell them about, uh, your history as it began when you were elected Sheriff, and what you encountered and by whom?

Sheriff Corpus:     00:04:50     Yeah. Um, so just to give you some background, for those of you that don't know me, um, I am the daughter of immigrants. Um, I, um, my mother is from Nicaragua. My father is from Mexico. And, um, the reason why I got into law enforcement was when I was 16 years old, um, you know, I had this perception of law enforcement that, um, maybe wasn't very positive, but when I was 16 years old, I was the victim of a violent carjacking. Um, I was, um, assaulted with the weapon. And, um, it was, um, a very scary circumstance. I had never been involved in anything like that. And, um, the, uh, assailant tried to throw me into my vehicle and I knew that I had to fight back. And so I fought back as best as I could, and I was able to get out. Although I was screaming and there were people walking out of the mall, nobody came to my aid.

00:05:46     Um, and until I saw these two men running towards me to- to try and help me. But at that point, the assailant had taken off. Um, but it was the way that those law enforcement officers treated me that, uh, treated me with respect, with dignity, with care, with compassion that- and that's just at the scene. But

This transcript was exported on Jun 12, 2025 - view latest version here.

throughout the entire trial, when the defense attorney really made it seem like I had asked for it, um, really changed the way that I viewed law enforcement. Um, so, um, you know, I started my career, um, with the County of San Mateo. Um, in October, it'll be 30 years. Uh, I started working at the District Attorney's Office under Jim Foxx, and I was assigned to, uh, family law, which was basically at the time Child- uh, um, it was Child Support Services.

00:06:35          Um, I would help the attorneys go and try to get people to stipulate when, um, they were not represented. And, um, that- uh, you know, that really taught me a lot about people and about just the law. Because initially I thought I wanted to become an attorney, but, uh, having to deal with- or having to work with the families and just seeing the dynamics and seeing kind of the ugliness about that, um, I decided that, you know, I wanted to pursue my dream of being a law enforcement officer. And at that time, it was the first kind of like dot-com, uh, fall, um, in- um, in the tech world. And so I, um, went to go take the test to become a correctional officer. Um, I walk into this huge, um, uh, gym that was at CSM, the College of San Mateo, and I see nothing but really big men, uh, that look like, uh, they should be on a football team. And I, um, I thought, oh, gosh, uh, what am I doing here? They're not gonna want me because I'm- I don't look like any one of them.

00:07:43          And at the time that's what I saw. I saw big men, mostly Caucasian men, that were law enforcement officers. Uh, so I said, "You know what? I'm here. I'm gonna take the test." So I took the test and, um, I got an invitation to, uh, an interview process. So went in for the interview, I passed that, and then I was asked to come into the Sheriff's Office, uh, conference room where I was with about 100 other individuals. And, uh, given a background packet at the time that was about this big. And, um, so, you know, I started in the process and at every point when they would bring us back, um, there were less and less of us. And so, um, at the end, um, it was myself and another female that were hired through that entire process.

00:08:31          Um, and so, you know, working at the DA's Office, I, you know, came from a very professional atmosphere where there were probably more women than men that worked there. And so, one of my first encounters in the jail, when I went to work in the jail, I was, um, approached by, uh, a Deputy that, um, had probably a few more years left in his career before he retired. And he, you know, pulled me aside and asked me what I was doing there. And I said, " I'm here to protect and serve and to

This transcript was exported on Jun 12, 2025 - view latest version here.

work." And he says to me and looks at me in the eye and says, "Well, you look like you should be barefoot and pregnant in the kitchen." And so, at that point in time, I knew, um, the, um, struggles that I would have as a female. I was, uh, not a big per- you know, I'm not a big per person. Um, I am feminine. I've, um, always worn makeup and always, you know, cared about my appearance.

00:09:26    Um, you know, my grandmother used to always tell me, "You know, if you spend money, spend money on your face and your feet. You always have to look at yourself in the mirror and your feet, you gotta- they gotta take you places, so always buy good shoes." And so, um- um, I always, you know, cared about myself and my health. And so, um, that was just, you know, the first of many circumstances that I met, um, in an organization that, um, was racist, um, that, um, was, uh, sexist. Um, you know, I can go on for hours and tell you stories about what I dealt with. Um, you know, another encounter, I worked in intake, and there was a Deputy by the name of Brian Watt, who has since retired. Um, but we worked nights. We worked in intake. He went to 7-Eleven to go do a food run, as people- cops do at night working nights.

00:10:17    And, uh, there were, uh, other law enforcement agencies that were standing there waiting for their arrest scene to be cleared by the medical staff. And he walks in with, you know, all the the- the goodies and says, "Hey, Corpus, I just saw you at 7-Eleven." And I said, "Well, it's- that's- I was here the whole time working." He said, "No, you are on the front cover of Lowrider Magazine." So these are a little snippet of everything that I've had to deal with. I- you know, uh- uh, at every point and turn in my career, uh, when I was, um... I worked very hard. I had to work harder than the average person just to, um, you know, be recognized. And, uh, at every point and turn that I was, um, you know, promoted, it was either because I was sleeping with somebody or because I, um, checked a box, I filled, you know, a quota for, um, you know, for e- for- for employment, uh, rules.

00:11:20    And so, um, when, um, I decided to run for Sheriff, um, you know, I- I looked back at my career because they were trying to push me out. Um, within a six-month period back in 2021 and 20- 2021, 2022, um, most of my peers that were Captains were pushed out and they retired. And I was pretty much the last one standing and, um, because I didn't, uh, kiss the ring, so to speak, um, with, um, the prior administration. Um, so I had to make a decision and I decided that, um, I was gonna run for Sheriff. And I knew, um, what that, uh, would entail. Um, my predecessor

This transcript was exported on Jun 12, 2025 - view latest version here.

was, um, a- a leader of fear. He led by fear, and I knew that, um, when I would- uh, when he would find out about it, then I would have to face the music, so to speak.

00:12:18    Um, I had to find, um, a, um, campaign consultant that was out of the area. Um, I used someone by the name of Dan Mullen, who, um, was, um, in the North Bay. And because nobody would touch me, because everyone said I can't go against Carlos. If I go against Carlos, then I'm done. Um, so, um, I found, um, a, um, campaign consultant. I, uh, put a team together. Um, and some of them were employees. Some of them had been employees, uh, that were given promotions or that were not, um, that didn't have a chance with the prior administration. And so, um, I, uh, formed a team, uh, started a grassroots campaign, and, um, during the time I was a Captain in Millbrae, I had previously been a Captain in one of the largest, um, patrol bureaus, which is called Headquarters Patrol.

00:13:17    But I was pulled in, uh, prior to being transferred to the City of Millbrae by, at the time, Sheriff Carlos Bolanos, who told me that I worked for him and I don't work for Warren Slocum, who was a Board Supervisor, because I had been trying to really collaborate and build a relationship and- and do more things, especially in the area of North Fair Oaks, which had been primarily an area that is- um, uh, the population is mostly immigrant families from, um, Mexico and Central America. But, uh, the resources were very different in North Fair Oaks than they were in the, say, in the town of Woodside. They looked very different. And so I really wanted to change that and so I started working with the board- with- with Supervisor Slocum. And, um, at the time, the Sheriff didn't like that.

00:14:04    And so I was, um, sent to the City of Millbrae for a- um, to work as the Chief there. Smaller, um, very smaller, um, uh, patrol bureau. But, um, you know, it was not too far from where I live so I took it in stride and, um, was able to, um, you know, do a lot of positive things for the City of Millbrae. But when I ran for Sheriff, um, um, resources started- uh, were being withheld from me. I was, um, uh, I- I- I- by the assistant Sheriff at the time, Ed Wood. He had me writing, uh, weekly reports. I was the only Captain that had to bring in these weekly reports, and they were, you know, basically minute by minute what I was doing. Um, and, you know, I was very, uh, uh, careful, and I never did any campaigning on duty. Um, never used any, um, equipment or paper, anything, uh, to do anything because I knew that they were just looking for something like that to, um, kind of hurt me.

This transcript was exported on Jun 12, 2025 - view latest version here.

00:15:10    Um, but throughout that, uh, experience, you know, there were- um, supporters of mine were, uh, threatened. Um, the DA actually looked into a case where, um, Ed Wood at the time threatened, uh, a Deputy by the name of Christopher Armonino. And his- told him that, um, if he didn't, um, have his wife unlike my Facebook page, which I thought was kind of silly, um, he would- um, he would- he would pay the price. And then proceeded to tell them that the way to do it is to- to make it better is to kiss the ring of the Sheriff and apologize. But then also, he and his wife needed to both contribute $1,000 each to his campaign. Um, but this was not anything surprising to me because, um, as a Deputy... Um, let me take that back. As a Captain, Lieutenant, Sergeant, I always had to give to, um, the Sheriff's campaign.

00:16:07    Um, there was an unwritten rule in the Sheriff's Office that if you want to be promoted, and, uh, for some reason promotions were done around, um, campaign time, um, you- for- if you wanted to increase your chances of being a Sergeant, you would give $250 to the campaign if you wanted to be a Lieutenant, 350. If you wanted to be a Captain, it was 500. And if you wanted to increase your chances, then your spouse would match what your contribution would be. Uh, I was myself given, um, an envelope by, at the time, under Sheriff Trista Sanchez, while I was on duty, she called me into her office and had me open my portfolio and put in a envelope, uh, a Carlos Bolanos 2018 campaign envelope in which I had to give.

00:16:54    Um, because if you didn't, then, you know, you might be banished to the jail for the rest of your career. So, um, leading up to the campaign, um, you know, these are things that I faced. This is a reason why I ran for Sheriff, and, you know, the things that I saw when I was on patrol, um. When I was on patrol, uh, I saw a lot of, you know, um, police brutality and, um, people being beaten. Um, and I couldn't say anything because then I would, you know, pay the price or I would be ousted. Um, I- uh, you know, I was, uh, tested when I was sent to teams. There was a cowboy team. Uh, the- the, um, Sergeant at the time was Denny Scott. Um, and, um, during that time when I was transferred there, I was the only female on the team. Uh, we worked nights. It was a very active team.

00:17:52    Um, uh, one of my first, after I was transferred to the team, um, I walked into the substation and there were, uh, pornography photos on the workstations, um, as a test to see if I was gonna say anything. And that was their test to me to see if they could trust me. Um, so, um, the- the team was very active, but very

This transcript was exported on Jun 12, 2025 - view latest version here.

aggressive. Um, there were times where I would go out and I was again assigned to North Fair Oaks. I was a- um, I would stop a car, and it had, at the time when I was a Deputy, there were a lot of gangs out in North Fair Oaks and there's drug trafficking and such, and, um, I would stop a vehicle with five or six people that happened to, you know, be associated to some gang. And, um, at the time, uh, Deputy Amon Allen would say he would, uh, you know, uh, cover me and he- on the radio, he would say he was on his way, and then he would say he was at 97, and he would never show up.

00:18:56    And that was common for me. So I knew I had to be smart about how I patrolled and, um, how I, um, couldn't, you know, for my own safety as well. Um, but those are just snippets of, you know, the environment that existed at the time and somewhat still exists with, um, racism, with sexism in this organization. So when I ran, that's something that I wanted to change. I wanted to bring 21st century policing and, you know, justice to people that we are in charge of rehabilitating and taking care of. And, you know, when I first came in to the organization, you know, we- I started out as a correctional officer working in a jail so I know firsthand, um, the environment and the- the population that we had back then to what it is today.

00:19:52    And we have 50% of our population suffers from grave mental illness. And in the past, we used to put them on this, uh, floor that was called Three West, and it's like a dungeon in there. And people would just be in the rooms, given their medication and, you know, would maybe be able to come out for a shower or, you know, some rec time. Very limited, but, you know, they were pretty much on that floor. And, you know, as a mother now, I think about how, if that was my child, would I want that to happen to them? Would I want them to just be locked away in a room? And so, um, I, uh, you know, established a few different, um, uh, pods that are rehabili- rehabilitative specifically for people that have mental illness. And I was able to launch those.

00:20:41    Um, and they've been extremely successful, but I've been ridiculed by certain individuals within the organization that I'm an inmate lover because I'm providing, um, classes and more, um, training and- and things outside of the box, um, bringing in different types of, um, programs for our- um, our- you know, the people that are in custody, our- our incarcerated population, because we can't just let them just sit there and, you know, rot away, as I say. We need to provide these

This transcript was exported on Jun 12, 2025 - view latest version here.

programs to support their mental illness and to support their rehabilitation, because I'm pretty sure everyone in this room either has a family member or knows someone that, you know, went down the wrong path and that they care for. And I always put myself in- in those shoes. Um, I, uh, can tell you that, um, with, um, you know, the fallback that I've received, um, from, um, individuals that- why we're here today is because they didn't like the way that I was trying to change the organization.

00:21:48     Um, you know, things get leaked out to the press all the time. They're leaked out by Captains. They're leaked out by our Professional Standards Bureau, which they're supposed to be trusted to really help us in, um, keeping the sanctity of investigations, um, of personnel, uh, matters. And, um, that's not what's happening, um, in the world that I'm living in as the Sheriff. Um, the individuals feel emboldened because they feel that they can go to the County Executive and, you know, be protected by that individual. Um, and, uh, it's made it really hard for me to hold anyone accountable. When I try to hold people accountable, you know, the word, you know, retaliation is immediately, you know, thrown out there.

00:22:39     Um, it- uh, you know, I- I'm not sure if I can really talk about some of the personnel matters that are going on right now, but what I can tell you is I- if I, as the Sheriff, if somebody comes to me and makes a complaint and- and alleges that someone, um, that is a trusted law enforcement officer is, um, doing something that goes against policy or that is illegal, I have to look into it. Um, I can't just put it aside or sweep it under the rug. Uh, those days are, uh, gone and, um, we have to hold each other accountable.

John Keene:     00:23:17     Sure. That's one clarifying comment about something you just said.

Sheriff Corpus:     00:23:20     Sure.

John Keene:     00:23:21     Um, so is it your stance that every- all- the vast majority of the comments that are coming from the internal staff is due to your efforts to make changes, the- similar to what you outlined? Um, you've given some examples of things you've done in the jail, some things you've done to kind of, as you said, bring the department up to 21st century policing. Is it your general statement that most of the things or all of the things that have kind of come out as kind of comments from staffing is due to that?

This transcript was exported on Jun 12, 2025 - view latest version here.

| | | |
|---|---|---|
| Sheriff Corpus: | 00:23:55 | Well, I- you know, well, it's due to trying to hold people accountable... |
| John Keene: | 00:23:58 | Yeah. |
| Sheriff Corpus: | 00:23:58 | ... and to change the organization. Um, you know, we- we have to go out and serve the community, and we have to give equity, uh, equality to people. And what I have seen is, you know, and even my personal experience growing up in the organization for 25 years, is that, that- that- that hasn't happened a whole lot. And that's the changes that I wanted to make. And these individuals that primarily are, um, the complainants, uh, were my predecessors', um, supporters, and they were winning on that team. And so I'm trying to make things more equitable. Um, you know, uh, when I think about, uh, if- if I'm the subject, or anyone's the subject of an internal investigation, um, you know, I- I used to do IA's myself, so I think about, I used to tell the individuals, "Well, if you didn't do it, then I'm gonna do everything possible to prove that you didn't do it by just doing this investigation." So not always look at it as something negative, but to look at that it's clearing your name. |
| | 00:25:06 | Um, unfortunately, um, we've had to farm some of the internal investigations out because things were leaked out. And it's also to protect the employee from the information being leaked out. And, you know, when I'm given a memo that basically is already persecuting an employee before an investigation is even done, that's problematic. Or when the Professional Standards Bureau, um, violates policy and starts an investigation without sending me a memo at- informing me of the, uh, circumstances and then asking if we should open an IA. Um, that's problematic as well. And, uh, what I can tell you is that, uh, people that, uh, have- that the complaints that have said that I, you know, favor people or that I, you know, maybe took too long for an investigation, um, that's- those are perceived people that support me, and they all happen to be Hispanic. |
| | 00:26:16 | And, uh, or they think that people have some type of a, you know, personal relationship with me, or there's even one individual that there was a rumor that she was my niece. And that's not factual. And so you have to understand that I'm dealing with individuals that just want to come after me for every single thing that I do when I try to hold people accountable and I'm being handcuffed because of the fact that they'll throw the word- you know, they'll- they'll throw that retaliation word out there for me to be able to do my job effectively. But like I said, I only want people- things to happen |

This transcript was exported on Jun 12, 2025 - view latest version here.

and be fair for people. And I've not seen that in the environment that I've been working in. Um, because at every point and turn, when I try to do something, uh, that benefits either the organization which they don't like or benefits the community, um, then, you know, it's- things are twisted. And so-

Thomas Mazzucco:     00:27:16     Sheriff, can I interrupt for one quick second.

Sheriff Corpus:     00:27:17     Sure.

Thomas Mazzucco:     00:27:18     Talking about the 21st century policing and just wanna move- then we'll move into the people that are making the allegations, you know, predominantly these alle- these complaints, are they coming from Deputies that are on the line that are doing their job? Or are they coming from people that are command staff level or commissioned officers who had affiliations with the prior administration and or who wanted to have significant rank within your organization?

Sheriff Corpus:     00:27:43     Right. They're, um, coming from Captains, Lieutenants, and some Sergeants. Uh, the rank and file, the boots on the ground, um, are not making these complaints.

Thomas Mazzucco:     00:27:53     And so you talked about 21st century policing and you campaigned on the grounds of changing the way things are done. Um, give- give- uh, there's a couple other examples that we've talked about. Tell- uh, let's share with them about your wanting to bring the Deputies on the Sojourn.

Sheriff Corpus:     00:28:09     Yeah. So, um, I became aware of a program called Sojourn Journey, which is, um, there's a- actually a Millbrae resident who is a retired, um, history teacher who happens to be, um, a Jewish man, uh, is very proud of, uh, the work that he's done. So he, um, takes, uh, primarily students, and then he started taking law enforcement, on, uh, a journey that's called the Sojourn Journey. And we go back to the south. So, um, it's a, uh, trip that, uh, you- uh, we go to Alabama, we go to Tennessee, and we go to Mississippi and we learn things that are not written in, um, our history books. And for me, um, you know, Chief, uh, Bill Scott, um, he- um, he had taken- he kind of was kind of the pioneer for law enforcement. And so, um, I had a very good working relationship with Chief Scott, and he had informed me about an upcoming trip and, um, had said, "You know, my officers have really benefited from this because they come back a really changed person."

This transcript was exported on Jun 12, 2025 - view latest version here.

00:29:24    And so, um, I, uh, said, "You know, I'd love to." And so I, um, took, you know, uh, about- I myself went on the trip. Um, I took, uh, about 30 individuals the first time. The second time I did not go on the trip and I sent in about- about another 30 people. But, uh, being on that trip with, um, the Deputies, and I took people from all ranks, uh, we walked away all different people because of the injustices that were done. Um, you know, seeing, um, canines being deployed on, you know, eight-year-old boys, um, and seeing the photos, um, talking, going to a family's home, their farm, um. Their father was murdered by the KKK. He was an activist, a civil rights activist, and, you know, his father was a slave owner, and the- his father, uh, left his mother the- the farm. And, um, talking to his 99-year-old widow and thinking that, you know, they embraced law enforcement to come in because they wanted to tell them about their father and- and her husband and how, um, we have to keep this, you know, these- as awful as they are, we have to keep this alive so people understand why there's this adversity to law enforcement and why people of color may see law enforcement a certain way. Um, even myself, I- I never thought that if I lived in those times that I would be sitting on the back of the bus. And until I saw, um, um, the Jim Crow rhetoric, um, at the Legacy Museum where it said- you know, it- it- it said some really awful things, but it talked about Mexicans in there.

00:31:26    And, um, I- it hit me and I- I was like, I would've had the same struggle being if I were born in this- during this era. Um, but I was criticized. Um, I was criticized that I was, um, trying to shove woke shit down people's throats. And, um, you know, that was very hurtful after experiencing that, um.

Thomas Mazzucco:    00:31:53    And where did that criticism come from? Members of your command staff? Captains?

Sheriff Corpus:    00:31:57    Captains, yes.

Thomas Mazzucco:    00:31:58    So you were shoving woke shi- bullshit down their throats?

Sheriff Corpus:    00:32:03    Yeah.

Thomas Mazzucco:    00:32:03    A lot of times you talked about dealing with the issues you talked about with members of your command staff that were either insubordinate or leaking information. Would you often turn to County Counsel for advice about what to do? And when you did turn to County Counsel, what would be County Counsel's response to when you think that I should take action

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | against a particular senior level Deputy or even a lower level Deputy? What was County Counsel's mantra for the past year? |
|---|---|---|
| Sheriff Corpus: | 00:32:33 | Yeah. So, um, that it would be, um, seen as retaliation on my end and that, um, the County probably wouldn't indemnify me if they filed a lawsuit. |
| Thomas Mazzucco: | 00:32:45 | And how many times did they tell you, you ought to just let it go? |
| Sheriff Corpus: | 00:32:48 | Uh, lots of times. More than I can count. And that was mainly coming from, uh, County Counsel, David Silverman, who, uh, was known to be, um, you know, the- the- the road dog, so to speak, for, um, uh, Sheriff Carlos Villalmos. |

PART 1 OF 4 ENDS [00:33:04]

| Sheriff Corpus: | 00:33:00 | ... so to speak for, um, uh, Sheriff Carlos Bolanos. |
|---|---|---|
| Thomas Mazzucco: | 00:33:05 | And so, many occasions you were told let this go 'cause there'd be retaliation. And you think that was 'cause of County Counsel Silberman's affiliation with this whole group that didn't favor you being the sheriff. Is that accurate? |
| Sheriff Corpus: | 00:33:16 | That's accurate. And in fact, he would say, "Well, you know, those guys will get on the stand and they're all well-spoken, and you won't make it, it won't fair werl, well for you." |
| Thomas Mazzucco: | 00:33:25 | Yeah. And at some point, uh, during our representation of you, did County Counsel John Nibbelin, uh, relieve Mr., uh, Silberman of his duties of being your assigned counsel? |
| Sheriff Corpus: | 00:33:36 | After my second request. Um, the first request was, um, when I first became Sheriff, because I knew his, uh, loyalty to Bolanos and, um, I was made aware that he was not happy that I became the sheriff. So, um, I tried to play nice in the sandbox and, you know, he, he, he, uh, Mr. Nibbelin, uh, reassured me that he would, you know, keep a close eye on things and matters. And, um, it wasn't until, uh, I had enough when, uh, actually, uh, Mr. Silberman, I was telling him about some a- the actions of three captains who did something terrible to my, um, undersheriff, um, in, in the public and, um.... Is it okay if I speak about it? |
| Thomas Mazzucco: | 00:34:28 | Well, County, uh, C- County Counsel has representative here who's familiar with the rules, um, in POBR and related. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| Speaker 1: | 00:34:35 | Mm-hmm |
| Thomas Mazzucco: | 00:34:35 | Um, there's a significant incident that is an administrative investigation- |
| Speaker 1: | 00:34:42 | Mm-hmm. |
| Thomas Mazzucco: | 00:34:43 | ... involving three captains making allegations against the undersheriff, which were 100% inaccurate, proven to be inaccurate with strong factual evidence from videotape, audiotape and in test results. Would you feel comfortable today? Would you allow the sheriff to talk about that situation? 'Cause it provides a flavor for what the sheriff has to deal with from her command staff and their insubordination in failure to recognize her as the elected sheriff. And I say that because all of us have familiarity with law enforcement agencies- |
| Speaker 1: | 00:35:20 | Mm-hmm. |
| Thomas Mazzucco: | 00:35:20 | ... we know that when there's a change of administration, there's people jockeying for position that most of, when you hear morale is bad, it's- |
| Speaker 1: | 00:35:27 | Mm. |
| Thomas Mazzucco: | 00:35:28 | ... that the top level that are vying for the higher pensions, the sworn-officer level. I lived it, I lived it as a kid, as a son of a police officer, I've lived it as a prosecutor and I've lived it as a police commissioner. So we all know that's a fact. So that's where all this, and then they use threats and intimidation on down to the union members to get them to agree to things otherwise their careers are with, which you've heard the sampling of now. So I think, uh, would it be approved, would you approve of us discussing this incident here today? |
| Speaker 1: | 00:35:56 | Uh, this is, this is the sheriff's opportunity. I'm sorry, Chief. |
| John Keene: | 00:36:00 | Absolutely. |
| Speaker 1: | 00:36:00 | Chief? Okay. |
| John Keene: | 00:36:00 | No, absolutely- |
| Speaker 1: | 00:36:00 | Okay. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| | | |
|---|---|---|
| John Keene: | 00:36:00 | ... 'cause I think, when you consider, even though I will certainly concede that the notice is not written in traditional format, I will- |
| Thomas Mazzucco: | 00:36:00 | Yes. |
| John Keene: | 00:36:00 | ... concede that pursuant- |
| Thomas Mazzucco: | 00:36:00 | Thank you. Thank you. |
| John Keene: | 00:36:15 | Um, and, but I think that it certainly outlines statements as to what they believe the sheriff has done and given cause to- |
| Thomas Mazzucco: | 00:36:23 | Context. |
| John Keene: | 00:36:24 | ... context to remove her from office. So I think that this is the sheriff's opportunity to provide context. And so I think that this provides additional flavor as to that. |
| Thomas Mazzucco: | 00:36:33 | Oh, it sure does, Your... |
| John Keene: | 00:36:33 | I think that this- |
| Thomas Mazzucco: | 00:36:34 | I just called you "Your Honor." (laughs) |
| John Keene: | 00:36:37 | Yeah. Yeah. I think it's, I think it's important to do that. |
| Thomas Mazzucco: | 00:36:38 | Yeah. Okay. |
| John Keene: | 00:36:39 | So, so Sheriff Corpus, please. |
| Thomas Mazzucco: | 00:36:39 | Sheriff, please. |
| Sheriff Corpus: | 00:36:40 | So, um, we, uh, this is, so this happened, um, I wanna say, well, probably about five months ago. Um, when, um, they, uh, the, the, uh, three captains, uh, Bill Fogarty, um, Mark Myers and, uh, Frank Del Porto, um, uh, we- apparently went to my office to tell me that they're demanding, that they were demanding my resignation. I was not in the office. I was out, out at offsite at a meeting. And so, um, uh, apparently they went, uh, downstairs into our new building in the public lobby and, um, Undersheriff Dan Perea was walking in, and Undersheriff Dan Perea, uh, went to go shake their hands and, um, Captain Mark Myers is seen on video, like, going like this, like, like, how dare you try to, uh, um, shake my hand, and yet- |
| Speaker 2: | 00:37:40 | Going like this and pulling his arm away. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| | | |
|---|---|---|
| Sheriff Corpus: | 00:37:43 | He pulled his arm away, um, with a look, a look of kind of, um, uh, disapprovement on his face, like, he was upset. Um, and, uh, then the other two did shake the undersheriff's hand. Uh, there was a, um, it's, it, it, the lobby is a records bureau, and then there's a station for the security guard, um, with kind of a, a reception area that, uh, has a metal detector. And so the, um, the, um, uh, security guard was there and present. |
| | 00:38:18 | And, uh, these, uh, three captains then surround the undersheriff, and they said, "Where's the Sheriff?" And he said, uh, "I believe she's offsite at a meeting." And he said, "Well, we're, we came here to ask her for a resignation." And the undersheriff just looked at them like, you know, "Okay." And then, um, they said, "Well, we want your resignation." And he says, I, I, "I'm here with the Sheriff." He's like, "I'm here to work for the sheriff." |
| | 00:38:44 | And, um, then they say to him, Frank Del Porto says to him, well, he sniffs like if he could smell something and he says, "Undersheriff, are you drunk? I can smell alcohol on your breath," loud enough to where the security guard heard it. And my undersheriff, um, does not drink. He, uh, has really never drank alcohol in his life. And, um, they said, "Well, we smell alcohol on you. We smell alcohol. You're, you're, you're drunk." And then they walk away after they surrounded him. |
| | 00:39:22 | And the undersheriff just is, he, he, he comes from San Francisco Police Department where he spent more than 30 years, retired as a deputy chief, and he was flabbergasted out and appalled at what had just happened, especially in the public lobby. Um, so I come back from my meeting and he tells me, "Sheriff," and he has tears in his eyes, he says, "I just got accused of drinking and being drunk." And I said, uh, "Dan, that's not true. Like, like, obviously, you know, I see you right here. I know you don't drink." I can, um, I can, I was close enough where I obviously knew that I could not, there was no alcohol on his breath. |
| | 00:40:03 | Uh, so I had asked him to go see his doctor and, uh, he went to take a, uh, both a drug and urine test for both drugs and, um, alcohol. And those test results came back negative. Um, those, um, sar- those captains had a, a duty, if they really thought he was drunk to, uh, disarm him and to report it to me as the sheriff. Uh, but apparently they didn't, obviously they didn't do that. And I, they, so they, the, the, when I brought this up to Mr. Silberman, he basically told me that, "You know, that, uh, those, the captains, you know, they are all well-spoken and, you know, |

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | they're gonna say you retaliated on them. And I'm not sure if the county will indemnify you if they file a lawsuit." |
|---|---|---|
| Thomas Mazzucco: | 00:40:56 | And so as part of the investigation, did you have the security guards that were present interviewed by your outside internal affairs investigator? Because of your concerns about your actual IA investigators, you hired an outside contractor, and did that outside contractor conduct an interview of security guards? And if so, what did the security guard say, all of which is on tape? |
| Sheriff Corpus: | 00:41:18 | Yes. Um, so the security guard, it wasn't our, um, our station security guard. He was there giving a break. Um, but he told him, "You know, I, I didn't, I thought they were deputies." He's like, "But I was like, wow, how could they say that and talk like that to the sheriff?" um, and heard that exactly what they accused him of being drunk and told him that they thought he was, uh, they could smell alcohol in his breath and accused him of obviously being drunk while on duty. |
|  | 00:41:47 | Um, the, um, our, our, um, primary security guard came back and reported that the security guard that was giving him, him a break advised him of the circumstances of what happened and that he was like, "I don't know how they could do that. They, they were talking to the sheriff and they were accusing him of being drunk, and that they smelled alcohol in his breath." And so they both test- they both gave testimony that, um, that, that corroborates what happened. Yeah. |
| Thomas Mazzucco: | 00:42:18 | Just to clarify one thing. Um, the, there was one, one witness, one of them, he had broken the other security guard? |
| Sheriff Corpus: | 00:42:25 | He went to give, he was giving him a break. |
| Thomas Mazzucco: | 00:42:27 | But they were both interviewed? |
| Sheriff Corpus: | 00:42:28 | They were both interviewed. |
| Thomas Mazzucco: | 00:42:29 | Okay. Sheriff Corpus, how serious is it to be accused of being drunk on duty as a cop? |
| Sheriff Corpus: | 00:42:35 | That's, that's serious. It's career-ending. And especially if he was the undersheriff and doing it in the, in, in, in the public lobby where people could hear, and the way that they, they, they, they circled him. So they had... one was behind him and the other two were on the side of him. So, you have to understand that in the sheriff's office, there are gangs in the sheriff's office that existed before the Millbrae Mafia. And the Millbrae Mafia |

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | used to call the Hispanics the cartel. And this mindset is still existing. Okay? And that was with the prior administration, the Millbrae Mafia. |
|---|---|---|
|  | 00:43:22 | Um, you have to understand, I'm trying to give you some context as to what I'm dealing with right now and why I'm trying to change and why the resistance and why there are people... And the worst part about this, that there's cops that are lying, people that are lying. Um, and that really bothers me 'cause if they're lying in this arena, what are they doing out when they're serving our community members? |
| Thomas Mazzucco: | 00:43:49 | So with reference, these three captains, there's currently a pending investigation that's, uh, we haven't seen the file, but it's almost complete, but you were advised by county counsel that it would look like retaliation if you did bring administrative proceedings against these three captains. Is that correct? |
| Sheriff Corpus: | 00:44:03 | That is correct. |
| Thomas Mazzucco: | 00:44:04 | And that would be David Silberman that gave you that advice, correct? |
| Sheriff Corpus: | 00:44:07 | Correct. |
| Thomas Mazzucco: | 00:44:10 | So that affects your ability to run the organization of the sheriff's department, is that correct? |
| Sheriff Corpus: | 00:44:14 | Right. And, and so when I asked for... The last straw with David Silberman was when he was screaming at me and talking over me and, um, disrespecting me like I've never been disrespected before. |
| Thomas Mazzucco: | 00:44:26 | How would you describe his behavior with you in terms of how he responds to you in emails, which we've seen many of, uh, with giving you advice? Would you describe as counsel giving you advice or somebody talking down to you in a misogynistic attitude? |
| Sheriff Corpus: | 00:44:40 | Um, the latter, and very condescending to me, almost as if I were, um, he was trying to exert his, uh, knowledge of the law, but also in a w- in a way where it made me like I was inferior to him. |
| Thomas Mazzucco: | 00:44:54 | Yeah. And just so, so the record's clear, I think, you know, obviously our hearing officer, Mr. Estrada, understand law enforcement agencies well. Law enforce- it... would it be safe to |

This transcript was exported on Jun 12, 2025 - view latest version here.

|                    |          | say that law enforcement agencies, well, it's not safe to say, it's a fact, law enforcement agencies are paramilitary organizations, is that- |
|--------------------|----------|---|
| Sheriff Corpus:    | 00:44:54 | Correct. |
| Thomas Mazzucco:   | 00:45:09 | ... correct? And that in order for a law enforcement agency to effectively be run, those in the agency who are given orders ha- must follow those orders unless they're being asked to break the law. Is that correct? |
| Sheriff Corpus:    | 00:45:21 | Correct. |
| Thomas Mazzucco:   | 00:45:22 | And are you having difficulties with the folks in your organization not following orders pursuant to your department general orders, or I call department, your office's depart- uh, general orders, or you find that there's difficulty in resistance and people are relying upon their political connections to other people in the county to avoid doing what you're asking them to do pursuant to what you ran and was elected to be the sheriff for? |
| Sheriff Corpus:    | 00:45:47 | That is correct. |
| Thomas Mazzucco:   | 00:45:48 | And who do they go to in the county? Who's their, who's their godfather, so to speak? We talked about- |
| Sheriff Corpus:    | 00:45:48 | Mm-hmm. |
| Thomas Mazzucco:   | 00:45:52 | ... the mafia here. It's a term I don't like, being Italian-American. |
| Speaker 2:         | 00:45:55 | (laughs) |
| Thomas Mazzucco:   | 00:45:55 | Uh, but, uh, it is what it is. Uh, who, who seems to be their godfather? Who is their protector throughout this, and who's the antagonist in this entire play that we have in front of us? |
| Sheriff Corpus:    | 00:46:06 | Yeah. Uh, Mike Callagy. |
| Thomas Mazzucco:   | 00:46:08 | And Mike- |
| Mr. Estrada:       | 00:46:08 | Just, can I just clarify one thing? |
| Thomas Mazzucco:   | 00:46:08 | Sure. |
| Mr. Estrada:       | 00:46:10 | I'm not the hearing officer. The pre-removal conference officer [inaudible 00:46:13]. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| | | |
|---|---|---|
| Thomas Mazzucco: | 00:46:12 | Yeah, pre- yeah, yeah. Okay. |
| Mr. Estrada: | 00:46:12 | Okay. |
| Thomas Mazzucco: | 00:46:15 | And, um, have you found, and I know that you requested an investigation and Mr. Callagy was allegedly from the investigators', uh, Oppenheimer Group that he hired. He was, they championed the fact that he had been, uh, exonerated. Um, but, uh, you had asked for that investigation. And why did you ask for that investigation? |
| Sheriff Corpus: | 00:46:36 | Because he was interfering in my organization. Um, you know, he, um, uh, in my, I've worked for three different sheriffs, and I've never seen a county executive be so intertwined in, uh, in backdoor deals with, um, members of my organization or my predecessors at the time when they were the sheriff. Uh, if anything, you know, he maybe had some advers- adversarial relationships because they would stand up to him and tell him, you know... He wouldn't even, I don't think even dare other than what, you know, approving, uh, budgets and going, uh, to, you know, the board for things, um, for things that were asked of the sheriff. I don't, he's, it, it was never anything o- other than that. |
| | 00:47:28 | So when I first came in, you know, my, my interview with him, it was just he and I in the room. He asked me in October of 2022 to come have a meeting with him. Um, I was the sheriff-elect. I wasn't the sheriff at the time. And, um, he called me in and talked to me about some rumors that he had heard. And I clarified that there are rumors and, um, explained to him what had occurred. And, you know, he did tell me and said, " You know, if you ever date anyone in San Mateo County, I need to be the first to know about it. I don't want any scandals." |
| | 00:48:05 | And, you know, he and I were in the room together. Uh, why would I make something up of, of that nature? If I wanted to make something up that was egregious, I would've said something totally different. I mean, that was very specific. I, you know, to me, it, it showed me how I was gonna be treated by him. |
| Thomas Mazzucco: | 00:48:27 | Okay. Other than using his position of authority to interfere with the process of running the Sheriff's Office, does he have authority over you to tell you who you can have a relationship with or not? |

This transcript was exported on Jun 12, 2025 - view latest version here.

| Sheriff Corpus: | 00:48:38 | I'm a 54-year-old woman. Uh, I would hope that nobody can tell me who I can and cannot date. Uh, nonetheless, the county executive. |
| --- | --- | --- |
| Thomas Mazzucco: | 00:48:57 | Okay. Now, some of these problems began with people unhappy with you being in office. Lemme step out for a second. People have said that from the day you got in the office, you had a target on your back. And I'm not gonna give up who that witness is at this point. It's a very high-ranking law enforcement official who eventually testify that she had a target on her back from day one. Tell us a little bit about that target on your back from day one, and we will present some evidence which may have precipitated some of the additional concerns coming out of other people in the county going after you. |
| Sheriff Corpus: | 00:49:35 | Yeah. Um, you know, uh, when I became the sheriff-elect, um, I won in the primary in June of 2022. Um, the then, uh, sheriff started making, uh, moves with personnel members and putting people strategically into positions that, uh, would really be harmful to me. Um, he also, um, would, was spending, uh, down the budget, so when I came in, I would still have six months of that budget that would've been left. |
| | 00:50:09 | Um, but when even, you know, he, he left the office, he was coming to work maybe one day a week after the primary. Um, we had vacancies, uh, about 100 vacancies at least. Um, there were no efforts to try and hire people. In fact, um, the, um, unions, at the time, the union president, DJ Wozniak, there were, uh, it was very contentious because they had gone without a contract for almost two and a half years. |
| | 00:50:46 | Um, when I was a captain, I was going to the board and asking them to please, you know, um, agree to the contract because we were losing people. People were leaving the organization. Um, and DJ Wozniak went on the record, uh, during a board meeting and called Mike Callgy a liar. So that relationship was strained, uh, because they weren't meeting anywhere in the middle to solidify and agree to a contract. |
| | 00:51:13 | Um, and, uh, you know, uh, he wasn't in the good graces of the union at that time. And so when I came on, they finally, uh, agreed to something in the latter part of 2022. Um, when I became the sheriff, um, or even prior to that, we were having some torrential rains and storms. On New Year's Eve, I wasn't the sheriff yet, but there was nobody from the executive team around. And so I was in the EOC trying to work and get resources and equipment to our coastside communities and |

This transcript was exported on Jun 12, 2025 - view latest version here.

other communities in the peninsula that were flooding. Um, the coast was disseminated.

00:51:55    Um, when I had my swearing in, um, I had asked for people to, um, they had sea- they were sea- um, we had, uh, reserved seating for people, especially county officials, other electeds. And, um, Mr. Callgy decided he was gonna sit towards the back of the room and he, um, wore jeans and a button-up shirt to kind of send me a message that, uh, he didn't think that this was so important, and, um, it, it really, uh, I, I knew that, uh, I was gonna have an uphill battle with him. Um, but, you know, the target started when, you know, um, I, uh, I had to leave people in place. So, traditionally in the Sheriff's Office, when I, at least my experience, if you did anything to the sheriff and, um, went, uh, crossed the sheriff, you would be, uh, you would be transferred to the jail. We don't have a transfer poli- policy at the Sheriff's Office, and so, um, everyone was fearful and would never, you know, cross that line because then they would be banished to the jail.

00:53:05    Um, so, uh, when I became the sheriff, as I said, there were key people in places, and I tried, and maybe it was to my detriment, but I left them in place. Um, normally, um, the Sheriff's Office does major, um, transfers in January and in July. I have not done any of those transfers because of the fact, first of the fact I wanted to show people that I was different, regardless if they supported my predecessor, that I was going to give them an opportunity. I just wanted them to do their work, and this was not political, and that I was different. Um, but that ended up working against me, um, because all of these people were still in, in play.

00:53:48    Um, and then it got to the point where, um, you know, all, this all started stirring up, and if I moved anybody, it would've been retaliation. So, um, a lot of these allegations that I retaliated on people and moved people are not factual. Um, there's a lieutenant by the name of Jonathan Sebring, who, um, was a pr- was in professional standards as a sergeant. He was there from 2018 until July of 2024. Um, I promoted him.

Thomas Mazzucco:    00:53:48    Mm-hmm.

Sheriff Corpus:    00:54:23    So I promoted him to the rank of lieutenant. And when I promoted him, I told him, "Sebring, you know, you'll be here for maybe about a year, but then you're gonna have to get moved out," because we, the organization doesn't move-

This transcript was exported on Jun 12, 2025 - view latest version here.

| Thomas Mazzucco: | 00:54:36 | Mm-hmm. |
|---|---|---|

Sheriff Corpus:    00:54:36    ...and it wouldn't be fair to him, either. He was there from 2018 in that position. And, um, he's, uh, he knew, he, and I promoted him even though he had not finished his bachelor's degree. To this day, I don't know if he finished his bachejor, bachelor's degree, but the prior sheriff, you had to have at least a bachelor's degree to get promoted to the rank of sergeant or a lieutenant.

00:54:58    And, um, so he was well aware that he was going to get transferred, and it's not punitive. Um, he accepted it when I promoted him, and he was a Bolanos supporter. Um, you know, uh, most of the people that I promoted were Bolanos supporters. Um, Mark Myers, uh, Eamonn Allen, uh, Bill Fogarty, um, you know, they, at the time, they were Bolanos supporters and I still promoted them. Um, Frank, you know, uh, most of the, the people that I promoted, I've not looked at who they supported or not. I've promoted them based on what I felt was their ability and their experience and, you know, the, uh, attributes that they could give to the future of the organization.

Thomas Mazzucco:    00:55:48    With reference to some of the changes you were trying to make in the Sheriff's Department, did you request a, you know, top-to-bottom audit of the Sheriff's Department, everything from command staff to hiring to diversity, to what the food's gonna be served in the jail? Did you request that?

Sheriff Corpus:    00:56:04    I did.

Thomas Mazzucco:    00:56:05    And who did you, and then did you hire an organization to perform that?

Sheriff Corpus:    00:56:07    Yes. It's an-

Thomas Mazzucco:    00:56:08    And who did you hire?

Sheriff Corpus:    00:56:09    It's an organization called Melioria. And so, in 167 years, uh, the Sheriff's Office has never really had an outsider come in and take a look at best practices or, just because something has always been done a certain way. I really wanted them to give me a perspective of these professionals, and they're all law enforcement retirees from different parts of the country who come into an organization and they'll talk to employees, uh, they'll look at best practices, they'll look at policies, they'll look at structure, and then they give a report, um, which was a s- over 700 pages, um, for the Sheriff's Office.

This transcript was exported on Jun 12, 2025 - view latest version here.

| | | |
|---|---|---|
| Thomas Mazzucco: | 00:56:51 | And part of that was 'cause you're trying to move into 21st century policing and, and changing how the Sheriff's Office does business, correct? |
| Sheriff Corpus: | 00:56:58 | Correct and als- also for transparency, um, because I, I really wanted them to give me a perspective of, is this really how it should be working or i- should you change, you know, the way that you're doing things, just because it was done like that for so long? And, and I really wanted to show the community that I was open to constructive criticism of the organization, which most, um, you know, talking to other sheriffs, they thought I was crazy for doing this because, you know, some negativity could come out of it, um, and you could be criticized. But I said, "Well, I'm just, I inherited a, an o- an organization that needs some change." |
| Thomas Mazzucco: | 00:57:37 | So I'd like to provide for our hearing officer and counsel, uh, the San Mateo County Sheriff's Office Organizational Assessment, which was published on July 1st, 2024. And that's a significant date. Um, we actually have, uh, a binder. Now wait, sorry. |
| Speaker 3: | 00:57:55 | It's right next to you. |
| Thomas Mazzucco: | 00:57:57 | Where is it? |
| Speaker 4: | 00:57:57 | It's here. Right here, too. |
| Thomas Mazzucco: | 00:57:59 | There we go. For your casual reading. (laughs) |
| John Keene: | 00:58:02 | A little, a little evening reading. |
| Thomas Mazzucco: | 00:58:02 | Yeah, just a little, a little homework for tonight, I apologize in advance. And there's some highlights in that organizational assessment which may explain why, what are the best practices and why, what Sheriff Corpus has done and why there's backlash. So when you, let's start with the backlash, when you started asking for this report, you asked for it, was there a concern amongst county leadership about this report? |
| Sheriff Corpus: | 00:58:27 | Yes. So, um, they, um, had somehow, uh, someone went to, um, the board of supervisors, uh, John Nibbelin, to tell them that there was something in the report that they believed I was trying to hide, uh, where it went to the point where Noelia Corzo herself had asked me for coffee on a Sunday morning. Uh, I met her in Burlingame on the waterfront. We walked, and she said that she had concerns about what was in the report. It was in a draft form at the time. She said, "Well, I'm hearing that |

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | there's stuff about Victor in that report and we wanna see it now." And I said, "Well, it's in draft report." And I had some concerns about it getting leaked out, um, because it was still in draft report, and I had not gone through the entirety of the report, as you can see that it's, uh- |
|---|---|---|
| Thomas Mazzucco: | 00:59:19 | Mm-hmm. |
| Sheriff Corpus: | 00:59:20 | ... voluminous, right? And so, um, they, um, had, uh, she had mentioned that, "Well, then the board is gonna call in a special meeting and force you to do it, and you're not gonna like what the board's gonna do." And I said, "I have nothing to hide." |
|  | 00:59:38 | Um, so I contacted John Nibbelin and I said that I would give him a, um, paper copy of the report, which we printed out because I had concerns about giving an electronic form of the report as it was still in draft form. And I went back and forth with David Silberman because I had said, "Since when does anyone ever have to give a draft report?" or it's not PRA-able when it's in a draft report. And he felt otherwise. |
|  | 01:00:07 | Um, so, uh, I, uh, gave them a copy. Um, they came to pick it up at my office, um, the... I had, there was nothing to hide in that report. It really gives a perspective of, you know, um, how other law enforcement agencies run, but also kind of a deep dive into maybe some enhancements we could make, best practices. And they talked to employees throughout the organization, and I didn't hand-pick anybody. They talked to whoever they wanted to. I, I didn't put any ground rules down for them. |
| Thomas Mazzucco: | 01:00:38 | And that port, that report was eventually published on July 1st of 2024. And, um, what did you learn that happened about approximately a week later or two weeks later? Did County Executive Mike Callagy decide to commission his own report better known as the Judge LaDoris Cordell report? |
| Sheriff Corpus: | 01:00:57 | Yes. |
| Thomas Mazzucco: | 01:00:58 | And you were told about that report and you were told it was basically focusing on Victor INJ, is that correct? |
| Sheriff Corpus: | 01:00:58 | Correct, and whistleblower complaints- |
| Thomas Mazzucco: | 01:01:03 | Whistleblower complaints. |
| Sheriff Corpus: | 01:01:05 | ... about Victor. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| | | |
|---|---|---|
| Thomas Mazzucco: | 01:01:06 | Of Victor. And so there was a, this report that was published given to everybody for the world to see with some incredible recommendations, and then the County decided to do somewhat of their own audit through Judge Cordell. Is that correct? |
| Sheriff Corpus: | 01:01:06 | That is correct. |
| Thomas Mazzucco: | 01:01:20 | Um, with reference to this report, you know... First of all, let's put something on record. Do you, are you in a romantic relationship or have you been in a romantic relationship with Victor INJ? |
| Sheriff Corpus: | 01:01:33 | No. |
| Thomas Mazzucco: | 01:01:34 | There's been numerous rumors, allegations from folks about you, uh, favoring Victor because you are in a relationship with him. Is that true? |
| Sheriff Corpus: | 01:01:34 | No. That is not true. |
| Thomas Mazzucco: | 01:01:44 | Do you have a relationship with him because he worked on your campaign? |
| Sheriff Corpus: | 01:01:48 | I have a relationship with Victor for over, almost close to 18 years. I know his family. Um, his, uh, daughter, uh, helped me on my campaign, which I paid her. Um, we did podcasts together. She helped me with social media. Uh, Victor was a volunteer on my campaign and, um, I brought him on, um, to the Sheriff's Office because of his time as a level-one reserve, uh, working in the organization, volunteering his time, um, for over 18 years, um, to the organization, but then also because he shared the same vision of 21st-century policing. |
| | 01:02:30 | So he knew the, the organization. He has a doctorine degree, a PhD, which Judge Cordell in the report basically said he did not have a doctorine degree. Um, he's provided his transcripts, um, but also, he has a business sense. And when I was talking to the civilian employees who, prior to me bringing Victor on, they had to report to a assistant sheriff, uh, a sworn officer they felt that they weren't really being championed for. They felt like they were the kind of stepchildren of the organization. And I really wanted to change that perspective because we can't do and run the organization without our civilian staff. |
| Thomas Mazzucco: | 01:03:17 | So in this report that we're talking about, Melio- Meloria report, do they recommend a civilian director with business experience |

This transcript was exported on Jun 12, 2025 - view latest version here.

and organizational background to serve as either an executive director or a chief of staff, but a civilian director to serve within the Sheriff's Department to handle a lot of the administrative work?

| | | |
|---|---|---|
| Sheriff Corpus: | 01:03:38 | They do. |
| Thomas Mazzucco: | 01:03:39 | And then they recommend that it's right at the very beginning that there's a recommendation. They also interviewed Victor. And what did they say about Victor's role and what was their thought about that as they prepared this report in ju- that was finally released in July of 2024? |
| Sheriff Corpus: | 01:03:52 | Yeah. They thought that, you know, it was fitting in with the 21st-century policing model. There were other law enforcement agencies that have this kind of the same, uh, structure. Uh, Santa Clara Sheriff's Office. San Francisco PD has, um, you know, uh, different, uh, command, uh, people on their executive team or command staff that are civilians that actually have badges that they give them. Um, and LAPD has the same model, LA Sheriff's Office. |
| | 01:04:23 | So I wouldn't be the first one to do this, but it really does make a difference because you do have someone that, you know, you have the law enforcement experience, the knowledge of the organization, but also the business acumen that we need as an organization. You have to run the organization almost like a business. And I think in law enforcement we always have these, you know, uh, horse blinders on that we have to just be a certain way. And unless you start looking at, you know, it from a larger lens, you're just gonna keep repeating what we've done for 167 years. |
| Thomas Mazzucco: | 01:05:03 | So did you get backlash from folks for having Victor in a position as your chief of staff? |
| Sheriff Corpus: | 01:05:11 | Yes. |
| Thomas Mazzucco: | 01:05:12 | And when you bought Victor on to be your chief of staff, he was still also ironically a law enforcement officer, 'cause he was wor- he was a, an active reserve that served for 18 years. Um, and you told us there was, he actually served in the gang unit, worked in cold cases, and was a range master. So he wasn't just out directing traffic, is that correct? |
| Sheriff Corpus: | 01:05:31 | Correct. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| Thomas Mazzucco: | 01:05:31 | And so he had the added benefit of having organizational business experience in addition to understanding the organization and understanding what the boots on the ground do, the men and women who serve every day, you know, out on the street protecting the public. Is that correct? |
|---|---|---|
| Sheriff Corpus: | 01:05:45 | That's correct. |
| Thomas Mazzucco: | 01:05:46 | So it's recommended in this report. Uh, the report actually lauded the work that Victor is doing. What happened to Victor's position after that and who removed him? |
| Sheriff Corpus: | 01:05:56 | Um, so the, um, I was, um, I had several meetings with, um, the county executive and the coun... |

PART 2 OF 4 ENDS [01:06:04]

| Sheriff Corpus: | 01:06:00 | I had several meetings with, um, the county executive, Mike Callagy and Rocio Kiryczun, who basically told me that I should remove Victor, um, in the beginning, um, when he was part of my transition team. They, uh, took away his contract. Um, I brought him on then as a contractor, um, while we were looking at creating this Chief of Staff, uh, Director of, uh, Administration. |
|---|---|---|
| | 01:06:26 | And, um, uh, he, um, I was brought in by Rocio and Mike Callagy to tell me that regardless if it's true or not, the perception that it looks bad and you should let him go. And I told them that, you know, he brings a lot of, um, sh- and shares the vision that I have for the movement, forward movement of 21st century policing for the organization. And he's done nothing wrong. I, you know, uh, no one ever brought any of their gripes or anything to me. Uh, I think really behind this is they just didn't want him there, uh, because they thought in their eyes that he was taking the position of a sworn officer when, you know, in any administration, uh... |
| | 01:07:15 | I'll give you an example. Um, when Carlos Bolanos was the sheriff, uh, Ed Wood was the, um, Chief of Police for the City of Burlingame. He was, um, almost, uh, at the end of his career. And, uh, Carlos Bolanos's son, uh, was having a hard, difficulty getting hired as a police officer. And so, um, he, uh, Ed Wood had a conversation with, this is very well known, with, uh, with, uh, Bolanos and, um, Ed said, "I'm gonna do you a favor. I'm gonna hire your kid." So, he hired Mike Bolanos as a police officer. |

This transcript was exported on Jun 12, 2025 - view latest version here.

|  | 01:07:55 | Um, Carlos Bolanos goes to Mike Callagy and says, "Hey, we really need a number two at the 911 system at County Communications." Uh, at the time, Bob Lotti, who is Ed Wood's best friend, was the number one at, uh, County Comm. Uh, and then Ed Wood retires and then comes over as the number two for County Communications. Uh, he was there for about a year. Within that year, he hired Carlos Bolanos's daughter as a dispatcher. |
|---|---|---|
|  | 01:08:28 | And then, um, there's allegations, uh, brought against Ed Wood of sexual harassment by a dispatcher by the name of Christina Cross. While that's happening, um, a third assistant sheriff position is created for the San Mateo County Sheriff's Office, and Ed Wood becomes the third assistant sheriff for the San Mateo County Sheriff's Office when we previously only had two. |
| Thomas Mazzucco: | 01:08:54 | So, you know, these are assuming for the sake of argument, they're arguing because they assume you have a relationship with Victor. He should not be in that position. Plus, the fact they don't like that you civilianized a command staff position, so to speak, even though it's a civilian director, not necessarily within the chain of command. In the chain of command, Victor only oversaw civilians, is that correct? |
| Sheriff Corpus: | 01:08:54 | That is correct. |
| Thomas Mazzucco: | 01:09:15 | So, he never oversaw sworn law enforcement officers? |
| Sheriff Corpus: | 01:09:18 | He never oversaw sworn- |
| Thomas Mazzucco: | 01:09:18 | Okay, great. |
| Sheriff Corpus: | 01:09:18 | ... law enforcement officers. |
| Thomas Mazzucco: | 01:09:22 | Um, and I just wanna address one other issue that goes to context in some of who, well, these complaints are coming from. Uh, one of the people making the allegation that you were having a relationship or an affair with Victor, um, is Valerie Barnes. |
| Sheriff Corpus: | 01:09:35 | Correct. |
| Thomas Mazzucco: | 01:09:36 | And Valerie Barnes, uh, was close with you at one point? |
| Sheriff Corpus: | 01:09:42 | Um, she worked for me in Millbrae, but I knew to keep her at a arm's length distance because Valerie Barnes was the best friend of Christina Bolanos for many, many years. And Valerie |

This transcript was exported on Jun 12, 2025 - view latest version here.

had tried to get promotions through Carlos Bolanos's or his, at, when he was the sheriff, and, uh, they fell flat, um, because she has a reputation for being, um, very loud, for, um, acting a certain way, uh, not being very professional.

01:10:15     And, um, so when she wanted, she approached me to help me, um, I, I, I do believe that she'd thought she would have an opportunity to have more opportunity with me, um, as the sheriff. Uh, so when she did that and started helping on my campaign, I just go back to, you have a over 15-year relationship, best friend where you are at the Bolanos's home, and then you turn, how could... I just thought about Christina Bolanos and how she felt and how, uh, what kind of, told me a, a bit about her character.

01:10:54     Um, so Valerie Barnes, uh, worked for me, um, in Millbrae. She was a legal office specialist. And, um, she also, uh, volunteered on my campaign as well. Um, and she, uh, believed that I was going to, uh, promote her, um, if I won the election. Um, Valerie Barnes, uh, when we, when I was the sheriff-elect and I was still in Millbrae, I didn't want any problems. I had asked her... She had gone over on her vacation, uh, a- along with another, with another, with a sergeant, and I told them both, "Hey, you guys can't take any more vacation."

01:11:37     Uh, she, uh, had a son that was, um, in college down in Southern California area, I believe in Santa Barbara. Um, she, um, said, "Well, I have to take my vacation. I'm gonna go spend time with my family." And I said, "Well, I don't wanna get caught up in... Right now, we only have a few more months. Like, let's not get caught up." And then, um, the very next day, she went to the firehouse adjacent to, um, the Millbrae Police Station and, um, called me and said she was, uh, going to get transported by ambulance. And, uh, right before Thanksgiving, went out on a workers' comp disability.

Thomas Mazzucco:     01:12:13     And did Valerie Barnes have any conversations with, uh, a very high-ranking county slash city official about what her intent was with you and what she would do if she was not promoted?

Sheriff Corpus:     01:12:23     Yes.

Thomas Mazzucco:     01:12:24     What did she say?

Sheriff Corpus:     01:12:25     Uh, on, I wanna say, at least a dozen occasions, uh, told, um, this official that, um, "If that fucking bitch doesn't give me a

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | promotion, she's gonna regret it and I don't care what I have to do." |
|---|---|---|
| Thomas Mazzucco: | 01:12:39 | And since you've been in office and since Valerie Barnes no longer works directly for you, has she been involved in the campaign against you, including, but not limited to setting up what you assume are fake websites and cyber stalking you? |
| Sheriff Corpus: | 01:12:52 | Yes. |
| Thomas Mazzucco: | 01:12:53 | And did we refer that to the District Attorney's Office for investigation? |
| Sheriff Corpus: | 01:12:56 | We did. |
| Thomas Mazzucco: | 01:12:57 | And what leads you to believe that it's Valerie Barnes that's putting up these fake accounts and saying terrible things about you? Uh, just give them a little flavor about what's on these accounts. We don't wanna spend too much time with it. |
| Sheriff Corpus: | 01:13:07 | There's, uh, pictures of, um, where they superimpose my head, a woman naked, laying on a bed, and then like a little version, like a, a, like a character almost that with, with Victor's head on there and, you know, some pretty disgusting things on there. Um, they talk about my son. I have a son who is autistic. Talk about my child on there. Um, took a photo that it only exists in my office of, um, my daughter at my swearing in and stated some poor things about my daughter and about my parenting. |
|  | 01:13:43 | Um, there's also, um, a, a photo that recently happened that has recently been posted on her, on the X account where, um, I'm at in Mill- in Millbrae and I have on my cell phone, I have, um, my speech that I'm gonna, uh, pres- that I'm gonna say when it, it was a David Chetcuti who was a Millbrae officer. It was his 26th anniversary of his death. And so, I'm looking at my phone because I'm just kind of going over my speech while Captain Eamonn Allen is speaking. And she was directly there and she was taking photos. And so then, the next minute, you know, there's a photo of me, saying, "Christie can't even pay attention when, you know, we're having such a memorable, you know, remembering the, uh, the legacy of Dave Chetcuti." And she was the only one that was standing right directly and she was taking photos. |
|  | 01:14:39 | So, you know, her, um, her mother actually sent an attorney by the name of Paula Canny to speak to Matt Fox, who was a captain at the time. And, uh, the relationship there is Valerie |

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | Barnes's mother, Denise Barnes, works at a dentistry office in the Castro. That's the dentist, the dentistry office that Paula Canny goes to, so that's how they became family friends. Um, Paula Canny goes to Matthew Fox and says, "Hey, I got a message for you. If your boss doesn't give Valerie Barnes a promotion, she's gonna regret it." |
|---|---|---|
| Thomas Mazzucco: | 01:15:23 | So, Valerie Barnes is not a credible witness against you, fair to say? |
| Sheriff Corpus: | 01:15:27 | Fair to say. |
| Thomas Mazzucco: | 01:15:28 | Okay, um... |
| Alfonso Estrada: | 01:15:36 | Counsel, sorry to interrupt you. Um, how, how much, uh, longer do you have? |
| Thomas Mazzucco: | 01:15:41 | That's a good question. Probably about another hour or so. |
| Alfonso Estrada: | 01:15:43 | Okay. Um, if you need a bathroom break. |
| Thomas Mazzucco: | 01:15:46 | Let's take a bath... It's actually a time for a break. |
| Alfonso Estrada: | 01:15:49 | Yes. Okay. All right. Uh, we're gonna be taking a break and pausing our recorders. The time is, uh, 10:24. |
| Thomas Mazzucco: | 01:15:58 | Thank you so much. |
| Alfonso Estrada: | 01:16:00 | Okay. We are, uh, back on tape. The time is 10:40 AM, June 11th, 2025 here back at, uh, uh, the conference room. Um, and then, uh, Chief, uh, is there anything you'd like to say before we, uh, continue? |
| John Keene: | 01:16:16 | Yes. So, Sheriff, we want to just say thank you so much for, um, taking the time to, to walk us through, um, your earlier statements. We know this is not easy, and, um, just the time and care that you've taken up to this point has been extremely admirable 'cause we know it's been a difficult process for you. Um, we would like to know if it would be, if you would be willing to, um, narrow your focus and speak a little bit to maybe a specific space at this point, if that's okay. Um, we would like to hear a little bit about, uh, your thoughts or your attorney's thoughts about the allegation, um, around the Tapia issues. |
| Sheriff Corpus: | 01:16:16 | Mm-hmm. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| John Keene: | 01:16:52 | Um, if you want to speak to that and, um, give us a little bit of your perspective about what the notice is about, uh, the arrest of Mrs. Tapia. |
|---|---|---|
| Thomas Mazzucco: | 01:17:00 | Again, just for the record, you know, we were concerned. We received, we reached out to Carlos Tapia's counsel- |
| John Keene: | 01:17:07 | Mm-hmm. |
| Thomas Mazzucco: | 01:17:07 | ... by way of email. This is, as you are well aware, that this matter is also, you know, set for in a civil grand jury, be conducted by the DA. Um, and we asked for permission to speak freely about this, about the allegations against Carlos Tapia, and we were told no, they weren't gonna waive their POBR rights- |
| John Keene: | 01:17:07 | Okay. |
| Thomas Mazzucco: | 01:17:27 | ... under 32.7. There are some things we can talk about that would give you some food for thought, uh, and things to work with- |
| John Keene: | 01:17:34 | Okay. |
| Thomas Mazzucco: | 01:17:35 | ... regarding the Carlos Tapia matter as predominantly dealing with the lead investigator, Matt, Matthew Fox. |
| John Keene: | 01:17:42 | Mm-hmm. |
| Thomas Mazzucco: | 01:17:43 | Um, who has best been said by DA Steve Wagstaffe is that he's all over the place. |
| John Keene: | 01:17:48 | Mm-hmm. |
| Thomas Mazzucco: | 01:17:48 | Um, so what we can do for you is, uh, you know, Jim, I think we can talk to some generalities or- |
| John Keene: | 01:18:01 | Well, Counsel, that and if you feel- |
| Thomas Mazzucco: | 01:18:04 | Well, we can give you what's not in his personnel file, from his personnel file. |
| John Keene: | 01:18:07 | Okay. |
| Thomas Mazzucco: | 01:18:08 | So, here's what we'll do- |
| Speaker 5: | 01:18:09 | W- w- we're, we're working on the Hobson's choice. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| Thomas Mazzucco: | 01:18:12 | Yes. |
| | | |

| Speaker 5: | 01:18:13 | We have to be very careful, but we really want you to hear as much as we can tell you- |

| Thomas Mazzucco: | 01:18:17 | Yeah. |

| Speaker 5: | 01:18:18 | ... without putting the sheriff in a crack, so to speak. |

| John Keene: | 01:18:18 | Understood. |

| Thomas Mazzucco: | 01:18:21 | And so, what we will provide to you is, it's a very important document for all of us. That a hundred, how many years of prosecutorial experience sitting in this room. |

| Alfonso Estrada: | 01:18:31 | A thousand. |

| Thomas Mazzucco: | 01:18:32 | (Laughs) Just about. Um, we'll provide to you a document, Superior Court San Mateo County Crime Summary Information, Probable Cause Declaration, declaration by Captain Fox under penalty of perjury, that there's probable cause for the arrest of Deputy Carlos Tapia. And that's a document under penalty of perjury as- asserting that there's probable cause for the arrest. |

| Sheriff Corpus: | 01:18:58 | I think he was an assistant sheriff at the time. |

| Thomas Mazzucco: | 01:19:03 | Oh, the assistant sheriff. I'm sorry about that. I apologize. Um, we'll also gonna submit to you for the record regarding, uh, if in fact, Deputy Fox has changed his story, uh, Assistant Sheriff Fox has changed the story. |

| John Keene: | 01:19:15 | Mm-hmm. |

| Thomas Mazzucco: | 01:19:15 | Which we understand he has. An email that was sent to Sheriff Corpus and I'll read it into the record. It's essentially dated November 28th, 2024 at 1:48 PM. Christina, I wanted to send you an email and thank you for the opportunity you presented to me at the sheriff's office. For my first days, I always wanted to show up for you, comma, the SO, and carry out your vision each day. I'm forever grateful for that opportunity. I was always your biggest supporter and still root for you amongst all the odds and gang mentality you face every day. |

| | 01:19:56 | Having said that, I had to look out for my mental health and family concerns during my last month in office. I'm sorry I couldn't walk with you any more side by side, for that is my biggest regret in 26 years of law enforcement. I assume you |

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | hate me. And for that, I understand. May God watch over you and those that cut you one day realize that they will be on the wrong side of history. |
|---|---|---|
|  | 01:20:21 | You're a good person and only wanted what was best for the office. You did great things and hopefully can be continue in the eyes of the odds stacked against you. There are no winners in this. And, and for that, makes me sad. Until next time, God bless and hopefully, one day, we can meet again and life, laugh like we used to. Forever grateful, Matthew. |
|  | 01:20:46 | Um, there's also concerns about was there probable cause for an arrest? You've got this document saying there was. |
| John Keene: | 01:20:46 | Mm-hmm. |
| Thomas Mazzucco: | 01:20:57 | And you may want to ask, uh, DA Wagstaffe if he has told other people that there was actually probable cause for the arrest. Is there anything further I can add to that? Maybe I could ask a question. Sheriff, did you actually participate in this investigation? |
| Sheriff Corpus: | 01:21:11 | No. |
| John Keene: | 01:21:11 | Mm-hmm. |
| Thomas Mazzucco: | 01:21:12 | Did you assign it to Matthew Fox 'cause he's an experienced white collar crimes investigator? |
| Sheriff Corpus: | 01:21:16 | Yes. |
| Thomas Mazzucco: | 01:21:17 | He was your undersheriff, correct? I mean your assistant sheriff. |
| Sheriff Corpus: | 01:21:19 | Assistant sheriff, yes. |
| Thomas Mazzucco: | 01:21:20 | And why did you sign it to him and not somebody in IA? |
| Sheriff Corpus: | 01:21:23 | Uh, because of the fact that it was, uh, you know, so sensitive and, um, the people that are assigned to Internal Affairs are part of the OSS. |
| Thomas Mazzucco: | 01:21:37 | Okay. And OSS meaning your Internal Affairs investigators are members of the DSA and the Sheriff's Sergeant's Union, correct? |
| Sheriff Corpus: | 01:21:46 | The Sheriff's Sergeant's Union, yes. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| | | |
|---|---|---|
| Thomas Mazzucco: | 01:21:47 | Yeah. And then one last question I could ask you without getting into the personnel file, did, did Assistant Sheriff Fox come back to you and say he had a meeting with a, a, an assistant DA? |
| Sheriff Corpus: | 01:22:03 | Uh, yes, Shin-Mee. |
| Thomas Mazzucco: | 01:22:05 | And Shin-Mee is the first assistant district attorney in San Mateo County? |
| Sheriff Corpus: | 01:22:09 | Yeah, she's the number two in, uh, under Steve Wagstaffe. |
| Thomas Mazzucco: | 01:22:13 | And what did Assistant Sheriff Fox tell you? |
| Sheriff Corpus: | 01:22:16 | That he went over, had a meeting with her, showed her what he had, showed her the files, and that she said that there was enough probable cause for the arrest. |
| Thomas Mazzucco: | 01:22:25 | Did he talk about how overwhelming the evidence was? |
| Sheriff Corpus: | 01:22:27 | He did. He told- |
| Thomas Mazzucco: | 01:22:29 | And did you, did you take him for his word on that? |
| Sheriff Corpus: | 01:22:30 | I had nothing but to take him on his word on that. |
| Thomas Mazzucco: | 01:22:33 | At any point, did you withhold or refuse to show him any documentation or evidence? |
| Sheriff Corpus: | 01:22:38 | No. |
| Thomas Mazzucco: | 01:22:44 | Did you receive a phone call today from your chief as your fiscal person? |
| Sheriff Corpus: | 01:22:48 | Yes. |
| Thomas Mazzucco: | 01:22:49 | And what is her name? |
| Sheriff Corpus: | 01:22:50 | Uh, Stacy Stevens. |
| Thomas Mazzucco: | 01:22:51 | And what did she tell you today? |
| Sheriff Corpus: | 01:22:52 | Uh, she told me that she was, had, she wouldn't be meet, uh, being able to attend our command staff meeting because she was being called, uh, to give testimony elsewhere. |
| Thomas Mazzucco: | 01:23:05 | And did she tell you that they wanted to prepare her for her testimony? |

This transcript was exported on Jun 12, 2025 - view latest version here.

| | | |
|---|---|---|
| Sheriff Corpus: | 01:23:10 | Yes. She said that the District Attorney's Office, um, was upset with her because she, um, they wanted her, they wanted to prepare her for her testimony, uh, for today. And, uh, she asked if she could record that testimony and they became bothered. And, um, she never went to the, uh, to, to the meeting that they had scheduled. |
| Thomas Mazzucco: | 01:23:33 | And with reference to what you... We're not gonna assume anything because it is a grand jury, but did she tell you that somebody had leaked information to her regarding the Keker report and the allegations that are here before us today? |
| Sheriff Corpus: | 01:23:46 | Yes. |
| Thomas Mazzucco: | 01:23:47 | And what did she say about information that in the report that she had heard people said, and I hate dealing levels of hearsay, but in that report, did she hear that somebody misrep- that the report misrepresented your knowledge of whether or not there was a coding error? |
| Sheriff Corpus: | 01:24:05 | That is correct. |
| Thomas Mazzucco: | 01:24:06 | And that she never told you that there was anything related to a coding error? |
| Sheriff Corpus: | 01:24:10 | In regards to Carlos Tapia, no. |
| Thomas Mazzucco: | 01:24:12 | Okay. Uh, that's all we can go at this point. |
| Speaker 5: | 01:24:12 | Mm-hmm. |
| Thomas Mazzucco: | 01:24:14 | That's all superficial, I think. |
| Speaker 5: | 01:24:16 | How about the, um, manner of the taking, booking him? |
| Thomas Mazzucco: | 01:24:19 | Yeah, we could talk about that too. |
| Speaker 5: | 01:24:19 | Mm-hmm. |
| Thomas Mazzucco: | 01:24:20 | So, there's allegations that, you know, you humiliated Deputy Tapia and all that, uh, when he was... Tell us a little bit about the process and did you even contact the press or did he to have this filmed? |
| Sheriff Corpus: | 01:24:33 | No. |
| Thomas Mazzucco: | 01:24:34 | Tell us about the process- |

This transcript was exported on Jun 12, 2025 - view latest version here.

| | | |
|---|---|---|
| Sheriff Corpus: | 01:24:34 | No. |
| Thomas Mazzucco: | 01:24:35 | ... you afforded him. |
| Sheriff Corpus: | 01:24:36 | So, there were, uh, s- suggestions made by, uh, Assistant Sheriff Fox to, um, arrest, uh, Carlos Tapia at the airport because he was coming back from Las Vegas. And I said, "Absolutely not, that's... I'm not gonna humiliate him. And it's, it's not a crime that would meet that standard." Also, um, to go to his home and I said, "No, we're not doing that. He has family." And I asked for them to contact his attorney to do a, just to come in and, uh, turn himself in. |
| | 01:25:08 | Uh, we cleared the jail. Uh, we afforded him every, um, you know, every thought that I thought that would be, uh, uh, humiliating for him. Uh, we cleared the jail. He was never put in handcuffs. He was never put into a search style. He was basically processed and then put into an office with a telephone where he waited for his attorney to bail him out. |
| Speaker 5: | 01:25:32 | And media. |
| Thomas Mazzucco: | 01:25:35 | And the media showed up, is that correct? |
| Sheriff Corpus: | 01:25:37 | They did. |
| Thomas Mazzucco: | 01:25:37 | Did you call the media? |
| Sheriff Corpus: | 01:25:38 | I did not. |
| Thomas Mazzucco: | 01:25:39 | Who did? |
| Sheriff Corpus: | 01:25:40 | Carlos Tapia. |
| Thomas Mazzucco: | 01:25:42 | So, I also like to move into one of the allegations regarding Deputy Acosta. Um, there's, assuming there's retaliation against Deputy Acosta related to the fact that his brother is, uh, met, uh, executive at the Sergeant's Union. Can you please tell us a little bit about the administrative proceedings you have moving forward against Deputy Acosta and why there is an investigation? Is there still an investigation at this point? |
| Sheriff Corpus: | 01:26:10 | There is. |
| Thomas Mazzucco: | 01:26:11 | Okay. So, I think we ought to be a little... Counsel, your thoughts? |

This transcript was exported on Jun 12, 2025 - view latest version here.

| John Keene: | 01:26:16 | Yeah, I think we need to be careful with that. I mean, it is currently in process. We want to certainly protect their POBR rights. Um, hmm. |
| Thomas Mazzucco: | 01:26:29 | I mean, I think it, it's, uh, we would love to respond to it. |
| Speaker 5: | 01:26:37 | Outside of the investigation, a family member came and talked to her? |
| Thomas Mazzucco: | 01:26:40 | That is correct. Did a family member of an alleged victim come talk to you about Deputy Aco- Deputy, Deputy Acosta's actions as a deputy? |
| Sheriff Corpus: | 01:26:51 | It was actually, um- |
| Speaker 5: | 01:26:52 | Mm-hmm. |
| Sheriff Corpus: | 01:26:52 | ... Mason Locke who works for the, um, Sheriff's Activities League, uh, asked me if I would talk to, um, uh, the victim, uh, because she wanted to talk to a female and felt comfortable talking to me. Um, so I, um, brought her into my office with an HR manager, our HR manager, our internal HR manager, because I was not, I had no, uh, idea of what she was gonna tell me. |
| Thomas Mazzucco: | 01:27:25 | And what did she say to you? |
| Sheriff Corpus: | 01:27:31 | That, um, she wanted to report to me of the behavior of the sergeant, um, because she didn't want, um, anything to happen to another intern that happened to her. |
| Thomas Mazzucco: | 01:27:43 | I think that's it. |
| Speaker 5: | 01:27:43 | Mm-hmm. |
| Thomas Mazzucco: | 01:27:54 | Let's talk about Sergeant Jimmy Chan. |
| Sheriff Corpus: | 01:27:57 | Sure. |
| Thomas Mazzucco: | 01:27:59 | Did you retaliate against Sergeant Chan by transferring from pr- Professional Standards in recruiting to investigations at the airport? |
| Sheriff Corpus: | 01:28:09 | No. |
| Thomas Mazzucco: | 01:28:09 | Why did, why was he in Professional Standards and why was he transferred? |

This transcript was exported on Jun 12, 2025 - view latest version here.

| | | |
|---|---|---|
| Sheriff Corpus: | 01:28:13 | Uh, so as I stated previously, when I became the sheriff, um, we were down over a hundred, um, deputies and some other civilian positions. Uh, so I created a, um, a, a internal, uh, recruitment team. And so, I added a position to Professional Standards. Traditionally, we only had one sergeant assigned to Professional Standards. Um, but I, um, added a secondary sergeant that would primarily help with recruitment. So, I brought on two, um, detectives to be the recruitment, um, team. And, um, they reported to the, um, sergeant that was the, um, addition to the Professional Standards Bureau, but really based on focus on recruitment and we, uh, and, uh, re-recruitment efforts, um, for the organization. |
| Thomas Mazzucco: | 01:29:08 | And so, at some point, did you reach pretty much at this point your maximum staffing with a margin of error of about 30 deputies? Is that correct? |
| Sheriff Corpus: | 01:29:15 | That's about 27, I think, last checked it. |
| Thomas Mazzucco: | 01:29:18 | Yeah. And so, did you, did you continue to need Sergeant Chan in Professional Standards in recruiting role being that you're pretty much at full staffing? |
| Sheriff Corpus: | 01:29:26 | N- no. In fact, he actually started really taking on a role of doing, um, internal investigations where he was, uh, again, no memos to me, not advising me and just kind of going, uh, and starting his own investigations without approval from the executive team. Um, so, uh, you have to understand there's a influx of, we have some retirements before we did a sergeant's promotional process. So, I just concluded a sergeant's promotional process. |
| | 01:29:59 | Um, and so, the Investigations Unit, we have something that's called, um, a Measure K funding, that we get funding to have detectives at the airport. Um, San Francisco PD takes on primarily the, um, safety of the, uh, airport. It's in San Mateo County, but our detectives do all of the investigations, um, for the entire airport. And so, it becomes, uh, you know, a lot of workload. And we, um, had a vacant sergeant there because a sergeant just retired, uh, and moved to San Diego. |
| | 01:30:36 | So, um, to make best use of that position, and Jimmy Chan was assigned as a detective before to the airport, I thought just to fill in the gap that he be temporarily assigned. It's a TDY, which traditionally, in the sheriff's office, we've always done for business needs, for needs of the organization. Uh, that is funded, um, you know, through Measure K. And, uh, it made most sense to put him there because of the fact that we didn't |

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | need him for the recruitment part of it. And the IAs were manageable for Sergeant Fala at the time and it's just a temporary until we get more staffing or staffing levels get better. |
|---|---|---|
| Thomas Mazzucco: | 01:31:21 | So, is that an inferior assignment or is one of the, is that one of the premier assignments for the sheriff's department? |
| Sheriff Corpus: | 01:31:26 | Well, if I were a detective sergeant, I'd wanna be at the airport. Your, uh, view, uh, of the airport is on the tarmac and you get to see the airplanes, you know, taking off and landing all day long. |
| Thomas Mazzucco: | 01:31:37 | And did he keep his, quote unquote, company car? |
| Sheriff Corpus: | 01:31:40 | Uh, everything, uh, everything was kept the same. He, there was no loss of pay. Um, he kept the company car. Um, the only thing is that his, he reports to the airport instead of reporting to Redwood City. |
| Thomas Mazzucco: | 01:31:52 | And was there an accusation that you moved him 'cause he was at a Measure A rally? |
| Sheriff Corpus: | 01:31:57 | Um, I believe in the re- the Keker report, yes. |
| Thomas Mazzucco: | 01:31:58 | Yes. So, he's alleging you'd met, you moved him 'cause he was at a Measure A rally despite what you just told us. Have you promoted any of the other deputies who were at that Measure A rally? |
| Sheriff Corpus: | 01:32:08 | Yes. |
| Thomas Mazzucco: | 01:32:08 | So, you've actually promoted people there at the same rally? |
| Sheriff Corpus: | 01:32:11 | Yes. |
| Thomas Mazzucco: | 01:32:14 | And their names are? |
| Sheriff Corpus: | 01:32:17 | Um, so, uh, there was one, um, uh, Chris, Christopher Letty, who's at VTTF, he, um, I had offered him the position of sergeant. He told me for, uh, personal matters, uh, with his family, he would ask to delay his promotion. So, he basically declined the promotion. Uh, but David Brandt, um, was promoted, um, to Sergeant and he was also a big Measure A supporter. Um, uh, and, um, and then there's also, uh, another, uh, person, um, another sergeant that we just promoted, um, to, uh, uh, to Sergeant who, um, was a big Measure A supporter as well, um. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| Thomas Mazzucco: | 01:32:57 | So, you've not retaliated. In fact, you've continued to move people up in the ranks for the good of the organization, correct? |
| Sheriff Corpus: | 01:33:03 | That is correct. And that was Stephen Newman, is the other sergeant. Just to kind of go back on that. |
| Thomas Mazzucco: | 01:33:16 | Sure, please. |
| Sheriff Corpus: | 01:33:16 | Um, Stephen Newman lives on the coast, and there was a woman who suffers from mental illness. Um, she was seen by Stephen Newman, uh, taking a Measure, uh, yes, a Measure A sign off of a- |
| Speaker 5: | 01:33:32 | Bless you, excuse me. |
| Sheriff Corpus: | 01:33:32 | ... off of a, bless you, abandoned, uh, property that was basically a, it's Cal, Caltrans property. And, uh, Stephen Newman was the RP on the call, and the deputies went and arrested her, uh, because, um, she had taken some of those signs down and, um, she's often in our custody. So, um, she, um, they went and arrested her because of, she had taken some of those, um, you know, long signs that were in support of Measure A down and, um, they arrested her. But Stephen Newman was the reporting party, um, on that, um, on that case. |
| Thomas Mazzucco: | 01:34:15 | There's allegation that you retal- retaliated against Captain Rebecca Albin for posting a message on social media. Tell us about that. |
| Sheriff Corpus: | 01:34:23 | Yeah. Um, so Rebecca was already, um, she was going to, um, become a captain at a law enforcement agency that's close to her home in Morgan Hill. Uh, I believe it's the Los Altos Serrano PD. And, um, she posted something on next door that, um, you know, before I could even tell the city manager of the City of Half Moon Bay because it's a contract that she was going to be leaving the organization for, you know, to be closer to home, um, she put something on next door that basically said, you know, her goodbyes to everybody. |
| | 01:34:59 | But that to, politically, people have to remember that I'm a political figure and that I have to keep good relationships. So, it looked like I didn't inform the city manager of her departure, and I, I got some backlash for it. Um, so what I had asked is that, um... She was on vacation and I, all I asked was that, because I didn't know what she was going to do now, uh, that her email be suspended or her privileges be suspended until she can, |

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | came back to work to... She was coming back one day to grab her things and then, and then leave. |
|---|---|---|
| Thomas Mazzucco: | 01:35:34 | There's talk here that you retaliated against Lieutenant Sue, Sebring after he advised an employee that he, that he would file an HR complaint against Mr. [inaudible 01:35:44]. |
| Sheriff Corpus: | 01:35:44 | That is not factual. Um, Jon Sebring, again, I promoted him to the rank of Lieutenant. When I promoted him to Lieutenant, I advised him that within a year, he would be transferred because of the movement of the organization. And he had been in Professional Standards since 2018. And at that time, he did not have a problem with being transferred, um, and that normally happens when you get transferred. You know, we always say, there's a saying in the sheriff's office, you're a deputy on loan to the jail. Uh, that's where your home is at. The jail's always your home. And in fact, he received a bump in pay because he's a lieutenant now working in a specialty unit. He's an administrative lieutenant for the Maple Street Correctional Center. |
| Speaker 5: | 01:36:27 | Mm-hmm. |
| Thomas Mazzucco: | 01:36:28 | There's allegation you retaliated against Captain Philip for refusing to sign and serve the deficient Internal Affairs notice on Sergeant Javier Acosta. |
| Sheriff Corpus: | 01:36:37 | No, that is not true. Um, when Matthew Fox was, uh, promoted to the rank of Assistant Sheriff, that left a gap in our Headquarters' Patrol Bureau. Captain Frank Del Porto had been the most senior captain who had been, had the longest tenure working in corrections. Philip, Captain Phillip was kind of a floater, uh, because we weren't sure what to do with his position at the time, and he was the most junior captain. |
|  | 01:37:12 | And when somebody comes from a police department to a sheriff's office, you have to understand that the heart and soul of a sheriff's office is the jail, and everybody has to work in the jail. Um, as he was the most junior captain, it made the most sense for him to go to work in corrections. And we even afforded him side-by-side training with Captain, uh, Bill Fogarty, so we just didn't throw him in the jail. That we actually gave him some side-by-side training for a few weeks so he can become a little bit more acclimated and he's not just being thrown into, you know, into corrections. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| | 01:37:46 | And so, um, he was transferred there because there was a need for it and there was a hole and he was the most junior captain because I had to take the most senior captain and move him to Patrol. |
|---|---|---|
| Thomas Mazzucco: | 01:38:00 | So, again, it was another structural move in the organization that note somebody did not have a privilege or, and or a permanent right to, is that correct? |
| Sheriff Corpus: | 01:38:08 | No, I was, uh, obviously offended as working in corrections because he said he was put in a dead end position. And, um, being part of the sheriff's office, corrections, like I said, it's our heart and soul of the organization. And, uh, for someone to say you're being put in a dead end position to care, take care and custody of the people that we're entrusted to take care of, the incarcerated, um, to me was uh, kind of a slap in the face. |
| Thomas Mazzucco: | 01:38:34 | And you are a paramilitary organization and people should file, follow your orders when it's based in logic and for the good of the organization and the public, correct? |
| Sheriff Corpus: | 01:38:43 | Correct. As long as there's nothing, uh, legal about it, not illegal about it. |
| Thomas Mazzucco: | 01:38:48 | Let's talk about, uh, former Assistant Sheriff Monaghan. |
| Sheriff Corpus: | 01:38:53 | Mm-hmm. |
| Thomas Mazzucco: | 01:38:54 | So, tell us about how Monaghan became part of the sheriff's department, where he came from, what role he played. |
| Sheriff Corpus: | 01:39:00 | Yeah. |
| Thomas Mazzucco: | 01:39:00 | And what type of employment contract did he have? |
| Sheriff Corpus: | 01:39:02 | Yeah. Um, so the sheriff's office- |
| | | PART 3 OF 4 ENDS [01:39:04] |
| Thomas Mazzucco: | 01:39:00 | And what type of employment contract did he have? |
| Sheriff Corpus: | 01:39:02 | Yeah. Um, so the sheriff's office, um, on the executive team, um, the sheriff has an undersheriff, which is an at-will, unclassified position. And then, now there's three assistant sheriffs that are also unclassified. Um, they've always served at the will of the sheriff. And so, um, when I was looking for an assistant sheriff, um, uh, Mike Callagy had mentioned Ryan |

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | Monaghan's name. He had worked with him in, um, San Mateo, uh, for quite some time. I believe Mike Callagy was Ryan's FTO, um, and, uh, had grown to have admiration for him and spoke very highly of him. At the time, Ryan Monaghan was the, um, chief of the City of Tiburon, which I believe maybe has maybe 20 law enforcement officers in total. |
|---|---|---|
| Thomas Mazzucco: | 01:39:02 | 12. |
| Sheriff Corpus: | 01:39:53 | 12. Okay, sorry. Well, I was counting out me. |
| Thomas Mazzucco: | 01:39:56 | (laughs) |
| Sheriff Corpus: | 01:39:56 | Um, and so, um, based on the recommendation, based that he was, um, a San Mateo County resident, um, you know, I brought him on as, um, the assistant sheriff. When I brought him on as the assistant sheriff, I had a, before I brought him on and offered him the letter, I asked him, uh, what his relationship was with Mike Callagy, because I said, "I don't want to be backdoored here. Um, and, um, we have to trust each other." |
|  | 01:40:23 | And he told me that, um, you know, his relationship with Mike was very benign, that they, you know, had worked together, um, in, um, in, at San Mateo PD. Uh, but you know, he talks to him every now and then, but he didn't make it seem as if they were, um, very close. |
| Thomas Mazzucco: | 01:40:42 | And why was, why were you concerned about that? |
| Sheriff Corpus: | 01:40:44 | Uh, well, when you have an executive team, you have to trust that things... We talk about sensitive information, you know, there's, uh, uh, processes that you don't want going outside of the organization, because you don't want it to be influenced. And I already had concerns about Mr. Callagy and his, you know, wanting to control the organization, wanting, really, essentially, to have a chief of police and not a sheriff. Um, but it seems specific to me. Uh, so I had, I did have some concerns about their relationship. And so, that's why it was important for me to have that conversation with him about his relationship. |
| Thomas Mazzucco: | 01:41:21 | Yeah. So, given that he was on the command staff, retired from another department, he was essentially an at-will employee working for you, is that correct? |
| Sheriff Corpus: | 01:41:29 | Yes, he was. |

This transcript was exported on Jun 12, 2025 - view latest version here.

Thomas Mazzucco:    01:41:29    Mm-hmm. And so, he served at your pleasure and he served, you know, basically related to, if he shares your vision, your philosophies, and candidly, people were afraid to say, but is he loyal to the mission of you and the sheriff's department?

Sheriff Corpus:    01:41:43    Correct.

Thomas Mazzucco:    01:41:44    Did you find out, at some point, that he was not?

Sheriff Corpus:    01:41:46    Yes.

Thomas Mazzucco:    01:41:46    And tell us a little bit about that.

Sheriff Corpus:    01:41:48    Um, after, um, the departure of Chris Shum, I started finding some things out that he was going to Mike Callagy, telling Mike Callagy about what was going on. Um, he had, um, been meeting with the captains. Um, he was in charge of operations, but talking about other things, not, uh, operational, but talking about, you know, things that they didn't agree upon, uh, that I was doing. And, um, you know, a lot of things were getting leaked out to Mike Callagy. And so, um, I was told by a city manager that, what he had heard that Mike, Mike and Ryan were, had been talking, and, uh, he was going behind my back and giving Mike Callagy a bunch of information.

Thomas Mazzucco:    01:42:34    Now, would you find that to be insubordinate or just sharing of information?

Sheriff Corpus:    01:42:38    Well, if he's sharing things that's outside of the trust of the executive team, then that's insubordination.

Thomas Mazzucco:    01:42:44    And was he making statements to any of the, the captains in your department, that, "Just listen to me and you don't have to pay attention to what the sheriff says"?

Sheriff Corpus:    01:42:51    Yes. So, things that I would, um, ask to happen, um, were manipulated. Things weren't being done in the manner that I wanted them done. Um, he was holding up processes. Uh, for instance, um, we, um, I brought in a doctor from Johns Hopkins University to do autism training and, uh, training on, um, how to recognize when somebody has, uh, dementia, um, or Alzheimer's. And, uh, he, instead of going and having this meeting with the captains to talk about, "This is the directive I want you to, you know, have, start signing people up for it," because she was coming for two weeks. Um, it was a very important training, um, for various reasons.

This transcript was exported on Jun 12, 2025 - view latest version here.

| | 01:43:38 | And, uh, they had a three-hour meeting that he went around and around with and it never was solidified. Um, I don't know what they talked about in that three-hour meeting, but the end result was, we were still in the same place that we were before he went into that meeting. Um, so there were a lot of deficiencies, um, on top of the fact that, when the undersheriff was asking him to do things, um, he would do the polar opposite and, at one point, told the undersheriff, "Well, if you just wanna write me up, go ahead and do it." |
| --- | --- | --- |
| Thomas Mazzucco: | 01:44:13 | So, he's actually emboldening, also, your captains to basically try to control a higher level of the command staff, is that correct? |
| Sheriff Corpus: | 01:44:20 | That is correct. |
| Thomas Mazzucco: | 01:44:21 | I want to talk about an example that, uh, something that, uh, we've learned about, with reference to, again, getting back to Matthew Fox. At any point, did any of the captains threaten Matthew Fox 'cause he was an outsider, Daly City police officer, not a career sheriff deputy? At any point, did one of your captains threaten him? And was that overheard by an independent witness? |
| Sheriff Corpus: | 01:44:45 | Yes. Um, it was, uh, Captain Mark Myers. |
| Thomas Mazzucco: | 01:44:48 | And what did Captain Mark Myers say, and who overheard it, and what did he say to Matt Fox at the time? |
| Sheriff Corpus: | 01:44:53 | Uh, Matthew Fox was in his office as the assistant sheriff. Uh, Gretchen Spiker, who was our PIO, was in the room as well. And, um, he saw that he got a phone call from, um, uh, from Captain Mark Myers. He, uh, told Gret- Gretchen Spiker that he was gonna put it on speakerphone 'cause he didn't trust Mark Myers. He puts the call on and he, basically, Mark Myers tells him that he's not wanted there, um, that he's a crook just like me. Um, uh, it had, uh, to do with the Carlos Tappi investigation, and that, um, he, that he better leave, otherwise he's gonna go down. |
| Thomas Mazzucco: | 01:45:32 | Did he mention anything about AB Do, AB2 not being able to testify? |
| Sheriff Corpus: | 01:45:36 | Yeah, he said that, um, that the whole executive team was gonna face, um, charges and that, uh, he was gonna be reported to post and SB2'd. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| Thomas Mazzucco: | 01:45:45 | Okay. So, as a result of what Ryan Monaghan was doing, and... By the way, how long was he actually in place for him? |
|---|---|---|
| Sheriff Corpus: | 01:45:52 | Monaghan? He was there for, uh, a- about, he started in February of 2023 and he departed, um, in October of, Sep- September, October of 2024. |
| Thomas Mazzucco: | 01:46:03 | Right. At some point, you, as the elected sheriff, lost confidence in him. |
| Sheriff Corpus: | 01:46:03 | I did. |
| Thomas Mazzucco: | 01:46:07 | Did you lose confidence in him, not only was he back-channeling you, but because he didn't share your philosophies or visions in running the San Mateo County Sheriff's Office? |
| Sheriff Corpus: | 01:46:17 | That is correct. |
| Thomas Mazzucco: | 01:46:19 | And he was an at-will employee on your command staff. At that point, you moved to terminate him? |
| Sheriff Corpus: | 01:46:24 | I did. |
| Thomas Mazzucco: | 01:46:24 | And what happened when you went to terminate him? |
| Sheriff Corpus: | 01:46:26 | Um- |
| Thomas Mazzucco: | 01:46:27 | And is he terminated today? |
| Sheriff Corpus: | 01:46:28 | ... he, uh, he's not terminated today. Um, in fact, um, what happened was, is I learned that, um, Mike Callagy instructed HR to take his whole profile. So, his electronic profile was taken from the Sheriff's Office, and he is still employed, um, with the salary and benefits of an assistant sheriff, which only exists in the San Mateo County Sheriff's Office. |
| Thomas Mazzucco: | 01:46:28 | Excuse me. |
| Sheriff Corpus: | 01:46:51 | Um, I don't know. Um, if you look on Workday, it says that he reports directly to Michelle Kuka, but he's being paid as an assistant sheriff with the benefits and, uh, his retirement continues. |
| Thomas Mazzucco: | 01:47:04 | Is that coming from your budget? |
| Sheriff Corpus: | 01:47:05 | No. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| Thomas Mazzucco: | 01:47:06 | Is he representing himself to continue to be a peace officer as he's working for the County? |
|---|---|---|
| Sheriff Corpus: | 01:47:11 | Uh, he still has his peace officer, he still has all his credentials. So, I, I don't know, I don't know that part. What I can tell you though is that, I did have a conversation with Mike Callagy about why he kept him on. And at first, Mike Callagy was holding the position and said that I was gonna pay for it. And then, with meaning the fiscal, it was gonna come out of my budget. Um, and then I argued with him and said, "You can't do that to me. You can't hold that position while he's in there." |
| | 01:47:39 | Um, so they finally released that position, um, but he is still, again, there was no break in service for him. Uh, there was, uh, he, he didn't, he's not found without a paycheck, um, since the day I terminated him. |
| Thomas Mazzucco: | 01:47:54 | What was the pay and, what was the salary he was receiving as your assistant sheriff? |
| Sheriff Corpus: | 01:47:59 | With salary and benefits, it's, uh, close to $400,000. |
| Thomas Mazzucco: | 01:48:02 | The County is still carrying that? |
| Sheriff Corpus: | 01:48:04 | Yes. |
| Thomas Mazzucco: | 01:48:09 | Okay. And Mike Callagy stopped that firing? |
| Sheriff Corpus: | 01:48:11 | He did. |
| Thomas Mazzucco: | 01:48:11 | Okay. |
| Sheriff Corpus: | 01:48:12 | The reason that he told me was that, um, he didn't want any other litigation to occur. Uh, but Ryan Monaghan actually has, uh, a claim and hired, uh, Charles Stone as his attorney, who is representing him, uh, to, uh, uh, file a lawsuit of $5 million against me and against the County of San Mateo. |
| Thomas Mazzucco: | 01:48:34 | Also, let's talk a little bit about, um, you requested a, a whistleblower complaint and into Mike Callagy, and it was done through the Oppenheimer Firm. And they turned, they kind of turned it in, they wanted to talk about salacious rumors, gossip, hearsay, and they cleared Michael Callagy. One of the things that stood out to you there, tell us a little bit about how, when this Cordell report was published, you felt strongly was a violation of your POBAR rights under 832.7 of the penal code, |

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | that it was a confidential investigation that started out on Victor, INJ, and then turned on you. |
|---|---|---|
| Sheriff Corpus: | 01:49:06 | Mm-hmm. |
| Thomas Mazzucco: | 01:49:07 | And they published this report. Uh, you were complaining that you thought Mr. Callagy helped Supervisor Corzo put it on their Instagram page, is that correct? |
| Sheriff Corpus: | 01:49:16 | Uh, I think that was actually said in a board meeting recently. |
| Thomas Mazzucco: | 01:49:19 | Yeah. And then, what did we later find out about whether or not he actually put on Instagram page, he did not. Is that correct? |
| Sheriff Corpus: | 01:49:28 | That's correct. |
| Thomas Mazzucco: | 01:49:29 | But what did he do with it? Where did he publish it? |
| Sheriff Corpus: | 01:49:30 | He published it on the County's website. He encouraged county staff, which, um, every employee of San Mateo County received, um, an email that was sent by Iliana Rodriguez, but signed by Mike Callagy, to look at and read the Cordell report. And then also to look and, uh, a link for the press conferences that both Noelia Corzo and Ray Mueller put out, where they were talking about, you know, uh, salacious, the salaciousness hearsay that was in that report. |
| Thomas Mazzucco: | 01:50:07 | So, he published it on the county executives' webpage, actually in three languages, is that correct? |
| Sheriff Corpus: | 01:50:12 | Correct. |
| Thomas Mazzucco: | 01:50:13 | And that you, it's your opinion that's a violation of your POBAR rights? |
| Sheriff Corpus: | 01:50:16 | That is correct. |
| Thomas Mazzucco: | 01:50:17 | You did not authorize him to do that? |
| Sheriff Corpus: | 01:50:18 | I did not. |
| Thomas Mazzucco: | 01:50:20 | Getting back to Michael Callagy again. A witness came forward who was very concerned and ha- had an encounter with Mr. Callagy, maybe a month or so ago, at a restaurant- |
| Sheriff Corpus: | 01:50:20 | Mm-hmm. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| Thomas Mazzucco: | 01:50:30 | ... at a bar. And, uh, what statements to Mr. Callagy make to this person who was complaining about the process, seeing that it's unfair and it's biased and political? What did Mr. Callagy say to that individual? |
|---|---|---|
| Sheriff Corpus: | 01:50:41 | That he knows what he's doing and he's gonna take me out. |
| Thomas Mazzucco: | 01:50:46 | Is there anything I missed? Any questions you have for any of these other allegations? 'Cause they are all over the place. |
| John Keene: | 01:50:57 | Yeah, I mean, they are. Um, I think, you know, at this point, I think I would probably wrap with the, the most basic and germane questions that come from these types of, these types of, uh, processes, which are, I mean, they're obvious, but I still have to ask them. |
| Thomas Mazzucco: | 01:51:10 | No, no, please do. |
| John Keene: | 01:51:10 | Um, one, is it, is it safe to say that it is your statement that you do not agree with the facts of the Notice of Intent? |
| Sheriff Corpus: | 01:51:22 | Yes. |
| Thomas Mazzucco: | 01:51:23 | Yes. |
| John Keene: | 01:51:24 | Um, do you intend to offer an alternative to the facts of Notice of Intent? |
| Thomas Mazzucco: | 01:51:32 | We have offered significant information today, probably more- |
| John Keene: | 01:51:35 | Mm-hmm. |
| Thomas Mazzucco: | 01:51:35 | ... so than most Skelly hearings. |
| John Keene: | 01:51:37 | Yes. |
| Thomas Mazzucco: | 01:51:37 | 'Cause we really, this is a, not just... You know, it's a, it's a bigger issue, it's the elected sheriff. And so, I think we gave you more than, I'm sure, both of you have ever seen in a Skelly, and we have seen in a Skelly. |
| John Keene: | 01:51:37 | Mm-hmm . |
| Thomas Mazzucco: | 01:51:48 | And we wanted to give you something to work with. |
| John Keene: | 01:51:50 | Mm-hmm. |

This transcript was exported on Jun 12, 2025 - view latest version here.

| Thomas Mazzucco: | 01:51:51 | Um, so, I think we've given you plenty. There's a lot more we could give you. |
| --- | --- | --- |
| Speaker 5: | 01:51:53 | If you think there's any holes of areas- |
| John Keene: | 01:51:56 | Mm-hmm. |
| Speaker 5: | 01:51:56 | ... that we need to cover, please tell us. |
| Thomas Mazzucco: | 01:51:59 | Yeah. |
| John Keene: | 01:52:00 | No, I think... So, and that's why I said, I wanted to ask specifically, 'cause I, I think it's obvious that you do not agree with, um, the Notice of Intent. And I think that you have hit the major points that come from it. But as I can see when we first started, it's not a traditional, um, Notice of Intent that we see in, um, peace officer letters. So, but I think that I understand your position and I think you have given us a lot to work with at this point. I don't know, Mr. Strada, do you have anything specific that you feel like you need to hear at this point? |
| Alfonso Estrada: | 01:52:37 | No. Well, procedurally, that's, that's about right. |
| John Keene: | 01:52:39 | Okay. |
| Thomas Mazzucco: | 01:52:41 | Alright. Um, okay. So, anything else, Chief? |
| John Keene: | 01:52:45 | I don't have anything else. |
| Speaker 5: | 01:52:46 | Yeah, if you do have some follow up questions, please. |
| John Keene: | 01:52:48 | I don't. I mean, at this point, I don't. I think I said, I think, um, obviously you, you've handed us this. Is there anything else you would like us to consider? Any other materials you would like for us to have today? |
| Sheriff Corpus: | 01:52:57 | Yeah. Um, if you... Yes. Um, I, um, as a result of the Cordell report, I've, uh, received death threats from a specific individual who was incarcerated. Um, he, um, uh, said in great detail how he was going to kill me with, um, his, um, saxophone case, that it was sharp. Um, and, um, the assigned detective, um, is also a union, um, secretary. Uh, he, um, when he went to interview the, uh, individual, he said, "Well, you didn't really mean it did, did you? Why don't you write the sheriff, uh, an apology letter?" |

This transcript was exported on Jun 12, 2025 - view latest version here.

01:53:40        And, um, the suspect said, uh, "I'm not writing her anything. I wanna kill her because of what I read about the Cordell report, that she's homophobic." Um, he submitted the report to the DA's office. The DA's office, uh, sent him something that's called a golden rod, which is basically a, um, follow, more follow up is needed before they can look at the case. Um, and that was back in, um, November. Uh, he let it sit there. Um, and in February of 2025, I was contacted by, um, the psychiatric doctor of the jail who told me that she had a duty to tell me that her clinician, uh, interviewed the, um, inmate, the same inmate that made the previous death threat, and he was moved because of the programs that I, uh, I, that I, that, you know, uh, started with me to try to help people that are mentally ill.

01:54:38        He was on, now, a floor that he had more liberty and walking around, was able to be out. And, um, I, I go to the jail a lot and I go talk to people and I wanna see how things are going. And, um, I was not informed that he was moved from maximum security to this, um, you know, more lenient, um, behavioral unit. And, um, he said, uh, to the clinician that, if I were to walk on the pod, he already had, um, a tray that he had identified, and he was gonna catch a 187 case, 'cause my brains were gonna be all over the ground.

01:55:15        Uh, I was never contacted by, um, the, um, corrections captain, which was Bill Fogarty. Um, the detective, as a result of the detective who is a DSA secretary not doing the follow-up, the case just sat there and this individual was released because he had been incarcerated for a couple of years because there was an innocent standby, an innocent person that, um, why he was incarcerated originally, he, he almost killed by, uh, his beating this person up physically for just, for no reason. Uh, he was getting out of jail. And so, he got out of jail and I had to get the DA's office involved. Or actually, my counsel, Tiff, had to get them involved because nothing was being done.

01:56:04        And this individual was now, um, although he may suffer from mental illness, he was very lucid when he was talking about the way that he was going to kill me. And, um, it wasn't until the DA's office got involved that I was able to get a, um, a restraining order. Um, but I had to upgrade all of my home security system. And, you know, still to this day, he's still out. Um, and, uh, there were, there was no real sense of urgency from the Detective Bureau to try and, uh, put things out there to the other law enforcement agencies, which is basically a track flyer. Uh, the undersheriff had to guide the detective lieutenant, because he basically just put a photo of him and just said, you

This transcript was exported on Jun 12, 2025 - view latest version here.

|   |   | know, "He's made death threats to law enforcement officers." And so- |
|---|---|---|
| John Keene: | 01:57:00 | Sheriff, did, did the track flyer ever go out? I don't recall ever seeing that. |
| Sheriff Corpus: | 01:57:03 | Um, for the lieutenant, he said he sent it out. |
| Speaker 5: | 01:57:09 | As you know, for a mental health counselor, does it give a terrace off warning. That's significant. And if the, if the law enforcement doesn't understand it, they gotta be the three monkeys. |
| Thomas Mazzucco: | 01:57:23 | And also, I just, while we have this little bit of time, there was a couple other allegations in here that we didn't address. One was the investigation of, um, two, two investigations of correctional officers where they're accusing the sheriff of slowing the process on those. We probably could hit those really quick. |
| Sheriff Corpus: | 01:57:38 | Yeah. |
| John Keene: | 01:57:38 | Sure. |
| Thomas Mazzucco: | 01:57:38 | Talk about de- uh, Correctional Officer Serrano and the incident regarding her gun. |
| Sheriff Corpus: | 01:57:42 | Yeah. Uh, I think I mentioned earlier, um, there was a gossip that there was a correctional officer, uh, she was a deputy, she's a deputy sheriff trainee, that she was my family member. She's not my family member. |
| John Keene: | 01:57:53 | Yes. |
| Sheriff Corpus: | 01:57:53 | Um, that is, uh, Genesis Serrano. Genesis Serrano, um, uh, comes from a, um, law enforcement family that are from San Francisco. Um, she was actually, she came to the Sheriff's Office because of Matt Fox. Uh, she knew Matt Fox because she was, I believe, a Explorer at the Daly City Police Department. Um, she's not had, um, she's had a rough, rough, uh, you know, life. Her, um, her mother is a drug addict, um, the father of her, uh, daugh- one of her daughters was killed in an accident. She's a single mom of two. Um, she would, it was, um, in the police academy at CSM, uh, our range, uh, is very close to Burlingame, it's at Coyote Point. |
|   | 01:58:41 | She then went to study with her boyfriend, who's a deputy sheriff. Uh, but he picked her up in a Tesla, a hatchback Tesla. |

This transcript was exported on Jun 12, 2025 - view latest version here.

She was afraid that if she left her gun in the car, maybe that somebody would break in. So, she put her gun, which had, um, it was, the slide was back, there was no ammo in it, and there was a, uh, safety through the barrel. And she put it inside of a bag that she had, like, a crossover bag, cross body bag. Uh, they went to a restaurant in Burlingame Ave, she put it down. Uh, she went to the re- she went to the restroom. And then, I guess, when they left, she forgot that the bag was there. The restaurant manager knew who she was, um, and within probably 10 minutes, a, uh, uh, Burlingame, uh, dep- uh, officer who was on foot patrol, walked by. The manager asked him to come in and say, "Can you take this? I know who it belongs to. She's, uh, a deputy with the sheriff's office, but we just don't want this gun here."

01:59:42    So, they took it back to the PD. She realizes that she left the bag, she goes back to the restaurant. They said that they gave it to the police officer, Burlingame police officer. She calls right away to tell professional standards what happened. Um, she goes to the PD, they inform her that she was not gonna be able to get her gun, because Jimmy Chan, Sergeant Jimmy Chan was on his way to come to the PD. Um, so, uh, you know, the first thing is, is without even having a investigation done, I was, um, told by professional standards that we should fire her. And I said, "That's not gonna happen without a due process."

[NEW_PARAGRAPH]"She needs to be removed from the academy."

02:00:23    I'm like, "She's almost done. People make mistakes." We had an assistant sheriff, Jeff Kernan, who left his weapon in the bathroom of a car dealership and his weapon was stolen and never recovered. And he was not fired. I had, uh, a deputy who did not have authority to have a staccato gun. He had it in his locker. You, you have to qualify it, you have to do some extra training with that staccato gun, and he shot, grabbed the gun to show another deputy and the gun goes off and it almost kills the sergeant that's sitting in an office in San Carlos. The, the bullet goes into the phone and the phone explodes, and he got a letter of reprimand. So, but he's, you know, he's a San Carlos, uh, deputy. So, they wanted me to fire her and or take her out of the police academy. And I said, "Not until there's an investigation."

02:01:17    And so, we did an investigation, it's still ongoing. There's processes when it comes to an investigation. Um, you know, the county attorneys have to look at the letter, uh, discipline, HR is

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | involved. And so, we have emails that we sent to Katie Roberts that show that we've asked, "Hey, where is the-" |
|---|---|---|
| John Keene: | 02:01:37 | Mm-hmm. |
| Sheriff Corpus: | 02:01:37 | "... where's this, where's this at?" It, it takes a while for them. Um, so there's no, by no means did I try to slow walk this or impede it. And she's actually been working, so she's, not like she's sitting at home on admin leave or anything like that. |
|  | 02:01:54 | Uh, the other case was, um, a correctional officer by the name of Avendaño. Avendaño was on FMLA. His wife was in labor at Redwood City Kaiser. She, uh, is, he's in the, he's in the labor room with her. He has a four-year-old daughter and he has an eleven-year-old son. His mother-in-law takes them to a park that's close to Redwood City Kaiser. Uh, the little girl who's four starts playing, um, with a little boy who has curly hair. Uh, her hand gets stuck in his hair and then the little boy starts crying, 'cause she's trying to pull her hand out and is pulling his hair. The father, who is either on parole or probation, sees what's happening and sees his son crying. He runs over, grabs the little girl's hand, pulls it out of his son's hair, spits on her face, and calls her a puta. Which is a whore in Spanish. |
| John Keene: | 02:02:49 | Mm-hmm. |
| Sheriff Corpus: | 02:02:49 | A four-year-old little girl. The brother, Avendaño's eleven-year-old son, calls his father and says, "Dad, I need you to come. Somebody just spat on my sister's face. We're scared." He runs down and he tells the guy to stop. The guy sees him and starts running away. |
|  | 02:03:05 | So, he goes and he pins him down and he gets on his cell phone and calls 911. Redwood City Police Department shows up. This guy starts going off on Redwood City Police Department. They ended up arresting him, basically, um, for, um, you know, uh, not for spitting on the little girl's face, but for, because- |
| Thomas Mazzucco: | 02:03:05 | 148. |
| Sheriff Corpus: | 02:03:24 | 148, because he was interfering with, with, with an investigation. So, if, 148, they arrest him. Um, and he, Avendaño calls his sergeant, professional standards is, um, notified. Um, and he never, body-worn camera was reviewed. At no point in time did he say he was a peace officer. He said he was a correctional officer. He said, "I, whenever I'm following my policy, whenever I have contact with law enforcement, I have to |

This transcript was exported on Jun 12, 2025 - view latest version here.

tell you." He told the police officers that he was a correctional officer, he was on FMLA, he, um, was not on duty and then called his sergeant.

| | | |
|---|---|---|
| John Keene: | 02:04:02 | Mm-hmm. |

Sheriff Corpus: 02:04:02 Um, and then I get something from, um, Joe Faba and Jimmy Chan saying that, "We need to go," in both cases, both the Avendaño and the Serrano case, "we need to go back to the police departments and tell them that they need to write different reports on these." So, in Serrano's case, they did a found property report, a lost, you know, found property.

John Keene: 02:04:23 Mm-hmm.

Sheriff Corpus: 02:04:23 They wanted to charge her with, uh, being a, not having authority to have a weapon as a civilian. And then they wanted us to say he was, Avendaño was impersonating a police officer. So, we involved County Attorney Greg Yip, because I already know where this was gonna go. And I said, "This is what's happening here." And it was the undersheriff that was leading the way on this.

02:04:48 And Greg Yip says, "We can't, and we can't get involved and have another law enforcement agency rewrite an investigation, because then it's gonna look like we're going after these people."

John Keene: 02:04:48 Mm-hmm.

Sheriff Corpus: 02:04:58 And so, they both... One they think is my family member, and the other one, they, they both think they're my supporters, but they're both Hispanic. What I have to tell you is that, there is racism in the Sheriff's Office and it's strong.

Thomas Mazzucco: 02:05:13 And just one other thing as try and leave no stone unturned here. Um, you know, we, we're doing this interview and I think, uh, you'll be aware, we, we're act- we're actually making allegations in court regarding Measure A. So, I wanna state our objection for the record. One, we think that Measure A is unconstitutional and doesn't afford due process. No, no offense to you and your process you put in place, but we think that, at the end of the day, they'll never have four-fifths of a vote of the Board of Supervisors because of serious pretrial statements that were made, which are kind of related to the context you're getting here today from Supervisor Corzo-Mueller. There's no way that they'll be able to vote on this, 'cause we've got a list of

This transcript was exported on Jun 12, 2025 - view latest version here.

statements we filed in our brief that basically are prejudging the fact. Um, we should bring that up too.

02:05:59    Uh, we'll bring that up in all... So, they have made terrible, terrible statements. And I think that there's, it's important to know why they made those statements and I'll let the sheriff explain to you, but they can't vote on this. And secondly, we're making an ex post facto argument. We think that all the County can really look at at this point, is that Measure A was passed in March 5th, it was certified on April 19th. And, you know, this is punitive in nature. So, anything that she's investigated for, she'll only start from April 19th, 2025, on. 'Cause we're making up rules to go after her for things that happened prior to that.

02:06:36    And, you know, the attorneys will think, "Okay, ex post facto, definitely not in criminal law," but this is punitive and there's case law that's pretty tight saying that, you know, that they can't do this. But we're submitting to this interview only because the process has been thrown upon us, and so we're gonna respond to this in the process, 'cause we feel good about what the facts are. And then, I'm gonna let the sheriff tell you two reasons why maybe Supervisor Corzo made these terrible statements, uh, and why Supervisor Mueller is cozying up to the DSA.

02:07:03    Let's start with Mueller and the DSA.

Sheriff Corpus:    02:07:04    Yeah. So, um, with the double overtime, um, you know, Mueller is on, at a board meeting saying, you know, well, you know, that he wanted a champion for this, so he was really spearheading this. Um, because, you know, he obviously wanted the DSA's backing, um, because he's gonna run again for supervisor. But also, um, he wanted to make sure that he was the voice, the champion, behind it, right? It was an opportunity for him to champion for the double overtime, but also to gain the trust and, you know, hopefully the backing of, um, of the DSA. And so, he made, I have a text message from him to say, "Make sure you send that to the DSA and send a shout-out to me that I am backing this up and that I'm behind it, um, for the DSA when I went to go and, uh, you know, support, um, the, um, the double overtime at the board meeting."

02:08:07    Um, the other thing is that, he, um, you know, he, he definitely is, um, with the overtime, uh, made sure that he asked, um, Mike Callagy that I wouldn't be put in the red and it's on the record when Mike Callagy says that $12 million would be allocated towards Measure A. I'm sorry, uh, allocated towards

This transcript was exported on Jun 12, 2025 - view latest version here.

|  |  | the double overtime, and then that the, um, I would not be put in the red. And, uh, at the end, I was only, he only, he said that he would only then give me the difference between regular overtime and double overtime, which was $4 million. |
|---|---|---|
|  | 02:08:46 | So, $17 million, then I was only told that I was then only going to get $4 million, uh, to support the $17 million price tag for the six months of double overtime. Um, Supervisor Corzo, um, had contacted me to let me know that her, uh, then boyfriend, I don't know what her private life is like and if this is still her boyfriend, but that her boyfriend was going to apply to be a deputy sheriff. Um, so, uh, his background was conducted and, unfortunately, he was dequeued. |
| Thomas Mazzucco: | 02:09:25 | And we'll leave it at that. He flunked the background check. |
| John Keene: | 02:09:29 | Mm-hmm. |
| Thomas Mazzucco: | 02:09:30 | Was Supervisor Corzo happy with that? |
| Sheriff Corpus: | 02:09:30 | No. |
| Speaker 5: | 02:09:32 | Okay. Is there any other allegations in the notice that we haven't covered? We deny them all categorically. |
| Alfonso Estrada: | 02:09:44 | Thank you. |
| Thomas Mazzucco: | 02:09:45 | Okay. |
| Speaker 5: | 02:09:46 | I want you to search all over the Bay Area and find another chief of police or sheriff who knows their department as well. You know? |
| Alfonso Estrada: | 02:09:59 | Appreciate it. Anything else, Chief? |
| John Keene: | 02:10:02 | No. |
| Thomas Mazzucco: | 02:10:03 | Okay. Seems like you're in a rush. |
| Alfonso Estrada: | 02:10:04 | Um, no, I'm not. Um, but, uh, the, I just wanna clarify one thing. This isn't an interview, this is a pre-removable conference. Um, we do appreciate, uh, your cooperation and participation with the removal procedures and, uh, now the ball is in, uh, Chief Keene's court, uh, to consider everything that's been said here today and to issue his recommendation, just so you know what the process is, okay, Sheriff? |

This transcript was exported on Jun 12, 2025 - view latest version here.

| Sheriff Corpus: | 02:10:29 | Thank you. |
| Thomas Mazzucco: | 02:10:29 | Thank you. |
| Alfonso Estrada: | 02:10:29 | All right. |
| Thomas Mazzucco: | 02:10:29 | Thank you so much. |
| Alfonso Estrada: | 02:10:30 | Thank you all. Appreciate your time. We'll be going off tape now. The time is... Did you have anything else, sir? |
| Speaker 5: | 02:10:35 | Uh, only do you consider these written, the recording to, these confidential? |
| Alfonso Estrada: | 02:10:40 | Yes. They're, they're part of the disciplinary process. |
| Speaker 5: | 02:10:43 | Okay, good. |
| Alfonso Estrada: | 02:10:43 | Yeah. |
| Speaker 5: | 02:10:43 | Alright. |
| Alfonso Estrada: | 02:10:44 | It is, uh, 11:35 AM. |
| Thomas Mazzucco: | 02:10:45 | Thank you. |

PART 4 OF 4 ENDS [02:10:46]